1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2               EASTERN DIVISION-RIVERSIDE

3

        HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

4

5    UNITED STATES OF AMERICA,        )
                                      )
6                  PLAINTIFF,         )
                                      )
7    V.                               )DOCKET NO. EDCR 04-42(A) VAP
                                      )
8    JAMES SANDERS,                   )
                                      )
9                  DEFENDANT.         )
     _____)

10

11        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                    RIVERSIDE, CALIFORNIA
12                 TUESDAY, JUNE 5, 2007

13

                  PHYLLIS A. PRESTON, CSR
14                  LICENSE NO. 8701
              FEDERAL OFFICIAL COURT REPORTER
15              UNITED STATES DISTRICT COURT
                    3470 TWELFTH STREET
16             RIVERSIDE, CALIFORNIA 92501

17

18

19

20

21

22

23

24

25

1                              <u>APPEARANCES</u>

2

   FOR THE PLAINTIFF:      OFFICE OF THE UNITED STATES ATTORNEY
3                          BY:  <u>BRIAN MICHAEL</u>
                                <u>JOSEPH AKROTIRIANAKIS</u>
4                          ASSISTANT UNITED STATES ATTORNEYS
                           3880 LEMON STREET, SUITE 210
5                          RIVERSIDE, CALIFORNIA 92501

6

   FOR THE DEFENDANT:      <u>JEFFREY AARON</u>
7                          FEDERAL CRIMINAL DEFENSE PANEL
                           THE RIVERSIDE BARRISTER BUILDING
8                          3993 MARKET STREET
                           RIVERSIDE, CALIFORNIA 92501
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    TUESDAY, JUNE 5, 2007, RIVERSIDE, CALIFORNIA

2    ---O0O---

3    THE CLERK:  CALLING ITEM NO. 1 ON CALENDAR,

4    CASE NO. EDCR 04-42 VAP, UNITED STATES OF AMERICA VERSUS

5    JAMES SANDERS.

6    COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

7    RECORD.

8    MR. MICHAEL:  GOOD MORNING, YOUR HONOR.  BRIAN

9    MICHAEL FOR THE GOVERNMENT.  WITH ME IS ASSISTANT UNITED

10    STATES ATTORNEY JOSEPH AKROTIRIANAKIS AND ICE SPECIAL AGENT

11    JOSH MORENO.

12    MR. AKROTIRIANAKIS:  GOOD MORNING, YOUR HONOR.

13    MR. AARON:  GOOD MORNING, YOUR HONOR.  JEFFREY

14    AARON FOR MR. SANDERS WHO IS PRESENT AT COUNSEL TABLE.

15    THE COURT:  GOOD MORNING.  I HAVE A FEW MATTERS TO

16    TAKE UP WITH COUNSEL THAT I UNDERSTAND THAT WERE -- WELL,

17    BEFORE WE BEGIN WITH INDIVIDUAL VOIR DIRE OF THE JURORS.  I

18    UNDERSTAND THAT COUNSEL HAS SOME ISSUES TO BRING UP WITH THE

19    COURT.

20    MR. AARON:  OH, YOUR HONOR, I HAD ACTUALLY BEEN

21    GOING OVER THOSE WITH OPPOSING COUNSEL.  THE COURT HAD

22    MENTIONED AND WANTED TO RULE ON AS MANY OBJECTIONS BEFOREHAND

23    AS IT COULD, AND I BROUGHT UP A NUMBER OF THOSE OBJECTIONS.

24    I CAN GO THROUGH THEM NOW, BUT SOME I AM STILL RESEARCHING.

25    THE COURT:  OBJECTIONS TO WHAT, TO EXHIBITS?

1          MR. AARON:  YES, TO WHAT WE ANTICIPATE THE EVIDENCE

2   WOULD BE.  A NUMBER OF THEM WERE THINGS WE HAD ALREADY TALKED

3   ABOUT, LIKE THE EXCERPTS, BUT SOME WE HAD TALKED --

4          THE COURT:  I THOUGHT I HAD ALREADY RULED ON THE

5   EXHIBITS, THE OBJECTIONS AS TO THE EXHIBITS.

6          MR. AARON:  YES, THE COURT HAD.  I JUST WANTED TO

7   COLLECT KIND OF JUST MAYBE FOR MY OWN ORGANIZATIONAL NEEDS,

8   COLLECT ALL THE OBJECTIONS I HAD MADE SO WE CAN SAY, LOOK, I

9   HAVE STANDING OBJECTIONS TO ALL OF THESE; TO THESE, I DON'T.

10  THAT SORT OF THING.

11         THE COURT:  OH, I SEE.

12         MR. AARON:  BUT A COUPLE OF THEM WE HADN'T YET

13  DISCUSSED.  AND I DON'T KNOW IF THE COURT WANTS TO DO THAT

14  NOW OR AT THE END OF THE DAY OR EARLY TOMORROW MORNING.  I

15  DON'T KNOW WHEN.  SOME OF THEM THE COURT HAS ALREADY HEARD,

16  AND WE HAVE ALREADY HAD HEARINGS ON.  AND I JUST WANT TO MAKE

17  SURE THAT THE COURT'S RULINGS ON THE LAST TRIAL ARE GOING TO

18  APPLY IN THIS TRIAL, OR IF THE COURT WANTS TO HAVE NEW

19  HEARINGS.  THAT SORT OF THING.

20         THE COURT:  WELL, FOR EXAMPLE, WHICH?

21         MR. AARON:  THE EVIDENCE BY FBI SPECIAL AGENT

22  CLEMENTE REGARDING THE GROOMING.

23         THE COURT:  ALL RIGHT.  I THINK THAT WAS A SUBJECT

24  OF A MOTION IN LIMINE.

25         MR. AARON:  THAT'S CORRECT.

1          THE COURT:  SO, THE RULINGS, JUST SO THE RECORD IS

2     CLEAR, THE RULING ON ALL THE MOTIONS IN LIMINE, ALL THE

3     EVIDENCE THAT WAS THE SUBJECT OF THE MOTIONS IN LIMINE ARE

4     DEEMED -- THOSE MOTIONS IN LIMINE ARE DEEMED RENEWED FOR THE

5     PURPOSES OF THE RETRIAL, AND THE RULINGS ARE THE SAME EXCEPT

6     AS NOTED ON THE RECORD.

7          MR. AARON:  WE HAD ONE MORE COMPREHENSIVE ISSUE

8     THAT THE COURT DIDN'T RULE ON.  THAT WAS THE USE, THE

9     POSSIBLE USE OF THE UNPUBLISHED NOVELS.

10          THE COURT:  YES.  AND I AM READY TO RULE ON THAT

11     BECAUSE I HAVE READ THE EXCERPTS.  MY UNDERSTANDING IS THE

12     GOVERNMENT IS NOT SEEKING TO INTRODUCE THE ENTIRE MANUSCRIPTS

13     BUT THE EXCERPTS THAT IT SUBMITTED LAST TIME, WHICH I READ

14     AND AM PREPARED TO DISCUSS WITH COUNSEL.  BUT I DON'T THINK

15     WE NEED TO DO THAT THIS MORNING BECAUSE WE HAVE JURORS

16     WAITING DOWNSTAIRS.  BUT I CAN DO THAT AT THE END THE DAY

17     TODAY, OR WHENEVER WE FINISH WITH VOIR DIRE.

18          MR. AARON:  THAT'S FINE.  IF THE GOVERNMENT COULD

19     PROVIDE COPIES BECAUSE I HAD SO MANY COPIES I'M NOT SURE

20     WHICH COPIES OF THE EXCERPTS FROM THE UNPUBLISHED WRITINGS

21     WE'RE TALKING ABOUT.

22          THE COURT:  WELL, THEY WERE FILED.  DO YOU HAVE A

23     COPY OF WHAT WAS FILED?

24          MR. AARON:  FILED AT WHAT TIME AND DURING WHAT --

25          THE COURT:  IT WAS FILED -- WELL, I WILL GIVE YOU

1  THE DATE BECAUSE I HAVE A COPY ON MY DESK.  IT WAS FILED

2  SHORTLY BEFORE THE LAST TRIAL.

3          MR. AARON:  I CAN TALK WITH COUNSEL ON THAT ONE.

4          JUST ONE MORE MATTER, YOUR HONOR.  I'M SORRY.

5  COUNSEL HAD FILED A MOTION OR SOME PLEADING REGARDING THE

6  CHILD WITNESS.  I WENT TO MY OFFICE EARLY THIS MORNING TRYING

7  TO DOWNLOAD IT AND PRINT IT OUT BECAUSE I COULDN'T DO IT AT

8  HOME, AND I COULDN'T DO IT AT MY OFFICE EITHER.

9          THE COURT:  DO YOU HAVE AN EXTRA COPY OF IT,

10 COUNSEL?

11         MR. MICHAEL:  I HAVE ONE COPY, BUT I CAN GET

12 ANOTHER ONE FOR MYSELF.  SO, I WILL PROVIDE THIS TO DEFENSE

13 COUNSEL.

14         MR. AARON:  THANK YOU.

15         THE COURT:  WE ARE GOING TO BEGIN WITH -- WE ARE

16 GOING TO HAVE THE JURORS COME UP IN GROUPS OF FIVE AND TALK

17 TO THEM ONE AT A TIME WHILE THE OTHER FOUR REMAIN WAITING

18 OUTSIDE.

19         SO, THE FIRST FIVE THAT WE NEED WILL BE

20 MS. ANDERSON, MR. ATWATER, MS. BONDY, MS. BRINKERHOFF,

21 MS. CHILDERS.

22         WE CAN GO OFF THE RECORD.

23   (PROSPECTIVE JUROR ANDERSON IS PRESENT IN THE COURTROOM.)

24         THE COURT:  GOOD MORNING.  HAVE A SEAT ANYWHERE

25 YOU LIKE.

1              YOU'RE MS. ANDERSON, CORRECT?

2              PROSPECTIVE JUROR ANDERSON:   CORRECT.

3              THE COURT:   THANK YOU FOR COMING BACK IN TODAY.

4    YOU REMEMBER THAT WHEN YOU WERE HERE A WEEK OR SO AGO YOU

5    WERE GIVEN THE OATH, BY THE COURTROOM CLERK, TO TELL THE

6    TRUTH?

7              PROSPECTIVE JUROR ANDERSON:   RIGHT.

8              THE COURT:   WITH MANY OF THE JURORS THIS MORNING,

9    WE ARE GOING TO BEGIN BY TALKING TO YOU OUTSIDE THE PRESENCE

10   OF SOME OF THE OTHER JURORS SO WE CAN ASK YOU SOME FOLLOW-UP

11   QUESTIONS ABOUT YOUR ANSWERS TO THE QUESTIONNAIRES, TO GIVE

12   YOU A LITTLE MORE PRIVACY.

13             YOU INDICATED IN YOUR ANSWERS THAT WHEN YOU WERE A

14   CHILD YOU WERE MOLESTED; IS THAT RIGHT?

15             PROSPECTIVE JUROR ANDERSON:   CORRECT.

16             THE COURT:   CAN YOU TELL ME WAS THAT -- FIRST OF

17   ALL, WAS THAT BY A FAMILY MEMBER OR BY A FAMILY FRIEND?

18             PROSPECTIVE JUROR ANDERSON:   FAMILY FRIEND.

19             THE COURT:   HOW OLD WERE YOU AT THE TIME?

20             PROSPECTIVE JUROR ANDERSON:   NINE.

21             THE COURT:   WAS IT REPORTED TO ANY AUTHORITIES?

22             PROSPECTIVE JUROR ANDERSON:   NO.

23             THE COURT:   REPORTED TO FAMILY MEMBERS?

24             PROSPECTIVE JUROR ANDERSON:   A FAMILY MEMBER WAS

25   PRESENT.

1          THE COURT:  SO, DID YOU REPORT IT TO ANYONE?

2          PROSPECTIVE JUROR ANDERSON:  NO.

3          THE COURT:  WHEN YOU WERE OLDER, DID YOU REPORT IT?

4          PROSPECTIVE JUROR ANDERSON:  ONLY TO THE THERAPIST.

5          THE COURT:  SO, THAT WAS MY NEXT QUESTION.  SO, YOU

6   EVENTUALLY GOT SOME TREATMENT OR HELP IN REGARDS TO IT?

7          PROSPECTIVE JUROR ANDERSON:  CORRECT.

8          THE COURT:  AND THEN YOU ALSO TOLD US THAT TWO OF

9   YOUR SONS WERE MOLESTED?

10          PROSPECTIVE JUROR ANDERSON:  CORRECT.

11          THE COURT:  NOW, IN CONNECTION WITH THAT, WAS THAT

12   TWO SEPARATE INCIDENTS, OR WERE THEY MOLESTED BY THE SAME

13   PERSON?

14          PROSPECTIVE JUROR ANDERSON:  NO, THEY WERE NOT

15   MOLESTED BY THE SAME PERSON.  ONE SON WAS MOLESTED THE OTHER

16   SON, BUT THE FIRST WAS MOLESTED SOMEWHERE ELSE BY A FAMILY

17   MEMBER OR FRIEND.

18          THE COURT:  AND THEN HE IN TURN MOLESTED THE OTHER

19   SON?

20          PROSPECTIVE JUROR ANDERSON:  CORRECT.

21          THE COURT:  WHEN YOUR ONE SON WAS MOLESTED BY AN

22   OUTSIDER, WAS THAT EVER REPORTED?

23          PROSPECTIVE JUROR ANDERSON:  NO.  DIDN'T KNOW ABOUT

24   IT.

25          THE COURT:  HOW OLD WAS YOUR SON WHEN THAT

1    HAPPENED?

2              PROSPECTIVE JUROR ANDERSON:  I HAVEN'T ASKED THAT

3    PARTICULAR QUESTION.

4              THE COURT:  ALL RIGHT.  WHEN DID YOU LEARN ABOUT

5    IT?

6              PROSPECTIVE JUROR ANDERSON:  I LEARNED ABOUT IT

7    WHEN THE YOUNGER ONE WAS MOLESTED.

8              THE COURT:  AND HOW OLD WAS YOUR YOUNGER SON AT THE

9    TIME?

10             PROSPECTIVE JUROR ANDERSON:  WHEN I FOUND OUT?

11             THE COURT:  YES.

12             PROSPECTIVE JUROR ANDERSON:  OR WHEN I ASKED THE

13   QUESTION?

14             THE COURT:  WELL, WHEN YOU --

15             PROSPECTIVE JUROR ANDERSON:  I ASKED HIM A NUMBER

16   OF TIMES.  BUT WHEN I DEFINITELY FOUND OUT, HE WAS 18.

17             THE COURT:  DO YOU KNOW WHEN IT OCCURRED?  HOW OLD

18   HE WAS WHEN IT OCCURRED?

19             PROSPECTIVE JUROR ANDERSON:  PROBABLY WHEN HE WAS

20   ABOUT 10.

21             THE COURT:  NOW, THE CASE THAT WE'RE HERE FOR TODAY

22   INVOLVES ALLEGATIONS ABOUT THE MOLESTING OF A BOY WHO WAS

23   SEVEN YEARS OLD AT THE TIME.  ONE OF THE THINGS THAT YOU SAID

24   IN YOUR ANSWERS IS THAT HAVING BEEN THE SURVIVOR OF INCEST

25   YOURSELF AND A MOTHER OF BOYS WHO WERE MOLESTED, THIS MIGHT

1    BE A DIFFICULT CASE FOR YOU TO SIT ON?

2              PROSPECTIVE JUROR ANDERSON:  RIGHT.

3              THE COURT:  AS I HAVE BEEN TALKING TO YOU FOR JUST

4    THE LAST FEW MOMENTS, DO YOU HAVE ANY FURTHER THOUGHTS NOW

5    THAT YOU HAVE BEEN ANSWERING A FEW QUESTIONS ABOUT IT AND YOU

6    KNOW THE AGE OF THE CHILD IN THIS CASE WHO WAS ALLEGEDLY

7    MOLESTED, HOW DO YOU FEEL ABOUT SITTING AS A JUROR ON THIS

8    KIND OF A CASE?

9              PROSPECTIVE JUROR ANDERSON:  I DON'T WANT TO BE

10   HERE.

11             THE COURT:  WOULD IT BE HARD FOR YOU TO BE FAIR?

12             PROSPECTIVE JUROR ANDERSON:  I'M NOT EVEN MAKING

13   EYE CONTACT.

14             THE COURT:  WHEN YOU SAY YOU'RE NOT MAKING EYE

15   CONTACT, DO YOU MEAN WITH THE DEFENDANT IN THIS CASE?

16             PROSPECTIVE JUROR ANDERSON:  CORRECT.

17             THE COURT:  AND THAT'S BECAUSE IT IS TOO DIFFICULT

18   FOR YOU TO DO THAT?

19             PROSPECTIVE JUROR ANDERSON:  CORRECT.

20             THE COURT:  WELL, THANK YOU VERY MUCH,

21   MS. ANDERSON.  I'M GOING TO ASK YOU TO JUST WAIT OUTSIDE FOR

22   A MOMENT OR TWO.

23        (PROSPECTIVE JUROR ANDERSON EXITS THE COURTROOM.)

24             THE COURT:  I REALIZE I DIDN'T GIVE COUNSEL A

25   CHANCE TO INQUIRE, BUT I THINK THIS IS A CLEAR CASE.  EITHER

1    SIDE HAVE ANY OBJECTIONS TO EXCUSING MS. ANDERSON?

2          MR. AARON:  NO.  WE WOULD STIPULATE.

3          MR. MICHAEL:  NO.  WE WOULD STIPULATE.

4          THE COURT:  THANK YOU.  ALL RIGHT.  BEFORE YOU

5    BRING THE NEXT JUROR IN, GIVE ME JUST A MOMENT.

6          MR. MICHAEL:  YOUR HONOR --

7          THE COURT:  OFF THE RECORD.

8     (PROSPECTIVE JUROR ATWATER IS PRESENT IN THE COURTROOM.)

9          THE COURT:  GOOD MORNING, MR. ATWATER.

10        PROSPECTIVE JUROR ATWATER:  GOOD MORNING.

11        THE COURT:  HAVE A SEAT ANYPLACE YOU WOULD LIKE

12    THERE.  ANYPLACE YOU LIKE.

13        PROSPECTIVE JUROR ATWATER:  OKAY.

14        THE COURT:  MR. ATWATER, WE ARE GOING TO BE ASKING

15    MOST OF THE JURORS JUST A FEW FOLLOW-UP QUESTIONS BEFORE WE

16    BEGIN THE GENERAL VOIR DIRE PROCESS -- A COUPLE OF QUESTIONS

17    BASED ON YOUR ANSWERS TO THE QUESTIONNAIRE -- ON AREAS THAT

18    YOU MIGHT APPRECIATE A LITTLE MORE PRIVACY ABOUT.

19        YOU INDICATED IN ANSWER TO ONE OF THE QUESTIONS ON

20    THE QUESTIONNAIRE THAT YOUR WIFE WAS A VICTIM OF A SEXUALLY

21    RELATED CRIME?

22        PROSPECTIVE JUROR ATWATER:  RIGHT.

23        THE COURT:  BEFORE YOU MET HER?

24        PROSPECTIVE JUROR ATWATER:  BEFORE I MET HER, YES.

25        THE COURT:  CAN YOU TELL US ABOUT THAT?

1          PROSPECTIVE JUROR ATWATER:  IT WAS HER

2  FATHER-IN-LAW (SIC), WHEN SHE WAS A CHILD.  IT WENT ON, I

3  THINK, FOR A COUPLE OF YEARS.  AND THAT'S ALL THAT SHE TOLD

4  ME ABOUT IT.

5          MR. AARON:  I'M SORRY?

6          THE COURT:  YOU SAY HER FATHER-IN-LAW?

7          PROSPECTIVE JUROR ATWATER:  IT WAS HER STEPFATHER.

8          THE COURT:  STEPFATHER?

9          PROSPECTIVE JUROR ATWATER:  STEPFATHER, YES.  SHE

10  WAS AROUND EIGHT YEARS OLD.

11          THE COURT:  AND DO YOU KNOW ANYTHING ELSE ABOUT IT?

12          PROSPECTIVE JUROR ATWATER:  I JUST KNOW THAT IT

13  WENT ON FOR, LIKE I SAID, A COUPLE YEARS.

14          THE COURT:  AND IS HER MOTHER STILL MARRIED TO THAT

15  MAN, DO YOU KNOW?

16          PROSPECTIVE JUROR ATWATER:  YES.

17          THE COURT:  WAS ANYTHING EVER REPORTED TO THE

18  AUTHORITIES ABOUT IT?

19          PROSPECTIVE JUROR ATWATER:  NO, IT WASN'T.

20          THE COURT:  ANYTHING ELSE THAT YOU HAVE BEEN TOLD

21  ABOUT IT?

22          PROSPECTIVE JUROR ATWATER:  NOT MUCH, NO.

23          THE COURT:  ANY DETAILS ABOUT THE EXTENT OF THE

24  MOLESTING OR THE TYPE OF MOLESTING?

25          PROSPECTIVE JUROR ATWATER:  JUST BASICALLY THAT

1    STEPFATHER WAS TOUCHING HER, BASICALLY, AND TRYING TO GET HER

2    TO TOUCH HIM.

3            THE COURT:  ALL RIGHT.  HAS YOUR WIFE, TO YOUR

4    KNOWLEDGE, EVER SOUGHT OR RECEIVED ANY COUNSELING OR THERAPY?

5            PROSPECTIVE JUROR ATWATER:  NO, SHE HASN'T.

6            THE COURT:  IN THIS CASE, THE DEFENDANT IS ACCUSED

7    OF -- AMONG OTHER THINGS THAT YOU WILL HEAR ABOUT -- IS

8    ACCUSED OF TRAVELING ACROSS STATE LINES WITH THE INTENT TO

9    MOLEST OR SEXUALLY ASSAULT A CHILD UNDER THE AGE OF 12.  IN

10   THIS CASE, THE CHILD WAS A SEVEN-YEAR-OLD BOY, AND ACTUALLY

11   TO HAVE MOLESTED A SEVEN-YEAR-OLD BOY.  SO, THOSE ARE THE

12   ACCUSATIONS OR THE CHARGES IN THIS CASE.

13           GIVEN WHAT YOU KNOW ABOUT WHAT HAPPENED TO YOUR

14   WIFE WHEN SHE WAS AROUND THE SAME AGE AS THE ALLEGED VICTIM

15   IN THIS CASE, DO YOU THINK THAT YOU WOULD BE ABLE TO BE A

16   FAIR AND IMPARTIAL JUROR TO BOTH SIDES IN THIS CASE?

17           PROSPECTIVE JUROR ATWATER:  YES, I WOULD.

18           THE COURT:  WHEN DID YOU FIRST LEARN ABOUT WHAT

19   HAPPENED TO YOUR WIFE?  WAS IT BEFORE YOU GOT MARRIED?

20           PROSPECTIVE JUROR ATWATER:  YES.  OH, I ACTUALLY --

21   WELL, BEFORE WE GOT MARRIED.  WE LIVED TOGETHER BEFORE WE GOT

22   MARRIED.

23           THE COURT:  YOU HAVE CHILDREN YOURSELF RIGHT, YOUNG

24   CHILDREN?

25           PROSPECTIVE JUROR ATWATER:  THAT IS CORRECT.

1          THE COURT:  IN FACT, IF I REMEMBER, YOU HAVE THREE

2    KIDS UNDER THE AGE OF FOUR, FOUR AND UNDER?

3          PROSPECTIVE JUROR ATWATER:  YES.

4          THE COURT:  SO, YOUR HOUSE IS PRETTY BUSY?

5          PROSPECTIVE JUROR ATWATER:  YES, IT IS.

6          THE COURT:  SO, THIS MIGHT SEEM LIKE A NICE QUIET

7    PLACE TO BE?

8          PROSPECTIVE JUROR ATWATER:  YES, IT WOULD.

9          THE COURT:  THE OTHER THING -- AND WE WILL BE

10   ASKING ALL THE JURORS ABOUT THIS -- BUT DURING THIS TRIAL TWO

11   OF THE CHARGES DEAL WITH CHILD PORNOGRAPHY.  AND THE JURORS

12   WILL BE ASKED -- WILL BE REQUIRED TO LOOK AT VERY EXPLICIT

13   IMAGES OF YOUNG CHILDREN IN CONNECTION WITH THE CHILD

14   PORNOGRAPHY CHARGES.  WOULD YOU BE ABLE TO DO THAT AND REMAIN

15   A FAIR AND IMPARTIAL JUROR IN THIS CASE?

16         PROSPECTIVE JUROR ATWATER:  I THINK SO.

17         THE COURT:  YOU WOULD DO YOUR BEST TO DO THAT?

18         PROSPECTIVE JUROR ATWATER:  YES, I WOULD.

19         THE COURT:  ALL RIGHT.  DOES COUNSEL HAVE ANY

20   QUESTIONS?

21         MR. AARON:  THANK YOU, YOUR HONOR.

22         MORNING, SIR.

23         PROSPECTIVE JUROR ATWATER:  MORNING.

24         MR. AARON:  I MISSED THE FIRST PART OF THE DIALOGUE

25   THAT YOU HAD WITH THE JUDGE.  I COULDN'T HEAR THAT WELL.

1          IF I UNDERSTAND CORRECTLY, YOUR WIFE WAS MOLESTED

2    AROUND THE AGE OF EIGHT BY A STEPFATHER?

3          PROSPECTIVE JUROR ATWATER:  THAT'S CORRECT.

4          MR. AARON:  BUT YOU DIDN'T HAVE ANY FURTHER

5    DETAILS?

6          PROSPECTIVE JUROR ATWATER:  NO, I DON'T.

7          MR. AARON:  BUT YOU KNEW THAT --

8          PROSPECTIVE JUROR ATWATER:  SHE WAS JUST BRIEF

9    ABOUT IT.  SHE DIDN'T GET INTO MUCH DETAIL.  SHE DOESN'T LIKE

10   TALKING ABOUT IT.

11         MR. AARON:  UNDERSTANDABLY.  YOU KNEW IT INVOLVED

12   SOME SORT OF INAPPROPRIATE TOUCHING?

13         PROSPECTIVE JUROR ATWATER:  THAT'S CORRECT, YES.

14         MR. AARON:  THERE IS GOING TO BE ALLEGATIONS HERE

15   OF THE SAME TYPE OF THING.  THERE MAY BE MORE, BUT THERE WILL

16   DEFINITELY BE AT LEAST THAT.  AND I AM CERTAIN THAT YOU'RE

17   AWARE OF THE PROBLEMS THAT IT HAS CAUSED YOUR WIFE?

18         PROSPECTIVE JUROR ATWATER:  IT HAS CAUSED SOME, BUT

19   SHE HAS KIND OF PUT IT BEHIND HER AND MOVED ON.

20         THE COURT:  WHAT I WANT TO TALK ABOUT IS WHEN YOU

21   MENTIONED THAT YOU THINK YOU COULD REMAIN IMPARTIAL LOOKING

22   AT PHOTOGRAPHS, THERE IS GOING TO BE PHOTOGRAPHS AND SOME

23   VIDEO, AS WELL.  I THINK, AT LEAST -- AND COUNSEL CAN CORRECT

24   ME IF I AM WRONG -- I THINK AT LEAST TWO VIDEOS.

25         WHEN YOU SAY "I THINK," THAT LEAVES LAWYERS,

1    OBVIOUSLY, TO SPECULATE THAT MAYBE YOU MIGHT NOT BE ABLE TO

2    BE.

3                 PROSPECTIVE JUROR ATWATER:  I WOULD.  I MEAN, THAT

4    WAS A SEPARATE CASE FROM THIS.  I MEAN, SO --

5                 MR. AARON:  WOULD YOUR -- THANK YOU.  I HAVE

6    NOTHING FURTHER.

7                 THE COURT:  THANK YOU.

8                 MR. MICHAEL?

9                 MR. MICHAEL:  NO QUESTIONS.

10                THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

11   MR. ATWATER.  YOU MAY GO BACK DOWN TO THE JURY ASSEMBLY ROOM.

12                PROSPECTIVE JUROR ATWATER:  THANK YOU.

13         (PROSPECTIVE JUROR ATWATER EXITS THE COURTROOM.)

14                THE COURT:  DID MS. INGRAM TALK TO YOU ABOUT THE

15   PICTURE TAKING OF THE WITNESSES?

16                MR. MICHAEL:  PICTURE TAKING?

17                THE COURT:  SHE DIDN'T?  OKAY.  THIS IS SOMETHING

18   THAT I WANT TO DO FOR THE JUROR NOTEBOOKS.  SOME JUDGES DO IT

19   IN EVERY TRIAL, AND I'M GOING TO START DOING IT PROBABLY IN

20   TRIALS THAT ARE MORE THAN A WEEK LONG.

21                IN THEIR NOTEBOOKS, I WANT THEM TO HAVE A PICTURE

22   OF EVERY WITNESS WHO TESTIFIES.  WE HAVE A DIGITAL CAMERA.

23   MS. INGRAM WILL GO OUT AND TAKE A QUICK SNAPSHOT OF THEM,

24   AND THEN SHE PUTS IT ON A PAGE, GIVES IT TO EVERY JUROR, SO

25   WHEN THEY DELIBERATE THEY CAN REMEMBER WHAT THEY LOOK LIKE.

1          (PROSPECTIVE JUROR BONDY IS PRESENT IN THE COURTROOM.)

2               THE COURT:  MS. BONDY, GOOD MORNING.

3               PROSPECTIVE JUROR BONDY:  GOOD MORNING.

4               THE COURT:  YOU CAN HAVE A SEAT ANYWHERE YOU LIKE.

5               BEFORE WE GET STARTED WITH VOIR DIRE OF THE ENTIRE

6     PANEL THIS MORNING, I AM TAKING THE OPPORTUNITY TO TALK TO

7     SOME OF THE -- WELL, MOST OF THE JURORS INDIVIDUALLY ABOUT

8     SOME OF YOUR ANSWERS TO THE QUESTIONNAIRES.  AND I JUST HAVE

9     ONE OR TWO QUESTIONS FOR YOU, AND THEN THE ATTORNEYS MAY HAVE

10    SOME ALSO.

11              AS YOU MAY HAVE BEEN ABLE TO GATHER FROM THE

12    QUESTIONS IN THE QUESTIONNAIRE, THIS CASE INVOLVES CHARGES OF

13    CHILD PORNOGRAPHY, TWO SETS OF CHARGES REGARDING CHILD

14    PORNOGRAPHY AND TWO SETS OF CHARGES REGARDING MOLESTATION OF

15    A SEVEN YEAR OLD -- OR ALLEGED MOLESTATION OF A

16    SEVEN-YEAR-OLD BOY.

17              AND IN CONNECTION WITH THE CHILD PORNOGRAPHY

18    CHARGES, DURING THE COURSE OF THE TRIAL THERE WILL BE

19    EVIDENCE BEFORE THE JURY IN THE FORM OF SOME STILL PICTURES

20    AND TWO VERY SHORT, ONE OR TWO VERY SHORT VIDEO CLIPS.

21         AND THAT'S THE REASON FOR THE QUESTION IN THE

22    QUESTIONNAIRE ABOUT, WOULD YOU BE ABLE, IF YOU WERE A JUROR

23    ON THIS CASE, TO VIEW THAT TYPE OF EVIDENCE AND REMAIN FAIR

24    AND IMPARTIAL AND DECIDE THE CASE BASED ON THE EVIDENCE THAT

25    YOU SEE IN THE COURSE OF THE TRIAL AND THE LAW AS THE COURT

1    INSTRUCTS YOU ON IT?

2          ONE OF YOUR ANSWERS, IN CONNECTION WITH THAT

3    QUESTION, YOU MAY NOT REMEMBER BECAUSE IT HAS BEEN A WEEK OR

4    TWO NOW -- AND THIS ISN'T AN EXAM, SO I WILL TELL YOU THAT

5    YOUR ANSWER, IN CONNECTION WITH THAT QUESTION, WAS THAT IT

6    WOULD BE EXTREMELY UPSETTING EMOTIONALLY TO YOU TO SEE AND

7    HEAR TESTIMONY OR EVIDENCE OF THAT NATURE.

8          A LOT OF TIMES -- LET ME JUST TELL YOU THAT A LOT

9    OF TIMES, DEPENDING ON THE NATURE OF THE CASE, EVIDENCE

10   DURING THE COURSE OF A TRIAL CAN BE UPSETTING OR HAVE AN

11   EMOTIONAL IMPACT ON EVERY ONE WHO SEES IT.  SO, I APPRECIATE

12   YOUR CANDOR IN ANSWERING THE QUESTION.

13         WOULD YOU BE ABLE -- AND IT IS HARD TO KNOW THIS IN

14   ADVANCE, BUT DO YOU THINK YOU WOULD BE ABLE TO, DESPITE BEING

15   UPSET OR SHOCKED AT THE KIND OF EVIDENCE THAT YOU MIGHT SEE

16   IN THIS CASE OR HEAR, WOULD YOU BE ABLE TO FOCUS,

17   NEVERTHELESS, AND BE FAIR AND IMPARTIAL AND DO YOUR DUTY AS A

18   JUROR?  AND YOUR DUTY AS A JUROR IS TO JUDGE THE FACTS OF THE

19   CASE AND DECIDE THE CASE BASED ON THE EVIDENCE THAT YOU SEE

20   IN THE COURTROOM AND NOT OUTSIDE INFLUENCES, FOR EXAMPLE, AND

21   THE LAW AS THE COURT INSTRUCTS YOU ON IT?

22         THAT WAS A LONG QUESTION, BUT DO YOU UNDERSTAND MY

23   QUESTION?

24         PROSPECTIVE JUROR BONDY:  YES, AND I THINK I COULD.

25         THE COURT:  IS THERE ANYTHING ELSE THAT YOU COULD

1  TELL US ABOUT YOUR REACTION TO THAT QUESTION ABOUT BEING

2  UPSET AT THE IDEA OF SEEING THOSE KINDS OF IMAGES?

3          PROSPECTIVE JUROR BONDY:  I THINK JUST BECAUSE IT

4  INVOLVES CHILDREN THAT'S WHAT BOTHERS ME.  IT WOULD BOTHER

5  ME.

6          THE COURT:  YOU HAVE A DAUGHTER?

7          PROSPECTIVE JUROR BONDY:  YEAH.

8          THE COURT:  AND SHE IS HOW OLD?

9          PROSPECTIVE JUROR BONDY:  TWELVE.

10          THE COURT:  THIS INVOLVES THE MOLESTATION OF A

11  SEVEN-YEAR-OLD BOY.  SO, A YOUNG CHILD.  AND YOU WOULD BE

12  ASKED TO VIEW THE TESTIMONY, LOOK AT IT, AND THEN DECIDE THE

13  CASE ON A DISPASSIONATE BASIS.

14          HOW DO YOU FEEL ABOUT BEING ASKED TO DO THAT?

15          PROSPECTIVE JUROR BONDY:  OKAY, I GUESS.

16          THE COURT:  ALL RIGHT.

17          MR. AARON?

18          MR. AARON:  THANK YOU.

19          GOOD MORNING.

20          PROSPECTIVE JUROR BONDY:  GOOD MORNING.

21          MR. AARON:  JUST A COUPLE OF QUESTIONS.

22          IN THIS CASE, THERE IS A VERY YOUNG BOY INVOLVED,

23  AGE SEVEN.  THERE MAY BE TESTIMONY BY THAT YOUNG BOY.  THERE

24  MAY BE TESTIMONY BY HIS MOTHER OR FATHER, AS WELL, AND IT MAY

25  BE VERY EMOTIONAL AND SAD.  THERE IS GOING TO BE A LOT OF

1   IMAGES, I THINK MAYBE OVER 30, AND THOSE IMAGES ARE ALSO SAD

2   AND DISTURBING.   THERE IS ALSO POSSIBLY GOING TO BE EVIDENCE

3   ABOUT FANTASIES INVOLVED WITH CHILDREN.

4          GIVEN ALL OF THIS EVIDENCE, I THINK ANYONE WOULD

5   FIND DISTURBING.   WHAT STRUCK ME ABOUT YOUR QUESTIONNAIRE,

6   NOT THAT YOU SAID IT WOULD BE UPSETTING, BUT EXTREMELY

7   UPSETTING.   AND HAVING BEEN A PARENT WITH YOUNG CHILDREN, I

8   CAN UNDERSTAND THAT.   BUT ONLY YOU UNDERSTAND YOUR STATE OF

9   MIND.   AND NOT EVERY TRIAL IS FOR EVERY PERSON.

10          HOW DO YOU FEEL, KNOWING IN ADVANCE THAT THE

11   LAWYERS, THE JUDGE, ALL THE PROFESSIONALS HERE KNOW THIS

12   EVIDENCE IS DISTURBING, SO A LAYPERSON SUCH AS YOURSELF, WE

13   KNOW IT CAN BE EMOTIONAL.

14          PROSPECTIVE JUROR BONDY:   WHAT WAS YOUR QUESTION

15   AGAIN?   I'M SORRY.

16          MR. AARON:   HOW WOULD YOU FEEL KNOWING THAT --

17   BECAUSE WE KIND OF HAVE TO HAVE AN OPEN-ENDED COMMITMENT,

18   WHICH IS ALMOST IMPOSSIBLE, BECAUSE ONLY YOU WILL KNOW

19   ULTIMATELY WHAT YOU'RE FEELING.   WE CAN'T REALLY KNOW WHAT

20   YOU'RE FEELING, BUT WE KNOW FOR A FACT THAT THIS STUFF IS

21   GOING TO BE DISTURBING.

22          PROSPECTIVE JUROR BONDY:   I THINK IT WOULD BE

23   DISTURBING, UPSETTING, BUT I REALIZE THAT IT IS FOR

24   EVERYBODY.   MOST PEOPLE HAVE KIDS, OR, YOU KNOW.

25          MR. AARON:   AND YOU WOULD BE ABLE TO SET THAT

1    ASIDE?

2            PROSPECTIVE JUROR BONDY:  I THINK SO.  I THINK IT

3    WOULD BE TOUGH, BUT IT IS NOT GOING TO BE EASY FOR ANYBODY.

4            MR. AARON:  RIGHT.

5            THE COURT:  SO, IN OTHER WORDS, I THINK -- ARE YOU

6    SAYING THAT YOU DON'T THINK IT WOULD BE HARDER FOR YOU THAN

7    IT WOULD BE FOR MOST PEOPLE, WHEN YOU SAY IT'S HARD FOR

8    EVERYBODY?

9            PROSPECTIVE JUROR BONDY:  YEAH.  HAVING A CHILD

10   THAT'S, YOU KNOW, SHE IS OLDER THAN THAT, BUT IT STILL KIND

11   OF HITS HOME A LITTLE BIT.

12           MR. AARON:  THANK YOU.  NOTHING FURTHER.

13           THE COURT:  MR. MICHAEL?

14           MR. MICHAEL:  THANK YOU, YOUR HONOR.

15           IF THE JUDGE WERE TO INSTRUCT YOU, YOU COULD PUT

16   ASIDE YOUR PERSONAL FEELINGS AND YOU WOULD FOCUS ONLY ON THE

17   EVIDENCE IN THIS CASE, AND TO GIVE THE DEFENDANT THE BENEFIT

18   OF THE BURDEN THE GOVERNMENT HAS TO PROVE, WOULD YOU BE ABLE

19   TO FOLLOW THOSE INSTRUCTIONS?

20           PROSPECTIVE JUROR BONDY:  YEAH.

21           MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

22           THE COURT:  THANK YOU.  THANK YOU VERY MUCH.  YOU

23   MAY GO BACK DOWN TO THE JURY ASSEMBLY ROOM.

24        (PROSPECTIVE JUROR BONDY EXITS THE COURTROOM.)

25           MR. AKROTIRIANAKIS:  YOUR HONOR, BEFORE THE NEXT

1   JUROR COMES IN, THE GOVERNMENT OBJECTS TO A COUPLE OF THINGS

2   THAT JUST HAPPENED.

3        ONE, COUNSEL ESSENTIALLY ASKED FOR A COMMITMENT

4   FROM THE JURORS, SOMETHING THAT WE DISCUSSED LAST WEEK.

5        THE GOVERNMENT FURTHER OBJECTS TO COUNSEL MAKING

6   STATEMENTS SUCH AS, "MYSELF BEING A PARENT OF YOUNG

7   CHILDREN," AND SO ON.  I THINK THAT'S --

8        THE COURT:  I DON'T THINK ANY -- I DON'T THINK

9   EITHER SIDE, ANY OF THE COUNSEL SHOULD MAKE REFERENCE TO

10  THEIR OWN CHILDREN.  SO I DON'T WANT ANYONE DOING THAT.

11       MR. AKROTIRIANAKIS:  MOREOVER, YOUR HONOR, THE

12  WHOLE FIRST STATEMENT WAS BASICALLY A SPEECH WITHOUT EVEN A

13  QUESTION, SORT OF TESTING OUT THE CASE.  I MEAN, THAT'S NOT

14  PROPER VOIR DIRE.  THE GOVERNMENT OBJECTS TO IT.  IT IS NOT

15  PROPER VOIR DIRE, GENERALLY, AND UNDER THIS COURT'S --

16       THE COURT:  ALL RIGHT.  I UNDERSTAND YOUR POINT.

17       I THINK YOU WENT TOO FAR WITH THIS JUROR,

18  MR. AARON.

19       MR. AARON:  I DID NOT ASK FOR ANY COMMITMENT FROM

20  THIS JUROR, YOUR HONOR.  BECAUSE I ASKED A QUESTION THAT HAS

21  THE WORD "COMMITMENT" IN IT, THAT DOESN'T MEAN I'M ASKING FOR

22  A COMMITMENT.

23       THE COURT:  WELL, IT WASN'T SO MUCH IN MY VIEW THAT

24  YOU ASKED FOR A COMMITMENT.  IT WAS THAT I THOUGHT YOU WERE

25  ALMOST CROSS-EXAMINING HER.  AND NOT THAT YOUR TONE WAS

1    HOSTILE AT ALL, BUT I THINK THAT THE QUESTIONS THAT SEEMED

2    DESIGNED TO ELICIT A RESPONSE THAT THE JUROR IS GOING TO BE

3    UPSET, I THINK THAT THE ANSWERS TO THESE QUESTIONS SHOW THAT

4    MOST PEOPLE, YOU KNOW -- I AM SORT OF TORN WITH THE IDEA IN

5    DISCUSSING THIS WITH THE JURORS, OF TALKING TO THEM ABOUT

6    BEING A JUROR ON A MURDER CASE, FOR EXAMPLE.  BECAUSE IF

7    YOU'RE ASKED TO BE A JUROR ON A MURDER CASE AND YOU'RE TOLD

8    THAT YOU'RE GOING TO SEE AUTOPSY PHOTOGRAPHS, MOST PEOPLE

9    DON'T RELISH THAT.

10        BUT SAY YOU'RE GOING TO SEE VERY DISTURBING

11   PHOTOGRAPHS FROM A MURDER CASE, BUT WOULD YOU STILL BE ABLE

12   TO BE FAIR AND IMPARTIAL AND DECIDE THE CASE.  I THINK THEY

13   ARE MORE ABLE TO UNDERSTAND THAT.

14        AND THEN YOU HAD SOME VERY GOOD QUESTIONS IN YOUR

15   PROPOSED VOIR DIRE ABOUT, ARE THERE SOME CRIMES THAT WHEN YOU

16   HEAR ABOUT THEM PEOPLE BECOME SO ANGRY THAT THEY JUST WANT TO

17   THINK THAT THE ACCUSED PERSON IS GUILTY?

18        AND I'M GOING TO ASK THOSE QUESTIONS IN GENERAL

19   VOIR DIRE.  BUT I THINK THAT'S A BETTER APPROACH THAN JUST

20   SAYING TO PEOPLE WHO HAVE SAID CANDIDLY, IN ANSWERS TO THE

21   QUESTIONNAIRES, THAT THEY THINK IT WOULD BE UPSETTING TO LOOK

22   AT, YOU KNOW, IMAGES OF CHILD PORNOGRAPHY, AND THEN QUESTION

23   THEM AS THOUGH THAT'S A DISQUALIFYING ANSWER.  BECAUSE I

24   DON'T THINK IT IS.

25        SO, APART FROM SAYING THAT, I DON'T WANT EITHER

```
1    SIDE TO MENTION THAT -- ANY OF THE COUNSEL -- THAT THEY HAVE
2    CHILDREN.  I AM AFRAID I HAVEN'T GIVEN VERY CLEAR GUIDANCE.
3    BUT LET'S BRING IN THE NEXT JUROR.
4    (PROSPECTIVE JUROR BRINKERHOFF IS PRESENT IN THE COURTROOM.)
5              THE COURT:  GOOD MORNING.
6              PROSPECTIVE JUROR BRINKERHOFF:  GOOD MORNING.
7              THE COURT:  MS. BRINKERHOFF, BEFORE WE GET STARTED
8    WITH THE GENERAL VOIR DIRE OF ALL THE JURORS, I WANT TO TAKE
9    THE OPPORTUNITY TO ASK, ACTUALLY, MOST OF THE JURORS, A FEW
10   FOLLOW-UP QUESTIONS BASED ON THE ANSWERS TO THE
11   QUESTIONNAIRES, OUTSIDE THE PRESENCE OF ALL THE OTHER JURORS
12   SO THAT YOU CAN HAVE A LITTLE MORE PRIVACY.
13             YOU MENTIONED IN YOUR QUESTIONNAIRE ANSWERS THAT
14   YOUR SON WAS MOLESTED WHEN HE WAS IN HIS MIDDLE TEENS?
15             PROSPECTIVE JUROR BRINKERHOFF:  RIGHT.
16             THE COURT:  AND THAT CASE WENT TO COURT?
17             PROSPECTIVE JUROR BRINKERHOFF:  YES, IT DID.
18             THE COURT:  I BELIEVE THAT YOU HAVE TOLD US THIS
19   WAS IN CONNECTION WITH A PAPER, A NEWSPAPER ROUTE THAT HE
20   HAD?
21             PROSPECTIVE JUROR BRINKERHOFF:  RIGHT.
22             THE COURT:  CAN YOU TELL US A LITTLE BIT ABOUT WHAT
23   HAPPENED?
24             PROSPECTIVE JUROR BRINKERHOFF:  HE WAS AROUND
25   COLLECTING FOR HIS ROUTE, AND A FELLOW INVITED HIM INSIDE FOR
```

1    A GLASS OF WATER OR SOMETHING AND HAD HIM PULL DOWN HIS

2    PANTS.

3              THE COURT:  WAS HE TOUCHED?

4              PROSPECTIVE JUROR BRINKERHOFF:  OH, YES.

5              THE COURT:  DID THE MOLESTATION GO BEYOND TOUCHING?

6              PROSPECTIVE JUROR BRINKERHOFF:  NO.

7              THE COURT:  AND THIS WAS REPORTED TO THE

8    AUTHORITIES AND THE CASE WENT TO COURT, YOU SAID?

9              PROSPECTIVE JUROR BRINKERHOFF:  YES.

10             THE COURT:  WAS THERE A TRIAL OR --

11             PROSPECTIVE JUROR BRINKERHOFF:  YES, THERE WAS.

12   THERE WAS A TRIAL.

13             THE COURT:  WAS IT A JURY TRIAL?

14             PROSPECTIVE JUROR BRINKERHOFF:  I BELIEVE IT GOT

15   CALLED OFF AT THE LAST MINUTE.

16             THE COURT:  AND WAS THAT BECAUSE THE DEFENDANT PLED

17   GUILTY?

18             PROSPECTIVE JUROR BRINKERHOFF:  YES.

19             THE COURT:  SO, DID YOU GO TO COURT WITH YOUR SON?

20             PROSPECTIVE JUROR BRINKERHOFF:  I WAS IN COURT WHEN

21   IT STARTED, BUT WE NEVER WENT THROUGH THE TRIAL.

22             THE COURT:  AND HOW OLD WAS YOUR SON AT THE TIME

23   THAT THE COURT PROCEEDINGS, ABOUT THE SAME AGE?

24             PROSPECTIVE JUROR BRINKERHOFF:  I THINK IT WAS

25   ABOUT THE SAME AGE.

1          THE COURT:  WAS YOUR SON PREPARED TO HAVE TO

2    TESTIFY?

3          PROSPECTIVE JUROR BRINKERHOFF:  YES, HE WAS.

4          THE COURT:  NOW, WAS THERE A PRELIMINARY PROCEEDING

5    BEFORE TRIAL, SOMETHING LIKE A PRELIMINARY HEARING?

6          PROSPECTIVE JUROR BRINKERHOFF:  IT'S BEEN A LONG

7    TIME AGO.  I HAVE FOUR CHILDREN.

8          THE COURT:  OKAY.  DID YOUR SON EVER TESTIFY IN

9    COURT?

10          PROSPECTIVE JUROR BRINKERHOFF:  I DON'T BELIEVE HE

11   DID.  HE DID NOT NEED TO BECAUSE MY HUSBAND WAS IN LAW

12   ENFORCEMENT.  I DON'T KNOW IF YOU WANT THIS INFORMATION OR

13   NOT, BUT HE WAS ABLE TO TALK WITH THE DETECTIVES WHO WIRED

14   OUR SON TO GO IN FOR A SECOND TIME.  AND HE WAS A LITTLE BIT

15   GUILTY AT THE TIME THEY FOUND HIM, BASED ON THE

16   TAPE-RECORDING THEY GOT.  MY SON WAS WIRED, WENT BACK --

17          THE COURT:  AND TALKED TO THE PERPETRATOR?

18          PROSPECTIVE JUROR BRINKERHOFF:  -- BEFORE IT EVER

19   WENT TO COURT, YEAH.

20          THE COURT:  ALL RIGHT.  WHAT'S YOUR SON DOING NOW?

21          PROSPECTIVE JUROR BRINKERHOFF:  HE IS AN INSURANCE

22   BROKER.

23          THE COURT:  DID YOUR SON EVER GET ANY COUNSELING OR

24   THERAPY IN CONNECTION WITH THIS?

25          PROSPECTIVE JUROR BRINKERHOFF:  NO, HE DIDN'T.

1          THE COURT:  DO YOU THINK THAT HE RECOVERED PRETTY

2    WELL FROM THE INCIDENT?

3          PROSPECTIVE JUROR BRINKERHOFF:  I DO.

4          THE COURT:  THERE IS TWO SETS OF ALLEGATIONS IN

5    THIS CASE.  THERE ARE FOUR CHARGES, I SHOULD SAY.  TWO OF THE

6    CHARGES DEAL WITH CHILD PORNOGRAPHY, AND TWO OF THE CHARGES

7    DEAL WITH TRAVELING ACROSS STATE LINES WITH THE INTENT TO

8    SEXUALLY ASSAULT A MINOR, A BOY, IN THIS CASE, AT THE AGE OF

9    SEVEN.  AND THE LAST CHARGE IS SEXUAL ASSAULT OF A

10   SEVEN-YEAR-OLD BOY.  SO, THOSE ARE THE ACCUSATIONS THAT WE'RE

11   HERE FOR.

12          WOULD YOU HAVE ANY DIFFICULTY SITTING IN A CASE

13   THAT INVOLVES THE ACCUSATION OF MOLESTING A BOY?

14          PROSPECTIVE JUROR BRINKERHOFF:  NO, I DON'T BELIEVE

15   I WOULD.

16          THE COURT:  WOULD YOU BE ABLE TO DECIDE THIS CASE

17   WITHOUT THINKING ABOUT WHAT HAPPENED TO YOUR SON OR FACTORING

18   THAT IN?

19          PROSPECTIVE JUROR BRINKERHOFF:  I WOULD BE ABLE TO

20   SIT IN AND NOT TAKE IT ALL WITH MY PERSONAL LIFE.

21          THE COURT:  NOW, THE ALLEGATIONS ABOUT THE

22   MOLESTING ARE SOMEWHAT -- THEY ARE NOT VERY SIMILAR.  THE BOY

23   IS MUCH YOUNGER, AND SO FORTH, BUT IT DOES INVOLVE TOUCHING,

24   FONDLING, AND THAT KIND OF THING.  WOULD YOU BE ABLE TO

25   LISTEN TO THAT KIND OF EVIDENCE AND, AGAIN, DECIDE THE CASE

1    BASED ONLY ON THE EVIDENCE THAT YOU HEAR IN THE COURTROOM?

2             PROSPECTIVE JUROR BRINKERHOFF:  I WOULD.

3             THE COURT:  ALL RIGHT.  NOW, YOU SAID YOUR HUSBAND

4    WAS IN LAW ENFORCEMENT.  IS HE RETIRED NOW?

5             PROSPECTIVE JUROR BRINKERHOFF:  HE IS.  HE WAS 28

6    YEARS WITH THE SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT.

7    HE RETIRED AS ASSISTANT SHERIFF.

8             THE COURT:  HE GOT INVOLVED PERSONALLY, IT SOUNDS

9    LIKE, WITH THE INVESTIGATION ABOUT WHAT HAPPENED TO YOUR SON?

10            PROSPECTIVE JUROR BRINKERHOFF:  YES.  HE WAS A

11   DETECTIVE SERGEANT, I BELIEVE, AT THE TIME.

12            THE COURT:  I WILL BE TALKING ABOUT THIS WITH ALL

13   OF THE JURORS LATER ON, SO I DON'T WANT TO MAKE YOU SIT

14   THROUGH A COMPLETE REPEAT OF IT.  BUT YOU WILL HEAR

15   TESTIMONY, IF YOU ARE SEATED AS A JUROR IN THIS CASE, FROM

16   LAW ENFORCEMENT FROM VARIOUS AGENCIES.  WOULD YOU TEND TO

17   GIVE MORE WEIGHT TO THE TESTIMONY OF SOMEONE WHO IS IN LAW

18   ENFORCEMENT THAN SOMEONE WHO ISN'T?

19            PROSPECTIVE JUROR BRINKERHOFF:  YES AND NO.  I

20   REALLY AND TRULY WANT TO WEIGH WHAT I AM HEARING, AND I KNOW

21   WHO LAW ENFORCEMENT ARE, OVERALL.  BUT AS IN EVERY

22   PROFESSION, WE ARE ALL HUMAN BEINGS, SO YOU NEED TO LOOK AT

23   EVERYTHING.

24            THE COURT:  SO, WOULD YOU TREAT EACH WITNESS THE

25   SAME AND LISTEN TO THEIR TESTIMONY AND DECIDE WHETHER EACH

1    WITNESS IS BELIEVABLE?

2            PROSPECTIVE JUROR BRINKERHOFF:  YES, I WOULD.

3            THE COURT:  IN OTHER WORDS, WHEN SOMEONE TAKES THE

4    STAND AND THAT WITNESS IS IN LAW ENFORCEMENT, WOULD YOU BE

5    LESS LIKELY TO BELIEVE THEM BECAUSE THEY ARE IN LAW

6    ENFORCEMENT?  AND, YOU KNOW, SOME PEOPLE IN LAW ENFORCEMENT

7    THAT YOU MIGHT NOT THINK ARE SO TRUTHFUL?

8            PROSPECTIVE JUROR BRINKERHOFF:  NO, I DON'T BELIEVE

9    THAT.

10            THE COURT:  AND WOULD YOU BE MORE LIKELY TO BELIEVE

11    A WITNESS WHO IS IN LAW ENFORCEMENT BECAUSE YOU KNOW PEOPLE

12    IN LAW ENFORCEMENT AND YOU THINK THEY ARE VERY TRUTHFUL AND

13    HONEST?

14            PROSPECTIVE JUROR BRINKERHOFF:  I DON'T THINK SO.

15    MY HUSBAND GOT INTO THE POSITION OF ALMOST PERSONNEL MANAGER

16    IN HIS UPPER RANK, AND SO HE SAW A LOT OF DIFFERENT

17    INDIVIDUALS.

18            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

19    MS. BRINKERHOFF.  JUST A MOMENT.  I NEED TO LET THE ATTORNEYS

20    HAVE A CHANCE.  THEY MAY HAVE SOME FOLLOW-UP QUESTIONS FOR

21    YOU.

22            PROSPECTIVE JUROR BRINKERHOFF:  SURE.

23            THE COURT:  MR. AARON?

24            MR. AARON:  THANK YOU.

25            GOOD MORNING.

1          PROSPECTIVE JUROR BRINKERHOFF:  GOOD MORNING.

2          MR. AARON:  FOLLOWING YOUR SON'S MOLESTATION, YOU

3     WENT TO COURT WITH HIM TO TESTIFY?

4          PROSPECTIVE JUROR BRINKERHOFF:  RIGHT.

5          MR. AARON:  IN THIS CASE, THERE MAY BE KIND OF A

6     SIMILAR SITUATION; ALTHOUGH, THE BOY IS MUCH YOUNGER.  THERE

7     MAY BE A BOY THAT WHEN THE CLAIM OF MOLESTATION WAS MADE WAS

8     ABOUT SEVEN YEARS OLD.  HE IS OLDER NOW, BUT ABOUT SEVEN

9     YEARS OLD WHEN IT HAPPENED.  BUT HIS MOTHER MAY ALSO TESTIFY.

10          GIVEN THAT, THAT YOU MAY HEAR TESTIMONY FROM THE

11    BOY AND HIS MOTHER, JUST LIKE WHAT HAD HAPPENED TO YOU IN THE

12    SAME SORT OF SITUATION, HOW DO YOU THINK THAT MIGHT AFFECT

13    YOU?

14          PROSPECTIVE JUROR BRINKERHOFF:  I THINK I COULD SIT

15    AND LISTEN TO IT AND, YOU KNOW, FORM MY OWN OPINION ON IT.

16          MR. AARON:  THANK YOU.  NOTHING FURTHER.

17          THE COURT:  THANK YOU.

18          MR. MICHAEL?

19          MR. MICHAEL:  NO QUESTIONS, YOUR HONOR.

20          THE COURT:  THANK YOU VERY MUCH, MS. BRINKERHOFF.

21    YOU MAY GO BACK TO THE JURY ASSEMBLY ROOM.

22          PROSPECTIVE JUROR BRINKERHOFF:  THANK YOU.

23       (PROSPECTIVE JUROR BRINKERHOFF EXITS THE COURTROOM.)

24      (PROSPECTIVE JUROR CHILDERS IS PRESENT IN THE COURTROOM.)

25          THE COURT:  GOOD MORNING.

1          PROSPECTIVE JUROR CHILDERS:  GOOD MORNING.

2          THE COURT:  YOU MAY HAVE A SEAT ANYWHERE YOU LIKE,

3     MS. CHILDERS.  IS IT CHILDERS?

4          PROSPECTIVE JUROR:  CHILDERS.

5          THE COURT:  CHILDERS.  THANK YOU.  MS. CHILDERS,

6     BEFORE WE GET STARTED WITH VOIR DIRE OF THE ENTIRE GROUP THIS

7     MORNING, I WANT TO TAKE THE OPPORTUNITY TO ASK SOME FOLLOW-UP

8     QUESTIONS TO THE ANSWERS TO THE QUESTIONNAIRES.

9          YOU WORKED AS A CHILD PSYCHOLOGIST?

10         PROSPECTIVE JUROR CHILDERS:  A SCHOOL PSYCHOLOGIST.

11         THE COURT:  A SCHOOL PSYCHOLOGIST WITH ELEMENTARY

12     CHILDREN?

13         PROSPECTIVE JUROR CHILDERS:  MM-HMM.

14         THE COURT:  AS YOU KNOW FROM THE QUESTIONS IN THE

15     QUESTIONNAIRE, SOME OF THE CHARGES IN THIS CASE RELATE TO

16     CHILD PORNOGRAPHY, AND TWO OF THE CHARGES RELATE TO

17     ALLEGATIONS OF CHILD MOLESTATION OF A SEVEN-YEAR-OLD BOY IN

18     THIS CASE.  THAT'S WHAT THE DEFENDANT IS ACCUSED OF.

19         IN CONNECTION WITH THE CHILD PORNOGRAPHY CHARGES,

20     THE JURORS WILL BE ASKED TO WATCH EVIDENCE, LOOK AT EVIDENCE,

21     AND HEAR TESTIMONY ABOUT IMAGES AND TWO SHORT, VERY SHORT

22     VIDEO CLIPS OF CHILD PORNOGRAPHY.  IT IS DISTURBING AND IT IS

23     YOUNG CHILDREN.  AND ONE OF THE THINGS THAT YOU SAID ON YOUR

24     QUESTIONNAIRE IS THAT YOU WEREN'T SURE HOW YOU WOULD REACT.

25     THAT'S A CANDID, UNDERSTANDABLE RESPONSE, I THINK, IN MOST

1   PEOPLE; UNTIL THEY HAVE SEEN IT THEY AREN'T SURE.

2            LET ME ASK YOU THIS:  IS THERE ANYTHING IN YOUR

3   LIFE EXPERIENCE, OTHER THAN WORKING WITH YOUNG CHILDREN, THAT

4   MAKES YOU PARTICULARLY APPREHENSIVE ABOUT SEEING THIS KIND OF

5   EVIDENCE?

6            PROSPECTIVE JUROR CHILDERS:  NO.  IT IS JUST THAT I

7   WORK WITH YOUNG CHILDREN.  I'M JUST, YOU KNOW, BEING HONEST.

8   I WOULD --

9            THE COURT:  AND WE APPRECIATE THAT.

10           PROSPECTIVE JUROR CHILDERS:  I MEAN, I FEEL LIKE I

11  AM ETHICAL, AND I CERTAINLY TRY TO BE AS IMPARTIAL AS I COULD

12  BECAUSE I UNDERSTAND WHAT MY ROLE IS AS A JUROR, BUT I JUST

13  DON'T KNOW UNTIL I AM FACED ACTUALLY WITH IT.

14           THE COURT:  WELL, LET ME GIVE YOU AN EXAMPLE.  IT

15  IS NOT -- NO EXAMPLE IS PERFECT, SO THIS ONE ISN'T EITHER.

16  BUT LET'S SAY YOU WERE CALLED IN TO SIT AS A JUROR ON A

17  MURDER CASE AND I WAS ASKING YOU QUESTIONS ABOUT HOW YOU

18  WOULD FEEL, IF YOU WERE GOING TO BE SITTING AS A JUROR ON A

19  MURDER CASE.  AND IN THE COURSE OF IT YOU WERE GOING TO BE

20  ASKED TO LOOK AT AUTOPSY PHOTOGRAPHS, MANY OF THEM, AND

21  GRIZZLY AND DISTURBING ONES, BUT THEY WERE NECESSARY TO MAKE

22  A DECISION ABOUT THE DEFENDANT'S GUILT.  NOBODY WOULD RELISH

23  DOING THAT, AND SOME PEOPLE WOULD NOT BE ABLE TO DO IT.  SOME

24  PEOPLE WOULD NOT BE ABLE TO FORCE THEMSELVES TO LOOK AT THOSE

25  IMAGES.

1          WITH THAT SORT OF EXAMPLE, DO YOU THINK, IF YOU

2     THINK ABOUT IT IN THOSE TERMS, DO YOU THINK YOU COULD FOLLOW

3     THE COURT'S INSTRUCTIONS IN THIS CASE AND LOOK AT THE

4     EVIDENCE AND THEN MAKE A DECISION BASED, YOU KNOW, A

5     DISPASSIONATE DECISION BASED ON THE EVIDENCE, ALL OF THE

6     EVIDENCE THAT COMES IN DURING THE COURSE OF THE TRIAL AND THE

7     LAW AS THE COURT INSTRUCTS YOU ON IT?

8          PROSPECTIVE JUROR CHILDERS:  I HONESTLY THINK I

9     COULD.  I WOULD TRY.  I WILL BE HONEST WITH YOU, LIKE, RIGHT

10    NOW I WOULD SAY YES I WOULD DEFINITELY TRY.  I THINK I COULD

11    LOOK AT IT WITH THE INSTRUCTIONS THAT YOU GIVE US AS A JUROR.

12          THE COURT:  DURING THE COURSE OF THE TRIAL, IF,

13    DESPITE YOUR BEST EFFORTS AND YOUR GOOD INTENTION, YOU FOUND

14    AFTER ALL THAT YOU WEREN'T ABLE TO, WOULD YOU FEEL

15    COMFORTABLE IN LETTING ME KNOW?

16          PROSPECTIVE JUROR CHILDERS:  YES.

17          THE COURT:  MR. AARON?

18          MR. AARON:  THANK YOU.

19          GOOD MORNING.

20          PROSPECTIVE JUROR CHILDERS:  GOOD MORNING.

21          MR. AARON:  WHEN YOU SAY -- IN RESPONSE TO ONE OF

22    THE QUESTIONS YOU WROTE, "IT MIGHT BE DIFFICULT FOR ME.  I

23    WORK WITH ELEMENTARY-AGED CHILDREN."

24          PROSPECTIVE JUROR CHILDERS:  YES.

25          MR. AARON:  "I'M NOT SURE HOW I WOULD REACT."

1           WHEN YOU WROTE THAT PHRASE, "I'M NOT SURE HOW I

2   WOULD REACT," IS IT FAIR TO SAY YOU KNOW YOU MIGHT REACT

3   NEGATIVELY, YOU ARE JUST NOT SURE HOW NEGATIVELY?

4           PROSPECTIVE JUROR CHILDERS:  RIGHT.  BUT AT THE

5   SAME TIME, I FEEL LIKE IF I HAD MY INSTRUCTIONS AS A JUROR I

6   WOULD TRY TO LOOK AT IT AS THE LAW AND DO WHAT I AM SUPPOSED

7   TO DO.

8           MR. AARON:  OKAY.  THANK YOU.  NOTHING FURTHER.

9           THE COURT:  MR. MICHAEL?

10          MR. MICHAEL:  NOTHING, YOUR HONOR.

11          THE COURT:  THANK YOU VERY MUCH, MS. CHILDERS.  YOU

12  MAY GO DOWN TO THE JURY ASSEMBLY ROOM.

13      (PROSPECTIVE JUROR CHILDERS EXITS THE COURTROOM.)

14          MR. AARON:  YOUR HONOR, I JUST WANTED TO CONFIRM

15  SOMETHING FOR MY RECORDS.  WE HAVE EXCUSED JURORS ALMURTADA,

16  ANDERSON, BARNES AND CASTILLO?

17          MR. MICHAEL:  THAT'S WHAT THE GOVERNMENT'S RECORDS

18  SHOW, YOUR HONOR, TOO.

19          THE COURT:  YES.  WE HAD TWO NO-SHOWS, SARA RAMIREZ

20  AND MS. GOUPIL.  THE CLERK GOT AHOLD OF MS. RAMIREZ.

21          IS THAT RIGHT?  MS. RAMIREZ SAID SHE FORGOT TO CALL

22  IN.  SHE IS ON HER WAY, SO SHE WILL BE HERE.

23          WE HAD TO LEAVE A MESSAGE FOR MS. GOUPIL, SO WE

24  DON'T KNOW WHAT HAPPENED TO HER.

25          DO WE HAVE ANYBODY ELSE OUTSIDE?

```
 1              THE CLERK:  NO.

 2              THE COURT:  WE NEED THE NEXT FIVE, AND THAT WOULD

 3    BE TO ASK QUESTIONS.  SO THAT WOULD BE DAVIS -- DO YOU HAVE

 4    THE LIST OF THE NEXT FIVE?

 5              MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT IS

 6    ASSUMING THERE IS NO OBJECTION TO MS. CHILDERS TO CONTINUE ON

 7    THE PANEL FROM DEFENSE COUNSEL.

 8              THE COURT:  NO OBJECTION AT THIS POINT?

 9              MR. AARON:  THAT'S CORRECT.

10              THE COURT:  SO THE NEXT FIVE JURORS WOULD BE DAVIS,

11    EASTIS, ELSNER, GARDEA AND GRAY.

12              MR. AARON:  ON THE NEXT PAGE, THE ONLY PEOPLE WE

13    HAVE EXCUSED SO FAR ARE MR. DELTORO AND MS. FERNANDEZ; IS

14    THAT CORRECT?

15              MR. MICHAEL:  THAT'S WHAT THE GOVERNMENT'S RECORDS

16    SHOW, YOUR HONOR.

17              THE COURT:  DELTORO AND FERNANDEZ.

18              MR. MICHAEL:  YOUR HONOR, I DID NOT HEAR WHO YOU

19    ARE CALLING UP.

20              THE COURT:  DAVIS, EASTIS, ELSNER, GARDEA, AND

21    GRAY.

22              MR. MICHAEL:  THANK YOU, YOUR HONOR.

23              THE COURT:  YOU'RE WELCOME.

24       (PROSPECTIVE JUROR DAVIS IS PRESENT IN THE COURTROOM.)

25              THE COURT:  GOOD MORNING, MR. DAVIS.  WE'RE TAKING
```

1    THE OPPORTUNITY THIS MORNING TO TALK TO MANY OF THE JURORS

2    INDIVIDUALLY BEFORE WE BEGIN THE ENTIRE VOIR DIRE PROCESS, TO

3    ASK YOU SOME FOLLOW-UP QUESTIONS ABOUT YOUR ANSWERS OUTSIDE

4    THE PRESENCE OF THE OTHER JURORS, TO GIVE YOU A LITTLE MORE

5    PRIVACY.

6            YOU INDICATED, IN ANSWER TO ONE OF THE QUESTIONS ON

7    THE QUESTIONNAIRE, THAT YOUR WIFE HAD BEEN MOLESTED WHEN SHE

8    WAS A CHILD?

9            PROSPECTIVE JUROR DAVIS:  CORRECT.

10           THE COURT:  DO YOU KNOW MUCH ABOUT THAT?

11           PROSPECTIVE JUROR DAVIS:  NO, NOT REALLY.

12           THE COURT:  WAS IT BY A FAMILY MEMBER OR FAMILY

13   FRIEND?

14           PROSPECTIVE JUROR DAVIS:  IT WAS BY A RELATIVE.

15           THE COURT:  WAS IT AN UNCLE?  HER FATHER?

16           PROSPECTIVE JUROR DAVIS:  I BELIEVE IT WAS AN

17   UNCLE.

18           THE COURT:  DO YOU KNOW HOW OLD SHE WAS AT THE

19   TIME?

20           PROSPECTIVE JUROR DAVIS:  SHE WAS AROUND SEVEN

21   YEARS OLD.

22           THE COURT:  WAS IT EVER REPORTED TO THE

23   AUTHORITIES, DO YOU KNOW?

24           PROSPECTIVE JUROR DAVIS:  NO.

25           THE COURT:  DID OTHER FAMILY MEMBERS BECOME AWARE

 1   OF IT, DO YOU KNOW?

 2            PROSPECTIVE JUROR DAVIS:  WELL, HER MOTHER KNEW.

 3   ANYONE ELSE OTHER THAN THAT, I DON'T KNOW.

 4            THE COURT:  DID IT STOP WHEN HER MOTHER BECAME

 5   AWARE OF IT?

 6            PROSPECTIVE JUROR DAVIS:  I DON'T KNOW THAT.

 7            THE COURT:  DO YOU KNOW HOW LONG THE MOLESTATION

 8   WENT ON FOR?

 9            PROSPECTIVE JUROR DAVIS:  NO, I DON'T.

10            THE COURT:  DO YOU KNOW THE EXTENT OF IT?  WAS IT

11   TOUCHING, OR DID IT GO BEYOND THAT?

12            PROSPECTIVE JUROR DAVIS:  JUST MOSTLY TOUCHING.

13            THE COURT:  DID YOUR WIFE EVER LATER, PERHAPS WHEN

14   SHE WAS AN ADULT, OR AT ANY TIME, DID SHE SEEK ANY COUNSELING

15   OR HELP FOR WHAT HAD HAPPENED TO HER AS A CHILD?

16            PROSPECTIVE JUROR DAVIS:  NOT AS AN ADULT.  IT WAS

17   DONE WHEN SHE WAS A CHILD.

18            THE COURT:  I'M SORRY?

19            PROSPECTIVE JUROR DAVIS:  IF SHE SOUGHT COUNSELING

20   AS A CHILD, SHE DIDN'T MAKE ME AWARE OF IT.

21            THE COURT:  YOU ALSO STATED ON YOUR QUESTIONNAIRE

22   THAT YOU DIDN'T THINK THAT THAT WOULD AFFECT YOUR ABILITY TO

23   SIT AS A JUROR ON THIS CASE.  DO YOU STILL FEEL THAT WAY?

24            PROSPECTIVE JUROR DAVIS:  PRETTY MUCH.

25            THE COURT:  WHEN YOU SAY "PRETTY MUCH," DO YOU HAVE

1   ANY DOUBTS ABOUT IT?

2              PROSPECTIVE JUROR DAVIS:  WELL, I HAVE A LITTLE

3   DOUBT, INCLINATIONS.  I TRY TO BE FAIR.

4              THE COURT:  WELL, THE ACCUSATIONS OR THE

5   ALLEGATIONS IN THIS CASE SORT OF FALL INTO TWO GROUPS.

6   COUNTS 1 AND 2 -- AND YOU WILL HEAR MORE ABOUT THIS AS WE GET

7   STARTED WITH THE PROCESS OF SELECTING A JURY.

8              COUNTS 1 AND 2 ALLEGE THAT THE DEFENDANT POSSESSED

9   AND CONSPIRED TO POSSESS CHILD PORNOGRAPHY.

10             AND COUNTS 3 AND 4 RELATE TO CHILD MOLESTATION.

11  THEY ALLEGE THAT THE DEFENDANT TRAVELED ACROSS STATE LINES

12  WITH THE INTENT TO SEXUALLY ASSAULT A CHILD UNDER THE AGE OF

13  12.  AND IN THIS CASE, A SEVEN-YEAR-OLD BOY.

14             AND THE FOURTH COUNT ALLEGES THAT THE DEFENDANT

15  MOLESTED A SEVEN-YEAR-OLD BOY.

16             SO ONE THING I REMARKED ONTO MYSELF WHEN YOU WERE

17  TALKING, IT WAS ABOUT THE SAME AGE YOUR WIFE WAS WHEN SHE WAS

18  MOLESTED.  ANYTHING ABOUT THAT THAT GIVES YOU CONCERN ABOUT

19  WHETHER YOU COULD BE FAIR IN LISTENING TO THE EVIDENCE AND IN

20  DECIDING THIS CASE, THE AGE OF THE ALLEGED VICTIM?

21             PROSPECTIVE JUROR DAVIS:  WELL, IF IN FACT IT DID

22  HAPPEN, IT IS A CRIME, AND I WOULD WOULDN'T FEEL TOO WELL

23  ABOUT.

24             THE COURT:  IN OTHER WORDS, THE NATURE OF THE CRIME

25  ITSELF?

1           PROSPECTIVE JUROR DAVIS:  RIGHT.

2           THE COURT:  I DON'T WANT TO REPEAT EVERYTHING THAT

3    I WILL BE SAYING LATER ON TODAY, SO FORGIVE ME IF YOU END UP

4    HEARING SOME OF THIS TWICE.  BUT IN EVERY CRIME, WHETHER IT'S

5    A SPEEDING TICKET OR A HUGE FINANCIAL CRIME LIKE SOME OF THE

6    PERSONS INVOLVED, SAY, IN THE ENRON CASE WERE ACCUSED OF AND

7    EVENTUALLY CONVICTED OF, OR A MURDER CASE, OR A CASE

8    INVOLVING PORNOGRAPHY OR ASSAULT ON A YOUNG CHILD, THERE IS

9    ONE THING THAT ANY OF THOSE CASES HAVE IN COMMON, FROM

10   JAYWALKING TO MURDER, AND THAT IS, EVERY ONE WHO IS ACCUSED

11   OF A CRIME IN THIS COUNTRY IS ENTITLED TO THE SAME

12   PRESUMPTION OF INNOCENCE.

13           DO YOU AGREE WITH THAT?

14           PROSPECTIVE JUROR DAVIS:  YES.

15           THE COURT:  IS IT HARDER IN SOME CASES TO MAINTAIN

16   IN YOUR MIND, IN ONE'S MIND, THE PRESUMPTION OF INNOCENCE,

17   GIVEN THE NATURE OF THE CRIME?

18           PROSPECTIVE JUROR DAVIS:  YES, IT CAN BE.

19           THE COURT:  ARE THE CHARGES IN THIS CASE ONE OF

20   THOSE CASES WHERE IT MIGHT BE HARDER TO HOLD ONTO THAT

21   PRESUMPTION OF INNOCENCE?

22           PROSPECTIVE JUROR DAVIS:  YES.

23           THE COURT:  WOULD YOU DO YOUR BEST, IF YOU WERE A

24   JUROR ON THE CASE, TO HOLD ONTO IT?

25           PROSPECTIVE JUROR DAVIS:  YES, I WOULD.

1    THE COURT:  NOW, ALSO, AS YOU, I THINK, GATHERED

2    FROM THE QUESTIONNAIRE, DURING THE COURSE OF THIS TRIAL IN

3    CONNECTION WITH THE PORNOGRAPHY CHARGES, THE JURORS WILL BE

4    VIEWING EVIDENCE OF CHILD PORNOGRAPHY.  AND SOME OF THAT

5    EVIDENCE IS VERY DISTURBING IMAGES OF YOUNG CHILDREN.

6    I MENTIONED MURDER CASES A MOMENT AGO.  IN A MURDER

7    CASE, THERE IS, FOR EXAMPLE, AS TO LOOK AT SOME HORRIFYING

8    AUTOPSY PHOTOGRAPHS.  AND SOMETIMES WHEN YOU ARE CONDUCTING

9    VOIR DIRE, FOR JURORS TO SIT ON THAT KIND OF A CASE THERE IS

10   SOME PEOPLE WHO HONESTLY SAY, I DON'T THINK I COULD DO THAT.

11   I DON'T THINK I COULD LOOK AT THOSE PHOTOGRAPHS.  I DON'T

12   THINK I COULD BE A JUROR ON THAT KIND OF A CASE.

13   AND THE EVIDENCE IN THIS CASE, IN CONNECTION

14   ESPECIALLY WITH THE CHILD PORNOGRAPHY CHARGES, IS VERY

15   GRAPHIC.  IT IS MOSTLY PHOTOGRAPHS, AND THERE IS TWO VERY

16   SHORT VIDEO CLIPS.  HOW WOULD YOU FEEL ABOUT BEING ASKED TO

17   LOOK AT THAT SORT OF EVIDENCE BEFORE YOU MADE UP YOUR MIND

18   ABOUT GUILT OR INNOCENCE BEFORE YOU REACHED A VERDICT?

19   IN OTHER WORDS, WOULD YOU BE ABLE TO MAINTAIN THAT

20   PRESUMPTION OF INNOCENCE AND REVIEW ALL THE EVIDENCE BEFORE

21   YOU MADE UP YOUR MIND?

22   PROSPECTIVE JUROR DAVIS:  YES.

23   THE COURT:  THANK YOU VERY MUCH.  I'M GOING TO GIVE

24   COUNSEL THE OPPORTUNITY TO ASK A FEW QUESTIONS, IF THEY WANT

25   TO.

```
 1              MR. AARON?

 2              MR. AARON:  THANK YOU.

 3              GOOD MORNING, SIR.

 4              PROSPECTIVE JUROR DAVIS:  GOOD MORNING.

 5              MR. AARON:  YOU HAD MENTIONED THAT YOU HAD SOME --

 6    READ SOME PRESS COVERAGE ABOUT THIS CASE?

 7              PROSPECTIVE JUROR DAVIS:  CORRECT.

 8              MR. AARON: CAN YOU TELL US WHAT YOU READ?

 9              PROSPECTIVE JUROR DAVIS:  I'M NOT CLEAR ON THE

10    DETAILS AT THIS POINT, BUT IT BASICALLY -- I SPENT A LOT OF

11    TIME IN IDYLLWYLD EVERY YEAR, AND I BELIEVE IT CAME OUT IN

12    THE TOWN CRIER, LITTLE NEWSPAPER, AND IT JUST MENTIONED ABOUT

13    THE INCIDENT, THE MOLESTATION INVOLVING A SEVEN YEAR OLD.

14    THE DETAILS OF WHICH I DON'T REMEMBER, BUT I REMEMBER READING

15    ABOUT IT.

16              MR. AARON:  WHAT WAS THE NAME OF THE NEWSPAPER?

17              PROSPECTIVE JUROR DAVIS:  I BELIEVE IT WAS THE TOWN

18    CRIER.

19              MR. AARON:  DO YOU RECALL ABOUT WHEN YOU READ THESE

20    ARTICLES?

21              PROSPECTIVE JUROR DAVIS:  OH, IT WAS ABOUT A COUPLE

22    YEARS, PROBABLY.  IT'S BEEN A WHILE BACK.

23              MR. AARON:  THE ARTICLES THAT YOU READ, WAS THAT

24    TALKING ABOUT A MOLESTATION THAT HAD OCCURRED IN IDYLLWYLD?

25              PROSPECTIVE JUROR DAVIS:  IT WAS, YES, IN
```

1    IDYLLWYLD.

2            MR. AARON:  IN THIS CASE, THE CLAIMED MOLESTATION

3    TOOK PLACE IN NEW MEXICO.  MY CLIENT WAS WORKING AT A GIRL

4    SCOUT CAMP IN CALIFORNIA WHERE ALLEGEDLY HE POSSESSED CHILD

5    PORNOGRAPHY.  BUT THE ALLEGED MOLESTATION ITSELF SUPPOSEDLY

6    TOOK PLACE IN NEW MEXICO.

7            IS THAT KIND OF WHAT YOU READ IN THE NEWSPAPER

8    ARTICLES, OR WAS IT A DIFFERENT CASE?

9            PROSPECTIVE JUROR DAVIS:  THAT'S A POSSIBILITY.  I

10   DON'T REMEMBER THE DETAILS OF THE ARTICLE.

11           MR. AARON:  WHEN YOU MENTIONED -- YOU MENTIONED

12   THAT YOU MIGHT HAVE TROUBLE.  THIS MIGHT BE THE SORT OF CASE

13   WHERE IT IS TO HOLD ONTO THE PRESUMPTION OF INNOCENCE.

14           WHAT DID YOU MEAN?

15           PROSPECTIVE JUROR DAVIS:  GENERALLY, THIS TYPE OF

16   CASE, SOMETHING HAPPENED FOR THE GENTLEMAN TO BE IN THAT SEAT

17   OVER THERE.  THAT MAKES IT HARDER TO MAINTAIN PRESUMPTION OF

18   INNOCENCE.

19           MR. AARON:  OKAY.  SO, IN YOUR FEELING, FOR IT TO

20   GET TO THIS POINT, SOMETHING MUST HAVE HAPPENED?

21           PROSPECTIVE JUROR DAVIS:  CORRECT.

22           MR. AARON:  AND THAT'S SOMETHING THAT YOU WOULDN'T

23   BE ABLE TO SET ASIDE, THAT SUSPICION OR BELIEF?

24           PROSPECTIVE JUROR DAVIS:  IT WOULD BE IN MY

25   THOUGHTS, YES.

1            MR. AARON:  THANK YOU.  I HAVE NOTHING FURTHER.

2            THE COURT:  MR. MICHAEL?

3            MR. MICHAEL:  GOOD MORNING.

4            PROSPECTIVE JUROR DAVIS:  GOOD MORNING.

5            MR. MICHAEL:  A MOMENT AGO YOU INDICATED THAT IT'S

6    YOUR BELIEF THE DEFENDANT IS HERE CHARGED, THAT SOMETHING

7    MUST HAVE HAPPENED.  IF THE JUDGE WERE TO INSTRUCT YOU THAT

8    AT THE START OF THE TRIAL YOU ARE TO GIVE THE DEFENDANT THE

9    PRESUMPTION OF INNOCENCE, AND THAT IT IS THE GOVERNMENT'S

10   BURDEN TO PROVE BEYOND A REASONABLE DOUBT WHETHER OR NOT HE

11   IS GUILTY, AND UNTIL THAT TIME YOU ARE TO MAINTAIN THE

12   PRESUMPTION OF INNOCENCE, AND UNTIL YOU HAVE AN OPPORTUNITY

13   TO DELIBERATE IN THE JURY ROOM AND TO CONSIDER ALL OF THE

14   EVIDENCE YOU ARE TO MAINTAIN THAT PRESUMPTION OF INNOCENCE.

15           DESPITE YOUR INCLINATION YOU BELIEVE HE MUST HAVE

16   DONE SOMETHING, WOULD YOU BE ABLE TO SET THAT ASIDE AND

17   FOLLOW THE COURT'S INSTRUCTIONS?

18           PROSPECTIVE JUROR DAVIS:  I BELIEVE I COULD.

19           MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

20           THE COURT:  MR. DAVIS, YOU SAID SOMETHING ABOUT IN

21   A CASE -- IN THIS KIND OF CASE, SOMETHING MUST HAVE

22   HAPPENED.  WELL, CAN YOU EXPLAIN THAT A LITTLE BIT MORE TO

23   ME?  I'M NOT EXACTLY SURE WHAT YOU MEAN.  ARE YOU TALKING

24   ABOUT THE MOLESTATION CASE?

25           PROSPECTIVE JUROR DAVIS:  MOLESTATION, YES.

1          THE COURT:  CAN YOU TELL ME A LITTLE BIT ABOUT WHAT

2     YOU HAVE IN MIND?

3          PROSPECTIVE JUROR DAVIS:  GENERALLY, IT'S STILL

4     PRETTY THOROUGHLY, AND CHARGES AREN'T GOING TO BE MADE UNLESS

5     THEY HAVE FOUND AN INDICATION THAT SOMETHING OCCURRED.

6          THE COURT:  WELL, WHEN AN INDICTMENT IS MADE, YOU

7     WILL BE IN THIS CASE -- THE JURY WILL BE, AT THE VERY

8     BEGINNING OF THE SELECTION PROCESS, YOU WILL BE READ WHAT THE

9     INDICTMENT ACTUALLY CHARGES.  BUT THEN YOU'RE IMMEDIATELY

10    TOLD THAT THE DEFENDANT HAS PLED NOT GUILTY TO THE CHARGES

11    AND YOU'RE NOT TO CONSIDER THE CHARGES IN THE INDICTMENT AS

12    EVIDENCE.

13         PROSPECTIVE JUROR DAVIS:  RIGHT.

14         THE COURT:  SO, THE FACT THAT SOMEONE HAS BEEN

15    CHARGED OR ACCUSED OF SOMETHING THAT SHE OR HE DID --

16         PROSPECTIVE JUROR DAVIS:  THAT'S CORRECT.

17         THE COURT:  BUT YOU HAVE A FEELING THAT THEY

18    WOULDN'T BE CHARGED IF THERE WASN'T SOMETHING TO IT?

19         PROSPECTIVE JUROR DAVIS:  EXACTLY.

20         THE COURT:  WOULD YOU BE ABLE TO SET THAT FEELING

21    ASIDE?

22         PROSPECTIVE JUROR DAVIS:  YES.

23         THE COURT:  OR WOULD THAT FEELING STILL LINGER WITH

24    YOU WHEN YOU WERE THINKING ABOUT THIS?

25         PROSPECTIVE JUROR DAVIS:  YOUR FEELINGS DON'T GO

1    AWAY.  BUT I CAN SET IT ASIDE AND LISTEN AND SEE THE

2    EVIDENCE.

3              THE COURT:  YOU UNDERSTAND THAT SOMEONE CAN BE --

4    OR DO YOU UNDERSTAND, I GUESS, DO YOU HAVE ANY QUESTIONS

5    ABOUT THE IDEA THAT SOMEONE CAN BE CHARGED WITH A CASE OR

6    CHARGED WITH SOMETHING, ACCUSED OF SOMETHING, BUT

7    NEVERTHELESS NOT BE -- THE GOVERNMENT MIGHT NOT BE ABLE TO

8    MEET ITS BURDEN OF PROVING THEIR GUILT BEYOND A REASONABLE

9    DOUBT?

10             PROSPECTIVE JUROR DAVIS:  THAT'S TRUE.  IT HAPPENS

11   ALL THE TIME.

12             THE COURT:  NOW, GIVEN THE NATURE OF THE CHARGES IN

13   THIS CASE, IF YOU WERE A JUROR ON IT AND YOU HAVE THIS

14   FEELING THAT SOMETHING PROBABLY HAPPENED OR THEY WOULDN'T

15   HAVE BROUGHT THE CHARGES, IF AT THE END --

16             PROSPECTIVE JUROR DAVIS:  IT IS MY FEELING THAT THE

17   GOVERNMENT HAS TO PROVE IT HAPPENED.

18             THE COURT:  AND SO IF, AT THE END OF THE CASE, IF

19   YOU FELT THE GOVERNMENT HADN'T MET THAT BURDEN, WOULD YOU

20   VOTE TO FIND THE DEFENDANT NOT GUILTY?

21             PROSPECTIVE JUROR DAVIS:  THAT WOULD BE MY

22   INCLINATION, YES.

23             THE COURT:  ALL RIGHT.  THANK YOU, MR. DAVIS.

24             MR. AARON:  YOUR HONOR, MAY I ASK ONE QUESTION?

25             THE COURT:  GO AHEAD.

1          MR. AARON:  IF AT THE END OF THE CASE YOU FELT THE

2    GOVERNMENT HADN'T PROVEN ITS CASE BEYOND A REASONABLE DOUBT,

3    BUT YOU STILL SUSPECTED THAT SOMETHING HAPPENED, WOULD YOU BE

4    ABLE TO VOTE NOT GUILTY?

5          PROSPECTIVE JUROR DAVIS:  YES, I WOULD.

6          MR. AARON:  THANK YOU.

7          THE COURT:  THANK YOU, MR. DAVIS.  YOU MAY GO DOWN

8    TO THE JURY ASSEMBLY ROOM.

9          (PROSPECTIVE JUROR DAVIS EXITS THE COURTROOM.)

10          MR. AARON:  YOUR HONOR, WE WOULD CHALLENGE

11    MR. DAVIS FOR CAUSE.  EVEN THOUGH HE DID SAY HE WOULD BE ABLE

12    TO SET IT ASIDE, I THINK THE PROBLEM OF HIS SUSPICION, WHICH

13    HE WOULDN'T BE ABLE TO SET ASIDE, HE WOULD STILL SUSPECT THAT

14    SOMETHING HAS HAPPENED.  BUT HE SAID THE FEELING WOULD STILL

15    BE THERE, BUT HE WOULD BE ABLE TO SET IT ASIDE.

16          I THINK THAT LEVEL OF INTELLECTUAL GYMNASTICS IS

17    NOT REALLY WHAT'S CALLED FOR IN THE STATE OF MIND OF A JUROR

18    DEALING WITH A POTENTIAL LIFE CASE.  I THINK THE PROBLEM IS,

19    WHAT HE IS SAYING IS, THAT HE WOULD ALWAYS HAVE A SUSPICION

20    THAT SOMETHING HAPPENED FOR IT TO HAVE GOTTEN TO THIS POINT,

21    BUT HE WOULD BE OPEN TO HEARING THE EVIDENCE AND PERHAPS

22    MIGHT BE ABLE TO RETURN A VERDICT OF NOT GUILTY.  I THINK IT

23    SPOKE VOLUMES --

24          THE COURT:  WELL, I THINK THAT LAST STATEMENT IS A

25    MISCHARACTERIZATION OF WHAT THE JUROR SAID.

1          MR. AARON:  WELL, IF I MIGHT?

2          THE COURT:  WELL, GO AHEAD.

3          MR. AARON:  IF I MIGHT FINISH.

4          I THINK WHAT SPOKE VOLUMES ABOUT THE JUROR'S STATE

5     OF MIND IS WHEN THE COURT ASKED HIM, "IF THEY HADN'T PROVEN

6     THEIR CASE, WOULD YOU BE ABLE TO VOTE NOT GUILTY?"

7          AND HE SAID, "THAT WOULD BE MY INCLINATION."

8          WHEN, IN REALITY, HE WOULD BE INCLINED TO DO THAT,

9     BUT IN REALITY THAT WOULD JUST BE WHAT ANY NORMAL PERSON

10    SHOULD DO.

11         THE COURT:  THAT'S RIGHT.  ALTHOUGH, I THINK THAT

12    WAS SORT OF HIS MATTER OF SPEAKING.  THAT WAS HIS TERM OF

13    PHRASE HE USED QUITE A BIT.  HE ALSO ANSWERED VERY QUICKLY,

14    WITHOUT ANY PROMPTING, IN ANSWER TO A COUPLE OF QUESTIONS

15    ABOUT HE UNDERSTOOD VERY EASILY AND ANSWERED VERY QUICKLY TO

16    A NUMBER OF QUESTIONS THAT THERE IS A DIFFERENCE BETWEEN WHAT

17    IT TAKES TO ACCUSE SOMEBODY AND THE BURDEN OF PROOF TO PROVE

18    THEIR GUILT.

19         MR. MICHAEL?

20         MR. MICHAEL:  THAT WAS THE GOVERNMENT'S IMPRESSION,

21    YOUR HONOR.  THAT IT WAS A CANDID STATEMENT FROM THE JUROR

22    THAT ACKNOWLEDGES FACTS THAT EXIST, WHICH IS THE GOVERNMENT

23    BELIEVES SOMETHING HAPPENED.  THE GOVERNMENT BELIEVES TO THE

24    POINT THEY INDICTED THE DEFENDANT.  SO, HE DRAWS A

25    CONCLUSION, AT THE MINIMUM, THE GOVERNMENT THINKS SOMETHING

1   HAPPENED.

2            BUT HE MADE IT VERY CLEAR THAT HE WOULD SET THOSE

3   FEELINGS ASIDE.  AND IF THE GOVERNMENT DOESN'T PROVE ITS

4   BURDEN, NO MATTER WHAT THE GOVERNMENT HAS ACCUSED THE

5   DEFENDANT OF DOING SOMETHING, HE WAS UNEQUIVOCAL THAT HE

6   WOULD VOTE NOT GUILTY EVEN IF HE PERSONALLY, BASED ON THE

7   EVIDENCE, SUSPECTED THAT SOMETHING HAD HAPPENED.

8            AND THAT LAST ANSWER, THE GOVERNMENT SUBMITS THAT

9   HE WAS QUITE CLEAR THAT HE WILL HOLD THE GOVERNMENT TO THEIR

10  BURDEN DESPITE WHATEVER PERSONAL FEELINGS HE MIGHT HAVE.  AND

11  HE SAID THAT HE WOULD BE ABLE TO SET THEM ASIDE WITHOUT ANY

12  EQUIVOCATION, YOUR HONOR.

13           THE COURT:  I'M GOING TO DENY THE CHALLENGE AT THIS

14  TIME.

15           NEXT IS MR. EASTIS.  THE REASON I'M CALLING

16  MR. EASTIS IN IS JUST THAT HE IS THE JUROR WHO KNOWS ONE OF

17  OUR CSOS.

18    (PROSPECTIVE JUROR EASTIS IS PRESENT IN THE COURTROOM.)

19           THE COURT:  GOOD MORNING, MR. EASTIS.  YOU CAN HAVE

20  A SEAT ANYWHERE YOU LIKE.

21           PROSPECTIVE JUROR EASTIS:  THANK YOU.

22           THE COURT:  MR. EASTIS, I UNDERSTAND YOU KNOW ONE

23  OF OUR COURT SECURITY OFFICERS, JOE ARTEAGA?

24           PROSPECTIVE JUROR EASTIS:  YES.

25           THE COURT:  AND I BELIEVE THAT YOU WORK WITH HIS

1    WIFE; IS THAT CORRECT?

2            PROSPECTIVE JUROR EASTIS:  THAT IS CORRECT.

3            THE COURT:  WHEN YOU WERE HERE A COUPLE -- WAS IT A

4    COUPLE WEEKS AGO NOW, OR LAST WEEK?

5            PROSPECTIVE JUROR EASTIS:  A WEEK AND A HALF,

6    ALMOST TWO.

7            THE COURT:  YOU SAW MR. ARTEAGA AND SPOKE TO HIM

8    BRIEFLY?

9            PROSPECTIVE JUROR EASTIS:  UH-HUH.

10           THE COURT:  CAN YOU TELL ME THE ESSENCE OF YOUR

11   CONVERSATION WITH HIM?

12           PROSPECTIVE JUROR EASTIS:  I DON'T REMEMBER, OTHER

13   THAN I WAS IN HERE THE 1ST OF MAY, 2ND OF MAY -- I CAN'T

14   REMEMBER THE DATE -- AND I WAS CALLED IN FOR A TRIAL AND

15   EXCUSED FROM THAT PANEL.

16           THE COURT:  AND THAT WAS THE TRIAL BEFORE JUDGE

17   LARSON?

18           PROSPECTIVE JUROR EASTIS:  I BELIEVE THAT WAS HIS

19   NAME.  AND HE MENTIONED THAT WHAT HAD HAPPENED, OR SOMETHING

20   BRIEFLY -- I DON'T KNOW WHAT HAPPENED.  BUT I GUESS THE PANEL

21   WAS NO LONGER -- IT WAS A MISTRIAL OR SOMETHING.  BUT THAT

22   WAS ABOUT ALL I UNDERSTOOD.  AND HE JUST ASKED -- I GUESS

23   WHAT HE MENTIONED, I WAS HERE FOR THIS.  AND I SAID, YEAH.

24           THAT'S ABOUT ALL THAT'S ANYTHING THAT PERTAINS TO

25   THIS.

1          THE COURT:  DID HE SAY ANYTHING THAT PERTAINED TO

2    THIS CASE?

3          PROSPECTIVE JUROR EASTIS:  NOTHING, OTHER THAN THE

4    FACT THAT I WAS HERE WAS ALL.

5          THE COURT:  SO WHEN YOU SAY HE MENTIONED A

6    MISTRIAL, WAS THAT IN CONNECTION --

7          PROSPECTIVE JUROR EASTIS:  I THINK THAT'S WHAT HE

8    SAID.  I DON'T REMEMBER.  IT WAS SOMETHING ABOUT THE PREVIOUS

9    CASE THAT I HAD BEEN IN AND EXCUSED FROM.

10          THE COURT:  OH, FROM JUDGE LARSON'S COURT?

11          PROSPECTIVE JUROR EASTIS:  YES.  I WAS EXCUSED OFF

12    OF THAT THE FIRST DAY, SO I DON'T KNOW ANYTHING ABOUT THAT

13    TRIAL.  IT'S JUST -- HE HAD MENTIONED THAT I HAD BEEN

14    EXCUSED, BUT -- I MEAN, THAT IT HAD MISTRIALED, BUT I DIDN'T

15    KNOW.

16          THE COURT:  ALL RIGHT.  IF YOU'RE SEATED AS A JUROR

17    ON THIS CASE AND YOU SEE MR. ARTEAGA, YOU UNDERSTAND THAT YOU

18    WON'T BE ABLE TO SPEAK TO HIM WHILE YOU'RE HERE?

19          PROSPECTIVE JUROR EASTIS:  I WORK WITH HIS WIFE AND

20    WE DON'T TALK, EITHER.  I UNDERSTAND THE RULES.

21          THE COURT:  ANYTHING ELSE ABOUT YOUR DISCUSSION

22    WITH HIM THAT DAY THAT YOU CAN RECALL?

23          PROSPECTIVE JUROR EASTIS:  HE DIDN'T BUY ME LUNCH.

24          THE COURT:  NOTHING ABOUT THAT --

25          PROSPECTIVE JUROR EASTIS:  I MEAN, I ASKED -- I

1    GUESS IT WAS TOO EARLY IN THE DAY FOR HIM TO GET OFF FOR

2    LUNCH, SO, BUT THAT'S --

3              THE COURT:  THERE IS NOTHING ABOUT THAT THAT YOU

4    WOULD HOLD AGAINST EITHER SIDE?

5              PROSPECTIVE JUROR EASTIS:  I DON'T NEED LUNCH.

6              THE COURT:  EITHER SIDE WISH TO INQUIRE?

7              MR. AARON:  NO.  THANK YOU.

8              MR. MICHAEL:  NO, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

10   CAN GO BACK TO THE JURY ASSEMBLY ROOM.

11         (PROSPECTIVE JUROR EASTIS EXITS THE COURTROOM.)

12             THE COURT:  MS. ELSNER.

13      (PROSPECTIVE JUROR ELSNER IS PRESENT IN THE COURTROOM.)

14             THE COURT:  GOOD MORNING, MS. ELSNER.

15             PROSPECTIVE JUROR ELSNER:  HELLO.

16             THE COURT:  YOU CAN HAVE A SEAT ANYWHERE YOU LIKE.

17             MS. ELSNER, IN THE PROCESS OF SELECTING A JURY TO

18   SIT ON THIS CASE, WE ARE TAKING THE OPPORTUNITY TO DISCUSS

19   WITH MANY OF THE JURORS THIS MORNING SOME OF YOUR ANSWERS TO

20   THE QUESTIONS ON THE QUESTIONNAIRE IN A SETTING THAT GIVES

21   YOU A LITTLE MORE PRIVACY.

22             ONE OF THE QUESTIONS THAT YOU HAVE ANSWERED, YOUR

23   ANSWER INDICATED THAT BOTH YOUR MOTHER AND YOUR AUNT WERE

24   SEXUALLY MOLESTED WHEN THEY WERE CHILDREN.  YOUR MOTHER WAS

25   ABUSED BY HER FATHER.  HOW OLD WAS SHE DURING THAT PERIOD OF

1    TIME?

2              PROSPECTIVE JUROR ELSNER:  I THINK PROBABLY A YOUNG

3    GIRL, LIKE FIVE OR SIX OR SEVEN.  SHE DOESN'T TALK ABOUT IT

4    MUCH.

5              THE COURT:  DO YOU KNOW ANYTHING ELSE ABOUT IT?  DO

6    YOU KNOW WHAT IT CONSISTED OF?  WAS IT TOUCHING OR FONDLING

7    OR ANYTHING ELSE?

8              PROSPECTIVE JUROR ELSNER:  I DON'T KNOW.

9              THE COURT:  DO YOU KNOW IF IT WAS EVER REPORTED TO

10   ANYONE, ANOTHER FAMILY MEMBER OR THE AUTHORITIES OR ANYTHING

11   LIKE THAT?

12             PROSPECTIVE JUROR ELSNER:  I THINK MY GRANDMOTHER

13   KNEW ABOUT IT, BUT SHE WASN'T ABOUT TO CONFRONT MY MOM'S DAD

14   ABOUT IT.  BESIDES THAT, NO AUTHORITIES WERE EVER TOLD ABOUT

15   IT.

16             THE COURT:  ALL RIGHT.  WHAT ABOUT YOUR AUNT -- IS

17   THIS YOUR MOTHER'S SISTER?

18             PROSPECTIVE JUROR ELSNER:  NO, MY DAD'S SISTER.

19             THE COURT:  AND WHAT DO YOU KNOW ABOUT THAT

20   SITUATION?

21             PROSPECTIVE JUROR ELSNER:  SHE WAS SEXUALLY

22   ASSAULTED BY A FAMILY FRIEND.  I DON'T KNOW WHAT IT CONSISTED

23   OF, AND I DON'T KNOW IF ANY AUTHORITIES WERE EVER TOLD ABOUT

24   THAT.

25             THE COURT:  SO YOU DON'T KNOW WHETHER IT WAS

1    TOUCHING OR FONDLING OR MORE THAN THAT?

2              PROSPECTIVE JUROR ELSNER:  NO.

3              THE COURT:  DO YOU KNOW HOW OLD SHE WAS?

4              PROSPECTIVE JUROR ELSNER:  PROBABLY 10 YEARS OLD,

5    MAYBE OLDER.  I DON'T KNOW.

6              THE COURT:  ALL RIGHT.  YOU INDICATED ON THE

7    QUESTIONNAIRE THAT YOU DIDN'T THINK THAT THOSE EXPERIENCES OF

8    YOUR FAMILY MEMBERS WOULD AFFECT YOUR ABILITY TO JUDGE THIS

9    CASE FAIRLY.

10             DO YOU STILL FEEL THAT WAY?

11             PROSPECTIVE JUROR ELSNER:  YES.

12             THE COURT:  THERE IS TWO GROUPS OF ALLEGATIONS IN

13   THIS CASE, OR ACCUSATIONS.  THE FIRST TWO CHARGES IN THE

14   INDICTMENT DEAL WITH POSSESSION OF CHILD PORNOGRAPHY.  AND

15   THE SECOND TWO DEAL WITH TRAVELING ACROSS STATE LINES WITH

16   THE INTENT TO SEXUALLY ASSAULT A YOUNG CHILD, A BOY THE AGE

17   OF SEVEN, AND ACTUALLY ASSAULTING OR MOLESTING A

18   SEVEN-YEAR-OLD BOY.

19             DO YOU THINK THERE IS ANYTHING ABOUT THE NATURE OF

20   THOSE CHARGES, GIVEN YOUR FAMILY HISTORY, THAT WOULD MAKE IT

21   DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL TO BOTH SIDES

22   HERE?

23             PROSPECTIVE JUROR ELSNER:  NO.

24             THE COURT:  NOW, IN ANSWER TO THE QUESTIONS, YOU

25   INDICATED YOU HAVE SOME STRONG PERSONAL BELIEFS ABOUT

1    PORNOGRAPHY; IS THAT RIGHT?

2              PROSPECTIVE JUROR ELSNER:  YES.

3              THE COURT:  IN CONNECTION WITH THIS CASE, YOU'RE

4    GOING TO SEE THE JURY WOULD BE ASKED -- IS GOING TO BE ASKED

5    TO VIEW SOME IMAGES OF CHILD PORNOGRAPHY AND IMAGES OF YOUNG

6    CHILDREN, AND SOME VIDEO, TWO VERY SHORT VIDEO CLIPS.  AND

7    THIS IS VERY DISTURBING EVIDENCE.  JUST AS IN DIFFERENT KINDS

8    OF CASES, THERE IS DIFFERENT KINDS OF EVIDENCE.

9              SOMETIMES, IF YOU HAVE A FINANCIAL CASE INVOLVING

10   AN ALLEGATION OF A FINANCIAL CRIME, THERE MAY BE LOTS AND

11   LOTS OF EVIDENCE CONSISTING OF ACCOUNTING EVIDENCE.  SOME

12   JURORS MAY NOT BE INTERESTED IN SITTING OR MAY NOT FEEL THAT

13   THEY HAVE THE CAPACITY TO SIT ON A CASE LIKE THAT.

14             IF YOU ARE ASKED TO SIT AS A JUROR ON A MURDER

15   CASE, YOU MAY BE ASKED TO LOOK AT IMAGES OF, SAY, AUTOPSY

16   PHOTOGRAPHS THAT MAY BE VERY DISTURBING AND GRIZZLY BUT THAT

17   MUST BE VIEWED IN ORDER FOR THE JURY TO DO ITS JOB.

18             SOME PEOPLE, AS DIFFICULT AS IT MIGHT BE, ARE ABLE

19   TO DO THAT, AND SOME PEOPLE MAY NOT BE ABLE TO.  SAME THING

20   APPLIES HERE.

21             DO YOU THINK YOU WOULD BE ABLE TO LOOK AT THE

22   EVIDENCE IN THIS CASE AND REMAIN A FAIR AND DISPASSIONATE

23   JUROR?

24             PROSPECTIVE JUROR ELSNER:  YES.

25             THE COURT:  HOW WOULD YOU FEEL ABOUT HAVING TO DO

1    THAT?

2             PROSPECTIVE JUROR ELSNER:  I KNOW IT WOULD BE

3    DIFFICULT FOR ME BECAUSE I DON'T WANT TO LOOK AT IT, BUT I DO

4    UNDERSTAND THAT BECAUSE OF THE CASE THAT IT IS A NECESSITY

5    FOR IT.

6             THE COURT:  I DON'T WANT TO REPEAT EVERYTHING THAT

7    YOU WILL HEAR ME SAY WHEN ALL THE OTHER JURORS ARE HERE, BUT

8    IN EVERY CASE, WHETHER IT'S A CASE INVOLVING AN ACCUSATION

9    THAT SOMEONE JAYWALKED ACROSS THE STREET, OR DROVE OVER THE

10   SPEED LIMIT, OR INVOLVING A BIG FINANCIAL CASE LIKE THE ENRON

11   CASE, OR A MURDER CASE, OR A CHILD PORNOGRAPHY CASE, ONE

12   THING THAT ALL THOSE CASES HAVE IN COMMON, AND THAT IS THE

13   PRESUMPTION OF INNOCENCE THAT THE DEFENDANT, LIKE ALL OF US,

14   ENJOY.

15            NOW, IS THERE ANYTHING ABOUT THE KINDS OF CHARGES

16   IN THIS CASE THAT WOULD MAKE IT DIFFICULT FOR YOU TO PRESUME

17   THE DEFENDANT IS INNOCENT ALL THE WAY THROUGH THE TRIAL?

18            PROSPECTIVE JUROR ELSNER:  NO.

19            THE COURT:  I'M GOING TO ACTUALLY -- I KNOW IT HAS

20   BEEN A COUPLE OF WEEKS, ALMOST, SINCE YOU FILLED OUT THAT

21   QUESTIONNAIRE.  I HAD A QUESTION IN PARTICULAR ABOUT ONE OF

22   YOUR ANSWERS.

23            COULD YOU HAND MS. ELSNER HER QUESTIONNAIRE.

24            THIS ISN'T AN EXAM ABOUT YOUR MEMORY, SO I WANT YOU

25   TO LOOK AT IT.  IF YOU LOOK AT YOUR ANSWER TO QUESTION NO. 6,

```
 1    MS. ELSNER, WHICH IS ON PAGE 4.  I WAS A LITTLE CONFUSED
 2    ABOUT WHAT YOU MEANT THERE WHEN YOU SAID "UNPLEASANT TO SEE
 3    MAGIC"?
 4              PROSPECTIVE JUROR ELSNER:  OH, SORRY.  THAT SAYS
 5    "IMAGES."
 6              THE COURT:  IMAGES.  THANK YOU.  THAT'S MY
 7    QUESTION.
 8              PROSPECTIVE JUROR ELSNER:  IT IS MY WRITING.
 9              THE COURT:  PEOPLE OFTEN HAVE TROUBLE WITH MY
10    HANDWRITING.  I AM GLAD I'M NOT ALONE.  THANK YOU.  THAT WAS
11    MY LAST MY QUESTION FOR YOU.  YOU CAN GIVE THE QUESTIONNAIRE
12    BACK TO MS. SASSE.  I'M GOING TO GIVE THE ATTORNEYS A CHANCE
13    TO ASK YOU A FEW FOLLOW-UP QUESTIONS.
14              MR. AARON?
15              MR. AARON:  THANK YOU.
16              GOOD MORNING.
17              PROSPECTIVE JUROR ELSNER:  GOOD MORNING.
18              MR. AARON:  I WANTED TO TALK TO YOU ABOUT THREE OF
19    YOUR QUESTIONS.  ONE OF THEM YOU SAID THAT, "ME, MY FAMILY
20    AND MY CLOSE FRIENDS DO BELIEVE THAT PORNOGRAPHY IS A SINFUL
21    HABIT/INTEREST."
22              DO YOU THINK THAT PORNOGRAPHY SHOULD BE A CRIME?
23              PROSPECTIVE JUROR ELSNER:  SHOULD BE A CRIME?
24              THE COURT:  WELL, ACTUALLY, MR. AARON, I'M SORRY.
25    I'M GOING TO ASK YOU TO REWORD THAT QUESTION BECAUSE I THINK
```

1    THE ISSUE, FIRST OF ALL, WE ARE DEALING WITH CHILD

2    PORNOGRAPHY NOT PORNOGRAPHY.

3              MR. AARON:  RIGHT.

4              THE COURT:  CHILD PORNOGRAPHY IS A CRIME.  THAT'S

5    WHY WE ARE HERE.

6              MR. AARON:  RIGHT.  I'M TRYING TO ESTABLISH IF THE

7    JUROR BELIEVES THAT EXPLICIT SEXUAL IMAGES IN GENERAL SHOULD

8    BE A CRIME.  THEN I WAS GOING TO ASK SOME QUESTIONS ABOUT

9    CHILD PORNOGRAPHY.

10             THE COURT:  ALL RIGHT.  FIRST OF ALL, MS. ELSNER,

11   YOU UNDERSTAND THAT WHAT'S ALLEGED HERE AND WHAT THE CRIME

12   HERE IS, IS THAT THE DEFENDANT POSSESSED CHILD PORNOGRAPHY.

13             YOU UNDERSTAND?

14             PROSPECTIVE JUROR ELSNER:  MM-HMM.

15             THE COURT:  GO AHEAD, MR. AARON.

16             MR. AARON:  WHAT I'M TRYING TO FIND OUT, DO YOU

17   THINK ORDINARY PORNOGRAPHY, PORNOGRAPHY INVOLVING ADULTS, DO

18   YOU THINK THAT SHOULD BE A CRIME?

19             PROSPECTIVE JUROR ELSNER:  YES.

20             MR. AARON:  KNOWING, SO, YOU'VE GOT PRETTY STRONG

21   FEELINGS ABOUT PORNOGRAPHY IN GENERAL.  AND WHY DO YOU HAVE

22   THOSE STRONG FEELINGS?

23             PROSPECTIVE JUROR ELSNER:  I AM A CHRISTIAN, AND

24   THE BIBLE AND GOD SPEAK STRONGLY ABOUT NOT -- ABOUT SEXUAL

25   RELATIONS BEING BETWEEN A MAN AND A WOMAN WHO ARE MARRIED,

1    AND THAT SHOULD BE THE EXTENT OF IT.  AND SO ANYTHING THAT

2    GOES BEYOND THAT, BECAUSE GOD SAYS IT'S WRONG, I BELIEVE IT

3    IS WRONG, TOO.

4             SO, IN THAT CASE, PORNOGRAPHY WOULD BE GOING BEYOND

5    THE BOUNDS OF MARRIAGE, SO I BELIEVE THAT IT IS WRONG.

6             MR. AARON:  OKAY.  LET'S SEE IF I CAN PARAPHRASE

7    WHAT YOU'RE SAYING.

8             IS IT FAIR TO SAY THAT IN YOUR MIND YOU'RE

9    WITNESSING WHEN YOU CONDEMN HOMOSEXUALITY OR PORNOGRAPHY;

10   WOULD THAT BE FAIR TO SAY?

11            PROSPECTIVE JUROR ELSNER:  CAN YOU REPEAT THAT?

12   I'M SORRY.

13            MR. AARON:  WHAT YOU BELIEVE TO BE THE WORD OF GOD

14   IN CONDEMNING HOMOSEXUALITY OR PORNOGRAPHY?

15            PROSPECTIVE JUROR ELSNER:  I WOULDN'T SAY THAT I'M

16   CONDEMNING THOSE THINGS BECAUSE I KNOW, LIKE, THERE IS THINGS

17   IN MY LIFE THAT SHOULDN'T BE THERE, YOU KNOW.  LIKE, WE ALL

18   HAVE SIN ISSUES IN OUR LIVES.  SO IT IS NOT A MATTER OF ME

19   SAYING GOD HATES THIS PERSON BECAUSE THEY ARE A HOMOSEXUAL.

20   THAT'S NOT THE CASE.

21            MR. AARON:  I'M NOT TALKING ABOUT THE PERSON.  I'M

22   TALKING ABOUT THE ACT OR THE PRACTICE.

23            PROSPECTIVE JUROR ELSNER:  OH, THE ACT, FOR THAT

24   MATTER -- WELL, I DON'T KNOW.

25            MR. AARON:  TAKE YOUR TIME.

1          PROSPECTIVE JUROR ELSNER:  I AM.  I GUESS

2    CONDEMNING THE ACT BECAUSE IT IS DISOBEDIENT TO GOD'S WILL.

3          MR. AARON:  OKAY.  THAT BEING SAID, HOW WOULD YOU

4    THINK, IF YOU WERE SITTING ON TRIAL IN THIS CASE AND THERE

5    WAS A COMMUNITY, A NUMBER OF PEOPLE WHO ARE TALKING OPENLY

6    ABOUT POSSESSING PORNOGRAPHY OR TRADING IMAGES, OR THINGS

7    LIKE THAT, WOULD THAT SEEM TO YOU TO BE SINFUL AND WRONG?

8          PROSPECTIVE JUROR ELSNER:  WOULD I CONSIDER IT

9    SINFUL AND WRONG FOR PEOPLE TO BE TRADING PORNOGRAPHY?

10   OKAY.  YES.

11         MR. AARON:  AND IF PEOPLE WERE TALKING ABOUT

12   FANTASIZING ABOUT SEXUAL RELATIONS THAT DIDN'T INVOLVE A MAN

13   AND A WOMAN IN THE CONTEXT OF MARRIAGE, AND THAT, SADLY,

14   INVOLVED CHILDREN, AND THINGS LIKE THAT, YOU WOULD ALSO THINK

15   THAT IS SINFUL AND WRONG?

16         PROSPECTIVE JUROR ELSNER:  YES.

17         MR. AARON:  AND YOU HAVE PRETTY STRONG FEELINGS

18   ABOUT THAT BECAUSE THEY STEM FROM YOUR RELIGIOUS FAITH?

19         PROSPECTIVE JUROR ELSNER:  MM-HMM.

20         MR. AARON:  DO YOU THINK THAT MIGHT CAUSE YOU SOME

21   TROUBLE HERE IN BEING FAIR AND IMPARTIAL?  BECAUSE ON THE ONE

22   HAND, YOU KNOW WHAT THE WORD OF GOD IS, ORDAINED, YOU KNOW

23   WHAT THE PHYSICAL TRUTH IS.  ON THE OTHER HAND, YOU MIGHT BE

24   TOLD THAT THE LAW HAS A DIFFERENT VIEW.

25         LET ME ASK YOU THIS -- AND IF THAT QUESTION WAS

1   KIND OF CONFUSING, I APOLOGIZE.  IF THERE WAS A CONFLICT

2   BETWEEN WHAT YOU WERE TOLD BY THE JUDGE OR WHAT YOU ARE TOLD

3   BY THE LAW AND WHAT YOU BELIEVE THE BIBLE TELLS YOU, WHICH

4   WOULD WIN OUT?

5           PROSPECTIVE JUROR ELSNER:  THE BIBLE.

6           MR. AARON:  SO EVEN IF THE JUDGE HAD INSTRUCTED

7   THAT THIS THING IS OKAY OR THAT THING IS OKAY, OR YOU WOULD

8   HAVE TO CONSIDER IT IN SUCH A WAY, IF THE BIBLE TOLD YOU

9   DIFFERENTLY, THE BIBLE WOULD WIN OUT?

10          PROSPECTIVE JUROR ELSNER:  MM-HMM.

11          MR. AARON:  THANK YOU.  NOTHING FURTHER.

12          THE COURT:  MR. MICHAEL?

13          MR. MICHAEL:  GOOD MORNING.

14          IN THE QUESTIONNAIRE I THINK YOU LOOKED AT A MOMENT

15  AGO, THAT YOU FILLED OUT, YOU INDICATED YOU HAVE THESE STRONG

16  PERSONAL FEELINGS BASED ON YOUR FAITH.  AND DEFENSE COUNSEL

17  JUST PROBED YOU ABOUT THAT.  BUT IN THAT QUESTIONNAIRE, YOU

18  ALSO SAID THAT YOU COULD REMAIN FAIR AND IMPARTIAL.

19          DO YOU STILL HOLD THAT BELIEF?

20          PROSPECTIVE JUROR ELSNER:  YES.

21          MR. MICHAEL:  AND COULD YOU PUT YOUR FEELINGS, YOUR

22  PERSONAL FEELINGS ASIDE IN THIS CASE IF THE JUDGE INSTRUCTED

23  YOU THIS IS THE LAW AND YOU MUST FOLLOW THE LAW, COULD YOU

24  FOLLOW THE LAW IN THIS CASE?

25          PROSPECTIVE JUROR ELSNER:  CAN YOU REPEAT THAT?

```
 1            MR. MICHAEL:  SURE.  LET ME TRY A BETTER QUESTION.

 2            IF THE COURT WERE TO INSTRUCT YOU THAT REGARDLESS

 3    OF WHAT THE CHARGES ARE IN THIS CASE THE DEFENDANT IS

 4    ENTITLED TO A PRESUMPTION OF INNOCENCE THROUGHOUT THE COURSE

 5    OF THIS TRIAL, WOULD YOU BE ABLE TO GRANT THE DEFENDANT THAT

 6    PRESUMPTION OF INNOCENCE REGARDLESS OF WHAT THE CHARGES ARE?

 7            PROSPECTIVE JUROR ELSNER:  YES.

 8            MR. MICHAEL:  AND IF THE JUDGE WERE TO INSTRUCT YOU

 9    THAT IT IS THE GOVERNMENT'S BURDEN TO PROVE BEYOND A

10    REASONABLE DOUBT THE DEFENDANT'S GUILT, WOULD YOU HOLD THE

11    GOVERNMENT TO THAT BURDEN?

12            PROSPECTIVE JUROR ELSNER:  YES.

13            MR. MICHAEL:  AND ALTHOUGH YOU, A MOMENT AGO,

14    TALKED ABOUT THE CONFLICT OF THE LAW AND THE BIBLE, THE BIBLE

15    WOULD WIN OUT, IN THE CONTEXT IN THIS CASE, THIS IS THE LAW

16    THAT APPLIES TO THIS CASE, AND YOU MUST APPLY THE LAW TO THE

17    FACTS AND EVIDENCE PRESENTED HERE.

18            WOULD YOU BE ABLE TO DO THAT?

19            PROSPECTIVE JUROR ELSNER:  CAN YOU REPEAT THAT?

20            MR. MICHAEL:  SURE.  IT'S OKAY.

21            IN THIS CASE, IF THE JUDGE INSTRUCTED YOU ON THE

22    LAW AND SAID, THIS IS THE LAW THAT APPLIES TO THIS CASE, AND

23    I INSTRUCT THE JURY -- THE COURT SAYS, THE JURY IS INSTRUCTED

24    THAT YOU MUST FOLLOW THIS LAW --

25            PROSPECTIVE JUROR ELSNER:  MM-HMM.
```

```
 1              MR. MICHAEL:  -- WOULD YOU BE ABLE TO FOLLOW THE
 2    JUDGE'S INSTRUCTIONS?
 3              PROSPECTIVE JUROR ELSNER:  IF IT DIDN'T CONTRADICT
 4    SOMETHING THAT WAS IN THE BIBLE SPECIFICALLY.
 5              MR. MICHAEL:  SO IN THIS CASE YOU WOULD, IF YOU
 6    WERE TOLD SOMETHING WAS NOT LEGAL BUT YOU BELIEVED IT WAS
 7    WRONG, WOULD YOU STILL BE ABLE TO HOLD THE GOVERNMENT TO ITS
 8    BURDEN TO PROVE THE DEFENDANT WAS GUILTY ONLY OF THE ILLEGAL
 9    ACTS?
10              PROSPECTIVE JUROR ELSNER:  YES.
11              MR. MICHAEL:  AND BECAUSE THE DEFENDANT MAY HAVE
12    DONE SOMETHING THAT -- OR IT IS ALLEGED THE DEFENDANT MAY
13    HAVE DONE SOMETHING THAT YOU THINK IS WRONG UNDER THE BIBLE,
14    YOU WOULD NOT THUS CONVICT THE DEFENDANT IF THE GOVERNMENT
15    HAD NOT PROVEN THE CHARGES BEYOND A REASONABLE DOUBT?
16              PROSPECTIVE JUROR ELSNER:  YES.
17              MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.
18              THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY GO BACK
19    DOWN TO THE JURY ASSEMBLY ROOM.
20         (PROSPECTIVE JUROR ELSNER EXITS THE COURTROOM.)
21              MR. AARON:  YOUR HONOR, WE WOULD CHALLENGE THIS
22    JUROR FOR CAUSE.  AND THE PRIMARY REASON IS BECAUSE OF HER
23    REMARKS, IF THERE IS A CONFLICT BETWEEN THE COURT'S
24    INSTRUCTION AND WHAT SHE BELIEVES THE BIBLE SAYS, THE BIBLE
25    WOULD WIN OUT.
```

1           AND I WOULD NOTE COUNSEL TRIED TO REHABILITATE HER,

2    BUT I DON'T THINK SUCCESSFULLY, AND HERE IS WHY:  SETTING

3    ASIDE --

4           THE COURT:  YOU DON'T NEED TO ARGUE FACTUALLY.  I'M

5    GOING TO GRANT THE CHALLENGE FOR CAUSE.  I KNOW THAT COUNSEL

6    FOR THE GOVERNMENT DID TRY TO REHABILITATE, AND YOU WERE

7    SPECIFIC ON A COUPLE OF GROUNDS, BUT THERE WAS, FIRST OF ALL,

8    HESITATION FROM THE JUROR.

9           AND, SECONDLY, WE COULD NOT POSSIBLY GO INTO ALL

10   POTENTIAL CONFLICTS BETWEEN WHAT HER BELIEFS ARE AND WHERE

11   THERE MIGHT BE A CONFLICT BETWEEN HER BELIEFS AND THE LAW.

12          AND IN THIS CASE, WE HAVE SO MANY AREAS IN WHICH

13   THE COURT IS GOING TO BE GIVING A LIMITING INSTRUCTION THAT

14   THE JURORS ARE TO CONSIDER CERTAIN KINDS OF EVIDENCE FOR A

15   LIMITED PURPOSE, AND IT IS EVIDENCE THAT DEALS WITH AREAS IN

16   WHICH SHE HAS JUST -- THIS JUROR HAS JUST INDICATED THAT SHE

17   HAS VERY STRONG BELIEFS, THAT I DON'T THINK THAT SHE CAN GIVE

18   US -- SHE CAN'T GIVE US AN UNQUALIFIED ASSURANCE THAT SHE

19   WILL ALWAYS FOLLOW THE COURT'S INSTRUCTIONS.

20          SO, I'M GOING TO GRANT THE CHALLENGE FOR CAUSE AS

21   TO MS. ELSNER.

22          SO LET'S BRING IN MS. GARDEA.  AND IF YOU GO DOWN,

23   AFTER YOU BRING HER IN, IF YOU GO DOWN TO THE JURY ASSEMBLY

24   ROOM, BRING IN THE NEXT FIVE JURORS AND TELL MS. ELSNER SHE

25   IS EXCUSED.

```
 1        (PROSPECTIVE JUROR GARDEA IS PRESENT IN THE COURTROOM.)

 2              THE COURT:  GOOD MORNING, MS. GARDEA.

 3              PROSPECTIVE JUROR GARDEA:  GOOD MORNING.

 4              THE COURT:  YOU MAY HAVE A SEAT ANYWHERE YOU LIKE.

 5    AM I PRONOUNCING YOUR NAME, CORRECT?

 6              PROSPECTIVE JUROR:  GAR-DAY.

 7              THE COURT:  THANK YOU.  ANYWHERE YOU LIKE.

 8              MS. GARDEA, WE HAVE BEEN TALKING TO MANY OF THE

 9    JURORS INDIVIDUALLY BEFORE WE GET STARTED WITH THE WHOLE

10    GROUP THIS MORNING SO THAT WE CAN ASK SOME FOLLOW-UP

11    QUESTIONS ABOUT YOUR ANSWERS ON THE QUESTIONNAIRE AND GIVE

12    YOU SOME PRIVACY, SO WE'RE NOT TALKING TO YOU ABOUT CERTAIN

13    ANSWERS WITH ALL THE OTHER JURORS PRESENT.

14              FIRST OF ALL, YOU TOLD US IN YOUR QUESTIONNAIRE

15    ANSWERS THAT A MEMBER OF YOUR FAMILY WAS MOLESTED?

16              PROSPECTIVE JUROR GARDEA:  YES.

17              THE COURT:  CAN YOU TELL ME WHO THAT WAS IN YOUR

18    FAMILY?

19              PROSPECTIVE JUROR GARDEA:  IT WAS A COUSIN.

20              THE COURT:  WAS IT A BOY OR GIRL?

21              PROSPECTIVE JUROR GARDEA:  A GIRL.

22              THE COURT:  HOW OLD WAS SHE AT THE TIME?

23              PROSPECTIVE JUROR GARDEA:  ABOUT BETWEEN THE AGES

24    OF SIX AND NINE.  SHE DIDN'T SAY ANYTHING AT ALL UNTIL SHE

25    WAS 11, 12 YEARS OLD.
```

1            THE COURT:  THE MOLESTATION OCCURRED BETWEEN THE

2    AGES OF SIX AND NINE?

3            PROSPECTIVE JUROR GARDEA:  YES.

4            THE COURT:  AND THE FAMILY LEARNED ABOUT IT WHEN

5    SHE WAS 11?

6            PROSPECTIVE JUROR GARDEA:  YES.

7            THE COURT:  AND WHO WAS THE PERPETRATOR?

8            PROSPECTIVE JUROR GARDEA:  IT WAS A FRIEND OF THE

9    FAMILY.

10            THE COURT:  AND SO WHEN SHE REPORTED IT THAT'S WHEN

11    THE FAMILY TURNED IT OVER TO THE AUTHORITIES?

12            PROSPECTIVE JUROR GARDEA:  HER MOTHER CALLED THE

13    POLICE AS SOON AS SHE WAS AWARE OF IT.

14            THE COURT:  AND THEN, IF I UNDERSTAND WHAT YOU HAVE

15    TOLD US CORRECTLY, THE POLICE DID SOME INVESTIGATION BUT THE

16    PERSON WAS NEVER PROSECUTED?

17            PROSPECTIVE JUROR GARDEA:  NO.

18            THE COURT:  IS THAT RIGHT?

19            PROSPECTIVE JUROR GARDEA:  YES.

20            THE COURT:  ALL RIGHT.  DOES YOUR COUSIN AND YOUR

21    AUNT, DID THEY LIVE PRETTY CLOSE TO YOUR FAMILY AT THE TIME?

22            PROSPECTIVE JUROR GARDEA:  YES.

23            THE COURT:  WERE YOU AWARE OF THIS WHEN IT WAS

24    HAPPENING?

25            PROSPECTIVE JUROR GARDEA:  NO.

1          THE COURT:  WHEN DID YOU BECOME AWARE OF IT?

2          PROSPECTIVE JUROR GARDEA:  LAST YEAR.

3          THE COURT:  ARE YOU CLOSE IN AGE TO THIS COUSIN?

4          PROSPECTIVE JUROR GARDEA:  NO.  SHE IS 15.  I AM

5   26.

6          THE COURT:  SO, SHE IS QUITE A BIT YOUNGER?

7          PROSPECTIVE JUROR GARDEA:  YEAH.

8          THE COURT:  SO, THIS HAPPENED ABOUT FOUR YEARS AGO?

9          PROSPECTIVE JUROR GARDEA:  YES.

10          THE COURT:  DO YOU KNOW -- PARDON ME IF I ASKED YOU

11   THIS ALREADY BECAUSE I HAVE BEEN TALKING TO A LOT OF PEOPLE

12   THIS MORNING.  I'M ALREADY GETTING CONFUSED.

13          DO YOU KNOW WHAT THE EXTENT OF THE MOLESTATION WAS?

14   WAS SHE TOUCHED AND FONDLED, OR DID IT GO BEYOND THAT?

15          PROSPECTIVE JUROR GARDEA:  I DON'T KNOW.  SHE NEVER

16   WENT INTO DETAILS ABOUT IT.

17          THE COURT:  HAVE YOU EVER TALKED TO HER DIRECTLY?

18          PROSPECTIVE JUROR GARDEA:  NO.  I HAVE ASKED.  WHEN

19   I LEARNED ABOUT IT, I ASKED HER, AND SHE ALL -- SHE -- SHE

20   JUST LEFT IT AT "HE MOLESTED ME."  AND SHE NEVER WENT INTO

21   DETAILS, AND I NEVER ASKED.

22          THE COURT:  AND IS THAT THE ONLY TIME YOU HAVE EVER

23   TRIED TO TALK TO HER ABOUT IT?

24          PROSPECTIVE JUROR GARDEA:  YES.

25          THE COURT:  SORT OF LET YOU KNOW SHE WASN'T

1    INTERESTED IN SAYING ANYTHING ELSE?

2              PROSPECTIVE JUROR GARDEA:  I JUST WASN'T ABLE TO

3    ASK ANYTHING ELSE.  I WASN'T ABLE.

4              THE COURT:  DO YOU KNOW IF SHE HAS GOTTEN ANY

5    TREATMENT OR HELP FROM A PSYCHOLOGIST OR A THERAPIST?

6              PROSPECTIVE JUROR GARDEA:  I DON'T THINK SHE DOES,

7    OR SHE HAS HAD ANY HELP.

8              WHEN MY AUNT CALLED THE POLICE AND THEY CAME TO THE

9    HOUSE, SHE JUST GAVE UP.  BECAUSE BASICALLY WHAT THEY TOLD US

10   WAS THAT YOU DON'T HAVE ANY PROOF.  WE CAN'T DO ANYTHING

11   ABOUT IT.  SO, SHE LEFT IT AT THAT.

12             I DID MENTION TO HER THAT SHE SHOULD GET HELP FROM

13   THE COUNSELOR AT SCHOOL OR OUTSIDE THERAPY, BUT SHE HASN'T

14   DONE ANYTHING.

15             THE COURT:  THE CHARGES IN THIS CASE -- THERE ARE

16   FOUR CHARGES.  THEY SORT OF FALL INTO TWO GROUPS.  AND YOU

17   MAY HAVE GATHERED THIS FROM WHAT WE TOLD YOU IN THE

18   QUESTIONNAIRE.  THE FIRST TWO COUNTS ARE ACCUSATIONS

19   REGARDING CHILD PORNOGRAPHY.  AND THE SECOND TWO COUNTS ARE

20   ALLEGATIONS OR ACCUSATIONS REGARDING MOLESTATION.

21             NOW, AS TO THE CHILD PORNOGRAPHY CHARGES, THE JURY

22   WILL BE ASKED TO VIEW IMAGES AND TO HEAR TESTIMONY ABOUT

23   PORNOGRAPHY AND SHOWING IMAGES OF VERY YOUNG CHILDREN AND

24   SOME VERY DISTURBING IMAGES.  AND THE MOLESTATION THAT IS

25   ALLEGED TO HAVE TAKEN PLACE INVOLVES THE ALLEGED FONDLING AND

1    TOUCHING AND SO FORTH OF A YOUNG BOY, LIKE I SAID, SEVEN

2    YEARS OLD.

3              HOW WOULD YOU FEEL -- GIVEN WHAT HAPPENED TO YOUR

4    COUSIN, HOW WOULD YOU FEEL ABOUT BEING ABLE TO SIT AS A JUROR

5    ON THIS CASE?  ANYTHING ABOUT WHAT HAPPENED TO YOUR COUSIN

6    THAT WOULD AFFECT YOUR ABILITY TO BE FAIR TO BOTH SIDES HERE?

7              PROSPECTIVE JUROR GARDEA:  I COULD BE FAIR, BUT I

8    FEEL THAT IT WOULD AFFECT ME PERSONALLY.  BECAUSE LIKE I SAID

9    -- I SAID IN MY QUESTIONNAIRE I SUFFER FROM DEPRESSION.  I

10   HAVE A 19-MONTH-OLD BABY GIRL.  I JUST DON'T KNOW WHAT KIND

11   OF FEELINGS IT WOULD TRIGGER.  I DON'T THINK IT WOULD AFFECT

12   WHETHER I WOULD BE FAIR OR NOT, BUT AS A PERSON I WOULDN'T

13   KNOW HOW MAYBE TO HANDLE IT.

14             THE COURT:  IT MIGHT TAKE A TOLL ON YOU; IS WHAT

15   YOU'RE CONCERNED ABOUT?

16             PROSPECTIVE JUROR GARDEA:  YES.

17             THE COURT:  NOW, YOU'RE TAKING SOME MEDICATION?

18             PROSPECTIVE JUROR GARDEA:  YES.

19             THE COURT:  ARE YOU ALSO -- I TAKE IT THAT'S BEEN

20   PRESCRIBED BY --

21             PROSPECTIVE JUROR GARDEA:  YES.  I SEE A THERAPIST.

22             THE COURT:  A THERAPIST?  SO, YOU'RE SEEING A

23   THERAPIST FOR YOUR DEPRESSION?

24             PROSPECTIVE JUROR GARDEA:  YES.

25             THE COURT:  ARE YOU CONCERNED ABOUT SITTING ON THIS

1    CASE AS A JUROR BECAUSE IT MAY MAKE YOUR DEPRESSION WORSE?

2          PROSPECTIVE JUROR GARDEA:  YES.

3          THE COURT:  HAVE YOU TALKED ABOUT THAT WITH ANYONE,

4    YOUR THERAPIST, OR ANYONE ELSE?

5          PROSPECTIVE JUROR GARDEA:  NO.

6          THE COURT:  YOU'RE CONCERNED ABOUT SITTING AS A

7    JUROR?

8          PROSPECTIVE JUROR GARDEA:  NO.  I HAVEN'T SEEN HIM

9    SINCE THE LAST TIME I WAS HERE.  I HAVEN'T HAD AN

10   APPOINTMENT.

11         THE COURT:  LET ME GIVE YOU AN EXAMPLE.  IT IS NOT

12   A PERFECT EXAMPLE, SO BEAR WITH ME.

13         AS I'M SURE YOU CAN IMAGINE -- WELL, LET ME START

14   IT THIS WAY:  HAVE YOU EVER BEEN CALLED FOR JURY DUTY BEFORE?

15         PROSPECTIVE JUROR GARDEA:  YES, BUT NOT TO WHERE I

16   HAVE HAD TO SIT IN THE JURY BOX AND BE QUESTIONED, NO.

17         THE COURT:  WELL, AS YOU CAN IMAGE, I STARTED TO

18   SAY THERE IS ALL DIFFERENT KINDS OF CASES, BOTH CRIMINAL,

19   LIKE THIS ONE, AND CIVIL.  BUT JUST STICKING TO CRIMINAL

20   CASES FOR A MOMENT, THERE ARE STILL ALL KINDS OF CASES,

21   EVERYTHING FROM ACCOUNTING, AN ACCOUNTING FRAUD CASE, OR A

22   FINANCIAL CRIME LIKE THE ENRON CASE THAT YOU MAY HAVE HEARD

23   ABOUT, TO TRAFFIC INFRACTIONS LIKE SPEEDING OR RECKLESS

24   DRIVING, TO MURDER, TO A CRIME LIKE THIS.

25         SOME JURORS ARE PERHAPS SUITED TO SIT ON ONE KIND

1    OF A CASE AND NOT ANOTHER.  IF YOU WERE ASKED TO SIT AS A

2    JUROR ON A MURDER CASE, FOR EXAMPLE, YOU WOULD BE ASKED

3    PROBABLY TO LOOK AT VERY DISTURBING AUTOPSY PHOTOGRAPHS.  AND

4    IT IS DISTURBING FOR EVERYONE.  SOME PEOPLE CAN DO IT EVEN

5    THOUGH IT IS DISTURBING.  SOME PEOPLE JUST CANNOT.  BUT THEY

6    COULD MAYBE SERVE ON, SAY, THE ENRON CASE, WHICH IS, YOU

7    KNOW, TAKES A LONG TIME AND IT HAS A LOT OF VERY COMPLICATED

8    ACCOUNTING MATTERS.

9            THIS CASE, AS YOU HEARD ME SAY, INVOLVES ASKING THE

10   JURORS TO LOOK AT IMAGES THAT WOULD BE DISTURBING TO MOST

11   PEOPLE, AND ALSO LISTEN TO TESTIMONY ABOUT THE ALLEGED

12   MOLESTATION OF A YOUNG BOY.

13           DO YOU THINK THAT FOR YOU THAT, BECAUSE OF YOUR

14   ILLNESS RIGHT NOW WITH DEPRESSION, THIS WOULD BE MORE

15   DIFFICULT FOR YOU THAN YOU WOULD BE ABLE TO HANDLE?

16           PROSPECTIVE JUROR GARDEA:  I DON'T THINK I WOULD BE

17   COMFORTABLE.  BECAUSE LIKE I SAID, I DON'T KNOW WHAT THE

18   AFTEREFFECTS OF IT WOULD BE.  AT THIS POINT, I FEEL THAT I

19   COULD SIT AND VIEW OR SEE ANYTHING THAT I HAVE TO.  BUT BEING

20   THAT I HAVE NEVER EXPERIENCED IT, I JUST DON'T KNOW IF I

21   WOULD BE NERVOUS ABOUT IT AFTERWARDS OR IF I WOULD BE JUST

22   NOT COMFORTABLE WITH IT AFTERWARDS.

23           AT THIS POINT, I DO FEEL THAT I WOULD BE ABLE TO,

24   BUT I'M JUST A LITTLE CONCERNED ABOUT HOW I WOULD FEEL AFTER.

25           THE COURT:  IN OTHER WORDS, AFTER THE TRIAL IS OVER

1    YOU THINK THAT IT MIGHT AFFECT YOUR MENTAL HEALTH AFTERWARDS?

2              PROSPECTIVE JUROR GARDEA:  YES.

3              THE COURT:  ALL RIGHT.  EITHER SIDE WISH TO BE

4    HEARD?

5              MR. AARON:  NO, YOUR HONOR.

6              MR. MICHAEL:  NO, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  THANK YOU, MS. GARDEA.  AND

8    YOU MAY GO BACK DOWN TO THE JURY ASSEMBLY ROOM.

9         (PROSPECTIVE JUROR GARDEA EXITS THE COURTROOM.)

10             MR. AARON:  WE WOULD OFFER TO STIPULATE.

11             MR. MICHAEL:  STIPULATE.

12             THE COURT:  THANK YOU VERY MUCH, COUNSEL.

13             WOULD YOU LET MS. GARDEA KNOW SHE IS EXCUSED AND

14   THANK HER VERY MUCH.

15             SO, WE HAVE MR. GRAY, AND WE HAVE THE NEXT FIVE.

16             MR. MICHAEL:  YOUR HONOR, JUST TO MAKE SURE WE ARE

17   ON THE SAME PAGE THUS FAR, RATHER BY CAUSE OR BY STIPULATION,

18   JURORS ANDERSON, ELSNER AND GARDEA HAVE BEEN REMOVED?

19             THE COURT:  YES.

20             MR. AARON:  DID MS. GOUPIL ARRIVE?

21             THE COURT:  NO, NOT TO MY KNOWLEDGE.

22             MR. MICHAEL:  YOUR HONOR, OF THE THREE JURORS WHO

23   FINISHED THE QUESTIONNAIRES, THE GOVERNMENT WOULD ONLY HAVE

24   QUESTIONS FOR MR. HO.  I SPOKE WITH DEFENSE COUNSEL.  I

25   BELIEVE THAT HE ONLY HAS QUESTIONS FOR MR. HO.

1          THE COURT:  I HAVE QUESTIONS FOR MR. HO.  THANK

2    YOU.

3        (PROSPECTIVE JUROR HO IS PRESENT IN THE COURTROOM.)

4          THE COURT:  GOOD MORNING.

5          PROSPECTIVE JUROR GRAY:  GOOD MORNING.

6          THE COURT:  MR. GRAY, YOU INDICATED -- WELL, LET ME

7    BACK UP HERE.

8          BEFORE WE GET STARTED THIS MORNING WITH ALL OF THE

9    JURORS, I'M GOING TO TAKE THE OPPORTUNITY TO SPEAK TO MANY OF

10   YOU INDIVIDUALLY ABOUT SOME OF YOUR ANSWERS TO THE QUESTIONS

11   ON THE QUESTIONNAIRE, OUTSIDE OF THE PRESENCE OF THE OTHER

12   JURORS.

13         YOU INDICATED IN THE ANSWERS TO YOUR QUESTIONNAIRE

14   THAT YOU WOULD TRY TO BE OPEN-MINDED?

15         PROSPECTIVE JUROR GRAY:  YES.

16         THE COURT:  DO YOU HAVE A QUESTION IN YOUR OWN MIND

17   ABOUT WHETHER YOU WOULD BE ABLE TO BE OPEN-MINDED ON A CASE

18   WITH CHARGES LIKE THE ONE IN THIS CASE?

19         PROSPECTIVE JUROR GRAY:  I BELIEVE SO.

20         THE COURT:  YOU BELIEVE?

21         PROSPECTIVE JUROR GRAY:  YEAH.  I THINK I CAN.  I

22   CAN ASSESS THE INFORMATION AND MAKE A DECISION WITH AN OPEN

23   MIND.

24         THE COURT:  ALL RIGHT.  YOU ALSO INDICATED THAT YOU

25   BELIEVE THAT PORNOGRAPHY IS WRONG?

1                    PROSPECTIVE JUROR GRAY:  I DO.

2                    THE COURT:  NOW, YOU UNDERSTAND THAT IN THIS CASE

3        THERE IS TWO SETS OF CHARGES.  THE FIRST TWO CHARGES DEAL

4        WITH POSSESSION OR CONSPIRING TO POSSESS CHILD PORNOGRAPHY,

5        NOT JUST PORNOGRAPHY.

6                    PROSPECTIVE JUROR GRAY:  YES.

7                    THE COURT:  BECAUSE OF YOUR OWN PERSONAL BELIEFS,

8        DO YOU THINK IT WOULD BE MORE DIFFICULT FOR YOU TO BE

9        OPEN-MINDED IN A CASE WHERE THE DEFENDANT IS ACCUSED OF

10       POSSESSING CHILD PORNOGRAPHY THAN ANOTHER KIND OF CASE?

11                   PROSPECTIVE JUROR GRAY:  CAN YOU REPEAT THAT AGAIN?

12                   THE COURT:  CERTAINLY.  LET ME ASK IT A DIFFERENT

13       WAY.

14                   IN EVERY KIND OF CRIMINAL CASE, WHETHER IT'S

15       JAYWALKING, OR DRIVING ABOVE THE SPEED LIMIT, OR FINANCIAL

16       FRAUD, OR MURDER, OR POSSESSION OF CHILD PORNOGRAPHY, ALL

17       THOSE CASES HAVE ONE THING IN COMMON.  THEY PROBABLY HAVE

18       MORE THAN ONE THING IN COMMON.  BUT ONE THING THEY HAVE IN

19       COMMON IS THAT THE PERSON ACCUSED OF ALL OF THOSE CRIMES AND

20       ALL OF THOSE DIFFERENT KINDS OF CASES IS ENTITLED TO BE

21       PRESUMED INNOCENT.

22                   PROSPECTIVE JUROR GRAY:  YES.

23                   THE COURT:  DO YOU AGREE WITH THAT?

24                   PROSPECTIVE JUROR GRAY:  I AGREE WITH THAT.

25                   THE COURT:  WOULD IT BE MORE DIFFICULT FOR YOU TO

1    PRESUME THE INNOCENCE OF SOMEBODY WHO IS ACCUSED OF

2    POSSESSING CHILD PORNOGRAPHY THAN IT WOULD BE FOR YOU TO

3    PRESUME THE INNOCENCE OF SOMEONE WHO IS ACCUSED OF DRIVING

4    OVER THE SPEED LIMIT?

5            PROSPECTIVE JUROR GRAY:  AGAIN, THEY ARE ACCUSED,

6    AND I BELIEVE I CAN MAKE THE ASSESSMENT BASED ON THE FACT

7    THAT THEY ARE ASSUMED NOT GUILTY AT THAT POINT.

8            THE COURT:  BUT WOULD IT BE MORE DIFFICULT FOR YOU

9    TO DO THAT IN A CASE WHERE THE CHARGES ARE RELATED TO CHILD

10   PORNOGRAPHY THAN IN A CASE WHERE THE DEFENDANT IS ACCUSED OF

11   DRIVING OVER THE SPEED LIMIT OR JAYWALKING?

12           PROSPECTIVE JUROR GRAY:  IT IS A MUCH MORE SERIOUS

13   OFFENSE, BUT I THINK I CAN MAKE THAT JUDGMENT.

14           THE COURT:  ANYTHING ABOUT YOUR PERSONAL BELIEFS

15   THAT PORNOGRAPHY IS WRONG THAT MAKE IT MORE DIFFICULT FOR YOU

16   TO FOLLOW THE COURT'S INSTRUCTIONS AND PRESUME THE

17   DEFENDANT'S INNOCENCE IN A CASE LIKE THIS ONE?

18           PROSPECTIVE JUROR GRAY:  I DO HAVE MY BELIEFS, YOU

19   KNOW.  I UNDERSTAND THAT THOSE ARE MY BELIEFS AND NOT

20   NECESSARILY AN ISSUE FOR THE COURT, AND I THINK I CAN MAKE

21   THAT JUDGMENT.

22           THE COURT:  AND WHEN YOU SAY YOU THINK, CAN YOU

23   EXPAND ON THAT A LITTLE FOR ME?

24           PROSPECTIVE JUROR GRAY:  UNTIL I'VE ENCOUNTERED THE

25   SITUATION, I REALLY CAN'T SAY.  YES, I THINK I CAN DO THAT.

```
 1              THE COURT:  LET ME GIVE YOU A LITTLE MORE

 2    INFORMATION.  I UNDERSTAND WHAT YOU'RE SAYING.  UNTIL YOU ARE

 3    IN THE POSITION, IT IS A LITTLE HARD TO FORECAST?

 4              PROSPECTIVE JUROR GRAY:  RIGHT.

 5              THE COURT:  IN CONNECTION WITH A SECOND SET OF

 6    CHARGES WHICH ARE THE MOLESTATION CHARGES, TRAVELING ACROSS

 7    STATE LINES WITH THE INTENT TO MOLEST A CHILD UNDER THE AGE

 8    OF 12, IN THIS CASE, A SEVEN YEAR OLD, AND ACTUALLY MOLESTING

 9    A SEVEN-YEAR-OLD CHILD, THOSE ARE THE ACCUSATIONS IN

10    CONNECTION WITH THOSE TWO CHARGES.

11              THERE WILL BE TESTIMONY ABOUT THAT, AND THERE WILL

12    BE -- IN CONNECTION WITH THE PORNOGRAPHY CHARGES, THE JURY

13    WILL BE ASKED TO VIEW IMAGES OF CHILD PORNOGRAPHY, AND THAT'S

14    IMAGES OF VERY YOUNG CHILDREN ENGAGED IN SEXUAL CONDUCT WITH

15    OTHER CHILDREN AND WITH ADULTS.

16              WOULD YOU BE ABLE TO VIEW THOSE IMAGES IF YOU WERE

17    ASKED TO SIT AS A JUROR ON THIS CASE?

18              PROSPECTIVE JUROR GRAY:  YES.

19              THE COURT:  ONE OF THE OTHER ANSWERS IN YOUR

20    QUESTIONNAIRE REGARDING THE QUESTION ABOUT BELIEFS ABOUT

21    HOMOSEXUAL BEHAVIOR OR ORIENTATION WAS THAT YOU BELIEVED

22    HOMOSEXUAL BEHAVIOR IS DEVIANT, IF I READ YOUR HANDWRITING

23    CORRECTLY?

24              PROSPECTIVE JUROR GRAY:  CORRECT.

25              THE COURT:  ANYTHING ABOUT THOSE BELIEFS THAT WOULD
```

1    HAVE AN IMPACT ON YOU IF YOU SAT AS A JUROR ON THIS CASE?

2    BECAUSE YOU HEARD ME SAY A MOMENT AGO THAT THE MOLESTATION

3    CHARGES IN THIS CASE INVOLVE AN ACCUSATION THAT THE DEFENDANT

4    MOLESTED A SEVEN-YEAR-OLD BOY.

5         PROSPECTIVE JUROR GRAY:  RIGHT.

6         THE COURT:  KNOWING THAT, HOW DO YOU FEEL ABOUT

7    SITTING AS A JUROR ON THIS CASE?

8         PROSPECTIVE JUROR GRAY:  I THINK I CAN DRAW THE

9    DISTINCTION BETWEEN MY BELIEFS AND THAT POSITION THAT

10   HOMOSEXUALITY IS A DEVIANT ACT, AGAINST THE FACTS THAT ARE

11   PRESENTED IN THIS COURT AND MAKE A DECISION ON THE LAW AS IT

12   STANDS HERE.  SO, I THINK I CAN MAKE THAT DISTINCTION.

13        I DO SPEND THE MAJORITY OF MY TIME IN MY WORK

14   WORKING WITH LAW ENFORCEMENT, AND SO I, YOU KNOW -- I

15   UNDERSTAND.  I UNDERSTAND THE LAW AND I UNDERSTAND BEING ABLE

16   TO PARSE OUT ISSUES AND MAKE DECISIONS ON THOSE ISSUES

17   INDEPENDENT OF MY PERSONAL FEELINGS.

18        THE COURT:  NOW, IF THE COURT, IN THE COURSE OF

19   THIS TRIAL -- I MEAN, YOU WILL HEAR INSTRUCTIONS FROM THE

20   COURT IN THE COURSE OF THE TRIAL, AT THE BEGINNING OF THE

21   TRIAL, THROUGHOUT THE TRIAL, AS THE JURY IS HEARING EVIDENCE

22   THERE WILL BE MANY TIMES WHEN THE JURY IS INSTRUCTED ABOUT

23   THE LAW DURING THE COURSE OF THE TRIAL AND AT THE END OF THE

24   TRIAL.

25        IF THE COURT'S INSTRUCTIONS ON THE LAW CONFLICT

1    WITH YOUR OWN PERSONAL BELIEFS, HOW WOULD YOU RESOLVE THAT?

2             PROSPECTIVE JUROR GRAY:  I CAN'T SEE THAT BEING THE

3    CASE.  BUT IF IT DID, I WOULD NOTIFY THE COURT.

4             THE COURT:  IN OTHER WORDS, ANOTHER WAY TO SAY IT

5    MAY NOT BE EXACTLY THE SAME THING, BUT ONE OF THE

6    INSTRUCTIONS THE JURY RECEIVES IN GENERAL IS THAT YOU HAVE TO

7    FOLLOW THE LAW AS THE COURT INSTRUCTS YOU ON IT.  AND YOU

8    CAN'T SUBSTITUTE YOUR OWN IDEAS OF WHAT YOU THINK THE LAW

9    SHOULD BE OR OUGHT TO BE.

10            DO YOU UNDERSTAND?

11            PROSPECTIVE JUROR GRAY:  I DO.

12            THE COURT:  DO YOU AGREE?

13            PROSPECTIVE JUROR GRAY:  I DO.

14            THE COURT:  IF ANY TIME DURING THE COURSE OF THE

15   TRIAL YOU FELT THAT YOU COULD NOT, IN GOOD CONSCIENCE, FOLLOW

16   THE COURT'S INSTRUCTIONS, YOU WOULD INFORM THE COURT OF THAT?

17            PROSPECTIVE JUROR GRAY:  I WOULD.

18            THE COURT:  YOU SAID YOU WORK A LOT WITH LAW

19   ENFORCEMENT?

20            PROSPECTIVE JUROR GRAY:  YES.

21            THE COURT:  IF I RECALL, YOU'RE A VICE-PRESIDENT OF

22   A PUBLIC SAFETY SYSTEM?

23            PROSPECTIVE JUROR GRAY:  COMPANY.

24            THE COURT:  COMPANY.  CAN YOU TELL ME A LITTLE BIT

25   ABOUT YOUR COMPANY?

1          PROSPECTIVE JUROR GRAY:  YEAH.  I WORK FOR R.C.C.

2     CONSULTANT, PROBABLY THE LARGEST SAFETY COMPANY IN THE

3     COUNTRY.  BASICALLY, WHAT WE DO IS WE SIT AND WORK WITH LAW

4     ENFORCEMENT, FIRE AGENCIES, OTHER ESSENTIAL SERVICES,

5     CLIENTS, IN DEFINING, ONE, HOW THEY OPERATE, AND, TWO,

6     DEVELOPING THE TOOLS TO MAKE THEM OPERATE MORE EFFICIENTLY.

7          WE ARE WORKING WITH THE COUNTY AND CITY OF LOS

8     ANGELES, COUNTY OF RIVERSIDE.  THESE ARE HALF A BILLION

9     DOLLAR PROJECTS IN REDEFINING RADIO COMMUNICATIONS.  INSTEAD

10    OF FOLLOWING 911 INOPERABILITY BETWEEN AGENCIES IS ONE OF THE

11    MAIN THINGS WE WORK AT, TOUCH ON THE TECHNICAL ASPECTS, AS

12    WELL AS OPERATIONAL ASPECTS.  WE JUST DON'T BUILD NEW

13    EQUIPMENT AND OPERATE THE SAME WAY THEY ALWAYS OPERATED, WE

14    SIT DOWN AND COLLABORATE WITH THEM AND FIND NEW WAYS TO

15    ACTUALLY DO THEIR JOB.

16         THE COURT:  SO, IN THE COURSE OF THAT, YOU WORK

17    QUITE A BIT WITH LAW ENFORCEMENT, IT SOUNDS LIKE?

18         PROSPECTIVE JUROR GRAY:  VERY MUCH.

19         THE COURT:  WOULD I BE GUESSING CORRECTLY IF I

20    THOUGHT THAT YOU WORKED MOSTLY WITH MANAGEMENT?

21         PROSPECTIVE JUROR GRAY:  I DO.  MY POSITION IS

22    THAT.

23         THE COURT:  MANAGEMENT OF LAW ENFORCEMENT?

24         PROSPECTIVE JUROR GRAY:  I WORK WITH CHIEF BRATTON.

25    I WORK WITH SHERIFF BACA, IN LOS ANGELES, PROBABLY ON A

 1    MONTHLY BASIS.  I MEET WITH THEM ABOUT ONCE A MONTH.

 2              THE COURT:  NOW, IN THE COURSE OF THIS TRIAL, THE

 3    JURORS WILL HEAR TESTIMONY FROM MANY DIFFERENT LAW

 4    ENFORCEMENT WITNESSES FROM DIFFERENT AGENCIES.  AND ONE OF

 5    THE INSTRUCTIONS THAT THEY WILL HEAR IS THAT THEY ARE TO

 6    CONSIDER THE TESTIMONY FROM LAW ENFORCEMENT WITNESSES AND

 7    JUDGE THEM BY THE SAME STANDARDS THAT APPLY TO ANY OTHER

 8    WITNESS.  IN OTHER WORDS, NOT TREAT THEM AS MORE LIKELY TO BE

 9    BELIEVABLE AND HONEST THAN ANY OTHER WITNESSES.

10              PROSPECTIVE JUROR GRAY:  RIGHT.

11              THE COURT:  DO YOU AGREE WITH THAT?

12              PROSPECTIVE JUROR GRAY:  I DO.  I THINK ALL OF

13    THESE INSTITUTIONS, WHETHER THEY ARE PUBLIC SAFETY, JUDICIAL,

14    OR WHATEVER, ARE HUMAN INSTITUTIONS, AND THEY HAVE THEIR

15    FACULTIES.  AND, YOU KNOW, IT IS -- YOU HAVE TO LOOK AT THE

16    INDIVIDUAL AND WEIGH WHAT THEIR COMMENTS ARE.  AND I HAVE TO

17    DO THAT IN EVALUATING HOW PUBLIC SAFETY SYSTEMS WORK, BECAUSE

18    I SIT DOWN AND INTERVIEW LAW ENFORCEMENT FOLKS AND TRY TO GET

19    AS MUCH INFORMATION OUT OF THEM AS I CAN AS TO HOW THEY SEE

20    AND HOW THEY DO THEIR BUSINESS.  AND SOME OF THE THINGS, TRY

21    TO MITIGATE ANY PROBLEMS THEY MIGHT HAVE IN PRESENTING

22    INFORMATION INCORRECTLY.  SO, I DEAL WITH THAT.

23              THE COURT:  THANK YOU.

24              MR. AARON?

25              MR. AARON:  THANK YOU.

1           GOOD MORNING, SIR.

2           PROSPECTIVE JUROR GRAY:  HI.

3           MR. AARON:  AT THE END OF YOUR QUESTIONNAIRE, YOU

4    WERE ASKED IF THERE WAS ANYTHING YOU DIDN'T WANT TO WRITE IN

5    THE QUESTIONNAIRE AND THAT YOU DIDN'T WANT TO TALK ABOUT IN

6    FRONT OF THE OTHER JURORS, AND YOU WROTE "YES."

7           PROSPECTIVE JUROR GRAY:  I THINK JUST, YOU KNOW,

8    BASICALLY, AS FAR AS THE OTHER JURORS, MY PERSONAL POSITIONS

9    STATED.  I DIDN'T WANT TO GO INTO A LOT OF DETAIL, AND ALSO

10   MY POSITION, BASICALLY, WHERE I WORK.

11          MR. AARON:  OKAY.  OTHER THAN YOUR PUBLIC SAFETY

12   POSITION, YOU JUST DON'T WANT TO TALK ABOUT YOUR POSITION

13   RELATING TO PORNOGRAPHY?

14          PROSPECTIVE JUROR GRAY:  NOT IN FRONT OF THE OTHER

15   JURORS.

16          MR. AARON:  OKAY.  WHEN YOU SAY THAT YOU BELIEVE

17   PORNOGRAPHY -- DO YOU BELIEVE THAT BOTH PORNOGRAPHY AND

18   HOMOSEXUALITY ARE DEVIANT BEHAVIORS?

19          PROSPECTIVE JUROR GRAY:  I DO.

20          MR. AARON:  IS THAT BIBLICALLY BASED?

21          PROSPECTIVE JUROR GRAY:  NOT REALLY, NO.

22          MR. AARON:  WHAT DO YOU BASE THAT ON?

23          PROSPECTIVE JUROR GRAY:  BASICALLY, MY PERCEPTION

24   OF THE WAY SOCIETY SHOULD FUNCTION.  AND I BELIEVE THAT, YOU

25   KNOW, I BELIEVE IN A CERTAIN AMOUNT OF ORDER.  AND I BELIEVE

1    IN -- I MEAN, THERE IS A BIBLICAL CONTENT THERE AS WELL, BUT

2    I DON'T THINK THAT'S WHAT'S DRIVING THAT.

3              MR. AARON:  IN THIS CASE THERE IS GOING TO BE A LOT

4    OF EVIDENCE, A LOT OF DOCUMENTARY EVIDENCE, AS WELL, ABOUT

5    FANTASIES, SPECULATION, VARIOUS TYPES, BUT CERTAINLY

6    INVOLVING POSSESSION OF CHILD PORNOGRAPHY, SEXUAL RELATIONS

7    WITH YOUNG CHILDREN, THINGS LIKE THAT.

8              GIVEN YOUR STRONG VIEWS ON PORNOGRAPHY AND

9    HOMOSEXUALITY, HOW DO YOU THINK THAT MIGHT AFFECT YOU?

10             PROSPECTIVE JUROR GRAY:  AS I STATED BEFORE, I

11   THINK I CAN DRAW A DISTINCTION BETWEEN MY PERSONAL FEELINGS

12   AND THE LETTER OF THE LAW.

13             MR. AARON:  HOW WOULD YOU DO THAT?

14             PROSPECTIVE JUROR GRAY:  BASICALLY, BY CONSIDERING

15   WHAT'S, YOU KNOW -- I THINK I CAN SEPARATE WHAT I CONSIDER TO

16   BE RIGHT AND WRONG FROM PERSONAL, YOU KNOW, FROM MY PERSONAL

17   BELIEFS, FROM MAKING A DECISION BASED ON WHAT'S PRESENTED IN

18   COURT.

19             MR. AARON:  WHEN YOU SAID THAT YOU MET WITH CHIEF

20   BRATTON AND SHERIFF BACA ON A MONTHLY BASIS --

21             PROSPECTIVE JUROR GRAY:  MM-HMM.

22             MR. AARON:  -- WHY DO YOU MEET WITH THEM?

23             PROSPECTIVE JUROR:  BASICALLY, TO FOLLOW THIS

24   PROJECT CALLED L.A. RITTS, WHICH IS A NEW REGIONAL -- LET ME

25   BACK UP.

```
 1            WE WERE FIRST HIRED BY THE CITY OF LOS ANGELES TO
 2    MAKE AN ASSESSMENT ON THE WAY PUBLIC SAFETY SYSTEMS WORK IN
 3    THE L.A. BASIN.  AND WE CAME AWAY WITH A RECOMMENDATION THAT
 4    WE THOUGHT THAT RATHER THAN BUILD 60 OR SO DIFFERENT RADIO
 5    SYSTEMS, THAT THEY OUGHT TO BUILD A NEW OPERATING MODEL, NEW
 6    DISPATCH FACILITIES, AND A REGULAR PLATFORM THAT SERVED THE
 7    ENTIRE AREA AND ALLOWED THESE AGENCIES TO INTERACT.
 8            WE HAVE BEEN INVOLVED -- I PERSONALLY HAVE BEEN
 9    INVOLVED WITH THE DEVELOPMENT OF INFORMATION, GO OUT AND GET
10    GRANT FUNDING FOR THAT PROJECT.  AND IN THAT MODE, TYPICALLY
11    I MEET WITH BACA AND BRATTON, EACH REPRESENTING LAW
12    ENFORCEMENT.  AS WELL AS, AT THE TIME, CHIEF BERMONTRY I MET
13    WITH, THE FIRE CHIEF THAT WAS LET GO IN L.A., AND CHIEF
14    FREEMAN, IN THE COUNTY.  SO, I STAY INVOLVED WITH THEM AT A
15    FAIRLY TOP LEVEL BECAUSE WE MIGHT HAVE A WHOLE STAFF OF
16    ENGINEERS WORKING ON A PROJECT, AND I TRY TO CAPSULIZE WHAT'S
17    GOING ON WITH THOSE ENGINEERS AND PRESENT IT TO THEM.
18            MR. AARON:  SO, YOU WORK DEALING WITH -- ON A VERY
19    LARGE COMMUNICATIONS PROJECT INVOLVING THE CHIEF OF POLICE OF
20    LOS ANGELES CITY, AND THE SHERIFF OF LOS ANGELES COUNTY?
21            PROSPECTIVE JUROR GRAY:  AS WELL AS SOME 40 OTHER
22    CITIES: BURBANK, GLENDALE.  HALF OF THE 84 CITIES WITHIN LOS
23    ANGELES ARE CONTRACT CITIES WITH THE COUNTY, AND THE OTHER 40
24    OR SO CITIES WE'RE WORKING WITH THEM, AS WELL.
25            MR. AARON:  AND THESE ARE COMMUNICATIONS SYSTEMS
```

1    THAT THEY USE TO COMMUNICATE WITH EACH OTHER?

2              PROSPECTIVE JUROR GRAY:  YEAH.  THESE ARE VOICE AND

3    DATA COMMUNICATION SYSTEMS FOR PUBLIC SAFETY.

4              MR. AARON:  AND THEY COMMUNICATE WITH OTHER

5    AGENCIES LIKE RIVERSIDE SHERIFF'S?

6              PROSPECTIVE JUROR GRAY:  YES.

7              MR. AARON:  UNITED STATES MARSHALS, THINGS LIKE

8    THAT?

9              PROSPECTIVE JUROR GRAY:  COUNTY OF RIVERSIDE IS ONE

10   OF OUR OTHER CLIENTS.  WE ARE BUILDING A SYSTEM FOR THEM AS

11   WELL.

12             MR. AARON:  AND DO YOU DO ANY WORK WITH THE FEDERAL

13   GOVERNMENT?

14             PROSPECTIVE JUROR GRAY:  MYSELF -- OUR COMPANY IS.

15   MYSELF, I'M NOT.  I'M WORKING WITH THE STATE OF ARIZONA,

16   STATE OF ALASKA, AND STATE OF OREGON, AND STATE OF

17   CALIFORNIA.

18             MR. AARON:  WHAT DOES YOUR COMPANY DO WITH THE

19   FEDERAL GOVERNMENT?

20             PROSPECTIVE JUROR GRAY:  WE DID -- WE HAVE DONE

21   SOME MILITARY WORK FOR THE COAST GUARD.  WE ARE VERY MUCH

22   INVOLVED WITH THE FCC AND THE DEPLOYMENT OF AN ISSUE CALLED

23   "REBANDING," WHICH IS TAKING THE COMMERCIAL CARRIERS AND

24   MOVING THEM OUT OF THE SEGMENT OF THE RADIO SPECTRUM AND KIND

25   OF CONSOLIDATING, IF YOU WILL, PUBLIC SAFETY RADIO SPECTRUM.

```
 1              AND I GUESS TO SOME EXTENT I AM WORKING WITH THE

 2    CITY AND COUNTY OF SAN FRANCISCO ON THAT, AND THE CITY AND

 3    COUNTY OF HONOLULU ON THAT, AS WELL.  I PERSONALLY AM NOT

 4    THAT DIRECTLY INVOLVED.  PEOPLE THAT WORK FOR ME WORK ON

 5    THOSE.

 6              MR. AARON:  YOU MENTIONED GETTING GRANT FUNDING.

 7    WAS THAT STATE AND FEDERAL FUNDS?

 8              PROSPECTIVE JUROR GRAY:  PRIMARILY FEDERAL FUNDS,

 9    UASI FUNDING.  AND THIS $650 MILLION PROJECT FOR THE LOS

10    ANGELES REGION IS PRIMARILY FROM THE HOMELAND SECURITY UASI

11    FUNDS.

12              MR. AARON:  OKAY.  SO, YOU'RE GETTING GRANT FUNDING

13    FROM THE FEDERAL AGENCY HOMELAND SECURITY?

14              PROSPECTIVE JUROR GRAY:  MM-HMM.

15              MR. AARON:  AND ABOUT HOW MUCH IS THAT, IF YOU CAN

16    ESTIMATE?

17              PROSPECTIVE JUROR GRAY:  HOW MUCH MONEY?  WELL,

18    RIGHT NOW OUR CONTRACT -- I CAN SPEAK SPECIFICALLY TO WHAT

19    OUR COMPANY IS BEING PAID.  WE ARE BEING PAID ABOUT $2.2

20    MILLION FOR THE NEXT SIX MONTHS TO COMPLETE AN ASSESSMENT OF

21    THE RADIO INFRASTRUCTURE CURRENTLY IN THE L.A. BASIN AND TO

22    CREATE SPECIFICATIONS TO GO OUT AND PROCURE A SOLUTION.

23              MR. AARON:  SO IT'S A LOT OF MONEY?

24              PROSPECTIVE JUROR GRAY:  THE OVERALL PROJECT IS

25    $650 MILLION, AND THAT'S GOING TO GO ON FOR ANOTHER FIVE
```

1    YEARS, AND WE ANTICIPATE BEING PART OF THAT.

2              MR. AARON:   OKAY.   SO YOUR COMPANY HAS SOME VESTED

3    INTEREST INVOLVING HOMELAND SECURITY?

4              PROSPECTIVE JUROR GRAY:   YEAH.

5              MR. AARON:   AND LOCAL LAW ENFORCEMENT, INCLUDING

6    RIVERSIDE COUNTY SHERIFF'S?

7              PROSPECTIVE JUROR GRAY:   RIGHT.   I HAVE PERSONALLY

8    BEEN -- APPEARED BEFORE THE CONGRESSIONAL COMMITTEE IN

9    WASHINGTON, ON ADA ISSUES AND OTHER ISSUES LIKE THAT.   SO, I

10   HAVE PARTICIPATED AT THE FEDERAL LEVEL ON FCC AND PUBLIC

11   SAFETY ISSUES.

12             MR. AARON:   DO THOSE INVOLVE THE U.S. MARSHALS, AS

13   WELL?

14             PROSPECTIVE JUROR GRAY:   NO.

15             MR. AARON:   BUT TURNING TO YOUR WORK WITH THE

16   HOMELAND SECURITY AND THE LOCAL LAW ENFORCEMENT, NOW WOULD IT

17   BE FAIR TO SAY THAT YOU HAVE HAD GOOD RELATIONSHIPS WITH

18   THOSE AGENCIES?

19             PROSPECTIVE JUROR GRAY:   YEAH, SOME.

20             MR. AARON:   WELL, YOU WOULDN'T WANT TO DO ANYTHING

21   THAT WOULD IMPAIR THOSE RELATIONSHIPS?

22             PROSPECTIVE JUROR GRAY:   AGAIN, I HAD A SITUATION

23   WHERE SHERIFF BACA GOT UP AND LEFT THE ROOM AFTER SOMETHING I

24   SAID.   IT WASN'T VERY PLEASANT FOR ME, EITHER.

25             MR. AARON:   ALL RIGHT.

1           PROSPECTIVE JUROR GRAY:  I BASICALLY TOLD HIM HIS

2    DEPARTMENT WAS IMPEDING THE PROCESS OF THE PROJECT.

3           MR. AARON:  ALL RIGHT.  WOULD IT BE FAIR TO SAY,

4    THOUGH, THAT YOU NEED TO RELY -- JUST LIKE THEY NEED TO RELY

5    ON YOU, YOU NEED TO RELY UPON THEM TO FULFILL THEIR END OF

6    THE CONTRACT?

7           PROSPECTIVE JUROR GRAY:  YES.  I MEAN, IF WE CAN'T

8    COME TO SOME SORT OF CONSENSUS, WE ARE NOT GOING TO GET

9    ANYTHING DONE.

10          MR. AARON:  AND IT IS A PRETTY IMPORTANT CONTRACT

11   FOR YOUR COMPANY?

12          PROSPECTIVE JUROR GRAY:  UM, IT IS NOT THE BIGGEST,

13   BUT FOR ME IT IS A FAIRLY SIZABLE PIECE OF WORK.

14          MR. AARON:  $650 MILLION?

15          PROSPECTIVE JUROR GRAY:  WE ARE NOT GOING TO GET

16   ALL OF THAT.  BUT WE'LL GET MAYBE $2 MILLION NOW, MAYBE,

17   HOPEFULLY, OVER THE NEXT 10 YEARS A SIZABLE AMOUNT.

18          MR. AARON:  AND THAT'S JUST INVOLVING THE HOMELAND

19   SECURITY?

20          PROSPECTIVE JUROR GRAY:  THAT'S JUST INVOLVING LOS

21   ANGELES.

22          MR. AARON:  OKAY.  I'M SORRY.  WHAT ABOUT HOMELAND

23   SECURITY?

24          PROSPECTIVE JUROR GRAY:  HOMELAND SECURITY IS

25   FUNDING THAT PROJECT.

1              MR. AARON:  OKAY.  THANK YOU.

2              PROSPECTIVE JUROR GRAY:  THERE IS, YOU KNOW, EVER

3    SINCE 9/11 THERE HAS BEEN A DRIVE TO CREATE INNER-OPERABILITY

4    BETWEEN AGENCIES.  THE PROJECT HERE AT L.A. RITT IS THE

5    PROJECT TO CREATE A SOLUTION FOR LOS ANGELES.

6              THERE IS ANOTHER PROJECT IN THE BAY AREA, INCLUDING

7    10 COUNTIES, CALLED SUPER UASI.  THAT'S ANOTHER

8    HALF-BILLION-DOLLAR PROJECT, TO CREATE INNER-OPERABILITY IN

9    THE BAY AREA.

10             I HAVE BEEN A REALLY STRONG ADVOCATE IN TAKING THIS

11   MORE TO THE STATE LEVEL.  I CONTINUE TO LOBBY UP IN

12   SACRAMENTO ON THESE ISSUES.

13             MR. AARON:  WHAT IF YOU ARE ON THIS CASE AND YOU

14   SEE AN AGENT OR AGENTS OF HOMELAND SECURITY, OF THAT FEDERAL

15   AGENCY TO COME IN AND TESTIFY?  HOW DO YOU THINK THAT WOULD

16   IMPACT YOU?

17             PROSPECTIVE JUROR GRAY:  I DON'T THINK IT WOULD

18   IMPACT ME AT ALL.

19             MR. AARON:  YOU DON'T THINK IT WOULD HAVE ANY

20   NEGATIVE EFFECT THAT YOU DISBELIEVED FEDERAL AGENTS?

21             PROSPECTIVE JUROR GRAY:  I REALLY DON'T.

22             MR. AARON:  NO, I'M SAYING IF IT HAD COME OUT TO

23   THE PEOPLE THAT YOU DEAL WITH THAT YOU HAD DISBELIEVED

24   FEDERAL AGENTS WHO YOU HAD CONTRACTED WITH, THAT WOULDN'T BE

25   A PROBLEM?

```
 1              PROSPECTIVE JUROR GRAY:  NO.

 2              MR. AARON:  THANK YOU.

 3              MR. MICHAEL:  NO QUESTIONS, YOUR HONOR.

 4              THE COURT:  THANK YOU.  THANK YOU.  YOU MAY GO BACK

 5     DOWN TO THE JURY ASSEMBLY ROOM.

 6         (PROSPECTIVE JUROR GRAY HAS EXITED THE COURTROOM.)

 7              LET'S TAKE ABOUT A FIVE-MINUTE RECESS.

 8                        (RECESS)

 9              MR. AARON:  YES, YOUR HONOR.  WE WOULD CHALLENGE

10     HIM FOR CAUSE.  HE IS A CONTRACTING PARTY WITH AN AGENCY THAT

11     EMPLOYS MOST OF THE WITNESSES IN THIS CASE.

12              MR. MICHAEL:  YOUR HONOR, I BELIEVE THAT MISSTATES

13     HIS STATEMENTS.  HE INDICATED HE GETS FUNDING.  HE

14     PARTICIPATES IN L.A. COUNTY, WHICH IS THE GRANTEE, AND HE

15     FACILITATES THE GRANT PROCESS AS A CONSULTANT.  IT DIDN'T

16     APPEAR TO THE GOVERNMENT THAT HE HAS ANY CONTRACT WITH THE

17     DEPARTMENT OF HOMELAND SECURITY, OR THAT HE RECEIVES FUNDS

18     DIRECTLY FROM THEM.  IT IS GRANTS SECURED BY LOCAL

19     AUTHORITIES WHO PAY HIS COMPANY AS A CONSULTANT.

20              IN ADDITION, HIS TESTIMONY WAS UNEQUIVOCAL, AND I

21     BELIEVE HE ANSWERED AS FORTHRIGHT AS WITH REGARD TO ANY OF

22     HIS ANSWERS AND QUICKLY AND WITH STRENGTH WHEN ASKED IF THAT

23     WOULD AFFECT HIS ABILITY TO JUDGE WITNESSES HERE.  AND HE

24     SAID THAT IT WOULD NOT AT ALL.

25              MR. AARON:  YOUR HONOR --
```

```
 1                  THE COURT:  WELL, GO AHEAD.

 2                  MR. AARON:  I'M SORRY TO INTERRUPT.

 3                  COUNSEL IS RIGHT.  HE IS NOT A CONTRACTING PARTY

 4    WITH HOMELAND SECURITY.  BUT THEY DO PAY, IF I UNDERSTAND HIS

 5    TESTIMONY CORRECTLY, THEY DO PAY FOR THE CONTRACT THAT HE HAS

 6    WITH THE COUNTY OFFICIALS AND THE OTHER AGENCIES.

 7                  THE COURT:  BUT HE IS A VICE-PRESIDENT OF THE

 8    COMPANY.  NOBODY ASKED HIM WHETHER HE IS EVEN A PRINCIPAL.

 9                  MY INCLINATION, BASED ON WHAT HE SAID, IS THAT HE

10    IS AN EMPLOYEE.  YOU COULD ASK HIM ABOUT THAT FURTHER WHEN HE

11    COMES UP WITH THE REST OF THE JURORS.

12                  I'M GOING TO DENY THE MOTION, THE CHALLENGE FOR

13    CAUSE, AT THIS TIME.

14                  LET'S TAKE ABOUT A SEVEN-MINUTE BREAK.

15                          (RECESS)

16                  THE COURT:  WE CAN BRING IN THE NEXT JUROR,

17    MR. HO.  WE CAN BRING HIM IN.

18                  MR. MICHAEL:  YOUR HONOR, WE'RE GOING TO QUESTION

19    ROSWITHA GREEN.  NO, SHE WAS NOT ON THE LIST.

20                  THE COURT:  SHE WAS?

21                  MR. MICHAEL:  NO, SHE WAS NOT.  EXCUSE ME.

22                  THE COURT:  SHE HAD ONE REMARK, BUT WE CAN ASK HER

23    ABOUT THAT WITH THE OTHERS PRESENT.

24         (PROSPECTIVE JUROR HO IS PRESENT IN THE COURTROOM.)

25                  THE COURT:  GOOD MORNING, MR. HO.
```

1              PROSPECTIVE JUROR HO:  GOOD MORNING.

2              THE COURT:  GO AHEAD AND HAVE A SEAT.

3              WE ARE TALKING TO MANY OF THE JURORS INDIVIDUALLY

4    BEFORE WE GET STARTED WITH TALKING TO THE WHOLE GROUP SO THAT

5    WE CAN ASK YOU SOME QUESTIONS ABOUT YOUR ANSWERS ON THE

6    QUESTIONNAIRE.

7              THE CASE THAT YOU'RE HERE FOR, AS I THINK YOU KNOW,

8    INVOLVES TWO SETS OF CHARGES.  THE FIRST SET INVOLVES CHARGES

9    OR ACCUSATIONS THAT THE DEFENDANT IN THIS CASE POSSESSED

10   CHILD PORNOGRAPHY.  AND THE SECOND SET OF CHARGES ARE

11   ACCUSATIONS INVOLVING THE MOLESTATION OR SEXUAL ASSAULT ON A

12   SEVEN-YEAR-OLD BOY.

13             AND YOU STATED, IN ANSWER TO THE QUESTIONS ON THE

14   QUESTIONNAIRE, THAT YOU DID NOT FEEL THAT YOU COULD BE FAIR

15   AND IMPARTIAL ON A CASE OF THIS KIND.  CAN YOU TELL ME A

16   LITTLE ABOUT THAT OR WHY YOU FEEL THAT YOU COULD NOT BE A

17   FAIR JUROR IN THIS CASE?

18             PROSPECTIVE JUROR HO:  ACTUALLY, MY ENGLISH

19   UNDERSTANDING, IT'S NOT VERY GOOD AND VERY CLEAR ON THING

20   LIKE THAT.  SO, MAYBE I DON'T UNDERSTAND VERY WELL.  SO, I

21   DIDN'T FIGURE OUT --

22             THE COURT:  WELL, WHAT DO YOU DO FOR A LIVING?

23             PROSPECTIVE JUROR HO:  I MOVE FOR -- I AM

24   MACHINE -- I WORK FOR AEROSPACE COMPANY.

25             THE COURT:  AND WHAT DO YOU DO FOR THEM?

1              PROSPECTIVE JUROR HO:  I AM MACHINE --

2              THE COURT:  I'M SORRY.  COULD YOU REPEAT THAT?

3              PROSPECTIVE JUROR HO:  I -- MACHINE, WORK WITH

4    MACHINE.

5              THE COURT:  I'M SORRY.  COULD YOU REPEAT THAT?

6              PROSPECTIVE JUROR HO:  I AM MACHINIST.

7              THE COURT:  YOU WORK ON MACHINERY?

8              PROSPECTIVE JUROR HO:  YES.

9              THE COURT:  HOW LONG HAVE YOU DONE THAT SORT OF

10   WORK?

11             PROSPECTIVE JUROR HO:  TWENTY-THREE YEAR.

12             THE COURT:  DO YOU SPEAK ENGLISH ON THE JOB?

13             PROSPECTIVE JUROR HO:  YES, I DO.

14             THE COURT:  HAVE YOU DONE THAT KIND OF WORK AT THE

15   SAME COMPANY FOR 22 YEARS?

16             PROSPECTIVE JUROR HO:  ACTUALLY, I START JOB AT

17   THAT COMPANY ABOUT 21 YEARS.

18             THE COURT:  SO YOU HAVE BEEN WORKING AT THAT JOB

19   AND SPEAKING ENGLISH ON THE JOB FOR MORE THAN 20 YEARS?

20             PROSPECTIVE JUROR HO:  YES.

21             THE COURT:  WELL, IN ANSWER TO THE QUESTION ON THE

22   QUESTIONNAIRE, YOU CIRCLED "NO," IN ANSWER TO THE QUESTION,

23   "COULD YOU BE A FAIR AND IMPARTIAL JUROR IN A CASE IF IT WAS

24   ALLEGED THAT THE DEFENDANT, OR THAT SOMEONE POSSESSED CHILD

25   PORNOGRAPHY?"

1           AND YOU ANSWERED "NO" TO THAT QUESTION.

2           CAN YOU TELL ME WHY YOU FEEL YOU COULDN'T BE FAIR

3    AND IMPARTIAL?

4           PROSPECTIVE JUROR HO:  BE HONESTLY, I'M NOT SURE

5    WHAT THE QUESTION IS ABOUT AND WHY THERE IS, YOU KNOW --

6    LIKE, I SPEAK IN MY JOB OR MY -- WHAT I DO IN THERE, LIKE

7    WHAT ABOUT THE, YOU KNOW, THE LAW THING, LIKE THAT, I DON'T

8    UNDERSTAND TOO MUCH ABOUT.

9           MR. AARON:  YOUR HONOR, I'M SORRY.  I COULDN'T

10   UNDERSTAND THAT ANSWER.

11          THE COURT:  WOULD YOU REPEAT YOUR LAST ANSWER,

12   MR. HO?

13          PROSPECTIVE JUROR HO:  PARDON?

14          THE COURT:  COULD YOU PLEASE REPEAT WHAT YOU JUST

15   SAID?

16          PROSPECTIVE JUROR HO:  I, LIKE, I SAY, YOU KNOW, I

17   SPEAK ENGLISH AT WORK, YES, I DO.  BUT MY LAW OR MY -- I

18   DON'T REALLY UNDERSTAND TOO MUCH ABOUT IT.  SO, BASICALLY,

19   DAILY I JUST SPEAK, LIKE, NO MORE, LIKE, YOU KNOW, LIKE,

20   SOCIALIZING.  I DON'T REALLY UNDERSTAND TOO WELL, TO BE

21   HONEST.

22          THE COURT:  EITHER SIDE WISH TO INQUIRE?

23          MR. AARON:  NO, YOUR HONOR.

24          MR. MICHAEL:  NO.

25          THE COURT:  ALL RIGHT.  THANK YOU, MR. HO.  YOU MAY

1   GO DOWNSTAIRS AND WAIT IN THE JURY ASSEMBLY ROOM.

2             PROSPECTIVE JUROR HO:  SORRY?

3             THE COURT:  THANK YOU VERY MUCH.

4             COUNSEL WILLING TO STIPULATE?

5             MR. AARON:  YES.

6             MR. MICHAEL:  YES.

7             THE COURT:  MR. HO, YOU ARE EXCUSED.  YOU MAY GO

8    BACK DOWNSTAIRS TO THE JURY ASSEMBLY ROOM AND TURN IN YOUR

9    BADGE.  AND YOU ARE EXCUSED FROM SERVING AS A JUROR ON THIS

10   CASE.  ALL RIGHT?

11            PROSPECTIVE JUROR HO:  SO I GO DOWNSTAIRS?

12            THE COURT:  AND TURN IN YOUR BADGE.  YOU'RE DONE.

13            PROSPECTIVE JUROR HO:  YES.

14            THE COURT:  ALL RIGHT.  THANK YOU.

15            PROSPECTIVE JUROR HO:  SORRY?

16            THE COURT:  THANK YOU VERY MUCH.

17          (PROSPECTIVE JUROR HO EXITS THE COURTROOM.)

18            THE COURT:  MR. HOFFMANN.

19            MR. AARON:  I THOUGHT MR. HOFFMANN WAS EXCUSED.

20            THE COURT:  OH, HE WAS EXCUSED.  THAT'S RIGHT.

21            MR. MICHAEL:  MS. JONES, YOUR HONOR.

22        (PROSPECTIVE JUROR JONES IS PRESENT IN THE COURTROOM.)

23            THE COURT:  JONES.  GOOD MORNING, MS. JONES.

24            PROSPECTIVE JUROR JONES:  GOOD MORNING.

25            THE COURT:  YOU CAN HAVE A SEAT ANYWHERE YOU LIKE.

1          BEFORE WE GET STARTED WITH THE WHOLE GROUP THIS

2    MORNING, WE ARE TAKING THE TIME TO TALK TO MANY OF THE JURORS

3    ONE BY ONE TO ASK YOU SOME FOLLOW-UP QUESTIONS ABOUT YOUR

4    ANSWERS ON THE QUESTIONNAIRE, TO GIVE YOU A LITTLE MORE

5    PRIVACY.  I JUST HAVE A COUPLE OF QUESTIONS FOR YOU.

6          YOU INDICATED THAT, ON YOUR QUESTIONNAIRE, THAT YOU

7    WERE AN INCEST SURVIVOR?

8          PROSPECTIVE JUROR JONES:  YES, MA'AM.

9          THE COURT:  SO, I TAKE IT, THAT WAS A FEW YEARS AGO

10   THAT THAT HAPPENED; YOU WERE A CHILD?

11         PROSPECTIVE JUROR JONES:  ABOUT 50 YEARS AGO.

12         THE COURT:  HOW OLD WERE YOU DURING THE PERIOD OF

13   TIME THAT YOU WERE MOLESTED BY YOUR FATHER?

14         PROSPECTIVE JUROR JONES:  EIGHT TO 18.

15         THE COURT:  ALL RIGHT.  SO, THAT'S A 10-YEAR

16   PERIOD.  WERE ANY CHARGES EVER BROUGHT IN CONNECTION WITH

17   THAT?

18         PROSPECTIVE JUROR JONES:  AT THAT TIME NOBODY --

19         THE COURT:  I KNOW.  THAT'S A VERY UNLIKELY THING.

20   I JUST HAVE TO ASK IT.

21         PROSPECTIVE JUROR JONES:  NOBODY WOULD HAVE

22   BELIEVED IT.  NOBODY WOULD HAVE CARED.  THE COURTS DIDN'T DO

23   THIS IN TEXAS, OKAY.

24         THE COURT:  SO I GUESS YOUR ANSWER IS NO?

25         PROSPECTIVE JUROR JONES:  NO.

1          THE COURT:  THANK YOU.  AND YOU INDICATED ON YOUR

2   QUESTIONNAIRE THAT YOU THOUGHT THAT YOU COULD BE A FAIR AND

3   IMPARTIAL JUROR IF YOU WERE SELECTED ON THIS CASE, AND YOU

4   COULD BE FAIR TO BOTH SIDES?

5          PROSPECTIVE JUROR JONES:  YES.

6          THE COURT:  STILL FEEL THAT WAY?

7          PROSPECTIVE JUROR JONES:  I KNOW WHAT IT IS LIKE TO

8   BE ACCUSED OF SOMETHING YOU HAVEN'T DONE, OKAY, IN RELATION

9   TO THIS INCEST.  AND, YOU KNOW, IT CUTS BOTH WAYS.

10          THE COURT:  SO THE PRESUMPTION OF INNOCENCE THAT I

11   TALKED ABOUT WHEN EVERYONE WAS HERE A COUPLE OF WEEKS AGO,

12   THAT APPLIES TO EVERYONE WHO IS ACCUSED OF ANY KIND OF A

13   CRIME, WHETHER IT'S THE KIND OF CHARGES IN THIS CASE, OR A

14   TRAFFIC VIOLATION, OR A BANK ROBBERY.  IT APPLIES IN ALL

15   CASES.

16          YOU WOULD NOT HAVE ANY DIFFICULTY TO APPLYING IT TO

17   THE DEFENDANT IN THIS CASE?

18          PROSPECTIVE JUROR JONES:  NO.

19          THE COURT:  NOW, WHEN YOU SAY YOU KNOW WHAT IT'S

20   LIKE TO BE ACCUSED, CAN YOU TELL ME A LITTLE BIT MORE ABOUT

21   THAT?

22          PROSPECTIVE JUROR JONES:  HOW DOES AN

23   EIGHT-YEAR-OLD GIRL SEDUCE HER FATHER, OKAY?

24          THE COURT:  SO WERE YOU ACCUSED OF THAT?

25          PROSPECTIVE JUROR JONES:  YES, MA'AM.  I WAS

1    ACCUSED OF THAT.  IT WAS ALL MY FAULT.  AND I JUST KNOW WHAT

2    IT'S LIKE TO BE ACCUSED AND BE INNOCENT, BUT, YET, YOU WEAR

3    THE TAG ANYHOW.

4            THE COURT:  NOW, WAS THIS SOMETHING THAT YOUR

5    FATHER ACCUSED YOU OF OR LED YOU TO BELIEVE, TOLD YOU?

6            PROSPECTIVE JUROR JONES:  EVERYBODY.

7            THE COURT:  SO OTHER PEOPLE FOUND OUT ABOUT THIS?

8            PROSPECTIVE JUROR JONES:  WHERE I CAME FROM IT WAS

9    LIKE A CULT.  THE ONLY PEOPLE THAT MATTERED WERE THE GUYS.

10   WHATEVER ANY MAN WANTED ANY GIRL OR WOMAN TO DO, SHE DID IT.

11   THERE WAS NO QUESTIONS.  YOU WERE LIKE A COW OR A HORSE.  YOU

12   WERE PROPERTY.  ALL OF THE RELATIVES KNEW.  THIS WAS JUST --

13   THIS WAS HOW IT WAS.

14           THE COURT:  THERE COULD BE TESTIMONY IN THIS CASE

15   ABOUT THE SAME KINDS OF THINGS, VERY SIMILAR TO WHAT YOU'RE

16   JUST DESCRIBING.  EVIDENCE, FOR EXAMPLE, ABOUT THE DIFFERENT

17   PEOPLE, NOT JUST -- WELL, DIFFERENT PEOPLE DISCUSSING

18   CHILDREN, AND THAT CHILDREN ARE SEDUCERS, FOR EXAMPLE.

19           WOULD IT BE UPSETTING TO YOU TO SEE AND HEAR THAT

20   KIND OF EVIDENCE ABOUT THOSE KINDS OF -- LET'S SAY,

21   ACCUSATIONS AGAINST CHILDREN, GIVEN WHAT YOU HAVE BEEN

22   THROUGH?

23           PROSPECTIVE JUROR JONES:  TO BE PERFECTLY HONEST,

24   I'D PROBABLY SAY YOU'RE A DAMN LIAR IF YOU'RE ACCUSING A

25   LITTLE CHILD OF SEDUCING ANYBODY BECAUSE THEY DON'T KNOW HOW.

1    THAT'S MY OPINION, ANYWAY.

2              THE COURT:  WELL, YOUR OPINION IS WHAT WE ARE

3    INTERESTED IN.

4              PROSPECTIVE JUROR JONES:  OKAY.  THEN, NO, I DON'T

5    BELIEVE IT IS POSSIBLE.  LITTLE CHILDREN ARE INNOCENT.

6              THE COURT:  WOULD IT BE DISTURBING TO YOU TO EVEN

7    HAVE TO LISTEN TO THIS KIND OF EVIDENCE OR SEE THAT KIND OF

8    EVIDENCE?  OR WOULD YOU -- LET ME ASK THE QUESTION ANOTHER

9    WAY.  OR WOULD YOU BE ABLE TO VIEW IT AND SET ASIDE YOUR OWN

10   EXPERIENCES AND DECIDE THE CASE BASED ON THE EVIDENCE AND THE

11   LAW AS THE COURT GIVES IT TO YOU?  OR WOULD THAT BE PAINFUL

12   OR DIFFICULT FOR YOU TO THE POINT WHERE YOU MIGHT NOT BE ABLE

13   TO BE DISPASSIONATE AND IMPARTIAL?

14             PROSPECTIVE JUROR JONES:  I THINK I WOULD SEE IT

15   JUST AS -- HOW DO I SAY THIS -- AS A DISTANT RELATIVE.  THIS

16   IS WHAT MY RELATIVES DID, AND THIS IS HOW I HAVE ALWAYS

17   MENTALLY HANDLED THIS STUFF:  YOU'RE LIKE MY FATHER.  YOU'RE

18   LIKE MY GRANDFATHER.

19             AND THERE IS NO EMOTION INVOLVED HERE.  THIS IS

20   JUST HOW IT IS.

21             THE COURT:  ALL RIGHT.

22             PROSPECTIVE JUROR JONES:  BUT I ALSO BELIEVE THAT

23   SOMEBODY BEING ACCUSED -- THIS IS TERRIBLE.  THIS IS SERIOUS.

24   AND SOMEBODY'S LIFE CAN BE TOTALLY RUINED BY ACCUSATIONS.

25   AND I THINK IT'S WORSE FOR SOMEBODY'S LIFE TO BE RUINED

1    THAT'S INNOCENT, THAN WHAT HAPPENED TO ME.  I SURVIVED.

2           THE COURT:  ONE OF THE WAYS THAT I ASK THIS

3    QUESTION IS TO GIVE AN EXAMPLE.  I ASKED SOME OF THE OTHER

4    JURORS A QUESTION LIKE THIS, AND I WAS A LITTLE HESITANT TO

5    DO THIS BECAUSE IT'S NOT A PERFECT EXAMPLE, SO BEAR WITH ME.

6           IN EVERY CRIMINAL CASE, IT DOESN'T MATTER WHAT THE

7    CRIME IS.  THE CRIME COULD BE, THAT THE PERSON IS ACCUSED OF

8    COMMITTING, COULD BE ANYTHING FROM JAYWALKING, TO A TRAFFIC

9    VIOLATION, TO A BANK ROBBERY, TO A FINANCIAL CRIME LIKE THE

10   ENRON CASE, TO MURDER, TO HAVING TOO MANY CATS AND DOGS ON

11   YOUR PROPERTY, TO A CRIME LIKE THIS ONE.  AND ALL OF THOSE

12   CASES HAVE ONE THING IN COMMON, OR AT LEAST ONE THING IN

13   COMMON, AND THAT IS, THE PERSON WHO IS ACCUSED OF THOSE

14   DIFFERENT TYPE OF CRIMES IS ENTITLED TO THE SAME PRESUMPTION

15   OF INNOCENCE UNLESS AND UNTIL THE GOVERNMENT PROVES THEIR

16   GUILT BEYOND A REASONABLE DOUBT.

17          DO YOU AGREE WITH THAT?

18          PROSPECTIVE JUROR JONES:  YES.

19          THE COURT:  WOULD YOU BE ABLE TO APPLY THE

20   PRESUMPTION OF INNOCENCE TO THE DEFENDANT IN THIS CASE

21   THROUGHOUT THE TRIAL?

22          PROSPECTIVE JUROR JONES:  YES.

23          THE COURT:  DO YOU HAVE ANY DOUBTS AT THIS TIME?

24   DO YOU HAVE ANY DOUBTS ABOUT YOUR ABILITY TO DO THAT?

25          PROSPECTIVE JUROR JONES:  NO.

1          THE COURT:  THANK YOU VERY MUCH, MS. JONES.  BUT --

2   I'M SORRY.  DON'T LEAVE QUITE YET BECAUSE THE ATTORNEYS MIGHT

3   HAVE A FEW QUESTIONS TO ASK OF YOU, TOO.

4          MR. AARON, DO YOU HAVE ANY QUESTIONS?

5          MR. AARON:  THANK YOU.

6          GOOD MORNING, MA'AM.  YOU HAD MENTIONED THAT, IN A

7   CERTAIN TIME OF YOUR DISCUSSION WITH THE JUDGE, YOU MENTIONED

8   THAT AT THAT TIME WHERE YOU GREW UP A WOMAN OR A GIRL WAS

9   PROPERTY, LIKE A HORSE OR A COW?

10         PROSPECTIVE JUROR JONES:  YES.

11         MR. AARON:  WHERE WAS THAT?

12         PROSPECTIVE JUROR JONES:  OKLAHOMA, TEXAS.

13         MR. AARON:  ABOUT 50 YEARS AGO?

14         PROSPECTIVE JUROR:  I'M 67, AND THIS TOOK PLACE

15   FROM THE TIME I WAS EIGHT.

16         MR. AARON:  IN THIS CASE THERE IS GOING TO BE A LOT

17   OF EVIDENCE ABOUT CONVERSATIONS ON THE INTERNET, THINGS LIKE

18   THAT, WHICH WE'RE GOING TO MAINTAIN -- THE DEFENSE IS GOING

19   TO SAY THAT'S FANTASY; THE PROSECUTION IS GOING TO SAY THAT

20   SHOWS MR. SANDERS' INTENT, AND OTHER THINGS, IN RELATION TO

21   HIM WANTING TO HAVE SEX WITH YOUNG CHILDREN.  WE'RE GOING TO

22   CLAIM THAT IS JUST FANTASY.

23         WHAT I'M CURIOUS ABOUT IS HOW YOU MIGHT REACT TO

24   THAT SORT OF EVIDENCE.  DO YOU THINK THAT BECAUSE OF YOUR

25   EXPERIENCES THAT EVIDENCE MIGHT HAVE SOME SORT OF EMOTIONAL

1    REACTION FOR YOU?

2              MR. MICHAEL:  YOUR HONOR, WE WOULD OBJECT TO THAT

3    QUESTION.

4              PROSPECTIVE JUROR JONES:  LET ME SAY THIS --

5              THE COURT:  OVERRULED.

6              PROSPECTIVE JUROR JONES:  IF YOU CONVINCE ME HE IS

7    INNOCENT, I'M YOUR BEST ALLY.  BUT IF HE CONVINCES THAT HE IS

8    GUILTY, I WILL BURN HIM IN A HEARTBEAT.

9              THE COURT:  OKAY.  MS. JONES, LET ME ASK YOU THIS:

10   ONE OF THE INSTRUCTIONS THAT THE JURORS WOULD RECEIVE IN THIS

11   CASE IS THAT THE GOVERNMENT HAS THE BURDEN OF PROVING THAT

12   THE DEFENDANT IS GUILTY BEYOND A REASONABLE DOUBT.  YOU'RE

13   FAMILIAR WITH THAT IDEA?

14             PROSPECTIVE JUROR JONES:  MM-HMM.

15             THE COURT:  AND ANOTHER THING THAT'S SORT OF

16   CONNECTED TO THAT IS THAT THE DEFENDANT DOESN'T HAVE TO PROVE

17   HE IS INNOCENT.

18             DO YOU UNDERSTAND THAT?

19             PROSPECTIVE JUROR JONES:  OKAY.

20             THE COURT:  BECAUSE THE DEFENDANT DOESN'T HAVE TO

21   TAKE THE WITNESS STAND TO TESTIFY, THE DEFENDANT DOESN'T HAVE

22   TO DO ANYTHING BECAUSE, FIRST, THE GOVERNMENT HAS TO PROVE --

23   FIRST AND FOREMOST, THE GOVERNMENT HAS TO PROVE THE DEFENDANT

24   IS GUILTY.  THE BURDEN IS ON THE GOVERNMENT --

25             PROSPECTIVE JUROR JONES:  OKAY.

1          THE COURT:  -- TO SHOW THAT ANY PERSON THAT'S

2     ACCUSED OF A CRIME IS GUILTY.

3          DO YOU UNDERSTAND THAT?

4          PROSPECTIVE JUROR JONES:  YES.

5          THE COURT:  SO WHEN YOU SAID A MOMENT AGO THAT THE

6     DEFENSE, IF THEY PROVE HE IS INNOCENT YOU'RE THEIR BEST ALLY,

7     THE DEFENSE DOESN'T HAVE TO PROVE THAT HE IS INNOCENT.

8          PROSPECTIVE JUROR JONES:  OKAY.  THEY JUST HAVE TO

9     PROVE HE IS GUILTY.

10         THE COURT:  EXACTLY.  AND IF THEY DON'T PROVE HE'S

11    GUILTY -- "THEY," MEANING THE GOVERNMENT -- THEN THE JURY --

12    IF THEY DON'T PROVE HE IS GUILTY BEYOND A REASONABLE DOUBT,

13    THEN THE JURY MUST VOTE TO FIND HIM NOT GUILTY.

14         PROSPECTIVE JUROR JONES:  YES.

15         THE COURT:  DO YOU AGREE WITH THAT?

16         PROSPECTIVE JUROR JONES:  YES.

17         THE COURT:  WHETHER OR NOT THE DEFENDANT HAS PROVED

18    HIMSELF INNOCENT.

19         DO YOU AGREE WITH THAT?

20         PROSPECTIVE JUROR JONES:  YES.

21         THE COURT:  DO YOU UNDERSTAND THE DIFFERENCE?

22         PROSPECTIVE JUROR JONES:  YES.

23         THE COURT:  I'M SORRY.  GO AHEAD, MR. AARON.

24         MR. AARON:  THANK YOU.  ONE MORE QUESTION ON THAT

25    POINT.

1        LET'S SAY THE GOVERNMENT HASN'T PROVEN HIM,

2    MR. SANDERS, GUILTY BEYOND A REASONABLE DOUBT, BUT THERE IS

3    SOME EVIDENCE OF GUILT.  AND YOU LOOK AT IT AND YOU SAY,

4    THERE IS SOME EVIDENCE OF GUILT, BUT THERE IS NOT GUILT

5    BEYOND A REASONABLE DOUBT.

6            WOULD YOU STILL BE ABLE TO VOTE NOT GUILTY?

7            PROSPECTIVE JUROR JONES:  I DON'T UNDERSTAND THAT.

8        MR. AARON:  THERE IS A BURDEN OF PROOF.  THAT'S

9    WHAT WE'RE TALKING ABOUT WHEN WE SAY "PROOF BEYOND A

10   REASONABLE DOUBT."  IN OTHER WORDS, THEY HAVE TO CONVINCE

11   YOU, NOT JUST THAT HE'S GUILTY, BUT YOU CAN'T HAVE ANY

12   REASONABLE DOUBT THAT HE'S GUILTY.

13           DO YOU UNDERSTAND THAT?

14           PROSPECTIVE JUROR JONES:  MM-HMM.

15       MR. AARON:  LET'S JUST SAY YOU KIND OF SUSPECT, YOU

16   HAVE A NAGGING SUSPICION IN THE BACK OF YOUR MIND "I THINK HE

17   IS GUILTY, BUT THEY HAVEN'T PROVEN IT TO ME BEYOND A

18   REASONABLE DOUBT."

19           DO YOU UNDERSTAND THAT?

20           PROSPECTIVE JUROR JONES:  YES.

21       MR. AARON:  WOULD YOU STILL BE ABLE TO VOTE NOT

22   GUILTY IN THAT SITUATION?

23           PROSPECTIVE JUROR JONES:  IF I BELIEVED HE WAS

24   INNOCENT, YES.

25       MR. AARON:  WELL, WHAT I'M SAYING IS, LET'S SAY YOU

 1    SUSPECTED -- LET'S SAY YOU HAD A NAGGING SUSPICION OR SOME

 2    BELIEF THAT HE WAS GUILTY, BUT IT WASN'T BEYOND A REASONABLE

 3    DOUBT.

 4            DO YOU UNDERSTAND WHAT I'M SAYING?

 5            PROSPECTIVE JUROR JONES:  YES.

 6            MR. AARON:  WOULD YOU, IN THAT SITUATION, BE ABLE

 7    TO VOTE NOT GUILTY?

 8            THE COURT:  YOU KNOW WHAT?  THIS IS NOT MEANT TO BE

 9    A QUIZ.  LET ME DO SOMETHING RIGHT NOW, MS. JONES.  I'M GOING

10    TO READ THIS TO ALL THE JURORS.  I'M GOING TO READ YOU WHAT

11    THE DEFINITION IS OF BEYOND A REASONABLE DOUBT, SO THAT WILL

12    MAKE IT A LITTLE EASIER FOR YOU.

13            PROSPECTIVE JUROR JONES:  OKAY.

14            THE COURT:  PROOF BEYOND A REASONABLE DOUBT IS

15    PROOF THAT LEAVES YOU FIRMLY CONVINCED THAT THE DEFENDANT IS

16    GUILTY.

17            IT IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT

18    BEYOND ALL POSSIBLE DOUBT.  A REASONABLE DOUBT IS A DOUBT

19    BASED UPON REASON AND COMMON SENSE.  IT IS NOT BASED PURELY

20    ON SPECULATION.

21            REASONABLE DOUBT MAY ARISE FROM THE CAREFUL AND

22    IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE, OR FROM A

23    LACK OF EVIDENCE.  SO, IF, AFTER A CAREFUL AND IMPARTIAL

24    CONSIDERATION OF ALL THE EVIDENCE, YOU'RE NOT CONVINCED

25    BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, THEN

1    IT IS YOUR DUTY TO FIND THE DEFENDANT NOT GUILTY.

2              AND, ON THE OTHER HAND, IF, AFTER A CAREFUL AND

3    IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE YOU ARE

4    CONVINCED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS

5    GUILTY, THEN IT IS YOUR DUTY TO FIND THE DEFENDANT GUILTY.

6              BUT YOU NOTICE THAT IN THAT INSTRUCTION THERE IS

7    NOTHING IN THERE -- WELL, THERE IS NO USE OF THE WORD

8    "INNOCENT."  SO NOBODY HAS TO PROVE INNOCENCE.  THE

9    GOVERNMENT HAS TO PROVE THE DEFENDANT IS GUILTY BEYOND A

10   REASONABLE DOUBT.

11             PROSPECTIVE JUROR JONES:  GOT IT.

12             THE COURT:  OKAY.  BY THE WAY, IF YOU ARE SEATED AS

13   A JUROR ON THE CASE, YOU WILL HAVE A COPY OF THIS INSTRUCTION

14   AND ALL THE INSTRUCTIONS IN WRITING DURING THE COURSE OF THE

15   TRIAL.  SO IF YOU NEED TO REFRESH YOUR MEMORY ABOUT WHAT THIS

16   OR ANY OF THE OTHER INSTRUCTIONS ARE, IT IS NOT A MEMORY

17   CONTEST.  MANY OF US WOULD FAIL IF IT WAS.  THAT'S WHY I HAD

18   TO LOOK IT UP BEFORE I READ IT TO YOU.

19             BUT KEEPING THAT IN MIND ABOUT WHAT THIS DEFINITION

20   OF REASONABLE DOUBT IS, YOU UNDERSTAND THAT THE DEFENDANT

21   DOESN'T HAVE TO PROVE HIS INNOCENCE?

22             PROSPECTIVE JUROR JONES:  YES.

23             THE COURT:  AND I THINK WHAT MR. AARON WAS ASKING

24   YOU A MOMENT AGO IS, THAT IF AT THE END OF THE TRIAL, EVEN IF

25   THERE HAD BEEN SOME EVIDENCE OF GUILT BUT IN YOUR MIND NOT

1    ENOUGH TO BE PROOF BEYOND A REASONABLE DOUBT OF GUILT, WOULD

2    YOU BE ABLE TO VOTE NOT GUILTY?

3                 PROSPECTIVE JUROR JONES:  YES.

4                 THE COURT:  MR. AARON, DO YOU HAVE ANYTHING

5    FURTHER?

6                 MR. AARON:  NOTHING, YOUR HONOR.  THANK YOU.

7                 THE COURT:  MR. MICHAEL?

8                 MR. MICHAEL:  NO, YOUR HONOR.  NO QUESTIONS.

9                 THE COURT:  MS. JONES, THANK YOU FOR YOUR PATIENCE

10   WITH OUR QUESTIONS, AND THANK YOU FOR COMING IN.  AND YOU MAY

11   GO BACK DOWN TO THE JURY ASSEMBLY ROOM.

12                 PROSPECTIVE JUROR JONES:  THANK YOU.

13                 THE COURT:  YOU'RE WELCOME.

14        (PROSPECTIVE JUROR JONES EXITS THE COURTROOM.)

15                 THE COURT:  MS. RAMIREZ HAS ARRIVED.  HE WAS ONE OF

16   OUR MISSING JURORS.

17                 WE HAVEN'T HEARD FROM MS. GOUPIL.

18                 EITHER SIDE HAVE A MOTION AS TO MS. JONES?

19                 MR. AARON:  WE'LL CHALLENGE HER FOR CAUSE, YOUR

20   HONOR.

21                 WE WILL CHALLENGE HER BECAUSE WE BELIEVE SHE HAS

22   GOT PRECONCEIVED OPINIONS REGARDING THE TESTIMONY OF THE

23   REMARK AND THE BEHAVIOR OF LITTLE CHILDREN.  WE ALSO DON'T

24   BELIEVE -- ALTHOUGH, SHE DID SAY THAT SHE COULD VOTE NOT

25   GUILTY IF THERE WAS SOME EVIDENCE OF GUILT BUT IT DIDN'T RISE

1   TO PROOF BEYOND A REASONABLE DOUBT.  WE BELIEVE THAT WAS ONLY

2   AFTER EXTENSIVE PRODDING.  WE DON'T BELIEVE THAT THE JUROR

3   ACTUALLY UNDERSTANDS THE CONCEPT, LET ALONE FOLLOW IT.

4          THE COURT:  AS TO THE LAST GROUND FOR YOUR

5   CHALLENGE, I WOULD DENY IT ON THAT GROUND.  I THINK THAT

6   ACTUALLY THIS JUROR WAS MORE CANDID THAN -- WELL, WAS VERY

7   CANDID ABOUT HER UNDERSTANDING -- WELL, HER MISUNDERSTANDING,

8   INITIALLY, ABOUT THE BURDEN.  AND I HAVE TO RESPECTFULLY

9   DISAGREE.  I DON'T THINK THAT MY QUESTIONING OF HER WAS

10  PRODDING BUT AN EXPLANATION ABOUT THE LAW.  AND ONCE THE LAW

11  WAS EXPLAINED TO HER --

12         MR. AARON:  I DIDN'T MEAN THAT THE COURT WAS

13  PUTTING WORDS IN HER MOUTH.  I MEANT THAT BOTH COUNSEL AND

14  THE COURT HAD TO QUESTION HER EXTENSIVELY BEFORE SHE

15  UNDERSTOOD THE CONCEPT.  AND IN THE PROCESS OF DOING THAT --

16         THE COURT:  BUT MANY LAY PEOPLE ARE OF THE

17  MISCONCEPTION THAT A DEFENDANT HAS TO PROVE INNOCENCE.  AND

18  IT WAS A MISCONCEPTION AND A MISUNDERSTANDING ON HER PART.

19         BUT ONCE, I THINK, THAT MISUNDERSTANDING WAS DEALT

20  WITH, I THINK SHE WAS UNEQUIVOCAL ABOUT HER ABILITY TO FOLLOW

21  THE COURT'S INSTRUCTIONS AND APPLY THE PRESUMPTION OF

22  INNOCENCE AND THE BURDEN OF PROOF.

23         NOW, THE FIRST GROUND IS MORE TROUBLING TO ME

24  BECAUSE IT GOES RIGHT TO ONE OF THE KEY AREAS IN HERE ABOUT

25  HER BELIEFS ABOUT ACCUSATIONS OF CHILDREN SEDUCING ADULTS.

1          DO YOU WISH TO ADDRESS THAT AREA?

2          MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD

3     SUBMIT THAT SHE INDICATED A STRONG VIEW AS TO WHAT SORT OF

4     WEIGHT SHE WOULD GIVE A STATEMENT LIKE THAT.

5          THE GOVERNMENT WOULD SUBMIT THAT IT APPEARED, AT

6     TIMES, DEFENSE COUNSEL WAS ARGUING THE CASE AND NOT

7     PRESENTING ALL OF THE FACTS TO HER IN A WAY THAT ALLOWED HER

8     TO MAKE A MEANINGFUL ASSESSMENT.

9          WHAT THE GOVERNMENT TOOK OF HER STATEMENT WAS THAT

10    SHE WILL DO WHAT ALL JURORS ARE ASKED TO DO AT THE END OF THE

11    TRIAL.  THEY WILL ASSESS THE EVIDENCE AND USE THEIR COMMON

12    SENSE AND BRING THEIR EXPERIENCE IN LIFE TO BEAR IN JUDGING

13    THE CREDIBILITY OF WITNESSES.  AND SHE WILL BE ENTITLED TO

14    INCLUDE THAT SUCH A STATEMENT LIKE THAT IS NOT A TRUTHFUL

15    STATEMENT OR ONE THAT SHE IS NOT GOING TO ACCEPT.

16         IF THAT'S ALL SHE SAID, THOUGH, THEN THE GOVERNMENT

17    WOULD SHARE THE COURT'S CONCERNS BECAUSE SHE DID, IN

18    ADDITIONAL VOIR DIRE, INDICATED THAT HER OWN PERSONAL

19    EXPERIENCE AND BIASES ULTIMATELY DON'T WEIGH -- OUTWEIGH THE

20    DEFENDANT'S RIGHT TO HAVE THE GOVERNMENT GIVE HIM A FAIR

21    TRIAL; THAT AN INNOCENT LIFE SHOULD NOT BE RUINED, AND THAT

22    IT IS THE GOVERNMENT'S BURDEN.

23         THE GOVERNMENT UNDERSTOOD HER TESTIMONY THAT SHE

24    UNDERSTOOD THE LAW AFTER IT WAS EXPLAINED TO HER AND

25    INDICATED A CLEAR WILLINGNESS TO FOLLOW IT.

1        IN ADDITION, YOU KNOW, THE ISSUE OF THAT THERE IS

2   NO DEFENSE BEING RAISED IN THIS CASE ABOUT WHETHER OR NOT THE

3   VICTIM WAS THE SEDUCER, SO I JUST DON'T EVEN KNOW IF THAT'S

4   -- I KNOW THAT THERE IS STATEMENTS ABOUT THAT.  I DON'T KNOW

5   IF THAT'S BEING RAISED AS A DEFENSE IN THE CASE.  I DON'T

6   KNOW IF SHE IS PREJUDGING THE DEFENSE IN THE CASE, OTHER THAN

7   SHE INDICATED SHE WOULD HAVE A RESPONSE TO STATEMENTS THAT

8   MIGHT HAVE BEEN SET FORTH IN THE CHATS.

9        THE COURT:  WELL, WHAT CONCERNS ME ABOUT THAT IS

10  IF THE DEFENSE IS GOING TO CALL KALEN, THOSE KINDS OF

11  STATEMENTS COULD BE USED TO ATTACK HIS CREDIBILITY.  I DON'T

12  KNOW IF THE DEFENSE IS PLANNING TO DO THAT.  BUT FROM SOME OF

13  THE REMARKS THAT WERE MADE YESTERDAY -- I MEAN, LAST WEEK,

14  REGARDING THE USE OF -- WELL, THE USE OF SOME OF THAT

15  EVIDENCE, AND IT IS CERTAINLY PRESENT IN THE CHAT ROOM

16  EVIDENCE -- IT SEEMS TO ME THAT THAT'S AN ISSUE IN THE CASE.

17       MR. AARON:  THERE IS A RELATED ISSUE, AS WELL, AND

18  THAT INVOLVES TESTIMONY OF SPECIAL AGENT CLEMENTE AND CHARLES

19  SUTHERLAND, WHERE I BELIEVE THE PROSECUTION IS GOING TO TRY

20  AND SHOW THAT MY CLIENT WAS GROOMING THIS CHILD.  IN OTHER

21  WORDS, TEACHING HIM BEHAVIORS THAT WERE INAPPROPRIATE.

22  WHEREAS, WE MAINTAIN -- AND I THINK THE EVIDENCE WILL SHOW --

23  THAT THE CHILD ON HIS OWN DID THESE BEHAVIORS.

24       AND THAT, I THINK, IS ANALOGOUS TO WHAT THIS LADY

25  IS SPEAKING ON WHEN SHE IS TALKING ABOUT HOW SHE WAS ACCUSED

1    OF BEING THE SEDUCER.  IT MIGHT BE THE SAME SORT OF THING

2    HERE.

3              MR. MICHAEL:  I'M SORRY, YOUR HONOR.

4              THE COURT:  GO AHEAD.

5              MR. MICHAEL:  THAT IS NOT A DEFENSE --

6              THE COURT:  IT IS NOT A DEFENSE.

7              MR. MICHAEL:  I UNDERSTAND THAT IT IS AN ISSUE THAT

8    YOUR HONOR BELIEVES IS AT PLAY IN THIS CASE.  THE GOVERNMENT

9    TOOK HER TESTIMONY AFTER HER INITIAL STRONG STATEMENT THAT,

10   YOU KNOW, IF A CHILD WAS ACCUSED OF BEING THE SEDUCER, SHE

11   WOULDN'T ACCEPT THAT STATEMENT AS TRUTHFUL.  AND SHE WOULD BE

12   ENTITLED TO COME TO THAT CONCLUSION UPON DELIBERATIONS.  AND

13   THE GOVERNMENT DID NOT BELIEVE THAT SHE WAS SAYING SHE WOULD

14   -- BECAUSE OF THAT BELIEF -- NOT SIT WITH AN OPEN MIND.

15             SHE MADE IT VERY CLEAR THAT SHE WOULD BE IMPARTIAL

16   AND FAIR AND FOLLOW THE COURT'S INSTRUCTIONS.  EVEN THOUGH

17   SHE WAS PROBED EXTENSIVELY ABOUT IT, AND WHEN SHOWN HER

18   MISUNDERSTANDING ABOUT THE LAW, SHE APPEARED TO HAVE A

19   WILLINGNESS TO ACCEPT THE LAW.

20             THE COURT:  ON THE MISUNDERSTANDING ABOUT THE

21   BURDEN OF PROOF, I'M NOT CONCERNED.  BECAUSE WHEN SHE WAS

22   TOLD ABOUT WHAT THE LAW WAS ON THAT, I THINK SHE UNDERSTOOD

23   IT AND SHE ACCEPTED IT.

24             BUT ON THIS ISSUE, SHE REALLY -- THERE WAS ONE

25   OTHER THING SHE SAID THAT I THINK IS RELEVANT ON THIS ISSUE

1   ABOUT WHETHER HER MIND, WHETHER SHE WOULD CONSIDER THE

2   EVIDENCE IMPARTIALLY.  AND THAT WAS, SHE SAID THAT SHE HAD

3   DEALT WITH THIS THROUGHOUT HER LIFE, HER SITUATION, OR THE

4   CRIME THAT WAS COMMITTED ON HER BY HER FATHER, BY I THINK SHE

5   SAID, ACTING AS THOUGH IT HAPPENED TO ANOTHER PERSON AND SORT

6   OF ASSIGNING ROLES TO OTHER PERSONS.

7           AND IN CONNECTION WITH THAT, SHE SAID SOMEBODY IS

8   HER FATHER AND SOMEBODY IS HER GRANDFATHER, WHICH MADE ME

9   CONCERNED THAT SHE WAS IN THE COURSE OF DEALING WITH IT BY

10  ASSIGNING ROLES, WHETHER SHE WOULD BE ASSIGNING ROLES IN THIS

11  CASE TO THE VICTIM, THE DEFENDANT, AND SO FORTH.

12          MR. MICHAEL:  MAY I ADDRESS THAT POINT, YOUR HONOR?

13          THE COURT:  YES.

14          MR. MICHAEL:  I BELIEVE THAT EXCHANGE -- THE

15  GOVERNMENT RECALLS IT IN RESPONSE TO A QUESTION FROM THE

16  COURT ABOUT WHETHER OR NOT SHE WOULD BE ABLE TO VIEW THE

17  EVIDENCE AND SET ASIDE HER OWN PERSONAL VIEWS.

18          HER RESPONSE WAS, FIRST, INDICATING HOW SHE HAD

19  LIVED HER LIFE, AS EVERYBODY DOES.  WE DRAW UPON OUR OWN

20  PERSONAL EXPERIENCE AS HOW WE DEAL WITH FUTURE SITUATIONS.

21  BUT IT WAS IMMEDIATELY AFTER THAT SHE INDICATED THE

22  DEFENDANT'S LIFE CAN BE RUINED BY ACCUSATIONS ALONE, AND THAT

23  IT WOULD BE WORSE TO RUIN AN INNOCENT LIFE THAN WHAT HAPPENED

24  TO HER; SHE SURVIVED.

25          SHE APPEARED, TO THE GOVERNMENT, TO DRAW ON THE

1    DISTINCTION THAT, THIS IS HOW I LIVED MY LIFE, AS ANY PERSON

2    WOULD HAVE DRAWN ON THEIR EXPERIENCE.  BUT SHE WASN'T GOING

3    TO BRING THAT EXPERIENCE TO BEAR ON QUESTIONS OF THE

4    DEFENDANT'S GUILT OR INNOCENCE.  SHE WASN'T GOING TO MAKE

5    THOSE TYPES OF COMPARISONS IN THIS CASE AND JEOPARDIZE THE

6    DEFENDANT'S GUILT OR INNOCENCE.

7            THE GOVERNMENT TOOK IT SHE WAS GOING TO SAY, THAT'S

8    HOW I LIVE MY LIFE, BUT IN THIS CASE, BECAUSE SOMEONE'S LIFE

9    IS AT STAKE, THE DEFENDANT, SHE WOULD SET THAT ASIDE.

10           THE COURT:  WELL, I'M GOING TO TAKE THIS ONE UNDER

11   SUBMISSION AND THINK ABOUT IT A LITTLE FURTHER AT THIS TIME.

12           LET'S CALL ON THE NEXT JUROR, WHICH IS MR. RUSSELL,

13   LEWIS RUSSELL (SIC).

14           MR. MICHAEL:  YOUR HONOR, BRIEFLY, ALSO ONE OTHER

15   ISSUE THE GOVERNMENT WANTED TO RAISE, WHICH WAS RAISED IN THE

16   PAPERS WE FILED ABOUT THE CHILD VICTIM, THAT TO THE EXTENT

17   THE DEFENSE IS GOING TO BRING OUT A DEFENSE ABOUT SEXUAL

18   PREDISPOSITION OF THE VICTIM, THAT'S SPECIFICALLY BARRED.  I

19   JUST WANT TO MAKE SURE THAT ISSUE IS ADDRESSED BEFORE ANY

20   POTENTIAL TESTIMONY IS SOUGHT BY DEFENSE COUNSEL.

21           THE COURT:  WE WILL BE ADDRESSING THAT.

22       (PROSPECTIVE JUROR LEWIS IS PRESENT IN THE COURTROOM.)

23           THE COURT:  GOOD MORNING, MR. RUSSELL (SIC).  YOU

24   CAN HAVE A SEAT ANYPLACE THAT YOU LIKE THERE.

25           WHAT WE'RE DOING THIS MORNING, BEFORE WE GET

1    STARTED WITH THE ENTIRE GROUP OF JURORS, IS TALKING TO MANY

2    OF YOU INDIVIDUALLY SO I CAN ASK YOU SOME -- AND COUNSEL,

3    TOO, MAYBE -- ASK YOU SOME INDIVIDUAL QUESTIONS BASED ON YOUR

4    QUESTIONNAIRE ANSWERS.

5            PROSPECTIVE JUROR LEWIS:  OKAY.

6            THE COURT:  YOU HAVE FOUR DAUGHTERS YOURSELF?

7            PROSPECTIVE JUROR LEWIS:  YES.

8            THE COURT:  AND SEVEN GRANDCHILDREN?

9            PROSPECTIVE JUROR LEWIS:  YES.

10           THE COURT:  YOU'RE A WEALTHY MAN.

11           PROSPECTIVE JUROR LEWIS:  AND ONE GREAT-GRANDCHILD.

12           THE COURT:  YOU ARE A WEALTHY MAN.

13   CONGRATULATIONS.

14           CAN YOU HEAR ME ALL RIGHT?

15           PROSPECTIVE JUROR LEWIS:  YEAH, THAT'S GOOD.  I'M

16   GLAD YOU ARE SPEAKING UP BECAUSE MY HEARING IS GETTING BAD.

17           THE COURT:  LET ME KNOW.  I WILL REPEAT ANYTHING.

18           PROSPECTIVE JUROR LEWIS:  THANK YOU.

19           THE COURT:  YOU HAD A CONCERN THAT YOU EXPRESSED IN

20   ANSWER TO A QUESTION ON THE QUESTIONNAIRE ABOUT WHETHER YOU

21   COULD BE FAIR IN THIS CASE.

22           PROSPECTIVE JUROR LEWIS:  YES.

23           THE COURT:  CAN YOU TELL ME A LITTLE ABOUT THAT?

24           PROSPECTIVE JUROR LEWIS:  WELL, I HAVE FOUR

25   DAUGHTERS.  AND IF SOMEBODY WAS BEING PROSECUTED FOR ABUSE, I

```
 1   WOULD BE -- I COULDN'T HELP BUT BE PROBABLY MORE TOWARDS THE

 2   ABUSED CHILD AND LOOKING AT IT IN THAT RESPECT AS TO, IN

 3   LAYMAN'S TERM, "HANG THE SON OF A BITCH."  EXCUSE ME.

 4           THE COURT:  WELL, I APPRECIATE YOUR BEING CANDID

 5   WITH US.  THERE'S NO SHAME IN THAT.  IN FACT, WE REALLY, ALL

 6   OF US, REALLY APPRECIATE IT.  SO I JUST WANT TO ASK YOU A

 7   COUPLE MORE QUESTIONS TO MAKE SURE I UNDERSTAND YOUR ANSWERS.

 8           PROSPECTIVE JUROR LEWIS:  OKAY.

 9           THE COURT:  WHEN YOU WERE HERE A COUPLE OF WEEKS

10   AGO FOR THE FIRST DAY --

11           PROSPECTIVE JUROR LEWIS:  YES.

12           THE COURT:  -- I JUST SPOKE VERY BRIEFLY TO THE

13   JURORS.  BUT ONE OF THE THINGS I DID MENTION, REMIND PEOPLE

14   OF, IS THAT PEOPLE ARE PRESUMED INNOCENT WHEN THEY ARE

15   ACCUSED OF A CRIME.

16           PROSPECTIVE JUROR LEWIS:  KEEP AN OPEN MIND.

17           THE COURT:  RIGHT.  AND REMEMBER THAT ALL OF US IN

18   THIS COUNTRY, IF WE ARE ACCUSED OF A CRIME, WE ARE ENTITLED

19   TO BE PRESUMED INNOCENT UNLESS AND UNTIL THE GOVERNMENT

20   PROVES GUILT BEYOND A REASONABLE DOUBT.

21           NOW, ALL KINDS OF CASES COME BEFORE THE COURT.  SO,

22   THERE COULD BE A CASE WHERE SOMEONE IS ACCUSED OF JAYWALKING,

23   OR MURDER, OR BANK ROBBERY, OR DRIVING OVER THE SPEED LIMIT,

24   OR POSSESSING -- IN THIS CASE, POSSESSING CHILD PORNOGRAPHY,

25   MOLESTING A SEVEN-YEAR-OLD BOY.
```

1            BUT ONE THING THAT ALL OF THOSE CASES HAVE IN

2    COMMON IS THAT IN ALL OF THEM, FROM JAYWALKING, TO

3    PORNOGRAPHY, CHILD PORNOGRAPHY, TO BANK ROBBERY, AND

4    EVERYTHING THAT I MENTIONED, EVERY ONE OF THE PERSONS ACCUSED

5    OF THOSE THINGS IS ENTITLED TO THE SAME PRESUMPTION OF

6    INNOCENCE.

7            NOW, THAT'S THE LAW.  BUT DO YOU AGREE WITH THAT,

8    OR WOULD YOU BE ABLE TO DO THAT?

9            PROSPECTIVE JUROR LEWIS:  YES.  IF I WERE CHOSEN TO

10   BE ON THIS, I WOULD KEEP IT AS POSITIVE OR AS NEUTRAL AS

11   POSSIBLE.

12           THE COURT:  OKAY.  BUT IT WOULD BE HARD FOR YOU?

13           PROSPECTIVE JUROR LEWIS:  I THINK SO.

14           THE COURT:  WHAT ARE THE AGES OF YOUR

15   GRANDCHILDREN?

16           PROSPECTIVE JUROR LEWIS:  SEVEN TO 30.  IT WAS A

17   SECOND MARRIAGE FOR BOTH OF US, AND I WENT FROM BEING A

18   BACHELOR OF 10 YEARS -- I WAS MARRIED ONCE BEFORE -- BEING A

19   BACHELOR FOR 10 YEARS TO BEING A FATHER OF FOUR DAUGHTERS.  I

20   AM THE YOUNGEST OF THREE BROTHERS.  THEY GO, OH, MY GOD.

21           THE COURT:  GOT A LOT OF GIRLS TO TAKE CARE OF?

22           PROSPECTIVE JUROR LEWIS:  AND TWO YEARS AGO --

23   THREE YEARS AGO, A LITTLE OVER THREE YEARS AGO I LOST MY

24   WIFE.  SHE HAD AN ANEURYSM.  IT LASTED EIGHT HOURS.

25           THE COURT: OH, I'M SO SORRY.  I'M SO SORRY.  YOUR

1    DAUGHTERS ARE --

2              PROSPECTIVE JUROR LEWIS:  PRETTY GOOD, YEAH.

3              THE COURT:  WELL, SO YOU HAVE ONE -- YOUR YOUNGEST

4    GRANDCHILD IS SEVEN?

5              PROSPECTIVE JUROR LEWIS:  YES.

6              THE COURT:  AND IS THAT A BOY OR A GIRL?

7              PROSPECTIVE JUROR LEWIS:  BOY.

8              THE COURT:  NOW, THE ALLEGED VICTIM IN THIS CASE

9    WAS SEVEN YEARS OLD AT THE TIME OF THE MOLESTATION.

10             PROSPECTIVE JUROR LEWIS:  YEAH.

11             THE COURT:  AND IT IS A BOY.  HE IS A LOT OLDER

12   THAN THAT NOW, AND HE MAY OR MAY NOT TESTIFY IN THE TRIAL.

13   BUT HOW WOULD YOU FEEL ABOUT LISTENING TO TESTIMONY ABOUT A

14   SEVEN-YEAR-OLD BOY BEING MOLESTED?

15             PROSPECTIVE JUROR LEWIS:  PROBABLY HAVE FLASHBACKS

16   TO SEEIN' MY GRANDSON, IF HE WAS THE PERSON THAT WAS BEING

17   MOLESTED.  BECAUSE AT SEVEN, THEY ARE SO INNOCENT.

18             THE COURT:  AND BECAUSE OF THAT, WOULD YOU HAVE A

19   HARD TIME HOLDING ON TO WHAT I MENTIONED A MOMENT AGO; THAT

20   IS, THAT THE DEFENDANT IN THIS CASE IS PRESUMED INNOCENT

21   UNTIL THE GOVERNMENT PROVES HIM GUILTY BEYOND A REASONABLE

22   DOUBT?

23             PROSPECTIVE JUROR LEWIS:  I THINK SO, JUDGE.

24             THE COURT:  ALL RIGHT.  EITHER SIDE WISH TO INQUIRE

25   FURTHER?

```
 1              MR. AARON:  NO QUESTIONS.

 2              THE COURT:  MR. MICHAEL?

 3              MR. MICHAEL:  NOTHING, YOUR HONOR.

 4              THE COURT:  ALL RIGHT.  COUNSEL, WILLING TO

 5    STIPULATE AS TO MR. LEWIS?

 6              MR. MICHAEL:  WE STIPULATE.

 7              MR. AARON:  YES, YOUR HONOR.

 8              MR. MICHAEL:  YES.

 9              THE COURT:  MR. LEWIS, THANK YOU VERY MUCH FOR

10    COMING IN TO SERVE, AND YOUR HONESTY.  I'M GOING TO EXCUSE

11    YOU AT THIS TIME.  YOU CAN GO BACK DOWNSTAIRS TO THE JURY

12    ASSEMBLY ROOM AND TURN IN YOUR BADGE AND LET THEM KNOW YOU

13    HAVE BEEN EXCUSED.  THANK YOU AGAIN.

14              PROSPECTIVE JUROR LEWIS:  YOU'RE WELCOME.

15         (PROSPECTIVE JUROR LEWIS EXITS THE COURTROOM.)

16              THE COURT:  MR. MELENDY.

17              MR. AARON:  YOUR HONOR, JUST TO CONFIRM, ON THAT

18    PAGE, PAGE 4, WE'VE ALREADY EXCUSED LEWIS, MARTIN, MENON,

19    MURGUIA, AND NAPPI; IS THAT CORRECT?

20              THE COURT:  YES.

21              MR. MICHAEL:  YOUR HONOR, WITH REGARD TO MS. JONES,

22    YOUR HONOR HAS SOME QUESTIONS ABOUT WHETHER OR NOT SHE WOULD

23    BE AN APPROPRIATE JUROR.  PERHAPS IT MIGHT MAKE SENSE TO

24    BRING HER BACK.  THE GOVERNMENT HAS SOME QUESTIONS THAT MAYBE

25    WE COULD ASK THAT WOULD ELICIT ANSWERS THAT WOULD PERHAPS
```

```
 1    CAUSE THE GOVERNMENT TO STIPULATE, AS OPPOSED TO THE CURRENT

 2    POSITION WHERE WE THINK SHE IS APPROPRIATE.

 3              THE COURT:  ALL RIGHT.  LET ME THINK ABOUT THAT.

 4       (PROSPECTIVE JUROR MELENDY IS PRESENT IN THE COURTROOM.)

 5              THE COURT:  MR. MELENDY, GOOD MORNING.

 6              PROSPECTIVE JUROR MELENDY:  GOOD MORNING.

 7              THE COURT:  YOU CAN HAVE A SEAT ANYPLACE YOU LIKE

 8    IN THE JURY BOX.

 9              COULD YOU GIVE MR. MELENDY A COPY OF HIS

10    QUESTIONNAIRE.

11              MR. MELENDY, WHAT WE'RE DOING RIGHT NOW IS -- GO

12    AHEAD AND HAVE A SEAT -- TALKING TO MANY OF THE JURORS ONE BY

13    ONE ABOUT THE ANSWERS TO THE QUESTIONNAIRES, OUTSIDE THE

14    PRESENCE OF THE OTHER JURORS, BEFORE WE GET STARTED WITH

15    EVERYONE AS A WHOLE.

16              I JUST HAD ONE -- I THINK MAYBE ONE QUESTION FOR

17    YOU BASED ON ONE OF YOUR ANSWERS TO THE QUESTIONNAIRE.

18    BECAUSE IT HAS BEEN ALMOST TWO WEEKS, I'M GOING TO HAVE

19    MS. SASSE FIND THE QUESTIONNAIRE AND HAND IT TO YOU, BECAUSE

20    IT'S NOT A MEMORY EXAM, YOU WILL BE HAPPY TO HEAR.

21              MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WILL

22    OFFER --

23              THE COURT:  OKAY.  THANK YOU.

24              MR. MICHAEL:  MAY I APPROACH?

25              THE COURT:  CERTAINLY.
```

1        IF YOU CAN TAKE A LOOK AT YOUR ANSWER TO QUESTION

2   NO. 5, WHICH IS ON PAGE 4, SIR.

3         THIS CASE INVOLVES TWO SETS OF CHARGES.  THERE IS

4   FOUR COUNTS IN THE INDICTMENT.  THE FIRST TWO INVOLVE

5   ALLEGATIONS THAT THE DEFENDANT POSSESSED OR CONSPIRED TO

6   POSSESS CHILD PORNOGRAPHY.

7         AND THE SECOND TWO COUNTS INVOLVE ALLEGATIONS ABOUT

8   CHILD MOLESTATION.

9         YOU ANSWERED QUESTION NO. 6 -- ABOUT BEING ABLE TO

10  SIT THROUGH THE TRIAL AND VIEW THE IMAGES OF CHILD

11  PORNOGRAPHY AND BE FAIR AND IMPARTIAL -- BY SAYING, YES, THAT

12  YOU THOUGHT YOU COULD, WHICH SEEMED TO CONTRADICT YOUR ANSWER

13  TO NO. 5.

14        PROSPECTIVE JUROR MELENDY:  I MUST HAVE BEEN

15  DRINKING.  TO BE HONEST WITH YOU, YOUR HONOR, THAT SHOULD

16  HAVE BEEN YES.

17        THE COURT:  THAT'S WHAT I THOUGHT.  SO YOUR ANSWER

18  TO NO. 5 SHOULD HAVE BEEN YES?

19        PROSPECTIVE JUROR MELENDY:  YES ON 5.

20        THE COURT:  THANK YOU VERY MUCH.  THAT'S ALL I

21  NEEDED TO KNOW.

22        PROSPECTIVE JUROR MELENDY:  I DON'T KNOW HOW I DID

23  THAT.

24        THE COURT:  THAT'S ALL RIGHT.  THANK YOU VERY MUCH.

25        EITHER COUNSEL WISH TO INQUIRE?

1          MR. AARON:  YOUR HONOR, IF THERE WAS NO ANSWER TO

2     QUESTION 4 --

3          THE COURT:  OH, THANK YOU.  OH, YES.

4          COULD YOU TAKE A LOOK AT QUESTION NO. 4 ON THE

5     PREVIOUS PAGE.

6          PROSPECTIVE JUROR MELENDY:  NO.  THAT COMES OUT ON

7     -- OKAY.  NO.

8          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, SIR.

9          MR. MICHAEL, YOU WANT TO RETRIEVE YOUR COPY.

10          AND YOU MAY GO BACK DOWNSTAIRS TO THE JURY ASSEMBLY

11     ROOM.  WE HOPE WE WON'T BE KEEPING YOU MUCH LONGER; THAT IS,

12     BEFORE EVERYBODY COMES BACK UPSTAIRS. I HOPE YOU BROUGHT SOME

13     GOOD READING MATERIAL.

14          PROSPECTIVE JUROR MELENDY:  I CAN GO DOWNSTAIRS?

15          THE COURT:  YES, YOU CAN.  THANK YOU, SIR.

16       (PROSPECTIVE JUROR MELENDY EXITS THE COURTROOM.)

17          THE COURT:  AND YOU CAN BRING IN MR. MIGUEL.

18      (PROSPECTIVE JUROR MIGUEL IS PRESENT IN THE COURTROOM.)

19          THE COURT:  GOOD MORNING, MR. MIGUEL.  YOU MAY HAVE

20     A SEAT ANYWHERE YOU LIKE.

21          MR. MIGUEL, WHAT WE ARE DOING THIS MORNING, BEFORE

22     WE BEGIN TALKING TO ALL OF THE JURORS AS A GROUP IS, I'M

23     TALKING TO MANY OF THE JURORS ONE BY ONE IF I HAVE QUESTIONS

24     ABOUT SOME OF THE ANSWERS IN YOUR QUESTIONNAIRE THAT YOU

25     ANSWERED WHEN YOU WERE HERE ALMOST TWO WEEKS AGO.  AND I JUST

1    HAVE ONE OR TWO QUESTIONS FOR YOU, I THINK.

2              ONE OF THE QUESTIONS THAT WE ASKED WAS ABOUT

3    WHETHER YOU COULD SIT THROUGH THIS TRIAL AND BE A FAIR AND

4    IMPARTIAL JUROR IN A CASE THAT HAS ALLEGATIONS ABOUT CHILD

5    PORNOGRAPHY.  AND YOUR ANSWER WAS THAT YOU WOULD DEPEND ON

6    THE EVIDENCE AND ON THE STATEMENTS OF THE VICTIM.

7              DO YOU REMEMBER THAT ANSWER?

8              PROSPECTIVE JUROR MIGUEL:  YES.

9              THE COURT:  THERE WILL BE A LOT OF EVIDENCE IN THIS

10   CASE.  ARE YOU SAYING YOU WOULD NOT MAKE UP YOUR MIND UNTIL

11   YOU HEARD ALL THE EVIDENCE?

12             PROSPECTIVE JUROR MIGUEL:  AS I SAID BEFORE, I'M

13   BASING IT ON THE EVIDENCE.  AND PROBABLY IF THERE IS

14   WITNESSES, I WOULD BASE IT ON THAT.

15             THE COURT:  ALL RIGHT.  AS TO THE WITNESSES, WOULD

16   YOU BE OPEN-MINDED ABOUT THE WITNESSES AND MAKE UP YOUR MIND

17   ABOUT EACH ONE OF THEM INDIVIDUALLY?  OR WOULD YOU TEND TO

18   BELIEVE, LET'S SAY, THE PERSON WHO IS ALLEGED TO BE THE

19   VICTIM MORE THAN YOU WOULD BELIEVE SOMEONE ELSE?

20             PROSPECTIVE JUROR MIGUEL:  YOUR HONOR, THIS IS MY

21   FIRST TIME I'VE BEEN IN THIS KIND OF COURT, SO I CAN SAY IT

22   IS REALLY VERY HARD TO DECIDE.

23             THE COURT:  DO YOU WANT ME TO ASK MY QUESTION

24   AGAIN?

25             PROSPECTIVE JUROR MIGUEL:  YES.  I DO BELIEVE I'D

1    BASE IT ON THE WITNESSES.

2              THE COURT:  SO YOU WOULD LISTEN TO ALL OF THE

3    WITNESSES; IS THAT WHAT YOU'RE SAYING?

4              PROSPECTIVE JUROR MIGUEL:  NOT EXACTLY LIKE THAT.

5    WHAT THE EVIDENCE IS AND THE STATEMENT OF THE WITNESS.

6              THE COURT:  WELL, AS TO THE -- I'M SORRY.  LET ME

7    START OVER AGAIN.

8              THERE IS TWO SETS OF CHARGES OR ALLEGATIONS IN THIS

9    CASE.  ONE SET IS THE CHILD PORNOGRAPHY CHARGES, AND ONE SET

10   IS THE CHILD MOLESTATION CHARGES.  THAT IS, THE DEFENDANT IN

11   THIS CASE IS ACCUSED OF TRAVELING ACROSS STATE LINES TO

12   MOLEST A SEVEN-YEAR-OLD BOY.

13             AND THEN HE IS ALSO ACCUSED OF MOLESTING OR

14   SEXUALLY ASSAULTING A SEVEN-YEAR-OLD BOY.

15             THE VICTIM, WHO WAS SEVEN AT THE TIME AND IS OLDER

16   NOW, MAY OR MAY NOT TESTIFY IN THIS CASE.  IF HE DOES

17   TESTIFY, WOULD YOU LISTEN TO HIS TESTIMONY AND DECIDE WHETHER

18   OR NOT TO BELIEVE HIM, JUST LIKE YOU WOULD WITH ALL THE OTHER

19   WITNESSES?

20             PROSPECTIVE JUROR MIGUEL:  HONESTLY, I'D DECIDE ON

21   THAT PERSON.  I WOULD DECIDE ON THE SIDE OF THE VICTIM.

22             THE COURT:  SO YOU SORT OF ALREADY MADE YOUR MIND

23   UP THAT IF THE VICTIM TESTIFIES IN THIS CASE YOU WOULD

24   BELIEVE THE VICTIM?

25             PROSPECTIVE JUROR MIGUEL:  YES.  AFTER THE PERSON

1    DOES THE LONG PROCESS OF THE INVESTIGATION, YES, I WOULD

2    ALWAYS DEPEND IN THE CASE, THE INVESTIGATION, IS I DEPEND ON

3    THE VICTIM.

4              THE COURT:  I'M SORRY.  COULD YOU REPEAT THE LAST

5    PART OF YOUR ANSWER ABOUT AFTER THE INVESTIGATION --

6              PROSPECTIVE JUROR MIGUEL:  AFTER THE INVESTIGATION

7    RESOLVE, IT RELEASE ON THE PAPERWORK FOR THE VICTIMS, I VOTE

8    ON THE VICTIMS.

9              THE COURT:  ALL RIGHT.  SO YOU WOULD BELIEVE THE

10   VICTIM?

11             PROSPECTIVE JUROR MIGUEL:  I WOULD BELIEVE THE

12   VICTIM.

13             THE COURT:  ALL RIGHT.  EITHER SIDE WISH TO INQUIRE

14   OF MR. MIGUEL?

15             MR. AARON:  NO, YOUR HONOR.

16             THE COURT:  MR. MICHAEL?

17             MR. MICHAEL:  I HAVE A QUICK QUESTION, YOUR HONOR.

18             THE COURT:  GO AHEAD.

19             MR. MICHAEL:  GOOD MORNING, SIR.

20             A MOMENT AGO YOU SAID THAT IF THE VICTIM WERE TO

21   TESTIFY, AS THE COURT INDICATED HE MAY TESTIFY; HE MAY NOT

22   TESTIFY, BUT IF THE VICTIM WERE TO TESTIFY, YOU WOULD BELIEVE

23   WHAT HE SAID NO MATTER WHAT?

24             PROSPECTIVE JUROR MIGUEL:  IT DEPENDS ON THE

25   INVESTIGATION.

1          MR. MICHAEL:  SO YOU WOULD JUDGE -- IS IT FAIR TO

2     SAY THAT YOU WOULD JUDGE THE VICTIM'S TESTIMONY BASED ON HIS

3     TESTIMONY, AS WELL AS ALL OF THE OTHER EVIDENCE AND OTHER

4     WITNESSES THAT MAY TESTIFY?

5          PROSPECTIVE JUROR MIGUEL: YES, OF COURSE.  IF THEY

6     PASS THROUGH THE PROCESS OF, LET'S SAY, THE CERTIFICATION OR

7     SOMETHING ELSE, AN INVESTIGATION WAS DONE, IF -- IF IT IS

8     SOLVED, IT IS POSSIBLE TO THE VICTIMS, I WOULD GO WITH THE

9     VICTIMS.

10          MR. MICHAEL:  JUST SO I THINK I UNDERSTAND, JUST

11    BECAUSE THE VICTIM MAY TESTIFY -- FOR EXAMPLE, IF A VICTIM

12    WERE TO TESTIFY AND SAY, "I WAS MOLESTED" --

13          PROSPECTIVE JUROR:  MM-HMM.

14          MR. MICHAEL:  -- WOULD YOU AUTOMATICALLY BELIEVE

15    THAT, OR WOULD YOU WAIT TO LISTEN TO ALL OF THE OTHER

16    EVIDENCE AND LISTEN TO ALL OF THE OTHER WITNESSES THAT COME

17    FORTH?

18          PROSPECTIVE JUROR MIGUEL:  YES, I WOULD LISTEN TO

19    ALL, IF IT IS POSITIVE OR NEGATIVE.  THEN I CAN HONESTLY

20    DECIDE.

21          MR. MICHAEL:  AND YOU WOULD RESERVE JUDGMENT ABOUT

22    THE DEFENDANT, WHETHER OR NOT THE GOVERNMENT HAS PROVED THAT

23    HE IS GUILTY BEYOND A REASONABLE DOUBT, UNTIL AFTER LISTENING

24    TO ALL OF THE EVIDENCE?

25          PROSPECTIVE JUROR MIGUEL:  YES, OF COURSE.

124

1          MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  MR. AARON?

3          MR. AARON:  THANK YOU.

4          SIR, IN THIS CASE THE GOVERNMENT HAS ALREADY

5    COMPLETED ITS INVESTIGATION.  THE GOVERNMENT IS GOING TO

6    ARGUE TO YOU THAT BASED ON WHAT HAS BEEN DONE IN THE

7    INVESTIGATION AND, PERHAPS, IF THE VICTIM TESTIFIES, BASED ON

8    THAT, AS WELL, THAT THEY BELIEVE MR. SANDERS IS GUILTY.

9          WE ARE GOING TO ARGUE TO YOU THAT HE IS NOT GUILTY.

10          ARE YOU SAYING THAT IF THE GOVERNMENT HAS COMPLETED

11    ITS INVESTIGATION AND HAS DETERMINED AND ARGUES TO YOU THAT

12    HE IS GUILTY, THEN BECAUSE OF THAT YOU WOULD BELIEVE HE IS

13    GUILTY?

14          PROSPECTIVE JUROR MIGUEL:  YES.  THAT'S WHAT I

15    BELIEVE.

16          MR. AARON:  OR ARE YOU -- DO YOU HAVE SOME PROBLEMS

17    UNDERSTANDING AND COMMUNICATING IN ENGLISH?

18          PROSPECTIVE JUROR MIGUEL:  NOT SO -- I CAN WRITE.

19    I CAN READ.  I CAN SPEAK IT; NOT FLUENTLY SPEAKING.

20          MR. AARON:  HAVE YOU HAD ANY PROBLEM UNDERSTANDING

21    WHAT'S BEING SAID HERE TODAY IN COURT?

22          PROSPECTIVE JUROR MIGUEL:  IT'S JUST NOT 100

23    PERCENT.

24          MR. AARON:  SO YOU'RE NOT UNDERSTANDING EVERYTHING

25    THAT'S BEING SAID?

1          PROSPECTIVE JUROR MIGUEL:  YES.

2          MR. AARON:  SETTING ASIDE THE LEGALESE, THE LEGAL

3    LANGUAGE, ARE YOU UNDERSTANDING EVERYTHING THAT'S BEING SAID?

4          PROSPECTIVE JUROR MIGUEL:  YES, SIR.

5          MR. AARON:  OKAY.  WHAT I'M TRYING TO GET AT -- AND

6    IT IS NOT A TRICK QUESTION -- I'M JUST TRYING TO FIND OUT

7    YOUR STATE OF MIND.

8          IF YOU LEARN THAT THERE HAS BEEN THIS BIG

9    INVESTIGATION, AND AT THE END OF IT THE GOVERNMENT DECIDED TO

10   PRESS CHARGES BECAUSE THEY BELIEVED MR. SANDERS WAS GUILTY,

11   WOULD THAT BE ENOUGH IN YOUR OPINION?

12         PROSPECTIVE JUROR MIGUEL:  YES, I COULD SAY IT IS.

13         MR. AARON:  THANK YOU.  NOTHING FURTHER.

14         THE COURT:  ALL RIGHT.  MR. MIGUEL --

15         PROSPECTIVE JUROR MIGUEL:  YES, YOUR HONOR.

16         THE COURT:  PARDON?

17         PROSPECTIVE JUROR MIGUEL:  YES, YOUR HONOR.

18         THE COURT:  ONE OF THE THINGS THAT I WILL BE

19   TELLING THE JURY AT THE BEGINNING OF MY DISCUSSION WITH THE

20   ENTIRE GROUP WHEN WE GET STARTED IS -- WELL, TO ASK ONE OF

21   THE PROSECUTORS TO READ TO THE JURY THE INDICTMENT, THE FOUR

22   CHARGES IN THIS CASE.  AND THEN I'M GOING TO TELL THE JURY

23   THAT THE FACT THAT THE DEFENDANT IS ACCUSED OF THE THINGS

24   CHARGED IN THE INDICTMENT, THE INDICTMENT ISN'T EVIDENCE.

25         IN OTHER WORDS, THE FACT THAT THE GOVERNMENT HAS

1    BROUGHT THIS CASE ISN'T EVIDENCE THAT THE DEFENDANT IS

2    GUILTY, AND THAT THE JURY HAS TO PRESUME THAT HE IS INNOCENT

3    AND ONLY MAKE UP ITS MIND ABOUT WHETHER OR NOT THE GOVERNMENT

4    HAS PROVED HIS GUILT AFTER ALL THE EVIDENCE.

5              SO WOULD YOU BE ABLE TO FOLLOW THAT INSTRUCTION?

6    OR DO YOU HAVE SOME DOUBT THAT THE DEFENDANT MIGHT BE GUILTY

7    BECAUSE HE HAS BEEN CHARGED IN THIS CASE?

8              PROSPECTIVE JUROR MIGUEL:  IT IS A CASE-TO-CASE

9    BASIS, PROBABLY, BECAUSE I USED TO -- I USED TO DEPEND ALSO

10   WHATEVER THE CODE OF THE GOVERNMENT, IF IT IS REALLY CLEARLY

11   EVIDENTLY PROVEN, I GUESS I WOULD GO ON THE SIDE ON THE

12   GOVERNMENT.

13             THE COURT:  ALL RIGHT.  SO AS YOU SIT HERE THIS

14   MORNING, BEFORE YOU'VE HEARD ANY EVIDENCE, DO YOU UNDERSTAND

15   THAT THE DEFENDANT IS PRESUMED INNOCENT?

16             PROSPECTIVE JUROR MIGUEL:  IT DEPENDS, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

18   MR. MIGUEL.  YOU ARE EXCUSED.  YOU MAY GO DOWNSTAIRS TO THE

19   JURY ASSEMBLY ROOM.  JUST GO BACK DOWNSTAIRS.

20        (PROSPECTIVE JUROR MIGUEL EXITS THE COURTROOM.)

21             MR. AARON:  WE WOULD CHALLENGE MR. MIGUEL FOR

22   CAUSE.

23             THE COURT:  MR. MICHAEL?

24             MR. MICHAEL:  THE GOVERNMENT IS NOT PREPARED TO

25   STIPULATE.  WE WOULD OPPOSE THAT.

1          WHAT THE GOVERNMENT UNDERSTOOD MR. MIGUEL TO BE

2     SAYING -- AND RECOGNIZES THAT HE DIDN'T SPEAK PERFECT ENGLISH

3     AND DIDN'T HAVE PERFECT COMPREHENSION, BUT APPEARED TO THE

4     GOVERNMENT TO BE SUFFICIENT COMPREHENSION TO SIT AS A JUROR

5     THAT -- AND WITH ALL DUE RESPECT TO MY OPPOSING COUNSEL WHO

6     IS VERY EFFECTIVE IN VOIR DIRE -- AS I UNDERSTOOD THE

7     REACTIONS OF THE QUESTIONS, OR THE QUESTIONS POSED, WAS THAT

8     JUST BECAUSE HE HAS BEEN CHARGED AND THERE HAS BEEN A BIG

9     INVESTIGATION DOESN'T NECESSARILY MEAN THAT THE JUROR WALKS

10    IN HERE THINKING HE IS GUILTY.  BUT IT APPEARED THAT HE WAS

11    ASSUMING THAT IF ALL OF THAT IS PRESENTED DURING TRIAL AND IF

12    ALL THE EVIDENCE WAS PRESENTED -- BECAUSE HE REPEATEDLY SAID,

13    "I WILL CONSIDER ALL OF THE EVIDENCE AND ALL THE WITNESSES."

14          SO, THE GOVERNMENT, TAKING THOSE STATEMENTS

15    TOGETHER, UNDERSTOOD HIM TO BE SAYING IF THERE WAS A BIG

16    INVESTIGATION AND THERE WERE CHARGES AND ALL OF THAT WAS

17    SHOWN TO HIM, ALL THE EVIDENCE AND WITNESSES, ONLY THEN WOULD

18    HE RENDER JUDGMENT, AND DIDN'T FEEL THAT HE HAD PREJUDGED THE

19    CASE JUST BECAUSE THERE WERE CHARGES.

20          THE COURT:  WELL, YOU KNOW, I THINK HE COMPREHENDED

21    CERTAINLY WELL ENOUGH TO SIT AS A JUROR, AND IT WAS SOMEWHAT

22    DIFFICULT TO UNDERSTAND HIS RESPONSES.  BUT I THINK THAT AND

23    CERTAINLY HIS LAST ANSWER TO MY QUESTION FINALLY WAS WHAT

24    CONVINCED ME THAT HE COULD NOT APPLY THE PRESUMPTION OF

25    INNOCENCE IN THIS CASE.  AND THAT HAD HE -- WHETHER IT IS

1    BECAUSE HE DOESN'T QUITE UNDERSTAND THE COURT'S INSTRUCTIONS

2    OR BECAUSE HE BELIEVES THAT SOMEONE WHO IS ACCUSED OF THE

3    CRIME ISN'T REALLY ENTITLED TO THE FULL PRESUMPTION OF

4    INNOCENCE, I'M NOT QUITE SURE.  I THINK IT IS THE LATTER.

5             BUT I REALLY NEVER GOT -- I FELT AN UNEQUIVOCAL

6    RESPONSE THAT HE WOULD APPLY THE PRESUMPTION OF INNOCENCE TO

7    THE DEFENDANT IN THIS CASE.  SO I'M GOING TO GRANT THE

8    CHALLENGE FOR CAUSE AS TO MR. MIGUEL.

9             NOW, MS. MULDER IS NEXT.  AND AFTER YOU BRING HER

10   IN, WOULD YOU LET THE JURY ROOM KNOW MR. MIGUEL HAS BEEN

11   EXCUSED.

12            MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I RISE TO

13   ADDRESS A SEPARATE MATTER, THEN, TO THIS JUROR'S RESPONSES?

14            AT LEAST IN MY VIEW, THIS IS THE THIRD TIME THAT

15   COUNSEL IS REALLY ARGUING THE SIDES OF THE CASE IN A WAY TO

16   SORT OF SAY, HEY, WHAT DO YOU THINK ABOUT THAT?

17            THAT'S AS I PERCEIVE IT.  I THINK IT'S NOT

18   APPROPRIATE.  THOSE QUESTIONS IN THOSE AREAS ARE APPROPRIATE,

19   BUT CAN BE APPROACHED IN --

20            THE COURT:  LET ME JUST INTERRUPT AND SAY I'M NOT

21   COMFORTABLE WITH EITHER SIDE -- AND I DO THINK IT IS THE

22   DEFENSE WHO HAS MOSTLY DONE IT -- TO SAY THE OTHER SIDE IS

23   GOING TO BE ARGUING THIS AND THE OTHER SIDE IS GOING TO BE

24   ARGUING THAT.  SO I DON'T WANT ANY MORE QUESTIONS IN THAT

25   MANNER.

```
 1              MR. AARON:  YOUR HONOR, I THINK WE HAVE TO BE ABLE
 2    -- AND MAYBE IT IS JUST MY PHRASING.  IF THAT'S THE PROBLEM,
 3    I HAVE NO PROBLEM CHANGING THAT.  BUT I THINK WE HAVE A DUTY,
 4    BOTH SIDES HAVE A DUTY, TO SAY, THIS MIGHT BE THE EVIDENCE IN
 5    THE CASE.  AND WE HAVE DONE THAT IN THE QUESTIONNAIRE, AS
 6    WELL.
 7              AND I'M NOT TRYING TO PUT WORDS OR TO RUN THE
 8    PROSECUTION'S CASE, BUT WHEN HE SAYS, WELL, WHEN THIS JUROR
 9    IN PARTICULAR SAID, IF I SEE THAT THERE HAS BEEN AN
10    INVESTIGATION, I WILL VOTE GUILTY.  AND AT THE END OF IT, YOU
11    KNOW, "I WOULD VOTE GUILTY."
12              WELL, THERE IS GOING TO BE EVIDENCE OF A HUGE
13    INVESTIGATION IN THIS CASE, A HUGE INVESTIGATION SPANNING --
14              THE COURT:  WELL, THERE IS EVIDENCE -- YOU WILL
15    HEAR EVIDENCE OF X OR YOU MAY HERE EVIDENCE OF X.  BUT, YOU
16    KNOW, AFTER ALL OF THIS AND AFTER MY VOIR DIRE, THERE IS
17    GOING TO BE VERY LITTLE ATTORNEY VOIR DIRE THIS AFTERNOON
18    BECAUSE THERE IS GOING TO BE VERY LITTLE TO BE FOLLOWED UP
19    ON.
20              ALL RIGHT.  LET'S BRING THE NEXT JUROR IN.
21       (PROSPECTIVE JUROR MULDER IS PRESENT IN THE COURTROOM.)
22              THE COURT:  GOOD MORNING, MS. MULDER.
23              PROSPECTIVE JUROR MULDER:  GOOD MORNING.
24              THE COURT:  YOU MAY HAVE A SEAT ANYWHERE IN THE
25    JURY BOX.
```

1          WHAT WE ARE DOING THIS MORNING IS TALKING TO MANY

2   OF THE JURORS INDIVIDUALLY OUTSIDE THE PRESENCE OF THE OTHERS

3   SO I CAN ASK YOU SOME FOLLOW-UP QUESTIONS ABOUT SOME OF YOUR

4   ANSWERS, GIVE YOU A LITTLE MORE PRIVACY.

5          PROSPECTIVE JUROR MULDER:  RIGHT.

6          THE COURT:  YOU ANSWERED ON YOUR QUESTIONNAIRE THAT

7   YOU HAVE A COUSIN WHO WAS MOLESTED BY A FAMILY FRIEND?

8          PROSPECTIVE JUROR MULDER:  YEAH.

9          THE COURT:  CAN YOU TELL ME A LITTLE BIT ABOUT

10  THAT?

11         PROSPECTIVE JUROR MULDER:  WELL, I DON'T KNOW A

12  WHOLE LOT ABOUT IT BECAUSE I THINK MY PARENTS -- I WAS IN

13  COLLEGE WHEN IT HAPPENED.  MY PARENTS AND FAMILY MEMBERS SORT

14  OF SHELTERED ME FROM IT.  AND I GUESS I SHOULD CLARIFY.  I

15  CONSIDER HER A COUSIN BECAUSE SHE IS THE DAUGHTER OF MY FIRST

16  COUSIN, BUT SHE WAS IN THE CUSTODY OF HER MOTHER AND

17  APPARENTLY ONE OF HER FRIENDS.

18         THE COURT:  HER MOTHER'S FRIEND?

19         PROSPECTIVE JUROR MULDER:  ONE OF HER MOTHER'S

20  FRIENDS, I GUESS, FONDLED HER.  AND THAT'S ABOUT ALL THAT I

21  REALLY KNOW ABOUT WHAT HAPPENED.

22         THE COURT:  HOW OLD WAS -- WHAT'S YOUR COUSIN'S

23  NAME, HER FIRST NAME?

24         PROSPECTIVE JUROR MULDER:  DANIELLE.

25         THE COURT:  LET'S CALL HER THAT.

1          PROSPECTIVE JUROR MULDER:  I BELIEVE SHE WAS

2   BETWEEN THE AGES OF SEVEN AND EIGHT.

3          THE COURT:  TO YOUR KNOWLEDGE, WERE ANY CHARGES

4   EVER PRESSED?

5          PROSPECTIVE JUROR MULDER:  I DON'T KNOW IF ANY

6   CHARGES WERE FILED.  I DO KNOW THAT SHE WAS TAKEN OUT OF THE

7   CUSTODY OF HER MOTHER.  SO HER FATHER NOW RETAINS SOLE

8   CUSTODY OF HER WITH, I THINK, VISITATION IS WITH HER MOTHER

9   IS --

10          THE COURT:  MONITORED?

11          PROSPECTIVE JUROR MULDER:  YES.  SO I DON'T KNOW

12   ANYTHING OUTSIDE OF THAT.

13          THE COURT:  HAVE YOU EVER TALKED TO DANIELLE ABOUT

14   IT?

15          PROSPECTIVE JUROR MULDER:  NO, I HAVE NOT.

16          THE COURT:  HAVE YOU EVER TALKED TO DANIELLE'S

17   MOTHER, WHO IS YOUR COUSIN?

18          PROSPECTIVE JUROR MULDER:  NO, NO.  SHE IS NOT MY

19   COUSIN.  HER MOTHER IS NOT MY COUSIN.  MY COUSIN IS HER

20   FATHER.

21          THE COURT:  OH, ALL RIGHT.

22          PROSPECTIVE JUROR MULDER:  NO, I HAVE NOT.  IT'S

23   BASICALLY STAYED BETWEEN THE OLDER MEMBERS OF OUR FAMILY.

24   OTHER THAN THE BASIC SORT OF DETAILS, I DON'T REALLY KNOW A

25   WHOLE LOT ELSE ABOUT IT, OTHER THAN THE FACT THAT I KNOW THAT

1    FOR A LONG TIME AFTERWARDS THEY WERE STILL HAVING TO DEAL

2    WITH REPERCUSSIONS OF THE INCIDENT.

3             THE COURT:  WHAT KINDS OF REPERCUSSIONS?

4             PROSPECTIVE JUROR MULDER:  JUST SOME, LIKE, MINOR

5    -- WELL, NOT MINOR, BUT SOCIAL PROBLEMS.  SHE WAS DISTANT,

6    REALLY QUIET, KIND OF STAYED TO HERSELF; GRADES SUFFERED.  I

7    KNOW THEY PUT HER IN SOME COUNSELING FOR A WHILE.

8             THE COURT:  AND HOW OLD IS DANIELLE NOW?

9             PROSPECTIVE JUROR MULDER:  SHE IS -- IS SHE 15?

10   FOURTEEN OR 15, I THINK.

11            THE COURT:  WHEN IS THE LAST TIME YOU SAW HER?

12            PROSPECTIVE JUROR MULDER:  IT'S BEEN FIVE YEARS.  I

13   KNOW WE HAVE -- I HAVE SPOKEN TO HER RECENTLY IN THE LAST

14   FOUR OR FIVE MONTHS.

15            THE COURT:  IS SHE DOING PRETTY WELL NOW?

16            PROSPECTIVE JUROR MULDER:  SHE HATES MATH, BUT SHE

17   SEEMS TO BE DOING FAIRLY OKAY NOW.  I KNOW THAT THEY STILL

18   SORT OF KEEP A CLOSE EYE ON HER GRADES AND JUST HER EVERYDAY

19   ACTIVITIES AND STUFF LIKE THAT, JUST TO MAKE SURE THAT SHE

20   IS, YOU KNOW, HANDLING OKAY ON STUFF.  BUT SHE SEEMS TO BE, I

21   GUESS, WELL-ADJUSTED.

22            THE COURT:  ALL RIGHT.  NOW, THERE IS TWO SETS OF

23   CHARGES IN THIS CASE, AS YOU MAY REMEMBER FROM THE

24   QUESTIONNAIRE.  TWO OF THE CHARGES DEAL WITH POSSESSION OF

25   CHILD PORNOGRAPHY, AND TWO OF THE CHARGES DEAL WITH

1    MOLESTATION.

2             ON THE MOLESTATION CHARGES, ONE IS THAT THE

3    DEFENDANT TRAVELED ACROSS STATE LINES WITH THE INTENT TO

4    MOLEST OR SEXUALLY ASSAULT A SMALL CHILD.  IN THIS CASE, A

5    CHILD WHO WAS ABOUT SEVEN.

6             AND IN THE OTHER OF THE MOLESTATIONS CHARGES IS

7    THAT THE DEFENDANT ACTUALLY MOLESTED THE CHILD.  AGAIN, IT IS

8    A BOY ABOUT THE AGE OF SEVEN.  SO, THAT'S KIND OF THE SAME

9    AGE AS DANIELLE.

10            PROSPECTIVE JUROR MULDER:  RIGHT.

11            THE COURT:  AND THE ALLEGED MOLESTATION WAS

12   FONDLING, TOUCHING.

13            DO YOU THINK THAT -- YOU ANSWERED ON YOUR

14   QUESTIONNAIRE ABOUT WHETHER OR NOT YOU COULD BE FAIR IN THIS

15   CASE; THAT IT REPULSES -- YOUR ANSWER WAS BECAUSE THIS IS NOT

16   A MEMORY YET.

17            PROSPECTIVE JUROR MULDER:  IT REPULSES ME.

18            THE COURT:  BECAUSE THAT ANYONE COULD DO THAT TO A

19   CHILD?

20            PROSPECTIVE JUROR MULDER:  YEAH.

21            THE COURT:  PROBABLY WOULDN'T SURPRISE YOU IF I

22   TOLD YOU THAT MANY PEOPLE HAVE THAT REACTION AS SITTING AS A

23   JUROR ON THIS CASE OR ON THIS KIND OF A CASE, I SHOULD SAY.

24   AND WE THANK YOU FOR BEING CANDID ABOUT THAT.

25            THERE IS ALL DIFFERENT KINDS OF CASES, AND

1    SOMETIMES A JUROR IS PERFECTLY SUITED TO ONE KIND OF A CASE

2    BUT NOT ANOTHER.  SO NO SHAME IN TELLING US WHAT YOUR

3    REACTION IS ABOUT SITTING HERE.

4            DO YOU STILL FEEL THAT IT WOULD BE -- WELL, LET ME

5    ASK YOU THIS, BECAUSE I DON'T THINK YOU WORDED YOUR ANSWER

6    QUITE LIKE THIS:  WOULD YOU BE ABLE TO SIT ON THIS CASE AND

7    BE FAIR AND IMPARTIAL TO BOTH SIDES?

8            PROSPECTIVE JUROR MULDER:  I HONESTLY -- I DON'T

9    REALLY THINK SO, MOSTLY BECAUSE I HAVE, YOU KNOW, OTHER

10   FAMILY MEMBERS WHO -- AND I AM AROUND, THROUGH MY FAMILY

11   MEMBERS AND FRIENDS, AROUND YOUNG CHILDREN, AND I HAVE SORT

12   OF A FAMILY SORT OF ATTACHMENT TO THEM.  AND IF THAT EVER

13   HAPPENED TO THEM, IF, YOU KNOW, JUST THE THOUGHT -- I

14   WOULDN'T EVEN KNOW HOW TO -- LIKE, I DON'T EVEN KNOW HOW TO

15   VERBALIZE IT NOW.  IT JUST WOULD AFFECT ME.

16           THE COURT:  IT WOULD BE VERY DISTRESSING?

17           PROSPECTIVE JUROR MULDER:  YES.

18           THE COURT:  AND YOU'D HAVE A HARD TIME SETTING THAT

19   POSSIBILITY ASIDE AS YOU LISTEN TO THE EVIDENCE HERE?

20           PROSPECTIVE JUROR MULDER:  YEAH, I THINK SO.

21           THE COURT:  ALL RIGHT.  DID I UNDERSTATE THAT?

22           PROSPECTIVE JUROR MULDER:  A LITTLE BIT.

23           THE COURT:  OKAY.  YOU ALSO SAID THAT YOUR FATHER

24   HAD A BAD EXPERIENCE WITH A HOMOSEXUAL MAN WHO FORCED HIMSELF

25   ON YOUR FATHER?

1        PROSPECTIVE JUROR MULDER:  YEAH.

2        THE COURT:  THE ALLEGATIONS, AGAIN, IN THIS CASE

3   ARE OF A DEFENDANT, A MAN ALLEGEDLY MOLESTING A SEVEN YEAR

4   OLD.  WOULD THAT, TOO, MAKE IT DIFFICULT?

5        PROSPECTIVE JUROR MULDER:  YEAH, I WOULD THINK SO.

6   I MEAN, I SUPPOSE I CAN PROBABLY SET ASIDE THE HOMOSEXUALITY

7   THING BECAUSE I HAD A ROOMMATE WHO WAS HOMOSEXUAL, AND

8   EVERYTHING LIKE THAT, AND I HAVE FRIENDS WHO ARE HOMOSEXUAL.

9   BUT I THINK WHEN IT COMES DOWN TO A KID, IT IS JUST NEVER

10  RIGHT.

11       THE COURT:  SO THAT REALLY GOES BACK MORE TO WHAT

12  THE FIRST ISSUE IS FOR YOU, WHICH IS, IT IS VERY DIFFICULT

13  FOR YOU TO EVEN HEAR ABOUT THESE CHARGES?

14       PROSPECTIVE JUROR MULDER:  YES.

15       THE COURT:  COUNSEL, WISH TO INQUIRE?

16       MR. AARON:  NO, YOUR HONOR.

17       MR. MICHAEL:  THE GOVERNMENT WOULD STIPULATE.

18       THE COURT:  ALL RIGHT.  MR. AARON?

19       MR. AARON:  WE WOULD STIPULATE.

20       THE COURT:  ALL RIGHT.  THANK YOU.  I'M GOING TO

21  EXCUSE YOU --

22       PROSPECTIVE JUROR MULDER:  ALL RIGHT.  THANK YOU.

23       THE COURT:  -- MS. MULDER.  AND I THANK YOU AGAIN

24  FOR YOUR HONESTY IN ANSWERING THE QUESTIONS.  WE REALLY

25  APPRECIATE THAT AND YOUR SERVICE IN APPEARING LAST WEEK AND

1    THIS WEEK.  THANK YOU VERY MUCH.  YOU'RE EXCUSED.

2               PROSPECTIVE JUROR MULDER:  THANK YOU.

3          (PROSPECTIVE JUROR MULDER EXITS THE COURTROOM.)

4        (PROSPECTIVE JUROR NYBERG IS PRESENT IN THE COURTROOM.)

5               THE COURT:  MR. NYBERG.

6               GOOD MORNING, MR. NYBERG.

7               PROSPECTIVE JUROR NYBERG:  GOOD MORNING.

8               THE COURT:  YOU MAY HAVE A SEAT IN THE JURY BOX

9    ANYWHERE YOU LIKE.

10              WE'RE TAKING THE OPPORTUNITY TO TALK TO MANY OF THE

11   JURORS ONE BY ONE BEFORE WE BEGIN WITH THE WHOLE PANEL SO

12   THAT WE CAN ASK YOU SOME QUESTIONS ABOUT YOUR ANSWERS, AND

13   GIVE YOU A LITTLE MORE PRIVACY WHILE WE DO THAT.

14              YOU INDICATED IN YOUR QUESTIONNAIRE ANSWERS THAT

15   BOTH YOUR WIFE AND YOUR SISTER WERE RAPED MANY YEARS AGO; IS

16   THAT RIGHT?

17              CAN YOU TELL ME ABOUT THE SITUATION WITH YOUR WIFE?

18              PROSPECTIVE JUROR NYBERG:  IT WAS A DATE RAPE.

19              THE COURT:  DO YOU KNOW IF ANYONE WAS PROSECUTED?

20              PROSPECTIVE JUROR NYBERG:  NO.

21              THE COURT:  YOU DON'T KNOW?

22              PROSPECTIVE JUROR NYBERG:  NO, THEY WERE NOT.

23              THE COURT:  NO ONE WAS PROSECUTED?

24              PROSPECTIVE JUROR NYBERG:  RIGHT.

25              THE COURT:  DID YOUR WIFE REPORT IT TO THE

1   AUTHORITIES, DO YOU KNOW?  I KNOW THAT THIS WAS BEFORE YOU

2   WERE MARRIED.

3              PROSPECTIVE JUROR NYBERG:  RIGHT.  I REALLY DON'T

4   KNOW.  BUT I DOUBT THAT SHE PURSUED IT.  I DOUBT THAT SHE DID

5   ANYTHING.

6              THE COURT:  HOW OLD WAS SHE AT THE TIME?

7              PROSPECTIVE JUROR NYBERG:  WELL, SHE MUST HAVE BEEN

8   AT LEAST IN HER EARLY 30S, I WOULD SAY.

9              THE COURT:  SO, HOW LONG AGO WAS THAT?

10             PROSPECTIVE JUROR NYBERG:  WELL, I DON'T KNOW.  IT

11  WAS AFTER HER FIRST DIVORCE, SO --

12             THE COURT:  APPROXIMATELY 10 YEARS AGO?  TWENTY

13  YEARS AGO?

14             PROSPECTIVE JUROR NYBERG:  OH, I WOULD SAY PROBABLY

15  15.

16             THE COURT:  WAS SHE TREATED BY A PHYSICIAN

17  AFTERWARDS, DO YOU KNOW?

18             PROSPECTIVE JUROR NYBERG:  NO.  BUT SHE HAS SINCE

19  GOTTEN HERPES FROM IT.

20             THE COURT:  SO SHE HAS BEEN TREATED FOR THAT?

21             PROSPECTIVE JUROR NYBERG:  WELL, IT IS JUST AN

22  ONGOING THING.

23             THE COURT:  AND HAS SHE GOTTEN ANY COUNSELING, ANY

24  PSYCHOLOGICAL COUNSELING OR THERAPY, OR ANYTHING LIKE THAT?

25             PROSPECTIVE JUROR NYBERG:  WELL, SHE IS KIND OF A

1   COUNSELOR AT A DIVORCE GROUP, THAT WAS BECAUSE OF HER FIRST

2   MARRIAGE.  SHE KIND OF KNOWS THAT.  I THINK SHE'S DEALT WITH

3   IT.

4           THE COURT:  NOW, YOU SAID YOUR SISTER ALSO WAS --

5           PROSPECTIVE JUROR NYBERG:  RIGHT.

6           THE COURT:  -- A RAPE VICTIM?

7           PROSPECTIVE JUROR NYBERG:  THAT WAS AT AN ALL-NIGHT

8   CONVENIENCE STORE, AND SHE HADN'T TOLD ME THAT UNTIL LIKE A

9   FEW YEARS AGO.

10          THE COURT:  AND THAT HAPPENED, YOU SAID, ABOUT 30

11  YEARS AGO?

12          PROSPECTIVE JUROR NYBERG:  YEAH.

13          THE COURT:  NO ONE WAS EVER PROSECUTED IN

14  CONNECTION WITH THAT?

15          PROSPECTIVE JUROR NYBERG:  NO.

16          THE COURT:  DO YOU KNOW IF THAT WAS EVER REPORTED

17  TO THE POLICE?

18          PROSPECTIVE JUROR NYBERG:  I DOUBT IT.

19          THE COURT:  AND YOU DOUBT IT BECAUSE?

20          PROSPECTIVE JUROR NYBERG:  SHE CONTINUED WORKING

21  THERE FOR A WHILE.  SHE DIDN'T TELL ME MUCH.

22          THE COURT:  DO YOU REMEMBER ANYTHING ELSE SHE TOLD

23  YOU ABOUT IT?

24          PROSPECTIVE JUROR NYBERG:  NO.  SHE JUST, IN

25  PASSING, LET ME KNOW.

1          THE COURT:  JUST IN PASSING TO LET YOU KNOW?

2          PROSPECTIVE JUROR NYBERG:  SHE LET ME KNOW THAT

3    THAT HAD HAPPENED TO HER.

4          THE COURT:  DID YOU HAVE ANY DISCUSSION ABOUT IT?

5          PROSPECTIVE JUROR NYBERG:  NO.  I MEAN, SHE SAYS AS

6    FAR AS SHE THOUGHT THAT HER BLOOD PRESSURE WENT UP FOR A

7    WHILE AFTER THAT, YOU KNOW, NOT KNOWING ANYTHING.  BUT I

8    THINK IT -- SHE REASSESSED THE KIND OF POWER SHE HAS OVER HER

9    LIFE ON THAT.

10          THE COURT:  WELL, CAN YOU TELL ME WHAT YOU MEAN BY

11    THAT A LITTLE BIT?  EXPLAIN THAT.

12          PROSPECTIVE JUROR NYBERG:  WELL, SHE JUST -- THINGS

13    HAPPEN.  AND SHE, YOU KNOW, IT WAS BROUGHT CLEAR TO HER YOU

14    DON'T NECESSARILY KNOW WHAT'S GOING TO BE AROUND THE CORNER.

15          THE COURT:  HOW OLD WAS YOUR SISTER AT THE TIME?

16          PROSPECTIVE JUROR NYBERG:  SHE WAS PROBABLY ABOUT

17    18.

18          THE COURT:  AS FAR AS SITTING AS A JUROR ON THIS

19    CASE, AS YOU KNOW, THERE ARE SORT OF TWO SETS OF CHARGES

20    HERE.  ONE, DEALING WITH PORNOGRAPHY, POSSESSION OF CHILD

21    PORNOGRAPHY, AND ONE SET DEALING WITH ALLEGED MOLESTATION OF

22    A SEVEN-YEAR-OLD BOY.

23          WOULD THE EXPERIENCES YOU HAVE TOLD ME ABOUT THAT

24    YOUR WIFE AND YOUR SISTER -- FIRST OF ALL, DO YOU BELIEVE

25    THAT BOTH OF THEM WERE RAPED?

1          PROSPECTIVE JUROR NYBERG:  OH, YEAH.

2          THE COURT:  ANYTHING ABOUT THOSE EXPERIENCES AND

3   WHAT YOU HEARD ABOUT THEM THAT WOULD AFFECT YOUR ABILITY TO

4   BE FAIR TO BOTH SIDES IN THIS CASE?

5          PROSPECTIVE JUROR NYBERG:  NO.  ACTUALLY, NO.

6          THE COURT:  THE JURORS IN THIS CASE, IN CONSIDERING

7   ALL THE EVIDENCE, WILL HAVE TO VIEW THE PORNOGRAPHY, THE

8   CHILD PORNOGRAPHY, THAT THE DEFENDANT IS ACCUSED IN THIS CASE

9   OF POSSESSING.  AND THAT INCLUDES SOME IMAGES, STILL IMAGES,

10  AND TWO SHORT VIDEO CLIPS.

11         YOU STATED ON THE QUESTIONNAIRE THAT YOU DON'T WISH

12  TO SEE ANY TYPE OF PORNOGRAPHY?

13         PROSPECTIVE JUROR NYBERG:  RIGHT.  I THINK I GOT

14  THAT DOWN A LITTLE BETTER THAN MARTHA STEWART, YOU KNOW.  I

15  DON'T THINK YOU HAVE TO SEE IT TO KNOW.  BASICALLY, YOU CAN

16  PRETTY WELL UNDERSTAND THE SCOPE OF IT.

17         THE COURT:  IF YOU WERE SEATED AS A JUROR ON THE

18  CASE, WOULD YOU BE ABLE TO FOLLOW THE COURT'S INSTRUCTIONS

19  AND LOOK AT THE EVIDENCE, CONSIDER ALL THE EVIDENCE?  AND

20  THAT MEANS IN THIS CASE LOOKING AT THE IMAGES THAT THE

21  DEFENDANT IS ACCUSED OF POSSESSING.

22         PROSPECTIVE JUROR NYBERG:  WELL, I DON'T SEE THAT

23  IT IS NECESSARY.  I MEAN, THERE IS ALREADY STUFF, YOU KNOW,

24  BUT THEN THERE IS -- I DON'T THINK IT'S -- I WOULD RATHER

25  NOT.

1          THE COURT:  ALL RIGHT.  WELL, I APPRECIATE YOUR

2    CANDOR ABOUT IT.  LET ME GIVE YOU ANOTHER EXAMPLE.  IT IS NOT

3    A PERFECT EXAMPLE, BUT IT IS THE BEST ONE I COULD COME UP

4    WITH.

5          FIRST OF ALL, NOT EVERYONE CAN SIT AS A JUROR ON

6    EVERY CASE.  YOU MIGHT BE PERFECTLY QUALIFIED TO SIT AS A

7    JUROR IN ONE KIND OF CASE AND NOT ANOTHER.  THAT APPLIES TO

8    ALL OF US.

9          BUT LET'S SAY THERE WAS A MURDER CASE BEFORE THE

10   COURT, ALL RIGHT.  AND THE JURORS ON THAT CASE WERE GOING TO

11   BE ASKED TO LOOK AT SOME VERY DISTURBING AUTOPSY PHOTOGRAPHS

12   OF --

13          PROSPECTIVE JUROR NYBERG:  RIGHT.

14          THE COURT:  -- VERY GRIZZLY, DISTURBING AUTOPSY

15   PHOTOGRAPHS.  AND A LOT OF THEM IT WOULD BE NECESSARY FOR THE

16   JURORS TO REACH THEIR DECISION TO LOOK AT THAT.

17          SOME JURORS WOULD SAY, I COULD NOT DO IT.  I COULD

18   NOT LOOK AT THAT EVIDENCE, AND I COULD NOT FOLLOW THE COURT'S

19   INSTRUCTIONS TO DO SO.

20          IS THAT THE POSITION THAT YOU WOULD BE IN, IN THIS

21   CASE, IF YOU WERE SEATED AS A JUROR; YOU WOULD NOT BE ABLE TO

22   FOLLOW THE COURT'S INSTRUCTIONS AND REVIEW THE EVIDENCE?

23          PROSPECTIVE JUROR NYBERG:  I GUESS.  I MEAN, THE

24   POSSESSION OF PORNOGRAPHY CHARGE, IF IT IS PORNOGRAPHY, IT IS

25   REASONABLE TO ASSUME.  SO THEN THAT'S A DONE DEAL.  IT IS

```
 1   PART OF THE CASE, BUT IT SHOULD BE A CHARGE, YOU KNOW -- I
 2   MEAN, NOT A TRIAL.  I DON'T KNOW WHY I WOULD HAVE TO SEE
 3   THAT.
 4        I DON'T KNOW HOW TO PUT THIS IN WORDS, BUT, I MEAN,
 5   PEOPLE JUST ARE -- IF THEY HAVE NOT THOUGHT OF SOMETHING
 6   BEFORE, THEN IT IS PUT IN FRONT OF THEM, SOMETIMES IT IS --
 7   JUST DIGS AT THEM.  AND I THINK THAT'S WHY WE HAVE THE
 8   WIDESPREAD PROBLEM OF ALL THIS STUFF GOING ON THAT WE JUST
 9   NORMALLY THINK OF ON YOUR OWN.
10        THE COURT:  ALL RIGHT.  SO YOU HAVE STATED ON THE
11   QUESTIONNAIRE THAT YOU THOUGHT YOU COULD BE FAIR AND
12   IMPARTIAL?
13        PROSPECTIVE JUROR NYBERG:  AS FAR AS FIGURING OUT
14   THE FACTS AND GOING THROUGH THE CASE, YEAH.  THAT'S NOT A
15   PROBLEM.  YOU KNOW, I HOPE THERE IS A REAL QUESTION AS TO
16   WHAT HAPPENED, NOT JUST TRYING TO ASSESS THE AMOUNT.  I MEAN,
17   THE PORNOGRAPHY CHARGE WOULD BE ONE CHARGE.  THE MOLESTATION
18   WOULD BE DID IT HAPPEN OR NOT.  I MEAN, THAT'S WHAT I'M
19   ASSUMING.
20        THE COURT:  WELL, LET ME SEE IF THIS EXPLANATION
21   MAKES IT CLEAR:
22        AS TO ALL THE CHARGES IN THIS CASE, AND AS TO ANY
23   CASE, WHETHER IT IS A JAYWALKING CASE, OR A DRIVING OUTSIDE
24   THE SPEED LIMIT, OR A BANK ROBBERY, WHATEVER THE CASE MAY BE,
25   OR POSSESSION OF CHILD PORNOGRAPHY, THE GOVERNMENT -- ALL
```

1    THOSE CASES HAVE ONE THING IN COMMON.  THE GOVERNMENT HAS TO

2    PROVE THAT THE PERSON ACCUSED IS GUILTY, AND THEY HAVE TO

3    PROVE IT BEYOND A REASONABLE DOUBT.

4              DO YOU UNDERSTAND THAT?

5              PROSPECTIVE JUROR NYBERG:  YES.

6              THE COURT:  DO YOU AGREE WITH THAT?

7              PROSPECTIVE JUROR NYBERG:  YEAH, ABSOLUTELY.

8              THE COURT:  AND DO YOU AGREE THAT THAT PRESUMPTION

9    HAS TO BE APPLIED IN EVERY CASE, NO MATTER WHAT THE CRIME IS?

10             PROSPECTIVE JUROR NYBERG:  WELL, YEAH.  THAT'S THE

11   STRENGTH OF THE JURY SYSTEM.  I AGREE WITH THAT.

12             THE COURT:  IN THIS CASE, YOU'RE STILL TROUBLED BY

13   THE IDEA THAT YOU WOULD HAVE TO VIEW THE IMAGES, AND YOU

14   DON'T THINK YOU COULD DO THAT, OR WOULD WANT TO DO THAT?

15             PROSPECTIVE JUROR NYBERG:  WELL, IF ONE IMAGE WAS

16   THERE AND THAT RANG THE BELL FOR PORNOGRAPHY, WHY WOULD I

17   NEED TO SEE ANY MORE, IF IT IS ALL OF THE RELATIVE SAME LEVEL

18   OR WORSE?

19             THE COURT:  WELL, LET ME ASK YOU THIS:  IF THE

20   COURT INSTRUCTS YOU THAT YOU MUST CONSIDER ALL THE EVIDENCE

21   BEFORE YOU MAKE UP YOUR MIND ABOUT THE CASE --

22             PROSPECTIVE JUROR NYBERG:  THAT'S WHAT I'M SAYING.

23   THAT'S WHY I SAY THAT THE ORIGINAL CASE AGAINST PORNOGRAPHY

24   WAS SILLY THAT WE HAVE TO SIT THROUGH ALL OF IT JUST TO FIND

25   OUT IF IT IS ALL PORNOGRAPHY.  THAT'S SETTING YOU FOR

1    SENTENCING YOURSELF.  EXACTLY WHAT YOU DON'T WANT TO DO.

2              THE COURT:  OKAY.  ALL RIGHT.  COUNSEL WISH TO

3    INQUIRE?

4              MR. AARON:  THANK YOU, YOUR HONOR.

5              GOOD MORNING, SIR.  I APOLOGIZE.  I AM STILL NOT

6    CLEAR ON YOUR ANSWER.

7              IF YOU WERE ON THE JURY AND YOU HAD TO LOOK AT THE

8    IMAGES -- BECAUSE BOTH SIDES WILL PROBABLY MAKE ARGUMENTS

9    ABOUT THE IMAGES -- WILL YOU DO THAT?

10             PROSPECTIVE JUROR NYBERG:  WELL, IF YOU SHOWED ME

11   ONE IMAGE, YOU KNOW, AND IT WAS SOMETHING LESS THAN ARGUMENT,

12   YOU KNOW WHAT I MEAN?  THERE ARE NAKED IMAGES THAT ARE ART,

13   AND I WILL GO WITH THAT.  BUT THERE ARE NAKED IMAGES THAT

14   AREN'T.  IF I AM SEEING SOME KIND OF DEAL THAT'S OBVIOUSLY

15   EXPLICIT, WHY DO I HAVE TO GO FURTHER?

16             MR. AARON:  I SEE WHAT YOU'RE SAYING.

17             IN THIS CASE, YOU MAY HEAR EVIDENCE AND YOU MAY SEE

18   UP TO 30 OR SO IMAGES.  WOULD YOU BE ABLE TO LOOK AT ALL OF

19   THOSE?

20             PROSPECTIVE JUROR NYBERG:  I WOULD RATHER NOT.  I

21   MEAN, WHY WOULD I DO THAT TO MYSELF?

22             MR. AARON:  OKAY.  IN YOUR QUESTIONNAIRE YOU WERE

23   ASKED IF YOU HAVE ANY STRONGLY HELD RELIGIOUS, MORAL, OR

24   ETHICAL VIEWS ON HOMOSEXUALITY, YOU, YOUR FAMILY, OR CLOSE

25   ONES.  AND YOU WROTE, "THE MECHANICS DON'T WORK.  THE LAW

1    CANNOT REPAIR THE PSYCHE OF SOMEONE SUBJECTED TO THAT."

2              WHAT DID YOU MEAN WHEN YOU WROTE THAT?

3              PROSPECTIVE JUROR NYBERG:  AS FAR AS HOMOSEXUALITY

4    GOES, I THINK IT DOESN'T TAKE MUCH TO UNDERSTAND THAT THAT'S

5    NOT WHAT IT IS MADE FOR, OKAY.

6              ON THE OTHER END OF IT, THE JUSTICE SYSTEM DOESN'T

7    HAVE THE CAPABILITY OF FIXING THE VICTIM THERE.

8              MR. AARON:  IN THIS CASE, IT IS ALLEGED THAT THE

9    VICTIM IS A SEVEN-YEAR-OLD BOY.  DO YOU THINK THAT YOUR VIEWS

10   THAT THE LAW CAN'T REPAIR THE PSYCHE OF SOMEONE SUBJECTED TO

11   THAT, DO YOU THINK THAT THEY MIGHT BE -- YOUR VIEWS MIGHT BE

12   MAYBE MORE STRONGLY HELD, GIVEN THAT IT IS SUCH A YOUNG

13   CHILD?

14             PROSPECTIVE JUROR NYBERG:  EXACTLY.  THAT'S EXACTLY

15   WHERE I'M AT ON THAT.  YOU DON'T KNOW.  IT MAY NOT, YOU KNOW,

16   DESTROY THEM, BUT IT HAS A CHANCE.

17             MR. AARON:  WHAT KIND OF AFFECT DO YOU THINK, GIVEN

18   THAT THE CHILD IS SO YOUNG, WHAT TYPE OF AFFECT MIGHT THAT

19   HAVE ON YOU IN THIS TRIAL?

20             PROSPECTIVE JUROR NYBERG:  WELL, ON ME, I MEAN,

21   THAT KIND OF A CRIME TO ME, IF IT GOES TO TRIAL, IT IS NOT

22   REALLY THE SEX THING; IT IS THE SPOILING OF INNOCENCE.  LIKE,

23   IT GOES BEYOND THE ACTUAL THING.  IT IS ANOTHER WHOLE OTHER

24   LEVEL OF DESTRUCTION.

25             MR. AARON:  YOU MIGHT HEAR EVIDENCE IN THIS CASE

1    THAT THE DEFENDANT AND OTHER PERSONS HE KNEW FANTASIZED OR

2    DISCUSSED HAVING SEX WITH CHILDREN, SOME VERY YOUNG CHILDREN.

3              HOW MIGHT THAT AFFECT YOU?

4              PROSPECTIVE JUROR NYBERG:  I THINK PEOPLE DO STUPID

5    THINGS AND NOT LOOKING AT THE CONSEQUENCES OF IT.  I JUST SAY

6    THAT TO ME, SEE, THAT IS PUTTING THINGS IN MOTION.  IT IS

7    THEIR FREE WILL PUT IN MOTION TO GET TO THE END RESULT.  IT

8    DOESN'T HELP THE CASE ANY.

9              MR. AARON:  DO YOU THINK THAT SORT OF THING MIGHT

10   MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL HERE?

11             PROSPECTIVE JUROR NYBERG:  WELL, YEAH.  IF THAT'S

12   WHAT WENT ON, I WOULD JUST -- I WOULD HAVE A HARD TIME.  I

13   MEAN, BECAUSE IT SOUNDS LIKE THE ROCK'S ALREADY ROLLING DOWN

14   THE HILL.

15             MR. AARON:  SO IF THERE WAS EVIDENCE OF DISCUSSIONS

16   OF FANTASY, YOU WOULD THINK THEN THAT'S CLEAR?

17             PROSPECTIVE JUROR NYBERG:  NO.  IT DOESN'T MAKE IT

18   CLEAR, NECESSARILY.  GEEZ, I READ A ROLLING STONE HERE.  I

19   COULDN'T BELIEVE WHAT IS HAPPENING IN THAT MAGAZINE.  BUT,

20   YOU KNOW, THE SOCIETY IS PEOPLE -- PEOPLE ARE WILLING TO

21   QUESTION WHAT HAS NOT GONE BEFORE WITHOUT LOOKING AT THE

22   CONSEQUENCES OF WHERE IT GOES.

23             THAT'S SILLY, BUT THAT'S WHAT THEY DO.

24             THE COURT:  ALL RIGHT.  I THINK WE SHOULD WRAP THIS

25   UP.  THANK YOU, MR. NYBERG.  YOU CAN GO BACK DOWNSTAIRS TO

1    THE JURY ASSEMBLY ROOM.

2          (PROSPECTIVE JUROR NYBERG EXITS THE COURTROOM.)

3            THE COURT:  I SHOULD HAVE NOT PERMITTED ANY

4    ATTORNEY QUESTIONING BECAUSE THIS JUROR MADE IT CLEAR HE

5    WOULD NOT FOLLOW THE COURT'S INSTRUCTIONS AND VIEW THE

6    IMAGES, CHILD PORNOGRAPHY IMAGES.  SO I'M GOING TO EXCUSE

7    THIS JUROR.

8            MR. MICHAEL:  THE GOVERNMENT WOULD STIPULATE.

9            THE COURT:  ALL RIGHT.

10           MR. MICHAEL:  YOUR HONOR, MAY I ASK A QUESTION,

11   MAKE SURE THE GOVERNMENT IS CLEAR ON THE INSTRUCTIONS YOU'RE

12   GOING TO BE GIVING TO THE JURORS.

13           THE JURORS ARE REQUIRED TO CONSIDER ALL THE

14   EVIDENCE AND THE IMAGES, BUT THEY ALSO -- THERE IS SOME

15   DISCRETION TO THE EXTENT THEY CAN LOOK AWAY WHEN THE IMAGES

16   ARE BEING SHOWN.

17           MY UNDERSTANDING IS THEY WILL BE PRESENTED TO THE

18   JURORS.  THEY WILL BE DESCRIBED, THEY WILL BE AVAILABLE TO

19   THEM, AND THEY SHOULD CONSIDER THEM.

20           THE COURT:  WELL, THEY HAVE TO LOOK AT THEM.  THEY

21   DON'T HAVE TO STARE AT THE SCREEN, BUT THEY HAVE TO LOOK AT

22   THEM.  IT IS EVIDENCE AND IT HAS TO BE CONSIDERED.

23           MR. MICHAEL:  BUT I JUST WANT TO MAKE SURE THEY CAN

24   LOOK AWAY.  I THINK YOUR HONOR MADE IT CLEAR --

25           THE COURT:  WELL, I DON'T WANT YOU TO TELL THEM OR

1    ANYBODY TO TELL THEM THEY CAN LOOK AWAY.

2            MR. MICHAEL:  THAT'S WHAT I'M GETTING AT HERE.  I

3    JUST WANT TO UNDERSTAND IF THEY LOOK, THEY DON'T HAVE TO --

4            THE COURT:  I DON'T WANT YOU TELLING THEM ANYTHING.

5            MR. MICHAEL:  I UNDERSTAND.  I DIDN'T KNOW IF THE

6    INSTRUCTION TO THE JURORS, WHEN THEY ARE SHOWN, THAT YOU NEED

7    TO LOOK AT THIS EVIDENCE, BUT YOU DON'T HAVE TO STARE AT IT

8    FOR THE ENTIRETY THAT IT IS BEING SHOWN ON THE SCREEN.

9            THE COURT:  WELL, I'M NOT GOING TO SAY ANYTHING.  I

10   NEVER DO WHEN ANYTHING IS SHOWN.  I'M GOING TO LOOK AT THE

11   JURORS.  AND IF I SEE IT APPEARS THAT THERE IS SOMEBODY WHO

12   IS JUST ABSOLUTELY NOT LOOKING AT ALL, THEN I WILL TELL THEM,

13   WHEN THE IMAGE IS SHOWN, LADIES AND GENTLEMEN, YOU MUST LOOK.

14   YOU DON'T HAVE TO KEEP LOOKING, BUT YOU MUST LOOK.

15           MR. MICHAEL:  OKAY.

16           THE COURT:  IS THAT AGREEABLE TO BOTH SIDES?

17           MR. MICHAEL:  THAT'S WHAT THE GOVERNMENT WAS

18   SEEKING, YOUR HONOR.

19           THE COURT:  ALL RIGHT.  LET'S SEE.  NOW, BEFORE WE

20   BRING ANYBODY ELSE UP OR IN, LET'S TALK ABOUT WHAT THE

21   SCHEDULE SHOULD BE.  WE HAVE REALLY GOT TO SPEED THINGS UP.

22   WE HAVE SIX MORE JURORS -- NO, SEVEN MORE JURORS TO QUESTION

23   INDIVIDUALLY, I BELIEVE.  THAT WOULD BE ALEX PANER, SARA

24   RAMIREZ, TRACY SATO, SUSAN STEFFEN, JEWEL WILMOTHAVILES.

25           MR. AARON:  I'M SORRY.  WAS GUSTAVO VASQUEZ,

1    QUESTION 7, WAS HE ONE OF THE --

2              THE COURT:  WELL, ALBIN YAMBAO AND ROBERT TIGHE, I

3    DIDN'T SEE THAT WE HAD QUESTIONS TO ASK OF THEM.

4              MR. AARON:  THE ONLY REASON THAT I HAD ASKED ABOUT

5    MR. TIGHE WAS HE BELIEVED THAT THERE HAD BEEN PRESS.

6              THE COURT:  YES, I UNDERSTAND THAT.  SO THAT

7    SHOULDN'T TAKE LONG.

8              MR. AARON:  I DON'T REMEMBER ANYMORE.  I DIDN'T

9    HAVE NOTES FOR JUROR YAMBAO, BUT I DID HAVE NOTES FOR JUROR

10   VASQUEZ, AND IT IS AS TO QUESTION 7.

11             THE COURT:  ALL RIGHT.  WELL, I HAD A QUESTION FOR

12   JUROR YAMBAO, NOT SURE IF HE CAN BE FAIR BECAUSE HE HAS

13   CHILDREN.  BUT HE SAID HE WILL DO HIS BEST TO BE FAIR AND

14   IMPARTIAL.  I THINK WE SHOULD ASK ABOUT THAT QUICKLY.

15             LET'S BRING MR. PANER IN.  BRING THE REST OF THE

16   JURORS UP AFTER BRINGING HIM IN.  AND THEN THE JURY ROOM, WE

17   CAN TELL EVERYONE ELSE THEY CAN GO TO LUNCH UNTIL 1:30.

18     (PROSPECTIVE JUROR PANER IS PRESENT IN THE COURTROOM.)

19             THE COURT:  GOOD MORNING, MR. -- IS IT PANER?

20             PROSPECTIVE JUROR PANER:  PAN-AH.

21             THE COURT:  THANK YOU.  AND IT IS REALLY "GOOD

22   AFTERNOON" BY NOW.  I WILL VOUCH FOR THAT.

23             YOU MENTIONED, IN ANSWER TO THE QUESTIONNAIRE, YOU

24   MENTIONED THAT YOUR FATHER WAS A JUROR ONCE IN A TRIAL?

25             PROSPECTIVE JUROR PANER:  YEAH.

1          THE COURT:  AND YOU TALKED TO HIM ABOUT HIS

2     EXPERIENCE?

3          PROSPECTIVE JUROR PANER:  NOT REALLY, JUST VAGUELY

4     TOLD ME ABOUT IT AFTER THAT.

5          THE COURT:  SO HE TALKED TO YOU AFTER THE TRIAL WAS

6     OVER?

7          PROSPECTIVE JUROR PANER:  YEAH.

8          THE COURT:  DID HE DISCUSS IT WITH YOU AT ALL

9     DURING THE TRIAL?

10         PROSPECTIVE JUROR PANER:  NO.

11         THE COURT:  WHAT DID HE TELL YOU ABOUT THE CASE?

12         PROSPECTIVE JUROR PANER:  HE TOLD ME IT INVOLVED

13    SEXUAL ASSAULT, THAT THERE WAS A RAPE, A RAPE, AND THE VICTIM

14    WAS A MOTHER AND ALSO A CHILD.

15         THE COURT:  AND BOTH OF THEM WERE ASSAULTED?

16         PROSPECTIVE JUROR PANER:  YES.

17         THE COURT:  DID HE TELL YOU ANYTHING ABOUT THE

18    EVIDENCE THAT WAS PRESENTED?

19         PROSPECTIVE JUROR PANER:  NO.

20         THE COURT:  DID HE TELL YOU ANYTHING ABOUT HIS

21    FELLOW JURORS OR THE DELIBERATION PROCESS?

22         PROSPECTIVE JUROR PANER:  NO, NEVER DID.

23         THE COURT:  DID HE TELL YOU WHAT THE VERDICT WAS?

24         PROSPECTIVE JUROR PANER:  NO.

25         THE COURT:  WERE YOU CURIOUS ABOUT THE VERDICT?

1        PROSPECTIVE JUROR PANER:  CROSSED MY MIND, BUT I

2   DIDN'T PURSUE IT.

3        THE COURT:  I WANT TO TALK TO MOST, WELL, MOST OF

4   THE JURORS INDIVIDUALLY ABOUT SOME OF THE ANSWERS TO THE

5   QUESTIONS BEFORE WE BEGIN TALKING TO THE ENTIRE GROUP.  AND I

6   JUST HAD A COUPLE OF QUESTIONS ABOUT YOUR ANSWERS.

7        YOU STATED THAT YOU HAVE BELIEFS THAT PORNOGRAPHY,

8   CHILD -- LET'S SEE.  PORNOGRAPHY OR SEXUALLY EXPLICIT STORIES

9   ARE MORALLY AND RELIGIOUSLY WRONG.  AND YOU WENT ON TO SAY,

10  "I BELIEVE I COULD BE IMPARTIAL BECAUSE I HAVE" -- IT LOOKS

11  LIKE THE WORD "NO" WAS THERE, AND THEN YOU CROSSED IT OUT.

12       SO IT READS, "...BECAUSE I HAVE PRECONCEIVED

13  NOTIONS OF HUMAN BEHAVIOR AND RESPONSIBILITY."

14       COULD YOU EXPLAIN THAT A LITTLE BIT?  WHAT ARE YOUR

15  PRECONCEIVED NOTIONS?

16       PROSPECTIVE JUROR PANER:  I BELIEVE THAT I MEANT TO

17  THAT TO BE PARTIAL, PARTIAL.  MY PRECONCEIVED NOTIONS ARE

18  BASICALLY CHRISTIANS ARE ALL CHRISTIAN.  I JUST BELIEVE IT IS

19  MORALLY WRONG.  AND IF THE JURY WAS PRESENTED WITH EVIDENCE,

20  ESPECIALLY WITH PORNOGRAPHY, I WOULD HAVE A PRECONCEIVED

21  NOTION THAT THE EVIDENCE AND THE FACT OF POSSESSION, THAT

22  WOULD TELL A LOT ABOUT A PERSON.

23       THE COURT:  DOES THE FACT THAT THE DEFENDANT IS

24  ACCUSED OF THAT, DOES THAT MAKE YOU TEND TO THINK HE IS MORE

25  LIKELY TO BE GUILTY THAN IF HE WAS ACCUSED OF ANOTHER KIND OF

1    CRIME?

2              PROSPECTIVE JUROR PANER:  ESPECIALLY IF THAT WAS

3    THE -- THE EVIDENCE IS THERE, YES, ESPECIALLY.

4              THE COURT:  BUT ONLY IF THE EVIDENCE IS THERE?

5              PROSPECTIVE JUROR PANER:  YES.

6              THE COURT:  LET ME ASK IT ANOTHER WAY:  WOULD IT

7    TAKE LESS EVIDENCE -- LET ME START OVER AGAIN.

8              IN EVERY CRIMINAL CASE, NO MATTER WHAT KIND OF A

9    CASE, WHETHER IT IS BANK ROBBERY, OR JAYWALKING, OR DRIVING

10   OVER THE SPEED LIMIT, OR POSSESSING CHILD PORNOGRAPHY, THE

11   DEFENDANT, IN EVERY ONE OF THOSE CASES, IS ENTITLED TO BE

12   PRESUMED INNOCENT UNTIL THE GOVERNMENT PROVES HIM GUILTY.

13             DO YOU AGREE WITH THAT?

14             PROSPECTIVE JUROR PANER:  I AGREE WITH IT.  I DON'T

15   KNOW IF I COULD FOLLOW IT, THOUGH.

16             THE COURT:  THAT'S MY QUESTION.

17             AND THEN A CONNECTED QUESTION IS, YOU'RE PRESUMED

18   INNOCENT REGARDLESS OF WHAT CRIME YOU'RE ACCUSED OF.  AND

19   WITH ANY OF THOSE CRIMES, THE BURDEN ON THE GOVERNMENT TO

20   PROVE GUILT IS THE SAME.  WHATEVER THE CRIME, THE GOVERNMENT

21   HAS TO PROVE YOU GUILTY BEYOND A REASONABLE DOUBT.

22             NOW, IF YOU'RE SITTING AS A JUROR ON A CASE WHERE

23   SOMEBODY IS ACCUSED OF POSSESSING CHILD PORNOGRAPHY OR

24   MOLESTING A CHILD, WOULD YOU STILL MAKE THE GOVERNMENT PROVE

25   THAT BEYOND A REASONABLE DOUBT?  OR WOULD YOU THINK LESS

1    EVIDENCE WOULD BE ENOUGH?

2              PROSPECTIVE JUROR PANER:  I WOULD STILL -- FOR ME,

3    IT WOULDN'T REQUIRE A LARGE AMOUNT OF EVIDENCE.  JUST THE

4    FACT I HEAR A LOT OF STORIES ON THE INTERNET BEFORE AND ON

5    THE NEWS IN THE PAST YEARS ABOUT IT, YOU KNOW.  AND READING

6    ABOUT HOW A LOT OF PORNOGRAPHY, YOU KNOW, STORIES AFFECT A

7    PERSON, I WOULD PUT A LOT OF WEIGHT ON THE PAST, IN WHAT I

8    HAVE HEARD IN THE PAST.

9              THE COURT:  ALL RIGHT.  NOW, YOU STATED THAT YOU

10   HAVE RELIGIOUS AND MORAL BELIEFS THAT HOMOSEXUALITY IS WRONG?

11             PROSPECTIVE JUROR PANER:  YES.

12             THE COURT:  AND IN THIS CASE ON THE MOLESTATION

13   CHARGES, THE ALLEGATIONS OR THE ACCUSATIONS ARE THAT THE

14   DEFENDANT, MR. SANDERS, MOLESTED A SEVEN-YEAR-OLD BOY.

15             WOULD YOUR BELIEFS, YOUR RELIGIOUS OR MORAL BELIEFS

16   THAT YOU REFERRED TO, WOULD THAT AFFECT YOUR ABILITY TO SIT

17   AS A FAIR AND IMPARTIAL JUROR IN THIS CASE, GIVEN THAT THERE

18   ARE THESE MOLESTATION CHARGES?

19             PROSPECTIVE JUROR PANER:  MY BELIEFS, NO, I DON'T

20   THINK THEY WOULD BE.  I WOULD -- LIKE, I WOULD ALSO LIKE -- I

21   DON'T WANT TO HAVE A PERSON CONVICTED WRONGLY.  SO I WOULD

22   WANT TO SEE, MAKE SURE THAT THAT PERSON HAS A FAIR CHANCE AS

23   WELL.

24             THE COURT:  AND SO AS TO THE MOLESTATION CHARGES,

25   YOU WOULD BE ABLE TO HOLD THE GOVERNMENT TO ITS BURDEN OF

1    PROVING THE DEFENDANT GUILTY BEYOND A REASONABLE DOUBT?

2               PROSPECTIVE JUROR PANER:  YEAH.  THAT WOULD BE MY

3    CONCERN, TOO, IF THAT PERSON GOT A FAIR TRIAL.

4               THE COURT:  BUT YOU HAVE MORE OF A CONCERN ABOUT

5    THE CHILD PORNOGRAPHY?

6               PROSPECTIVE JUROR PANER:  THAT'S -- YEAH.  THAT HAS

7    AN EFFECT ON ME, YES.

8               THE COURT:  MR. MICHAEL, DO YOU WISH TO INQUIRE?

9               MR. MICHAEL:  NO QUESTIONS, YOUR HONOR.

10              THE COURT:  MR. AARON?

11              MR. AARON:  THANK YOU.

12              SIR, YOU WROTE -- YOU WERE ASKED, "COULD YOU BE

13   FAIR AND IMPARTIAL IN A CASE IF IT WAS ALLEGED THAT SOMEONE

14   POSSESSED CHILD PORNOGRAPHY?"

15              AND YOU WROTE, "NO."

16              IS THAT STILL YOUR STATE OF MIND?

17              PROSPECTIVE JUROR PANER:  I WOULD SAY, YES, IF THE

18   PERSON HAS PORNOGRAPHY AND MAGAZINE, OR IF IT IS ON HIS

19   COMPUTER FILE, THAT HAS A BIG BEARING ON ME.

20              MR. AARON:  EVEN IF NOT CHILD PORNOGRAPHY?

21              PROSPECTIVE JUROR PANER:  EVEN IF NOT CHILD

22   PORNOGRAPHY, YES.

23              MR. AARON:  THANK YOU.  NOTHING FURTHER.

24              THE COURT:  THANK YOU VERY MUCH, MR. PANER.  YOU

25   MAY GO BACK DOWN TO THE JURY ASSEMBLY ROOM.

```
1              (PROSPECTIVE JUROR PANER EXITS THE COURTROOM.)

2              MR. AARON:  CAUSE, YOUR HONOR.

3              MR. MICHAEL:  WE STIPULATE.

4              THE COURT:  MR. PANER IS EXCUSED.

5              AND WOULD YOU CALL DOWN TO THE JURY ROOM AND LET

6    THEM KNOW.  AND BRING MS. RAMIREZ IN.

7       (PROSPECTIVE JUROR RAMIREZ IS PRESENT IN THE COURTROOM.)

8              THE COURT:  GOOD AFTERNOON, MS. RAMIREZ.

9              PROSPECTIVE JUROR RAMIREZ:  GOOD AFTERNOON.

10             THE COURT:  I UNDERSTAND THAT YOU FORGOT TO CALL IN

11   LAST NIGHT?

12             PROSPECTIVE JUROR RAMIREZ:  YES.

13             THE COURT:  YOU HAD TO DRIVE HERE THIS MORNING FROM

14   LONG BEACH?

15             PROSPECTIVE JUROR RAMIREZ:  YES.

16             THE COURT:  IF YOU'RE SELECTED TO SIT AS A JUROR ON

17   THIS CASE, YOU DON'T HAVE ANY PROBLEM SERVING?

18             PROSPECTIVE JUROR RAMIREZ:  NO.

19             THE COURT:  YOU WILL REMEMBER TO BE HERE EVERY DAY?

20             PROSPECTIVE JUROR RAMIREZ:  YES, I WILL.

21             THE COURT:  OKAY.  THANK YOU.

22             MS. RAMIREZ, I'M TALKING TO MANY OF THE JURORS ONE

23   BY ONE BEFORE WE GET STARTED AS A GROUP SO I CAN ASK YOU JUST

24   A FEW FOLLOW-UP QUESTIONS BASED ON THE ANSWERS YOU GAVE US TO

25   YOUR QUESTIONNAIRE.  AND YOU INDICATED THAT YOU WORK IN A
```

```
 1    PSYCHOLOGY CENTER?

 2              PROSPECTIVE JUROR RAMIREZ:  THAT'S RIGHT.

 3              THE COURT:  SO YOU'RE USED TO HEARING ALL KINDS OF

 4    DIFFERENT INFORMATION AND MATERIAL.  WHAT DO YOU DO?

 5              PROSPECTIVE JUROR RAMIREZ:  I DO INTAKE, LIKE

 6    ADMISSIONS.

 7              THE COURT:  ALL RIGHT.  AND WHAT KIND OF PSYCHOLOGY

 8    CENTER IS IT?

 9              PROSPECTIVE JUROR RAMIREZ:  IT IS A NONPROFIT

10    ORGANIZATION, AND IT IS FUNDED BY DIFFERENT -- LIKE, THE

11    COUNTY ONE, AND THEN WE GET SOURCES FROM HOSPITALS.

12              THE COURT:  WHAT KINDS OF SERVICES DO YOU PROVIDE?

13              PROSPECTIVE JUROR RAMIREZ:  ALL KINDS.  ALL KINDS.

14              THE COURT:  COUNSELING SERVICES?

15              PROSPECTIVE JUROR RAMIREZ:  YES, AND PSYCHIATRY.

16              THE COURT:  SO IT IS BOTH PSYCHOLOGICAL COUNSELING

17    AND PSYCHIATRY?

18              PROSPECTIVE JUROR RAMIREZ:  YES.

19              THE COURT:  IS IT FOR LOW-INCOME PERSONS?

20              PROSPECTIVE JUROR RAMIREZ:  EVERYBODY.  EVERYBODY.

21    WE MOSTLY WORK WITH MEDICAL FAMILY CLIENTS.

22              THE COURT:  I'M SORRY, MEDICAL?

23              PROSPECTIVE JUROR RAMIREZ:  FAMILIES, YOU KNOW, THE

24    STATE FAIR INSURANCE, HMO.

25              THE COURT:  RIGHT.  IS THERE ANY PARTICULAR AGE
```

1    GROUP THAT YOU WORK WITH?

2              PROSPECTIVE JUROR RAMIREZ:  YES, FROM TWO TO

3    EIGHTEEN.

4              THE COURT:  SO CHILDREN?

5              PROSPECTIVE JUROR RAMIREZ:  YES.

6              THE COURT:  OH, I SEE.  YOU SAID YOU WORK IN

7    INTAKE?

8              PROSPECTIVE JUROR RAMIREZ:  YES.

9              THE COURT:  CAN YOU TELL US WHAT YOU DO?

10             PROSPECTIVE JUROR RAMIREZ:  I INTERVIEW THE CLIENTS

11   AND MAKE SURE THEY HAVE EVERYTHING THAT WE NEED TO START

12   DOING THE COUNSELING, AND ALSO VERIFY INSURANCE.  AND IF THEY

13   DON'T HAVE INSURANCE OR THEY NEED SOME SORT OF ASSISTANCE

14   WITH SERVICES TO GET ANOTHER TYPE OF BENEFITS, I CAN HELP

15   THEM GET THAT BECAUSE I'M A CERTIFIED ASSISTANT.

16             THE COURT:  ALL RIGHT.  DO YOU HAVE ANY SPECIALIZED

17   TRAINING IN COUNSELING?

18             PROSPECTIVE JUROR RAMIREZ:  YOU MEAN TO COUNSEL?

19             THE COURT:  TO DO COUNSELING?

20             PROSPECTIVE JUROR RAMIREZ:  JUST THE BASIC.  JUST

21   TO HELP IN CASE OF A CRISIS.

22             THE COURT:  WAS THAT ON-THE-JOB TRAINING --

23             PROSPECTIVE JUROR RAMIREZ:  YES.

24             THE COURT:  -- THAT YOU GOT IN CONNECTION WITH THIS

25   WORK?

1                    PROSPECTIVE JUROR RAMIREZ:  YES.

2                    THE COURT:  CAN YOU TELL US WHAT YOUR EDUCATION,

3     YOUR FORMAL EDUCATION IS?

4                    PROSPECTIVE JUROR RAMIREZ:  MY FORMAL EDUCATION IS

5     BILINGUAL SECRETARY.  I DID ALL MY SCHOOLING IN GUADELAJARA,

6     MEXICO.  AND THAT'S ABOUT IT.

7                    THE COURT:  ALL RIGHT.  SO YOUR WORK AT THIS

8     CLINIC, IN TERMS OF WHAT YOU MENTIONED, CRISIS MANAGEMENT AND

9     SO FORTH, THAT'S ALL TRAINING THAT YOU GOT THERE?

10                    PROSPECTIVE JUROR RAMIREZ:  RIGHT.

11                    THE COURT:  IN YOUR WORK THERE, DO YOU DEAL WITH

12    CHILDREN WHO COME IN BECAUSE THEY HAVE BEEN MOLESTED OR

13    SEXUALLY ABUSED?

14                    PROSPECTIVE JUROR RAMIREZ:  YES.

15                    THE COURT:  HOW OFTEN DOES THAT HAPPEN?  EVERY DAY

16    DO YOU SEE THOSE CHILDREN?

17                    PROSPECTIVE JUROR RAMIREZ:  FOR THE FIRST TIME?

18                    THE COURT:  YES.

19                    PROSPECTIVE JUROR RAMIREZ:  WELL, IT DEPENDS.

20    BECAUSE THEY GIVE US A CALL AND THEY ACCESS AND GET

21    INFORMATION, AND THEY ARE THE ONES THAT GET MOST OF THE

22    INFORMATION.  AND, ACTUALLY, WHEN I GET THE REFERRAL IS

23    BECAUSE THEY ALREADY KNOW WHAT'S GOING ON.

24                    THE COURT:  AND YOU'RE DEALING MORE WITH THE

25    INSURANCE AND OTHER THINGS?

1          PROSPECTIVE JUROR RAMIREZ:  YES.

2          THE COURT:  SO SOMEBODY ELSE DEALS MORE WITH THE

3    INFORMATION ABOUT WHAT THEY ARE SEEKING TREATMENT FOR?

4          PROSPECTIVE JUROR RAMIREZ:  RIGHT.

5          THE COURT:  IS THAT RIGHT?

6          PROSPECTIVE JUROR RAMIREZ:  YES.

7          THE COURT:  I THINK I UNDERSTAND.

8          NOW, IN THIS CASE THERE WILL BE TESTIMONY, AS YOU

9    HAVE GATHERED, PROBABLY, FROM THE QUESTIONNAIRE, ABOUT A

10   CHILD WHO WAS SEVEN AT THE TIME THAT THE DEFENDANT IS ACCUSED

11   OF MOLESTING.  DO YOU THINK THAT YOU WOULD BE ABLE TO SIT AS

12   A JUROR ON THIS CASE AND BE FAIR TO BOTH SIDES?

13         PROSPECTIVE JUROR RAMIREZ:  I THINK SO.

14         THE COURT:  NOW, THE FACT THAT YOU WORK WITH PEOPLE

15   WHO -- OR CHILDREN, SEE THEM AND THEIR PARENTS IN YOUR

16   WORKPLACE, WOULD THAT CAUSE YOU TO BE TROUBLED OR MAKE YOU

17   TEND TO BELIEVE ONE SIDE OVER THE OTHER WITNESSES IN THIS

18   CASE?

19         PROSPECTIVE JUROR RAMIREZ:  I DON'T THINK SO.

20         THE COURT:  IT HASN'T BEEN DECIDED -- I'M NOT SURE

21   YET -- IF THE YOUNG PERSON WHO WAS MOLESTED -- HE IS A LITTLE

22   OLDER THAN THAT NOW -- IS GOING TO TESTIFY.  IF HE DOES

23   TESTIFY --

24         MR. AARON:  YOUR HONOR, I'M SORRY.  I WOULD OBJECT.

25   THEY HAVE TO PROVE THAT HE WAS MOLESTED.

1           THE COURT:  I'M SORRY.  I THOUGHT I SAID

2    "ALLEGEDLY."  I APOLOGIZE.  I THINK I SAID THE DEFENDANT WAS

3    ACCUSED OF MOLESTING, SO I THOUGHT THAT TOOK CARE OF IT.

4           IT IS NOT CERTAIN WHETHER OR NOT HE WILL TESTIFY.

5    IF HE DOES TESTIFY, WOULD YOU BE ABLE TO FOLLOW THE COURT'S

6    INSTRUCTIONS AND TREAT HIS TESTIMONY BY THE SAME STANDARDS

7    THAT YOU WOULD APPLY TO EVERY OTHER WITNESS?

8           PROSPECTIVE JUROR RAMIREZ:  YES.

9           THE COURT:  NOW, IN YOUR WORK, DO YOU ALSO -- DOES

10   YOUR CLINIC DO ANY TREATMENT FOR ADULTS OR FAMILY TREATMENT?

11          PROSPECTIVE JUROR RAMIREZ:  YES.  WE HAVE FAMILY

12   PRESERVATION PROGRAM AND CAL WORKS.

13          THE COURT:  AND WHAT'S THE OTHER ONE?

14          PROSPECTIVE JUROR RAMIREZ:  CAL WORKS.

15          THE COURT:  CAL WORKS?

16          PROSPECTIVE JUROR RAMIREZ:  YES.

17          THE COURT:  WHAT'S THAT?

18          PROSPECTIVE JUROR RAMIREZ:  THAT'S A WORK PROGRAM

19   THAT THE CLIENTS GO THERE BECAUSE THEY WANT TO GET A JOB AND

20   THEY WANT COUNSELING, IF THEY NEED TO, BEFORE THEY GET A JOB.

21          THE COURT:  OH, I SEE.  SO THERE IS SOME WORK WITH

22   ADULTS?

23          PROSPECTIVE JUROR RAMIREZ:  YES.

24          THE COURT:  AND IN CONNECTION WITH THE FAMILY

25   THERAPY, DO YOU EVER DEAL WITH ADULTS WHO HAVE BEEN ACCUSED

```
 1   OF MOLESTING?  DOES YOUR CLINIC EVER TREAT OR WORK WITH

 2   ADULTS WHO HAVE BEEN ACCUSED OF MOLESTING CHILDREN?

 3             PROSPECTIVE JUROR RAMIREZ:  NOT THAT I KNOW OF.

 4             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

 5             EITHER COUNSEL WISH TO INQUIRE?

 6             MR. AARON:  NO, YOUR HONOR.

 7             MR. MICHAEL:  NO, YOUR HONOR.

 8             THE COURT:  THANK YOU, MS. RAMIREZ.  YOU CAN GO TO

 9   LUNCH.  AND JUST MAKE SURE YOU COME BACK AT 1:30.  COME BACK

10   TO THE JURY ASSEMBLY ROOM AT 1:30.

11             PROSPECTIVE JUROR RAMIREZ:  OKAY.

12             THE COURT:  THANK YOU.

13      (PROSPECTIVE JUROR RAMIREZ HAS EXITED THE COURTROOM.)

14             THE COURT:  TRACY SATO IS NEXT.

15      (PROSPECTIVE JUROR SATO IS PRESENT IN THE COURTROOM.)

16             THE COURT:  HELLO, MS. SATO.  HAVE A SEAT ANYWHERE

17   YOU LIKE IN THE JURY BOX.

18             I'M TALKING TO MANY OF THE JURORS ONE BY ONE ABOUT

19   SOME OF THE ANSWERS ON THE QUESTIONNAIRE, TO GIVE YOU A

20   LITTLE PRIVACY AND TALK TO YOU ABOUT SOME OF YOUR ANSWERS

21   OUTSIDE THE PRESENCE OF THE ENTIRE GROUP BEFORE WE BRING

22   EVERYBODY IN.

23             ONE OF YOUR ANSWERS -- AS YOU KNOW, THERE IS TWO

24   SETS OF CHARGES IN THIS CASE.  ONE SET DEALING WITH CHILD

25   PORNOGRAPHY, AND THE OTHER SET OF CHARGES OR ACCUSATIONS
```

1    DEALS WITH MOLESTATION.  THE DEFENDANT IS ACCUSED OF

2    MOLESTING A SEVEN-YEAR-OLD BOY.

3              AS TO THE FIRST SET OF CHARGES, THE CHILD

4    PORNOGRAPHY CHARGES, IN ONE OF YOUR ANSWERS TO THE QUESTIONS,

5    YOU SAID THAT YOU THOUGHT THAT CHILD PORNOGRAPHY -- THAT YOU

6    WEREN'T OPPOSED IN ANY WAY TO ADULT PORNOGRAPHY, BUT YOU

7    FOUND CHILD PORNOGRAPHY MORALLY REPREHENSIBLE.

8              DO YOU THINK THAT YOU COULD SET ASIDE PERSONAL

9    VIEWS AND LISTEN TO THE EVIDENCE AND BE FAIR AND IMPARTIAL TO

10   BOTH SIDES?

11             PROSPECTIVE JUROR SATO:  YES.  I FIND CHILD

12   PORNOGRAPHY JUST AWFUL.  THAT'S WRONG.  BUT, YOU KNOW, IF THE

13   DEFENDANT DOES NOT POSSESS IT, OR WHATEVER, THEN HE DIDN'T.

14   SO, THAT'S, YOU KNOW, IT'S A JUDGMENT OF ONE WAY OR THE

15   OTHER, AND I CAN DO THAT.

16             THE COURT:  AS YOU HEARD ME SAY WHEN YOU WERE HERE

17   A COUPLE OF WEEKS AGO -- YOU'LL HEAR ME SAY IT AGAIN LATER

18   THIS AFTERNOON -- THE DEFENDANT IN THIS CASE, AS IN ALL

19   CASES, WHETHER IT IS JAYWALKING, OR BANK ROBBERY, OR

20   WHATEVER, IS ENTITLED TO BE PRESUMED INNOCENT.

21             DO YOU AGREE WITH THAT?

22             PROSPECTIVE JUROR SATO:  YES, I DO.

23             THE COURT:  REGARDLESS OF WHAT THE NATURE OF THE

24   CHARGES ARE?

25             PROSPECTIVE JUROR SATO:  YES.

1        THE COURT:  HE DOESN'T HAVE TO PROVE HIS INNOCENCE;

2   THE GOVERNMENT ALWAYS HAS TO PROVE HIS GUILT.

3        PROSPECTIVE JUROR SATO:  YES.

4        THE COURT:  NOW, YOU HAVE A PHYSICAL PROBLEM?

5        PROSPECTIVE JUROR SATO:  YES.

6        THE COURT:  LET ME EXPLAIN A COUPLE OF THINGS.  WE

7   REALLY APPRECIATE YOUR SHOWING UP FOR JURY DUTY, FIRST OF

8   ALL, ESPECIALLY GIVEN THAT YOU HAVE THAT I.B.S.  IT IS NOT AN

9   ENDURANCE CONTEST HERE.  AND I SAY THE SAME THING IN EVERY

10  TRIAL, SO I WOULD BE SAYING IT WHETHER YOU ARE ONE OF MY

11  JURORS OR NOT.  LET ME TELL YOU WHAT I ALWAYS TELL PEOPLE,

12  AND TELL ME IF THIS WOULD ACCOMMODATE YOUR SITUATION OR NOT.

13  I COULD SAY IT WITH MY EYES CLOSED.  PROBABLY, THESE

14  ATTORNEYS HAVE BEEN IN FRONT OF ME A LOT AND COULD LIP-SYNC

15  IT A LOT.

16       WHAT I TELL JURORS, AS SOON AS THE JURY IS SEATED,

17  IS THE FOLLOWING:  THAT IT IS NOT AN ENDURANCE CONTEST.  WE

18  TAKE A BREAK.  WE USUALLY TAKE ONE BREAK IN THE MORNING,

19  MID-MORNING, AND ONE BREAK IN THE AFTERNOON.  SOMETIMES WE

20  MAY TAKE, DEPENDING ON THE SCHEDULE, WE MAY TAKE MORE BREAKS

21  THAN THAT, ESPECIALLY IN THE AFTERNOON WHEN MY EXPERIENCE

22  TELLS ME THAT JURORS GET SLEEPY AFTER LUNCH.  BUT I TRY TO

23  WATCH THE JURY WITHOUT MAKING YOU FEEL LIKE YOU'RE UNDER A

24  MICROSCOPE.  AND ALL YOU HAVE TO DO, IF YOU NEED A RECESS, IS

25  GIVE ME THE HIGH SIGN, AND YOU DON'T HAVE TO TELL ME WHY,

1    BECAUSE IT'S NOT THE SECOND GRADE.  JUST IF ANY JUROR LET'S

2    ME KNOW THAT THEY NEED A RECESS, WE WILL TAKE A RECESS.

3            I WOULD RATHER HAVE AN EXTRA RECESS AND HAVE YOU

4    ABLE TO CONCENTRATE ON THE EVIDENCE.  AND WE WILL TAKE A

5    RECESS ANY TIME WHEN A JUROR FEELS THAT THEY NEED ONE, AND

6    YOU DON'T HAVE TO TELL ME WHY.  SO, THAT'S MY STANDARD

7    STATEMENT TO JURORS IN A CASE.

8            WE HAVE A SCHEDULED RECESS AFTER ABOUT AN HOUR AND

9    A HALF OF TESTIMONY IN THE MORNING.  AND WE HAVE A SCHEDULED

10   RECESS IN THE AFTERNOON, A LITTLE LONGER, AN HOUR AND THREE

11   QUARTERS, TO GET IT EXACTLY MIDWAY.  NOW, IF WE ARE HAVING A

12   BREAK BECAUSE WE FINISHED WITH ONE WITNESS, IT MIGHT BE ONE

13   SIDE OR THE OTHER.  BUT THAT'S BASICALLY IT.

14           WITH THOSE KIND OF PARAMETERS, HOW WOULD YOU FEEL

15   ABOUT SITTING HERE?

16           PROSPECTIVE JUROR SATO:  IT IS PROBABLY GOING TO BE

17   FINE.  MY I.B.S. ONLY ACTS UP WHEN I'M UNDER VERY STRESSFUL

18   SITUATIONS.  SO, IF I DON'T THINK IT IS GOING TO BE

19   STRESSFUL, I WILL BE OKAY.

20           HOWEVER, IF IT IS SOMETHING THAT DOES CAUSE A LOT

21   OF EMOTIONAL STRESS -- LIKE THIS I THINK HAS THE POTENTIAL TO

22   DO -- I WILL HAVE TO LEAVE TO GO TO THE BATHROOM.  SO, IT IS

23   NOT -- AND IT DOES HAPPEN QUITE SUDDENLY.  SO, I DON'T -- IT

24   IS NOT A MATTER OF WAITING, THAT I CAN SIT AND WAIT FOR

25   30 MINUTES.  IT IS NOT A POSSIBILITY.

1          THE COURT:  CAN YOU WAIT FOR TWO MINUTES?

2          PROSPECTIVE JUROR SATO:  USUALLY I CAN.

3          THE COURT:  IF WE SEATED YOU IN ONE OF THOSE CHAIRS

4   NEAR THE DOOR, WOULD THAT HELP?

5          PROSPECTIVE JUROR SATO:  THAT WOULD HELP.

6          THE COURT:  NOW, THE DOOR HAS AN ALARM ON IT, BUT

7   IT IS A SILENT ALARM.  AND WHAT HAPPENS IS, WHENEVER WE TAKE

8   A RECESS, THE CLERK ESCORTS THE JURORS OUT.  IF YOU HAVE TO,

9   THOUGH, IT IS NOT LOCKED AND YOU CAN GO OUT.

10          WOULD THAT REASSURE YOU ABOUT THAT?

11          PROSPECTIVE JUROR SATO:  YES.  THAT WOULD BE FINE,

12   AS LONG AS IT IS NOT -- I WAS JUST WORRIED ABOUT THAT IT

13   WOULD BE A LITTLE MORE DISRUPTIVE IF I HAD -- IF SOMEBODY HAD

14   TO STOP.

15          THE COURT:  WELL, WE DO HAVE TO STOP.  WE WOULD

16   DEFINITELY HAVE TO STOP IF YOU HAD TO LEAVE.  AND I ALSO --

17   YOU'RE RIGHT ABOUT THE NATURE OF SOME OF THE EVIDENCE IN THIS

18   CASE, AND I DON'T WANT TO MISLEAD YOU ABOUT THAT.

19          ON THE OTHER HAND, THESE ARE VERY FINE ATTORNEYS

20   AND THERE IS -- AND IT IS A PRETTY -- IT IS A TRIAL IN WHICH

21   THE LAWYERS ARGUE ABOUT THE LEGAL ISSUES.  THERE ARE NO

22   RAISED VOICES.  IT IS NOT THAT KIND OF AN ATMOSPHERE.  I

23   MEAN, THERE IS RAISED VOICES IF SOMEBODY WANTS TO EMPHASIZE

24   SOMETHING IN AN APPROPRIATE WAY, PERHAPS.  BUT IT IS NOT LIKE

25   TELEVISION OR THE MOVIES.  THERE IS NO POUNDING ON THE

1    WITNESS STAND.  THEY DON'T EVEN GET TO COME CLOSE TO THE

2    WITNESS STAND UNLESS THEY ASK FOR PERMISSION AND I FEEL LIKE

3    GIVING IT.  AND IT'S NOT THAT SORT OF A CIRCUS ATMOSPHERE.

4         BUT THE EVIDENCE -- IT IS A VERY SERIOUS CASE.  AND

5    THE EVIDENCE IN THE CASE MAY BE DISTURBING.  SO, FROM THAT

6    PERSPECTIVE, YOUR FEARS -- I CAN'T TELL YOU THAT YOUR FEARS

7    ARE NOT SERIOUS.

8         PROSPECTIVE JUROR SATO:  WELL, THAT'S -- I CAN'T

9    EVEN WATCH C.S.I. OR ANY OF THE POLICE PROGRAMS.  NOT BECAUSE

10   OF THE DRAMA IN A SITUATION, BUT BECAUSE OF THE CRIME, THE

11   CRIMINAL ACTS AGAINST ANOTHER PERSON.  AND THAT CAUSES --

12   THAT CAN CAUSE SEVERE EMOTIONAL STRAIN FOR ME.  SO, I DON'T

13   WATCH ANY OF THOSE PROGRAMS ON TV AT ALL BECAUSE OF THE PAST

14   EXPERIENCES.  SO, THAT'S WHY I WANTED TO MAKE SURE IT WAS

15   LISTED OR THAT I INDICATED THAT, BECAUSE THERE IS THE

16   POTENTIAL FOR IT, FOR MY I.B.S. TO ACT UP.

17        THE COURT:  DO YOU TAKE MEDICATION FOR THAT?

18        PROSPECTIVE JUROR SATO:  I DO NOT.  I CONTROL IT

19   WITH DIET.

20        THE COURT:  ALL RIGHT.  NOW, LET ME TELL YOU A

21   LITTLE BIT MORE ABOUT THE EVIDENCE SO YOU HAVE FAIR WARNING

22   OF WHAT YOU PROBABLY WILL SEE AND HEAR IN THIS CASE, AND THEN

23   MAYBE YOU WILL HAVE A BETTER IDEA OF WHETHER YOU THINK YOU

24   WILL BE ABLE TO SIT THROUGH IT.

25        PROSPECTIVE JUROR SATO:  ALL RIGHT.

1          THE COURT:  IN TERMS OF THE CHILD PORNOGRAPHY

2     CHARGES, THERE ARE -- I'M JUST ESTIMATING, BUT SOMEWHERE

3     BETWEEN 30 AND 40 IMAGES, STILL IMAGES, AND SOME OF THEM ARE

4     VERY -- ALL OF THEM ARE CHILDREN UNDER THE AGE OF 18, BUT

5     MOSTLY VERY YOUNG CHILDREN UNDER THE -- WELL, UNDER THE AGE

6     OF -- MANY OF THEM ARE CHILDREN UNDER THE AGE OF 12.  AND

7     THEY SHOW VERY EXPLICIT SEXUAL BEHAVIOR BETWEEN CHILDREN AND

8     ADULTS.  I THINK SOME OF THE IMAGES SHOW SADO/MASOCHISTIC

9     BEHAVIOR, CHILDREN IN BONDAGE.  THERE ARE TWO SHORT VIDEO

10    CLIPS, VERY SHORT, BUT STILL, VIDEO CLIPS, AND THEY ARE VERY

11    EXPLICIT AND SHOW -- ONE OF THEM SHOWS A CHILD, A YOUNG BOY

12    AND AN ADULT, AND THE BOY BEING PENETRATED WITH A FOREIGN

13    OBJECT.  SO WE'RE TALKING ABOUT THE JURORS HAVING TO VIEW

14    VERY EXPLICIT, GRAPHIC SEXUAL IMAGES.

15          DO YOU THINK YOU WOULD BE ABLE TO DO THAT, GIVEN

16    YOUR PHYSICAL CONDITION IN THIS CASE?

17          PROSPECTIVE JUROR SATO:  I WOULD BE ABLE TO VIEW

18    IT, BUT IT MAY -- IT MAY BRING ON THE I.B.S.  I CAN'T

19    GUARANTEE IT EVERY TIME THAT IT HAPPENS.  IT IS FAIRLY WELL

20    UNDER CONTROL, SO THERE IS THE POTENTIAL.  MY PREFERENCE IS

21    TO NOT HAVE TO SIT THROUGH IT AND TAKE THE CHANCE AND

22    POTENTIALLY DISRUPT THE TRIAL, AS WELL.  BECAUSE WHEN IT DOES

23    FLARE UP, IT IS NOT A FIVE-MINUTE BREAK THAT I NEED.

24          THE COURT:  OKAY.  ABOUT HOW LONG A BREAK IS IT?

25          PROSPECTIVE JUROR SATO:  USUALLY ABOUT 30 MINUTES,

1     POTENTIALLY.

2               THE COURT:  ALL RIGHT.  THERE IS ALSO TESTIMONY IN

3     THIS CASE THAT CONSISTS OF TRANSCRIPTS FROM INTERNET CHAT

4     ROOMS, ALL RIGHT.  AND IN THOSE TRANSCRIPTS, THERE IS VERY

5     EXPLICIT EVIDENCE ABOUT A NUMBER OF SEXUAL MATTERS THAT THE

6     JURY WILL BE ASKED TO LISTEN AND READ THAT EVIDENCE, TOO, AND

7     THAT MAY BE DISTURBING.

8               PROSPECTIVE JUROR SATO:  THAT'S LESS SO OF A

9     PROBLEM.  IT'S THE VISUAL THAT'S USUALLY THE ISSUE THAT I

10    HAVE.

11              THE COURT:  IN THE COURSE OF THIS TRIAL, IF YOU

12    PROCEEDED AS A JUROR AND YOU HAD A FLARE-UP OF YOUR SYMPTOMS

13    OF YOUR CONDITION, BUT IT WAS MANAGEABLE, WOULD YOU HOLD THAT

14    AGAINST ONE SIDE OR THE OTHER?

15              PROSPECTIVE JUROR SATO:  NO.

16              THE COURT:  YOU WOULD STILL MANAGE TO BE FAIR AND

17    IMPARTIAL TO BOTH SIDES?

18              PROSPECTIVE JUROR SATO:  YES, I WOULD.

19              THE COURT:  MR. AARON?

20              MR. AARON:  ABOUT HOW OFTEN DOES THE CONDITION

21    STRIKE?

22              PROSPECTIVE JUROR SATO:  I USUALLY HAVE A FLARE-UP

23    EVERY MONTH, AT LEAST ONCE A MONTH.

24              MR. AARON:  IF YOU WERE IN THIS TRIAL AND IF IT WAS

25    MAYBE EVEN MORE STRESSFUL THAN C.S.I., COULD IT HAPPEN

1    MULTIPLE TIMES IN A DAY?

2             PROSPECTIVE JUROR SATO:  TYPICALLY, NO.  IT USUALLY

3    IS ONLY ONCE A DAY.

4             MR. AARON:  ONCE IT HAPPENS, YOU SAY THAT THE

5    EPISODE PERSISTS FOR ABOUT 30 MINUTES?

6             PROSPECTIVE JUROR SATO:  IT CAN.  SOMETIMES IT CAN

7    PERSIST OVER ABOUT AN HOUR, ON AND OFF.  AND THEN I -- JUST

8    TO BE BLUNT, THERE IS NOTHING LEFT, SO IT IS PRETTY MUCH

9    OVER.

10             MR. AARON:  I SEE.

11             PROSPECTIVE JUROR SATO:  I'M JUST TRYING --

12             THE COURT:  THANK YOU.

13             PROSPECTIVE JUROR SATO:  -- TO MAKE IT CLEAR.

14             THE COURT:  YOU'RE BEING A REAL TROOPER ABOUT THIS,

15    AND WE ALL APPRECIATE IT.

16             PROSPECTIVE JUROR SATO:  THERE IS NOTHING MORE

17    EMBARRASSING.  BUT I HAVE TO DEAL WITH THIS.  I HAVE TO GIVE

18    A LOT OF PRESENTATIONS, SO I HAVE LEARNED HOW TO DEAL WITH

19    THIS IN A VERY STRESSFUL SITUATION.  THAT'S WHY I WANT TO BE

20    FAIR ABOUT IT.

21             I DO HAVE TO GIVE IMPROMPTU PRESENTATIONS WITH

22    ELECTED OFFICIALS AND STUFF, SO I HAVE LEARNED HOW TO CONTROL

23    IT IN STRESSFUL SITUATIONS A LOT MORE, MOSTLY WITH DIET.  I

24    KNOW WHAT TO EAT BEFORE I DEAL WITH STUFF, AND THAT TAKES

25    CARE OF IT.

1          MR. AARON:  AND AFTER THE EPISODE, THERE IS NO,

2     LIKE, WEAKNESS OR INABILITY TO CONCENTRATE, OR ANYTHING LIKE

3     THAT?

4          PROSPECTIVE JUROR SATO:  NO.

5          MR. AARON:  AND FROM WHAT YOU KNOW OF THE EVIDENCE

6     SO FAR, KNOWING IT DOES INVOLVE ALLEGATIONS OF CHILD

7     PORNOGRAPHY; THERE ARE IMAGES THAT, UNFORTUNATELY, YOU WILL

8     HAVE TO VIEW; THERE ARE GOING TO BE ALLEGATIONS OF AGGRAVATED

9     SEXUAL ABUSE; POSSIBLY TESTIMONY BY THE ALLEGED VICTIM OR

10    FAMILY MEMBERS, GIVEN ALL OF THAT, WHAT'S YOUR STATE OF MIND?

11    DO YOU THINK YOU CAN SIT THROUGH THAT TRIAL?

12         PROSPECTIVE JUROR SATO:  I WOULD FIND IT VERY

13    DIFFICULT.  WHETHER IT WAS THE I.B.S. OR JUST EMOTIONALLY, I

14    WOULD FIND THAT VERY DIFFICULT.  I TEND TO BE VERY EMPATHETIC

15    WITH CHILDREN, AND IT WILL PROBABLY HAUNT ME FOR A VERY LONG

16    TIME.  SO, I'M JUST EMOTIONALLY CONCERNED, YOU KNOW, TO HAVE

17    TO SIT THROUGH SOMETHING LIKE THIS MYSELF.

18         MR. AARON:  OKAY.  WOULD IT BE FAIR TO SAY THAT,

19    ALL TOTAL, THAT IT WOULD BE DIFFICULT FOR YOU TO SIT THROUGH

20    THIS TRIAL TO BE COMPLETELY FAIR AND IMPARTIAL, AS YOU MIGHT

21    IN SOME OTHER TRIAL, BECAUSE OF THE PHYSICAL CONDITIONS AND

22    THINGS LIKE THAT?

23         PROSPECTIVE JUROR SATO:  I DON'T THINK THAT THE

24    I.B.S. WILL SWAY ME ONE WAY OR THE OTHER.  I DON'T THINK THE

25    PHYSICAL CONDITION WILL SWAY ME ONE WAY OR THE OTHER.  IT IS

 1   MORE GOING TO BE STRICTLY JUST THE EMOTIONS AND ALSO DEALING

 2   WITH WHAT THE CASE SITUATION IS, WHAT IS PRESENTED.

 3           MR. AARON:  THANK YOU.

 4           MR. MICHAEL:  MAY I, YOUR HONOR, BRIEFLY?

 5           THE COURT:  YES.

 6           MR. MICHAEL:  GOOD AFTERNOON.

 7           PROSPECTIVE JUROR SATO:  GOOD AFTERNOON.

 8           MR. MICHAEL:  IF I UNDERSTAND YOUR STATEMENTS TO

 9   THE COURT, YOU WOULD PREFER NOT TO DO THIS BECAUSE OF YOUR

10   CONDITION, BUT YOU ARE WILLING TO DO IT AND TO SEE HOW IT

11   GOES?

12           PROSPECTIVE JUROR SATO:  YES.

13           MR. MICHAEL:  AND IF IT GOT TO A POINT WHERE YOUR

14   CONDITION IMPEDED YOUR ABILITY TO BE FAIR AND IMPARTIAL, OR

15   TO PAY ATTENTION TO THE EVIDENCE, WOULD YOU LET THE COURT

16   KNOW THAT?

17           PROSPECTIVE JUROR SATO:  YES, I WOULD.

18           MR. MICHAEL:  NOTHING FURTHER.

19           THE COURT:  THANK YOU, MS. SATO.  YOU CAN GO TO

20   LUNCH, AND WE WILL SEE YOU BACK AT 1:30 IN THE JURY ASSEMBLY

21   ROOM.

22           (PROSPECTIVE JUROR SATO EXITS THE COURTROOM.)

23           THE COURT:  WHAT I THINK WE OUGHT TO DO, AS TO

24   MS. SATO, IS KEEP HER FOR NOW.  IF WE HAVE PLENTY OF JURORS,

25   WE COULD EXCUSE HER.  SHE IS A REAL TROOPER TO SHOW UP AND BE

1    WILLING TO SERVE.

2              IS THAT AGREEABLE?

3              MR. AARON:  YES.

4              MR. MICHAEL:  YES, YOUR HONOR.  AND TO BE SO

5    CANDID.

6              THE COURT:  MS. STEFFEN.

7      (PROSPECTIVE JUROR STEFFEN IS PRESENT IN THE COURTROOM.)

8              THE COURT:  HELLO, MS. STEFFEN.

9              PROSPECTIVE JUROR STEFFEN:  HELLO.

10             THE COURT:  YOU MAY HAVE A SEAT.  I JUST HAVE A FEW

11   FOLLOW-UP QUESTIONS I AM ASKING MANY OF THE JURORS BASED ON

12   WHAT YOU ANSWERED ON YOUR QUESTIONNAIRE, BEFORE WE BRING THE

13   WHOLE GROUP IN.

14             YOU HAVE, IN ANSWER TO THE QUESTIONNAIRE, I THINK

15   YOU PUT AN EX -- YOU SAID A FRIEND, AN EX-FRIEND, BOYFRIEND.

16   DID I READ THAT RIGHT?

17             PROSPECTIVE JUROR STEFFEN:  AN EX-GIRLFRIEND'S

18   BOYFRIEND.

19             THE COURT:  AN EX-GIRLFRIEND'S BOYFRIEND IS A

20   CONVICTED CHILD MOLESTER?

21             PROSPECTIVE JUROR STEFFEN:  YES.

22             THE COURT:  DO YOU KNOW ANYTHING ABOUT THE

23   CIRCUMSTANCES UNDER WHICH HE WAS CONVICTED?

24             PROSPECTIVE JUROR STEFFEN:  NOT VERY MUCH, NO.

25             THE COURT:  CAN YOU TELL US WHAT YOU DO KNOW?

1               PROSPECTIVE JUROR STEFFEN:  I KNOW THEY WERE AROUND

2      TWO GIRLS, AROUND FIVE YEARS OLD.

3               THE COURT:  FIVE AND --

4               PROSPECTIVE JUROR STEFFEN:  FIVE YEAR OLDS.

5               THE COURT:  ALL RIGHT.  WERE THEY YOUR FRIEND'S

6      DAUGHTERS?

7               PROSPECTIVE JUROR STEFFEN:  NO.

8               THE COURT:  WAS THIS BEFORE --

9               PROSPECTIVE JUROR STEFFEN:  SHE MET HIM AFTER HE

10     GOT OUT OF JAIL.

11              THE COURT:  SO HE WENT TO JAIL FOR THIS?

12              PROSPECTIVE JUROR STEFFEN:  I THINK SO.

13              THE COURT:  ALL RIGHT.  AND WHEN DID YOU LEARN OF

14     THAT?

15              PROSPECTIVE JUROR STEFFEN:  IT WAS PROBABLY ABOUT

16     FOUR MONTHS AFTER SHE STARTED DATING HIM SHE STARTED TELLING

17     US THINGS ABOUT HIM.

18              THE COURT:  AND WAS THAT WHEN YOU LEARNED -- WHEN

19     YOU LEARNED ABOUT THIS, WAS THAT THE CAUSE OF A RUPTURE IN

20     YOUR FRIENDSHIP?

21              PROSPECTIVE JUROR STEFFEN:  IT WAS.  THERE WERE A

22     LOT OF BAD THINGS ABOUT HIM.  DESPITE INTERVENTION BY

23     FRIENDS, SHE STILL STAYED WITH HIM.

24              THE COURT:  AND THIS WAS ONE OF THE BAD THINGS?

25              PROSPECTIVE JUROR STEFFEN:  MM-HMM.

1              THE COURT:  WAS THAT YES?

2              PROSPECTIVE JUROR STEFFEN:  YES.

3              THE COURT:  WHEN IS THE LAST TIME THAT YOU SAW HER?

4              PROSPECTIVE JUROR STEFFEN:  PROBABLY ABOUT A YEAR

5    AGO.

6              THE COURT:  SO ARE YOU NOT IN TOUCH WITH HER AT ALL

7    ANYMORE?

8              PROSPECTIVE JUROR STEFFEN:  NO.

9              THE COURT:  AND IS THERE ANYTHING ELSE YOU KNOW

10   ABOUT THE CRIME FOR WHICH HER BOYFRIEND WENT TO JAIL?

11             PROSPECTIVE JUROR STEFFEN:  NO.  I JUST LOOKED HIM

12   UP ON THE MEGAN'S LAW WEB SITE.

13             THE COURT:  AND WHAT DID YOU FIND WHEN YOU DID

14   THAT?

15             PROSPECTIVE JUROR STEFFEN:  HE WAS CONVICTED OF

16   LEWD AND LASCIVIOUS BEHAVIOR WITH A CHILD UNDER 14.

17             THE COURT:  ANYTHING ELSE THAT YOU FOUND OUT?

18             PROSPECTIVE JUROR STEFFEN:  THAT'S ALL THE WEB SITE

19   HAD.

20             THE COURT:  IS THERE ANYTHING ELSE YOU FOUND OUT

21   FROM ANY OTHER SOURCE?

22             PROSPECTIVE JUROR STEFFEN:  NO.

23             THE COURT:  YOU SAID THAT YOUR SON NOW -- YOUR SON

24   IS AN ADULT NOW; IS THAT RIGHT?

25             PROSPECTIVE JUROR STEFFEN:  YES.  HE IS 30.

1          THE COURT:  AND WHAT DOES HE DO FOR A LIVING?

2          PROSPECTIVE JUROR STEFFEN:  AUTOMOTIVE MACHINIST.

3          THE COURT:  WHEN HE WAS A YOUNGSTER, YOU SAID HE

4     RECEIVED A PSYCHIATRIC OR PSYCHOLOGICAL EVALUATION?

5          PROSPECTIVE JUROR STEFFEN:  YES.

6          THE COURT:  AND HE WENT TO PRESCHOOL SOMEWHERE NEAR

7     THE MCMARTIN SCHOOL?

8          PROSPECTIVE JUROR STEFFEN:  YES.

9          THE COURT:  CAN YOU TELL ME A LITTLE BIT MORE ABOUT

10    THAT PSYCHOLOGICAL EVALUATION THAT CAUSED YOU SOME CONCERN?

11         PROSPECTIVE JUROR STEFFEN:  HE WAS HAVING VERY,

12    VERY DIFFICULT BEHAVIORAL PROBLEMS THAT STARTED AFTER HE

13    STARTED GOING TO THAT PRESCHOOL.  THEN THE MCMARTIN THING

14    BROKE.  AND I CAN'T REMEMBER WHO WE TALKED TO, BUT GOT HIM A

15    PSYCHIATRIC EVALUATION TO FIND OUT IF ANYTHING HAPPENED

16    THERE.

17         I DO KNOW HE WASN'T TREATED VERY WELL THERE.  I

18    CAME TO PICK HIM UP ONE DAY AND HE WAS LAYING ON THE CONCRETE

19    FLOOR, WITH A TEMPERATURE OF 104, AND NO ONE BOTHERED TO CALL

20    ME OR TAKE CARE OF HIM OR ANYTHING.  I TOOK HIM OUT OF THERE.

21    HE WAS ONLY THERE ABOUT SIX MONTHS.

22         THE COURT:  HOW OLD WAS HE AT THE TIME?

23         PROSPECTIVE JUROR STEFFEN:  THIS WAS BEFORE

24    KINDERGARTEN, SO HE WAS THREE OR FOUR.

25         THE COURT:  IS THERE ANYTHING ABOUT THAT EXPERIENCE

1    THAT YOU THINK IS RELATED TO MOLESTATION?  DO YOU THINK YOUR

2    SON WAS MOLESTED, FOR EXAMPLE, AT THE PRESCHOOL?

3              PROSPECTIVE JUROR STEFFEN:  I DON'T KNOW WHAT WENT

4    ON THERE.  I KNOW THE MCMARTIN WAS, SO I DON'T KNOW ANYTHING

5    THAT HAPPENED.  I JUST KNOW THAT HE HAD VERY BAD BEHAVIOR

6    RELATED TO THAT PRESCHOOL.

7              THE COURT:  CAN YOU TELL US WHAT KINDS OF BEHAVIOR

8    HE EXHIBITED?

9              PROSPECTIVE JUROR STEFFEN:  DRIVING HIM TO SCHOOL,

10   HE WOULD BE IN HIS CAR SEAT IN THE FRONT SEAT -- IT WAS LEGAL

11   AT THE TIME -- AND HE WOULD SCREAM.  HE WOULDN'T GET DRESSED,

12   FOR ONE THING, IN THE MORNING.  I WOULD GET HIM DRESSED, PUT

13   HIM IN THE CAR SEAT, AND IT WAS AN HOUR DRIVE TO WHERE I

14   WORKED AND HIS BABY-SITTER.  ON THE WAY, HE WOULD WIGGLE

15   HIMSELF OUT OF THE CAR SEAT, RIP OFF HIS CLOTHES, TRY TO

16   CLIMB OVER ME.  HE WOULD BE BITING ME AND HITTING ME AND

17   TRIED TO GET OUT OF THE CAR.  AND IT WAS JUST HORRIBLE

18   BEHAVIOR.  I JUST DIDN'T KNOW WHAT WAS GOING ON.

19             HE HAD PROBLEMS WITH HIS BOTTOM, AND THE DOCTOR

20   THOUGHT IT WAS PINWORMS, AND HE KEPT SAYING HIS BOTTOM HURT.

21             THE COURT:  DID YOU GET ANY TREATMENT FOR HIM AFTER

22   YOU HAD THIS EVALUATION DONE?

23             PROSPECTIVE JUROR STEFFEN:  IN THE EVALUATION, THEY

24   SAID HE DID NOT REVEAL ANY MOLESTATION.  SO WE LET IT GO AT

25   THAT.

1           THE COURT:  AND THEN YOU CHANGED PRESCHOOLS?

2           PROSPECTIVE JUROR STEFFEN:  WE CHANGED BACK TO HIS

3   OLD BABY-SITTER, AND HE WAS FINE.

4           THE COURT:  ALL RIGHT.  NOW, THIS CASE INVOLVES TWO

5   SETS OF CHARGES, ONE DEALING WITH ACCUSATIONS OF CHILD

6   PORNOGRAPHY, AND ONE DEALING WITH ACCUSATIONS OF CHILD

7   MOLESTATION.  THAT IS AN ACCUSATION THAT THE DEFENDANT

8   MOLESTED A SEVEN-YEAR-OLD BOY.

9           YOU ALSO TOLD US, IN ANSWERS TO THE QUESTIONNAIRE,

10  THAT IT WOULD BE DIFFICULT FOR YOU TO SIT THROUGH THIS KIND

11  OF A TRIAL, AND YOU WEREN'T SURE IF YOU COULD BE A FAIR AND

12  IMPARTIAL JUROR.

13          DO YOU REMEMBER GIVING US THAT ANSWER?  CAN YOU

14  TELL ME A LITTLE BIT MORE ABOUT YOUR DOUBTS ABOUT SITTING

15  THROUGH THIS TRIAL AND SERVING AS AN IMPARTIAL JUROR?

16          PROSPECTIVE JUROR STEFFEN:  I WOULD TRY TO BE

17  IMPARTIAL, BUT I THINK THERE IS JUST A PART OF ME THAT IS A

18  LITTLE BIT PREJUDICE ABOUT THAT CRIME.

19          THE COURT:  WHEN YOU SAY "THAT CRIME," DO YOU MEAN

20  BOTH OF THOSE KINDS OF --

21          PROSPECTIVE JUROR STEFFEN:  BOTH.

22          THE COURT:  BOTH?  SOMETIMES A JUROR CAN'T SIT ON A

23  CERTAIN KIND OF A CASE BUT IS PERFECTLY QUALIFIED TO SIT ON

24  ANOTHER KIND OF CASE.  SO THERE IS NO SHAME IN TELLING US

25  THAT.  WE APPRECIATE IT.

1      IF YOU WERE TO COME BACK WITH THE OTHER JURORS

2  AFTER LUNCH -- DON'T WORRY.  YOU'RE GOING TO GET SOME LUNCH,

3  BUT --

4      PROSPECTIVE JUROR STEFFEN:  GOOD.

5      THE COURT:  -- ONE OF THE THINGS I -- IN FACT, I

6  THINK I ALREADY MENTIONED THIS.  BUT ONE OF THE THINGS I

7  WOULD INSTRUCT THE JURY THAT IS THE LAW THAT APPLIES IN ANY

8  CRIMINAL CASE, IS THAT WHETHER THE CHARGE IS JAYWALKING, OR

9  MURDER, OR DRIVING OVER THE SPEED LIMIT, OR BANK ROBBERY, OR

10  CHILD MOLESTATION, WHATEVER THE CHARGE IS, THE DEFENDANT IN

11  ANY CASE IS ENTITLED TO BE PRESUMED INNOCENT.

12      WOULD YOU BE ABLE TO PRESUME THAT THE DEFENDANT IN

13  THIS CASE IS INNOCENT THE SAME AS THE DEFENDANT CHARGED WITH

14  ANOTHER CRIME?  OR IS IT HARDER FOR YOU TO DO THAT IN THIS

15  CASE BECAUSE OF WHAT HE IS CHARGED WITH?

16      PROSPECTIVE JUROR STEFFEN:  I MEAN, I KNOW PEOPLE

17  ARE CHARGED AND THEY ARE INNOCENT ALL THE TIME FOR EVERY TYPE

18  OF CRIME.  IT DOESN'T MATTER.  BUT I JUST CAN'T SAY --

19      THE COURT:  LET ME ASK ANOTHER QUESTION.

20      AS WELL AS BEING PRESUMED INNOCENT, THE OTHER PART

21  OF THE LAW THAT GOES ALONG WITH THAT IS THAT IN EVERY CASE

22  YOU'RE PRESUMED INNOCENT UNLESS AND UNTIL THE GOVERNMENT

23  PROVES YOUR GUILT BEYOND A REASONABLE DOUBT.  IN OTHER WORDS,

24  THE DEFENDANT DOESN'T HAVE TO PROVE HE IS INNOCENT.  THE

25  GOVERNMENT HAS TO PROVE HE IS GUILTY BEYOND A REASONABLE

1    DOUBT.  AND YOU WILL BE INSTRUCTED WHAT THE DEFINITION OF

2    THAT IS.

3            WOULD YOU BE INCLINED TO THINK IT TOOK A LITTLE

4    LESS EVIDENCE TO PROVE THIS KIND OF A CHARGE THAN ANOTHER

5    KIND OF A CHARGE BECAUSE OF WHAT THE DEFENDANT HERE IS

6    ACCUSED OF?

7            PROSPECTIVE JUROR STEFFEN:  POSSIBLY.

8            THE COURT:  EITHER SIDE WISH TO INQUIRE?

9            MR. AARON:  NO, YOUR HONOR.

10           THE COURT:  MR. MICHAEL?

11           MR. MICHAEL:  I DIDN'T HEAR HER ANSWER TO THE LAST

12   QUESTION THAT SHE GAVE.

13           THE COURT:  I THINK SHE SAID PROBABLY.

14           MR. MICHAEL:  NO QUESTIONS, YOUR HONOR.

15           THE COURT:  THANK YOU VERY MUCH, MS. STEFFEN.  AND

16   YOU MAY GO DOWNSTAIRS TO THE JURY ASSEMBLY ROOM AT THIS

17   TIME.

18        (PROSPECTIVE JUROR STEFFEN EXITS THE COURTROOM.)

19           THE COURT:  ARE COUNSEL GOING TO STIPULATE AS TO

20   MS. STEFFEN?

21           MR. AARON:  YES.

22           MR. MICHAEL:  YES.

23           THE COURT:  SHE IS EXCUSED.  AND WOULD YOU PLEASE

24   CALL THE JURY ROOM AND LET THEM KNOW.

25           THE CLERK:  I DON'T HAVE MR. VASQUEZ.

1              IS IT MR. TIGHE?

2              THE COURT:  OH, MR. TIGHE.  MR. VASQUEZ HAS GONE TO

3    LUNCH, SO I WILL JUST ASK SOME QUESTIONS WITH THE OTHER

4    JURORS.

5        (PROSPECTIVE JUROR TIGHE IS PRESENT IN THE COURTROOM.)

6              THE COURT:  GOOD AFTERNOON, MR. TIGHE.  WE JUST

7    HAVE A COUPLE OF QUESTIONS FOR YOU BEFORE WE LET YOU GO TO

8    LUNCH.

9              PROSPECTIVE JUROR TIGHE:  OKAY.

10             THE COURT:  YOU CAN HAVE A SEAT.

11             WE ARE ASKING MOST OF THE JURORS A FEW QUESTIONS

12   BASED ON YOUR ANSWERS TO THE QUESTIONNAIRE.  YOU INDICATED

13   THAT YOU ACTUALLY HEARD SOMETHING ABOUT THIS CASE ON THE

14   RADIO?

15             PROSPECTIVE JUROR TIGHE:  I JUST SAID IT SOUNDED

16   FAMILIAR.  NO SPECIFICS, JUST SEEMED FAMILIAR TO ME.  THAT'S

17   ALL.

18             THE COURT:  AND IT WAS OVER THE RADIO THAT YOU

19   HEARD SOMETHING ABOUT IT?

20             PROSPECTIVE JUROR TIGHE:  THAT'S WHAT I'M

21   THINKING.  AGAIN, I SAID IT SEEMED FAMILIAR, AND THERE SEEMED

22   TO BE A TIE-IN WITH HEARING IT ON KEN -- ON JOHN & KEN, BUT

23   NO SPECIFICS.

24             THE COURT:  DO YOU REMEMBER WHAT YOUR REACTION WAS

25   WHEN YOU FIRST HEARD ABOUT WHATEVER YOU HEARD?

1          PROSPECTIVE JUROR TIGHE:  NO, NOT REALLY.

2          THE COURT:  IN WHAT PART OF THE RIVERSIDE OR SAN

3  BERNARDINO COUNTY DO YOU LIVE?

4          PROSPECTIVE JUROR TIGHE:  REDLANDS.

5          THE COURT:  DO YOU SUBSCRIBE TO ANY NEWSPAPERS?

6          PROSPECTIVE JUROR TIGHE:  NO.

7          THE COURT:  EITHER ONLINE OR PHYSICALLY?

8          PROSPECTIVE JUROR TIGHE:  NO.

9          THE COURT:  DO YOU READ THEM REGULARLY?

10          PROSPECTIVE JUROR TIGHE:  I READ SOME NEWSPAPERS

11  ONLINE, BUT NOT REGULARLY.

12          THE COURT:  SO IS IT POSSIBLE YOU MIGHT HAVE READ A

13  REFERENCE TO THIS IN THE NEWSPAPER?

14          PROSPECTIVE JUROR TIGHE:  IT IS POSSIBLE.

15          THE COURT:  BUT YOU DON'T RECALL?

16          PROSPECTIVE JUROR TIGHE:  LIKE I SAID, NOT

17  SPECIFICS.  THE DEFENDANT'S NAME AND SOME OF THE PARTICULARS

18  THAT WERE IN THE JURY QUESTIONNAIRE JUST HAD A FAMILIAR FEEL

19  TO IT.  THAT'S ALL.

20          THE COURT:  DO YOU REMEMBER ANY DETAILS OR ANY

21  REACTION THAT YOU HAD WHEN YOU READ ABOUT IT?

22          PROSPECTIVE JUROR TIGHE:  NOTHING SPECIFIC.

23          THE COURT:  WELL, ANYTHING?

24          PROSPECTIVE JUROR TIGHE:  I MEAN, JUST A GENERAL

25  REACTION ONE WOULD HAVE WITH THAT TYPE OF ACCUSATION, I

1    GUESS.

2              THE COURT:  AND WHAT WOULD THAT BE?

3              PROSPECTIVE JUROR TIGHE:  NOT PLEASANT.

4              THE COURT:  NOT PLEASANT BECAUSE OF JUST THE TYPE

5    OF THE CRIME THAT'S ALLEGED?

6              PROSPECTIVE JUROR TIGHE:  YEAH.

7              THE COURT:  YOU TOLD US, IN ANSWER TO THE

8    QUESTIONNAIRE, THAT, FOR EXAMPLE, IN YOUR ANSWER TO ONE OF

9    THE QUESTIONS YOU SAID THAT SEEING THE IMAGES ON THE CHILD

10   PORNOGRAPHY CHARGES MIGHT BE DIFFICULT, BUT YOU WOULD BE ABLE

11   TO DO YOUR BEST TO NOT PREJUDGE.

12             IS THAT WHAT YOU'RE -- SOME OF THE SAME THINGS

13   YOU'RE REFERRING TO WHEN YOU SAY THAT YOUR REACTION WAS THESE

14   CHARGES WERE NOT PLEASANT?

15             PROSPECTIVE JUROR TIGHE:  YEAH.  I DON'T KNOW HOW I

16   WOULD REACT TO THE PICTURES.  OBVIOUSLY, I WOULD HAVE SOME

17   EMOTIONAL REACTION TO THEM, BUT, YOU KNOW, I'M AN INTELLIGENT

18   PERSON.  I KNOW THE GRAVITY OF THE CHARGES.  I WOULD NOT -- I

19   WOULD DO MY BEST NOT TO ALLOW IT TO COVER MY JUDGMENT, BUT IT

20   IS NOT SOMETHING I COULD JUST LOOK AT AND NOT HAVE ANY

21   REACTION TO.

22             THE COURT:  ALL RIGHT.  EITHER SIDE WISH TO

23   INQUIRE?

24             MR. AARON:  NO, YOUR HONOR.

25             THE COURT:  MR. MICHAEL?

1           MR. MICHAEL:  NO, YOUR HONOR.

2           THE COURT:  THANK YOU, MR. TIGHE.  YOU CAN GO TO

3    LUNCH.  PLEASE COME BACK AT 1:45.

4           PROSPECTIVE JUROR TIGHE:  COME BACK DOWNSTAIRS?

5           THE COURT:  TO THE JURY ASSEMBLY ROOM, YES.

6        (PROSPECTIVE JUROR TIGHE EXITS THE COURTROOM.)

7     (PROSPECTIVE JUROR WILMOTHAVILES PRESENT IN THE COURTROOM.)

8           THE COURT:  MS. WILMOTHAVILES, GOOD AFTERNOON.

9           PROSPECTIVE JUROR WILMOTHAVILES:  GOOD AFTERNOON.

10          THE COURT:  PLEASE HAVE A SEAT.

11          MS. WILMOTHAVILES, I'M ASKING MANY OF THE JURORS A

12   FEW FOLLOW-UP QUESTIONS BASED ON WHAT YOU TOLD US IN YOUR

13   QUESTIONNAIRE.

14          FIRST OF ALL, YOU SAID IN YOUR ANSWER THAT YOU

15   STUDIED LAW TO A CERTAIN EXTENT IN COLLEGE?

16          PROSPECTIVE JUROR WILMOTHAVILES:  YES.

17          THE COURT:  CAN YOU TELL ME ABOUT THAT?

18          PROSPECTIVE JUROR WILMOTHAVILES:  JUST ADMIN TO

19   JUSTICE.  I JUST TOOK THE COURSES FOR ADMIN TO JUSTICE,

20   R.O.P. POLICE.  I WAS ON-THE-JOB TRAINING IN COLTON P.D.

21          THE COURT:  SO ARE THOSE TWO DIFFERENT THINGS?

22          PROSPECTIVE JUROR WILMOTHAVILES:  NO.  THEY ARE

23   ESSENTIALLY THE SAME SUBJECT.

24          THE COURT:  SO WERE YOU THINKING OF PURSUING A

25   CAREER IN LAW ENFORCEMENT?

1           PROSPECTIVE JUROR WILMOTHAVILES:  AT THAT TIME,

2   YES.

3           THE COURT:  SO WERE THE COURSES IN ADMINISTRATION

4   OF JUSTICE?

5           PROSPECTIVE JUROR WILMOTHAVILES:  YES.

6           THE COURT:  WERE THESE COURSES IN THE JUNIOR

7   COLLEGE?

8           PROSPECTIVE JUROR WILMOTHAVILES:  YES.

9           THE COURT:  DO YOU RECALL HOW MANY COURSES?

10          PROSPECTIVE JUROR WILMOTHAVILES:  NO.  IT HAS BEEN

11  TOO MANY YEARS.

12          THE COURT:  I WASN'T GOING TO SUGGEST THAT.

13          PROSPECTIVE JUROR WILMOTHAVILES:  I WILL SAY IT FOR

14  YOU.

15          THE COURT:  THAT'S OKAY.  DID YOU RECEIVE AN

16  ASSOCIATE'S DEGREE?

17          PROSPECTIVE JUROR WILMOTHAVILES:  NO.  I QUIT RIGHT

18  BEFORE I GOT MY ASSOCIATE'S.

19          THE COURT:  YOU WERE A VICTIM OF INCEST?

20          PROSPECTIVE JUROR WILMOTHAVILES:  CORRECT.

21          THE COURT:  AND HOW OLD WERE YOU AT THE TIME?

22          PROSPECTIVE JUROR WILMOTHAVILES:  NINE.

23          THE COURT:  DID IT GO ON FOR A PERIOD OF TIME?

24          PROSPECTIVE JUROR WILMOTHAVILES:  YES.

25          THE COURT:  ABOUT HOW LONG?

1          PROSPECTIVE JUROR WILMOTHAVILES:  PROBABLY ABOUT

2     10 YEARS.

3          THE COURT:  AND WAS IT EVER REPORTED?  DID YOU EVER

4     REPORT IT?

5          PROSPECTIVE JUROR WILMOTHAVILES:  YES.

6          THE COURT:  TO WHOM?

7          PROSPECTIVE JUROR WILMOTHAVILES:  THE AUTHORITIES.

8          THE COURT:  WAS THERE EVER A PROSECUTION?

9          PROSPECTIVE JUROR WILMOTHAVILES:  NO.

10          THE COURT:  SO, YOU NEVER APPEARED IN COURT OR

11     TESTIFIED, OR ANYTHING LIKE THAT?

12          PROSPECTIVE JUROR WILMOTHAVILES:  NO.  THEY DIDN'T

13     PURSUE IT.

14          THE COURT:  THE FACT THAT IT WASN'T PROSECUTED OR

15     PURSUED, DOES THAT GIVE YOU ANY PARTICULAR FEELINGS ABOUT THE

16     JUSTICE SYSTEM?

17          PROSPECTIVE JUROR WILMOTHAVILES:  AT THAT TIME,

18     THAT'S HOW THEY HANDLED IT.

19          THE COURT:  SO, THAT DOESN'T AFFECT HOW YOU WOULD

20     FEEL ABOUT THE JUSTICE SYSTEM TODAY?

21          PROSPECTIVE JUROR WILMOTHAVILES:  TO BE HONEST, I

22     DON'T KNOW.  I DON'T KNOW.

23          THE COURT:  MIGHT BE SOMETHING THAT STILL LINGERS

24     WITH YOU?

25          PROSPECTIVE JUROR WILMOTHAVILES:  I DON'T THINK, AS

1  FAR AS THAT, NO.  I PROBABLY HAVE MORE ISSUES WITH THINGS

2  THAT HAVE HAPPENED LATER IN MY LIFE.

3           THE COURT:  YOU HAVE A NEPHEW WHO WAS MURDERED?

4           PROSPECTIVE JUROR WILMOTHAVILES:  YES.

5           THE COURT:  WAS ANYONE EVER PROSECUTED IN

6  CONNECTION?

7           PROSPECTIVE JUROR WILMOTHAVILES:  YES, HE WAS.

8           THE COURT:  AND WAS HE CONVICTED?

9           PROSPECTIVE JUROR WILMOTHAVILES:  YES, HE WAS.

10          THE COURT:  DID YOU ATTEND ANY OF THAT TRIAL?

11          PROSPECTIVE JUROR WILMOTHAVILES:  YES, I DID.

12          THE COURT:  ALL OF IT?

13          PROSPECTIVE JUROR WILMOTHAVILES:  NO, JUST THE

14  FIRST PART.

15          THE COURT:  NOW, IS THIS A SISTER'S CHILD?

16          PROSPECTIVE JUROR WILMOTHAVILES:  MY SISTER'S SON.

17          THE COURT:  HOW OLD WAS HE?

18          PROSPECTIVE JUROR WILMOTHAVILES:  HE WAS 12.

19          THE COURT:  SO, WERE YOU AT THE TRIAL WITH YOUR

20  SISTER?

21          PROSPECTIVE JUROR WILMOTHAVILES:  YES.

22          THE COURT:  HOW LONG DID THAT TRIAL LAST?

23          PROSPECTIVE JUROR WILMOTHAVILES:  PROBABLY A MONTH

24  AND A HALF.

25          THE COURT:  AND DO YOU KNOW WHAT THE SENTENCE WAS?

1          PROSPECTIVE JUROR WILMOTHAVILES:  YES, I DO.

2          THE COURT:  WHAT WAS IT?

3          PROSPECTIVE JUROR WILMOTHAVILES:  LIFE WITHOUT.

4          THE COURT:  THE ALLEGATIONS IN THIS CASE, THERE ARE

5    TWO SETS.  ONE IS CHILD PORNOGRAPHY CHARGES, AND THE OTHER

6    SET IS THAT THE DEFENDANT IN THIS CASE IS ACCUSED OF

7    TRAVELING ACROSS STATE LINES TO MOLEST A SEVEN-YEAR-OLD BOY.

8    AND THAT THE OTHER ACCUSATION IS THAT HE DID MOLEST A SEVEN-

9    YEAR-OLD BOY.

10          GIVEN WHAT YOUR OWN LIFE EXPERIENCES HAVE BEEN, DO

11   YOU THINK YOU COULD BE A FAIR AND IMPARTIAL JUROR IN THIS

12   CASE TO BOTH SIDES?

13          PROSPECTIVE JUROR WILMOTHAVILES:  YOU KNOW WHAT.  I

14   DON'T KNOW.  I HAVE NEVER BEEN FACED WITH --

15          THE COURT:  WITH THIS SITUATION?

16          PROSPECTIVE JUROR WILMOTHAVILES:  -- WITH THIS

17   SITUATION, CORRECT.

18          THE COURT:  YOUR NEPHEW AT THE TIME THAT HE WAS

19   KIDNAPPED AND MOLESTED AND MURDERED WAS ABOUT 12.  SO HE WAS

20   A YOUNG BOY, TOO?

21          PROSPECTIVE JUROR WILMOTHAVILES:  YES, HE WAS.

22          THE COURT:  THE SAME AS THE ALLEGED VICTIM IN THIS

23   CASE; LIKEWISE, A LITTLE BIT YOUNGER.  BUT THE DEFENDANT IN

24   THIS CASE, LIKE THE DEFENDANT IN ANY CASE, IS ENTITLED TO BE

25   PRESUMED INNOCENT.  WOULD YOU BE ABLE TO APPLY THAT

1    PRESUMPTION IN A CASE LIKE THIS?

2                PROSPECTIVE JUROR WILMOTHAVILES:  I DON'T KNOW.

3    BEING PERFECTLY HONEST, I TRULY DON'T KNOW.

4                THE COURT:  THAT'S WHAT WE'RE ASKING YOU TO BE, IS

5    PERFECTLY HONEST.  AND WE APPRECIATE YOUR ANSWERS.

6                WHEN YOU ATTENDED THE TRIAL AND WERE, I GUESS,

7    AWARE OF ALL OF THE PROCEEDINGS INVOLVING YOUR NEPHEW'S

8    MURDER?

9                PROSPECTIVE JUROR WILMOTHAVILES:  YES.

10               THE COURT:  OVERALL, HOW DID YOU AND YOUR FAMILY

11   MEMBERS FEEL ABOUT THE WAY THE JUSTICE SYSTEM TREATED YOUR

12   FAMILY?

13               PROSPECTIVE JUROR WILMOTHAVILES:  OUR FAMILY?

14               THE COURT:  YES.

15               PROSPECTIVE JUROR WILMOTHAVILES:  WE WERE VERY

16   FORTUNATE.  WE FELT THAT THEY REALLY TREATED US VERY WELL.

17               THE COURT:  HOW DID YOU FEEL ABOUT THE TRIAL IN

18   THAT CASE?  DID YOU THINK IT WAS A FAIR TRIAL?

19               PROSPECTIVE JUROR WILMOTHAVILES:  YES.

20               THE COURT:  IF YOU WERE SEATED, AS -- WELL, HOW DO

21   YOU FEEL ABOUT SITTING AS A JUROR ON THIS CASE?

22               PROSPECTIVE JUROR WILMOTHAVILES:  VERY MIXED

23   EMOTIONS.

24               THE COURT:  TELL ME, WHAT ARE THE PARTS IN THAT

25   MIXTURE?

```
 1              PROSPECTIVE JUROR WILMOTHAVILES:  I BASICALLY THINK
 2    THAT I'M VERY FAIR-MINDED.  I WORK WITH KIDS FOR A LIVING,
 3    SO, AS YOU KNOW BY MY QUESTIONNAIRE, I VOLUNTEER WITH CPS AND
 4    JUVENILE HALL AND STUFF.  SO I THINK THAT I'M VERY
 5    FAIR-MINDED.  I JUST -- I DON'T KNOW HOW FAIR-MINDED I REALLY
 6    AM.
 7              THE COURT:  TELL US ABOUT VOLUNTEERING AT JUVENILE
 8    HALL.
 9              PROSPECTIVE JUROR WILMOTHAVILES:  WE DO A PROGRAM
10    THERE FOR GIRLS THAT ARE LOCKED UP.
11              THE COURT:  WHAT KINDS OF THINGS DO YOU DO
12    INVOLVING THE PROGRAM?
13              PROSPECTIVE JUROR WILMOTHAVILES:  WE HAVE A PROGRAM
14    THAT WE DO CALLED FAITH, THAT IS TEACHING BULLYING.  AND THAT
15    IDENTIFIES GIRLS THAT ARE BEING BULLIED, AND BULLIES TO
16    IDENTIFY SOME OF THEIR OWN RESPONSIBILITIES.
17              THE COURT:  AND WHEN YOU SAID YOU DO PROGRAMS WITH
18    CPS, THAT'S CHILD PROTECTIVE SERVICES?
19              PROSPECTIVE JUROR WILMOTHAVILES:  YES, I DO.
20              THE COURT:  IS IT THE SAME TYPE OF BULLYING?
21              PROSPECTIVE JUROR WILMOTHAVILES:  YES.  ONE OF THE
22    PROGRAMS I GO FAMILY TO FAMILY.  I AM A COMMUNITY PARTNER.
23              THE COURT:  TELL ME ABOUT THAT PROGRAM.
24              PROSPECTIVE JUROR WILMOTHAVILES:  THAT PROGRAM
25    WHERE WE ARE CALLED, AND WE DO -- WHERE THE CHILDREN HAVE
```

1    BEEN REMOVED.  AND WITHIN A CERTAIN AMOUNT OF TIME WE MEET

2    WITH THE FAMILY AND THE PARENTS, IF THEY ARE AVAILABLE, TO

3    PUT A PLAN TOGETHER TO EITHER RETURN THE CHILDREN OR LOOK AT

4    OR ASSESS AND SEE WHAT WE, AS THE COMMUNITY, CAN OFFER THEM.

5              THE COURT:  NOW, THAT'S A VOLUNTEER PROGRAM THAT

6    YOU DO?

7              PROSPECTIVE JUROR WILMOTHAVILES:  YES, IT IS.

8              THE COURT:  SO YOU DO BOTH OF THOSE ON A VOLUNTEER

9    BASIS?

10             PROSPECTIVE JUROR WILMOTHAVILES:  YES, I DO.

11             THE COURT:  I WISH THERE WERE MORE PEOPLE LIKE YOU.

12             PROSPECTIVE JUROR WILMOTHAVILES:  I DON'T KNOW

13   ABOUT THAT.

14             THE COURT:  THAT IS PROBABLY A LOT OF INVESTMENT OF

15   YOUR TIME?

16             PROSPECTIVE JUROR WILMOTHAVILES:  YES, IT IS.

17             THE COURT:  WHEN YOU SAY YOU'RE NOT SURE IF YOU

18   COULD REMAIN FAIR AND IMPARTIAL IN THIS CASE, LET ME GIVE YOU

19   A LITTLE MORE INFORMATION ABOUT WHAT THE EVIDENCE PROBABLY

20   WILL BE IN THE CASE.

21             ON THE CHILD PORNOGRAPHY CHARGES, THERE WILL BE

22   EVIDENCE INCLUDING 30 TO 40 IMAGES OF YOUNG CHILDREN INVOLVED

23   IN EXPLICIT SEXUAL CONDUCT, SOMETIMES WITH ADULTS.  SOME OF

24   THEM SHOW BONDAGE OR SADO/MASOCHISTIC-TYPE IMAGES.

25             THERE WILL ALSO BE EVIDENCE OF TRANSCRIPTS OF

1    INTERNET CHAT ROOMS INVOLVING DESCRIPTIONS, EXPLICIT

2    DESCRIPTIONS, OF SEXUAL CONDUCT.

3            NOW, FORGIVE ME IF I START TO REPEAT MYSELF BECAUSE

4    I HAVE TALKED TO A LOT OF PEOPLE TODAY AND I MAY HAVE ALREADY

5    SAID THIS TO YOU:  THE DEFENDANT IN EVERY CASE, REGARDLESS OF

6    THE NATURE OF THE CHARGES, IS ENTITLED TO THE SAME

7    PRESUMPTION OF INNOCENCE.  SO, GIVEN WHAT THE EVIDENCE IS --

8    THAT'S SOME OF THE EVIDENCE I JUST DESCRIBED -- DO YOU THINK

9    YOU WOULD BE ABLE TO LISTEN AND WATCH, SEE THAT EVIDENCE, AND

10   STILL MAINTAIN THAT PRESUMPTION OF INNOCENCE AS TO THE

11   DEFENDANT IN THIS CASE?

12           PROSPECTIVE JUROR WILMOTHAVILES:  I'M GOING TO HAVE

13   TO SAY PROBABLY NOT.

14           THE COURT:  NOW THAT YOU KNOW A LITTLE MORE ABOUT

15   WHAT THE EVIDENCE WILL BE?

16           PROSPECTIVE JUROR WILMOTHAVILES:  YES.

17           THE COURT:  DOES EITHER SIDE WISH TO INQUIRE ANY

18   FURTHER?

19           MR. AARON:  NO, YOUR HONOR.

20           THE COURT:  MR. MICHAEL?

21           MR. MICHAEL:  NO, YOUR HONOR.

22           THE COURT:  COUNSEL WILLING TO STIPULATE?

23           MR. AARON:  WE ARE.

24           MR. MICHAEL:  YES, YOUR HONOR.

25           THE COURT:  MS. WILMOTHAVILES, I WANT TO THANK YOU

```
 1    AGAIN FOR APPEARING HERE TODAY.  I KNOW YOU HAD ANOTHER

 2    COMMITMENT WITH REGARD TO YOUR SON, SO I REALLY APPRECIATE

 3    YOUR ARRANGING THAT AND APPEARING.  WE ARE GOING TO EXCUSE

 4    YOU.

 5              PROSPECTIVE JUROR WILMOTHAVILES:  OKAY.  THANK YOU.

 6              THE COURT:  THANK YOU.  THANK YOU VERY MUCH FOR

 7    YOUR CANDOR AND YOUR RESPONSIBILITY, AND FOR THE WORK THAT

 8    YOU DO IN THE COMMUNITY.

 9              PROSPECTIVE JUROR WILMOTHAVILES:  THANK YOU.

10              THE COURT:  YOU ARE EXCUSED.

11              PROSPECTIVE JUROR WILMOTHAVILES:  THANK YOU.

12              THE COURT:  YOU ARE EXCUSED.  JUST GO BACK DOWN TO

13    THE JURY ASSEMBLY ROOM AND LET THEM KNOW.

14              PROSPECTIVE JUROR WILMOTHAVILES:  OKAY.  THANK YOU.

15     (PROSPECTIVE JUROR WILMOTHAVILES HAS EXITED THE COURTROOM.)

16       (PROSPECTIVE JUROR YAMBAO IS PRESENT IN THE COURTROOM.)

17              THE COURT:  MR. YAMBAO, GOOD AFTERNOON.

18              PROSPECTIVE JUROR YAMBAO:  GOOD AFTERNOON, MA'AM.

19              THE COURT:  YOU MAY HAVE A SEAT, SIR.

20              I JUST WANT TO ASK YOU A COUPLE OF QUESTIONS,

21    FOLLOW-UP QUESTIONS, BASED ON YOUR QUESTIONNAIRE AND ANSWERS.

22              AM I PRONOUNCING YOUR NAME CORRECTLY, YAMBAO?

23              PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

24              THE COURT:  IS THAT CLOSE?

25              YOU HAVE THREE YOUNG CHILDREN?
```

1              PROSPECTIVE JUROR YAMBAO:  YES.

2              THE COURT:  WELL, 14, 11 AND 9?

3              PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

4              THE COURT:  YOU MUST BE BUSY AT HOME?

5              PROSPECTIVE JUROR YAMBAO:  ALWAYS.

6              THE COURT:  AND YOU ANSWERED, IN CONNECTION WITH

7    ONE OR MORE OF THE QUESTIONNAIRE QUESTIONS THAT YOU HAD A

8    CONCERN ABOUT BEING A FAIR AND IMPARTIAL JUROR ON THIS CASE

9    BECAUSE YOU HAVE CHILDREN, BUT YOU WOULD DO YOUR BEST TO BE

10   FAIR AND IMPARTIAL.

11             DO YOU REMEMBER THAT ANSWER?

12             PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

13             THE COURT:  CAN YOU TELL US ANYTHING ELSE TO

14   EXPLAIN THAT?

15             PROSPECTIVE JUROR YAMBAO:  AS I SAID ON MY ANSWER,

16   MA'AM, I'M NOT SURE IF I WOULD BE FAIR BECAUSE OF -- IF I

17   HAVE TO CONVERT AND LOOK AT MY FAMILY AT THE SAME TIME.  SO,

18   BEING, YOU KNOW -- BUT IT WAS NOT GOING TO BE -- HOPEFULLY,

19   WILL NOT BE GOING ABOUT WITH THAT.  THAT WILL BE JUST MY OWN

20   DECISION, THAT I WILL DECIDE THAT.  I JUST WANT TO BE -- HAVE

21   TO GO AND TRY TO BE THE BEST, FAIR, WITHOUT LOOK AT MY

22   FAMILY, WITHOUT GOING THROUGH IT.

23             THE COURT:  AND YOU WOULD DO YOUR BEST TO DO THAT?

24             PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

25             THE COURT:  NOW, THERE IS TWO KINDS OF CHARGES IN

1    THIS CASE, AS YOU MAY REMEMBER FROM THE QUESTIONNAIRE.  THE

2    CHILD PORNOGRAPHY CHARGES, THAT THE DEFENDANT IS ACCUSED OF

3    POSSESSING CHILD PORNOGRAPHY.  HE IS ALSO ACCUSED OF

4    TRAVELING ACROSS STATE LINES WITH THE INTENT TO MOLEST A

5    SEVEN-YEAR-OLD BOY, AND MOLESTING A SEVEN-YEAR-OLD BOY.

6              YOUR YOUNGEST CHILD IS ABOUT NINE?

7              PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.  THAT'S

8    RIGHT.

9              THE COURT:  AND, SO, IN THIS CASE, LIKE IN EVERY

10   CASE WHERE SOMEONE IS ACCUSED OF A CRIME, THE DEFENDANT IS

11   ENTITLED TO BE PRESUMED INNOCENT.

12             PROSPECTIVE JUROR YAMBAO:  YES.

13             THE COURT:  AND YOU WOULD BE ABLE TO PRESUME THAT

14   MR. SANDERS IS INNOCENT UNLESS THE GOVERNMENT PROVES HIM

15   GUILTY?

16             PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

17             THE COURT:  YOU UNDERSTAND HE DOESN'T HAVE TO PROVE

18   HE IS INNOCENT?

19             PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

20             THE COURT:  THE EVIDENCE IN THIS CASE THAT THE JURY

21   WILL CONSIDER WILL BE QUITE A LOT OF EVIDENCE.  AND AMONG THE

22   OTHER THINGS THAT YOU WOULD CONSIDER THERE WILL BE SOME

23   IMAGES OF CHILD PORNOGRAPHY.  AND THOSE ARE IMAGES -- THERE

24   IS TWO VERY SHORT VIDEO CLIPS, AND THEN THERE ARE SEVERAL

25   DOZEN STILL IMAGES OR PHOTOGRAPHS OF VERY YOUNG CHILDREN IN

 1    VERY EXPLICIT SEXUAL POSES.  SO, THE JURY HAS TO CONSIDER OR

 2    VIEW THOSE IMAGES.

 3              AND, ALSO, THERE IS TRANSCRIPTS OF SORT OF

 4    CONVERSATIONS AMONG PEOPLE IN INTERNET CHAT ROOMS.  AND THOSE

 5    CONVERSATIONS SOMETIMES ARE ABOUT VERY EXPLICIT SEXUAL

 6    CONDUCT.

 7              WOULD YOU BE ABLE TO CONSIDER ALL OF THE EVIDENCE

 8    BEFORE YOU MADE UP YOUR MIND IN THIS CASE?

 9              PROSPECTIVE JUROR YAMBAO:  THAT'S TRUE, YES.

10              THE COURT:  YOU UNDERSTAND THAT'S WHAT THE JURY HAS

11    TO DO?

12              PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

13              THE COURT:  DOES EITHER SIDE WISH TO INQUIRE ANY

14    FURTHER?

15              MR. MICHAEL:  NO, YOUR HONOR.

16              MR. AARON:  NO, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  THANK YOU, MR. YAMBAO.  YOU

18    CAN GO TO LUNCH, FINALLY.  PLEASE COME BACK -- IF YOU COULD

19    JUST GET YOURSELF SOMETHING TO EAT RATHER QUICKLY AND GET

20    BACK IN ABOUT 45 MINUTES.  THANK YOU VERY MUCH.  COME BACK TO

21    THE JURY ASSEMBLY ROOM.

22         (PROSPECTIVE JUROR YAMBAO EXITS THE COURTROOM.)

23              THE COURT:  COUNSEL, DO YOU NEED TO SAY ANYTHING

24    ELSE ON THE RECORD BEFORE I EXCUSE THE COURT REPORTER, EVEN

25    IF THERE ARE ANY OTHER MATTERS YOU WANT TO BRING UP WITH ME?

1           MR. MICHAEL:  NO, YOUR HONOR.

2           MR. AARON:  NO.

3           THE COURT:  LET'S GO OFF THE RECORD.

4                    (RECESS)

5           THE CLERK:  CALLING ITEM NO. 1 ON CALENDAR, CASE

6    NO. EDCR 04-42 VAP, UNITED STATES OF AMERICA VERSUS JAMES

7    SANDERS.

8           COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

9    RECORD.

10          MR. MICHAEL:  GOOD AFTERNOON, YOUR HONOR.  BRIAN

11   MICHAEL FOR THE GOVERNMENT.

12          MR. AKROTIRIANAKIS:  GOOD AFTERNOON.  JOE

13   AKROTIRIANAKIS, ALSO ON BEHALF OF THE UNITED STATES.

14          WITH US AT COUNSEL TABLE IS IMMIGRATION AND CUSTOMS

15   ENFORCEMENT SPECIAL AGENT JOSH MORENO.

16          THE COURT:  THANK YOU.  GOOD AFTERNOON.

17          MR. AARON:  GOOD AFTERNOON.  JEFFREY AARON FOR

18   MR. JAMES SANDERS WHO IS WITH ME AT COUNSEL TABLE.

19          THE COURT:  GOOD AFTERNOON.

20          GOOD AFTERNOON, LADIES AND GENTLEMEN.  WHEN YOU

21   WERE HERE ABOUT A WEEK AND A HALF AGO, I INTRODUCED TO YOU

22   THE OTHER PEOPLE IN THE COURTROOM.  BUT I WILL DO SO AGAIN,

23   NOW.

24          MY COURT REPORTER, PHYLLIS PRESTON.

25          MY COURTROOM DEPUTY CLERK, RACHEL INGRAM.

1              AND OUR RELIEF CLERK, CINDY SASSE.

2              MY LAW CLERKS ARE LAURA ROBBINS AND JOHN FATTAHI.

3    AND THIS SUMMER I HAVE TWO LAW STUDENTS WHO ARE VOLUNTEERING

4    IN MY CHAMBERS, AND THEY ARE HERE THIS AFTERNOON, AS WELL,

5    HANNAH HAMPTON AND CHRIS MENDOZA.

6              AND AS I TOLD YOU BEFORE, IF YOU NEED ASSISTANCE

7    FROM ANYONE ON MY STAFF, IN TERMS OF WHERE TO FIND YOUR WAY

8    AROUND THE COURTHOUSE OR WHEN TO BE BACK IN COURT, ANYONE

9    WOULD BE HAPPY TO HELP YOU.

10             MS. PRESTON'S JOB, AS FAR AS YOU'RE CONCERNED

11   TODAY, IS ESPECIALLY IMPORTANT.  SHE HAS THE JOB -- YOU MAY

12   REMEMBER -- OF TAKING DOWN EVERYTHING THAT ANY OF US SAY IN

13   THE COURTROOM.  AND SHE IS VERY GOOD AT HER JOB, BY THE WAY,

14   WHICH IS A VERY CHALLENGING ONE.

15             BUT IF YOU KEEP A FEW THINGS IN MIND TODAY AS YOU

16   ARE TALKING TO US, IT WILL MAKE IT EASIER FOR HER TO MAKE AN

17   ACCURATE RECORD OF EVERYTHING THAT WE SAY.

18             PLEASE, FIRST OF ALL, SHE CAN ONLY TAKE DOWN WHAT

19   WE SAY OUT LOUD.  SO, RATHER THAN NODDING OR SHAKING YOUR

20   HEAD, WE HAVE TO ANSWER OUT LOUD.  SHE CAN ONLY TAKE DOWN A

21   VERBAL RESPONSE.

22             MANY OF US HAVE A BAD HABIT, IN ORDINARY

23   CONVERSATION, OF SPEAKING OVER ONE ANOTHER.  BUT IT IS

24   DIFFICULT FOR THE COURT REPORTER TO TAKE DOWN MORE THAN ONE

25   PERSON SPEAKING AT A TIME.  SO, PLEASE REMEMBER TO WAIT UNTIL

1    THE PERSON SPEAKING TO YOU, WHETHER IT IS MYSELF OR ONE OF

2    THE ATTORNEYS, WAIT UNTIL WE ARE DONE WITH OUR QUESTION

3    BEFORE YOU BEGIN YOUR ANSWER.  THAT WILL MAKE IT MUCH EASIER

4    FOR HER TO GET YOUR ANSWER DOWN CORRECTLY.

5             AS YOU ALREADY KNOW, YOU ARE HERE -- WELL, THIS

6    AFTERNOON, I HAVE BEEN TALKING TO MANY OF YOU THROUGHOUT THE

7    DAY, BUT NOT QUITE ALL OF YOU; SO, I APPRECIATE EVERYONE'S

8    PATIENCE -- FOR THE TRIAL OF A CRIMINAL MATTER.

9             AND I HAVE ALREADY TOLD YOU AND INTRODUCED TO YOU

10   ONCE THE ATTORNEYS, BUT I'M GOING TO GIVE THEM A CHANCE ONCE

11   AGAIN TO STAND UP AND INTRODUCE THEMSELVES AND THEIR CLIENTS.

12            FOR THE PROSECUTION, THERE ARE TWO ATTORNEYS FROM

13   THE FEDERAL PROSECUTOR'S OFFICE, WHICH IS CALLED THE OFFICE

14   OF THE UNITED STATES ATTORNEY'S OFFICE.

15            AND IF YOU WOULD INTRODUCE YOURSELVES TO THE PANEL.

16            MR. MICHAEL:  GOOD AFTERNOON.  MY NAME IS BRIAN

17   MICHAEL.  I AM AN ASSISTANT UNITED STATES ATTORNEY.

18            MR. AKROTIRIANAKIS:  GOOD AFTERNOON.  MY NAME IS

19   JOE AKROTIRIANAKIS, AND I AM AN ASSISTANT UNITED STATES

20   ATTORNEY.

21            THIS IS UNITED STATES DEPARTMENT OF HOMELAND

22   SECURITY, BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT,

23   SPECIAL AGENT JOSH MORENO.

24            THE COURT:  THANK YOU.

25            AND FOR THE DEFENSE?

```
 1              MR. AARON:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

 2    MY NAME IS JEFFREY AARON, AND I REPRESENT JAMES SANDERS.  AND

 3    THIS IS MY CLIENT, MR. SANDERS.

 4              THE COURT:  THANK YOU VERY MUCH.

 5              AS YOU KNOW, LADIES AND GENTLEMEN, THIS TRIAL IS

 6    EXPECTED TO LAST APPROXIMATELY TWO WEEKS, THE REST OF THIS

 7    WEEK AND NEXT WEEK.  AND ON MOST DAYS WE WILL BE IN SESSION,

 8    AS FAR AS THE JURY IS CONCERNED, FROM 9:00 TO 4:30.  THERE

 9    MAY BE A COUPLE OF DAYS NEXT WEEK, ONE FOR SURE, AND THERE

10    MAY BE TWO, WHERE WE WILL HAVE A SLIGHTLY DIFFERENT SCHEDULE

11    WHERE WE WILL ASK YOU TO COME IN AT 8:00 IN THE MORNING AND

12    WE WILL GO UNTIL 1:30 WITHOUT A LUNCH BREAK.  WE WILL TAKE A

13    COUPLE OF SHORT BREAKS, AND THEN YOU WILL BE DONE AT 1:30.

14    SO, WE HAVE ALMOST THE SAME NUMBER OF HOURS, BUT IT IS A

15    LITTLE BIT OF A COMPRESSED SCHEDULE.  AND WE WILL LET YOU

16    KNOW IN ADVANCE IF THAT'S THE CASE.

17              THIS PART OF THE CASE IS CALLED VOIR DIRE, JURY

18    SELECTION, AND IT IS THE PART OF THE CASE WHERE I HAVE THE

19    OPPORTUNITY TO ASK YOU SOME QUESTIONS ABOUT YOURSELVES AND

20    YOUR QUALIFICATIONS TO SERVE AS JURORS ON THE CASE.

21              THE ATTORNEYS WILL HAVE A VERY LIMITED OPPORTUNITY

22    TO SPEAK TO YOU, AS WELL.

23              FIRST OF ALL, IS EVERY ONE ABLE TO HEAR ME?  I

24    DIDN'T HAVE MY MICROPHONE ON.  NOW CAN YOU HEAR ME EVEN

25    BETTER, I HOPE?
```

1              ARE ALL OF YOU ABLE TO UNDERSTAND AND SPEAK
2    ENGLISH?
3              ARE ALL OF YOU CITIZENS OF THE UNITED STATES?
4              AND HAS ANYONE BEEN CONVICTED OF A FELONY CRIME?
5              THERE ARE TWO PURPOSES FOR THIS VOIR DIRE OR JURY
6    SELECTION PROCESS.  FIRST, TO ENABLE THE COURT TO MAKE A
7    DECISION AS TO WHETHER ANY POTENTIAL JUROR SHOULD BE EXCUSED
8    FOR CAUSE.  AND THAT MEANS, CAUSE, THAT IS, MEANS THAT THERE
9    IS A REASON WHY A JUROR WOULD NOT BE ABLE TO RENDER AN
10   IMPARTIAL VERDICT IN THIS CASE.  FOR EXAMPLE, PERHAPS WHEN
11   YOU COME TO THE COURTROOM TO BEGIN YOUR JURY DUTY YOU REALIZE
12   YOU KNOW SOMEONE IN THE COURTROOM VERY WELL.  YOU MIGHT KNOW
13   THE DEFENDANT.  YOU MIGHT KNOW ONE OF THE ATTORNEYS, AND THAT
14   MIGHT BE A REASON -- IT MIGHT BE A REASON FOR YOU TO BE
15   EXCUSED FOR CAUSE.
16             OR YOU MIGHT HAVE A RELATIONSHIP WITH SOMEONE WHO
17   IS GOING TO BE A WITNESS IN THE CASE, AND THAT MIGHT BE A
18   REASON THAT THAT JUROR SHOULD BE EXCUSED FOR CAUSE.
19             OR A JUROR MIGHT HAVE A FRAME OF MIND OR A STATE OF
20   MIND THAT HE OR SHE COULD NOT BE A FAIR AND IMPARTIAL JUROR
21   TO BOTH SIDES OF THE CASE IN THIS SORT OF A CASE.  YOU MIGHT
22   BE A FAIR AND IMPARTIAL JUROR ON ANOTHER SORT OF CASE, BUT
23   NOT THIS ONE.
24             SO THAT'S ONE REASON FOR ASKING QUESTIONS DURING
25   VOIR DIRE.

1          AND THE OTHER REASON IS TO HELP THE LAWYERS FOR

2    BOTH SIDES TO EXERCISE THEIR JUDGMENT AS TO MAKING PEREMPTORY

3    CHALLENGES.  YOU MAY BE FAMILIAR WITH THAT TERM.  BUT THE LAW

4    GIVES EACH SIDE A LIMITED NUMBER OF TIMES THAT THEY CAN ASK

5    THE JUDGE TO THANK AND EXCUSE A JUROR WITHOUT GIVING ANY

6    REASON AS TO WHY THEY WOULD JUST HAVE ANOTHER JUROR SIT ON

7    THE CASE.

8          AND BY GETTING SOME INFORMATION ABOUT YOU AND YOUR

9    BACKGROUND AND SO FORTH, THEY CAN MAKE INTELLIGENT USE OF

10   THEIR PEREMPTORY CHALLENGES.

11         BY ASKING QUESTIONS, BOTH IN THE QUESTIONNAIRES

12   THAT YOU HAVE ALREADY ANSWERED, AND TODAY VERBALLY, WE'RE NOT

13   TRYING TO PRY INTO YOUR PERSONAL AFFAIRS, BUT WE ARE SEEKING

14   INFORMATION SO THAT THE LAWYERS AND THE COURT CAN MAKE

15   INTELLIGENT DECISIONS ABOUT CHALLENGES FOR CAUSE AND

16   PEREMPTORY CHALLENGES.

17         WE ARE ONLY TRYING TO GAIN INFORMATION THAT BEARS

18   ON THE ISSUES THAT MAY COME UP IN THIS TRIAL SO THAT WE CAN

19   OBTAIN A FAIR AND IMPARTIAL JURY THAT WILL TRY THIS CASE

20   BASED ON THE EVIDENCE THAT IS PRESENTED TO THE JURY AND THE

21   LAW THAT'S GIVEN TO THE JURY BY THE COURT.

22         BOTH SIDES IN THIS CASE, IN EVERY CASE, ARE

23   ENTITLED TO A FAIR AND IMPARTIAL JURY.  THEY CANNOT ASK MORE

24   OF YOU, THAT IS, MORE OF YOU THAN BEING FAIR AND IMPARTIAL,

25   AND YOU CANNOT GIVE THEM LESS.

1    EVERYTHING THAT'S SAID DURING THIS VOIR DIRE OR

2    QUESTION-AND-ANSWER SESSION IS NOT EVIDENCE IN THE CASE, AND

3    IT IS NOT TO BE TAKEN AS PROOF OF ANY FACT OR AS EVIDENCE.

4    SO, IF YOU ARE CHOSEN AS A JUROR IN THIS CASE, YOU MUST

5    CONSIDER NOTHING IN DETERMINING THE FACTS OF THE FACTS EXCEPT

6    THE EVIDENCE THAT ACTUALLY COMES IN DURING THE TRIAL.

7    NOTHING THAT COMES IN DURING THIS VOIR DIRE SESSION IS

8    EVIDENCE.

9    IT IS THE SWORN DUTY OF JURORS TO HEAR AND SEE ALL

10   OF THE EVIDENCE AND THEN CONSCIENTIOUSLY CONSIDER ALL OF THE

11   EVIDENCE THAT'S INTRODUCED AT TRIAL, AND THEN MAKE A

12   DETERMINATION OF THE FACTS OF THE CASE BASED ENTIRELY AND

13   EXCLUSIVELY ON THE EVIDENCE, WITHOUT PREJUDICE, FAVORITISM,

14   OR BIAS.

15   AND IT IS ALSO THE SWORN DUTY OF EACH AND EVERY

16   JUROR TO ACCEPT FROM THE COURT THE RULES OF LAW THAT APPLY TO

17   THE CASE AND TO ACCEPT THE COURT'S RULINGS ON THE LAW AND THE

18   INSTRUCTIONS ON THE LAW TO THE FACTS OF THE CASE, AS FOUND BY

19   THE JURORS.

20   THIS MUST BE DONE REGARDLESS OF ANY PERSONAL OR

21   PRECONCEIVED NOTION OF WHAT THE LAW IS OR OUGHT TO BE.  ALL

22   OF THESE ARE VERY IMPORTANT DUTIES.  AND THE PROPER

23   ADMINISTRATION OF OUR SYSTEM OF JUSTICE RESTS UPON JURORS IN

24   EVERY CASE FULFILLING THOSE DUTIES.

25   THIS CASE IS BROUGHT BY THE UNITED STATES OF

1    AMERICA, AND JAMES SANDERS IS THE DEFENDANT.  AND THE

2    ATTORNEYS AND THE CLIENTS HAVE JUST INTRODUCED THEMSELVES TO

3    YOU.

4           THIS MATTER IS HERE BECAUSE OF AN INDICTMENT THAT'S

5    BEEN FILED AGAINST THE DEFENDANT, AND I'M GOING TO CALL ON

6    THE ATTORNEY FOR THE GOVERNMENT TO READ THE CHARGES IN THE

7    INDICTMENT TO YOU NOW.

8           MR. AKROTIRIANAKIS?

9           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

10          UNITED STATES OF AMERICA, PLAINTIFF, VERSUS JAMES

11   SANDERS, DEFENDANT.  FIRST SUPERSEDING INDICTMENT.

12          THE GRAND JURY CHARGES:

13          COUNT 1, OBJECT OF THE CONSPIRACY.

14          BEGINNING IN AT LEAST IN OR ABOUT MARCH 2000, AND

15   CONTINUING TO AT LEAST IN OR ABOUT JUNE 2001, IN RIVERSIDE

16   COUNTY, WITHIN THE CENTRAL DISTRICT OF CALIFORNIA, AND

17   ELSEWHERE, DEFENDANT JAMES SANDERS, AND OTHERS KNOWN AND

18   UNKNOWN TO THE GRAND JURY, KNOWINGLY AND INTENTIONALLY

19   CONSPIRED AND AGREED WITH EACH OTHER TO POSSESS CHILD

20   PORNOGRAPHY, AS DEFINED IN TITLE 18, UNITED STATES CODE,

21   SECTION 2256(8)(A), THAT HAD BEEN SHIPPED AND TRANSPORTED IN

22   INTERSTATE AND FOREIGN COMMERCE BY ANY MEANS, INCLUDING BY

23   COMPUTER, KNOWING THAT THE IMAGES WERE CHILD PORNOGRAPHY, IN

24   VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION

25   2252A(A)(5)(B).

1    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO

2    BE ACCOMPLISHED:

3          THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

4    IN SUBSTANCE AS FOLLOWS:

5          1. DEFENDANT SANDERS AND HIS CO-CONSPIRATORS WOULD

6    CORRESPOND IN INTERNET CHAT ROOMS ABOUT CHILD PORNOGRAPHY AND

7    THEIR MUTUAL SEXUAL INTEREST IN BOYS UNDER 18 YEARS OF AGE.

8          2. DEFENDANT SANDERS AND HIS CO-CONSPIRATORS WOULD

9    SHARE VIDEOS AND IMAGES OF CHILD PORNOGRAPHY WITH EACH OTHER

10   VIA THE INTERNET AND BY OTHER MEANS.

11         3. A CO-CONSPIRATOR NOT NAMED HEREIN, ("CC-1")

12   WOULD PROCURE VIDEOTAPES AND COMPACT DISKS CONTAINING CHILD

13   PORNOGRAPHY FROM CO-CONSPIRATORS IN MOSCOW, RUSSIA, AMONG

14   OTHER PLACES.

15         4. CC-1 WOULD DUPLICATE THE VIDEOTAPES AND

16   COMPACT DISKS IN HIS HOME AND DISTRIBUTE THEM TO DEFENDANT

17   SANDERS AND OTHER CO-CONSPIRATORS IN CALIFORNIA AND ELSEWHERE

18   VIA MAIL AND THE INTERNET.

19         5. CC-1 WOULD SEND VIDEOTAPES AND COMPACT DISKS

20   CONTAINING CHILD PORNOGRAPHY TO DEFENDANT SANDERS AT SANDERS'

21   HOME IN MOUNTAIN CENTER, CALIFORNIA, AND TO OTHER

22   CO-CONSPIRATORS IN CALIFORNIA AND ELSEWHERE.

23         OVERT ACTS:

24         IN FURTHERANCE OF THE CONSPIRACY AND TO ACCOMPLISH

25   THE OBJECT OF THE CONSPIRACY, DEFENDANT SANDERS, AND OTHERS

1    KNOWN AND UNKNOWN TO THE GRAND JURY, COMMITTED VARIOUS OVERT

2    ACTS WITHIN THE CENTRAL DISTRICT OF CALIFORNIA AND ELSEWHERE,

3    INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING:

4              1. BETWEEN IN OR ABOUT MARCH 2000 AND JANUARY 2001,

5    DEFENDANT SANDERS AND CC-1 CORRESPONDED IN INTERNET CHAT

6    ROOMS WITH EACH OTHER AND WITH OTHER CO-CONSPIRATORS ABOUT

7    CHILD PORNOGRAPHY;

8              2. BETWEEN IN OR ABOUT MARCH 2000 AND JANUARY 2001,

9    CC-1 PURCHASED NUMEROUS VIDEOTAPES AND COMPACT DISKS

10   CONTAINING CHILD PORNOGRAPHY FROM CO-CONSPIRATORS IN MOSCOW,

11   RUSSIA, AND ELSEWHERE;

12             3. BETWEEN IN OR ABOUT MARCH 2000 AND JANUARY 2001,

13   CC-1 SENT COMPACT DISKS AND VIDEOCASSETTES CONTAINING CHILD

14   PORNOGRAPHY TO DEFENDANT SANDERS AT HIS HOME IN MOUNTAIN

15   CENTER, CALIFORNIA;

16             4. IN OR ABOUT DECEMBER 2000, CC-1 VISITED

17   DEFENDANT SANDERS AT HIS HOME IN MOUNTAIN CENTER,

18   CALIFORNIA;

19             5. ON OR ABOUT JANUARY 4, 2001, CC-1 POSSESSED IN

20   HIS HOME IN WALNUT CENTER, CALIFORNIA, HUNDREDS OF VIDEOTAPES

21   AND COMPACT DISKS WHICH CONTAINED CHILD PORNOGRAPHY, AS WELL

22   AS DUPLICATING EQUIPMENT, PACKAGING SUPPLIES, AND RECORDS

23   REFLECTING THE IDENTITIES OF CO-CONSPIRATORS TO WHOM HE HAD

24   SENT PORNOGRAPHY, INCLUDING DEFENDANT SANDERS;

25             6. ON OR ABOUT JUNE 5, 2001, DEFENDANT SANDERS

1    POSSESSED A COMPUTER HARD DRIVE AND FLOPPY DISKS WHICH

2    CONTAINED CHILD PORNOGRAPHY, CORRESPONDENCE FROM CC-1, AND

3    TWO TORN ENVELOPES BEARING THE RETURN ADDRESS OF CC-1.

4            COUNT 2.  ON OR BEFORE JUNE 5, 2001, IN RIVERSIDE

5    COUNTY, WITHIN THE CENTRAL DISTRICT OF CALIFORNIA, DEFENDANT

6    JAMES SANDERS KNOWINGLY POSSESSED A COMPUTER HARD DRIVE AND

7    FLOPPY DISKS WHICH CONTAINED AT LEAST ONE IMAGE OF CHILD

8    PORNOGRAPHY, AS DEFINED IN TITLE 18, UNITED STATES CODE,

9    SECTION 2256(8)(A), THAT HAD BEEN SHIPPED AND TRANSPORTED IN

10   INTERSTATE AND FOREIGN COMMERCE BY ANY MEANS, INCLUDING BY

11   COMPUTER, KNOWING THAT THE IMAGES WERE CHILD PORNOGRAPHY.

12           COUNT 3.  IN OR ABOUT DECEMBER 2000, IN RIVERSIDE

13   COUNTY, WITHIN THE CENTRAL DISTRICT OF CALIFORNIA, AND

14   ELSEWHERE, DEFENDANT JAMES SANDERS TRAVELED IN INTERSTATE

15   COMMERCE, NAMELY, FROM CALIFORNIA TO NEW MEXICO, FOR THE

16   PURPOSE OF ENGAGING IN A SEXUAL ACT, AS DEFINED IN TITLE 18,

17   UNITED STATES CODE, SECTION 2246, WITH A BOY UNDER 12 YEARS

18   OF AGE.

19           COUNT 4.  IN OR ABOUT DECEMBER 2000, IN RIVERSIDE

20   COUNTY, WITHIN THE CENTRAL DISTRICT OF CALIFORNIA, AND

21   ELSEWHERE, DEFENDANT JAMES SANDERS CROSSED A STATE LINE,

22   NAMELY, THE CALIFORNIA STATE LINE, WITH THE INTENT TO ENGAGE

23   IN A SEXUAL ACT, AS DEFINED IN TITLE 18, UNITED STATES CODE,

24   SECTION 2246, WITH A BOY UNDER 12 YEARS OF AGE, AND KNOWINGLY

25   ENGAGED, AND ATTEMPTED TO ENGAGE, IN A SEXUAL ACT WITH THAT

1   SAME BOY IN NEW MEXICO.

2          IN ATTEMPTING TO ENGAGE IN A SEXUAL ACT WITH THE

3   BOY, DEFENDANT TOOK SUBSTANTIAL STEPS, INCLUDING, BUT NOT

4   LIMITED TO: (1) DEFENDANT SLEPT WITH THE BOY; (2) DEFENDANT

5   SHOWERED WITH THE BOY; AND (3) DEFENDANT TOUCHED THE BOY'S

6   ANUS.

7          THE COURT:  THANK YOU.

8          LADIES AND GENTLEMEN, TO THESE CHARGES WHICH HAVE

9   JUST BEEN READ TO YOU, THE DEFENDANT HAS ENTERED A PLEA OF

10  NOT GUILTY AND HAS REQUESTED A JURY TRIAL, WHICH IS HIS

11  CONSTITUTIONAL RIGHT, AS I EXPLAINED TO YOU IN MORE DETAIL

12  WHEN WE WERE HERE THE FIRST DAY ABOUT TWO WEEKS AGO.

13         IT IS VERY IMPORTANT TO UNDERSTAND AND REMEMBER

14  THAT THE INDICTMENT IS MERELY AN ACCUSATION WHICH PERMITS

15  THIS MATTER TO COME TO COURT.

16         THE INDICTMENT IS NOT EVIDENCE, AND YOU MAY NOT

17  CONSIDER IT AS HAVING ANY BEARING ON THE ISSUE OF INNOCENCE

18  OR GUILT.

19         IN A CRIMINAL CASE, IT IS THE LAW THAT THE

20  DEFENDANT IS PRESUMED TO BE INNOCENT, AND THIS PRESUMPTION

21  CONTINUES THROUGHOUT THE TRIAL.  IT IS THE DUTY OF THE JURY

22  TO ACQUIT THE DEFENDANT, UNLESS THE EVIDENCE PRODUCED IN

23  COURT CONVINCES THE JURY BEYOND A REASONABLE DOUBT OF THE

24  DEFENDANT'S GUILT.  IN OTHER WORDS, THE GOVERNMENT ALWAYS

25  BEARS THE BURDEN OF PROVING TO YOU THE DEFENDANT'S GUILT

1    BEYOND A REASONABLE DOUBT.

2          PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT

3    LEAVES YOU FIRMLY CONVINCED THAT THE DEFENDANT IS GUILTY.  IT

4    IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL

5    POSSIBLE DOUBT.  A REASONABLE DOUBT IS DOUBT BASED UPON

6    REASON AND COMMON SENSE AND IS NOT BASED PURELY ON

7    SPECULATION.  IT MAY ARISE FROM A CAREFUL AND IMPARTIAL

8    CONSIDERATION OF ALL OF THE EVIDENCE, OR IT MAY ARISE FROM A

9    LACK OF THE EVIDENCE.

10         IF, AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF

11   ALL THE EVIDENCE, THE JURORS ARE NOT CONVINCED BEYOND A

12   REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, THEN IT IS THE

13   DUTY OF THE JURORS TO FIND THE DEFENDANT NOT GUILTY.

14         AND, ON THE OTHER HAND, IF, AFTER A CAREFUL AND

15   IMPARTIAL CONSIDERATION OF ALL OF THE EVIDENCE THE JURORS ARE

16   CONVINCED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS

17   GUILTY, IT IS THE DUTY OF THE JURORS TO FIND THE DEFENDANT

18   GUILTY.

19         A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL

20   RIGHT NOT TO TESTIFY.  IN FACT, AS YOU HAVE JUST HEARD ME

21   SAY, THE INDICTMENT IS NOT EVIDENCE, AND THE DEFENDANT HAS

22   PLEADED NOT GUILTY TO THE CHARGE IN THE INDICTMENT.  HE IS

23   PRESUMED TO BE INNOCENT, AND SO HE DOESN'T HAVE TO TESTIFY OR

24   PRESENT ANY EVIDENCE TO PROVE HE'S INNOCENT BECAUSE THE

25   GOVERNMENT ALWAYS HAS THE BURDEN OF PROVING EVERY ELEMENT OF

1    THE CHARGES BEYOND A REASONABLE DOUBT.

2           I'M GOING TO BEGIN BY ASKING QUESTIONS TO ALL OF

3    YOU IN THE ROOM.  FIRST OF ALL, DO ANY OF YOU KNOW THE

4    DEFENDANT IN THIS CASE, MR. JAMES SANDERS?  ANYONE KNOW HIM?

5           HAVE ANY OF YOU, APART FROM WHAT YOU MAY HAVE TOLD

6    ME WHEN I TALKED TO YOU INDIVIDUALLY THIS MORNING, HAVE ANY

7    OF YOU HEARD OR READ ANYTHING ABOUT THIS CASE, APART FROM

8    WHAT YOU ALREADY TOLD ME?

9           HAVE ANY OF YOU PARTICIPATED IN ANY DISCUSSIONS

10   ABOUT THIS CASE, OTHER THAN ANYTHING THAT OCCURRED IN THIS

11   COURTROOM?  ANYONE?

12          DO ANY OF YOU KNOW ANY OF THE ATTORNEYS FOR EITHER

13   SIDE?

14          DO ANY OF YOU KNOW ANYONE IN THE FEDERAL

15   PROSECUTOR'S OFFICE, NOT THE DISTRICT ATTORNEY'S OFFICE, BUT

16   THE OFFICE OF THE UNITED STATES ATTORNEY?

17          I'M GOING TO READ YOU A LIST OF THE WITNESSES WHO

18   MAY BE CALLED TO TESTIFY DURING THE TRIAL OF THIS CASE.  IT

19   IS POSSIBLE THAT NOT ALL OF THESE PEOPLE MIGHT ACTUALLY

20   TESTIFY.  IT IS ALSO POSSIBLE THERE MIGHT BE A FEW OTHERS WHO

21   DO TESTIFY.  BOTH OF THOSE THINGS ARE NORMAL, SO IF THAT

22   HAPPENS DON'T ATTACH ANY SIGNIFICANCE TO IT.

23          AT THIS TIME, THESE ARE THE WITNESSES WE EXPECT WHO

24   WILL BE CALLED TO TESTIFY:

25          I-C-E, THAT STANDS FOR ICE, WHICH STANDS FOR

1   IMMIGRATIONS AND CUSTOMS ENFORCEMENT, ATTACHE MARSHALL

2   HEEGER; BRUCE PIXLEY; JAMES CLEMENTE -- AND AGENT CLEMENTE IS

3   WITH THE FBI, CORRECT?

4           MR. MICHAEL:  YES, YOUR HONOR.

5           THE COURT:  ICE SPECIAL AGENT KELLY CORSETTI; ICE

6   SPECIAL AGENT JOHN OWEN; ICE SPECIAL AGENT PATRICK MCGAHA;

7   ICE SPECIAL AGENT RALPH PENDLETON, WHO IS RETIRED; RANDALL

8   MARTIN; ICE SPECIAL AGENT PERRY JOHNSON; PEDRO FLORES; TOM

9   OLIVAS; ICE SPECIAL AGENTS MICHAEL IMPERATRICE.  I'M SORRY,

10  WHAT DOES "GS" STAND FOR?

11          MR. AKROTIRIANAKIS:  GROUP SUPERVISOR.

12          THE COURT:  GROUP SUPERVISOR JAMES MORAN; ICE

13  SPECIAL AGENT LEE BROWN; DISTRICT ATTORNEY INVESTIGATOR BILL

14  HUBBARD; SETH BEKENSTEIN; CHARLES ANTHONY SUTHERLAND; FBI

15  INTELLIGENCE ANALYST MONIQUE BUENO; ICE SPECIAL AGENT JOSH

16  MORENO.  I BELIEVE ONE OTHER WITNESS WHO MAY TESTIFY, TONY

17  STYLES.

18          AT THIS TIME, THOSE ARE ALL OF THE WITNESSES WE

19  KNOW OF WHO MAY TESTIFY.  DO ANY OF YOU RECOGNIZE ANY OF THE

20  NAMES, THINK YOU MIGHT KNOW ANY OF THE PEOPLE I JUST READ TO

21  YOU?

22          NOW, WHAT ALMOST ALWAYS HAPPENS IN THE PROCESS OF

23  JURY SELECTION, IN ANSWER TO SOME QUESTION OR ANOTHER, AFTER

24  A FEW MINUTES, OR MAYBE ANOTHER JUROR ANSWERS A QUESTION AND

25  YOU MIGHT BE REMINDED OF SOMETHING THAT YOU DIDN'T THINK

1    ABOUT AT FIRST.  SO, IF THAT HAPPENS, JUST RAISE YOUR HAND

2    LATER, EVEN IF I MOVED ONTO ANOTHER SUBJECT.  IT PROBABLY

3    WOULDN'T HAPPEN HERE.

4            FOR EXAMPLE, YOU START THINKING ABOUT THE NAMES OF

5    THE WITNESSES, AND YOU THINK, ACTUALLY, YOU DID REMEMBER THAT

6    YOU MIGHT KNOW SOMEBODY.  EVEN IF I HAVE MOVED ON, RAISE YOUR

7    HAND AND TELL ME.  SAME THING APPLIES TO ANY OTHER QUESTION.

8            ARE ANY OF YOU OR ANY MEMBERS OF YOUR FAMILY NOW

9    EMPLOYED BY THE UNITED STATES GOVERNMENT?  NOT THE STATE OF

10   CALIFORNIA, BUT THE UNITED STATES GOVERNMENT.  ANYONE?

11           MS. LEE?

12           PROSPECTIVE JUROR LEE:  MARINE CORPS.

13           THE COURT:  ALL RIGHT.  AND WHO IN YOUR FAMILY?

14   OH, I THOUGHT YOU SAID SOMEONE IN YOUR FAMILY.

15           PROSPECTIVE JUROR LEE:  JUST ME.

16           THE COURT:  WHAT'S YOUR OCCUPATION?

17           PROSPECTIVE JUROR LEE:  I AM A BUDGET TECHNICIAN

18   AND CONTROLLER.

19           THE COURT:  AND WHERE DO YOU WORK?

20           PROSPECTIVE JUROR LEE:  TWENTY-NINE PALMS.

21           THE COURT:  ALL RIGHT.  AND HOW LONG HAVE YOU

22   WORKED AS A CIVILIAN ON THE BASE?

23           PROSPECTIVE JUROR LEE:  YES.

24           THE COURT:  HOW LONG HAVE YOU WORKED THERE?

25           PROSPECTIVE JUROR LEE:  THREE YEARS.

1            THE COURT:  THE FACT THAT THIS IS A CASE BROUGHT BY

2     THE UNITED STATES, WOULD THAT AFFECT YOUR ABILITY TO BE FAIR

3     TO BOTH SIDES?

4            PROSPECTIVE JUROR LEE:  NO.

5            THE COURT:  ALL RIGHT.  ANYONE ELSE?

6            MR. YAMBAO?

7            PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.  I USED TO

8     WORK FOR MILITARY, U.S. CUSTOMS.

9            THE COURT:  AND HOW LONG AGO WAS THAT?

10           PROSPECTIVE JUROR YAMBAO:  IT WAS BACK IN '87 TO

11    '91, '90.

12           THE COURT:  THROUGH '90?  WHAT WAS YOUR POSITION

13    WITH U.S. CUSTOMS SERVICE?

14           PROSPECTIVE JUROR YAMBAO:  JUST, WE WORK FOR THE

15    PERSONAL PROPERTY CUSTOMS FOR THE MILITARY.

16           THE COURT:  WAS THAT WHILE YOU WERE IN THE

17    MILITARY?

18           PROSPECTIVE JUROR YAMBAO:  YES, MA'AM.

19           THE COURT:  ALL RIGHT.  DID YOU RECOGNIZE THE NAMES

20    OF ANY OF THE PERSONS I READ TO YOU ON THE WITNESS LIST?

21           PROSPECTIVE JUROR YAMBAO:  NO.

22           THE COURT:  NOW, LET ME MAKE SURE I UNDERSTOOD YOUR

23    ANSWER CORRECTLY.  THIS IS WHILE YOU WERE IN THE MILITARY?

24           PROSPECTIVE JUROR YAMBAO:  I WAS IN THE AIR FORCE

25    WORKING FOR THE U.S. CUSTOMS.

1          THE COURT:  SO, WHILE YOU WERE IN THE AIR FORCE,

2   YOU WERE --

3          PROSPECTIVE JUROR YAMBAO:  I WAS ONE OF THE --

4          THE COURT:  -- WORKING FOR THE CUSTOMS?

5          PROSPECTIVE JUROR YAMBAO:  I WAS ONE OF THE -- YES,

6   MA'AM, CUSTOMS.

7          THE COURT:  NOW, THERE IS GOING TO BE SEVERAL

8   WITNESSES FROM WHAT'S NOW CALLED THE IMMIGRATION AND CUSTOMS

9   ENFORCEMENT, WHICH IS PART OF THE DEPARTMENT OF HOMELAND

10  SECURITY.  SO, THINGS HAVE BEEN REARRANGED A LITTLE.

11          WOULD YOU TEND TO FAVOR THE SIDE THAT'S CALLING

12  THOSE WITNESSES?

13          PROSPECTIVE JUROR YAMBAO:  NO.

14          THE COURT:  ANYONE ELSE EMPLOYED BY THE UNITED

15  STATES GOVERNMENT OR HAVE FAMILY MEMBERS WHO ARE?

16          AS YOU HEARD ME SAY, THE WITNESSES IN THIS CASE

17  INCLUDE LAW ENFORCEMENT AGENTS, AND THERE WILL BE WITNESSES

18  WHO TESTIFY FROM A VARIETY OF LAW ENFORCEMENT AGENCIES,

19  INCLUDING THE FBI, THE DEPARTMENT OF HOMELAND SECURITY, THE

20  BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CUSTOMS

21  SERVICE, THE RIVERSIDE COUNTY SHERIFF'S DEPARTMENT -- AND I

22  MAY HAVE FORGOTTEN ONE OR TWO, BUT QUITE A FEW LAW

23  ENFORCEMENT AGENCIES.

24          ONE OF THE INSTRUCTIONS ON THE LAW THAT I WILL GIVE

25  TO YOU IN THE COURSE OF THIS CASE IS THAT THE JURORS ARE TO

1    LISTEN TO THE TESTIMONY OF THE WITNESSES AND DECIDE WHETHER

2    OR NOT YOU BELIEVE EACH WITNESS, NOT BASED UPON WHAT THEIR

3    STATION IN LIFE IS OR WHAT THEY DO FOR A LIVING, BUT ON

4    CERTAIN OTHER FACTORS:  WHETHER YOU BELIEVE THEY HAVE

5    TESTIFIED HONESTLY AND TRUTHFULLY, BASED ON WHETHER THEIR

6    TESTIMONY IS BELIEVABLE, WHETHER IT IS CONSISTENT WITH THE

7    OTHER EVIDENCE IN THE CASE, AND MANY OTHER FACTORS.

8             BUT THE LAW DOES NOT GIVE ANY SPECIAL WEIGHT OR

9    EMPHASIS OR BELIEVABILITY TO SOMEONE SIMPLY BECAUSE OF WHAT

10   HE OR SHE DOES FOR A LIVING.

11            SO, WOULD ANY OF YOU TEND TO HAVE ANY BIAS OR

12   PREJUDICE IN FAVOR OF WITNESSES, IN FAVOR OF, OR AGAINST

13   WITNESSES WHO ARE MEMBERS OF LAW ENFORCEMENT?

14            ANYONE IN THE JURY BOX TEND TO FAVOR OR DISFAVOR A

15   WITNESS SIMPLY BECAUSE HE OR SHE IS A MEMBER OF LAW

16   ENFORCEMENT?  ANYONE HAVE ANY THOUGHTS ON THAT SUBJECT?

17            WHAT ABOUT IN THE SPECTATOR SECTION, ANYONE HAVE

18   ANY THOUGHTS ON WHETHER OR NOT YOU'D TEND TO OR BE MORE

19   LIKELY TO BELIEVE SOMEONE SIMPLY BECAUSE THEY ARE IN LAW

20   ENFORCEMENT, OR DISBELIEVE THEM SIMPLY BECAUSE THEY ARE IN

21   LAW ENFORCEMENT?  ANYONE?

22            DO ANY OF YOU FEEL THAT YOU HAVE ANY BIAS OR

23   PREJUDICE IN FAVOR OF OR AGAINST LAW ENFORCEMENT OFFICERS FOR

24   ANY REASON?  ANYONE?

25            HAVE ANY OF YOU EVER FILED A COMPLAINT CONCERNING

1    THE CONDUCT OF A LAW ENFORCEMENT OFFICER?

2              HAS ANYONE EVER HAD ANY UNPLEASANT CONTACT,

3    NEGATIVE CONTACT, WITH A LAW ENFORCEMENT OFFICER THAT MIGHT

4    AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL?

5              LET ME GIVE YOU AN EXAMPLE.  SOMETIMES MANY OF YOU

6    HAVE BEEN PULLED OVER FOR SPEEDING AND YOU THOUGHT THAT THE

7    OFFICER TREATED YOU RUDELY OR UNFAIRLY.  ANYONE HAVE THAT

8    KIND OF EXPERIENCE?

9              WE DON'T HAVE ANY SPEEDERS IN THIS JURY?  YOU

10   REMEMBER YOU'RE UNDER OATH.  I'M NOT MAKING LIGHT OF THIS,

11   REALLY.  ANYBODY HAVE ANY EXPERIENCE WITH A LAW ENFORCEMENT

12   OFFICER THAT WAS UNPLEASANT OR WHERE YOU FELT THE OFFICER

13   DIDN'T TREAT YOU FAIRLY, OR YOU OBSERVED THE OFFICER, A LAW

14   ENFORCEMENT OFFICER, TREATING SOMEONE ELSE UNFAIRLY?  NO ONE?

15             MS. SATO?

16             PROSPECTIVE JUROR SATO:  I DID HAVE AN EXPERIENCE

17   PROBABLY 12 YEARS AGO WITH A POLICE OFFICER THAT WAS

18   INVESTIGATING ONE OF MY SISTER'S BOYFRIENDS AT THE TIME, AND

19   HE MADE IT SEEM LIKE THE PARTNERING WAS A GOOD-COP/BAD-COP

20   TYPE OF SITUATION, AND THE HARASSMENT THAT WE FELT FROM ONE

21   POLICE OFFICER ON OUR FAMILY SEEMED TO BE VERY UNFAIR.

22             BUT I DON'T KNOW THAT I AM BIASED AGAINST A POLICE

23   OFFICER ONE WAY OR THE OTHER.  IT WAS JUST AN UNPLEASANT

24   EXPERIENCE.

25             THE COURT:  SO, YOU DON'T THINK THAT WOULD AFFECT

1    YOUR ABILITY TO LISTEN TO EACH OF THE WITNESSES' TESTIMONY IN

2    THIS CASE WITH AN OPEN MIND?

3              PROSPECTIVE JUROR SATO:  I WOULD HAVE AN OPEN MIND,

4    YES.

5              THE COURT:  NOW, DID YOU PERSONALLY OBSERVE

6    ANYTHING IN THE SITUATION YOU'RE TALKING ABOUT, OR WAS IT

7    REPORTED TO YOU BY YOUR SISTER OR SOMEONE ELSE?

8              PROSPECTIVE JUROR SATO:  YOU KNOW, I HEARD HIM

9    YELLING AT MY PARENTS, SAYING THAT THEY WERE PROTECTING THIS

10   PERSON.  HE ALSO TENDED TO FOLLOW ME AND PULL ME OVER FOR

11   VARIOUS TRAFFIC VIOLATIONS THAT HE NEVER WROTE A TICKET FOR,

12   THINKING THAT IT WAS MY SISTER OR HER BOYFRIEND IN THE CAR

13   DRIVING BECAUSE WE SHARED THE VEHICLE.  SO, THIS WAS -- WE

14   WERE IN HIGH SCHOOL.

15             THE COURT:  WHAT WAS THE BOYFRIEND BEING

16   INVESTIGATED FOR, DID YOU KNOW?

17             PROSPECTIVE JUROR SATO:  YES.  HE WAS BEING

18   INVESTIGATED AT THE TIME FOR FELONY AUTO THEFT.  AND I GUESS

19   HE WAS RUNNING A CHOP-SHOP.  AND, ALSO, I THINK IT WAS

20   VIOLENCE, SOME SORT OF VIOLENCE AGAINST ANOTHER PERSON.  BUT

21   HE DID END UP IN PRISON, THE BOYFRIEND DID.

22             THE COURT:  ON THOSE KINDS OF CHARGES?

23             PROSPECTIVE JUROR SATO:  ON THOSE CHARGES, YES.

24             THE COURT:  DID YOU OR ANYONE ELSE IN YOUR FAMILY

25   EVER FILE ANY KIND OF COMPLAINT --

1          PROSPECTIVE JUROR SATO:  NO, WE DID NOT.

2          THE COURT:  -- WITH THE POLICE DEPARTMENT?

3          PROSPECTIVE JUROR SATO:  NO, WE DID NOT.

4          THE COURT:  WELL, FIRST OF ALL, I THINK I MAY HAVE

5   FORGOTTEN TO ASK YOU.  HOW LONG AGO WAS THAT?

6          PROSPECTIVE JUROR SATO:  AGAIN, IT IS PROBABLY --

7   IT WAS PROBABLY ABOUT 15 YEARS AGO.

8          THE COURT:  ALL RIGHT.  THANK YOU.

9          ANYONE ELSE HAVE ANY EXPERIENCE LIKE THAT?

10  ANYTHING ELSE AT ALL LIKE THAT?

11         ARE ANY OF YOU MEMBERS OF ANY ORGANIZATION WHOSE

12  AIM IS TO SUPPORT THE WORK OF LAW ENFORCEMENT, ANY SUPPORT

13  GROUP OF AFFILIATES, OR OF POLICE OFFICERS BENEFICIAL

14  ORGANIZATION?  ANYTHING LIKE THAT THAT SUPPORTS LAW

15  ENFORCEMENT?

16         MR. TIGHE?

17         PROSPECTIVE JUROR TIGHE:  YEAH.  I AM A MEMBER OF

18  APCO AND A MEMBER OF NENA.  APCO, WHICH IS A PUBLIC SAFETY

19  COMMUNICATIONS OFFICER, AND NENA IS THE NATIONAL EMERGENCY

20  NUMBER ASSOCIATION.

21         THE COURT:  ALL RIGHT.  AND HOW LONG HAVE YOU BEEN

22  A MEMBER OF THOSE?

23         PROSPECTIVE JUROR TIGHE:  PROBABLY 15, 20 YEARS.

24         THE COURT:  ARE YOU AN OFFICER IN ANY OF THE

25  ORGANIZATIONS?

1              PROSPECTIVE JUROR TIGHE:  NO.

2              THE COURT:  DO YOU DONATE MONEY TO THEM?

3              PROSPECTIVE JUROR TIGHE:  NO.

4              THE COURT:  SO, WHAT DOES YOUR MEMBERSHIP CONSIST

5    OF?

6              PROSPECTIVE JUROR TIGHE:  WELL, I HAVE PRESENTED AT

7    THE CONFERENCES NATIONALLY AND INTERNATIONALLY.  I HAVE BEEN

8    PUBLISHED IN SOME OF THEIR MAGAZINES.

9              THE COURT:  WHAT KINDS OF TOPICS HAVE YOU BEEN

10   PUBLISHED ON?

11             PROSPECTIVE JUROR TIGHE:  WITH APCO, WHICH IS THE

12   EUROPEAN VERSION OF APCO, I WROTE AN ARTICLE ON THE NEW 911

13   FACILITY IN LOS ANGELES.

14             THE COURT:  SO, FOR EXAMPLE, WOULD I BE ACCURATE IF

15   I SAID THAT THE PUBLICATION IN THE GROUP IS DEVOTED TO

16   FOSTERING THE COMMUNICATIONS ASPECTS OF LAW ENFORCEMENT?

17             PROSPECTIVE JUROR TIGHE:  APCO MOSTLY FOR RADIO;

18   NENA FOR 911.

19             THE COURT:  ALL RIGHT.  ANYONE ELSE BELONG TO ANY

20   ORGANIZATION LIKE THAT?

21             MS. BRINKERHOFF?

22             PROSPECTIVE JUROR BRINKERHOFF:  MY HUSBAND AND I

23   ARE MEMBERS OF THE INTERNATIONAL FOOTPRINT ASSOCIATION,

24   CHAPTER 63, IN VICTORVILLE.  AND MY HUSBAND WAS THE PRESIDENT

25   FOR A YEAR, PROBABLY 10, 12 YEARS AGO.

```
 1              THE COURT:  DID YOU SAY "FOOTPRINT"?
 2              PROSPECTIVE JUROR BRINKERHOFF:  INTERNATIONAL
 3    FOOTPRINT ASSOCIATION.
 4              THE COURT:  WHAT SORT OF ORGANIZATION IS THAT?
 5              PROSPECTIVE JUROR BRINKERHOFF:  IN SUPPORT OF LAW
 6    ENFORCEMENT.  BUT IT IS THE PUBLIC AT LARGE, AND SO THEY ARE
 7    SUPPORTING -- PEOPLE IN THE COMMUNITY COME TOGETHER TO
 8    SUPPORT LAW ENFORCEMENT, GENERALLY.
 9              THE COURT:  AND YOU HAVE BEEN A MEMBER OF THAT,
10    THEN, FOR A LONG TIME?
11              PROSPECTIVE JUROR BRINKERHOFF:  YES.
12              THE COURT:  AND DO YOU GET ENGAGED IN FUNDRAISING
13    AND THINGS LIKE THAT TO SUPPORT LAW ENFORCEMENT?
14              PROSPECTIVE JUROR BRINKERHOFF:  YES, THEY DO THAT.
15              THE COURT:  ANYONE ELSE?  ANYONE ELSE?  OR I
16    HAVEN'T ASKED THIS QUITE LIKE THIS, BUT DO ANY OF YOU
17    CURRENTLY WORK FOR LAW ENFORCEMENT OR HAVE FAMILY OR CLOSE
18    FRIENDS WHO WORK IN LAW ENFORCEMENT?
19              MR. SHANTELER?
20              PROSPECTIVE JUROR SHANTELER:  CORRECT.  MY
21    DAUGHTER'S GODMOTHER IS A DEPUTY SHERIFF, AND HER HUSBAND'S A
22    SERGEANT IN THE SAN BERNARDINO SHERIFF'S OFFICE.
23              THE COURT:  SO, THERE IS A DEPUTY SHERIFF AND A
24    SERGEANT, AND DID YOU SAY SAN BERNARDINO?
25              PROSPECTIVE JUROR SHANTELER:  CORRECT.
```

1          THE COURT:  YOU HAVE KNOWN THEM FOR LONG TIME, I

2     TAKE IT?

3          PROSPECTIVE JUROR SHANTELER:  YES.

4          THE COURT:  DO YOU TALK TO THEM ABOUT THEIR WORK?

5          PROSPECTIVE JUROR SHANTELER:  NOT NORMALLY.

6          THE COURT:  HAVE YOU EVER TALKED TO THEM ABOUT WHAT

7     THEY DO?

8          PROSPECTIVE JUROR SHANTELER:  OCCASIONALLY, AT A

9     GATHERINGS.

10          THE COURT:  WOULD YOU BE ABLE TO LISTEN TO THE

11    TESTIMONY OF LAW ENFORCEMENT AND TREAT IT THE SAME AS YOU

12    WOULD ANY OTHER WITNESS?

13          PROSPECTIVE JUROR SHANTELER:  YES.

14          THE COURT:  THANK YOU.

15          MS. COLE?

16          PROSPECTIVE JUROR COLE:  MY SON WORKS FOR THE STATE

17    OF CALIFORNIA IN THE PRISON SYSTEM.

18          THE COURT:  IS HE A CORRECTIONS OFFICER?

19          PROSPECTIVE JUROR COLE:  YES.

20          THE COURT:  AND HOW LONG HAS HE DONE THAT SORT OF

21    WORK?

22          PROSPECTIVE JUROR COLE:  TEN YEARS.  HE IS IN

23    BLYTHE.

24          THE COURT:  ALL RIGHT.  SO, HE WORKS OVER AT THE

25    PRISON IN BLYTHE?

1          PROSPECTIVE JUROR COLE:  YES.

2          THE COURT:  I'M TRYING TO REMEMBER WHAT THAT ONE --

3     I'M TRYING TO REMEMBER WHAT THAT ONE IS CALLED.

4          PROSPECTIVE JUROR COLE:  I DON'T REMEMBER THE NAME.

5          THE COURT:  WOULD YOU BE ABLE TO TREAT THE

6     TESTIMONY OF WITNESSES IN LAW ENFORCEMENT THE SAME AS OTHER

7     WITNESSES?

8          PROSPECTIVE JUROR COLE:  ABSOLUTELY.

9          THE COURT:  AND DO YOU TALK TO YOUR SON ABOUT HIS

10    WORK?

11         PROSPECTIVE JUROR COLE:  NO.

12         THE COURT:  HOW OFTEN DO YOU GET TO SEE HIM?

13         PROSPECTIVE JUROR COLE:  MAYBE A COUPLE TIMES A

14    YEAR.

15         THE COURT:  THANK YOU.

16         ANYONE ELSE IN THE JURY BOX IN LAW ENFORCEMENT?

17         MR. GODINEZ?

18         PROSPECTIVE JUROR GODINEZ:  MY BROTHER-IN-LAW IS A

19    CORRECTIONS OFFICER.

20         THE COURT:  DOES HE WORK IN CALIFORNIA?

21         PROSPECTIVE JUROR GODINEZ:  YES.

22         THE COURT:  HOW OFTEN DO YOU GET TO SEE YOUR

23    BROTHER OR BROTHER-IN-LAW?

24         PROSPECTIVE JUROR GODINEZ:  BROTHER-IN-LAW.  ONCE

25    OR TWICE A YEAR.

1          THE COURT:  DO YOU EVER TALK TO HIM ABOUT HIS WORK?

2          PROSPECTIVE JUROR GODINEZ:  I TALK TO HIM ABOUT

3     WHAT HE DOES ON THE FIELD.  HE USUALLY WATCHES OVER

4     PRISONERS, INMATES, WHILE THEY GO AND FIGHT FIRES.  SO, HE IS

5     JUST A FACILITATOR, BASICALLY, OUT IN THE FIELD.

6          THE COURT:  ALL RIGHT.  ANYONE ELSE?

7          MR. EASTIS?

8          PROSPECTIVE JUROR EASTIS:  YES.  I HAVE AN OLDER

9     BROTHER WHO IS A RESERVE OFFICER IN PASADENA, MOSTLY WORKING

10    THE ROSE BOWL TYPE STUFF.

11         THE COURT:  SO HE IS A RESERVE WITH WHAT

12    DEPARTMENT?

13         PROSPECTIVE JUROR EASTIS:  PASADENA POLICE

14    DEPARTMENT.

15         THE COURT:  PASADENA.  SO IS HE RETIRED FROM THE

16    DEPARTMENT?

17         PROSPECTIVE JUROR EASTIS:  NO.  HE'S A SCHOOL

18    TEACHER, PART-TIME JOB, WEEKENDS.

19         THE COURT:  ANYONE ELSE, FAMILY MEMBERS WHO ARE OR

20    WERE EMPLOYED IN LAW ENFORCEMENT?

21         MS. BRINKERHOFF, DID YOU SAY YOUR HUSBAND WAS

22    RETIRED LAW ENFORCEMENT?

23         PROSPECTIVE JUROR BRINKERHOFF:  I THOUGHT YOU HAD

24    ASKED CURRENTLY, SO I WASN'T GOING TO SAY ANYTHING.

25         THE COURT:  THAT'S ALL RIGHT.  CURRENTLY OR

1    FORMERLY?

2            PROSPECTIVE JUROR BRINKERHOFF:  FORMERLY, YES.  MY

3    HUSBAND HAD 27 YEARS WITH SAN BERNARDINO COUNTY SHERIFF'S

4    DEPARTMENT.

5            THE COURT:  AND, SO, WHAT RANK DID HE RETIRE?

6            PROSPECTIVE JUROR BRINKERHOFF:  ASSISTANT SHERIFF.

7            THE COURT:  NOW, WERE YOU MARRIED TO HIM ALL THOSE

8    27 YEARS?

9            PROSPECTIVE JUROR BRINKERHOFF:  YES.

10           THE COURT:  SO, WOULD IT BE SAFE TO ASSUME YOU

11   TALKED TO HIM ABOUT WHAT HE DID FOR A LIVING?

12           PROSPECTIVE JUROR BRINKERHOFF:  DINNER

13   CONVERSATIONS.

14           THE COURT:  I AM GLAD TO HEAR THAT.  I THINK I HAVE

15   ASKED YOU THIS BEFORE, SO FORGIVE ME.  WOULD YOU BE ABLE TO

16   TREAT THE TESTIMONY OF A LAW ENFORCEMENT WITNESS, CONSIDER IT

17   THE SAME, BY THE SAME STANDARD YOU WOULD APPLY TO OTHER

18   WITNESSES IN THE CASE?

19           PROSPECTIVE JUROR BRINKERHOFF:  YES, I WOULD.

20           THE COURT:  ALL RIGHT.  LET ME START DOWN HERE.

21           MS. NEVINS?

22           PROSPECTIVE JUROR NEVINS:  MY MOTHER IS RETIRED

23   FROM THE D.A.'S OFFICE.

24           THE COURT:  WHAT WAS HER POSITION WITH THE D.A.'S

25   OFFICE?

1          PROSPECTIVE JUROR NEVINS:  SHE WAS AN INVESTIGATOR.

2          THE COURT:  ALL RIGHT.  WAS THAT RIVERSIDE OR SAN

3   BERNARDINO?

4          PROSPECTIVE JUROR NEVINS:  LOS ANGELES.

5          THE COURT:  HOW LONG AGO DID SHE RETIRE?

6          PROSPECTIVE JUROR NEVINS:  IT'S BEEN POSSIBLY -- I

7   WANT TO SAY ABOUT 14 YEARS.

8          THE COURT:  SO, DID YOU TALK TO HER ABOUT HER WORK

9   WHEN SHE WAS WORKING AS AN INVESTIGATOR?

10          PROSPECTIVE JUROR NEVINS:  YEAH.  I GREW WITH IT.

11   MY FATHER WAS A D.A., ALSO.

12          THE COURT:  WAS HE A D.A. OR INVESTIGATOR?

13          PROSPECTIVE JUROR NEVINS:  HE WAS AN INVESTIGATOR,

14   ALSO, AND HE IS NOW DECEASED.

15          THE COURT:  THERE IS ONE OF THE WITNESSES IN THIS

16   CASE THAT IS A D.A. INVESTIGATOR, ACTUALLY FROM NEW MEXICO.

17   YOU WOULD TREAT HIS TESTIMONY THE SAME AS YOU WOULD ANYONE

18   ELSE, NOT MAKING UP YOUR MIND AHEAD OF TIME TO BELIEVE HIM

19   BECAUSE OF WHAT HE DOES FOR A LIVING?

20          PROSPECTIVE JUROR NEVINS:  NOT AT ALL.

21          THE COURT:  ANY PARTICULAR KINDS OF CASES THAT

22   EITHER OF YOUR PARENTS SPECIALIZED IN WHEN THEY WERE

23   INVESTIGATORS?

24          PROSPECTIVE JUROR NEVINS:  MY MOTHER SPECIALIZED IN

25   WELFARE FRAUD.

1              THE COURT:  AND WHAT ABOUT YOUR FATHER?

2              PROSPECTIVE JUROR NEVINS:  WOW.  VERY GENERAL, THAT

3    I CAN ACTUALLY REMEMBER.

4              THE COURT:  NOTHING IN PARTICULAR THAT YOU --

5              PROSPECTIVE JUROR NEVINS:  NOTHING THAT I CAN

6    PARTICULARLY REMEMBER.

7              THE COURT:  THANK YOU VERY MUCH.

8              ANYONE ELSE?  MORE HANDS IN THAT ROW.

9              MR. TIGHE?

10             PROSPECTIVE JUROR TIGHE:  I HAVE TWO UNCLES THAT

11   ARE RETIRED.  THEY ARE POLICE OFFICERS IN NEW JERSEY.

12             THE COURT:  IN NEW JERSEY?

13             PROSPECTIVE JUROR TIGHE:  YES.

14             THE COURT:  EVER TALK TO THEM ABOUT THEIR WORK?

15             PROSPECTIVE JUROR TIGHE:  NO.

16             THE COURT:  ANYONE ELSE?

17             MS. SATO?

18             PROSPECTIVE JUROR SATO:  IN MY CURRENT EMPLOYMENT,

19   I DO HAVE ACQUAINTANCES THAT ARE NOT IN THE FAMILY, BUT I DO

20   SEE THE POLICE OFFICERS EVERY DAY, AND I MEET WITH THEM FROM

21   OUR CITY OF ANAHEIM, WHICH IS MY EMPLOYER.  SO, YES, WE DO AT

22   VARIOUS TIMES DISCUSS AT LEAST WHAT THEY DO IN THEIR JOBS.

23             THE COURT:  SO, ARE YOU IN A VANPOOL, SOMETHING

24   LIKE THAT?

25             PROSPECTIVE JUROR SATO:  YES.

1          THE COURT:  AND THERE ARE TWO OFFICERS THAT ARE IN

2   YOUR VANPOOL WITH YOU?

3          PROSPECTIVE JUROR SATO:  ACTUALLY, THERE IS SEVERAL

4   OFFICERS, AS WELL AS FIRE INVESTIGATORS, AS WELL.

5          THE COURT:  SO, FROM TIME TO TIME THERE IS

6   DISCUSSION ABOUT THE KIND OF WORK THAT THEY DO?

7          PROSPECTIVE JUROR SATO:  WHAT THEY DO, YES.

8          THE COURT:  ANYONE ELSE?

9          MR. SHANTELER?

10          PROSPECTIVE JUROR SHANTELER:  I FORGOT TO MENTION.

11   MY DAD IS DECEASED, BUT HE IS RETIRED FROM THE SHERIFF'S

12   DEPARTMENT.

13          THE COURT:  WHICH ONE?

14          PROSPECTIVE JUROR SHANTELER:  SAN BERNARDINO.

15          THE COURT:  SAN BERNARDINO?  AND WHAT RANK WAS HE

16   WHEN HE RETIRED?

17          PROSPECTIVE JUROR SHANTELER:  DETECTIVE.

18          THE COURT:  ANYONE ELSE?  THANK YOU FOR FULFILLING

19   MY PREDICTION THAT SOMEBODY WOULD REMEMBER SOMETHING.

20          ALL RIGHT.  I'M SORRY.  YOU KNOW, I ASKED THE

21   QUESTION ABOUT WHETHER ANY OF YOU WERE MEMBERS OF AN

22   ORGANIZATION WHOSE AIM IS TO SUPPORT THE WORK OF LAW

23   ENFORCEMENT.  AND I ALSO MEANT TO ASK IF ANY OF YOU ARE

24   MEMBERS OF ANY ORGANIZATION WHOSE GOAL IS TO SCRUTINIZE THE

25   WORK OF LAW ENFORCEMENT OR TO BE WATCHDOGS OVER THE WORK OF

1    LAW ENFORCEMENT.  ANYONE BELONG TO A GROUP LIKE THAT, AN

2    ORGANIZATION LIKE THAT?

3              DO ANY OF YOU HAVE ANY EDUCATION, TRAINING, OR

4    EXPERIENCE IN THE LAW, OR HAVE ANY FAMILY MEMBERS WHO HAVE?

5    THAT IS, EDUCATION OR WORKING AS AN ATTORNEY, A SECRETARY, A

6    PARALEGAL, AS A LAW FIRM, A PROBATION OFFICER.  ANYTHING LIKE

7    THAT?

8              I WILL START UP HERE.  LET'S SEE, MR. EASTERDAY,

9    DID YOU HAVE YOUR HAND UP?

10             PROSPECTIVE JUROR EASTERDAY:  YES.  MY WIFE IS A

11   PARALEGAL.

12             THE COURT:  IS THERE SOMEBODY ELSE IN YOUR FAMILY?

13             PROSPECTIVE JUROR EASTERDAY:  NO.

14             THE COURT:  YOU'RE GOING TO STOP WITH YOUR WIFE?

15             PROSPECTIVE JUROR EASTERDAY:  YES.

16             THE COURT:  OKAY.  DOES SHE WORK FOR A LAWYER?

17             PROSPECTIVE JUROR EASTERDAY:  YES, FAMILY LAW.

18             THE COURT:  SO, SHE ASSISTS WITH PEOPLE WHO ARE

19   INVOLVED IN DIVORCE, CHILD CUSTODY DISPUTES, AND THAT KIND OF

20   THING?

21             PROSPECTIVE JUROR EASTERDAY:  RIGHT.

22             THE COURT:  YOU UNDERSTAND THIS MIGHT SOUND

23   OBVIOUS, BUT I HAVE TO ASK IT ANYWAY BECAUSE IT IS VERY

24   IMPORTANT.  IF YOU ARE SEATED AS A JUROR ON THIS CASE, YOU

25   HAVE ANY QUESTIONS ABOUT WHY THINGS ARE DONE IN A CERTAIN

```
 1   WAY, YOU CAN'T ASK ANYONE ABOUT IT DURING THE COURSE OF THE

 2   TRIAL.

 3              PROSPECTIVE JUROR EASTERDAY:  I UNDERSTAND.

 4              THE COURT:  INCLUDING YOUR WIFE.  DO YOU UNDERSTAND

 5   THAT?

 6              PROSPECTIVE JUROR EASTERDAY:  YES.

 7              THE COURT:  THANK YOU.

 8              WHO ELSE HAD THEIR HAND UP?  IN THE BACK ROW,

 9   MR. GRAY?

10              PROSPECTIVE JUROR GRAY:  YEAH.  MY SON IS WITH THE

11   TRIBAL COURT UP IN WASHINGTON STATE.  HE IS A -- I THINK HE

12   IS A LEGAL AIDE, BUT BASICALLY INVOLVED IN CHILD ENDANGERMENT

13   ISSUES RELATED TO DRUG ABUSE AND THAT SORT OF THING, AND HE

14   REPRESENTS THE TRIBE.

15              THE COURT:  ALL RIGHT.  HOW LONG HAS HE DONE THAT

16   SORT OF WORK?

17              PROSPECTIVE JUROR GRAY:  ABOUT TWO YEARS.

18              THE COURT:  SAME THING YOU HEARD ME ASK

19   MR. EASTERDAY.  IF YOU HAVE A QUESTION ABOUT WHY THINGS ARE

20   BEING DONE IN A CERTAIN WAY, YOU UNDERSTAND YOU CAN'T TALK TO

21   ANYONE, INCLUDING YOUR SON?

22              PROSPECTIVE JUROR GRAY:  YES, I UNDERSTAND.

23              THE COURT:  HOW ABOUT IN THE FRONT ROW?

24              MR. SHANTELER?

25              PROSPECTIVE JUROR SHANTELER:  MY WIFE IS RETIRED
```

1     FROM SAN BERNARDINO COUNTY AS AN OFFICIAL COURT REPORTER.

2             THE COURT:  DID SHE WORK FOR THE SAN BERNARDINO

3     SUPERIOR COURT?

4             PROSPECTIVE JUROR SHANTELER:  CORRECT.

5             THE COURT:  DID SHE HAVE SOME INTERESTING STORIES

6     TO TELL IN HER DAY?

7             PROSPECTIVE JUROR SHANTELER:  YES.

8             THE COURT:  ANYONE ELSE?

9             MR. DREW?

10            PROSPECTIVE JUROR DREW:  YES.  MY SISTER IS A

11    PARALEGAL FOR -- SHE WORKED FOR A PRIVATE LAW FIRM, AND THEN

12    NOW WORKS FOR THE ATTORNEY GENERAL'S OFFICE IN THE STATE OF

13    WASHINGTON, WORKERS' COMP STUFF.

14            THE COURT:  DID YOU HAVE YOUR HAND UP, MR. MELENDY?

15    I DIDN'T MEAN TO OVERLOOK YOU.

16            ALL RIGHT.  HOW ABOUT THE FIRST ROW OUT HERE?

17            MS. BONDY?

18            PROSPECTIVE JUROR BONDY:  I AM A LEGAL SECRETARY.

19            THE COURT:  DO YOU WORK IN A LAW FIRM?

20            PROSPECTIVE JUROR BONDY:  YES.

21            THE COURT:  IS IT A LOCAL LAW FIRM?

22            PROSPECTIVE JUROR BONDY:  BEST, BEST & KREIGER.

23            THE COURT:  I HAVE HEARD OF THAT FIRM.  THE

24    ATTORNEY -- WELL, I THINK IT IS PROBABLY SAFE TO SAY.  YOU

25    DON'T WORK FOR AN ATTORNEY WHO DOES ANY CRIMINAL --

1            PROSPECTIVE JUROR BONDY:  NO.

2            THE COURT:  -- PRACTICE?

3            PROSPECTIVE JUROR BONDY:  NO.

4            THE COURT:  YOU UNDERSTAND THE SAME THING I HAVE

5     ASKED SOME OF YOUR FELLOW JURORS, THAT IS, THAT IF YOU WERE

6     SEATED AS A JUROR ON THIS CASE AND YOU HAD A QUESTION ABOUT

7     ANYTHING THAT HAPPENS DURING THE COURSE OF THE TRIAL, YOU

8     CAN'T ASK ANYONE ABOUT IT, NONE OF THE LAWYERS IN THE FIRM,

9     ANYONE.

10            DO YOU UNDERSTAND THAT?

11            PROSPECTIVE JUROR BONDY:  YES.

12            THE COURT:  DO YOU HAVE ANY -- IS IT ONLY

13     ON-THE-JOB TRAINING THAT YOU HAVE, OR DO YOU HAVE ANY

14     SPECIFIC COURSES THAT PREPARED YOU FOR YOUR WORK?

15            PROSPECTIVE JUROR BONDY:  I WENT TO A TRADE SCHOOL.

16            THE COURT:  AND WHO IS IT THAT YOU WORK FOR?

17            PROSPECTIVE JUROR BONDY:  JOHN MULLIN.

18            THE COURT:  OH.  ALL RIGHT.  THANK YOU.

19            ANYONE ELSE?

20            MS. PLUNK?

21            PROSPECTIVE JUROR PLUNK:  I WENT TO LAW SCHOOL FOR

22     TWO-AND-A-HALF YEARS.

23            THE COURT:  ALL RIGHT.  AND WHAT ARE YOU DOING NOW?

24            PROSPECTIVE JUROR PLUNK:  I AM AN ADMINISTRATOR FOR

25     MORONGO BAND OF INDIANS.

1           THE COURT:  MORONGO BAND OF INDIANS?

2           PROSPECTIVE JUROR PLUNK:  MM-HMM.

3           THE COURT:  WHAT KIND OF WORK DO YOU DO IN THAT

4     POSITION?

5           PROSPECTIVE JUROR PLUNK:  CURRENTLY, THE INTERIM

6     CHIEF ADMINISTRATOR OFFICER, SO I OVERSEE EVERYTHING THAT

7     GOES ON ON THE RESERVATION, FROM EVERYTHING FROM PUBLIC WORKS

8     TO, YOU KNOW, BASIC OPERATIONS, HR, IT.

9           THE COURT:  NOW, WHEN YOU WERE IN LAW SCHOOL, WERE

10    YOU IN A THREE-YEAR PROGRAM?

11          PROSPECTIVE JUROR PLUNK:  I WAS IN A FOUR-YEAR

12    PROGRAM.

13          THE COURT:  SO, YOU FINISHED JUST A LITTLE OVER

14    HALF OF A FOUR-YEAR PROGRAM?

15          PROSPECTIVE JUROR PLUNK:  THAT'S CORRECT.

16          THE COURT:  IF YOU'RE SEATED AS A JUROR ON THIS

17    CASE, YOU HAVE THE SAME OBLIGATIONS AS ALL OF THE OTHER

18    JURORS, TO FOLLOW THE LAW AS THE COURT INSTRUCTS YOU ON IT.

19    WOULD YOU GIVE YOUR SOLEMN ASSURANCE THAT YOU WOULD DO THAT?

20          PROSPECTIVE JUROR PLUNK:  YES, I CAN.

21          THE COURT:  AND IF YOUR MEMORY OR FROM YOUR LEGAL

22    TRAINING CONFLICTS WITH ANYTHING -- YOUR MEMORY ABOUT THE LAW

23    THAT YOU RECEIVED DURING YOUR LEGAL TRAINING CONFLICTS IN ANY

24    WAY WITH ANYTHING THE COURT INSTRUCTS YOU IN THIS CASE, WOULD

25    YOU, NEVERTHELESS, FOLLOW THE COURT'S INSTRUCTIONS AND SET

1    ASIDE WHATEVER, EITHER YOUR PERSONAL BELIEFS OR YOUR OWN

2    LEGAL TRAINING?

3              PROSPECTIVE JUROR PLUNK:  YES.

4              THE COURT:  DO YOU UNDERSTAND WHAT I HAVE ASKED

5    SOME OF YOUR FELLOW JURORS, THAT DURING THE COURSE OF THIS

6    TRIAL YOU CAN'T SPEAK TO ANYONE ELSE ABOUT IT, ASK ANY

7    QUESTIONS, NOTHING LIKE THAT.  DO YOU UNDERSTAND THAT?

8              PROSPECTIVE JUROR PLUNK:  YES.

9              THE COURT:  YOU UNDERSTAND THAT?

10             PROSPECTIVE JUROR PLUNK:  YES, I DO.

11             THE COURT:  THANK YOU.

12             ANYONE ELSE?

13             MS. SATO?

14             PROSPECTIVE JUROR SATO:  MY AUNT IS A LAWYER AND IS

15   A CALIFORNIA JUDGE.  SHE WORKS IN PROPERTY RIGHTS DISPUTES.

16             THE COURT:  AND DO YOU KNOW WHERE SHE SITS?

17             PROSPECTIVE JUROR SATO:  I BELIEVE SHE GOES UP TO

18   SACRAMENTO.

19             THE COURT:  DO YOU KNOW ANY MORE ABOUT THE KIND OF

20   WORK SHE DOES?

21             PROSPECTIVE JUROR SATO:  I DO NOT.  I'M NOT VERY

22   CLOSE WITH HER WORK AND WHAT SHE DOES.

23             THE COURT:  SAME QUESTION YOU HAVE HEARD ME ASK,

24   YOU UNDERSTAND THAT DURING THE COURSE OF THIS TRIAL YOU

25   ABSOLUTELY CANNOT SPEAK TO HER ABOUT THIS CASE --

```
 1              PROSPECTIVE JUROR SATO:  YES.

 2              THE COURT:  -- OR ANYTHING INVOLVED WITH IT?

 3              PROSPECTIVE JUROR SATO:  YES.

 4              THE COURT:  ANYONE ELSE?

 5              DO ANY OF YOU HAVE ANY SPECIAL EDUCATION, TRAINING,

 6   OR EXPERIENCE IN WORKING WITH CHILDREN WHO HAVE BEEN VICTIMS

 7   OF CHILD ABUSE OR MOLESTATION?  ANYONE?

 8              MS. RAMIREZ?

 9              PROSPECTIVE JUROR RAMIREZ:  YES.

10              THE COURT:  AND IS THAT ANYTHING OTHER THAN WHAT OR

11   MORE THAN WHAT YOU TOLD US WHEN WE TALKED TO YOU EARLIER

12   TODAY?

13              PROSPECTIVE JUROR RAMIREZ:  NO, JUST ABOUT IT.

14              THE COURT:  THAT'S JUST ABOUT WHAT WE COVERED

15   EARLIER?

16              PROSPECTIVE JUROR RAMIREZ:  RIGHT.

17              THE COURT:  DO ANY OF YOU, OR ANY OF YOUR FAMILY

18   MEMBERS WORK OR HAVE WORKED IN THE PAST IN ANY POSITION WHERE

19   IT WAS YOUR RESPONSIBILITY TO REPORT SUSPECTED CHILD ABUSE,

20   INCLUDING MOLESTATION?  ANYONE?

21              MR. MELENDY?

22              PROSPECTIVE JUROR MELENDY:  LAW ENFORCEMENT.

23              THE COURT:  CAN YOU TELL ME ABOUT THAT?  WHAT WAS

24   YOUR POSITION?

25              PROSPECTIVE JUROR MELENDY:  I WAS A SERGEANT WITH
```

1    THE STATE POLICE, UNIVERSITY CALIFORNIA POLICE DEPARTMENT.

2              THE COURT:  AT WHICH CAMPUS?

3              PROSPECTIVE JUROR MELENDY:  I WORKED ANYWHERE FROM

4    SANTA BARBARA, SOUTH.  MAINLY IN UCLA.  SPENT A FEW WEEKS

5    HERE IN RIVERSIDE.  IRVINE.

6              THE COURT:  IS THAT A SWORN LAW ENFORCEMENT

7    POSITION?

8              PROSPECTIVE JUROR MELENDY:  SWORN LAW ENFORCEMENT

9    POSITION.

10             THE COURT:  AND HOW MANY YEARS DID YOU WORK IN LAW

11   ENFORCEMENT?

12             PROSPECTIVE JUROR MELENDY:  TWENTY-FOUR-AND-A-HALF

13   YEARS.

14             THE COURT:  DID YOU NOT HEAR MY QUESTION A FEW

15   MOMENTS AGO ABOUT WHETHER YOU WORKED IN LAW ENFORCEMENT?

16             PROSPECTIVE JUROR MELENDY:  YOU SAID DO I KNOW ANY

17   ANYBODY THAT WORKS IN LAW ENFORCEMENT.  AND THEN EXPLAINED

18   THAT IN MY BROCHURE, AND I THOUGHT WE COVERED THAT.

19             THE COURT:  ALL RIGHT.  LET ME MAKE SURE EVERYBODY

20   UNDERSTANDS.

21             ANYONE ELSE CURRENTLY OR EVER WORKED IN LAW

22   ENFORCEMENT THEMSELVES?

23             I WILL COME BACK TO YOU.  YOU ARE MS. SMITH?

24             PROSPECTIVE JUROR SMITH:  YES.

25             THE COURT:  THANK YOU FOR POINTING OUT.

 1          PROSPECTIVE JUROR MELENDY:  I ALSO HAD AN

 2   EIGHT-HOUR SEMINAR AT ONE TIME, LONG TIME AGO, ON SEXUALLY

 3   EXPLOITED CHILDREN.

 4          THE COURT:  IS THAT IN CONNECTION WITH YOUR WORK IN

 5   LAW ENFORCEMENT?

 6          PROSPECTIVE JUROR MELENDY:  IT WAS CONNECTED WITH

 7   LAW ENFORCEMENT DOWN IN IRVINE, COSTA MESA, OR SOMEWHERE.

 8          THE COURT:  WAS THAT MORE THAN 15 YEARS AGO?

 9          PROSPECTIVE JUROR MELENDY:  OH, YEAH.

10          THE COURT:  MORE THAN 25 YEARS AGO?

11          PROSPECTIVE JUROR MELENDY:  SOMEWHERE AROUND 25

12   YEARS AGO.  YOU'RE CLOSE.

13          THE COURT:  OKAY.  I DON'T WANT TO GUESS TOO HIGH.

14          PROSPECTIVE JUROR MELENDY:  I REMEMBER THE

15   INSTRUCTOR.

16          THE COURT:  I USUALLY STARTED AND JUST KEEP GOING

17   UP.

18          IN YOUR WORK FOR THE UNIVERSITY OF CALIFORNIA, DID

19   YOU EVER HAVE OCCASION TO MAKE A REPORT ABOUT CHILD ABUSE OR

20   A CHILD MOLESTATION?

21          PROSPECTIVE JUROR MELENDY:  NO.

22          THE COURT:  BUT YOU DID HAVE THE TRAINING?

23          PROSPECTIVE JUROR MELENDY:  WE DID HAVE THE

24   TRAINING, YES.

25          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

1           MS. SMITH, YOU WORK IN LAW ENFORCEMENT?

2           PROSPECTIVE JUROR SMITH:  I DON'T.  I DID 28 YEARS

3    AGO.  I WORKED AS A CLERK AT LOS ANGELES COUNTY INMATE

4    RECEPTION CENTER.

5           THE COURT:  SO, THAT WAS THE JAIL?

6           PROSPECTIVE JUROR SMITH:  YES.

7           THE COURT:  THE LOS ANGELES COUNTY JAIL?

8           PROSPECTIVE JUROR SMITH:  YES.

9           THE COURT:  HOW LONG DID YOU DO THAT SORT OF WORK?

10          PROSPECTIVE JUROR SMITH:  I THINK I STAYED THERE

11   TWO YEARS.

12          THE COURT:  AND THAT WAS, YOU SAID, 28 YEARS AGO?

13          PROSPECTIVE JUROR SMITH:  YES.

14          THE COURT:  WHEN YOU WERE DOING THAT SORT OF WORK,

15   IS IT FAIR TO SAY YOU HAD DAILY CONTACT WITH BOTH LAW

16   ENFORCEMENT, PEOPLE WHO WORKED IN LAW ENFORCEMENT, LIKE

17   YOURSELF, AND ALSO INMATES?  DID YOU HAVE CONTACT WITH

18   INMATES?

19          PROSPECTIVE JUROR SMITH:  I SAW THEM.  I DIDN'T

20   HAVE CONTACT WITH THEM.

21          THE COURT:  IN OTHER WORDS, YOU DIDN'T SPEAK TO

22   THEM?

23          PROSPECTIVE JUROR SMITH:  NO.

24          THE COURT:  TELL ME WHAT YOU DID IN THAT POSITION.

25          PROSPECTIVE JUROR SMITH:  WHEN I FIRST STARTED, I

1    WORKED IN THE INMATE RECEPTION CENTER SIDE WHERE YOU -- AND I

2    WORKED IN THE CALL CENTER THEN.  AND I WORKED EARLY, SO I

3    FOUND ME A DAY JOB.  AND I WENT OVER ON THE JAIL SIDE, AND I

4    WORKED ON THE FIRST FLOOR, SERGEANT'S OFFICE, JUST AS A

5    SECRETARY.

6              I WORKED IN PRISONER PERSONNEL WHERE YOU ASSIGN

7    THEM JOBS FOR THE TRUSTEE, THE JOBS.  AND THAT WAS IT.

8              THE COURT:  SOUNDS LIKE YOU WORKED SEVERAL

9    DIFFERENT JOBS WHILE YOU WERE THERE?

10             PROSPECTIVE JUROR SMITH:  YES.

11             THE COURT:  SO, IN ANY OF THOSE, DID YOU HAVE

12   CONTACT WITH INMATES, SPEAKING TO THEM, LIKE WHEN YOU WERE

13   ASSIGNING JOBS, FOR EXAMPLE?

14             PROSPECTIVE JUROR SMITH:  NO.  THAT WAS ON PAPER.

15             THE COURT:  SO, SOMEBODY ELSE DID THE ACTUAL

16   CONTACTS?

17             PROSPECTIVE JUROR:  OTHER PERSONNEL DID THAT.

18             THE COURT:  THANK YOU VERY MUCH.

19             MS. GREEN?

20             PROSPECTIVE JUROR GREEN:  I WORKED FOR SIX MONTHS

21   AS A SECURITY GUARD IN A PRISON IN BAKER.

22             THE COURT:  IN BAKER?  HOW LONG AGO WAS THAT?

23             PROSPECTIVE JUROR GREEN:  IT WAS '98.

24             THE COURT:  IN 1998?

25             PROSPECTIVE JUROR GREEN:  MM-HMM.

```
1              THE COURT:  WERE YOU A CORRECTIONS OFFICER?

2              PROSPECTIVE JUROR GREEN:  YES.

3              THE COURT:  SO, WERE YOU A SWORN PEACE OFFICER?

4              PROSPECTIVE JUROR GREEN:  IT IS A PRIVATE PRISON.

5              THE COURT:  SO, THAT'S WHY YOUR TITLE WAS

6      SECURITY --

7              PROSPECTIVE JUROR GREEN:  YEAH.

8              THE COURT:  -- SECURITY GUARD?

9              AND YOU SAID YOU DID THAT FOR SIX MONTHS?

10             PROSPECTIVE JUROR GREEN:  SIX MONTHS.

11             THE COURT:  WHY DID YOU LEAVE THAT JOB?

12             PROSPECTIVE JUROR GREEN:  IT WASN'T MY KIND OF A

13     JOB.

14             THE COURT:  DIDN'T ENJOY THAT KIND OF WORK?

15             PROSPECTIVE JUROR GREEN:  NO.

16             THE COURT:  TELL ME WHAT YOU DIDN'T LIKE ABOUT IT.

17             PROSPECTIVE JUROR GREEN:  EVERYTHING.

18             THE COURT:  WHAT DID YOU DO WHEN YOU LEFT THAT

19     WORK?

20             PROSPECTIVE JUROR GREEN:  EXCUSE ME?

21             THE COURT:  WHAT DID YOU DO NEXT?

22             PROSPECTIVE JUROR GREEN:  AFTER THAT, I WORKED AT

23     THE RAILROAD IN BARSTOW.

24             THE COURT:  AT THE WHAT?

25             PROSPECTIVE JUROR GREEN:  RAILROAD.
```

1          THE COURT:  AT THE RAILROAD?

2          PROSPECTIVE JUROR GREEN:  YEAH.

3          THE COURT:  ALL RIGHT.  ANYBODY ELSE?

4          HAVE ANY OF YOU EVER BEEN INVOLVED WITH A LAWSUIT,

5  WHETHER YOU EITHER SUED SOMEONE OR BEEN SUED?  OR ARE YOU

6  CURRENTLY INVOLVED IN A LAWSUIT OF ANY KIND, A TRAFFIC

7  ACCIDENT, ANYTHING LIKE THAT?

8          MS. PLUNK?

9          PROSPECTIVE JUROR PLUNK:  ABOUT 15 YEARS AGO I WAS

10 SUED OVER A CAR ACCIDENT.

11         THE COURT:  DID YOU HAVE AN ATTORNEY REPRESENTING

12 YOU?

13         PROSPECTIVE JUROR PLUNK:  IT WAS A RENTAL CAR, SO I

14 DID THROUGH THE RENTAL CAR AGENCY.

15         THE COURT:  ARE YOU SATISFIED WITH THE WAY THINGS

16 ENDED UP?

17         PROSPECTIVE JUROR PLUNK:  YES.

18         THE COURT:  THANK YOU.

19         MS. PATTON?

20         PROSPECTIVE JUROR PATTON:  ABOUT 22, 24 YEARS AGO,

21 I OWNED A CRAFT STORE, AND A CAR DROVE THROUGH THE STORE AND

22 SOMEBODY GOT INJURED AND SUED EVERYBODY.  SO, IT WAS WRONG

23 AGAINST ME BECAUSE I COULDN'T STOP THE CAR FROM COMING

24 THROUGH.  AND IT WAS FINE.

25         THE COURT:  YOU SAID THAT WAS MORE THAN 20 YEARS

```
 1    AGO?

 2              PROSPECTIVE JUROR PATTON:  YEAH.

 3              THE COURT:  WERE YOU REPRESENTED BY A LAWYER AT THE

 4    TIME?

 5              PROSPECTIVE JUROR PATTON:  YES.  MY INSURANCE

 6    COMPANY FOR THE BUSINESS REPRESENTED ME.

 7              THE COURT:  THANK YOU.

 8              MS. NEVINS?

 9              PROSPECTIVE JUROR NEVINS:  IS A DISABILITY SUIT

10    CONSIDERED -- OKAY.  DISABILITY CLAIM AGAINST AN EMPLOYER.

11              THE COURT:  AND THAT WAS YOUR CLAIM?

12              PROSPECTIVE JUROR NEVINS:  YES, IN 2005.

13              THE COURT:  IS THAT CLAIM RESOLVED NOW?

14              PROSPECTIVE JUROR NEVINS:  YES, IT IS.

15              THE COURT:  AND DID YOU HAVE A LAWYER REPRESENTING

16    YOU?

17              PROSPECTIVE JUROR NEVINS:  YES, I DID.

18              THE COURT:  WERE YOU SATISFIED WITH THE WAY IT WAS

19    RESOLVED?

20              PROSPECTIVE JUROR NEVINS:  YES.

21              THE COURT:  THANK YOU.

22              MS. LEWIS?

23              PROSPECTIVE JUROR LEWIS:  YES.  ABOUT 25 YEARS AGO

24    I WAS INVOLVED IN A LAWSUIT.  I SUED THE PERSON THAT HIT ME,

25    BROADSIDED ME.  AND MY INSURANCE COMPANY AND I WAS
```

1    REPRESENTED BY AN ATTORNEY.  IT TURNED OUT FINE.

2              THE COURT:  THANK YOU.

3              LET'S SEE, MR. SHANTELER?

4              PROSPECTIVE JUROR SHANTELER:  YOUR HONOR, THE

5    QUESTION BEFORE, WHEN YOU ASKED -- KIND OF SKIPPED TO THE LAW

6    ENFORCEMENT PEOPLE, BUT I WORKED FOR THE SCHOOL DISTRICT, SO

7    I WAS A MANDATED REPORTER.

8              THE COURT:  SO, YOU HAD SOME TRAINING ON THAT

9    ISSUE?

10             PROSPECTIVE JUROR SHANTELER:  YES.

11             THE COURT:  WHAT'S YOUR POSITION WITH THE SCHOOL

12   DISTRICT?

13             PROSPECTIVE JUROR SHANTELER:  I AM THE FOREMAN OF

14   THE AIR CONDITIONING AND HEATING AND REFRIGERATION

15   DEPARTMENT.

16             THE COURT:  HAVE YOU EVER HAD THE OCCASION TO

17   REPORT SOMEBODY --

18             PROSPECTIVE JUROR SHANTELER:  NO.

19             THE COURT:  -- ON CHILD ABUSE OR CHILD MOLESTATION?

20             PROSPECTIVE JUROR SHANTELER:  NO, MA'AM.

21             THE COURT:  LET ME GO BACK OVER HERE.

22             MR. GRAY?

23             PROSPECTIVE JUROR GRAY:  YEAH.  ABOUT 20 YEARS AGO,

24   I WAS AN OFFICER IN A CORPORATION THAT WAS INVOLVED IN A

25   WRONGFUL DISMISSAL AND SEXUAL HARASSMENT CASE.  SO, I WAS

1    NAMED AS ONE OF THE DEFENDANT'S AS BEING PART OF THE

2    CORPORATION.

3              THE COURT:  WERE YOU REPRESENTED BY AN ATTORNEY?

4              PROSPECTIVE JUROR GRAY:  OUR CORPORATION WAS, YES.

5              THE COURT:  WERE YOU SATISFIED WITH THE WAY IT WAS

6    RESOLVED?

7              PROSPECTIVE JUROR GRAY:  RIGHT.  IT SETTLED OUT OF

8    COURT.

9              THE COURT:  AND MS. LANDFRIED?

10             PROSPECTIVE JUROR LANDFRIED:  YES.  I AM A RETIRED

11   TEACHER, AND WE ARE OBLIGATED TO REPORT.  BUT I NEVER HAD ANY

12   OPPORTUNE OR REASON TO REPORT ANYTHING.

13             THE COURT:  BUT YOU DID HAVE SOME TRAINING ON THAT

14   ISSUE?

15             PROSPECTIVE JUROR LANDFRIED:  WE DIDN'T HAVE ANY

16   TRAINING.  WE WERE JUST INFORMED THAT IT WAS -- IF WE KNEW OF

17   ANYTHING, THAT WE SHOULD REPORT IT.

18             THE COURT:  THANK YOU VERY MUCH.

19             LET'S SEE, MS. CHILDERS?

20             PROSPECTIVE JUROR CHILDERS:  YES.  I WORK FOR A

21   SCHOOL DISTRICT, AND I AM A MANDATED REPORTER.

22             THE COURT:  AND WHAT ABOUT TRAINING, ANY TRAINING?

23             PROSPECTIVE JUROR CHILDERS:  YES.

24             THE COURT:  CAN YOU TELL ME HOW MUCH?

25             PROSPECTIVE JUROR CHILDERS:  JUST WITHIN MY

1    MASTER'S PROGRAM, PSYCHOLOGIST.  THEY WENT OVER THE WAY, THE

2    PROPER WAY THAT WE WOULD HAVE TO DO THAT, AND IT -- WE WOULD

3    BE MANDATED TO REPORT.

4              THE COURT:  BUT YOU NEVER HAD ANY OCCASION TO

5    REPORT?

6              PROSPECTIVE JUROR CHILDERS:  I DID ONCE ABOUT SEVEN

7    YEARS AGO.

8              THE COURT:  WHAT WAS IT THAT YOU SUSPECTED?

9              PROSPECTIVE JUROR CHILDERS:  A PARENT HAD CALLED ME

10   AND TALKED TO ME ABOUT SOMETHING THAT HAPPENED TO HER CHILD,

11   AND ASKED ME MY ADVISE.  SHE WAS VERY HESITANT.  SO, SINCE

12   SHE HAD TOLD ME ALREADY WHAT HAD HAPPENED, THEN I WAS

13   MANDATED TO REPORT WHAT I HAD HEARD.  SO, I DID CALL CPS ON

14   THE ISSUE.

15             THE COURT:  AND DO YOU KNOW WHAT HAPPENED AS A

16   RESULT?

17             PROSPECTIVE JUROR CHILDERS:  NO.  I NEVER GOT ANY

18   INFORMATION BACK FROM CPS, SO I DIDN'T HEAR ANYTHING.

19             THE COURT:  THANK YOU.

20             ANYONE ELSE HAVE THEIR HAND UP?  I'M SORRY.

21   MS. SMITH?

22             PROSPECTIVE JUROR SMITH:  LOS ANGELES COUNTY WE ARE

23   ALSO MANDATED TO REPORT.  I HAVE HAD NO TRAINING ON IT.  WE

24   JUST HAVE TO SIGN THAT WE ARE AWARE.

25             THE COURT:  AND THAT'S IN YOUR CURRENT POSITION?

1              PROSPECTIVE JUROR SMITH:  YES.

2              THE COURT:  WHAT DO YOU DO?  WHAT'S YOUR CURRENT

3      POSITION?

4              PROSPECTIVE JUROR SMITH:  I WORK IN THE DEPARTMENT

5      OF PUBLIC SOCIAL SERVICES, ELIGIBILITY WORKER.

6              THE COURT:  THANK YOU.  HAVE YOU EVER HAD OCCASION

7      TO MAKE SUCH A REPORT?

8              PROSPECTIVE JUROR SMITH:  NO.

9              THE COURT:  THANK YOU.

10             I THINK THERE WAS ONE MORE HAND UP.

11             MS. RAMIREZ?

12             PROSPECTIVE JUROR RAMIREZ:  ARE YOU TALKING ABOUT

13     THE LAWSUIT --

14             THE COURT:  YES.

15             PROSPECTIVE JUROR RAMIREZ:  -- STILL?

16             THE COURT:  WE KIND OF WENT BACK AND FORTH.  WE ARE

17     STILL ON THAT ONE, TOO.

18             PROSPECTIVE JUROR RAMIREZ:  OKAY.  TWO YEARS AGO I

19     HAD A CAR ACCIDENT, AND THIS GUY MADE A U-TURN, ILLEGAL

20     U-TURN, AND I HIT HIM.

21             THE COURT:  AND SO DID YOU GET SUED?

22             PROSPECTIVE JUROR RAMIREZ:  NO.  HE DID.

23             THE COURT:  HE MADE THE ILLEGAL U-TURN?

24             PROSPECTIVE JUROR RAMIREZ:  RIGHT.

25             THE COURT:  I WASN'T LISTENING TO THE FIRST PART.

1    I'M SORRY.  IS THAT CASE STILL GOING ON, OR IS THAT OVER?

2              PROSPECTIVE JUROR RAMIREZ:  NO, IT IS OVER.

3              THE COURT:  WERE YOU REPRESENTED BY A LAWYER?

4              PROSPECTIVE JUROR RAMIREZ:  YES.

5              THE COURT:  ARE YOU SATISFIED WITH THE WAY IT

6    RESOLVED?

7              PROSPECTIVE JUROR RAMIREZ:  YES.

8              THE COURT:  THANK YOU.

9              MR. VASQUEZ?

10             PROSPECTIVE JUROR VASQUEZ:  BOOK STORE, WORKERS'

11   COMP.  MY COMPANY.  IT WAS SETTLED, PAYING.

12             THE COURT:  COULD YOU REPEAT THE LAST PART OF YOUR

13   ANSWER?

14             PROSPECTIVE JUROR VASQUEZ:  YES.  I HAD SUIT FOR MY

15   COMPANY, FOR WORKERS' COMP.

16             THE COURT:  SO, YOU FILED A WORKERS' COMP CLAIM?

17             PROSPECTIVE JUROR VASQUEZ:  YES.

18             THE COURT:  AND IS THAT STILL GOING ON?

19             PROSPECTIVE JUROR VASQUEZ:  YES, IT IS STILL GOING

20   ON.

21             THE COURT:  DO YOU HAVE A LAWYER REPRESENTING YOU?

22             PROSPECTIVE JUROR VASQUEZ:  YES.

23             THE COURT:  IS THERE ANYTHING ABOUT THAT THAT WOULD

24   AFFECT YOUR ABILITY TO BE FAIR TO BOTH SIDES IN THIS CASE?

25             PROSPECTIVE JUROR VASQUEZ:  NO.

1              THE COURT:  THANK YOU.

2              ANY OTHER HANDS THAT I MISSED?

3              DOES THAT COVER EVERYBODY WHO HAS HAD ANY TRAINING,

4     HAD ANY RESPONSIBILITY TO REPORT ANY SUSPECTED CHILD ABUSE,

5     AND ALSO THE QUESTION ABOUT WHETHER YOU HAVE EVER SUED OR

6     BEEN SUED BY ANYONE?

7              ALL RIGHT.  DURING THE COURSE OF THIS TRIAL, WE'RE

8     GOING TO HEAR EVIDENCE, THE JURY WILL HEAR EVIDENCE, ABOUT

9     COMPUTERS AND TECHNOLOGY AND THE STATE OF COMPUTER AND

10    INTERNET TECHNOLOGY AS IT EXISTED SEVERAL YEARS AGO, IN ABOUT

11    2000 AND 2001, WHICH MIGHT -- THAT EVIDENCE MIGHT BE

12    DIFFERENT FROM WHAT YOU REMEMBER OR BELIEVE ABOUT THE STATE

13    OF TECHNOLOGY, FOR EXAMPLE, SIX, SEVEN YEARS AGO.  BUT AS YOU

14    HAVE HEARD ME SAY SEVERAL TIMES ALREADY, JURORS MUST DECIDE

15    THE CASE BASED ON THE EVIDENCE HEARD IN THE COURTROOM.

16             SO, WOULD YOU BE ABLE TO GIVE ME YOUR ASSURANCE

17    THAT WHEN YOU HEAR EVIDENCE REGARDING THE TECHNOLOGY AND THE

18    STATE OF TECHNOLOGY, ESPECIALLY WITH RESPECT TO COMPUTERS AND

19    THE INTERNET, WOULD YOU GIVE ME YOUR ASSURANCE THAT YOU WILL

20    DECIDE THE CASE BASED ON THE EVIDENCE THAT IS HEARD HERE IN

21    THE COURTROOM AND NOT YOUR OWN BELIEFS OR MEMORIES?

22             EVERYONE CAN GIVE ME THAT ASSURANCE?

23             AS YOU HAVE HEARD, THERE ARE TWO SETS OF CHARGES IN

24    THIS CASE.  COUNTS 1 AND 2, WHICH DEAL WITH ACCUSATIONS

25    RELATING TO CHILD PORNOGRAPHY, AND COUNTS 3 AND 4, WHICH

1   RELATE TO ACCUSATIONS REGARDING MOLESTATION OR SEXUAL

2   ASSAULT.

3           DO ANY OF YOU BELONG TO OR ARE ASSOCIATED WITH ANY

4   GROUP OR ORGANIZATION THAT SUPPORTS CHANGES IN THE LAW

5   CONCERNING CHILD PORNOGRAPHY?

6           ANYONE?

7           OR CHANGES IN THE LAW REGARDING CHILD MOLESTATION?

8           DOES ANYONE FEEL THAT THE LAWS OF THIS COUNTRY ARE,

9   IN ANY MANNER, UNCONSTITUTIONAL OR UNFAIR WITH RESPECT TO

10  CHILD PORNOGRAPHY?

11          WHETHER THEY SHOULD BE CHANGED IN ANY WAY?

12          OTHER THAN WHAT YOU HAVE ALREADY REPORTED ON YOUR

13  QUESTIONNAIRE RESPONSES -- YOU DON'T NEED TO REPEAT THAT --

14  OTHER THAN THAT, HAVE ANY OF YOU OR ANY MEMBERS OF YOUR

15  FAMILY EVER BEEN THE VICTIM OF AN OFFENSE WHICH IS SIMILAR TO

16  THE OFFENSE THAT'S CHARGED IN THIS CASE?  ANYONE?

17          AND, AGAIN, APART FROM WHAT I HAVE ALREADY TOLD

18  YOU, HAVE ANY OF YOU OR ANY OF YOUR FAMILY MEMBERS BEEN

19  CHARGED WITH AN OFFENSE THAT'S SIMILAR TO THE OFFENSES

20  CHARGED IN THIS CASE?  THAT IS, POSSESSION OF CHILD

21  PORNOGRAPHY OR CHILD MOLESTATION.

22          THE COURT:  MR. SHANTELER?

23          PROSPECTIVE JUROR SHANTELER:  YES.

24          THE COURT:  WOULD YOU LIKE TO DISCUSS THAT AT THE

25  SIDEBAR, OR ARE YOU COMFORTABLE TALKING?

```
 1                  PROSPECTIVE JUROR SHANTELER:  PROBABLY.

 2                  THE COURT:  IF YOU WAIT JUST A MOMENT, I WILL COME

 3      BACK TO THAT.

 4                  HAVE ANY OF YOU BEEN INVOLVED IN ANY OTHER WAY,

 5      SUCH AS A WITNESS, FOR EXAMPLE, IN ANY CASE WHICH IS SIMILAR

 6      TO THIS CASE?

 7                  MS. GREEN?

 8                  PROSPECTIVE JUROR GREEN:  WHEN I ATTENDED THE

 9      COLLEGE IN BARSTOW, A TUTOR OVER THERE WAS KIND OF A FRIEND

10      OF OUR FAMILY, AND HE TRIED TO GET FRIENDLY, WHICH I FOUND

11      OUT LATER BECAUSE DURING ALL THE INVESTIGATION THEY TOOK MY

12      COMPUTER BECAUSE HE WAS DOING HIS HOMEWORK ON MY COMPUTER.

13      AND THEY TOOK THE COMPUTER BECAUSE THEY WANTED TO SEE IF ANY

14      CHILD PORNOGRAPHY WAS ON THERE.

15                  THE COURT:  HOW LONG AGO WAS THAT?

16                  PROSPECTIVE JUROR GREEN:  THAT WAS '96.

17                  THE COURT:  SO, ABOUT 10 YEARS AGO OR SO?

18                  SO, THE POLICE WERE INVESTIGATING HIM BECAUSE HE

19      WAS SUSPECTED OF CRIMINAL BEHAVIOR, AND AS PART OF THAT

20      INVESTIGATION THEY INVESTIGATED INTO YOUR COMPUTER?

21                  PROSPECTIVE JUROR GREEN:  YEAH, BECAUSE HE WAS

22      USING MY COMPUTER TO DO HOMEWORK.

23                  THE COURT:  WAS HE TUTORING YOUR SONS AT THE TIME?

24                  PROSPECTIVE JUROR GREEN:  YEAH.

25                  THE COURT:  DID YOU GET YOUR COMPUTER BACK?
```

1          PROSPECTIVE JUROR GREEN:  YEAH, AFTER ABOUT THREE

2    YEARS.

3          THE COURT:  DO YOU KNOW IF HE WAS EVER CHARGED WITH

4    A CRIME?

5          PROSPECTIVE JUROR GREEN:  YES, HE WAS.

6          THE COURT:  DO YOU KNOW IF THAT CASE WENT TO TRIAL?

7          PROSPECTIVE JUROR GREEN:  YES.  IT WENT TO TRIAL,

8    BUT HE WENT OUT OF THE COUNTRY.  THE POLICE, THE DETECTIVE

9    THAT WENT TO MY HOUSE GETTING MY COMPUTER TELLS US WHAT WAS

10   GOING ON.  HE INTERVIEWED MY BOYS, TOO.  HE TOLD ME LATER ON

11   THAT HE WAS -- THEY CAUGHT HIM IN CANADA.

12         THE COURT:  NOW, HOW OLD WERE YOUR SONS AT THE

13   TIME?

14         PROSPECTIVE JUROR GREEN:  ELEVEN AND 13.

15         THE COURT:  IS THERE ANYTHING ABOUT YOUR EXPERIENCE

16   WITH THAT CASE THAT YOU THINK MIGHT AFFECT YOUR ABILITY TO BE

17   FAIR IN THIS CASE?

18         PROSPECTIVE JUROR GREEN:  NO.

19         THE COURT:  ANYONE ELSE EVER BEEN INVOLVED IN A

20   CASE IN ANY FASHION THAT'S SIMILAR TO THIS CASE?

21         HAVE ANY OF YOU ALREADY FORMED AN OPINION AS TO

22   THIS CASE OR AS TO THE DEFENDANT'S GUILT OR INNOCENCE?

23         THERE ARE SOME TYPES OF CRIMES THAT BY THEIR VERY

24   NATURE MAKE PEOPLE ANGRY OR CONCERNED TO THE EXTENT THAT

25   BECAUSE A PERSON IS ACCUSED OF THAT SORT OF A CRIME THEY

1    BELIEVE OR ASSUME THAT HE IS GUILTY.

2              DO ANY OF YOU AGREE THAT SOMETIMES PEOPLE REACT IN

3    THAT FASHION TO CERTAIN TYPES OF CRIMES MORE THAN OTHER TYPES

4    OF CRIMES?

5              I APOLOGIZE BECAUSE SOME OF YOU HAVE ALREADY HEARD

6    ME SAY SOMETHING VERY LIKE THIS WHEN I TALKED TO YOU

7    INDIVIDUALLY.   THERE ARE ALL DIFFERENT KINDS OF CRIMES THAT

8    COME INTO A COURTROOM, ALL KINDS OF ACCUSATIONS OF CRIMES.

9    EVERYTHING FROM JAYWALKING, TO BANK ROBBERY, TO MURDER, TO

10   DRIVING OVER THE SPEED LIMIT, TO A CRIME THAT'S CHARGED OR

11   ACCUSED IN THIS CASE.   PEOPLE HAVE DIFFERENT REACTIONS WHEN

12   THEY HEAR THAT SOMEBODY IS CHARGED WITH BANK ROBBERY VERSUS

13   DRIVING OVER THE SPEED LIMIT.

14             WOULD YOU ALL AGREE WITH THAT?

15             ONE OF THE THINGS THAT ALL OF THOSE CRIMES HAVE IN

16   COMMON IS THAT THE PERSON THAT'S ACCUSED OF ANY OF THOSE

17   CRIMES IS ENTITLED TO THE SAME PRESUMPTION OF INNOCENCE NO

18   MATTER WHAT CRIME THEY ARE ACCUSED OF.   WE'RE ALL ENTITLED TO

19   THE SAME PRESUMPTION THAT WE ARE INNOCENT UNLESS AND UNTIL

20   THE GOVERNMENT PROVES OUR GUILT BEYOND A REASONABLE DOUBT.

21             DOES EVERY ONE UNDERSTAND AND AGREE WITH THAT?

22             AND AS YOU HAVE HEARD ME -- I DON'T WANT TO REPEAT

23   MYSELF.   YOU ALL HEARD ME SAY A FEW MOMENTS AGO THE

24   DEFINITION OF WHAT IT MEANS TO PROVE GUILT BEYOND A

25   REASONABLE DOUBT.   AND THAT DEFINITION APPLIES, AGAIN, TO

251

1   EVERY KIND OF CRIME, WHETHER IT'S DRIVING BEYOND THE SPEED

2   LIMIT OR POSSESSING CHILD PORNOGRAPHY.  WHATEVER THE

3   ACCUSATION IS, THE GOVERNMENT HAS TO PROVE GUILT BY THE SAME

4   STANDARD.  IT IS NOT A DIFFERENT STANDARD DEPENDING ON WHAT

5   THE CRIME IS.

6           DOES EVERYBODY UNDERSTAND THAT?

7           ANYBODY THINK THAT THEY WOULD HAVE A PROBLEM

8   APPLYING EITHER THE PRESUMPTION OF INNOCENCE OR MAKING THE

9   GOVERNMENT PROVE GUILT BEYOND A REASONABLE DOUBT IN THIS

10  CASE?

11          ANYONE THINK THEY WOULD HAVE A PROBLEM APPLYING THE

12  LAW, IN OTHER WORDS?

13          AND, AGAIN, MANY OF YOU, BUT NOT ALL OF YOU, HAVE

14  HEARD ME SAY THIS, BUT THERE WILL BE EVIDENCE THAT'S

15  PRESENTED DURING THIS TRIAL THAT WILL BE DISTURBING TO MOST,

16  IF NOT ALL, OF THE MEMBERS OF THE JURY.  THAT INCLUDES IMAGES

17  OF CHILD PORNOGRAPHY.  THERE WILL BE SEVERAL DOZEN STILL

18  IMAGES OF CHILD PORNOGRAPHY, AND TWO SHORT VIDEO CLIPS THAT

19  THE JURY WILL BE REQUIRED TO VIEW.  AND IT IS EXPLICIT

20  PORNOGRAPHY.  IT'S CHILD PORNOGRAPHY.  IT SHOWS IMAGES OF

21  YOUNG CHILDREN INVOLVED IN SEXUALLY EXPLICIT CONDUCT,

22  SOMETIMES WITH ADULTS.  AND THE JURY MUST FOLLOW THE LAW AND

23  VIEW WHAT'S SHOWN.

24          WOULD ALL OF YOU BE ABLE TO GIVE ME YOUR ASSURANCE

25  THAT YOU WILL LISTEN TO THE TESTIMONY AND VIEW THE EVIDENCE

1    AS YOU'RE REQUIRED TO DO IN THIS CASE?

2            WHEN I SAY "LISTEN TO THE TESTIMONY," ALSO THERE

3    WILL BE TRANSCRIPTS OF CHATS FROM CHAT ROOMS ON THE INTERNET,

4    AND SOME OF THAT TESTIMONY IS SEXUALLY EXPLICIT AND DETAILED,

5    ALSO.  AND SOME OF IT INVOLVES DESCRIPTIONS OF SEXUAL CONDUCT

6    WITH SMALL CHILDREN.

7            WOULD ALL OF YOU BE ABLE TO GIVE ME YOUR ASSURANCE

8    THAT YOU WOULD CONSIDER ALL OF THE EVIDENCE, INCLUDING THAT

9    EVIDENCE, IF YOU WERE SEATED AS A JUROR IN THIS CASE?

10           DO ANY OF YOU HAVE ANY MORAL, PHILOSOPHICAL, OR

11   RELIGIOUS BELIEFS THAT IT IS NOT PROPER TO SIT IN JUDGMENT OF

12   ANOTHER PERSON?  ANYONE?

13           THE JURORS, AS I THINK I SAID BEFORE, ARE THE SOLE

14   JUDGES OF THE CREDIBILITY, THE BELIEVABILITY OF THE

15   WITNESSES, AND ALSO OF ALL OF THE WEIGHT OF THE OTHER

16   EVIDENCE THAT'S PRESENTED TO YOU.  SO, IF YOU'RE SEATED AS A

17   JUROR ON THIS CASE, IT WILL BE YOUR SOLEMN DUTY AS JURORS TO

18   DETERMINE ALL OF THE QUESTIONS OF FACT AND TO DECIDE THOSE

19   QUESTIONS SOLELY ON THE EVIDENCE PRESENTED TO YOU IN THIS

20   CASE.

21           IS THERE ANY OF YOU WHO, FOR ANY REASON, FEEL YOU

22   COULD NOT DO THAT?  ANYONE?

23           AND IT IS IMPORTANT THAT I HAVE THE ASSURANCE FROM

24   EACH AND EVERY ONE OF YOU THAT YOU WILL FOLLOW MY

25   INSTRUCTIONS AND RULINGS ON THE LAW, AND THAT YOU WILL APPLY

1    THE LAW AS I GIVE IT TO YOU IN THIS CASE.  AND TO PUT IT

2    DIFFERENTLY, WHETHER YOU APPROVE OR DISAPPROVE OF THE COURT'S

3    RULINGS OR INSTRUCTIONS ON THE LAW, IT IS YOUR SOLEMN DUTY TO

4    ACCEPT AS CORRECT THE COURT'S RULINGS AND THE COURT'S

5    STATEMENTS OF THE LAW.  YOU CAN'T SUBSTITUTE, AS I SAID, YOUR

6    OWN IDEAS OF WHAT YOU THINK THE LAW OUGHT TO BE OR SHOULD BE.

7             DO ANY OF YOU FEEL THAT YOU WOULD NOT BE ABLE TO

8    FOLLOW THE COURT'S RULINGS OR THE LAW GIVEN TO YOU BY THE

9    COURT ON THIS CASE?  ANYONE?

10            IT IS ALSO VERY IMPORTANT DURING THE COURSE OF THIS

11   TRIAL -- AND YOU HAVE HEARD ME ASK A FEW OF THE JURORS THIS

12   -- IT IS EQUALLY, EQUALLY IMPORTANT OF ALL THE JURORS THAT

13   YOU NOT DISCUSS THE CASE DURING THE COURSE OF THE TRIAL.  AND

14   THAT'S A VERY IMPORTANT INSTRUCTION.  AND IT IS ACTUALLY

15   ASKING A LOT OF PEOPLE TO SIT FOR SIX HOURS OR SO AND LISTEN,

16   PAY COMPLETE ATTENTION TO ONE SUBJECT DAY AFTER DAY FOR TWO

17   WEEKS.  AND THEN EVERY DAY YOU WALK OUT OF HERE AND YOU CAN'T

18   TALK ABOUT IT WITH ANYONE.  YOU CAN'T TALK ABOUT IT WITH EACH

19   OTHER.  YOU CAN'T GO HOME AND TALK ABOUT IT WITH YOUR FAMILY.

20   AND PEOPLE ARE ALWAYS CURIOUS ABOUT SOMEONE ELSE'S JURY DUTY,

21   AND YOU ABSOLUTELY CAN'T TALK ABOUT IT.  AND THAT'S A VERY

22   DIFFICULT THING.

23            WOULD ALL OF YOU BE ABLE TO GIVE ME YOUR ASSURANCE

24   THAT YOU WILL FOLLOW MY INSTRUCTIONS AND NOT DISCUSS THIS

25   CASE DURING THE COURSE OF THIS TRIAL IF YOU'RE SELECTED AS A

1    JUROR?

2              I'M GOING TO ASK YOU ALL TO GIVE ME SOME BACKGROUND

3    INFORMATION ABOUT YOURSELVES.  STARTING WITH JUROR NO. 1,

4    MS. GREEN?

5              PROSPECTIVE JUROR GREEN:  MY NAME IS ROSEWITHA

6    GREEN.  I WORK FOR THE UNITED STATES MARINE CORPS AS A

7    TECHNICIAN.

8              THE COURT:  COULD I ASK YOU TO SPEAK UP AND SLOW

9    DOWN A LITTLE.

10             PROSPECTIVE JUROR GREEN:  OKAY.

11             THE COURT:  THANK YOU.

12             PROSPECTIVE JUROR GREEN:  I LIVE IN TWENTY-NINE

13   PALMS AND BARSTOW.  I STAY A WEEK IN TWENTY-NINE PALMS

14   BECAUSE THAT'S MY OFFICE IS.  AND EVERY OTHER WEEKEND I GO TO

15   MY HOUSE IN BARSTOW.

16             I'M DIVORCED.  I HAVE TWO SONS.  THEY ARE NOW 23

17   AND 19.  BOTH GO TO COLLEGE.  ONE IS ALMOST GRADUATED.

18             IN TWENTY-NINE PALMS, I LIVE WITH FRIENDS OF MINE.

19   SHE IS A HOUSEWIFE.

20             I NEVER BEEN ON JURY DUTY, ONLY TO INTERVIEW ONE

21   TIME.

22             AND I DON'T READ REGULAR NEWSPAPERS, MAGAZINES, OR

23   ANY OTHER PUBLICATIONS, EXCEPT REAL ESTATE.

24             THE COURT:  REAL ESTATE?

25             PROSPECTIVE JUROR GREEN:  REAL ESTATE.

1          THE COURT:  MS. GREEN, DO YOU HAVE A COMPUTER AT

2     YOUR HOUSE?

3          PROSPECTIVE JUROR GREEN:  YES.

4          THE COURT:  IS IT CONNECTED TO THE INTERNET?

5          PROSPECTIVE JUROR GREEN:  YES.

6          THE COURT:  DO YOU USE IT PERSONALLY?

7          PROSPECTIVE JUROR GREEN:  YES.

8          THE COURT:  AND DO YOU USE THE COMPUTER AT WORK, AT

9     YOUR WORK?

10          PROSPECTIVE JUROR GREEN:  YES.

11          THE COURT:  HAVE YOU EVER GOTTEN TRAINING OR TAKEN

12     ANY COURSES IN USING THE COMPUTER, OR ARE YOU SELF-TAUGHT?

13          PROSPECTIVE JUROR GREEN:  MOSTLY SELF-TAUGHT; SOME

14     BASIC COURSES.

15          THE COURT:  OKAY.  APART FROM -- WELL, LET'S START

16     WITH WHAT YOU DO ON THE COMPUTER AT HOME.  YOU USE THE

17     COMPUTER FOR INTERNET ACCESS, YOU SAID?

18          PROSPECTIVE JUROR GREEN:  YES.

19          THE COURT:  WHAT KINDS OF THINGS?  DO YOU MAKE

20     PURCHASES ONLINE?  DO YOU DO RESEARCH ONLINE?  WHAT DO YOU

21     USE THE COMPUTER FOR?

22          PROSPECTIVE JUROR GREEN:  I PURCHASE ONLINE.  I PAY

23     MY BILLS ONLINE.  AND I COMMUNICATE WITH MY FAMILY IN

24     GERMANY.

25          THE COURT:  IS THAT THROUGH E-MAIL?

1    PROSPECTIVE JUROR GREEN:  YEAH.

2    THE COURT:  ANYTHING ELSE?

3    PROSPECTIVE JUROR GREEN:  I PLAY POKER.

4    THE COURT:  OKAY.  ANYTHING ELSE?

5    PROSPECTIVE JUROR GREEN:  THAT'S IT.

6    THE COURT:  ALL RIGHT.  MS. COLE?

7    PROSPECTIVE JUROR COLE:  MY NAME IS CHARLENE

8    COLE, AND I AM RETIRED FROM NORDSTROM.  I DID ACCOUNTING.

9    AND I HAVE THREE YEARS OF COLLEGE.

10   I LIVE IN ONTARIO.  I AM MARRIED, AND MY HUSBAND'S

11   ALSO RETIRED.  I HAVE TWO CHILDREN.  THEY ARE 43 AND 37.  AND

12   ONE IS A DIESEL MECHANIC, AND THE OTHER WORKS FOR THE STATE,

13   AS I ALREADY STATED.  THERE IS NO OTHER LIVING ADULTS IN MY

14   HOME.

15   AND I HAVE BEEN CALLED FOR JURY SERVICE, BUT IT WAS

16   A LOTTERY SYSTEM AND I WAS NOT PICKED.

17   AND WE GET THE NEWSPAPER DAILY AND THE L.A. TIMES.

18   THE COURT:  I KNOW YOU TOLD US THIS ON YOUR

19   QUESTIONNAIRE.  WHAT WAS YOUR HUSBAND'S OCCUPATION BEFORE HE

20   RETIRED?

21   PROSPECTIVE JUROR COLE:  HE WORKED FOR OWEN

22   ILLINOIS GLASS.

23   THE COURT:  WHAT DID HE DO FOR THEM?

24   PROSPECTIVE JUROR COLE:  HE WAS A MECHANIC UPKEEP,

25   KEPT THE MACHINERY GOING.

1              THE COURT:  THANK YOU.  SO, WHEN YOU SAID YOU

2     HADN'T BEEN SELECTED -- YOU NEVER SERVED ON A JURY; IS THAT

3     RIGHT?

4              PROSPECTIVE JUROR COLE:  NO, I HAVE NOT.

5              THE COURT:  OKAY.  THANK YOU VERY MUCH.  OH, DO YOU

6     HAVE A COMPUTER IN YOUR HOME?

7              PROSPECTIVE JUROR COLE:  YES.

8              THE COURT:  DO YOU HAVE INTERNET ACCESS?

9              PROSPECTIVE JUROR COLE:  YES.

10             THE COURT:  ARE YOU SELF-TAUGHT OR ARE YOU TAKING

11    COURSES?

12             PROSPECTIVE JUROR COLE:  I TOOK COLLEGE CLASSES.

13             THE COURT:  NOW, BEFORE YOU RETIRED FROM NORDSTROM,

14    DID YOU USE THE COMPUTER THERE?

15             PROSPECTIVE JUROR COLE:  YES.

16             THE COURT:  SO WHAT DO YOU USE THE COMPUTER FOR AND

17    THE INTERNET FOR?

18             PROSPECTIVE JUROR COLE:  TRAFFIC STOPS.

19             THE COURT:  ANY TIPS?  ANYTHING ELSE THAT YOU USE

20    IT FOR?

21             PROSPECTIVE JUROR COLE:  I PLAY POKER, TOO.

22             THE COURT:  BETTER GET ANOTHER DECK OF CARDS FOR

23    THE JURY ROOM.

24             ANYTHING ELSE?  DO YOU MAKE PURCHASES ONLINE?  PAY

25    BILLS ONLINE?

```
 1              PROSPECTIVE JUROR COLE:  NO, I DON'T.

 2              THE COURT:  WHAT ABOUT E-MAIL, DO YOU HAVE E-MAIL?

 3              PROSPECTIVE JUROR COLE:  I HAVE E-MAIL, YES.

 4              THE COURT:  DO YOU USE IT REGULARLY?

 5              PROSPECTIVE JUROR COLE:  CONTACT FAMILY, I USE IT,

 6    AND FRIENDS.

 7              THE COURT:  WELL, I'M NOT ASKING YOU WHETHER YOU'RE

 8    GOOD ABOUT RETURNING E-MAILS, BUT YOU DO KNOW HOW TO USE IT

 9    AND YOU USE IT?

10              PROSPECTIVE JUROR COLE:  YES.

11              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

12              MS. DILLARD?

13              PROSPECTIVE JUROR DILLARD:  MY NAME IS ROSE

14    DILLARD.  RIGHT AFTER HIGH SCHOOL I STARTED WORKING IN

15    SEMI-CONDUCTORS.

16              THE COURT:  IN WHAT?

17              PROSPECTIVE JUROR DILLARD:  SEMI-CONDUCTORS.  SO, I

18    HAVE BEEN WORKING FOR THE PHONE COMPANY FOR ALMOST 11 YEARS.

19              I LIVE IN FONTANA.  I'M MARRIED.  AND MY HUSBAND

20    WORKS FOR BOEING, IN HUNTINGTON BEACH.  I HAVE TWO KIDS.  MY

21    DAUGHTER IS SEVEN, AND MY SON IS FIVE.

22              MY MOTHER STAYS AT MY HOUSE PART OF THE WEEK TO

23    WORK -- WE WORK AT THE SAME PLACE, AND THEN SHE DRIVES BACK

24    TO BARSTOW.

25              I HAVE NEVER SERVED ON A JURY BEFORE.
```

1              THE COURT:  AND DO YOU HAVE A COMPUTER IN YOUR

2    HOUSE?

3              PROSPECTIVE JUROR DILLARD:  I HAVE A FEW, YES.

4              THE COURT:  MORE THAN ONE?

5              PROSPECTIVE JUROR DILLARD:  YES.  MY HUSBAND DOES

6    NETWORKING, COMPUTER NETWORKING.

7              THE COURT:  ALL RIGHT.  NOW, YOU HAVE INTERNET

8    ACCESS?

9              PROSPECTIVE JUROR DILLARD:  I DO.

10             THE COURT:  WHAT DO YOU USE THE INTERNET FOR?

11             PROSPECTIVE JUROR DILLARD:  I SHOP.

12             THE COURT:  DO YOU HAVE E-MAIL?

13             PROSPECTIVE JUROR DILLARD:  I DO.

14             THE COURT:  ANYTHING ELSE THAT YOU USE IT FOR?

15             PROSPECTIVE JUROR DILLARD:  THE KIDS' HOMEWORK, AND

16   PLAY.

17             THE COURT:  WHAT DOES YOUR HUSBAND DO FOR BOEING?

18             PROSPECTIVE JUROR DILLARD:  HE IS A MECHANICAL

19   ENGINEER.

20             THE COURT:  AND YOU SAID YOUR MOTHER WORKS IN THE

21   SAME PLACE THAT YOU DO?

22             PROSPECTIVE JUROR DILLARD:  EQUIPMENT OPERATOR,

23   YES.

24             THE COURT:  THANK YOU VERY MUCH.

25             MR. EASTERDAY?

```
 1                PROSPECTIVE JUROR EASTERDAY:  MY NAME IS BRYAN
 2    EASTERDAY.  I WORK FOR HSBC BANK, AND THAT'S SELLING
 3    FORECLOSED HOMES.
 4                I LIVE IN FONTANA.  I AM MARRIED.  MY WIFE IS A
 5    PARALEGAL.  I HAVE TWO DAUGHTERS, AGES TEN AND NINE MONTHS.
 6    AND THEN NO OTHER LIVING ADULTS IN MY HOUSE.
 7                THIS IS MY FIRST TIME ON JURY DUTY.
 8                NO NEWSPAPERS OR MAGAZINES -- WELL,
 9    SPORTS ILLUSTRATED.
10                THE COURT:  OH, I FORGOT.  DO YOU SUBSCRIBE,
11    MS. DILLARD, TO ANY MAGAZINES?
12                PROSPECTIVE JUROR DILLARD:  WE GET THE SUNDAY
13    PAPER.
14                THE COURT:  OKAY.  THANK YOU.
15                MR. EASTERDAY, DO YOU HAVE COMPUTERS AT YOUR HOUSE?
16                PROSPECTIVE JUROR EASTERDAY:  YES.
17                THE COURT:  CONNECTED TO THE INTERNET?
18                PROSPECTIVE JUROR EASTERDAY:  YES.
19                THE COURT:  AND WHAT DO YOU USE INTERNET ACCESS
20    FOR?
21                PROSPECTIVE JUROR EASTERDAY:  E-MAIL, SPORT SCORES,
22    TRACK STOCKS.
23                THE COURT:  OKAY.  THANK YOU VERY MUCH.
24                MR. SANCHEZ?
25                PROSPECTIVE JUROR SANCHEZ:  MY NAME IS GABRIEL
```

1    SANCHEZ, AND I WORK FOR A MORTGAGE COMPANY, LOAN SERVICING

2    AND DEFAULT PREVENTION.

3              THE COURT:  DID YOU GUYS PLAN TO SIT NEXT TO EACH

4    OTHER?

5              PROSPECTIVE JUROR SANCHEZ:  AND I HAVE GOT JUST A

6    HIGH SCHOOL EDUCATION.

7              I LIVE IN SAN BERNARDINO.  AND I AM MARRIED.  MY

8    WIFE WORKS FOR TARGET.  SHE IS A DEPARTMENT MANAGER.  I HAVE

9    NO CHILDREN.  JUST ME AND MY WIFE LIVE ALONE, NO OTHER

10   ADULTS.

11             I HAVE NEVER BEEN ON A JURY BEFORE.

12             I DO RECEIVE THE SAN BERNARDINO SUN NEWSPAPER AND

13   JUST CAR MAGAZINES.

14             THE COURT:  ALL RIGHT.  DO YOU HAVE A COMPUTER WITH

15   INTERNET ACCESS AT YOUR HOUSE?

16             PROSPECTIVE JUROR SANCHEZ:  YES.

17             THE COURT:  AND WHAT DO YOU USE THE INTERNET FOR?

18             PROSPECTIVE JUROR SANCHEZ:  PRETTY MUCH FOR MY

19   E-MAIL.  AT WORK, I USE IT FOR E-MAILING A LOT, AND JUST DO A

20   LOT OF THINGS THAT HAVE TO DO WITH CAR SHOWS.

21             THE COURT:  THANK YOU VERY MUCH.

22             MS. LANDFRIED?

23             PROSPECTIVE JUROR LANDFRIED:  MY NAME IS JANET

24   LANDFRIED.  I AM A RETIRED TEACHER.  I HAVE TAUGHT 37 YEARS

25   AT REDLANDS HIGH SCHOOL AND REDLANDS EAST VALLEY.  I TEACH

1     HISTORY AND GOVERNMENT, ECONOMICS.  I AM DIVORCED.  NO

2     CHILDREN.  I LIVE ALONE.

3          I SERVED ONCE ON A CIVIL TRIAL IN SAN BERNARDINO

4     COUNTY COURT.  I WAS ONE OF THE TWO ALTERNATES ON THAT TRIAL.

5     WE DID SIT IN WITH THE JURY.

6          I REGULARLY SUBSCRIBE AND READ THE

7     SAN BERNARDINO SUN, REDLANDS DAILY FACTS, NEWSWEEK, AARP,

8     WESTWAYS, AND SUNSET.

9          THE COURT:  ALL RIGHT.  THE CIVIL CASE THAT YOU

10    SERVED AS A JUROR ON, FIRST OF ALL, HOW MANY YEARS AGO WAS

11    THAT?

12         PROSPECTIVE JUROR LANDFRIED:  ABOUT EIGHT.

13         THE COURT:  WHAT WAS THE CASE ABOUT, DO YOU RECALL?

14         PROSPECTIVE JUROR LANDFRIED:  YES.  A WOMAN WAS

15    REAR-ENDED IN BIG BEAR, AND AFTER A NUMBER -- ABOUT A YEAR --

16    WAS SUING THE WOMAN THAT HIT HER BECAUSE SHE WAS FINALLY

17    DIAGNOSED WITH TMJ, AND SHE WAS SUING FOR THAT, FOR MEDICAL

18    EXPENSES.

19         THE COURT:  WITHOUT TELLING ME WHAT THE VERDICT

20    WAS, DID YOU SAY THAT THE JURY SAT IN -- THE ALTERNATES SAT

21    IN?

22         PROSPECTIVE JUROR LANDFRIED:  YES.  ALL 14 OF US

23    SAT THROUGH THE TRIAL.  AND AT THE END, TWO NUMBERS WERE

24    CALLED FOR ALTERNATES AND I HAPPENED TO BE ONE OF THEM.  AND

25    THE JUDGE REQUIRED US TO SIT IN WITH THE JURY.

1          THE COURT:  BUT NOT SPEAK DURING DELIBERATIONS?

2          PROSPECTIVE JUROR LANDFRIED:  THAT'S CORRECT.

3          THE COURT:  INTERESTING.

4          PROSPECTIVE JUROR LANDFRIED:  WHICH WAS HARD.

5          THE COURT:  I'M SURE.  DO YOU KNOW IF THE JURY

6   REACHED A VERDICT?

7          PROSPECTIVE JUROR LANDFRIED:  YES, THEY DID.

8          THE COURT:  DO YOU HAVE A COMPUTER?

9          PROSPECTIVE JUROR LANDFRIED:  YES, I DO.

10         THE COURT:  INTERNET ACCESS?

11         PROSPECTIVE JUROR LANDFRIED:  YES.

12         THE COURT:  AND WHAT DO YOU USE THE INTERNET FOR?

13         PROSPECTIVE JUROR LANDFRIED:  E-MAIL, ONLINE

14   BANKING, SOME RESEARCH, PURCHASES, ONLINE SHOPPING.  I'M ON

15   IT VERY SPORADICALLY -- AND BOOKING AND TRAVEL.

16         THE COURT:  THANK YOU VERY MUCH.

17         MR. YAMBAO?

18         PROSPECTIVE JUROR YAMBAO:  MY NAME IS ALBIN YAMBAO.

19   I WORK FOR THE POST OFFICE AS A MAIL CARRIER.  AND I HAVE

20   HIGH SCHOOLING AND SOME COLLEGE.  I WORK IN -- I HAVE

21   MILITARY CUSTOMS BACKGROUND.

22         I LIVE IN THE CITY OF CORONA.  I AM MARRIED.  MY

23   WIFE WORKS AS A CERTIFIED MEDICAL ASSISTANT IN PHLEBOTOMY, IN

24   KAISER.

25         THE COURT:  SHE WORKS AS A CERTIFIED MEDICAL

```
 1    ASSISTANT?

 2              PROSPECTIVE JUROR YAMBAO:  PHLEBOTOMY.

 3              THE COURT:  OH, PHLEBOTOMIST?

 4              PROSPECTIVE JUROR YAMBAO:  I HAVE THREE CHILDREN,

 5    14, 11 AND 9.  THEY ARE ALL STUDENTS.  AND THERE IS NO ONE

 6    LIVING IN OUR HOUSE EXCEPT US.

 7              AND NEVER HAD -- NEVER SERVED AS A JUROR.

 8              AND I ONLY READ THE NEWSPAPER AND READING THE

 9    SPORTS PAGES.

10              THE COURT:  ALL RIGHT.  AND DO YOU HAVE A COMPUTER

11    AT YOUR HOUSE?

12              PROSPECTIVE JUROR YAMBAO:  YES, WE DO.

13              THE COURT:  INTERNET ACCESS?

14              PROSPECTIVE JUROR YAMBAO:  YES.

15              THE COURT:  WHAT DO YOU USE THE INTERNET FOR?

16              PROSPECTIVE JUROR YAMBAO:  MOSTLY, I ONLY USE IT TO

17    E-MAIL.  MY WIFE USE IT FOR THE ACCOUNT.

18              THE COURT:  FOR THE WHAT?

19              PROSPECTIVE JUROR YAMBAO:  ONLINE ACCOUNT.

20              THE COURT:  OH, FOR ACCOUNTING?

21              PROSPECTIVE JUROR YAMBAO:  MY KIDS USE IT FOR

22    HOMEWORK.

23              THE COURT:  THANK YOU VERY MUCH.

24              MR. GRAY?

25              PROSPECTIVE JUROR GRAY:  YES.  MY NAME IS TOM GRAY.
```

1    I AM A VICE-PRESIDENT, GENERAL MANAGER FOR A CONSULTING FIRM

2    THAT FOCUSES IN PUBLIC SAFETY.

3              LET'S SEE, MY EDUCATIONAL BACKGROUND, THREE YEARS

4    OF COLLEGE, AND I INTERNED IN CANADA AND TOOK A SPECIAL

5    TRAINING COURSE AT A TECHNICAL SCHOOL AT SWITCHING

6    TECHNOLOGY.  I HAVE BEEN AN ELECTRICAL ENGINEER MOST OF MY

7    LIFE.

8              WE LIVE IN SAN BERNARDINO.  I AM MARRIED.  I HAVE

9    FOUR CHILDREN OF MY OWN, TWO STEPCHILDREN.  MY ELDEST SON IS

10   AN ASTROPHYSICIST.  MY SECOND YOUNGEST SON IS A LEGAL

11   ASSISTANT IN TRIBAL COURT.  MY OTHER TWO DAUGHTERS ARE AT A

12   UNIVERSITY.  MY TWO STEPSONS ARE ELECTRICAL ENGINEERS, AND

13   THE OTHER ONE WORKS IN A SUPERMARKET.

14             NO OTHER ADULTS LIVING AT HOME.

15             MY LAST -- I HAVE HAD -- I HAVE BEEN CALLED ON JURY

16   DUTY SEVERAL TIMES, BUT I HAVE NEVER SERVED ON A JURY.

17             BASICALLY, MY RECREATIONAL READING IS TRADE

18   MAGAZINES, AND A MAGAZINE CALLED GUITAR PLAYER.

19             THE COURT:  CALLED WHAT?

20             PROSPECTIVE JUROR GRAY:  A MAGAZINE CALLED

21   GUITAR PLAYER.

22             THE COURT:  AND DO YOU HAVE A COMPUTER AT YOUR

23   HOUSE?

24             PROSPECTIVE JUROR GRAY:  WE HAVE SEVEN AND A

25   SERVER.  I BASICALLY WORK OUT OF MY HOME, AND SOME OF THOSE

1    COMPUTERS ARE SPECIALIZED.

2            THE COURT:  NOW, APART FROM WORK, WHAT DO YOU USE

3    THE INTERNET FOR?

4            PROSPECTIVE JUROR GRAY:  A LITTLE BIT OF E-MAIL.  I

5    MEAN, MOSTLY FOR WORK.  I DISCOVERED E-BAY A COUPLE OF YEARS

6    AGO, BUT MY WIFE GOT ME OFF OF THAT.

7            THE COURT:  I'M GOING TO TAKE THE FIFTH.

8            ANYTHING ELSE?

9            PROSPECTIVE JUROR GRAY:  NO.

10           THE COURT:  AND YOU SAID YOU HAVE BEEN CALLED FOR

11   JURY DUTY, BUT YOU HAVE NEVER ACTUALLY SERVED?

12           PROSPECTIVE JUROR GRAY:  RIGHT.

13           THE COURT:  THANK YOU VERY MUCH.

14           MR. EASTIS?

15           PROSPECTIVE JUROR EASTIS:  I AM RON EASTIS.  MY

16   OCCUPATION IS DATA TECH OR COMMUNICATIONS TECH FOR AT&T.  I

17   HAVE A B.A. IN BUSINESS ADMINISTRATION.

18           I LIVE IN GLEN IVY.  I AM MARRIED.  MY WIFE THINKS

19   SHE'S RETIRED, AND SHE USES THE COMPUTER.  E-BAY, AND YOU

20   NAME IT.

21           THE COURT:  WHAT DID SHE DO BEFORE SHE, QUOTE,

22   "RETIRED"?

23           PROSPECTIVE JUROR GRAY:  SHE WORKED SEVERAL JOBS,

24   FROM INSURANCE, MAIL ROOM, TO CAREGIVER AT A SKILLED NURSING

25   FACILITY, AND ENTERTAINING, WHATEVER.

```
 1              LET'S SEE.  I HAVE TWO STEPSONS.  ONE IS 36, GOING

 2   TO BE 37 NEXT WEEK.  AND THE OTHER ONE IS 40.  THE YOUNGEST

 3   WORKS OVER HERE FOR THE WATER DISTRICT HERE IN CHINO HILLS.

 4   AND THE OLDEST WORKS IN A STORE AT THE BEACH, A CLOTHING

 5   STORE OF SOME SORT.

 6              THERE ARE NO OTHER ADULTS IN OUR HOME.

 7              I HAVE BEEN ON TWO JURIES, THAT ONE WAS IN EARLY

 8   '80S, AND THE OTHER WAS LAST AUGUST.  AND WE DIDN'T --

 9              THE COURT:  THE FIRST ONE, THE ONE IN THE 1980S, DO

10   YOU REMEMBER IF IT WAS A CRIMINAL CASE?

11              PROSPECTIVE JUROR GRAY:  YES, IT WAS.

12              THE COURT:  OH, IT WAS?  ALL RIGHT.  WHAT WAS THE

13   NATURE OF THE CASE?

14              PROSPECTIVE JUROR GRAY:  THE NATURE?

15              THE COURT:  WHAT WAS IT ABOUT?

16              PROSPECTIVE JUROR GRAY:  THE GUY HAD A GUN AND HAD

17   A FIGHT, AND HE TRIED TO --

18              THE COURT:  WITHOUT TELLING ME WHAT THE VERDICT

19   WAS, DID THE JURY REACH A VERDICT?

20              PROSPECTIVE JUROR GRAY:  WE DID REACH A VERDICT.

21              THE COURT:  WERE YOU THE FOREPERSON OF THE JURY?

22              PROSPECTIVE JUROR GRAY:  NO.

23              THE COURT:  AND THEN THE MOST RECENT TIME YOU WERE

24   ON JURY DUTY, WHAT WAS THAT CASE ABOUT?

25              PROSPECTIVE JUROR GRAY:  IT WAS CIVIL, AND WE
```

1    REACHED A VERDICT.

2              THE COURT:  WHEN YOU SAY "CIVIL," WHAT WAS THE CASE

3    ABOUT?

4              PROSPECTIVE JUROR GRAY:  A COMPANY IN SOUTHERN

5    CALIFORNIA VERSUS A COMPANY IN THE EAST -- OR THE SOUTH,

6    WHATEVER, AND THEY COUNTERSUED.  EVERYBODY GOT WHAT THEY

7    WANTED.

8              THE COURT:  AND DO YOU HAVE A COMPUTER AT YOUR

9    HOUSE?

10             PROSPECTIVE JUROR GRAY:  YES, I DO, UNFORTUNATELY.

11             THE COURT:  WELL, WE HAVE HEARD WHAT YOUR WIFE USES

12   IT FOR.  WHAT DO YOU USE IT FOR?

13             PROSPECTIVE JUROR GRAY:  TRACKING STOCKS, CHECKING

14   THE TRAFFIC BEFORE I GO TO WORK, THINGS LIKE THAT.  AND

15   LOOKING AT DIFFERENT RESEARCHING STUFF.

16             THE COURT:  E-MAILS?

17             PROSPECTIVE JUROR GRAY:  YEAH.

18             THE COURT:  YOU EVER USE IT FOR CHAT ROOMS?

19             PROSPECTIVE JUROR GRAY:  I HAVE NEVER.  I DON'T

20   KNOW HOW TO DO THAT.

21             THE COURT:  THANK YOU.

22             MS. SMITH?

23             PROSPECTIVE JUROR SMITH:  MY NAME IS PAULA SMITH.

24   I WORK FOR THE COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC

25   SOCIAL SERVICES.

```
 1              FOUR YEARS OF COLLEGE.  I LIVE IN ALTA LOMA.  I'M
 2   MARRIED.  AND MY HUSBAND ALSO WORKS FOR THE COUNTY OF LOS
 3   ANGELES AS A GAIN SERVICE WORKER.
 4              I HAVE TWO ADULT CHILDREN.  I HAVE A SON THAT'S 37
 5   YEARS OLD, AND A DAUGHTER THAT IS 31.  MY SON DOES, LIKE,
 6   MORTGAGE FINANCING, AND MY DAUGHTER WORKS IN A CHIROPRACTOR
 7   OFFICE.
 8              THERE NO OTHER ADULTS IN MY HOME.
 9              AND I HAD PRIOR JURY DUTY WHERE I SERVED IN LOS
10   ANGELES ABOUT 25 YEARS AGO IN TRAFFIC COURT.
11              AND WE SUBSCRIBE TO A NEWSPAPER AND DISNEY
12   MAGAZINE.
13              THE COURT:  SO, THE LAST TIME YOU WERE ON JURY DUTY
14   WAS THIS ONE TIME 25 YEARS AGO IN TRAFFIC COURT?
15              PROSPECTIVE JUROR SMITH:  I HAVE GONE TO JURY DUTY,
16   BUT I NEVER SERVED.  SINCE THEN, THE TRAFFIC COURT, I WAS ONE
17   OF THE JURORS.
18              THE COURT:  DID THE JURY REACH A VERDICT ON THE
19   CASE?
20              PROSPECTIVE JUROR SMITH:  YES.
21              THE COURT:  WERE YOU THE FOREWOMAN OF THE JURY?
22              PROSPECTIVE JUROR SMITH:  NO.
23              THE COURT:  DO YOU HAVE A COMPUTER AT YOUR HOUSE?
24              PROSPECTIVE JUROR SMITH:  YES.
25              THE COURT:  INTERNET ACCESS?
```

1          PROSPECTIVE JUROR SMITH:  YES.

2          THE COURT:  AND WHAT DO YOU USE THE INTERNET FOR?

3          PROSPECTIVE JUROR SMITH:  MOSTLY HOMEWORK.

4          THE COURT:  ARE YOU STUDYING YOURSELF RIGHT NOW?

5          PROSPECTIVE JUROR SMITH:  NO, MY GRANDCHILDREN,

6    LOOKING UP RESEARCH, MAKING IT MY HOMEWORK.

7          THE COURT:  HOW OLD ARE YOUR GRANDCHILDREN?

8          PROSPECTIVE JUROR SMITH:  I HAVE FIVE.  THIRTEEN,

9    ELEVEN, NINE -- NO, THIRTEEN, ELEVEN, TEN, FOUR, AND TWO.

10          THE COURT:  CONGRATULATIONS.

11          PROSPECTIVE JUROR SMITH:  IT IS WORK.

12          THE COURT:  EXCEPT FOR THE HOMEWORK.  THANK YOU

13    VERY MUCH.

14          MS. BRINKERHOFF?

15          PROSPECTIVE JUROR BRINKERHOFF:  MY NAME IS BONNIE

16    BRINKERHOFF.  I AM RETIRED FROM THE DIOCESE OF SAN

17    BERNARDINO, WHICH IS THE CATHOLIC CHURCH.

18          MY EDUCATIONAL BACKGROUND IS HIGH SCHOOL.  I LIVE

19    IN CANYON HILLS.  BEEN MARRIED FOR 43 YEARS, AND MY SPOUSE IS

20    RETIRED FROM LAW ENFORCEMENT.  WE HAVE FOUR CHILDREN.  THE

21    42-YEAR OLD IS A SUPERINTENDENT WITH YEAGER/STANSKA.  THE

22    40-YEAR OLD IS AN INSURANCE BROKER.  THE 39-YEAR OLD IS PART

23    OWNER OF THE FAMILY BUSINESS.  AND THE 38-YEAR OLD IS AN

24    ELEMENTARY EDUCATOR.

25          WE HAVE ONE OTHER ADULT LIVING IN OUR HOME, AND IT

```
 1    IS MY MOTHER-IN-LAW.  AND AT 89, SHE IS OBVIOUSLY RETIRED.

 2              AND I HAVE NO PRIOR JURY EXPERIENCE.  I HAVE BEEN

 3    CALLED; I NEVER SERVED.

 4              WE GET THE DAILY PRESS OUT OF VICTORVILLE, SUNSET,

 5    RIGHT TO LIFE MAGAZINE, READERS DIGEST.  THAT'S BASICALLY IT.

 6              THE COURT:  ALL RIGHT.  YOU MENTIONED -- WELL,

 7    FIRST OF ALL, YOUR OLDEST SON WORKS FOR WHAT COMPANY?

 8              PROSPECTIVE JUROR BRINKERHOFF:  YEAGER/STANSKA

 9    CONSTRUCTION, FREEWAY BRIDGE BUILDING.

10              THE COURT:  AND YOU SAID ONE OF THE OTHER CHILDREN

11    WORKS IN THE FAMILY BUSINESS.  WHAT'S THAT BUSINESS?

12              PROSPECTIVE JUROR BRINKERHOFF:  IT IS THEIR FAMILY

13    BUSINESS, WHICH IS PIPELINE CONSTRUCTION.

14              THE COURT:  AND DO YOU HAVE A COMPUTER AT THE

15    HOUSE?

16              PROSPECTIVE JUROR BRINKERHOFF:  YES, WE DO.

17              THE COURT:  WHAT DO YOU USE THE COMPUTER FOR?

18              PROSPECTIVE JUROR BRINKERHOFF:  SHOPPING, AND THEN

19    THE BILL PAYING.

20              THE COURT:  OKAY.

21              PROSPECTIVE JUROR BRINKERHOFF:  JUST LOOKING THINGS

22    UP, AND E-MAILING.

23              THE COURT:  ALL RIGHT.  THANK YOU.

24              LET ME GO BACK.  MS. SMITH, YOUR HUSBAND, YOU SAID,

25    WORKS -- HE IS A GANG -- HE WORKS IN GANG SERVICES FOR L.A.;
```

1    IS THAT RIGHT?

2              PROSPECTIVE JUROR SMITH:  YES.

3              THE COURT:  IS THAT A LAW ENFORCEMENT POSITION?

4              PROSPECTIVE JUROR SMITH:  NO, NO.  THAT'S WHERE YOU

5    FIND WELFARE PARTICIPANTS, TO WORK IN THE PROGRAM CALLED

6    GAIN.

7              THE COURT:  OH.

8              PROSPECTIVE JUROR SMITH:  G-A-I-N.

9              THE COURT:  GAIN.  I'M SORRY.  NOT G-A-N-G.  I

10   UNDERSTAND.  THANK YOU.

11             MR. SHANTELER?

12             PROSPECTIVE JUROR SHANTELER:  I AM CHRIS SHANTELER.

13   I AM FOREMAN FOR THE AIR CONDITIONING/HEATING DEPARTMENT AT

14   REDLANDS UNIFIED SCHOOL DISTRICT.

15             I LIVE IN REDLANDS.  I AM MARRIED.  MY WIFE IS A

16   RETIRED COURT REPORTER.  I HAVE ONE DAUGHTER.  SHE IS SIX.

17   WE HAVE NO OTHER ADULTS LIVING IN MY HOUSE.

18             I HAVE SERVED ON A JURY ABOUT FOUR YEARS AGO.  IT

19   WAS A CRIMINAL CASE.  WE DID REACH A VERDICT.

20             THE COURT:  WHAT WAS THAT CASE ABOUT?

21             PROSPECTIVE JUROR SHANTELER:  IT WAS MANUFACTURING

22   METHAMPHETAMINE.

23             LET'S SEE.  I GET THE TRADE MAGAZINES, AND I AM A

24   UNION LEADER, SO I GET SOME UNION-TYPE MAGAZINES.

25             THE COURT:  BY THE WAY, ON THE JURY THAT YOU SERVED

1    ON, WERE YOU THE FOREMAN OF THE JURY?

2              PROSPECTIVE JUROR SHANTELER:  NO, MA'AM.

3              THE COURT:  AND DO YOU HAVE A COMPUTER WITH

4    INTERNET ACCESS?

5              PROSPECTIVE JUROR SHANTELER:  YES.

6              THE COURT:  AND WHAT DO YOU USE IT FOR?

7              PROSPECTIVE JUROR SHANTELER:  E-MAIL, BILL PAYING,

8    RESEARCH FOR MY DAUGHTER, THAT KIND OF THING.

9              THE COURT:  THANK YOU.

10             MR. GODINEZ?

11             PROSPECTIVE JUROR GODINEZ:  THANK YOU.  MY NAME IS

12   JOSE GODINEZ.  I AM A STEEL WORKER.  I GRADUATED HIGH SCHOOL.

13             I LIVE IN MORENO VALLEY.  MY WIFE AND I LIVE

14   TOGETHER WITH FIVE CHILDREN.  I HAVE THREE STEPCHILDREN.  SHE

15   IS A HOMEMAKER.  THE OLDEST CHILD IS 13 YEARS OLD, SO THERE

16   IS NO ADULTS.

17             I HAVE BEEN SUMMONED BUT NEVER SERVED OVER HERE AT

18   PRESLEY HALL.

19             SUBSCRIBE TO THE PRESS ENTERPRISE, BASICALLY, FOR

20   COUPONS, MY WIFE.

21             I DO HAVE A COMPUTER WITH INTERNET ACCESS.  I USE

22   IT FOR -- I AM REALLY INTERESTED IN THE IRAN THING.  I

23   BASICALLY READ THE NEWS ABOUT WHAT'S GOING ON IN IRAN AND

24   NUCLEAR WEAPONS AND ALL THAT.

25             THE COURT:  SO, YOU USE IT, YOU WOULD SAY, FOR

1    RESEARCH AND NEWS?

2              PROSPECTIVE JUROR SHANTELER:   CURIOUS, YEAH.

3              AND MY TWO OLDER STEP-BOYS, THEY USE IT FOR CHEATS

4    -- FOR CHEAT CODES FOR THEIR GAMES, AND HOMEWORK.   AND I LIKE

5    CHECKERS.

6              THE COURT:   ALL RIGHT.   THANK YOU VERY MUCH.

7              LADIES AND GENTLEMEN, WE ARE GOING TO TAKE A

8    BREATHER.   WE DON'T HAVE TO.   I REALLY APPRECIATE YOUR

9    PATIENCE TODAY.

10             BEFORE WE TAKE A RECESS, I HAVE TO REMIND YOU OF

11   WHAT I HAVE ALREADY DISCUSSED WITH YOU.   IT IS VERY IMPORTANT

12   THAT YOU NOT DISCUSS THE CASE WITH ANYONE DURING THE

13   RECESSES, WHEN WE ADJOURN TONIGHT AND AT ALL TIMES.   THAT

14   MEANS AMONGST YOURSELVES OR WITH ANYONE ELSE.   YOU CAN'T HAVE

15   ANY CONTACT -- AS I TOLD YOU WHEN I FIRST MENTIONED A COUPLE

16   WEEKS AGO -- YOU CAN'T HAVE ANY CONTACT WITH ANYONE HAVING

17   ANYTHING TO DO WITH THE CASE.   THAT MEANS THE LAWYERS, THE

18   PARTIES, THE WITNESSES, ANYONE.   YOU CAN'T EVEN SAY "GOOD

19   MORNING" OR "NICE WEATHER," OR "NOT NICE WEATHER," ANYTHING.

20   THEY CAN'T HAVE ANY CONTACT WITH YOU.

21             IF YOU TRY TO TALK WITH THEM, THEY WILL TURN AND

22   WALK AWAY FROM YOU.   NOT BECAUSE THEY ARE RUDE, BUT THEY KNOW

23   THEY CAN'T HAVE ANY CONVERSATION WITH YOU ABOUT THE CASE OR

24   ABOUT ANYTHING.   SO PLEASE REMEMBER YOU CANNOT HAVE ANY

25   CONVERSATION WITH ANYONE INVOLVED IN THIS CASE.

1            REMEMBER, YOU CAN'T DO ANY RESEARCH ABOUT THE CASE.

2    YOU CAN'T DISCUSS IT.  YOU CAN'T MAKE UP YOUR MINDS ABOUT

3    IT.  KEEP AN OPEN MIND.

4            AND WE WILL SEE YOU BACK HERE IN 15 MINUTES.

5    PLEASE JUST WAIT RIGHT OUTSIDE THE COURTROOM DOOR.

6            AND REMEMBER WHERE YOU ARE SEATED.

7            MR. SHANTELER, IF YOU WOULD WAIT BEHIND.

8            FIFTEEN MINUTES, LADIES AND GENTLEMEN.  WE WILL SEE

9    YOU BACK IN 15 MINUTES.

10            (PROSPECTIVE JURORS EXIT COURTROOM.)

11        (PROSPECTIVE JUROR SHANTELER REMAINS IN THE COURTROOM.)

12            THE COURT:  YOU MAY HAVE A SEAT, MR. SHANTELER.

13            WE ARE ON THE RECORD OUTSIDE THE PRESENCE OF ALL

14    MEMBERS OF THE JURY PANEL WITH THE EXCEPTION OF JUROR NO. 12,

15    MR. SHANTELER.

16            I'LL GO BACK TO THE QUESTION.  I THINK I HAD ASKED

17    YOU THAT YOU SAID YOU PREFERRED TO DISCUSS OUTSIDE THE

18    PRESENCE OF THE OTHER JURORS, WHICH I THINK WAS WHETHER YOU

19    HAD ANYONE IN YOUR FAMILY OR CLOSE FRIEND WHO HAD EVER BEEN

20    ACCUSED OF A CRIME SIMILAR TO THIS ONE?

21            PROSPECTIVE JUROR SHANTELER:  CORRECT.

22            THE COURT:  CAN YOU TELL ME ABOUT THAT?

23            PROSPECTIVE JUROR SHANTELER:  I APOLOGIZE FOR NOT

24    PUTTING IT ON THE QUESTIONNAIRE.  I TOTALLY FORGOT ABOUT THIS

25    SITUATION.  BUT IT IS MY SISTER'S SON.  HE WAS 18 YEARS OLD.

1    HE HAD A 30-YEAR-OLD, OR SO, GIRLFRIEND, AND SHE HAD A

2    10-YEAR-OLD DAUGHTER.

3              AND DURING SCHOOL ONE DAY, THEY HAD A SESSION WHERE

4    THEY CAME IN AND TALKED ABOUT INAPPROPRIATE TOUCHING AND

5    WHATNOT, AND SHE RAISED HER HAND AND SAID THAT SHE HAD BEEN

6    BY HIM.  AND SO THEY ARRESTED HIM.

7              AND HE DIDN'T GO TO TRIAL, HE JUST PLED GUILTY AND

8    IS SERVING TIME NOW FOR THAT.

9              THE COURT:  AND HE HAD A LAWYER REPRESENTING HIM?

10             PROSPECTIVE JUROR SHANTELER:  CORRECT.  THE PUBLIC

11   DEFENDER.

12             THE COURT:  DID THIS HAPPEN LOCALLY?  WAS HE LIVING

13   LOCALLY?

14             PROSPECTIVE JUROR SHANTELER:  COLORADO.

15             THE COURT:  IN COLORADO?

16             PROSPECTIVE JUROR SHANTELER:  YES.

17             THE COURT:  WERE YOU LIVING HERE AT THE TIME?

18             PROSPECTIVE JUROR SHANTELER:  YES.

19             THE COURT:  DID YOU EVER GO TO COLORADO AND GO TO

20   ANY OF THE HEARINGS IN HIS CASE?

21             PROSPECTIVE JUROR SHANTELER:  NO.  IN FACT, MY

22   SISTER DIDN'T TELL ME.  I JUST HAPPENED TO FIND OUT ABOUT IT.

23   MY WIFE WAS ON THE INTERNET AND IT WAS AN ARTICLE ON HIM,

24   THIS WHOLE MESS, THIS WHOLE BUSINESS.

25             THE COURT:  HAVE YOU TALKED ABOUT IT WITH YOUR

1   SISTER SINCE THIS TIME?

2        PROSPECTIVE JUROR SHANTELER:  ONLY THAT IN SMALL

3   CONVERSATION ABOUT IT.  SHE IS REALLY, YOU KNOW, KIND OF LIKE

4   TURNED IT -- SHE IS NOT TALKING ABOUT IT.  THEY LET HIM OUT

5   AND HE WENT TO A HALFWAY HOUSE, AND HE ESCAPED.  AND THEN

6   THEY CAUGHT HIM AND PUT HIM BACK AND LET HIM OUT AGAIN TO A

7   HALFWAY HOUSE.  HE ESCAPED, AND HE MADE HIS WAY OUT HERE.  I

8   DIDN'T KNOW HE WAS OUT HERE.  HE WAS IN LONG BEACH, TRIED TO

9   GET ON A BUS TO GO BACK TO COLORADO, AND THEY -- HE DIDN'T

10  HAVE ANY MONEY FOR A TICKET.  AND THIS WAS IN LOS ANGELES, SO

11  THEY ARRESTED HIM AND TRANSPORTED HIM BACK.  AND HE IS

12  INCARCERATED NOW.

13       THE COURT:  ANYTHING ABOUT THAT CASE -- IS THAT

14  PRETTY MUCH ALL YOU KNOW ABOUT THAT CASE?

15       PROSPECTIVE JUROR SHANTELER:  CORRECT.

16       THE COURT:  ANYTHING ABOUT IT THAT WOULD CAUSE YOU

17  TO DOUBT WHETHER YOU COULD BE FAIR TO BOTH SIDES IN THIS

18  CASE?

19       PROSPECTIVE JUROR SHANTELER:  NO.  YOU KNOW, I

20  DON'T KNOW MUCH ABOUT IT.  ALL I KNOW IS WHAT HAPPENED.  I

21  DON'T REALLY KNOW BECAUSE MY SISTER ISN'T TALKING ABOUT IT.

22  AND MY MOTHER AND FATHER PASSED AWAY, SO THERE IS NO WAY OF

23  GETTING ANY OTHER INFORMATION ABOUT IT.

24       THE COURT:  ANYTHING THAT YOUR SISTER HAS SAID OR

25  THAT YOU HAVE MAY HAVE GATHERED FROM ANY SOURCE THAT LEADS

1   YOU TO DRAW ANY CONCLUSIONS ABOUT WHETHER OR NOT YOUR NEPHEW

2   WAS TREATED UNFAIRLY BY THE JUSTICE SYSTEM?

3            PROSPECTIVE JUROR SHANTELER:  NO.  HE WAS TREATED

4   FAIRLY.  HE WAS LET OUT, ESCAPED, AND LET HIM OUT AGAIN.  SO

5   I THINK HE WAS TREATED PRETTY FAIR.

6            THE COURT:  EITHER SIDE WISH TO INQUIRE?

7            MR. AARON:  THANK YOU, YOUR HONOR.

8            YOUR NEPHEW WAS 18 YEARS OLD AT THE TIME?

9            PROSPECTIVE JUROR SHANTELER:  CORRECT.

10           MR. AARON:  AND THE CHILD WAS 10 YEARS OLD?

11           PROSPECTIVE JUROR SHANTELER:  YES, SIR.

12           MR. AARON:  AND SHE APPARENTLY REPORTED HIM WHEN

13  SHE WAS BEING GIVEN SOME SORT OF AWARENESS TRAINING?

14           PROSPECTIVE JUROR SHANTELER:  I ASSUME IT WAS SOME

15  TYPE OF, LIKE, D.A.R.E., OR SOMETHING LIKE THAT THAT CAME IN

16  IN THE CLASSES THERE WHERE THEY TALKED ABOUT INAPPROPRIATE,

17  YOU KNOW, SITUATIONS.  AND THEN APPARENTLY SHE RAISED HER

18  HAND, AND THAT'S HOW IT ALL STARTED.

19           MR. AARON:  JUST A COUPLE OF ISSUES I WANT TO TALK

20  TO YOU ABOUT.  ONE IS, DO YOU THINK THAT THIS MIGHT HAVE AN

21  EFFECT ON HOW YOU VIEW COMPLAINTS OR ALLEGATIONS BY CHILDREN?

22           AND, TWO, LEARNING A LITTLE BIT ABOUT, AT LEAST IN

23  COLORADO LAW, HOW CONVICTED SEX OFFENDERS ARE TREATED, DO YOU

24  THINK THAT MIGHT AFFECT YOU HERE IN THIS CASE; YOU MIGHT

25  START CONSIDERING PENALTY OR PUNISHMENT?

```
 1              PROSPECTIVE JUROR SHANTELER:  IN ANSWER TO YOUR
 2    FIRST QUESTION, BEING WORKING FOR THE SCHOOL DISTRICT, IT'S
 3    -- ALLEGATIONS, A SIMPLE ALLEGATION CAN REALLY TURN SOMEONE'S
 4    LIFE AROUND.  SO, I DON'T HAVE ANY PROBLEM WITH THAT BECAUSE
 5    I KNOW THAT AN ALLEGATION -- WHAT AN ALLEGATION CAN DO.
 6              AND THEN SECONDLY, I DON'T FEEL THAT I WOULD HAVE
 7    ANY PROBLEM LOOKING AT --
 8              THE COURT:  AS TO THE SECOND QUESTION, LET ME
 9    INTERRUPT FOR A MOMENT AND JUST TELL YOU THAT IF YOU WERE
10    SEATED AS A JUROR ON THIS CASE, THE COURT WOULD INSTRUCT YOU
11    THAT YOU'RE NOT TO CONSIDER -- IN DECIDING THE QUESTIONS OF
12    GUILT OR INNOCENCE, THE JURY CAN'T CONSIDER, IN ANY FASHION
13    WHATSOEVER, THE ISSUE OF PUNISHMENT.
14              WOULD YOU BE ABLE TO FOLLOW THAT INSTRUCTION?
15              PROSPECTIVE JUROR SHANTELER:  YES.
16              MR. AARON:  AND THE SENTENCE THAT MAY HAVE BEEN
17    GIVEN TO YOUR RELATIVE IN COLORADO, THIS IS A COMPLETELY
18    DIFFERENT SITUATION --
19              THE COURT:  THERE CAN'T BEING ANY MORE DISCUSSION
20    ABOUT IT BECAUSE THE JURY ISN'T TO CONSIDER IT.
21              MR. AARON:  AND YOU WOULD BE ABLE TO PUT THAT OUT
22    OF YOUR MIND COMPLETELY?
23              PROSPECTIVE JUROR SHANTELER:  CORRECT.
24              MR. AARON:  THANK YOU.  NOTHING FURTHER.
25              THE COURT:  THANK YOU.
```

1              MR. MICHAEL?

2              MR. MICHAEL:  NOTHING, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

4    CAN TAKE A BREAK.

5              PROSPECTIVE JUROR SHANTELER:  THANK YOU.

6              THE COURT:  ALL RIGHT.  THE COURT IS IN RECESS.

7         (PROSPECTIVE JUROR SHANTELER EXITS THE COURTROOM.)

8              MR. AARON:  YOUR HONOR, IF WE CAN HAVE A MOMENT ON

9    ANOTHER MATTER?

10             THE COURT:  YES.

11             MR. AARON:  JUROR NO. 20 IN THE RANDOM DRAW IS A

12   SALLY BONDY.  SHE WORKS AS A PARALEGAL AT --

13             THE COURT:  LEGAL SECRETARY?

14             MR. AARON:  LEGAL SECRETARY.  WELL, THE ATTORNEY

15   THAT SHE WORKS FOR IS OUR CORPORATE ATTORNEY.  I AM HANDLING

16   THIS AS A CJA ATTORNEY.  BUT JOHN WALLEN IS THE CORPORATE

17   ATTORNEY FOR OUR LAW OFFICE, AND SHE HAS DONE WORK ON THE

18   ACCOUNT.

19             THE COURT:  SHE MAY NOT KNOW YOU WORK AT THE

20   VIRGINIA BLUMENTHAL LAW OFFICE.

21             MR. AARON:  THAT'S CORRECT.  BUT I THINK SHE DOES.

22             THE COURT:  WELL, DO YOU WANT ME TO BRING THAT UP

23   AND ASK HER?

24             MR. AARON:  NO.  BUT SHE HAS A FINANCIAL INTEREST

25   IN MY FIRM.

```
 1              THE COURT:  WELL, FIRST OF ALL, I SHOULD STATE ON

 2    THE RECORD I WAS A PARTNER AT BEST, BEST & KREIGER.  THAT'S

 3    WHY I ASKED HER WHO SHE WORKED FOR.  I DON'T THINK SHE HAS A

 4    FINANCIAL INTEREST.  YOU'RE PAID BY THE CJ -- YOU'RE PAID BY

 5    CJA FUNDS.  SHE WORKS AT BEST, BEST & KREIGER.  SHE DOESN'T

 6    -- SHE SAID SHE DIDN'T KNOW YOU.

 7              MR. AARON:  THE TAXPAYER I.D. ON MY CHECKS IS

 8    BLUMENTHAL LAW OFFICES.  MY CHECKS GO TO BLUMENTHAL LAW

 9    OFFICES.

10              THE COURT:  SHE IS AN EMPLOYEE AT THE LAW FIRM?

11              MR. AARON:  OF BEST, BEST & KREIGER.  BUT THEY GET

12    MONEY FROM US TO DO OUR CORPORATE WORK.  AND, PRESUMABLY, I

13    ASSUME THAT SHE IS PAID, AT LEAST IN PART, FROM THAT MONEY.

14              I AM JUST PUTTING THAT OUT THERE.

15              THE COURT:  I THINK THAT SHE IS AN EMPLOYEE OF A

16    BUSINESS THAT DOES WORK FOR YOUR FIRM.

17              MR. AARON:  CORRECT.  AND I WOULD BE WILLING TO

18    STIPULATE.

19              THE COURT:  ALL RIGHT.  I DON'T THINK IT IS GROUNDS

20    FOR A CHALLENGE FOR CAUSE BECAUSE I DON'T THINK IT IS A

21    DIRECT FINANCIAL INTEREST.

22              DOES THE GOVERNMENT WANT TO STIPULATE?

23              MR. MICHAEL:  NO, YOUR HONOR.  THE GOVERNMENT

24    DOESN'T SEE A BASIS, DOESN'T SEE A FINANCIAL INTEREST HERE

25    THAT WOULD AFFECT HER IMPARTIALITY, AND AGREES WITH YOU THERE
```

1    IS NO DIRECT FINANCIAL INTEREST.

2            THE COURT:  ONE OF MY CONCERNS WAS, IN ASKING HER

3    ABOUT WHICH ATTORNEY SHE WORKED FOR, WAS I WANTED TO MAKE

4    SURE THAT SHE DID NOT WORK FOR THE WIFE OF ROB STACEY, WHO IS

5    A PARTNER AT BEST, BEST & KREIGER.  AND I DON'T REMEMBER HER

6    NAME.  ROB STACEY BEING ONE OF THE ASSISTANT UNITED STATES

7    ATTORNEYS IN THE RIVERSIDE OFFICE.

8            NOW, I COULD ASK HER WHETHER SHE IS AWARE THAT THE

9    LAW OFFICES OF VIRGINIA BLUMENTHAL IS A CLIENT OF BEST, BEST

10   & KREIGER.  SHE MAY OR MAY NOT KNOW THAT.

11           MR. AARON:  THAT'S TRUE.  BUT I BELIEVE THAT SHE

12   HAS DONE WORK ON THAT ACCOUNT.  THE OTHER PROBLEM IS SHE MAY

13   HAVE DONE WORK ON THE ACCOUNT AND NOT REMEMBERED IT.  I

14   BELIEVE SHE HAS DONE WORK ON THE ACCOUNT, AND I CHECKED.  I

15   CHECKED WITH OUR OFFICE.

16           THE COURT:  AND FOUND OUT THAT SHE HAS DONE WORK ON

17   THE ACCOUNT?

18           MR. AARON:  YES.

19           THE COURT:  I PROBABLY SHOULD ASK HER THAT.  OF

20   COURSE, SHE DOESN'T KNOW THAT YOU'RE WITH THE BLUMENTHAL LAW

21   OFFICE, SO YOU WOULD BE TELLING HER SOMETHING THAT SHE

22   DOESN'T KNOW, AND THAT MIGHT BE CREATING THE POTENTIAL FOR A

23   CONFLICT.

24           MR. AARON:  BUT SHE MIGHT FIND OUT DURING THE

25   PENDENCY OF THE CASE.

1          THE COURT:  I WILL INQUIRE ABOUT IT WITH HER.  AND

2    WE DON'T NEED TO DO THAT OUTSIDE THE PRESENCE OF THE OTHER

3    JURORS.

4          WE CAN GO OFF THE RECORD.

5               (RECESS)

6          THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

7    PRESENCE OF ALL OF THE JURORS, EXCEPT FOR JUROR NO. 24,

8    MR. VASQUEZ.

9          MR. VASQUEZ, THE CLERK TOLD ME THAT YOU WANTED TO

10   SPEAK TO ME BECAUSE YOU WERE HAVING TROUBLE UNDERSTANDING?

11          PROSPECTIVE JUROR VASQUEZ:  YES.

12          THE COURT:  CAN YOU TELL ME A LITTLE ABOUT DO YOU

13   HAVE TROUBLE UNDERSTANDING ENGLISH?

14          PROSPECTIVE JUROR VASQUEZ:  YES.  I HAVE PROBLEM TO

15   WRITE IT, TO WRITE IT AND READ ENGLISH.  I CAN SPEAK SOME,

16   BUT I CAN'T UNDERSTAND ALL THE -- EVERYTHING.  THAT'S WHY IT

17   IS MY -- I TALK TO THE SECRETARY TO MAYBE I HAVE A TRIAL FOR

18   BOTH PARTY TO UNDERSTAND, YOU KNOW, TO EACH -- FOR EACH ONE.

19          THE COURT:  WHEN YOU FILLED OUT THE QUESTIONNAIRE

20   IN THIS CASE, DID YOU UNDERSTAND THE QUESTIONS ON THE

21   QUESTIONNAIRE?

22          PROSPECTIVE JUROR VASQUEZ:  YES.  I READ -- I

23   UNDERSTAND SOME THINGS, YOU KNOW.  BUT I EXPLAIN TO THE LADY

24   ON THE DOWNSTAIRS, THE FIRST DAY WHEN I CAME TO, AND SHE TOLD

25   ME YOU WOULD DECIDE, THE JUDGE DECIDE IF I BE ABLE TO BE ON

1    THE JURY.  THAT'S WHY IT IS I WANT IT TO BE KNOWN I'M NOT

2    ABLE TO DO IT.

3              THE COURT:  WELL, WHEN YOU FILLED OUT -- ANSWERED

4    THE QUESTIONS ON THE QUESTIONNAIRE, WERE YOU ABLE TO

5    UNDERSTAND THE QUESTIONS ON THE QUESTIONNAIRE?

6              PROSPECTIVE JUROR VASQUEZ:  WELL, I UNDERSTAND SOME

7    THING, AND THEN OTHER ONES I DON'T UNDERSTAND.  BUT I KNOW --

8    I FEEL WHAT I CAN SAY, YOU KNOW, I UNDERSTAND EVERYTHING.

9    BUT, YOU KNOW, I CAN, IF YOU UNDERSTAND SOME LETTERS,

10   SOMETHING YOU FILL WITH SOMETHING, MAYBE I CAN UNDERSTAND.

11   WELL, YOU KNOW, I TRY TO DO IT BEST I CAN DO IT.

12             THE COURT:  ALL RIGHT.  AND WHAT YOU DO FOR A

13   LIVING, MR. VASQUEZ?

14             PROSPECTIVE JUROR VASQUEZ:  I'M A TRUCK DRIVER.

15             THE COURT:  AND HOW LONG HAVE YOU BEEN DOING THAT?

16             PROSPECTIVE JUROR VASQUEZ:  ABOUT SEVEN MONTHS

17   RIGHT NOW BECAUSE MY OLD JOB IS PRESSMAN.  I DO IT FOR 25

18   YEARS.

19             THE COURT:  OKAY.  WHEN YOU WORKED AS A PRESSMAN,

20   DID YOU SPEAK ENGLISH ON THE JOB?

21             PROSPECTIVE JUROR VASQUEZ:  SOMETIME WE DO.  ALL

22   EMPLOYEES, WE SPEAK SPANISH.

23             THE COURT:  AS YOU HAVE BEEN SITTING IN HERE THIS

24   AFTERNOON, ARE YOU ABLE TO UNDERSTAND WHAT I AM SAYING IN

25   ENGLISH?

1          PROSPECTIVE JUROR VASQUEZ:  SOMETIME SOME THINGS I

2    UNDERSTAND.  BUT I DON'T UNDERSTAND SOME PEOPLE USE A

3    DIFFERENT KIND OF -- NOT LANGUAGE BUT SOME DIFFERENT WORDS.

4    SOME WORDS WHEN THEY SAY, I DON'T UNDERSTAND EVERYTHING

5    THAT'S --

6          THE COURT:  ALL RIGHT.  YOU HAVE TROUBLE READING

7    ENGLISH?

8          PROSPECTIVE JUROR VASQUEZ:  YES.

9          THE COURT:  OKAY.  HOW MUCH EDUCATION DO YOU HAVE,

10   SIR?

11         PROSPECTIVE JUROR VASQUEZ:  I HAVE -- I FINISH 9TH

12   GRADE.

13         THE COURT:  OKAY.  WAS THAT IN THE UNITED STATES OR

14   SOMEWHERE ELSE?

15         PROSPECTIVE JUROR VASQUEZ:  NO, IN MY COUNTRY, IN

16   CENTRAL AMERICA.

17         THE COURT:  GUATEMALA?

18         PROSPECTIVE JUROR VASQUEZ:  YES, FROM GUATEMALA.

19         THE COURT:  HAVE YOU TAKEN ANY ADULT EDUCATION

20   COURSES IN THIS COUNTRY, ANY COURSES IN ENGLISH?

21         PROSPECTIVE JUROR VASQUEZ:  YES.  I TOOK A LOT --

22   MANY YEARS I WENT TO THE SCHOOL, TO CLASSES FOR ENGLISH.  AND

23   I READ IN MAGAZINES OR BOOKS ABOUT THE ENGLISH, BUT I CAN'T

24   FINISH OR UNDERSTAND.

25         THE COURT:  DO YOU SUBSCRIBE TO ANY NEWSPAPERS IN

1   ENGLISH?  DOES YOUR FAMILY GET ANY NEWSPAPERS OR MAGAZINES AT

2   HOME?

3            PROSPECTIVE JUROR VASQUEZ:  NO.  USUALLY, MY SON,

4   HE GET THE MAGAZINES FOR THE SPORTS AND NUTRITION MAGAZINE IN

5   ENGLISH.  AND ANOTHER TIME I READ IN SPANISH OR TAKE IT IN

6   SPANISH, TALK IN SPANISH WITH MY FAMILY.  WE WATCH TV IN

7   SPANISH.

8            THE COURT:  YOU DON'T WATCH TV IN ENGLISH?

9            PROSPECTIVE JUROR VASQUEZ:  YES.  I LIKE IT, BUT

10  SOMETIMES WE USE IT -- WELL, I USE IT FOR ENGLISH, TO LEARN.

11  BUT USUALLY MY WIFE, SHE IS USING SPANISH MORE.

12           THE COURT:  ARE YOU ASKING TO BE EXCUSED BECAUSE

13  YOU'RE HAVING A HARD TIME UNDERSTANDING ENGLISH IN THIS

14  TRIAL?

15           PROSPECTIVE JUROR VASQUEZ:  WELL, I ASKED FOR

16  EXCUSE BECAUSE FOR THE MOST PART IT IS IMPORTANT TO BE IN

17  THIS POSITION.  BUT THIS POSITION, WHEN I TOOK IT, I HAVE TO

18  -- THEY WANT TO BE, UNDERSTAND CLEAR EVERYTHING.  THAT'S WHY

19  I WANT TO -- I ASKED FOR THIS.  I GOT EXCUSED.

20           THE COURT:  I'M SORRY.  I'M NOT SURE I UNDERSTAND.

21  YOU ARE ASKING TO BE EXCUSED?

22           PROSPECTIVE JUROR VASQUEZ:  YES.  I ASKED FOR THE

23  EXCUSE, YOU KNOW.  IF BOTH PARTIES, I THINK, SO THEY WANT TO

24  HAVE SOMEBODY TOOK SOME POSITION, THEY SUPPOSED TO BE

25  UNDERSTAND WELL, YOU KNOW.

1          THE COURT:  AND YOU FEEL THAT YOU DON'T UNDERSTAND

2     ENGLISH WELL ENOUGH?

3          PROSPECTIVE JUROR VASQUEZ:  I UNDERSTAND RIGHT NOW

4     WHEN I TALK TO YOU, YOU KNOW.  THERE IS SOMETIMES SOME KIND

5     OF LANGUAGE PEOPLE USE THAT I DON'T UNDERSTAND.

6          THE COURT:  SO, AS YOU HAVE BEEN SITTING HERE

7     TODAY, DO YOU UNDERSTAND ME WHEN I AM TALKING?

8          PROSPECTIVE JUROR VASQUEZ:  BEFORE THAT OR RIGHT

9     NOW?

10          THE COURT:  ALL DAY TODAY, ALL AFTERNOON WHILE YOU

11    HAVE BEEN HERE, WERE YOU ABLE TO UNDERSTAND EVERYTHING I HAVE

12    SAID?

13          PROSPECTIVE JUROR VASQUEZ:  NOT EVERYTHING, BUT

14    SOME THINGS.

15          THE COURT:  DOES COUNSEL WISH TO BE HEARD?

16          MR. AARON:  NO, YOUR HONOR.

17          MR. MICHAEL:  NO, YOUR HONOR.

18          THE COURT:  ALL RIGHT.  ANY OBJECTION TO EXCUSING

19    MR. VASQUEZ?

20          MR. AARON:  NONE.

21          MR. MICHAEL:  NO, YOUR HONOR.

22          THE COURT:  ALL RIGHT.  I'M GOING TO EXCUSE YOU AT

23    THIS TIME, MR. VASQUEZ.  THANK YOU VERY MUCH FOR YOUR

24    SERVICE.  YOU'RE EXCUSED.  YOU MAY GO BACK DOWN TO THE JURY

25    ROOM AND TURN IN YOUR BADGE.

```
 1              PROSPECTIVE JUROR VASQUEZ:  OKAY.  THANK YOU.

 2              THE COURT:  AND YOU'RE DONE.  ALL RIGHT.  THANK

 3    YOU.

 4              PROSPECTIVE JUROR VASQUEZ:  THANK YOU.

 5          (PROSPECTIVE JUROR VASQUEZ EXITS THE COURTROOM.)

 6              THE COURT:  LET'S BRING THE REST OF THE JURORS IN.

 7          (IN THE PRESENCE OF THE PROSPECTIVE JURORS:)

 8              THE COURT:  THE JURY PANEL IS NOW PRESENT IN THE

 9    COURTROOM.

10              LET THE RECORD REFLECT THE PRESENCE OF ALL MEMBERS

11    OF THE JURY PANEL AND COUNSEL FOR BOTH PARTIES AND THE

12    DEFENDANT ARE ALSO PRESENT.

13              JUROR NO. 14, MR. DREW?

14              PROSPECTIVE JUROR DREW:  YES.  MY NAME IS KEN DREW.

15    LET'S SEE, I AM A DIRECTOR OF SAFETY, HEALTH AND

16    ENVIRONMENTAL AFFAIRS FOR THE BOEING COMPANY, IN LONG BEACH.

17    MASTER'S DEGREE IN THAT FIELD.

18              I LIVE IN CORONA.  MARRIED.  AND MY WIFE IS A

19    SPEECH PATHOLOGIST.  I HAVE ONE CHILD, 24 YEARS OLD, DOES NOT

20    LIVE AT HOME, AND HE IS A CONSTRUCTION PROFESSIONAL.  NO

21    OTHER ADULTS LIVING IN MY HOUSEHOLD.

22              I HAVE SERVED ON JURIES TWICE BEFORE.  BOTH WERE

23    CIVIL CASES IN THE STATE OF WASHINGTON.

24              AND NEWSPAPERS, WE GET A LOCAL NEWSPAPER.  I THINK

25    MY WIFE GETS SUNSET AND ARCHITECTURAL DIGEST, OR SOMETHING.
```

1          THE COURT:  ALL RIGHT.  THE TWO CIVIL JURIES THAT

2   YOU SERVED ON, WHAT WERE THOSE CASES ABOUT?

3          PROSPECTIVE JUROR DREW:  THEY WERE BOTH TRAFFIC

4   RELATED, AND ONE WAS SETTLED BEFORE THE JURY MADE A DECISION.

5   THE OTHER ONE WASN'T.

6          THE COURT:  DID THE JURY REACH A VERDICT ON THE

7   OTHER CASE?

8          PROSPECTIVE JUROR DREW:  THEY DID.

9          THE COURT:  WERE YOU THE FOREMAN OF THE JURY?

10          PROSPECTIVE JUROR DREW:  I WAS.

11          THE COURT:  THANK YOU VERY MUCH.  AND DO YOU HAVE A

12   COMPUTER AT HOME?

13          PROSPECTIVE JUROR DREW:  I DO.

14          THE COURT:  WHAT DO YOU USE IT FOR?

15          PROSPECTIVE JUROR DREW:  MOSTLY FOR RESEARCH.  MY

16   WIFE USES IT MORE THAN I DO.  I DO A TON OF STUFF AT WORK.  I

17   WILL OCCASIONALLY GET ON THERE AND LOOK UP ADDRESSES, MAPS,

18   TRAVEL TICKETS, YOU KNOW, THAT KIND OF THING.

19          THE COURT:  E-MAIL, DO YOU USE IT FOR PERSONAL

20   E-MAIL?

21          PROSPECTIVE JUROR DREW:  WORK I DO, A LOT, YES.

22          THE COURT:  ALL RIGHT.  THANK YOU.

23          MR. MELENDY?

24          PROSPECTIVE JUROR MELENDY:  MY NAME IS ALBERT

25   MELENDY.  MY OCCUPATION AT THE MOMENT IS PRIVATE

```
 1    INVESTIGATOR, WHICH I'M GOING TO GIVE UP IN ABOUT TWO
 2    MONTHS.  PRIOR OCCUPATION 25 YEARS IN LAW ENFORCEMENT, AND
 3    10-AND-A-HALF YEARS IN THE MARINE CORPS.
 4            I GOT ENOUGH UNITS FOR A B.A. DEGREE IN CRIMINAL
 5    JUSTICE, BUT I DON'T HAVE THEM IN THE PROPER AREA.  STILL
 6    NEED ABOUT TWO SEMESTERS.
 7            I LIVE IN DESERT HOT SPRINGS.  I AM MARRIED.  MY
 8    WIFE IS A SUPERVISOR IN THE CAGE AT ONE OF THE CASINOS.  I
 9    HAVE ONE OTHER ADULT LIVING IN MY HOUSEHOLD AT THIS TIME.
10    ONE OF MY DAUGHTERS IS OUT ON VACATION FROM OREGON.  I HAVE
11    SIX CHILDREN ALTOGETHER.  THE OLDEST DAUGHTER IS LIVING IN
12    TWENTY-NINE PALMS.  SHE IS A BARTENDER.  MY SON IS AN
13    ARCHITECT -- OR A GRAPHIC DESIGNER, LIVING IN L.A.  AND THE
14    OTHER SON IS SOMETHING TO DO WITH THE MOVIE INDUSTRY.  FOURTH
15    DAUGHTER IS -- OR THE THIRD DAUGHTER, YOUNGEST ONE, IS LIVING
16    IN ORANGE COUNTY, AND SHE IS A SUPERVISOR AT A TRUST COMPANY,
17    REAL ESTATE TRUST COMPANY.
18            I HAVE JURY EXPERIENCE AT LEAST ONCE EVERY YEAR FOR
19    THE LAST 10 YEARS.  LAST TIME WAS THE ROSE TRIAL.  TOOK ABOUT
20    A MONTH.  IT WASN'T A VERY NICE TRIAL.
21            I DON'T SUBSCRIBE TO ANY NEWSPAPERS, MAGAZINES, OR
22    OTHER PUBLICATIONS.  I READ THE NEWSPAPERS ON A REGULAR
23    BASIS, USUALLY ONLINE.  I DO HAVE A COMPUTER.  I USE IT FOR
24    ANYTHING FROM LOOKING UP CALIFORNIA CODES TO RUNNING PEOPLE
25    DOWN FOR THE VARIOUS ATTORNEYS THAT I WORK FOR, WITNESSES,
```

1    WHAT HAVE YOU.  PRETTY MUCH SUMS IT UP.

2            THE COURT:  HAVE YOU ACTUALLY SERVED ON TEN JURIES

3    OR JUST BEEN CALLED?

4            PROSPECTIVE JUROR MELENDY:  OH, I HAVE SERVED ON

5    ABOUT FOUR.  THE ONLY ONE THAT REALLY COMES TO MIND IS THAT

6    ROSE TRIAL.

7            THE COURT:  TELL ME WHAT THAT CASE WAS ABOUT,

8    BRIEFLY.

9            PROSPECTIVE JUROR MELENDY:  CHILD ABDUCTION.

10   ACTUALLY, IT WAS SPOUSAL ABDUCTION.

11           THE COURT:  DID THE JURY REACH A VERDICT?  DID THE

12   JURY REACH A VERDICT?

13           PROSPECTIVE JUROR MELENDY:  OH, YES.

14           THE COURT:  WERE YOU THE FOREMAN OF THE JURY?

15           PROSPECTIVE JUROR MELENDY:  NO, MA'AM.

16           THE COURT:  WHEN YOU SAY IT WASN'T A VERY NICE

17   TRIAL, WHAT DID YOU MEAN BY THAT?

18           PROSPECTIVE JUROR MELENDY:  WELL, YOU KNOW, IF YOU

19   LIKE TO GO TO TRIAL, AT LEAST SAY "I'M NOT GUILTY" AND PUT ON

20   A DEFENSE AND SAY "I'M NOT GUILTY."  THIS ONE HERE, EVERYBODY

21   COME IN AND SAID, YUP, I AM GUILTY, IN WHAT THEY SAID.  BUT,

22   YOU KNOW, I THOUGHT I WAS DOING SOMETHING ELSE.  IT DIDN'T

23   WORK AT ALL.

24           THE COURT:  WHEN YOU SAY IF YOU'RE GOING TO GO TO

25   TRIAL COME IN AND PUT ON A DEFENSE AT LEAST, YOU UNDERSTAND,

```
 1    AND AS I HAVE ALREADY INSTRUCTED EVERYONE ON THE JURY, THE
 2    DEFENDANT DOES NOT HAVE TO PROVE HIS INNOCENCE.
 3              PROSPECTIVE JUROR MELENDY:  THEY ACTUALLY
 4    TESTIFIED.
 5              THE COURT:  OKAY.  BUT DO YOU UNDERSTAND WHAT I
 6    MEAN WHEN I SAY THE DEFENDANT DOES NOT HAVE TO PUT ON A CASE?
 7              PROSPECTIVE JUROR MELENDY:  NO, HE DOESN'T HAVE TO
 8    PUT ON A CASE AT ALL.
 9              THE COURT:  YOU UNDERSTAND THAT?
10              PROSPECTIVE JUROR MELENDY:  I WASN'T QUESTIONING
11    THAT.
12              THE COURT:  ALL RIGHT.  WAS THERE ANYTHING ABOUT
13    YOUR SERVICE AS A JUROR ON THAT CASE THAT YOU THINK WOULD
14    AFFECT YOUR SERVICE IF YOU WERE A JUROR HERE?
15              PROSPECTIVE JUROR MELENDY:  NO, NOTHING.
16              THE COURT:  AND YOU UNDERSTAND THAT IF YOU WERE
17    INSTRUCTED ON THE LAW IN THAT CASE IN A WAY THAT CONFLICTS
18    WITH WHAT YOU'RE INSTRUCTED HERE, YOU HAVE TO FOLLOW THE LAW
19    AS THE COURT INSTRUCTS YOU HERE?
20              PROSPECTIVE JUROR MELENDY:  IT IS APPLES AND
21    ORANGES.  TWO DIFFERENT PLATES.
22              THE COURT:  WHAT OTHER CASES HAVE YOU SERVED ON?
23              PROSPECTIVE JUROR MELENDY:  NOTHING COMES TO MIND
24    RIGHT NOW.  WENT IN, WENT THROUGH VOIR DIRE ONE DAY.  THEY
25    WERE ALL ONE-DAY TRIALS.  ONE WAS A NARCOTICS CASE --
```

1          THE COURT:  DID THE JURY REACH A VERDICT?

2          PROSPECTIVE JUROR MELENDY:  -- OUT OF ONE OF THE

3  CASINOS.

4          THE COURT:  WITHOUT TELLING ME WHAT THE VERDICT

5  WAS, DID THE JURY REACH A VERDICT?

6          PROSPECTIVE JUROR MELENDY:  THEY DID REACH A

7  VERDICT.

8          THE COURT:  WERE YOU THE FOREMAN ON THAT CASE?

9          PROSPECTIVE JUROR MELENDY:  I WAS NOT.

10          THE COURT:  WHAT OTHER KINDS OF CASES?

11          PROSPECTIVE JUROR MELENDY:  I CAN'T REMEMBER. THESE

12  ARE RECENT ONES.

13          THE COURT:  NOW, BACK TO THAT ROSE CASE.  WAS THERE

14  ANYTHING ELSE ABOUT IT THAT MADE YOU SAY -- MADE YOU FEEL

15  AFTERWARDS THAT IT WASN'T A VERY NICE CASE, OR YOU DIDN'T --

16          PROSPECTIVE JUROR MELENDY:  WELL, IT WAS THE WAY IT

17  WAS MORE OR LESS PRESENTED, THAT IT WAS SORT OF A MESS THE

18  WAY IT WAS PRESENTED.

19          THE COURT:  WHEN YOU SAY "THE WAY IT WAS

20  PRESENTED," YOU MEAN THE WAY THE TRIAL --

21          PROSPECTIVE JUROR MELENDY:  I AM USED TO A LITTLE

22  BIT MORE STRUCTURE.

23          THE COURT:  YOU MEAN THE WAY THE TRIAL WAS

24  CONDUCTED?

25          PROSPECTIVE JUROR MELENDY:  JUDGE DID A GOOD JOB,

1    BUT THE -- HOW DO YOU SAY IT?  THE --

2            THE COURT:  DIDN'T THINK THE ATTORNEYS DID A VERY

3    GOOD JOB?

4            PROSPECTIVE JUROR MELENDY:  I DON'T THINK THE

5    DISTRICT ATTORNEY DID A VERY GOOD JOB.

6            THE COURT:  WHAT ABOUT THE DEFENSE ATTORNEY?  OR

7    WAS THERE MORE THAN ONE DEFENSE ATTORNEY?

8            PROSPECTIVE JUROR MELENDY:  THE DEFENSE ATTORNEY

9    WOULD HAVE BEEN MUCH SMARTER TO KEEP ALL THOSE PEOPLE OFF THE

10   -- THERE WERE FOUR DEFENDANTS, AND THREE OF THEM ACTUALLY GOT

11   UP AND TESTIFIED.  THEY SHOULD NEVER HAD GOT UP THERE, IF

12   THEY WERE THE VICTIM THEMSELVES.

13           THE COURT:  NOW, AGAIN, YOU UNDERSTAND THAT THE

14   DEFENDANT HAS A CONSTITUTIONAL RIGHT NOT TO TESTIFY?

15           PROSPECTIVE JUROR MELENDY:  HE DOES.

16           THE COURT:  ANYTHING ELSE ABOUT THAT TRIAL THAT

17   LEFT YOU FEELING AS THOUGH -- WELL, LET ME ASK YOU THIS:  DO

18   YOU WISH YOU HAD NOT SERVED ON THAT TRIAL?

19           PROSPECTIVE JUROR MELENDY:  THE ONLY OTHER THING

20   THAT CAME UP, THEY WOULD HAVE FOUND GUILTY ON ALL COUNTS --

21           THE COURT:  EXCUSE ME, SIR.  IF YOU WILL JUST --

22   LET'S GO BACK TO WHAT MY QUESTION WAS, OKAY?

23           DO YOU WISH THAT YOU HADN'T SERVED AS A JUROR ON

24   THAT TRIAL?

25           PROSPECTIVE JUROR MELENDY:  NO.  YOU KNOW, I DIDN'T

1    MIND SERVING AS A JUROR ON THE TRIAL.

2              THE COURT:  ALL RIGHT.  THEN IS THERE ANYTHING

3    ABOUT YOUR SERVICE, OR HAVING SACRIFICED YOUR TIME, OR PUT IN

4    YOUR TIME AND SERVED AS A JUROR ON THAT CASE, AND YOUR

5    DISSATISFACTION WITH THE WAYS IN WHICH IT WAS HANDLED, THAT

6    YOU THINK WOULD AFFECT YOUR ABILITY TO BE FAIR TO BOTH SIDES

7    IN THIS CASE?

8              PROSPECTIVE JUROR MELENDY:  NO.  NO PROBLEM AT

9    ALL.  LIKE I SAID, IT IS APPLES AND ORANGES.

10             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

11             MS. PATTON?

12             PROSPECTIVE JUROR PATTON:  YES.  MY NAME IS GAIL

13   PATTON.  I AM A VONS STORE MANAGER, VONS GROCERY STORE

14   MANAGER.  I HAVE A HIGH SCHOOL EDUCATION, A COUPLE YEARS OF

15   COLLEGE; NO DEGREE.

16             I LIVE IN MURRIETA.  I AM MARRIED.  MY HUSBAND'S

17   RETIRED FROM THE CAR BUSINESS.  WE HAVE NO CHILDREN.  AND

18   THERE ARE NO OTHER ADULTS LIVING IN OUR HOUSE.

19             I HAVE SERVED ON THREE JURIES.  THEY HAVE ALL BEEN

20   CRIMINAL.  ONE, THE FIRST ONE, WAS PROBABLY AROUND '95, 1995.

21   THERE WERE FOUR COUNTS.  WE CAME TO A VERDICT ON THREE.  WE

22   HUNG ON ONE.  IT INVOLVED AN AMBULANCE THEFT, TWO COUNTS OF

23   DRUNK DRIVING, AND EVADING POLICE.

24             MY SECOND WAS PROBABLY -- IT WAS AROUND '97, '98.

25   IT WAS A DRUNK DRIVING.  CAME TO A VERDICT.

1          AND THEN I SERVED IN 2005 ON A DOMESTIC VIOLENCE,

2     AND CAME TO A VERDICT ON THAT.

3          THE COURT:  AND WERE YOU THE FOREPERSON ON ANY OF

4     THOSE JURIES?

5          PROSPECTIVE JUROR PATTON:  I WAS ON THE SECOND ONE,

6     THE DRUNK DRIVING.

7          THE COURT:  ALL RIGHT.  THANK YOU.

8          PROSPECTIVE JUROR PATTON:  I DON'T SUBSCRIBE TO ANY

9     NEWSPAPERS OR MAGAZINES.  ONCE IN A WHILE I WILL BUY A CRAFT

10    MAGAZINE, OR SOMETHING LIKE THAT.  AND NEITHER DOES MY

11    HUSBAND.

12         WE DO HAVE A COMPUTER.  WE ARE NOT TOO COMPUTER

13    LITERATE.  IT IS JUST E-MAIL, DO SOME SHOPPING, PAY SOME

14    BILLS, HAVE A COUPLE STOCKS WE WATCH, JUST THAT KIND OF

15    STUFF.

16         THE COURT:  ALL RIGHT.  WHAT DID YOUR HUSBAND DO IN

17    THE AUTO INDUSTRY?

18         PROSPECTIVE JUROR PATTON:  OH, HE SOLD CARS.

19         THE COURT:  THANK YOU VERY MUCH.

20         MS. CHILDERS?

21         PROSPECTIVE JUROR CHILDERS:  MY NAME IS JONI

22    CHILDERS.  I'M A SCHOOL PSYCHOLOGIST, AND I HAVE A MASTER'S

23    DEGREE IN SCHOOL PSYCHOLOGY.

24         I LIVE IN TEMECULA.  I AM MARRIED.  AND MY HUSBAND

25    OWNS HIS OWN BUSINESS.  I HAVE TWO CHILDREN.  MY DAUGHTER IS

1    23.  SHE JUST GRADUATED FROM THE UNIVERSITY OF SANTA BARBARA.

2    AND MY SON IS 20, AND HE IS A COLLEGE STUDENT AT UCSD.

3              NO OTHER ADULTS LIVING IN MY HOME.

4              I HAVE BEEN CALLED SEVERAL TIMES FOR JURY, AND I

5    HAVE SERVED ON TWO JURIES.  THE FIRST ONE WAS IN TEXAS, IN

6    PROBABLY 1978, AND I DON'T EVEN REMEMBER -- IT WAS A ONE-DAY

7    JURY.  I DON'T REMEMBER WHAT THE CHARGE WAS.

8              THE OTHER ONE WAS JUST ABOUT TWO YEARS AGO, AND IT

9    WAS A DRIVING UNDER THE INFLUENCE, AND WE DID REACH A

10   VERDICT.

11             THE COURT:  WERE YOU THE FOREPERSON OF THAT JURY?

12             PROSPECTIVE JUROR CHILDERS:  NO, I WASN'T.

13             THE COURT:  WE SUBSCRIBE TO THE PRESS-ENTERPRISE,

14   READERS DIGEST, AND EDUCATORS MAGAZINE.

15             I USE A COMPUTER BOTH AT HOME AND SCHOOL.  AT HOME

16   FOR E-MAIL, TRAVEL PLANS.  I DO SOME RESEARCH FOR MY WORK.

17             THE COURT:  ALL RIGHT.  WHAT SORT OF BUSINESS DOES

18   YOUR HUSBAND OWN?

19             PROSPECTIVE JUROR CHILDERS:  HE IS A SALES AND

20   MARKETING MANAGER FOR TWO SMALL COMPANIES IN CHINA.

21             THE COURT:  WHAT SORT OF -- DO THEY MANUFACTURE?

22             PROSPECTIVE JUROR CHILDERS:  YES.

23             THE COURT:  WHAT SORT OF THINGS DO THEY

24   MANUFACTURE?

25             PROSPECTIVE JUROR CHILDERS:  IRRIGATION EQUIPMENT,

1    ALONG THOSE LINES LIKE THAT.

2              THE COURT:  THANK YOU VERY MUCH.

3              MS. RAMIREZ?

4              PROSPECTIVE JUROR RAMIREZ:  MY NAME IS SARA

5    RAMIREZ.  I WORK AT THE GUIDANCE CENTER --

6              THE COURT:  COULD I ASK YOU TO KEEP YOUR VOICE UP A

7    LITTLE?

8              PROSPECTIVE JUROR RAMIREZ:  SURE.  MY NAME IS SARA

9    RAMIREZ.  I LIVE IN CORONA.  I WORK AT THE GUIDANCE CENTER.

10   I AM A GROUP REPRESENTATIVE.

11             I AM MARRIED.  MY HUSBAND'S AN ELECTRICIAN.  AND I

12   HAVE FOUR DAUGHTERS.  THE OLDEST IS 30, AND SHE IS AN

13   ACCOUNTANT.  MY SECOND ONE IS 28, AND SHE LIVES IN NEBRASKA.

14   AND SHE IS A LOAN OFFICER.  MY THIRD ONE IS -- SHE IS 23, AND

15   SHE IS A MAKEUP ARTIST.  AND MY LAST DAUGHTER, SHE IS 16.

16   SHE IS STILL IN SCHOOL.

17             THIS IS MY FIRST TIME ON A JURY.

18             I ONLY HAVE A MAGAZINE SUBSCRIPTION FOR

19   HOME & GARDENS.

20             THE COURT:  DO YOU HAVE A COMPUTER AT YOUR HOUSE?

21             PROSPECTIVE JUROR RAMIREZ:  YES.  MY HUSBAND AND I

22   DO EVENTS FOR ON THE WEEKENDS, AND I DO THE VIDEOGRAPHING.

23   AND WE USE THE COMPUTER FOR THE DIGITAL PHOTOGRAPHY.

24             THE COURT:  DO YOU USE IT FOR ANYTHING ELSE?

25             PROSPECTIVE JUROR RAMIREZ:  NO.

```
 1                THE COURT:  THANK YOU VERY MUCH.

 2                MR. TIGHE -- AM I PRONOUNCING YOUR NAME CORRECTLY?

 3                PROSPECTIVE JUROR TIGHE:  I'M SORRY?

 4                THE COURT:  TIE?

 5                PROSPECTIVE JUROR TIGHE:  YES.  MY NAME IS ROBERT

 6      TIGHE.  I WORK FOR A CARDINAL HEALTH AND MANUFACTURER AS AN

 7      ENGINEER.

 8                I HAVE A BACHELOR'S DEGREE IN PHYSICS.

 9                I LIVE IN REDLANDS.  I AM DIVORCED.  I HAVE NO

10      CHILDREN.  NO OTHER ADULTS LIVING IN MY HOUSE.

11                NO PRIOR JURY EXPERIENCE.

12                PUBLICATION I SUBSCRIBE TO BESIDES THE

13      TRADE JOURNAL, A NEWSPAPER CALLED THE ONION, REASON

14      MAGAZINE AND AMERICAN CONSERVATOR.

15                I HAVE A COMPUTER.  I USE THE INTERNET FOR E-MAIL,

16      READ THE NEWS, DO SOME SHOPPING.

17                THE COURT:  THANK YOU VERY MUCH.

18                MS. BONDY?

19                PROSPECTIVE JUROR BONDY:  I AM SALLY BONDY.  I AM A

20      LEGAL SECRETARY.

21                I LIVE IN RIVERSIDE.  I AM MARRIED.  MY HUSBAND'S

22      AN I.T. MANAGER.  I HAVE ONE DAUGHTER WHO IS 12.

23                NO ADULTS LIVING IN THE HOME -- WELL, OTHER THAN

24      US.

25                I HAVE SERVED ON TWO JURIES.  THE FIRST ONE WAS
```

1   ABOUT THREE YEARS AGO, AND IT WAS ATTEMPTED MURDER OF A PEACE

2   OFFICER.  AND WE REACHED A VERDICT.

3         THE SECOND ONE WAS ASSAULT WITH A DEADLY WEAPON,

4   AND WE REACHED A VERDICT.  I WAS NOT THE FOREPERSON ON

5   EITHER.

6         THE ONLY SUBSCRIPTION WE GET IS A FITNESS MAGAZINE.

7         THE COURT:  DO YOU HAVE A COMPUTER AT YOUR HOUSE

8   WITH INTERNET ACCESS?

9         PROSPECTIVE JUROR BONDY:  SEVERAL.

10        THE COURT:  THAT'S RIGHT.  YOUR HUSBAND IS AN I.T.

11  MANAGER.  WHAT DO YOU USE THE COMPUTER FOR?

12        PROSPECTIVE JUROR BONDY:  JUST E-MAIL, SHOPPING.

13        THE COURT:  AND I WHEN I WAS TALKING TO YOU

14  EARLIER, YOU TOLD US THAT YOU WORK AT A LOCAL LAW FIRM, BEST,

15  BEST & KREIGER; IS THAT RIGHT?  ARE YOU A PARALEGAL THERE?

16        PROSPECTIVE JUROR BONDY:  SECRETARY.

17        THE COURT:  SECRETARY?  ONE OF THE FIRM'S CLIENTS

18  AND MR. LONG'S CLIENT IS THE LAW OFFICES OF VIRGINIA

19  BLUMENTHAL.  ARE YOU AWARE OF THAT?

20        PROSPECTIVE JUROR BONDY:  YES.

21        THE COURT:  DO YOU WORK ON THAT ACCOUNT FROM TIME

22  TO TIME?

23        PROSPECTIVE JUROR BONDY:  YES.

24        THE COURT:  THE ATTORNEY FOR THE DEFENDANT IN THIS

25  CASE, MR. AARON, HE IS AN ATTORNEY THAT WORKS AT THE OFFICES

```
 1    OF VIRGINIA BLUMENTHAL.  DID YOU KNOW THAT?

 2              PROSPECTIVE JUROR BONDY:  NO, I DIDN'T.

 3              THE COURT:  KNOWING THAT, DOES THAT MAKE ANY

 4    DIFFERENCE -- WOULD THAT MAKE ANY DIFFERENCE TO YOU?  WOULD

 5    YOU BE ABLE TO BE FAIR AND IMPARTIAL TO BOTH SIDES IN THIS

 6    CASE?

 7              PROSPECTIVE JUROR BONDY:  YES.  IT WOULDN'T MATTER.

 8              THE COURT:  WHEN YOU SAY YOU HAVE WORKED ON THAT

 9    ACCOUNT, CAN YOU TELL US WHAT YOUR WORK CONSISTS OF?

10              PROSPECTIVE JUROR BONDY:  WE DO HER CORPORATE WORK,

11    AND I THINK THAT'S ABOUT ALL.

12              THE COURT:  WHEN I SAY "YOUR WORK," I MEAN YOU IN

13    PARTICULAR.  WHAT'S YOUR FUNCTION?

14              PROSPECTIVE JUROR BONDY:  JUST SENDING

15    CORRESPONDENCE.  THAT'S ABOUT ALL.

16              THE COURT:  OKAY.  DO YOU HANDLE ANY OF THE MATTERS

17    IN TERMS OF KEEPING THE LEGAL CORPORATION, THE BLUMENTHAL

18    CORPORATION, CURRENT?  DO YOU DO ANY OF THE PAPERWORK

19    ASSOCIATED WITH THAT?

20              PROSPECTIVE JUROR BONDY:  I PROCESS THE PAPERWORK.

21    I DON'T GENERATE IT MYSELF.

22              THE COURT:  IS THERE SOMEBODY ELSE IN THE OFFICE

23    THAT DOES THAT?

24              PROSPECTIVE JUROR BONDY:  YES.

25              THE COURT:  HAVE YOU EVER MET MS. BLUMENTHAL?
```

1              PROSPECTIVE JUROR BONDY:  NO.  NO, I HAVEN'T.

2              THE COURT:  AND YOU DIDN'T RECOGNIZE MR. AARON?

3              PROSPECTIVE JUROR BONDY:  NO, I DIDN'T.

4              THE COURT:  BUT KNOWING THAT HE IS A LAWYER IN THE

5    OFFICE, IN AN OFFICE THAT IS A CLIENT OF THE FIRM WHERE YOU

6    WORK, DOES THAT GIVE YOU ANY HESITATION ABOUT WHETHER YOU

7    COULD BE FAIR AND IMPARTIAL IN THIS CASE?

8              PROSPECTIVE JUROR BONDY:  NO.

9              THE COURT:  ALL RIGHT.  THANK YOU.

10             MS. NEVINS?

11             PROSPECTIVE JUROR NEVINS:  MY NAME IS ALEXIA

12   NEVINS.  I AM A RECRUITING SPECIALIST FOR STAPLES

13   CORPORATION, THE BUSINESS-TO-BUSINESS DIVISION.

14             I LIVE IN SAN BERNARDINO.  I AM MARRIED.  MY

15   HUSBAND'S A MERCHANDISER.

16             AND I HAVE TWO CHILDREN.  MY HUSBAND HAS TWO

17   CHILDREN.  THE 24 YEAR OLD, HE HAS A CHILD CARE BUSINESS.  I

18   HAVE A 17-YEAR-OLD DAUGHTER.

19             HE HAS A 19-YEAR-OLD SON, SECOND YEAR IN COLLEGE,

20   AND AN 11-YEAR-OLD DAUGHTER.  AND THERE IS NO ADULTS -- NO

21   OTHER ADULTS LIVING IN THE HOUSE.

22             AND I HAVE BEEN SUMMONED FOR JURY DUTY BUT NEVER

23   ACTUALLY PARTICIPATED ON A JURY.

24             I DO SUBSCRIBE TO THE SUN NEWSPAPER.  I PURCHASE

25   MAGAZINES SUCH AS GARDEN MAGAZINES, EBONY MAGAZINES, AND

1    HEALTH MAGAZINES.

2            THE COURT:  ALL RIGHT.  DO YOU HAVE A COMPUTER?

3            PROSPECTIVE JUROR NEVINS:  YES, I DO.

4            THE COURT:  INTERNET ACCESS?

5            PROSPECTIVE JUROR NEVINS:  YES.

6            THE COURT:  AND WHAT DO YOU USE THE COMPUTER FOR?

7            PROSPECTIVE JUROR NEVINS:  BASICALLY, E-MAILING AND

8    RESEARCH.

9            THE COURT:  WHAT SORT OF RESEARCH?

10           PROSPECTIVE JUROR NEVINS:  WELL, CURRENTLY, MY

11   DAUGHTER HAS BEEN ACCEPTED INTO SAN DIEGO UNIVERSITY, SO WE

12   HAVE BEEN ON-THE-WEB PORTAL A LOT, DOING A LITTLE RESEARCH ON

13   THE FINANCIAL AIDE PROCESS.  SO I AM ON IT QUITE A BIT RIGHT

14   NOW.

15           THE COURT:  WELL, GOOD LUCK WITH THAT.

16           PROSPECTIVE JUROR NEVINS:  ALL RIGHT.

17           THE COURT:  MS. LEWIS?

18           PROSPECTIVE JUROR LEWIS:  MY NAME IS MILDRED LEWIS.

19   I AM A SENIOR OFFICE SPECIALIST IN THE REAL PROPERTY DIVISION

20   OF THE CITY OF RIVERSIDE.

21           I RECEIVED MY B.A. IN 1991 IN BUSINESS

22   ADMINISTRATION.

23           I LIVE IN SUN CITY.  I AM MARRIED.  AND MY

24   HUSBAND'S SEMI-RETIRED FROM THE AEROSPACE INDUSTRY AND

25   CURRENTLY ON SUBSTITUTE TEACHING IN FOUR DISTRICTS.

1          I HAVE ONE DAUGHTER WHO IS 38.  SHE HAS HER

2     DOCTORATE IN EDUCATION.  SHE IS AN ADJUNCT PROFESSOR AT CAL

3     BAPTIST AND TEACHES 5TH GRADE IN RIVERSIDE.

4          MY HUSBAND HAS A 32-YEAR-OLD DAUGHTER WHO IS A HAIR

5     DRESSER, AND A 36-YEAR-OLD DAUGHTER WHO IS AN RN.

6          THERE ARE NO OTHER ADULTS LIVING IN OUR HOUSEHOLD.

7          I HAVE BEEN CALLED FOR JURY DUTY, BUT I NEVER

8     SERVED.

9          I DON'T SUBSCRIBE TO ANY NEWSPAPERS.  I READ THE

10    L.A. TIMES AND THE PRESS-ENTERPRISE EVERY DAY.  MAGAZINES,

11    GARDENING MAGAZINES AND CRAFT MAGAZINES.

12         WE DO HAVE A COMPUTER IN THE HOUSE.  WE HAVE

13    INTERNET ACCESS.  I AM FAMILIAR WITH E-MAIL.  I USE THAT AND

14    MY HUSBAND USES THAT.  HE USES IT TO PAY THE BILLS.  WE

15    OCCASIONALLY USE EXCEL AND ACCESS PROGRAMS.  AND I SHOP A

16    LITTLE ONLINE AND DO A LITTLE RESEARCH, THINGS LIKE THAT.

17         THE COURT:  THANK YOU.

18         MS. EDWARDS?

19         PROSPECTIVE JUROR EDWARDS:  MY NAME IS FRANCES

20    EDWARDS.  I AM A HOMEMAKER.  I HAVE A HIGH SCHOOL EDUCATION.

21         I LIVE IN RIVERSIDE.  I HAVE BEEN MARRIED FOR 52

22    YEARS.  MY HUSBAND'S RETIRED FROM THE MILITARY.  WE HAVE FOUR

23    CHILDREN.  THE OLDEST GIRL IS 48.  SHE'S IN SPECIAL

24    EDUCATION.  THE SECOND GIRL IS 43.  SHE IS DISABLED.  AND THE

25    YOUNGEST DAUGHTER IS 40, AND SHE WORKS FOR THE COUNTY OF

```
 1    RIVERSIDE IN ADOPTION.  THE SON WORKS FOR AEROSPACE, IN
 2    BURBANK.  HE IS 54.  AND WE HAVE NO CHILDREN LIVING IN THE
 3    HOUSEHOLD WITH US.
 4              I HAVE HAD PRIOR JURY DUTY IN THE '90S.  I DON'T
 5    REMEMBER EXACTLY THE YEAR.  IT WAS A THEFT CASE.
 6              AND I TAKE THE PRESS-ENTERPRISE,
 7    ARCHITECTURAL DIGEST MAGAZINE, TRADITIONAL HOME MAGAZINE,
 8    AND EBONY MAGAZINE.
 9              THE COURT:  ALL RIGHT.  ON THE JURY THAT YOU SERVED
10    ON, MS. EDWARDS, DID THE JURY REACH A VERDICT?
11              PROSPECTIVE JUROR EDWARDS:  YES.
12              THE COURT:  AND WERE YOU THE FOREPERSON OF THE
13    JURY?
14              PROSPECTIVE JUROR EDWARDS:  NO.
15              THE COURT:  IS THAT THE ONLY TIME YOU SERVED ON A
16    JURY?
17              PROSPECTIVE JUROR EDWARDS:  YES.
18              THE COURT:  YOU SAID YOUR HUSBAND WAS IN THE -- HOW
19    MANY YEARS DID YOUR HUSBAND SERVE IN THE MILITARY?
20              PROSPECTIVE JUROR EDWARDS:  TWENTY.
21              THE COURT:  AND THEN AFTER HE WAS NOT ON ACTIVE
22    DUTY, DID HE STILL WORK FOR THE MILITARY?
23              PROSPECTIVE JUROR EDWARDS:  NO.  HE WORKED FOR
24    RIVERSIDE UNIFIED SCHOOL DISTRICT.
25              THE COURT:  WHAT DID HE DO FOR THE SCHOOL DISTRICT?
```

```
 1              PROSPECTIVE JUROR EDWARDS:  HE WAS THE NIGHT
 2    LEADMAN.
 3              THE COURT:  LET'S SEE --
 4              PROSPECTIVE JUROR EDWARDS:  WE DON'T HAVE A
 5    COMPUTER.
 6              THE COURT:  OKAY.  THANK YOU VERY MUCH.
 7              NOW, BEFORE I GET TO THE BACK ROW, LET'S SEE.
 8    MS. GRISHAM, DO YOU WANT TO MOVE TO A MORE COMFORTABLE CHAIR?
 9              PROSPECTIVE JUROR GRISHAM:  I'M SORRY?
10              THE COURT:  YOU ARE HAVING A BACK PROBLEM?
11              PROSPECTIVE JUROR GRISHAM:  I AM.  I BROKE MY BACK
12    IN '99, SO SITTING MORE THAN FOUR HOURS IS A PAIN IN THE --
13              THE COURT:  IF WE MOVE YOU TO ONE OF THOSE CHAIRS
14    RIGHT THERE --
15              CAN YOU MOVE THAT CHAIR TO THE END OF THE ROW?
16              THANK YOU, DEPUTY JOHNSON.
17              WHY DON'T YOU TAKE A SEAT AT THE END OF THE ROW IN
18    THIS CHAIR.  THAT MIGHT BE MORE COMFORTABLE FOR YOU.
19              PROSPECTIVE JUROR EDWARDS:  THANK YOU.
20              THE COURT:  MR. DAVIS?
21              PROSPECTIVE JUROR DAVIS:  MY NAME IS JAMES DAVIS.
22    RECENTLY RETIRED FROM THE CITY OF RIVERSIDE AFTER 35 YEARS AS
23    AN INSPECTOR.
24              I LIVE IN THE CITY OF RIVERSIDE.  I AM MARRIED.  I
25    HAVE -- MY WIFE IS AN APPRENTICE TECHNICIAN FOR LOWES.  I
```

1   HAVE THREE ADULT CHILDREN.  THE OLDEST IS 30.  THE SECOND IS

2   28.  AND THE YOUNGEST, WHO STILL LIVES WITH US, IS 25.  THE

3   OLDEST, MY DAUGHTER, IS A HOMEMAKER.  MY MIDDLE SON IS A

4   PAINTER FOR A MEDICAL MANUFACTURER.

5            I HAVE BEEN ON FOUR JURIES, ONE CRIMINAL, THREE

6   CIVIL.  WE REACHED A VERDICT IN THE CRIMINAL.  WE REACHED

7   VERDICTS IN TWO OF THE CIVIL.  ONE, A SETTLEMENT PRIOR TO A

8   VERDICT.

9            AND WE SUBSCRIBE TO THE PRESS-ENTERPRISE.  THAT'S

10  THE ONLY SUBSCRIPTION WE HAVE.

11            AND WE DO NOT CURRENTLY HAVE A COMPUTER AROUND THE

12  HOUSE.

13            THE COURT:  HAVE YOU HAD ONE BEFORE?

14            PROSPECTIVE JUROR DAVIS:  WHEN MY TWO OLDEST

15  CHILDREN WERE AT HOME, WE HAD A COMPUTER.

16            THE COURT:  DID YOU EVER USE THE COMPUTER?

17            PROSPECTIVE JUROR DAVIS:  ONLY IN WORK.

18            THE COURT:  SO, YOU STILL USE THE COMPUTER AT WORK?

19            PROSPECTIVE JUROR DAVIS:  NO, I DO NOT.

20            THE COURT:  NOW, THE CRIMINAL CASE THAT YOU SERVED

21  AS A JUROR ON, WHAT WAS THAT CASE ABOUT?

22            PROSPECTIVE JUROR DAVIS:  IT WAS A MURDER CASE.

23            THE COURT:  A MURDER CASE?  AND THE TWO CIVIL CASES

24  WHERE YOU DELIBERATED, WHAT WERE THOSE TWO CASES ABOUT?

25            PROSPECTIVE JUROR DAVIS:  THE ONLY ONE I REMEMBER

```
 1    WAS A SUIT AGAINST A VET WHO HAD INJURED AN ANIMAL THAT WAS

 2    IN HIS CARE.

 3                THE COURT:  AND YOU DON'T RECALL THE OTHER ONE?

 4                PROSPECTIVE JUROR DAVIS:  NO.

 5                THE COURT:  ON ANY OF THE CASES, WERE YOU THE

 6    FOREMAN OF THE JURY?

 7                PROSPECTIVE JUROR DAVIS:  NO, I WAS NOT.

 8                THE COURT:  MR. ENGLUTT?

 9                PROSPECTIVE JUROR ENGLUTT:  MY NAME IS VIRGEL

10    ENGLUTT.  I'M A RETIRED MEAT CUTTER.  I STILL WORK A COUPLE

11    OF DAYS A WEEK.

12                I LIVE IN TEMECULA.  MY WIFE IS RETIRED FROM

13    MACY'S, AND SHE GOT A PART-TIME JOB.  SHE WORKS A COMPUTER

14    SYSTEM.  I HAVE ONE CHILD OF MY OWN AND TWO STEPCHILDREN.  MY

15    CHILD IS 43 AND IS A LONG-HAUL TRUCK DRIVER.  AND THE

16    STEPDAUGHTER IS IN CANADA.  AND THE STEPSON IS ELSEWHERE.

17    AND THERE IS NO OTHER ADULTS LIVING IN THE HOUSE.

18                I WAS A JUROR ON A DUI IN VAN NUYS, AND IT WAS A

19    MISTRIAL THERE.

20                THE NEWSPAPER -- I GET THE TIMES AND THE EXPRESS,

21    OR DAILY NEWSPAPER.

22                AND I HAVE A COMPUTER AT HOME, AND I DON'T KNOW HOW

23    TO TURN IT ON.  MY WIFE USES IT.  I HAVE GOLF CLUBS THAT I

24    USE.

25                THE COURT:  ALL RIGHT.  LET'S SEE.  YOU HAVE A
```

1    STEPSON THAT YOU SAID IS ELSEWHERE.  DOES THAT MEAN YOU ARE

2    NOT IN CONTACT WITH HIM?

3             PROSPECTIVE JUROR ENGLUTT:  HE IS IN PLEASANTON.

4             THE COURT:  OH, PLEASANTON?

5             PROSPECTIVE JUROR ENGLUTT:  YES, PLEASANTON,

6    COALINGA.

7             THE COURT:  DO YOU KNOW WHAT HE DOES FOR A LIVING?

8             PROSPECTIVE JUROR ENGLUTT:  HE IS A MACHINIST.

9             THE COURT:  AND YOUR SON IS THE LONG-HAUL TRUCK

10   DRIVER?

11            PROSPECTIVE JUROR ENGLUTT:  YES.

12            THE COURT:  AND WHAT DID YOU SAY YOUR STEP-

13   DAUGHTER'S OCCUPATION IS?

14            PROSPECTIVE JUROR ENGLUTT:  SHE WORKS AT SOME STORE

15   IN VANCOUVER, B.C.

16            THE COURT:  OH, SHE IS IN CANADA.  ALL RIGHT.

17   THANK YOU VERY MUCH.

18            MS. GRISHAM?

19            PROSPECTIVE JUROR GRISHAM:  I AM CORINA GRISHAM.  I

20   AM A PROPERTY MANAGER ACCOUNTANT.

21            I HAVE TWO YEARS OF COLLEGE.

22            I LIVE IN RIVERSIDE.  I AM MARRIED.  MY HUSBAND'S

23   AN ELECTRICIAN.  I HAVE TWO CHILDREN.  MY DAUGHTER IS 21.  MY

24   SON IS 20.  MY SON IS AN APPRENTICE ELECTRICIAN, AND MY

25   DAUGHTER IS WAITRESS, GOES TO SCHOOL.

1              NO OTHER ADULTS LIVE IN THE HOUSE.

2              AND THERE IS NO OTHER PRIOR JURY EXPERIENCE.

3              AND I DON'T READ NEWSPAPERS OR MAGAZINES OR WATCH

4  TV.

5              I OWN A COMPUTER, AND I MAY GO ON IT FOR MAPQUEST.

6  MY DAUGHTER USES IT FOR HOMEWORK, BUT THAT'S IT.

7              THE COURT:  THANK YOU VERY MUCH.

8              ACTUALLY, LET ME GO BACK TO MR. ENGLUTT FOR A

9  MOMENT.

10             I MAY HAVE FORGOTTEN TO ASK YOU.  WHEN YOU WERE A

11  JUROR ON THAT DUI CASE, DID THE JURY REACH A VERDICT?

12             PROSPECTIVE JUROR ENGLUTT:  NO.  IT WAS A HUNG

13  JURY.

14             THE COURT:  OH, YOU SAID IT WAS AN HUNG JURY.

15             PROSPECTIVE JUROR ENGLUTT:  MISTRIAL OR WHATEVER;

16  NO VERDICT.

17             THE COURT:  WAS THAT A FRUSTRATING EXPERIENCE,

18  BEING ON A JURY THAT DIDN'T REACH A VERDICT?

19             PROSPECTIVE JUROR ENGLUTT:  YES.

20             THE COURT:  ANYTHING ABOUT THAT THAT MAKES YOU LESS

21  WILLING TO SERVE AGAIN AS A JUROR?

22             PROSPECTIVE JUROR ENGLUTT:  NO, NOT REALLY.

23             THE COURT:  AND WERE YOU THE FOREPERSON OF THAT

24  JURY?

25             PROSPECTIVE JUROR ENGLUTT:  NO.

```
 1              THE COURT:  THANK YOU, SIR.

 2              MS. SATO?

 3              PROSPECTIVE JUROR SATO:  MY NAME IS TRACY SATO.  I

 4   AM AN URBAN AND REGIONAL PLANNER.

 5              I HAVE A MASTER'S DEGREE IN PLANNING.

 6              I LIVE IN THE COUNTY AREA OF RIVERSIDE, CLOSE TO

 7   THE CITY OF RIVERSIDE.  I AM MARRIED.  AND MY HUSBAND'S A

 8   NETWORK SYSTEMS ADMINISTRATOR.  WE HAVE ONE CHILD.  SHE IS

 9   THREE YEARS OLD.  MY MOTHER-IN-LAW LIVES WITH US DURING THE

10   WEEK AND TAKES CARE OF MY DAUGHTER.  AND MY BROTHER-IN-LAW IS

11   LIVING WITH US RIGHT NOW WHILE HE IS BETWEEN JOBS.  HE IS

12   ALSO -- HE IS A GAME PROGRAMMER, COMPUTER GAMES.

13              I HAVE BEEN CALLED FOR JURY SERVICE BUT NEVER SAT

14   ON A JURY.

15              WE SUBSCRIBE TO THE L.A. TIMES, SMITHSONIAN,

16   SEVERAL CHILDREN'S MAGAZINES AND CRAFT MAGAZINES.  AND WE

17   ALSO READ SEVERAL NEWSPAPERS AND OTHER PUBLICATIONS ONLINE.

18              WE DO HAVE NUMEROUS COMPUTERS IN THE HOUSE.  I

19   PERSONALLY USE IT FOR RESEARCH AND SOMETIMES ONLINE GAMING,

20   E-MAIL, DIGITAL PHOTOGRAPHY THAT I SHARE WITH MY FAMILY, AND

21   MAPS, AND THINGS LIKE THAT.

22              THE COURT:  ALL RIGHT.  YOUR MOTHER-IN-LAW, SHE

23   LIVES WITH YOU DURING THE WEEK, YOU SAID?

24              PROSPECTIVE JUROR SATO:  YES.

25              THE COURT:  WHAT WAS HER OCCUPATION BEFORE SHE
```

```
 1   RETIRED?

 2              PROSPECTIVE JUROR SATO:  SHE WAS A HOUSEWIFE AND

 3   ALSO A WEB PROGRAMMER.  SHE DESIGNED WEB SITES.

 4              THE COURT:  OKAY.  THANK YOU VERY MUCH.

 5              MR. ATWATER?

 6              PROSPECTIVE JUROR ATWATER:  YES.  MY NAME IS BRIAN

 7   ATWATER.  I WORK FOR BANK OF AMERICA.

 8              I HAVE A HIGH SCHOOL EDUCATION.

 9              I LIVE IN THE CITY OF VICTORVILLE.  I AM MARRIED.

10   WE HAVE THREE CHILDREN.  MY WIFE STAYS AT HOME.

11              NO OTHER ADULTS LIVE IN OUR HOUSEHOLD.

12              I SERVED ON ONE OTHER CASE.  IT WAS A BATTERY; CAME

13   TO A VERDICT.

14              WE HAVE NO NEWSPAPER OR MAGAZINES THAT WE SUBSCRIBE

15   TO.

16              THE COURT:  AND YOU HAVE A COMPUTER AT THE HOUSE?

17              PROSPECTIVE JUROR ATWATER:  YES, WE DO.

18              THE COURT:  INTERNET ACCESS?

19              PROSPECTIVE JUROR ATWATER:  YES.

20              THE COURT:  AND WHAT DO YOU USE THE COMPUTER FOR?

21              PROSPECTIVE JUROR ATWATER:  JUST BROWSING THE WEB,

22   BUYING AND SELLING ON E-BAY SOMETIMES.

23              THE COURT:  ALL RIGHT.  AND WERE YOU THE FOREMAN OF

24   THE JURY THAT YOU SERVED ON?

25              PROSPECTIVE JUROR ATWATER:  NO, I WAS NOT.
```

1                    THE COURT:  THANK YOU, SIR.

2                    MR. ROBINSON?

3                    PROSPECTIVE JUROR ROBINSON:  MY NAME IS MELVIN

4     ROBINSON.  I AM AN ELECTRICIAN FOR CALTRANS.  I REPAIR

5     TRAFFIC SIGNALS AND RAMP METERS.

6                    HIGH SCHOOL EDUCATION, TWO YEARS OF COLLEGE; NO

7     DEGREE.

8                    I LIVE IN RIALTO.  I AM MARRIED.  MY WIFE IS A

9     FULL-TIME HOUSEMAKER.  I HAVE THREE CHILDREN.  THE OLDEST

10    GIRL IS 36.  SHE TEACHES SCHOOL IN FONTANA.  MY SON IS AN

11    ELECTRICIAN AT FED EX.  HE IS 34.  MY NEXT DAUGHTER IS 32,

12    AND SHE TEACHES SCHOOL IN ADELANTO.

13                   THERE ARE NO OTHER ADULTS IN THE HOUSEHOLD.

14                   I DID SIT ON A JURY ABOUT 15 YEARS AGO FOR DRUNK

15    DRIVING, AND WE DID REACH A VERDICT.

16                   THE COURT:  AND WERE YOU THE FOREMAN OF THE JURY?

17                   PROSPECTIVE JUROR ROBINSON:  I WAS NOT THE

18    FOREMAN.

19                   I SUBSCRIBE TO THE L.A. TIMES AND

20    SAN BERNARDINO SUN, AND U.S. NEWS, AND WORLD REPORT.

21                   WE DO HAVE A COMPUTER.  MOSTLY, IT'S USED FOR

22    ONLINE BANKING, A LITTLE BIT OF E-MAIL.  AND MOST OF THE TIME

23    I PLAY BLACKJACK.

24                   THE COURT:  THANK YOU VERY MUCH.

25                   MS. PLUNK?

1          PROSPECTIVE JUROR PLUNK:  MY NAME IS SANDRA PLUNK.

2    I AM AN ADMINISTRATOR, CURRENTLY ACTING AS CEO AT MORONGO

3    BAND OF MISSION INDIANS.

4          THE COURT:  DID YOU SAY ACTING CEO?

5          PROSPECTIVE JUROR PLUNK:  YES.

6          I LIVE IN SAN BERNARDINO.  I'M NOT MARRIED, AND I

7    DON'T HAVE ANY CHILDREN.  AND I DON'T HAVE ANY OTHER ADULTS

8    LIVING IN MY HOUSEHOLD.

9          I HAVE BEEN CALLED FOR JURY DUTY BUT HAVE NEVER

10   BEEN SELECTED.

11         AND I SUBSCRIBE TO A LOT OF MAGAZINES:  THE SUN,

12   AND PRESS-ENTERPRISE, NEWSWEEK, GOURMET, SPIN.  THAT'S THE

13   ONLY THING I HAVE THE CAPACITY TO READ IS MAGAZINES, ANYMORE.

14         AND I HAVE A COUPLE COMPUTERS AT MY HOUSE USED FOR

15   INTERNET AND PURCHASING, SOME RESEARCH, AND WATCHING TV SHOWS

16   ONLINE.

17         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

18         CAN I SEE COUNSEL AT THE SIDEBAR, PLEASE.

19         LADIES AND GENTLEMEN, WHENEVER I -- ON RARE

20   OCCASIONS, I HOPE, WHEN I SAY THAT, THE CLERK IS GOING TO PUT

21   ON SORT OF A BUFFER NOISE.  IT MEANS YOU CAN STAND UP AND

22   STRETCH, SHOULD YOU FEEL THE URGE TO DO SO.

23         I'M SORRY.  I MISSED MS. JONES.  I'M SO SORRY.

24         PROSPECTIVE JUROR JONES:  IT'S ALL --

25         THE COURT:  I MISSED YOU BACK THERE, QUIETLY

1    SITTING IN THE CORNER.

2              PROSPECTIVE JUROR JONES:  MY NAME IS GLAYNE JONES.

3    WE HAVE A BUSINESS.

4              I LIVE IN RIALTO.  WE HAVE A CAT AND A TORTOISE,

5    AND THAT'S THE ONLY PEOPLE THAT LIVE IN MY HOUSE.

6              THE COURT:  I MISSED YOUR LAST ANSWER BEFORE THE

7    ONLY PEOPLE THAT LIVE IN YOUR HOUSE.

8              PROSPECTIVE JUROR JONES:  MY HUSBAND AND ME AND A

9    CAT AND A TORTOISE.

10             THE COURT:  A CAT AND A TORTOISE.  ALL RIGHT.  THAT

11   WAS IMPORTANT.

12             PROSPECTIVE JUROR JONES:  YES, VERY.

13             I HAVE BEEN CALLED FOR JURY DUTY, BUT I HAVE NEVER

14   SERVED.

15             WE HAVE THREE COMPUTERS.  ONE IS CONNECTED.  I

16   DON'T USE E-MAIL.  THE COMPUTER IS USED -- I TRADE STOCK.

17             THE COURT:  YOU DO WHAT?

18             PROSPECTIVE JUROR JONES:  I TRADE STOCK.

19             THE COURT:  OH, YOU TRADE STOCK.  SO THAT'S MOSTLY

20   WHAT YOU USE IT FOR?

21             PROSPECTIVE JUROR JONES:  YES.

22             THE COURT:  AND WHAT'S YOUR FAMILY BUSINESS THAT

23   YOU WORK IN?

24             PROSPECTIVE JUROR JONES:  WE SUPPLY HARDWARE IN THE

25   LUMBER BUSINESS.

1          THE COURT:  AND YOU AND YOUR HUSBAND ARE BOTH

2     WORKING IN THAT LUMBER BUSINESS?

3          PROSPECTIVE JUROR JONES:  YES.

4          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

5          NOW, COUNSEL, YOU MAY APPROACH.

6          (ON-THE-RECORD DISCUSSION AT SIDEBAR.)

7          MR. AKROTIRIANAKIS:  YOUR HONOR, JUST SO I DON'T

8     FORGET, I BELIEVE IN THE LAST TRIAL THE COURT ASKED FOR THE

9     DEFENDANT'S WAIVER OF PRESENCE AT SIDEBAR.  I DON'T RECALL

10    FOR THIS TRIAL IF IT IS NECESSARY.

11         THE COURT:  I THINK THAT WAIVER IS STILL IN EFFECT.

12    DOES YOUR CLIENT WAIVE HIS PRESENCE AT THE SIDEBAR?

13         MR. AARON:  I HAVEN'T ASKED HIM SINCE THE LAST

14    TRIAL.

15         THE COURT:  WELL, WOULD YOU LIKE TO GO ASK HIM

16    RIGHT NOW.

17         MR. AARON:  THANK YOU.

18         THE COURT:  OFF THE RECORD.

19              (BRIEF PAUSE)

20         (ON-THE-RECORD DISCUSSION AT SIDEBAR.)

21         MR. AARON:  YES.

22         THE COURT:  THANK YOU VERY MUCH.

23         THERE WAS AN OUTSTANDING CHALLENGE FOR CAUSE AS TO

24    MS. JONES, AND I'M GOING TO -- I HAVE GIVEN IT A LOT OF

25    THOUGHT, AND I'M GOING TO GRANT THE CHALLENGE FOR CAUSE.

1  ALTHOUGH, I THINK IT IS A VERY CLOSE CALL.  AND I THINK SHE

2  IS A VERY CONSCIENTIOUS JUROR.  SHE DIDN'T SAY ANYTHING ELSE

3  IN ANSWER TO ANY OF THE QUESTIONS, NOT THAT I REALLY HAVE

4  ANYTHING ELSE TO BASE IT ON.  BUT AS I INDICATED EARLIER, THE

5  PORTION OF HER ANSWER THAT I -- HER ANSWERS THAT I THINK ARE

6  A VALID BASIS FOR CHALLENGE FOR CAUSE HAVE TO DO WITH HER

7  CERTAIN ACTIONS TO WHAT I THINK WE EXPECT THE TESTIMONY WILL

8  BE.  SO, I THINK SHE IS EXTREMELY CONSCIENTIOUS, CANDID.

9           I'M GOING TO GRANT THE CHALLENGE FOR CAUSE AS TO

10  MS. JONES.

11           ARE THERE ANY OTHER CHALLENGES FOR CAUSE AT THIS

12  TIME?

13           MR. AARON:  THERE ARE, YOUR HONOR, IF I CAN GO

14  THROUGH THOSE.

15           WE CHALLENGE JUROR NO. 1, GREEN.  WE CHALLENGE HER,

16  IN PART, ON THE FACT THAT SHE WAS INVOLVED, HOWEVER

17  TANGENTIALLY, IN A PRIOR CASE ALMOST EXACTLY LIKE THIS, AT

18  LEAST WHERE THE TUTOR WAS CHARGED WITH FONDLING.  THERE WAS A

19  CRIMINAL PROSECUTION, AND THERE WAS A CONVICTION IN THAT

20  CASE.

21           SHOULD I JUST GO THROUGH ALL OF THEM, OR DO YOU

22  WANT TO --

23           THE COURT:  WELL, ALL RIGHT.  WHAT'S THE NEXT ONE?

24           MR. AARON:  NEXT ONE IS THOMAS GRAY, JUROR NO. 8.

25  THAT WAS ALREADY PREVIOUSLY MADE.

1           AND THE ONLY OTHER ADDITIONAL FACT THAT I WOULD

2    LIKE THE COURT TO CONSIDER IS THAT HE IS A MEMBER OF, I

3    THINK, A COUPLE OF POLICE BENEVOLENT ASSOCIATIONS.

4           THE COURT:  I WOULD DISAGREE AS TO MR. GRAY.  I

5    DON'T THINK THAT THOSE COULD BE DESCRIBED AS POLICE

6    BENEVOLENT ASSOCIATIONS.  WHEN I ASKED HIM ABOUT THEM, THEY

7    ARE MORE SORT OF PROFESSIONAL GROUPS THAT ARE -- HE DOESN'T

8    DONATE MONEY.  IT DOESN'T SOUND LIKE THEY SOLICIT MONEY.

9    THEY ARE MORE PROFESSIONAL ORGANIZATIONS ABOUT POLICE

10   COMMUNICATIONS INDUSTRY.

11          MR. AARON:  HE DID SAY HE DIDN'T DONATE MONEY, AND

12   THAT'S JUST A BAD NOTE ON MY PART.  I THOUGHT THEY WERE MORE

13   IN THE WAY OF POLICE ORGANIZATIONS.  I DON'T THINK THEY ARE

14   TO BENEFIT THE MEMBERSHIP, BUT I THINK PEOPLE INVOLVED IN THE

15   LAW ENFORCEMENT COMMUNITY IN THIS AREA, COMMUNICATIONS AREA

16   ARE --

17          THE COURT:  I'M GOING TO DENY THE CHALLENGE FOR

18   CAUSE AS TO MR. GRAY.

19          MR. AARON:  I WOULD CHALLENGE JUROR NO. 11, BONNIE

20   BRINKERHOFF.

21          THE COURT:  ALL RIGHT.

22          MR. AARON:  IN FACT, BECAUSE HER HUSBAND'S THE

23   ASSISTANT SHERIFF.  I BELIEVE HIS NAME IS NOT BRINKERHOFF.  I

24   BELIEVE HE HAS A DIFFERENT LAST NAME.  HE WAS ASSISTANT

25   SHERIFF IN SAN BERNARDINO FOR A NUMBER OF YEARS.  SHE IS A

1    MEMBER OF A PEACE OFFICER ORGANIZATION, SO I WOULD CHALLENGE.

2          THE COURT:  DO YOU HAVE ANYTHING ELSE FOR YOUR

3    CHALLENGE TO MS. BRINKERHOFF?

4          MR. AARON:  NO.

5          THE COURT:  I'M GOING TO DENY THE CHALLENGE FOR

6    CAUSE AS TO MS. BRINKERHOFF.

7          WHEN WE SPOKE TO HER OUTSIDE THE PRESENCE OF THE

8    OTHER JURORS, FOR EXAMPLE, SHE WAS VERY ARTICULATE AND

9    CONSIDERED ANSWERS ABOUT HER ABILITY TO BE FAIR AND IMPARTIAL

10   TO BOTH SIDES IN THIS CASE.

11         GO AHEAD.

12         MR. AARON:  WE CHALLENGE JUROR NO. 17, JONI

13   CHILDERS.  AND I WOULD RENEW THAT CHALLENGE AND SUBMIT.

14         THE COURT:  THE CHALLENGE IS DENIED AS TO

15   MS. CHILDERS.

16         MR. AARON:  I THOUGHT WE HAD A CHALLENGE FOR CAUSE.

17   IF SO, WE WOULD RENEW IT.  IF NOT, MAKE IT FOR THE FIRST TIME

18   AS TO JUROR NO. 20, SALLY BONDY, WHO IS THE SECRETARY FOR OUR

19   CORPORATE ATTORNEY WHO HAS DONE WORK ON OUR CASE.

20         THE COURT:  FOR YOUR LAW FIRM?

21         MR. AARON:  RIGHT.

22         THE COURT:  BUT NOT ON THIS CASE.

23         MR. AARON:  I DON'T KNOW.  I'M NOT SURE.  I'M NOT

24   SURE IF I HAVE DONE ANY CJA BILLINGS.  I DON'T KNOW.  I DON'T

25   THINK.  SPECIFICALLY, MR. WALLEN DOES WORK ON SPECIFIC CASES.

1    I THINK HE JUST DOES WORK, CORPORATE TAXES, AND THAT SORT OF

2    THING.  BUT SHE IS AFFILIATED WITH A LAWYER, OUR FIRM'S

3    LAWYER, AND I AM A MEMBER OF THE FIRM.

4             THEN, YEAH, I HAD A CHALLENGE FOR HER.

5             THE COURT:  I THINK YOU DID MAKE A CHALLENGE FOR

6    HER EARLIER ON THAT BASIS.

7             MR. AARON:  RIGHT.

8             THE COURT:  DOES THE GOVERNMENT WISH TO BE HEARD ON

9    MS. BONDY?

10            MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT OPPOSES.

11   WE BELIEVE HER ANSWERS INDICATED CLEARLY, WITHOUT

12   EQUIVOCATION, ANY POTENTIAL BIAS DIDN'T EXIST.  IF ANYTHING,

13   THE BIAS WOULD BE IN FAVOR OF THE CLIENT OF THE MAN THAT SHE

14   IS THE SECRETARY TO.  BUT THE GOVERNMENT HAS NO CONCERNS

15   ABOUT ANY BIAS BASED ON HER ANSWERS.

16            AS YOUR HONOR IS AWARE, SOME PEOPLE EQUIVOCATE.

17   SHE DIDN'T AT ALL IN ANSWERS.  THERE IS NO DIRECT FINANCIAL

18   RELATIONSHIP THAT'S A BASE FOR A CAUSE CHALLENGE.

19            MR. AARON:  YOUR HONOR, THE CHALLENGE WOULD BE IN

20   OUR FAVOR.  BUT I THINK ETHICALLY I SHOULD MAKE IT.  I DON'T

21   THINK I SHOULD ALLOW A JUROR THAT I KNOW OUR FIRM HAS A

22   FINANCIAL RELATIONSHIP, OR WITH HER EMPLOYER, TO SIT ON THE

23   CASE.

24            THE COURT:  ALL RIGHT.  I THINK THAT THE FINANCIAL

25   RELATIONSHIP IS SO ATTENUATED IN THIS CASE I DON'T THINK

1    THERE IS A CONFLICT.  AND BASED ON MY QUESTIONS WITH HER,

2    AFTER YOU BROUGHT IT UP, MR. AARON, I AM SATISFIED THERE IS

3    NOT A CONFLICT.

4         SO I'M GOING TO DENY THE CHALLENGE AS TO

5    MS. BONDY.

6         MR. AARON:  I THINK I HAD MADE IT PREVIOUSLY, AND I

7    DON'T HAVE ANY ADDITIONAL NOTES, AND I WOULD RENEW IT, IS

8    JAMES DAVIS, NO. 25.  I BELIEVE I MADE A CHALLENGE BECAUSE OF

9    HIS RESPONSES IN THE INDIVIDUAL QUESTIONING.

10        THE COURT:  LET ME FIND MY NOTES.  YOU'RE CORRECT,

11   MR. AARON.  YOU DID MAKE THAT CHALLENGE EARLIER.  THIS IS A

12   JUROR WHO DID READ SOME ARTICLE HE THINKS -- WELL, FIRST, HE

13   SAID HE THOUGHT HE READ AN ARTICLE ABOUT THIS, AND THEN IT

14   TURNED OUT IT MIGHT NOT HAVE BEEN ABOUT THIS CASE.  HE DIDN'T

15   RECALL ANY DETAILS.

16        HE STATED THAT IT WAS MORE DIFFICULT TO HOLD ON TO

17   THE PRESUMPTION OF INNOCENCE WITH THESE KINDS OF CHARGES,

18   SAID THAT SOMETHING MUST HAVE HAPPENED FOR THE CHARGES TO

19   HAVE BEEN BROUGHT.  BUT THEN SAID THAT HE WOULD FOLLOW THE

20   LAW AS THE COURT INSTRUCTED HIM ON THE PRESUMPTION OF

21   INNOCENCE AND THE BURDEN OF PROOF.

22        DID YOU WISH TO ARGUE IT ANY FURTHER?

23        MR. AARON:  NOTHING FURTHER.

24        THE COURT:  NO, I'M GOING TO DENY THE CHALLENGE FOR

25   CAUSE.  THERE WAS NOTHING THAT HE SAID FURTHER THAT I THINK

1    SUPPORTS THE CHALLENGE FOR CAUSE AT THIS POINT.

2          I'M GOING TO LET COUNSEL INQUIRE VERY BRIEFLY, BUT

3    I REALLY WOULD LIKE TO FINISH THIS AFTERNOON.

4          MR. AARON:  I HAVE NO FURTHER CHALLENGES.

5          THE COURT:  DO YOU HAVE ANY QUESTIONS YOU WISH TO

6    INQUIRE OF THE JURORS?

7          MR. AARON:  WELL, WE DID COVER THE LAW FIRM.

8          THE COURT:  I WILL LET YOU INQUIRE.

9          MR. AARON:  I HAD QUESTIONS FOR JUROR NO. 1, ON THE

10   TUTOR ISSUE.

11         THE COURT:  I'M SORRY.  I DON'T THINK I RULED ON

12   THAT CHALLENGE.  WELL, DO YOU WISH TO BE HEARD?

13         I'M INCLINED TO GRANT THE CHALLENGE AS TO JUROR

14   NO. 1.  THAT'S MS. GREEN.

15         MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT'S

16   UNDERSTANDING OF WHAT SHE STATED ON THE RECORD WAS THAT IT

17   WAS A TUTOR OF HER SONS; THAT THERE WAS AN INVESTIGATION OF A

18   TUTOR, AND THEY TOOK THE COMPUTER, HER COMPUTER, FOR THAT

19   INVESTIGATION.

20         IT WASN'T CLEAR TO THE GOVERNMENT THAT THERE WAS

21   ANY ALLEGATION THAT THE TUTOR HAD ANY INAPPROPRIATE CONDUCT

22   WITH HER SONS.  SHE SAID HE WAS ULTIMATELY CHARGED.  HE WAS

23   CHARGED, HE FLED, AND WAS PROSECUTED.  I WOULD FURTHER

24   INQUIRE AS TO THE NATURE --

25         THE COURT:  SHE SAID THERE WAS AN ALLEGATION THAT

1    HE MIGHT HAVE.  BUT THAT WASN'T THE ISSUE.  THE ISSUE IS THAT

2    HE MIGHT HAVE USED HER COMPUTER.

3            MR. AARON:  FOR CHILD PORNOGRAPHY.

4            MR. MICHAEL:  AND MY UNDERSTANDING -- I DIDN'T

5    HAVE A SENSE -- THE GOVERNMENT DIDN'T HAVE A SENSE THAT SHE

6    WAS INVOLVED IN THE INVESTIGATION BEYOND PERCIPIENT WITNESS

7    OF WHO PERHAPS BORROWED HER COMPUTER.  IT DOESN'T SEEM IT

8    TOUCHED UPON HER FAMILY.

9            IF ANYTHING, IF SHE WAS INQUIRED AS TO WHETHER SHE

10   COULD BE FAIR AND IMPARTIAL AS TO OTHER JURORS WHO HAD

11   SIMILAR OR PAST EXPERIENCE.

12           THE COURT:  WITH MS. GREEN, IT IS A COMBINATION OF

13   ALL OF HER RESPONSES TO THE QUESTIONS.  SOMETIMES I FELT SHE

14   DIDN'T UNDERSTAND THE COURT'S QUESTIONS.  AND OTHER TIMES I

15   FELT THAT SHE WAS REALLY NOT VERY FORTHCOMING.

16           WHEN I ASKED HER, FOR EXAMPLE, ABOUT HER

17   EXPERIENCE, AS SHE SAID SHE WAS A SECURITY GUARD AT A PRIVATE

18   PRISON, SHE ONLY WORKED THERE FOR SIX MONTHS.  I REALLY

19   COULDN'T GET AN ARTICULATE RESPONSE FROM HER AS TO WHY SHE

20   LEFT.

21           THERE WERE A NUMBER OF QUESTIONS, WHETHER I DIDN'T

22   KNOW IF SHE UNDERSTOOD MY QUESTION, OR SHE WAS BEING EVASIVE,

23   OR WHAT THE PROBLEM WAS.  OVERALL, I WAS NOT SATISFIED THAT

24   SHE WAS GIVING A COMMITMENT TO THE COURT THAT SHE WOULD

25   FOLLOW THE COURT'S INSTRUCTIONS ON THE LAW.

```
 1              SO I'M GOING TO GRANT THE CHALLENGE FOR CAUSE AS TO

 2    MS. GREEN.

 3              DOES THE GOVERNMENT HAVE ANY CHALLENGES FOR CAUSE?

 4              MR. MICHAEL:  NO, YOUR HONOR.

 5              THE COURT:  ALL RIGHT.  I WILL LET BOTH SIDES

 6    INQUIRE VERY BRIEFLY.

 7              MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR, NO. 1?

 8              THE COURT:  NO. 1 I GRANTED, AND MS. JONES.  AND I

 9    WILL EXCUSE THEM AT THIS TIME.  I'M SORRY.

10              THAT WOULD LEAVE US WITH 29 JURORS.

11              RACHEL -- WE CAN GO OFF THE RECORD FOR THIS,

12    PHYLLIS.

13                   (OFF-THE-RECORD DISCUSSION.)

14         (IN THE PRESENCE OF THE PROSPECTIVE JURORS:)

15              THE COURT:  LADIES AND GENTLEMEN, I'M SORRY THIS

16    HAS BEEN SUCH A LONG DAY.  WHAT I'M TRYING TO DO -- WE ARE

17    ALMOST DONE, I THINK -- IS TO FINISH, I HOPE, I HOPE, THIS

18    AFTERNOON SO THAT THOSE OF YOU WHO WILL NOT BE SERVING ON THE

19    JURY CAN GO HOME AND NOT HAVE TO COME BACK TOMORROW.

20              SO, I APPRECIATE YOUR PATIENCE, BUT I AM MAKING AN

21    ASSUMPTION YOU WOULD RATHER GO A LITTLE LATER TONIGHT; THE

22    MAJORITY OF YOU WHO WON'T BE CALLED BACK WILL BE DONE.

23              FOR THAT MAJORITY OF YOU, I KNOW THAT TOMORROW

24    MORNING I THINK YOU WILL BE PLEASED WITH THE WAY WE DID

25    THINGS.  BUT I APOLOGIZE THAT WE ARE GOING LATE TONIGHT.
```

1            AT THIS TIME, I'M GOING TO THANK AND EXCUSE JUROR

2    NO. 1, MS. GREEN, AND JUROR NO. 2, MS. JONES.  THANK YOU VERY

3    MUCH FOR YOUR SERVICE, AND YOU ARE EXCUSED.  YOU CAN GO

4    DOWNSTAIRS AND TURN IN YOUR BADGE.

5            PROSPECTIVE JUROR COLE:  DID YOU SAY CHARLENE COLE?

6            THE COURT:  NO.  MS. GLAYNE JONES.

7            PROSPECTIVE JUROR JONES:  THANK YOU.  BYE-BYE.

8            THE COURT:  LADIES AND GENTLEMEN, WE HAVE ALREADY

9    ASKED A LOT OF QUESTIONS, SO THE ATTORNEYS IN THE CASE HAVE

10   THE VERY LIMITED OPPORTUNITY TO ASK A FEW FOLLOW-UP

11   QUESTIONS.  I CAN'T REALLY OVERSTRESS HOW LIMITED THAT

12   OPPORTUNITY IS.  SO, DON'T BE SURPRISED -- THEY WON'T BE

13   ASKING EACH OF YOU QUESTIONS, SO DON'T BE SURPRISED AT THAT.

14   BUT THEY DO HAVE THE OBLIGATION, IF THEY FEEL THAT THEY NEED

15   TO, ON BEHALF OF THEIR CLIENTS, TO ASK SOME FOLLOW-UP

16   QUESTIONS, AND NOW IS THEIR OPPORTUNITY TO DO THAT.

17           MR. MICHAEL, OR MR. AKROTIRIANAKIS, YOU MAY

18   PROCEED.

19           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

20           MS. CHILDERS?

21           PROSPECTIVE JUROR CHILDERS:  YES.

22           MR. AKROTIRIANAKIS:  YOU STATED THAT YOU HAD SERVED

23   ON A JURY IN TEXAS SOME YEARS AGO AND YOU COULDN'T REMEMBER

24   THE NATURE OF THAT CASE.  DO YOU RECALL AT ALL WHETHER THERE

25   WAS A VERDICT OR NO VERDICT?

1               PROSPECTIVE JUROR CHILDERS:  WE DID REACH A

2      VERDICT.  IT WAS JUST A ONE-DAY TRIAL.  I THINK IT MAY HAVE

3      BEEN SOMETHING WITH THEFT.

4               MR. AKROTIRIANAKIS:  SOMETHING --

5               PROSPECTIVE JUROR CHLDERS:  THEFT, MAYBE.

6               MR. AKROTIRIANAKIS:  OH, THEFT.  PARDON ME.

7               AND, MR. SHANTELER -- I HOPE I'M PRONOUNCING YOUR

8      NAME CORRECTLY.

9               PROSPECTIVE JUROR SHANTELER:  YES, SIR.

10               MR. AKROTIRIANAKIS:  AND I MAY HAVE JUST MISSED IT,

11     DID YOU ANSWER QUESTIONS ABOUT WHETHER OR NOT YOU USED THE

12     INTERNET IN YOUR HOME?

13               PROSPECTIVE JUROR SHANTELER:  YES.

14               MR. AKROTIRIANAKIS:  YES, YOU HAD ANSWERED THE

15     QUESTIONS?

16               PROSPECTIVE JUROR SHANTELER:  YES.

17               MR. AKROTIRIANAKIS:  THEN, I'M SURE I HAVE IT HERE.

18               THE COURT:  ALL RIGHT.  THANK YOU.

19               MR. AARON?

20               MR. AARON:  THANK YOU.

21               MS. NEVINS?

22               PROSPECTIVE JUROR NEVINS:  YES.

23               MR. AARON:  YOU HAD SAID THAT YOUR MOTHER AND

24     FATHER WERE BOTH DISTRICT ATTORNEY INVESTIGATORS?

25               PROSPECTIVE JUROR NEVINS:  YES.

1          MR. AARON:  AND HOW LONG DID THEY WORK AS DISTRICT

2     ATTORNEY INVESTIGATORS?

3          PROSPECTIVE JUROR NEVINS:  I'M ESTIMATING.  MY DAD

4     WAS A D.A. PROBABLY FOR 18 TO 20 YEARS.

5          MR. AARON:  ALL RIGHT.

6          PROSPECTIVE JUROR NEVINS:  AND MY MOM RETIRED EARLY

7     RETIREMENT.

8          MR. AARON:  IN THAT PERIOD OF TIME, DID THEY TALK

9     NOT ONLY ABOUT THEIR WORK AS INVESTIGATORS BUT ABOUT

10    PRESENTING CASES IN COURT?

11         PROSPECTIVE JUROR NEVINS:  NO, NOT COURT CASES,

12    THAT I REMEMBER.

13         MR. AARON:  OKAY.  THANK YOU.

14         MR. ENGLUTT, YOU HAD MENTIONED THAT IT WAS

15    FRUSTRATING ON THE CASE IN WHICH YOU WERE A JUROR WHICH THERE

16    WAS A MISTRIAL.  DID THIS ACTUALLY GO TO A JURY VOTE?

17         PROSPECTIVE JUROR ENGLUTT:  YES.

18         MR. AARON:  WITHOUT TELLING US THE RESULT OR

19    ANYTHING LIKE THAT, WHAT ABOUT IT WAS FRUSTRATING TO YOU?

20         PROSPECTIVE JUROR ENGLUTT:  TRYING TO CONVICT A GUY

21    ON SOMETHING THAT HE SHOULDN'T HAVE DONE IN THE FIRST PLACE.

22    I MEAN, IF YOU'RE IN HOT WATER, A GUY IS TRYING TO ROB YOU,

23    YOU DRIVE TO THE POLICE STATION AND THEY ARREST YOU FOR DRUNK

24    DRIVING, WHERE ARE YOU SUPPOSED TO GO?  I COULDN'T CONVICT

25    THAT GUY MYSELF.

1          MR. AARON:  I HAVE TO STOP AND THINK ABOUT IT.  I

2    DON'T OFTEN FIND MYSELF IN THAT SITUATION, BUT I UNDERSTAND

3    WHAT YOU'RE SAYING.  THERE WERE EXTENUATING CIRCUMSTANCES?

4          PROSPECTIVE JUROR ENGLUTT:  YES.

5          MR. AARON:  MS. PLUNK, YOU SAID THAT YOU HAD TWO

6    YEARS IN LAW SCHOOL?

7          PROSPECTIVE JUROR PLUNK:  YES.

8          MR. AARON:  AND THEN YOU STOPPED?

9          PROSPECTIVE JUROR PLUNK:  YES.

10         MR. AARON:  ANY PARTICULAR REASON?

11         PROSPECTIVE JUROR PLUNK:  I HAD HELPED -- MY MOTHER

12   WENT TO THE HOSPITAL, AND SHE WAS IN THE HOSPITAL FOR QUITE A

13   WHILE.  AND THEN MY DAD GOT SICK.  BY THAT TIME, I KIND OF

14   LOST MY INTEREST IN GOING BACK.

15         MR. AARON:  THANK YOU.

16         MR. MELENDEZ -- MR. MELENDY, I'M SORRY.  YOU SAID

17   THAT YOU NOW WORK AS A PRIVATE INVESTIGATOR?

18         PROSPECTIVE JUROR MELENDY:  YES, SIR.

19         MR. AARON:  DO YOU DO CRIMINAL DEFENSE WORK OR --

20         PROSPECTIVE JUROR MELENDY:  CRIMINAL DEFENSE.

21         MR. AARON:  IS THIS IN THE RIVERSIDE AREA?

22         PROSPECTIVE JUROR MELENDY:  I GET OVER HERE ONCE IN

23   A WHILE, BUT I DO MANY OF THEM IN THE PALM SPRINGS AREA.

24         MR. AARON:  AND IN THAT CONTEXT, I IMAGINE YOU WORK

25   CLOSELY WITH ATTORNEYS PRESENTING CASES IN COURT?

1              PROSPECTIVE JUROR MELENDY:  DEFENDING CASES.

2              MR. AARON:  ANYTHING ABOUT THAT WORK THAT MIGHT

3    AFFECT YOU HERE?

4              PROSPECTIVE JUROR MELENDY:  NO, SIR.

5              MR. AARON:  MS. CHILDERS, AS A SCHOOL PSYCHOLOGIST

6    YOU'RE -- ARE YOU LICENSED BY THE BOARD OF BEHAVIORAL SCIENCE

7    EXAMINERS?

8              PROSPECTIVE JUROR CHILDERS:  NO.

9              MR. AARON:  YOUR LICENSING BODY, DO THEY REQUIRE

10   CONTINUING EDUCATION?

11             PROSPECTIVE JUROR CHILDERS:  YES.

12             MR. AARON:  AND DOES THAT INCLUDE EDUCATION IN

13   SEXUAL ABUSE OR MOLESTATION?

14             PROSPECTIVE JUROR CHILDERS:  NO.

15             MR. AARON:  HAVE YOU HAD ANY -- OTHER THAN YOUR

16   TRAINING TO QUALIFY FOR YOUR POSITION, HAVE YOU HAD ANY OTHER

17   TRAINING IN THAT AREA?

18             PROSPECTIVE JUROR CHILDERS:  NO.

19             MR. AARON:  THANK YOU.

20             MR. EASTERDAY, YOUR WIFE HAS WORKED AS A PARALEGAL

21   IN FAMILY LAW?

22             PROSPECTIVE JUROR EASTERDAY:  YES.

23             MR. AARON:  HAS SHE EVER WORKED IN ANOTHER BRANCH

24   OF LAW OTHER THAN FAMILY LAW?

25             PROSPECTIVE JUROR EASTERDAY:  NO, SHE HASN'T.

```
 1              MR. AARON:  MS. BRINKERHOFF, YOU MENTIONED THAT YOU
 2   WERE A MEMBER OF SOME INTERNATIONAL FINGERPRINT?
 3              PROSPECTIVE JUROR BRINKERHOFF:  INTERNATIONAL
 4   FOOTPRINT.
 5              MR. AARON:  FOOTPRINT, I'M SORRY.
 6              PROSPECTIVE JUROR BRINKERHOFF:  AND IT IS A PRETTY
 7   SOCIAL ORGANIZATION, FUNDRAISING FOR CHILDREN WHO HAVE DENTAL
 8   NEEDS, AND THINGS OF THAT NATURE.
 9              MR. AARON:  DOES IT HAVE ANY LAW ENFORCEMENT
10   CONNECTION AT ALL?
11              PROSPECTIVE JUROR BRINKERHOFF:  IT DOES.  MY
12   HUSBAND WAS THE PRESIDENT ONE YEAR WHILE HE WAS THE POLICE
13   CHIEF IN VICTORVILLE, AND THEY USUALLY HAVE LAW ENFORCEMENT
14   OFFICERS.  THE SHERIFF SWEARS THE PEOPLE IN TO BECOME
15   INTERNATIONAL FOOTPRINT ASSOCIATION MEMBERS.
16              MR. AARON:  OKAY.  THANK YOU.  I HAVE NOTHING
17   FURTHER.
18              THE COURT:  ALL RIGHT.  THANK YOU.
19              MR. AKROTIRIANAKIS:  YOUR HONOR, MAY THE GOVERNMENT
20   ASK ONE FOLLOW-UP QUESTION?
21              THE COURT:  YES.
22              MR. AKROTIRIANAKIS:  MR. MELENDY, HOW LONG IS IT
23   THAT YOU HAVE BEEN A PRIVATE INVESTIGATOR?
24              PROSPECTIVE JUROR MELENDY:  1993.
25              MR. AKROTIRIANAKIS:  FROM 1993 ON?
```

```
 1              PROSPECTIVE JUROR MELENDY:  MM-HMM.

 2              MR. AKROTIRIANAKIS:  THANK YOU, SIR.

 3         THANK YOU, YOUR HONOR.

 4         THE COURT:  THANK YOU.  PASS FOR CAUSE?

 5              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

 6         THE COURT:  MR. AARON, PASS FOR CAUSE?

 7              MR. AARON:  EXCEPT AS PREVIOUSLY NOTED.

 8         THE COURT:  OKAY.  THANK YOU.  MR. AARON, WHENEVER

 9    YOU'RE READY, I AM READY TO SEE COUNSEL AT SIDEBAR.

10              MR. AARON:  I'M SORRY.

11         THE COURT:  I HADN'T SAID ANYTHING BECAUSE I WANTED

12    TO GIVE YOU A MOMENT.

13              (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

14         THE COURT:  ALL RIGHT.  THE FIRST CHALLENGE IS WITH

15    THE GOVERNMENT.

16              MR. AKROTIRIANAKIS:  THE GOVERNMENT WOULD ASK THE

17    COURT TO THANK AND EXCUSE MR. MELENDY, WHICH IS JUROR NO. 15.

18         THE COURT:  HE IS IN SEAT NO. 15.  ALL RIGHT.  THE

19    DEFENDANT HAS ONE CHALLENGE.

20              MR. AARON:  JUROR NO. 11, BONNIE BRINKERHOFF.

21         THE COURT:  THE GOVERNMENT HAS THE CHALLENGE.

22              MR. AKROTIRIANAKIS:  JUROR NO. 19, MR. TIGHE.

23         THE COURT:  MR. TIGHE?

24              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

25         THE COURT:  ALL RIGHT.  THE DEFENDANT HAS TWO
```

1    CHALLENGES.

2            MR. AARON:  JUROR NO. 8, THOMAS GRAY.

3            THE COURT:  OKAY.  AND YOUR NEXT CHALLENGE?

4            MR. AARON:  JUROR NO. 16, GAIL PATTON.

5            THE COURT:  THANK YOU.  THE CHALLENGE IS WITH THE

6    GOVERNMENT.

7            MR. MICHAEL:  WE ARE UP TO NO. 17; IS THAT

8    CORRECT, YOUR HONOR?

9            THE COURT:  YES.

10           MR. MICHAEL:  MS. SATO, JUROR NO. 28.

11           MR. AARON:  I'M SORRY.  I COULDN'T HEAR.

12           MR. AKROTIRIANAKIS:  NO. 28.

13           THE COURT:  JUROR NO. 28.

14           THE CLERK:  HE DID NOT SAY 17.  DID YOU SAY 17

15   EARLIER?

16           MR. AKROTIRIANAKIS:  I ASKED IF WE WERE UP TO NO.

17   17.

18           THE COURT:  IF WE WERE UP TO NO. 17.

19           THE DEFENSE NOW HAS TWO CHALLENGES.

20           MR. AARON:  JUROR NO. 12, PAULA SMITH.

21           MR. AARON:  NO. 12, PAULA SMITH.

22           THE COURT:  PAULA SMITH IS NO. 10.

23           MR. AARON:  I'M SORRY.  JUROR NO. 10.

24           THE COURT:  AND YOU HAVE ONE MORE CHALLENGE.

25           MR. AARON:  JUROR NO. 13, JOSE GODINEZ.

```
 1              THE COURT:  THE CHALLENGE IS WITH THE GOVERNMENT.

 2              MR. AKROTIRIANAKIS:  JUROR NO. 5, MR. SANCHEZ.

 3              THE COURT:  ALL RIGHT.  THE GOVERNMENT HAS TWO

 4    CHALLENGES -- EXCUSE ME.  THE DEFENSE HAS TWO CHALLENGES.

 5              MR. AARON:  I'M SORRY, YOUR HONOR.  I DIDN'T CATCH

 6    THAT.

 7              THE COURT:  THEY CHALLENGED NO. 5, AND YOU NOW HAVE

 8    TWO.

 9              MR. AARON:  SANCHEZ.

10              THE CLERK:  WHAT, NO. 5, SANCHEZ?

11              THE COURT:  SO, WE'RE UP TO NO. 21.

12              MR. AKROTIRIANAKIS:  HOW MANY CHALLENGES DOES THE

13    DEFENSE HAVE?

14              MR. MICHAEL:  HOW MANY CHALLENGES DOES DEFENSE

15    COUNSEL HAVE LEFT?

16              THE COURT:  FIVE.

17              MR. AARON?

18              MR. AARON:  IF I MIGHT JUST HAVE A MOMENT?

19              JUROR NO. 2, CHARLENE COLE.

20              THE COURT:  ALL RIGHT.  AND YOUR NEXT CHALLENGE?

21              MR. AARON:  JUROR NO. 21, ALEXIA NEVINS.

22              THE COURT:  NEXT CHALLENGE IS WITH THE GOVERNMENT.

23              MR. AKROTIRIANAKIS:  GOVERNMENT ACCEPTS THE PANEL,

24    YOUR HONOR.

25              THE COURT:  ALL RIGHT.  THE GOVERNMENT PASSES AND
```

```
 1    ACCEPTS THE PANEL.

 2              MR. AARON?

 3              MR. AARON:  JUROR NO. 18, SARA RAMIREZ.

 4              MR. AKROTIRIANAKIS:  IF I MAY?

 5              THE COURT:  NO. 18, MS. RAMIREZ.

 6              MR. AARON:  JUROR NO. 25, JAMES DAVIS.

 7              THE COURT:  ALL RIGHT.  THIS IS THE GOVERNMENT'S

 8    LAST CHALLENGE.

 9              WHAT WE HAVE RIGHT NOW, WE GO UP TO MR. -- THE

10    PANEL CONSIST OF THE JURORS UP TO MR. ENGLUTT, AND THEN

11    ACTUALLY RIGHT NOW WE JUST HAVE ENOUGH IF NO MORE --

12              MR. AKROTIRIANAKIS:  THE GOVERNMENT DIDN'T STRIKE

13    ANY OF THE ALTERNATES.

14              THE COURT:  IF NOBODY EXERCISED ANY -- WELL, WE

15    HAVE -- THERE IS -- WE CAN GO OFF THE RECORD FOR THIS.  I'M

16    SORRY.

17                   (OFF-THE-RECORD DISCUSSION.)

18              MR. AKROTIRIANAKIS:  THE GOVERNMENT ACCEPTS THE

19    PANEL, YOUR HONOR.

20              THE COURT:  THE GOVERNMENT ACCEPTS THE PANEL.

21              OKAY.  MR. AARON, THE GOVERNMENT ACCEPTED THE

22    PANEL.  IT'S YOUR LAST CHALLENGE.

23              MR. AARON:  CAN I HAVE A MINUTE, YOUR HONOR?

24              THE COURT:  COUNSEL, ONE OF THE JURORS -- WE ARE

25    LOSING JURORS.  ONE OF THE JURORS WANTS TO LEAVE THE
```

1    COURTROOM, SO WE REALLY NEED TO WRAP THIS UP.

2            MR. AARON?

3            MR. AARON:  JUROR NO. 7.

4            YOUR HONOR, IN ORDER TO PRESERVE OUR ISSUE, WE

5    WOULD HAVE TWO MORE PEREMPTORIES:  JUROR NO. 20 AND JUROR NO.

6    17.

7            THE COURT:  YOU MEAN CHALLENGES FOR CAUSE?

8            MR. AARON:  WHAT I WANT TO DO, YOUR HONOR --

9            THE COURT:  JUST A MOMENT.

10           COUNSEL, WHAT DO YOU MEAN TWO MORE PEREMPTORY

11   CHALLENGES?

12           MR. AARON:  I WANT TO PRESERVE THE ISSUE FOR

13   CHALLENGES FOR CAUSE, AND THESE JURORS ARE NOW ON THE PANEL.

14   AND I MAINTAIN THAT I HAD TO USE PRE-CHALLENGES IN PART FOR

15   OTHER CHALLENGES WHICH WE HAVE MADE BUT THE COURT HAD DENIED.

16   AND BECAUSE OF THAT, WE DON'T HAVE CHALLENGES ANYMORE

17   AVAILABLE FOR JURORS NO. 17 AND 20.

18           AND I ALSO BELIEVE THAT THOSE CHALLENGES -- I'M

19   ASKING FOR TWO MORE PEREMPTORY CHALLENGES TO CHALLENGE AND

20   EXCUSE THOSE JURORS.

21           MR. AKROTIRIANAKIS:  MAY I INQUIRE?

22           THE COURT:  WELL, IN OTHER WORDS, YOU'RE ASKING FOR

23   THE COURT TO RECONSIDER ITS CHALLENGE FOR CAUSE SO THAT YOU

24   CAN --

25           MR. AARON:  OR TO GRANT ME ADDITIONAL CHALLENGES,

1    TWO MORE ADDITIONAL.

2              THE COURT:  AND THEN YOU WOULD USE THOSE ON THOSE

3    TWO JURORS?

4              MR. AARON:  THAT'S RIGHT.

5              THE COURT:  SO, ESSENTIALLY, YOU'RE ASKING THE

6    COURT TO RECONSIDER THE CHALLENGES FOR CAUSE?

7              MR. AARON:  WELL, THAT'S ONE WAY OF LOOKING AT IT.

8              THE COURT:  I MADE MY DECISION, AND THERE IS NO NEW

9    INFORMATION AS TO THE CHALLENGES FOR CAUSE.

10             DID YOU WISH --

11             MR. MICHAEL:  THE GOVERNMENT SUBMITS, YOUR HONOR.

12   THERE IS NO NEW INFORMATION ON THAT BASIS TO GIVE THEM, IN

13   ESSENCE, STRIKE FOR CAUSE.

14             THE COURT:  SO, YOU EXCUSED NO. 7.  ALL RIGHT.

15   THAT MEANS, ALL RIGHT, UP TO NO. 27 IS OUR JURY.

16             AND WE HAVE RIGHT NOW THE ALTERNATES WOULD BE

17   MR. ATWATER AND MR. ROBINSON.

18             DOES THE GOVERNMENT WISH TO EXERCISE A PEREMPTORY

19   CHALLENGE AS TO MR. ATWATER OR MR. ROBINSON?

20             MR. MICHAEL:  THE GOVERNMENT ACCEPTS THE

21   ALTERNATES, YOUR HONOR.

22             THE COURT:  AND THE DEFENSE?

23             MR. AARON:  WE WOULD EXCUSE JUROR NO. 29, BRIAN

24   ATWATER.

25             THE COURT:  ALL RIGHT.  THEN THE ALTERNATES WILL BE

1    MR. ROBINSON AND MS. PLUNK.

2            NOW, WHICH JUROR WAS THAT?  MS. SMITH?  IS THAT

3    PAULA SMITH WHO LEFT?

4            THE CLERK:  ACTUALLY, IT WAS.  SHE JUST CAME BACK.

5        (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

6          (IN THE PRESENCE OF THE PROSPECTIVE JURORS:)

7            THE COURT:  LADIES AND GENTLEMEN, I AM AT A LOSS

8    FOR WORDS TO THANK YOU FOR YOUR PATIENCE HERE TODAY.  I KNOW

9    IT HAS BEEN A REALLY LONG DAY, AND THOSE OF YOU WHO DROVE A

10   LONG DISTANCE TO ARRIVE HERE ON TIME THIS MORNING HAVE HAD AN

11   EVEN LONGER DAY, I REALLY DO THANK YOU ON BEHALF OF THE COURT

12   AND BOTH SIDES IN THIS CASE.

13           AS I TOLD YOU WHEN YOU FIRST CAME HERE A WEEK AGO

14   TOMORROW, THE FUNCTIONING OF THE JUSTICE SYSTEM; THAT IS, A

15   JURY SYSTEM RELIES ENTIRELY ON THE GOOD SERVICE OF ALL OF US

16   TO SHOW UP FOR JURY DUTY.  SO I APPRECIATE VERY MUCH YOUR

17   SERVICE, ESPECIALLY GIVEN THAT IT WAS SUCH A LONG DAY.

18           WHAT I'M GOING TO DO IS READ OUT THE NAMES OF THE

19   12 JURORS IN THIS CASE AND THE TWO ALTERNATES.  LISTEN

20   CAREFULLY FOR YOUR NAME.  AND IF YOUR NAME IS CALLED, YOU'RE

21   GOING TO REMAIN IN THE COURTROOM.

22           EVERY ONE ELSE, YOU'RE EXCUSED, AND YOU'RE DONE.

23   AND YOU GO WITH MY SINCERE THANKS, ONCE AGAIN.  I WOULD GO ON

24   LONGER AND THANK YOU LONGER, BUT I KNOW -- BUT CONSIDER MY

25   THANKS TO HAVE BEEN EXPRESSED SINCERELY.

1          THE FOLLOWING PERSONS WILL SERVE AS THE JURORS ON

2    THIS CASE, AND THE REST OF YOU MAY GO DOWN TO THE JURY

3    ASSEMBLY ROOM:

4          JUROR NO. 3, MS. DILLARD;

5          JUROR NO. 4, MR. EASTERDAY;

6          JUROR NO. 6, MS. LANDFRIED;

7          JUROR NO. 9, MR. EASTIS;

8          JUROR NO. 12, MR. SHANTELER;

9          JUROR NO. 14, MR. DREW;

10          JUROR NO. 17, MS. CHILDERS;

11          JUROR NO. 20, MS. BONDY;

12          JUROR NO. 22, MS. LEWIS;

13          JUROR NO. 23, MS. EDWARDS;

14          JUROR NO. 26, MR. ENGLUTT;

15          JUROR NO. 27, MS. GRISHAM.

16          AND THE ALTERNATES, JUROR NO. 30, MR. ROBINSON, AND

17    JUROR NO. 31, MS. PLUNK.

18          SO, IF I CALLED YOUR NAME, REMAIN HERE.  THE REST

19    OF YOU, THANK YOU VERY MUCH, AND YOU ARE EXCUSED.  THE JURY

20    ASSEMBLY ROOM, THE DOOR IS OPEN.  ALL YOU HAVE TO DO IS TAKE

21    YOUR BADGES OFF AND HANG THEM UP.

22          THANK YOU VERY MUCH, LADIES AND GENTLEMEN.

23          DON'T WORRY, LADIES AND GENTLEMEN, YOU'RE GOING TO

24    GET TO GO, TOO.

25          MS. GRISHAM, I THINK YOU'RE GOING TO FIND THE SEATS

1    IN THE JURY BOX VERY COMFORTABLE.  I HAVE RECEIVED RAVE

2    REVIEWS, AND I PICKED THEM OUT MYSELF WHEN WE OPENED THE

3    COURT HERE SEVERAL YEARS AGO.  I TEST DROVE ALL THE SEATS.  I

4    THINK THEY ARE PRETTY COMFORTABLE.

5            ALL RIGHT.  MS. INGRAM IS GOING TO SEAT YOU, OR

6    MS. SASSE.  ONE OF YOU IS GOING TO SEAT THE JURORS IN THEIR

7    SEATS.  THEN WE WILL SWEAR YOU, AND THEN I'M GOING TO LET YOU

8    GO.  MS. INGRAM WILL SHOW YOU HOW TO GAIN ACCESS TO THE

9    SECURED HALLWAY.

10           PLEASE RISE AND FACE THE CLERK TO BE SWORN.

11           THE CLERK:  LADIES AND GENTLEMEN, PLEASE RAISE YOUR

12   RIGHT HAND.

13           DO YOU SOLEMNLY SWEAR THAT YOU WILL WELL AND TRULY

14   TRY THE CAUSE NOW PENDING BEFORE THIS COURT, AND A TRUE

15   VERDICT THEREIN RENDERED ACCORDING TO THE EVIDENCE, SO HELP

16   YOU GOD?

17      (WHEREUPON, THE JURORS AND ALTERNATES WERE SWORN.)

18           THE COURT:  THANK YOU.  YOU MAY BE SEATED.

19           LADIES AND GENTLEMEN, AS I SAID, THE CLERK IS GOING

20   TO TAKE YOU AND SHOW YOU WHERE THE JURY ROOM WILL BE THAT YOU

21   WILL BE ABLE TO USE THROUGHOUT THE TRIAL.  WE WILL START

22   TOMORROW MORNING WITH THE JURY AT 9:00.  AND YOU CAN ARRIVE

23   ANY TIME AFTER 8:30.

24           WE HAVE FRESH COFFEE BREWED AT 8:30, WAITING FOR

25   YOU.  IT TAKES A JOINT EFFORT OF ALL OF US THAT WE RESPECT

1    EACH OTHER AND BE HERE ON TIME AND START ON TIME.  AND WE

2    CERTAINLY DO OUR BEST TO MAKE SURE THAT WE START ON TIME AND

3    WE ARE ALL HERE.  ACTUALLY, WE HAVE ALWAYS HAD A GOOD

4    EXPERIENCE WITH JURORS BEING ON TIME, AND WE DO OUR BEST TO

5    RESPECT THAT AND START RIGHT ON TIME.  AND IT SHOULDN'T BE A

6    PROBLEM.

7            BUT WE DO HAVE THAT GOOD, FRESH COFFEE WAITING

8    EARLY IF YOU GET HERE EARLY.

9            WHEN YOU GO HOME TONIGHT, OR WHEREVER YOU ARE GOING

10   AFTER THIS, REMEMBER WHAT I HAVE ALREADY TOLD YOU ABOUT AND

11   INSTRUCTED YOU ON.  UNTIL THE TRIAL IS OVER, YOU ARE NOT TO

12   DISCUSS IT WITH ANYONE, INCLUDING FELLOW JURORS, MEMBERS OF

13   YOUR FAMILY, OF COURSE ANYONE INVOLVED IN THE TRIAL, OR

14   ANYONE ELSE, NOR ARE YOU PERMITTED TO ALLOW OTHERS TO DISCUSS

15   IT WITH YOU.  IF ANYONE APPROACHES YOU AND TRIES TO TALK TO

16   YOU ABOUT THE CASE, YOU MUST REPORT THAT TO THE COURT

17   IMMEDIATELY.

18           DON'T READ OR LISTEN TO ANY NEWS REPORTS ABOUT THE

19   CASE OR ABOUT THE TRIAL OR ABOUT ANYTHING HAVING TO DO WITH

20   THIS CASE, THE TRIAL, OR ANYONE INVOLVED IN IT.

21           YOU MUST NOT DO ANY RESEARCH INVOLVED WITH ANYTHING

22   HAVING TO DO WITH THE CASE.  THAT MEANS LOOKING AT

23   DICTIONARIES, LOOKING IN ENCYCLOPEDIAS, RESEARCHING ON THE

24   INTERNET.  AND WHEN I SAY "ANYTHING TO DO WITH THE CASE,"

25   THAT MEANS ANYTHING.  THAT MEANS ANYTHING INVOLVED WITH THE

1   CHARGES IN THIS CASE, ANYTHING INVOLVED WITH THE EVIDENCE IN

2   THIS CASE, ANYTHING THAT YOU HEAR DURING THE TRIAL, ANY OF

3   THE PARTICIPANTS.  SO, LAWYERS, THE DEFENDANT, ANY OF THE

4   WITNESSES, THE JUDGE, ANYONE.

5              YOU MUST KEEP AN OPEN MIND UNTIL YOU HAVE HEARD ALL

6   OF THE EVIDENCE, UNTIL YOU HAVE HEARD THE ARGUMENTS OF

7   COUNSEL, UNTIL THE COURT HAS GIVEN YOU THE INSTRUCTIONS OF

8   THE LAW ON THE CASE AND YOU HAVE DELIBERATED AND LISTENED TO

9   THE VIEWS OF YOUR FELLOW JURORS.  YOU MUST KEEP AN OPEN MIND

10  UNTIL THEN.

11             IF YOU NEED TO COMMUNICATE WITH THE COURT ABOUT

12  ANYTHING, YOU MAY GIVE A SIGNED NOTE TO THE CLERK WHO WILL

13  GIVE IT TO ME.

14             EVERY TIME WE TAKE A RECESS, I WILL REPEAT THESE

15  ADMONITIONS TO YOU, PERHAPS IN A SHORTENED FORM, AND I WILL

16  REPEAT THEM AND EXPAND ON THEM DURING THE COURSE OF THE

17  TRIAL.

18             I CAN'T EMPHASIZE TOO MUCH HOW IMPORTANT IT IS THAT

19  YOU FOLLOW ALL OF THESE ADMONITIONS.  AS I TOLD YOU WHEN YOU

20  FIRST CAME HERE TWO WEEKS AGO, IF THE JURORS FAIL TO FOLLOW

21  ALL OF THESE WARNINGS AND INSTRUCTIONS OF THE COURT, IT COULD

22  RESULT IN A TERRIBLE WASTE OF EVERYONE'S TIME; YOUR TIME, IN

23  PARTICULAR, I'M CONCERNED ABOUT.  SO PLEASE DO NOT DISCUSS

24  THE CASE, DO ANY RESEARCH ABOUT THE CASE, AND DO NOT MAKE UP

25  YOUR MINDS ABOUT ANY ASPECT OF IT.

1           AND, AGAIN, THANK YOU VERY MUCH FOR YOUR TIME AND

2    PATIENCE THIS AFTERNOON AND ALL DAY TODAY, LADIES AND

3    GENTLEMEN.

4           WE WILL SEE YOU BACK HERE TOMORROW MORNING AT

5    9:00.  YOU'RE EXCUSED.

6               (OUTSIDE THE PRESENCE OF THE JURY:)

7           THE COURT:  WE'RE ON RECORD OUTSIDE THE PRESENCE OF

8    THE JURY.

9           WHAT I THOUGHT WE WOULD DO FOR JUST A FEW MOMENTS

10   -- BECAUSE I KNOW WE'RE GOING TO BE PUTTING ON YOUR OPENING

11   STATEMENTS FIRST THING IN THE MORNING -- I WOULD LIKE TO GO

12   OVER A COUPLE OF THINGS WITH YOU OFF THE RECORD.  TOMORROW

13   MORNING, WE CAN PUT A FEW MATTERS ON THE RECORD.  THAT WAY,

14   AT LEAST WE CAN COVER A FEW THINGS RELATED TO YOUR OPENINGS

15   WITHOUT TYING UP THE COURT REPORTER TONIGHT.

16          SO, BEFORE WE EXCUSE THE COURT REPORTER, IS THERE

17   ANYTHING THAT EITHER SIDE WISHES TO PUT ON THE RECORD

18   TONIGHT?

19          MR. AKROTIRIANAKIS:  I HAVE ONE THING, YOUR HONOR.

20   IT RELATES TO CUSTOMS ATTACHE HEEGER'S TESTIMONY, SINCE I

21   ANTICIPATE WE WILL GET TO THAT BEFORE THE FIRST BREAK.

22          THE COURT:  WHAT'S THE NATURE OF IT?

23          MR. AKROTIRIANAKIS:  IT IS SIMPLY AN OBJECTION I

24   HAVE TO A QUESTION THAT WAS ASKED.  I THINK IT IS

25   INAPPROPRIATE.

```
 1              THE COURT:  WHAT'S THE QUESTION?

 2              MR. AKROTIRIANAKIS:  COUNSEL ASKED WHAT THE AGE OF

 3    CONSENT IN RUSSIA WAS.

 4              THE COURT:  LET'S TAKE THAT UP OUTSIDE THE PRESENCE

 5    OF THE COURT REPORTER FOR NOW, AND THEN YOU CAN PUT IT ON THE

 6    RECORD TOMORROW.

 7              MR. AKROTIRIANAKIS:  YES.

 8              THE COURT:  RIGHT NOW IS THERE ANYTHING THAT WE

 9    HAVE TO DO WITH THE COURT REPORTER?

10              MR. MICHAEL:  I BELIEVE, JUST ON THE RECORD, RETURN

11    THE JURY QUESTIONNAIRES.

12              THE COURT:  YES.  THANK YOU VERY MUCH.

13              BOTH COUNSEL PLEASE RETURN YOUR JUROR

14    QUESTIONNAIRES.  YOU CAN HAND THAT UP TO MR. FATTAHI.  YOUR

15    COPIES WILL BE SHREDDED.  THE ORIGINAL WILL BE KEPT BY THE

16    CLERK, SEALED UNTIL THE CASE IS FINALLY COMPLETED, APPEALS,

17    IF THERE ARE ANY, AND SO FORTH.

18              MR. MICHAELS:  NOTHING FURTHER, YOUR HONOR.

19              THE COURT:  THANK YOU, PHYLLIS.

20              MS. INGRAM JUST TOLD ME THAT THERE ARE TWO JURORS

21    THAT THEY INFORMED HER THAT THEY HAVE PROBLEMS.

22              MR. SHANTELER SAYS HE HAS A COMMITMENT ON THURSDAY.

23    HE DIDN'T TELL HER WHERE IT WAS, BUT HE SAYS HE COULDN'T BE

24    HERE ALL DAY THURSDAY.  SO I'M GOING TO ASK HIM ABOUT THAT.

25              MR. AARON:  I'M SORRY.
```

```
 1              (JUROR SHANTELER IS PRESENT IN THE COURTROOM.)

 2              THE COURT:  WE'RE ON THE RECORD WITH MR. SHANTELER.

 3              JUROR SHANTELER:  CORRECT.

 4              THE COURT:  MR. SHANTELER, WHAT'S THE SITUATION ON

 5    THURSDAY?

 6              JUROR SHANTELER:  WELL, THIS MORNING WHEN WE

 7    CHECKED IN, THEY SAID WE'D HAVE AN OPPORTUNITY TO TALK ABOUT

 8    IT, AND IT HADN'T COME UP YET.  AND THEN THURSDAY, I AM A

 9    MEMBER OF CTA AND WE HAVE -- WHEN I CAME HERE ON THE 23RD WAS

10    THE FIRST TIME I HAD BEEN BACK TO WORK FOR FIVE MONTHS.  I

11    HAD AN AMPUTATION OF SOME TOES.  SO, I DIDN'T KNOW THE

12    SCHEDULE, AND IT CAME UP THAT THURSDAY I HAVE TO BE IN L.A.

13    FOR AN ALL-DAY MEETING.  BUT FRIDAY I CAN COME BACK.

14              THE COURT:  WELL, IS THERE ANY -- THIS IS A UNION

15    ISSUE WHEN YOU SAY CTA?

16              JUROR SHANTELER:  CORRECT.

17              THE COURT:  IS THERE ANYONE ELSE IN THE UNION THAT

18    COULD DO THIS?

19              JUROR SHANTELER:  PROBABLY, BUT IT'S -- YOU KNOW,

20    WE HAVE ARRANGED FOR THE HOTEL AND ALL THAT STUFF.  I HAVE TO

21    BE BACK HERE BY 9:00 ON THURSDAY NIGHT.  THERE IS A MEETING.

22    I GUESS I CAN TRY TO DO SOMETHING FOR THURSDAY.

23              THE COURT:  I'M VERY SORRY.  I WISH I HAD KNOWN

24    ABOUT THIS.  AND I'M SORRY THAT THE SIGNALS MAYBE GOT CROSSED

25    AND YOU DIDN'T HAVE A CHANCE TO TELL ME.  BUT WE WOULD HAVE
```

1   TO RECESS THE WHOLE TRIAL, AND WE ALREADY ARE IN SESSION ON

2   FRIDAY.

3            JUROR SHANTELER:  YOU KNOW, I CAN DRIVE BACK FROM

4   L.A. TO GET HERE FOR FRIDAY'S DEAL.  IF YOU'RE TELLING ME

5   THAT I NEED TO BE HERE THURSDAY, THEN I WILL.

6            THE COURT:  I'M SORRY.  I WOULD HAVE TO ASK YOU TO.

7            JUROR SHANTELER:  THIS MORNING THEY SAID WE WILL

8   HAVE A CHANCE TO TALK TO YOU ABOUT IT.  I WAS WAITING FOR

9   THAT CHANCE.  I DON'T REMEMBER IT, IF I MISSED IT OR NOT.

10           THE COURT:  WELL, THAT'S WHAT I MEAN WHEN I SAY I'M

11   SORRY.  I THINK SIGNALS GOT CROSSED.  I PROBABLY SHOULD HAVE

12   -- I THINK THERE WAS A BETTER WAY FOR -- THE PEOPLE IN THE

13   JURY ROOM SHOULD HAVE BROUGHT IT TO MY ATTENTION.  I SHOULD

14   TELL THEM IN THE FUTURE THAT -- I KNOW THAT I SHOULD HAVE

15   ASKED ALL OF YOU AS A GROUP IF THERE WAS ANY PROBLEMS THAT

16   ANY OF YOU HAD.  I APOLOGIZE FOR THAT.  I REALLY APOLOGIZE

17   FOR ASKING YOU TO CHANGE THAT COMMITMENT.  BUT IF I HAD KNOWN

18   ABOUT IT EARLIER, I MIGHT HAVE BEEN ABLE TO DO SOMETHING

19   ABOUT IT.  NOW WE'VE GOT THE JURY PICKED AND EVERYBODY ELSE

20   HAS BEEN EXCUSED.

21           GIVEN THE SCHEDULE THAT WE'RE ON FOR THIS JURY AND

22   THE WITNESSES WHO ARE TRAVELING TO BE HERE, I'M GOING TO HAVE

23   TO ASK YOU TO CHANGE YOUR APPOINTMENT.

24           JUROR SHANTELER:  OKAY.

25           THE COURT:  IF THERE IS ANYTHING I CAN DO, IF YOU

1    NEED ME TO WRITE A LETTER TO SOMEONE --

2            JUROR SHANTELER:  THAT PROBABLY WOULD BE, SO I

3    WOULDN'T, YOU KNOW -- IT WOULD BE NICE.

4            THE COURT:  OKAY.  IF YOU WILL JUST GIVE AN ADDRESS

5    AND A NAME TO MS. INGRAM OR MS. SASSE TOMORROW, I WILL GET A

6    LETTER FOR YOU --

7            JUROR SHANTELER:  THANK YOU.

8            THE COURT:  -- THAT EXPLAINS THAT YOU ARE REQUIRED

9    TO BE HERE IN THE COURTROOM.

10            PROSPECTIVE JUROR:  THANK YOU.

11            THE COURT:  YOU'RE WELCOME.  ALL RIGHT.  THANK YOU,

12    SIR.

13            (JUROR SHANTELER EXITS THE COURTROOM.)

14            THE COURT:  AND THE OTHER JUROR WAS MR. DREW, WHO

15    TOLD THE CLERK THAT HE HAD A DOCTOR'S APPOINTMENT ON FRIDAY

16    AFTERNOON, BUT HE THOUGHT MAYBE HE COULD CHANGE IT.  SO I

17    ASKED HER TO TELL HIM TO MAKE ARRANGEMENTS TO CHANGE IT.  IF

18    WE HEAR ANYTHING FURTHER ON THAT, WE WILL LET YOU KNOW.

19                    (PROCEEDINGS ADJOURNED)

20                        ---OOO---

21

22

23

24

25

# C E R T I F I C A T E

### DOCKET NO. EDCR 04-42(A) VAP

       I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____
PHYLLIS A. PRESTON, CSR          DATED:  OCTOBER 14, 2008
FEDERAL OFFICIAL COURT REPORTER
LICENSE NO. 8701