1       UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA
2        EASTERN DIVISION-RIVERSIDE

3

   HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING
4

5 UNITED STATES OF AMERICA,   )
             )
6      PLAINTIFF,   )
             )
7 V.          )DOCKET NO. EDCR 04-42(A)-VAP
             )
8 JAMES SANDERS,     )
             )
9      DEFENDANT.   )
 _____)
10

11   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
       RIVERSIDE, CALIFORNIA
12      THURSDAY, JUNE 14, 2007

13

       PHYLLIS A. PRESTON, CSR
14       LICENSE NO. 8701
     FEDERAL OFFICIAL COURT REPORTER
15     UNITED STATES DISTRICT COURT
       3470 TWELFTH STREET
16     RIVERSIDE, CALIFORNIA 92501

17

18

19

20

21

22

23

24

25

1                                          <u>APPEARANCES</u>

2

   FOR THE PLAINTIFF:        OFFICE OF THE UNITED STATES ATTORNEY
3                            BY:  <u>BRIAN MICHAEL</u>
                                  <u>JOSEPH AKROTIRIANAKIS</u>
4                            ASSISTANT UNITED STATES ATTORNEYS
                             3880 LEMON STREET, SUITE 210
5                            RIVERSIDE, CALIFORNIA 92501

6

   FOR THE DEFENDANT:        <u>JEFFREY AARON</u>
7                            FEDERAL CRIMINAL DEFENSE PANEL
                             THE RIVERSIDE BARRISTER BUILDING
8                            3993 MARKET STREET
                             RIVERSIDE, CALIFORNIA 92501

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I N D E X

 2    WITNESSES

 3    FOR PLAINTIFF:                              PAGE

 4    MONIQUE BUENO
      DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 11
 5    CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 21
      REDIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . 22

 6

 7

 8

 9    EXHIBITS                                  RECEIVED

10       141    . . . . . . . . . . . . . . . . .       17
         140    . . . . . . . . . . . . . . . . .       20
11       142    . . . . . . . . . . . . . . . . .       20

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THURSDAY, JUNE 14, 2007, RIVERSIDE, CALIFORNIA

2                              ---OOO---

3          (OUTSIDE THE PRESENCE OF THE JURY:)

4          THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

5   PRESENCE OF THE JURY, MANY OF WHOM ARE HERE IN THE JURY ROOM,

6   OF COURSE.

7          I GUESS THE CLERK IS MAKING COPIES OF WHAT COUNSEL

8   HAS BROUGHT IN THIS MORNING.

9          MR. AKROTIRIANAKIS:  I HAD UNDERSTOOD THE COURT'S

10  INSTRUCTION TO E-MAIL IT.  I'M SORRY IF I MADE THE MISTAKE --

11         THE COURT:  NO, YOU'RE RIGHT.  MAYBE MY LAW CLERK

12  GOT THE E-MAIL.  IT DOESN'T COME TO MY E-MAIL.

13         MR. AKROTIRIANAKIS:  YEAH.  I PUT IT TO VAP

14  CHAMBERS ACCOUNT, AND I COPIED IT TO COUNSEL.

15         MR. AARON:  I DID HAVE A CHANCE TO REVIEW IT AND I

16  THOUGHT IT WAS FINE.

17         THE COURT:  ALL RIGHT.  THERE WAS ONE THAT YOU WERE

18  GOING TO SUBMIT?

19         MR. AARON:  I WAS GOING TO LOOK AT IT, YOUR HONOR,

20  AND THE COURT HAD SAID IF I WANTED AN INSTRUCTION, I HAD TO

21  PROPOSE ONE.  BUT I'M LOOKING AT IT AND I WILL WAIVE

22  INSTRUCTION ON THAT.

23         THE COURT:  THE OTHER ISSUE WAS AN INSTRUCTION ON

24  WHEN MR. MARTIN REFUSES TO TESTIFY WHEN HE INVOKED HIS FIFTH

25  AMENDMENT PRIVILEGE.  AND I DID SOME RESEARCH ON THAT.  AND

1    ALTHOUGH IN SOME CIRCUITS IT'S URGED -- WELL, I THINK IT'S IN

2    THE SECOND CIRCUIT IT'S HELD TO BE INAPPROPRIATE TO GIVE SUCH

3    AN INSTRUCTION.  AND OTHER CIRCUITS -- AND I DIDN'T FIND

4    ANYTHING IN THIS CIRCUIT -- IT'S URGED TO BE DONE WITH GREAT

5    CAUTION.  AND I DID FIND SOME PROPOSED -- AN INSTRUCTION FROM

6    THE -- I THINK IT'S THE FIRST CIRCUIT, WHICH I THINK WOULD BE

7    APPROPRIATE IN THIS CASE, WHICH INSTRUCTS THE JURY THAT THEY

8    MAY, BUT THEY ARE NOT REQUIRED TO, DRAW AN ADVERSE INFERENCE

9    WHEN A WITNESS REFUSES, AS IN THIS CASE, TO ANSWER A

10   QUESTION.

11           SO, MR. FATTAHI IS TYPING THAT UP FOR YOU RIGHT

12   NOW.

13           MR. AKROTIRIANAKIS:  THE SECOND OF THE TWO

14   DOCUMENTS THAT THE COURT HAS IS THE GOVERNMENT'S PROPOSED

15   INSTRUCTION ON ATTEMPT.  AND IF THE COURT WERE TO GIVE THIS

16   OR ANOTHER ATTEMPT INSTRUCTION, IT WOULD REQUIRE SOME

17   MODIFICATION TO THE COURT'S INSTRUCTION ON COUNT 4.

18           THE COURT:  THAT'S THE JOINT PROPOSED INSTRUCTION?

19   THE DOCUMENT THAT'S ENTITLED JOINT PROPOSED?

20           MR. AKROTIRIANAKIS:  IT WASN'T ACTUALLY A JOINT

21   PROPOSED AT THE TIME; ALTHOUGH, I UNDERSTAND NOW COUNSEL HAS

22   NO OBJECTION TO IT.

23           THE COURT:  ALL RIGHT.  SO THIS WOULD REQUIRE A

24   CHANGE?

25           MR. AKROTIRIANAKIS:  IT WOULD REQUIRE THE FOLLOWING

 1   CHANGES TO THE COURT'S INSTRUCTION ON NO. 4, ON PAGE 22 OF

 2   THE INSTRUCTIONS CIRCULATED YESTERDAY.

 3            THE COURT:  OH, I'M NOT SURE I HAVE THEM.

 4            MR. AKROTIRIANAKIS:  I'M SORRY.

 5            THE COURT:  I'M SORRY.  LET ME GET THE -- YOU'RE

 6   WORKING OFF THE ONE FROM YESTERDAY?

 7            MR. AKROTIRIANAKIS:  YEAH.  IT DOESN'T MATTER.  I

 8   CAN MODIFY IT.

 9            THE COURT:  I DON'T HAVE ANY VERSION, SO LET ME GO

10   GET THEM.

11            THE ONE THAT YOU'RE COMPARING IT TO OR YOU WERE

12   REFERRING TO IS THE ELEMENTS OF COUNT 4?

13            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

14            THE COURT:  ALL RIGHT.

15            MR. AKROTIRIANAKIS:  WELL, THIS HAS NOTHING TO DO

16   WITH THAT, BUT ON LINE 12 I WOULD PROPOSE ADDING AN "AND"

17   AFTER THE SEMICOLON.

18            AND THEN ON LINE 15, THE VERY LAST WORD "OR"

19   THROUGH THE END OF THE CLAUSE, I WOULD PROPOSE STRIKING.  AND

20   THEN ENDING THAT WITH A UNANIMITY LANGUAGE THE COURT

21   DISCUSSED YESTERDAY.

22            AND THEN THE LAST --

23            THE COURT:  I'M SORRY.

24            MR. AKROTIRIANAKIS:  I WOULD STRIKE THE WORDS

25   "...OR ATTEMPTED TO ENGAGE IN A SEXUAL ACT WITH A PERSON WHO

1   HAD NOT ATTAINED THE AGE OF 12 YEARS."

2           THE COURT:  STRIKING IT?

3           MR. AKROTIRIANAKIS:  YES, SINCE THE ATTEMPT THEORY

4   IS NOW COVERED BY THE NEXT INSTRUCTION.

5           THE COURT:  OH, SO PUT A COMMA THERE?

6           MR. AKROTIRIANAKIS:  CORRECT.  "...12 YEARS" COMMA

7   "WITH ALL MEMBERS OF THE JURY AGREEING..." SO ON AND SO

8   FORTH.

9           AS FAR AS THE LAST PARAGRAPH, YOUR HONOR, AND THIS

10  DOESN'T HAVE ANYTHING TO DO WITH THE ATTEMPT INSTRUCTION, BUT

11  I WOULD PROPOSE WORDING THE MIDDLE LINE THERE, JUST SAY

12  RATHER THAN "...KNEW THAT THE OTHER PERSON ENGAGING IN A

13  SEXUAL ACT..." MORE APPROPRIATE LANGUAGE, PERHAPS, WOULD BE

14  "...KNEW THAT THE PERSON WITH WHOM THE DEFENDANT ENGAGED IN A

15  SEXUAL ACT..."

16          THE COURT:  "THE GOVERNMENT NEED NOT PROVE THAT THE

17  DEFENDANT KNEW THAT THE PERSON WITH WHOM HE ENGAGED..."

18          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  NOW, AND THEN YOUR PROPOSED

20  INSTRUCTION ON ATTEMPT WOULD COME AFTER THIS ONE?

21          MR. AKROTIRIANAKIS:  RIGHT.  AND THIS IS CONFORMED

22  TO WHAT I WAS JUST PROPOSING TO THE COURT.  WELL, YOU MIGHT

23  HAVE MADE A LITTLE CHANGE TO THE LAST PARAGRAPH, BUT I WOULD

24  PROPOSE THAT IT GO IN THAT SPACE.

25          THE COURT:  THE INSTRUCTION THAT I JUST HANDED THE

1    PARTIES, IS THAT AGREEABLE?

2          MR. AKROTIRIANAKIS:  IT IS.  I WOULD PROPOSE ONLY

3    ON LINE 6, "...IF YOU CHOSE TO DRAW ADVERSE INFERENCES FROM

4    THIS REFUSAL..." AND THEN AT THE BOTTOM "...YOU ARE NOT

5    REQUIRED TO DRAW SUCH INFERENCES."

6          THE COURT:  ANY INFERENCE.

7          MR. AKROTIRIANAKIS:  OR ANY INFERENCE.  IT'S JUST

8    TO MAKE THE TWO AGREE.

9          MR. AARON:  I THINK IT'S REPETITIOUS AND

10   ARGUMENTATIVE.

11         IT SAYS, "YOU MAY, IF YOU CHOSE, DRAW ADVERSE

12   INFERENCES...BUT YOU ARE NOT REQUIRED TO DRAW THAT

13   INFERENCE."

14         I DON'T KNOW WHAT MORE NEEDS TO BE SAID.  I DOUBT

15   THAT THEY WOULD DRAW A POSITIVE INFERENCE FROM IT.

16         THE COURT:  WELL, I THINK IT SHOULD SAY, "YOU ARE

17   NOT REQUIRED TO DRAW ANY INFERENCE."

18         I THINK THAT'S THE -- NO, ACTUALLY, I THINK IT

19   SHOULD STAY THE WAY IT IS BECAUSE I THINK THAT'S CLEAR TO SAY

20   "THAT INFERENCE."  BECAUSE YOU CAN DRAW "AN INFERENCE," BUT

21   YOU ARE NOT REQUIRED TO DRAW "THAT INFERENCE."

22         THAT'S THE POINT OF THE INSTRUCTION.  SO I'M GOING

23   TO LEAVE IT AS PROPOSED.

24         ALL RIGHT.  I THINK WE'RE JUST -- HAVE WE PRINTED

25   OUT THE INSTRUCTIONS?  SO WE ARE COPYING THEM.  AND WE WILL

1    HAND OUT THE COPY SET TO YOU.  AND THEN IN JUST A MOMENT WE

2    WILL BRING YOU THESE CHANGED ONES AND SUBSTITUTE THESE.  I

3    WILL GIVE YOU A FEW MOMENTS TO LOOK AT THEM IN THE ORDER THAT

4    YOU THINK THEY SHOULD BE GIVEN.

5            MR. AKROTIRIANAKIS:  YOUR HONOR, WHAT'S THE FIRST

6    INSTRUCTION OF THE CONCLUDING INSTRUCTIONS?

7            THE COURT:  "MEMBERS OF THE JURY, YOU NOW HAVE

8    HEARD ALL THE EVIDENCE."

9            MR. AKROTIRIANAKIS:  SO WE DON'T HAVE THAT.

10           THE COURT:  YOU ARE ABOUT TO GET THE FULL SET.

11           MR. AKROTIRIANAKIS:  OKAY.  I DIDN'T KNOW IF THE

12   COURT, IN LIGHT OF THE PROPOSED SPECIAL VERDICT, WANTED TO

13   MODIFY 34 IN A WAY THAT EXPLAINS THAT.

14           THE COURT:  PAGE 34?

15           MR. AKROTIRIANAKIS:  YES, PAGE 34.

16           THE COURT:  I DON'T THINK -- THERE ARE ANSWERS,

17   RIGHT?

18           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

19           THE COURT:  WHAT I DO IS I SHOW THEM WHEN I GET TO

20   THAT VERDICT FORM -- I MEAN, THAT INSTRUCTION, I SHOW IT TO

21   THEM, YOU KNOW, AND GO OVER IT.

22           MR. AKROTIRIANAKIS:  OKAY.

23           THE COURT:  THERE IS NOT TOO MUCH MORE TO SAY, JUST

24   THAT THAT INSTRUCTION IS STILL ACCURATE.  AS TO THAT

25   INSTRUCTION, THEY ANSWER EACH OF THE QUESTIONS THAT THEY

```
 1    CAN.  IT IS NOT LIKE A CIVIL VERDICT FORM WHERE YOU PICK ONE

 2    AND GO TO THE NEXT.

 3              MR. AKROTIRIANAKIS:  THANK GOODNESS.

 4              THE COURT:  DO YOU HAVE THIS ON A DISK?  YOU

 5    E-MAILED IT TO US.

 6              MR. AKROTIRIANAKIS:  I DID E-MAIL IT, YOUR HONOR,

 7    IN WORD PERFECT.

 8              THE COURT:  AND THERE WERE OTHERS THAT YOU

 9    E-MAILED?

10              MR. AKROTIRIANAKIS:  THE ONLY THING I E-MAILED WAS

11    THE SPECIAL VERDICT FORM AND, SADLY, MUCH LATER, THE

12    INSTRUCTION THAT I --

13              THE COURT:  THIS?

14              MR. AKROTIRIANAKIS:  YES.

15              THE COURT:  SO WE CAN PRINT THOSE OUT.

16              OKAY.  THEN I WILL MAKE SURE THAT THEY'RE PUT IN

17    THE RIGHT FONT AND INCLUDED IN THE PACKET WHICH YOU WILL HAVE

18    IN JUST A MOMENT.  THANK YOU.

19              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

20                        (RECESS)

21                (IN THE PRESENCE OF THE JURY:)

22              THE COURT:  GOOD MORNING.  LET THE RECORD REFLECT

23    THE PRESENCE OF ALL MEMBERS OF THE JURY, COUNSEL FOR BOTH

24    PARTIES, THE DEFENDANT IS ALSO PRESENT.

25              THE GOVERNMENT MAY CALL ITS FIRST WITNESS.
```

```
 1              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

 2              THE GOVERNMENT CALLS MONIQUE BUENO.

 3              THE CLERK:  PLEASE STOP NEXT TO THE COURT

 4     REPORTER.  PLEASE RAISE YOUR RIGHT HAND.

 5              PLAINTIFF'S WITNESS, MONIQUE BUENO, WAS SWORN

 6              THE CLERK:  PLEASE TAKE THE STAND.

 7              STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

 8     THE RECORD.

 9              THE WITNESS:  MY NAME IS MONIQUE D. BUENO.  MY LAST

10     NAME IS SPELLED B-U-E-N-O.

11              THE COURT:  THANK YOU.  YOU MAY INQUIRE.

12              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

13                        DIRECT EXAMINATION

14     BY MR. AKROTIRIANAKIS:

15     Q.   MS. BUENO, WHAT IS YOUR PRESENT OCCUPATION?

16     A.   I AM CURRENTLY EMPLOYED AS AN INTELLIGENCE ANALYST WITH

17     THE FBI, IN LOS ANGELES.

18     Q.   HOW LONG HAVE YOU BEEN SO EMPLOYED?

19     A.   I HAVE BEEN EMPLOYED IN THIS POSITION FOR APPROXIMATELY

20     EIGHT YEARS.

21     Q.   DO YOU WORK IN A PARTICULAR PROGRAM FOR THE FBI?

22     A.   YES.  I WORK IN THE INNOCENT IMAGES PROGRAM WHICH DEALS

23     WITH THE SEXUAL EXPLOITATION OF CHILDREN.

24     Q.   HAVE YOU WORKED FOR THE INNOCENT IMAGES PROGRAM WITH THE

25     FBI FOR THE ENTIRE TIME YOU HAVE BEEN WITH THE BUREAU SINCE
```

1    1999?

2    A.   YES.

3    Q.   DO YOUR DUTIES AS AN ANALYST IN THE FBI INNOCENT IMAGES

4    PROGRAM INCLUDE ANALYSIS OF SUSPECTED CHILD PORNOGRAPHY?

5    A.   YES.

6    Q.   DOES THE FBI MAINTAIN AN ARCHIVE OF SOURCE MATERIALS

7    THAT CONTAIN CHILD PORNOGRAPHY?

8    A.   YES.

9    Q.   AND WHERE DO THOSE SOURCE MATERIALS COME FROM?

10   A.   THESE SOURCE MATERIALS WERE SEIZED THROUGH VARIOUS

11   INVESTIGATIONS BY OTHER LAW ENFORCEMENT AGENCIES.

12   Q.   WHAT TYPES OF INVESTIGATIONS WERE THOSE SOURCE MATERIALS

13   SEIZED?

14   A.   THEY WERE SEIZED THROUGH THE SEXUAL EXPLOITATION OF

15   CHILDREN INVESTIGATIONS.

16   Q.   DOES THAT INCLUDE INVESTIGATIONS OF CHILD PORNOGRAPHY?

17   A.   YES.

18   Q.   APPROXIMATELY HOW MANY SOURCE MATERIALS ARE IN THE FBI

19   ARCHIVE THAT YOU HAVE NOW TESTIFIED TO?

20   A.   WE HAVE APPROXIMATELY 450 MAGAZINES.

21   Q.   AND HAVE YOU BROUGHT ANY OF THOSE 450 MAGAZINES TO COURT

22   TODAY?

23   A.   YES, I HAVE.

24   Q.   HOW MANY?

25   A.   I HAVE BROUGHT THREE MAGAZINES.

1    Q.    NOW, DOES THE FBI ARCHIVES INCLUDE ALL EXISTING CHILD

2    PORNOGRAPHY?

3    A.    NO, IT DOES NOT.

4    Q.    AND DOES THE FBI COORDINATE WITH ANY OTHER AGENCIES IN

5    CONNECTION WITH THE IMAGES -- INNOCENT IMAGES PROGRAM TO --

6    WELL, IN CONNECTION WITH THE INNOCENT IMAGES PROGRAM?

7    A.    YES, WE DO.  WE ACTUALLY COORDINATE WITH THE NATIONAL

8    CENTER FOR MISSING AND EXPLOITED CHILDREN.  WHICH IS A

9    NATIONAL CLEARINGHOUSE FOR NONGOVERNMENTAL ORGANIZATION.

10    Q.    AND IS THE NATIONAL CENTER FOR MISSING AND EXPLOITED

11    CHILDREN COMMONLY REFERRED TO NCMEC?

12    A.    YES.

13    Q.    IS THAT -- WHAT IS NCMEC?

14    A.    NCMEC IS THE NATIONAL CLEARINGHOUSE FOR MATERIAL RELATED

15    TO SEXUAL EXPLOITATION OF CHILDREN, AND IT ALSO HELPS WITH

16    PROTECTING CHILDREN.  IT PROVIDES RESOURCES TO BOTH THE

17    COMMUNITY AND LAW ENFORCEMENT COMMUNITY.

18    Q.    DOES IT SEEK, AS PART OF ITS MISSION, FOR EXAMPLE, TO

19    IDENTIFY MISSING CHILDREN?

20    A.    YES.

21    Q.    SO WHEN WE SEE FLIERS ON MILK CARTONS AND SO ON OF

22    MISSING CHILDREN, IS THAT THE TYPE OF THING THAT NCMEC IS

23    INVOLVED IN?

24    A.    YES.

25    Q.    ARE YOU FAMILIAR WITH CVIP OR THE CHILD VICTIM

1    IDENTIFICATION PROGRAM?

2    A.    YES.

3    Q.    IS CVIP, OR C-V-I-P, WHICH IS IT?

4    A.    CHILD VICTIM IDENTIFICATION PROGRAM.

5    Q.    I WILL CALL IT CVIP.

6    A.    YES.

7    Q.    IS CVIP PART OF NCMEC?

8    A.    YES.

9    Q.    AND WHAT IS CVIP REPRESENTING?

10   A.    CVIP IS A DATABASE TO IDENTIFY VICTIMS.  THESE ARE

11   CHILDREN THAT HAVE BEEN IDENTIFIED THROUGH CHILD PORNOGRAPHY

12   INVESTIGATIONS.

13   Q.    NOW, DO YOUR DUTIES WITH THE FBI'S INNOCENT IMAGES

14   PROGRAM INCLUDE COMPARISON OF SUSPECTED CHILD PORNOGRAPHY

15   WITH THE SOURCE MATERIALS THAT YOU HAVE NOW TESTIFIED TO?

16   A.    YES.

17   Q.    WHAT IS THE PURPOSE OF COMPARING SUSPECTED CHILD

18   PORNOGRAPHY -- WELL, LET ME ASK YOU THIS FIRST:  THE

19   SUSPECTED CHILD PORNOGRAPHY THAT YOU COMPARE TO THE EXISTING

20   ARCHIVE AT THE FBI, WHERE DOES THE SUSPECTED CHILD

21   PORNOGRAPHY COME FROM WHEN IT'S PROVIDED TO YOU?

22   A.    THEY ARE NORMALLY PROVIDED THROUGH INVESTIGATORS THROUGH

23   ACTIVE CASES.

24   Q.    WHAT IS THE PURPOSE OF COMPARING THAT SUSPECTED CHILD

25   PORNOGRAPHY WITH THE SOURCE MATERIALS IN THE FBI ARCHIVE?

1    A.    IT IS TO DETERMINE IF THESE SUSPECTED IMAGES APPEAR IN

2    THESE MAGAZINES IN OUR ARCHIVE.

3    Q.    NOW, REFERRING TO THE ARCHIVE YOU TESTIFIED TO, WHAT IS

4    THE GENERAL TIME FRAME OF THE PUBLICATION OF THOSE MATERIALS?

5    A.    THESE MAGAZINES WERE PUBLISHED GENERALLY IN THE EARLY

6    '70S AND EARLY '80S.

7    Q.    NOW, IN CONNECTION WITH THIS TRIAL, WERE YOU ASKED TO

8    COMPARE IMAGES OF SUSPECTED CHILD PORNOGRAPHY TO SOURCE

9    MATERIALS IN THE FBI ARCHIVE?

10   A.    YES.

11   Q.    AND WERE YOU ABLE TO MAKE ANY MATCHES OF THE IMAGES THAT

12   YOU WERE ASKED TO COMPARE TO MATERIALS IN THE FBI ARCHIVE?

13   A.    YES.

14   Q.    HOW MANY IMAGES WERE YOU ABLE TO MATCH?

15   A.    I WAS ABLE TO MATCH ONE IMAGE.

16   Q.    BEFORE YOU ARE A FEW FOLDERS.  DO YOU SEE THOSE?

17   A.    YES.

18   Q.    IS ONE OF THEM LABELED 117?

19   A.    I HAVE 140 THROUGH 142.

20   Q.    OKAY.  IN THE BOX RIGHT BEHIND YOU -- IN FACT, IT IS THE

21   FIRST BOX OF THE TWO -- IT IS THE SECOND BOX OF THE TWO.

22   THERE IS A FOLDER THAT SAYS EXHIBIT 117 ON IT.

23            IF YOU CAN REFER TO THAT, PLEASE?

24   A.    IT JUMPS TO 139 TO 110.

25            MR. AKROTIRIANAKIS:  MAY I ASSIST THE WITNESS, YOUR

```
 1    HONOR?

 2              THE COURT:  YES, YOU MAY.

 3    BY MR. AKROTIRIANAKIS:

 4    Q.   MS. BUENO, I ASK THAT YOU LOOK AT EXHIBIT 117.

 5    DO YOU RECOGNIZE EXHIBIT 117?

 6    A.   YES, I DO.

 7    Q.   WAS EXHIBIT 117 AMONG THE IMAGES PROVIDED TO YOU IN

 8    CONNECTION WITH THIS CASE?

 9    A.   YES.

10    Q.   WERE YOU ABLE TO MATCH EXHIBIT 117 TO AN IMAGE FROM THE

11    FBI ARCHIVE?

12    A.   YES, I WAS.

13    Q.   NOW, I WOULD ASK YOU NOW TO REFER TO EXHIBITS 140, 141,

14    AND 142.

15              MY QUESTION FOR YOU IS GOING TO BE WHETHER THOSE

16    THREE EXHIBITS ARE TRUE AND CORRECT COPIES OF RELEVANT

17    PORTIONS OF THE THREE MAGAZINES YOU TESTIFIED YOU BROUGHT

18    WITH YOU TODAY?

19    A.   YES, THEY ARE.

20    Q.   REFERRING YOU TO EXHIBIT 141, WHICH IS BEFORE YOU, DO

21    YOU RECOGNIZE THAT ITEM?

22    A.   YES.

23    Q.   WHAT IS IT?

24    A.   IT IS A PHOTOCOPY OF THE MAGAZINE.

25    Q.   WHAT MAGAZINE?
```

1    A.    THE MAGAZINE IS ENTITLED PICCOLO NO. 29.

2    Q.    BASED ON YOUR WORK AS FBI INTELLIGENCE ANALYST, ARE YOU

3    FAMILIAR WITH PICCOLO MAGAZINE?

4    A.    YES, I AM.

5    Q.    WHAT IS PICCOLO MAGAZINE?

6    A.    PICCOLO MAGAZINE IS A CHILD PORNOGRAPHY MAGAZINE.

7    Q.    AND IF I CAN NOW REFER YOU TO THE ORIGINALS OF THE --

8    INCLUDING THE ORIGINAL OF PICCOLO MAGAZINE THAT YOU BROUGHT

9    WITH YOU TODAY, THEY ARE IN AN ENVELOPE THAT'S BEFORE YOU

10   THERE.  COULD YOU PLEASE REFER TO ONE OF THE THREE MAGAZINES

11   WHICH IS COPIED IN EXHIBIT 141.

12          GO AHEAD AND TAKE THEM OUT.  DO YOU HAVE THE ONE

13   BEFORE YOU THAT IS COPIED AS PART OF EXHIBIT 141?

14   A.    YES.

15   Q.    I WOULD LIKE YOU TO TURN TO THE 10TH PAGE OF THAT

16   MAGAZINE.

17          MS. BUENO, WERE YOU ABLE TO MATCH EXHIBIT 117 TO

18   THE IMAGE ON PAGE 10 OF EXHIBIT 141?

19   A.    YES.

20          MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 141.

21          THE COURT:  ANY OBJECTIONS OTHER THAN WHAT'S BEEN

22   PREVIOUSLY STATED?

23          MR. AARON:  NO.

24          THE COURT:  THANK YOU.  EXHIBIT 141 IS ORDERED

25   ADMITTED.

1          MR. AKROTIRIANAKIS:  MAY I RETRIEVE IT TO PUBLISH

2     IT, YOUR HONOR?

3          THE COURT:  YOU MAY.

4     BY MR. AKROTIRIANAKIS:

5     Q.   MS. BUENO, DOES EXHIBIT 141 HAVE A VOLUME NUMBER?

6     A.   YES, IT DOES.

7     Q.   WHAT IS THAT VOLUME NUMBER?

8     A.   THE VOLUME NUMBER IS NO. 29.

9     Q.   DOES EXHIBIT 141, MS. BUENO, HAVE A PUBLICATION DATE?

10    A.   NO, IT DOES NOT.

11         MR. AKROTIRIANAKIS:  I'M PLACING EXHIBIT 141 ON THE

12    OVERHEAD DOCUMENT CAMERA.  AND I WILL NOW OPEN IT TO PAGE 10

13    AND PLACE THAT DOCUMENT ON THE OVERHEAD DOCUMENT CAMERA.

14         AND WITH THE COURT'S PERMISSION, MAY I PUBLISH 117?

15         THE COURT:  YOU MAY.

16         MR. AKROTIRIANAKIS:  I'M NOW PUBLISHING EXHIBIT 117

17    SIDE BY SIDE TO PAGE 10 FROM EXHIBIT 141.

18    BY MR. AKROTIRIANAKIS:

19    Q.   MY QUESTION FOR YOU, MS. BUENO, IS WHETHER EXHIBIT 117

20    IS THE IMAGE THAT YOU MATCHED TO PAGE 10 OF EXHIBIT 141,

21    VOLUME 29, PICCOLO MAGAZINE?

22    A.   YES, IT IS.

23    Q.   DOES EXHIBIT 141 INDICATE IN WHAT COUNTRY THAT MAGAZINE

24    WAS PUBLISHED?

25    A.   YES, IT DOES.

1    Q.    AND WHAT COUNTRY IS THAT?

2    A.    DENMARK.

3            MR. AKROTIRIANAKIS:   I AM PLACING THE 12TH PAGE OF

4    EXHIBIT 141, WITH THE COURT'S PERMISSION, ON THE OVERHEAD

5    DOCUMENT CAMERA.

6            THE COURT:   GO AHEAD.

7    BY MR. AKROTIRIANAKIS:

8    Q.    IS THIS THE REFERENCE TO HAVING BEEN PUBLISHED IN

9    DENMARK THAT YOU ARE REFERRING TO?

10   A.    YES, IT IS.

11   Q.    AND DOES EXHIBIT 141 INCLUDE LANGUAGE BOTH IN ENGLISH

12   AND A GERMANIC LANGUAGE?

13   A.    YES, IT DOES.

14   Q.    NOW, YOU TESTIFIED THAT EXHIBIT 141 DOES NOT HAVE A

15   PRECISE PUBLICATION DATE IN IT?

16   A.    THAT'S CORRECT.

17   Q.    HAVE YOU BROUGHT WITH YOU TODAY VOLUMES FROM PICCOLO

18   MAGAZINE THAT ARE PUBLISHED PRIOR TO AND/OR EARLIER VOLUMES

19   AND LATER VOLUMES OF THE SAME MAGAZINE?

20   A.    YES, I HAVE.

21   Q.    SO, EXHIBIT 141 IS VOLUME 29, RIGHT?

22   A.    YES.

23   Q.    WHAT OTHER VOLUMES DID YOU BRING WITH?

24   A.    I BROUGHT VOLUME NO. 27 AND VOLUME NO. 32.

25   Q.    AND IS VOLUME 27 WHAT'S BEEN MARKED AS EXHIBIT 140?

1    A.    YES, IT IS.

2    Q.    COPIES OF VOLUME 27; IS THAT RIGHT?

3    A.    YES, IT IS.

4    Q.    AND IS EXHIBIT 142 COPIES OF PORTIONS OF VOLUME 32 OF

5    PICCOLO MAGAZINE?

6    A.    YES, IT IS.

7    Q.    NOW, DO EXHIBITS 140 AND 142 HAVE PRINTING DATES IN

8    THEM?

9    A.    YES, THEY DO.

10           MR. AKROTIRIANAKIS:   THE GOVERNMENT OFFERS 140 AND

11   142.

12           THE COURT:   ANY OBJECTIONS OTHER THAN THOSE

13   PREVIOUSLY STATED?

14           MR. AARON:   NO, YOUR HONOR.

15           THE COURT:   THANK YOU.   THEY ARE ADMITTED.   AND YOU

16   MAY PUBLISH.

17   BY MR. AKROTIRIANAKIS:

18   Q.    IN WHAT YEAR WAS EXHIBIT 140 INDICATE IT WAS

19   PRINTED?

20   A.    IT WAS PRINTED IN 1978.

21   Q.    AND IN WHAT YEAR DOES EXHIBIT 142 INDICATE THAT IT WAS

22   PRINTED?

23   A.    THIS MAGAZINE WAS PRINTED IN 1979.

24   Q.    DO EXHIBITS 140 AND 142 INDICATE THE COUNTRY OF

25   PUBLICATION?

1    A.    YES, THEY DO.

2    Q.    IN WHAT COUNTRY DO EXHIBITS 140 AND 142 INDICATE THAT

3    THEY WERE PUBLISHED?

4    A.    THESE MAGAZINES WERE BOTH PUBLISHED IN DENMARK.

5    Q.    PLACING EXHIBIT 140, THE COPY OF THE COVER PAGE ON THE

6    OVERHEAD DOCUMENT CAMERA.  IT INDICATES VOLUME 27.

7              AND NOW I'M PLACING THE COVER PAGE OF EXHIBIT 142

8    ON THE OVERHEAD DOCUMENT CAMERA.  IT INDICATES VOLUME 32.

9              NOW I'M PLACING PAGE 2 OF EXHIBIT 140 THAT IS

10   VOLUME 27 ON THE DOCUMENT CAMERA.  AND READING FROM THE

11   DOCUMENT, PRINTED IN DENMARK, APRIL 1978.

12             I AM NOW PLACING THE OTHER PAGE OF EXHIBIT 142 ON

13   OVERHEAD DOCUMENT CAMERA.  AND READING FROM THE DOCUMENT,

14   1979, DENMARK.

15             MR. AKROTIRIANAKIS:  I HAVE NO FURTHER QUESTIONS,

16   YOUR HONOR.

17             THE COURT:  THANK YOU.

18             CROSS-EXAMINATION?

19                      CROSS-EXAMINATION

20   BY MR. AARON:

21   Q.    GOOD MORNING.

22   A.    GOOD MORNING.

23   Q.    IMAGES CAN BE SCANNED INTO A COMPUTER, RIGHT?

24   A.    YES.

25   Q.    AND THEN ONCE THOSE IMAGES ARE SCANNED INTO A COMPUTER,

```
 1    THEY CAN BE PRINTED OUT, RIGHT?

 2    A.   YES.

 3    Q.   OR THEY COULD BE E-MAILED?

 4    A.   YES.

 5    Q.   OR THEY COULD BE CROPPED?

 6    A.   YES.

 7    Q.   THEY COULD BE MANIPULATED IN ANY NUMBER OF WAYS?

 8    A.   YES.

 9    Q.   YOU CAN SCAN IMAGES FROM A VARIETY OF MEDIA, RIGHT?  YOU

10    COULD SCAN AN IMAGE FROM A NEWSPAPER OR FROM A MAGAZINE?

11    A.   YES.

12    Q.   AND IF YOU SCANNED IT -- LET'S SAY YOU SCANNED AN IMAGE

13    HERE IN RIVERSIDE AND THEN YOU PUT IT ON A DISK.  THEN YOU

14    WOULD HAVE IT ON FLOPPY DISK, RIGHT?

15    A.   YES.

16    Q.   AND ALL OF THOSE ACTIONS WOULD HAVE TAKEN PLACE IN

17    RIVERSIDE, CALIFORNIA, RIGHT?

18    A.   YES.

19              MR. AARON:  THANK YOU.  NOTHING FURTHER.

20              THE COURT:  ANY REDIRECT?

21              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

22              MAY I HAVE A VERY BRIEF MOMENT?

23                        REDIRECT EXAMINATION

24    BY MR. AKROTIRIANAKIS:

25    Q.   MS. BUENO, GIVEN THAT THESE IMAGES WERE PRINTED IN -- OR
```

1   THIS IMAGE WAS PRINTED IN A MAGAZINE PUBLISHED IN DENMARK, IS

2   IT TRUE THAT IT HAD BEEN SHIPPED OR TRANSPORTED AT SOME POINT

3   IN ORDER TO END UP HERE IN CALIFORNIA?

4   A.   YES.

5   Q.   AND WOULD THAT HAVE BEEN SHIPPING OR TRANSPORTING IN

6   FOREIGN COMMERCE?

7   A.   YES.

8           MR. AKROTIRIANAKIS:  NO FURTHER QUESTIONS.

9           THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

10           MR. MICHAEL:  YOUR HONOR, SUBJECT TO VERIFICATION

11   THAT ALL EXHIBITS HAVE BEEN ADMITTED, THE GOVERNMENT RESTS.

12           THE COURT:  THANK YOU.

13           COUNSEL, WOULD YOU PLEASE APPROACH.

14            (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

15           MR. AARON:  WE REST.

16           THE COURT:  DO YOU WISH TO MAKE YOUR RULE 29

17   MOTION?

18           MR. AARON:  YES.

19           THE COURT:  GO AHEAD.

20           MR. AARON:  I WILL MAKE A RULE 29 MOTION AS TO

21   COUNT 2, POSSESSION OF CHILD PORNOGRAPHY; COUNT 3, THE

22   TRAVELING; AND COUNT 4, THE TRAVELING WITH THE COMMISSION OR

23   ATTEMPTED COMMISSION OF A SEXUAL ACT.

24           THERE IS NO EVIDENCE, YOUR HONOR, THAT A SEXUAL ACT

25   WAS COMMITTED ON OR ABOUT DECEMBER 2000, WHICH IS WHAT'S IN

1    THE INDICTMENT.  THERE IS ONLY ONE REFERENCE, I BELIEVE, IN

2    THE ENTIRE CHATS TO ANYTHING INVOLVING KALEN BEFORE THAT

3    TRIP, AND THAT'S AN ENTRY, I THINK, ON 12-14-00.  THERE IS NO

4    ENTRY AS TO ANY INTENT TO COMMIT A SEXUAL ACT ON OR ABOUT

5    THAT TIME.

6            IF YOU LOOK AT THE EVIDENCE FROM WHICH YOU CAN

7    REASONABLY INFER INTENT, YOU LOOK AT THE DEFENDANT'S ACTIONS,

8    THE DEFENDANT'S STATEMENTS, NOTHING BEFORE 2000, DECEMBER

9    2000, INDICATES THAT HE IS GOING TO COMMIT A SEXUAL ACT.

10           IF HE IS GOING TO NEW MEXICO TO ENGAGE IN CRIMINAL

11    BEHAVIOR, THAT MIGHT BE A DIFFERENT TYPE OF CRIME, BUT IT IS

12    NOT A CRIME AGAINST 3 AND 4.

13           IN TERMS OF COUNT 2, THE POSSESSION CHARGE, ALMOST

14    ALL OF THE IMAGES --

15           THE COURT:  I WOULD ASK YOU TO RESPOND TO ONE COUNT

16    AT A TIME.

17           MR. MICHAEL:  YOUR HONOR, DRAWING ALL INFERENCES IN

18    FAVOR OF THE GOVERNMENT, AS REQUIRED AT THIS POINT, THE

19    GOVERNMENT WOULD NOTE THAT IN THE CHATS THE DEFENDANT TALKS

20    ABOUT PUTTING SOFT PORNOGRAPHY ON HIS COMPUTER PRIOR TO

21    SEEING KALEN, SO THAT KALEN CAN ACCIDENTALLY SEE IT OVER HIS

22    SHOULDER.

23           IN LIGHT OF THE TESTIMONY OF AGENT CLEMENTE, IT IS

24    CLEAR GROOMING BEHAVIOR -- IN LIGHT OF ALL OF THE OTHER OF

25    DEFENDANT'S ACTIONS IN THE CHATS, AND THE OTHER EVIDENCE AS

1    CORROBORATED BY TONY SUTHERLAND, THE FATHER -- IT IS CLEAR

2    THE DEFENDANT ENGAGED IN A KNOWING AND WILLFUL PATTERN OF

3    GROOMING WITH INTENT TO ENGAGE IN A SEX ACT WITH KALEN.

4         IN ADDITION, THERE ARE SUBSEQUENT CHATS IN WHICH

5    THE DEFENDANT DESCRIBES HOW HE HAS BEEN BONDING WITH KALEN

6    SINCE HE WAS THREE MONTHS OLD.  AND HE DESCRIBES IT AS THE

7    LITTLE IMP CAME ONTO HIM WHEN HE WAS SIX YEARS OLD.

8         SO, CLEARLY, IN THE DEFENDANT'S VIEW, THIS WAS

9    BEHAVIOR, AN INTENT THAT EXISTED BEFORE HE WENT TO NEW MEXICO

10   WHEN HE TRAVELED.  AND THEN, OBVIOUSLY, THE DEFENDANT

11   DESCRIBED AFTER THE TRAVEL WHAT HAD HAPPENED AND WHAT HE HAD

12   DONE THERE AND DISCUSSES IN OTHER CHATS HOW HE USES HIS

13   LAPTOP, SPECIFICALLY WITH THE SOFT PORNOGRAPHY, TO SHOW IT TO

14   HIS BOYS.

15        AND ALTHOUGH IT IS AFTER THE FACT, IT'S CERTAINLY

16   DESCRIBING BEHAVIOR THAT HE HAS COMMITTED HISTORICALLY AND IS

17   CONSISTENT WITH THE DECEMBER 14TH -- I BELIEVE DECEMBER 14TH

18   -- ENTRY IN WHICH HE TALKS ABOUT CHILD PORNOGRAPHY.

19        IN ADDITION, INFERENCES CAN BE DRAWN FROM WHAT HE

20   SAYS ACTUALLY HAPPENED, IN TERMS OF HIS INTERACTION WITH

21   KALEN.  AND INFERENCES CAN ALSO BE DRAWN FROM TONY

22   SUTHERLAND'S TESTIMONY ABOUT THE NATURE OF THEIR

23   RELATIONSHIP, DEFENDANT'S BEHAVIOR, AND INTERACTION WITH

24   KALEN WHEN HE SPENT TIME WITH HIM, TIME ALONE WITH HIM.  HE

25   INCREASED AFFECTION BACK FROM KALEN, INCREASED AFFECTION

1   BACK, BUYING GIFTS FOR HIM.

2           ONCE, HE WAS THERE TAKING HIM TO THE HOT TUB ALONE.

3   AND THEN, OBVIOUSLY, WHEN HE DESCRIBES THE SEX ACTS AT A

4   LATER POINT OF MASSAGING HIS ANUS, JUST ARRIVING AT THE POINT

5   OF ORGASM OR DRY ORGASM, OBVIOUSLY, A STRONG INFERENCE THAT

6   HE HAD TOUCHED THE BOY'S PENIS.

7           AND TAKEN IN CONTEXT, YOUR HONOR, THE GOVERNMENT

8   SUBMITS THERE IS AMPLE EVIDENCE TO WITHSTAND A RULE 29 MOTION

9   AT THIS POINT.

10          THE COURT:  ALL RIGHT.  THE NEXT COUNT?

11          MR. AARON:  THE CHILD PORNOGRAPHY COUNT.

12          AND I WOULD ARGUE THAT ALMOST ALL OF THE IMAGES ARE

13  ON UNALLOCATED SPACE INDICATING THAT THEY HAD BEEN DELETED.

14  SO THE INTENT WAS NOT TO POSSESS THOSE IMAGES.  THERE WAS ONE

15  IMAGE FOUND IN AN ALLOCATED SPACE ON A DISK WHICH WAS FOUND

16  IN THE STORAGE LOCKER WITH MR. BEKENSTEIN'S PROPERTY.  HE

17  WOULD MAINTAIN THAT WAS MR. BEKENSTEIN'S PROPERTY.

18          THERE WAS ANOTHER FILE WHICH WAS FOUND ON THE ICQ

19  FOLDER.  AND AS THE AGENT TESTIFIED, THAT FOLDER IS NOT

20  READABLE.  MR. SANDERS MAY NOT EVEN HAVE KNOWN THAT FOLDER

21  WAS ON HIS -- THAT FILE WAS ON HIS COMPUTER.

22          SO, WE WOULD SUBMIT AS TO COUNT 2.

23          THE COURT:  WELL --

24          MR. MICHAEL:  MAY I BE HEARD WITH REGARD TO COUNT

25  4?

1           I WAS ARGUING PRIMARILY WITH THE INTENT TO COUNT 3,

2   WHICH ALSO IS THE SAME ELEMENT, SAME ELEMENT FOR THE FIRST

3   ELEMENT OF COUNT 4.

4           WITH REGARD TO THE ACTUAL COMMISSION OR ATTEMPTED

5   COMMISSION OF THE SEX ACT, THE GOVERNMENT WOULD SUBMIT THAT A

6   REASONABLE INFERENCE THAT MASSAGING THE ANUS OF THE BOY, IN

7   LIGHT OF THE DEFENDANT'S REPEATED STATEMENTS ABOUT AN

8   AFFINITY FOR BOYS' BUTTOCKS, ANUS, AND PERFORMING SEXUAL ACTS

9   OR ORALLY AND DIGITALLY AND PENILE WITH A BOY'S ANUS, WHEN

10  THE DEFENDANT SAYS HE WAS MASSAGING THE ANUS, IT IS CLEAR AN

11  INFERENCE CAN BE DRAWN THAT MASSAGING AN APERTURE WOULD

12  ENTAIL SLIGHT PENETRATION, THAT THE DEFENDANT'S INTENT WAS

13  THERE.

14          IF YOU REFER TO THE CROW18 CHAT IN EXHIBIT 3, HE

15  TALKS ABOUT DIGITAL PENETRATION.  HE POSSESSED AN IMAGE OF A

16  YOUNG BOY, PREPUBESCENT, DIGITALLY PENETRATING HIMSELF.  HE

17  DESCRIBES HIMSELF -- I DON'T KNOW IF THIS IS THE EXACT WORD,

18  BUT AS A MAN WITH A PARTICULAR AFFINITY FOR BOYS' BUTTOCKS.

19          AND SO IN LIGHT OF THAT, AS WELL AS TALKING ABOUT

20  JUST ARRIVING AT ORGASM, THERE IS STRONG INFERENCES AND

21  REASONABLE INFERENCES THAT HE TOUCHED THE BOY'S PENIS, HE

22  DIGITALLY PENETRATED HIS ANUS, HOWEVER SLIGHT, AND THAT THERE

23  WERE CERTAINLY SUBSTANTIAL STEPS BEYOND MERE PREPARATION WITH

24  REGARD TO MANY OF THE OTHER ACTS DESCRIBED IN THE CHATS.

25          MR. AARON:  IF I MIGHT RESPOND?

1              THE COURT:  ALL RIGHT.

2              MR. AARON:  WE DON'T KNOW WHEN THIS MASSAGE

3     ALLEGEDLY TOOK PLACE.  I BELIEVE IT IS A REFERENCE TO A PAST

4     ACT, AND THE ACT HAS TO TAKE PLACE IN DECEMBER OR REASONABLY

5     NEAR TO THAT DATE.

6              SECONDLY, AS I SAID BEFORE, IF YOU ARE TO ENGAGE IN

7     GROOMING BEHAVIOR, UNLESS IT IS A SEX ACT, 2246, IT DOESN'T

8     COUNT.

9              ALSO, SPECIAL AGENT CLEMENTE SAID THAT GROOMING CAN

10    TAKE YEARS.  IT MAY BE SOME OTHER CRIME, BUT IT IS NOT THIS

11    CRIME.  HE MAY HAVE HAD AN INTENT TO HAVE SEX, BUT IT HAD TO

12    HAVE BEEN SEX IN DECEMBER OF 2000, NOT AT SOME FUTURE POINT.

13             THE COURT:  WELL, DECEMBER OF 2000 IS WHEN HE

14    VISITED.  AND I THINK THERE IS AMPLE EVIDENCE FOR WHICH THE

15    JURY COULD MAKE THAT FINDING THAT THE CRIME OCCURRED, AND

16    SPECIFICALLY THE CRIME IN COUNT 4 OCCURRED ON OR ABOUT

17    DECEMBER OF 2000.

18             HAVE YOU FINISHED ARGUING AS TO ALL THE COUNTS?

19             MR. AARON:  I HAVE.

20             THE COURT:  THANK YOU.

21             MR. MICHAEL:  YOUR HONOR, FOR THE RECORD, MAY I ADD

22    ONE ADDITIONAL POINT?

23             THE COURT:  YES.

24             MR. MICHAEL:  THE DEFENDANT ALSO INDICATED THAT THE

25    MOTHER UNDERSTOOD HIS NEED TO BE WITH THE BOY.  AND WE KNOW

```
 1   FROM TONY SUTHERLAND'S TESTIMONY THAT THE DEFENDANT RESIDED

 2   AT THE MOTHER'S HOUSE WHEN THE BOY WAS THERE.

 3            THE COURT:  I FOUND ONE SMALL TYPOGRAPHICAL ERROR

 4   IN ONE OF THE INSTRUCTIONS IT WAS CONNECTED WITH.  MY CLERK

 5   IS CORRECTING IT RIGHT NOW.

 6            MR. MICHAEL:  WE INDICATE THERE IS NO NEED TO ARGUE

 7   WITH REGARD TO THE MOTION OF COUNT 2, FROM THE GOVERNMENT.

 8            MR. AARON:  WOULD IT BE POSSIBLE TO TAKE A SMALL

 9   BREAK?

10            THE COURT:  AFTER THE INSTRUCTIONS.

11            MR. AARON:  WELL, I WANTED TO GET A COUPLE OF

12   EXHIBITS BEFORE MY ARGUMENT.

13            THE COURT:  I THINK -- HOW LONG FOR YOUR OPENING?

14            MR. MICHAEL:  I THINK I WILL BE CLOSE TO MY

15   MAXIMUM.  MY GOAL IS TO SAVE A SMALL AMOUNT OF TIME FOR

16   REBUTTAL.

17            MR. MICHAEL:  YOUR HONOR, IF I COULD JUST -- MAY

18   MS. BUENO COME INTO THE ROOM AT THIS POINT TO OBSERVE?

19            THE COURT:  OH, YES.

20            THE RULING IS DENIED ON THE RULE 29 MOTION.

21      (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

22            COUNSEL, THE CLERK IS HANDING YOU THE INSTRUCTION.

23            MR. MICHAEL:  MAY I GET SOME EXHIBITS TO PREPARE?

24            THE COURT:  YOU MAY.  MEMBERS OF THE JURY, NOW THAT

25   YOU HAVE HEARD ALL OF THE EVIDENCE, IT IS MY DUTY TO INSTRUCT
```

1  YOU ON THE LAW WHICH APPLIES TO THIS CASE.  COPIES OF THESE

2  INSTRUCTIONS WILL BE AVAILABLE TO YOU IN THE JURY ROOM FOR

3  YOU TO CONSULT.

4        IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

5  EVIDENCE IN THIS CASE.  TO THOSE FACTS, YOU WILL APPLY THE

6  LAW AS I GIVE IT TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE

7  IT TO YOU WHETHER YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT

8  BE INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS,

9  PREJUDICES, OR SYMPATHY.  THAT MEANS YOU MUST DECIDE THIS

10 CASE SOLELY ON THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT

11 YOU TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING OF THE

12 CASE.

13        IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL

14 OF THEM AND YOU MUST NOT SINGLE OUT SOME AND IGNORE OTHERS;

15 THEY ARE ALL EQUALLY IMPORTANT.  YOU MUST NOT READ INTO THESE

16 INSTRUCTIONS OR INTO ANYTHING THAT I MAY HAVE SAID OR DONE AS

17 ANY SUGGESTION AS TO WHAT VERDICT YOU SHOULD RETURN; THAT IS

18 A MATTER ENTIRELY UP TO YOU.

19        THE INDICTMENT IN THIS CASE IS NOT EVIDENCE.  THE

20 DEFENDANT HAS PLEADED NOT GUILTY TO THE CHARGES CONTAINED IN

21 THE INDICTMENT.  THE DEFENDANT IS PRESUMED TO BE INNOCENT AND

22 HE DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE TO PROVE

23 INNOCENCE.  THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY

24 ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

25        PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT

1   LEAVES YOU FIRMLY CONVINCED THAT THE DEFENDANT IS GUILTY.  IT

2   IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL

3   POSSIBLE DOUBT.

4          A "REASONABLE DOUBT" IS A DOUBT BASED UPON REASON

5   AND COMMON SENSE AND IS NOT BASED PURELY ON SPECULATION.  IT

6   MAY ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL

7   THE EVIDENCE, OR FROM A LACK OF EVIDENCE.

8          IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF

9   ALL THE EVIDENCE YOU ARE NOT CONVINCED BEYOND A REASONABLE

10  DOUBT THAT THE DEFENDANT IS GUILTY, IT IS YOUR DUTY TO FIND

11  THE DEFENDANT NOT GUILTY.

12         ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

13  CONSIDERATION OF ALL THE EVIDENCE YOU ARE CONVINCED BEYOND A

14  REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, IT IS YOUR

15  DUTY TO FIND THE DEFENDANT GUILTY.

16         UNLESS THE GOVERNMENT PROVES BEYOND A REASONABLE

17  DOUBT THAT THE DEFENDANT HAS COMMITTED EACH AND EVERY ELEMENT

18  OF THE OFFENSE CHARGED IN THE INDICTMENT, YOU MUST FIND THE

19  DEFENDANT NOT GUILTY OF THE OFFENSE.  IF THE JURY VIEWS THE

20  EVIDENCE IN THE CASE AS REASONABLY PERMITTING EITHER OF TWO

21  CONCLUSIONS -- ONE OF INNOCENCE, THE OTHER OF GUILT -- THE

22  JURY MUST, OF COURSE, ADOPT THE CONCLUSION OF INNOCENCE.

23         A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL

24  RIGHT NOT TO TESTIFY.  NO PRESUMPTION OF GUILT MAY BE RAISED,

25  AND NO INFERENCE OF ANY KIND MAY BE DRAWN FROM THE FACT THAT

1    A DEFENDANT DOES NOT TESTIFY.

2             THE EVIDENCE FROM WHICH YOU ARE TO DECIDE WHAT THE

3    FACTS ARE CONSISTS OF:

4             (1) THE SWORN TESTIMONY OF ANY WITNESS -- OF ANY

5    WITNESSES;

6             (2) THE EXHIBITS WHICH HAVE BEEN RECEIVED INTO

7    EVIDENCE; AND

8             (3) ANY FACTS TO WHICH ALL THE LAWYERS HAVE

9    STIPULATED OR AGREED.

10            IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY

11   THE TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN

12   THINGS ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN

13   DECIDING WHAT THE FACTS ARE.  I WILL LIST THOSE FOR YOU:

14            1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

15   EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  AND WHAT THEY HAVE

16   SAID IN THEIR OPENING STATEMENTS, WHAT THEY ARE ABOUT TO SAY

17   IN THEIR CLOSING ARGUMENTS AND AT OTHER TIMES DURING THE

18   TRIAL IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IS

19   NOT EVIDENCE.  SO, IF THE FACTS AS YOU REMEMBER THEM DIFFER

20   FROM THE WAY THE LAWYERS STATE THEM, YOUR MEMORY OF THE FACTS

21   CONTROLS.

22            2.  QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT

23   EVIDENCE.  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT

24   WHEN THEY BELIEVE THAT A QUESTION IS IMPROPER UNDER THE RULES

25   OF EVIDENCE.  YOU SHOULD NOT BE INFLUENCED BY EITHER THE

1    QUESTION, THE OBJECTION, OR THE COURT'S RULING ON THE

2    OBJECTION.

3            3.   TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN,

4    OR THAT YOU HAVE BEEN INSTRUCTED TO DISREGARD, IS NOT

5    EVIDENCE AND MUST NOT BE CONSIDERED.  IN ADDITION, SOMETIMES

6    THERE IS TRIAL TESTIMONY AND EXHIBITS THAT HAVE BEEN RECEIVED

7    ONLY FOR A LIMITED PURPOSE; WHERE I HAVE GIVEN A LIMITING

8    INSTRUCTION, YOU MUST FOLLOW IT.

9            4.   ANYTHING THAT YOU MAY HAVE SEEN OR HEARD WHEN

10   THE COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO

11   DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

12           EVIDENCE MAY BE EITHER DIRECT OR CIRCUMSTANTIAL.

13   DIRECT EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY

14   OF AN EYEWITNESS.  CIRCUMSTANTIAL EVIDENCE IS INDIRECT

15   EVIDENCE.  THAT MEANS IT IS PROOF OF A CHAIN OF FACTS FROM

16   WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH

17   KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE

18   WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

19   EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO

20   ANY EVIDENCE.

21           IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

22   DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

23   BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART

24   OF IT, OR NONE OF IT.

25           IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU

1   MAY TAKE INTO ACCOUNT:

2           1.   THE OPPORTUNITY AND ABILITY OF THE WITNESS TO

3   SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

4           2.   THE WITNESS'S MEMORY;

5           3.   THE WITNESS'S MANNER WHILE TESTIFYING;

6           4.   THE WITNESS'S INTEREST IN THE OUTCOME OF THE

7   CASE AND ANY BIAS OR PREJUDICE;

8           5.   WHETHER OTHER EVIDENCE CONTRADICTED THE

9   WITNESS'S TESTIMONY;

10          6.   THE REASONABLENESS OF THE WITNESS'S TESTIMONY

11  IN LIGHT OF ALL THE EVIDENCE; AND

12          7.   ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

13          THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

14  NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

15          YOU ARE HERE ONLY TO DETERMINE WHETHER THE

16  DEFENDANT IS GUILTY OR NOT GUILTY OF THE CHARGES IN THE

17  INDICTMENT, AND YOUR DETERMINATION MUST BE MADE ONLY FROM THE

18  EVIDENCE IN THE CASE.  THE DEFENDANT IS NOT ON TRIAL FOR ANY

19  CONDUCT OR OFFENSE NOT CHARGED IN THE INDICTMENT IN THIS

20  CASE.  YOU SHOULD CONSIDER EVIDENCE ABOUT THE ACTS,

21  STATEMENTS, AND INTENTION OF OTHERS, OR EVIDENCE ABOUT OTHER

22  ACTS OF THE DEFENDANT, ONLY AS THEY RELATE TO THIS CHARGE --

23  THESE CHARGES AGAINST THIS DEFENDANT.

24          A SEPARATE CRIME IS CHARGED AGAINST THE DEFENDANT

25  IN EACH COUNT IN THE INDICTMENT.  YOU MUST DECIDE EACH COUNT

1    SEPARATELY.  YOUR VERDICT ON ONE COUNT SHOULD NOT CONTROL

2    YOUR VERDICT ON ANY OTHER COUNT.

3              NOW, I'M GOING TO INSTRUCT YOU ABOUT THE ELEMENTS

4    OF THE FOUR COUNTS:

5              THE DEFENDANT IS CHARGED IN COUNT 1 OF THE

6    INDICTMENT WITH CONSPIRING TO POSSESS CHILD PORNOGRAPHY, IN

7    VIOLATION OF SECTION 2252A(B)(2) OF TITLE 18 OF THE UNITED

8    STATES CODE.  IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY

9    OF THAT CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE

10   FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

11             FIRST, BEGINNING IN OR ABOUT MARCH 2000, AND ENDING

12   IN OR ABOUT JUNE 2000 (SIC), THERE WAS AN AGREEMENT BETWEEN

13   TWO OR MORE PERSONS --

14             MR. MICHAEL:  YOUR HONOR, I BELIEVE YOU SAID 2000.

15             THE COURT:  2001.  LET ME START THAT AGAIN.

16             FIRST, BEGINNING IN OR ABOUT MARCH 2000 AND ENDING

17   IN OR ABOUT JUNE 2001, THERE WAS AN AGREEMENT BETWEEN TWO OR

18   MORE PERSONS TO COMMIT AT LEAST ONE CRIME CHARGED IN THE

19   INDICTMENT; AND

20             SECOND, THE DEFENDANT BECAME A MEMBER OF THE

21   CONSPIRACY KNOWING OF AT LEAST ONE OF ITS OBJECTS AND

22   INTENDING TO HELP ACCOMPLISH IT.

23             I WILL DISCUSS WITH YOU BRIEFLY THE LAW RELATING TO

24   EACH OF THESE ELEMENTS.

25             A "CONSPIRACY" IS A KIND OF CRIMINAL PARTNERSHIP --

1   AN AGREEMENT OF TWO OR MORE PERSONS TO COMMIT ONE OR MORE

2   CRIMES.  THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO

3   SOMETHING UNLAWFUL; IT DOESN'T MATTER WHETHER THE CRIME

4   AGREED UPON WAS COMMITTED.

5          FOR A CONSPIRACY TO HAVE EXISTED, IT IS NOT

6   NECESSARY THAT THE CONSPIRATORS MADE A FORMAL AGREEMENT OR

7   THAT THEY AGREED ON EVERY DETAIL OF THE CONSPIRACY.  IT IS

8   NOT ENOUGH, HOWEVER, THAT THEY SIMPLY MET, DISCUSSED MATTERS

9   OF COMMON INTEREST, ACTED IN SIMILAR WAYS, OR PERHAPS HELPED

10  ONE ANOTHER.  YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT

11  AT LEAST ONE OF THE CRIMES ALLEGED IN THE INDICTMENT AS AN

12  OBJECT OF THE CONSPIRACY WITH ALL OF YOU AGREEING AS TO THE

13  PARTICULAR CRIME WHICH THE CONSPIRATORS AGREED TO COMMIT.

14         ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY

15  PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE

16  OR FURTHER SOME OBJECT OR PURPOSE OF THE CONSPIRACY EVEN

17  THOUGH THE PERSON DOESN'T HAVE FULL KNOWLEDGE OF ALL OF THE

18  DETAILS OF THE CONSPIRACY.  FURTHERMORE ONE WHO WILLFULLY

19  JOINS AN EXISTING CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE

20  ORIGINATORS.  ON THE OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF

21  THE CONSPIRACY BUT HAPPENS TO ACT IN A WAY WHICH FURTHERS

22  SOME OBJECT OR PURPOSE OF THE CONSPIRACY DOESN'T THEREBY

23  BECOME A CONSPIRATOR.  AND, SIMILARLY, A PERSON DOESN'T

24  BECOME A CONSPIRATOR MERELY BY ASSOCIATING WITH ONE OR MORE

25  PERSONS WHO ARE CONSPIRATORS, NOR MERELY BY KNOWING THAT A

1    CONSPIRACY EXISTS.

2              A CONSPIRACY MAY CONTINUE FOR A LONG PERIOD OF TIME

3    AND MAY INCLUDE THE PERFORMANCE OF MANY TRANSACTIONS.  IT IS

4    NOT NECESSARY THAT ALL MEMBERS OF THE CONSPIRACY JOIN IN IT

5    AT THE SAME TIME, AND ONE MAY BECOME A MEMBER OF THE

6    CONSPIRACY WITHOUT FULL KNOWLEDGE OF ALL THE DETAILS OF THE

7    UNLAWFUL SCHEME OR THE NAMES, IDENTITIES, OR LOCATIONS OF ALL

8    THE OTHER MEMBERS.

9              EVEN THOUGH A DEFENDANT DID NOT DIRECTLY CONSPIRE

10   WITH OTHER CONSPIRATORS IN THE OVERALL SCHEME, THE DEFENDANT

11   HAS, IN EFFECT, AGREED TO PARTICIPATE IN THE CONSPIRACY IF IT

12   IS PROVED BEYOND A REASONABLE DOUBT THAT:

13             1.  THE DEFENDANT DIRECTLY CONSPIRED WITH ONE OR

14   MORE CONSPIRATORS TO CARRY OUT AT LEAST ONE OF THE OBJECTS OF

15   THE CONSPIRACY;

16             2.  THE DEFENDANT KNEW OR HAD REASON TO KNOW THAT

17   OTHER CONSPIRATORS WERE INVOLVED WITH THOSE WITH WHOM THE

18   DEFENDANT DIRECTLY CONSPIRED; AND

19             3.  THE DEFENDANT HAD REASON TO BELIEVE THAT

20   WHATEVER BENEFITS THE DEFENDANT MIGHT GET FROM THE CONSPIRACY

21   ARE PROBABLY DEPENDENT UPON THE SUCCESS OF THE ENTIRE

22   VENTURE.

23             IT IS NO DEFENSE THAT A PERSON'S PARTICIPATION IN A

24   CONSPIRACY WAS MINOR OR FOR A SHORT PERIOD OF TIME.

25             THE DEFENDANT IS CHARGED IN COUNT 2 OF THE FIRST

1    SUPERSEDING INDICTMENT WITH POSSESSION OF CHILD PORNOGRAPHY,

2    IN VIOLATION OF SECTION 2252A(B)(2) OF TITLE 18 OF THE UNITED

3    STATES CODE.   IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY

4    OF THAT CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE

5    FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

6         FIRST, THE DEFENDANT KNOWINGLY POSSESSED ANY BOOK

7    MAGAZINE, PERIODICAL, FILM, VIDEOTAPE, COMPUTER DISK,

8    COMPUTER HARD DRIVE, AND/OR ANY OTHER MATTER WHICH THE

9    DEFENDANT KNEW CONTAINED A VISUAL DEPICTION OF A MINOR

10   ENGAGED IN SEXUALLY EXPLICIT CONDUCT;

11        SECOND, THE DEFENDANT KNEW THE VISUAL DEPICTION

12   CONTAINED IN THE BOOK, MAGAZINE, PERIODICAL, FILM, VIDEOTAPE,

13   COMPUTER DISK, COMPUTER HARD DRIVE, AND/OR OTHER MATTER

14   SHOWED A VISUAL DEPICTION OF A MINOR ENGAGED IN SEXUALLY

15   EXPLICIT CONDUCT;

16        THIRD, THE DEFENDANT KNEW THAT THE PRODUCTION OF

17   SUCH VISUAL DEPICTIONS INVOLVE USE OF A MINOR IN SEXUALLY

18   EXPLICIT CONDUCT; AND

19        FOUR, THE VISUAL DEPICTION HAD BEEN MAILED, OR

20   SHIPPED OR TRANSPORTED IN INTERSTATE OR FOREIGN COMMERCE BY

21   ANY MEANS, INCLUDING BY COMPUTER.

22        THE TERM "CHILD PORNOGRAPHY" MEANS ANY VISUAL

23   DEPICTION, INCLUDING ANY PHOTOGRAPH, FILM, VIDEO, PICTURE, OR

24   COMPUTER OR COMPUTER-GENERATED IMAGE OR PICTURE, WHETHER MADE

25   OR PRODUCED BY ELECTRONIC, MECHANICAL, OR OTHER MEANS, OF

1    SEXUALLY EXPLICIT CONDUCT WHERE:

2              THE PRODUCTION OF VISUAL DEPICTION INVOLVES THE USE

3    OF A MINOR ENGAGING IN SEXUALLY EXPLICIT CONDUCT; OR

4              SUCH VISUAL DEPICTION HAS BEEN CREATED, ADAPTED, OR

5    MODIFIED TO APPEAR AN IDENTIFIABLE MINOR IS ENGAGING IN

6    SEXUALLY EXPLICIT CONDUCT.

7              THE TERM "MINOR" MEANS ANY PERSON UNDER THE AGE OF

8    18 YEARS.

9              AND A "VISUAL DEPICTION" INCLUDES ANY PHOTOGRAPH,

10   FILM, VIDEO, PICTURE, OR COMPUTER-GENERATED IMAGE OR PICTURE,

11   WHETHER MADE OR PRODUCED BY ELECTRONIC, MECHANICAL, OR OTHER

12   MEANS.  THE TERM "VISUAL DEPICTION" ALSO INCLUDES ANY DATA

13   STORED ON COMPUTER DISK OR BY ELECTRONIC MEANS WHICH IS

14   CAPABLE OF CONVERSION INTO A VISUAL IMAGE.

15             THE TERM "SEXUALLY EXPLICIT CONDUCT" MEANS ANY OF

16   THE FOLLOWING, WHETHER ACTUAL OR SIMULATED:

17             1. SEXUAL INTERCOURSE, INCLUDING GENITAL-GENITAL,

18   ORAL-GENITAL, ANAL-GENITAL, OR ORAL-ANAL, WHETHER BETWEEN

19   PERSONS OF THE SAME OR OPPOSITE SEX; OR

20             2.  MASTURBATION;

21             3.  SADISTIC OR MASOCHISTIC ABUSE; OR

22             4.  LASCIVIOUS EXHIBITION OF THE GENITALS OR PUBIC

23   AREA OF ANY PERSON.

24             THE GOVERNMENT MUST PROVE THAT THE MATERIAL CHARGED

25   IN THE INDICTMENT DOES MORE THAN DEPICT ARTIFICIAL OR

1    SIMULATED CHILD PORNOGRAPHY.  IT MUST PROVE THAT THE PEOPLE

2    IN THE PICTURES ARE IDENTIFIABLE MINORS, THAT IS, THAT THEY

3    ARE REAL AND THAT THEY ARE MINORS, THAT IS, PERSONS UNDER THE

4    AGE OF 18 YEARS.

5         THE WORD "LASCIVIOUS" MEANS TENDING TO EXCITE LUST;

6    LEWD; INDECENT; OBSCENE; SEXUAL IMPURITY; TENDING TO DEPRAVE

7    THE MORALS IN RESPECT TO SEXUAL RELATIONS; LICENTIOUS.

8         A VISUAL DEPICTION HAS BEEN "SHIPPED OR TRANSPORTED

9    IN INTERSTATE OR FOREIGN COMMERCE" IF THE VISUAL DEPICTION

10   HAS TRAVELED AT ANY TIME IN THE PAST IN INTERSTATE OR

11   INTERNATIONAL COMMERCE.

12        THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT THE

13   DEFENDANT KNEW THAT THE VISUAL DEPICTIONS HAD BEEN SHIPPED OR

14   TRANSPORTED IN INTERSTATE OR INTERNATIONAL COMMERCE.

15        A PERSON HAS POSSESSION OF SOMETHING IF THE PERSON

16   KNOWS OF ITS PRESENCE AND HAS PHYSICAL CONTROL OF IT, OR

17   KNOWS OF ITS PRESENCE AND HAS THE POWER AND INTENTION TO

18   CONTROL IT.

19        THE DEFENDANT IS CHARGED IN COUNT 3 OF THE FIRST

20   SUPERSEDING INDICTMENT WITH TRAVELING FOR THE PURPOSE OF

21   ENGAGING IN ANY SEXUAL ACT WITH A MINOR, IN VIOLATION OF

22   SECTION 2423(B) OF TITLE 18 OF THE UNITED STATES CODE.

23        IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF

24   THAT CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

25   ELEMENTS BEYOND A REASONABLE DOUBT:

1        FIRST, THE DEFENDANT TRAVELED FROM CALIFORNIA TO

2  NEW MEXICO; AND

3        SECOND, THE DEFENDANT DID SO WITH THE INTENT TO

4  ENGAGE IN ANY SEXUAL ACT WITH A PERSON UNDER THE AGE OF 18.

5        THE DEFENDANT IS CHARGED IN COUNT 4 OF THE FIRST

6  SUPERSEDING INDICTMENT WITH AGGRAVATED SEXUAL ABUSE OF A

7  CHILD UNDER 12 YEARS OF AGE, IN VIOLATION OF SECTION 2241(C)

8  OF TITLE 18 OF THE UNITED STATES CODE.

9        IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF

10  THAT CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

11  ELEMENTS BEYOND A REASONABLE DOUBT:

12        FIRST, THE DEFENDANT CROSSED THE CALIFORNIA STATE

13  LINE WITH THE INTENT TO ENGAGE IN A SEXUAL ACT WITH A PERSON

14  WHO HAS NOT ATTAINED THE AGE OF 18 -- WHO HAS NOT ATTAINED

15  THE AGE OF 12 YEARS; AND

16        SECOND, AFTER CROSSING THE CALIFORNIA STATE LINE

17  WITH THE DEFENDANT KNOWINGLY ENGAGED IN A SEXUAL ACT WITH A

18  PERSON WHO HAD NOT ATTAINED THE AGE OF 12 YEARS, WITH ALL

19  MEMBERS OF THE JURY AGREEING ON THE ACT THE DEFENDANT ENGAGED

20  IN WITH A PERSON WHO NOT ATTAINED THE AGE OF 12 YEARS.

21        THE GOVERNMENT NEED NOT PROVE THAT THE DEFENDANT

22  KNEW THAT THE PERSON WITH WHOM THE DEFENDANT ENGAGED IN A

23  SEXUAL ACT HAD NOT ATTAINED THE AGE OF 12 YEARS.

24        THE DEFENDANT IS ALSO CHARGED IN COUNT 4 OF THE

25  FIRST SUPERSEDING INDICTMENT WITH ATTEMPTED AGGRAVATED SEXUAL

1    ABUSE OF A CHILD UNDER 12 YEARS OF AGE, IN VIOLATION OF

2    SECTION 2241(C) OF TITLE 18 OF THE UNITED STATES CODE.

3              IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF

4    THAT CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

5    ELEMENTS BEYOND A REASONABLE DOUBT:

6              FIRST, THE DEFENDANT CROSSED THE CALIFORNIA STATE

7    LINE WITH THE INTENT TO ENGAGE IN A SEXUAL ACT WITH A PERSON

8    WHO HAD NOT ATTAINED THE AGE OF 12 YEARS; AND

9              SECOND, THE DEFENDANT DID SOMETHING THAT WAS A

10   SUBSTANTIAL STEP TOWARDS ENGAGING IN A SEXUAL ACT WITH A

11   PERSON WHO HAD NOT ATTAINED THE AGE OF 12 YEARS, WITH ALL OF

12   YOU AGREEING AS TO WHAT CONSTITUTED THE SUBSTANTIAL STEP;

13             MERE PREPARATION IS NOT A SUBSTANTIAL STEP TOWARD

14   THE COMMISSION OF THE CRIME OF AGGRAVATED SEXUAL ABUSE OF A

15   CHILD.

16             THE GOVERNMENT NEED NOT PROVE THAT THE DEFENDANT

17   KNEW THAT THE PERSON WITH WHOM DEFENDANT ATTEMPTED TO ENGAGE

18   IN A SEXUAL ACT HAD NOT ATTAINED THE AGE OF 12 YEARS.

19             NOW, IN REFERENCE TO THE SECOND ELEMENT OF COUNT 4,

20   AN ACT IS DONE KNOWINGLY IF THE DEFENDANT IS AWARE OF THE ACT

21   AND DOES NOT ACT IN IGNORANCE, MISTAKE, OR ACCIDENT.  THE

22   KNOWLEDGE THAT A PERSON POSSESSES AT ANY GIVEN TIME MAY NOT

23   ORDINARILY BE PROVED DIRECTLY BECAUSE THERE IS NO WAY OF

24   DIRECTLY SCRUTINIZING THE WORKINGS OF THE HUMAN MIND.  YOU

25   MAY CONSIDER EVIDENCE OF THE DEFENDANT'S WORDS, ACTS, OR

1  OMISSIONS, ALONG WITH ALL THE OTHER EVIDENCE, IN DECIDING

2  WHETHER THE DEFENDANT ACTED KNOWINGLY.

3          THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT THE

4  DEFENDANT KNEW THAT HIS ACTS WERE UNLAWFUL.

5          THE TERM "SEXUAL ACT," AS USED IN THE INSTRUCTIONS

6  RELATING TO COUNTS 3 AND 4 MEANS:

7          (A) CONTACT BETWEEN THE PENIS AND THE ANUS

8  INVOLVING PENETRATION, HOWEVER SLIGHT;

9          (B) CONTACT BETWEEN THE MOUTH AND THE PENIS, OR THE

10  MOUTH AND THE ANUS;

11          (C) THE PENETRATION, HOWEVER SLIGHT, OF THE ANAL

12  OPENING OF ANOTHER BY A HAND OR FINGER OR BY ANY OBJECT, WITH

13  AN INTENT TO ABUSE, HUMILIATE, HARASS, DEGRADE, OR AROUSE OR

14  GRATIFY THE SEXUAL DESIRE OF ANY PERSON; OR

15          (D) THE INTENTIONAL TOUCHING, NOT THROUGH THE

16  CLOTHING, OF THE GENITALIA OF ANOTHER PERSON WHO HAS NOT

17  ATTAINED THE AGE OF 16 YEARS, WITH AN INTENT TO ABUSE,

18  HUMILIATE, HARASS, DEGRADE, OR AROUSE OR GRATIFY THE SEXUAL

19  DESIRE OF ANY PERSON.

20          THE INDICTMENT CHARGES THE OFFENSES ALLEGED WERE

21  COMMITTED "ON OR ABOUT" A CERTAIN DATE.

22          ALTHOUGH IT IS NECESSARY FOR THE GOVERNMENT TO

23  PROVE BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE

24  COMMITTED ON DATES REASONABLY NEAR THE DATES ALLEGED IN THE

25  INDICTMENT, IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE

1   THAT THE OFFENSES WERE COMMITTED PRECISELY ON THE DATES

2   CHARGED.

3          YOU HAVE HEARD TESTIMONY FROM PERSONS WHO, BECAUSE

4   OF EDUCATION OR EXPERIENCE, ARE PERMITTED TO STATE OPINIONS

5   AND THE REASONS FOR THEIR OPINIONS.

6          OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY

7   OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT

8   AS MUCH WEIGHT AS YOU THINK IT DESERVES CONSIDERING THE

9   WITNESS' EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE

10  OPINION, AND ALL THE OTHER EVIDENCE IN THE CASE.

11         YOU HEARD TESTIMONY FROM RANDALL MARTIN, A WITNESS

12  WHO RECEIVED IMMUNITY.  THAT TESTIMONY WAS GIVEN IN EXCHANGE

13  FOR A PROMISE BY THE GOVERNMENT THAT THE TESTIMONY WILL NOT

14  BE USED IN ANY CASE AGAINST THAT WITNESS IN THE UNITED STATES

15  DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS.

16         THE WITNESS, RANDALL MARTIN, ALSO PLEADED GUILTY TO

17  A CRIME ARISING OUT OF THE SAME EVENTS FOR WHICH THE

18  DEFENDANT HERE IS ON TRIAL.  THIS GUILTY PLEA IS NOT EVIDENCE

19  AGAINST THE DEFENDANT, AND YOU MAY CONSIDER IT ONLY IN

20  DETERMINING THIS WITNESS' BELIEVABILITY.

21         FOR THESE REASONS, IN EVALUATING RANDALL MARTIN'S

22  TESTIMONY, YOU SHOULD CONSIDER THE EXTENT TO WHICH OR WHETHER

23  HIS TESTIMONY MAY HAVE BEEN INFLUENCED BY ANY OF THESE

24  FACTORS.  IN ADDITION, YOU SHOULD EXAMINE HIS TESTIMONY WITH

25  GREATER CAUTION THAN THAT OF OTHER WITNESSES.

1          AND YOU ALSO HEARD RANDALL MARTIN, A WITNESS,

2    REFUSE TO ANSWER CERTAIN QUESTIONS ON THE GROUND THAT IT

3    MIGHT VIOLATE HIS RIGHT NOT TO INCRIMINATE HIMSELF.  YOU MAY,

4    IF YOU CHOSE, DRAW ADVERSE INFERENCES FROM THIS REFUSAL TO

5    ANSWER, AND YOU MAY TAKE THE REFUSAL INTO ACCOUNT IN

6    ASSESSING RANDALL MARTIN'S CREDIBILITY AND MOTIVES, BUT YOU

7    ARE NOT REQUIRED TO DRAW THAT INFERENCE.

8          YOU HEARD TESTIMONY THAT THE DEFENDANT MADE A

9    STATEMENT.  IT IS FOR YOU TO DECIDE (1) WHETHER THE DEFENDANT

10   MADE THE STATEMENT, AND (2) IF SO, HOW MUCH WEIGHT TO GIVE TO

11   IT.

12          IN MAKING THOSE DECISIONS, YOU SHOULD CONSIDER ALL

13   OF THE EVIDENCE ABOUT THE STATEMENT, INCLUDING THE

14   CIRCUMSTANCES UNDER WHICH THE DEFENDANT MAY HAVE MADE IT.

15          YOU SHOULD USE COMMON SENSE IN WEIGHING EVIDENCE

16   AND CONSIDER THE EVIDENCE IN LIGHT OF YOUR OWN OBSERVATIONS

17   IN LIFE.  IN OUR LIVES, WE OFTEN LOOK AT ONE FACT AND

18   CONCLUDE FROM IT THAT ANOTHER FACT EXISTS.  IN LAW WE CALL

19   THIS "INFERENCE."  A JURY IS ALLOWED TO MAKE REASONABLE

20   INFERENCES.  AND ANY INFERENCES THAT YOU MAKE MUST BE

21   REASONABLE AND MUST BE BASED ON THE EVIDENCE IN THIS CASE.

22          IF YOU VIEW THE EVIDENCE AS REASONABLY PERMITTING

23   EITHER OF TWO INFERENCES -- ONE OF GUILT AND THE OTHER OF

24   INNOCENCE -- THEN YOU MUST ADOPT THE INFERENCE OF INNOCENCE.

25          ALL RIGHT.  LADIES AND GENTLEMEN WITH THE EXCEPTION

1    OF A VERY FEW INSTRUCTIONS REGARDING THE MANNER OF YOUR

2    DELIBERATIONS AND A FEW OTHER MATTERS, THAT CONCLUDES THE

3    INSTRUCTIONS THAT APPLY TO THE LAW OF THIS CASE.

4              THANK YOU FOR YOUR ATTENTION.

5              MR. MICHAEL, YOU MAY PROCEED.

6              MR. MICHAEL:  THANK YOU, YOUR HONOR.

7              MAY I PROCEED, YOUR HONOR?

8              THE COURT:  YOU MAY PROCEED.

9              MR. MICHAEL:  LADIES AND GENTLEMEN, THIS CASE IS

10   NOT ABOUT GROTESQUE FANTASIES THAT EXISTED ONLY IN THE

11   DEFENDANT'S MIND.  THIS CASE IS NOT ABOUT MERE FANTASY AND

12   ROLE PLAYING ON THE INTERNET.  THIS CASE IS ABOUT REAL BOYS,

13   REAL CHILDREN.  REAL CHILDREN ENGAGED IN SEX ACTS, AND REAL

14   CHILDREN CAPTURED IN IMAGES AND VIDEOS, ENGAGED IN SEXUALLY

15   EXPLICIT CONDUCT.

16             THESE ARE REAL VICTIMS.  THIS IS REAL SEX ABUSE.

17   AND THIS CASE IS ABOUT A REAL SEXUAL PREDATOR:  THE

18   DEFENDANT, JAMES SANDERS, AND WHAT THE DEFENDANT DID TO

19   FULFILL HIS VILE SEXUAL FANTASIES.  HOW DID HE DO THAT?  WHAT

20   DID THIS SELF-PROFESSED BOY LOVER DO?  WHAT DID HE USE?  HE

21   USED KALEN, A SEVEN-YEAR-OLD BOY.  HE IS NOT A CHARACTER IN A

22   FICTIONAL NOVEL, SOME FIGMENT OF DEFENDANT'S IMAGINATION.  HE

23   IS A TRUE, INNOCENT, TO BE PROTECTED AND CHERISHED, THE SON

24   OF OLD FAMILY FRIENDS, FRIENDS WHO TREATED THE DEFENDANT AS

25   FAMILY AND WELCOMED HIM INTO THEIR HOME, ONLY TO HAVE

1    SEVEN-YEAR-OLD KALEN'S INNOCENCE SHATTERED, TAKEN AWAY FROM

2    HIM FOREVER, TO FULFILL THE DEFENDANT'S SEXUAL AROUSAL AND

3    GRATIFICATION.

4            HOW DO YOU KNOW WHAT THE DEFENDANT INTENDED AND

5    ATTEMPTED TO DO AND ACTUALLY DID WITH KALEN?  YOU KNOW IT

6    FROM THE DEFENDANT'S OWN WORDS.  IT IS ALL RIGHT THERE IN THE

7    CHAT, WORDS THAT HE WROTE HIMSELF:  EXHIBIT 1, THE CHATS FROM

8    SETH BEKENSTEIN'S COMPUTER; EXHIBIT 2, THE CHATS FROM RANDALL

9    MARTIN'S COMPUTER; AND EXHIBIT 3, THE CHATS FROM HIS OWN

10   COMPUTER.

11           THAT EVIDENCE, LADIES AND GENTLEMEN, IS POWERFUL.

12   IT LITERALLY, LITERALLY SPEAKS VOLUMES ABOUT WHAT HAPPENED IN

13   THIS CASE.

14           YOU WILL HAVE THOSE WITH YOU DURING YOUR

15   DELIBERATIONS.  LOOK AT THEM.  READ THEM.  THINK ABOUT WHAT

16   YOU HEARD DURING THIS TRIAL.  THEY SPEAK FOR THEMSELVES.  THE

17   CHATS SPEAK FOR THEMSELVES.

18           WHAT DEFENDANT INTENDED TO DO TO KALEN, WHAT HE

19   ATTEMPTED TO DO TO KALEN, AND WHAT HE DID TO THAT

20   SEVEN-YEAR-OLD BOY.

21           YOU KNOW FROM THOSE CHATS THAT THE DEFENDANT HAD

22   THE DEEP-ROOTED SEXUAL INTEREST IN LITTLE BOYS.  IT IS THERE

23   IN UNMISTAKABLE TERMS, IN GRAPHIC DETAIL OVER AND OVER

24   AGAIN.  AND IT IS ALL CORROBORATED BY THE OTHER EVIDENCE THAT

25   WAS PRESENTED TO YOU DURING THIS CASE.

1              WHAT DID DEFENDANT SAY ABOUT HIS SEXUAL INTEREST IN

2      LITTLE BOYS?  IT DOESN'T ALL BEAR REPEATING, BUT SOME OF THEM

3      REALLY STAND OUT, IF YOU THINK ABOUT IT:

4              "THERE'S NOTHING LIKE THE SMELL OF A 6YO EXCEPT THE

5      TASTE."

6              HIS WORDS.

7              "11YOS HAVE THE MOST PERFECT BUTS OF THE SPECIES."

8              HIS WORDS.

9              "8YOS AND 11 ARE MY FAVORITES."

10             HIS WORDS.

11             "WHEN MY BOYS TURN 14, I ENCOURAGE THEM TO MATE

12     WITH GIRLS.  THEY ARE YOUNG ADULTS AT THAT AGE AND I LOSE

13     INTEREST IN THEM AS SEXUAL PARTNERS."

14             AND THEN HE WANTS TO "BREED THEM LIKE ANIMALS, TO

15     KEEP IT GOING."

16             HIS WORDS.

17             AND THERE IS SO MUCH MORE.  YOU HEARD SO MUCH MORE

18     AND THERE IS SO MUCH MORE IN THOSE CHATS, LADIES AND

19     GENTLEMEN.  YOU DON'T NEED TO SEE IT AGAIN.  IT IS ALL RIGHT

20     THERE IN EXHIBITS 1 AND 3.  AND THERE IS SO MUCH MORE THAT

21     WASN'T EVEN READ ALOUD DURING THE TRIAL.

22             AND THEN WHAT DID HE SAY ABOUT SEVEN-YEAR-OLD

23     KALEN?  HOW HE, IN HIS WORDS, "MASSAGED HIS LITTLE ASSHOLE."

24             THAT'S A SEVEN-YEAR-OLD BOY HE'S TALKING ABOUT.

25     THAT'S THE SON OF HIS FRIEND, LADIES AND GENTLEMEN.  HOW THEY

1    WERE JUST ARRIVING AT "BEAUTIFUL ORGASMS."

2            A SEVEN-YEAR-OLD BOY.

3            HOW HE WANTED TO "GIVE KALEN A DRY ORGASM WHEN HE

4    HAD A GREAT OPPORTUNITY, BUT HE WAS TOO CAUTIOUS."

5            AGAIN, HIS WORDS.  HOW THEY BOTH WANTED TO, AND HOW

6    HE SAID "KALEN, A SEVEN-YEAR-OLD BOY, WILL LOVE IT."

7            HOW HE INTENDED TO GIVE KALEN -- AGAIN FROM THE

8    CHATS -- A NICE "CUM."

9            CALLING KALEN A "LITTLE IMP, A VERY HORNY 7YO AND

10   HE WOULD WANT TO GET IN YOUR PANTS IN 20 MINUTES."  THAT

11   KALEN MIGHT WANT HIS -- IN HIS WORDS, "HIS BUTT LICKED."

12           HOW THEY SHOWERED TOGETHER, SLEPT TOGETHER, AND

13   NEVER GOT ANY SLEEP.  HOW HE SPANKED HIM.  HOW HE TRIED TO

14   TAKE NUDIE SHOTS.  HOW HE WAS PLANNING TO ACCIDENTALLY SHOW

15   THIS LITTLE BOY SOFT PORN OVER HIS SHOULDER ON THE LAPTOP

16   COMPUTER, THAT LAPTOP COMPUTER THAT HE BROUGHT WITH HIM FROM

17   CALIFORNIA TO NEW MEXICO IN DECEMBER 2000.

18           HOW HE HAD PHOTOS OF KALEN ON THAT LAPTOP THAT HE

19   SENT TO HIS FELLOW BOY-LOVER FRIENDS.  AND HOW HE WAS WORKING

20   ON A WAY THAT THEY COULD BE TOGETHER ALL THE TIME, ANOTHER

21   SIX YEARS UNTIL KALEN WAS TOO OLD FOR THE DEFENDANT'S SEXUAL

22   PREFERENCES.

23           AND THEN, OF COURSE, THE DEFENDANT TALKED ABOUT HOW

24   HE HAD TO BE CAREFUL, SO DANGEROUS, HAD TO MAKE SURE THAT

25   LITTLE KALEN COULD KEEP HIS MOUTH SHUT.

1          LADIES AND GENTLEMEN, YOU KNOW BEYOND A REASONABLE

2    DOUBT FROM THE EVIDENCE PRESENTED IN THIS CASE THAT THE

3    DEFENDANT INTENDED AND ATTEMPTED TO ENGAGE IN A SEX ACT WITH

4    KALEN, AND THAT THE DEFENDANT ACTUALLY ENGAGED IN A SEX ACT

5    WITH HIM.

6          IT'S ALL RIGHT THERE, EXHIBITS 2C, 3F, 3M, 3T, AND

7    THE LIST CAN GO ON.

8          THE DEFENDANT HAS TOLD YOU HIMSELF.  THE EVIDENCE

9    IS CLEAR.  SADLY, KALEN IS NOT THE ONLY YOUNG VICTIM IN THIS

10   CASE WHO HAD HIS INNOCENCE STOLEN FOR THE SEXUAL AROUSAL AND

11   GRATIFICATION OF A GROWN MAN, BECAUSE THIS CASE IS ALSO ABOUT

12   THOSE OTHER YOUNG MANY PREPUBESCENT BOYS DEPICTED IN THOSE

13   IMAGES AND VIDEOS, THOSE TRULY SHOCKING AND SADDENING IMAGES

14   AND VIDEOS THAT DEFENDANT KNOWINGLY POSSESSED ON HIS LAPTOP

15   AND ON HIS DISKS, AND THAT DEFENDANT KNOWINGLY AND

16   INTENTIONALLY CONSPIRED AND AGREED WITH HIS FELLOW

17   CO-CONSPIRATORS TO POSSESS.

18          AND HOW DO YOU KNOW THIS?  THE CHATS.  THE CHATS

19   SPEAK FOR THEMSELVES.  DEFENDANT AND HIS CO-CONSPIRATORS,

20   WITH REGARD TO THE CONSPIRACY COUNT, TALKED ABOUT IT

21   INCESSANTLY HOW THEY SHARED, TRADED, POSTED, VIEWED AND

22   POSSESSED THESE IMAGES AND VIDEOS OF CHILD PORNOGRAPHY,

23   IMAGES AND VIDEOS OF CHILDREN BEING SEXUALLY ABUSED.  THESE

24   WERE REAL YOUNG BOYS POSING IN A LEWD AND LASCIVIOUS MANNER,

25   WITH THEIR GENITALS AND BUTTOCKS DISPLAYED, MASTURBATING,

1    TOUCHING EACH OTHER AND THEMSELVES, ENGAGING IN ORAL SEX WITH

2    MEN AND EACH OTHER, BEING ANALLY PENETRATED BY MEN, OBJECTS,

3    AND EACH OTHER.

4            AND YOU KNOW THE DEFENDANT KNOWINGLY POSSESSED

5    IMAGES AND VIDEO AND A VIDEO OF CHILD PORNOGRAPHY ON HIS

6    LAPTOP AND HIS DISKS RIGHT THERE.  HOW?  BECAUSE HE TOLD YOU

7    IN THE CHATS OVER AND OVER AGAIN.

8            AND YOU SAW HIS CHILD PORNOGRAPHY RECOVERED FROM

9    THAT LAPTOP AND THOSE TWO DISKS IN THAT BAG THERE.  YOU SAW

10   HIS STILL IMAGE FROM THE "BLUE ORCHID" VIDEO "THIEF'S

11   PUNISHMENT."  YOU SAW A STILL IMAGE FROM THE "RUSSIAN

12   FLOWERS" SERIES.  YOU SAW THAT YOUNG ASIAN BOY IN THE VIDEO

13   FROM HIS ICQ RECEIPTS FOLDER FROM CROW18.  YOU SAW THAT

14   PREPUBESCENT BOY, MOMENTS AGO IN THIS COURTROOM, IN THAT

15   DANISH PICCOLO MAGAZINE FROM THE 1970S.  YOU SAW THE OTHER

16   IMAGES.

17           DEFENDANT WASN'T REPULSED OR MORTIFIED BY THESE

18   IMAGES.  TO THE CONTRARY, THE CHATS AND THE FORENSIC EVIDENCE

19   FROM HIS COMPUTER SHOWED THAT HE WAS CONSTANTLY SEEKING THEM

20   OUT.  HE CHERISHED THEM.  THEY SEXUALLY AROUSED AND THEY

21   GRATIFIED HIM.  AND HE WENT TO GREAT LENGTHS TO CONCEAL AND

22   PROTECT THEM AND TO PROTECT HIMSELF.

23           HIS ENCRYPTED LAPTOP COMPUTER HE HAD BESTCRYPT.  HE

24   HAD THOSE ENCRYPTED CONTAINERS ON THE LAPTOP, KEPT HIS DISKS

25   AND OTHER STASH AWAY FROM HIS HOUSE SO IT WOULD BE SAFE.

1    BECAUSE IN THE CHATS, LADIES AND GENTLEMEN, EVIDENCE OF

2    ELIMINATOR FILE WIPING, BCWIPE, CLEANING UP DELETED IMAGES.

3    HE EVEN KNOWS THAT DELETED IMAGES STAY IN YOUR COMPUTER.  HE

4    TALKED ABOUT CLEANING IT OFF OF HIS COMPUTER.

5            AND THEN, OF COURSE, HE TRIED TO FLEE.  AND WHAT

6    DID HE TRY TO FLEE WITH?  HIS LAPTOP.  AND WHAT WAS IT IN?

7    THAT BACKPACK.  AND THAT BACKPACK WAS PADLOCKED, LADIES AND

8    GENTLEMEN.

9            YOU DON'T NEED TO SPECULATE ABOUT WHY HE HAD THOSE

10   PROGRAMS ON HIS COMPUTER.  YOU KNOW, LADIES AND GENTLEMEN.

11   YOU KNOW.  HE HAS ALREADY TOLD YOU IN HIS OWN WORDS.

12           EXHIBITS 3G, 3L, 3N, 3R, IF YOU WANT TO, THEY ARE

13   RIGHT THERE FOR YOU TO SEE THEM AGAIN.  AND THERE ARE SO MANY

14   OTHERS, LADIES AND GENTLEMEN.  HOW AND WHY HE USED THESE

15   PROGRAMS, AND WHY:  IN HOPES THAT TODAY WOULD NEVER COME, SO

16   THAT HE COULD NEVER BE HELD ACCOUNTABLE.

17           YOU KNOW BEYOND A REASONABLE DOUBT THAT THE

18   DEFENDANT KNOWINGLY AND INTENTIONALLY CONSPIRED AND AGREED

19   WITH HIS CO-CONSPIRATORS TO POSSESS CHILD PORNOGRAPHY.  AND

20   YOU KNOW BEYOND A REASONABLE DOUBT THE DEFENDANT KNOWINGLY

21   POSSESSED CHILD PORNOGRAPHY.  THE EVIDENCE IS SIMPLY

22   OVERWHELMING.

23           BEFORE I PROCEED FURTHER, LET ME THANK YOU ON

24   BEHALF OF THE UNITED STATES FOR YOUR SERVICE AS JURORS AND

25   YOUR ATTENTION DURING THIS DIFFICULT BUT IMPORTANT CASE.  YOU

1    HAVE SEEN AND HEARD THINGS THAT YOU PROBABLY NEVER THOUGHT

2    YOU WOULD SEE AND HEAR.  BUT THAT'S BECAUSE, SADLY, THOSE ARE

3    THE FACTS OF THIS CASE.  AND IT IS YOUR FUNCTION AS JURORS

4    THAT IS SO ESSENTIAL TO OUR JUSTICE SYSTEM AND MAKES IT SO

5    UNIQUE AND SPECIAL AND WONDERFUL, BECAUSE THIS CASE IS ABOUT

6    TO BE IN YOUR HANDS, LADIES AND GENTLEMEN.  AND THEN IT IS

7    YOUR JOB, IT IS YOUR DUTY TO CONSIDER ALL OF THE EVIDENCE AND

8    TO APPLY THE LAW AS INSTRUCTED BY THE COURT.

9            AND BASED ON THAT EVIDENCE AND THAT LAW, IT IS YOUR

10   DUTY TO HOLD THE DEFENDANT ACCOUNTABLE FOR CRIMES PROVEN

11   BEYOND A REASONABLE DOUBT; FOR KNOWINGLY AND INTENTIONALLY

12   CONSPIRING TO POSSESS CHILD PORNOGRAPHY, FOR INTENTIONALLY

13   AND KNOWINGLY POSSESSING CHILD PORNOGRAPHY, FOR TRAVELING

14   FROM CALIFORNIA TO NEW MEXICO IN DECEMBER WITH THE INTENT TO

15   ENGAGE IN A SEX ACT WITH A MINOR, KALEN, AND FOR AFTER

16   TRAVELING WITH THAT INTENT OR ATTEMPTING AND ACTUALLY

17   ENGAGING IN A SEX ACT WITH A BOY UNDER 12, KALEN.

18           AND IT IS THE GOVERNMENT'S BURDEN TO PROVE EACH OF

19   THESE CHARGES TO YOU BEYOND A REASONABLE DOUBT.  THE

20   GOVERNMENT EMBRACES THAT BURDEN AND HAS MET IT HERE.

21           THE GOVERNMENT'S GOING TO ASK YOU TO DO THREE

22   THINGS WHEN YOU DELIBERATE:

23           CONSIDER ALL THE EVIDENCE, NOT BITS AND PIECES HERE

24   OR THERE.  TAKE IT TOGETHER.  PUT IT INTO CONTEXT.  THE

25   IMAGES AND THE VIDEOS, THE CHATS, THE FORENSIC EVIDENCE.

1    LOOK AT THE SURROUNDING CIRCUMSTANCES, HOW IT CORROBORATES

2    EACH OTHER AND HOW IT TELLS A STORY, THE STORY OF SEXUAL

3    ABUSE AND SEXUAL EXPLOITATION.

4            SECOND, FOLLOW THE COURT'S INSTRUCTIONS ON THE LAW

5    AS YOU HAVE ALREADY PROMISED YOU WOULD.

6            AND, THIRD, USE YOUR COMMON SENSE.  IT IS THAT SAME

7    COMMON SENSE THAT GUIDES YOU EVERY DAY IN YOUR REGULAR LIVES

8    OUTSIDE OF THIS COURTROOM.  AND DON'T LEAVE THAT COMMON SENSE

9    AT THE COURTHOUSE STEPS.  BRING IT WITH YOU INTO THAT JURY

10   ROOM WHEN YOU DELIBERATE.

11           NOW, IN A MOMENT I'M GOING TO BRIEFLY GO THROUGH

12   EACH OF THE FOUR CHARGES, THEIR ELEMENTS AND SOME OF THE

13   EVIDENCE, THAT THE GOVERNMENT SUBMITS SHOWS THE DEFENDANT IS

14   GUILTY OF EACH OF THE FOUR CHARGES BEYOND A REASONABLE DOUBT.

15           BEFORE I DO THAT, LET ME ADDRESS TWO POINTS IN

16   WHICH THERE IS SIMPLY NO QUESTION IN THIS CASE.  FIRST, THE

17   DEFENDANT USED THE SCREEN NAMES BOYSAN, BOYSAN1, OJIBOYSAN,

18   OJITEMP, PEI, PEI314.  NOT ONLY IS THERE NO EVIDENCE TO THE

19   CONTRARY, BUT THERE IS OVERWHELMING EVIDENCE SHOWING THAT

20   THIS IS TRUE.  AND, SECOND, IT WAS THE DEFENDANT AND THE

21   DEFENDANT ALONE WHO USED THOSE SCREEN NAMES IN THE CHATS.

22           YOU MAY BE ASKED TO SPECULATE ABOUT THIS, BUT

23   DON'T.  THE EVIDENCE IS CLEAR, LADIES AND GENTLEMEN.

24           AND HOW DO YOU KNOW DEFENDANT USED ALL THOSE SCREEN

25   NAMES?  WELL, FIRST, YOU KNOW HE INTRODUCED HIMSELF AS BOYSAN

1    TO RANDALL MARTIN.  YOU KNOW THAT HIS FELLOW BOY LOVER, SETH

2    BEKENSTEIN, HAD A FOLDER ON HIS COMPUTER CALLED BOYSAN, WITH

3    A PICTURE OF THE DEFENDANT; THAT SETH BEKENSTEIN HAD HIS

4    PHONE BOOK WITH THE NAME BOYSAN, WITH THE DEFENDANT'S NAME

5    AND ADDRESS.  THE DEFENDANT'S OWN LAPTOP COMPUTER HAD THE

6    SCREEN NAMES OJIBOYSAN AND PEI ON IT.  DEFENDANT'S OWN

7    HANDWRITTEN NOTES, EXHIBIT 15, SHOW THAT HE HAD USED THE

8    SCREEN NAMES BOYSAN AND PEI, HIS OWN HANDWRITTEN NOTES FROM

9    HIS BACKPACK.

10           AND THEN THERE IS THE CHATS, THE CHATS ON WHICH HE

11   TALKED ABOUT USING THOSE SCREEN NAMES AND THAT THEY WERE ALL

12   HIS, INTERCHANGABLE FOR DIFFERENT PLACES AND DIFFERENT

13   TIMES.  THERE IS SIMPLY NO QUESTION THAT THE DEFENDANT USED

14   ALL THOSE SCREEN NAMES.

15           AND THEN HOW DO YOU KNOW THAT THE DEFENDANT WAS THE

16   ONE ALWAYS USING THOSE SCREEN NAMES?  FROM EVERYTHING HE

17   WROTE IN THE CHATS, LADIES AND GENTLEMEN.  INFORMATION IN THE

18   CHATS THAT WERE RECOVERED FROM HIS OWN LAPTOP, THE LAPTOP IN

19   HIS POSSESSION.  THE CHATS IN EXHIBIT 3 IN WHICH HE USES THE

20   SCREEN NAME PEI AND TALKS ABOUT ALL HIS OTHER SCREEN NAMES.

21   AND IN THOSE CHATS, HE TALKS ABOUT INFORMATION THAT ONLY HE

22   COULD KNOW.  NOT ONLY IS THERE NO INDICATION IN THE CHATS OR

23   THE OTHER EVIDENCE THAT SOMEONE ELSE WAS USING HIS NAMES OR

24   POSING AS HIM, BUT THERE IS JUST NO DOUBT THAT HE

25   PARTICIPATED.

 1          AND LOOK AT WHAT WAS WRITTEN.  HIS NAME ALL OVER

 2   THE CHATS, "JIM."  HE RESPONDS.  HE ACKNOWLEDGES IT.  HE USES

 3   IT.  HIS PERSONAL INFORMATION:  HIS BIRTHDAY ON MARCH 18TH.

 4   YOU SAW HIS PASSPORT.  HE IS A PISCES, GREW UP IN ARKANSAS

 5   WITH HIS GRANDPARENTS.

 6          YOU HEARD TONY SUTHERLAND'S TESTIMONY WHERE HE

 7   LIVED AND WHERE HE WORKED AT THE CAMP.  HE TALKS ABOUT THE

 8   CAMP.  THE HUNDREDS OF CAMPERS.  GIVES HIS BIG SECRET AWAY TO

 9   ONE OF HIS FELLOW BUDDIES IN ONE OF THE CHAT ROOMS, THAT HE

10   WORKED FOR THE GIRL SCOUTS.  TALKED ABOUT THE MOUNTAINS OF

11   CALIFORNIA; THE LAKE AT THE CAMP THAT YOU SAW IN THAT

12   PHOTOGRAPH, THAT HE WOULD GO SWIMMING IN; THE PACIFIC CREST

13   TRAIL RIGHT NEAR THE CAMP; DOING THINGS IN PALM DESERT, SAN

14   BERNARDINO, REDLANDS, IDYLLWYLD, ALL NEAR THE CAMP;

15   ACTIVITIES THAT HE DID AT THOSE PLACES; WENT TO SKATE PARKS.

16   YOU SAW THAT SKATE PARK FLIER IN HIS BACKPACK FROM PERRIS,

17   CALIFORNIA.  GOING ON BOY-LOVER SAFARIS, TO FRYE'S.  YOU SAW

18   FRYE'S RECEIPTS IN HIS BACKPACK.  AN 18 YEAR OLD THAT HE MET

19   IN A RESTAURANT IN IDYLLWYLD.  AND REMEMBER THAT ENCOUNTER?

20   THAT WAS KINKY AND UNUSUAL FOR THE DEFENDANT TO BE ATTRACTED

21   TO SOMEONE SO OLD.

22          TALKED ABOUT MOVING TO LAS VEGAS, GETTING A

23   MORTGAGE.  YOU SAW THE BANK OF AMERICA MORTGAGE DOCUMENTS IN

24   HIS BACKPACK.  TALKED ABOUT HIS 10-YEAR-OLD BOYFRIEND IN LAS

25   VEGAS, THAT OTHER YOUNG BOY.  YOU SAW THE PICTURES ON HIS

1   LAPTOP, THE LV, LAS VEGAS PICS THAT HE HAD.  HE EVEN

2   DESCRIBED THOSE PICTURES IN THE CHATS:  THE PICTURE WITH THE

3   JAWBREAKER IN THAT BOY'S MOUTH, THE CANDY; THE PICTURE OF THE

4   BOY'S BUTTOCKS; THE PICTURE OF THE BOY WITH THE SHIRT, DAISY

5   DUKES STYLE, POSING LIKE A GIRL, THE DEFENDANT DESCRIBED IT.

6          AND THEN, OF COURSE, THERE IS THE STORAGE LOCKER IN

7   LAS VEGAS WHERE HE SHOWED UP DURING THE SEARCH.

8          AND THEN HE TALKED ABOUT HIS POSSESSIONS IN THOSE

9   CHATS:  HIS BRONCO; HIS NISHIKI MOUNTAIN BIKE; HIS CAMERA;

10  THAT CAMERA, A FUJI FINE PICS 2400.  THAT CAMERA, LADIES AND

11  GENTLEMEN.

12         AND THEN, OF COURSE, HE TALKED ENDLESSLY IN THE

13  CHATS ABOUT WHAT HE HAD ON HIS COMPUTER, THE PROGRAMS THAT HE

14  USED.  HE HAD A LAPTOP, A DESKTOP, A SONY VAIO LAPTOP, JUST

15  LIKE THE ONE SITTING BEFORE YOU.  THE ENCRYPTION ON ALL OF

16  THOSE COMPUTERS.  THE WIPING CLEAN PROGRAMS HE USED: EVIDENCE

17  ELIMINATOR; BCWIPE; FREEDOM; NEOTRACE; ICQ, AND YAHOO!

18  MESSENGER PROGRAMS; NEWS GROUPS; ZING ALBUMS; VISITING CHILD

19  PORNOGRAPHY WEB SITES; GOING TO CHILD PORNOGRAPHY GROUPS;

20  USING AN EXTERNAL HARD DRIVE, THAT EXTERNAL HARD DRIVE

21  SITTING RIGHT IN FRONT OF YOU, LADIES AND GENTLEMEN.

22         AND HE WROTE ABOUT IT IN THE CHATS.  IT IS WRITTEN

23  ABOUT HOW HE HAD THREE ENCRYPTED CONTAINERS ON THAT.  THERE

24  IS SO MANY OTHER DETAILS IN THE CHATS THAT ARE SO CLEAR IT IS

25  THE DEFENDANT.

1          HE TALKED ABOUT SETH BEKENSTEIN.  HE TALKED ABOUT

2     THE OTHER BOYS.  HE TALKED ABOUT THE CHILD PORNOGRAPHY THAT

3     HE POSSESSED, HOW HE SAVED IT TO THE ENCRYPTED FILES IN THE

4     MEDIA AND WIPED HIS DELETED FILES.  HE TALKED ABOUT GOING TO

5     THE BAY AREA AND HELPING SETH MOVE.  HAD THE PICTURES FROM

6     THE COMPUTER FROM MAY OF 2000.

7          AND THEN, OF COURSE, HE TALKED ABOUT KALEN.  YOU

8     KNOW THE DEFENDANT KNEW KALEN; CALLED HIM A SEVEN YEAR OLD.

9     HE KNEW HIS FAMILY.  TALKED ABOUT TRAVELING TO SEE HIM.  YOU

10    KNOW HE DID THAT.  TONY SUTHERLAND TOLD YOU.  THE PHONE

11    RECORDS SHOW THAT.  AND HOW HE BROUGHT HIS OWN LAPTOP.  TONY

12    SUTHERLAND TOLD YOU THAT, AS WELL.

13         LADIES AND GENTLEMEN, THERE IS ALSO THE CHATS

14    THEMSELVES THAT HE POSSESSED ON HIS LAPTOP.  THERE IS SIMPLY

15    NO QUESTION THAT THE DEFENDANT WAS THE PERSON WHO WROTE THESE

16    CHATS.

17         SO NOW LET'S TURN TO THE CHARGES.  THE FIRST TWO

18    CHARGES ARE THE CHILD PORNOGRAPHY CHARGES.  FIRST CHARGE IS

19    THAT HE PARTICIPATED IN A CONSPIRACY TO POSSESS CHILD

20    PORNOGRAPHY, AND THE SECOND CHARGE IS THAT HE ACTUALLY

21    POSSESSED CHILD PORNOGRAPHY.

22         NOW, THE COURT HAS DEFINED CHILD PORNOGRAPHY FOR

23    YOU DURING THIS TRIAL AND IN THE INSTRUCTIONS.  AND KEEP THIS

24    DEFINITION IN MIND FOR BOTH COUNTS, WITH REGARD TO THE IMAGES

25    AND VIDEOS THAT THE DEFENDANT POSSESSED ON HIS LAPTOP AND

 1    DISKS, AND WITH REGARD TO THE TYPES OF IMAGES AND VIDEOS HE

 2    AND HIS CO-CONSPIRATORS TALKED ABOUT IN THE CHATS, THAT THEY

 3    HAD CONSPIRED AND AGREED TO POSSESS.  AND IT'S CLEAR THAT

 4    THEY ARE CHILD PORNOGRAPHY, LADIES AND GENTLEMEN.  LIKE THE

 5    CHATS, THE IMAGES SPEAK FOR THEMSELVES.

 6         THERE ARE OBVIOUSLY VISUAL DEPICTIONS: PHOTOGRAPHS

 7    AND VIDEOS WHICH INCLUDE ELECTRONIC DATA STORED ON THE

 8    COMPUTER THAT CAN BE CONVERTED.  AND THEY OBVIOUSLY DEPICT

 9    SEXUALLY EXPLICIT CONDUCT, ACTS OR SIMULATED:  SEXUAL

10    INTERCOURSE, GENITAL-GENITAL CONTACT, ORAL-GENITAL, ANAL-

11    GENITAL CONTACT, MASTURBATION, SADISTIC ABUSE, LEWD AND

12    LASCIVIOUS EXHIBITION OF GENITALS.

13         AND YOU ALSO KNOW THAT THEY INVOLVE THE USE OF A

14    MINOR, CHILDREN UNDER THE AGE OF 18 YEARS OLD.

15         YOU CAN SEE FOR YOURSELF THOSE ARE REAL CHILDREN,

16    LADIES AND GENTLEMEN.  THEY ARE NOT COMPUTER-GENERATED

17    CREATIONS, SCANNED IMAGES.  AND IF YOU NEED TO, ALTHOUGH ONCE

18    MAY HAVE BEEN ENOUGH, YOU CAN LOOK AT THEM AGAIN, THOSE

19    IMAGES, EXHIBITS 111 TO 131, AND THAT VIDEO FROM DEFENDANT'S

20    LAPTOP.

21         DO YOU REMEMBER IN THAT VIDEO THE WINCE OF THAT

22    YOUNG BOY AS HE WAS BEING ANALLY PENETRATED?

23         YOU CAN SEE FOR YOURSELVES HOW YOUNG THEY ARE.

24    MANY OF THEM PREPUBESCENT.  LOOK AT THEIR BODIES.  LOOK AT

25    THEIR PHYSICAL DEVELOPMENT.  YOU KNOW FROM THE CHATS THAT

1    THEY ARE FOR REAL, THAT THE DEFENDANT AND HIS CO-CONSPIRATOR

2    DID NOT FAKE IMAGES.  USE YOUR COMMON SENSE.  THESE ARE REAL

3    CHILDREN, LADIES AND GENTLEMEN, REAL SEXUALLY EXPLICIT

4    CONDUCT.

5         AND THEN, OF COURSE, IN ADDITION TO SEEING THE

6    IMAGES AND JUDGING FOR YOURSELVES, YOU CAN ALSO DRAW FROM THE

7    TESTIMONY OF CUSTOM ATTACHE HEEGER.  HE MET THAT LITTLE BOY

8    IN THE THIEF'S PUNISHMENT VIDEO.  THAT'S A REAL CHILD IN THE

9    STILL, MATCHED ON THE DEFENDANT'S COMPUTER, AS HE WAS BEING

10   WHIPPED AND HELD DOWN AND HIS BUTTOCKS SPREAD APART.

11        YOU HEARD THE TESTIMONY OF LEE BROWN HOW HE MATCHED

12   TWO OF THE RUSSIAN FLOWERS IMAGES TO A VIDEO RECOVERED FROM

13   SETH BEKENSTEIN.

14        YOU HEARD THE TESTIMONY THIS MORNING OF FBI ANALYST

15   MONIQUE BUENO HOW EXHIBITS 117 AND 141, THE IMAGES OF THAT

16   YOUNG BOY WITH THAT VACANT, SAD LOOK ON HIS FACE, BEING

17   ANALLY PENETRATED, WAS FROM THE PICCOLO DANISH MAGAZINE

18   SERIES PUBLISHED IN THE 1970S.  AND YOUR COMMON SENSE WILL

19   TELL YOU WHAT COMPUTER TECHNOLOGY WAS IN THE 1970S.  THERE

20   WAS NO INTERNET LIKE WE KNOW IT TODAY.  NO DIGITAL CAMERAS.

21   NO TECHNOLOGY SOFTWARE, VIDEO GAMES.  MAYBE PALM.  THERE

22   WASN'T PHOTO SHOP OR MORPHING TECHNOLOGY.

23        IT IS CLEAR, LADIES AND GENTLEMEN, THAT THESE ARE

24   REAL CHILDREN DEPICTED IN THESE IMAGES.  AND IT IS CLEAR,

25   WITH REGARD TO THE OBJECT OF THE CONSPIRACY, AGAIN FROM THE

1    CHATS OVER AND OVER AND OVER AND OVER AGAIN, THAT THE OBJECT

2    OF THEIR CONSPIRACY WAS THE POSSESSION OF CHILD PORNOGRAPHY.

3            AND, IN FACT, YOU HEARD THE TESTIMONY FROM RANDALL

4    MARTIN.  YOU REMEMBER THAT TESTIMONY, LADIES AND GENTLEMEN?

5    NOW, FEEL FREE NOT TO LIKE RANDALL MARTIN.  FEEL FREE TO

6    DESPISE RANDALL MARTIN.  BUT WHEN YOU EVALUATE HIS TESTIMONY,

7    THINK ABOUT WHY HE WAS HERE.  AND THERE WAS ONLY ONE REASON

8    WHY HE WAS HERE, LADIES AND GENTLEMEN.  AND THAT'S BECAUSE HE

9    IS A FELLOW BOY LOVER WHO POSSESSED CHILD PORNOGRAPHY AND

10   CONSPIRED WITH THE DEFENDANT.  WHO ELSE WOULD KNOW THE

11   DETAILS ABOUT THOSE ALBUMS HE POSSESSED WITH THOSE AWFUL

12   NAMES?

13           RECALL HIS TESTIMONY, THE STARTLING CANDOR AND

14   HONESTY, THE TEARS THAT HE SHED UP THERE.  WHO WOULD ADMIT

15   SUCH THINGS ABOUT THEMSELVES?  HE DIDN'T WANT TO BE HERE.  HE

16   THOUGHT HIS CASE WAS OVER.  HE TOLD YOU HE HAS ALREADY BEEN

17   SENTENCED TO THE MAX AND HE IS DOING HIS TIME.  HIS TESTIMONY

18   IN THIS COURTROOM HAD NO IMPACT ON HIS SENTENCE.  AND IF HE

19   LIED ON THE STAND, HE WOULD DO MORE TIME OR FACE MORE -- THE

20   POSSIBILITY OF MORE TIME.  SO DID HE REALLY RECEIVE A

21   BENEFIT?  WELL, YOU HEARD IT WAS JUST FOR HIS STATEMENTS AT

22   TRIAL HERE.  HE CAN STILL BE PROSECUTED FOR ANY OTHER CRIME

23   THAT HE HAS COMMITTED, BUT IT WAS JUST HIS STATEMENTS.

24           AND, OF COURSE, IF YOU FEEL YOU CAN'T BELIEVE HIM,

25   THEN YOU KNOW WHAT?  DISREGARD IT.  YOU DON'T EVEN NEED HIS

 1    TESTIMONY, BECAUSE YOU HAVE THE CHATS AND ALL OF THE OTHER

 2    EVIDENCE IN THIS CASE, LADIES AND GENTLEMEN.

 3            WITH REGARD TO THE CONSPIRACY, LADIES AND

 4    GENTLEMEN, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE

 5    DOUBT THAT THERE IS AN AGREEMENT BETWEEN TWO OR MORE PEOPLE

 6    TO COMMIT A CRIME.  AND IN SIMPLE TERMS, THE GOVERNMENT MUST

 7    SHOW THE DEFENDANT WILLFULLY BECAME A MEMBER OF THAT

 8    CONSPIRACY, KNOWING THAT ITS OBJECT WAS TO POSSESS CHILD

 9    PORNOGRAPHY.

10            IT IS CRYSTAL CLEAR, AGAIN FROM THE CHATS.

11            LOOK AT THE CONVERSATIONS BETWEEN THE PARTICIPANTS

12    AND THE COMMUNICATION WITH EACH OTHER.  DEFENDANT'S

13    COMMUNICATION WITH SETH BEKENSTEIN, RANDALL MARTIN;

14    COMMUNICATION BETWEEN DIFFERENT CHATTERS, SARLO99, PLAYTP,

15    CROW, DANIEL, IN EXHIBIT 1 FROM SETH BEKENSTEIN'S COMPUTER;

16    AND EXHIBIT 3, DEFENDANT'S COMPUTER: HANS, DRAGON, RWP; IN

17    CHATS IN EXHIBIT 1 AND IN CHATS IN EXHIBIT 2 FROM RANDALL

18    MARTIN'S COMPUTER.  OTHER CO-CONSPIRATORS MENTION THE

19    DEFENDANT.

20            AND THEN WHAT DID THEY TALK ABOUT?  CHILD

21    PORNOGRAPHY AND SEX WITH LITTLE BOYS.  DEFENDANT'S WILLING

22    AND KNOWING PARTICIPATION IN THAT CONSPIRACY IS ALSO EQUALLY

23    AS CLEAR FROM THE CHATS, OVER AND OVER AND OVER AGAIN.  LOOK

24    AT EXHIBIT 3, THE CHATS FROM HIS OWN COMPUTER.  AND THEN

25    THERE IS STILL THE CHATS IN EXHIBIT 1 AND EXHIBIT 2 IN WHICH

1    HE PARTICIPATED.

2            AND THEN THERE IS HIS DIRECT TIES TO RANDALL MARTIN

3    AND SETH BEKENSTEIN.

4            RANDALL MARTIN TOLD YOU ABOUT THE TELEPHONE CALLS.

5    YOU KNOW DEFENDANT AND SETH BEKENSTEIN WERE REAL GOOD

6    FRIENDS; HELPED HIM MOVE, LETTERS BACK AND FORTH TO EACH

7    OTHER, PICTURES ON THEIR -- PICTURES ON EACH OTHERS'

8    COMPUTERS OF EACH OTHER, TAKING TRIPS TOGETHER, SETH

9    BEKENSTEIN'S PHONE BOOK.

10            AND THEN THINK ABOUT WHAT SPECIAL AGENT ARNOLD TOLD

11    YOU ON THE DAY THAT HE WENT TO SEARCH THE CAMP.  REMEMBER

12    WHAT THE DEFENDANT SAID?  "I KNOW WHY YOU'RE HERE.  BECAUSE I

13    KNOW SOMEONE IN SAN FRANCISCO."

14            AND DO YOU REMEMBER WHAT HE TALKED ABOUT?  HE

15    CALLED IT "LITERATURE."  AND YOU KNOW FROM HIS CHATS WHEN HE

16    SAID "LITERATURE," HE MEANT CHILD PORNOGRAPHY, LADIES AND

17    GENTLEMEN.  IT IS IN THE CHATS.  HE USED "LITERATURE" TO

18    DESCRIBE CHILD PORNOGRAPHY.

19            AND IT IS CLEAR THAT HE HAD THE INTENT TO ADVANCE

20    THAT CONSPIRACY AND ADVANCE HIS OBJECT.  IT IS CLEAR THAT HE

21    KNEW OTHERS WHO WERE INVOLVED IN THE CONSPIRACY.  AND IT IS

22    CLEAR THAT HE KNEW THE BENEFITS TO HIM WERE PROBABLY

23    DEPENDENT ON THE SUCCESS OF THE VENTURE.  WHAT WAS THAT

24    SUCCESS?  MORE CHILD PORNOGRAPHY.  EVADING LAW ENFORCEMENT;

25    KEEPING IT GOING.  HE DIDN'T NEED TO KNOW EVERY DETAIL,

1     EVERY CO-CONSPIRATOR, EVERY IMAGE, EVERY CHAT.

2             AND HE CERTAINLY KNEW IT WAS ILLEGAL.  HE KNEW WHAT

3     HE WAS DOING AND PARTICIPATING IN.  HE CONTINUED AFTER SETH

4     WAS ARRESTED.  HE ENCRYPTED AND WIPED HIS COMPUTER.  HE

5     BOASTED ABOUT HOW IMAGES WOULD NEVER BE FOUND ON HIS COMPUTER

6     BECAUSE OF HIS ENCRYPTION.  "EVEN IF THEY LOOK, THEY WON'T

7     FIND ANYTHING, BUT IT REMAINS READILY AVAILABLE TO ME," HE

8     WROTE.

9             HE TALKED ABOUT CREATING THE MOTHER OF ALL

10    PASSWORDS.  WELL, YOU KNOW WHAT?  HE DID THAT IN THIS CASE.

11    HE SHOWED OTHERS HOW TO CREATE PASSWORDS AND ENCRYPTED

12    CONTAINERS AND TALKED ABOUT AVOIDING LAW ENFORCEMENT ALL THE

13    TIME.  THE TRADERS, HOW THEY ARE THE FLAVOR OF THE DAY;

14    NOTHING BETTER TO DO.  GET RID OF THE EVIDENCE.

15            HE TOLD RANDALL MARTIN, YOUR BROTHER WILL LIE IF HE

16    HAS TO.

17            HE TOLD SPECIAL AGENT ARNOLD THAT HE WOULD LIE TO

18    PROTECT HIS OWN FREEDOM.

19            IT ALL SHOWS ONE THING, LADIES AND GENTLEMEN:  HIS

20    CONSCIOUSNESS OF GUILT.

21            NOW, WITH REGARD TO THE CHILD PORNOGRAPHY

22    POSSESSION COUNT -- THE FIRST ELEMENT, THE GOVERNMENT MUST

23    SHOW THE DEFENDANT KNOWINGLY POSSESSED THE COMPUTER HARD

24    DRIVE AND THE DISKS, AND THAT ON THEM THEY CONTAINED AT LEAST

25    ONE IMAGE OF CHILD PORNOGRAPHY.

1        THE GOVERNMENT NEED ONLY PROVE THAT HE POSSESSED

2   ONE IMAGE, LADIES AND GENTLEMEN, KNOWINGLY.

3        AND WITH REGARD TO POSSESSION, AS THE JUDGE HAS

4   INSTRUCTED, POSSESSION IS SOMETHING IF THE PERSON KNOWS OF

5   ITS PRESENCE AND HAS PHYSICAL CONTROL OF IT.  THERE IS A

6   LITTLE BIT MORE TO THAT DEFINITION.  BUT YOU KNOW IN THIS

7   CASE THAT THE DEFENDANT DID KNOWINGLY POSSESS THE COMPUTER

8   HARD DRIVE IN HIS LAPTOP, THE COMPUTER, AND HIS DISK, AND

9   WHILE, WITH REGARD TO THE COMPUTER, IT WAS UNDER HIS

10  CONTROL.  HE POSSESSED IT WHEN IT WAS SEIZED.  HE WAS FLEEING

11  WITH IT IN HIS LOCKED BACKPACK, ALONG WITH HIS PASSPORT AND

12  OTHER PAPERS.

13       HE ADMITTED TO SPECIAL AGENT ARNOLD IT WAS HIS

14  LAPTOP.  YOU HAVE THE HANDWRITTEN NOTES IN WHICH HE HAS THE

15  SAME REGISTRY INFORMATION, THAT PHONY NAME HE MADE UP,

16  ELLIOTT BURSON, AS WAS ACTUALLY FOUND ON THE LAPTOP COMPUTER.

17       AND THEN, OF COURSE, THERE IS ALL THE OTHER FILES

18  AND DATA ON THE COMPUTER THAT YOU KNOW WERE HIS.  AND THEN

19  THERE IS HIS STATEMENTS IN HIS OWN CHATS WHERE HE TALKED

20  ABOUT THE LAPTOP.

21       THERE IS NO REAL DISPUTE ABOUT WHO THAT LAPTOP

22  BELONGED TO, LADIES AND GENTLEMEN.

23       AND WITH REGARD TO THE DISKS, YOU ALSO KNOW THAT

24  DEFENDANT KNOWINGLY POSSESSED THOSE TWO DISKS.  WHY?  BECAUSE

25  THEY WERE UNDER THE DEFENDANT'S CONTROL.

1            FIRST, THE STORAGE LOCKER WAS RENTED IN HIS NAME.

2    SETH BEKENSTEIN WAS ALREADY IN JAIL.  THE RENTAL AGREEMENT

3    WAS IN HIS POSSESSION, IN HIS NAME.  HE SHOWED UP AT THE

4    LOCKER DURING THE SEARCH THE DAY AFTER THEY SEIZED HIS

5    LAPTOP.  AND EVEN IF THOSE DISKS WERE ORIGINALLY SETH

6    BEKENSTEIN'S, SO WHAT.  SETH BEKENSTEIN, IN THE CHATS, IT IS

7    WRITTEN, GAVE AWAY ALL OF HIS POSSESSIONS.  HE LEFT HIS STUFF

8    IN HIS STORAGE LOCKER UP NORTH BEFORE HE WENT TO JAIL.

9            AND YOU ALSO KNOW SETH BEKENSTEIN POSSESSED A TON

10   OF CHILD PORNOGRAPHY THAT HE DISTRIBUTED TO A WHOLE HOST OF

11   PEOPLE.  HE DISTRIBUTED IT ON CDS, ON DISKS, ON VHS TAPES.

12   WHO KNOWS, MAYBE HE USED OLD DISKS WHEN HE GAVE THESE TO THE

13   DEFENDANT.  MAYBE HE GAVE OLD DISKS TO THE DEFENDANT AND HE

14   USED THEM HIMSELF.  MAYBE HE GAVE THE DEFENDANT AS A PRESENT.

15   IT DOESN'T MATTER, LADIES AND GENTLEMEN.

16           NOW, LET'S JUMP AHEAD TO THE FOURTH ELEMENT REAL

17   QUICK, INTERSTATE COMMERCE.  YOU KNOW THAT IMAGES HERE

18   TRAVELED IN INTERSTATE COMMERCE.  YOU HAVE THE BLUE ORCHID

19   STILL, THE VIDEOS FROM RUSSIA.  YOU HAVE THE RUSSIAN FLOWERS

20   IMAGES.  YOU KNOW THEY CAME FROM RUSSIA.

21           THERE IS THE PICCOLO MAGAZINE.  YOU KNOW THAT CAME

22   FROM DENMARK.

23           THERE IS THE IMAGES AND VIDEO ON DEFENDANT'S

24   COMPUTER THAT CAME VIA THE INTERNET.  REMEMBER ONE OF THE

25   FIRST WITNESSES, MR. PIXLEY, TOLD YOU HOW THE INTERNET WORKS

1    CROSSING STATE LINES, INTERNATIONAL BOUNDARIES.

2              AND THEN THERE IS CHATS, PEOPLE FROM OVERSEAS ABOUT

3    THEIR TRADING AND POSSESSION OF CHILD PORNOGRAPHY.

4              AND THEN MR. MARTIN.  HE IS FROM TEXAS.

5              SO WITH REGARD TO THE SECOND AND THIRD ELEMENTS,

6    THAT'S WHERE THE DISPUTE IS.  THE GOVERNMENT HAS ALREADY TOLD

7    YOU THAT THEY ARE REAL CHILDREN.  THE GOVERNMENT HAS ALREADY

8    SHOWN YOU THAT THOSE ARE REAL CHILDREN.  SO, WHAT IS REALLY

9    IN DISPUTE?  LET'S CUT THROUGH THE LEGAL STUFF.  DID THE

10   DEFENDANT KNOW ABOUT THE CHILD PORNOGRAPHY ON HIS LAPTOP AND

11   HIS DISKS?

12             AND THE ANSWER TO THAT IS, YES, BY ALL THE EVIDENCE

13   IN THIS CASE.

14             LOOK AT THE ALTERNATIVE.  CAN YOU REALLY BELIEVE

15   AND ACCEPT THAT THE DEFENDANT WILL LIKELY CLAIM THAT SOMEHOW

16   HE DIDN'T KNOW ABOUT ANY OF IT?  COME ON.

17             ENDLESS CHATS.  DEFENDANT SAYS, "YOU KNOW ME.  I'VE

18   GOT A ZILLION PICS."  TALKING ABOUT LITTLE BOYS, HIS SEXUAL

19   PREFERENCES, HIS ENCRYPTION, THE GROUPS AND WEB SITES HE WENT

20   TO.  ALL OF THAT STUFF, THAT WAS ALL THAT INFORMATION THAT

21   WAS ON HIS COMPUTER.  COULD THIS ALL BE SOME BIG MISTAKE OR

22   MISUNDERSTANDING, POP-UPS, SPOOFS, VIRUSES, TROJAN HORSES,

23   SOME BAND OF ROVING CHILD PORNOGRAPHY HACKERS PUTTING THIS

24   STUFF ON HIS COMPUTER, THAT HE DOESN'T WANT?  COME ON, LADIES

25   AND GENTLEMEN.

1           MYSTERIOUS AND UNKNOWN COMPUTER PROBLEMS THAT

2      SOMEHOW HE COULDN'T FIX?  COME ON, LADIES AND GENTLEMEN.

3           THE ONLY REAL PROBLEM THE DEFENDANT HAD IS HE

4      COULDN'T DOWNLOAD THE IMAGES AND VIDEOS AS FAST AS HE WANTED

5      AND AS MUCH AS HE WANTED.

6           I EXPECT THAT THE DEFENDANT'S LAWYER WILL ARGUE THE

7      DEFENDANT DID POSSESS THE IMAGES THAT WERE IN HIS UNALLOCATED

8      SPACE.  WELL, FIRST OF ALL, THE VIDEO, EXHIBIT 132, THAT WAS

9      IN HIS ALLOCATED SPACE.  AND LOOK AT HIS CHAT WITH CROW18 IN

10     EXHIBIT 3N WHERE THEY TALK ABOUT TRADING CHILD PORNOGRAPHY

11     AND THEIR INTERESTS.  THE DEFENDANT KNEW THAT THAT VIDEO WAS

12     THERE IN HIS ALLOCATED SPACE.

13          AND WITH REGARD TO THE IMAGES IN THE UNALLOCATED

14     SPACE, JUST USE YOUR COMMON SENSE.  PUT ALL THE EVIDENCE

15     TOGETHER IN CONTEXT, AND IT IS CLEAR; DEFENDANT ABSOLUTELY

16     KNEW THOSE IMAGES WERE THERE.  IT'S JUST TOO BAD FOR HIM THAT

17     IT WAS SEIZED BEFORE HE COULD WIPE THEM AWAY.

18          LET'S GO TO THE TWO REMAINING COUNTS:  THE TRAVEL

19     COUNT AND THE SEX ABUSE COUNT ABOUT KALEN.

20          WELL, FIRST, THERE IS REALLY NO DISPUTE AS TO BOTH

21     COUNTS.  THE DEFENDANT TRAVELED FROM CALIFORNIA TO NEW MEXICO

22     IN DECEMBER OF 2000.  YOU HAVE TONY SUTHERLAND'S TESTIMONY.

23     YOU HAVE THE PHONE RECORDS.  YOU HAVE THE PHOTOS ON THE

24     LAPTOP WITH DATES CONSISTENT WITH TONY SUTHERLAND'S

25     TESTIMONY.  AND THEN YOU HAVE DEFENDANT'S CHATS WHERE HE

1    TALKED ABOUT GOING TO SEE KALEN IN DECEMBER.  AND THEN YOU

2    HAVE HIM TALKING ABOUT COMING BACK AFTER SEEING KALEN.

3              SO, WHAT'S REALLY IN DISPUTE?  WELL, WITH REGARD TO

4    BOTH COUNTS 3 AND 4, DEFENDANT'S INTENT; AND WITH REGARD TO

5    COUNT 4, WHAT DEFENDANT ATTEMPTED TO DO AND ACTUALLY DID ONCE

6    HE GOT THERE TO NEW MEXICO.

7              WELL, WITH REGARD TO INTENT AS TO BOTH COUNTS, LET

8    ME DRAW YOUR ATTENTION TO FBI SPECIAL AGENT CLEMENTE'S

9    TESTIMONY.  DO YOU REMEMBER HIS TESTIMONY, LADIES AND

10   GENTLEMEN?  HE AND HIS COLLEAGUES HAVE SPENT YEARS STUDYING

11   CHILD SEX OFFENDERS, THOUSANDS OF CASES, INTERVIEWS.  AND HIS

12   TESTIMONY PUTS THE EVIDENCE IN THIS CASE TOGETHER, PUTS IT IN

13   CONTEXT.  IT TELLS THE STORY OF THIS CASE, KALEN'S STORY,

14   LADIES AND GENTLEMEN.

15             HE DESCRIBED THE HALLMARKS OF THE PREFERENTIAL

16   CHILD SEX OFFENDER WHO HAS A SEXUAL INTEREST IN YOUNG BOYS.

17   AND WITHOUT EVEN HAVING KNOWN OR STUDIED THE FACTS OF THIS

18   CASE, LEARNING KALEN'S NAME FOR THE FIRST TIME ON

19   CROSS-EXAMINATION, LADIES AND GENTLEMEN, HIS TESTIMONY

20   SOUNDED IN SO MANY WAYS LIKE HE WAS TALKING ABOUT THIS CASE.

21             DEFENDANT'S BEHAVIOR, AS SHOWN BY THE EVIDENCE, IS

22   ENTIRELY CONSISTENT WITH A MAN WHO HAS AN INTENT TO ENGAGE IN

23   AND WAS ACTIVELY SEEKING AND DID ENGAGE IN SEX WITH A YOUNG

24   BOY.  THE FACTS FIT.

25             BUT, LADIES AND GENTLEMEN, DEFENDANT DIDN'T JUST

1    HAVE A SEXUAL INTEREST THAT WAS A FANTASY, BECAUSE HE ALSO

2    EXHIBITED THE BEHAVIOR DRIVEN BY THAT FANTASY, THE FANTASY --

3    EXCUSE ME -- THE DESIRE-DRIVEN BEHAVIOR.  AND IT HAS TO START

4    WITH A FANTASY.  OF COURSE IT DOES.  IF YOU DON'T HAVE THE

5    FANTASY, YOU'RE NOT GOING TO ACT OUT ON IT.  OF COURSE IT

6    STARTS WITH FANTASY.

7         AND SPECIAL AGENT CLEMENTE TOLD YOU, FOR SOME IT

8    STARTS AND STOPS WITH A FANTASY.  BUT NOT FOR THE DEFENDANT,

9    LADIES AND GENTLEMEN.  HERE, DEFENDANT TOOK STEPS TO MAKE

10   THAT FANTASY A REALITY.  LOOK AT HIS CHATS.  THOSE AREN'T

11   FANTASTICAL STORIES THAT HE'S TELLING YOU HERE.  THEY RING

12   TRUE, LADIES AND GENTLEMEN.

13        HE NOT ONLY COLLECTED AND POSSESSED CHILD

14   PORNOGRAPHY, BUT HE SOUGHT OUT REAL BOYS FOR SEX, LIKE KALEN.

15   AND AS THE JUDGE HAS TOLD YOU, THE STATEMENTS ABOUT OTHER

16   BOYS BEING RELEVANT TO SHOW HIS MOTIVE, INTENT, PREPARATION,

17   PLAN, LACK OF MISTAKE IN THIS CASE, AND HIS IDENTITY.

18        AND THEN YOU KNOW THAT DEFENDANT HAD THE

19   WELL-DEVELOPED GROOMING TECHNIQUES, LADIES AND GENTLEMEN.  HE

20   GROOMED KALEN, AND HE GROOMED HIS PARENTS TO GET ACCESS,

21   AUTHORITY AND CONTROL.  AND WHEN THE OPPORTUNITY PRESENTED

22   ITSELF, HE TOOK IT, LADIES AND GENTLEMEN.  AND YOU KNOW THAT

23   FROM HIS OWN WORDS, AND IT IS CORROBORATED BY THE OTHER

24   EVIDENCE.

25        AND HOW DID HE DO THIS?  HE GAVE ATTENTION,

1   ATTENTION TO A VULNERABLE BOY WHOSE PARENTS WERE RECENTLY

2   SEPARATED.  AND YOU LEARNED THAT FROM HIS DAD.  YOU KNOW THAT

3   FROM HIS CHATS.  HE SHOWED AN AFFECTION TO KALEN, INCLUDING

4   IN FRONT OF THE PARENTS, TO DESENSITIZE THE BOY AND HIS

5   PARENTS.  HE SOUGHT OUT MORE TIME WITH KALEN, TIME ALONE.

6   ENGAGED IN CERTAIN ACTIVITIES GEARED TOWARD HIS GOAL OF

7   SEXUAL ACTS.  TAKING KALEN SWIMMING IN THE HOT TUB, IN

8   DECEMBER 2000.  SLEEPING IN THE SAME ROOM AS KALEN AND NEVER

9   GETTING ANY SLEEP.  TAKING SHOWERS WITH KALEN.  SPANKING

10  KALEN.  GIVING CERTAIN GIFTS, ASSETS, TO KALEN DESIGNED TO

11  FACILITATE DEFENDANT'S ACCESS: A BATHING SUIT, THAT SPEEDO

12  THAT MATCHED THE DEFENDANT'S, IN DECEMBER OF 2000.

13          USING TECHNOLOGY TO GROOM AND DESENSITIZE KALEN.

14  PLANNING TO SHOW HIM DIRTY PICTURES ON THE LAPTOP,

15  ACCIDENTALLY.  USING A DIGITAL CAMERA TO RECORD KALEN.  YOU

16  SAW THOSE PICTURES OF KALEN WITH HIS SHIRT OFF, LADIES AND

17  GENTLEMEN, TAKEN IN DECEMBER OF 2000.  AND YOU KNOW THAT

18  DEFENDANT WANTED TO GET NUDIE PICS, AS HE CALLED THEM, WANTED

19  TO GET PICTURES OF KALEN'S CROTCH BEFORE HE GOT TOO OLD, TO

20  DOCUMENT HIM AND TO DESENSITIZE HIM.

21          AND THEN WHAT DID DEFENDANT DO?  HE USED THAT CLOSE

22  RELATIONSHIP HE HAD WITH KALEN AND THE FAMILY, KNEW THE

23  PARENTS FOR YEARS, KNEW KALEN SINCE BIRTH, SINCE HE WAS THREE

24  MONTHS OLD, BEEN BONDING EVER SINCE, USING THAT TIME TO GET

25  CLOSER TO GROOMING.

1        AND THEN DEFENDANT HAD THE ACCESS WHEN HE WAS IN

2   NEW MEXICO STAYING WITH KALEN AT KALEN'S MOM'S HOUSE, IN

3   DECEMBER OF 2000, WRITING HOW "KALEN'S MOM UNDERSTANDS HIS

4   NEED TO BE WITH ME," SEEKING OUT MORE TIME AND MORE TIME

5   ALONE WITH KALEN.

6        AND WITH THAT ACCESS CAME THE OPPORTUNITIES IN NEW

7   MEXICO.  THE DEFENDANT WROTE, "ALL BOYS LOVE MEN.  IT IS

8   MAKING IT HAPPEN THAT'S THE TRICKY PART."

9        AND THERE IS THAT FAMOUS QUOTE THE DEFENDANT USED,

10  "LUCK IS WHERE PREPARATION AND OPPORTUNITY MEET."

11       HE EVEN WROTE ABOUT "MISSING A GREAT OPPORTUNITY

12  LAST TIME."  BY HIS OWN WORDS, THE DEFENDANT ADMITS HE

13  CREATED THE OPPORTUNITY.  AND WHEN HE SAYS HE MISSED IT, IT

14  DOESN'T MEAN NOTHING HAPPENED.  BECAUSE YOU KNOW WHAT

15  HAPPENED FROM HIS OWN WORDS.  HE BROUGHT THE LAPTOP WITH

16  PORNOGRAPHY ON IT TO NEW MEXICO, TALKED ABOUT SHOWING IT TO

17  KALEN AND HIS OTHER BOYS, TO DESENSITIZE THEM.  THE SHOWERS,

18  THE SLEEPING TOGETHER, MASSAGING KALEN'S ANUS, HOW KALEN WAS

19  JUST ARRIVING -- HOW THEY WERE JUST ARRIVING AT ORGASM; HOW

20  THEY BOTH WANTED TO.

21       IT DOESN'T MEAN DEFENDANT DIDN'T GET AS FAR AS HE

22  WANTED.  IT ONLY MEANT HE DIDN'T GET AS FAR AS HE HAD

23  INTENDED -- EXCUSE ME.  IT DOESN'T MEAN IT DOESN'T GET AS FAR

24  AS -- AS WHEN HE TRAVELED TO NEW MEXICO IN 2001, CAN ONLY

25  IMAGINE WHAT THE NEXT VISITS WOULD HAVE BROUGHT FOR KALEN.

1    IT'S CLEAR WHAT THE DEFENDANT'S INTENT WAS.  AND HE

2  EVEN TALKED ABOUT HOW HE HAD TO BE SO CAREFUL; IT WAS SO

3  DANGEROUS.  AND WHY MAINTAIN THE CONSPIRACY OF SILENCE, AVOID

4  GETTING CAUGHT, FIGURE OUT A WAY TO BE TOGETHER MORE AND KEEP

5  IT GOING UNTIL KALEN TURNED 14, WHEN HE WAS TOO OLD AFTER

6  THAT.

7    AND WHY BE SO CAREFUL AND SO DANGEROUS?

8  CONSCIOUSNESS OF GUILT, LADIES AND GENTLEMEN.  THE DEFENDANT

9  INTENDED AND WANTED TO ENGAGE IN SEX ACTS WITH A SEVEN YEAR

10  OLD.  WHY ELSE THE NEED TO BE SO CAREFUL?  WHY WAS IT SO

11  DANGEROUS?  BECAUSE HE WAS FEARFUL THAT THIS DAY WOULD COME,

12  LADIES AND GENTLEMEN, TODAY.

13    AND THINK ABOUT WHAT HE ASKED SPECIAL AGENT ARNOLD

14  AT THE CAMP:  "HOW IS KALEN?"

15    HE DIDN'T CARE ABOUT KALEN THE WAY THAT A FAMILY

16  FRIEND CARES ABOUT A FRIEND'S YOUNG SON.  HE DIDN'T WANT TO

17  GET CAUGHT.  HE WAS WORRIED HE HAD BEEN CAUGHT.  THAT'S WHY

18  HE ASKED, "HOW IS KALEN?"  BECAUSE HE KNEW, LADIES AND

19  GENTLEMEN, HE KNEW WHAT HE HAD DONE.

20    AND THEN YOU ALSO HEARD THE TESTIMONY FROM SPECIAL

21  AGENT CLEMENTE ABOUT BOY LOVERS.  THE DEFENDANT IS A

22  SELF-PROFESSED BOY LOVER.  CALLS HIMSELF A PEDOPHILE; HOW HE

23  IS BEING PERSECUTED BY SOCIETY BECAUSE OF HIS INTEREST.  HOW

24  THESE BOYS LOVE US.  EVEN HAVING A PASSWORD IN HIS NOTES HERE

25  OF KALEN, AND WHAT IS THE PROMPT TO REMIND HIM OF THAT,

1    "LOVER."  RATIONALIZING HIS BEHAVIOR, CALLING THE CHILDREN

2    THE "AGGRESSORS."

3              "KALEN IS AN IMP.  STARTED COMING ON TO ME WHEN HE

4    WAS SIX."  CALLING HIM A "HORNY 7YO WHO WILL GET IN YOUR

5    PANTS IN 20 MINUTES."

6              LADIES AND GENTLEMEN, THE DEFENDANT IS JUST

7    RATIONALIZING HIS OWN BEHAVIOR.  AND ONCE YOU PUT IT ALL

8    TOGETHER, WHAT MIGHT SEEM LIKE HARMLESS, NORMAL ACTS, SHOW

9    THAT THEY ARE NOT.  AND IT SHOWS BEYOND A REASONABLE DOUBT

10   WHAT THE DEFENDANT INTENDED AND ATTEMPTED AND WANTED TO DO TO

11   KALEN.

12             THE DEFENDANT IS A SEXUAL PREDATOR WHO WAS PREYING

13   AND PREYED UPON KALEN.

14             THE DEFENDANT WANTED HIS ACTIONS MISINTERPRETED.

15   THAT WAS HIS GOAL.  BUT THERE IS NO LONGER ANY ROOM FOR

16   MISINTERPRETATION, LADIES AND GENTLEMEN, BECAUSE IT IS ALL

17   CLEAR IN THIS COURTROOM TODAY.

18             NOW, THE LAST COUNT, AGGRAVATED SEX, SEX ABUSE, THE

19   GOVERNMENT HAS TO SHOW THAT THE DEFENDANT KNOWINGLY ENGAGED

20   IN OR ATTEMPTED TO ENGAGE IN A SEX ACT WITH A PERSON UNDER

21   12, KALEN.

22             NOW, KEEP IN MIND, AS THE COURT HAS INSTRUCTED YOU,

23   THE DEFENDANT IS JUST AS GUILTY FOR ATTEMPTING TO ENGAGE IN A

24   SEX ACT WITH KALEN AS HE IS FOR ACTUALLY ENGAGING IN THE ACT

25   ITSELF.  HE IS GUILTY EITHER WAY, SO LONG AS YOU FIND THE

1    DEFENDANT TOOK A SUBSTANTIAL STEP BEYOND MERE PREPARATION.

2    IT DOESN'T MATTER WHETHER HE ACTUALLY ENGAGED IN A SEX ACT.

3              BUT HERE, LADIES AND GENTLEMEN, THE EVIDENCE SHOWS

4    THAT HE NOT ONLY ATTEMPTED TO, BUT THAT HE DID THAT.  HE IS

5    GUILTY OF BOTH.

6              THE COURT HAS DEFINED "SEXUAL ACT" FOR YOU.  THERE

7    IS NO NEED TO REPEAT IT.

8              AND SO WITH THAT DEFINITION IN MIND, WHAT DID THE

9    DEFENDANT DO AND WHAT DID HE ATTEMPT TO DO TO KALEN?  AND

10   YOU, AS THE COURT HAS INSTRUCTED, ARE ALLOWED TO DRAW

11   REASONABLE INFERENCES.  YOU'RE ALLOWED TO USE YOUR COMMON

12   SENSE, YOUR REASON, YOUR OWN EXPERIENCE, AS WELL AS TO

13   CONSIDER ALL OF THE EVIDENCE IN THIS CASE TOGETHER IN

14   CONTEXT.

15             AND LOOK AT IT.  YOU KNOW HE HAD THE MOTIVE.  YOU

16   KNOW HE HAD THE INTENT.  YOU KNOW HE HAD THE OPPORTUNITY.  HE

17   HAD CREATED THAT.  AND IN THIS CONTEXT, WITHIN THESE

18   CIRCUMSTANCES, LOOK AT DEFENDANT'S WORDS.

19             HE WANTED TO USE THE LAPTOP TO SHOW SOFT PORN TO

20   KALEN, JUST ARRIVING AT ORGASM; WANTED TO GIVE HIM A "DRY

21   ORGASM," HIS WORDS.  WANTED TO GIVE HIM A "NICE CUM," WORDS

22   FROM THE CHATS.  WANTED TO "MASSAGE HIS LITTLE ASSHOLE,"

23   DEFENDANT TOLD YOU.

24             NOW, FIRST OF ALL, THINK OF ALL THE SUBSTANTIAL

25   STEPS BETWEEN MERE PREPARATION AND SEX ACTS, AND THINK ABOUT

```
 1   WHAT THE DEFENDANT DESCRIBED.  THINK ABOUT THE SEX ACTS, AND

 2   THINK ABOUT THOSE SUBSTANTIAL STEPS.  WHAT DOES IT TAKE TO

 3   BRING SOMEONE TO THE BRINK OF ORGASM, TO SEXUALLY AROUSE

 4   THEM?  HOW WOULD YOU DO THAT, TO BRING A SEVEN YEAR OLD TO

 5   THE STATE OF AROUSAL?  WHAT DOES IT MEAN TO MASSAGE A SEVEN

 6   YEAR OLD'S ANUS?

 7            AND DRAWING THE REASONABLE INFERENCES AND LOOKING

 8   AT THE EVIDENCE BASED ON YOUR COMMON SENSE AND EXPERIENCE,

 9   LOOK AT IT.  THIS IS A DEFENDANT IN THE CHATS WHO REPEATEDLY

10   PROFESSES A STRONG, STRONG AFFINITY FOR YOUNG BOYS' BUTTOCKS

11   AND ANUSES.  HE REPEATEDLY TALKS ABOUT SEX ACTS INVOLVING

12   YOUNG BOYS' RECTUMS, SPHINCTERS, AS HE DESCRIBES IT AT ONE

13   POINT, TALKS ABOUT ORAL PENETRATION OF THE ANUS AS A SEX ACT

14   THAT HE WANTS TO DO OVER AND OVER AGAIN, LADIES AND

15   GENTLEMEN.

16            AND THEN THERE IS THAT CHAT WITH CROW18, TALKING

17   ABOUT DIGITAL PENETRATION, PENETRATION OF THE ANUS WITH

18   FINGERS, WHERE THEY USE THOSE REPULSIVE MEDICAL ANALOGIES TO

19   DESCRIBE THE SEX ACTS THAT THEY WERE TALKING ABOUT.

20            AND THEN THERE IS THE IMAGE THAT THE DEFENDANT

21   POSSESSED WITH THE YOUNG BOY DIGITALLY PENETRATING HIS OWN

22   ANUS WITH HIS OWN FINGERS.  AND, I'M SORRY, LADIES AND

23   GENTLEMEN, TO TAKE YOU TO THIS PLACE AND ASK YOU TO THINK

24   ABOUT THESE THINGS AND PUT YOUR MIND THERE, BUT YOU NEED TO

25   FOR THIS COUNT.  THINK ABOUT THE PHYSICAL MECHANICS OF
```

1    MASSAGING A YOUNG BOY'S ANUS.

2           IT IS AN OPENING, AND ALL THE GOVERNMENT HAS TO

3    SHOW IS PENETRATION, HOWEVER SLIGHT.  THINK ABOUT IT,

4    MASSAGING AN ANUS, AN OPENING.  THERE IS SLIGHT PENETRATION,

5    LADIES AND GENTLEMEN.  YOU CAN BE SURE OF THAT FROM THE

6    EVIDENCE.

7           BUT AGAIN, DEFENDANT'S ALSO JUST AS GUILTY BECAUSE

8    OF ALL OF THE SUBSTANTIAL STEPS BEYOND MERE PREPARATION THAT

9    WE TALKED ABOUT IN THIS CASE.  HE IS JUST AS GUILTY IF HE

10   ACTUALLY ENGAGED IN THE SEX ACT.

11          AND THERE IS OTHER SEX ACTS THAT YOU CAN INFER

12   REASONABLY FROM THE STATEMENTS.  YOU KNOW BEYOND A REASONABLE

13   DOUBT THAT IN DECEMBER 2000 THE DEFENDANT TRAVELED FROM NEW

14   MEXICO TO CALIFORNIA WITH THE INTENT TO ENGAGE IN A SEX ACT

15   WITH KALEN.  AND YOU KNOW THAT ONCE HE GOT THERE WITH THAT

16   INTENT, HE ATTEMPTED TO ENGAGE AND DID ENGAGE IN A SEX ACT

17   WITH THAT YOUNG BOY.

18          NOW, THE GOVERNMENT ASKS, BASED ON THIS EVIDENCE,

19   THAT YOU RETURN THE ONLY VERDICT SUPPORTED BY THAT EVIDENCE

20   AND UNDER THE LAW:

21          THE DEFENDANT IS GUILTY AS TO COUNT 1;

22          THE DEFENDANT IS GUILTY AS TO COUNT 2;

23          THE DEFENDANT IS GUILTY AS TO COUNT 3; AND

24          THE DEFENDANT IS GUILTY AS TO COUNT 4, THAT HE BOTH

25   ATTEMPTED AND ENGAGED IN A SEX ACT COUNT.

1          THANK YOU.

2          THE COURT:  THANK YOU.  BEFORE WE HEAR ARGUMENT

3   FROM THE DEFENSE IN THIS CASE, WE WILL TAKE A RECESS, LADIES

4   AND GENTLEMEN.  WE WILL BE IN RECESS UNTIL 10:15 THIS

5   MORNING.

6          AGAIN, PLEASE REMEMBER YOU HAVEN'T HEARD ARGUMENT

7   YET FROM THE DEFENSE, SO DON'T MAKE UP YOUR MIND YET ABOUT

8   THE CASE.  DON'T DISCUSS IT.  DON'T DISCUSS ANY OF THE

9   EVIDENCE.  AND WE WILL SEE YOU BACK AT 10:15.

10          (THE JURY HAS EXITED THE COURTROOM.)

11          THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

12   PRESENCE OF THE JURY.

13          BEFORE I READ THE INSTRUCTIONS TO THE JURY, I DID

14   CATCH, IN THE INSTRUCTION AS TO COUNT 4 IN THE PACKET, THAT

15   YOU HAVE -- THERE WAS THE WRONG INSTRUCTION WHICH WAS

16   SUBSTITUTED BEFORE I READ IT.  SO I TOOK OUT -- IT WAS THE

17   ONE FROM LAST NIGHT WHICH WE HAD AGREED TO CHANGE TO TAKE OUT

18   THE LANGUAGE ABOUT ATTEMPTING TO MAKE, BECAUSE WE HAVE A

19   SEPARATE ATTEMPT INSTRUCTION.  SO THE ONE THAT YOU HAVE IS

20   NOT THE CORRECT ONE THAT THE JURY WILL HAVE.  AND THAT WAS

21   CORRECTED BEFORE I READ IT.

22          THE JURY -- I DON'T KNOW IF I TOLD COUNSEL THIS,

23   BUT THE JURY, EACH MEMBER OF THE JURY HAS A COPY OF THE

24   INSTRUCTIONS IN THE JURY ROOM.

25          ALL RIGHT.  THANK YOU.  WE ARE IN RECESS.

1          MR. AKROTIRIANAKIS:  YOUR HONOR, THERE IS, ON

2     EXHIBIT 34 -- I'M SORRY, COURT'S INSTRUCTION 34, IS A TOTALLY

3     IMMATERIAL ITEM.  BUT IT SAYS, "THE CASE AGAINST THE

4     DEFENDANTS," PLURAL.

5          THE COURT:  OH, THANK YOU.  I WILL FIX THAT.

6          MR. AKROTIRIANAKIS:  AND WITH REGARD TO THE RULE 29

7     MOTION, YOUR HONOR?

8          THE COURT:  ON NO. 34?

9          MR. AKROTIRIANAKIS:  UNLESS I MISNUMBERED, THE

10    PUNISHMENT PROVIDED BY LAW FOR THIS CRIME, ET CETERA.

11          AND THEN THE LAST PART OF THE CASE AGAINST THE

12    DEFENDANTS.

13          THE COURT:  OH, I SEE.  YES.

14          MR. AKROTIRIANAKIS:  WITH REGARD TO THE RULE 29,

15    THE COURT HAD INDICATED AT SIDEBAR THAT THE COURT HAD DENIED

16    THE DEFENDANT'S RULE 29 MOTION.  BUT WE WERE --

17          THE COURT:  I CHECKED.  THE COURT REPORTER GOT MY

18    RULING.

19          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

20          THE COURT:  ALL RIGHT.  WE ARE IN RECESS.

21               (RECESS)

22          (IN THE PRESENCE OF THE JURY:)

23          THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

24    ALL MEMBERS OF THE JURY, COUNSEL FOR BOTH PARTIES, AND THE

25    DEFENDANT ALSO PRESENT.

1          MR. AARON, YOU MAY PROCEED.

2          MR. AARON:  THANK YOU, YOUR HONOR.

3          GOOD MORNING, LADIES AND GENTLEMEN.

4          I KNOW THAT AFTER THE EVIDENCE THAT YOU HAVE SEEN

5     IN THIS CASE, I KNOW THAT A LOT OF YOU ARE VERY ANGRY.  I

6     KNOW THAT SOME OF YOU ARE DISGUSTED, AND SOME OF YOU ARE SAD.

7     I UNDERSTAND ALL OF THAT, AND I ACCEPT IT.

8          THE ONLY THING THAT I WOULD IMPLORE YOU TO DO IS TO

9     REMEMBER THAT EMOTION IS NOT EVIDENCE.  EMOTION IS NOT

10    EVIDENCE.

11         WHEN YOU LOOK AT THE PICTURES, WHEN YOU READ THE

12    CHATS, YOU MAY HAVE EMOTIONS, AND THAT'S FINE.  BUT YOU NEED

13    TO READ THE CHATS.  YOU NEED TO LOOK AT THE PICTURES.  SADLY,

14    YOU NEED TO DO THAT BECAUSE YOU NEED TO BASE YOUR VERDICT, IF

15    YOU HAVE A VERDICT, ON THE EVIDENCE AND NOT ON YOUR EMOTIONS.

16         YOU HAVE SEEN AND YOU HAVE HEARD THAT MR. SANDERS

17    AND THE OTHER PEOPLE SAY MANY STRANGE AND HORRIBLE THINGS.  I

18    AM NOT HERE TO DEFEND THOSE THINGS.  AND YOU MAY DISLIKE

19    MR. SANDERS.  YOU MAY HATE HIM.

20         AND MANY JURORS DON'T REALLY UNDERSTAND THE ROLE OF

21    THE LAWYER, AND THEY THINK, WELL, IF YOU'RE HIS LAWYER,

22    YOU'RE AN EXTENSION OF HIM AND, THEREFORE, THEY HATE THE

23    LAWYER, TOO.  AND IF YOU WANT TO, YOU CAN HATE ME, TOO.

24    THAT'S OKAY.

25         I JUST HOPE THAT WHEN YOU GET TO THE END OF THE

1    CASE, THAT WHEN YOU START DELIBERATING, THAT YOU LOVE JUSTICE

2    MORE THAN YOU HATE THE DEFENSE.  THAT'S ALL THAT I REALLY

3    NEED.  BECAUSE ONCE I HAVE THAT, I HAVE EVERYTHING.

4          WE TALKED ABOUT THE LAW.  THERE IS ONE INSTRUCTION

5    WHICH IS THE MOST IMPORTANT OF ALL, AND OBVIOUSLY THAT'S AN

6    INSTRUCTION ABOUT REASONABLE DOUBT.  THAT'S THE ONE THING

7    THAT YOU NEED TO REMEMBER AND HOLD CLOSE TO YOU BECAUSE

8    THAT'S THE TEST THAT YOU HAVE TO PUT EVERYTHING THROUGH.

9          IF THE GOVERNMENT FAILS TO PROVE A SINGLE ELEMENT

10   -- PERHAPS WE SHOULD INQUIRE OF THE JUROR IF SHE WANTS SOME

11   WATER.

12         THE COURT:  I'M SORRY.  DO YOU WANT SOME WATER?

13         A JUROR:  I'M OKAY.

14         MR. AARON:  IF THEY FAIL TO PROVE A SINGLE ELEMENT

15   OF A SINGLE CHARGE BEYOND A REASONABLE DOUBT, YOU MUST VOTE

16   NOT GUILTY.  YOU MUST VOTE NOT GUILTY EVEN IF YOU DON'T WANT

17   TO, EVEN IF YOU WISH YOU COULD VOTE DIFFERENTLY.  YOU MUST.

18   THAT'S THE OATH THAT YOU TOOK.

19         THE INSTRUCTION -- AND THIS IS INSTRUCTION 3, AND

20   YOU WILL HAVE A PACKET.  BUT IT TELLS YOU YOU HAVE TO BE

21   CONVINCED MORE THAN THAT, FIRMLY CONVINCED, AND YOU HAVE TO

22   BE FIRMLY CONVINCED BEYOND A REASONABLE DOUBT.  THAT MEANS

23   ANYTHING LESS, ANYTHING LESS, IF IT'S AN UNREASONABLE DOUBT,

24   THAT'S ALL THAT YOU CAN HAVE LEFT WHEN YOU GO -- IF YOU

25   RETURN A GUILTY VERDICT, YOU HAVE TO SAY ALL OF MY DOUBTS ARE

1    UNREASONABLE, ALL OF THEM.

2            LET'S SAY YOU COME TO THE END OF THIS CASE AND YOU

3    SAY, I'VE HEARD THE ARGUMENTS.  I'VE LOOKED AT THE EVIDENCE

4    TIME AND TIME AND AGAIN, AND I THINK IT IS MORE LIKELY THAN

5    NOT THAT IN THE ENCRYPTED FILES THERE WAS CHILD PORN.  IT IS

6    MORE LIKELY THAN NOT THAT HE HAD THAT INTENT.  THAT IS THE

7    STANDARD OF PROOF.  THAT'S CALLED "PROOF BY A PREPONDERANCE

8    OF THE EVIDENCE."  THAT IS NOT THE STANDARD HERE.

9            IF YOU BELIEVE THAT MY CLIENT IS GUILTY OF ONE OR

10   MORE CHARGES MORE LIKELY THAN NOT, YOU MUST VOTE HIM NOT

11   GUILTY.

12           IF YOU BELIEVE THAT THERE IS SUBSTANTIAL EVIDENCE,

13   SUBSTANTIAL EVIDENCE OF GUILT, YOU MUST STILL VOTE NOT

14   GUILTY.

15           IF YOU BELIEVE THAT THERE IS CLEAR AND CONVINCING

16   EVIDENCE OF GUILT, EVEN THAT STANDARD, THAT IS NOT THE

17   STANDARD HERE.  EVEN IF THERE IS CLEAR AND CONVINCING

18   EVIDENCE OF GUILT, YOU MUST VOTE NOT GUILTY.

19           ONLY IF ALL OF YOUR DOUBTS ARE UNREASONABLE CAN YOU

20   VOTE GUILTY.

21           WHEN YOU EXAMINE THE EVIDENCE IN THIS CASE, YOU

22   DON'T GO LOOKING THROUGH THE CASE SAYING, WELL, I REALLY WANT

23   TO CONVICT.  I REALLY WANT TO FIND HIM GUILTY, SO LET ME PICK

24   OUT THINGS HERE AND THERE TO SUPPORT A GUILTY VERDICT.

25           NO.  YOU SCRUTINIZE THE CASE FOR REASONS TO VOTE

1    NOT GUILTY BECAUSE YOU MUST SEE IF ANY OF YOUR DOUBTS ARE

2    REASONABLE OR UNREASONABLE.  THAT'S WHAT YOU MUST DO.  YOU

3    MUST SCRUTINIZE THE EVIDENCE IN THIS CASE TO SEE IF THERE IS

4    A REASONABLE DOUBT.

5            BUT BEFORE YOU BEGIN LOOKING AT THIS CASE, LET ME

6    JUST ASK EACH OF YOU, HONESTLY, DID MR. SANDERS EVER HAVE A

7    FAIR SHOT?

8            WHEN YOU CAME IN AND SAT DOWN, LOOKING BACK NOW,

9    DID HE REALLY EVER HAVE A FAIR SHOT?

10           DO THE PROSECUTION AND THE DEFENSE REALLY START AT

11   THE SAME STARTING LINE?  AND LET ME TELL YOU WHAT I MEAN.

12   LOOK AT THE TYPE OF EVIDENCE THAT YOU HEARD.  WE HEARD

13   EVIDENCE FROM SPECIAL AGENT ARNOLD.  THE VERY BEGINNING OF

14   THIS CASE HE TESTIFIED, I NEVER GAVE HIM THE MIRANDA RIGHTS.

15           HE SAID THAT IN THE PRIOR PROCEEDINGS.  HE SAID

16   THAT HERE.  HE SAID THAT REPEATEDLY.  AND THEN LO AND BEHOLD,

17   ON THE SEARCH WARRANT AFFIDAVIT HE TESTIFIED UNDER PENALTY OF

18   PERJURY THAT HE DID GIVE THE MIRANDA WARNINGS.

19           THAT'S CALLED A FALSE STATEMENT.  EITHER THE

20   TESTIMONY HERE WAS FALSE OR THE TESTIMONY IN THE AFFIDAVIT

21   WAS FALSE.  ONE OF THEM WAS FALSE.

22           HE TELLS YOU, MR. SANDERS DIDN'T GIVE ME A KEY.

23           DO YOU REMEMBER PERRY JOHNSON?  PERRY JOHNSON SAID,

24   "I GAVE THE KEY TO THE RESIDENCE BACK TO MR. ARNOLD BECAUSE

25   HE HAD GIVEN IT TO ME."

1          AND REMEMBER ALL OF THE DISCUSSION ABOUT THE

2    MYSTERIOUS PHOTO WITH THE BACKPACK?  AND AGENT ARNOLD SAID,

3    "WELL, MR. JOHNSON TOOK THAT PHOTO."

4          MR. JOHNSON TOLD YOU, "NO, I DID THE SEARCH AT THE

5    RESIDENCE, AND THEN I CAME BACK AND DID NOTHING."

6          THE REASON I BRING THIS UP IS, LET'S PRETEND FOR A

7    MOMENT THAT THE DEFENSE HAD CALLED THAT WITNESS.  LET'S

8    PRETEND FOR A MOMENT THE DEFENSE HAD CALLED A WITNESS WHO

9    TESTIFIED FALSELY UNDER OATH.  WOULD YOU BELIEVE THAT WITNESS

10   FOR A MINUTE?  A WITNESS THAT SO CRUCIALLY SPEAKS TO THE

11   STATEMENTS MY CLIENT SUPPOSEDLY MADE.  WOULD YOU BELIEVE SUCH

12   A CRUCIAL WITNESS?

13         LET'S SAY IT WAS AN ALIBI AND YOU HAD LEARNED THAT

14   IN THE VERY COURSE OF DISCUSSING THE ALIBI THE WITNESS HAD

15   LIED UNDER OATH.  WOULD YOU GIVE THE DEFENSE A PASS ON THAT?

16   I DON'T THINK SO.

17         WHAT IF -- LET ME GIVE YOU ANOTHER EXAMPLE.  LET'S

18   TAKE A LOOK AT AGENT BROWN.  AGENT BROWN TESTIFIED, AND HE

19   CONTINUED TO ARGUE DURING THE TESTIMONY.  HE CONTINUED TO ADD

20   THINGS AGAIN AND AGAIN.  AND AT ONE POINT HE SAID, "WELL, YOU

21   JUST KEEP ASKING ME ABOUT THESE LITTLE SECTIONS HERE."

22         AND I SAID, DIDN'T THE PROSECUTOR ASK YOU ABOUT

23   LITTLE SECTIONS OR EXCERPTS?  AREN'T I DOING EXACTLY THE SAME

24   THING?

25         AND HE GOES, YES, BUT -- AND THEN I THINK HE TRIED

1    TO IMPLY THAT I WAS MISCHARACTERIZING HIM.

2         REMEMBER ON REDIRECT WHEN THE PROSECUTOR STOOD UP?

3    DID THAT PROSECUTOR ONCE POINT TO A SECTION I HAD QUESTIONED

4    HIM ON AND CORRECT A MISAPPREHENSION, A MISSTATEMENT?  NOT

5    ONCE.

6         IF THE DEFENSE PUT ON A WITNESS LIKE THAT, A

7    WITNESS WHO IS SO OBVIOUSLY ARGUING WITH THE PROSECUTOR, WHO

8    IS SO OBVIOUSLY TRYING TO ANSWER EVERY QUESTION BUT THE ONE

9    ASKED, WOULD YOU BELIEVE THAT WITNESS?  AND LET'S GO TO A

10   WITNESS THAT THE PROSECUTOR DESCRIBED AS HAVING STARTLING

11   CANDOR.  THAT'S MR. MARTIN.

12        MR. MARTIN.  WHAT DOES HE TELL YOU?  HE SAYS HE

13   WANTS TO WATCH HIS SONS MOVIE AND HE SAW, QUOTE, "SOME NEAT

14   BULGES."  HE ACKNOWLEDGED, ON CROSS-EXAMINATION, THAT

15   REFERRED TO THEIR PENISES, BUT HE SAID "I DIDN'T FEEL

16   SEXUALLY AROUSED BY THAT."  IT HAD NOTHING TO DO WITH IT.

17        HE TELLS YOU HE IS NOT REALLY WORRIED ABOUT THE

18   CHARGES.  HE BELIEVES THAT THE PROSECUTOR IN THE NORTHERN

19   DISTRICT OF TEXAS, IN DALLAS, WON'T PROSECUTE HIM AND CAN'T

20   PROSECUTE HIM, BUT STILL HE WANTS IMMUNITY.

21        TELLS YOU SOMETHING ELSE THAT'S INTERESTING.  HE

22   SAYS, "YES, I KNEW COUNT 3 CARRIED UP TO 15 YEARS."

23        BUT HE SAYS, "I DIDN'T KNOW ABOUT COUNT 4."

24        NOW, DOES THAT SOUND REASONABLE TO YOU, OR DOES IT

25   SOUND TO YOU LIKE HE IS HIDING SOMETHING?  AND YOU KNOW FOR

1    SURE HE IS HIDING SOMETHING BECAUSE AT LEAST TWICE HE TOOK

2    THE FIFTH AMENDMENT.

3              IS THIS A WITNESS WITH STARTLING CANDOR?  IS THIS A

4    WITNESS, IF THIS WITNESS WAS TESTIFYING FOR THE DEFENSE ON A

5    CRUCIAL MATTER, THAT YOU WOULD BELIEVE?  NO.  NO, MY FRIENDS,

6    YOU WOULDN'T BELIEVE US.  YOU WOULDN'T BELIEVE THAT FOR AN

7    INSTANCE.

8              IF YOU DO BELIEVE THOSE WITNESSES, ASK YOURSELF,

9    ARE YOU GIVING THE GOVERNMENT THE BENEFIT OF THE DOUBT?

10   BECAUSE YOU SHOULDN'T.  YOU SHOULD GIVE US THE BENEFIT OF THE

11   DOUBT OF EVERY REASONABLE DOUBT THAT GOES TO THE DEFENSE.

12   WHEN THE GOVERNMENT SAYS, EXCUSE THAT, OR, DON'T LISTEN TO

13   THAT WITNESS; IGNORE THAT.  THAT'S JUST A MINOR ERROR.

14   REMEMBER, THEY'RE NOT ENTITLED TO THE BENEFIT OF THE DOUBT.

15   YOU HAVE SWORN TO FOLLOW THE LAW, AND THE LAW GIVES US THE

16   BENEFIT OF EVERY REASONABLE DOUBT.

17             I DON'T WANT SPECIAL FAVORS, BUT I WANT THE SAME

18   FAVORS THAT THE LAW GUARANTEES ME.  AND THAT IS, IN FAVOR OF

19   WHAT THE LAW SAYS, THAT THE DEFENSE GETS THE BENEFIT OF EVERY

20   REASONABLE DOUBT.  AND THAT'S ALL WE'RE TALKING ABOUT, IS THE

21   LAW HERE.

22             BACK IN THE DAYS OF THE FREEDOM RIDERS, MARTIN

23   LUTHER KING HAD A VERY INTERESTING COMMENT.  HE SAID, "I KNOW

24   THE LAW CAN'T MAKE A MAN LOVE ME, BUT IT CAN STOP HIM FROM

25   LYNCHING ME, AND SOMETIMES THAT'S ENOUGH."

1    AND THAT'S WHAT WE'RE ASKING.  WE DON'T EXPECT THE

2  JURY TO LOVE MR. SANDERS, BUT WE DO EXPECT YOU TO BE FAIR.

3    LET'S GO TO COUNT 1.  THIS IS A VERY UNUSUAL

4  SITUATION FOR A DEFENSE ATTORNEY TO BE IN, BUT I ACKNOWLEDGE

5  HE IS GUILTY.  HE IS GUILTY OF COUNT 1.  HE DID CONSPIRE WITH

6  MR. BEKENSTEIN AND MR. MARTIN TO RECEIVE IMAGES OF CHILD

7  PORNOGRAPHY, AND NOT JUST TO LOOK AT THEM, BECAUSE LOOKING IS

8  NOT A CRIME.  HE DID CONSPIRE TO GET IMAGES TO DOWNLOAD.  AND

9  THAT IS IN THE CHATS.  THAT IS.  THERE IS EVIDENCE OF THAT.

10  SO WE ACKNOWLEDGE HE IS GUILTY AS TO COUNT 1.

11    WAS HE CONSPIRING WITH ALL OF THE PEOPLE ON ALL OF

12  THE CHATS?  NO.  NO, HE WASN'T.

13    HE DID CONSPIRE WITH MR. BEKENSTEIN AND MR. MARTIN,

14  AND THAT'S ENOUGH FOR COUNT 1.  BUT THERE IS A MORE IMPORTANT

15  ISSUE, BECAUSE IF HE IS NOT CONSPIRING WITH ALL OF THOSE

16  OTHER PEOPLE, YOU HAVE TO READ THE CHATS BECAUSE,

17  UNFORTUNATELY, YOU HAVE THE DUTY OF DETERMINING WHICH PERSONS

18  HE WAS CONSPIRING WITH, BECAUSE YOU CAN USE THOSE STATEMENTS.

19    IF HE IS NOT CONSPIRING WITH THEM, YOU CAN'T, AND

20  YOU WOULD HAVE TO SUBTRACT THOSE STATEMENTS FROM YOUR

21  ANALYSIS OF THE CASE.

22    WE MAINTAIN HE IS NOT GUILTY AS TO COUNT 2,

23  POSSESSION, AND LET ME EXPLAIN TO YOU WHY.

24    DID HE POSSESS CHILD PORNOGRAPHY IN THE PAST?

25  MAYBE.

1          WAS HE PLANNING ON POSSESSING IT IN THE FUTURE?

2     MAYBE.

3          WHAT THEY'VE GOT TO SHOW IS THAT THE IMAGES THAT

4     ARE IN THIS CASE HE KNOWINGLY POSSESSED.  THEY HAVE GOT TO

5     SHOW THAT, AND THEY CANNOT SHOW THAT.

6          THE PROSECUTION WILL ARGUE, WELL, WE KNOW THAT

7     THERE IS ENCRYPTED FILES AND THERE IS PROBABLY CHILD

8     PORNOGRAPHY IN THERE.

9          "PROBABLY" IS NOT GOOD ENOUGH.  "PROBABLY" DOESN'T

10    PAY THE BILLS.  "PROBABLY" IS SPECULATION.  YOU HAVE TO LOOK

11    AT THE IMAGES.  YOU HAVE TO SAY, YES, THIS IS AN IDENTIFIABLE

12    MINOR, THAT IS, A REAL PERSON UNDER THE AGE OF 18.

13         IF YOU CAN'T DO THAT, YOU CAN'T SAY IT IS CHILD

14    PORN.  NO MATTER WHAT THE DEFENDANT SAYS, HE MAY NOT KNOW AN

15    IMAGE IS PORN.  MR. MORAN SAID THEY ARE INDISTINGUISHABLE

16    FROM MERE IMAGES.  NO MATTER WHAT MR. BEKENSTEIN SAYS, NO

17    MATTER WHAT RICOCHET SAYS, NO MATTER WHAT MY CLIENT HAS SAID,

18    NO MATTER HOW MANY TIMES HE TALKS ABOUT LOOKING AT ZINGS OR

19    PHOTO ALBUMS OR HAVING PARTITIONED ENCRYPTED DRIVES, UNLESS

20    YOU SEE THE IMAGE AND UNLESS YOU CAN SAY THERE IS PROOF

21    POSITIVE BEYOND A REASONABLE DOUBT AND I AM FIRMLY CONVINCED

22    THAT'S AN IDENTIFIABLE MINOR, UNLESS YOU CAN SAY THAT, YOU

23    HAVEN'T EVEN GOTTEN CLOSE TO SAYING IT IS CHILD PORNOGRAPHY.

24         THERE IS NO WAY THAT IF YOU DON'T SEE AN IMAGE YOU

25    CAN SAY IT'S CHILD PORN.  IT COULD BE PORN.  THERE IS NO WAY.

1   IF YOU DON'T SEE AN IMAGE, YOU CAN'T SAY THAT THERE IS AN

2   OLDER ACTOR.   THERE COULD BE AN OLDER ACTOR PRETENDING TO BE

3   YOUNGER.   THERE IS NO WAY YOU CAN SAY AN IMAGE THAT YOU

4   HAVEN'T SEEN WAS OR WAS NOT MODIFIED BY PHOTO SHOT BECAUSE

5   YOU HAVEN'T SEEN IT.

6          THE IMAGES WERE NOT KNOWINGLY POSSESSED.   SOMETHING

7   -- AND THE JURY INSTRUCTION TELLS YOU SOMETHING HAS TO BE IN

8   MY POSSESSION AND I MUST KNOW IT IS IN MY POSSESSION.   I HAVE

9   TO HAVE POWER AND CONTROL OVER IT.

10          LET'S SAY MR. SANDERS KNOWINGLY DOWNLOADS CHILD

11   PORN.   HE LOOKS AT IT AND HE DELETES IT.   AT THAT POINT, IT

12   GOES INTO UNALLOCATED SPACE.   AND AT THAT POINT HE SAYS, I

13   DELETED IT.   I BELIEVE I NO LONGER POSSESS IT.   AND HE

14   DOESN'T POSSESS IT.

15          COURT'S INSTRUCTION NO. 20:   A PERSON HAS

16   POSSESSION OF SOMETHING IF THE PERSON KNOWS OF ITS PRESENCE

17   AND HAS PHYSICAL CONTROL OF IT OR KNOWS OF ITS PRESENCE AND

18   HAS THE POWER AND INTENTION TO CONTROL IT.

19          YOU MUST KNOW OF ITS PRESENCE.   THAT MEANS HE MUST

20   KNOW OF ITS PRESENCE ON THE DRIVE.

21          COUNSEL SPECULATES, WELL, HE JUST HADN'T GOTTEN

22   AROUND TO WIPING IT.   WELL, IT SEEMS IN THE CHAT THAT HE IS

23   WIPING ALL THE TIME.   AND IT SEEMS THAT, IF COUNSEL IS

24   CORRECT, THAT HE HAD THESE OTHER PROGRAMS WHICH COULD GO INTO

25   UNALLOCATED SPACE AND OVERWRITE THEM, WHY WOULD HE HAVE LEFT

1    IT ON THE DISK?  WHY WOULD HE HAVE DONE THAT?

2            THEY CAN'T HAVE IT BOTH WAYS.  THEY CAN'T SAY HE'S

3    GOT THIS PROGRAM WHICH CAN ONLY WRITE DELETED FILES, AND

4    THAT'S WHY HE KNOWS HE HAS DELETED FILES.

5            BUT, ON THE OTHER HAND, WHEN HE HAS DELETED FILES,

6    HE INTENTIONALLY LEFT THEM THERE.

7            THAT MAKES NO SENSE AT ALL.

8            LET'S GO THROUGH THE IMAGES, EXHIBITS 111 THROUGH

9    131.  ALL OF THESE ARE UNALLOCATED SPACE.  WE DON'T EVEN KNOW

10   HOW THEY GOT TO THE HARD DRIVE.  THEY COULD HAVE BEEN

11   POP-UPS.  THEY COULD HAVE BEEN FROM FLOPPIES.  THEY COULD

12   HAVE BEEN FROM THE INTERNET.  IF THEY WERE FROM FLOPPIES, WE

13   DON'T EVEN HAVE AN INTERSTATE CONNECTION BECAUSE IT COULD BE

14   AS SIMPLE AS ONE PERSON GIVING A FLOPPY TO ANOTHER, SO THERE

15   IS NO INTERSTATE TRANSPORTATION AT ALL.

16           EXHIBITS 130 AND 131, THESE ALSO ARE IN THE

17   UNALLOCATED SPACE.  THERE IS SOME TEXT DATA ASSOCIATED WITH

18   THEM THAT MIGHT TELL US THEY CAME FROM THE INTERNET, BUT IT

19   IS NOT PART OF THE FILE.  IT IS SIMPLY NEXT TO THE FILE.  BUT

20   IT DOESN'T MATTER.  FROM 111 TO 131, WE KNOW THAT MR. SANDERS

21   DELETED THEM.  WE KNOW THAT HE MADE THE DECISION NOT TO

22   POSSESS THEM, AND THEY WERE IN UNALLOCATED SPACE.

23           EXHIBIT 132 WAS THE VIDEO CLIP, AND THAT'S IN

24   ALLOCATED SPACE.  AND THAT'S IN AN ICQ FOLDER.

25           WHAT DID MR. MORAN TELL US ABOUT THAT?  WE KNOW WE

 1   HAD TESTIMONY ABOUT VIDEOS IN THIS CASE BEFORE THAT TYPICALLY

 2   THEY HAVE A FILE EXTENSION, MPEG, SOMETHING LIKE THAT.  THE

 3   FILE EXTENSION IS IMPORTANT BECAUSE THEN THE PROGRAM KNOWS IT

 4   CAN PLAY.

 5           HERE, WHAT IS THE FILE EXTENSION?  THE FILE

 6   EXTENSION IS DAT.  WHAT'S THE SIGNIFICANCE OF THAT?

 7           MR. MORAN TELLS US IT IS VERY SIGNIFICANT:

 8           ONE, IT IS NOT READABLE BY HUMANS;

 9           TWO, YOU NEED TO GET AN ADDITIONAL PROGRAM TO OPEN

10   IT UP;

11           THREE, IT IS SAVED AUTOMATICALLY.  YOU DON'T NEED

12   TO DO ANYTHING.  IT IS AUTOMATICALLY SAVED ON YOUR HARD

13   DRIVE;

14           FOUR, YOU WON'T EVEN KNOW THAT IT IS BEING SAVED.

15           IF THAT'S SO, HOW CAN MR. SANDERS HAVE KNOWINGLY

16   POSSESSED IT?  HOW COULD HE HAVE KNOWINGLY POSSESSED A FILE

17   HE CAN'T READ?  THERE IS NO EVIDENCE THAT HE HAD THIS OTHER

18   PROGRAM THAT MR. MORAN USED.  WHY WOULD HE HAVE KNOWINGLY

19   POSSESSED A FILE HE COULDN'T READ AND COULDN'T ACCESS?

20           EXHIBIT 133, THAT'S A FILE RECOVERED FROM THE

21   UNALLOCATED SPACE IN DISK 51.  THIS IS THE PLAIN DISK.  IT

22   HAD NO WRITING ON IT, FROM THE LAG VEGAS STORAGE UNIT.  WE

23   HAVE ALREADY TALKED ABOUT HOW THESE ARE THE ITEMS THAT BELONG

24   TO MR. BEKENSTEIN.  THERE IS MANY OF THEM.  MANY OF THEM.

25   THERE IS, I BELIEVE, 62 DISKS.  A NUMBER OF THEM HAD WRITING

1   RELATED TO SETH BEKENSTEIN.  AND I SHOWED YOU, IF YOU LOOK AT

2   THE ENVELOPES AND YOU COMPARE IT TO THE ENVELOPES ADDRESSED

3   TO THE SELF-ADDRESSED ENVELOPES TO SETH BEKENSTEIN, YOU WILL

4   SEE THAT THE WRITING IS EXACTLY THE SAME AS ON ONE OF THE

5   DISKS WHERE THE IMAGES COME FROM.

6           THIS WRITING, THIS DISK, HAS NO WRITING.  WE DON'T

7   KNOW WHERE THIS DISK IS FROM.  WE KNOW IT IS FROM THE STORAGE

8   UNIT.  BUT WE DON'T KNOW IF IT IS WHERE THE OTHER DISK THAT

9   HAD THE BEKENSTEIN WRITING.  WE DON'T KNOW WHEN IT GOT THERE.

10  WE DON'T KNOW HOW IT GOT THERE.  WE KNOW IT IS IN THE

11  UNALLOCATED SPACE, SO SOMEONE WAS ON THAT DISK AND SOMEONE

12  DELETED THAT.

13          EXHIBITS 134 TO 138, THESE ARE ON THE ALLOCATED

14  SPACE AT DISK 47.  AND THIS IS THE DISK -- AND YOU CAN SEE

15  FOR YOURSELF -- THAT HAS THE WRITING THAT APPEARS TO BE

16  MR. BEKENSTEIN.  THERE IS NO EVIDENCE THAT MR. SANDERS KNEW

17  THERE WAS PORNOGRAPHY ON THAT DISK.  THERE IS NO EVIDENCE,

18  INTERESTINGLY, THAT HE EVER TOUCHED THAT DISK.

19          NOW, REMEMBER I ASKED HIM.  BECAUSE ONE THING, IF

20  YOU DO HAVE CONTRABAND, YOU WANT TO ESTABLISH OWNERSHIP.

21  THAT'S WHY THEY LOOK FOR DOCUMENTS.  THEY LOOK FOR INDICIA OF

22  OWNERSHIP THAT WILL TELL THEM WHO IS LIVING AT THIS PLACE,

23  WHO IS CONTROLLING THIS.  WELL, THEY CAN DO BETTER THAN THAT.

24  THEY CAN DO FINGERPRINTS.  THEY CAN DO DNA.  DID THEY?  NO,

25  THEY DIDN'T.

1          SO THEY HAD THEIR MECHANISM OF PERHAPS DETERMINING

2     IF MR. SANDERS HAD EVEN TOUCHED THAT ITEM, AND THEY DIDN'T DO

3     IT.

4          THE PROSECUTOR WILL ARGUE THAT, ACCORDING TO THE

5     TRANSCRIPTS, MR. SANDERS SAYS THAT MR. BEKENSTEIN PUTS HIS

6     PROPERTY IN WALNUT CREEK.  THERE IS A COMMENT IN THE

7     TRANSCRIPTS WHERE MR. SANDERS DOES SAY HE PUT SOME OF HIS

8     PROPERTY IN WALNUT CREEK AND GAVE SOME AWAY.  BUT IF YOU TAKE

9     A LOOK AT -- I'M GOING TO SHOW YOU AN EXCERPT.  THIS IS FROM

10    3J, 5/14 6:39 P.M.  AND HE SAYS, "HEHEHE.  NICE TO SEE YOU

11    AGAIN.  I JUST GOT BACK FROM SAN FRANCISCO AND LAS VEGAS."

12         AND THEN LATER DOWN HE SAYS, "HEHEHE.  I DON'T

13    GAMBLE.  I MADE $2100 HELPING A FRIEND MOVE OUT OF HIS

14    APARTMENT, AND I GOT ALL THE FURNITURE."

15         ALL RIGHT.  WE DON'T KNOW IF THERE WAS ANY

16    FURNITURE IN THE LAS VEGAS STORAGE UNIT.  I PRESUME THERE WAS

17    FURNITURE IN MR. SANDERS' RESIDENCE, BUT WE DON'T EVEN KNOW

18    THAT.  BUT THE INTERESTING THING ABOUT THIS IS HE NEVER

19    MENTIONS WALNUT CREEK.  IF HE HAD JUST GOTTEN BACK FROM

20    MOVING AND HE HAD MOVED STUFF TO WALNUT CREEK, WOULDN'T HE

21    HAVE SAID, I JUST GOT BACK FROM SAN FRANCISCO AND WALNUT

22    CREEK?

23         NO.  HE SAYS, SAN FRANCISCO AND LAS VEGAS.  BECAUSE

24    HE WENT TO SAN FRANCISCO, TOOK THE PROPERTY, AND WENT TO LAS

25    VEGAS AND PUT IT THERE.  THAT'S WHY HE GOT THE $2100.  WOULD

1    YOU GIVE SOMEONE $2100 TO MOVE PROPERTY FROM SAN FRANCISCO TO

2    WALNUT CREEK?  THAT'S LIKE GOING FROM RIVERSIDE TO MORENO

3    VALLEY.

4            INTERESTINGLY, WE HAD EVIDENCE, ACCORDING TO THE

5    PROSECUTION, THAT THERE WAS A STORAGE LOCKER IN WALNUT CREEK.

6    WE KNOW -- WE KNOW THAT ALL OF THESE LOGS WERE DOWNLOADED

7    WHEN?  IN 2001.  THEY HAVE HAD THEM FOR FIVE, SIX, SEVEN

8    YEARS.  THEY HAVE KNOWN ABOUT A STORAGE UNIT THERE IN WALNUT

9    CREEK.  THEY HAVE KNOWN THAT -- THEY WENT THROUGH THE LITANY

10   OF WHAT WAS FOUND IN MR. BEKENSTEIN'S APARTMENT, 100,000

11   IMAGES, I THINK 1,200 VIDEO CLIPS, OVER 100 VCRS.  CERTAINLY,

12   SOMEONE COULD HAVE AN ASTONISHING LARGE AMOUNT OF

13   PORNOGRAPHY.  THEY DISCOVERED OTHER CONTACTS, OTHER PEOPLE,

14   MR. SANDERS, MR. MARTIN.  IF THEY KNEW HE HAD A STORAGE

15   LOCKER, DON'T YOU THINK THEY WOULD BE THERE THE VERY NEXT DAY

16   WITH A WARRANT?  IS THAT REASONABLE TO YOU?

17           LOOK AT WHAT AGENT BROWN TELLS YOU.  WE JUST

18   FIGURED WE'D GET EVERYTHING, SO WE DIDN'T BOTHER TO TAKE THE

19   TROUBLE TO LOOK.

20           DOES THAT SOUND LIKE THE FEDERAL GOVERNMENT TO

21   YOU?  DOES THAT SOUND REASONABLE TO YOU?

22           LOOK AT THIS.  THEY BRING WITNESSES FROM

23   WASHINGTON, D.C.; FROM LAS VEGAS; FROM SAN FRANCISCO; FROM

24   DALLAS, TEXAS; FROM MOSCOW, BUT THEY CAN'T CHECK A STORAGE

25   LOCKER IN WALNUT CREEK?  THAT DOESN'T SOUND REASONABLE TO ME.

1          SOMETHING ELSE DOESN'T SOUND REASONABLE TO ME,

2     EITHER.  THE PROSECUTION SAID THAT MR. BEKENSTEIN WOULD

3     TESTIFY IN HIS OPENING, AND HE DIDN'T.  THE PROSECUTION HAD A

4     NUMBER OF IMAGES, A NUMBER OF IMAGES WHERE THEY COULD HAVE

5     GONE TO MR. BEKENSTEIN OR MR. MARTIN AND SAID, CAN YOU

6     IDENTIFY THESE?  WERE THESE IMAGES THAT YOU SENT HIM?  WERE

7     THESE FROM ANY OF YOUR DISKS?

8          NOT ONE.  NOT ONE.  WE DON'T KNOW WHERE ANY OF

9     THOSE IMAGES CAME FROM, EXCEPT WE KNOW THAT THEY WERE NOT

10    IDENTIFIED BY BEKENSTEIN AND MARTIN.

11         BEFORE I TALK TO YOU ON COUNTS 3 AND 4, ALL OF US,

12    ALL OF US, I THINK, FEEL RESPONSIBILITY TOWARDS CHILDREN.

13    ALL OF US HAVE CHILDREN IN OUR LIVES.  ALL OF US WERE

14    CHILDREN.  WE KNOW HOW PARTICULARLY VULNERABLE YOU ARE AS A

15    CHILD.  EVEN TODAY, I'M SURE, LIKE ALL OF YOU, LIKE ME AND

16    LIKE EVERY ONE ELSE IN THE COURTROOM, YOU REMEMBER THINGS

17    THAT HAPPENED TO YOU AS A CHILD THAT STILL HURT TODAY JUST AS

18    MUCH AS THEY DID BACK THEN.  THINGS THAT YOU DID AS A CHILD

19    MAYBE THAT STILL DELIGHTS YOU JUST AS MUCH AS WHETHER YOU ARE

20    NINE OR TEN.  I UNDERSTAND ALL THAT.  AND THIS IS

21    EXTRAORDINARY AND INFLAMMATORY EVIDENCE.  BUT, AGAIN, IF I

22    CAN JUST REMIND YOU, YOU NEED TO HAVE THE COURAGE TO VOTE NOT

23    YOUR EMOTIONS BUT THE EVIDENCE.  YOU NEED TO HAVE THE COURAGE

24    TO BE ABLE TO SAY, EVEN IF THERE IS EVIDENCE OF GUILT, EVEN

25    IF THERE IS A SUSPICION OF GUILT, THAT YOU'RE GOING TO FOLLOW

```
 1    THE LAW.  AND IF YOU CAN'T DO THAT, TELL US.  THAT'S ALL.
 2    JUST LET US KNOW.
 3              WHEN I ARGUE TO YOU THAT MR. SANDERS IS NOT GUILTY
 4    OF TRAVELING WITH THE INTENT TO COMMIT A SEX ACT WITH A MINOR
 5    UNDER THE AGE OF 12, A NUMBER OF YOU ARE GOING TO SAY, HOW
 6    COULD THAT BE?  HE TALKS ABOUT SEX ALL THE TIME.  LET ME
 7    EXPLORE THAT WITH YOU FOR A MINUTE.
 8              HE TALKS ABOUT KALEN.  HE TALKS ABOUT -- I THINK
 9    THERE MAY BE ONE OR TWO OTHER BOYS, I'M NOT SURE, THAT AREN'T
10    MENTIONED BY NAME.  HOW CAN YOU CONSIDER THAT AS PROOF OF
11    WHAT HE INTENDED WITH KALEN?  THINK ABOUT THAT FOR A MOMENT.
12    WHETHER OR NOT THOSE PERSONS ARE REAL, WE DON'T KNOW.  THEY
13    WERE NEVER IDENTIFIED.
14              BUT HOW CAN THAT BE HIS INTENT, SHOW YOU HIS
15    INTENT?  WHAT THE PROSECUTION DOES, I THINK, IS THEY HAVE
16    ASSEMBLED A HUGE MASS OF EXTRAORDINARY, UNPLEASANT EVIDENCE,
17    AND THEY ARE SAYING, DRAW THESE CONCLUSIONS FROM IT.  PLEASE,
18    DRAW THESE CONCLUSIONS FROM IT.
19              BUT IF YOU LOOK AT WHAT'S ACTUALLY BEING SAID AND
20    DONE, REALITY, THERE IS VERY, VERY LITTLE.
21              THE CHARGE IS TRAVELING TO HAVE -- TRAVELING WITH
22    THE INTENT TO COMMIT A SEX ACT WITH A MINOR UNDER THE AGE OF
23    12 ON OR ABOUT DECEMBER OF 2000.  THAT'S WHAT IT IS.
24              LET'S LOOK AT MR. SANDERS' STATEMENTS ABOUT KALEN.
25    LET ME SHOW YOU WHAT HE SAYS ABOUT KALEN.  I'VE GONE THROUGH
```

1    EXHIBITS 1 THROUGH 3 AND I HAVE LISTED ALL THE TIMES THAT

2    KALEN IS MENTIONED.  FIRST, I HAVE GONE THROUGH WITH

3    EXHIBIT 1 AND I HAVE LISTED HOW MANY TIMES DOES MR. SANDERS

4    APPEAR.  HE DOESN'T APPEAR IN EVERY DIALOGUE.  HE ONLY

5    APPEARS IN A FEW.

6            HOW MANY TIMES DOES HE MENTION KALEN?  HE MENTIONS

7    HIM ONCE.  AND THAT'S IN MR. BEKENSTEIN'S CHATS IN

8    EXHIBIT 1.

9            IN EXHIBIT 2, HOW MANY TIMES DOES MR. SANDERS

10   APPEAR IN RICOCHET OR MARTIN'S CHATS?  NOT THAT MANY TIMES.

11   HOW MANY TIMES DOES HE MENTION KALEN?  ONLY ONCE.

12           IN HIS OWN CHATS, EXHIBIT 3, OBVIOUSLY MR. SANDERS

13   APPEARS IN ALL OF THEM.  HOW MANY OF THEM DOES HE MENTION

14   KALEN?  A FEW TIMES.  LET ME GO THROUGH THAT WITH YOU.

15           HERE IS 1K, THE FIRST TIME.  THIS IS IMPORTANT

16   BECAUSE THIS IS THE ONLY ENTRY.  THIS IS AN ENTRY FROM

17   12/14/2000.  IT IS THE ONLY ENTRY OF THE ENTIRE -- OF THIS

18   ENTIRE VOLUME.  THIS IS THE ONLY ENTRY OF THIS ENTIRE VOLUME

19   THAT IS BEFORE DECEMBER OF 2000.

20           AND WHAT DOES HE SAY?  HE DISCUSSES HAVING SOFT

21   PORN ON THE COMPUTER SO KALEN CAN SEE IT.  AND THEN THERE IS

22   ANOTHER DISCUSSION, AND I'M JUST GOING TO GO THROUGH THESE

23   BRIEFLY.  YOU WILL BE ABLE TO REVIEW THEM AT YOUR LEISURE.

24           THERE IS ANOTHER DISCUSSION THAT SPEED AND

25   SINGULARIT AND SOME OTHER PEOPLE ARE HAVING.  AND MY CLIENT,

1   APPARENTLY, IS JUST VOLUNTEERING THIS INFORMATION.

2          THEN HE SAYS, "HEHEHEHE.  I THINK IT IS ME THAT

3   NEEDS IT, JUST A CRACK."

4          AND IF YOU LOOK AT THE CONVERSATION, IT APPEARS HE

5   IS SAYING THAT IN RESPONSE TO KNOW ONE, THAT IT IS A

6   CONTINUATION OF HIS SHOWING THE SOFT PORN.  SO, I BELIEVE

7   HE'S SAYING HE NEEDS TO LOOK AT THE PORN, TOO.

8          SPEED, THAT'S MR. BEKENSTEIN, CREATES SOME SORT OF

9   ANAL REFERENCE TO THAT, NOT ME.  "IF HE SHOWS YOU THAT LITTLE

10  HOLE, LUBE IT UP AND ENTER."

11         THERE IS NO STATEMENT OF INTENT HERE, OTHER THAN TO

12  JUST SHOW HIM SOFT-CORE PORNOGRAPHY.  IS THAT A CRIME?  SURE.

13  BUT IT IS NOT THIS CRIME.

14         THE NEXT ENTRY IS ON 2M.  THIS IS A CONVERSATION

15  WHERE HE TALKS ABOUT SEEING KALEN.  AND IN THE BEGINNING, HE

16  JUST TALKS ABOUT GOING TO SEE KALEN FOR A FEW DAYS.

17         THEN HE TALKS A LITTLE BIT ABOUT SETH.  HE EXPLAINS

18  WHO KALEN IS.  HE TALKS ABOUT HIS RELATIONSHIP WITH THE MOM,

19  KALEN'S MOM, WHO SUPPOSEDLY KNOWS THAT KALEN IS -- WELL, I

20  GUESS IS GAY, A SEVEN-YEAR-OLD BOY IS GAY.  AND THAT'S

21  ANOTHER EXAMPLE, I THINK, OF THIS FANTASY.  THEN HE TALKS

22  ABOUT HAVING BONDED WITH HIM AND SLEEPING TOGETHER EVERY

23  NIGHT -- THIS IS IN APRIL OF '01 -- AND NEVER GETTING ANY

24  SLEEP.

25         AND THEN HE TALKS ABOUT, "OH, HE MUST HAVE

1    BEAUTIFUL ORGASMS."  THAT'S A QUESTION BY RICOCHET.  AND THEY

2    HAVEN'T GOTTEN THERE, APPARENTLY, ACCORDING TO OJIBOYSAN.

3    "WE ARE JUST ARRIVING AT THAT."

4            AND THEN IT CONCLUDES.  AND THIS IS THE COMMENT

5    THAT COUNSEL HAD TALKED ABOUT:  "I GAVE HIM A MASSAGE LAST

6    TIME, AND HE KEPT TELLING ME TO GO LOWER UNTIL I WAS

7    MASSAGING HIS LITTLE ASSHOLE."

8            WE DON'T KNOW WHAT ACTUALLY "THE LAST TIME" MEANS.

9    WAS THAT IN DECEMBER OF '00?  WAS IT ANOTHER TIME?  WE DON'T

10   KNOW.  COUNSEL ASKED YOU TO DRAW INFERENCES OF WHAT THE ACT

11   OF MASSAGING WAS.  WE DON'T KNOW IF THOSE INFERENCES ARE

12   CORRECT.  AND WE DON'T HAVE ANY CORROBORATION FROM THAT, NOT

13   FROM KALEN, NOT FROM ANY PEDIATRICIAN WHO MIGHT HAVE EXAMINED

14   HIM OR NOT.  WE HAVE NO CORROBORATION WHATSOEVER.

15           AND THAT'S IT.  THAT'S IT FOR THE ENTIRE REFERENCES

16   ON MR. MARTIN'S COMPUTER, ON MR. BEKENSTEIN'S COMPUTER.

17   THAT'S IT.

18           NOW, IF YOU LOOK AT THE REFERENCES ON HIS OWN

19   COMPUTER, THE FIRST IS KIND OF A MINOR REFERENCE.  HE JUST

20   SAYS, KALEN, UNLIKE CALEB.

21           HE IS TALKING ABOUT KALEN -- THAT IS IN 3A -- IS

22   SEVEN.

23           THE OTHER ONES ARE, FOR THE MOST PART, FAIRLY -- I

24   KIND OF PUT A LITTLE BLURB THERE.  AND THIS IS 3F WHERE HE

25   DOES TALK ABOUT SHOWING PHOTOGRAPHS OF HIM.  HE MENTIONS THAT

1    -- PEI MENTIONS THAT HE MIGHT LIKE DANIEL TO LICK HIS BUTT

2    AND HE LIKES TO SPANK.  WE DON'T KNOW WHEN THOSE ACTS

3    OCCURRED.  AGAIN, THERE IS NO CORROBORATION FOR THEM, IF THEY

4    EVER HAD OCCURRED.

5              HE DOES MENTION TRYING TO GET PHOTOS.  HE SAYS,

6    "I'M GOING TO TRY TO GET SOME CLOSEUPS OF HIS BUTT AND CROTCH

7    IN A COUPLE WEEKS."

8              COULD THAT BE A CRIME, TAKING PICTURES OF HIM?

9    YEAH, THAT COULD BE A CRIME, TOO.  BUT IT IS NOT THIS CRIME.

10             THE NEXT CONVERSATION IS 3P, IS BASICALLY JUST

11   TALKING ABOUT SEEING KALEN, AND WHEN HE MENTIONS NOT SEEING

12   KALEN.  LET ME GO TO -- TO THE TRULY STARTLING CONVERSATION

13   ON MAY 20TH.  THIS IS MAY 20TH, 2001, IN EXHIBIT 3T.

14             THERE IS CONVERSATION ABOUT GIVING KALEN A DRY

15   ORGASM.  AND COUNSEL MENTIONED HE SAYS, "THE LAST TIME WE HAD

16   THE GREAT OPPORTUNITY AND I WAS TOO CAUTIOUS."

17             AND WE DON'T KNOW, IS THAT REFERRING TO DECEMBER OF

18   2000 OR SOME OTHER TIME?

19             THE PROBLEM WITH THESE CHATS IS COUNSEL IS ARGUING

20   TO YOU, BASICALLY, LOOK AT CHATS WHICH TOOK PLACE AFTER 2000,

21   AND THEN STEP BACK AND SAY BECAUSE HE SAID THAT IN MAY OR

22   APRIL, THAT WAS HIS INTENT IN DECEMBER.  THAT'S NOT THE WAY

23   PEOPLE OPERATE.  AND IT ONLY MAKES SENSE BEFORE HE DOES

24   SOMETHING TO SEE WHAT HIS INTENT IS, NOT WHAT HE SAYS AFTER

25   IT.

1          AND THEN HERE NEO SAYS, "SO YOU INTEND TO GIVE

2    KALEN A NICE CUM?

3          "PEI:  YES, THAT'S TRUE."

4          NOW, THAT, THAT IS AN INTENDED SEX ACT, CLEARLY.

5    THE ONLY PROBLEM IS THAT IT IS FANTASY.  HOW DO WE KNOW THAT

6    IT IS FANTASY?  WE KNOW THAT BECAUSE IT IS PHYSICALLY

7    IMPOSSIBLE.  IT IS IMPOSSIBLE.  A BOY AGE SEVEN CANNOT

8    CLIMAX.  THAT'S WHAT HE'S TALKING ABOUT, A CUM.  THAT IS NOT

9    POSSIBLE.  THAT IS FANTASY.  YOU CANNOT CONVICT HIM OF

10   INTENDING TO COMMIT A FANTASY.

11         WHEN YOU REVIEW THE TRANSCRIPTS, YOU NEED TO BEAR

12   IN MIND WHAT A SEX ACT IS.  THIS IS AN INSTRUCTION,

13   INSTRUCTION 25.  IT IS CONTACT BETWEEN THE PENIS AND ANUS

14   INVOLVING PENETRATION.  IT IS PENETRATION OF THE ANAL OPENING

15   BY A HAND OR A FINGER.  IT IS THE INTENTIONAL TOUCHING NOT

16   THROUGH CLOTHING.  THAT MEANS SKIN TO SKIN OF THE GENITALIA

17   OF ANOTHER PERSON.

18         BASICALLY, I'M JUST SUMMARIZING THIS INSTRUCTION,

19   INSTRUCTION NO. 25.  NOWHERE DOES HE TALK ABOUT THAT.

20         TOUCHING IS NOT A SEX ACT UNLESS IT IS SKIN TO SKIN

21   INVOLVING THE GENITALS.  SPANKING IS NOT A SEX ACT UNLESS IT

22   IS SKIN TO SKIN INVOLVING THE GENITALS.  SHOWING SOFT-CORE

23   PORNOGRAPHY IS NOT A SEX ACT.  TAKING PHOTOS IS NOT A SEX

24   ACT.  GROOMING, ALL OF THE THINGS THAT MAY BE ASSOCIATED WITH

25   GROOMING -- THE HOURS THAT WE LISTENED TO AGENT CLEMENTE --

1    GROOMING IS NOT A SEX ACT.

2              THESE THINGS MAY BE CRIMES.  THEY MAY BE STATE

3    CRIMES.  THEY MAY BE OTHER FEDERAL CRIMES.  THAT ISSUE IS NOT

4    BEFORE YOU.  THEY MAY BE SOMETHING ELSE, BUT THEY ARE NOT

5    THIS CRIME.

6              WHEN THE GOVERNMENT ARGUES TO YOU, AS THEY HAVE,

7    AND I'M SURE THEY PROBABLY WILL AGAIN, THAT GIVING HIM THE

8    DRY ORGASM, OR SAYING THAT THEY WANTED TO GIVE HIM THE DRY

9    ORGASM IN MAY, OR GIVE HIM A "NICE CUM" IN MAY, IS A SEX ACT,

10   AND THAT'S WHAT HIS INTENT WAS THEN, AND THAT'S WHAT HIS

11   INTENT WAS IN DECEMBER, CONSIDER FOR A MOMENT THE INSTRUCTION

12   THAT DESCRIBES TO YOU WHAT "ON OR ABOUT" MEANS.  IT MEANS

13   REASONABLY NEAR IN TIME.

14             IN OTHER WORDS, THEY DON'T HAVE TO SHOW THAT IT WAS

15   RIGHT IN DECEMBER THAT HE HAD THAT INTENT WITH WHEN HE

16   TRAVELED TO NEW MEXICO.  IT COULD BE A FEW DAYS HERE OR

17   THERE, BUT IT IS REASONABLY CLOSE IN TIME.  MAY VERSUS

18   DECEMBER IS NOT REASONABLY CLOSE.  THAT'S ALMOST HALF A YEAR

19   AWAY.

20             YOU MUST INTEND TO HAVE SEX, TO HAVE A SEX ACT AT

21   THE TIME THAT YOU TRAVEL.  IN OTHER WORDS, IF MR. SANDERS

22   TRAVELS TO NEW MEXICO WITH THE INTENT TO GROOM KALEN, THAT

23   MAY BE SOME CRIME, BUT IT IS NOT THIS CRIME.  IT MAY BE

24   UNLAWFUL, BUT IT IS NOT THIS CRIME.

25             HE MUST INTEND TO COMMIT A SEX ACT WHEN HE GOES

1    THERE.  IT IS NOT SOMETHING LOOKING BACK WHERE HE SAYS, OH, I

2    MIGHT HAVE WANTED TO DO THIS.  I MIGHT HAVE WANTED TO DO

3    THAT.

4         BECAUSE YOU WILL SEE, ONCE YOU READ THESE CHATS,

5    THAT THESE MEN, SICK AS IT MAY BE, EXAGGERATE AND BRAG AND

6    BOAST AND ACQUIRE CERTAIN STATUS IN THESE CHAT ROOMS BECAUSE

7    OF THEIR ACTIVITIES WITH YOUNG BOYS.  SO, FOR THAT REASON

8    ALONE, I THINK YOU HAVE TO VIEW LATER STATEMENTS EVEN MORE

9    CAREFULLY THAN YOU DO STATEMENTS THAT PRECEDE THE ACTUAL TRIP

10   ITSELF.

11        BUT MOST IMPORTANTLY, THERE IS NO CORROBORATION.

12   THERE IS NO CORROBORATION.  THINK ABOUT THAT.  FOR BOTH

13   COUNTS 3 AND 4, NO CORROBORATION AT ALL.

14        THERE IS NO CONFIRMATION THAT MR. SANDERS SHOWED

15   KALEN, SHOWED KALEN SOFT PORNOGRAPHY.

16        NO CONFIRMATION THAT MR. SANDERS EVER MASSAGED

17   KALEN.

18        NO CONFIRMATION THAT MR. SANDERS SLEPT WITH KALEN.

19        NO CONFIRMATION THAT HE EVER HAD SKIN-TO-SKIN

20   CONTACT, AS SET FORTH IN AN INSTRUCTION, WITH KALEN.

21        NO CONFIRMATION THAT KALEN'S MOTHER SUPPORTED HIS

22   CHOSEN SEXUALITY.

23        NO CONFIRMATION EVEN THAT SOFT-CORE PORNOGRAPHY WAS

24   EVER DOWNLOADED ON THAT COMPUTER.  AND THEY RAN AN ENCASE ON

25   IT.  NO CONFIRMATION THAT THERE WAS SPANKING.

1        NO CONFIRMATION ABOUT SHOWERING TOGETHER.  NONE.

2        ALL OF THESE ARGUMENTS ALSO APPLY TO COUNT 4, BUT

3   EVEN STRONGER BECAUSE THERE THE GOVERNMENT MUST SHOW THAT

4   THERE IS A SUBSTANTIAL ACT TOWARDS COMMITTING A SEX ACT OR A

5   COMPLETED SEX ACT.  WHAT SEX ACT DID HE ATTEMPT TO DO?  WHAT

6   SEX ACT WAS COMPLETED?  THERE IS NO CONFIRMATION.  WE DON'T

7   EVEN KNOW IF THIS MASSAGE TOOK PLACE IN DECEMBER OR AT SOME

8   EARLIER TIME.  WE CERTAINLY DON'T KNOW THAT BEYOND A

9   REASONABLE DOUBT.

10       THE GOVERNMENT NEVER CALLED THE PEOPLE WHO WE

11  REALLY KNOW.  THE GOVERNMENT NEVER CALLED THE PEOPLE WHO WERE

12  THERE.  THE GOVERNMENT NEVER CALLED THE ALLEGED VICTIM.

13  KALEN WAS SEVEN AT THE TIME, BUT HE IS 13 NOW.

14       LORI STYLES, THE MOTHER, WAS AT THE HOME WITH HIM.

15  WOULD SHE KNOW WHERE MY CLIENT WAS SLEEPING WHEN HE STAYED

16  OVER AT HER HOUSE?  YES, SHE WOULD.  WHY DID THE GOVERNMENT

17  NOT CALL HER?

18       WHY DID THEY NOT CALL KALEN?  THERE IS ALL SORTS OF

19  SPECULATION.  AND SPECULATION IS NOT PROOF.  BUT THAT'S

20  REALLY MY POINT.  YOU SEE, YOU DON'T HAVE THAT PROOF.  YOU

21  HAVE A GIANT ABSENCE AT THE HEART OF THE CASE.  AND AROUND IT

22  THEY HAVE PUT ALL THE DISCUSSIONS ABOUT CHILD PORN, ALL OF

23  THE CHATS AND EVERYTHING LIKE THAT AROUND IT.  THEY HAVE PUT

24  AND SURROUNDED YOU WITH THIS HORRIBLE EVIDENCE.  BUT WHAT

25  ACTUALLY HAPPENED?  THERE IS NO EVIDENCE.

1          THE GOVERNMENT WILL SAY, WELL, YOU KNOW WHAT?

2     MR. AARON COULD HAVE CALLED KALEN.  MR. AARON COULD HAVE

3     CALLED MS. LORI STYLES.  THAT'S TRUE.  I COULD HAVE.  BUT WHO

4     HAS THE BURDEN HERE?  THEY DO.  WHO GETS THE BENEFIT OF THE

5     BURDEN OF REASONABLE DOUBT?  THE DEFENSE DOES.

6          WE DON'T HAVE TO PROVE THE PROSECUTION'S CASE FOR

7     THEM.  WE COULD SIT HERE AND DO NOTHING.  I COULD HAVE SAT

8     DOWN, LEANED BACK IN MY CHAIR, GONE TO SLEEP, WOKE UP A FEW

9     MINUTES AGO AND SAID, VOTE NOT GUILTY.  AND IF THERE WASN'T

10    EVIDENCE SHOWN BEYOND A REASONABLE DOUBT, THAT WOULD HAVE

11    BEEN YOUR DUTY.

12         IT IS THE GOVERNMENT'S RESPONSIBILITY AND THEIR

13    BURDEN TO CALL THE WITNESSES TO MAKE THEIR CASE.

14         WHAT REALLY HAPPENED HERE?  WE HAVE ACKNOWLEDGED

15    THAT HE CONSPIRED WITH MR. BEKENSTEIN AND WITH MR. MARTIN TO

16    POSSESS CHILD PORN.  BUT THERE IS A NUMBER OF OTHER THINGS

17    THAT HAPPENED HERE, AND THIS IS WHY I BROUGHT A LOT OF THE

18    PERSONAL THINGS UP WITH SPECIAL AGENT BROWN AND WHY I INVITED

19    YOU SO MANY TIMES TO ACTUALLY READ THE CHATS.  BECAUSE IF YOU

20    READ THE CHATS -- AND WE'VE ONLY GOT, AT LEAST WITH

21    MR. BEKENSTEIN, WE'VE ONLY GOT 80 PERCENT OF THEM.  IF YOU

22    READ THE CHATS, I THINK YOU'LL SEE SOMETHING INTERESTING.

23    YES, THERE IS NAUSEATING MATERIAL.  THERE IS JUST DEPLORABLE

24    COMMENTS WHICH ARE IN THERE.  BUT WE KNOW THAT MR. SANDERS

25    WAS ISOLATED.  WE KNOW HE IS LIVING UP IN THIS CAMP.  WE KNOW

1    THAT, BASICALLY, HE WAS GETTING ODDER AND ODDER.  WE KNOW

2    THAT HE IS ON THE INTERNET NIGHT AND DAY.  IF YOU LOOK AT

3    SOME OF THE TIMES, YOU WILL SEE THE TIME OF THE CHATS.  6:00

4    IN THE MORNING; 1:00 IN THE MORNING; 3:00 IN THE AFTERNOON.

5            HIS LIFE, I THINK, IF YOU LOOK AT THE CHATS, WAS

6    REALLY ONLINE.  THERE WAS A COMMUNITY THERE.  A SICK

7    COMMUNITY, BUT A COMMUNITY.  AND LIKE ALL COMMUNITIES, IT HAD

8    ITS OWN RULES.  WHEN YOU LOOK AT THE CHATS, YOU'RE GOING TO

9    SEE GROWN MEN ACTING LIKE 12-YEAR-OLD GIRLS GUSHING OVER ONE

10   ANOTHER.  GROWN MEN TALKING ABOUT THINGS THAT CLEARLY ARE

11   DESIGNED TO IMPRESS OTHERS.  AND, IN FACT, THEY EVEN MENTION

12   THAT ON CHATS.  GROWN MEN PRETENDING TO BE ONE ANOTHER OR

13   PRETENDING TO BE OTHER PEOPLE.

14           THERE IS AN INTERESTING PART IN ONE OF THE CHATS

15   WHEN IT SHOWS YOU JUST HOW ISOLATED MR. SANDERS WAS.  BECAUSE

16   WE DO MAINTAIN THAT HE MADE MANY OF THESE THINGS UP.  WE DO

17   MAINTAIN THAT HE DID THIS IN ORDER TO FIT IN, TO HAVE

18   FRIENDS, TO BE SOMEONE OF CONSEQUENCE IN THE SAD, PATHETIC

19   WORLD OF THE ICQ.  BUT LOOK AT THIS.  HERE IS JEREMIAH, MARCH

20   18TH:

21           "WHAT ARE YOU TALKING ABOUT?  YOU'RE BEING VERY

22   WEIRD.  YOU'RE KIND OF WEIRD AT TIMES."

23           IF YOU LOOK THROUGH THE CHATS, YOU WILL SEE THERE

24   IS THINGS LIKE THAT AGAIN AND AGAIN.  EVEN PEOPLE -- REMEMBER

25   THE DIALOGUE WITH HANS AND RICOCHET WHERE HANS SAYS, "I CAN'T

1    BELIEVE THE STUFF THAT HE'S SAYING."

2              DOES ANYONE BELIEVE THAT A MOTHER WOULD SAY, "IT'S

3    OKAY THAT MY SEVEN-YEAR-OLD SON LIKES BOYS, AND I RESPECT HIS

4    CHOSEN SEXUALITY" AT SEVEN?

5              BOYS ARE NOT SEXUAL CREATURES AT SEVEN.  NO MOTHER

6    WOULD.  FOR HIM TO SAY THAT SHOWS TRULY HOW LOST IN HIS OWN

7    FANTASY WORLD HE IS.

8              I'M NOT SAYING THIS TO EXCUSE WHAT HE SAYS.  WHAT

9    HE SAYS IS WRONG.  I'M NOT SAYING THIS TO EXCUSE HIS

10   CONSPIRING TO POSSESS CHILD PORN.  THAT'S WRONG, AND I

11   ACKNOWLEDGE THAT.  I'M SAYING YOU NEED TO LOOK AT THESE

12   THINGS, PLEASE.  BECAUSE YOU NEED TO PLACE THEM IN CONTEXT.

13   BECAUSE, UNFORTUNATELY, YOU HAVE TO BASE YOUR VERDICT ON

14   WHAT'S HAPPENING IN HIS MIND, NOT IN YOUR MIND.  YOU NEED TO

15   KNOW WHAT HIS INTENT IS.  YOU CAN'T LOOK AT IT AND SAY, IF I

16   SAID -- PARDON MY LANGUAGE -- IF I SAID I MASSAGED A LITTLE

17   BOY'S ASSHOLE, THAT WOULD MEAN SOMETHING.  IT MAY NOT MEAN

18   THE SAME THING TO HIM.  AND YOU NEED TO LOOK AT THOSE CHATS

19   TO UNDERSTAND IT, AND YOU NEED TO LOOK AT THEM WITH FRESH,

20   HONEST, AND UNBIASED EYES.

21             I SAT UP A LONG TIME LAST NIGHT, LADIES AND

22   GENTLEMEN, THINKING WHAT I WAS GOING TO SAY.  AND IT STRUCK

23   ME HOW HARD YOUR JOB IS.  AND IT STRUCK ME, ALSO, HOW HARD IT

24   IS WHAT I'M ASKING YOU TO DO.  I KNOW THAT SOME OF YOU HAVE

25   PROBABLY ALREADY CLOSED YOUR MINDS TO ME.  AND IF I CAN'T

1    OPEN THEM, IF I HAVEN'T OPENED THEM, I'M SORRY FOR THAT.  BUT

2    I THINK THAT OTHERS OF YOU ARE WILLING TO LISTEN, BUT YOU

3    SAY, MR. AARON, THERE IS JUST SO MUCH.  THERE IS JUST -- YOU

4    HAVE TO SEPARATE IT OUT.  YOU HAVE TO SIT AND YOU HAVE TO

5    LOOK AT IT.  I KNOW IT IS HARD TO DO IT.  I KNOW IT IS

6    UNPLEASANT.

7            YOU KNOW, I REMEMBER YEARS AND YEARS AGO, I WAS

8    MUCH YOUNGER, AND I REMEMBER LISTENING TO A PRESIDENT.  AND

9    HE WAS SPEAKING, AND HE SAID, WE ARE GOING TO END POVERTY.

10   WE ARE GOING TO END HUNGER.  WE ARE GOING TO PUT A MAN ON THE

11   MOON.

12           AND I THOUGHT, HOW CAN WE DO THAT?  AND I REMEMBER

13   THE PRESIDENT SAYING, AND WE CHOSE TO DO THESE THINGS, NOT

14   BECAUSE THEY'RE EASY BUT BECAUSE THEY ARE HARD.

15           AND THAT IS THE AMERICA I HAVE ALWAYS LOVED.  THANK

16   YOU.

17           THE COURT:  THANK YOU.

18           ALL RIGHT.  YOU MAY BEGIN YOUR REBUTTAL.

19           MR. MICHAEL:  MAY WE APPROACH FOR A BRIEF SIDEBAR?

20           THE COURT:  YOU MAY.

21            (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

22           MR. MICHAEL:  YOUR HONOR, THERE WERE TWO MATTERS

23   RAISED IN DEFENDANT'S CLOSING THAT WE THOUGHT NEEDED TO BE

24   BROUGHT TO THE COURT'S ATTENTION.

25           THE DEFENDANT CLAIMED THAT THERE WAS -- OR DEFENSE

1   COUNSEL, THERE IS NO EVIDENCE OF SOFT PORN ON THE COMPUTER

2   THAT WAS DOWNLOADED.

3            AS YOU MAY RECALL, THE GOVERNMENT SOUGHT TO ADMIT

4   THAT EVIDENCE AT TRIAL.  DEFENDANT SOUGHT TO HAVE IT

5   EXCLUDED.  AND YOUR HONOR GRANTED THE MOTION.  THERE WERE

6   IMAGES OF SCANTILY CLAD BOYS AND OTHER NUDE BOYS OF EROTICA.

7            MR. AARON:  I DON'T REMEMBER THAT.

8            MR. MICHAEL:  YOU SPECIFICALLY MOVED TO KEEP IT

9   OUT.  WE THINK IT SHOULD BE -- A CORRECTIVE INSTRUCTION NEEDS

10  TO BE GIVEN BECAUSE IT WAS ON HIS COMPUTER AND THERE WAS SOFT

11  PORN.

12           MR. AARON:  I DON'T REMEMBER THAT.

13           IF THE COURT DOES REMEMBER IT, I WOULD AGREE THAT

14  AN INSTRUCTION STRIKING THAT PART OF THE CLOSING ARGUMENT

15  WOULD BE APPROPRIATE.

16           MR. MICHAEL:  THE OTHER MATTER WAS THAT THERE WAS

17  REFERENCE MADE TO THE EFFECT THEY HAVE 80 PERCENT OF THE

18  CHATS AND WE -- 80 PERCENT OF THE BEKENSTEIN CHATS.  AND WE

19  ASK THAT YOUR HONOR GIVE AN INSTRUCTION.

20           THE COURT:  THAT INSTRUCTION IS MY OPENING --

21           MR. MICHAEL:  I REALIZE THAT.

22           THE COURT:  -- THE FIRST ISSUE.

23           MR. AARON:  I DON'T REMEMBER ANY --

24           THE COURT:  I DO REMEMBER TALKING ABOUT THIS BEFORE

25  THE TRIAL.  IT WAS BEFORE THE FIRST TRIAL THAT ISSUE CAME UP.

```
 1    I'M TRYING TO THINK HOW I WOULD FRAME THIS.
 2            MR. MICHAEL:  THE GOVERNMENT WOULD PROPOSE THAT
 3    THERE WERE OTHER IMAGES RECOVERED FROM THE LAPTOP THAT THE
 4    GOVERNMENT -- THAT THE GOVERNMENT DIDN'T -- WASN'T ADMITTED
 5    AT TRIAL BECAUSE THEY DIDN'T MEET THE DEFINITION OF CHILD
 6    PORNOGRAPHY.
 7            THE COURT:  THE CLEANER WAY TO DO IT WOULD BE JUST
 8    TELL THE JURY THAT THE PORTION OF THE DEFENSE COUNSEL'S
 9    CLOSING ARGUMENT -- AND I'LL LOOK BACK ON IT SO I CAN LOOK AT
10    EXACTLY WHAT COUNSEL ARGUED -- AND JUST SAY THAT THE
11    STATEMENT, IN CLOSING ARGUMENT BY DEFENSE COUNSEL, THAT NO
12    SOFT-CORE PORNOGRAPHY WAS FOUND ON THE DEFENDANT'S COMPUTER
13    IS ORDERED STRICKEN --
14            MR. MICHAEL:  THAT'S FINE WITH THE GOVERNMENT.
15            THE COURT:  -- AND TO DISREGARD IT.
16            MR. MICHAEL:  THAT'S FINE WITH THE GOVERNMENT.
17            THE COURT:  I WILL LOOK QUICKLY AND FIND OUT
18    EXACTLY.  ALL RIGHT.  THANK YOU.
19                (IN THE PRESENCE OF THE JURY:)
20            THE COURT:  LADIES AND GENTLEMEN, BEFORE YOU HEAR
21    THE LAST PORTION OF ARGUMENT WHICH IS CALLED THE REBUTTAL
22    ARGUMENT FROM COUNSEL FOR THE GOVERNMENT, I NEED TO INSTRUCT
23    YOU THAT THERE WAS ONE VERY BRIEF PORTION OF THE ARGUMENT
24    FROM COUNSEL FOR THE DEFENSE THAT I'M GOING TO ORDER
25    STRICKEN.
```

1        WELL, OF COURSE, AS YOU ALREADY KNOW, ANYTHING THAT

2   COUNSEL SAYS, ANYTHING THAT THE LAWYERS SAY, IS NOT EVIDENCE.

3   IT IS STATEMENTS THAT ARE INTENDED TO HELP YOU INTERPRET THE

4   EVIDENCE.

5        BUT THERE WAS A REFERENCE MADE DURING ARGUMENT TO A

6   LACK OF EVIDENCE REGARDING SOFT-PORN PORNOGRAPHY ON THE

7   LAPTOP COMPUTER.  AND THAT STATEMENT, IN THE CLOSING ARGUMENT

8   FROM DEFENSE COUNSEL, IS ORDERED STRICKEN, AND YOU ARE TO

9   DISREGARD THAT PORTION OF THE ARGUMENT.

10       ALL RIGHT.  MR. MICHAEL, YOU MAY PROCEED.

11       MR. MICHAEL:  THANK YOU, YOUR HONOR.

12       LADIES AND GENTLEMEN, A TRIAL IS A SEARCH FOR THE

13  TRUTH.  AND THAT SEARCH IS BASED ON ALL OF THE EVIDENCE AND

14  THE LAW THAT APPLIES.

15       AND IT IS YOU, LADIES AND GENTLEMEN, WHO DETERMINE

16  WHAT THE EVIDENCE SHOWS, WHAT THE TRUTH IS.  AND IF YOU READ

17  ALL OF THE CHATS, AND IF YOU LOOK AT ALL OF THE EVIDENCE, THE

18  SURROUNDING CIRCUMSTANCES TOGETHER IN CONTEXT, NOT BITS AND

19  PIECES, LITTLE MISTAKES, FAULTY HUMAN MEMORY SIX YEARS AFTER

20  THE FACT, AND IF YOU DRAW ALL OF THE REASONABLE INFERENCES

21  FROM THAT EVIDENCE, AND THEN IF YOU APPLY YOUR COMMON SENSE,

22  YOUR OWN EXPERIENCE AND REASON, AND YOU LOOK AT THAT

23  EVIDENCE, NOT BASED ON SPECULATION, NOT BASED ON MERE

24  POSSIBILITIES, THEN, LADIES AND GENTLEMEN, YOU WILL SEE THAT

25  THE EVIDENCE SHOWS BEYOND A REASONABLE DOUBT THE DEFENDANT IS

1    GUILTY OF THE FOUR CRIMES CHARGED IN THE INDICTMENT.

2            AND IF YOU SO FIND, IT IS YOUR JOB AND IT IS YOUR

3    DUTY TO HOLD HIM ACCOUNTABLE.

4            NOW, DEFENSE COUNSEL RAISED SOME ARGUMENTS DURING

5    HIS CLOSING, AND I'M GOING TO BRIEFLY ADDRESS A COUPLE OF

6    THEM.  I'M NOT GOING TO TAKE MUCH MORE OF YOUR TIME.  IT HAS

7    BEEN A LONG TRIAL.

8            DEFENSE COUNSEL TALKED ABOUT THE IMAGES, THE

9    DELETED SPACE ON -- THE DEFENDANT'S DELETED SPACE OF THE HARD

10   DRIVE AND HOW WOULD YOU KNOW THAT THEY ARE THERE.  AND I HAVE

11   ALREADY ARGUED AND SHOWN AND POINTED OUT THE EVIDENCE IN THE

12   CHATS, THE EVIDENCE ON HIS COMPUTERS, WHAT DEFENDANT SAID.

13   AND JUST ONE EXAMPLE -- AND THERE IS SO MANY -- IN THE CHATS,

14   LADIES AND GENTLEMEN, EXHIBIT 3A, TALKING WITH JEREMIAH, ONE

15   OF HIS FELLOW BOY LOVERS, STARTS WITH PEI SAYING, DID YOU

16   WORK OUT THE CORRECT WAY TO USE THE NEWS GROUPS?

17           JEREMIAH:  YES, HMMM, YES.  BOYSAN GAVE ME ONE.  I

18   THINK I AM ALLOWED TO SAY THAT.

19           PEI:  WHAT?

20           JEREMIAH:  BOYSAN GAVE ME A PASSWORD.

21           PEI:  ME?

22           AND THEN JEREMIAH GOES ON TO ASK DEFENDANT WHAT HE

23   IS DOING.

24           AND PEI SAYS, I AM ON THE LAPTOP TONIGHT BECAUSE I

25   AM WIPING MY DESKTOP HARD DRIVE, HEHEHE.

```
 1              JEREMIAH:  WHY ARE YOU DOING THAT?
 2              PEI:  JUST CLEANING UP THE DELETED FILES LAYING
 3    AROUND MY HARD DRIVE AS EMPTY SPACE.
 4              AND THEN HE CONTINUES, SO THERE IS NO POSSIBILITY
 5    OF ANYONE RETRIEVING MY DELETED FILES?
 6              AND THIS IS ON JANUARY 22ND AROUND 6:20 P.M.
 7              THINK ABOUT IT, LADIES AND GENTLEMEN.  YES, HE
 8    DELETED AND CLEANED HIS FILES ON HIS HARD DRIVE AND, YES, HIS
 9    LAPTOP WAS FOUND WITH IMAGES IN HIS DELETED SPACE.  THINK
10    ABOUT IT.  YOU KNOW FROM THOSE CHATS AND EVIDENCE ON THE HARD
11    DRIVE AND THOSE CRYPT-IT CONTAINERS THAT THIS IS SOMEONE WHO
12    HAD A MASSIVE COLLECTION OF CHILD PORNOGRAPHY.  AND ALL THAT
13    WAS FOUND ARE THE IMAGES THAT WERE PRESENTED TO YOU.  WHY SO
14    FEW?  BECAUSE THIS DEFENDANT SPENT SO MUCH TIME -- AND THE
15    EVIDENCE SHOWS THAT -- DELETING AND WIPING HIS FILES.  BUT HE
16    DIDN'T DO IT 24 HOURS A DAY, SEVEN DAYS A WEEK.  HE HAD TO GO
17    TO WORK.  HE HAD TO EAT.
18              AND GUESS WHAT HAPPENED, LADIES AND GENTLEMEN.  HE
19    GOT CAUGHT.  AND HE GOT CAUGHT WITH THE HARD DRIVE.  WHY DO
20    YOU THINK HE WAS RUNNING WITH IT?  BECAUSE HE KNEW THEY WERE
21    GOING TO FIND SOMETHING, AND THEY DID.
22              DEFENSE COUNSEL ALSO TALKED ABOUT THE DISKS IN LAS
23    VEGAS.  EVEN IF THE DISKS WERE IN SETH BEKENSTEIN'S
24    HANDWRITING, OR ONE OF THEM WAS, EVEN IF THE DISK CAME FROM
25    SETH BEKENSTEIN, YOU KNOW THAT DEFENDANT POSSESSED THEM AND
```

1   YOU KNOW THE DEFENDANT HAD CHILD PORNOGRAPHY ALSO ON HIS

2   LAPTOP HARD DRIVE.  AND ALL THE GOVERNMENT NEEDS TO SHOW IS

3   THAT HE ONLY POSSESSED ONE IMAGE OF CHILD PORNOGRAPHY, LADIES

4   AND GENTLEMEN.  AND YOU KNOW FROM THE EVIDENCE IN THIS CASE

5   BEYOND A REASONABLE DOUBT THAT THE DEFENDANT CERTAINLY DID

6   POSSESS AT LEAST ONE IMAGE OF CHILD PORNOGRAPHY, KNOWINGLY.

7   AND ALL THE OTHERS, AS WELL.

8        DEFENSE COUNSEL ALSO TALKED TO YOU ABOUT AN

9   APPARENT PROMISE OR A STATEMENT THE GOVERNMENT MADE IN ITS

10  OPENING STATEMENT THAT SETH BEKENSTEIN WAS GOING TO TESTIFY.

11  IT IS YOUR MEMORY THAT CONTROLS.

12       DO YOU REMEMBER THE GOVERNMENT COUNSEL SAYING THAT,

13  LADIES AND GENTLEMEN?  IT IS YOUR MEMORY THAT CONTROLS.

14       DON'T YOU REMEMBER DEFENSE COUNSEL TELLING YOU

15  THERE WERE GOING TO BE FICTIONAL NOVEL MANUSCRIPTS BY THE

16  DEFENDANT INTRODUCED AT TRIAL?  DID YOU SEE ANY EVIDENCE OF

17  THAT, LADIES AND GENTLEMEN?

18       DEFENSE COUNSEL ALSO TALKED ABOUT THE CHATS AND

19  CREATED A LIST FOR YOU AND WENT THROUGH DIFFERENT PORTIONS IN

20  WHICH KALEN WAS MENTIONED.  THE NUMBER OF TIMES THAT KALEN IS

21  MENTIONED IN THE CHATS ISN'T WHAT MATTERS.  IT IS WHAT

22  DEFENDANT SAID IN EACH OF THOSE CHATS THAT MATTERS, AND WHAT

23  THE DEFENDANT SAID HAPPENED, AND WHAT THE DEFENDANT SAID HE

24  INTENDED TO DO, AND WHAT THE DEFENDANT ATTEMPTED TO DO,

25  THAT'S WHAT MATTERS, LADIES AND GENTLEMEN.  AND YOU CAN READ

```
 1    THEM FOR YOURSELF.  YOU'VE HEARD THEM.  AND IT'S YOUR MEMORY
 2    THAT CONTROLS, AND IT'S YOUR JOB TO DETERMINE WHAT THE
 3    EVIDENCE SHOWS.
 4          DEFENSE COUNSEL ALSO TALKED ABOUT SOME OF THE
 5    INDIVIDUAL ACTS THAT DEFENDANT MAY HAVE ENGAGED IN AND DID
 6    ENGAGE IN AND TRIED TO PULL THEM OUT OF CONTEXT, LITTLE
 7    PIECES HERE AND THERE.  IT WASN'T CLEAR IF DEFENSE COUNSEL
 8    HEARD THE TESTIMONY OF SPECIAL AGENT CLEMENTE FROM THE
 9    BEHAVIORAL ANALYSIS UNIT, BUT YOU CERTAINLY DID.  AND IN HIS
10    TESTIMONY, HE SAID YOU HAVE TO TAKE IT ALL TOGETHER; PUT IT
11    INTO CONTEXT.  LOOK AT ANY ONE OF THESE INDIVIDUALLY.  THEY
12    ALL SEEM INNOCUOUS, NORMAL THINGS THAT ANYBODY WOULD DO WITH
13    A FAMILY FRIEND'S CHILD.  BUT WHEN YOU PUT IT TOGETHER, THE
14    MISINTERPRETATION, THAT'S THE GOAL OF GROOMING, FALLS APART
15    AND THE REALITY IS EXPOSED.  AND THAT'S WHAT THE EVIDENCE IN
16    THIS CASE SHOWS, LADIES AND GENTLEMEN.
17          LOOK AT ALL OF DEFENDANT'S BEHAVIOR.  LOOK AT IT
18    ALL TOGETHER IN CONTEXT, NOT BITS AND PIECES.
19          DEFENSE COUNSEL ALSO TALKED ABOUT HOW YOU CAN'T
20    LOOK AT DEFENDANT'S DESCRIPTION OF THINGS THAT HAPPENED IN
21    THE PAST AND DETERMINE WHAT HIS INTENT WAS AND WHAT HE DID AT
22    THE TIME.  WELL, CERTAINLY THE DESCRIPTION OF WHAT HE DID
23    PREVIOUSLY IS EVIDENCE OF WHAT HE DID PREVIOUSLY.  IF HE
24    TELLS YOU HE MASSAGED LITTLE KALEN'S ANUS, THE EVIDENCE
25    SHOWS, AND YOU'RE ENTITLED TO TAKE HIS ADMISSION THAT'S WHAT
```

1     HE DID, IN DECEMBER OF 2000.

2              THE DEFENDANT'S ADMISSIONS TELL YOU WHAT HAPPENED.

3     HE IS TELLING YOU WHAT HAPPENED.  AND ALTHOUGH HE TOLD YOU AT

4     A LATER TIME, HE TOLD YOU WHAT HAPPENED PREVIOUSLY.  AND

5     THAT, LADIES AND GENTLEMEN, SHOWS WHAT DEFENDANT DID IN THIS

6     CASE.

7              NOW, DEFENSE COUNSEL ALSO TALKED ABOUT THE IDEA

8     THAT THIS IS FANTASY.  SEVEN YEAR OLDS CAN'T CLIMAX.  WHO

9     KNOWS WHAT EXACTLY DEFENDANT MEANT BY A "DRY ORGASM."  WHO

10    HAS EVER REALLY THOUGHT ABOUT WHETHER OR NOT A SEVEN YEAR OLD

11    CAN PHYSICALLY HAVE A CLIMAX LIKE AN ADULT?  BUT YOU KNOW

12    WHAT THE DEFENDANT WANTED TO DO, WHAT HE INTENDED TO DO, AND

13    YOU KNOW THAT THERE ARE LOTS OF THINGS THAT AN ADULT CAN DO

14    WITH A BOY TO AROUSE HIM IN A WAY THAT WOULD SATISFY HIS

15    SEXUAL DESIRE, LADIES AND GENTLEMEN, YOUR OWN COMMON SENSE

16    TELLS YOU WHAT DEFENDANT MEANT WHEN HE SAID THAT.  THE ACTUAL

17    PHYSICAL CAPABILITIES OF A SEVEN YEAR OLD DON'T MATTER,

18    LADIES AND GENTLEMEN.  IT DOESN'T MEAN IT WAS FANTASY WHAT HE

19    WANTED TO DO, WHAT HE WAS TRYING TO DO.  IT'S WHAT HE DID,

20    LADIES AND GENTLEMEN.

21             AND IT'S WHAT YOU DO TO GET TO THAT POINT.  WHAT

22    WOULD DEFENDANT NEED TO DO TO GET KALEN TO THAT POINT, LADIES

23    AND GENTLEMEN?  COMMON SENSE TELLS YOU, LADIES AND GENTLEMEN.

24    YOU KNOW THAT.  AND THE EVIDENCE SHOWS THAT.

25             AND DEFENDANT ALSO -- EXCUSE ME, DEFENSE COUNSEL

1    ALSO WENT THROUGH A WHOLE LIST OF SEX ACTS -- OR A WHOLE LIST

2    OF ACTS, BECAUSE HE THOUGHT THESE WERE SEX ACTS.  ANY NUMBER

3    OF THOSE ARE A POTENTIAL ACT BEYOND MERE PREPARATION, LADIES

4    AND GENTLEMEN.  AND AS THE JUDGE HAS INSTRUCTED YOU, IF YOU

5    FIND THAT DEFENDANT WAS TAKING A SUBSTANTIAL STEP TOWARD

6    ENGAGING IN A SEX ACT WITH KALEN, BEYOND MERE PREPARATION,

7    THEN HE IS GUILTY BEYOND A REASONABLE DOUBT JUST AS IF HE

8    ACTUALLY HAD ENGAGED IN THE ACTUAL SEX ACT.

9            WHEN YOU THINK ABOUT DEFENDANT'S INTENT WHEN HE WAS

10   GOING TO TRAVEL FROM NEW MEXICO TO CALIFORNIA, AGAIN LOOK AT

11   ALL OF THE STATEMENTS -- AND NOT JUST HIS STATEMENTS IN

12   DECEMBER BEFORE HE TRAVELED -- ABOUT PUTTING SOFT PORNOGRAPHY

13   ON THE LAPTOP.  BUT LOOK AT WHAT HE DID WHEN HE GOT THERE.

14   THE TESTIMONY FROM TONY SUTHERLAND.  THE TIME ALONE.  THE HOT

15   TUB.  THE BATHING SUIT.  THE AFFECTION.  AGAIN, PUT IT ALL

16   INTO CONTEXT, LADIES AND GENTLEMEN, AND IT'S CLEAR WHAT

17   HAPPENED IN THIS CASE, WHAT HAPPENED IN THIS CASE BEYOND A

18   REASONABLE DOUBT.

19           DON'T LET DEFENSE COUNSEL DIVERT AND DISTRACT YOUR

20   ATTENTION FROM THE BIG PICTURE.  WHEN YOU PUT IT TOGETHER,

21   IT'S CLEAR, LADIES AND GENTLEMEN.

22           AND WHEN DEFENSE COUNSEL SAYS THAT DEFENDANT WAS

23   BOASTING IN THESE CHATS, ACTING LIKE A GIDDY TEENAGER, A

24   FANTASY, HE SEEMS TO BE TRYING TO HAVE IT BOTH WAYS.

25           CAN'T SAY ON ONE HAND, LOOK AT THESE CHATS.  WE

1    HAVE A LONELY MAN WITH COMPUTER PROBLEMS, WHO WAS ISOLATED.

2    BUT THEN SAY, WELL, EVERYTHING HE WROTE ABOUT KALEN,

3    EVERYTHING THAT SHOWS WHAT HE DID TO KALEN WAS FANTASY.

4         AND IF THE DEFENDANT WAS REALLY BOASTING, WHY WOULD

5    HE USE THE NAME OF A REAL SEVEN-YEAR-OLD BOY, THE NAME OF THE

6    SON OF FAMILY FRIENDS WHO TOOK HIM INTO HIS HOME?  AND WHY

7    WOULD HE STOP AT THE DESCRIPTIONS THAT HE PROVIDED?

8         YOU HEARD DEFENDANT IN THOSE CHATS DESCRIBE A WHOLE

9    HOST OF VERY GRAPHIC, EXPLICIT DETAILED SEX ACTS.  SO, IF HE

10   WAS JUST FANTASIZING ABOUT KALEN, IF HE WAS JUST BOASTING,

11   WHY STOP WHERE HE DID?

12        IT DOESN'T MAKE SENSE.  AND THE REASON WHY HE

13   DIDN'T STOP THERE IS BECAUSE IT WAS TRUE.  WHY SAY IN THE

14   CHATS THAT HE HADN'T DONE ANYTHING YET WITH CALEB, THE OTHER

15   BOY, HIS 10-YEAR-OLD BOYFRIEND?  BECAUSE IF IT WAS FANTASY,

16   HE CERTAINLY KNEW -- DEFENDANT CERTAINLY KNEW HOW TO WRITE IN

17   VERY GRAPHIC, DESCRIPTIVE TERMS ABOUT SEX ACTS WITH KIDS.  IF

18   THAT WAS ALL FANTASY, WHY DID HE SAY IT HADN'T GOTTEN THERE

19   YET, BUT THE NEXT TIME HE HOPED IT WOULD HAPPEN?  AND WHY DID

20   HE STOP AND SAY THAT HE MASSAGED KALEN'S ANUS AND WAS GETTING

21   TO THE POINT OF DRY ORGASM?  HE COULD HAVE DESCRIBED A WHOLE

22   GAME OF DOCTOR WITH KALEN, JUST LIKE HE DID WITH CROW18.  AND

23   THE REASON WHY, LADIES AND GENTLEMEN, IS BECAUSE IT WAS REAL.

24   IT WAS TRUE.

25        WHY TALK ABOUT THE PACE, TAKING IT SLOW, BEING

1    CAREFUL SO KALEN WON'T TELL ANYONE, "TO KEEP HIS MOUTH SHUT

2    SO HE WILL BE COMFORTABLE WHEN I'M NOT THERE.  IT'S SO

3    DANGEROUS."

4           WHY WOULD HE SAY THAT IF IT WAS FANTASY?  WHAT'S

5    THE DANGER IN FANTASY, LADIES AND GENTLEMEN?  AGAIN, BECAUSE

6    IT WAS TRUE.

7           ALL OF THESE STATEMENTS BY DEFENDANT ARE HALLMARKS

8    OF TRUTH, LADIES AND GENTLEMEN.  THIS WASN'T FANTASY.  THIS

9    WASN'T BOASTING.  THE CHATS SPEAK FOR THEMSELVES.  YOU'VE

10   HEARD THEM.  YOU CAN LOOK AT THEM AGAIN.  DEFENDANT WAS

11   TELLING YOU WHAT HE INTENDED TO DO, WHAT HE ATTEMPTED TO DO,

12   AND WHAT HE DID DO TO KALEN.

13          A COUPLE FOLLOW-UP POINTS, THEN I'M DONE.

14          DEFENSE COUNSEL TELLS YOU THAT DEFENDANT IS AN ODD

15   MAN, A MEMBER OF A SICK COMMUNITY.  THE GOVERNMENT AGREES.

16   THE GOVERNMENT AGREES.  THAT DOESN'T MEAN THAT HE'S NOT A

17   SEXUAL PREDATOR, LADIES AND GENTLEMEN.  IT DOESN'T MEAN THAT

18   HE TOOK HIS FANTASY FROM HIS HEAD TO THE INTERNET AND PUT IT

19   INTO PLAY.  HE GATHERED AND COLLECTED CHILD PORNOGRAPHY.

20   DEFENSE COUNSEL TELLS YOU HE CERTAINLY SOUGHT IT OUT.  HE

21   WANTED IT AND CONSPIRED TO DO IT.  JUST BECAUSE YOU'RE ODD

22   AND YOU'RE WEIRD AND YOU'RE A MEMBER OF A SICK COMMUNITY, IT

23   DOESN'T MEAN THAT YOU DON'T THEN DO REALLY BAD THINGS, LADIES

24   AND GENTLEMEN.  AND THE EVIDENCE SHOWS THAT IN THIS CASE.

25          DEFENDANT COULD HAVE STAYED AT THAT CAMP, ISOLATED,

 1   AND NEVER LAID A HAND ON KALEN.  BUT HE CHOSE TO, LADIES AND

 2   GENTLEMEN, AND THE EVIDENCE SHOWS THAT.

 3           AND WHEN HE TRAVELED TO NEW MEXICO, YOU KNOW THAT

 4   HE TOOK SUBSTANTIAL STEPS BEYOND HIS PREPARATION TO MAKE IT

 5   HAPPEN.  AND ONCE HE CHOSE TO STEP OUT OF HIS ISOLATION, OUT

 6   OF WHATEVER FANTASIES MAY HAVE EXISTED IN HIS HEAD AND MAKE

 7   IT A REALITY AND PREY UPON KALEN, THAT WAS HIS CHOICE.  AND

 8   NOW, LADIES AND GENTLEMEN, THE EVIDENCE HAS BEEN PRESENTED TO

 9   YOU, AND IT SHOWS BEYOND A REASONABLE DOUBT THAT HE IS GUILTY

10   OF WHAT HE HAS BEEN ACCUSED OF.

11           AND YOU ALSO SAW IN THE CHATS, AND I THINK DEFENSE

12   COUNSEL REMARKED ABOUT THIS, HOW DEFENDANT IN HIS CHATS

13   ALMOST BLAMES KALEN.  KALEN IS THE AGGRESSOR.  KALEN IS THE

14   ONE WHO IS COMING ON TO HIM.

15           BUT WHAT YOU KNOW, AGAIN, FROM SPECIAL AGENT

16   CLEMENTE'S TESTIMONY, THAT'S WHAT A BOY LOVER DOES.  THEY

17   RATIONALIZE.  THEY BLAME THE VICTIM.  THEY SAY THE VICTIM IS

18   THE AGGRESSOR.  IT FITS THE MODELING, LADIES AND GENTLEMEN.

19   IT IS WHAT YOU WOULD EXPECT SOMEONE LIKE DEFENDANT TO SAY.

20           SO LET ME LEAVE YOU WITH THIS FINAL REMARK:  THIS

21   IS AN IMPORTANT CASE.  IT IS IMPORTANT TO DEFENDANT, FOR

22   OBVIOUS REASONS.  BUT IT IS ALSO IMPORTANT THAT JUSTICE BE

23   DONE WHEN, AS HERE, THE EVIDENCE ESTABLISHES BEYOND A

24   REASONABLE DOUBT THAT DEFENDANT COMMITTED THE FOUR CRIMES

25   CHARGED IN THE INDICTMENT.  AND IT IS YOUR DUTY TO HOLD HIM

1    ACCOUNTABLE FOR THAT, FOR THE IMAGES AND VIDEOS OF YOUNG

2    BOYS, EACH A VICTIM, ENGAGED IN SEXUALLY EXPLICIT CONDUCT HE

3    POSSESSED, AND THAT HE KNOWINGLY AGREED AND CONSPIRED TO

4    POSSESS WITH HIS CO-CONSPIRATORS -- BECAUSE HE HAS ALREADY

5    ADMITTED OR AGREED THAT HE HAS -- FOR DEFENDANT'S TRAVEL FROM

6    CALIFORNIA TO NEW MEXICO IN DECEMBER 2000 WITH THE INTENT TO

7    ENGAGE IN A SEX ACT WITH A MINOR, AND FOR THE SEX ACTS THE

8    DEFENDANT ATTEMPTED AND ACTUALLY ENGAGED IN WITH KALEN AFTER

9    HE TRAVELED FROM CALIFORNIA TO NEW MEXICO IN DECEMBER 2000.

10            AND THE JUDGE HAS INSTRUCTED YOU ON THE STANDARD OF

11   BEYOND A REASONABLE DOUBT.  DEFENSE COUNSEL HAS TALKED ABOUT

12   IT WITH YOU, THE STANDARD OF PROOF THAT THE GOVERNMENT MUST

13   SHOW.  AND IT IS A STANDARD WHICH THE GOVERNMENT MENTIONED IT

14   EMBRACES, EMBRACES THAT.  AND IN THAT STANDARD, IT SAYS THAT

15   YOU MUST BE FIRMLY CONVINCED.

16            AND WHAT DOES IT MEAN "FIRMLY CONVINCED"?  WELL,

17   WHAT THAT MEANS IS, THAT BASED ON THE EVIDENCE PRESENTED IN

18   THIS CASE YOU WOULD MAKE THE SAME DECISION TODAY, TOMORROW,

19   NEXT WEEK, OR WHENEVER.

20            IT IS NOT AN IMPOSSIBLE STANDARD, LADIES AND

21   GENTLEMEN.  AND IF YOU THINK ABOUT IT, IT IS THE SAME

22   STANDARD THAT APPLIES IN EVERY CRIMINAL CASE ACROSS THIS

23   COUNTRY THAT'S HELD EVERY DAY, FROM THE MOST MINOR CRIMINAL

24   INFRACTIONS TO THE MOST HEINOUS OF CRIMES.  AND IT IS A

25   STANDARD THAT'S MET COUNTLESS NUMBERS OF TIMES IN THOSE

1    COURTROOMS, LADIES AND GENTLEMEN, ACROSS THIS COUNTRY.

2              MR. AARON:  I'LL OBJECT.  IT'S IRRELEVANT.

3              THE COURT:  THAT'S IRRELEVANT.  MOVE ON.

4              MR. MICHAEL:  IT'S NOT AN IMPOSSIBLE STANDARD,

5    LADIES AND GENTLEMEN.  AND IT'S A STANDARD THAT HAS BEEN MET

6    HERE.

7              CLEARLY, THE EVIDENCE IN THIS CASE HAS BEEN

8    SHOCKING, AT TIMES VILE, UPSETTING.  AND AS THE COURT HAS

9    TOLD YOU, DEFENSE COUNSEL HAS TOLD YOU, AND AS THE GOVERNMENT

10   AGREES, YOUR DECISION IS NOT TO BE BASED ON EMOTION, PASSION,

11   ANGER, RETRIBUTION.  NO.  YOUR DECISION IS TO BE BASED SOLELY

12   ON THE EVIDENCE, THE EVIDENCE THAT'S BEEN PRESENTED TO YOU.

13             AND THAT EVIDENCE, LADIES AND GENTLEMEN, IF YOU

14   LOOK AT AND DO THOSE THREE THINGS THE GOVERNMENT ASKED YOU TO

15   DO, LOOK AT ALL THE EVIDENCE IN CONTEXT TOGETHER, IF YOU

16   FOLLOW THE LAW AS INSTRUCTED BY THE COURT, AS YOU PROMISED

17   YOU WILL, AND IF YOU USE YOUR COMMON SENSE IN CONSIDERING

18   THAT EVIDENCE, THE GOVERNMENT SUBMITS THAT YOU WILL REACH THE

19   ONLY TRUE AND JUST VERDICT SUPPORTED BY LAW.  AND THAT IS A

20   VERDICT THAT THE DEFENDANT JAMES SANDERS IS GUILTY OF ALL

21   FOUR COUNTS CHARGED IN THE INDICTMENT.  IT IS A VERDICT WE

22   ASK YOU TO RETURN.

23             THE COURT:  THANK YOU.

24             LADIES AND GENTLEMEN, WHEN YOU RETIRE AND BEGIN

25   YOUR DELIBERATIONS, YOU SHOULD BEGIN BY ELECTING ONE MEMBER

1    OF THE JURY AS YOUR FOREPERSON OR PRESIDING JUROR.  AND THAT

2    PERSON WILL PRESIDE OVER THE DELIBERATIONS AND SPEAK FOR YOU

3    HERE IN COURT.

4          YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW

5    JURORS TO REACH AGREEMENT, IF YOU CAN DO SO.  YOUR VERDICT,

6    WHETHER GUILTY OR NOT GUILTY, MUST BE UNANIMOUS.

7          EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT

8    YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL THE

9    EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

10   LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

11         DON'T BE AFRAID TO CHANGE YOUR OPINION IF THE

12   DISCUSSION PERSUADES YOU THAT YOU SHOULD, BUT DON'T COME TO A

13   DECISION SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

14         IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A

15   UNANIMOUS VERDICT BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO

16   SO AFTER HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT

17   CHANGE AN HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE

18   EVIDENCE SIMPLY TO REACH A VERDICT.

19         YOUR VERDICT MUST BE BASED SOLELY ON THE EVIDENCE

20   AND ON THE LAW AS I HAVE GIVEN IT TO YOU IN THESE

21   INSTRUCTIONS.  HOWEVER, NOTHING THAT I HAVE SAID OR DONE

22   DURING THE COURSE OF THE TRIAL IS INTENDED TO SUGGEST WHAT

23   YOUR VERDICT SHOULD BE; THAT IS ENTIRELY FOR YOU TO DECIDE.

24         THE PUNISHMENT PROVIDED BY LAW FOR THIS CRIME IS

25   FOR THE COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN

1    DECIDING WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST

2    THE DEFENDANT BEYOND A REASONABLE DOUBT.

3            I KNOW SOME OF YOU HAVE TAKEN NOTES DURING THE

4    TRIAL.  WHETHER OR NOT YOU TOOK NOTES, YOU SHOULD RELY ON

5    YOUR OWN MEMORY OF WHAT WAS SAID.  NOTES ARE ONLY TO ASSIST

6    YOUR MEMORY, AND YOU SHOULD NOT BE OVERLY INFLUENCED BY THE

7    NOTES.

8            A VERDICT FORM HAS BEEN PREPARED FOR YOU.  THIS IS

9    WHAT IT LOOKS LIKE.  THERE IS A COVER PAGE THAT SAYS SPECIAL

10   VERDICT FORM.  AND THERE ARE THREE PAGES TO IT.  QUESTION AS

11   TO COUNT 1 AND A PLACE FOR THE JURORS TO FIND EITHER A

12   VERDICT OF GUILTY OR NOT GUILTY AS TO THE CRIME OF CONSPIRING

13   TO POSSESS CHILD PORNOGRAPHY AS CHARGED IN COUNT 1.

14           COUNT 2 THERE IS A PLACE FOR THE JURY TO ENTER

15   THEIR VERDICT OF GUILTY -- OR ITS VERDICT OF GUILTY OR NOT

16   GUILTY AS TO THE CRIME CHARGED IN COUNT 2.  THAT'S THE CRIME

17   OF POSSESSION OF CHILD PORNOGRAPHY.

18           THEN COUNT 3, SAME THING AS TO INDICATE YOUR

19   VERDICT AS TO THE CRIME OF TRAVELING FOR THE PURPOSE OF

20   ENGAGING IN A SEXUAL ACT WITH A MINOR.

21           AND AS TO COUNT 4, THERE IS THREE QUESTIONS AS TO

22   COUNT 4.  YOUR ANSWER AS TO THE FIRST QUESTION AS TO ITEM ONE

23   BY SELECTING ONE, GUILTY OR NOT GUILTY.  AND THEN IT ASKS YOU

24   TO ANSWER THE NEXT QUESTION, WHICH IS THE QUESTION ABOUT

25   ATTEMPT, AS TO COUNT 4.

1        AND THEN ITEM 3 AGAIN ASKS YOU TO ANSWER A QUESTION

2   ABOUT IF YOU HAVE FOUND THE DEFENDANT GUILTY, DEPENDING ON

3   HOW YOU ANSWERED THE EARLIER QUESTION, YOU WOULD ANSWER THE

4   THIRD QUESTION, AS WELL.  AND THEN THAT'S A YES OR NO

5   QUESTION.  AND THEN ONCE, IF YOU REACH A VERDICT, THEN THE

6   FOREPERSON OF THE JURY SIGNS AND DATES THE VERDICT FORM.

7        NOW, YOU MUST UNANIMOUSLY AGREE ON THE ANSWERS TO

8   EACH OF THE QUESTIONS ON THE VERDICT FORM.  AND AFTER YOU

9   HAVE REACHED UNANIMOUS AGREEMENT ON THE VERDICT, AS I SAID,

10  YOUR FOREPERSON FILLS IN THE FORM THAT I'M SHOWING YOU, AND

11  THEN SIGNS IT, DATES IT, AND ADVISES THE BAILIFF THAT YOU ARE

12  READY TO RETURN TO THE COURTROOM.

13       IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS

14  TO COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE

15  BAILIFF, SIGNED EITHER BY YOUR FOREPERSON OR BY ONE OR MORE

16  MEMBERS OF THE JURY.  NO MEMBER OF THE JURY SHOULD EVER

17  ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING,

18  AND I WILL RESPOND TO THE JURY CONCERNING THE CASE ONLY IN

19  WRITING OR HERE IN OPEN COURT.

20       IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

21  LAWYERS BEFORE I ANSWER IT, AND SOMETIMES THAT TAKES A LITTLE

22  TIME.  YOU CAN CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR

23  THE ANSWER TO ANY QUESTION.

24       IN SENDING OUT A QUESTION, PLEASE REMEMBER THAT

25  YOU'RE NOT TO TELL ANYONE, INCLUDING ME, HOW THE JURY STANDS,

1   NUMERICALLY OR OTHERWISE, ON THE QUESTION OF THE GUILT OF THE

2   DEFENDANT UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR

3   HAVE BEEN DISCHARGED.  SO, IF YOU SEND OUT A QUESTION, MAKE

4   SURE THAT THERE IS NOTHING IN THE QUESTION THAT INDICATES HOW

5   THE JURY STANDS.  IF THERE IS ANY TALLIES OR VOTES THAT HAVE

6   BEEN TAKEN, DO NOT INCLUDE SUCH INFORMATION IN ANY QUESTION.

7           YOU MAY AT THIS POINT, FROM NOW ON, YOU MAY DECIDE

8   WHEN AND HOW OFTEN YOU WISH TO TAKE BREAKS AND RECESSES

9   DURING YOUR DELIBERATIONS.  HOWEVER, YOU MAY ONLY DELIBERATE

10  WHEN ALL JURORS ARE PRESENT IN THE JURY ROOM AND ONLY WHEN

11  ALL OF YOU ARE IN THE JURY ROOM.  SO, IF A JUROR LEAVES IN

12  ORDER TO USE THE BATHROOM, OR A CIGARETTE, OR ANY OTHER

13  REASON, ALL DELIBERATIONS AND DISCUSSIONS OF THE CASE MUST

14  CEASE.  YOU CAN ONLY CONTINUE DISCUSSING THE CASE,

15  DELIBERATING ABOUT THE CASE, WHEN ALL 12 OF YOU ARE TOGETHER

16  IN THE JURY ROOM.

17          NOW WITH YOU IN THE JURY ROOM YOU WILL HAVE ALL OF

18  THE EXHIBITS THAT HAVE ACTUALLY BEEN ADMITTED DURING THE

19  TRIAL, THAT HAVE BEEN ADMITTED INTO EVIDENCE.  AND YOU WILL

20  ALSO HAVE COPIES OF ALL OF THE INSTRUCTIONS THAT I HAVE JUST

21  READ TO YOU.  EACH OF YOU WILL HAVE A COPY OF ALL OF THE

22  INSTRUCTIONS.  AND YOU WILL HAVE WORKING COPIES -- EACH OF

23  YOU WILL HAVE A WORKING COPY OF THIS VERDICT FORM.

24          IN THE FOLDER, WHICH LOOKS LIKE THIS, THERE WILL BE

25  THE ORIGINAL VERDICT FORM THAT WILL BE STAMPED "ORIGINAL."

1   THAT WILL BE THE ONE, IF YOU REACH A VERDICT, THE FOREPERSON

2   SIGNS.

3        AND THEN YOU ALSO HAVE IN HERE A COPY OF THE

4   INDICTMENT, THE FIRST SUPERSEDING INDICTMENT.  AND THEN ON

5   THIS SIDE YOU HAVE THIS FORM, THIS JURY NOTE.  SO, IF YOU

6   HAVE NOTES, YOU CAN SEND OUT A NOTE TO US.  AND AS I SAID,

7   WRITE THE NOTE ON THIS FORM AND HAND IT TO THE BAILIFF, WHO

8   WILL BE STANDING OUTSIDE THE JURY ROOM, TO HAND IT TO US.

9        IF YOU REACH A UNANIMOUS VERDICT, PLEASE NOTIFY US

10  BY SENDING OUT THE NOTE WITH THE BOX CHECKED ON THE FORM THAT

11  SAYS YOU'VE REACHED A UNANIMOUS VERDICT.  HOWEVER, DO NOT

12  SEND OUT THE VERDICT FORM.  THE PRESIDING JUROR SHOULD HOLD

13  ONTO THE VERDICT FORM IN THE JURY ROOM AND BRING IT INTO THE

14  COURTROOM WHEN THE BAILIFF BRINGS THE ENTIRE JURY IN.  DO NOT

15  GIVE THAT TO THE BAILIFF.

16       THE BAILIFFS MAY COME FORWARD TO BE SWORN.

17       THE CLERK:  PLEASE STATE YOUR NAME.

18       BAILIFF EVANS:  SCOTT EVANS.

19       BAILIFF MARMION:  DAVE MARMION.

20       **THE BAILIFFS WERE SWORN BY THE CLERK**

21       THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, NOW

22  YOU MAY TAKE YOUR NOTEBOOKS WITH YOU.  I WANT TO THANK YOU

23  AGAIN VERY MUCH FOR YOUR PATIENCE AND ATTENTION DURING THE

24  TRIAL.

25       JURORS 1 THROUGH 12 ARE EXCUSED.

1        I'M GOING TO ASK MR. ROBINSON AND MS. PLUNK, IF YOU

2   WILL WAIT HERE IN THE COURTROOM FOR A MOMENT.

3        YOU'RE MISSING IN YOUR NOTEBOOKS THE PHOTOGRAPHS OF

4   THE LAST TWO WITNESSES WHO TESTIFIED, AND THE CLERK IS GOING

5   TO GIVE YOU THOSE PHOTOGRAPHS TO PUT IN THERE.  AND THEN IN

6   JUST A MOMENT THEY ARE GOING TO BRING YOU THE ITEMS I JUST

7   MENTIONED.  THEY WILL BE BRINGING YOU ALL THE EXHIBITS AND

8   THE INSTRUCTIONS AND THE WORKING COPIES OF THE VERDICT.

9        THANK YOU, LADIES AND GENTLEMEN.  YOU'RE EXCUSED.

10   (JURORS EXITED THE COURTROOM TO COMMENCE DELIBERATIONS.)

11        THE COURT:  MR. ROBINSON AND MS. PLUNK, YOU ARE

12   CONDITIONALLY EXCUSED IN PART AT THIS TIME.  WHEN I SAY

13   "CONDITIONALLY" IT IS BECAUSE WE DON'T KNOW WHETHER WE MAY

14   STILL NEED YOU.  IF ANYTHING HAPPENS TO ONE OF THE JURORS,

15   THEN WE WILL CALL YOU BACK IN AND PLACE YOU ON THE JURY AND

16   TELL THE JURORS THAT THEY HAVE TO BEGIN THEIR DELIBERATIONS

17   ALL OVER AGAIN.

18        SO YOU'RE STILL UNDER THE COURT'S ADMONITION THAT

19   YOU CANNOT DISCUSS THE CASE WITH ANYONE BECAUSE YOU MAY STILL

20   BE NEEDED.  AND YOU CAN'T, BECAUSE YOU HAVEN'T BEGUN

21   DELIBERATING, YOU STILL CAN'T MAKE UP YOUR MINDS.  YOU HAVE

22   TO LISTEN TO THE DISCUSSIONS OF YOUR FELLOW JURORS, IF YOU'RE

23   CALLED UPON TO DO THAT.

24        YOU'RE GOING TO BE RELEASED TO GO BACK TO WORK AND

25   SO FORTH, BECAUSE MS. INGRAM OR MS. SASSE WILL CALL YOU IF WE

1    NEED YOU.  SO, WHEN I'M DONE TALKING TO YOU, THEY WILL GET

2    YOUR CONTACT INFORMATION AND EXPLAIN HOW WE GET IN CONTACT

3    WITH YOU.

4            AND THEN IF THE JURY REACHES A VERDICT OR IS

5    DISCHARGED, WE WILL LET YOU KNOW RIGHT AWAY, AND AT THAT

6    POINT, YOU'RE RELEASED FROM ALL OF THE COURT'S ADMONITIONS.

7            I MAY OR MAY NOT SEE YOU AGAIN, SO I WILL TAKE THIS

8    OPPORTUNITY TO TELL YOU, IN CASE I DON'T SEE YOU AGAIN, ON

9    BEHALF OF BOTH PARTIES AND THE COURT HOW MUCH WE APPRECIATE

10   YOUR SERVICE.  SOMETIMES I THINK THAT BEING AN ALTERNATE

11   JUROR IS THE -- THOSE ARE THE JURORS WE SHOULD THANK THE MOST

12   FERVENTLY BECAUSE YOU WORK VERY HARD TO PAY ATTENTION AND

13   YOU'RE NOT SURE WHETHER YOU'RE EVER GOING TO BE ABLE TO TALK

14   ABOUT IT WITH ALL THE OTHER PEOPLE THAT YOU HAVE BEEN SITTING

15   HERE WITH FOR TWO WEEKS.

16           AND MANY YEARS AGO MY HUSBAND WAS AN ALTERNATE

17   JUROR ON A CASE, AND WHEN IT WAS OVER, AND HE DID NOT EVER

18   HAVE THE CHANCE TO DELIBERATE, I HEARD A LOT ABOUT WHAT IT

19   WAS LIKE TO BE AN ALTERNATE JUROR AND NOT GET THE CHANCE TO

20   DELIBERATE.  AND HE FOUND IT TO BE FRUSTRATING, FOR THAT

21   REASON, THAT HE HAD PUT IN THE SACRIFICE TO SERVE AND HAD

22   REALLY WANTED TO HEAR THE VIEWS OF HIS FELLOW JURORS AND SO

23   FORTH.

24           SO I DON'T KNOW IF YOU WILL GET THAT CHANCE.  YOU

25   STILL MAY.  BUT WE APPRECIATE YOUR SERVICE JUST AS MUCH AS

1    THE OTHER JURORS ON THE CASE.

2              AND AS I ALWAYS TELL JURORS, I'M GOING TO -- THE

3    LONGER I DO THIS, THE MORE I COME TO APPRECIATE HOW IMPORTANT

4    IT IS THAT WE HAVE CONSCIENTIOUS JURORS TO SERVE.  AND I HAVE

5    COME TO APPRECIATE HOW MUCH ALL OF US ENJOY, AS CITIZENS OF

6    THE UNITED STATES -- AND OUR JUSTICE SYSTEM ISN'T A PERFECT

7    ONE AND SUBJECT TO A LOT OF CRITICISM, AND A LOT OF THAT IS

8    PERHAPS JUSTIFIED BECAUSE IT IS A HUMAN SYSTEM, AND AS HUMANS

9    NONE OF US ARE PERFECT, SO IT IS NOT A PERFECT SYSTEM.

10             BUT AS I SAID, THE FIRST DAY I MET ALL OF YOU IN

11   THIS TRIAL WHEN YOU CAME IN TO FILL OUT THE QUESTIONNAIRES,

12   HAVING A JURY SYSTEM MEANS THAT IT'S NOT A GOVERNMENT

13   OFFICIAL THAT DECIDES THE GUILT OR INNOCENCE OF ANY CITIZEN

14   OR ANY PERSON WHO'S ACCUSED OF COMMITTING A CRIME.  SO HAVING

15   A JURY SYSTEM IS A REALLY IMPORTANT CHECK ON GOVERNMENT

16   POWER.  AND WE ONLY HAVE THAT CHECK ON GOVERNMENT POWER

17   BECAUSE IF ALL OF US ARE WILLING TO TAKE OUR TURN, MAKE THE

18   SACRIFICE FROM OUR DAILY LIVES AND OUR COMMITMENTS, TO SERVE

19   AS JURORS -- AND I KNOW BOTH OF YOU HAVE A LOT OF

20   COMMITMENTS, FAMILY COMMITMENTS AND WORK COMMITMENTS.

21             AND, MS. PLUNK, YOU HAVE A REALLY IMPORTANT JOB.

22   AND I THINK YOU'RE THE ACTING CEO, WHICH MEANS YOU HAVE EVEN,

23   I THINK, I WOULD GUESS EVEN MORE COMMITMENTS THAN IF YOU WERE

24   THE PERMANENT CEO, BECAUSE YOU HAVE SORT OF TAKEN OVER THAT

25   JOB; THERE WAS A VACANCY.  AND I REALLY APPRECIATE YOUR

1    COMMITMENT TO COME IN AND SERVE.

2         MR. ROBINSON, YOU, AS WELL, YOU'RE OF AN AGE, I

3    THINK, WHEN YOU AND SOME OF THE OTHER MEMBERS OF THE JURY,

4    YOU PROBABLY HAVE MANY, MANY OTHER THINGS YOU COULD DO IN

5    YOUR LEISURE TIME.  AND WE ALL REALLY APPRECIATE WHAT YOU

6    HAVE DONE TO CONTRIBUTE IN THIS CASE.  THANK YOU VERY, VERY

7    MUCH.

8         I'M GOING TO ASK YOU TO LEAVE YOUR NOTEBOOKS HERE

9    BECAUSE IF YOU COME IN AND BEGIN DELIBERATING, NOBODY LOOKS

10   AT THEM.  IN THE MEANTIME, LEAVE THEM HERE.  AND IF I DON'T

11   SEE YOU AGAIN, GO WITH MY SINCERE APPRECIATION.  THANK YOU.

12        MS. INGRAM WILL GET YOUR CONTACT INFORMATION.

13       (THE ALTERNATE JURORS HAVE EXITED THE COURTROOM.)

14        THE COURT:  WE'RE ON RECORD OUTSIDE THE PRESENCE OF

15   ALL MEMBERS OF THE JURY.

16        THERE ARE TWO GLITCHES, TWO SMALL GLITCHES, I THINK

17   I MENTIONED IN THE INSTRUCTIONS, WHICH MAY BE A RECORD FOR

18   THE FEWEST, WHICH WE CORRECTED BEFORE THEY WERE READ AND HAVE

19   BEEN CORRECTED IN YOUR PACKETS THAT THE JURORS HAVE.

20        I HAVE A QUESTION FOR COUNSEL ABOUT THE VERDICT

21   FORM.

22        MR. MICHAEL:  YES, YOUR HONOR.

23        THE COURT:  IT SEEMS TO ME THAT WE MAY NEED A

24   FURTHER INSTRUCTION AFTER THE QUESTION ON ITEM 1.

25        IF THE JURY FINDS THE DEFENDANT GUILTY, IN ANSWER

1   TO ITEM 1, YOU STILL -- WELL, I GUESS I UNDERSTAND.  YOU

2   STILL WANT THE JURY TO ANSWER AS TO WHETHER THEY ALSO FIND

3   HIM GUILTY OF AN ATTEMPT?

4           MR. AKROTIRIANAKIS:  I THINK IT'S IMPORTANT, YOUR

5   HONOR, FOR PURPOSES OF THE RECORD, FOR THE JURY TO ANSWER

6   WHETHER THEY WERE UNANIMOUS ON THE THEORY.  THAT'S ONE POINT.

7           AND THEN TWO, WHETHER THEY FOUND THE DEFENDANT

8   GUILTY BOTH OF -- OR ONE OR THE OTHER OR BOTH OF ATTEMPT OR

9   THE COMPLETED CRIME.  AND THE REASON WHY IS BECAUSE --

10          THE COURT:  WELL, OKAY.  I'M SORRY.  BUT WOULDN'T

11  YOU ALSO WANT THE JURY, IF THEY SAY NOT GUILTY AS TO

12  ITEM 1 --

13          MR. AKROTIRIANAKIS:  THEN THEY DON'T NEED TO ANSWER

14  ITEM 2.  THAT'S WHY IT SAYS -- WELL, PERHAPS IF THE COURT

15  WANTED TO MAKE A CHANGE, YOU COULD PUT "IF, AND ONLY IF, YOU

16  FIND THE DEFENDANT GUILTY."

17          THE COURT:  SO, YOUR THEORY IS THAT THE DEFENDANT

18  -- THE DEFENDANT CAN ONLY BE FOUND GUILTY OF ATTEMPT IF HE IS

19  ALSO FOUND GUILTY OF THE CRIME?

20          MR. AKROTIRIANAKIS:  NO.

21          THE COURT:  THAT'S THE WAY THIS VERDICT FORM READS,

22  AS I SEE IT.

23          MR. AKROTIRIANAKIS:  THEY CAN FIND HIM GUILTY OF

24  THE CRIME ON ONE OF TWO THEORIES, ATTEMPT OR THE COMPLETED

25  CRIME.  IF THEY FIND HIM GUILTY, IF THIS WAS A GENERAL

1    VERDICT, YOU WOULD JUST SAY GUILTY OR NOT GUILTY.

2              HOWEVER, I EXPECT THAT COUNSEL IS GOING TO RENEW

3    HIS RULE 29 MOTION ON APPEAL.  AND IT IS THEORETICALLY

4    POSSIBLE FOR THE COURT OF APPEALS TO AGREE WITH HIM ON ONE

5    THEORY BUT NOT THE OTHER THEORY.

6              THE COURT:  I UNDERSTAND THAT.  I'M JUST NOT SURE

7    THAT THE VERDICT FORM REFLECTS YOUR ARGUMENT.

8              MR. MICHAEL:  TO THE EXTENT THE JURORS FOLLOW YOUR

9    HONOR'S INSTRUCTION, AS WE PRESUME THEY WILL, IF THEY FOUND

10   HIM GUILTY OF COUNT 1, THEY WILL EITHER HAVE FOUND

11   UNANIMOUSLY THAT HE ATTEMPTED OR UNANIMOUSLY THAT HE ENGAGED,

12   OR BOTH.  SO THE FOLLOWING INTERROGATORIES JUST CLARIFY WHAT

13   THEIR BASIS FOR THEIR DECISION WAS SO THAT THEY WILL

14   EXPLICITLY STATE THAT THERE WAS UNANIMOUS FINDING AS TO

15   ATTEMPT OR UNANIMOUS FINDING AS TO ACTUAL ENGAGEMENT, OR

16   BOTH.

17             THE COURT:  OH, I SEE.  ALL RIGHT.

18             MR. AKROTIRIANAKIS:  THE JURY INSTRUCTIONS ARE IN

19   THE BOOKS ALREADY, RIGHT?

20             THE COURT:  THE JURY INSTRUCTIONS, THE ONES I GAVE

21   DURING THE TRIAL, ARE IN THE BOOKS.  WE JUST BROUGHT BACK THE

22   ONES I GAVE JUST NOW.  THOSE ARE THICK PACKETS.  IS THERE A

23   CHANGE YOU WANT TO MAKE IN ONE OF THEM?

24             MR. AKROTIRIANAKIS:  NOT IF THEY ARE ALREADY WITH

25   THE JURY.  IF THEY WEREN'T, I JUST POINT OUT ONE ITEM THAT I

```
 1    DON'T THINK IS REALLY --

 2              THE COURT:  THERE WAS A MISTAKE IN ONE OF YOURS

 3    THAT WE FOUND AND CORRECTED.

 4              MR. AKROTIRIANAKIS:  RIGHT, YOUR HONOR.

 5              THE COURT:  NO. 32, I THINK IT WAS.

 6              MR. AKROTIRIANAKIS:  WAS THAT THE ONE AS TO

 7    COUNT 4?

 8              THE COURT:  YES.

 9              MR. MICHAEL:  THERE WAS A MISTAKE IN THERE.

10              THE COURT:  THAT'S THE ONE THERE WAS A

11    TYPOGRAPHICAL ERROR.  I BELIEVE WE FIXED IT.

12              MR. MICHAEL:  I THINK WE MAY HAVE NOTICED ANOTHER

13    TYPOGRAPHICAL ERROR, BUT THEY ARE NOT MATERIAL ENOUGH TO --

14              THE COURT:  WELL, THE ONE THAT WE FIXED, WE HAD

15    UNNECESSARY WORDS IN IT.  IS THAT THE ONE YOU'RE TALKING

16    ABOUT?

17              MR. AKROTIRIANAKIS:  IT HAD THE ATTEMPT LANGUAGE IN

18    IT STILL.

19              THE COURT:  OH, WE FIXED THAT.

20              MR. AKROTIRIANAKIS:  THE ONLY OTHER THING I WAS

21    GOING TO POINT OUT -- I SHOULD HAVE THOUGHT OF EARLIER -- THE

22    ONE, THE COURT'S INSTRUCTION THAT SAID IS DEFENDANT'S -- IT

23    SAYS "THIS CRIME."  TO BE COMPLETELY CORRECT, IT SHOULD

24    PROBABLY SAY "THESE CRIMES."  I DON'T THINK IT'S OF ANY LEGAL

25    --
```

1          THE COURT:  I READ IT AS "THESE CRIMES."  WE

2    PROBABLY SHOULD HAVE FIXED THAT.

3          ALL RIGHT.  ANYTHING ELSE THAT WE NEED TO TAKE UP?

4          MR. MICHAEL:  YOUR HONOR, ARE WE PREPARED TO ALLOW

5    THE JURORS TO DELIBERATE PAST 1:00?

6          THE COURT:  WELL, 1:30.  I DON'T KNOW IF THEY'VE

7    ASKED.

8          THE CLERK:  THEY DID.  THEY JUST ASKED.

9          MR. MICHAEL:  IF THEY COULD, RACHEL?

10         THE COURT:  WELL, THEY CAN, BUT THIS IS WHAT I'M

11   PREPARED TO TELL THEM, AND WE CAN PUT IT IN WRITING SO WE

12   DON'T HAVE TO BRING THEM BACK IN THE COURTROOM.  THEY CAN.

13   HOWEVER, THE COURT CANNOT TAKE THEIR VERDICT TODAY.  THEY ARE

14   GOING TO HAVE TO RETURN TOMORROW.

15         MR. AARON:  WELL, WE WOULDN'T BE ABLE TO ANSWER

16   THEIR QUESTIONS, EITHER.

17         THE COURT:  IF THAT COMES UP, I WILL ADDRESS IT.

18   BUT THEY CAN STAY HERE.  AND IF A QUESTION COMES UP, WE WILL

19   TELL THEM -- I MEAN, THE REASON I DON'T WANT TO TELL THEM

20   THAT IS, LET'S SAY FIVE MINUTES AFTER YOU'VE LEFT THE

21   BUILDING, AND IT'S AN EASY QUESTION, AND YOU'VE AGREED WE CAN

22   CONTACT YOU BY YOUR CELL PHONE, WE CAN SEND AN ANSWER IN BY

23   WRITING, IF YOU AGREE.  SO WE'LL DEAL WITH THAT.

24         IT'S ACTUALLY NOT GOING TO HAPPEN.  COUNSEL, I'M

25   SORRY.  A COUPLE OF THE JURORS SAID THAT THEY HAVE OTHER

1    PLANS AND THEY ARE PLANNING TO LEAVE AT 1:30.

2            MR. MICHAEL:  OKAY.

3            THE COURT:  SO IT WON'T BE AN ISSUE.

4            THERE IS AN FBA MEETING WITH NEW PATENT LAW IN

5    JUDGE PARADA'S COURTROOM AT NOON.  YOU ARE ALL INVITED TO

6    ATTEND, IN CASE YOU'RE LOOKING TO CHANGE YOUR FOCUS.

7            MR. AARON:  I HAD A HUGE ARGUMENT WITH MY WIFE

8    ABOUT THAT BECAUSE I SAID, "HOW CAN I MISS A NEW DEVELOPMENT

9    IN PATENT LAW"?  AND SHE PUT HER FOOT DOWN.  I HAVE TO GO TO

10   THE GRADUATION.

11           THE COURT:  I HAVE AN E-MAIL FROM JUDGE PARADA

12   THAT, SHOCKINGLY ENOUGH, THAT ONLY 10 PEOPLE HAVE SIGNED UP.

13   AND I KNOW HE WOULD BE VERY PLEASED TO SEE YOU ALL THERE.

14           LET THE CLERKS KNOW YOU WILL BE WITHIN 15 MINUTES

15   UNTIL 1:30 TODAY.  YOU CAN'T LEAVE THE COURTROOM UNTIL SHE

16   RELEASES YOU FROM HER CUSTODY BECAUSE YOU HAVE TO GO OVER THE

17   EXHIBITS WITH HER.

18                    (PROCEEDINGS ADJOURNED)

19                        ---OOO---

20

21

22

23

24

25

C E R T I F I C A T E

DOCKET NO. EDCR 04-42(A) VAP

     I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

_____

PHYLLIS A. PRESTON, CSR     DATED:  OCTOBER 17, 2008
FEDERAL OFFICIAL COURT REPORTER
LICENSE NO. 8701