1        UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF CALIFORNIA
2          EASTERN DIVISION-RIVERSIDE

3

        HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING
4

5   UNITED STATES OF AMERICA,        )
                                     )
6                    PLAINTIFF,      )
                                     )
7   V.                               )DOCKET NO. EDCR 04-42(A)-VAP
                                     )
8   JAMES SANDERS,                   )
                                     )
9                    DEFENDANT.      )
    _____)
10

11        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                    RIVERSIDE, CALIFORNIA
12                THURSDAY, JUNE 7, 2007

13

                  PHYLLIS A. PRESTON, CSR
14                  LICENSE NO. 8701
            FEDERAL OFFICIAL COURT REPORTER
15          UNITED STATES DISTRICT COURT
                  3470 TWELFTH STREET
16          RIVERSIDE, CALIFORNIA 92501

17

18

19

20

21

22

23

24

25

1                              <u>APPEARANCES</u>

2

 FOR THE PLAINTIFF:      OFFICE OF THE UNITED STATES ATTORNEY
3                        BY:  <u>BRIAN MICHAEL</u>
                             <u>JOSEPH AKROTIRIANAKIS</u>
4                        ASSISTANT UNITED STATES ATTORNEYS
                        3880 LEMON STREET, SUITE 210
5                        RIVERSIDE, CALIFORNIA 92501

6

 FOR THE DEFENDANT:      <u>JEFFREY AARON</u>
7                        FEDERAL CRIMINAL DEFENSE PANEL
                        THE RIVERSIDE BARRISTER BUILDING
8                        3993 MARKET STREET
                        RIVERSIDE, CALIFORNIA 92501
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2        WITNESSES

3        FOR PLAINTIFF:                                     PAGE

4        JOHN OWEN
         DIRECT EXAMINATION BY MR. MICHAEL (RESUMED). . . . . 23
5        CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 37
         REDIRECT BY MR. MICHAEL. . . . . . . . . . . . . . 79
6
         BRIAN MCGAHA
7        DIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 91

8        RALPH PENDLETON
         DIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 103
9        CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 122
         REDIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . 127
10
         MICHAEL ARNOLD
11       DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 145
         CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 186
12       REDIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . 213

13       PERRY JOHNSON
         DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 216
14       CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 226

15       PEDRO FLORES
         DIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 231
16       CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 243

17       JOHN OWEN
         DIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 250

18

19

20

21       EXHIBITS                                        ADMITTED

22          5          . . . . . . . . . . . . . . . . . .     24
            83         . . . . . . . . . . . . . . . . . .     27
23          6          . . . . . . . . . . . . . . . . . .     33
            7          . . . . . . . . . . . . . . . . . .     149
24          41 - 42    . . . . . . . . . . . . . . . . . .     151

25

| EXHIBITS | | ADMITTED |
|---|---|---|
| 33 | . . . . . . . . . . . . . . . . | 158 |
| 32 | . . . . . . . . . . . . . . . . | 163 |
| 46 | . . . . . . . . . . . . . . . . | 168 |
| 8 | . . . . . . . . . . . . . . . . | 175 |
| 30 - 31 | . . . . . . . . . . . . . . . . | 176 |
| 9 - 14 | . . . . . . . . . . . . . . . . | 178 |
| 15 - 28 | . . . . . . . . . . . . . . . . | 181 |
| 47 | . . . . . . . . . . . . . . . . | 218 |
| 34 | . . . . . . . . . . . . . . . . | 220 |
| 37 | . . . . . . . . . . . . . . . . | 220 |
| 38 | . . . . . . . . . . . . . . . . | 220 |
| 39 | . . . . . . . . . . . . . . . . | 222 |
| 35 | . . . . . . . . . . . . . . . . | 223 |
| 36 | . . . . . . . . . . . . . . . . | 224 |

```
 1              THURSDAY, JUNE 7, 2007, RIVERSIDE, CALIFORNIA
 2                              ---OOO---
 3              THE CLERK:  ITEM NO. 1 ON CALENDAR,
 4    CASE NO. EDCR 04-42 VAP, UNITED STATES OF AMERICA VERSUS
 5    JAMES SANDERS.
 6              MR. MICHAEL:  GOOD MORNING.  BRIAN MICHAEL AND JOE
 7    AKROTIRIANAKIS FOR THE GOVERNMENT.
 8              MR. AKROTIRIANAKIS:  GOOD MORNING, YOUR HONOR.
 9              MR. MICHAEL:  SPECIAL AGENT MORENO WILL BE HERE IN
10    A MOMENT.
11              MR. AARON:  GOOD MORNING, YOUR HONOR.  JEFFREY
12    AARON FOR MR. SANDERS WHO IS PRESENT.
13              THE COURT:  GOOD MORNING.
14              WE ARE ON THE RECORD OUTSIDE THE PRESENCE OF THE
15    JURY.
16              MR. MICHAEL.
17              MR. MICHAEL:  SEVERAL MATTERS, YOUR HONOR.  FIRST,
18    LAST NIGHT THE GOVERNMENT ADVISED DEFENSE COUNSEL AND JUST
19    ADVISED THE COURT THAT WE WILL NOT BE CALLING MR. BEKENSTEIN
20    AS A WITNESS IN THIS CASE.
21              THE COURT:  ALL RIGHT.
22              MR. MICHAEL:  COUNSEL HAS BEEN ADVISED OF THAT AND
23    I JUST ASKED -- I'M NOT SURE OF THE PROCEDURES TO RELEASE A
24    WITNESS FROM A SUBPOENA, IF YOU NEED TO PUT SOMETHING ON THE
25    RECORD OR NOT, BUT WE'VE RELEASED HIM, SO I DON'T KNOW IF WE
```

```
 1   NEED A COURT ORDER.
 2            THE COURT:  I THINK THAT'S SUFFICIENT.
 3            MR. MICHAEL:  IN ADDITION, LAST NIGHT THE
 4   GOVERNMENT WAS GOING THROUGH SOME MATERIALS.  LET ME GIVE
 5   YOUR HONOR THE STORY.  THIS IS SOMETHING I DISCUSSED WITH
 6   DEFENSE COUNSEL.  PREVIOUSLY THE GOVERNMENT ADVISED DEFENSE
 7   COUNSEL, AND I BELIEVE WE MENTIONED IT IN ONE OF THE 404(B)
 8   MOTIONS, THAT THERE WERE SOME PICTURES OF CHILD EROTICA OR
 9   SCANTILY CLAD CHILDREN, NOT THE SUBJECT OF OUR MOTION, THAT
10   IS NOT SOMETHING THAT THE GOVERNMENT IS SEEKING TO INTRODUCE
11   NOW AT TRIAL, BUT WAS RECEIVED OR SENT TO THE SAN BERNARDINO
12   COUNTY JAIL WHERE DEFENDANT IS BEING HOUSED BY
13   MR. BEKENSTEIN.  THE GOVERNMENT DID COLLECT SOME OF THOSE
14   MATERIALS BUT, AGAIN, WAS NOT SEEKING TO USE THEM IN
15   CONNECTION WITH THE TRIAL.
16            THE GOVERNMENT HAS SUBSEQUENTLY LEARNED THAT ON ITS
17   OWN SAN BERNARDINO --
18            THE COURT:  MAY I INTERRUPT FOR A MOMENT?  IF I
19   RECALL CORRECTLY, WERE THESE MATERIALS THAT WERE SEIZED AT
20   THE TIME THAT THE MANUSCRIPTS WERE SEIZED?
21            MR. MICHAEL:  NO.  THE MANUSCRIPTS AND THE OTHER
22   EROTICA IMAGES THE GOVERNMENT --
23            THE COURT:  HE SENT THOSE -- THAT WAS THE GROUP
24   THAT WAS SENT BY THE DEFENDANT TO SOMEONE ELSE?
25            MR. MICHAEL:  WELL, THE MANUSCRIPTS WERE.  AND THEN
```

1    THERE WERE OTHER IMAGES THAT THE DEFENDANT HAD RECEIVED AND

2    HAD IN HIS JAIL CELL WHILE IN NEW MEXICO, AND THAT WAS THE

3    SUBJECT OF THE GOVERNMENT'S 404(B) MOTION.

4            THE COURT:  SO THIS IS A DIFFERENT --

5            MR. MICHAEL:  DIFFERENT SET OF MATERIALS.  I

6    BELIEVE WE PUT A FOOTNOTE IN ONE OF OUR BRIEFS.  WE NEVER

7    SOUGHT TO RELY ON IT FOR ANY PURPOSES AT TRIAL, AND WE

8    ADVISED DEFENSE COUNSEL OF THAT.

9            THE COURT:  AND THESE WERE KEPT WHERE?

10           MR. MICHAEL:  WELL, WHAT HAD HAPPENED WAS WE HAD

11   LEARNED THAT SAN BERNARDINO COUNTY SHERIFF'S HAD RECEIVED

12   THESE MATERIALS, THESE IMAGES.  AND SPECIAL AGENT MORENO TOOK

13   A LOOK AT THEM AND COPIED FOUR OR FIVE PAGES OF THE IMAGES

14   AND PRODUCED THOSE TO DEFENSE COUNSEL ALONG WITH THE

15   STATEMENT THAT WE'RE NOT GOING TO SEEK TO USE THESE AT TRIAL.

16           THE COURT:  LET ME ASK YOU A FEW MORE QUESTIONS.

17   WHEN YOU SAY "IMAGES," IN WHAT FORM WERE THEY?

18           MR. MICHAEL:  LIKE A PHOTOGRAPH OF A BOY IN A

19   BATHING SUIT.

20           THE COURT:  IT WAS A HARD COPY OF A PHOTOGRAPH?

21           MR. MICHAEL:  CORRECT.

22           THE COURT:  AND IT WAS BEING MAILED TO DEFENDANT?

23           MR. MICHAEL:  CORRECT.

24           MR. AARON:  YOUR HONOR, I'M SORRY TO INTERRUPT.  IT

25   APPEARS I'VE COPIED STUFF.  I CAME TO THE OFFICE EARLY AND I

1    COPIED SOME MATERIALS TO BRING INTO COURT AND I DON'T HAVE

2    THEM, AND THAT INCLUDES MY EXAMINATION OF A WITNESS.  CAN WE

3    TAKE A BRIEF RECESS SO I CAN CALL MY OFFICE?

4              THE COURT:  SO THEY CAN BRING THEM OVER SO YOU CAN

5    DO YOUR EXAMINATION?

6              MR. AARON:  YES.

7              THE COURT:  YES.

8              MR. AARON:  THANK YOU.

9                        (RECESS)

10             THE COURT:  ALL RIGHT.  GO AHEAD.

11             MR. MICHAEL:  THE GOVERNMENT THEN SOUGHT, AFTER

12   LEARNING THIS INFORMATION FROM SAN BERNARDINO COUNTY, TO SEE

13   THE FULL EXTENT OF THE MATERIALS THAT HAD BEEN SENT TO

14   MR. SANDERS.  AGAIN, NO EVIDENCE THAT MR. SANDERS POSSESSED

15   IT, JUST THAT IT HAD BEEN SENT TO HIM.  SAN BERNARDINO COUNTY

16   SHERIFF'S SAID WE PUT THOSE MATERIALS IN MR. SANDERS'

17   PERSONAL PROPERTY.  THEY HAVEN'T GONE TO HIM IN JAIL BECAUSE

18   WE THINK IT'S SOMEWHAT CONTRABAND, BUT WE CAN'T GIVE IT TO

19   YOU.  THE GOVERNMENT HAS TO DO A SEARCH WARRANT BECAUSE IT'S

20   IN HIS PERSONAL PROPERTY.  THE GOVERNMENT DID NOT SEEK A

21   SEARCH WARRANT FOR IT BECAUSE THERE'S NO EVIDENCE OF A CRIME,

22   AND WE ADVISED DEFENSE COUNSEL THOSE MATERIALS WERE IN HIS

23   PERSONAL PROPERTY, AND SHOULD DEFENSE COUNSEL RETRIEVE THEM,

24   JUST DON'T DESTROY THEM.  DEFENSE COUNSEL JUST ADVISED ME

25   THAT HE THOUGHT SAN BERNARDINO DENIED HIM A RIGHT OF ACCESS

1    TO THOSE.

2           APPARENTLY, ON ITS OWN, WITHOUT NOTIFYING US, SAN

3    BERNARDINO -- WE SUBSEQUENTLY LEARNED OF THIS.  SAN

4    BERNARDINO HAD SENT SOME OF THESE MATERIALS TO THE WALNUT

5    CREEK POLICE DEPARTMENT.  WALNUT CREEK IS THE RETURN ADDRESS

6    OF MR. BEKENSTEIN WHO IS THIS INDIVIDUAL SENDING THESE

7    MATERIALS TO MR. SANDERS.  I THINK THIS WAS IN THE NORMAL

8    COURSE OF THEIR DUTIES TO MANAGE THE JAIL.  THE GOVERNMENT

9    SUBSEQUENTLY LEARNED OF THAT FACT BUT PERCEIVED THAT AS A

10   SEPARATE INVESTIGATION INTO WHAT MR. BEKENSTEIN WAS SENDING

11   TO MR. SANDERS.

12          APPARENTLY, WALNUT CREEK HAD ACTUALLY SENT A PACKET

13   OF MATERIALS TO SPECIAL AGENT MORENO THAT HAD SOME OF THESE

14   IMAGES IN THEM, SOME OF THESE PHOTOGRAPHS.

15          THE COURT:  WALNUT CREEK POLICE?

16          MR. MICHAEL:  WALNUT CREEK POLICE HAD SENT THEM AND

17   HAD TOLD MR. MORENO, WE WILL BE SENDING YOU THE MATERIALS WE

18   RECEIVE FROM SAN BERNARDINO COUNTY SHERIFF.  AND THE

19   UNDERSTANDING WAS THAT THESE WERE JUST THESE IMAGES AND THESE

20   PICTURES.  AGAIN, THE GOVERNMENT HAD ALREADY DECIDED WE

21   WEREN'T GOING TO USE THIS AT TRIAL, SO WE REALLY DIDN'T PAY

22   MUCH ATTENTION TO IT.  WE WENT THROUGH IT LAST NIGHT,

23   LITERALLY, IN ORGANIZING FOR TRIAL AND DISCOVERED IN THERE,

24   BURIED WITHIN IT, TWO LETTERS FROM THE DEFENDANT THAT WERE

25   ADDRESSED -- APPEARED TO BE SENT TO MR. BEKENSTEIN.  WE

1   DIDN'T KNOW THOSE LETTERS WERE THERE.  WE HAD NEVER BEEN

2   ADVISED THAT THE PACKET INCLUDED THE DEFENDANT'S OWN

3   MATERIALS.  WE PRODUCED THOSE TO DEFENSE COUNSEL THIS MORNING

4   AND ADVISED HIM THAT ALTHOUGH THERE ARE SOME INCRIMINATING

5   STATEMENTS IN THERE, THE GOVERNMENT IS NOT GOING TO SEEK TO

6   USE THEM AT TRIAL SINCE WE JUST TURNED THEM OVER TO DEFENSE

7   COUNSEL RIGHT NOW.  ALTHOUGH, SHOULD DEFENDANT TESTIFY OR

8   DEPENDING ON A REBUTTAL CASE, WE WOULD RESERVE THE RIGHT TO

9   SEEK TO USE THEM AT THAT POINT IN TIME.

10          MORE TROUBLING TO THE GOVERNMENT WAS THAT WITHIN

11  THE STACK OF MATERIALS WAS A MANILA ENVELOPE, A SMALL MANILA

12  ENVELOPE, THAT HAD A CD IN IT.  AND, AGAIN, THE GOVERNMENT --

13  AGENT MORENO HAD NOT BEEN ADVISED BY WALNUT CREEK THAT THERE

14  WAS ANY CD IN THESE MATERIALS.  IT SAYS "JAMES SANDERS."  IT

15  HAS A DATE, LOOKS LIKE A NUMBER AND SOMEONE'S INITIALS.

16          WE DISCOVERED THIS LAST NIGHT FOR THE FIRST TIME

17  WITHIN THESE PAPERS AND PUT THE CD INTO A COMPUTER TO PLAY IT

18  AND DETERMINED THERE WERE THREE PHONE CALLS ON IT OF

19  RELATIVELY SHORT DURATION.  WE HIT PLAY AND IN THE FIRST

20  PHONE CALL WE HEAR A COLLECT PHONE CALL TO MR. AARON'S

21  OFFICE.  WE IMMEDIATELY STOPPED IT, DID NOT HEAR ANY

22  SUBSTANCE OF THE CONVERSATION.  DON'T EVEN KNOW IF ANYBODY

23  RECEIVED THE CALL OR IF IT WAS EVER LISTENED TO.  WE WERE

24  ABLE TO DETERMINE THAT ALL THREE PHONE CALLS, WITHOUT

25  LISTENING TO THEM, WERE ALL MADE TO MR. AARON'S OFFICE

1    NUMBER.  THE GOVERNMENT HAS NEVER LISTENED TO THESE.  THIS

2    IS -- NONE OF THE WITNESSES HAVE LISTENED TO THESE INVOLVED

3    IN THIS CASE AND THIS IS THE ONLY COPY THAT --

4            THE COURT:  HOW WERE YOU ABLE TO DETERMINE THAT ALL

5    THREE OF THE CALLS WENT TO MR. AARON'S OFFICE IF NOBODY

6    LISTENED?

7            MR. MICHAEL:  BECAUSE THE PLAYER THAT IS THERE HAS

8    A LINE OF INFORMATION ON THE TOP ABOUT THAT, I BELIEVE IS

9    RECORDED BY THE RECORDING SYSTEM AT THE JAIL THAT INDICATES

10   THE NUMBER THAT THE CALL IS GOING TO.  AND SO WE WERE ABLE TO

11   TURN THE VOLUME OFF AND LET THAT INFORMATION SCROLL UP.  AND

12   IT APPEARED THAT THERE MAY HAVE BEEN CONVERSATION BECAUSE

13   THERE'S SORT OF A DIGITAL IMAGE THAT APPEARS, BUT YOU

14   COULDN'T HEAR ANYTHING AND YOU DON'T KNOW WHO WAS TALKING,

15   BUT YOU CAN MAKE OUT THE PHONE NUMBER.

16           SO WE HAVE GIVEN THIS TO DEFENSE COUNSEL.  WE DON'T

17   KNOW IF SAN BERNARDINO JAIL LISTENED TO IT.  WE DON'T KNOW IF

18   WALNUT CREEK POLICE LISTENED TO IT.  AND ALL WE CAN ADVISE

19   THE COURT IS, WE HAVEN'T LISTENED TO IT AND WE ARE GIVING OUR

20   ONLY COPY TO DEFENSE COUNSEL BECAUSE IT APPEARS TO BE

21   PRIVILEGED MATERIAL.

22           THE COURT:  ALL RIGHT.

23           MR. MICHAEL:  MAY BE PRIVILEGED MATERIAL.  WE DON'T

24   KNOW WHAT'S ON IT.  THAT'S IT FOR THAT MATTER.

25           THE COURT:  ALL RIGHT.  THE GOVERNMENT STILL DOES

1   NOT INTEND TO USE ANY OF THE MATERIAL YOU'VE BEEN TALKING

2   ABOUT DURING TRIAL?

3            MR. MICHAEL:  CORRECT, YOUR HONOR.

4            THE COURT:  ALL RIGHT.

5            MR. MICHAEL:  NOW, THE NEXT MATTER IS WITH REGARD

6   TO THE MANUSCRIPT PORTIONS, YOUR HONOR.  THE GOVERNMENT

7   PROVIDED A COPY TO DEFENSE COUNSEL FOR HIS EASE OF THE

8   EXCERPT.  HE INDICATED HE WAS HAVING TROUBLE LOCATING IT.  I

9   KNOW THE GOVERNMENT TOLD YOUR HONOR THAT WE WERE

10  CONTEMPLATING NOT USING IT.  LET ME JUST CLARIFY THAT

11  POSITION FOR YOUR HONOR.

12           THE COURT:  ALL RIGHT.

13           MR. MICHAEL:  IT WAS BASED IN PART ON DEFENSE

14  COUNSEL'S OPENING AND HOW HE INDICATED HE WAS GOING TO SEEK

15  TO USE THEM, BUT ALSO BASED IN LARGE PART ON YOUR HONOR'S

16  RULING.  THE GOVERNMENT SUBMITS THAT THE PORTION YOUR HONOR

17  ORDERED WAS OVERLY PREJUDICIAL TO THE GOVERNMENT IS REALLY

18  ONE OF THE MAIN REASONS THAT WE WANTED TO USE THIS EXCERPT

19  THAT WE BELIEVE APPROPRIATELY BEARS ON ITS RELEVANCE.

20           THE COURT:  AND WHY IS THAT?

21           MR. MICHAEL:  YOUR HONOR, THE FIRST FEW PAGES THAT

22  YOUR HONOR INDICATED WERE ACCEPTABLE INDICATE --

23           THE COURT:  WHEN I SAY "ACCEPTABLE" -- PARDON ME

24  FOR INTERRUPTING YOU, BUT UNDER THE CASE LAW -- IT'S NOT THAT

25  I THINK YOU'RE TRYING TO MISSTATE MY RULING, BUT I THINK IT'S

1    ADMISSIBLE BECAUSE, FIRST OF ALL, YOU'RE OFFERING THIS FOR A

2    PROPER PURPOSE AND YOU WERE OFFERING IT, I THINK YOU STATED

3    FOR MORE THAN THESE TWO REASONS, BUT IT DOES GO TO INTENT AND

4    TO MOTIVE WHICH ARE PROPER UNDER 404(B).  IT IS RELEVANT TO A

5    DISPUTED ISSUE; AND THAT IS, THE DEFENDANT'S INTENT WHEN HE

6    TRAVELED TO NEW MEXICO, AT LEAST THAT ONE DISPUTED ISSUE, AND

7    YOU WOULD PROBABLY MAKE ARGUMENT THAT IT IS RELEVANT TO

8    OTHERS.  THE PROBATIVE VALUE OF IT, INCLUDING THE PORTIONS I

9    SPECIFIED IN PARTICULAR YESTERDAY REGARDING, FOR EXAMPLE, THE

10   SIMILARITIES BETWEEN STATEMENTS IN THAT WRITING REGARDING THE

11   AGE AND PHYSICAL LIKENESS OF THE CHILDREN TO WHOM THE

12   NARRATOR IN THAT STORY, THE MALE ADULT PROTAGONIST WAS

13   ATTRACTED TO AND THE ALLEGED VICTIM IN THIS CASE, THE

14   DEPICTION OF ALL OF THE CHILDREN IN THAT STORY, ALL OF THE

15   MALE CHILDREN IN THAT STORY, AS SEXUAL AGGRESSORS TOWARDS

16   ADULTS OR WILLING PARTICIPANTS IN SEXUAL BEHAVIOR WITH

17   ADULTS, ALL OF THOSE HAVE A GREAT DEAL OF PROBATIVE VALUE AND

18   THEY OUTWEIGH ANY PREJUDICE AND, OF COURSE, IT WOULD BE GIVEN

19   WITH A LIMITING INSTRUCTION.

20        MR. MICHAEL:  YOUR HONOR, I APPRECIATE THAT

21   CLARIFICATION OF YOUR RULING.  THE GOVERNMENT SUBMITS THAT IT

22   AGREES WITH THE POINTS THAT YOUR HONOR HAS MADE BUT ALSO

23   WOULD SUBMIT THAT THE PORTION BEGINNING ON THE BOTTOM OF 818

24   AND CONTINUING UNTIL, I BELIEVE NEAR THE MIDDLE SECTION OF

25   823 WHICH YOUR HONOR DESCRIBED AS SORT OF THE CATALOG OF

1    EXPLICIT SEX ACTS, AN ONGOING DESCRIPTION, IS RELEVANT FOR

2    THE FOLLOWING REASONS:  IT IS EXPLICIT AND ITS CONTENT IS

3    SHOCKING.  THE GOVERNMENT FULLY ACCEPTS THAT, YOUR HONOR.  IN

4    THIS CASE, THOUGH, THE GOVERNMENT WOULD SUBMIT THAT THE

5    CHARGES ARE ALSO SHOCKING AND EXPLICIT.

6            THE COURT:  HOWEVER, WHAT THE GOVERNMENT CONTENDS

7    IN THIS CASE THAT THE CONDUCT THAT TOOK PLACE BETWEEN THE

8    DEFENDANT AND THE ALLEGED VICTIM IN THIS CASE IS NOTHING LIKE

9    THE CONDUCT THAT'S BEING DESCRIBED THERE.

10           MR. MICHAEL:  WELL, THE GOVERNMENT SAYS THAT'S NOT

11   ENTIRELY THE CASE, YOUR HONOR.  THE GOVERNMENT HAS TO PROVE

12   DEFENDANT TRAVELED WITH THE INTENT TO COMMIT A SEX ACT AND

13   THAT HE ACTUALLY, FOR COUNT 4, COMMITTED OR ATTEMPTED TO

14   COMMIT SUCH A SEX ACT.  TO BE ABLE TO ESTABLISH THAT THERE IS

15   EXPLICIT STATUTORY GUIDANCE, ONE OF THE STATEMENTS THAT THE

16   GOVERNMENT IS RELYING ON AND ALMOST PRIMARILY RELYING ON TO

17   SHOW THAT AN ACTUAL SEX ACT HAPPENED, DIRECT STATEMENT AS

18   OPPOSED TO CIRCUMSTANTIAL EVIDENCE.  THERE'S A STATEMENT IN

19   THE CHATS WHERE THE DEFENDANT SAID HE MASSAGED THE VICTIM'S

20   ANUS, IN MORE EXPLICIT TERMS.  IT IS NOT ENTIRELY CLEAR -- I

21   THINK IT CAN BE ARGUED IT'S NOT ENTIRELY CLEAR WHAT THE WORDS

22   "MASSAGING AN ANUS," WHAT THAT MEANS, YOUR HONOR.  AND I

23   APOLOGIZE FOR BEING THIS GRAPHIC BUT IT IS REQUIRED BY THE

24   STATUTE.

25           THE GOVERNMENT HAS TO SHOW WITH REGARD TO THAT SORT

1    OF CONTACT PENETRATION, HOWEVER SLIGHT.  THAT'S THE LANGUAGE

2    IN THE STATUTE.  IN THIS PORTION THERE IS DISCUSSION OF

3    DIGITAL PENETRATION OF A BOY'S ANUS.  AND THE GOVERNMENT

4    WOULD SUBMIT THAT THE DEFENDANT ALSO IN OTHER CHATS TALKED TO

5    OTHER INDIVIDUALS ABOUT HOW THEY SHOULD DO THAT TO BOYS THAT

6    THEY WERE EITHER ACTIVELY OR SEEKING TO ENGAGE IN SEX ACTS

7    WITH.

8              AND IF THE GOVERNMENT IS GOING TO HAVE TO ARGUE TO

9    THE JURY AND MEET ITS VERY HIGH BURDEN OF BEYOND A REASONABLE

10   DOUBT THAT THE DEFENDANT ENGAGED IN A SEX ACT, AND THAT WHEN

11   HE SAID HE MASSAGED THE ANUS OF THE BOY, THEY CAN INFER FROM

12   THAT, REASONABLY INFER FROM THAT, THAT THAT ENTAILED

13   PENETRATION, HOWEVER SLIGHT, JUST BY THE PHYSICAL DYNAMICS OF

14   IT.  IT IS PROBATIVE TO SEE THAT THE DEFENDANT PREVIOUSLY

15   WROTE ABOUT -- AND AGAIN, THIS ISN'T -- THE GOVERNMENT

16   SUBMITS, AND I KNOW YOUR HONOR FOUND THERE WASN'T MUCH

17   DISTINCTION, BUT SUBMITS THAT THE FACT THAT THE DEFENDANT

18   WROTE THIS, VERSUS A SCENARIO IN CURTIN WHERE IT WAS JUST

19   POSSESSED, IS A SIGNIFICANT DIFFERENCE IN THIS CONTEXT,

20   BECAUSE IT'S NOT JUST THAT THE DEFENDANT WAS GRATIFIED BY

21   THESE STORIES, HE ACTUALLY WROTE THIS AND THIS CAME FROM HIS

22   OWN ACCOUNT.

23              THE COURT:  I THINK WHAT I SAID IN THIS PRIOR

24   RULING WAS, I DIDN'T HAVE TO REACH THAT.

25              MR. MICHAEL:  THAT THERE WAS ACTUAL --

1          THE COURT:  NO, NO, NO, THAT THAT DISTINCTION THAT

2    THE GOVERNMENT WAS ADVANCING BETWEEN WRITING IT AND

3    POSSESSING IT, I DIDN'T REACH IT.

4          MR. MICHAEL:  BUT IT WAS A DISTINCTION THAT YOU

5    DIDN'T NEED TO ADDRESS FOR PURPOSES OF YOUR RULING.

6          THE COURT:  MY PRIOR RULING.

7          MR. MICHAEL:  YOUR PRIOR RULING.

8          THE COURT:  BUT NOW I DO BECAUSE AFTER THE EN BANC

9    DECISION HAVING -- THE LAW SHIFTED -- BECAUSE I RELIED ON THE

10   EARLIER DECISION.

11         MR. MICHAEL:  CORRECT.  I DON'T MEAN TO MISSTATE

12   YOUR PRIOR RULING.

13         THE COURT:  NO, THAT'S ALL RIGHT.  I DID WANT TO

14   MAKE THE RECORD CLEAR I HADN'T REACHED IT BEFORE NOW.  I NEED

15   TO REACH THAT DISTINCTION THAT YOU'RE ADVANCING BETWEEN

16   AUTHORSHIP AND POSSESSION.

17         MR. MICHAEL:  AND THE GOVERNMENT SUBMITS THAT THAT

18   IS RELEVANT HERE BECAUSE WE NOW KNOW THAT THE MANUSCRIPTS ARE

19   RELEVANT TO INTENT.  AND IN THE ARENA OF INTENT, MERELY

20   POSSESSING SOMETHING AND HAVING WRITTEN IT, THE GOVERNMENT

21   WILL SUBMIT THERE IS AN IMPORTANT DISTINCTION THERE IN

22   CONSIDERING INTENT AND MOTIVE AND PLANNING AND OPPORTUNITY.

23   AND THE TYPES OF THINGS THAT ARE WRITTEN BY THE DEFENDANT'S

24   OWN HAND HERE, EVERY SINGLE WORD, EMANATED FROM HIS MIND,

25   EMANATED FROM HIS HAND.

1          SO IT'S NOT JUST THAT HE ENJOYED OR WAS GRATIFIED

2     BY SOMEONE ELSE'S DESCRIPTION OF SEX ACTS THAT MAYBE HE WAS

3     INTERESTED IN, SOME AND SOME HE WASN'T.  THE DEFENDANT WROTE

4     THIS.  AND SO THERE'S A REASONABLE INFERENCE THAT THESE ARE

5     ALL SEX ACTS THAT HE'S INTERESTED IN AND ENGAGING IN AND

6     SEXUALLY GRATIFIED BY AND AROUSED BY.  THAT ALSO GOES TO THE

7     INTENT BECAUSE THERE'S OTHER SEX ACTS IN THIS PORTION, YOUR

8     HONOR -- AND, AGAIN, WE SUBMIT, THEY'RE VERY GRAPHIC, BUT

9     THEY DO RELATE TO SOME OF THE DEFENDANT'S -- DIRECTLY RELATE

10    TO SOME OF THE DEFENDANT'S OTHER WRITINGS IN THE CHATS.

11          IN HIS CHATS HE TALKS ABOUT GETTING NEAR THE POINT

12    OF BRINGING THE SEVEN-YEAR-OLD VICTIM TO THE POINT OF AN

13    ORGASM, YOUR HONOR, AND IN HERE THERE IS DISCUSSIONS AND

14    THERE IS WRITING OF BRINGING THIS YOUNG BOY TO ORGASM.  THE

15    DEFENDANT ALSO WRITES ABOUT ORAL ANAL PENETRATION IN HIS

16    CHATS.  AND THERE'S ORAL ANAL PENETRATION IN THIS PORTION.

17    THE DEFENDANT ALSO WRITES ABOUT ORAL FELLATIO AND THERE IS

18    FELLATIO IN THIS PORTION.

19          AND, YOUR HONOR, THE REASON THE GOVERNMENT --

20          THE COURT:  I'M GOING TO INTERRUPT AGAIN, ACTUALLY,

21    BECAUSE AS YOU'RE ARGUING, THAT REMINDS ME THAT THERE IS

22    ANOTHER PORTION IN THERE THAT -- IN THE MANUSCRIPT THAT -- OR

23    ANOTHER PASSAGE THAT MAY BE MORE DIRECTLY, OR MAYBE YOU WERE

24    ABOUT TO GET TO IT, BUT MORE DIRECTLY RELEVANT FROM YOUR

25    PERSPECTIVE, AND THAT IS THE PASSAGE WHERE THERE'S A

1    CONVERSATION BETWEEN THE ADULT MALE AND THE BOY IN THE

2    MANUSCRIPT ABOUT THE AGE AT WHICH THE BOY WAS FIRST ABLE TO

3    REACH ORGASM.

4         MR. MICHAEL:  AND THAT IS ANOTHER ONE.

5         THE COURT:  ALL RIGHT.

6         MR. MICHAEL:  IF I MIGHT?

7         THE COURT:  GO AHEAD.  AND THAT I THINK IS RELEVANT

8    TO SOMETHING THAT WAS IN ONE OF THE CHAT DISCUSSIONS.

9         MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT ALSO

10   SUBMITS THAT IT NEEDS TO ESTABLISH THE DEFENDANT'S IDENTITY

11   WITH REGARD TO BEING THE PARTICIPANT IN THE CHATS, AND THIS

12   IS ANOTHER WAY TO DO THAT AS WELL.  IT WAS -- THE SAME PERSON

13   WHO WAS WRITING THOSE CHATS IS THE SAME PERSON WHO WROTE THIS

14   MANUSCRIPT BECAUSE THERE ARE ALL OF THESE CONSISTENCIES IN

15   TERMS OF SEXUAL INTERESTS AND THE TYPES OF ACTS.

16        WITH REGARD TO THE BALANCING BETWEEN THE PROBATIVE

17   AND PREJUDICIAL, THE GOVERNMENT WOULD NOTE, AS I'M SURE YOUR

18   HONOR IS AWARE, WE'RE TALKING ABOUT AN 18-PAGE EXCERPT OUT OF

19   HUNDREDS AND HUNDREDS OF PAGES, APPROACHING A THOUSAND PAGES,

20   WHICH IF YOU WERE TO PULL OUT ANY 5-PAGE EXCERPT OR PERHAPS

21   EVEN ANY SINGLE PAGE, THERE WILL BE DESCRIPTIONS OF EXPLICIT

22   SEX ACTS.  I IMAGINE YOUR HONOR HASN'T READ EVERY WORD OF THE

23   MANUSCRIPT, BUT IT IS REPLETE WITH THIS TYPE --

24        THE COURT:  AGAIN, JUST TO MAKE SURE THE RECORD IS

25   VERY CLEAR, UNDER THE <u>CURTAIN</u> CASE THE COURT IS REQUIRED TO

1    READ EVERY WORD OF WHATEVER THE GOVERNMENT OR EITHER SIDE IS

2    SEEKING TO HAVE ADMITTED.

3            MR. MICHAEL:  CORRECT, YOUR HONOR.

4            THE COURT:  AND NOW YOU'RE ONLY SEEKING TO HAVE

5    THESE PAGES ADMITTED AND I HAVE READ EVERY WORD OF IT.

6            MR. MICHAEL:  WE APPRECIATE THAT, YOUR HONOR.  WE

7    WERE TRYING TO PUT THE PORTION WE WERE SEEKING TO ADMIT IN

8    CONTEXT.  WE WEREN'T SEEKING TO ADMIT THE LARGER PORTION OF

9    IT.  SO IT SHOWS THAT IN OFFERING THIS EXHIBIT, THE

10   GOVERNMENT TOOK INTO ACCOUNT THE PROBATIVE VERSUS

11   PREJUDICIAL, THAT WE TRIED TO LIMIT ANY PREJUDICE BY LIMITING

12   HOW MUCH OF THE MANUSCRIPT WE EVEN SOUGHT TO OFFER.  AND SO

13   TO FURTHER LIMIT THIS PORTION THE GOVERNMENT SUBMITS WOULD

14   REDUCE ITS BURDEN.

15           THE COURT:  SORRY TO INTERRUPT YOU, BUT WE'RE

16   GETTING CLOSE TO 9:00.  IF I UNDERSTAND YOUR LAST BIT OF

17   ARGUMENT, YOU'RE SAYING THAT IT IS NOT UNDULY PREJUDICIAL

18   BECAUSE THIS IS A REPRESENTATIVE SAMPLE OF THE MANUSCRIPT.

19           MR. MICHAEL:  CORRECT, YOUR HONOR, AND THAT THE

20   GOVERNMENT SOUGHT OUT A PORTION THAT HAD REFERENCES, AS MUCH

21   AS WE COULD FIND, TO SEX ACTS AND OTHER SEXUAL INTERESTS

22   CONSISTENT WITH THIS CASE.  AS DEFENSE COUNSEL POINTED OUT IN

23   HIS BRIEFING, AND THE GOVERNMENT ADMITS, THERE WERE LOTS OF

24   OTHER SEXUAL SCENARIOS IN THE MANUSCRIPTS.

25           THE COURT:  WELL, THAT'S THE FLAW, IN PART, AS TO

1    THIS ARGUMENT ABOUT IT BEING REPRESENTATIVE.  IT IS

2    REPRESENTATIVE IN THE SENSE THAT YOU ARGUE THAT -- WELL, IT

3    MAY BE REPRESENTATIVE IN THE SENSE THAT THE MANUSCRIPT MAY BE

4    FULL OF DESCRIPTIONS OF SEXUAL ACTS, BUT IT'S NOT

5    REPRESENTATIVE IN THE SENSE THAT THERE'S THESE KINDS OF ACTS

6    BETWEEN A MAN AND A YOUNG BOY OF HIS AGE AND SO FORTH,

7    BECAUSE AS I SAID IN MY PRIOR RULING, THERE'S ALL KINDS OF

8    SEXUAL CONDUCT BETWEEN ALL KINDS OF AGES, SPECIES, ET CETERA.

9               MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT SUBMITS

10   THAT THERE ARE DEFINITELY PORTIONS OF THIS MANUSCRIPT THAT

11   THIS IS NOT REPRESENTATIVE.  WHAT THE GOVERNMENT MEANT TO

12   SAY, AND PERHAPS I WASN'T ARTICULATIVE ENOUGH, IT'S

13   REPRESENTATIVE OF MANY OF THE PORTIONS OF THESE MANUSCRIPTS.

14   AND THE GOVERNMENT WOULD SUBMIT THAT THERE ARE HUNDREDS OF

15   PAGES SIMILAR IN TERMS OF THE AGE AND TYPE OF BOY AND THE

16   TYPES OF SEX ACTS THAT WOULD BEAR OR HAVE SOME PROBATIVE

17   VALUE.  SO THE GOVERNMENT TOOK THAT INTO ACCOUNT AND SUBMITS

18   THAT THERE WERE OTHER 10- TO 20-PAGE SAMPLES THE GOVERNMENT

19   COULD HAVE SUBMITTED AND MADE MANY OF THE SAME ARGUMENTS THE

20   GOVERNMENT IS MAKING WITH REGARD TO THIS PORTION.  SO THAT'S

21   THE POINT THE GOVERNMENT IS MAKING, YOUR HONOR.

22               AND WE'VE ALREADY TAKEN INTO ACCOUNT THE BALANCING

23   TEST IN ONLY SUBMITTING THIS LIMITED PORTION TO YOUR HONOR.

24   AND IF THE SEX ACTS WERE EXCISED FROM THIS PORTION, THE

25   GOVERNMENT WOULD NOT SEEK TO OFFER IT, BECAUSE WHAT THE

```
 1   GOVERNMENT SUBMITS IS LEFT IS A DESCRIPTION OF MORE INNOCUOUS
 2   ACTS THAT, WHILE SEXUAL IN NATURE, DON'T RISE TO THE LEVEL OF
 3   SEX ACTS AND DON'T SHOW THE DEPTH OF THE DEFENDANT'S SEXUAL
 4   INTEREST BECAUSE IT APPEARS IT STOPS AT CUDDLING, FONDLING
 5   AND THINGS OF THAT NATURE.  SO THE GOVERNMENT WOULD SUBMIT
 6   THAT IT NEEDS TO PUT ALL THAT IN THERE TO GIVE THE JURORS
 7   PROPER CONTEXT.
 8            THE COURT:  I UNDERSTAND YOUR POSITION BETTER.
 9   THANK YOU.
10            I DON'T WANT TO KEEP THE JURORS WAITING.  DO YOU
11   WISH TO RESPOND?  I'LL GIVE YOU A CHANCE TO RESPOND FULLY,
12   MR. AARON, BUT DO YOU WISH TO RESPOND ON THE FIRST ISSUE
13   RIGHT NOW ABOUT THE MATERIALS RECOVERED FROM THE JAIL AND SO
14   FORTH?
15            MR. AARON:  I WAS ASTOUNDED TO LEARN -- I'M HOLDING
16   UP THE ENVELOPE WITH THE CD THAT THE GOVERNMENT TURNED OVER.
17   I WAS ASTOUNDED TO LEARN THAT AND I IMMEDIATELY CALLED MY
18   OFFICE.  WE HAVE APPARENTLY SOME PROBLEMS HAVING SECURE
19   COMMUNICATIONS WITH OUR CLIENTS IN SAN BERNARDINO.  IT IS ONE
20   THING FOR THEM TO LISTEN TO A CONVERSATION TO DETERMINE THAT
21   IT GOES TO AN ATTORNEY'S OFFICE AND THEN TO TURN OFF THE
22   MACHINE, IT'S YET ANOTHER THING TO LISTEN TO IT AND RECORD
23   IT, AND YET A THIRD THING FOR THEM TO LISTEN, RECORD IT, AND
24   THEN SEND IT OFF TO OTHER AGENCIES.
25            THE COURT:  WHEN YOU SAY "THEY," YOU'RE TALKING
```

```
 1    ABOUT SAN BERNARDINO COUNTY?
 2              MR. AARON:  I AM.
 3              THE COURT:  CINDY, WOULD YOU JUST HAVE THE JURORS
 4    IN THE HALLWAY.
 5              ANYTHING ELSE YOU WISH TO SAY ON THAT ISSUE?
 6              MR. AARON:  I THINK I NEED TO DO SOME MORE
 7    INVESTIGATION ON THAT ISSUE, YOUR HONOR.  I AM AND MY CLIENT
 8    IS VERY CONCERNED BECAUSE WE DID TALK ABOUT A NUMBER OF
 9    MATTERS IN RECENT TELEPHONE CONVERSATIONS.  AND THESE ARE
10    MATTERS -- IT'S NOT SO MUCH PERSONALITIES OR ANYTHING THAT
11    MIGHT BE, YOU KNOW, UNPLEASANT OR EMBARRASSING, IT'S MORE IN
12    TERMS OF STRATEGY OUR CONVERSATIONS.  AND WE HAD TALKED ABOUT
13    A NUMBER OF THE POSSIBLE WITNESSES IN THIS CASE, PARTICULARLY
14    THOSE RELATED TO KALEN S. AND TO MR. BEKENSTEIN AND
15    MR. MARTIN.
16              GIVEN WHAT HAS HAPPENED WITH MR. MARTIN AND THE
17    PROBLEMS WE'VE HAD THERE, I'M VERY CONCERNED ABOUT THAT.  AND
18    THAT LEADS ME TO BELIEVE, GIVEN THE NATURE OF THE
19    CONVERSATIONS I'VE HAD WITH MR. SANDERS, THAT IT WAS NOT AN
20    ACCIDENT THAT THEY HAD TIME TOGETHER.
21              THE COURT:  THOSE ARE ISSUES -- WELL, LET ME JUST
22    SAY THIS ON THE RECORD THAT'S BEFORE THE COURT.  I DON'T
23    THINK THE ATTORNEYS FOR THE GOVERNMENT ARE IMPLICATED IN
24    THIS.  THERE MAY BE ISSUES YOU MAY HAVE THAT YOU WISH TO
25    BRING BEFORE THE COURT, SOME ISSUES BEFORE ANOTHER -- SOME
```

```
 1   ISSUES WITH SAN BERNARDINO COUNTY.

 2           MR. AARON:  I DON'T HAVE ANY EVIDENCE THAT THE

 3   FACTS ARE OTHER THAN WHAT THE GOVERNMENT HAS SAID.  AND I'M

 4   NOT ACCUSING THE GOVERNMENT OF ANY WRONGDOING HERE.  I'M

 5   CONCERNED ABOUT WHAT IS HAPPENING IN SAN BERNARDINO COUNTY

 6   JAIL, BUT OTHER THAN THAT, AND I DON'T NEED TO ADDRESS THIS

 7   MATTER FURTHER AND I CAN ADDRESS THE OTHER MATTERS LATER, AND

 8   I AM PREPARED TO PROCEED.

 9           THE COURT:  BUT I WILL GIVE YOU AN OPPORTUNITY TO

10   ARGUE THIS ISSUE.

11           MR. AARON:  THANK YOU.

12           THE COURT:  THANK YOU.

13           THE COURT:  IS THE WITNESS MR. OWEN?

14           MR. MICHAEL:  YES.

15           THE COURT:  YOU CAN GET HIM AND PUT HIM ON THE

16   STAND.

17               (IN THE PRESENCE OF THE JURY:)

18           THE COURT:  GOOD MORNING.  LET THE RECORD REFLECT

19   THE PRESENCE OF ALL MEMBERS OF THE JURY, COUNSEL FOR ALL

20   PARTIES, AND THE DEFENDANT ALSO PRESENT.

21       PLAINTIFF'S WITNESS, JOHN OWEN, PREVIOUSLY SWORN

22           THE COURT:  YOU MAY RESUME THE WITNESS STAND, AGENT

23   OWEN.  AND YOU REMEMBER THAT YOUR TESTIMONY IS STILL GIVEN

24   UNDER OATH AS YOU WERE PREVIOUSLY SWORN AS A WITNESS AND YOU

25   DO NOT NEED TO BE RESWORN.
```

1              THE WITNESS:  THANK YOU.

2              THE COURT:  YOU MAY BE SEATED.

3              MR. MICHAEL:  MAY I PROCEED?

4              THE COURT:  YES, YOU MAY PROCEED.

5                   DIRECT EXAMINATION (RESUMED)

6    BY MR. MICHAEL:

7    Q.   GOOD MORNING, AGENT OWEN.

8    A.   GOOD MORNING.

9    Q.   DO YOU RECALL YESTERDAY BEFORE WE BROKE FOR THE DAY YOU

10   WERE -- I WAS ASKING YOU SOME QUESTIONS AND YOU WERE

11   TESTIFYING ABOUT THE FORENSIC REVIEW YOU CONDUCTED OF SETH

12   BEKENSTEIN'S COMPUTER?

13   A.   YES, THAT'S CORRECT.

14   Q.   DID YOU TESTIFY THAT YOU CREATED A REPORT USING THE

15   FORENSIC SOFTWARE PROGRAM ENCASE?

16   A.   YES, I DID.

17   Q.   AND DID YOU INDICATE WHETHER OR NOT THAT REPORT INCLUDED

18   A FILE TREE THAT SHOWED A LISTING OF THE FILES AND FOLDERS

19   THAT EXISTED ON MR. BEKENSTEIN'S COMPUTER?

20   A.   YES, IT SHOWED A LIST OF FOLDERS.

21   Q.   AND WAS THIS LISTING A LISTING OF ALL OF THE FOLDERS

22   THAT YOU OBSERVED ON MR. BEKENSTEIN'S COMPUTERS?

23   A.   YES, IT WAS.

24   Q.   CAN I ASK YOU TO TURN YOUR ATTENTION TO THE MANILA

25   ENVELOPE NEXT TO YOU THAT'S BEEN MARKED AS EXHIBIT 5.  AND IF

1    YOU COULD REVIEW EACH PAGE OF THAT EXHIBIT, PLEASE.  AND TELL

2    ME, PLEASE, WHEN YOU'VE HAD AN OPPORTUNITY TO REVIEW IT.

3    A.   YES.  ALL THE PAGES ARE HERE.

4    Q.   AND WHAT IS THIS?

5    A.   IT'S THE ENCASE COMPUTER FORENSIC REPORT I CREATED FOR

6    MR. BEKENSTEIN'S COMPUTERS.

7    Q.   AND DOES IT INCLUDE THAT LISTING OF ALL THE FILES, THAT

8    FILE TREE OR FOLDERS?

9    A.   YES.  IT INCLUDES THE FOLDER TREES FOR THE FOUR HARD

10   DRIVES.

11           MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD SEEK

12   TO ADMIT EXHIBIT 5.

13           THE COURT:  ANY OBJECTION TO EXHIBIT 5?

14           MR. AARON:  NONE EXCEPT AS PREVIOUSLY NOTED.

15           THE COURT:  THANK YOU.

16           THAT OBJECTION IS OVERRULED AND EXHIBIT 5 IS

17   ORDERED ADMITTED.  YOU MAY PUBLISH.

18   BY MR. MICHAEL:

19   Q.   IF I COULD DIRECT YOUR ATTENTION, PLEASE, TO THE SECOND

20   PAGE -- WELL, FIRST, THE FIRST PAGE OF THE EXHIBIT WHICH I'M

21   NOW PUTTING ON THE OVERHEAD PROJECTER FOR THE JURORS.  AT THE

22   TOP WHERE IT SAYS "COMPUTER FORENSIC REPORT, SETH BEKENSTEIN,

23   BLUE ORCHID," THAT'S JUST THE TITLE OF THIS REPORT, CORRECT?

24   A.   YES, THAT'S CORRECT.

25   Q.   AND BLUE ORCHID WAS THE NAME OF THE INVESTIGATION?

1   A.   YES.

2   Q.   AND IF I ASK YOU TO LOOK AT THE LINE UNDERNEATH IT, IT

3   SAYS EVIDENCE NO., PC NO. 2, HD 2 OF 2 WHERE MY FINGER IS

4   HERE.  AND IF YOU CAN TOUCH THE SCREEN YOU CAN ALSO SHOW --

5   IF YOU TOUCH THE SCREEN AND SHOW YOU KNOW WHERE I'M POINTING

6   TO.  AND THAT THERE REFERS TO WHICH HARD DRIVE THIS PORTION

7   OF THE REPORT PERTAINS TO; IS THAT CORRECT?

8   A.   YES.  IT REFERS TO COMPUTER NO. 2, HARD DRIVE 2 OF 2.

9   Q.   NOW I'M GOING TO DIRECT YOUR ATTENTION TO A LOWER

10  PORTION OF THE PAGE.

11          MR. AKROTIRIANAKIS:  EXCUSE ME, YOUR HONOR, MAY I

12  BRING THIS OUT HERE?  IT SEEMS THAT PEOPLE ARE CRAMPING THEIR

13  NECKS.

14          THE COURT:  YES.

15  BY MR. MICHAEL:

16  Q.   AND BENEATH IT NOW SAYS --

17          THE COURT:  I THINK YOU NEED TO MOVE IT A LITTLE

18  MORE THIS WAY.  CAREFUL OF THE CORDS.  I REMIND YOU THAT

19  SCREEN COSTS I THINK MORE THAN ANY OF US MAKE IN A YEAR.  AND

20  MS. INGRAM WILL HUNT YOU DOWN IF ANYTHING HAPPENS TO IT.

21          YOU, MR. AKROTIRIANAKIS.

22          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

23          THE COURT:  CAN EVERYONE SEE?

24          THANK YOU.

25          MR. MICHAEL:  I'LL CONTINUE, YOUR HONOR.

```
 1   BY MR. MICHAEL:
 2   Q.   MR. OWEN, BENEATH -- NOW I'M POINTING TO A LINE THAT
 3   SAYS PC NO. 2, HD 1 OF 2.  WOULD THAT THEN REFER TO THE FIRST
 4   HARD DRIVE IN WHAT YOU LABELED COMPUTER NO. 2 OF
 5   MR. BEKENSTEIN'S TWO COMPUTERS?
 6   A.   YES, IT WOULD.
 7   Q.   AND THEN DO THE FOLLOWING PAGES SHOW THE FILE TREE FOR
 8   THAT HARD DRIVE IN THE REPORT?
 9   A.   YEAH, IT SHOWS THE FOLDER TREE.
10   Q.   AND IF I WERE TO ASK YOU TO TURN TO WHAT'S LABELED
11   PAGE 2 OF 18 OF YOUR REPORT, THERE IS -- I PUT A PAGE TO THE
12   JURORS AND IT ALREADY HAS A HANDWRITTEN ARROW ON IT.  AND IT
13   READS, PROGRAMS, ACCESSORIES, AND THEN IT LOOKS LIKE AS A
14   SUBFOLDER -- EXCUSE ME, NOT ACCESSORIES, BUT WITHIN PROGRAMS
15   ICQ.  WHAT IS THAT?
16   A.   THAT'S ONE OF THE FOLDERS THAT THE ICQ APPLICATION
17   CREATED WHEN IT WAS INSTALLED.
18   Q.   AND DID YOU FIND OTHER FOLDERS LABELED "ICQ" AND RELATED
19   TO ICQ IN MR. BEKENSTEIN'S COMPUTER?
20   A.   YES.
21   Q.   AND DID THAT INFORMATION INDICATE TO YOU THAT
22   MR. BEKENSTEIN HAD THE ICQ PROGRAM AND CHAT CAPABILITY ON HIS
23   COMPUTER?
24   A.   YES, IT DID.
25   Q.   I'M GOING TO NOW ASK YOU TO DIRECT YOUR ATTENTION TO
```

1    WHAT'S LABELED AS PAGE 4 OF 18 OF THIS REPORT.  AND THEN

2    THERE'S AN ARROW DRAWN AS YOU WILL SEE TO A FOLDER TITLED

3    "CHATS."  AND UNDERNEATH THAT THERE IS A FOLDER LABELED

4    "BOYSAN1."  DO YOU SEE THAT?

5    A.    YES, I DO.

6    Q.    AND DID YOU FIND ANYTHING IN THE BOYSAN1 FOLDER, IN THIS

7    BOYSAN1 FOLDER?

8    A.    YES, I DID.  I FOUND AN IMAGE FILE.

9    Q.    AND WHAT DID THAT IMAGE DEPICT?

10   A.    LET'S SEE WHICH COMPUTER THIS IS.  THIS IS FROM PC NO. 2

11   SO IT WOULD HAVE BEEN THE IMAGE OF THE TWO BOYS STANDING IN

12   FRONT OF A PIANO INSIDE A HOUSE.

13   Q.    IF YOU COULD TURN TO THE MANILA ENVELOPE NEXT TO YOU

14   LABELED EXHIBIT 83 FOR IDENTIFICATION.  IS THIS THE

15   PHOTOGRAPH -- EXCUSE ME.

16         WHAT IS THIS EXHIBIT?

17   A.    THIS IS THE PHOTOGRAPH I FOUND IN THAT BOYSAN1 FOLDER ON

18   PC NO. 2.  IT'S THE PHOTOGRAPH OF THE TWO BOYS STANDING IN

19   FRONT OF A PIANO IN A HOUSE.

20         MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD SEEK

21   TO ADMIT EXHIBIT 83.

22         THE COURT:  ANY OBJECTION, MR. AARON?

23         MR. AARON:  NONE.

24         THE COURT:  THANK YOU.  EXHIBIT 83 IS ORDERED

25   ADMITTED.  YOU MAY PUBLISH.

1    BY MR. MICHAEL:

2    Q.    NOW, THE COPY I HAVE UP ON THE ELMO, I DON'T KNOW IF

3    IT'S QUITE AS CLEAR AS THE ORIGINAL IMAGE.  IS THIS THE

4    IMAGE?

5    A.    YES, IT IS.

6    Q.    AND ARE THESE THE TWO BOYS STANDING IN FRONT OF THE

7    PIANO THAT YOU'RE TALKING ABOUT?

8    A.    YES.

9    Q.    DO YOU KNOW WHO THESE TWO BOYS ARE?

10   A.    NO, I DO NOT.

11   Q.    DO YOU KNOW WHERE THIS IMAGE WAS TAKEN?

12   A.    NO, I DO NOT.

13   Q.    ALL YOU KNOW IS IT WAS IN THE BOYSAN1 FOLDER; IS THAT

14   CORRECT?

15   A.    YES, THAT'S CORRECT.

16   Q.    TURNING YOUR ATTENTION BACK TO THE FILE TREE PORTION

17   THAT WE WERE JUST LOOKING AT, PAGE 4 OF 18, YOU PREVIOUSLY --

18   I DON'T RECALL SO I'M JUST GOING TO ASK YOU.  DID YOU FIND

19   EVIDENCE OF CHILD PORNOGRAPHY ON MR. BEKENSTEIN'S COMPUTERS?

20   A.    YES, I DID.

21   Q.    AND I BELIEVE YOUR TESTIMONY IS YOU FOUND A VAST NUMBER

22   OF IMAGES AND VIDEO FILES; IS THAT CORRECT?

23   A.    YES, APPROXIMATELY 100,000 IMAGES AND 1,200 VIDEO FILES.

24   Q.    AND DID ANY OF THE FILE NAMES SIGNIFY TO YOU THAT THEY

25   WERE CHILD PORNOGRAPHY IN ADDITION TO THE CONTENT OF THE

1     IMAGES THEMSELVES?

2     A.    YES.

3     Q.    AND I'M SHOWING YOU ANOTHER PORTION OF THE FILE TREE AND

4     THERE'S AN ARROW DRAWN AND IT SAYS -- AND EXCUSE MY

5     LANGUAGE -- "PICS OF LITTLE BOY'S BIG SLONG."  IS THAT THE

6     TYPE OF FILE NAME THAT YOU'RE TALKING ABOUT?

7     A.    YES.  THIS WOULD BE A FOLDER NAME, BUT IT WOULD BE --

8     CONTAINS PICTURES INSIDE.  I WOULD THINK IT WOULD CONTAIN

9     PICTURES OF WHAT THE FOLDER NAME IS DESCRIBING.

10    Q.    AND RIGHT ABOVE THAT PICTURE -- AND I'M GOING TO DRAW AN

11    ARROW -- CAN YOU READ THE NAME OF THAT FILE FOLDER?

12    A.    PICCOLO.

13    Q.    AND IN ADDITION TO PICCOLO AT THE TOP THERE'S ANOTHER

14    FILE FOLDER THAT I'M GOING TO PUT AN ARROW TO.  WHAT DOES

15    THAT READ?

16    A.    YOUNG YEARS PICS.

17    Q.    SO ARE THERE MANY FILE FOLDERS LIKE THIS ON

18    MR. BEKENSTEIN'S HARD DRIVES?

19    A.    YES.

20    Q.    AND IN THESE FILE FOLDERS DID YOU FIND IMAGES OF CHILD

21    PORNOGRAPHY OR SUSPECTED CHILD PORNOGRAPHY?

22    A.    I DON'T REMEMBER WHAT -- I MEAN, I DON'T REMEMBER WHERE

23    THE PICTURES CAME FROM, BUT --

24    Q.    IN FILE FOLDERS NAMED LIKE THIS?

25    A.    YES, I THINK THAT WOULD BE THE CASE.

1    Q.   AND WERE SOME OF THE FILE FOLDERS THAT CONTAINED CHILD

2    PORNOGRAPHY WERE THEY NAMED SOMETHING SUCH AS PICCOLO WHERE

3    IT WASN'T ENTIRELY APPARENT UNTIL YOU OPENED THE FOLDER WHAT

4    WAS IN IT?

5    A.   CORRECT.

6    Q.   AND THEN WITHIN THAT WOULD YOU FIND CHILD PORNOGRAPHY IN

7    SOME INSTANCES?

8    A.   CORRECT.

9    Q.   NOW, WERE THERE OTHER -- DID YOU FIND ANY OTHER FILE

10   FOLDERS ON ANY OF MR. BEKENSTEIN'S HARD DRIVES LABELED

11   "BOYSAN1"?

12   A.   YES, THERE WAS ANOTHER FOLDER ON PC NO. 1.

13   Q.   WHEN YOU SAY THAT, THAT WOULD BE THE COMPUTER THAT YOU

14   LABELED AS COMPUTER NO. 1?

15   A.   YES, IT WOULD.

16   Q.   AND IF YOU COULD TURN YOUR ATTENTION TO PAGE 5 OF 18 OF

17   THE EXHIBIT, AND THERE'S A LINE AT THE BOTTOM THAT SAYS

18   EVIDENCE NO., PC NO. 1, HD 1 OF 2.  DOES THAT REFER TO HARD

19   DRIVE 1 OF PC NO. 1?

20   A.   YES, IT DOES.

21   Q.   AND WERE THERE SIMILAR FILE FOLDERS ON THIS COMPUTER ON

22   THIS HARD DRIVE WITH NAMES THAT EITHER BY THEIR VERY NAME

23   INDICATED PORNOGRAPHIC OR CHILD PORNOGRAPHIC MATERIALS?

24   A.   YES, THERE WERE.

25   Q.   AND DID YOU FIND CHILD PORNOGRAPHY ON THIS COMPUTER?

1   A.   YES, I DID.

2   Q.   WAS THERE A REFERENCE IN MULTIPLE FILES TO RUSSIAN

3   FOLDERS, IF YOU RECALL?

4   A.   I BELIEVE SEEING REFERENCE TO RUSSIAN NAMES, BUT I DON'T

5   REMEMBER THE SPECIFIC ONES.

6   Q.   IF I CAN DIRECT YOUR ATTENTION TO PAGE 6 OF 18.  AND YOU

7   WILL SEE A LISTING HERE OF FILE FOLDER NAMES ON THE LEFT-HAND

8   SIDE OF THE SCREEN.  AND DO YOU SEE -- I'M GOING TO POINT OUT

9   TO YOU -- HERE IT SAYS "RUSSIAN" WHERE MY PEN IS POINTING.

10  BENEATH IT IS "RUSSIAN."  BENEATH IT IS "RUSSIANS."  ARE

11  THESE THE FILE FOLDERS YOU'RE TAKING ABOUT?

12  A.   YES.

13  Q.   ARE THERE OTHER FILE FOLDERS WITH DESCRIPTIONS OF WHAT'S

14  BEING DEPICTED?

15  A.   YES, THERE ARE.

16  Q.   AND IF I CAN DIRECT YOUR ATTENTION TO PAGE 9 OF 18 OF

17  THE EXHIBIT.  THIS IS -- AND LOOKING AT THE EXHIBIT CAN YOU

18  TELL THE JURORS IS THIS STILL PART OF THAT SAME FILE TREE FOR

19  THAT SAME HARD DRIVE?

20  A.   YES, IT IS.

21  Q.   AND YOU WILL SEE THERE'S AN ARROW POINTING ON A FOLDER

22  AND IF I POINT TO THE TOP IT LOOKS LIKE IT IS A SUBFOLDER OF

23  A FOLDER CALLED "PRIVATE"; IS THAT CORRECT?

24  A.   YES, THAT'S CORRECT.  THEN PRIVATE IS UNDER MY

25  DOCUMENTS.

1    Q.   IT'S UNDER MY DOCUMENTS.  AND IT APPEARS THAT THERE'S A

2    LISTING OF NAMES.  WHAT DO THOSE NAMES APPEAR TO BE TO YOU?

3    A.   THEY APPEAR TO BE NAMES OF PEOPLE THAT SETH BEKENSTEIN

4    KNEW.

5    Q.   AND DO THEY APPEAR TO YOU TO BE SCREEN NAMES PERHAPS

6    USED IN CHAT SESSIONS?

7    A.   YES.

8    Q.   AND THERE'S A SECOND ARROW THERE AND IT'S POINTING TO --

9    WHAT DOES THAT NAME READ THERE?

10   A.   BOYSAN1.

11   Q.   AND IS THIS THE FOLDER YOU WERE TALKING ABOUT WHERE YOU

12   FOUND ANOTHER IMAGE?

13   A.   YES, I DID.

14   Q.   AND WHAT WAS THE IMAGE THAT YOU FOUND IN THIS FOLDER?

15   A.   IT WAS A PICTURE OF AN ADULT MALE SITTING CROSS-LEGGED

16   ON A PICNIC TABLE THAT APPEARED TO BE ON THE PORCH OF A

17   HOUSE.

18   Q.   AND IF YOU CAN TURN YOUR ATTENTION TO WHAT'S BEEN MARKED

19   AS EXHIBIT 6, IT'S IN THE MANILA FOLDER NEXT TO YOU.  IS THIS

20   THE PHOTOGRAPH?

21   A.   YES, IT IS.

22          MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD SEEK

23   TO ADMIT EXHIBIT 6.

24          THE COURT:  ANY OBJECTION TO EXHIBIT 6 OTHER THAN

25   WHAT WAS PREVIOUSLY STATED?

1           MR. AARON:  NO.

2           THE COURT:  THANK YOU.

3           EXHIBIT 6 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

4    BY MR. MICHAEL:

5    Q.   IS THIS THE PHOTOGRAPH IN THE EXHIBIT?

6    A.   YES, IT IS.

7    Q.   WHEN YOU FIRST SAW THIS PHOTOGRAPH DID YOU KNOW WHO WAS

8    DEPICTED IN IT?

9    A.   NO, I DID NOT.

10   Q.   SITTING HERE TODAY DO YOU KNOW?  I'M GOING TO ZOOM IN ON

11   THE FACE.  DO YOU KNOW WHO IS DEPICTED IN THIS IMAGE?

12   A.   IT IS THE DEFENDANT IN THIS CASE, MR. SANDERS.

13   Q.   CAN YOU ALSO JUST LOOK AT -- IS THAT A BICYCLE THAT'S IN

14   FRONT OF HIM, THAT MOUNTAIN BIKE?  CAN YOU READ THE NAME OF

15   THAT MOUNTAIN BICYCLE, COMPANY THAT MAKES IT?  IT APPEARS --

16   A.   I'M NOT A MOUNTAIN BIKER, BUT IT LOOKS LIKE IT'S N-I-S-H

17   AND THEN THREE LETTERS.  NISHIMO MAYBE.

18   Q.   IT APPEARS TO BE NISHI SOMETHING?

19   A.   YES.

20   Q.   I'M GOING TO DIRECT YOUR ATTENTION TO PAGE 8 OF 18 AND

21   SHOW YOU ANOTHER FILE FOLDER WHERE I'VE DRAWN AN ARROW AND

22   WHERE -- WHAT NAME IS THAT?

23   A.   PICCOLO.

24   Q.   AND ARE THERE OTHER FILE FOLDERS NEXT TO IT THAT HAVE

25   NAMES OF BOYS AND OTHER TITLES THAT APPEAR TO INDICATE THEY

1    HAVE PICTURES CONTAINING BOYS PERHAPS IN A SEXUAL CONTENT AS

2    WELL?

3    A.   YES, THEY COULD.

4    Q.   SUCH AS BOY, BOY5 AND CHRIS AND BRANDON AND OTHER BOYS'

5    NAMES?

6    A.   YES.

7    Q.   I BELIEVE THAT'S IT.  JUST GIVE ME ONE MOMENT, PLEASE,

8    WITH REGARD TO THE FILE TREE.

9         NOW, AT THE VERY LAST PAGE, PAGE 18 OF 18 ON THIS

10   EXHIBIT WHICH I'M NOW PUBLISHING FOR THE JURORS, THERE'S SOME

11   NAMES LISTED HERE.  WHAT ARE THESE NAMES?

12   A.   THOSE ARE THE NAMES OF THE KEY WORDS THAT I SEARCHED FOR

13   IN THIS CASE.

14   Q.   AND IS THERE AN INDICATION OF WHETHER OR NOT YOU FOUND

15   THESE KEY WORDS?

16   A.   YES.  AFTER -- BETWEEN THE NUMBER IN PARENTHESES AND THE

17   KEY WORD THERE'S A NUMBER.  AND THAT NUMBER WOULD INDICATE

18   THE NUMBER OF OCCURRENCES ON THE FOUR HARD DRIVES THAT THAT

19   KEY WORD OCCURRED.

20   Q.   AND I'M GOING TO DRAW ARROWS ON TWO OF THOSE ENTRIES.

21   WHAT ARE THOSE WORDS THERE?

22   A.   RUSSIAN FLOWER.

23   Q.   AND DOES IT INDICATE THAT YOU FOUND THOSE TERMS IN THE

24   FILE TREE OR ON THE HARD DRIVE?

25   A.   YES, IT DID, 671 OCCURRENCES.

1    Q.   AND IS THIS WHAT YOU WERE TESTIFYING ABOUT BEFORE, THAT

2    YOU CAN DO CERTAIN KEY WORD SEARCHES WHEN YOU'RE USING

3    ENCASE?

4    A.   YES.

5    Q.   I'M SORRY.  I MEANT TO SHOW YOU ANOTHER ONE.  AT THE TOP

6    OF THE PAGE THERE'S ALSO ANOTHER TWO WORDS.  WHAT ARE THOSE

7    WORDS?

8    A.   BLUE ORCHID.

9    Q.   AND DID THAT INDICATE YOU FOUND THOSE TERMS, FILE

10   FOLDERS BY THOSE NAMES?

11   A.   YES, IT WOULD.  1,324, IF MY MATH IS CORRECT.

12   Q.   AND THEN I'M ALSO GOING TO POINT YOUR ATTENTION TO

13   ANOTHER ONE, ANOTHER ARROW, ANOTHER POORLY DRAWN ARROW.  WHAT

14   IS THAT TERM THERE?

15   A.   THE LETTERS KDV.

16   Q.   AND DOES THAT REFER TO A CHILD PORNOGRAPHIC SERIES?

17   A.   I BELIEVE SO.  IT'S BEEN A LONG TIME.

18   Q.   TYPICALLY, THOSE ARE THE TYPES OF TERMS THAT YOU WOULD

19   USE IN SEARCHING?

20   A.   YES.  THAT'S WHAT THE OTHER TWO REFER TO, SO --

21   Q.   NOW, DID YOU FIND ANY -- YOU CAN PUT THE EXHIBITS ASIDE

22   NOW.

23            DID YOU FIND ANY OTHER INFORMATION ON

24   MR. BEKENSTEIN'S COMPUTERS THAT REFERRED TO BOYSAN?

25   A.   YES.  THERE WAS AN ADDRESS IN A MICROSOFT WORD DOCUMENT.

1    Q.    AND WHAT WAS THE INFORMATION IN THAT ADDRESS?

2    A.    IT HAD THE NAME JIM SANDERS AND THEN A P.O. BOX ADDRESS

3    IN MOUNTAIN CENTER, CALIFORNIA.

4    Q.    DID YOU ADVISE THE CASE AGENT OF THE INFORMATION THAT

5    YOU LEARNED IN THAT ADDRESS --

6    A.    YES, I DID.

7    Q.    -- IN THAT FOLDER?

8          AND ALL THE INFORMATION IN THAT FOLDER?

9    A.    YES, I DID.

10   Q.    NOW, IF YOU ALSO TESTIFIED I BELIEVE THAT YOU FOUND SOME

11   CHAT TRANSCRIPTS, OR RATHER, YOU FOUND SOME CHAT ICQ FILES,

12   CORRECT?

13   A.    YES, I DID.

14   Q.    AND YOU TESTIFIED THAT YOU WERE ABLE TO CONVERT THOSE

15   INTO A READABLE FORMAT, CORRECT?

16   A.    YES.

17   Q.    CAN I DIRECT YOUR ATTENTION TO WHAT'S BEEN MARKED AS

18   EXHIBIT 1.  IT'S THAT FIRST BLACK BINDER RIGHT NEXT TO YOU

19   THERE.  AND HAVE YOU HAD AN OPPORTUNITY TO REVIEW THIS BINDER

20   BEFORE?

21   A.    YES, I DID.

22   Q.    AND THIS EXHIBIT?

23   A.    YES.

24   Q.    AND ARE THESE EXCERPTS OF THOSE CHATS THAT YOU WERE ABLE

25   TO PRINT INTO A READABLE FORMAT?

1    A.    YES, THEY ARE.

2    Q.    AND THEY WERE ALL TAKEN FROM MR. BEKENSTEIN'S COMPUTER?

3    A.    YES.

4    Q.    YOU CAN SET THAT EXHIBIT ASIDE.

5              MR. MICHAEL:  MAY I HAVE ONE MOMENT, YOUR HONOR?  I

6    BELIEVE I'M FINISHED.

7              NO FURTHER QUESTIONS, YOUR HONOR.

8              THE COURT:  THANK YOU.

9              CROSS-EXAMINATION.

10             MR. MICHAEL:  CAN I HAVE ONE MOMENT TO COLLECT THE

11   EXHIBITS, YOUR HONOR?

12             THE COURT:  CERTAINLY.

13             THANK YOU.  YOU MAY INQUIRE.

14             MR. AARON:  THANK YOU.

15                       CROSS-EXAMINATION

16   BY MR. AARON:

17   Q.    GOOD MORNING.

18   A.    GOOD MORNING.

19   Q.    YOU TESTIFIED YOU USED WHICH VERSION OF ENCASE?

20   A.    THE ENCASE -- MY NOTES IN THE ENCASE REPORT MENTIONED IT

21   WAS 2.13 AND 2.14B, BUT THERE COULD HAVE BEEN LATER VERSIONS

22   DURING MY EXAMINATION PART OF THE CASE.

23   Q.    YOU TESTIFIED THAT BASED ON YOUR EXPERIENCE AS A

24   COMPUTER FORENSIC INVESTIGATOR ENCASE IS A RELIABLE PROGRAM?

25   A.    YES.

1    Q.    AND YOU DID AN ENCASE EXAMINATION OF TWO COMPUTERS AT

2    MR. BEKENSTEIN'S APARTMENT, RIGHT?

3    A.    YES.

4    Q.    AND I BELIEVE YOU TESTIFIED IN DIRECT EXAMINATION THAT

5    THE EXAMINATIONS WENT SMOOTHLY?

6    A.    YES.  I DID HAVE TO RE-IMAGE ONE OF THE HARD DRIVES

7    SEVERAL TIMES DUE TO TECHNICAL ISSUES WITH THE CABLE THAT WAS

8    USED.

9    Q.    NOW, ON 1/9/01, YOU TRIED TO DO THE EXAMINATION OF PC 1,

10   RIGHT?

11   A.    I DON'T REMEMBER THE EXACT DATES THAT --

12   Q.    DO YOU HAVE A COPY OF YOUR NOTES UP THERE?

13   A.    NO, I DON'T.

14   Q.    YOU DIDN'T BRING A COPY OF YOUR NOTES WITH YOU?

15   A.    NO, I DID NOT.  BUT, I MEAN, THAT SOUNDS WITHIN THE TIME

16   FRAME.  WE HAD SEIZED THE COMPUTERS ON JANUARY 4.

17           MR. MICHAEL:  YOUR HONOR, NO QUESTION PENDING.

18           MR. AARON:  MAY I APPROACH, YOUR HONOR?

19           THE COURT:  YOU MAY.

20           MR. AARON:  YOUR HONOR, I WOULD LIKE TO APPROACH

21   AND SHOW HIM EXHIBIT NO. 205 FOR IDENTIFICATION.

22           THE COURT:  GO AHEAD.

23   BY MR. AARON:

24   Q.    IF YOU COULD, I'M SHOWING YOU EXHIBIT 205.  IF YOU

25   COULD, PLEASE, IF YOU COULD REVIEW FROM PAGE 11 OF 17 THE

1    ENTRY I THINK IS 1/9/01.  AND THOSE ARE YOUR NOTES, CORRECT?

2    A.   YES, THESE ARE MY NOTES.  OKAY.

3    Q.   IS IT FAIR TO SAY ON 1/9/01, YOU TRIED TO DO AN

4    EXAMINATION OF PC 1?

5              THE COURT:  EXCUSE ME.

6              MR. MICHAEL:  I WAS GOING TO REQUEST THAT THE

7    WITNESS PUT THE DOCUMENT ASIDE.  IT HAS BEEN USED TO REFRESH

8    HIS RECOLLECTION.

9              THE COURT:  ALL RIGHT.

10             MR. MICHAEL:  I DON'T WANT AN IMPROPER USE OF THE

11   DOCUMENT.

12             THE COURT:  WHY DON'T YOU JUST EXAMINE -- JUST SET

13   THE DOCUMENT ASIDE.  AND YOU CAN EXAMINE THE WITNESS.

14   BY MR. AARON:

15   Q.   DOES LOOKING AT THAT DOCUMENT REFRESH YOUR RECOLLECTION?

16   A.   YES.

17   Q.   OKAY.  ON 1/9/01, DID YOU CONDUCT AN EXAMINATION OF

18   PC 1?

19   A.   THE COPY OF THE FIRST HARD DRIVE COMPLETED SUCCESSFULLY

20   AND THEN I STARTED THE COPY OF THE SECOND HARD DRIVE.

21   Q.   AND YOU LEFT THE PROGRAM RUNNING OVERNIGHT, RIGHT?

22   A.   YES, BECAUSE IT TAKES LIKE -- THE FIRST ONE TOOK

23   32 HOURS TO COMPLETE THE COPY.

24   Q.   AND ON 1/10, THE NEXT DAY, YOU CHECKED TO SEE WHAT HAD

25   HAPPENED?

1   A.   YES.

2   Q.   AND THE ACQUISITION HAD FAILED, RIGHT?

3   A.   I DIDN'T REVIEW THAT PAGE, BUT --

4   Q.   I'M SORRY.  IF YOU COULD GO, I BELIEVE IT'S PROBABLY THE

5   NEXT PAGE.

6   A.   OKAY.  YES, THAT WAS --

7   Q.   THAT REFRESHES YOUR RECOLLECTION?

8   A.   YES.

9   Q.   ON 1/10 IN THE MORNING, I BELIEVE YOU CHECKED TO SEE IF

10  THE ACQUISITION HAD BEEN SUCCESSFULLY ACCOMPLISHED?

11  A.   RIGHT.  IT HAD NOT BEEN.  THE COMPUTER WAS LOCKED UP

12  WITH A GRAY SCREEN.

13  Q.   AND IT FAILED, RIGHT?

14  A.   YES.

15  Q.   AND YOU WROTE IT FAILED FOR QUOTE/UNQUOTE UNKNOWN

16  REASONS, RIGHT?

17  A.   RIGHT.

18  Q.   SO YOU DIDN'T KNOW WHY IT HAD FAILED?

19  A.   CORRECT, NOT AT THE TIME.

20  Q.   THEN YOU TRIED TO DO IT ONCE AGAIN, RIGHT?

21  A.   THAT'S CORRECT.

22  Q.   AND IT FAILED A SECOND TIME?

23  A.   YES.

24  Q.   THEN YOU TRIED TO DO IT A THIRD TIME?

25  A.   CORRECT.

1   Q.   AND IT FAILED AGAIN?

2   A.   CORRECT.

3   Q.   AND THIS TIME YOU CALLED GUIDANT SOFTWARE FOR TECHNICAL

4   ASSISTANCE?

5   A.   YES.

6   Q.   AND YOU ALSO CALLED WINSTATION, RIGHT?

7   A.   YES, WHICH IS THE MAKER OF THE HARD DRIVE I WAS USING,

8   THE GOVERNMENT HARD DRIVE I WAS USING TO MAKE THE COPY ON.

9   Q.   BECAUSE YOU DIDN'T KNOW WHY IT HAD FAILED?

10   A.   CORRECT.

11   Q.   AND THEN YOU TRIED YET AGAIN?

12   A.   YES.

13   Q.   AND AGAIN IT FAILED?

14   A.   I WOULD HAVE TO LOOK FOR SURE, BUT IT COULD BE ONE MORE

15   TIME AFTER THAT.

16   Q.   I DON'T WANT YOU TO GUESS.

17          MR. AARON:  WITH THE COURT'S PERMISSION, MAY HE

18   TAKE A LOOK AT THE NOTES?

19          THE COURT:  GO AHEAD.

20   BY MR. AARON:

21   Q.   SIR, MAYBE YOU SHOULD TAKE A LOOK AT THE NOTES FOR 1/10

22   AND 1/11.

23   A.   OKAY.

24   Q.   1/11.

25   A.   OKAY.  FAILED.

1    Q.   AND ONCE AGAIN IT FAILED, RIGHT?

2    A.   YES.

3              MR. AARON:  MAY I APPROACH, YOUR HONOR?

4              THE COURT:  YES, YOU MAY.

5    BY MR. AARON:

6    Q.   I'M SHOWING YOU AN EXCERPT UNDER "NOTES."  DID YOU WRITE

7    THAT?

8    A.   YES, I DID.

9    Q.   AND CAN YOU READ WHAT YOU WROTE?

10             MR. MICHAEL:  OBJECTION, YOUR HONOR.  IT'S NOT IN

11   EVIDENCE.

12             THE COURT:  YOU MEAN READ IT TO YOURSELF?

13             MR. AARON:  YES.

14             THE COURT:  GO AHEAD.

15   BY MR. AARON:

16   Q.   READ IT TO YOURSELF.

17   A.   THAT'S THE SENTENCE YOU WANT ME TO READ?

18   Q.   YES, PLEASE.

19   A.   OKAY.

20   Q.   AND AFTER YOU -- AFTER THE ACQUISITION FAILED YET AGAIN,

21   YOU HAD WHAT'S CALLED THE SAME GRAY SCREEN OF DEATH?

22   A.   CORRECT.

23   Q.   CAN YOU EXPLAIN -- THAT'S A TECHNICAL TERM ACTUALLY?

24   A.   THAT'S JUST MY NAME FOR IT.  WINDOWS GETS A BLUE SCREEN

25   OF DEATH.  I CALLED IT THE GRAY SCREEN OF DEATH.  BASICALLY,

```
 1    IT MEANS I ONLY GOT A GRAY SCREEN ON THE COMPUTER AND IT
 2    WOULDN'T RESPOND TO ANY OF MY CONTROL ALT DELETE OR OTHER
 3    ATTEMPTS TO SEE IF THE COMPUTER WAS RUNNING.
 4    Q.   AND THE PC WAS UNRESPONSIVE AT THAT TIME?
 5    A.   YES.
 6    Q.   BUT THE PROGRAM WAS ALSO UNRESPONSIVE, RIGHT?
 7    A.   CORRECT.
 8    Q.   NOW -- AND THAT'S THE ENCASE VERSION 2.3?
 9    A.   2.1.
10    Q.   2.13?
11    A.   YES.  IT WAS THE ONE FOR THAT DATE.
12    Q.   AND THEN WHAT YOU DID AFTER THAT IS YOU DELETED ALL OF
13    THE OLD OR INCOMPLETE EVIDENCE FILES FROM THE WINSTATION,
14    RIGHT?
15    A.   RIGHT, FROM THE GOVERNMENT HARD DRIVE THAT I WAS USING
16    TO MAKE THE COPIES ON.  I DELETED THE INCOMPLETED COPY.
17    Q.   AND THEN --
18         MR. AARON:  MAY I APPROACH, YOUR HONOR?
19         THE COURT:  YES.
20    BY MR. AARON:
21    Q.   I'M JUST GOING TO SHOW THE NOTES FROM 1/12.  IF YOU
22    COULD REVIEW THAT AND LET US KNOW WHEN YOU'RE DONE.
23    A.   OKAY.
24    Q.   THANK YOU.  WHEN YOU DID THE NEXT EXAMINATION STARTING
25    ON 1/11 YOU CHECKED ON IT AT 1:12 IN THE MORNING?
```

1    A.    CORRECT.

2    Q.    AND YOU FOUND IT AGAIN HAD FAILED?

3    A.    YES.

4    Q.    NOW, DID THOSE FAILURES OCCUR BECAUSE OF A PROBLEM WITH

5    ENCASE?

6    A.    NO.

7    Q.    BUT AFTER THAT YOU DID NOT USE VERSION 2.13, YOU

8    SWITCHED TO 2.14, CORRECT?

9    A.    NO, I THINK IT WAS -- I THOUGHT IT WAS STILL 2.13 IN

10   THAT.

11              MR. AARON:   MAY I APPROACH AGAIN, YOUR HONOR?

12              THE COURT:   YOU MAY.

13   BY MR. AARON:

14   Q.    SHOWING YOU NOTES FROM I BELIEVE 1/17, IF YOU COULD READ

15   THE FIRST PARAGRAPHS THERE AND LET US KNOW WHEN YOU'RE DONE.

16   A.    OKAY.

17   Q.    I'M SORRY, SIR, THE NOTES FOR 1/17 ON THE PAGE RIGHT

18   THERE.

19   A.    OKAY.

20   Q.    ARE YOU DONE?

21   A.    DO YOU WANT ME TO READ THE -- JUST THE NOTE THE VERSION

22   OF ENCASE OR DO YOU WANT ME TO READ --

23   Q.    WHY DON'T YOU READ FROM "NOTES" TO ABOUT RIGHT THERE?

24   A.    OKAY.

25   Q.    DOES THAT REFRESH YOUR RECOLLECTION?

1    A.    YES.

2    Q.    IS IT FAIR TO SAY THAT ON JANUARY 17TH, 2001, YOU

3    DOWNLOADED ENCASE 2.14B, RIGHT?

4    A.    YES, THAT'S CORRECT.

5    Q.    AND YOU INSTALLED IT ON YOUR COMPUTER?

6    A.    YES.

7    Q.    AND THEN YOU USED IT IN EXAMINATION, RIGHT?

8    A.    YES.

9    Q.    SO YOU USED THAT -- AFTER THE FAILURES WITH 2.13 AT A

10   LATER POINT YOU MOVED TO 2.14?

11   A.    CORRECT.  AND THEN I WOULD UPGRADE IF SIGNIFICANT TIME

12   HAD PASSED, YOU KNOW, LIKE IN THAT CASE FIVE DAYS OR MORE.

13            MR. AARON:  MOVE TO STRIKE EVERYTHING AFTER "YES."

14            THE COURT:  MOTION TO STRIKE IS GRANTED.

15            AND, LADIES AND GENTLEMEN, THAT MEANS YOU ARE TO

16   DISREGARD EVERYTHING IN THE WITNESS' ANSWER TO THE LAST

17   QUESTION AFTER THE WORD "YES."

18   BY MR. AARON:

19   Q.    YOU HAD SOME OTHER PROBLEMS WITH THE ACQUISITION OF SOME

20   OF THE OTHER HARD DRIVES WITH YOUR ENCASE ANALYSIS, RIGHT?

21   A.    NO, I BELIEVE IT WAS JUST THAT ONE HARD DRIVE OUT OF THE

22   FOUR.

23   Q.    IF YOU COULD TAKE A LOOK AT EXHIBIT NO. 5.

24   A.    IS THAT THE ENCASE REPORT?

25   Q.    YES.  CAN YOU TAKE A LOOK AT PC NO. 2, HARD DRIVE 2 OF

1    2?

2    A.    DO YOU HAVE A PAGE NUMBER?

3    Q.    SURE.  IT'S PAGE 1 OF 18.

4    A.    OKAY.

5    Q.    YOU ACQUIRED THAT ON JANUARY 6TH, 2001, AT 3:44 P.M.,

6    RIGHT?

7    A.    YES, ACCORDING TO THE NOTES.

8    Q.    SO YOU ACQUIRED -- YOU DIDN'T NEED TO ACQUIRE IT AGAIN,

9    RIGHT?

10   A.    YES, I BELIEVE SO.

11   Q.    WELL, YOU DIDN'T -- ONCE YOU ACQUIRED THE HARD DRIVE YOU

12   PROCEEDED TO ANALYZE IT.  YOU DIDN'T REACQUIRE IT?

13   A.    CORRECT, YEAH, UNLESS SOMETHING HAPPENED TO MY COPY, BUT

14   IN THIS CASE I DON'T REMEMBER THAT HAPPENING.

15   Q.    OR UNLESS YOU THOUGHT SOMETHING WAS WRONG WITH THE

16   VERSION OF ENCASE YOU USED OR PERHAPS SOMETHING WAS WRONG

17   WITH THE HARD DRIVE, THE DISK THAT YOU BOOTED UP FROM?

18            MR. MICHAEL:  OBJECTION, COMPOUND.

19            THE COURT:  OVERRULED.

20            THE WITNESS:  I MIGHT HAVE THOUGHT THAT THERE WAS A

21   PROBLEM.  IF THERE WAS A PROBLEM WITH THE DISK THAT I USED OR

22   THERE WAS A PROBLEM WITH THE COPY, I WOULD HAVE RECOPIED IT,

23   BUT I DON'T BELIEVE THAT I'VE EVER QUESTIONED THE VALIDITY OF

24   A COPY I MADE WITH THE ENCASE SOFTWARE.

25   BY MR. AARON:

1    Q.   AND IF THERE WAS A PROBLEM WITH THE DISK OR WITH THE

2    PROGRAM, THAT COULD CORRUPT THE WHOLE PROCESS?

3    A.   YES, IT COULD CAUSE PROBLEMS WITH THE EXAMINATION.

4    Q.   OKAY.  SO YOU ACQUIRED PC 2, HARD DRIVE 2 OF 2, AT 1/6

5    AT 3:44 P.M., RIGHT?

6    A.   CORRECT.

7         MR. AARON:  MAY I APPROACH, YOUR HONOR?

8         THE COURT:  YOU MAY.

9    BY MR. AARON:

10   Q.   LET ME SHOW YOU, SIR, YOUR NOTES ON EXHIBIT 205.  IF YOU

11   COULD READ FROM THE VERY BEGINNING TO WHERE IT STARTS TALKING

12   ABOUT THE PARTITION.

13   A.   OKAY.

14   Q.   AND LET US KNOW WHEN YOU'RE DONE, PLEASE.

15   A.   OKAY.

16   Q.   NOW, ACCORDING TO YOUR NOTES, ON 1/8/2001, YOU ACQUIRED

17   PC 2, HARD DRIVE 2, AT 1/8, 17:23 OR 5:23, RIGHT?

18   A.   YEAH, THAT'S WHAT THE NOTES SAY.

19   Q.   SO WE HAVE TWO DIFFERENT DATES AND TIMES WHICH YOU

20   SUPPOSEDLY ACQUIRED THE PC 2, HARD DRIVE 2 OF 2?

21   A.   YES.

22   Q.   CHAT TRANSCRIPTS ARE SAVED IN A PROPRIETARY FORMAT,

23   RIGHT?

24   A.   CORRECT.

25   Q.   AT LEAST BY ICQ?

1    A.    YES.

2    Q.    AND CAN YOU TELL THE JURY WHAT YOU MEAN WHEN YOU SAY A

3    PROPRIETARY FORMAT?

4    A.    IT MEANS IT'S ONE THAT ICQ DEVELOPED AND IT'S NOT -- IT

5    WASN'T READABLE IN PLAIN TEXT.

6    Q.    SO IF YOU OR I WERE LOOKING AT IT, WE WOULD NOT BE ABLE

7    TO READ IT?

8    A.    CORRECT.

9    Q.    THERE'S SOME SORT OF CODE GOING ON?

10   A.    RIGHT.

11   Q.    AND THAT NEEDS TO BE CONVERTED INTO ORDINARY TEXT,

12   RIGHT?

13   A.    CORRECT.

14   Q.    AND YOU USED ANOTHER PROGRAM TO CONVERT THE RAW DATA, IF

15   YOU WILL, INTO -- OR THE CODED DATA INTO ORDINARY ENGLISH?

16   A.    CORRECT.

17   Q.    AND WHAT WAS THAT PROGRAM?

18   A.    I DON'T RECALL THE -- I THINK I USED TWO DIFFERENT ONES,

19   BUT I DON'T RECALL THE NAMES OF THEM OFF THE TOP OF MY HEAD.

20   Q.    DO YOU KNOW WHAT VERSIONS OF THOSE PROGRAMS YOU USED?

21   A.    NO, I DO NOT.

22   Q.    DO YOU KNOW IF THEY HAD ANY PATCHES OR UPDATES?

23   A.    NO, I DO NOT.

24   Q.    SO IF THERE WAS ANY ERROR IN THOSE PROGRAMS, ANY

25   TECHNICAL GLITCHES, YOU WOULDN'T BE ABLE TO TELL US?

1  A.   CORRECT.

2  Q.   BEFORE THE CHATS -- BEFORE THE LOGS ARE CONVERTED INTO

3  ORDINARY TEXT, THERE'S NO WAY FOR YOU TO TELL US WHAT THEY

4  SAID, RIGHT?

5  A.   CORRECT.

6  Q.   ALL THAT YOU KNOW IS THAT YOU TOOK THIS CODED DATA AND

7  CONVERTED IT INTO ORDINARY ENGLISH?

8  A.   CORRECT.

9  Q.   SO THERE'S NO WAY FOR YOU TO KNOW WHETHER OR NOT WHAT

10 WAS IN THE CODED LANGUAGE WAS ACCURATELY TRANSCRIBED INTO

11 ORDINARY ENGLISH, RIGHT?

12 A.   THAT'S NOT ENTIRELY CORRECT BECAUSE I TESTED IT

13 BEFOREHAND WITH SOME CHATS THAT I MADE MYSELF.

14 Q.   BUT WHEN YOU DID THAT, YOU DID IT ON YOUR COMPUTER, NOT

15 ON MR. BEKENSTEIN'S COMPUTER, RIGHT?

16 A.   CORRECT.

17 Q.   AND YOU DID IT ON YOUR COMPUTER WHICH DID NOT HAVE A

18 WRITE BLOCKER AND HADN'T BEEN RUN BY ENCASE, RIGHT?

19 A.   CORRECT.

20 Q.   SO IT WAS NOT EXACTLY THE SAME SITUATION, IT WAS A

21 DIFFERENT SITUATION, RIGHT?

22 A.   NO, BECAUSE --

23        MR. MICHAEL:  OBJECTION, VAGUE AND AMBIGUOUS.

24        MR. AARON:  LET ME REPHRASE IT.

25        THE COURT:  GO AHEAD.

1    BY MR. AARON:

2    Q.   YOU DID IT -- THE BEKENSTEIN CHATS WERE ON

3    MR. BEKENSTEIN'S COMPUTER, RIGHT?

4    A.   CORRECT.

5    Q.   YOUR CHATS WERE ON YOUR COMPUTER?

6    A.   CORRECT, BUT WHEN I CONVERTED HIS CHATS THEY WERE ALSO

7    ON MY COMPUTER.  I COPIED THEM OUT FROM ENCASE ONTO MY

8    COMPUTER THAT DIDN'T HAVE A WRITE BLOCKER ON IT AT THE TIME.

9    Q.   WHEN YOU DID YOUR CHATS, WHEN YOU ENGAGED IN THE CHATS,

10   THEY WERE ON YOUR COMPUTER, RIGHT?

11   A.   CORRECT.

12   Q.   THEY WERE NOT ON MR. BEKENSTEIN'S COMPUTER?

13   A.   CORRECT.

14   Q.   PRESUMABLY WHEN MR. BEKENSTEIN DID THE CHATS, THEY WERE

15   ON HIS COMPUTER, RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   AND THAT'S A FUNDAMENTAL DIFFERENCE, RIGHT?

18   A.   IT'S A DIFFERENCE.

19   Q.   AND YOU DON'T KNOW WHAT THE SIGNIFICANCE OF THAT

20   DIFFERENCE IS BECAUSE YOU WEREN'T ABLE TO DO ANY CHATS ON

21   MR. BEKENSTEIN'S COMPUTER?

22   A.   CORRECT.

23   Q.   BEFORE THE CHATS ARE CONVERTED INTO ORDINARY TEXT YOU

24   HAVE NO WAY OF TELLING WHO'S SPEAKING, RIGHT?

25   A.   CORRECT.

1    Q.    WHAT THEY'RE SAYING?

2    A.    CORRECT.

3    Q.    WHEN THEY'RE SAYING IT?

4    A.    CORRECT.

5    Q.    WHEN DID YOU DO THE EXPERIMENT WITH RUNNING CHATS ON

6    YOUR COMPUTER AND THEN TRANSCRIBING THEM?

7    A.    I BELIEVE IT WAS SOMETIME AFTER I FIRST STARTED USING

8    THAT PRODUCT, THE EXTERNAL PROGRAM THAT I USED TO CONVERT IT.

9    Q.    THE PROGRAM THAT YOU CAN'T REMEMBER WHAT IT IS?

10   A.    YES.  I JUST REMEMBER IT HAS ICQ IN THE NAME.  I DON'T

11   REMEMBER THE NAME OF IT.

12   Q.    SO YOU DID THIS EXPERIMENT ON YOUR OWN COMPUTER SHORTLY

13   AFTER YOU STARTED USING THIS UNKNOWN PROGRAM?

14   A.    CORRECT.

15   Q.    AND DO YOU KNOW WHEN THAT WAS?

16   A.    NO.  IN MY NOTES THERE MIGHT BE SOME INDICATION OF IT

17   BUT I DON'T REMEMBER.

18   Q.    WOULD YOU CARE TO REVIEW YOUR NOTES AGAIN?

19   A.    IF YOU WANT ME TO, SURE.

20           MR. AARON:  MAY I APPROACH, YOUR HONOR?

21           THE COURT:  YOU MAY.

22   BY MR. AARON:

23   Q.    SHOWING YOU AGAIN EXHIBIT NO. 205.

24   A.    OKAY.  I JUST SHOW IN MY NOTES THAT ON JANUARY 11TH I

25   INSTALLED ICQ ON MY PERSONAL COMPUTER, SO IT WOULD HAVE BEEN

1    SOMETIME AFTER THAT THAT I STARTED DOING MY OWN CHATS WITH

2    THE ICQ PROGRAM.

3    Q.    OKAY.  THANK YOU.  AND YOU INSTALLED ICQ 2000B BETA,

4    RIGHT?

5    A.    YEAH, IT WAS 2000B.

6    Q.    AND YOU DON'T KNOW IF THE CHATS THAT MR. BEKENSTEIN

7    ENGAGED IN WERE UNDER ICQ 1999 OR 2000?

8    A.    HE HAD A 2000B FOLDER ON HIS COMPUTER WHICH IS WHERE I

9    FOUND THE CHATS FROM, SO I THINK I REMEMBER TRYING TO USE THE

10   SAME VERSION.

11   Q.    DO YOU REMEMBER WHEN HE INSTALLED IT?

12   A.    NO, I DO NOT.

13   Q.    SO HE MAY HAVE HAD THE CHATS USING A PREVIOUS VERSION OF

14   ICQ, YOU DON'T KNOW?

15   A.    YEAH, I DON'T KNOW.  I WOULDN'T THINK THAT THE LOGS

16   WOULD MOVE FROM ONE VERSION TO THE OTHER, BUT I'M NOT SURE ON

17   THAT.

18   Q.    AND THAT'S JUST SPECULATION?

19   A.    CORRECT.

20   Q.    CAN YOU TELL US -- YOU'VE SEEN EXHIBIT 1.  THE

21   PROSECUTOR HAD YOU IDENTIFY EXHIBIT 1.  IS IT FAIR TO SAY IT

22   IS SPLIT UP INTO VARIOUS TRANSCRIPTS, A, B, C, D, THAT SORT

23   OF THING?

24   A.    YES, THAT'S CORRECT, EXHIBIT 1 IS.

25   Q.    IS THAT HOW -- THE PROGRAM THAT YOU'RE TALKING ABOUT

1    THAT CONVERTED THE UNREADABLE LOGS INTO READABLE TRANSCRIPTS,

2    IS THAT HOW IT PRODUCED THE TRANSCRIPTS, A NUMBER OF

3    DIFFERENT TRANSCRIPTS, IN OTHER WORDS?

4    A.    NO, IT WASN'T SPLIT UP INTO THAT MANY SECTIONS.  THOSE

5    WERE EXCERPTS.  THE ONES I PRODUCED, I PRODUCED I BELIEVE

6    AROUND FIVE DIFFERENT FILES THAT HAD THE TRANSCRIPTS IN IT SO

7    THEY WERE MORE LIKE ONE BIG LONG TRANSCRIPT.

8    Q.    YOU'RE SAYING THAT THE TRANSCRIPTS THAT YOU PRODUCED

9    WERE NOT THE SAME AS THE TRANSCRIPTS THERE?

10   A.    THOSE ARE EXCERPTS.  SORRY.

11             MR. MICHAEL:  IT'S ALL RIGHT.

12             THE WITNESS:  IT'S NOT -- THOSE DON'T -- I DON'T

13   BELIEVE THAT THOSE INCLUDE ALL OF THE PAGES THAT I PRODUCED.

14   THEY'RE LIKE -- THEY WOULD BE LIKE EXCERPTS, LIKE I BELIEVE

15   THEY HAD THE CHATS.  THERE WERE TWO DIFFERENT SCREEN NAMES ON

16   BOTH COMPUTERS WHICH WOULD ACCOUNT FOR FOUR OF THE FILES AND

17   I CAN'T REMEMBER WHAT THE FIFTH FILE WAS, BUT EXHIBIT 1

18   INCLUDES THOSE FOUR DIFFERENT CHAT DOCUMENTS THAT I PRODUCED,

19   BUT THEY WOULD BREAK THEM INTO DIFFERENT PARTS.  IN OTHER

20   WORDS, IF THERE WAS MAYBE A MIDDLE SECTION THAT WASN'T

21   PERTINENT, YOU KNOW, THEY WOULD TAKE THAT OUT AND IT WOULD

22   BREAK IT INTO A AND B.  DID I MAKE THAT CLEAR OR --

23   Q.    I THINK SO.  LET'S EXPLORE THAT FOR A MINUTE.  YOU HAD

24   FOUR OR MAYBE FIVE DIFFERENT TRANSCRIPTS WHICH WERE MUCH

25   LONGER?

1    A.    CORRECT.  I BELIEVE IT WAS FIVE.

2    Q.    OKAY.  ALL RIGHT.

3              MR. MICHAEL:  YOUR HONOR, I'M GOING TO OBJECT TO

4    THIS LINE OF QUESTIONING AND --

5              THE COURT:  ON WHAT BASIS?

6              MR. MICHAEL:  I BELIEVE IT WOULD BE APPROPRIATE TO

7    DO IT AT SIDEBAR.

8              THE COURT:  ALL RIGHT.  LET'S TAKE A STRETCH AND

9    APPROACH THE SIDEBAR.

10             (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

11             MR. MICHAEL:  YOUR HONOR, DEFENSE MOVED TO KEEP THE

12   CHATS OUT OF EVIDENCE AND GOVERNMENT WAS DIRECTED IN RESPONSE

13   TO AN OBJECTION TO IDENTIFY THE EXCERPTS THAT IT WOULD USE AT

14   TRIAL.  THE GOVERNMENT COMPLIED WITH THE COURT'S ORDER.

15   AFTER HAVING ALREADY SOUGHT TO INTRODUCE THE ENTIRETY OF THE

16   CHAT TRANSCRIPTS, DEFENSE COUNSEL IS NOW EXPLOITING THE FACT

17   THAT THE GOVERNMENT COMPLIED WITH THE COURT'S ORDER IN

18   RESPONSE TO THAT OBJECTION TO MAKE IT SEEM AS IF THESE DON'T

19   ACCURATELY REPRESENT THE CHATS.

20             MR. AARON:  I MUST BE CONFUSED BECAUSE I THOUGHT --

21   I MUST BE CONFUSED BECAUSE I THOUGHT THAT THAT'S THE WAY THEY

22   CAME OUT OF THE TEXT EDITOR, THEY CAME OUT IN THAT FORMAT,

23   BECAUSE WE'VE HAD A NUMBER OF CONVERSATIONS ABOUT THIS.  FOR

24   EXAMPLE, THE NUMBER OF CONVERSATIONS IN EXHIBIT -- SEE WHERE

25   THERE'S ONLY ONE APPEARING?  I'M NOT SURE.  I'M NOT SURE THAT

```
 1    I EVER HAD WHAT HE'S TALKING ABOUT.  HE'S TALKING ABOUT FIVE

 2    SEPARATE CHAT TRANSCRIPTS.  I DON'T RECALL HAVING THAT.

 3              MR. MICHAEL:  THE GOVERNMENT I BELIEVE WAS GIVEN

 4    FIVE CHATS AND FIVE PORTIONS AND THEY WERE ALL PRINTED OUT

 5    AND THEY WERE ALL PRODUCED TO DEFENSE COUNSEL AND THE

 6    GOVERNMENT ATTACHED ALL THOSE TO ITS 404(B) MOTION.  AND IT

 7    WAS ONLY BROKEN INTO THESE PORTIONS AFTER THE OBJECTIONS BY

 8    DEFENDANT AND YOUR HONOR'S RULING.

 9              MR. AARON:  I WILL HAVE TO CHECK THOSE

10    TRANSCRIPTS.  WHAT I WOULD AGREE -- WHAT I WOULD AGREE TO DO

11    IS TO MOVE ON TO A DIFFERENT AREA.

12              THE COURT:  WHY DON'T YOU REWORD THAT?

13              MR. AKROTIRIANAKIS:  PARDON ME, YOUR HONOR.  COULD

14    YOU CLARIFY, COUNSEL, PLEASE, THE CONFUSION THAT --

15              MR. AARON:  I DON'T KNOW THAT IT IS CONFUSION.  I

16    SAID THAT ON TRANSCRIPTS --

17              THE COURT:  WELL, WHY DON'T YOU DO THAT, BUT I DO

18    THINK THERE'S A CONFUSION BECAUSE I THINK -- LET ME THINK

19    JUST A MOMENT.  IT SEEMS TO ME THAT THIS LINE OF QUESTIONING

20    HAS LEFT IN THE AIR THAT THE GOVERNMENT HAS ONLY PRODUCED

21    HERE IN COURT LIMITED EXCERPTS, AND THAT'S BECAUSE THAT'S

22    WHAT THE GOVERNMENT WAS ORDERED TO DO IN RESPONSE TO A

23    DEFENSE OBJECTION, NOT FOR ANY OTHER REASON.

24              MR. AARON:  IF THAT'S YOUR HONOR'S -- I WILL

25    STIPULATE THAT WE CAN PERHAPS HAVE SOME SORT OF STIPULATION.
```

```
 1            THE COURT:  THAT'S WHAT I BELIEVE WOULD BE
 2   APPROPRIATE.
 3            MR. AARON:  AND I NEVER TRIED TO USE ANY
 4   UNDERHANDED OR DUPLICITAS MEANS.
 5            THE COURT:  I DON'T THINK -- I AGREE, MR. AARON.
 6   I DON'T THINK YOU'VE DONE ANY DUPLICITAS.
 7            MR. AKROTIRIANAKIS:  ABSOLUTELY, YOUR HONOR.
 8            THE COURT:  SO LET'S COME UP WITH A STIPULATION AT
 9   THE RECESS.
10            MR. AARON:  IF I MIGHT CHECK THE CHAT TRANSCRIPTS
11   FIRST.
12            MR. AKROTIRIANAKIS:  CREATED CONFUSION.
13            THE COURT:  I THINK THERE'S AN INNOCENT POSSIBILITY
14   OF CONFUSION ABOUT IT.
15            MR. AARON:  THANK YOU, YOUR HONOR.
16         (ON-THE-RECORD DISCUSSION AT SIDEBAR CONCLUDED.)
17            THE COURT:  THANK YOU.
18            MR. AARON, YOU MAY RESUME.
19            MR. AARON:  THANK YOU.
20   BY MR. AARON:
21   Q.   DO YOU KNOW HOW ICQ SAVES THE CHAT TRANSCRIPTS?
22   A.   NO, I DO NOT.
23   Q.   DO YOU KNOW IF ICQ SAVES ALL THE CHATS THAT ARE TAKING
24   PLACE AT ONE TIME IN THE SAME TRANSCRIPT OR LOG?
25   A.   COULD YOU CLARIFY THE QUESTION A LITTLE BIT?
```

1    Q.   SURE.  LET'S SAY MY SCREEN NAME IS JEFF AND I'M HAVING A

2    CHAT WITHIN ONE ICQ WINDOW WITH JOE.  AND THEN I'M HAVING

3    ANOTHER CHAT IN ANOTHER ICQ WINDOW WITH BILL.  WOULD ICQ SAVE

4    BOTH OF THOSE CHATS IN THE SAME LOG?

5    A.   I DON'T KNOW.

6    Q.   CAN YOU TAKE A LOOK AT EXHIBIT 1F?

7    A.   OKAY.

8    Q.   IF YOU COULD TAKE A LOOK AT AN ENTRY BY GARBIE,

9    G-A-R-B-I-E, AT 1/1/01, 7:26 P.M.

10   A.   OKAY.

11   Q.   NOW, THE NEXT ENTRY RIGHT BEFORE THE ENTRY BY GARBIE IS

12   AN ENTRY BY --

13          MR. MICHAEL:  OBJECTION, YOUR HONOR, REFERRING TO

14   THE CONTENTS OF THE DOCUMENT THAT IS NOT IN EVIDENCE.

15          THE COURT:  DON'T READ THE CONTENTS IN, MR. AARON,

16   UNTIL THEY'VE BEEN ADMITTED.

17          MR. AARON:  I'M ACTUALLY TALKING ABOUT -- I'M NOT

18   READING THE CONTENTS OF THE COMMUNICATION.  I'M JUST TALKING

19   ABOUT THE --

20          THE COURT:  THE ENTRY.  YOU WANT TO DIRECT HIS

21   ATTENTION TO THE ENTRY?

22          MR. AARON:  YES.

23   BY MR. AARON:

24   Q.   THE NEXT ENTRY BY SARLO99 AT 1/1/01 AT 10 P.M.

25   A.   CORRECT.

1    Q.   AND IT APPEARS THERE'S A GAP THERE OF APPROXIMATELY

2    TWO AND A HALF HOURS?

3    A.   CORRECT.

4    Q.   THEN IF COULD YOU TAKE A LOOK AT EXHIBIT Y -- I'M SORRY,

5    1Y.  IF YOU COULD TAKE A LOOK AT AN ENTRY BY SPEED AT 1/1/01,

6    7:59 P.M.

7    A.   OKAY.

8    Q.   NOW, IT APPEARS THAT THE TRANSCRIPT CONTINUES UNTIL --

9    IF YOU COULD GO --

10          MR. MICHAEL:  YOUR HONOR, I WOULD RENEW THE SAME

11   OBJECTION.

12          THE COURT:  AS LONG AS THE QUESTIONING IS LIMITED

13   TO THE TIME PERIODS AND NOT THE TEXT OF THE CONVERSATIONS,

14   THE OBJECTION IS OVERRULED.

15   BY MR. AARON:

16   Q.   IT'S THE THIRD PAGE AFTER THAT.  IT'S AN ENTRY BY

17   SINGULARIT, IT'S ACTUALLY SINGULARITY, BUT 1/1/01 AT

18   9:18 P.M.

19   A.   CORRECT.

20   Q.   NOW, THAT TIME PERIOD -- WOULD YOU AGREE THE TIME PERIOD

21   FROM 1/1, 7:27 P.M., TO 1/1 AT 10 P.M. IN EXHIBIT 1F, SEEMS

22   TO INCLUDE THE TIME PERIOD FROM EXHIBIT 1Y, RIGHT?

23   A.   THESE ARE FROM TWO DIFFERENT LOG FILES.

24   Q.   OKAY.

25   A.   THE FIRST ONE THAT YOU HAD ME READ, I BELIEVE IT WAS 1F,

1    WAS FROM A DIFFERENT -- I PRODUCED --

2            MR. MICHAEL:  OBJECTION.  THERE'S NO QUESTION

3    PENDING.

4            THE COURT:  THE OBJECTION IS SUSTAINED AND THE

5    ANSWER -- OR THE WITNESS' LAST STATEMENT IS ORDERED STRICKEN.

6    BY MR. AARON:

7    Q.   SO IF THERE'S -- IS IT FAIR TO SAY -- THESE ARE NOT

8    TRICK QUESTIONS.  I'M TRYING TO UNDERSTAND.

9            IS IT FAIR TO SAY THAT IF YOU USE A DIFFERENT USER

10   NAME, YOU WILL HAVE A DIFFERENT LOG FILE?

11   A.   THE LOG FILE -- THE FOUR DIFFERENT LOG FILES I PRODUCED

12   WAS -- ONE WAS THE ICQ NUMBER FOR MR. BEKENSTEIN.  I BELIEVE

13   USED SPEED AND DR. DOOM.  AND SO THEY WERE -- ON ONE COMPUTER

14   THERE WAS A LOG FILE OR MIGHT HAVE BEEN TWO LOG FILES FOR

15   SPEED AND THEN THERE WOULD BE ANOTHER LOG FILE FOR DR. DOOM.

16           MR. MICHAEL:  OBJECTION, NONRESPONSIVE TO THE

17   QUESTION.

18           THE WITNESS:  I'M TRYING TO ANSWER THE QUESTION.

19           THE COURT:  EXCUSE ME, BUT I'M THE ONE THAT RULES

20   ON THE OBJECTION.

21           THE WITNESS:  SORRY.

22           THE COURT:  AND THIS ONE IS SUSTAINED.

23   BY MR. AARON:

24   Q.   WHAT I'M TRYING TO UNDERSTAND IS YOU HAD FIVE -- YOU

25   BELIEVE THERE WERE FIVE SEPARATE LOG FILES WHEN YOU DID THE

1   EXAMINATION OF MR. BEKENSTEIN'S COMPUTER?

2   A.   CORRECT.

3   Q.   MY QUESTION TO YOU IS, IS THERE A DIFFERENT LOG FILE

4   CREATED IN THE CHAT ARCHIVE FOR EACH USER NAME?

5   A.   ARE YOU TALKING ABOUT FOR ALL INSTANCES OR JUST ON

6   MR. BEKENSTEIN'S COMPUTER?

7   Q.   LET'S START WITH MR. BEKENSTEIN'S COMPUTER.

8   A.   OKAY.   COULD YOU -- I LOST TRACK OF THE QUESTION.

9   Q.   IS THERE A DIFFERENT LOG FILE CREATED FOR EACH USER

10   NAME?   IN OTHER WORDS, WOULD THERE BE -- IF -- ASSUMING

11   MR. BEKENSTEIN USED THE NAME DR. DOOM, WOULD THERE BE ONE LOG

12   FILE CONTAINING ALL OF THE DR. DOOM CONVERSATIONS?   AND THEN

13   ASSUMING HE ALSO USED THE NAME SPEED, WOULD THERE BE ANOTHER

14   LOG FILE CONTAINING ALL OF THE CHAT CONVERSATIONS FOR THE

15   NAME SPEED?

16   A.   ON MR. BEKENSTEIN'S COMPUTER, THAT'S CORRECT.   I DID

17   FIND THEM SEPARATED OUT; HOWEVER, I BELIEVE ON ONE COMPUTER I

18   DID FIND TWO LOG FILES FOR THE SAME SCREEN NAME.

19   Q.   AND DO YOU KNOW WHY THAT WOULD BE?

20   A.   I ASSUMED IT WAS -- THE DATE PERIOD SEEMED DIFFERENT IN

21   THE TRANSCRIPTS SO I ASSUMED IT WAS CONVERSATIONS THAT TOOK

22   PLACE ON DIFFERENT DATES.

23   Q.   I WAS GETTING TO THAT.   ALL RIGHT.   WE'VE ESTABLISHED ON

24   MR. BEKENSTEIN'S COMPUTER IT APPEARS THAT EACH TIME THERE'S A

25   DIFFERENT USER NAME THERE'S A DIFFERENT CHAT LOG?

1   A.    CORRECT.

2   Q.    OKAY.  NOW, WITHIN THAT CHAT LOG LET'S SAY -- JUST AN

3   EXAMPLE.  LET'S SAY MR. BEKENSTEIN HAD A CHAT ON JANUARY 1ST

4   AND THEN ON JANUARY 10TH AND THEN ON JANUARY 20TH ALL USING

5   THE SCREEN NAME DR. DOOM, WOULD ALL OF THOSE CONVERSATIONS BE

6   IN THE SAME CHAT LOG?

7   A.    I DON'T KNOW.

8   Q.    WHEN YOU SAW THE FIVE CHAT LOGS THAT YOU HAD, DID THEY

9   CONTAIN MULTIPLE DATES OR WERE THEY JUST A SINGLE DATE?

10  A.    THEY WERE MULTIPLE DATES.  THEY WOULD START -- THEY

11  WOULD BE SEQUENTIAL.  THEY WOULD START AT A CERTAIN DATE AND

12  GO TO, YOU KNOW, A LATER DATE SO THEY CONTAINED MULTIPLE

13  DAYS.

14  Q.    OKAY.  DO YOU KNOW IF THE CONVERSATIONS THAT YOU

15  DOWNLOADED AND THEN USED THE TEXT EDITOR TO CHANGE INTO

16  ORDINARY ENGLISH, DO YOU KNOW IF THOSE WERE ALL OF THE

17  CONVERSATIONS?  FOR EXAMPLE, DO YOU KNOW THAT YOU HAD ALL OF

18  THE CONVERSATIONS THAT MR. BEKENSTEIN HAD AS DR. DOOM?

19  A.    YES.  THEY WERE ALL THAT I COULD FIND.  I LOOKED AND

20  THOSE WERE ALL THAT I COULD FIND.

21  Q.    NO, NO, NO.  MY QUESTION IS -- AND FORGIVE ME FOR

22  CONFUSING YOU.  DO YOU KNOW WHETHER OR NOT THOSE WERE ALL THE

23  CONVERSATIONS THAT MR. BEKENSTEIN HAD?

24  A.    NO, I DO NOT KNOW.

25  Q.    SO HE COULD HAVE HAD OTHER CONVERSATIONS THAT WEREN'T

1   PICKED UP FOR WHATEVER REASON AND ARCHIVED?

2   A.   CORRECT, OR THE LOGS GOT DELETED, CORRECT.

3   Q.   DOES IT EVER HAPPEN THAT THE PROGRAM THAT YOU USE TO

4   CONVERT THE UNREADABLE CHAT LOGS INTO READABLE CHAT

5   TRANSCRIPTS OMITS A SPEAKER ENTIRELY?

6   A.   NOT TO MY KNOWLEDGE.  I DON'T KNOW FOR SURE.

7   Q.   HAVE YOU EVER KNOWN OF THAT TO HAPPEN?

8   A.   NO.

9   Q.   THAT WOULD BE PRETTY UNUSUAL?

10  A.   I COULDN'T STATE ON THAT.  I'M LIMITING MY ANSWERS TO

11  HOW I'VE USED THE PROGRAM.

12         MR. AARON:  I WOULD LIKE TO APPROACH, YOUR HONOR.

13         THE COURT:  YOU MAY.

14         MR. AARON:  I HAVE A COPY OF THE EXHIBIT FOR THE

15  COURT.

16         THE COURT:  YOU MAY.

17  BY MR. AARON:

18  Q.   SHOWING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION

19  EXHIBIT NO. 203, IF YOU COULD TAKE A MOMENT AND REVIEW THAT

20  TO YOURSELF, PLEASE.

21  A.   OKAY.

22  Q.   ARE YOU FINISHED?

23  A.   YEAH.  I DON'T NEED TO READ ALL OF THE CONTEXT OF THE

24  STUFF I ASSUME.

25  Q.   THAT'S CORRECT.  IF YOU CAN TAKE A LOOK AT EXHIBIT 1Y IN

1   THE BINDER NEXT TO YOU FOR JUST A MOMENT, AND IF I COULD

2   DIRECT YOUR ATTENTION, PLEASE, TO THE ENTRY BY DRAGON AT

3   1/2/01, 11:21 A.M.

4   A.   OKAY.

5   Q.   NOW, COULD YOU READ TO YOURSELF EXHIBIT 1Y FROM 1/2/01,

6   DRAGON SPEAKING, AT 11:20 A.M. THROUGH THE END?  IT'S ONLY

7   TWO PAGES.

8   A.   OKAY.

9   Q.   DOES EXHIBIT Z SEEM TO BE ONE SIDE OF THAT CONVERSATION?

10          MR. MICHAEL:  OBJECTION, YOUR HONOR.  I BELIEVE IT

11   IS EXHIBIT 203.

12          MR. AARON:  I BEG YOUR PARDON.  COUNSEL IS CORRECT.

13   BY MR. AARON:

14   Q.   DOES EXHIBIT 203 APPEAR TO BE ONE SIDE OF THE

15   CONVERSATION IN THE PORTION OF EXHIBIT 1Y THAT I POINTED YOU

16   TO?

17   A.   CORRECT.

18   Q.   AND YOU HAVE NO EXPLANATION FOR WHY THAT WOULD BE?

19   A.   I HAVE AN EXPLANATION.  DO YOU WANT TO HEAR IT?

20   Q.   DO YOU HAVE AN EXPLANATION OF WHY THE TEXT EDITOR MIGHT

21   HAVE DONE THAT?

22   A.   YES.  I DON'T BELIEVE THAT THE CONVERTER PROGRAM DID

23   THIS.  I BELIEVE THAT AFTER I SUPPLIED MY TRANSCRIPTS I GAVE

24   THEM IN PRINTED FORM AND IN CD FORM.  I BELIEVE THAT THE WORD

25   DOCUMENT THAT SOMEONE WENT IN AND SELECTIVELY PICKED OUT JUST

1   DRAGON'S CONVERSATION AND SAVED IT TO A DIFFERENT DOCUMENT.

2   THIS ISN'T THE DOCUMENT THAT I PRODUCED, THIS EXHIBIT 213.

3   Q.   DO YOU KNOW WHO HAD GONE INTO THE WORD DOCUMENT AND DONE

4   THAT?

5   A.   NO, I DO NOT.

6   Q.   HOW DO YOU KNOW THAT HAPPENED?

7   A.   I DON'T KNOW THAT IT DID, BUT THAT'S THE LIKELY

8   EXPLANATION, IN MY VIEW, BECAUSE THIS ISN'T THE PRINTED PAGE

9   THAT I PRODUCED.

10  Q.   AND YOU'RE SURE OF THAT?

11  A.   YES, YES, BECAUSE OF --

12  Q.   THANK YOU.  NOTHING PENDING.

13       YOU TALKED A LITTLE BIT IN YOUR DIRECT EXAMINATION

14  ABOUT WHAT'S CALLED A HASH VALUE.

15  A.   CORRECT.

16  Q.   AND A HASH VALUE IS THE SECURITY DEVICE, RIGHT?

17  A.   IT'S --

18  Q.   IN THIS CONTEXT.

19  A.   WELL, IT CAN BE USED -- I GUESS IN THIS CONTEXT, IT'S

20  KIND OF LIKE AN IDENTIFICATION DEVICE.

21  Q.   AND WHAT YOU DO IS YOU HAVE THE HASH VALUE CALCULATED

22  FOR THE ORIGINAL COMPUTER, THE DRIVE ON THE ORIGINAL

23  COMPUTER, AND THEN YOU HAVE IT CALCULATED FOR THE MIRROR

24  IMAGE OR THE CLONE DRIVE THAT YOU'RE MAKING?

25  A.   CORRECT.

1    Q.    AND IF THEY MATCH, THEY'RE THE SAME THING?

2    A.    CORRECT.

3    Q.    SO THE ESSENCE OR REALLY THE FUNDAMENTAL BASIS OF YOUR

4    BEING ABLE TO ASSURE THE JURY THAT THAT'S AN ACCURATE DRIVE,

5    THE DRIVE THAT WAS CREATED AND FROM WHICH THESE IMAGES AND

6    WHATNOT ARE DRAWN, DEPENDS UPON THE SECURITY OF THE HASH

7    VALUE, RIGHT?

8    A.    CORRECT.

9    Q.    IF THE HASH VALUE IS NOT SECURE, THEN YOU'VE GOT TO

10   THROW OUT THAT EXAMINATION, RIGHT?

11   A.    NO.

12   Q.    WELL, YOU'VE GOT NO WAY OF ASSURING THAT IT'S AN EXACT

13   COPY, RIGHT?

14   A.    WELL, I DON'T KNOW HOW FAR YOU WANT ME TO GO INTO THE

15   EXPLANATION, BUT THE WAY THAT WE USE THE MD5 HASH, CORRECT,

16   IF THEY DIDN'T MATCH THE WAY THAT I --

17            MR. AARON:  IT'S NONRESPONSIVE.

18            THE COURT:  THE OBJECTION IS SUSTAINED AND THE

19   WITNESS' ANSWER TO THE LAST QUESTION IS ORDERED STRICKEN

20   WHICH MEANS, LADIES AND GENTLEMEN, YOU ARE TO DISREGARD IT.

21   BY MR. AARON:

22   Q.    IF YOU DO AN ANALYSIS AND YOU GET ONE HASH VALUE FOR THE

23   ORIGINAL COMPUTER AND THEN THE TARGET DRIVE THAT YOU'RE

24   CREATING HAS A DIFFERENT HASH VALUE, WHAT DO YOU DO?

25   A.    I WOULD RECOPY THE DRIVE.

1    Q.   BECAUSE YOU CAN'T BE SURE THAT THE DRIVE THAT YOU'VE

2    COPIED IS THE SAME AS THE ORIGINAL ONE, RIGHT?

3    A.   CORRECT.

4    Q.   SO THAT'S A FUNDAMENTAL BASIS BY WHICH YOU'RE ASSURING

5    THIS JURY THAT THE COPY DRIVE IS THE SAME AS THE ORIGINAL

6    DRIVE?

7    A.   CORRECT.

8    Q.   SO IT'S A VERY IMPORTANT SECURITY MEASURE?

9    A.   CORRECT.

10   Q.   THE MD5 HASH VALUE WAS DESIGNED BY WHO?

11   A.   I DON'T KNOW THE COMPANY.

12   Q.   IT WAS ACTUALLY A MAN.  IT WAS RON RIVEST.  DO YOU KNOW

13   WHY HE DESIGNED IT?

14   A.   NO.

15   Q.   DO YOU KNOW WHAT IT REPLACED?

16   A.   THERE WAS AN MD4 BEFORE THAT, BUT I DON'T --

17   Q.   IT IS POSSIBLE FOR A COMPUTER TO INCORRECTLY CALCULATE A

18   HASH VALUE, RIGHT?

19   A.   IT'S POSSIBLE, IF THERE WAS A MEMORY ERROR, SURE.

20   Q.   BUT ESSENTIALLY, A HASH VALUE IS LIKE A FINGERPRINT,

21   CORRECT?

22   A.   CORRECT.

23   Q.   IT'S A UNIQUE NUMBER LIKE A FINGERPRINT IS UNIQUE?

24   A.   CORRECT, IT'S LIKE A FINGERPRINT.

25   Q.   WHEN YOU GET A HASH VALUE FOR THE ORIGINAL DRIVE, YOU

1   KNOW THAT NO OTHER COMPUTER IS GOING TO HAVE THAT HASH VALUE,

2   SO IF THE TARGET DRIVE HAS THAT HASH VALUE, THEY'VE GOT TO BE

3   THE SAME THING?

4   A.   CORRECT.

5   Q.   NOW, ISN'T IT TRUE THAT AS EARLY AS ABOUT THE '90S,

6   ABOUT 1996, THAT COMPUTER SCIENTISTS WERE DISCOVERING THAT

7   THE MD5 HASH VALUE WAS COMPROMISED?

8   A.   I DON'T BELIEVE IT WAS THAT EARLY.  I BELIEVE THE

9   CHINESE MATHEMATICIANS DID IT VERY RECENTLY.

10   Q.   BY THE CHINESE MATHEMATICIANS, YOU'RE TALKING ABOUT

11   XIAYUN WANG?

12   A.   I DON'T KNOW THE GROUP OF MATHEMATICIANS THAT DID THAT.

13        MR. AARON:   YOUR HONOR, I WOULD LIKE TO APPROACH

14   WITH EXHIBIT NO. 204 AND I HAVE A COPY FOR THE COURT.

15        THE COURT:   YOU MAY.  AND YOU MAY APPROACH THE

16   WITNESS WITH IT.

17   BY MR. AARON:

18   Q.   SIR, I'M APPROACHING YOU WITH A COPY OF EXHIBIT NO.

19   204.  IF YOU WOULD READ THAT TO YOURSELF AND LET US KNOW WHEN

20   YOU'RE DONE.

21   A.   I'M FAMILIAR WITH THIS DOCUMENT.  DO YOU WANT ME TO LOOK

22   IT OVER.

23   Q.   IF YOU'RE FAMILIAR WITH IT, THAT'S FINE.

24        WHEN YOU WERE TALKING ABOUT THE CHINESE

25   MATHEMATICIANS WHO DISCOVERED THE PROBLEMS WITH THE MD5 HASH

1   ALGORITHM, THIS IS THE MATHEMATICAL PAPER THAT YOU'RE TALKING

2   ABOUT?

3   A.    CORRECT.

4   Q.    AND IT'S ENTITLED "COLLISIONS FOR HASH FUNCTIONS"?

5   A.    CORRECT.

6   Q.    AND A COLLISION IS WHEN YOU HAVE TWO SEPARATE BODIES OF

7   DATA THAT YIELD THE SAME NUMBER?

8   A.    RIGHT, TWO DIFFERENT FILES THAT WOULD YIELD THE SAME

9   NUMBER.

10  Q.    BECAUSE OF THAT, COMPUTER SCIENTISTS SAID THAT PEOPLE

11  SHOULD START USING OTHER ALGORITHMS OTHER THAN THE MD5, THAT

12  THEY SHOULD START USING SHA-1, THINGS LIKE THAT, MORE SECURE?

13  A.    SOME SAY THAT.

14  Q.    WHAT THEY DISCOVERED -- AND I'M HOLDING UP EXHIBIT 204.

15  WHAT THEY DISCOVERED IS THAT BASICALLY TWO DIFFERENT

16  COMPUTERS CAN ON OCCASION YIELD THE SAME MD5 HASH NUMBER,

17  RIGHT?

18  A.    WELL, THAT'S NOT ENTIRELY CORRECT.

19  Q.    THEY ALSO NOTE IN -- I'M READING FROM IT AND TELL ME

20  WHETHER OR NOT YOU AGREE WITH THIS.  IN 1993 BURT BOYER AND

21  --

22          MR. MICHAEL:  OBJECTION, YOUR HONOR.  IT'S NOT IN

23  EVIDENCE.  HE'S READING FROM THE DOCUMENT.

24          THE COURT:  SUSTAINED.

25  BY MR. AARON:

1   Q.   YOU'VE READ THIS DOCUMENT, EXHIBIT NO. 204?

2   A.   I LOOKED AT IT PREVIOUSLY.  DO YOU WANT ME TO REREAD IT

3   AGAIN?

4   Q.   NO, NO, THAT'S OKAY.  WHEN YOU READ IT PREVIOUSLY, YOU

5   READ IT BECAUSE YOU WERE UPDATING YOURSELF WITH COMPUTER

6   SCIENCE DEVELOPMENTS?

7   A.   CORRECT.

8   Q.   AND THIS IS THE SORT OF DOCUMENT THAT COMPUTER

9   SCIENTISTS WOULD REASONABLY RELY UPON?

10  A.   CORRECT.

11  Q.   LET ME READ YOU ONE SENTENCE FROM IT AND TELL ME IF YOU

12  AGREE OR DISAGREE.  IN 1993 BURT BOYER AND ANTON BUESLER

13  FOUND PSEUDOCOLLISION FOR MD5 WHICH IS MADE OF THE SAME

14  MESSAGE WITH TWO DIFFERENT SETS OF INITIAL VALUE.

15        DO YOU AGREE OR DISAGREE?

16  A.   THAT'S WHAT THE DOCUMENT SAYS.

17  Q.   WOULD YOU AGREE OR DISAGREE THAT DR. WANG AND HIS FELLOW

18  SCIENTISTS FOUND COLLISIONS USING THE MD5 HASH ALGORITHM

19  INVOLVING DIFFERENT SETS OF DATA?

20  A.   CORRECT.

21  Q.   SO IN OTHER WORDS, IT'S THE SAME THING AS HAVING

22  DIFFERENT COMPUTERS COLLIDING AT THE SAME MD5 HASH NUMBER OR

23  PRODUCING THE SAME MD5 HASH NUMBER?

24  A.   IT WOULD BE SIMILAR TO THAT.

25  Q.   SO IT'S DIFFERENT THAN TWO INDIVIDUALS WHO COULD NEVER

1    HAVE THE SAME FINGERPRINT, RIGHT, BECAUSE HERE YOU HAVE TWO

2    COMPUTERS WHICH CAN PRODUCE THE SAME --

3    A.    NO.    IT'S THE WAY WE COMPUTE WITH THE WAY THEY IDENTIFY

4    FINGERPRINTS.    THERE'S A POSSIBILITY THAT TWO PEOPLE COULD --

5    COULD HAVE THE SAME FINGERPRINT.    THE WAY WE -- THE WAY THE

6    COMPUTER HAS COMPUTERIZED THE FINGERPRINTS NOWADAYS, IT'S

7    POSSIBLE.

8    Q.    ALL RIGHT.    SO YOU'RE SAYING THAT COMPUTERS ARE NOT

9    UNIQUE TO AN INDIVIDUAL, BUT ONE MORE INDIVIDUALS CAN HAVE

10   THE SAME FINGERPRINTS?

11   A.    WHAT I'M SAYING IS THAT LIKE THE MD5 HASH WHERE THEY

12   CREATED TWO DIFFERENT FILES THAT HAD THE -- THEY WERE

13   DIFFERENT FILES THAT HAD THE SAME MD5 HASH.    THE WAY THE

14   FINGERPRINTS ARE IDENTIFIED, THEY'RE DONE WITH RIDGES AND

15   POINTS.    IT'S A VERY MATHEMATICAL THING THAT HAS -- THERE'S

16   AN ODDS OF TWO FINGERPRINTS FROM DIFFERENT PEOPLE.    THERE'S A

17   MATHEMATICAL ODDS THAT THEY WILL SHOW THE SAME FINGERPRINTS

18   FROM TWO DIFFERENT PEOPLE.    JUST LIKE THE MD5.    IN FACT, THE

19   MD5, THE ODDS ARE A LOT BETTER.    IT'S MUCH MORE ACCURATE THAN

20   FINGERPRINTING OR EVEN DNA.

21   Q.    BUT BASICALLY THE PROBLEM THAT THE MD5 HAS, ALTHOUGH IT

22   MAY BE RARE, IT'S POSSIBLE FOR TWO SEPARATE COMPUTERS TO

23   PRODUCE THE SAME HASH NUMBER?

24   A.    CORRECT.

25   Q.    AND IN THAT CASE IF YOU WERE DOING AN ENCASE REPORT, YOU

1   MIGHT CONCLUDE THAT THOSE WERE THE SAME HARD DRIVES BECAUSE

2   THEY HAD THE SAME HASH NUMBER, RIGHT?

3   A.   CORRECT.

4   Q.   ARE THE CHAT ARCHIVES KEPT IN MORE THAN ONE PLACE ON THE

5   HARD DRIVE?

6   A.   ARE TALKING JUST FOR ICQ OR FOR --

7   Q.   I'M SORRY, FOR ICQ.

8   A.   I BELIEVE THEY ARE STORED IN ONE FOLDER.

9   Q.   TURNING YOUR ATTENTION, PLEASE, TO EXHIBIT NO. 5, CAN

10  YOU TAKE A LOOK AT PAGE 4?

11          MR. AARON:   YOUR HONOR, PREVIOUSLY I BELIEVE THE

12  COURT SAID THAT THE EXHIBIT CAN BE PUBLISHED.

13          THE COURT:   EXHIBIT 4?

14          MR. AARON:   NO, I'M SORRY, EXHIBIT 5.   I WAS

15  DIRECTING HIM TO PAGE 4 OF EXHIBIT 5.

16          THE COURT:   I'M SORRY.   EXHIBIT 5 HAS BEEN

17  ADMITTED.   CORRECT?   I BELIEVE SO.

18          MR. MICHAEL:   YES, YOUR HONOR.

19          THE COURT:   YES.   THE EXHIBIT MAY BE PUBLISHED,

20  YES.

21  BY MR. AARON:

22  Q.   IF I MIGHT DRAW YOUR ATTENTION TO THE SCREEN.   DO YOU

23  SEE RIGHT UNDER -- RIGHT UNDER "DEFAULTS"?   DO YOU SEE RIGHT

24  THERE?

25  A.   CORRECT.

1    Q.   THERE'S ICQ ACC WITH CHATS?

2    A.   CORRECT.

3    Q.   AND THAT'S ON PAGE 4 OF 18 OF YOUR STUDY?

4    A.   CORRECT.

5    Q.   IF YOU TURN YOUR ATTENTION TO PAGE 5, THERE APPEARS TO

6    BE IN THE FIRST COLUMN ABOUT TWO-THIRDS OF THE WAY DOWN ICQ,

7    THE ICQ FOLDER?

8    A.   CORRECT.

9    Q.   AND THEN GOING DOWN FURTHER ON, THERE APPEARS TO BE THE

10   VERY TOP OF THE SECOND COLUMN, CHAT?

11   A.   CORRECT.

12   Q.   NOW, YOU'RE -- ONE MORE PAGE.  IF I COULD TURN YOUR

13   ATTENTION TO PAGE 11 OF 18.

14   A.   OKAY.

15   Q.   IN THE SECOND COLUMN THERE APPEARS TO BE AN ICQ FOLDER,

16   AND THEN ON THE THIRD COLUMN AGAIN WE SEE CHAT?

17   A.   CORRECT.

18   Q.   AND THEN FURTHER DOWN CHATS AGAIN?

19   A.   CORRECT.

20   Q.   THERE'S A FUNCTION IN WINDOWS -- WELL, AT LEAST IN

21   WINDOWS XP -- WHERE YOU CAN LOOK IN WINDOWS EXPLORER AND IT

22   WILL SHOW YOU KIND OF A FILE TREE, RIGHT?

23   A.   CORRECT.

24   Q.   AND YOU CAN BREAK IT DOWN.  YOU CAN GO UP A LEVEL, DOWN

25   A LEVEL, AND YOU CAN ACTUALLY SEE THE FILES THAT ARE IN THAT

1    FILE?

2    A.    CORRECT.

3    Q.    CAN YOU DO THAT WITH ENCASE?

4    A.    YES.

5    Q.    SO IT WOULD BE POSSIBLE FOR YOU TO BREAK DOWN THE FILE

6    SO WE COULD SEE WHAT'S IN THESE CHAT FILES?

7    A.    THESE ARE THE ITEMS LABELED "CHATS" OR "FOLDERS".

8    Q.    RIGHT.  WHAT I'M TRYING TO SAY IS, IS IT POSSIBLE FOR US

9    TO ACTUALLY SEE THE CHAT LOGS IN THE FOLDER WHERE YOU FOUND

10   THEM?

11   A.    WELL, THE FOLDERS YOU HIGHLIGHTED CALLED CHAT WEREN'T

12   THE FOLDERS THAT I FOUND THE LOGS IN.

13   Q.    WHERE WAS THE FOLDER YOU FOUND THEM IN?

14   A.    I BELIEVE IT WAS IN A FOLDER CALLED 2000B UNDER -- IT

15   WOULD BE TYPICALLY PROGRAM FILES, ICQ, AND THEN 2000B.  AND

16   THERE'S ONLY ONE OF THOSE FOLDERS ON EACH COMPUTER OR ON EACH

17   HARD DRIVE.

18   Q.    I'M SHOWING YOU AGAIN PAGE 11 OF 18.

19   A.    YEAH.  AND I SAW IT ON PAGE 4 AND THEN --

20   Q.    OKAY.  ON PAGE 11 OF 18 IS THAT WHERE YOU GOT -- THERE'S

21   2000B AND THEN THERE'S CHATS.  IS THAT WHERE YOU GOT IT FROM?

22   A.    YEAH.  IT WAS THE 2000B FOLDER.

23   Q.    AND THAT'S WHERE IT CAME FROM?  I'M SORRY, THAT'S WHERE

24   THE LOGS CAME FROM?

25   A.    YEAH, THAT'S MY RECOLLECTION.

1    Q.    OKAY.   WOULD IT BE POSSIBLE FOR YOU TO BREAK THAT DOWN

2    SO WE COULD ACTUALLY SEE THE CHAT TRANSCRIPTS?   I'M SORRY,

3    THE CHAT LOGS IN THAT FILE?

4    A.    YOU WOULD SEE FILES LIKE THAT AND .DAT.   THERE WOULD BE

5    A NUMBER OF FILES THAT WOULD HAVE A NAME AND .DAT.   YOU WOULD

6    SEE THE FILE NAMES.   IS THAT WHAT YOU'RE TALKING ABOUT?

7    Q.    WOULD WE BE ABLE TO SEE, I PRESUME, FIVE FILES IN THERE

8    BECAUSE YOU SAID THERE WERE FIVE TRANSCRIPTS?

9    A.    WELL, THIS IS FROM ONE COMPUTER.   I WAS TALKING FIVE

10   ALTOGETHER FROM BOTH COMPUTERS.   BUT THERE WOULD BE A NUMBER

11   OF FILES AND SOME OF THEM WOULD BE THE .DAT FILES THAT WOULD

12   BE THE FILES THAT I USED THE PROGRAM TO TRANSCRIBE.

13   Q.    AND THERE MIGHT BE OTHER FILES?

14   A.    CORRECT.

15   Q.    WHAT WOULD THOSE FILES BE?

16   A.    OTHER FILES THAT ICQ USES.

17   Q.    BUT WE WOULD BE ABLE TO SEE WHAT THEY ARE?

18   A.    YOU WOULD SEE THE NAMES.

19   Q.    AND DO YOU HAVE A COPY OF THAT PRINTOUT WITH YOU?

20   A.    NO.

21   Q.    DO YOU REMEMBER HOW MANY CHAT LOGS WERE IN THIS FILE?

22   A.    NO.

23   Q.    IF YOU WOULD LOOK AT THE VERY BEGINNING OF EXHIBIT 5.

24   A.    OKAY.

25   Q.    I BELIEVE THAT'S PC 2, HARD DRIVE 1 OF 2?

1    A.   OKAY.  I SEE THAT AT THE BOTTOM OF THAT PAGE.

2    Q.   AND YOU GO TO THE -- EXCUSE ME.  YOU GO TO THE NEXT PAGE

3    AND IT SHOWS VOLUME C FOLDERS?

4    A.   OKAY.

5    Q.   DO YOU SEE ICQ 2000B ANYWHERE IN THIS -- ON THIS HARD

6    DRIVE?

7    A.   YEAH, AT THE TOP OF PAGE 4 ON THE VERY LEFT.  IT'S ABOUT

8    SIX OR SEVEN LINES DOWN.

9    Q.   OKAY.  AND THEN AFTER THAT FURTHER DOWN THERE'S ICQ ACC

10   AND RIGHT AFTER THAT IS CHATS?

11   A.   YEAH, CORRECT.  THOSE ARE DIFFERENT FOLDERS ON THE SAME

12   LEVEL AS 2000B.

13   Q.   SO THOSE WOULDN'T BE THE CHAT TRANSCRIPTS WHICH WOULD BE

14   IN THE 2000B FOLDER?

15   A.   YEAH, THAT'S MY RECOLLECTION.  THE CHATS FOLDER IS ON

16   THAT SAME LEVEL.  IN OTHER WORDS, IT IS UNDER PROGRAM FILES

17   IN ICQ.  THEN YOU WOULD SEE -- TREE IS KIND OF HARD TO READ,

18   BUT THE 2000B FOLDER HAS TWO LITTLE SLASHES AND A PLUS NEXT

19   TO IT, THE SAME AS CHATS AND ICQ ACC WHICH INDICATES THEY'RE

20   ON THE SAME -- THEY'RE INSIDE THE SAME FOLDER.

21   Q.   SO IT'S NOT DEPENDENT ON THE FUNCTION OR THE

22   INSTALLATION OF 2000B?  BECAUSE YOU COULD HAVE OTHER CHATS

23   FROM OTHER VERSIONS OF ICQ THAT ARE IN THE CHAT FOLDER.

24   A.   I HAVEN'T HAD THAT.  I DON'T KNOW ABOUT IT.

25        MR. AARON:  IF I MIGHT HAVE A MOMENT, YOUR HONOR?

```
 1              THE COURT:  GO AHEAD.

 2              MR. AARON:  I'M FINISHED.  THANK YOU.

 3              THE COURT:  ALL RIGHT.  WHY DON'T WE TAKE OUR

 4   MORNING RECESS.

 5              LADIES AND GENTLEMEN, WE WILL BE IN RECESS UNTIL

 6   LET'S SAY 10:45 THIS MORNING.  AGAIN, PLEASE REMEMBER, DON'T

 7   TALK ABOUT THE CASE.  DON'T TALK ABOUT ANY OF THE EVIDENCE

 8   RELATED TO THE CASE INCLUDING ANYTHING REGARDING COMPUTERS,

 9   CHAT ROOMS, ANY OF THE EVIDENCE THAT YOU HAVE HEARD THIS

10   MORNING, ANYTHING RELATED TO IT IN ANY FASHION NO MATTER HOW

11   TANGENTIAL IT SEEMS TO BE.  REMEMBER I TOLD YOU A COUPLE OF

12   DAYS AGO DON'T EVEN TALK ABOUT YOUR COMPUTERS OR HOW YOU USE

13   COMPUTERS AT HOME OR ON THE JOB.  DON'T FORM ANY OPINIONS

14   ABOUT THE CASE.  DON'T EXPRESS ANY OPINIONS ABOUT THE CASE OR

15   ABOUT ANYONE WHO HAS ANYTHING TO DO WITH IT.

16              THANK YOU VERY MUCH.  ENJOY YOUR RECESS.  WE'LL SEE

17   YOU BACK AT 10:45.

18              (OUT OF THE PRESENCE OF THE JURY:)

19              THE COURT:  MR. AARON, PLEASE APPROACH.  WOULD YOU

20   GIVE ONE OF THOSE TO OPPOSING COUNSEL?

21              WE'RE ON THE RECORD OUTSIDE THE PRESENCE OF THE

22   JURY.  I WANT TO KEEP THIS VERY SHORT SO THAT WE CAN START

23   BACK UP ON TIME.  THIS IS AN INSTRUCTION I WOULD PROPOSE TO

24   GIVE THE JURY ON THE ISSUE WE DISCUSSED AT SIDEBAR.

25              I KNOW, MR. AARON, BEFORE YOU INDICATE WHETHER OR
```

```
 1    NOT YOU WOULD ASSENT TO IT, YOU WANT TO CHECK AND SEE WHETHER
 2    YOU AGREE THAT THOSE -- THE COMPLETE TRANSCRIPTS WERE TURNED
 3    OVER TO YOU, BUT I THINK THIS WOULD COVER THE ISSUE WE TALKED
 4    ABOUT.  THE GOVERNMENT MAY NOT WANT TO HAVE THAT LINE IN
 5    THERE ABOUT INTENDING TO OFFER THIS, BUT RIGHT NOW IT HASN'T
 6    BEEN OFFERED AND THE JURY MAY BE A LITTLE CONFUSED ABOUT
 7    THAT, SO THAT'S WHY I PUT THAT IN THERE.  ANYWAY, OVER THE
 8    RECESS TAKE A LOOK, AND I WOULD RATHER DO IT SOONER THAN
 9    LATER SO WE CLEAR IT UP AS SOON AS POSSIBLE.  SO LET ME KNOW
10    PREFERABLY BEFORE WE BRING THE JURY BACK IN WHETHER OR NO
11    THIS IS AGREEABLE TO YOU.
12              MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT HAS ALSO
13    PROPOSED A LIMITING INSTRUCTION REGARDING CO-CONSPIRATOR
14    STATEMENTS TO DEFENSE COUNSEL FOR HIS REVIEW THIS MORNING.
15              THE COURT:  THANK YOU VERY MUCH.
16                        (RECESS)
17              THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF
18    ALL MEMBERS OF THE JURY, COUNSEL FOR BOTH PARTIES, AND THE
19    DEFENDANT ALSO PRESENT.
20              DO COUNSEL NEED TO APPROACH ON THE --
21              MR. MICHAEL:  MAY I, YOUR HONOR?
22              THE COURT:  YES.  I'M SORRY, I FORGOT TO TAKE --
23               (ON-THE-RECORD DISCUSSION AT SIDEBAR:)
24              MR. MICHAEL:  YOUR HONOR, THE PROPOSAL IS
25    ACCEPTABLE TO BOTH SIDES.
```

1      MR. AARON:  ACTUALLY, THE GOVERNMENT'S PROPOSAL, WE

2   DON'T HAVE ANY OBJECTION TO.  I'D JUST LIKE TO MAKE A RECORD.

3   I JUST WANT TO MAKE IT CLEAR I DON'T WANT THE JURY TO DRAW AN

4   INFERENCE FROM THIS THAT I WAS TRYING TO DO SOMETHING SNEAKY.

5      THE COURT:  THAT'S WHY I DECIDED I WOULD WRITE IT.

6   I THINK IT'S NEUTRAL IN THAT SENSE.  IF THERE ARE NO

7   OBJECTIONS TO THIS, I WILL INSTRUCT THE JURY WITH THIS AT

8   THIS TIME.  ARE THERE ANY OBJECTIONS --

9      MR. MICHAEL:  NOT FROM THE GOVERNMENT.

10      THE COURT:  -- TO THE COURT'S INSTRUCTION B?

11      ALL RIGHT.  THANK YOU VERY MUCH, COUNSEL.

12      (ON-THE-RECORD DISCUSSION AT SIDEBAR CONCLUDED.)

13      THE COURT:  LADIES AND GENTLEMEN, BEFORE -- I THINK

14   WE'D BE ON REDIRECT EXAMINATION, CORRECT?

15      MR. MICHAEL:  CORRECT, YOUR HONOR.

16      THE COURT:  BEFORE REDIRECT EXAMINATION OF THIS

17   WITNESS I HAVE A SHORT INSTRUCTION TO GIVE YOU.  EXHIBIT 1,

18   WHICH YOU'VE JUST HEARD REFERENCE TO, CONSISTS OF ONLY

19   EXCERPTS OF CHAT ROOM TRANSCRIPTS THAT AGENT OWEN RECOVERED

20   FROM THE COMPUTERS OF SETH BEKENSTEIN.  THE COURT HAS ORDERED

21   THAT THE ENTIRE LENGTHY TRANSCRIPTS BE EXCERPTED AND THAT

22   ONLY THE PORTIONS INCLUDED IN EXHIBIT 1 BE USED IN THIS

23   TRIAL.

24      YOU MAY BEGIN YOUR REDIRECT EXAMINATION.

25      MR. MICHAEL:  THANK YOU, YOUR HONOR.

1          THE COURT:  THANK YOU.

2                    REDIRECT EXAMINATION

3   BY MR. MICHAEL:

4   Q.    AGENT OWEN, DO YOU RECALL ON CROSS-EXAM YOU WERE ASKED

5   QUESTIONS ABOUT THE ENCASE FORENSIC PROGRAM?

6   A.    YES.

7   Q.    AND YOU WERE ASKED ABOUT WHETHER OR NOT IT WAS A

8   RELIABLE PROGRAM?

9   A.    YES.

10  Q.    HOW WIDELY USED IS ENCASE AS A FORENSIC REVIEW PROGRAM?

11  A.    IT'S THE MOST WIDELY USED TOOL.

12  Q.    HAS ITS RELIABILITY BEEN SHOWN TO YOU THROUGH THE COURSE

13  OF YOUR OWN WORK WITH IT?

14  A.    YES.

15  Q.    AND HAS ITS RELIABILITY BEEN TESTED BY OTHER FORENSIC

16  EXAMINERS?

17  A.    YES.  IT HAS BEEN TESTED BY INDEPENDENT TESTING BODIES.

18  Q.    WOULD YOU CHARACTERIZE THERE'S BEEN A LOT OF TESTING OF

19  ITS RELIABILITY?

20  A.    YES.

21  Q.    AND HAS IT PROVEN TO BE RELIABLE AS A RESULT OF ALL OF

22  THAT TESTING?

23  A.    YES, IT HAS.

24  Q.    NOW, DO YOU RECALL THAT YOU WERE ASKED A SERIES OF

25  QUESTIONS ON CROSS-EXAMINATION ABOUT YOUR ATTEMPTS TO COPY

1    THE SECOND HARD DRIVE BUT THAT THE ACQUISITION FAILED?

2    A.   CORRECT.

3    Q.   AND IT FAILED ON MULTIPLE OCCASIONS?

4    A.   YES.

5    Q.   AND IF I RECALL, THERE WAS ALSO A QUESTION ON

6    CROSS-EXAMINATION ABOUT EFFORTS YOU MADE TO RESOLVE THAT

7    PROBLEM AND YOU EVEN CALLED A SOFTWARE COMPANY AND A HARD

8    DRIVE MAKER?

9    A.   CORRECT.

10   Q.   DID YOU ULTIMATELY DETERMINE WHAT THE CAUSE OF THOSE

11   FAILURES WAS?

12   A.   YES, I DID.

13   Q.   WHAT WAS IT?

14   A.   I NOTICED THAT WHEN I WAS BOOTING UP -- THE LAST ATTEMPT

15   I MADE WAS ON MY COMPUTER, AND I NOTICED WHEN I WAS BOOTING

16   UP THE COMPUTER THAT A MESSAGE POPPED UP SAYING THAT AN

17   80 PIN HARD DRIVE CABLE WASN'T DETECTED.  AND I LOOKED AT THE

18   CABLE THAT I WAS USING AND IT WAS A 40 PIN CABLE THAT ALSO

19   FITS ON THE SAME DRIVE.

20   Q.   CAN I ASK YOU TO SPEAK SLOWLY FOR THE COURT REPORTER,

21   PLEASE.

22   A.   IT WAS A -- SORRY -- A 40 CONDUCTOR CABLE INSTEAD OF AN

23   80 CONDUCTOR CABLE.  AND ONCE I REPLACED THE CABLE WITH THE

24   CORRECT CABLE IT WORKED.

25   Q.   SO WAS THE ONLY PROBLEM THE CABLE YOU USED TO CONNECT

1   THE TWO PIECES OF EQUIPMENT?

2   A.   YES, IT WAS.

3   Q.   AND ONCE YOU REPLACED THAT CABLE WITH THE CORRECT CABLE

4   DID IT WORK?

5   A.   YES, IT DID.

6   Q.   WAS THERE ANY PROBLEM WITH THE ENCASE PROGRAM?

7   A.   NO.

8   Q.   WAS THERE ANY PROBLEM WITH THE OPERATING SYSTEM OF YOUR

9   FORENSIC COMPUTER?

10   A.   NO.

11   Q.   WAS THERE ANY PROBLEM WITH THE OPERATING SYSTEM OF THE

12   SUSPECT HARD DRIVE THAT YOU DETECTED?

13   A.   NO.

14   Q.   AND WHEN YOU WERE ATTEMPTING TO COPY IT INITIALLY WHEN

15   IT FAILED, WAS THE ORIGINAL HARD DRIVE WRITE BLOCKED?

16   A.   YES, IT WAS.

17   Q.   SO IT WAS PROTECTED FROM ANY ALTERATIONS DESPITE THE

18   FAILURES?

19   A.   YES.

20   Q.   AND DO YOU HAVE ANY REASON TO BELIEVE THAT THERE WERE

21   ANY ALTERATIONS MADE TO THE ORIGINAL HARD DRIVE?

22   A.   NO, I DO NOT.

23   Q.   AND ULTIMATELY, YOU WERE SUCCESSFUL IN MAKING A COPY TO

24   YOUR FORENSIC COMPUTER, CORRECT?

25   A.   YES.

1    Q.    AND WERE YOU ABLE TO COMPARE THE HASH VALUES?

2    A.    YES.

3    Q.    AND WERE THOSE HASH VALUES THE SAME?

4    A.    YES, THEY WERE.

5    Q.    AND AFTER YOU MADE THAT COPY THAT YOU USED FOR YOUR

6    REVIEW AS WELL AS THE OTHER COPIES OF THE OTHER HARD DRIVES,

7    AT ANY POINT IN TIME DID YOU EVER DEVELOP ANY CONCERNS ABOUT

8    THE RELIABILITY AND INTEGRITY OF THOSE COPIES?

9    A.    NO, I DID NOT.

10   Q.    AND WERE YOU ABLE TO REPEATEDLY COMPARE THE HASH VALUES

11   FOR ALL THOSE TO THE ORIGINAL HARD DRIVE TO CONFIRM THAT THEY

12   REMAINED THE SAME?

13   A.    YES, I DID.

14   Q.    DO YOU RECALL THAT YOU WERE ALSO ASKED QUESTIONS ON

15   CROSS-EXAMINATION ABOUT AFTER YOU HAD SUCCESSFULLY -- I

16   BELIEVE YOUR TERM IS ACQUIRED.  IS THAT THE SAME AS COPIED?

17   A.    YES.

18   Q.    SUCCESSFULLY ACQUIRED PC NO. -- THE HARD DRIVE NO. 2

19   FROM PC NO. 2.  THERE WAS A DATE IN YOUR ENCASE REPORT ABOUT

20   HAVING DONE SO ON JANUARY 6TH, CORRECT?

21   A.    CORRECT.

22   Q.    AND YOU RECALL THAT YOU WERE ASKED ABOUT WHETHER OR NOT

23   AFTER YOU HAD THE SUCCESSFUL ACQUISITION YOU EVER HAD TO DO

24   IT OVER AGAIN?  DO YOU RECALL THAT QUESTION?

25   A.    CORRECT.

1   Q.   AND DO YOU RECALL BEING SHOWN YOUR NOTES WHICH INDICATE

2   THAT THE ACQUISITION WAS DONE ON THE DATE OF ACTIVITIES AS

3   JANUARY 8TH, 2001?

4   A.   CORRECT.

5   Q.   DID YOU HAVE TO REACQUIRE, RECOPY, THAT HARD DRIVE ON

6   JANUARY 8TH AFTER THE SUCCESSFUL COPY ON JANUARY 6TH?

7   A.   NO, I DID NOT.

8   Q.   CAN YOU EXPLAIN WHY THERE'S A DIFFERENCE IN THOSE TWO

9   DATES, PLEASE?

10   A.   I BELIEVE WHEN I WAS TYPING MY NOTES THAT I JUST INSTEAD

11   OF A 1/6 I TYPED 1/8.

12   Q.   AND DID YOU -- ON YOUR NOTES DOES IT INDICATE WHAT DATE

13   YOU HAD ENTERED YOUR NOTES?

14   A.   YEAH.  I BELIEVE IT WAS A FEW DAYS LATER.

15   Q.   IF I WERE TO SHOW YOU YOUR NOTES, WOULD THAT HELP

16   REFRESH YOUR RECOLLECTION?

17   A.   SURE.

18           MR. MICHAEL:  YOUR HONOR, MAY I APPROACH?

19           THE COURT:  YES.

20   BY MR. MICHAEL:

21   Q.   IF I CAN DIRECT YOUR ATTENTION TO THE TOP OF THE PAGE,

22   IF YOU CAN REVIEW THAT?

23   A.   YES.  IT WOULD BE THE 9TH, JANUARY 9TH.

24   Q.   SO VIEWING THIS DOCUMENT REFRESHED YOUR RECOLLECTION?

25   A.   YES, IT DID.

1    Q.   SO IF I UNDERSTAND YOUR TESTIMONY, IT'S NOT THAT YOU HAD

2    TO DO IT AGAIN BUT THAT YOU JUST MISTYPED AN 8 FOR A 6?

3    A.   CORRECT.

4              MR. AARON:  LEADING.

5              THE COURT:  SUSTAINED.  PLEASE REFRAIN FROM LEADING

6    QUESTIONS.

7              MR. MICHAEL:  YES, YOUR HONOR.

8    BY MR. MICHAEL:

9    Q.   AND DO YOU RECALL THAT YOU WERE ASKED A SERIES OF

10   QUESTIONS ABOUT YOUR CONVERSION OF THE ICQ CHAT DATA FILES

11   RECOVERED FROM MR. BEKENSTEIN'S HARD DRIVES INTO A READABLE

12   FORMAT?

13   A.   YES.

14   Q.   AND DO YOU RECALL THAT YOU WERE ASKED ABOUT THE PROGRAM

15   THAT YOU USED TO DO THAT CONVERSION?

16   A.   YES.

17   Q.   NOW, WHEN YOU WERE ASKED QUESTIONS TODAY IF YOU KNEW THE

18   NAME OF THAT PROGRAM, YOU TESTIFIED THAT YOU DID NOT RECALL.

19   A.   THAT'S CORRECT.

20   Q.   AT THE TIME THAT YOU USED THE PROGRAM, DID YOU KNOW WHAT

21   PROGRAM IT WAS?

22   A.   YES, I DID.

23   Q.   AND AT THE TIME THAT YOU USED THAT PROGRAM DID YOU KNOW

24   IT TO BE RELIABLE?

25   A.   YES.

1    Q.    AND IS IT JUST THAT SITTING HERE TODAY YOU DON'T RECALL

2    THE NAME OF THAT PROGRAM?

3    A.    CORRECT.

4    Q.    AND, IN FACT, DID YOU ALSO TESTIFY THAT YOU ACTUALLY

5    TESTED THE PROGRAM AND IT PROVED TO BE RELIABLE?

6    A.    YES.

7    Q.    AND AFTER YOU CONVERTED THOSE FILES, DID THEY APPEAR IN

8    THE ENGLISH LANGUAGE?

9    A.    YES, THEY DID.

10   Q.    AND WERE YOU ABLE TO READ THEM?

11   A.    YES, I WAS.

12   Q.    AND WERE THEY IN LOGICAL SEQUENTIAL TIME AND DATE ORDER?

13   A.    YES, THEY WERE.

14   Q.    DID IT APPEAR THAT THERE WERE CONVERSATIONS GOING ON?

15   A.    YES, IT DID.

16   Q.    AND WERE THOSE CONVERSATIONS LARGELY UNDERSTANDABLE TO

17   YOU?

18   A.    YES, THEY WERE.

19   Q.    DO YOU RECALL WHEN YOU WERE ASKED QUESTIONS ON

20   CROSS-EXAMINATION IF YOU RECOVERED ALL OF THE CHAT

21   CONVERSATIONS THAT MR. BEKENSTEIN EVER HAD USING THE SCREEN

22   NAME DR. DOOM ON ICQ?

23   A.    YES, I RECALL THAT QUESTION.

24   Q.    DID YOU RECOVER ALL OF THE CHAT LOGS THAT YOU COULD FIND

25   ON THE COMPUTER?

1    A.   YES, I DID.

2    Q.   SO TO THE EXTENT THAT DR. DOOM HAD OTHER CONVERSATIONS,

3    OR MR. BEKENSTEIN, USING THAT SCREEN NAME, THAT WERE DELETED

4    OR SAVED ON ANOTHER PIECE OF MEDIA, WERE YOU ABLE TO RECOVER

5    THOSE?

6    A.   NO, I WAS NOT.

7    Q.   DO YOU RECALL ON CROSS-EXAMINATION YOU WERE ASKED

8    QUESTIONS ABOUT WHAT WAS MARKED FOR IDENTIFICATION AS

9    DEFENDANT'S EXHIBIT 203 WHICH I BELIEVE WAS CHARACTERIZED BY

10    DEFENSE COUNSEL AS ONE SIDE OF A CONVERSATION?

11    A.   CORRECT.

12    Q.   AND YOU WERE ASKED TO COMPARE THAT TO WHAT'S BEEN MARKED

13    AS EXHIBIT 1Y?

14    A.   CORRECT.

15    Q.   NOW, DOES THE CONVERSATION IN 1Y APPEAR TO BE THE FULL

16    CONVERSATION WITH ALL OF THE PARTICIPANTS?

17    A.   YES, IT DOES.

18    Q.   AND DOES THE CONVERSATION IN EXHIBIT 1Y APPEAR TO BE THE

19    SAME CONVERSATION THAT YOU RECOVERED FROM MR. BEKENSTEIN'S

20    COMPUTER?

21    A.   YES.

22    Q.   AND WHEN YOU WERE ASKED QUESTIONS ABOUT HOW THIS DEFENSE

23    EXHIBIT 203 WAS ONE SIDED AND YOU OFFERED A POSSIBLE

24    EXPLANATION, CORRECT?

25    A.   CORRECT.

1    Q.   DO YOU KNOW FOR CERTAIN HOW THIS GOT TO BE THAT WAY OR

2    WERE YOU JUST SPECULATING?

3    A.   NO, I DON'T KNOW HOW IT GOT TO BE THAT WAY.

4    Q.   WOULD IT BE FAIR TO SAY THAT YOU WERE JUST SPECULATING?

5    A.   YES.

6    Q.   AND AFTER YOU RECOVERED ALL THE CHATS AND YOU CONVERTED

7    THEM INTO A READABLE FORMAT, WHAT DID YOU DO WITH THEM?

8    A.   I PROVIDED THEM TO THE CASE AGENT IN SAN FRANCISCO, LEE

9    BROWN.

10   Q.   AND DID YOU GIVE THOSE TO HIM ON A COMPACT DISK?

11   A.   YES, PRINTED AND COMPACT DISK.

12   Q.   AND THAT WAS LEE BROWN, THE CASE AGENT, YOU SAID?

13   A.   YES.

14   Q.   AND WAS HE THE CASE AGENT FOR THE SETH BEKENSTEIN CASE?

15   A.   THAT'S CORRECT.

16   Q.   AND YOU RECALL ON CROSS-EXAMINATION YOU WERE ASKED A

17   BUNCH OF QUESTIONS ABOUT HASH VALUES AND MD5, MD4, THINGS OF

18   THAT NATURE?

19   A.   CORRECT.

20   Q.   AND YOU WERE SPECIFICALLY ASKED ABOUT A REPORT THAT

21   WAS -- OR AN ARTICLE THAT WAS MARKED DEFENSE EXHIBIT 204?

22   A.   CORRECT.

23   Q.   AND YOU INDICATED YOU HAD AN OPPORTUNITY TO REVIEW THIS

24   REPORT BEFORE, CORRECT?

25   A.   CORRECT.

1   Q.   AND YOU'RE FAMILIAR WITH THIS STUDY?

2   A.   CORRECT.

3   Q.   WHAT DOES THE STUDY SAY?

4   A.   IT SAYS THAT THIS GROUP OF CHINESE MATHEMATICIANS WITH

5   OBVIOUSLY ADVANCED MATHEMATICAL KNOWLEDGE OF HOW THE MD5 HASH

6   FORMULA WORKS, THAT THEY CREATED AN ARTIFICIAL COLLISION IN

7   THE LAB OF TWO FILES THAT WERE THE EXACT SAME SIZE OF THE MD5

8   HASH ALGORITHM WHICH IS 512 BYTES WHICH WOULD BE, YOU KNOW,

9   SMALLER THAN 32 CHARACTERS.  SO IT WAS THESE -- THEY CREATED

10  AN ARTIFICIAL COLLISION IN THE LAB.  AND IT'S NEVER BEEN

11  DUPLICATED THAT IN THE REAL WORLD.

12  Q.   LET ME ASK YOU ABOUT THAT.  SO WHAT THEY WERE ABLE TO DO

13  IN THE LAB ARTIFICIALLY, IS IT YOUR UNDERSTANDING THAT THAT'S

14  NEVER HAPPENED IN THE REAL WORLD WITH REAL COPIES BEING MADE

15  USING ENCASE?

16  A.   CORRECT.  THE LARGER THE FILES ARE, THE MORE SECURE THE

17  ALGORITHM BECOMES.  AND THERE'S NEVER BEEN A KNOWN INSTANCE

18  OF FINDING TWO FILES IN THE REAL WORLD THAT ARE DIFFERENT

19  FILES THAT HAVE THE SAME MD5 HASH VALUE.

20  Q.   SO IT'S NEVER BEEN REPORTED EVER THAT ENCASE HAS

21  EXPERIENCED THIS ARTIFICIAL SCENARIO DOCUMENTED IN THE

22  REPORT?

23  A.   CORRECT, OR ANYONE ELSE THAT RELIES ON THE MD5 HASH.

24  Q.   SO THE MD5 HASH IS USED NOT JUST FOR ENCASE BUT IS USED

25  FOR OTHER COMPUTER-RELATED MATTERS?

1   A.   YES.

2   Q.   IS THAT A COMMON ITEM OR PIECE OF INFORMATION THAT'S

3   USED?

4   A.   YES, IT IS.

5   Q.   NOW, YOU ALSO TALKED ABOUT HOW THERE'S ODDS WITH REGARD

6   TO -- YOU RECALL YOUR LAST QUESTIONS ABOUT THE MD5 AS

7   COMPARED TO FINGERPRINTS, AND I BELIEVE YOU OFFERED SOME

8   INFORMATION ABOUT DNA AS WELL?

9   A.   YES.  BOTH FINGERPRINTING AND DNA HAVE A MATHEMATICAL

10  ODDS THAT, YOU KNOW, THAT THE WAY THAT THEY ARE COMPUTED THAT

11  YOU COULD HAVE COLLISIONS IN THOSE AS WELL.  AND THE MD5 HASH

12  IS EVEN MORE ACCURATE THAN FINGERPRINTING OR DNA.  THE ODDS

13  OF FINDING TWO FILES IN THE REAL WORLD THAT WOULD COLLIDE

14  WOULD BE LIKE ONE WITH A HUNDRED ZEROS AFTER IT.  IT'S A

15  REALLY HUGE NUMBER.

16  Q.   WHAT WAS THE NUMBER?

17  A.   ONE WITH A HUNDRED ZEROS AFTER IT.  IT'S A VERY, VERY

18  LARGE NUMBER.

19  Q.   WHEN YOU SAY THERE CAN BE A COLLISION BASED ON HOW THEY

20  ARE COMPUTED, YOU'RE NOT SAYING THAT THERE CAN BE TWO PEOPLE

21  WITH A DNA -- LET ME REPHRASE THAT.

22        YOU YOU'RE NOT SAYING THAT TWO PEOPLE CAN HAVE THE

23  SAME FINGERPRINT, YOU'RE TALKING ABOUT HOW IT'S ANALYZED?  A

24  CONCLUSION CAN BE DRAWN THAT IT'S THE SAME BASED ON THE

25  ANALYTICAL METHODS USED?

1    A.    CORRECT.

2    Q.    AND THE SAME WOULD APPLY TO DNA?

3              MR. AARON:  I WOULD OBJECT, LEADING.

4              THE COURT:  OVERRULED.

5              MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP

7    DOWN.

8              AND THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

9              MR. MICHAEL:  YOUR HONOR, CAN THE GOVERNMENT TAKE

10   THREE MINUTES FOR THE NEXT WITNESS?  DURING THE BREAK MY

11   QUESTIONS WERE SET DOWN ON A TABLE TO ADDRESS AN ISSUE

12   REQUESTED BY DEFENSE COUNSEL AND I BELIEVE I LEFT IT THERE.

13   I WILL WALK --

14             THE COURT:  SO YOU NEED TO GO GET YOUR --

15             MR. MICHAEL:  I NEED TO GET MY QUESTIONS, YOUR

16   HONOR.

17             THE COURT:  GO AHEAD.

18             MR. MICHAEL:  I APOLOGIZE.

19             THE COURT:  WHO IS YOUR NEXT WITNESS?

20             MR. MICHAEL:  AGENT PATRICK MCGAHA.

21             THE COURT:  THANK YOU.  HE CAN COME IN AND WE'LL --

22   HAVE THE WITNESS COME IN AND WE WILL GET HIM SWORN AND

23   SEATED.

24             THE CLERK:  PLEASE COME FORWARD AND STOP NEXT TO

25   THE COURT REPORTER.

```
 1              PLEASE RAISE YOUR RIGHT HAND.
 2          PLAINTIFF'S WITNESS, BRIAN MCGAHA, WAS SWORN
 3              THE CLERK:  PLEASE TAKE THE STAND.
 4              STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR
 5    THE RECORD.
 6              THE WITNESS:  I'M SORRY, MA'AM?
 7              THE CLERK:  PLEASE STATE YOUR NAME AND SPELL YOUR
 8    LAST NAME FOR THE RECORD.
 9              THE WITNESS:  MY NAME IS BRIAN PATRICK MCGAHA.
10    LAST NAME IS M-C-G-A-H-A.
11              THE COURT:  THANK YOU.
12              MR. MICHAEL:  THANK YOU.  LIVING PROOF THAT THIS
13    IS NOT LIKE TV.  I APOLOGIZE.
14              THE COURT:  YOU MAY INQUIRE.
15                      DIRECT EXAMINATION
16    BY MR. MICHAEL:
17    Q.   SIR, WHERE DO YOU WORK?
18    A.   I'M CURRENTLY EMPLOYED WITH THE DEPARTMENT OF HOMELAND
19    SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DALLAS
20    OFFICE, SPECIAL AGENT IN CHARGE, IN PARTICULAR, CYBER GROUP
21    AND COMPUTER FORENSICS SECTION.
22    Q.   THAT'S IN TEXAS?
23    A.   YES, SIR, THAT'S IN DALLAS, TEXAS.
24    Q.   I'M GOING TO ASK YOU TO SPEAK SLOWLY FOR THE SAKE OF THE
25    COURT REPORTER, PLEASE.
```

```
1   A.    OKAY.

2   Q.    I MAKE THE SAME MISTAKE.

3         WHAT IS YOUR TITLE, SIR?

4   A.    I'M A SENIOR SPECIAL AGENT, COMPUTER FORENSIC AGENT.

5   Q.    HOW LONG HAVE YOU BEEN A SPECIAL AGENT?

6   A.    I'VE BEEN EMPLOYED WITH THE FEDERAL GOVERNMENT FOR

7   16 YEARS.  I'VE BEEN A SPECIAL AGENT IN DALLAS SINCE 1998.

8   PRIOR TO THAT I WAS EMPLOYED AS A CRIMINAL INVESTIGATOR, AIR

9   INTERDICTION OFFICER IN THE HOUSTON AVIATION BRANCH IN

10  HOUSTON, TEXAS.

11  Q.    WAS THAT A LAW ENFORCEMENT POSITION?

12  A.    YES, SIR.

13  Q.    AND IF I REFER TO YOUR CURRENT EMPLOYER AS ICE, WILL YOU

14  KNOW WHAT I'M REFERRING TO?

15  A.    YES, SIR.

16  Q.    AND IS THE UNITED STATES CUSTOMS SERVICE ONE OF ITS

17  PREDECESSOR AGENCIES?

18  A.    YES, SIR, THAT'S CORRECT.

19  Q.    AND WAS THAT WHO YOU WERE EMPLOYED BY INITIALLY?

20  A.    YES, SIR.

21  Q.    AND I BELIEVE YOU TESTIFIED YOU WERE A COMPUTER FORENSIC

22  EXAMINER; IS THAT CORRECT?

23  A.    YES, SIR, THAT'S CORRECT.

24  Q.    AND ARE YOU ASSIGNED TO A COMPUTER FORENSIC GROUP?

25  A.    YES, SIR.  WITHIN THE DEPARTMENT OF HOMELAND SECURITY'S
```

1    OFFICE THERE IN DALLAS I'M IN THE CYBER GROUP WHICH IS A

2    COMPUTER FORENSIC SECTION OF WHICH I'M A MEMBER OF RIGHT NOW.

3    Q.   SO DO YOU CURRENTLY CONDUCT COMPUTER FORENSIC EXAMS IN

4    CONNECTION WITH INVESTIGATIONS?

5    A.   YES, SIR.

6    Q.   NOW, OVER THE COURSE OF YOUR CAREER, BEFORE YOU DID

7    COMPUTER FORENSICS, WHAT TYPES OF CASES DID YOU WORK ON?

8    A.   I'VE WORKED ON NARCOTICS INVESTIGATIONS, CUSTOMS FRAUD,

9    IMPORT/EXPORT, ILLEGAL EXPORT OF HIGH TECHNOLOGY, TERRORISM,

10   MONEY LAUNDERING, CHILD PORNOGRAPHY AND CHILD EXPLOITATION

11   CASES.

12   Q.   AND IN 2001 WHAT GROUP WERE YOU ASSIGNED TO?

13   A.   I WAS IN THE GENERAL SMUGGLING GROUP WHICH CARRIED -- IT

14   COVERED A COUPLE OF DIFFERENT PROGRAM AREAS INCLUDING

15   NARCOTICS AND CHILD PORNOGRAPHY.

16   Q.   AND WAS THAT IN DALLAS, TEXAS?

17   A.   YES, SIR.

18   Q.   SO THAT WAS BEFORE YOU DID COMPUTER FORENSIC EXAMS?

19   A.   THAT'S CORRECT.

20   Q.   AND WERE YOU WORKING AS A SPECIAL AGENT IN THAT GROUP IN

21   APRIL 2001?

22   A.   YES, SIR, I WAS.

23   Q.   AND WERE YOU ASSIGNED TO ASSIST WITH AN INVESTIGATION

24   THAT LED TO THE IDENTIFICATION OF RANDALL MARTIN?

25   A.   YES, SIR, I WAS.

1    Q.    AND WHAT WAS THE NATURE OF THAT INVESTIGATION?

2    A.    WE HAD RECEIVED INFORMATION FROM THE SAN FRANCISCO

3    OFFICE, THE U.S. CUSTOMS OFFICE, THAT A SHIPMENT OF CHILD

4    PORNOGRAPHY WAS SENT TO A PLACE IN ARLINGTON, TEXAS.  AND THE

5    ADDRESS -- WELL, I'M SORRY.  IT WAS IN ARLINGTON, TEXAS.

6    Q.    AND WHO WAS SUSPECTED OF HAVING SHIPPED THESE CHILD

7    PORNOGRAPHIC MATERIALS?

8    A.    AN INDIVIDUAL NAMED SETH BEKENSTEIN.

9    Q.    AND WHO WAS SUSPECTED OF HAVING RECEIVED THESE MATERIALS

10   IN ARLINGTON, TEXAS?

11   A.    MR. RONALD MARTIN OF ARLINGTON, TEXAS.

12   Q.    AND DID YOU COME TO LEARN WHO MR. RONALD MARTIN WAS IN

13   RELATION TO MR. RANDALL MARTIN?

14   A.    YES, SIR.

15   Q.    AND WHAT IS THAT RELATION?

16   A.    THEY'RE BROTHERS.

17   Q.    I'M GOING TO REFER TO THEM BY THEIR FIRST NAMES AS

18   RONALD AND RANDALL TO EASE IN THE UNDERSTANDING OF MANY OF MY

19   QUESTIONS.

20   A.    YES, SIR.

21            THE COURT:  BOTH OF YOU, COULD YOU PLEASE SLOW

22   DOWN.

23            MR. MICHAEL:  YES, YOUR HONOR.

24            THE COURT:  AND THEN PLEASE WAIT UNTIL THE ATTORNEY

25   HAS FINISHED HIS QUESTION BEFORE YOU BEGIN YOUR ANSWER.

1              THE WITNESS:  YES, MA'AM.  SORRY.

2    BY MR. MICHAEL:

3    Q.   WHAT IS YOUR UNDERSTANDING OF WHERE INFORMATION WAS

4    OBTAINED THAT INDICATED CHILD PORNOGRAPHY WAS BEING SENT BY

5    SETH BEKENSTEIN TO RONALD?

6    A.   THE INFORMATION WAS OBTAINED THROUGH A -- IT WAS A

7    SEARCH WARRANT THAT WAS DONE ON MR. BEKENSTEIN'S RESIDENCE.

8    AND DURING THE COURSE OF THAT SEARCH WARRANT SOME INFORMATION

9    WAS OBTAINED FROM, I BELIEVE HIS COMPUTER HARD DRIVE, AND

10   THAT INFORMATION WAS FORWARDED TO US TO LEAD US TO BELIEVE

11   THAT MR. RONALD MARTIN WAS THE RECIPIENT OF THIS SHIPMENT OF

12   CHILD PORNOGRAPHY.

13   Q.   UPON RECEIVING THAT INFORMATION WERE ANY SEARCHES

14   CONDUCTED DURING THE COURSE OF YOUR INVESTIGATION?

15   A.   YES, SIR.

16   Q.   WHERE?

17   A.   THE U.S. CUSTOMS SERVICE AT THE TIME CONDUCTED A FEDERAL

18   SEARCH WARRANT -- EXECUTED A FEDERAL SEARCH WARRANT ON

19   MR. RONALD MARTIN'S APARTMENT, HIS RESIDENCE IN ARLINGTON,

20   TEXAS.

21   Q.   AND WHAT WAS THE APPROXIMATE DATE OF THAT SEARCH?

22   A.   IT WAS APRIL THE 17TH OF 2001.

23   Q.   AND DID YOU PARTICIPATE IN THAT SEARCH?

24   A.   YES, SIR.

25   Q.   WHAT WAS YOUR ROLE?

1   A.   THAT DAY I WAS IN CHARGE OF MONITORING THE EVIDENCE

2   COLLECTION, THE EVIDENCE CUSTODIAN, IF YOU WILL.

3   Q.   AND DID YOU PARTICIPATE IN ANY OTHER ASPECT OF THE

4   EXECUTION OF THAT SEARCH WARRANT --

5   A.   I DID.  I'M SORRY.

6   Q.   DID YOU PARTICIPATE IN ANY OTHER ASPECT DURING THE

7   EXECUTION OF THAT SEARCH?

8   A.   YES, SIR.  I PARTICIPATED IN THE INTERVIEW OF MR. RONALD

9   MARTIN.

10   Q.   AND SO WAS HE COOPERATIVE DURING THE EXECUTION OF THE

11   SEARCH?

12   A.   HE WAS.

13   Q.   AND DID HE CONSENT TO BE INTERVIEWED?

14   A.   YES, SIR, HE DID.

15   Q.   AND WAS ANY SUSPECTED CHILD PORNOGRAPHY RECOVERED FROM

16   RONALD'S APARTMENT?

17   A.   NO, SIR, THERE WASN'T.

18   Q.   AND WHAT DID YOU OBSERVE IN HIS APARTMENT?

19   A.   MR. RONALD MARTIN HAD A VERY SPARTAN APARTMENT, ALMOST

20   EMPTY.  HE DID NOT HAVE A WORKING VCR.  HIS TELEVISION WAS

21   JUST BARELY WORKING, AND HE DID NOT OWN A COMPUTER.

22   Q.   AND DID YOU LEARN ANYTHING DURING THE COURSE OF YOUR

23   INTERVIEW OF RONALD THAT CAUSED YOU AND OTHER AGENTS TO

24   CONDUCT ADDITIONAL SEARCHES THAT SAME DAY?

25   A.   YES, SIR.

1    Q.   AND WHAT IS THE INFORMATION THAT YOU LEARNED THAT CAUSED

2    YOU TO DO ADDITIONAL SEARCHES?

3    A.   DURING THE INTERVIEW OF MR. RONALD MARTIN HE INDICATED

4    THAT HE WOULD OCCASIONALLY RECEIVE THINGS AT HIS APARTMENT

5    FROM HIS BROTHER, RANDALL MARTIN.

6    Q.   FROM HIS BOTHER?

7    A.   I'M SORRY, IN HIS BROTHER'S NAME.

8    Q.   SO RONALD WOULD RECEIVE PACKAGES AT RONALD'S APARTMENT

9    THAT WERE BEING SENT TO RANDALL; IS THAT WHAT YOUR TESTIMONY

10   IS?

11   A.   THAT'S CORRECT.  HE WOULD RECEIVE PACKAGES THAT WERE

12   ADDRESSED TO HIS BROTHER RANDALL.

13   Q.   AND WAS THERE ANY INDICATION THAT THOSE PACKAGES MAY

14   CONTAIN CHILD PORNOGRAPHY?

15   A.   YES, SIR.  DURING THE COURSE OF THE INTERVIEW HE --

16   MR. RONALD MARTIN NEVER SAID THAT HE FELT LIKE IT WAS CHILD

17   PORNOGRAPHY, BUT HE WAS VERY NERVOUS AND HE INDICATED THAT HE

18   FELT THAT THERE WAS SOMETHING GOING ON THAT WAS WRONG.

19   Q.   WERE ADDITIONAL SEARCHES THEN CONDUCTED THAT SAME DAY AS

20   A RESULT OF THE INFORMATION YOU LEARNED?

21   A.   YES, SIR.  WE CONDUCTED TWO CONSENSUAL SEARCHES, ONE AT

22   MR. RANDALL MARTIN'S PLACE OF BUSINESS, THE OTHER AT

23   MR. RANDALL MARTIN'S RESIDENCE, BOTH WERE LOCATED IN

24   ARLINGTON, TEXAS.

25   Q.   AND WHEN YOU SAY CONSENT SEARCHES, DOES THAT MEAN

1    SOMEONE THERE WITH AUTHORITY GAVE CONSENT FOR THE SEARCH?

2    A.   YES, SIR, THAT'S CORRECT.

3    Q.   SO WHO GAVE CONSENT FOR THE SEARCH AT RANDALL'S WORK?

4    A.   WHEN WE WENT TO MR. RANDALL MARTIN'S WORK, WE GOT

5    PERMISSION FROM BOTH MR. RANDALL MARTIN AND FROM HIS

6    SUPERVISOR TO LOOK AT HIS WORK COMPUTERS.

7    Q.   SO RANDALL WAS PRESENT FOR THAT SEARCH?

8    A.   THAT'S CORRECT.

9    Q.   AND WHO GAVE CONSENT FOR THE SEARCH OF HIS RESIDENCE?

10   A.   MR. RANDALL MARTIN.

11   Q.   WAS HE PRESENT FOR THAT SEARCH AS WELL?

12   A.   YES, SIR.

13   Q.   DID ONE OF THE SEARCHES HAPPEN FIRST?

14   A.   THE SEARCH OF MR. RANDALL MARTIN'S BUSINESS OCCURRED

15   FIRST.

16   Q.   DID ANYBODY ELSE GIVE CONSENT TO THE SEARCH OF THE

17   RESIDENCE IN ADDITION TO RANDALL?

18   A.   HIS WIFE ALSO.

19   Q.   WHERE DID MR. -- WHERE DID RANDALL WORK?

20   A.   RANDALL WORKED AT THE TEXAS DEPARTMENT OF HEALTH AS A

21   TRAINER FOR PARAMEDICS, AND HE DID TRAINING FOR I THINK CPR

22   AS WELL.

23   Q.   AND WAS ANYTHING SEIZED FROM HIS WORK?

24   A.   YES, SIR, WE TOOK HIS COMPUTER, HIS WORK COMPUTER.

25   Q.   DID YOU PARTICIPATE IN THAT SEIZURE?

1    A.    I DID.

2    Q.    WHAT ROLE DID YOU PLAY?

3    A.    I WAS -- I SECURED THE EVIDENCE AND TOOK IT DOWN TO

4    SENIOR SPECIAL AGENT BILL DAVIS' VEHICLE.

5    Q.    AND WHEN YOU SAY YOU SECURED IT, DOES THAT MEAN YOU PACK

6    IT UP?

7    A.    I PICKED IT UP AND MARKED IT AND TOOK IT DOWN TO HIS

8    VEHICLE.

9    Q.    YOU PERSONALLY PUT IT IN SPECIAL AGENT DAVIS' VEHICLE?

10   A.    YES, SIR, THAT'S CORRECT.

11   Q.    AND WAS A CUSTOMS FORM 6051 CHAIN OF CUSTODY FORM FILLED

12   OUT?

13   A.    IT WAS.

14   Q.    AND WHO SIGNED THAT?

15   A.    MR. BILL DAVIS, SENIOR SPECIAL AGENT BILL DAVIS.

16   Q.    WAS THAT BECAUSE THE COMPUTER WAS PUT INTO HIS CAR?

17   A.    THAT'S CORRECT.

18   Q.    HOW DID YOU KNOW THAT THIS WAS MR. MARTIN'S COMPUTER?

19   A.    I WAS THERE WHEN MR. MARTIN GAVE CONSENT AND HIS

20   SUPERVISOR.  THEY BOTH INDICATED THAT WAS HIS CUBICAL AND IT

21   WAS HIS COMPUTER.

22   Q.    AFTER YOU PUT THE WORK COMPUTER IN AGENT DAVIS' CAR WHAT

23   DID YOU DO NEXT?

24   A.    AT THAT POINT THE AGENTS THAT WERE AT MR. RANDALL

25   MARTIN'S PLACE OF WORK, WE CONVOYED TO MR. RANDALL MARTIN'S

1    RESIDENCE.

2    Q.    AND WHEN YOU SAY "CONVOYED," WHAT DO YOU MEAN BY THAT?

3    A.    WE FOLLOWED EACH OTHER OVER THERE.

4    Q.    WERE YOU IN THE SAME CAR AS AGENT DAVIS?

5    A.    I WAS NOT IN THE SAME CAR AS AGENT DAVIS.

6    Q.    WAS AGENT DAVIS IN THE CAR WITH THE COMPUTER?

7    A.    YES, SIR.

8    Q.    AND WAS HIS CAR IN YOUR SIGHT THE ENTIRE TIME?

9    A.    IT WAS.

10   Q.    AND HOW DO YOU RECALL THAT?

11   A.    BECAUSE I GET LOST FREQUENTLY, AND WHENEVER WE'RE GOING

12   TO WARRANTS OR CONSENT SEARCHES, I LIKE TO FOLLOW SOMEBODY SO

13   THAT I DON'T GET LOST.

14   Q.    AND WHAT HAPPENED ONCE YOU ARRIVED AT RANDALL'S

15   RESIDENCE?

16   A.    WE ARRIVED AT MR. MARTIN'S RESIDENCE, AND AT THAT POINT

17   THERE WERE SEVERAL AGENTS THAT WERE WATCHING THE HOUSE.  AND

18   THEY HAD ALREADY MADE CONTACT WITH MRS. MARTIN AT THE TIME

19   AND INDICATED THAT WE WERE COMING WITH MR. MARTIN IN TOW,

20   RANDALL MARTIN, TO CONDUCT A SEARCH OF THE COMPUTER.  AND WE

21   ASKED FOR PERMISSION TO LOOK AT THEIR COMPUTER.

22   Q.    LET ME ASK YOU SOME QUESTIONS.

23   A.    YES, SIR.

24   Q.    SO WAS THE SEARCH CONDUCTED OF HIS RESIDENCE?

25   A.    YES.

1    Q.   AND WAS ANY DIGITAL MEDIA -- LET ME ASK YOU.  WAS A

2    COMPUTER SEIZED DURING THAT --

3    A.   YES.

4    Q.   -- SEARCH?  LET ME REPHRASE THE QUESTION BECAUSE I THINK

5    WE TALKED OVER EACH OTHER.

6           WAS A COMPUTER SEIZED DURING THAT SEARCH?

7    A.   YES, SIR, A COMPUTER WAS SEIZED DURING THAT SEARCH.

8    Q.   DID YOU ASSIST IN THAT SEIZURE?

9    A.   I DID.

10   Q.   HOW?

11   A.   I DID -- I PERFORMED THE SAME FUNCTIONS THAT I DID AT

12   THE PLACE OF BUSINESS, MARKED AND PICKED THE COMPUTER UP AND

13   TOOK IT OUT TO MR. DAVIS' VEHICLE AND PUT IT IN THE BACK

14   SEAT.

15   Q.   YOU PUT BACK INTO AGENT DAVIS' CAR ALONG WITH THE WORK

16   COMPUTER?

17   A.   YES, SIR.

18   Q.   AND WHEN YOU PUT THE HOME COMPUTER IN THERE, IN THE CAR,

19   DID YOU OBSERVE THE WORK COMPUTER STILL THERE?

20   A.   YES, SIR.

21   Q.   SO WHAT HAPPENED AFTER BOTH COMPUTERS WERE IN SPECIAL

22   AGENT DAVIS' CAR?

23   A.   THE AGENTS THAT WERE AT THE RESIDENCE, WE ALL CONVOYED

24   BACK TO THE AT THE TIME U.S. CUSTOMS OFFICE, NOW WOULD BE THE

25   ICE OFFICE, TO PLACE THE EVIDENCE INTO EITHER THE COMPUTER

1    FORENSICS LAB OR TO THE EVIDENCE LOCKUP.

2    Q.    AND WERE YOU -- DID YOU DRIVE WITH AGENT DAVIS IN HIS

3    CAR BACK TO THE ICE OFFICES?

4    A.    NO, SIR.

5    Q.    DID YOU KEEP HIS CAR IN YOUR SIGHT THE ENTIRE TIME?

6    A.    I DID.

7    Q.    AND THAT WAS THE CAR WITH BOTH COMPUTERS IN IT?

8    A.    YES, SIR.

9    Q.    AND FOR THAT COMPUTER SEIZED FROM THE HOME WAS THE

10   PROPER FORM 6051 FILLED OUT?

11   A.    YES, SIR.

12   Q.    SO WHAT HAPPENED UPON ARRIVING AT THE ICE OFFICES WITH

13   THE COMPUTERS?

14   A.    THE COMPUTERS WERE TAKEN TO THE COMPUTER FORENSICS LAB.

15   SENIOR SPECIAL AGENT BILL DAVIS AND RALPH PENDLETON WERE OUR

16   EXAMINERS AT THE TIME.  THEY HAD CUSTODY OF THE COMPUTERS AND

17   PERFORMED AN EXAM ON THEM.

18   Q.    DID YOU OBSERVE AGENT DAVIS AND AGENT -- IS IT SPECIAL

19   AGENT PENDLETON?

20   A.    YES, SENIOR SPECIAL AGENT PENDLETON.

21   Q.    DID YOU OBSERVE THESE AGENTS REMOVE THE COMPUTERS AND

22   TAKE THEM INTO THE ICE BUILDING INTO THE LAB?

23   A.    I DID.

24   Q.    AND THESE ARE THE SAME COMPUTERS THAT YOU HAD HELPED

25   SEIZE AND PUT INTO THE CAR?

1   A.    THAT'S CORRECT.

2           MR. MICHAEL:  NO FURTHER QUESTIONS, YOUR HONOR.

3           THE COURT:  THANK YOU.

4           CROSS-EXAMINATION, MR. AARON?

5           MR. AARON:  NO QUESTIONS.  THANK YOU.

6           THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP

7   DOWN.  YOU'RE EXCUSED.

8           THE WITNESS:  YES, MA'AM.

9           THE COURT:  THE GOVERNMENT MAY CALL ITS NEXT

10  WITNESS.

11          MR. MICHAEL:  THE GOVERNMENT CALLS RETIRED SENIOR

12  SPECIAL AGENT RALPH PENDLETON, YOUR HONOR.

13          THE CLERK:  PLEASE COME FORWARD AND STOP NEXT TO

14  THE COURT REPORTER.

15          PLAINTIFF'S WITNESS, RALPH PENDLETON, WAS SWORN

16          THE CLERK:  PLEASE TAKE THE STAND.

17          STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

18  THE RECORD.

19          THE WITNESS:  RALPH EDWARD PENDLETON, JR.,

20  P-E-N-D-L-E-T-O-N.

21          THE COURT:  THANK YOU.  YOU MAY INQUIRE.

22          MR. MICHAEL:  THANK YOU.

23                     DIRECT EXAMINATION

24  BY MR. MICHAEL:

25  Q.    SIR, WHERE DO YOU WORK?

```
 1    A.    I WORK FOR E.D.S., ELECTRONIC DATA SYSTEMS.

 2    Q.    WHAT IS ELECTRONIC DATA SYSTEMS?

 3    A.    IT'S AN OUTSOURCING AND WE PROVIDE COMPUTER SUPPORT FOR

 4    CLIENTS WORLDWIDE.

 5    Q.    I'M SORRY, WHAT WAS THAT LAST PART?

 6    A.    WE PROVIDE COMPUTER SUPPORT FOR CLIENTS WORLDWIDE.

 7    Q.    AND WHERE DO YOU WORK?

 8    A.    I WORK IN PLANO, TEXAS.

 9    Q.    HOW BIG A COMPANY IS E.D.S.?

10    A.    WE HAVE OVER 20,000 EMPLOYEES.

11    Q.    WHAT IS YOUR CURRENT TITLE AT E.D.S.?

12    A.    I'M A SENIOR FORENSIC INVESTIGATOR.

13    Q.    AND WHAT ARE YOUR, IN GENERAL TERMS, JOB

14    RESPONSIBILITIES?

15    A.    I PROVIDE COMPUTER FORENSIC SUPPORT TO THE GLOBAL

16    INVESTIGATIONS GROUP AT E.D.S. INVESTIGATING FRAUD AND

17    INTERNAL ISSUES RELATED TO THE E.D.S. SYSTEMS.

18    Q.    SO IS THE SCOPE OF YOUR WORK INTERNAL INVESTIGATIONS,

19    INTERNAL TO E.D.S.?

20    A.    YES.

21    Q.    AND WHAT DID YOU DO BEFORE YOU JOINED E.D.S.?

22    A.    I WAS A SPECIAL AGENT WITH THE U.S. CUSTOMS SERVICE FOR

23    NINETEEN YEARS.

24    Q.    WHEN DID YOU RETIRE?

25    A.    JANUARY 2ND, 2003.
```

1    Q.   AND IS U.S. CUSTOMS SERVICE THE PREDECESSOR AGENCY OF

2    WHAT IS NOW KNOWN AS IMMIGRATION AND CUSTOMS ENFORCEMENT OR

3    ICE?

4    A.   YES.

5    Q.   AND DID YOU RETIRE BEFORE THE CUSTOMS SERVICE BECAME

6    PART OF ICE?

7    A.   YES.

8    Q.   AND, I'M SORRY, I BELIEVE IT WAS -- HOW LONG WERE YOU A

9    SPECIAL AGENT FOR?

10   A.   NINETEEN YEARS.

11   Q.   AND WHAT WAS YOUR TITLE BEFORE YOU RETIRED?

12   A.   I WAS A SUPERVISORY SPECIAL AGENT.

13   Q.   AND WHAT DID YOU DO BEFORE YOU BECAME A SPECIAL AGENT?

14   A.   I WAS A BORDER PATROL AGENT FOR SIX YEARS.

15   Q.   AND WERE YOU THEN PROMOTED TO SPECIAL AGENT?

16   A.   NO, I TRANSFERRED FROM THE U.S. BORDER PATROL TO THE

17   U.S. CUSTOMS SERVICE WHERE I BECAME AN AGENT.

18   Q.   AND WHAT TYPES OF CASES DID YOU WORK ON DURING YOUR

19   CAREER WITH CUSTOMS SERVICE?

20   A.   MY CASES WERE -- CONSISTED OF DRUG SMUGGLING, FRAUD,

21   HIGH TECHNOLOGY SMUGGLING, AND CHILD PORNOGRAPHY.

22   Q.   DID YOU WORK IN VARIOUS CITIES DURING THE COURSE OF YOUR

23   CAREER?

24   A.   YES.  I WORKED IN SAN DIEGO; COLUMBUS, GEORGIA; AND

25   DALLAS, TEXAS.

1    Q.   AND WHERE WERE YOU ASSIGNED IN APRIL OF 2001?

2    A.   I WAS ASSIGNED TO THE RESIDENT AGENT IN CHARGE OFFICE IN

3    DALLAS, TEXAS.

4    Q.   AND WERE YOU ASSIGNED TO A PARTICULAR GROUP AT THAT

5    TIME?

6    A.   NO.  I WAS IN THE -- I WAS THE LEAD FORENSIC AGENT IN

7    THE OFFICE SO I WASN'T ASSIGNED TO A SPECIFIC GROUP.

8    Q.   BUT YOU WERE THE LEAD FORENSIC AGENT?

9    A.   YES.

10   Q.   AND AS OF WHEN DID YOU START DOING -- DOES THAT MEAN YOU

11   DID COMPUTER FORENSIC EXAMS?

12   A.   RIGHT.  I SUPPORTED ALL THE AGENTS WITH THEIR

13   INVESTIGATIONS IN THE OFFICE.

14   Q.   AS OF WHEN DID YOU START DOING COMPUTER FORENSIC EXAMS?

15   A.   THAT WAS MID-1996.

16   Q.   AND WHEN DID YOU BECOME THE LEAD FORENSIC EXAMINER IN

17   DALLAS?

18   A.   AS SOON AS I STARTED DOING FORENSIC EXAMINATIONS.

19   Q.   AND IN GENERAL, WHAT WERE YOUR RESPONSIBILITIES AS A

20   LEAD FORENSIC EXAMINER?

21   A.   I WOULD GO OUT ON SEARCH WARRANTS AND HELP THEM SECURE

22   ELECTRONIC MEDIA AND THEN COME BACK AND DO THE ANALYSIS ON

23   THE COMPUTERS ONCE WE HAD THEM IN THE OFFICE.

24   Q.   WHEN YOU SAY YOU WOULD DO THE ANALYSIS, ARE YOU TALKING

25   ABOUT FORENSIC REVIEWS?

1    A.    YES.

2    Q.    AND YOU WOULD SUPPORT ONGOING INVESTIGATIONS BEING

3    CONDUCTED BY YOUR FELLOW AGENTS?

4    A.    YES.

5    Q.    AND DID YOU EVER CONDUCT FORENSIC REVIEWS OF COMPUTERS

6    IN CONNECTION WITH CHILD PORNOGRAPHY CASES?

7    A.    YES.

8    Q.    DID YOU RECOVER IMAGES DURING THOSE INVESTIGATIONS?

9    A.    YES.

10   Q.    VIDEOS?

11   A.    YES.

12   Q.    CHATS?

13   A.    YES.

14   Q.    AND TO CONDUCT FORENSIC EXAMS HAVE YOU RECEIVED ANY

15   SPECIALIZED TRAINING?

16   A.    YES.

17   Q.    AND HAVE YOU TAKEN CLASSES, SEMINARS AND COURSES IN

18   COMPUTER AND FORENSIC-RELATED TOPICS?

19   A.    YES.

20   Q.    HAVE YOU ALSO RECEIVED ON-THE-JOB-TRAINING?

21   A.    YES.

22   Q.    AND HAVE YOU REVIEWED PUBLICATIONS AND ARTICLES ON THOSE

23   SUBJECTS?

24   A.    YES.

25   Q.    HAVE YOU TAUGHT CLASSES AND TRAINED AGENTS YOURSELF?

1    A.    YES.

2    Q.    DID YOU MAKE EFFORTS -- AND MAYBE YOU STILL DO -- TO

3    KEEP CURRENT WITH THE STATE OF FORENSICS AND COMPUTERS?

4    A.    YES, I DO.

5    Q.    AND DID YOU AT THE TIME AS WELL?

6    A.    YES.

7    Q.    IN GENERAL TERMS, WHAT STEPS WOULD YOU TAKE IN 2001 TO

8    CONDUCT A FORENSIC EXAM OF A COMPUTER?

9    A.    THE ELECTRONIC MEDIA WOULD BE PICKED UP.  AND WHEN I SAY

10   "ELECTRONIC MEDIA," I MEAN THE COMPUTER.  YOU WOULD RECOVER

11   ANY DISKS, CD'S, FLOPPY DISKS THAT MIGHT BE ON THE SCENE.

12   THOSE ITEMS WOULD BE BROUGHT BACK TO THE OFFICE.  THE

13   COMPUTER WOULD BE EXAMINED, HARD DRIVE WOULD BE REMOVED.  IT

14   WOULD BE HOOKED UP TO A FORENSIC DESKTOP.  THE COMPUTER WOULD

15   THEN BE STARTED WITH A CONTROL BOOT DISK AND AN IMAGE OF THE

16   TARGET HARD DRIVE WOULD BE CREATED ON THE FORENSIC WORK

17   STATION.

18   Q.    AND WHAT WOULD BE ON THAT CONTROL BOOT DISK?

19   A.    IT'S GOT A WRITE BLOCKING PROGRAM AND IT ALSO HAS THE

20   ENCASE DOS ACQUISITION PROGRAM.

21   Q.    WHEN YOU SAY THE ENCASE DOS ACQUISITION PROGRAM, ARE YOU

22   REFERRING TO THE ENCASE FORENSIC PROGRAM?

23   A.    YES.

24   Q.    AND DOES THE WRITE BLOCKER PREVENT CHANGES OR

25   ALTERATIONS AS THEY'RE KNOWN TO THE SUSPECT HARD DRIVE?

1    A.    YES.

2    Q.    SO AFTER YOU'VE BOOTED UP THE COMPUTER USING THIS BOOT

3    DISKETTE, DOES THE WRITE BLOCKER TAKE EFFECT?

4    A.    YES, IT TAKES EFFECT IMMEDIATELY.

5    Q.    AND YOU THEN MAKE A FORENSIC COPY USING ENCASE?

6    A.    YES.

7    Q.    AND IN 2001 HAD YOU USED ENCASE MANY TIMES?

8    A.    YES.

9    Q.    LET ME -- I'M SORRY, SO WE DON'T SPEAK OVER EACH OTHER

10   FOR THE SAKE OF THE COURT REPORTER.

11             HAD YOU USED ENCASE MANY TIMES BY 2001?

12   A.    YES.

13   Q.    AND DID YOU FIND IT TO BE RELIABLE?

14   A.    YES.

15   Q.    AND THAT IT WORKED WELL?

16   A.    YES.

17   Q.    AND THAT IT MADE ACCURATE COPIES?

18   A.    YES.

19   Q.    AND THAT IT PRESERVED THE INTEGRITY OF THOSE COPIES?

20   A.    YES.

21   Q.    AND IS THERE A CAPABILITY OF ENCASE TO THEN PRESERVE THE

22   INTEGRITY OF THE COPY ITSELF?

23   A.    YES, THERE ARE.

24   Q.    HOW WOULD YOU VERIFY THAT THE COPIES ARE THE SAME?

25   A.    WHEN THE ENCASE PROGRAM DOES THE IMAGE OF THE TARGET

1    COMPUTER DURING ACQUISITION IT RUNS AN MD5 HASH ON THE

2    CONTENTS OF THE HARD DRIVE.  AND THAT HASH IS THEN COMPARED

3    WHEN YOU LOAD THE IMAGE UP WITH A VERIFICATION HASH WHERE IT

4    GOES BACK THROUGH AND VERIFIES THAT THE HASH ON THE

5    ACQUISITION AND THE VERIFICATION THEN MATCH.  AND IF THEY DO

6    MATCH, YOU HAVE AN EXACT COPY OF THE HARD DRIVE.

7    Q.   ARE YOU ABLE TO CREATE A NEW COPY IF THEY DON'T MATCH?

8    A.   I'VE NEVER HAD ONE NOT MATCH.

9    Q.   AND ARE YOU ABLE TO REPEATEDLY COMPARE THE HASH VALUES

10   DURING THE COURSE OF YOUR REVIEW?

11   A.   YES.  IN FACT, YOU CAN TAKE THE -- IF YOU DO AN

12   UNCOMPRESSED IMAGE OF THE HARD DRIVE ON THE INITIAL

13   ACQUISITION, YOU CAN GO BACK LATER AND COMPRESS YOUR IMAGE

14   AND IT PRODUCES THE SAME HASH AGAIN.

15   Q.   AND THEN ONCE YOU'VE VERIFIED THAT IT'S AN EXACT COPY,

16   ARE YOU ABLE TO THEN CONDUCT A REVIEW OF THE CONTENTS OF THE

17   HARD DRIVE?

18   A.   YES.

19   Q.   DOES THAT INCLUDE ALL OF THE FILES AND DATA THAT ARE ON

20   THAT HARD DRIVE?

21   A.   YES.  YOU CAN DO A LOGICAL REVIEW OF ALL THE FILES AND

22   FOLDERS AND DELETED MATERIAL ON THE HARD DRIVE.

23   Q.   AND CAN YOU CONDUCT SEARCHES USING KEY TERMS?

24   A.   YES.

25   Q.   AND CAN YOU MARK WHAT YOU BELIEVE TO BE SUSPECT FILES?

1    A.    YES.

2    Q.    AND IF YOU REVIEW MULTIPLE COMPUTER HARD DRIVES AT THE

3    SAME TIME, CAN YOU DO THAT IN A WAY TO ENSURE THE DATA

4    REMAINS SEPARATE?

5    A.    YES.

6    Q.    AFTER YOU'VE CONDUCTED YOUR REVIEW AND IDENTIFIED

7    SUSPECT FILES OR FILES RELATED TO THE INVESTIGATION, WHAT DO

8    YOU DO?

9    A.    YOU PREPARE A REPORT.

10   Q.    AND WHAT DO YOU DO WITH THAT REPORT?

11   A.    PROVIDE IT TO THE CASE AGENT.

12   Q.    AND IS THAT IN CONNECTION WITH THE INVESTIGATION?

13   A.    YES.

14   Q.    WERE YOU WORKING AS A SPECIAL AGENT ON APRIL 17, 2001?

15   A.    YES, I WAS.

16   Q.    WHAT WAS YOUR ASSIGNMENT THAT DAY?

17   A.    I WAS SUPPORTING AGENT IN OUR OFFICE ON A SEARCH WARRANT

18   IN ARLINGTON, TEXAS.

19   Q.    AND DO YOU RECALL WHERE THAT SEARCH WARRANT WAS

20   CONDUCTED OR WHOSE RESIDENCE IT WAS?

21   A.    IT WAS INITIALLY CONDUCTED AT AN APARTMENT THAT WAS

22   RENTED BY A RONALD MARTIN.  I BELIEVE HIS NAME WAS RONALD

23   MARTIN.

24   Q.    AND WHAT WAS THE NATURE OF THAT INVESTIGATION?

25   A.    IT WAS A CHILD PORNOGRAPHY INVESTIGATION.

1    Q.    AND WERE THERE -- AFTER THAT SEARCH WAS EXECUTED WERE

2    SUBSEQUENT SEARCHES CONDUCTED THAT SAME DAY?

3    A.    YES.

4    Q.    AND WERE THEY CONDUCTED IN CONNECTION WITH -- WELL,

5    WHERE WERE THEY CONDUCTED?

6    A.    THERE WERE TWO SEARCHES SUBSEQUENTLY CONDUCTED AFTER THE

7    INITIAL SEARCH WARRANT, AND THEY WERE AT THE PLACE OF

8    EMPLOYMENT FOR RANDALL MARTIN IN ARLINGTON, TEXAS, AND ALSO

9    HIS RESIDENCE IN ARLINGTON, TEXAS.

10   Q.    WHAT WAS THE RELATIONSHIP BETWEEN RONALD AND RANDALL?

11   A.    THEY WERE BROTHERS.

12   Q.    AND WHAT WAS RANDALL SUSPECTED OF HAVING DONE AT THAT

13   POINT?

14   A.    RANDALL WAS SUSPECTED OF RECEIVING A PACKAGE FROM SETH

15   BEKENSTEIN THAT CONTAINED CHILD PORNOGRAPHY VIDEOS AND CD'S.

16   Q.    AND WHERE WAS THE SETH BEKENSTEIN INVESTIGATION BASED?

17   A.    SAN FRANCISCO.

18   Q.    AND WERE YOU PRESENT FOR -- AFTER THE SEARCH OF RONALD'S

19   PLACE WERE YOU PRESENT FOR EITHER SEARCH IN CONNECTION WITH

20   RANDALL?

21   A.    I WAS PRESENT AT THE SEARCH CONDUCTED AT HIS RESIDENCE.

22   Q.    AND WAS ANYTHING SEIZED FROM THERE?

23   A.    COMPUTER AND SOME DIGITAL MEDIA.

24   Q.    AND DID YOU COME TO LEARN WHETHER OR NOT ANYTHING WAS

25   SEIZED AT THE SEARCH AT HIS PLACE OF EMPLOYMENT?

1    A.    YES.  A COMPUTER WAS SEIZED THERE.

2    Q.    DID YOU SEE THAT COMPUTER THAT DAY?

3    A.    YES.

4    Q.    NOW, WITH REGARD TO THE INVESTIGATION OR RATHER THE

5    SEARCH AT THE RESIDENCE, DID YOU PARTICIPATE IN THE SEIZURE

6    OF THE COMPUTER THERE?

7    A.    AT THE RESIDENCE?

8    Q.    AT THE RESIDENCE.

9    A.    YES, I DID.

10   Q.    AND WHAT ROLE DID YOU PLAY WITH REGARD TO THE SEIZURE?

11   A.    I INITIALLY CONDUCTED AN ON-SITE EXAMINATION OF THE

12   COMPUTER.  AND ONCE WE DETERMINED THAT THERE WAS CHILD

13   PORNOGRAPHY ON THE COMPUTER, WE SEIZED IT.

14   Q.    WHAT DID YOU DO -- DID YOU ASSIST WITH THE PHYSICAL

15   SEIZING OF IT OR WERE YOU PRESENT FOR THE PHYSICAL SEIZING?

16   A.    I WAS PRESENT FOR THE PHYSICAL SEIZING OF IT.

17   Q.    AND WHERE WAS THE COMPUTER PUT AFTER IT WAS SEIZED?

18   A.    IT WAS PUT IN BILL DAVIS' -- AGENT DAVIS' CAR.

19   Q.    AND WERE THERE ANY OTHER COMPUTERS IN AGENT DAVIS' CAR?

20   A.    YES.  THERE WAS ONE THAT WAS SEIZED AT THE TEXAS

21   DEPARTMENT OF HEALTH.

22   Q.    WAS THAT THE COMPUTER SEIZED AT RANDALL'S PLACE OF

23   EMPLOYMENT?

24   A.    YES.

25   Q.    AFTER THE TWO COMPUTERS WERE IN SPECIAL AGENT DAVIS' CAR

1    WHAT HAPPENED NEXT?

2    A.    WE CONVOYED BACK OVER TO THE RESIDENT AGENT IN CHARGE

3    OFFICE IN DALLAS, TEXAS, AND UNLOADED THE COMPUTERS AND TOOK

4    THEM AND PUT THEM IN THE FORENSIC LAB.

5    Q.    DID YOU PARTICIPATE IN BRINGING THOSE TWO COMPUTERS TO

6    THE FORENSIC LAB?

7    A.    YES.

8    Q.    DID THAT INCLUDE THE COMPUTER SEIZED FROM MR. RANDALL

9    MARTIN'S PLACE OF EMPLOYMENT, THE WORK COMPUTER?

10   A.    YES.

11   Q.    AND AFTER THEY WERE BROUGHT TO THE FORENSIC LAB WHO

12   CONDUCTED THE FORENSIC REVIEW ON THESE COMPUTERS?

13   A.    I DID.

14   Q.    ON BOTH THE WORK AND THE RESIDENCE COMPUTER?

15   A.    YES.

16   Q.    AND DID YOU USE THE PROCEDURES YOU SUMMARIZED BEFORE?

17   A.    YES.

18   Q.    AND THAT INCLUDED THE BOOT DISKETTE, WRITE BLOCKER, AND

19   ENCASE?

20   A.    YES.

21   Q.    AND THAT YOU COMPARED THE HASH VALUES OF THE DUPLICATES

22   AS WELL?

23   A.    YES.

24            MR. AARON:  OBJECTION, LEADING.

25            THE COURT:  OVERRULED.

1    BY MR. MICHAEL:

2    Q.    AND AFTER YOU MADE THOSE COPIES DID YOU RETURN THE

3    ORIGINAL COMPUTERS TO EVIDENCE?

4    A.    YES.

5    Q.    WITH REGARD TO YOUR REVIEW OF BOTH OF THESE COMPUTERS,

6    DO YOU RECALL WHAT VERSION OF ENCASE YOU USED?

7    A.    I BELIEVE AT THAT TIME IT WAS VERSION 3.

8    Q.    ARE YOU CERTAIN OF THAT OR IS THAT JUST YOUR BEST

9    RECOLLECTION?

10   A.    THAT'S JUST MY BEST RECOLLECTION.

11   Q.    AND AT THE TIME IN 2001 WERE THE VERSIONS OF ENCASE THAT

12   YOU WERE USING RELIABLE?

13   A.    YES.

14   Q.    DID YOU FIND THAT THEY MADE ACCURATE COPIES?

15   A.    YES.

16   Q.    AND THAT THEY PRESERVED THE INTEGRITY OF THOSE COPIES?

17   A.    YES.

18   Q.    AND DID YOU EVER HAVE ANY REASON TO BELIEVE THAT THERE

19   WAS ANY PROBLEM WITH ANY OF THE COPIES YOU MADE IN CONNECTION

20   WITH THIS CASE?

21   A.    NO.

22   Q.    OR THAT THE INTEGRITY OF THE DATA WAS IN ANY WAY

23   COMPROMISED?

24   A.    NO.

25   Q.    DURING YOUR REVIEW OF THE RESIDENCE COMPUTER DID YOU

1    OBSERVE ANY IMAGES OR VIDEOS OF CHILD PORNOGRAPHY?

2    A.   YES.

3    Q.   AND DURING YOUR FORENSIC REVIEW OF THE WORK COMPUTER DID

4    YOU OBSERVE ANY IMAGES OR VIDEOS OF CHILD PORNOGRAPHY?

5    A.   YES.

6    Q.   AND DID YOU OBSERVE -- WERE YOU ABLE TO VIEW THE VIDEO

7    FILES THAT YOU FOUND ON THE WORK COMPUTER?

8    A.   NOT INITIALLY, NO.

9    Q.   WHY NOT?

10   A.   THEY WERE ENCRYPTED.

11   Q.   AND WERE YOU ABLE TO DECRYPT THEM?

12   A.   YES.

13   Q.   WHEN I SAY "DECRYPT," DO YOU UNDERSTAND THAT TO MEAN

14   FIGURE OUT THE PASSWORD?

15   A.   YES.

16   Q.   AND HOW DID YOU FIGURE OUT THE PASSWORD?

17   A.   THERE WAS A FILE ON RANDALL MARTIN'S WORK COMPUTER THAT

18   WAS CALLED PASSWORD DOT TEXT.  AND I USED SEVERAL PASSWORDS

19   THAT I FOUND ON HIS COMPUTER DURING THE FORENSIC ANALYSIS AND

20   TRIED THOSE PASSWORDS AGAINST THE MOVIE FILES THAT WERE

21   ENCRYPTED, AND ONE OF THE PASSWORDS WAS THE CORRECT PASSWORD.

22   Q.   AND DURING YOUR REVIEW OF THE WORK COMPUTER WERE YOU

23   ABLE TO FIND ANY EVIDENCE OF INTERNET COMMUNICATION?

24   A.   YES.

25   Q.   AND WITHIN THAT DID YOU FIND COMMUNICATION OF INSTANT

```
 1   MESSAGING?

 2   A.   YES.

 3   Q.   WHAT WAS THE INSTANT MESSAGING PROGRAM THAT WAS USED?

 4   A.   ICQ.

 5   Q.   AND WERE YOU FAMILIAR WITH THAT PROGRAM?

 6   A.   YES.

 7   Q.   AND WERE YOU ABLE TO OBSERVE AND SEE ICQ FILES AND

 8   FOLDERS ON THE COMPUTER?

 9   A.   YES.

10   Q.   AND WAS THE PROGRAM ACTUALLY INSTALLED ON THE COMPUTER?

11   A.   YES, IT WAS.

12   Q.   AND WERE YOU ABLE TO FIND FOLDERS THAT HAD ICQ CHAT LOGS

13   IN THOSE FOLDERS?

14   A.   YES.

15   Q.   WERE YOU ABLE TO READ THOSE FOLDERS, THOSE CHAT LOGS,

16   UPON FIRST FINDING THEM?

17   A.   NO.

18   Q.   WHY NOT?

19   A.   THE NATIVE FORMAT THAT THE ICQ FILES ARE IN IS NOT

20   READABLE UNLESS THEY ARE BEING -- UNLESS YOU READ THEM INSIDE

21   THE ICQ PROGRAM.

22   Q.   WOULD IT BE FAIR TO SAY THAT THEY'RE IN A PROPRIETARY

23   FORMAT?

24   A.   YES, THAT WOULD BE CORRECT.

25   Q.   AND TO BE ABLE TO READ THEM WOULD IT BE FAIR TO SAY THAT
```

1    YOU NEED TO USE AN APPROPRIATE PROGRAM TO CONVERT THEM?

2    A.   YES.

3    Q.   AND IN THIS CASE I BELIEVE YOU SAID ONE OF THOSE

4    PROGRAMS WOULD BE THE ICQ PROGRAM ITSELF?

5    A.   RIGHT.

6    Q.   SO WERE YOU EVENTUALLY ABLE TO READ THOSE, THE DATA

7    FILES THAT CONTAINED CHAT TRANSCRIPTS?

8    A.   YES, I WAS.

9    Q.   AND HOW DID YOU DO THAT?

10   A.   INITIALLY I LOADED THEM UP IN AN ICQ PROGRAM THAT I HAD

11   INSTALLED ON THE FORENSIC WORK STATION AND READ THEM THROUGH

12   THE ICQ PROGRAM.

13   Q.   SO YOU ACTUALLY USED THE ICQ PROGRAM ITSELF TO CONVERT

14   THESE?

15   A.   RIGHT.

16   Q.   AND DID THEY CONVERT INTO A READABLE FORMAT?

17   A.   YES, THEY DID.

18   Q.   AND WAS THIS WAY OF CONVERTING THEM, USING THE ICQ

19   SOFTWARE AS LEAD FORENSIC EXAMINER, WAS THIS METHOD WITHIN

20   YOUR PROTOCOLS?

21   A.   YES.

22   Q.   SO AT ANY POINT DID YOU EVER EDIT THE CONTENT OF THE

23   CHAT TRANSCRIPTS ONCE THEY WERE IN A READABLE FORMAT?

24   A.   NO.

25   Q.   WHAT ABOUT BEFORE THEY WERE IN A READABLE FORMAT?

```
 1    A.    NO.

 2    Q.    DID YOU CONVERT THEM EXACTLY AS THEY WERE ON

 3    MR. MARTIN'S COMPUTER HARD DRIVE?

 4    A.    YES, I DID.

 5    Q.    AND ONCE THEY WERE CONVERTED WERE THEY READABLE IN PLAIN

 6    ENGLISH?

 7    A.    YES, THEY WERE.

 8    Q.    AND WERE YOU ABLE TO SEE THE SCREEN NAMES OF THE PEOPLE

 9    PARTICIPATING IN THE CHATS?

10    A.    YES.

11    Q.    AND DID THE DATES AND TIMES APPEAR IN A LOGICAL COHERENT

12    FASHION?

13    A.    YES, THEY DID.

14    Q.    DID THE CONVERSATIONS APPEAR TO BE LARGELY COHERENT?

15    A.    YES.

16    Q.    AND UPON YOUR REVIEW OF THOSE CHATS DID THEY APPEAR TO

17    BE RELEVANT TO YOUR INVESTIGATION OF MR. MARTIN?

18    A.    YES, THEY DID.

19    Q.    WHAT WAS MR. MARTIN'S SCREEN NAME, IF YOU RECALL?

20    A.    RICOCHET.

21    Q.    AND DID YOU LEARN -- DID YOU REVIEW AND SEE OTHER SCREEN

22    NAMES IN ANY OF THOSE CHATS?

23    A.    YES, I DID.

24    Q.    DID ANY OF THOSE SCREEN NAMES APPEAR TO YOU OR DID YOU

25    LEARN AT ANY POINT THAT ANY OF THOSE SCREEN NAMES WERE
```

1    RELEVANT TO OTHER ONGOING INVESTIGATIONS?

2    A.   YES, I DID.

3    Q.   WHAT IS ONE OF THOSE SCREEN NAMES?

4    A.   SOME OF THE SCREEN NAMES THAT TURNED OUT TO BE RELEVANT

5    WERE BOYSAN, BOYSAN1, OJIBOYSAN AND OJITEMP.

6    Q.   SO AFTER REVIEW OF THESE CHATS DID YOU FORWARD THEM ON

7    TO ANYBODY?

8    A.   YES.  I FORWARDED THE CHATS FROM THE RANDALL MARTIN

9    COMPUTER TO MIKE ARNOLD IN RIVERSIDE.

10   Q.   AND WHY DID YOU SEND -- WAS MIKE ARNOLD A SPECIAL AGENT?

11   A.   YES.

12   Q.   AND WAS HE THE CASE AGENT IN ANY INVESTIGATION?

13   A.   HE WAS THE CASE AGENT FOR RIVERSIDE.

14   Q.   WHO WAS BEING INVESTIGATED IN RIVERSIDE?

15   A.   A MAN NAMED SANDERS.

16   Q.   AND SPECIAL AGENT ARNOLD WAS THE CASE AGENT FOR THE

17   SANDERS INVESTIGATION?

18   A.   YES.

19            MR. MICHAEL:  MAY I HAVE A MOMENT, PLEASE, YOUR

20   HONOR?

21            THE COURT:  GO AHEAD.

22   BY MR. MICHAEL:

23   Q.   NEXT TO YOU IS A BLACK BINDER ON YOUR RIGHT-HAND SIDE.

24   YOU CAN SET THE ONE IN FRONT OF YOU ASIDE, AND IF YOU CAN

25   OPEN UP THE BINDERS I BELIEVE THE FIRST ONE THERE IS MARKED

1    EXHIBIT 2.  EXCUSE ME.  EXHIBIT -- YES, EXHIBIT 2.  IF YOU

2    COULD REVIEW THAT EXHIBIT.

3    A.    THESE APPEAR TO BE THE CHAT LOGS.

4              MR. AARON:  OBJECTION, NO QUESTION PENDING.

5    BY MR. MICHAEL:

6    Q.    DO YOU RECOGNIZE WHAT'S IN THOSE?

7    A.    YES.  THEY'RE CHAT LOGS.

8    Q.    AND ARE THESE EXCERPTS OF THE CHAT LOGS THAT YOU

9    RECOVERED FROM MR. MARTIN'S COMPUTER AND FORWARDED ON TO

10   RIVERSIDE, CALIFORNIA?

11   A.    YES.

12   Q.    AND HAVE YOU HAD AN OPPORTUNITY BEFORE TODAY TO REVIEW

13   THIS EXHIBIT AND CONFIRM THAT THESE ARE --

14             THE COURT:  COULD YOU REPEAT THAT AT ABOUT A THIRD

15   OF THE SPEED?

16             MR. MICHAEL:  YES, YOUR HONOR.

17             THE COURT:  THANK YOU.

18   BY MR. MICHAEL:

19   Q.    DID YOU HAVE AN OPPORTUNITY TO REVIEW THIS EXHIBIT

20   BEFORE TODAY?

21   A.    YES, I DID.

22   Q.    AND ARE THESE ACCURATE COPIES OF CHAT CONVERSATIONS THAT

23   YOU RECOVERED FROM MR. MARTIN'S WORK COMPUTER?

24   A.    YES, THEY ARE.

25   Q.    YOU CAN SET THE EXHIBIT ASIDE.

1              MR. MICHAEL:  NO FURTHER QUESTIONS, YOUR HONOR.

2              THE COURT:  THANK YOU.

3              MR. AARON, ANY CROSS-EXAMINATION.

4              MR. AARON:  THANK YOU.

5                          CROSS-EXAMINATION

6    BY MR. AARON:

7    Q.    GOOD MORNING.

8    A.    GOOD MORNING.

9    Q.    YOU EXAMINED TWO COMPUTERS THAT DAY, RIGHT?

10   A.    YOU MEAN ON-SITE DURING THE SEARCH WARRANTS OR LATER ON

11   IN THE LAB?

12   Q.    LATER ON IN THE LAB.

13   A.    YES, I EXAMINED TWO COMPUTERS.

14   Q.    HOW LONG DID IT TAKE YOU TO RUN THE ENCASE ON THE WORK

15   COMPUTER APPROXIMATELY?

16   A.    YOU MEAN TO IMAGE IT?

17   Q.    YES.

18   A.    PROBABLY TWO OR THREE HOURS.

19   Q.    DIDN'T TAKE MORE THAN THREE HOURS?

20   A.    YOU KNOW, I DON'T RECALL HOW LONG IT TOOK.  I KNOW IN

21   THE DOS ACQUISITION MODE IT ALWAYS TOOK LONGER TO DO THAN IT

22   DOES IN THE WINDOWS MODE.

23   Q.    OKAY.  I'M JUST TRYING TO UNDERSTAND YOUR TESTIMONY.

24             IT COULD HAVE TAKEN LONGER THAN THREE HOURS, YOU

25   JUST DON'T REMEMBER?

```
 1    A.    SURE, IT COULD HAVE TAKEN LONGER THAN THREE HOURS.

 2    DEPENDS ON THE SIZE OF THE DRIVE.

 3    Q.    THE OUTSIDE LIMIT, IT COULDN'T HAVE TAKEN MORE THAN

 4    FIVE?

 5    A.    IT COULDN'T HAVE TAKEN LONGER THAN FIVE OR SIX HOURS

 6    PROBABLY.

 7    Q.    AND YOU FOUND THE ICQ FILES ONLY ON THE WORK COMPUTER?

 8    A.    CORRECT.

 9    Q.    DO YOU KNOW WHAT VERSION OF ICQ WAS ON THE WORK

10    COMPUTER?

11    A.    NO, I DON'T.

12    Q.    ONCE YOU HAD CREATED THE IMAGE FILE YOU LOOKED AT -- YOU

13    HAD THAT IMAGE FILE ON THE GOVERNMENT'S COMPUTER?

14    A.    CORRECT.

15    Q.    AND YOU WERE LOOKING THROUGH THE TRANSCRIPT -- THE

16    MESSAGE LOGS, THE ICQ MESSAGE LOGS, AND YOU COULD NOT READ

17    THEM?

18    A.    NO, I COULD NOT READ THEM.

19    Q.    AND WHAT YOU DID IS YOU STARTED -- YOU VIEWED THEM

20    THROUGH THE ICQ PROGRAM?

21    A.    CORRECT.

22    Q.    YOU DIDN'T NEED TO USE ANY THIRD PARTY PROGRAM?

23    A.    YOU COULD USE A THIRD PARTY PROGRAM.

24    Q.    WELL, THAT WAS NOT MY QUESTION.  MY QUESTION WAS, YOU

25    DIDN'T USE ANY THIRD PARTY PROGRAM, YOU JUST USED THE ICQ
```

1    PROGRAM?

2    A.    THAT'S THE WAY I DID IT.

3    Q.    AND YOU READ THE FILES IN THE ICQ CHAT WINDOW?

4    A.    I READ THEM IN THE -- THROUGH THE ICQ PROGRAM.

5    Q.    AND THEN YOU PRINTED THEM OUT FROM THERE?

6    A.    YES.

7    Q.    AND THAT WAS THE MATERIAL THAT YOU SENT TO SPECIAL AGENT

8    ARNOLD?

9    A.    YES, IT IS.

10   Q.    DO YOU KNOW WHERE THE ICQ CHAT ARCHIVES ARE KEPT IN THE

11   COMPUTER?

12   A.    THEY'RE ON THE C DRIVE UNDER PROGRAM FILES IN THE ICQ

13   FOLDER.

14   Q.    SO IN THE HIERARCHY YOU'D HAVE FIRST THE C DRIVE, RIGHT?

15   A.    CORRECT.

16   Q.    AND THEN BELOW THAT YOU WOULD HAVE THE PROGRAM FILES?

17   A.    CORRECT.

18   Q.    AND THEN BELOW THAT YOU WOULD HAVE ICQ?

19   A.    CORRECT.

20   Q.    AND THEN BELOW THAT YOU WOULD HAVE THE CHAT ARCHIVES?

21   A.    THERE WOULD BE A SUBFOLDER DOWN THERE.  I DON'T RECALL

22   THE NAME OF THAT SUBFOLDER.

23   Q.    BUT THAT WOULD CONTAIN THE CHAT ARCHIVES?

24   A.    CORRECT.

25   Q.    SO THE CHAT ARCHIVES ARE IN A SUBFOLDER IN THE ICQ

1    FOLDER?

2    A.    YES.

3    Q.    SO THEY'RE NOT AT THE SAME LEVEL OF HIERARCHY, THEY'RE

4    BELOW IN THE SUBFOLDER?

5    A.    CORRECT.

6    Q.    YOU READ ALL THE TRANSCRIPTS WHILE YOU WERE VIEWING THEM

7    THROUGH THE ICQ PROGRAM, RIGHT?

8    A.    NO, I DID NOT READ ALL OF THEM AT THAT TIME.  I JUST

9    KNEW WHAT THEY WERE.

10   Q.    BUT YOU PRINTED THEM OUT?

11   A.    CORRECT.

12   Q.    DID YOU READ THEM ALL ONCE YOU HAD THEM PRINTED OUT?

13   A.    YES, I DID.

14   Q.    THEN YOU SENT THEM OFF TO SPECIAL AGENT ARNOLD?

15   A.    CORRECT.

16   Q.    AND THEN YEARS LATER YOU COME HERE TO RIVERSIDE AND YOU

17   READ EXHIBIT 2?

18   A.    YES.

19   Q.    AND WHEN YOU READ EXHIBIT 2 DID YOU HAVE A COPY, A

20   COMPLETE COPY, OF ALL OF THE TRANSCRIPTS YOU HAD DOWNLOADED

21   FROM THE ICQ FOLDER?

22   A.    I BELIEVE THAT THAT IS THE TOTAL SUM OF ALL THE CHAT

23   LOGS THAT I SENT AGENT ARNOLD.

24   Q.    THAT'S ALL OF THEM?

25   A.    THE ONES THAT WERE ON RANDALL MARTIN'S COMPUTER.

1    Q.   OKAY.  SO EXHIBIT 2 IS ALL OF THE CHAT LOGS FROM RANDALL

2    MARTIN'S COMPUTER?

3    A.   YES.

4    Q.   WHEN YOU LOOKED IN THE SUBFOLDER INSIDE THE ICQ FOLDER

5    THAT HAD THE CHATS, WAS THERE MORE THAN ONE FILE OR WAS THERE

6    JUST ONE LARGE FILE?

7    A.   I BELIEVE THERE WERE FIVE.

8    Q.   THERE WERE FIVE FILES?

9    A.   FIVE CHAT FILES.

10   Q.   DID EACH OF THOSE CHAT FILES INVOLVE A DIFFERENT USER

11   NAME?

12   A.   I DON'T RECALL.

13   Q.   DID THEY INVOLVE A DIFFERENT TIME?

14   A.   THEY HAVE DIFFERENT DATE STAMPS ON THE FILES.

15   Q.   BUT DID EACH FILE INCLUDE MORE THAN ONE TIME PERIOD OR

16   MORE THAN ONE DAY?

17   A.   ALL I CAN TELL YOU IS THAT EACH FILE HAD A DIFFERENT

18   DATE STAMP ON THE FILE.  I DON'T KNOW IF THAT RELATED TO THE

19   CHAT SESSION OR THE LAST MODIFIED DATE FOR THE FILE WHEN IT

20   WAS LAST MODIFIED.

21   Q.   WHEN YOU LOOK AT EXHIBIT 2 CAN YOU TELL WHICH FILE A

22   CERTAIN SUBEXHIBIT CAME FROM?  IN OTHER WORDS, WHEN YOU LOOK

23   AT EXHIBIT 2 CAN YOU TELL WHERE EXHIBIT 2A OR 2B OR 2C CAME

24   FROM?

25   A.   NO, I CAN'T.

1    Q.    BUT AS YOU LOOKED AT THOSE, AS YOU LOOKED AT EXHIBIT 2

2    TODAY, YOU DIDN'T SEE ANY CHAT LOGS THAT WERE MISSING?

3    A.    NO, I DON'T BELIEVE THERE WERE ANY MISSING FROM THIS.

4              MR. AARON:  THANK YOU, YOUR HONOR.  NOTHING

5    FURTHER.

6              THE COURT:  THANK YOU.  ANY REDIRECT EXAMINATION?

7              MR. MICHAEL:  BRIEFLY, YOUR HONOR.

8                    REDIRECT EXAMINATION

9    BY MR. MICHAEL:

10   Q.    AGENT PENDLETON, WHEN YOU SAY YOU DON'T BELIEVE ANY CHAT

11   LOGS WERE MISSING FROM THIS, IS IT POSSIBLE THAT YOU ARE

12   MISTAKEN AND THAT THESE ARE ONLY EXCERPTS OF THE CHATS

13   RECOVERED FROM MR. MARTIN'S COMPUTER?

14   A.    THAT IS CERTAINLY POSSIBLE.

15   Q.    BUT ARE ALL OF THE CHATS IN THIS EXHIBIT CHATS THAT WERE

16   RECOVERED FROM MR. MARTIN'S COMPUTER?

17   A.    YES, THEY ARE.

18   Q.    SO YOU HAVE CONFIRMED THAT ALL OF THE CHATS IN THIS

19   EXHIBIT ACTUALLY CAME FROM MR. MARTIN'S COMPUTER; IS THAT

20   CORRECT?

21   A.    YES, I AM.

22             MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

23             THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

24             DO YOU HAVE ANOTHER WITNESS THAT'S BRIEF?

25             MR. AARON:  YOUR HONOR, I WOULD ASK, PENDING SOME

1    CONVERSATION WITH COUNSEL, I WOULD LIKE THIS WITNESS TO

2    REMAIN SUBJECT TO RECALL, PLEASE.

3              THE COURT:  THANK YOU.

4              AGENT PENDLETON, YOU'RE EXCUSED AT THIS TIME

5    SUBJECT TO RECALL.  THANK YOU.

6              DO YOU HAVE A BRIEF WITNESS?

7              MR. MICHAEL:  I BELIEVE THE NEXT WITNESS IS GOING

8    TO BE SPECIAL AGENT ARNOLD.

9              THE COURT:  WE WILL RECESS AT THIS TIME.  WE WILL

10   BE IN RECESS, LADIES AND GENTLEMEN, UNTIL -- FOR AN HOUR AND

11   15 MINUTES TODAY, SO THAT WOULD BRING YOU BACK AT 5 MINUTES

12   AFTER 1:00.

13             ALL RIGHT.  AGAIN, PLEASE REMEMBER, DON'T DISCUSS

14   THE CASE AT ALL.  DON'T MAKE UP YOUR MINDS ABOUT IT OR FORM

15   ANY OPINIONS ABOUT IT.  DON'T DISCUSS ANY OF THE EVIDENCE IN

16   ANY FASHION WHATSOEVER OR ANYONE CONNECTED WITH THE CASE.

17   AND WE'LL SEE YOU BACK AT 5 MINUTES AFTER 1.  THANK YOU VERY

18   MUCH.  YOU ARE EXCUSED.

19             (OUTSIDE THE PRESENCE OF THE JURY:)

20             THE COURT:  WE ARE ON RECORD OUTSIDE THE PRESENCE

21   OF THE JURY.

22             THERE'S A COUPLE MATTERS WE NEED TO FINISH

23   DISCUSSING AND THAT I WOULD LIKE TO GO OVER WITH COUNSEL.

24             FIRST OF ALL, I DO WANT TO LET MR. AARON ARGUE

25   FURTHER ON THE ADMISSIBILITY OF THE EXCERPT FROM THE

1    MANUSCRIPT, BUT BEFORE WE DO THAT, I'VE BEEN THINKING FURTHER

2    ABOUT THE ISSUE OF THE DISK THAT -- THE ISSUE THAT THE

3    GOVERNMENT BROUGHT UP THIS MORNING ABOUT THE DISK THAT IT

4    RECEIVED FROM THE WALNUT POLICE DEPARTMENT WITH RECORDED --

5    WHAT IT BELIEVES TO HAVE ON IT RECORDED CONVERSATIONS BETWEEN

6    DEFENSE -- A PHONE CALL MADE FROM THE SAN BERNARDINO COUNTY

7    JAIL WHERE THE DEFENDANT IS HOUSED TO HIS ATTORNEY'S OFFICE.

8            SO FIRST LET ME ASK IF THERE'S ANY INDICATION --

9    AND YOU MAY HAVE TOLD ME THIS THIS MORNING, I DON'T RECALL.

10   IS THERE ANY INDICATION OF WHEN THE CALLS WERE MADE ON THOSE

11   DISKS?

12           MR. MICHAEL:  THEY MAY BE.  I WILL TELL YOU AS SOON

13   AS I SAW MR. AARON'S PHONE NUMBER, I HAD IT SHUT DOWN.

14           THE COURT:  SO YOU DON'T KNOW?

15           MR. MICHAEL:  I BELIEVE THE INFORMATION IS ON THE

16   DISK BUT I CAN'T TELL YOU STANDING HERE.

17           THE COURT:  IN TERMS OF WHAT'S WRITTEN ON IT,

18   MR. AARON, CAN YOU SHED ANY LIGHT ON THAT?

19           MR. AARON:  YOUR HONOR, I ACTUALLY HAVE THE DISK

20   AND WHAT I WILL DO IS I WILL PUT IT ON MY COMPUTER AND OPEN

21   THEM UP.

22           MR. MICHAEL:  I BELIEVE THAT HE NEEDS TO PLAY THEM

23   TO BE ABLE TO SEE THOSE.  I WOULD ADVISE HIM TO TURN THE

24   VOLUME OFF ON HIS COMPUTER.

25           THE COURT:  IN OTHER WORDS, ONCE HE PUTS IT IN,

```
 1    IT'S GOING TO BE PLAYED.

 2             MR. MICHAEL:  IT APPEARED -- I HAD SPECIAL AGENT

 3    MORAN, ONE OF OUR FORENSIC AGENTS, PLAY IT FOR ME.  HE KNEW

 4    HOW TO TURN THE SOUND OFF.

 5             THE COURT:  SO THE SOUND WAS TURNED OFF FROM --

 6             MR. MICHAEL:  HE DID SOME MECHANISM SO THERE WAS NO

 7    SOUND.

 8             THE COURT:  AND WHAT WAS SENT -- IF I RECALL WHAT

 9    YOU TOLD ME THIS MORNING CORRECTLY, THIS WAS SENT FROM THE

10    WALNUT POLICE DEPARTMENT TO AGENT MORENO?

11             MR. MICHAEL:  THAT'S OUR -- THAT'S HIS BELIEF

12    BECAUSE THERE'S NO OTHER ENTITY OUT THERE THAT, FIRST OF ALL,

13    TOLD AGENT MORENO THEY WERE SENDING HIM A CD WITH PHONE

14    CALLS.  AND IT WAS WITH A STACK OF MATERIAL THAT HE RECEIVED

15    FROM WALNUT.  AND HE HASN'T I THINK INQUIRED OF THE WALNUT

16    CREEK POLICE DEPARTMENT IF THEY HAD INCLUDED THIS CD IN

17    THERE, BUT WE FOUND IT WITH THOSE MATERIALS.  OUR BELIEF IS

18    THAT THAT'S HOW IT MADE IT TO AGENT MORENO'S CUSTODY.

19             THE COURT:  AND IN THOSE MATERIALS IS THERE ANY

20    INDICATION OR DOES AGENT MORENO KNOW WHEN THOSE MATERIALS

21    WERE SENT TO HIM?

22             MR. MICHAEL:  HE BELIEVES IN MARCH, YOUR HONOR.

23             THE COURT:  OF THIS YEAR?

24             MR. MICHAEL:  YES, YOUR HONOR.  AND THAT'S AN

25    APPROXIMATION.  AND, YOUR HONOR, AGENT MORENO ADVISES ME THAT
```

1    WHEN HE SPOKE WITH AN OFFICER OF THE WALNUT CREEK POLICE

2    DEPARTMENT, IT WAS AGENT MORENO'S UNDERSTANDING THAT WALNUT

3    CREEK HAD NOT DONE A THOROUGH REVIEW OF THE MATERIALS THEY

4    RECEIVED FROM SAN BERNARDINO AND THAT THEY SENT THEM ON TO

5    HIM, SO IT'S VERY POSSIBLE THAT WALNUT CREEK DID NOT KNOW THE

6    DISK WAS IN THERE EITHER.

7              THE COURT:  ALL RIGHT.

8              MR. AARON:  YOUR HONOR, I HAVE THE PROGRAM ON MY

9    COMPUTER.  I'VE OPENED UP MY COMPUTER AND I PUT THE CD IN.

10   I'M NOT QUITE SURE HOW TO PLAY IT.  WHEN I DOUBLE CLICK ON

11   IT, IT SAYS I CANNOT -- WINDOWS CANNOT OPEN IT.  IT DOES

12   HAVE -- IT HAS AN ACTIVE L PLAYER THERE.  I'VE TURNED THE

13   SOUND OFF.

14             MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD NOTE

15   ON THE ENVELOPE ITSELF THERE'S A BROAD DATE RANGE INDICATED,

16   BUT IT DOESN'T APPEAR TO BE SPECIFIC TO THE CALLS.

17             MR. AARON:  THE DATE RANGE IS 8/18/05 TO 1/31/07.

18   I'M WONDERING IF -- I FORGET EXACTLY WHEN MR. SANDERS CAME

19   HERE.  THE CASE WAS FILED IN '04, BUT HE DID NOT COME HERE

20   UNTIL LATER.  HE MAY HAVE ONLY COME HERE IN '05.  I'M NOT

21   SURE.

22             THE COURT:  WELL, THIS IS WHAT I'M GOING TO DO TO

23   BEGIN WITH, AND I'VE ASKED THE DEPUTY IN CHARGE OF OUR --

24   CHIEF DEPUTY MARSHAL IN CHARGE OF THE EASTERN DIVISION,

25   DEPUTY O'CONNOR, TO BE PRESENT BECAUSE I THINK WE WILL BE

1    NEEDING HIS ASSISTANCE IN THIS.  ONCE WE KNOW THE DATE, AND

2    IF YOU COULD LET US KNOW AS SOON AS YOU'RE ABLE, IF YOU'RE

3    ABLE TO DETERMINE THE DATE OF THOSE -- WELL, THE DATE OF THE

4    PHONE CALLS MAY NOT HELP THAT MUCH BECAUSE WHAT WE REALLY

5    NEED TO KNOW IS THE DATE THEY WERE RECORDED.  WELL, THEY MUST

6    HAVE BEEN RECORDED AT THE TIME THEY WERE MADE, SO MAYBE THE

7    DATE OF THE PHONE CALLS IS WHAT WE NEED TO KNOW.  BUT I THINK

8    ONCE WE KNOW THAT, I'M GOING TO ASK DEPUTY O'CONNOR TO

9    INQUIRE AT THE SAN BERNARDINO JAIL WHO HAD THE RESPONSIBILITY

10   AT THAT TIME AT THE SAN BERNARDINO COUNTY JAIL ON THE

11   RECORDING POLICIES, BUT MORE PARTICULARLY, WHO WOULD HAVE

12   BEEN RESPONSIBLE FOR MAILING THAT DISK TO THE WALNUT CREEK

13   POLICE DEPARTMENT.  AND I THINK THAT THE COURT NEEDS TO

14   INQUIRE HOW THAT CAME ABOUT,  HOW IT CAME ABOUT THAT THAT

15   DISK WAS MAILED TO THE WALNUT CREEK POLICE DEPARTMENT.

16           IN CONNECTION WITH ANOTHER CASE THAT WAS BEFORE THE

17   COURT ABOUT A YEAR AGO I THINK IT CAME TO THE COURT'S

18   ATTENTION THAT AT LEAST IN THE TIME PERIOD THAT -- AT A

19   CERTAIN TIME PERIOD, WHICH MAY OR MAY NOT BE THE SAME TIME

20   PERIOD AT ISSUE HERE, IF I RECALL CORRECTLY, SAN BERNARDINO

21   COUNTY JAIL AT WHATEVER TIME PERIOD THAT WAS HAD A POLICY

22   OF -- AND I DON'T WANT TO MISSTATE THINGS BECAUSE I'M NOT

23   SURE I REMEMBER THIS CORRECTLY.  THEY HAD A POLICY OF NOT

24   MONITORING PHONE CALLS BUT RECORDING PHONE CALLS WITH

25   AUTOMATED -- AND I DON'T REMEMBER IF IT WAS ALL PHONE CALLS

```
1    OR IT WAS A RANDOM RECORDING OF PHONE CALLS.

2              DEPUTY O'CONNOR, CAN YOU --

3              DEPUTY O'CONNOR:  IT'S FUNNY THIS COMES UP, YOUR

4    HONOR.  I'VE BEEN AT SAN BERNARDINO ALL WEEK TO HAVE A

5    FEDERAL DETENTION TRUSTEE'S INSPECTION SO I'VE BEEN THERE

6    MOST OF THE TIME.  THIS ACTUALLY CAME UP YESTERDAY MORNING,

7    BECAUSE I DIDN'T KNOW HOW THEY DID IT.  AND BASICALLY, THEY

8    DON'T LIVE MONITOR ANYTHING.

9              THE COURT:  RIGHT.  THAT'S CONSISTENT WITH THE

10   OTHER CASE.

11             DEPUTY O'CONNOR:  YES, MA'AM.  THE CALLS ARE ALL

12   RECORDED AND THEY ARE ONLY KEPT FOR 90 DAYS.  SO ONCE 90 DAYS

13   IS UP, IF THAT CALL NEEDS TO BE RETRIEVED FOR ANY REASON,

14   IT'S GONE, UNLESS IN THIS SITUATION WHERE IT WAS PROBABLY

15   RECORDED BEFORE THE 90 DAYS OBVIOUSLY WAS UP, BUT THEY DON'T

16   LIVE MONITOR ANYTHING, AND I BELIEVE THEY RECORD EVERYTHING.

17             THE COURT:  SO IT IS EVERYTHING.  THAT'S CONSISTENT

18   WITH MY RECOLLECTION; THAT IS, THAT IT'S NOT LIVE MONITORED

19   BUT EVERYTHING IS RECORDED.

20             DEPUTY O'CONNOR:  I'M ACTUALLY GOING THERE AS SOON

21   AS I LEAVE HERE.  I WILL ASK JUST TO MAKE SURE THAT THAT IS

22   THE CASE.

23             THE COURT:  SO WHAT WE DO NEED TO KNOW IS -- WELL,

24   THE ISSUE THAT'S OF THE GREATEST CONCERN TO ME RIGHT NOW IS

25   WHO WAS RESPONSIBLE FOR PLACING THESE CALLS THAT WERE
```

1    PRIVILEGED BECAUSE THEY WERE MADE FROM AN INMATE TO HIS

2    COUNSEL, PLACING THEM ON A SEPARATE DISK AND THEN MAILING

3    THAT DISK TO A LAW ENFORCEMENT AGENCY.  SO I WANT TO FIND

4    THAT OUT, AND THEN, OF COURSE, I'LL WANT TO SPEAK TO THAT

5    PERSON IN THE PRESENCE OF ALL COUNSEL, OF COURSE.

6          MR. AARON:  WHAT I WILL DO, YOUR HONOR, IS WHEN WE

7    ARE EXCUSED, I WILL GO BACK TO MY OFFICE AND I WILL GIVE THIS

8    TO OUR DEFACTO COMPUTER EXPERT AND HAVE THEM GET THE

9    INFORMATION AND TEXT MESSAGE ME SO THAT WE DON'T NEED TO

10   DELAY THE PROCEEDINGS AND I CAN PROBABLY HAVE THAT

11   INFORMATION THIS AFTERNOON.

12         THE COURT:  ALL RIGHT.

13         MR. MICHAEL:  YOUR HONOR?

14         THE COURT:  YES.

15         MR. MICHAEL:  IF I MAY, I JUST WANT TO BE SURE THE

16   COURT HAS NO CONCERNS AT THIS POINT OF ANY TAINT ON THE PART

17   OF THE PROSECUTION TEAM.

18         THE COURT:  I WANT TO ASK A FEW MORE QUESTIONS

19   ABOUT THAT.  THANK YOU FOR BRINGING THAT UP.

20         MY QUESTIONS IN CONNECTION WITH THAT ARE, I THINK

21   THE RECORD NEEDS TO BE FLUSHED OUT A BIT ON THAT.  NOTES OF

22   WHERE I WAS WRITING OUT THAT INSTRUCTION THAT I JUST GAVE --

23   HERE ARE THE REST OF MY QUESTIONS ABOUT THAT.

24         HAVE ANY OF THE AGENTS ON THIS CASE -- AND I

25   SUSPECT IT'S REALLY ONLY AGENT MORENO WHO HAS HAD ANY

1    CONNECTION ON THIS ISSUE, BUT I DON'T KNOW THAT, SO I HAVE TO

2    ASK IF ANY AGENTS ON THE CASE HAD ANY CONVERSATIONS WITH THE

3    WALNUT CREEK POLICE DEPARTMENT ABOUT ANY OF THIS MATERIAL?

4          MR. MICHAEL:  I BELIEVE AGENT MORENO HAD

5    CONVERSATIONS WITH WALNUT CREEK POLICE ABOUT THEIR

6    INVESTIGATION OF MR. BEKENSTEIN AND THE FACT THAT THEY HAD

7    RECEIVED MATERIALS FROM SAN BERNARDINO COUNTY JAIL, BUT I

8    DON'T BELIEVE HE'S EVER HAD A CONVERSATION ABOUT ANY COMPACT

9    DISK OR TELEPHONE CALLS.

10         YOUR HONOR, IF I MAY, I BELIEVE THAT WALNUT CREEK

11   P.D. MAY HAVE ALSO CONTACTED AGENT LEE BROWN WHO WAS THE CASE

12   AGENT FOR BEKENSTEIN IN SAN FRANCISCO, BUT I KNOW WHEN I SAW

13   HIM LAST NIGHT I ASKED HIM.  HE HAD NO KNOWLEDGE OF THIS CD

14   OR THAT IT EXISTED.

15         THE COURT:  AND HE'S NOT IN THE COURTROOM.

16         MR. MICHAEL:  HE'S NOT IN THE COURTROOM RIGHT NOW.

17         THE COURT:  WELL, IF I COULD, I'M GOING TO ASK

18   AGENT MORENO JUST TO WAIT OUTSIDE FOR A MOMENT BECAUSE I WANT

19   TO ASSESS THIS A LITTLE FURTHER WITH THE ATTORNEYS FOR THE

20   GOVERNMENT.  THANK YOU.

21         I ASKED THE AGENT TO WAIT OUTSIDE BECAUSE THIS IS

22   WHAT I WANT TO ASK COUNSEL FOR THE GOVERNMENT, AND YOU MAY

23   NEED TO TALK TO AGENT MORENO, AND YOU CAN ANSWER MY QUESTIONS

24   AFTER LUNCH, BUT I DON'T WANT HIM TO HEAR MY QUESTIONS BEFORE

25   YOU'VE HAD A CHANCE TO TALK TO HIM.

```
 1              MY CONCERN IS THIS:  AND I'M TRYING TO BE AS
 2   THOROUGH AS POSSIBLE ON THIS AND TO THINK THROUGH ALL THE --
 3   IT MAY BE -- WELL, I JUST WANT TO BE VERY CAREFUL ABOUT THIS
 4   TO MAKE SURE THAT NOTHING HAS BEEN COMMUNICATED THAT WOULD
 5   TAINT THE GOVERNMENT'S CASE, EVEN IN A WAY WHERE EITHER THE
 6   ATTORNEYS FOR THE GOVERNMENT OR EVEN THE CASE AGENT MIGHT NOT
 7   BE KNOWINGLY USING THE INFORMATION.  BUT I WANT COUNSEL FOR
 8   THE GOVERNMENT TO INQUIRE OF AGENT MORENO ABOUT ANY
 9   CONVERSATIONS THAT HE HAD WITH ANYONE AT THE WALNUT CREEK
10   POLICE DEPARTMENT, BECAUSE MY CONCERN IS IF ANYONE AT THE
11   WALNUT CREEK POLICE DEPARTMENT HAD LISTENED TO THOSE
12   CONVERSATIONS THAT ARE ON THE DISK AND THEREBY GAINED
13   KNOWLEDGE OF THE TRIAL STRATEGY, JUST AS AN EXAMPLE, TRIAL
14   STRATEGY OF THE DEFENSE OR ANY CONFIDENTIAL ATTORNEY/CLIENT
15   INFORMATION OF ANY KIND, EVEN IF THEY DIDN'T EXPLICITLY
16   COMMUNICATE THAT TO AGENT MORENO, BUT IF THEY IN TALKING TO
17   AGENT MORENO MADE ANY SUGGESTIONS ABOUT AVENUES TO
18   INVESTIGATE OR MADE ANY SUGGESTIONS TO ANY OF THE AGENTS ON
19   THE CASE, AGENT MORENO OR AGENT BROWN, ABOUT INVESTIGATION OR
20   STRATEGY THAT THE GOVERNMENT MIGHT WANT TO USE OR ANYTHING,
21   THEN I THINK THAT WOULD REFLECT A TAINT.
22              NOW, AT FIRST I WAS INCLINED TO THINK THAT THE BEST
23   WAY TO HANDLE THIS WOULD BE TO PUT AGENT MORENO AND THE OTHER
24   AGENTS ON THE STAND AND INQUIRE.  I'M A LITTLE HESITANT AND
25   THAT IS ONE WAY TO PROCEED.  IF THE GOVERNMENT HAS NO
```

1    OBJECTION, PERHAPS WE SHOULD DO THAT.

2         MR. AKROTIRIANAKIS:  YOUR HONOR, IT MIGHT OBVIATE

3    THE WHOLE ISSUE, TOO, IN THIS REGARD.  I KNOW AT MDC -- AND I

4    KNOW SOMETHING ABOUT WHAT THEY DO OVER AT SAN BERNARDINO AND

5    IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS IN THESE ISSUES

6    BASED ON AN INVESTIGATION.  AT MDC THE INMATES ARE TOLD, IF

7    YOU'RE GOING TO MAKE A CONFIDENTIAL CONVERSATION, YOU NEED TO

8    DO IT IN A CERTAIN WAY; OTHERWISE, YOUR CONVERSATIONS ARE

9    BEING MONITORED.  SO IF YOU'RE GOING TO TALK TO YOUR LAWYER,

10   YOU HAVE TO SET IT UP THIS WAY; OTHERWISE, IT'S NOT GOING TO

11   BE PRIVILEGED.  IF THAT WAS THE CASE, THAT WOULD BE A WAIVER

12   OF THE PRIVILEGE AND PERHAPS -- AND THERE'S ALSO AN OUTGOING

13   MESSAGE THAT INFORMS THE INMATE YOUR CALL IS BEING MONITORED

14   AND RECORDED.  SO THAT, TOO, WOULD CONSTITUTE A WAIVER IF

15   THEY THEREAFTER HAD A PRIVILEGED CONVERSATION.

16        SO IT MAY BE THAT WE CAN OBVIATE ALL OF THIS AND

17   POTENTIALLY THE NEED FOR AN EVIDENTIARY HEARING OR WHAT HAVE

18   YOU IF DEPUTY O'CONNOR HAD A CONVERSATION IN THE BREAK --

19   HE'S GOING TO HAVE A CONVERSATION ANYWAY, BUT IF HE INCLUDED

20   IN THAT CONVERSATION AN INQUIRY AS TO WHAT -- IF ANY OF

21   THOSE -- I KNOW THAT THERE ARE RECORDINGS ON THERE, BUT WHAT

22   OTHER INSTRUCTIONS ARE GIVEN TO THE INMATES. BECAUSE I THINK

23   THIS MAY ALL BE A TEMPEST IN A TEAPOT.  I DON'T MEAN TO

24   MINIMIZE THE DEFENDANT'S RIGHT TO CONFER WITH HIS COUNSEL IN

25   A PRIVILEGED WAY, BUT IF HE WILLINGLY WAIVED THOSE RIGHTS,

1    THEN IT WOULD OBVIATE ALL OF WHAT NOW WE NEED TO DO.

2              THE COURT:  WE DON'T KNOW THAT.  ASSUMING THAT

3    THERE'S AN OUTGOING MESSAGE, ASSUMING THERE'S A SIGN AND SO

4    FORTH, WE DON'T KNOW THAT -- LET'S ASSUME THOSE ARE THE CASE.

5    BUT THERE STILL IS A PROVISION AT THE JAIL WHERE CALLS CAN BE

6    MADE BY THE INMATES TO THEIR COUNSEL.

7              MR. AKROTIRIANAKIS:  THAT'S CORRECT.

8              THE COURT:  AND THEY CAN BE PRIVILEGED.

9              MR. AKROTIRIANAKIS:  AND THE WAY THAT THAT IS SET

10   UP AT THE MDC, AS FAR AS I UNDERSTAND --

11             THE COURT:  LET'S ASK DEPUTY O'CONNOR.

12             DEPUTY O'CONNOR:  I CAN'T ANSWER THAT QUESTION,

13   YOUR HONOR.  I CAN TELL YOU THAT THE ONLY PHONES AT SAN

14   BERNARDINO THAT ARE ABSOLUTELY NOT RECORDED -- IN FACT, THERE

15   IS NO CAPABILITY TO RECORD THEM -- ARE THE PHONES IN THE

16   RECEPTION CENTER WHERE THEY ORIGINALLY COME IN BEFORE THEY

17   ARE BOOKED.  THEY ARE TOLD ONCE THEY'RE BOOKED EVERY CALL

18   THEY MAKE IS RECORDED.  WHEN I GO THERE THIS AFTERNOON, I

19   WILL ACTUALLY GET ON THE PHONE AND MAKE A CALL LIKE THAT AND

20   I WILL CALL MY OFFICE AND FIND OUT IF THAT MESSAGE COMES ON,

21   WHAT EXACTLY IT SAYS, ET CETERA, AND I'LL ALSO -- I'M GOING

22   TO ACTUALLY BE MEETING WITH KEVIN BROWN OVER THERE THIS

23   AFTERNOON AND I'LL ASK HIM EXACTLY WHAT THE PROCEDURES ARE

24   FOR MAKING AN ATTORNEY/CLIENT CALL.

25             THE COURT:  ALL RIGHT.  THANK YOU.

1          MR. AARON:  YOUR HONOR, I'VE PRACTICED IN THESE

2   COUNTIES FOR SOME PERIOD OF TIME NOW AND MY UNDERSTANDING WAS

3   EVEN WHEN THESE CALLS WERE RECORDED IF THEY KNEW THAT THEY

4   WERE CALLS TO THE ATTORNEY, WHICH IS OBVIOUS FROM THE VERY

5   BEGINNING OF THE CALL, THEY WOULD SHUT OFF THE MACHINE OR

6   THEY WOULD NOT TRANSMIT IT.

7          HERE, THE PROBLEM --

8          THE COURT:  THEY'RE NOT LIVE -- THE THING IS,

9   THEY'RE NOT LIVE RECORDED.  THERE'S NOBODY MONITORING.

10  THEY'RE NOT MONITORED.

11         MR. AARON:  RIGHT.  BUT WHEN THEY DO COLLECT THEM,

12  AND I'VE OFTEN HAD CASES IN SAN BERNARDINO AND IN RIVERSIDE

13  WHERE THEY DO COLLECT ALL THE JAIL CALLS AND USE THEM FOR

14  VARIOUS PURPOSES, BUT MORE SO THE DISTRICT ATTORNEYS ON THE

15  STATE SIDE THAN FEDERAL PROSECUTORS.  BUT THEY DO NOT -- WITH

16  THE ATTORNEYS CALLS, IT'S OBVIOUS WHAT THE ATTORNEY/CLIENT

17  COMMUNICATIONS ARE.

18         THE PROBLEM I HAVE IN THIS CASE IS WE ALSO HAVE

19  THEM COLLECTING THIS INFORMATION AND SENDING IT OFF TO UP

20  NORTH.  AND I THINK THERE'S A PROBLEM AND I THINK THE COURT

21  REALLY HIT THE NAIL ON THE HEAD, THERE MAY BE A PROBLEM WHERE

22  THE PROSECUTION INADVERTENTLY OR UNKNOWN TO THEM HAS GOTTEN

23  THIS INFORMATION THROUGH AGENT MORENO OR THINGS AGENT MORENO

24  WAS TOLD OR THINGS THAT AGENT BROWN WERE TOLD AND MAYBE EVEN

25  THE AGENTS DON'T KNOW.

1          THE COURT:  EXACTLY.  IT COULD BE INADVERTENT ON

2    TWO LEVELS, THE AGENT LEVEL AND THE COUNSEL LEVEL.  SO RIGHT

3    NOW I THINK -- THE REASON I HESITATE OR ASK WHAT THE

4    GOVERNMENT'S POSITION IS BEFORE COMMENCING WITH AN

5    EVIDENTIARY HEARING AND PUTTING AGENT MORENO ON THE STAND IS

6    BECAUSE I WOULDN'T WANT TO PUT THE GOVERNMENT IN THE POSITION

7    OF HAVING ITS ATTORNEY WORK PRODUCT DIVULGED.

8          I THINK THAT ASKING AGENT MORENO UNDER OATH WHAT

9    CONVERSATIONS THAT HE HAS HAD WITH WALNUT CREEK POLICE

10   DEPARTMENT IS PRETTY BROAD.  AND THERE COULD BE INFORMATION

11   THAT IS NOT -- WOULD NOT IMPLICATE THIS PRIVILEGE BUT COULD

12   IMPLICATE THE GOVERNMENT'S WORK PRODUCT.  SO THAT'S MY ISSUE

13   WITH THAT.

14         SO THE OTHER WAY TO HANDLE IT IS FOR THE GOVERNMENT

15   TO DISCUSS THIS WITH AGENT MORENO AND MAKE A REPRESENTATION

16   TO THE COURT ON THAT ISSUE.

17         MR. AKROTIRIANAKIS:  THAT WOULD BE FINE, YOUR

18   HONOR, AND WE'LL DO THAT.  WE'LL BE PREPARED TO DO THAT AND

19   HOPEFULLY WITH REGARD ALSO TO THE OTHER AGENT.

20         THE COURT:  YES.  I KEEP FORGETTING THERE'S ANOTHER

21   AGENT INVOLVED.

22         MR. MICHAEL:  AND, YOUR HONOR, MAY I -- NOT TO TAG

23   TEAM, BUT IT MAY ALSO MAKE SENSE IF MR. AARON HAS THE

24   OPPORTUNITY TO LISTEN TO THE CALLS AND CONFIRM THAT THERE IS

25   ACTUALLY CONVERSATION BETWEEN THE LAWYER AND MR. SANDERS ON

1    IT.

2              THE COURT:  IT COULD BE THAT THE CALLS WEREN'T EVEN

3    ANSWERED OR IT WAS AFTER HOURS, THAT'S TRUE.

4              MR. MICHAEL:  AND IT COULD BE A DISCUSSION WITH THE

5    RECEPTIONIST.  IT'S UNCLEAR WHAT THE CONVERSATION WAS, AND

6    MR. AARON COULD ALSO LET US KNOW.  AND, AGAIN, I UNDERSTAND

7    IT DOESN'T OBVIATE YOUR HONOR'S CONCERNS IF THERE IS A

8    RECORDING OF EACH OF THE CALLS.  I CAN TELL YOU THAT WHEN WE

9    PLAYED THE FIRST CALL BEFORE THERE WAS ANY SUBSTANCE FROM

10   MR. SANDERS WHEN HE ASKED FOR MR. AARON, WE HEARD THE

11   RECORDING PLAYED --

12             THE COURT:  I'M GOING TO ASSUME THERE'S A

13   RECORDING.  I'M ASSUMING THERE'S A RECORDING.

14             MR. AARON:  I'M SORRY, YOUR HONOR.  ONE OF THE

15   PARTICULARITIES WITH SAN BERNARDINO IS YOU HAVE TO BE

16   REGISTERED TO ACCEPT COLLECT CALLS.  I BELIEVE THE MARSHAL

17   WILL DISCOVER THAT WHEN HE GOES DOWN THERE.  AND THEY HAVE

18   OUR NUMBER AT THE BLUMENTHAL LAW OFFICES AND MY NUMBER

19   BECAUSE WE'RE AUTHORIZED TO ACCEPT COLLECT CALLS.

20             IF THE CALL IS MADE AFTER HOURS WE HAVE AN

21   ANSWERING SERVICE AND WE STILL ACCEPT IT AND IT'S FORWARDED

22   TO MY CELL OR HOME PHONE.  AND I'VE HAD CONVERSATIONS WITH

23   MR. SANDERS ON MY CELL PHONE OR ON MY HOME PHONE.

24             AND, IN FACT, I BELIEVE DURING THIS PERIOD OF TIME

25   IN REGARDS TO AN ISSUE INVOLVING I BELIEVE MR. MARTIN, I

1    CALLED SAN BERNARDINO AND ASKED THAT MR. SANDERS BE GIVEN AN

2    ATTORNEY TELEPHONE CALL.  AND I IDENTIFIED MYSELF AND MY

3    NUMBER AND ALL OF THAT.  AND THEY DID, IN FACT -- AND IT WAS

4    ALSO A PLEA DISCUSSION AS WELL.  SO THERE'S BEEN A NUMBER OF

5    TIMES WHEN ANYONE IN SAN BERNARDINO WOULD KNOW THAT'S THE

6    ATTORNEY'S NUMBER.

7              THE COURT:  ALL RIGHT.  LET'S BREAK FOR LUNCH.

8              THERE'S ONE OTHER ISSUE THAT IS SOMEWHAT CONNECTED

9    TO THIS.  WE'RE NOT GOING TO GET TO RANDALL MARTIN TODAY, BUT

10   ANY OTHER PROGRESS BEING MADE ON THE IMMUNITY ISSUE?

11             MR. AKROTIRIANAKIS:  I BELIEVE IT HAS BEEN

12   RESOLVED, YOUR HONOR.

13             THE COURT:  ALL RIGHT.  IS HE GOING TO TESTIFY?

14             MR. AKROTIRIANAKIS:  HE IS GOING TO TESTIFY.

15             THE COURT:  THEN THIS IS THE NEXT ISSUE, AND MAYBE

16   YOU ALL HAVE ALREADY THOUGHT OF THIS, BUT IS THE GOVERNMENT

17   GOING TO ASK MR. MARTIN ABOUT THE -- FOR THE PURPOSES OF THE

18   IDENTIFICATION OF THE DEFENDANT, ABOUT THE INCIDENT THAT WAS

19   BROUGHT TO THE COURT'S ATTENTION IN THE RECREATION YARD AT

20   THE SAN BERNARDINO COUNTY JAIL.

21             MR. AKROTIRIANAKIS:  I'VE THOUGHT ABOUT THAT JUST

22   THIS MORNING, YOUR HONOR.  WELL, I CONTINUED TO THINK ABOUT

23   IT UNTIL THIS MORNING AND I DON'T KNOW THAT -- I THINK IT

24   JUST DEPENDS ON WHAT THE PROOF IS AT THAT POINT.

25             THE COURT:  WELL, LET ME TELL YOU WHAT MY CONCERN

```
 1   IS ABOUT THAT.  IF YOU'RE GOING TO -- IF YOU INTEND TO DO
 2   THAT, IT BRINGS UP THE FOLLOWING CONCERN:  THE DEFENDANT -- I
 3   MEAN, THE JURY WOULD THEN KNOW THAT MR. SANDERS IS IN
 4   CUSTODY.
 5            MR. AKROTIRIANAKIS:  I THOUGHT ABOUT THAT, TOO.  I
 6   THINK THERE'S A WAY TO DO IT THAT SANITIZES THAT ISSUE,
 7   ALTHOUGH I THINK ALSO IF I COULD SPEAK TO MR. AARON DURING
 8   THE BREAK, YOUR HONOR --
 9            THE COURT:  SPEAK ABOUT IT AND BRING IT UP TO ME
10   BEFORE YOU --
11            MR. AKROTIRIANAKIS:  I THINK IF WE CAN HAVE AN
12   AGREEMENT ON THE RECORD -- WELL, IT DOESN'T NEED TO BE ON THE
13   RECORD.
14            THE COURT:  WHY DON'T YOU GO AND TALK ABOUT IT AND
15   THEN AT SOME POINT I WOULD LIKE TO KNOW WHAT THE AGREEMENT
16   IS, IF THERE IS ONE, OR OTHERWISE WE NEED TO TALK ABOUT IT.
17   THANK YOU.
18            MR. MICHAEL:  YOUR HONOR, I HAVE TWO EXHIBITS,
19   EXHIBIT 107 AND 108.  THEY ARE INFORMATION RECOVERED FROM THE
20   DEFENDANT'S COMPUTER.  THEY ARE NOT IMAGES.  THEY HAVE
21   PREVIOUSLY BEEN MADE AVAILABLE TO DEFENSE COUNSEL AND THEY
22   ARE ALREADY MARKED AS EXHIBITS THAT WE PROBABLY WILL GET TO
23   WITH AGENT MORAN WHO MIGHT TESTIFY TOMORROW.  I WAS GOING TO
24   PROVIDE THEM TO YOUR HONOR SO THAT YOU CAN PREVIEW THEM AND
25   HAVE AN OPPORTUNITY TO SEE THEM.
```

```
 1              THE COURT:  THANK YOU.

 2              YES, MR. AARON.

 3              MR. AARON:  YOUR HONOR, CAN WE HAVE UNTIL 1:30

 4    BECAUSE I WAS HOPING TO GO BACK AND PLAY THESE CONVERSATIONS.

 5    I'M NOT SURE THAT I'LL BE ABLE TO.

 6              THE COURT:  WELL, I'VE ALREADY TOLD THE JURY TO BE

 7    BACK AT 1:05 AND THAT WOULD BE 25 MINUTES LONGER, SO, NO, BE

 8    BACK AT 1:05.  IF WE DON'T GET THAT TAKEN CARE OF THIS

 9    AFTERNOON, MR. AARON -- WE'LL GET IT TAKEN CARE OF,

10    MR. AARON, BUT I DON'T WANT TO KEEP THE JURY WAITING.

11                        (RECESS)

12              THE COURT:  GOOD AFTERNOON.  LET THE RECORD

13    REFLECT THE PRESENCE OF ALL MEMBERS OF THE JURY, ALL COUNSEL

14    PRESENT, AND THE DEFENDANT ALSO PRESENT.

15              YOUR NEXT WITNESS.

16              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THE

17    GOVERNMENT CALLS IMMIGRATION AND CUSTOMS ENFORCEMENT SPECIAL

18    AGENT MICHAEL W. ARNOLD.

19              THE COURT:  THANK YOU.  PLEASE COME FORWARD.

20              THE CLERK:  PLEASE STOP AT THE COURT REPORTER AND

21    RAISE YOUR RIGHT HAND.

22         PLAINTIFF'S WITNESS, MICHAEL ARNOLD, WAS SWORN

23              THE CLERK:  PLEASE TAKE THE STAND.  STATE YOUR

24    FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

25              THE WITNESS:  MICHAEL W. ARNOLD, A-R-N-O-L-D.
```

```
 1              MR. AKROTIRIANAKIS:  MAY I INQUIRE, YOUR HONOR?

 2              THE COURT:  I'M SORRY.  YOU MAY INQUIRE.

 3                         DIRECT EXAMINATION

 4    BY MR. AKROTIRIANAKIS:

 5    Q.   AGENT ARNOLD, HOW ARE YOU NOW EMPLOYED?

 6    A.   I'M A NATIONAL PROGRAM MANAGER WITH IMMIGRATION AND

 7    CUSTOMS ENFORCEMENT IN WASHINGTON, D.C.

 8    Q.   IS THAT WHERE YOU LIVE, IN THE WASHINGTON, D.C. AREA?

 9    A.   YES.

10    Q.   PRIOR TO BECOMING EMPLOYED BY THE IMMIGRATION AND

11    CUSTOMS ENFORCEMENT SERVICE, WERE YOU EMPLOYED BY THE UNITED

12    STATES CUSTOMS SERVICE?

13    A.   YES, I WAS.

14    Q.   DID YOU BECOME AN EMPLOYEE OF ICE AS PART OF THE MERGER

15    AND FORMATION OF THE DEPARTMENT OF HOMELAND SECURITY?

16    A.   YES.

17    Q.   IN WHAT YEAR DID YOU BECOME EMPLOYED BY THE UNITED

18    STATES CUSTOMS SERVICE?

19    A.   IN 1990.

20    Q.   AND WERE YOU CONTINUOUSLY EMPLOYED BY CUSTOMS UP THROUGH

21    THE POINT YOU BECAME AN ICE SPECIAL AGENT?

22    A.   YES.

23    Q.   WHAT WAS YOUR POSTING IN JUNE OF 2001?

24    A.   I WAS A SPECIAL AGENT ASSIGNED TO THE RIVERSIDE U.S.

25    CUSTOMS OFFICE.
```

1   Q.   DID YOU PARTICIPATE IN THE EXECUTION OF A SEARCH WARRANT

2   ON OR ABOUT JUNE 5, 2001?

3   A.   YES, I DID.

4   Q.   WHAT WERE THE PREMISES THAT THE WARRANT DIRECTED YOU TO

5   SEARCH?

6          PARDON ME.  LET ME REPHRASE THAT.

7          WHERE WERE THOSE PREMISES IN GENERAL TERMS?

8   A.   IT WAS UP AT A GIRL SCOUT CAMP NEAR IDYLLWILD.

9   Q.   ARE YOU FAMILIAR WITH MOUNTAIN CENTER, CALIFORNIA?

10  A.   YES.

11  Q.   AND WHERE IS MOUNTAIN CENTER IN RELATION TO THE LOCATION

12  YOU'RE TALKING ABOUT, THE GIRL SCOUT CAMP?

13  A.   WELL, IT'S UP IN THE MOUNTAINS.  IT'S VERY CLOSE TO THE

14  IDYLLWYLD AREA.

15  Q.   NOW, DO YOU KNOW THE NAME OF THE GIRL SCOUT CAMP YOU

16  TESTIFIED TO?

17  A.   YES, IT'S CAMP JOE SHERMAN.

18  Q.   WERE YOU THE AFFIANT FOR THE SEARCH WARRANT THAT YOU

19  EXECUTED ON JUNE 5, 2001?

20  A.   YES, I WAS.

21  Q.   AND WHAT DOES THAT MEAN, TO BE THE AFFIANT OF THE SEARCH

22  WARRANT?

23  A.   WELL, I WAS THE CASE AGENT AT THE TIME AND THAT MEANS

24  THAT I WROTE THE SEARCH WARRANT AND WAS SWORN TO THE SEARCH

25  WARRANT.

1   Q.   IN GENERAL TERMS, WHAT INFORMATION HAD YOU RECEIVED AND

2   FROM WHOM THAT CAUSED YOU TO SEEK A SEARCH WARRANT?

3   A.   I RECEIVED INFORMATION FROM SAN FRANCISCO AND ALSO FROM

4   OUR DALLAS OFFICE PERTAINING TO CHAT LOGS AND SUSPICION OF

5   THOSE CHAT LOGS AND CHILD PORNOGRAPHY BEING TRADED BY AN

6   INDIVIDUAL IDENTIFIED AS JAMES SANDERS.

7   Q.   NOW, YOU REFERRED TO SAN FRANCISCO.  IS THAT THE

8   UNITED -- WELL, THEN THE UNITED STATES CUSTOMS OFFICE IN SAN

9   FRANCISCO?

10  A.   YES, CORRECT.

11  Q.   IS THAT DALLAS LIKE YOU MENTIONED?

12  A.   YES, CORRECT.

13  Q.   ARE YOU FAMILIAR WITH ICE SPECIAL AGENT -- MAKE SURE I

14  GET HIS NAME RIGHT -- RALPH PENDLETON, NOW RETIRED?

15  A.   YES, I AM.

16  Q.   DID YOU HAVE ANY CONVERSATIONS OR RECEIVE ANY ITEMS FROM

17  HIM PRIOR TO YOU SEEKING A SEARCH WARRANT FROM THE DISTRICT

18  COURT HERE?

19  A.   YES, I DID.

20  Q.   AND BASED ON THE -- WELL, LET ME ASK YOU THIS:  DID

21  MR. PENDLETON OR AGENT PENDLETON SEND YOU CHATS TAKEN FROM

22  ANOTHER COMPUTER?

23  A.   YES, HE DID.

24  Q.   WAS THE SEARCH WARRANT THAT YOU OBTAINED, WHAT TYPES OF

25  PREMISES DID IT DIRECT YOU TO SEARCH?

1    A.    THE SEARCH WARRANT ACTUALLY COVERED TWO AREAS AT CAMP

2    JOE SHERMAN.   IT WAS FOR THE MAINTENANCE BUILDING AND FOR THE

3    RESIDENCE OF JAMES SANDERS WHICH WAS ACTUALLY AN ON-SITE

4    BUILDING AT THE GIRL SCOUT CAMP.

5    Q.    DID YOU GO TO THE GIRL SCOUT CAMP TO EXECUTE THAT SEARCH

6    WARRANT?

7    A.    YES, I DID.

8    Q.    ON WHAT DATE DID YOU GO TO THE GIRL SCOUT CAMP?

9    A.    THAT WAS ON JUNE 5TH.

10   Q.    2001?

11   A.    2001.

12   Q.    AT WHAT TIME APPROXIMATELY DID YOU ARRIVE AT THE GIRL

13   SCOUT CAMP ON THAT DAY?

14   A.    APPROXIMATELY 9 IN THE MORNING.

15   Q.    IF I CAN ASK YOU TO REFER TO A FEW OF THE EXHIBITS IN

16   THE FOLDERS THAT ARE DIRECTLY BEHIND YOU, AGENT ARNOLD, AND

17   IF YOU COULD REMOVE EXHIBITS 7, 41 AND 42.  I'M SORRY, AGENT

18   ARNOLD, THE FOLDERS ARE IN A BOX DIRECTLY BEHIND YOU.

19   A.    7, 41?

20   Q.    AND 42.  MY QUESTION FIRST IS, DO YOU RECOGNIZE THOSE

21   ITEMS?

22   A.    YES.

23   Q.    NOW, REFERRING YOU TO EXHIBIT 7, DID YOU MAKE ANY USE OF

24   EXHIBIT 7 IN PREPARATION OF YOUR PLAN TO EXECUTE THE SEARCH

25   AND TESTIFY TODAY?

1    A.   YES.  THIS IS A MAP OF THE GIRL SCOUT CAMP AND WE USED

2    THIS AS PART OF THE OPERATION PLAN IN PREPARATION FOR THE

3    SEARCH WARRANT.

4    Q.   DID YOU YOURSELF MAKE SOME OF THE NOTATIONS HERE ON

5    EXHIBIT 7?

6    A.   YES.  I HAVE ARROWS POINTING INDICATING SANDERS'

7    RESIDENCE AND THE MAINTENANCE BUILDING.

8    Q.   AND EITHER IN THE EXECUTION OF THE WARRANT ITSELF OR THE

9    PREPARATION OF THAT OPERATION DID YOU MAKE YOURSELF FAMILIAR

10   WITH THE LAYOUT OF THE BUILDINGS AND THE OTHER

11   CHARACTERISTICS OF THE AREAS SHOWN IN EXHIBIT 7?

12   A.   YES.

13   Q.   DOES EXHIBIT 7 FAIRLY AND ACCURATELY DEPICT THE RELATIVE

14   PLACEMENT OF THOSE ITEMS?

15   A.   YES, IT DOES.

16            MR. AKROTIRIANAKIS:  GOVERNMENT OFFERS 7.

17            THE COURT:  ANY OBJECTION TO EXHIBIT 7?

18            MR. AARON:  NO.

19            THE COURT:  THANK YOU.

20            EXHIBIT 7 IS ORDERED ADMITTED AND YOU MAY PUBLISH.

21            MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

22   BY MR. AKROTIRIANAKIS:

23   Q.   ARE THESE THE -- ON THE RIGHT SIDE OF THE DOCUMENT,

24   EXHIBIT 7, WHICH IS NOW ON THE OVERHEAD CAMERA, THERE ARE TWO

25   TYPEWRITTEN NOTATIONS, "SANDERS' RESIDENCE" AND "MAINTENANCE

1    BUILDING."  DO YOU SEE THAT?

2    A.   YES, I DO.

3    Q.   ARE THOSE THE NOTATIONS YOU JUST NOW TESTIFIED TO?

4    A.   YES, THEY ARE.

5    Q.   I'M POINTING TO A LINE ON THE RIGHT SIDE.  IT'S THE

6    UNBROKEN BLACK LINE FURTHEST TO THE RIGHT ON THE DOCUMENT

7    INSIDE THE RIGHT-HAND BORDER.  DO YOU SEE THAT LINE?

8    A.   YES.

9    Q.   I'M SORRY.  THE SECOND LINE, PARDON ME.  THE SECOND LINE

10   INSIDE THE UNBROKEN LINE INSIDE THE RIGHT-HAND BORDER, DO YOU

11   SEE THAT LINE?

12   A.   YES, I DO.

13   Q.   DO YOU SEE FURTHER DOWN IT IS ACTUALLY LABELED?

14   A.   MORRIS RANCH ROAD.

15   Q.   IS MORRIS RANCH ROAD THE APPROACH TO CAMP JOE SHERMAN?

16   A.   YES, IT IS.

17   Q.   AND IS THAT THE APPROACH THAT YOU TOOK WHEN YOU ARRIVED

18   THERE ON THE MORNING OF JUNE 5, 2001?

19   A.   YES, IT IS.

20   Q.   NOW, IS THIS GIRL SCOUT CAMP, CAMP JOE SHERMAN, FAIRLY

21   HIGH IN THE MOUNTAINS?

22   A.   YES, IT'S FAIRLY HIGH IN AN ISOLATED AREA.

23   Q.   AND MORRIS RANCH ROAD IS THE ROAD THAT LEADS THERE?

24   A.   YES, IT IS.

25   Q.   I'M GOING TO SHOW YOU EXHIBIT 41 NOW.  I'M GOING TO ASK

1    YOU TO REREFER TO EXHIBIT 41 AND ASK YOU IF THAT PICTURE

2    FAIRLY AND ACCURATELY DEPICTS THE RELATIVE PLACEMENT OF THE

3    BUILDINGS AND MORRIS RANCH ROAD AT CAMP JOE SHERMAN THAT YOU

4    ARE FAMILIAR WITH?

5    A.   YES, IT IS.

6            MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 41.

7            THE COURT:  ANY OBJECTION TO EXHIBIT 41?

8            MR. AARON:  IF I MIGHT HAVE A MOMENT, YOUR HONOR,

9    PLEASE.

10           NO OBJECTION.

11           THE COURT:  THANK YOU.

12           EXHIBIT 41 IS ORDERED ADMITTED AND YOU MAY PUBLISH.

13           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

14   BY MR. AKROTIRIANAKIS:

15   Q.   AND EXHIBIT 42, AGENT ARNOLD, IS ALSO THERE BEFORE YOU.

16   IT IS A PHOTOGRAPH FROM A DIFFERENT ANGLE.  DOES THAT ALSO

17   FAIRLY AND ACCURATELY DEPICT THE RELATIVE PLACEMENT OF THE

18   BUILDINGS AND THE ROAD AT CAMP JOE SHERMAN?

19   A.   YES, IT DOES.

20           MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 42.

21           THE COURT:  ANY OBJECTION TO 42?

22           MR. AARON:  NONE.

23           THE COURT:  THANK YOU.

24           EXHIBIT 42 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

25           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

1    BY MR. AKROTIRIANAKIS:

2    Q.   I HAVE EXHIBIT 41 ON THE OVERHEAD CAMERA NOW AND I'M

3    POINTING TO THE ROAD THAT'S IN THE BOTTOM RIGHT PART OF THAT

4    EXHIBIT.  DO YOU SEE THAT?  DO YOU SEE THAT, AGENT ARNOLD?

5    A.   YES.

6    Q.   WHAT IS THAT ROAD?

7    A.   THAT'S MORRIS RANCH ROAD.

8    Q.   AND WHAT IS THIS BUILDING RIGHT HERE IN THE CENTER OF

9    THE PATCH OF CLEARED AREA?

10   A.   THAT WOULD BE THE MAINTENANCE BUILDING.

11   Q.   AND WHAT IS THIS BUILDING OVER HERE ACROSS FROM THE

12   ACCESS ROAD THAT LEADS FROM MORRIS RANCH ROAD TO THE PARKING

13   LOT OF THE MAINTENANCE BUILDING?

14   A.   THAT WOULD BE JAMES SANDERS' RESIDENCE.

15   Q.   SO THE RESIDENCE THAT YOU JUST TESTIFIED TO AND THE

16   MAINTENANCE BUILDING YOU TESTIFIED TO A MOMENT AGO, WERE

17   THOSE THE BUILDINGS THAT YOU WERE DIRECTED TO SEARCH BY THE

18   SEARCH WARRANT?

19   A.   YES.

20   Q.   NOW, HOW MANY VEHICLES WENT WITH YOU?  LET ME BACK UP.

21        I TAKE IT THERE WERE A NUMBER OF PEOPLE WHO WENT

22   WITH YOU ON THE EXECUTION OF THE SEARCH WARRANT?

23   A.   THAT'S CORRECT.

24   Q.   IN HOW MANY VEHICLES DID YOU AND THOSE PEOPLE ARRIVE?

25   A.   I WOULD SAY APPROXIMATELY EIGHT OR SO.

```
 1    Q.    AND WERE ANY OF THOSE MARKED LAW ENFORCEMENT VEHICLES?

 2    A.    YES, WE HAVE A COUPLE OF VEHICLES THAT WERE MARKED LAW

 3    ENFORCEMENT VEHICLES.

 4    Q.    DO YOU REMEMBER AT ALL APPROXIMATELY HOW MANY MARKED LAW

 5    ENFORCEMENT VEHICLES THERE WERE?

 6    A.    I RECOLLECT THERE WERE TWO I BELIEVE.

 7    Q.    NOW, WHEN YOU WENT TO CAMP JOE SHERMAN IN THE MORNING,

 8    DID YOU DRIVE UP MORRIS RANCH ROAD?

 9    A.    YES, I DID.

10    Q.    ACTUALLY, WERE YOU YOURSELF DRIVING THE VEHICLE THAT YOU

11    WERE IN?

12    A.    YES, I WAS.

13    Q.    WAS ANYBODY ELSE IN THE VEHICLE WITH YOU?

14    A.    DETECTIVE DUFFY WITH THE RIVERSIDE SHERIFF'S OFFICE.

15    Q.    NOW, DID YOU ULTIMATELY GO TO THE -- DRIVE YOUR VEHICLE

16    IN THE PARKING LOT OF THE MAINTENANCE BUILDING?

17    A.    YES.

18    Q.    WHAT ROAD DID YOU TAKE TO GET FROM MORRIS RANCH ROAD TO

19    THAT PARKING LOT?

20    A.    JUST THE MAIN ROAD THAT YOU COULD SEE WHERE IN THIS

21    PHOTOGRAPH THERE'S A BLUE VEHICLE ON THAT ROAD.

22    Q.    THE BLUE VEHICLE ON THIS ACCESS ROAD?

23    A.    YES.

24    Q.    NOW, DURING YOUR APPROACH TO THE MAINTENANCE BUILDING

25    PARKING LOT WHEN YOU WERE ON THE ACCESS ROAD BETWEEN MORRIS
```

1    RANCH ROAD AND THE PARKING LOT, DID YOU SEE ANY VEHICLES?

2    A.   YES, I DID.

3    Q.   WHEN I SAY OTHER VEHICLES, I DON'T MEAN THE OTHER

4    VEHICLES THAT WERE WITH YOU AND THE PEOPLE THAT WERE COMING

5    WITH YOU TO DO THE OPERATION, I MEAN OTHER VEHICLES.  IS THAT

6    HOW YOU UNDERSTOOD MY QUESTION?

7    A.   YES.

8    Q.   WHAT TYPE OF VEHICLE WAS IT THAT YOU FIRST SAW?

9    A.   A WHITE PICKUP.

10   Q.   DID YOU ULTIMATELY SEE MORE THAN ONE WHITE PICKUP THAT

11   DAY?

12   A.   YES, I DID.

13   Q.   SO NOW I WANT TO FOCUS ON THE FIRST WHITE PICKUP THAT

14   YOU SAW.

15   A.   OKAY.

16   Q.   WHERE WERE YOU IN YOUR VEHICLE -- PARDON ME.  LET ME

17   WITHDRAW THAT.

18        WERE YOU THE LEAD VEHICLE IN THE COLUMN OF VEHICLES

19   PROCEEDING TO THIS CAMP?

20   A.   YES, I WAS.

21   Q.   WHERE WERE YOU IN YOUR VEHICLE, USING EXHIBIT 41, AT THE

22   TIME THAT YOU FIRST SAW THE WHITE PICKUP TRUCK?

23   A.   I WAS ON THE ACCESS ROAD APPROACHING THE MAINTENANCE

24   BUILDING APPROXIMATELY WHERE THE BLUE VEHICLE IS.

25   Q.   AND WHERE WAS THE WHITE PICKUP TRUCK THAT YOU SAW,

1    REFERRING AGAIN TO EXHIBIT 41?

2    A.   IT ALSO WAS ON THE ACCESS ROAD.  IT HAD JUST DEPARTED

3    FROM THE MAINTENANCE AREA AND WAS APPROACHING MY VEHICLE.

4    Q.   WHEN YOU SAY THE MAINTENANCE AREA, ARE YOU REFERRING TO

5    THE EXIT TO THE MAINTENANCE BUILDING PARKING LOT?

6    A.   YES.

7    Q.   DID YOU SEE ANYONE SEATED IN THE CAB OF THAT WHITE

8    PICKUP TRUCK DURING YOUR APPROACH?

9    A.   YES, I DID.

10   Q.   DO YOU NOW KNOW THE NAME OF THAT PERSON WHO YOU SAW IN

11   THE WHITE PICKUP TRUCK DURING YOUR APPROACH?

12   A.   YES, I DO.

13   Q.   DID YOU KNOW THAT PERSON AT THE TIME?

14   A.   NO, I DID NOT.

15   Q.   BUT YOU NOW KNOW?

16   A.   YES.

17   Q.   WHAT'S HIS NAME?

18   A.   PEDRO FLORES.

19   Q.   NOW, DID EITHER YOU OR DETECTIVE -- IS IT DEPUTY OR

20   DETECTIVE DUFFY?

21   A.   I BELIEVE IT'S DEPUTY I BELIEVE.

22   Q.   DID EITHER YOU OR DEPUTY DUFFY MAKE ANY STATEMENTS

23   DIRECTED TOWARD MR. FLORES AT THE TIME THAT YOU WERE

24   APPROACHING HIS WHITE PICKUP TRUCK ON THE ACCESS ROAD?

25   A.   YES.

1    Q.   WAS IT YOU OR WAS IT DEPUTY DUFFY?

2    A.   DEPUTY DUFFY.

3    Q.   WHAT DID YOU HEAR DEPUTY DUFFY TO SAY?

4    A.   HE ASKED MR. FLORES, "WHERE IS JIM?"

5    Q.   DID YOU HEAR MR. FLORES MAKE ANY RESPONSE?

6    A.   YES, I DID.

7    Q.   WHAT DID MR. FLORES SAY IN RESPONSE TO DEPUTY DUFFY'S

8    QUESTION, "WHERE IS JIM?"

9    A.   HE SAID, "HE'S IN THERE," AND POINTED TO THE MAINTENANCE

10   BUILDING.

11   Q.   NOW, PRIOR TO THAT EXCHANGE BETWEEN DEPUTY DUFFY AND THE

12   RESPONSE FROM PEDRO FLORES, HAD YOU OBSERVED PEDRO FLORES TO

13   HAVE DONE ANYTHING?

14   A.   YES.  HE HAD HELD A MICROPHONE, A RADIO, UP TO HIS

15   MOUTH.

16   Q.   NOW, DID HE APPEAR TO YOU TO BE DOING THAT IN RESPONSE

17   TO YOUR APPROACH TO THE CAMP?

18   A.   YES, IN RESPONSE TO SEEING ME.  THAT'S WHEN HE STOPPED

19   AND BEGAN TALKING ON THE RADIO.

20   Q.   WHAT DID YOU DO WHEN -- NOW RETURNING TO THE POINT WHERE

21   MR. FLORES HAD SAID, "HE'S IN THERE," POINTING TO THE

22   MAINTENANCE BUILDING, WHAT, IF ANYTHING, DID YOU DO IN

23   RESPONSE TO THAT MOTION ON HIS PART?

24   A.   WELL, I LOOKED OVER TOWARDS THE MAINTENANCE BUILDING.

25   Q.   WHAT DID YOU SEE WHEN YOU LOOKED OVER TOWARD THE

1  MAINTENANCE BUILDING?

2  A.   I SAW ANOTHER WHITE PICKUP, A WHITE CHEVY PICKUP,

3  BACKING UP AWAY FROM THE MAINTENANCE BUILDING.

4  Q.   DID YOU SEE ANYONE IN THE CAB OF THAT PICKUP TRUCK?

5  A.   YES, I COULD SEE SOMEONE IN THE CAB DRIVING.

6  Q.   DID YOU MAKE ANY STATEMENT TO MR. FLORES UPON YOU SEEING

7  SOMEONE IN THE CAB OF THE SECOND WHITE PICKUP TRUCK?

8  A.   YES.  I ASKED HIM, "IS THAT JIM?"

9  Q.   DID HE MAKE A RESPONSE?

10  A.   HE SAID, "YES."

11  Q.   CAN I HAVE YOU REFER, PLEASE, TO EXHIBITS -- WELL,

12  EXHIBIT 33 IN THE BOX BEHIND YOU.

13        DID YOU SUBSEQUENTLY STOP THE SECOND WHITE PICKUP

14  TRUCK?

15  A.   YES, WE DID.

16  Q.   AND DID YOU IDENTIFY AT SOME POINT THE DRIVER OF THAT

17  VEHICLE?

18  A.   YES, I DID.

19  Q.   WHO WAS THE DRIVER OF THAT VEHICLE?

20  A.   THAT WAS MR. SANDERS.

21  Q.   DO YOU SEE MR. SANDERS IN THE COURTROOM HERE TODAY?

22  A.   YES, I DO.

23  Q.   CAN YOU IDENTIFY HIM FOR THE RECORD BY WHERE HE'S SEATED

24  IN THE COURTROOM AND WHAT HE'S WEARING?

25  A.   HE'S SEATED JUST TO THE RIGHT OF DEFENSE COUNSEL IN A

1   GRAY PINSTRIPED SUIT WEARING GLASSES.

2           MR. AKROTIRIANAKIS:  YOUR HONOR, MAY THE RECORD

3   REFLECT THE IDENTIFICATION OF THE DEFENDANT?

4           THE COURT:  SO NOTED FOR THE RECORD.

5   BY MR. AKROTIRIANAKIS:

6   Q.    DO YOU RECOGNIZE EXHIBIT 33?

7   A.    YES, I DO.

8   Q.    WHAT DOES EXHIBIT 33 DEPICT?

9   A.    THAT'S THE WHITE CHEVY PICKUP THAT MR. SANDERS WAS

10  DRIVING.

11          MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 33.

12          THE COURT:  ANY OBJECTION TO 33?

13          MR. AARON:  NO, YOUR HONOR.

14          THE COURT:  THANK YOU.

15          EXHIBIT 33 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

16          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

17  BY MR. AKROTIRIANAKIS:

18  Q.    I'VE PLACED IT ON THE OVERHEAD CAMERA.  I'M GOING TO NOW

19  REMOVE IT AND REPLACE EXHIBIT 41.

20          NOW, CAN YOU TAP ON THE SCREEN WITH THE TIP OF YOUR

21  FINGER WHERE THE DEFENDANT WAS IN THE WHITE PICKUP TRUCK WHEN

22  YOU FIRST SAW HIM IN THAT CAR?

23  A.    THE TAP IS IN THE WRONG PLACE, BUT I'M TAPPING IN ONE

24  PLACE AND IT'S MARKING ANOTHER.

25  Q.    YOU'RE TAPPING ONE PLACE AND IT'S MARKING ANOTHER?

1    A.    YEAH.

2    Q.    WHY DON'T YOU TAP IN THE BOTTOM RIGHT CORNER OF THE

3    SCREEN.    OKAY.    NOW, ADJUSTING FOR AS IT APPEARS TO BE

4    SHOWING UP IN THE WRONG PLACE, CAN YOU NOW PLACE THE DOT

5    WHERE YOU THINK -- WHERE YOU RECALL SEEING THE DEFENDANT IN

6    THE WHITE TRUCK.

7    A.    (THE WITNESS COMPLIES).

8    Q.    OKAY.    NOW, DID YOU SEE THE DEFENDANT DRIVE THE PICKUP

9    TRUCK ANYWHERE?

10   A.    YES, I DID.

11   Q.    CAN YOU -- USING YOUR FINGER -- ACTUALLY, BEFORE I HAVE

12   YOU DO THAT, CAN YOU TAP ON THE SCREEN KEEPING IN MIND HAVING

13   TO ADJUST FOR THAT, CAN YOU TAP ON THE SCREEN WHERE YOU WERE

14   AT THE TIME THAT YOU SAW THE DEFENDANT IN THE SPOT THAT

15   YOU'VE MARKED WITH A RED DOT?

16   A.    (THE WITNESS COMPLIES).

17   Q.    CAN YOU NOW USING YOUR FINGER JUST TRACE ON THE SCREEN

18   THE ROUTE THAT THE DEFENDANT TOOK THAT YOU SAW HIM DRIVING?

19   A.    THE SCREEN IS NOT OPERATING PROPERLY, BUT --

20          THE COURT:    WELL, LET'S -- WHY DON'T WE DO IT THIS

21   WAY:    WHY DON'T YOU TAP ON THE SCREEN AND CLEAR IT.    WHY

22   DON'T YOU STEP DOWN FROM THE WITNESS STAND AND APPROACH THE

23   FLAT SCREEN MONITOR AND INDICATE ON THAT.

24          AND THEN, MR. AARON, IF YOU NEED TO WALK AROUND SO

25   THAT YOU CAN SEE WHAT THE WITNESS IS INDICATING, YOU MAY DO

1   SO.

2           MR. AARON:  THANK YOU.

3           MR. AKROTIRIANAKIS:  MAY I AS WELL?

4           THE COURT:  GO AHEAD.

5           MR. AKROTIRIANAKIS:  MAY I INQUIRE, YOUR HONOR?

6           THE COURT:  CERTAINLY.  AND WE HAVE AN EASEL TO

7   MAKE IT A LITTLE EASIER.

8           AND, AGENT MARTIN, IF YOU'LL REMEMBER TO KEEP YOUR

9   VOICE UP, BECAUSE YOUR BACK IS TO THE COURT REPORTER, THAT

10  WILL MAKE IT EASIER FOR HER.  THANK YOU.

11  BY MR. AKROTIRIANAKIS:

12  Q.   AGENT ARNOLD, PLEASE, USING THE POINTER, VERY GENTLY

13  SHOW -- ACTUALLY, DON'T EVEN TOUCH THE SCREEN.  JUST VERY

14  GENTLY POINT THE POINTER TO WHERE YOU WERE AT THE TIME --

15  YOUR VEHICLE AT THE TIME THAT YOU FIRST SAW THE DEFENDANT

16  DRIVING THE WHITE PICKUP TRUCK?

17  A.   NOT QUITE ON THE SCREEN, BUT I WOULD HAVE JUST BEEN BACK

18  FROM THIS ACCESS ROAD, PROBABLY IN THIS AREA.

19  Q.   AND THERE ARE SOME BUSHES THAT ARE THERE BETWEEN THE

20  ACCESS ROAD AND THE MAINTENANCE BUILDING PARKING LOT.  WERE

21  YOU ABLE TO SEE EITHER OVER OR THROUGH THOSE BUSHES TO SEE

22  THE PARKING LOT -- I'M SORRY, TO SEE THE WHITE PICKUP TRUCK

23  AT THE TIME THAT MR. FLORES HAD INDICATED TO YOU THAT IT WAS

24  THE DEFENDANT IN THE PICKUP TRUCK?

25  A.   YES, I WAS.

1    Q.    NOW, CAN YOU, USING THE POINTER AGAIN, AND AGAIN, NOT

2    TOUCHING THE SCREEN --

3              THE COURT:   MR. AKROTIRIANAKIS, I CAN HARDLY HEAR

4    YOU.

5              THE WITNESS:   I BEG YOUR PARDON, YOUR HONOR.

6    BY MR. AKROTIRIANAKIS:

7    Q.    AGAIN, USING THE POINTER, CAN YOU INDICATE WHERE ON THE

8    SCREEN YOU SAW THE DEFENDANT DRIVING THE WHITE PICKUP TRUCK

9    AT THE TIME YOU FIRST SAW HIM?

10   A.    IT WAS RIGHT ON THE CORNER OF THE BUILDING IN THE FIRST

11   STALL RIGHT HERE, AND HE WAS BACKING AWAY FROM THE BUILDING.

12   Q.    NOW, USING THE POINTER AGAIN, CAN YOU TRACE THE PATH

13   THAT YOU SAW THE DEFENDANT DRIVE AFTER HE STARTED BACKING

14   AWAY FROM THE BUILDING?

15   A.    HE BACKED AWAY FROM THE BUILDING, CAME THROUGH THIS AREA

16   DOWN TO THE PERIMETER OF THE MAINTENANCE YARD, AND THEN HE

17   CIRCLED AROUND THE YARD.   AT THIS TIME WE WERE COMING IN AND

18   APPROACHING AND WE WERE FOLLOWING.   AS HE CONTINUED AROUND

19   THIS CIRCLE THERE WAS NO EXIT AND HE MADE BASICALLY A U-TURN

20   AND THEN WENT BACK OUT ONTO THE ACCESS ROAD AS WE WERE

21   FOLLOWING BEHIND.

22   Q.    THANK YOU.   YOU MAY RETURN TO THE WITNESS STAND.

23              MR. AKROTIRIANAKIS:   FOR THE RECORD THE WITNESS

24   TRACED A CIRCLE BEGINNING AT THE UPPER RIGHT CORNER OF THE

25   MAINTENANCE BUILDING AS IT'S SHOWN IN EXHIBIT 41 AND

```
 1   CIRCLING -- PROCEEDING DOWN THE RIGHT SIDE OF THAT BUILDING,
 2   CIRCLING THE ENTIRE PARKING LOT, AND THEN EXITING THE PARKING
 3   LOT ONTO THE ACCESS ROAD.
 4   BY MR. AKROTIRIANAKIS:
 5   Q.   WHAT DID YOU DO WHEN YOU SAW THE DEFENDANT DRIVING THAT
 6   WHITE PICKUP TRUCK IN THE MANNER THAT YOU DESCRIBED?
 7   A.   WELL, I WAS -- WE WERE FOLLOWING BEHIND TRYING TO CATCH
 8   UP WITH HIM AND ALERTING THE OTHER AGENTS AND THE OTHER
 9   PERSONNEL IN THE AREA THAT WE WERE TRYING TO CATCH UP WITH
10   HIM AND IT APPEARED LIKE HE WAS TRYING TO LEAVE THE AREA.
11   Q.   DID YOU AT SOME POINT PULL THE DEFENDANT OVER?
12   A.   YES, I DID.
13   Q.   HOW DID YOU ACCOMPLISH THAT?
14   A.   I ACTIVATED THE SIREN IN MY VEHICLE.
15   Q.   AND DID THE DEFENDANT PULL OVER AT THAT POINT?
16   A.   THE DEFENDANT DID STOP.
17   Q.   DID HE DO SO READILY?
18   A.   YES, HE DID.
19   Q.   DID EITHER YOURSELF OR DEPUTY DUFFY GIVE ANY
20   INSTRUCTIONS TO THE DEFENDANT AT THAT POINT?
21   A.   YES.  WE PULLED JUST BEHIND HIS VEHICLE OFF TO THE SIDE.
22   AND DEPUTY DUFFY WAS THE PASSENGER IN MY VEHICLE AND HE GOT
23   OUT FIRST.  AND I STARTED AROUND MY VEHICLE, AND AT THAT TIME
24   MR. SANDERS WAS REMOVED FROM HIS VEHICLE.
25   Q.   DID YOU LOOK INTO THE WINDOW OF THE VEHICLE AT ANY TIME?
```

1   A.   WELL, YES, AND THE DRIVER'S SIDE DOOR WAS WIDE OPEN.

2   Q.   SO DID YOU HAVE THE OPPORTUNITY TO SEE IN THE VEHICLE?

3   A.   YES, I DID.

4   Q.   DID YOU SEE ANYTHING IN THE VEHICLE, ANY ITEMS?

5   A.   YES.

6   Q.   WHAT DID YOU SEE IN THE VEHICLE?

7   A.   THERE WAS A BLACK BACKPACK ON THE FLOORBOARD OF THE

8   PASSENGER SIDE.

9   Q.   I'M GOING TO ASK YOU TO REFER TO EXHIBIT 32, PLEASE.  DO

10   YOU RECOGNIZE EXHIBIT 32?

11   A.   YES, I DO.

12   Q.   DOES EXHIBIT 32 FAIRLY AND ACCURATELY DEPICT THE

13   PLACEMENT OF THE BLACK BACKPACK AS YOU DESCRIBED IT AT THE

14   TIME THAT YOU FIRST SAW IT IN THE WHITE PICKUP TRUCK BEING

15   DRIVEN BY THE DEFENDANT?

16   A.   YES, IT DOES.

17             MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 32.

18             THE COURT:  ANY OBJECTION TO EXHIBIT 32?

19             MR. AARON:  NONE.

20             THE COURT:  THANK YOU.

21             EXHIBIT 32 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

22             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

23   BY MR. AKROTIRIANAKIS:

24   Q.   IS THIS THE BACKPACK WE SEE HERE ON THE FLOORBOARD OF

25   THE VEHICLE ON THE PASSENGER SIDE?

1    A.   YES, IT IS.

2    Q.   DO YOU SEE ANYTHING ATTACHED TO THE ZIPPERS OF THE

3    BACKPACK?

4    A.   YES.  THERE WERE LOCKS ON THE ZIPPERS.

5    Q.   WHAT KIND OF LOCKS WERE THEY?

6    A.   JUST PADLOCKS, SMALL PADLOCKS.

7    Q.   PADLOCKS ON THE BACKPACK AT THE TIME THAT YOU FIRST SAW

8    IT?

9    A.   YES.

10   Q.   AS DEPICTED IN EXHIBIT 32?

11   A.   YES.

12   Q.   PARDON ME.  AS PLACED PARTICULARLY IN EXHIBIT 32?

13   A.   YES.

14   Q.   NOW, DID YOU AT SOME POINT OPEN THIS BACKPACK?

15   A.   YES, I DID.

16   Q.   DID YOU PRIOR TO OPENING THE BACKPACK OBTAIN A SEARCH

17   WARRANT FOR IT?

18   A.   YES, I DID.

19   Q.   WERE THE LOCKS STILL ON THE BACKPACK AT THE TIME THAT

20   YOU HAD OBTAINED THE SEARCH WARRANT?

21   A.   YES.

22   Q.   AND WERE THE LOCKS ON THE BACKPACK AT ALL TIMES FROM THE

23   TIME YOU SAW THE BACKPACK FOR THE FIRST TIME OUT ON MORRIS --

24   PARDON ME -- WHEN YOU PULLED THE DEFENDANT OVER UP UNTIL THE

25   TIME WHEN YOU OPENED THE BACKPACK PURSUANT TO THE SEARCH

1    WARRANT?

2    A.    YES.

3    Q.    INCIDENTLY, WHERE WAS IT THAT YOU HAD PULLED THE

4    DEFENDANT OVER?

5    A.    RIGHT ON MORRIS RANCH ROAD JUST OUTSIDE OF THE ACCESS

6    ROAD.

7    Q.    NOW, ON JUNE 5, 2001, DID YOU ULTIMATELY HAVE A

8    CONVERSATION WITH THE DEFENDANT?

9    A.    YES, I DID.

10   Q.    DID YOU HAVE MORE THAN ONE CONVERSATION?

11   A.    YES, I DID.

12   Q.    I WANT TO FOCUS FIRST ON THE FIRST CONVERSATION YOU HAD

13   WITH THE DEFENDANT ON JUNE 5, 2001.  WHERE DID THAT

14   CONVERSATION OCCUR?

15   A.    THAT WAS IN ANOTHER BUILDING ON THE CAMP CALLED MASSEY

16   HALL.

17   Q.    AND HOW IS IT THAT THE DEFENDANT CAME TO BE PRESENT IN

18   MASSEY HALL AT THE TIME THAT YOU HAD THE FIRST CONVERSATION?

19   A.    WELL, AFTER HE WAS STOPPED, HE WAS TAKEN BY DEPUTY

20   DUFFY.  I'M NOT SURE WHO ALL ELSE -- I WAS NOT PRESENT, BUT

21   HE WAS TAKEN TO MASSEY HALL.

22   Q.    NOW, APPROXIMATELY HOW LONG AFTER YOU FIRST ARRIVED --

23   WELL, LET ME WITHDRAW THAT, PLEASE.

24         APPROXIMATELY HOW LONG AFTER YOU FIRST PULLED THE

25   DEFENDANT OVER WAS IT THAT HE WAS TAKEN TO MASSEY HALL?

1    A.    OH, JUST WITHIN A FEW MINUTES.

2    Q.    LET'S TURN TO THAT CONVERSATION, THAT FIRST CONVERSATION

3    YOU HAD WITH THE DEFENDANT ON JUNE 5, 2001.  WHO SPOKE FIRST

4    IN THAT CONVERSATION, YOU OR THE DEFENDANT?

5    A.    I DID.

6    Q.    WHAT DID YOU SAY?

7    A.    WELL, I EXPLAINED TO HIM THAT I DIDN'T WANT HIM TO SAY

8    ANYTHING AND THAT I WANTED TO TALK TO HIM AND THAT I WANTED

9    -- WOULD MIRANDIZE HIM AT A LATER POINT IN TIME WHEN I WANTED

10   TO ASK HIM QUESTIONS BUT THAT I DIDN'T WANT HIM TO SAY

11   ANYTHING AND I WANTED TO EXPLAIN WHY WE WERE THERE.

12   Q.    NOW, NOTWITHSTANDING YOUR STATEMENT THAT YOU DID NOT

13   WANT THE DEFENDANT TO SAY ANYTHING, DID THE DEFENDANT

14   NONETHELESS MAKE A SPONTANEOUS STATEMENT AT THAT TIME?

15   A.    YES, HE DID.

16   Q.    WHAT DID THE DEFENDANT SAY?

17   A.    HE SAID, "I KNOW WHY YOU'RE HERE.  IT'S BECAUSE I KNOW

18   SOMEONE IN SAN FRANCISCO."

19   Q.    NOW, AFTER THE POINT IN TIME WHEN THE DEFENDANT

20   INDICATED THAT HE KNEW WHY YOU WERE THERE AND IT WAS BECAUSE

21   HE KNOWS SOMEONE IN SAN FRANCISCO, DID YOU GIVE THE DEFENDANT

22   ANY FURTHER INSTRUCTION IN TERMS OF WHETHER OR NOT YOU WANTED

23   HIM TO MAKE A STATEMENT AT THAT TIME?

24   A.    YES.  I AGAIN REMINDED HIM THAT I DID NOT WANT HIM TO

25   SAY ANYTHING, THAT I JUST WANTED TO TALK TO HIM.

1    Q.   IN SPITE OF THAT SECOND INSTRUCTION THAT YOU DID NOT

2    WANT THE DEFENDANT TO SPEAK, DID THE DEFENDANT MAKE ANY

3    ADDITIONAL SPONTANEOUS STATEMENTS?

4    A.   YES, HE DID.

5    Q.   IN RESPONSE TO YOUR SECOND INSTRUCTION TO THE DEFENDANT

6    THAT YOU DID NOT WANT HIM TO SPEAK, WHAT DID HE SAY?

7    A.   HE SAID, "MY CAREER IS OVER.   SEVENTEEN YEARS GONE, JUST

8    BECAUSE OF LITERATURE."

9    Q.   I WANT TO STEP AHEAD A BIT.   AFTER THIS FIRST

10   CONVERSATION WITH THE DEFENDANT, DID YOU AND THE OTHER LAW

11   ENFORCEMENT OFFICERS AND AGENTS THERE CARRY OUT THE EXECUTION

12   OF THE SEARCH WARRANT?

13   A.   YES.

14   Q.   DID YOU ULTIMATELY SEARCH THE TWO BUILDINGS THAT YOU

15   PREVIOUSLY TESTIFIED YOU WERE DIRECTED TO SEARCH BY THE

16   WARRANT?

17   A.   YES.

18   Q.   AND, AGAIN, WHAT WERE THOSE TWO BUILDINGS?

19   A.   THE MAINTENANCE BUILDING AND MR. SANDERS' RESIDENCE.

20   Q.   NOW, WERE ITEMS SEIZED FROM THE DEFENDANT'S RESIDENCE?

21   A.   YES.

22   Q.   WHO WAS THE EVIDENCE CUSTODIAN FOR THAT LOCATION?

23   A.   PERRY JOHNSON, SPECIAL AGENT PERRY JOHNSON.

24   Q.   IS SPECIAL AGENT PERRY JOHNSON A SPECIAL AGENT WITH

25   IMMIGRATION AND CUSTOMS ENFORCEMENT?

1    A.   YES, HE IS.

2    Q.   AND AT THE TIME WAS HE A SPECIAL AGENT WITH THE UNITED

3    STATES CUSTOMS SERVICE?

4    A.   YES.

5    Q.   NOW, RETURNING FOR THE MOMENT TO YOUR -- IF I CAN REFER

6    YOU ACTUALLY TO EXHIBIT 47 IN THE FILES BEHIND YOU.   SORRY.

7    EXHIBIT 46.

8         ARE YOU FAMILIAR WITH EXHIBIT 46?

9    A.   YES.

10   Q.   WHAT IS SHOWN IN EXHIBIT 46?

11   A.   THAT'S THE MAINTENANCE BUILDING.

12   Q.   DOES EXHIBIT 46 FAIRLY AND ACCURATELY DEPICT THE

13   MAINTENANCE BUILDING AS IT APPEARED ON JUNE 5, 2001, WHEN YOU

14   EXECUTED THE SEARCH WARRANT AT CAMP JOE SHERMAN?

15   A.   YES.

16        MR. AKROTIRIANAKIS:   THE GOVERNMENT OFFERS 46.

17        THE COURT:   ANY OBJECTION TO 46?

18        MR. AARON:   NO, YOUR HONOR.

19        THE COURT:   THANK YOU.

20        EXHIBIT 46 IS ADMITTED AND YOU MAY PUBLISH.

21   BY MR. AKROTIRIANAKIS:

22   Q.   I'M POINTING TO THE CLOSEST PARKING STALL SHOWN ON

23   EXHIBIT 46 WHICH IS ON THE OVERHEAD CAMERA.   AGENT ARNOLD,

24   IS THAT THE PARKING SPOT FROM WHICH YOU SAW THE DEFENDANT

25   WITHDRAWING WHEN YOU FIRST SAW HIM IN THE WHITE PICKUP TRUCK

1    ON JANUARY 5, 2001?

2    A.   YES.

3    Q.   AND IS THIS THE MAINTENANCE BUILDING IN THE BACKGROUND

4    OF THAT PARKING SPOT?

5    A.   YES.

6    Q.   NOW, TURNING TO YOUR SEARCH OF THE BACKPACK, WHAT DID

7    YOU -- YOU TESTIFIED THAT YOU ULTIMATELY OBTAINED A SEARCH

8    WARRANT FOR THE BACKPACK?

9    A.   YES.

10   Q.   YOU ULTIMATELY SEARCHED THE BACKPACK?

11   A.   THAT'S CORRECT.

12   Q.   DID YOU SEIZE ITEMS FROM WITHIN THE BACKPACK?

13   A.   YES.

14   Q.   AT THAT TIME I BELIEVE YOU TESTIFIED YOU WERE THE CASE

15   AGENT FOR THIS INVESTIGATION?

16   A.   THAT'S CORRECT.

17   Q.   WAS ONE OF YOUR ROLES AS THE CASE AGENT TO COLLECT AND

18   REVIEW THE EVIDENCE SEIZED AS PART OF THE INVESTIGATION?

19   A.   YES.

20   Q.   AND DID YOU DO THAT AS FAR AS THE EVIDENCE SEIZED FROM

21   WITHIN THE BACKPACK IS CONCERNED?

22   A.   YES.

23   Q.   AND WHAT DID YOU DO WITH THE CONTENTS OF THE BACKPACK

24   AFTER YOU HAD EXECUTED THE SEARCH WARRANT ON IT?

25   A.   WELL, WE REVIEWED IT AND THEN IT WAS LOGGED IN TO

1    EVIDENCE.

2    Q.    WHAT DOES IT MEAN TO LOG IT IN TO EVIDENCE?

3    A.    WELL, WE HAVE AN EVIDENCE ROOM AND THE ITEMS WERE

4    SEPARATED OUT AND ANNOTATED ON A CUSTODY RECEIPT.  AND THEN

5    WE TURN IT OVER TO THE EVIDENCE CUSTODIAN AND IT'S SECURED IN

6    A LOCKED STORAGE AREA.

7    Q.    NOW, THE RECEIPT THAT YOU TESTIFIED TO, IS THAT A U.S.

8    CUSTOMS FORM 6051?

9    A.    YES.

10   Q.    AND WHEN YOU SAY THAT YOU SECURED THE EVIDENCE IN THE --

11   WHAT WAS THE TERM YOU USED, EVIDENCE LOCKER OR SOMETHING?

12   A.    YES, EVIDENCE LOCKER, EVIDENCE ROOM.

13   Q.    IS THAT A SECURED LOCATION?

14   A.    YES, SECURED AND ALARMED.

15   Q.    AND DID YOU SECURE ALL OF THE EVIDENCE FROM THE BACKPACK

16   IN THAT ROOM?

17   A.    YES.

18   Q.    AND IS THAT LIKEWISE TRUE FOR THE EVIDENCE SEIZED FROM

19   THE DEFENDANT'S RESIDENCE ON JUNE 5, 2001?

20   A.    WELL, SOMETIMES EVIDENCE MIGHT BE LOGGED IN BY A

21   DIFFERENT PERSON, BUT AS CASE AGENT I MIGHT NOT HAVE BEEN

22   NECESSARILY THE ONE WHO ACTUALLY LOGGED IT IN TO THE ROOM BUT

23   WOULD HAVE INSURED THAT EVERYTHING WAS, EVEN THOUGH I MAY NOT

24   BE ON THE CHAIN OF CUSTODY.

25   Q.    IS IT THE EVIDENCE CUSTODIAN FOR THE PARTICULAR LOCATION

1   THAT IS CHARGED WITH SECURING THE EVIDENCE INTO THE SECURE

2   EVIDENCE ROOM?

3   A.   YES.

4   Q.   AND, AGAIN, WITH REGARD TO THE DEFENDANT'S RESIDENCE,

5   WHO WAS THAT PERSON?

6   A.   SPECIAL AGENT PERRY JOHNSON.

7   Q.   NOW, AFTER THE SEARCH OF THE RESIDENCE AND THE

8   MAINTENANCE BUILDING ON JUNE 5, 2001, DID YOU PRESENT THE

9   DEFENDANT WITH ANY DOCUMENTATION CONCERNING THE SEARCH?

10  A.   YES, I DID.

11  Q.   DID YOU GIVE HIM THE FORM 6051?

12  A.   YES, I DID.

13  Q.   AND WAS THAT THE FORM 6051 FOR THE BACKPACK OR THE

14  FORM 6051 FOR THE RESIDENCE OR BOTH?

15  A.   NO.   WELL, IT WOULD HAVE BEEN THE 6051 WITH A BREAKDOWN

16  OF EVERYTHING THAT WAS SEIZED FROM THE RESIDENCE AND THEN

17  JUST ONE LINE ITEM FOR THE BACKPACK BECAUSE WE HAD NOT YET

18  OPENED IT UP AND SEARCHED IT.   THAT DID NOT TAKE PLACE FOR

19  ANOTHER COUPLE OF DAYS.

20  Q.   DID YOU PRESENT THE DEFENDANT WITH BOTH OF THOSE ITEMS,

21  THE ITEMIZED 6051 FOR THE RESIDENCE AND THE OTHER FORM FOR

22  THE BACKPACK THAT JUST INDICATED A BACKPACK?

23  A.   YES.

24  Q.   DID THE DEFENDANT REVIEW THAT DOCUMENTATION IN YOUR

25  PRESENCE?

1    A.    YES.

2    Q.    NOW, FOLLOWING HIS REVIEW OF THAT DOCUMENTATION OR IN

3    THE COURSE OF HIS REVIEW OF THAT DOCUMENTATION, DID THE

4    DEFENDANT MAKE ANY STATEMENTS?

5    A.    YES, HE DID.

6    Q.    WHAT WAS THE FIRST THING THE DEFENDANT SAID?

7    A.    WELL, IN REVIEWING THE 6051 HE GOT TO THE LINE ITEM

8    WHERE THE BACKPACK WAS AND HE SAID, "ARE YOU GOING TO TAKE

9    THAT?"

10   Q.    DID YOU MAKE ANY RESPONSE TO THAT STATEMENT?

11   A.    I JUST SAID, "YES."

12   Q.    NOW, DID THE DEFENDANT MAKE ANY FURTHER STATEMENT IN

13   REPLY TO YOUR RESPONSE, YES?

14   A.    YES, HE DID.

15   Q.    WHAT DID HE SAY?

16   A.    HE SAID, "WELL, THEN I WON'T HAVE ANY COMPUTERS."

17   Q.    DID YOU MAKE ANY FURTHER STATEMENT IN RESPONSE TO THE

18   DEFENDANT'S STATEMENT, "WELL, THEN I WON'T HAVE ANY

19   COMPUTERS"?

20   A.    YES.  I ASKED HIM, "IS YOUR LAPTOP IN THERE?"

21   Q.    AND WHAT, IF ANYTHING, DID THE DEFENDANT RESPOND TO THAT

22   STATEMENT?

23   A.    HE SAID, "YES."

24   Q.    NOW, DID YOU HAVE ANY FURTHER CONVERSATION ON JUNE 5,

25   2001, WITH THE DEFENDANT?

1    A.   YES, I DID.

2    Q.   CAN YOU PLEASE DESCRIBE THE CIRCUMSTANCES OF THAT

3    FURTHER CONVERSATION YOU HAD WITH HIM?

4    A.   WELL, WE WERE -- THE SEARCH WARRANT HAD BEEN COMPLETE.

5    I HAD GIVEN HIM THE RECEIPT FOR ALL OF THE ITEMS OF EVIDENCE

6    THAT WE WERE TAKING.  AND WE WERE LEAVING, WE WERE LOADING UP

7    IN OUR VEHICLES.  I TOLD HIM, OF COURSE, THAT HE WAS FREE TO

8    LEAVE AND THAT WE WERE LEAVING, GIVING HIM MY BUSINESS CARD

9    AND HOW HE COULD CONTACT ME, AND THAT'S THE TIME THAT I

10   WAS -- WE HAD A FURTHER DISCUSSION.

11   Q.   AND DID THE DEFENDANT DO ANYTHING AS FAR AS SUMMONING

12   YOU TO HIM AT THAT TIME?

13   A.   YES.  I WAS WALKING AWAY GETTING IN MY VEHICLE AND

14   MR. SANDERS MOTIONED TO ME, ASKED TO SPEAK WITH ME PRIVATELY

15   BECAUSE THERE WERE OTHER OFFICERS AROUND.

16   Q.   DID YOU STEP AWAY FROM THE OTHER OFFICERS TOGETHER WITH

17   THE DEFENDANT?

18   A.   I DID.

19   Q.   AND WAS IT IN THAT MOMENT THAT DEFENDANT MADE A FURTHER

20   STATEMENT TO YOU?

21   A.   YES, IT IS.

22   Q.   WHAT WAS THE FIRST THING THAT THE DEFENDANT SAID AS PART

23   OF THAT THIRD CONVERSATION YOU HAD WITH HIM?

24   A.   HE ASKED ME, "HOW IS KALEN?"

25   Q.   AFTER MR. SANDERS THE DEFENDANT SAID, "HOW IS KALEN,"

1    DID YOU SAY ANYTHING?

2    A.   YES.  I TOLD HIM THAT THE NEW MEXICO OFFICIALS HAD NOT

3    BEEN ABLE TO CONTACT HIM THAT DAY AND SO I WAS UNSURE.

4    Q.   NOW, AT THAT POINT DID THE DEFENDANT MAKE ANY DENIALS OF

5    HAVING DONE ANYTHING TO KALEN?

6    A.   YES, HE DID.

7    Q.   WHAT DID HE SAY?

8    A.   WELL, HE JUST SAID, "I DIDN'T DO ANYTHING TO HIM."

9    Q.   AND DID YOU MAKE ANY FURTHER STATEMENT TO THE DEFENDANT

10   AT THAT POINT?

11   A.   I DID.  I SAID, "WELL, THAT'S NOT WHAT YOU SAID IN YOUR

12   ICQ CHATS, SO EITHER YOU'RE LYING TO ME NOW OR YOU LIED IN

13   YOUR CHATS."

14   Q.   AND IN RESPONSE TO THAT STATEMENT ON YOUR PART, DID THE

15   DEFENDANT MAKE ANY STATEMENT ABOUT LYING?

16   A.   HE DID.

17   Q.   WHAT DID HE SAY?

18   A.   HE SAID, "WELL, I WOULD LIE TO PROTECT MY FREEDOM, BUT I

19   STILL DIDN'T DO ANYTHING."

20   Q.   NOW, TURNING TO YOUR SEARCH OF THE BACKPACK --

21            MR. AKROTIRIANAKIS:  AND FOR THIS, YOUR HONOR, I

22   HAVE A NUMBER OF PHYSICAL ITEMS OF EVIDENCE.  MAY I APPROACH

23   THE WITNESS WITH THOSE?

24            THE COURT:  YOU MAY.

25   BY MR. AKROTIRIANAKIS:

1    Q.   THE ITEM BEFORE YOU IS EXHIBIT 8.  AGENT ARNOLD, DO YOU

2    RECOGNIZE THAT ITEM?

3    A.   YES, I DO.

4    Q.   AND WHAT IS EXHIBIT 8?

5    A.   THIS IS THE BLACK BACKPACK THAT WE SEIZED.

6             MR. AKROTIRIANAKIS:  GOVERNMENT OFFERS 8.

7             THE COURT:  ANY OBJECTION TO EXHIBIT 8?

8             MR. AARON:  NONE, YOUR HONOR.

9             THE COURT:  EXHIBIT 8.

10            MR. AARON:  EXCEPT AS PREVIOUSLY NOTED.

11            THE COURT:  THANK YOU.

12            EXHIBIT 8 IS ORDERED ADMITTED.

13   BY MR. AKROTIRIANAKIS:

14   Q.   AND I'LL ASK YOU TO REFER TO -- IN THE BOX BEHIND YOU

15   EXHIBIT 30 AND 31.

16   A.   3 AND 31?

17   Q.   30 AND 31.  MY QUESTION FOR YOU, AGENT ARNOLD, IS

18   WHETHER YOU RECOGNIZE WHAT'S SHOWN IN EXHIBIT 31.

19   A.   YES.

20   Q.   WHAT IS SHOWN IN EXHIBIT 31?

21   A.   THIS IS A PHOTOGRAPH THAT WAS TAKEN OF ALL THE ITEMS

22   THAT WE REMOVED FROM THE BACKPACK PURSUANT TO THE SEARCH

23   WARRANT.

24   Q.   DOES EXHIBIT 31 FAIRLY AND ACCURATELY DEPICT THOSE ITEMS

25   AFTER THEY WERE REMOVED FROM THE BACKPACK AND PLACED IN THE

1     LOCATION WHERE WE SEE THEM?

2     A.   YES.

3     Q.   AND TURNING TO EXHIBIT 30, IS THAT REALLY JUST A

4     CLOSE-UP OF PART OF EXHIBIT 31?

5     A.   YES.

6              MR. AKROTIRIANAKIS:   THE GOVERNMENT OFFERS 30 AND

7     31, YOUR HONOR.

8              THE COURT:  ANY OBJECTION?

9              MR. AARON:  NO, YOUR HONOR.

10             THE COURT:   30 AND 31 ARE ORDERED ADMITTED.

11             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.  MAY I

12    PUBLISH?

13             THE COURT:  YOU MAY PUBLISH.

14    BY MR. AKROTIRIANAKIS:

15    Q.   WHERE WAS EXHIBIT 31 WHICH IS NOW ON THE OVERHEAD CAMERA

16    TAKEN?

17    A.   THAT WAS IN THE -- ACTUALLY IN THE CONFERENCE ROOM OF

18    THE U.S. CUSTOMS OFFICE HERE IN RIVERSIDE.

19    Q.   AGAIN, ARE THESE THE CONTENTS OF -- I'M SORRY.  ARE

20    THESE THE CONTENTS SHOWN IN EXHIBIT 31 THAT WERE INSIDE

21    EXHIBIT 8, THE BACKPACK YOU PREVIOUSLY TESTIFIED TO?

22    A.   YES.

23    Q.   AND I'M PLACING EXHIBIT 30 ON THE OVERHEAD CAMERA VERY

24    BRIEFLY.  IS THIS A CLOSE-UP OF THOSE ITEMS?

25    A.   YES.

1    Q.    AND WHAT SPECIFICALLY IS SHOWN RIGHT HERE APPROXIMATELY

2    IN THE CENTER OF EXHIBIT 30?  IT'S A GRAY AND BLACK ITEM.

3    A.    MY SCREEN IS ACTUALLY DARK AND I CAN'T TELL FROM HERE.

4    Q.    REFERRING TO THE EXHIBIT ITSELF THAT YOU HAVE BEFORE

5    YOU, CAN YOU TELL WHAT THAT IS?

6    A.    I BELIEVE THAT'S A CAMERA CASE.

7    Q.    THANK YOU.  I'M GOING TO NOW ASK YOU TO REFER TO

8    EXHIBITS 9 THROUGH 28.  AND FOR EACH OF THEM I AM GOING TO

9    ASK YOU WHETHER YOU FOUND THAT IN THE BACKPACK AND PERHAPS

10   SOME FOLLOW-UP QUESTIONS.

11         IT MIGHT BE FASTER, AGENT ARNOLD, WITH THE COURT'S

12   PERMISSION, IF YOU COULD MAYBE TAKE THEM GROUPS AT A TIME,

13   SAY 9 THROUGH 14.

14   A.    YES, I REVIEWED 9 THROUGH 14 AND I RECOGNIZE THEM AS

15   BEING REMOVED FROM THE BACKPACK.

16   Q.    YOU ANSWERED MY NEXT QUESTION.  WHAT IS EXHIBIT 9?

17   A.    IT'S A PASSPORT FOR MR. SANDERS.

18   Q.    AND WHAT IS EXHIBIT 10?

19   A.    IT'S A MEMBERSHIP IN MR. SANDERS' NAME FOR THE GIRL

20   SCOUT CAMP, GIRL SCOUT COUNCIL.

21   Q.    WHAT IS EXHIBIT 11?

22   A.    IT IS A W-2 EARNINGS STATEMENT FOR MR. SANDERS FROM THE

23   GIRL SCOUT CAMP.

24   Q.    AND WHAT IS EXHIBIT 12 AND 13 AND 14?  YOU CAN JUST

25   IDENTIFY ALL OF THEM.

1   A.   12 IS A MEMORANDUM FROM THE GIRL SCOUT CAMP, 13 IS A

2   LETTER ADDRESSED TO MR. SANDERS FROM SETH BEKENSTEIN, AND 14

3   ARE SOME MISCELLANEOUS PAPERS WITH WRITING.

4   Q.   AND ALL OF THOSE ITEMS WERE FOUND WITHIN THE BACKPACK?

5   A.   YES.

6        MR. AKROTIRIANAKIS:  YOUR HONOR, THE GOVERNMENT

7   MOVES EXHIBIT 9 THROUGH 14 INTO EVIDENCE AND -- OR WOULD ASK

8   THAT 9 THROUGH 14 BE RECEIVED BY THE COURT IN EVIDENCE.  AND

9   I WOULD ASK FURTHER IF I COULD RETRIEVE THOSE ITEMS SO I

10  COULD PUBLISH THEM WHILE AGENT ARNOLD IS REVIEWING THE

11  REMAINDER OF THE ITEMS.

12        THE COURT:  SO YOU WANT TO RETRIEVE 9 THROUGH 14?

13        MR. AKROTIRIANAKIS:  YES.  AND I OFFER THEM AS

14  WELL, YOUR HONOR.

15        THE COURT:  ANY OBJECTION TO EXHIBITS 9 THROUGH 14?

16        MR. AARON:  NONE EXCEPT AS PREVIOUSLY NOTED.

17        THE COURT:  THANK YOU.

18        EXHIBITS 9 THROUGH 14 ARE ORDERED ADMITTED AND YOU

19  MAY PUBLISH.

20        MR. AKROTIRIANAKIS:  AND MAY I APPROACH THE

21  WITNESS?

22        THE COURT:  YES, YOU MAY.

23  BY MR. AKROTIRIANAKIS:

24  Q.   AND, AGENT ARNOLD, I'M GOING TO PUBLISH THOSE EXHIBITS.

25  IF YOU COULD REVIEW 15 THROUGH 28, AND I'M GOING TO HAVE THE

1    SAME QUESTIONS FOR YOU.

2              PLACING EXHIBIT 9 ON THE OVERHEAD CAMERA IT READS:

3    PASSPORT, UNITED STATES OF AMERICA.  AND OPENING THE DOCUMENT

4    IT IS A PICTURE AND IT READS:  SURNAME, SANDERS; GIVEN NAME,

5    JAMES EDWARD; DATE OF BIRTH 18, M-A-R FOR MARCH, '45.

6              EXHIBIT 10, CERTIFICATE OF MEMBERSHIP, GIRL

7    SCOUTS.

8              EXHIBIT 11 HAS BEEN CONFORMED TO THE LOCAL RULES.

9              THE COURT:  THANK YOU.

10             MR. AKROTIRIANAKIS:  THE YEAR 2000 W-2 AND EARNINGS

11   SUMMARY ADDRESSED TO JAMES E. SANDERS, P.O. BOX 277, MOUNTAIN

12   CENTER, CALIFORNIA, 92561.

13             EXHIBIT 12, A MEMO, GIRL SCOUT COUNCIL, ORANGE

14   COUNTY, ADDRESSED TO PAUL, JIM, DON, AND REFERRING TO

15   PROPERTY MAINTENANCE RELATED TOPICS AT CAMP SHERMAN.

16             EXHIBIT 13, AN ENVELOPE ADDRESSED TO JIM SANDERS,

17   P.O. BOX 277, MOUNTAIN CENTER, CALIFORNIA, 92561, WITH A

18   RETURN ADDRESS OF SETH BEKENSTEIN, MARIN COUNTY JAIL,

19   13 CEDAR BEHR, B-E-H-R, DRIVE, SAN RAFAEL, CALIFORNIA,

20   94903.

21             EXHIBIT 14, A COLLECTION OF PAPERS, NOT ALL OF

22   WHICH WILL I READ, BUT I WILL READ A FEW WITH THE COURT'S

23   PERMISSION.

24             THE COURT:  GO AHEAD.

25             MR. AKROTIRIANAKIS:  A SCRAP OF PAPER THAT READS

1    RICOCHET IS RANDY.  A PAPER WITH AN ADDRESS FOR JOSHUA

2    BEKENSTEIN IN WAYLAND, MASSACHUSETTS.  A PAPER THAT INCLUDES

3    AN IP ADDRESS AND THE WORDS:  USER, BOYSAN, B-O-Y-S-A-N, PW,

4    BOYSAN1, B-O-Y-S-A-N, AND THE NUMBER 1.

5           AND THE FINAL ONE THAT I WILL READ REFERS TO

6    ELLIOTT BURSON, E-MAIL PEI@FREEDOM.NET, UNSENSORED NEWS

7    SERVER E-MAIL, ELLIOTT1@FREEDOM.NET.  AT THE VERY TOP MY

8    LAPTOP REGISTRY AND PW.  AND ON THE BACK SIDE, MAIL AND NEWS,

9    MICK, ELLIOTT1, PASSWORD, AND THEN A NUMBER AND LETTER

10   COMBINATION.  NAME, ELLIOTT BURSON, ADDRESS AND AN ADDRESS IN

11   SOUTH LAKE TAHOE.  PHONE NUMBER AND A 916 AREA PHONE NUMBER.

12   E-MAIL ADDRESS, ELLIOTT1@FREEDOM.NET.  BELOW THAT, MSN

13   MESSENGER.  NEXT TO THE NOTATION FOR LAPTOP, NAME ELLIOTT

14   BURSON.  STATE, CALIFORNIA.  ZIP CODE, 96158.  BIRTHDATE,

15   8/15/55?  SIGN-IN NAME, PEI314@HOTMAIL.COM.  PASSWORD, LETTER

16   NUMBER COMBINATION.  SECRET QUESTION, LOVER.  ANSWER, KALEN.

17   BY MR. AKROTIRIANAKIS:

18   Q.   AGENT ARNOLD, REFERRING TO EXHIBIT 15 AND THEREAFTER,

19   WHAT IS EXHIBIT 15?

20          WELL, LET ME ASK YOU THIS:  DID YOU FIND EACH OF

21   THOSE ITEMS IN THE BACKPACK?

22   A.   YES, I DID.

23   Q.   WHAT IS EXHIBIT 15 BRIEFLY?

24   A.   IT IS A STATEMENT FROM TRIPLE A.

25   Q.   AND EXHIBIT 16?

1    A.    FINANCIAL SERVICE.  IT'S BASICALLY A BILL.

2    Q.    DOES IT APPEAR TO BE A CREDIT CARD STATEMENT?

3    A.    YES.

4    Q.    AND WHO IS THE ADDRESSEE OF THAT CREDIT CARD STATEMENT?

5    A.    JAMES SANDERS.

6    Q.    EXHIBIT 16?

7    A.    IT IS A RECEIPT FROM FRY'S ELECTRONICS.

8    Q.    THANK YOU.

9              MR. AKROTIRIANAKIS:  YOUR HONOR, I MAY BE ABLE TO

10   PROCEED MOST EXPEDITIOUSLY IF I SIMPLY OFFER ALL OF THE

11   DOCUMENTS NOW AND THEN WE CAN IDENTIFY THEM IF THEY ARE

12   RECEIVED.

13             THE COURT:  ALL RIGHT.  GO AHEAD.

14             MR. AKROTIRIANAKIS:  I WOULD OFFER EXHIBITS 15

15   THROUGH 28 WHICH THE WITNESS HAS TESTIFIED CAME FROM THE

16   BACKPACK.

17             THE COURT:  I'M SORRY, DID THE WITNESS TESTIFY IT

18   CAME FROM THE BACKPACK?

19             MR. AKROTIRIANAKIS:  CAME FROM WITHIN THE BACKPACK.

20             THE COURT:  ANY OTHER OBJECTION OTHER THAN

21   PREVIOUSLY MADE?

22             MR. AARON:  NO.  THANK YOU.

23             THE COURT:  EXHIBITS 15 THROUGH 28 --

24             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

25             THE COURT:  -- ARE ORDERED ADMITTED AND YOU MAY

1    PUBLISH.

2            MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

3    BY MR. AKROTIRIANAKIS:

4    Q.    EXHIBIT 15, THE CREDIT CARD STATEMENT FROM TRIPLE A

5    FINANCIAL SERVICES WHICH HAS BEEN CONFORMED TO THE LOCAL

6    RULES, WHAT IS THE FIRST ENTRY SHOWN UNDER PAYMENTS AND

7    CREDITS?

8    A.    APPEARS TO BE A CREDIT FROM FRY'S ELECTRONICS.

9    Q.    AND WHAT IS THE POSTING DATE?

10   A.    MAY 21ST.

11   Q.    DOES EXHIBIT 15 INDICATE ANYWHERE WHERE THE TRANSACTION

12   DATE FOR THAT PARTICULAR TRANSACTION, WHAT THAT DATE WOULD

13   BE?

14   A.    YES.

15   Q.    YOU SEE NEXT TO POSTING DATE COLUMN THERE'S A

16   TRANSACTION DATE COLUMN?

17   A.    YES.

18   Q.    AND DOES IT INDICATE THE TRANSACTION DATE FOR THAT

19   TRANSACTION?

20   A.    ON THIS VERY FIRST ONE?

21           MR. AARON:  FOR THE RECORD, YOUR HONOR, COUNSEL IS

22   INDICATING AS HE IS SPEAKING.

23   BY MR. AKROTIRIANAKIS:

24   Q.    I'M INDICATING THE POSTING DATE -- WELL, THERE'S A

25   SERIES IN THE MIDDLE OF THE PAGE OF COLUMN HEADER.  THE FIRST

1    IS POSTING DATE, THE SECOND IS TRANSACTION DATE.  UNDER THE

2    HEADER TRANSACTION DATE, AGENT ARNOLD, IS THERE AN ENTRY FOR

3    THE FIRST TRANSACTION, THE CREDIT FROM FRY'S ELECTRONICS,

4    ANAHEIM, CALIFORNIA?

5    A.    NO.

6    Q.    IS THERE A POSTING DATE HOWEVER?

7    A.    YES.

8    Q.    AND THAT POSTING DATE IS?

9    A.    MAY 21ST.

10   Q.    EXHIBIT 16, WHAT IS THAT RECEIPT?  FROM WHAT VENDOR IS

11   THAT RECEIPT?

12   A.    FRY'S ELECTRONICS.

13   Q.    AND THE SECOND PAGE OF THE DOCUMENT, DOES IT INDICATE

14   WHERE IT IS FROM?

15   A.    YES, FRY'S ELECTRONICS.

16   Q.    NOW, EXHIBIT 17 HAS THREE PARTS TO IT.  THERE'S

17   TWO PAGES AND THEN A REGISTER RECEIPT.  DO YOU SEE THAT?

18   A.    YES.

19   Q.    MY QUESTION FOR YOU, AGENT ARNOLD, I MAY HAVE ASKED

20   THAT.  IS THIS FROM FRY'S ELECTRONICS?

21   A.    YES.

22   Q.    AND DOES THIS INDICATE THE DATE OF THIS RECEIPT, THE

23   ACTUAL TRANSACTION DATE?  I CAN REFER YOU TO THE TOP RIGHT

24   CORNER.

25   A.    YES.  IT IS MAY 19TH, 2001.

1    Q.   EXHIBIT 18, IS THAT A REGISTER RECEIPT FROM PC CLUB, SAN

2    BERNARDINO?

3    A.   YES.

4    Q.   EXHIBIT 19, THAT APPEARS TO BE AN ATM STATEMENT, DOES IT

5    NOT?

6    A.   THAT'S CORRECT.

7    Q.   AND WHAT IS EXHIBIT 20?

8    A.   IT'S A RECEIPT FROM SOFTWARE, ETC.

9    Q.   EXHIBIT 21 IS A LETTER FROM BANK OF AMERICA.  I'M

10   PLACING IT ON THE OVERHEAD DOCUMENT CAMERA.  DOES IT REFER IN

11   ITS CONTENT TO A MORTGAGE TRANSACTION FOR THE SECOND LINE OF

12   THE SECOND PARAGRAPH IN THE BODY OF THE LETTER?

13   A.   YES.

14   Q.   EXHIBIT 22, WHAT IS THAT ITEM?

15   A.   THIS APPEARS TO BE A FLIER FOR A SKATE PARK.

16   Q.   DOES IT INDICATE WHERE THE SKATE PARK IS LOCATED?

17   A.   IN PERRIS, CALIFORNIA.

18   Q.   WHERE IS PERRIS, CALIFORNIA?

19   A.   IT'S -- IT WOULD NOT BE TOO FAR FROM IDYLLWYLD OR

20   MOUNTAIN CENTER, DOWN IN THE VALLEY.

21   Q.   I'M GOING TO SKIP AHEAD TO -- ACTUALLY, I WILL NOT.

22        MR. AKROTIRIANAKIS:  THE REMAINING ITEMS, YOUR

23   HONOR, 23 THROUGH 28, ARE NOT SUSCEPTIBLE TO BEING DISPLAYED

24   ON THE DOCUMENT CAMERA.  WELL, 23 IS, BUT MAY I RETRIEVE THEM

25   IN ANY EVENT FROM THE --

```
 1              THE COURT:  GO AHEAD.

 2              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

 3    BY MR. AKROTIRIANAKIS:

 4    Q.   I'M PLACING EXHIBIT 23 ON THE DOCUMENT CAMERA.  IT'S A

 5    POSTCARD.  IT'S ACTUALLY THREE POSTCARDS.  WHAT DOES IT READ

 6    DOWN HERE IN THE BOTTOM RIGHT-HAND CORNER OF THE FIRST PART

 7    OF EXHIBIT 23 WHERE I'M INDICATING?

 8    A.   IT SAYS TAOS, N.M.

 9    Q.   ARE YOU FAMILIAR WITH N.M.?

10    A.   NEW MEXICO.

11    Q.   AND THE NEXT POSTCARD, DOES THAT LIKEWISE INDICATE TAOS?

12    A.   YES.

13    Q.   AND THE FINAL POSTCARD, DOES IT LIKEWISE INDICATE TAOS,

14    N.M.?

15    A.   YES.

16    Q.   EXHIBIT 24 IS -- I WON'T PLACE ON THE DOCUMENT CAMERA,

17    I'LL JUST HOLD IT UP, WITH THE COURT'S PERMISSION.  A SONY

18    VAIO, V-A-I-O, FOR THE RECORD, LAPTOP COMPUTER.

19              EXHIBIT 25, CAN YOU SEE IT IN MY HAND HERE, AGENT

20    ARNOLD?

21    A.   YES.

22    Q.   DOES IT APPEAR TO BE THE CAMERA CASE YOU PREVIOUSLY

23    TESTIFIED YOU SAW IN EXHIBIT 30, A CLOSE-UP OF THE

24    PHOTOGRAPHED ITEMS ON THE TABLE?

25    A.   YES.
```

1    Q.    THE CAMERA -- FOR THE RECORD, THE CAMERA READS ON THE

2    FRONT:  FINE PICS, 2,400 ZOOM, FUJI FILM, THREE TIMES OPTICAL

3    ZOOM, 2.1 MEGA PIXELS.

4            EXHIBIT 26 I PUT ON THE DOCUMENT CAMERA.  AGENT

5    ARNOLD, DOES THAT APPEAR TO YOU TO BE A CONNECTER CORD FOR A

6    DIGITAL CAMERA?

7    A.    YES.

8    Q.    AND EXHIBIT 27, I'VE PUT IT ON THE OVERHEAD CAMERA.

9    AGENT ARNOLD, DOES THAT APPEAR TO YOU TO BE A DISK FOR A FUJI

10   FILM CARD THAT RECORDS PICTURES FROM INSIDE A DIGITAL CAMERA?

11   A.    YES.

12   Q.    AND FINALLY, EXHIBIT 28 IS NOW ON THE DOCUMENT CAMERA.

13   IS THAT AN ELECTRONIC STORAGE MEDIA DISK?

14   A.    I BELIEVE THAT'S AN ADAPTER.

15   Q.    A DISK ADAPTER?

16   A.    YES, I BELIEVE.

17   Q.    FOR A COMPUTER DISK?

18   A.    STORAGE MEDIA.

19            MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

20            THE COURT:  THANK YOU.

21            CROSS-EXAMINATION.

22                    CROSS-EXAMINATION

23   BY MR. AARON:

24   Q.    GOOD AFTERNOON.

25   A.    GOOD AFTERNOON.

1    Q.    WHEN YOU SAW MR. SANDERS ON MORRIS RANCH ROAD, HE GAVE

2    YOU THE KEYS TO HIS RESIDENCE, RIGHT?

3    A.    I DON'T RECALL.

4    Q.    THE AGENTS WHO EXECUTED THE SEARCH WARRANT AT HIS

5    PROPERTY, THEY DIDN'T HAVE TO BREAK DOWN HIS RESIDENCE DOORS,

6    DID THEY?

7    A.    NO.

8    Q.    IN FACT, YOU WERE AT HIS RESIDENCE?

9    A.    YES.

10   Q.    AND YOU SAW THAT THE DOORS WERE OPEN NORMALLY?

11   A.    YES.

12   Q.    WHEN YOU SAW HIM DRIVING ON MORRIS RANCH ROAD, HE WAS

13   DRIVING NORMALLY, RIGHT?

14   A.    YES.

15   Q.    AND HE STOPPED AS SOON AS THE CAR ACTIVATED ITS OVERHEAD

16   LIGHTS OR SIREN, I FORGET?

17   A.    JUST THE SIREN, YES.

18   Q.    HE PULLED OVER RIGHT AWAY?

19   A.    THAT'S CORRECT.

20   Q.    AND THERE WERE THREE CARS -- AT LEAST THREE CARS THAT

21   ENTERED INTO THAT AREA WHERE THE MAINTENANCE BUILDING WAS?

22   A.    I DON'T RECALL EXACTLY HOW MANY.

23   Q.    AND ONLY ONE OF THEM WAS MARKED?

24   A.    I BELIEVE THAT WE HAD TWO MARKED VEHICLES THERE WITH US

25   THAT DAY.

```
 1   Q.   NOW, YOU DID NOT INTEND ON INTERVIEWING MR. SANDERS,
 2   RIGHT?
 3   A.   NO, THAT'S NOT CORRECT.
 4   Q.   DO YOU RECALL TESTIFYING IN THIS AT A PREVIOUS HEARING
 5   IN THIS MATTER?
 6   A.   YES, I DO.
 7   Q.   DO YOU RECALL TESTIFYING -- DO YOU RECALL ME ASKING
 8   YOU -- MY QUESTION WAS, "YOU WEREN'T GOING TO SAY ANYTHING TO
 9   HIM THAT WAS DESIGNED TO GET HIM TO SAY SOMETHING IN
10   RESPONSE, 'YES' OR 'NO'?"  AND DO YOU RECALL THAT QUESTION
11   BEING ASKED OF YOU?
12   A.   COULD YOU REPEAT THE QUESTION AGAIN?
13         MR. AARON:  MAY I APPROACH, YOUR HONOR?
14         THE COURT:  YOU MAY.
15   BY MR. AARON:
16   Q.   SIR, IF I COULD HAVE YOU LOOK AT THE TRANSCRIPT.  IF YOU
17   COULD LOOK -- PERHAPS YOU SHOULD LOOK AT PAGE 123, LINES 13
18   THROUGH 21.  READ THAT TO YOURSELF, PLEASE.
19   A.   YES.
20   Q.   WERE THOSE QUESTIONS ASKED OF YOU AND DID YOU GIVE THOSE
21   RESPONSES?
22   A.   YES.
23   Q.   AND ISN'T IT TRUE I ASKED YOU, "SO YOU WEREN'T GOING TO
24   SAY ANYTHING TO HIM THAT WOULD BE DESIGNED FOR HIM TO SAY
25   SOMETHING IN RESPONSE"?
```

1    A.    THAT'S CORRECT.

2    Q.    AND YOUR RESPONSE WAS?

3    A.    I WAS JUST EXPLAINING THAT WE WERE GOING TO BE THERE FOR

4    THE SEARCH WARRANT.  WE WERE CONDUCTING A SEARCH WARRANT.

5    Q.    AND THEN MY NEXT QUESTION WAS -- MY QUESTION WAS, "YOU

6    WEREN'T GOING TO SAY ANYTHING TO HIM THAT WAS DESIGNED TO GET

7    HIM TO SAY SOMETHING IN RESPONSE, 'YES' OR 'NO'?"  RIGHT?

8    A.    THAT'S CORRECT.

9    Q.    AND YOUR RESPONSE WAS?

10   A.    "THAT'S CORRECT, I DID NOT PLAN ON ELICITING A COMMENT

11   FROM HIM."

12   Q.    THANK YOU.  WHAT WAS YOUR ASSIGNMENT IN THE EXECUTION OF

13   THE WARRANT?

14   A.    I WAS --

15   Q.    WARRANTS, I'M SORRY.

16   A.    I WAS THE CASE AGENT.

17   Q.    WHAT WERE YOU ASSIGNED TO DO DURING -- I MEANT WHAT WERE

18   YOU ASSIGNED TO DO DURING THE EXECUTION OF THE WARRANTS?

19   A.    WELL, AS CASE AGENT I'M BASICALLY THERE TO MANAGE THE

20   SEARCH WARRANT.  ONE OF THE PRIMARY THINGS I WOULD DO WOULD

21   BE TO INTERVIEW ANY PERSON THAT WE WOULD CONSIDER TO BE A

22   SUSPECT AND, AGAIN, TO MANAGE THE SEARCH WARRANT.

23   Q.    AND WAS THAT YOUR ASSIGNMENT IN THIS CASE, TO INTERVIEW

24   MR. SANDERS?

25   A.    YES.

```
 1    Q.    WERE YOU -- AND WHEN YOU WENT THERE YOU ALREADY PLANNED

 2    TO DETAIN MR. SANDERS?

 3    A.    YES.  WELL, YES.

 4    Q.    SO YOU PLANNED TO DETAIN HIM AND YOU PLANNED TO

 5    INTERVIEW HIM AS WELL?

 6    A.    YES.

 7    Q.    DID YOU EVER TESTIFY THAT HE WASN'T DETAINED?

 8    A.    I DON'T RECALL EXACTLY.

 9    Q.    YOU SAW THE BACKPACK AND YOU TOOK IT OUT OF THE VEHICLE,

10    CORRECT?

11    A.    THAT'S CORRECT.

12    Q.    NOW, AT THE TIME -- AND THAT WAS RIGHT IN THE INITIAL

13    DETENTION -- OR THE ONLY DETENTION OF MR. SANDERS.  AT THE

14    TIME OF THE DETENTION THERE WERE NO PHOTOGRAPHERS AROUND?

15    A.    THAT'S CORRECT.

16    Q.    AND NO ONE TOOK A VEHICLE -- NO ONE JUMPED OUT OF THE

17    VEHICLE, TOOK A PHOTOGRAPH OF IT, AND THEN YOU DETAINED HIM?

18    A.    I DON'T RECALL AT WHAT POINT THE PHOTOGRAPH WAS TAKEN.

19    Q.    IF YOU COULD JUST LISTEN TO MY QUESTION.  WHEN YOU WENT

20    TO DETAIN MR. SANDERS, YOU DON'T RECALL ANYONE JUMPING OUT

21    BEFORE YOU STARTED TO DETAIN HIM AND TAKING A PHOTOGRAPH OF

22    THE VEHICLE?

23    A.    THAT'S CORRECT, I DON'T RECALL THAT.

24    Q.    YOU DON'T RECALL ANY PHOTOGRAPHERS BEING AROUND THERE AT

25    ALL?
```

1    A.    THAT'S CORRECT.

2    Q.    NOW, A DETENTION CAN BE A PRETTY TENSE BUSINESS?

3    A.    IN CERTAIN CIRCUMSTANCES IT CAN BE.

4    Q.    IN THAT CASE YOU HAD ABOUT FIVE LAW ENFORCEMENT

5    OFFICERS?

6    A.    APPROXIMATELY THAT WOULD HAVE BEEN IN THE -- IN THAT

7    CLOSE VICINITY.

8    Q.    AND THEY HAD THEIR WEAPONS DRAWN?

9    A.    I DON'T RECALL IF WE DID OR NOT.

10   Q.    DON'T YOU RECALL TESTIFYING PREVIOUSLY THAT YOU PROBABLY

11   HAD YOUR WEAPONS DRAWN?

12   A.    A PROBABLY, YES.

13   Q.    AND YOU HAD YOUR WEAPON DRAWN?

14   A.    I DON'T RECALL.

15   Q.    NONETHELESS, EVEN IF THERE WAS A PHOTOGRAPHER PRESENT,

16   YOU WOULD HAVE TRIED TO MAKE SURE THAT NOBODY GETS HURT,

17   RIGHT?

18   A.    CORRECT.

19   Q.    AND YOUR FIRST PURPOSE WAS TO DETAIN MR. SANDERS AND

20   THEN TO LOOK AT EVIDENCE, RIGHT?

21   A.    YES.

22   Q.    AND RIGHT AFTER -- AND RIGHT AFTER MR. SANDERS WAS

23   DETAINED -- I'M SORRY.

24          DO YOU RECALL --

25          MR. AARON:  MAY I APPROACH AGAIN, YOUR HONOR?

1           THE COURT:  YOU MAY.

2    BY MR. AARON:

3    Q.    SIR, IF YOU COULD, PLEASE, READ ON PAGE 146 OF THE

4    TRANSCRIPT FROM LINE 8 TO 19.  READ IT TO YOURSELF AND LET US

5    KNOW WHEN YOU'RE DONE.

6    A.    OKAY.

7    Q.    THANK YOU.  DOES THAT REFRESH YOUR RECOLLECTION OF YOUR

8    PRIOR TESTIMONY?

9    A.    YES.

10   Q.    AND I DID, IN FACT, ASK YOU WHETHER OR NOT THE OFFICERS

11   HAD THEIR WEAPONS DRAWN?

12   A.    YES.

13   Q.    AND YOU SAID "PROBABLY"?

14   A.    THAT'S CORRECT.  I SAID, "PROBABLY."

15   Q.    AND I ASKED IF YOU HAD YOUR WEAPON DRAWN?

16           MR. AKROTIRIANAKIS:  I'M GOING TO OBJECT, YOUR

17   HONOR.  IT IS NOT AN INCONSISTENT STATEMENT.  IT'S IMPROPER

18   IMPEACHMENT.

19           THE COURT:  THE OBJECTION IS SUSTAINED.

20   BY MR. AARON:

21   Q.    WHEN YOU DETAINED MR. SANDERS, YOU TOOK THE BACKPACK AND

22   PUT IT IN YOUR TRUCK, CORRECT?

23   A.    ULTIMATELY, YES.

24   Q.    DO YOU HAVE A COPY OF YOUR ROI UP THERE?

25   A.    I DON'T BELIEVE SO, NO.

1    Q.   DO YOU REMEMBER WRITING IN YOUR ROI --

2              MR. AKROTIRIANAKIS:  OBJECTION, IT'S HEARSAY.

3              THE COURT:  WAIT UNTIL THE QUESTION IS FINISHED.

4    BY MR. AARON:

5    Q.   DO YOU REMEMBER WRITING IN YOUR ROI ABOUT THE REMOVAL OF

6    THE BACKPACK?

7    A.   YES.

8              MR. AARON:  MAY I APPROACH TO REFRESH RECOLLECTION?

9              THE COURT:  YES, YOU MAY.

10             AND THEN I WOULD LIKE TO SEE COUNSEL AT THE

11   SIDEBAR.

12   BY MR. AARON:

13   Q.   IF YOU COULD READ TO YOURSELF PARAGRAPHS 5 AND 6 FROM

14   THE TOP AND LET US KNOW WHEN YOU'RE DONE.

15   A.   1, 2, 3, 4 -- 5 AND 6?

16   Q.   PLEASE.

17             THE COURT:  WHILE HE'S DOING THAT, CAN I SEE

18   COUNSEL AT THE SIDEBAR, PLEASE?

19             MR. AARON:  YES.

20             (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

21             THE COURT:  MR. AARON, IF WHAT YOU ARE ABOUT TO DO

22   OR TO CONTINUE DOING IS TO ATTACK THE WITNESS' CREDIBILITY

23   WITH INCONSISTENT STATEMENTS, THAT'S PERMISSIBLE, BUT WHAT IS

24   NOT PERMISSIBLE, AND I'M NOT SURE THAT THIS IS WHERE YOU'RE

25   GOING, I'M JUST TRYING TO AVOID A PROBLEM IF THERE IS GOING

```
 1    TO BE ONE, IS TO GET INTO WHETHER OR NOT THERE ARE ANY

 2    PROBLEMS WITH THE DETENTION OF THE SEARCH.

 3              MR. AARON:  NO.

 4              THE COURT:  ALL RIGHT.  NO, THAT'S NOT WHERE YOU'RE

 5    GOING?

 6              MR. AARON:  NO.

 7              THE COURT:  YOU'RE JUST ASKING ABOUT PRIOR

 8    INCONSISTENT STATEMENTS TO ATTACK HIS CREDIBILITY, THE ISSUES

 9    ABOUT THE SEARCH AND THE SEIZURE?

10              MR. AARON:  YES.

11              THE COURT:  THAT'S CONSISTENT.  THAT'S MY

12    UNDERSTANDING.  I JUST WANTED TO MAKE SURE.

13              MR. AARON:  NO, NO, I'M ASKING SOME FOUNDATION

14    QUESTIONS.  I'M NOT GOING THERE.

15              THE COURT:  ALL RIGHT.  THANK YOU.

16         (ON-THE-RECORD DISCUSSION AT SIDEBAR CONCLUDED.)

17              THE COURT:  I'M SORRY, LADIES AND GENTLEMEN.  I

18    DIDN'T REALIZE WHAT TIME IT WAS.  WE COULD HAVE TAKEN A

19    RECESS.  I APOLOGIZE.  YOU WERE SAVED BY ONE OF THE COUNSEL

20    POINTING ME TOWARDS THE CLOCK, AND I WON'T TELL YOU WHICH

21    ONE.  WE WILL BE IN RECESS UNTIL 2:45.

22              WE MAY BE AT THAT POINT IN THE TRIAL THAT I THINK

23    IS SORT OF -- AND I'LL MAKE A LITTLE CONFESSION HERE.  IT'S

24    SORT OF LIKE THE WAY I AM WHEN I GET ON AN AIRPLANE AND THE

25    FLIGHT ATTENDANT STARTS TO TELL ME HOW TO BUCKLE MY SEAT BELT
```

```
 1   WHICH IS WHEN I OPEN MY BOOK AND STOP PAYING ATTENTION
 2   BECAUSE I'VE HEARD IT SO MANY TIMES.  SO THAT'S PROBABLY NOT
 3   VERY GOOD CITIZENSHIP ON MY PART BECAUSE THOSE SAFETY
 4   WARNINGS ARE IMPORTANT.  AND MY POINT IS THAT I HOPE THAT
 5   THIS IS NOT -- YOU'RE NOT STARTING TO TUNE OUT MY ADMONITIONS
 6   THAT I GIVE YOU AT ALL THE BREAKS BECAUSE NOW YOU'VE HEARD
 7   THEM QUITE A FEW TIMES.  SO DON'T FOLLOW MY EXAMPLE BECAUSE
 8   THEY ARE REALLY IMPORTANT EVEN THOUGH YOU HAVE NOW HEARD THEM
 9   SEVERAL TIMES.  THEY ARE AS IMPORTANT, IF NOT MORE IMPORTANT,
10   THE LONGER THE TRIAL GOES, THAT AGAIN, THAT YOU DON'T DISCUSS
11   THE CASE.
12           DON'T MAKE UP YOUR MINDS ABOUT IT.  THE MORE
13   EVIDENCE YOU HEAR THE MORE TEMPTING TO THINK YOU'VE HEARD
14   ENOUGH, BUT THAT'S NOT THE CASE, NOT UNTIL YOU'VE HEARD
15   EVERYTHING.  SO DON'T DISCUSS THE CASE, DON'T DISCUSS ANY OF
16   THE EVIDENCE, DON'T DISCUSS ANYONE INVOLVED IN THE CASE, AND
17   DON'T MAKE UP YOUR MINDS ABOUT THE CASE AT ALL.
18           THANK YOU VERY MUCH, LADIES AND GENTLEMEN.  WE'RE
19   IN RECESS.
20           (THE JURY HAS NOW EXITED THE COURTROOM.)
21           THE COURT:  YOU MAY STEP DOWN.
22           WE'RE ON THE RECORD OUTSIDE THE PRESENCE OF THE
23   JURY.
24           COUNSEL, AT THE LUNCH HOUR OR THE 45 MINUTES OR
25   WHATEVER WE HAD, MY LAW CLERKS COLLECTED THE JURY NOTEBOOKS
```

1    TO PUT IN THE LATEST SPECIAL INSTRUCTION AND WE DISCOVERED

2    THAT TWO OF THE SPECIAL INSTRUCTIONS THAT WERE GIVEN TO THE

3    JURY DURING THE LAST TRIAL WERE TUCKED IN THERE STILL, SO WE

4    REMOVED THEM, BUT I FEEL IT IS MY DUTY TO TELL YOU THAT THEY

5    WERE THERE.  ONE OF THEM IS ONE THAT WE ARE PROBABLY GOING TO

6    GIVE AGAIN.  WE HAVEN'T GIVEN IT YET, BUT WE WILL GIVE IT

7    AGAIN OR SOME VERY SIMILAR VERSION OF IT.  IT'S THE LIMITING

8    INSTRUCTION ON 404(B) EVIDENCE ABOUT CO-CONSPIRATOR EVIDENCE

9    THAT READS:  YOU WILL HEAR EVIDENCE THAT DEFENDANT OR

10   DEFENDANT'S ALLEGED CO-CONSPIRATORS MADE STATEMENTS ABOUT

11   THEIR INTEREST, INCLUDING THEIR INTEREST IN YOUNG BOYS OTHER

12   THAN THE ALLEGED VICTIM IDENTIFIED IN THE INDICTMENT.  THESE

13   INCLUDE ACTUAL INTENDED OR DESIRED SEXUAL INTERESTS IN YOUNG

14   BOYS AND SEX ACTS WITH THESE OTHER YOUNG BOYS.  AND YOU MAY

15   CONSIDER THAT EVIDENCE ONLY AS IT BEARS ON THE DEFENDANT'S

16   MOTIVE, OPPORTUNITY, INTENT, KNOWLEDGE, PREPARATION, PLAN,

17   IDENTITY -- PLAN, IDENTITY, ABSENCE OF MISTAKE OR ACCIDENT,

18   AND FOR NO OTHER PURPOSE.  THAT'S ALL FOUR COUNTS CHARGED IN

19   THE INDICTMENT.

20           AND THE SECOND PARAGRAPH READS:  YOU MAY ALSO

21   CONSIDER THAT EVIDENCE AS IT BEARS ON DEFENDANT'S

22   CO-CONSPIRATOR'S MOTIVE, OPPORTUNITY, PREPARATION, ET CETERA,

23   AND FOR NO OTHER PURPOSE, ONLY AS TO THE CONSPIRACY COUNT

24   CHARGED IN COUNT 1.  WE WILL PROBABLY BE GIVING THAT OR A

25   SIMILAR VERSION.

1          MR. MICHAEL:  THE GOVERNMENT PROPOSED AN

2     INSTRUCTION ON THOSE TOPICS AND GAVE IT TO DEFENSE COUNSEL.

3     COULDN'T FIND THE COPY THAT YOUR HONOR ACTUALLY READ.  COULD

4     I REQUEST A COPY OF THAT INSTRUCTION SO WE CAN MAKE SURE THAT

5     OURS IS CONFORMED TO THAT?

6          THE COURT:  CERTAINLY.  WE HAVE THE ONES WE JUST

7     REMOVED FROM THE JURY NOTEBOOKS.  I WILL HAVE ONE FOR BOTH

8     SIDES.

9          NOW, THE OTHER ONE THAT WAS IN THERE, KEEP IN MIND

10    THE JURORS ONLY HAVE THESE NOTEBOOKS IN THE COURTROOM SO THEY

11    HAVEN'T HAD THEM BACK IN THE JURY ROOM.  AND THEY ALSO HAVE

12    WITH THEM -- WELL, LET ME JUST READ YOU THE OTHER

13    INSTRUCTION.  IT WAS A CURATIVE INSTRUCTION FROM LAST TIME

14    THAT SAID:  YOU HEARD TESTIMONY FROM AGENT ARNOLD THAT THE

15    DEFENDANT SAID TO HIM THAT HE WISHED TO INVOKE HIS

16    CONSTITUTIONAL RIGHT TO HAVE AN ATTORNEY PRESENT.  YOU MUST

17    DISREGARD THAT TESTIMONY AND NOT CONSIDER IT.  THIS ONE WAS

18    IN THERE, TOO.  THIS IS MORE OF A PROBLEM.  AND THIS IS WHY I

19    WANTED TO BRING IT TO YOUR ATTENTION.

20          NOW, I DON'T THINK IT'S A SERIOUS PROBLEM FOR THE

21    FOLLOWING REASONS, BUT I DID WANT TO BRING IT TO YOUR

22    ATTENTION:  AS I STARTED TO SAY A MOMENT AGO, THE JURY DOES

23    NOT HAVE THOSE NOTEBOOKS IN THE JURY ROOM.  THEY'VE ONLY HAD

24    THEM IN THE COURTROOM.  I FIND IT A LITTLE UNLIKELY THAT

25    THEY'VE ACTUALLY READ THIS, BECAUSE IT WASN'T IN THERE BY

1    ITSELF.  IT WAS BEHIND ALL OF THE OTHER PRELIMINARY

2    INSTRUCTIONS I READ TO THEM, BUT IT'S POSSIBLE THAT ONE OR

3    MORE OF THEM MAY HAVE READ IT.  BUT THEY WOULD HAVE TO READ

4    IT HERE WHILE THEY'RE IN THE COURTROOM WHILE TESTIMONY IS

5    BEING GIVEN, AND I HAVEN'T REALLY OBSERVED ANY OF THEM DOING

6    THAT.

7          NOW, I CAN ASK EACH OF THEM INDIVIDUALLY IF ANY OF

8    THEM NOTICED AN INSTRUCTION ABOUT AGENT ARNOLD'S TESTIMONY,

9    IF YOU WOULD LIKE ME TO.  THAT MIGHT CALL MORE ATTENTION TO

10   IT, BUT I CAN CERTAINLY DO THAT.

11         MR. AARON:  I THINK PERHAPS IF I MIGHT MAKE A

12   SUGGESTION.  I THINK AT THE END OF THE DAY THE CLERK COULD

13   TAKE THE JURORS OUT, THEY COULD JUST COME IN ONE AFTER THE

14   ANOTHER, AND THE COURT COULD JUST SAY:  HAVE YOU READ -- SOME

15   SORT OF -- HOWEVER THE COURT WANTS TO STYLE IT.

16         THE COURT:  THERE WAS A MISTAKE.

17         MR. AARON:  THERE WAS A MISTAKE.  DID YOU READ ANY

18   INSTRUCTION ABOUT AGENT ARNOLD'S TESTIMONY.  AND IF THEY SAY

19   NO, JUST EXCUSE THEM.  IF THEY SAY YES, FURTHER INQUIRY.

20         MR. MICHAEL:  YOUR HONOR, PERHAPS IT WOULD BE

21   QUICKER TO INQUIRE OF ALL THE JURORS, HAVE THEM RAISE THEIR

22   HANDS, AND ONLY INQUIRE OF THOSE WHO RAISE THEIR HANDS.

23         MR. AARON:  I THINK THEY MIGHT BE INTIMIDATED

24   BECAUSE THEY MAY THINK THAT THEY'VE DONE SOMETHING WRONG.

25         THE COURT:  I'LL DO IT ONE BY ONE.

1          MR. MICHAEL:  I WILL RESCIND THAT REQUEST.

2          THE COURT:  THE ONLY PROBLEM IS, I HAVE A MEETING

3   WITH MY COLLEAGUES IN LOS ANGELES THAT I HAVE TO DO VIA VIDEO

4   CONFERENCE, AND IT'S AT 4:30 AND I'M THE CHAIR OF THAT

5   COMMITTEE.  SO I HAVE TO -- WE HAVE TO BREAK ABOUT 4:15 TO DO

6   THIS, SO WE'LL BREAK A LITTLE BIT EARLY THIS AFTERNOON.

7          MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WAS GOING

8   TO REQUEST TO BREAK A LITTLE EARLY SO WE CAN MEET WITH

9   MR. MARTIN'S ATTORNEY BECAUSE WE HAVE AN AGREEMENT IN

10  PRINCIPLE THAT WE HAVE RESOLVED, BUT IT WOULD ENABLE US TO DO

11  THAT.  I DON'T KNOW IF YOUR HONOR WANTS TO BREAK A LITTLE

12  EARLIER TO INQUIRE OF THE JURORS, PERHAPS AT 4, SO WE CAN

13  HAVE AN OPPORTUNITY TO MEET WITH MR. MARTIN.

14         THE COURT:  YOU DON'T THINK IT'S NECESSARY TO --

15         MR. AKROTIRIANAKIS:  MAYBE ONLY ONE OF US NEEDS TO

16  BE HERE WHILE THE COURT INQUIRES OF THE JURORS.  I'D OFFER

17  THAT.

18         THE COURT:  WELL, ACTUALLY, WITH 14 JURORS, I'LL

19  PROBABLY NEED TO BREAK AT 4.  I'M NOT GOING TO BE ABLE TO DO

20  THAT IN 15 MINUTES.

21         ALL RIGHT.  WE ARE IN RECESS.

22                    (RECESS)

23         THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

24  ALL MEMBERS OF THE JURY, COUNSEL FOR BOTH PARTIES, THE

25  DEFENDANT PRESENT, THE WITNESS ON THE WITNESS STAND.

1          YOU MAY RESUME YOUR EXAMINATION.

2     BY MR. AARON:

3     Q.    AFTER MR. SANDERS WAS DETAINED HE WAS TAKEN TO MASSEY

4     HALL, RIGHT?

5     A.    THAT'S CORRECT.

6     Q.    AND HE WAS DRIVEN BY INVESTIGATOR DUFFY OF THE RIVERSIDE

7     SHERIFF'S?

8     A.    YES.

9     Q.    NOT BY YOU?

10    A.    NO.

11    Q.    AND HE DIDN'T DRIVE HIMSELF IN HIS VEHICLE, RIGHT?

12    A.    THAT'S CORRECT.

13    Q.    HE WENT IN INVESTIGATOR DUFFY'S VEHICLE?

14    A.    I'M NOT EXACTLY SURE HOW HE GOT THERE.

15    Q.    HE DIDN'T TAKE HIM?  HE DIDN'T TAKE MR. SANDERS IN

16    MR. SANDERS' VEHICLE?

17    A.    PARDON ME?

18    Q.    HE DID NOT TAKE MR. SANDERS TO MASSEY HALL IN

19    MR. SANDERS' VEHICLE?

20    A.    I DID NOT TAKE MR. SANDERS THERE, SO I CAN'T TESTIFY TO

21    EXACTLY HOW HE GOT THERE BECAUSE I DON'T --

22    Q.    I'M SORRY --

23    A.    -- KNOW EXACTLY HOW HE GOT THERE.

24    Q.    SORRY TO INTERRUPT YOU.  MY QUESTION WAS HE,

25    INVESTIGATOR DUFFY, DID NOT TAKE MR. SANDERS TO MASSEY HALL

1    IN MR. SANDERS' VEHICLE, HE TOOK HIM IN A DIFFERENT VEHICLE?

2              MR. AKROTIRIANAKIS:  OBJECTION, FOUNDATION.

3              THE COURT:  SUSTAINED.

4              MR. AARON:  MAY I APPROACH, YOUR HONOR?

5              THE COURT:  YOU MAY.

6    BY MR. AARON:

7    Q.   IF YOU COULD READ TO YOURSELF ON PAGE 147, LINES 21 TO

8    25, AND PAGE 148, LINES 1 THROUGH 6.  READ THAT TO YOURSELF,

9    PLEASE, AND LET US KNOW WHEN YOU'RE DONE.

10   A.   THROUGH 9?

11   Q.   ACTUALLY, I MEANT THROUGH 6, BUT 9 IS FINE.  THANK YOU.

12              ISN'T IT TRUE THAT THE --

13              MR. AKROTIRIANAKIS:  I'M GOING TO OBJECT.  IT'S

14   IMPROPER IMPEACHMENT, YOUR HONOR.

15              THE COURT:  I HAVEN'T SEEN IT.  THE CLERK WENT TO

16   RETRIEVE MY COPY, SO COULD YOU APPROACH?

17              MR. AARON:  CERTAINLY.

18              THE COURT:  NOT NECESSARY.  SHE'S HERE WITH IT

19   NOW.

20              MR. AARON:  PAGE 147, LINES 21 THROUGH 25, AND

21   PAGE 148, LINES 1 THROUGH 6.

22              THE COURT:  THANK YOU.

23              THE OBJECTION IS SUSTAINED.

24   BY MR. AARON:

25   Q.   BEFORE YOU TOOK MR. SANDERS FROM THE MORRIS RANCH ROAD

1    YOU HAD SECURED HIS BACKPACK, RIGHT?

2    A.   YES.

3    Q.   YOU HAD TAKEN THE BACKPACK OUT OF HIS VEHICLE AND PUT IT

4    IN YOUR VEHICLE, RIGHT?

5    A.   I BELIEVE SO, YES.

6    Q.   AND YOU'VE HAD A CHANCE TO READ YOUR REPORT OF INCIDENT?

7    A.   YES.

8    Q.   REPORT OF INVESTIGATION, I'M SORRY.

9         AND DOES THAT REFRESH YOUR RECOLLECTION AS TO WHAT

10   YOU DID?

11   A.   YES.

12   Q.   AND THAT IS WHAT YOU DID, RIGHT?

13   A.   YES, I BELIEVE SO, YES.

14   Q.   NOW, WHEN YOU TOOK THE BACKPACK OUT AND PUT IT IN YOUR

15   VEHICLE, YOU ALREADY WANTED TO SECURE IT, RIGHT?

16   A.   YES.

17   Q.   YOU WERE PLANNING TO PUT IT IN A LOCKED FACILITY?

18   A.   YES.

19   Q.   AND GET A SEARCH WARRANT TO OPEN IT?

20   A.   YES.

21   Q.   AND YOU DIDN'T WANT ANYONE TO TAMPER WITH IT?

22   A.   THAT'S CORRECT.

23   Q.   AND THAT'S WHY YOU TOOK IT AND PUT IT IN YOUR VEHICLE,

24   RIGHT?

25   A.   YES.

1    Q.    AND, IN FACT, ONCE YOU TOOK THE BACKPACK OUT OF

2    MR. SANDERS' VEHICLE YOU STARTED WRITING A 6051, RIGHT?

3    A.    NO.  I MEAN, IT WOULDN'T HAVE BEEN NECESSARILY RIGHT AT

4    THAT POINT, BUT ULTIMATELY ONE WAS WRITTEN, YES.

5    Q.    WELL, YOU INITIATED THE 6051, RIGHT?

6    A.    YES.

7    Q.    MEANING THAT BACKPACK WAS IN YOUR CUSTODY BECAUSE 6051

8    IS A RECEIPT FOR SEIZED EVIDENCE?

9    A.    CORRECT.

10   Q.    AND YOU WOULDN'T HAVE GIVEN IT BACK TO THE DEFENDANT AT

11   THAT POINT, RIGHT?

12   A.    NO.

13   Q.    AND AT THAT POINT YOU HAD A RESPONSIBILITY TO MAKE SURE

14   THAT IT WAS KEPT SECURELY, CORRECT?

15   A.    THAT'S CORRECT.

16   Q.    AGAIN, YOU WOULDN'T HAVE ALLOWED ANYONE ELSE TO TAKE THE

17   BACKPACK AND GIVE IT BACK TO MR. SANDERS?

18   A.    NO.

19   Q.    NOW, LET ME SHOW YOU AGAIN --

20            MR. AARON:  I BELIEVE THIS HAS BEEN INTRODUCED INTO

21   EVIDENCE, YOUR HONOR, AS EXHIBIT NO. 32, THE PHOTOGRAPH OF

22   THE BACKPACK IN THE VEHICLE.

23            THE COURT:  I THINK THAT IS 32.

24   BY MR. AARON:

25   Q.    CAN YOU SEE THAT?

1    A.    YES.

2    Q.    NOW, THAT APPEARS TO BE THE BACKPACK INSIDE THE VEHICLE,

3    RIGHT?

4    A.    YES.

5    Q.    CAN YOU EXPLAIN HOW IF THERE WERE NO PHOTOGRAPHERS WHEN

6    YOU DETAINED MR. SANDERS AND NO PHOTOGRAPHERS WHEN YOU TOOK

7    THE BACKPACK OUT AND PUT IT IN YOUR VEHICLE AND YOU WOULD

8    NOT HAVE -- YOU WOULD HAVE NOT GIVEN IT BACK TO MR. SANDERS

9    OR ALLOWED ANYONE TO PUT THE BACKPACK IN THERE, CAN YOU

10   EXPLAIN WHO PUT THE BACKPACK BACK IN MR. SANDERS' VEHICLE?

11   A.    IT COULD HAVE BEEN ME OR PERRY JOHNSON WHO I BELIEVE

12   TOOK THE PHOTOGRAPHS.  I DON'T RECALL EXACTLY WHO.

13   Q.    YOU BELIEVE THAT YOU MIGHT HAVE PUT THE BACKPACK BACK IN

14   HIS TRUCK?

15   A.    IT'S A POSSIBILITY.  I DON'T RECALL.  I HAVE NO EXACT

16   RECOLLECTION OF WHO PUT IT THERE.

17   Q.    AND YOU DON'T KNOW HOW THIS PICTURE WAS TAKEN?

18   A.    I'M NOT SURE I UNDERSTAND THE QUESTION.

19   Q.    DO YOU KNOW WHO TOOK THE PICTURE?

20   A.    I BELIEVE PERRY JOHNSON TOOK THAT PICTURE.

21   Q.    DO YOU KNOW WHEN HE TOOK IT?

22   A.    AT SOME POINT DURING THE DAY.

23   Q.    AND HOW IS IT THAT YOU KNOW THAT HE TOOK IT?

24   A.    WELL, I SAID I BELIEVE THAT HE TOOK IT.  I'M NOT

25   100 PERCENT SURE, BUT I BELIEVE THAT PERRY JOHNSON HAD TAKEN

1    SEVERAL OF THE PICTURES THAT DAY.

2    Q.   ARE YOU JUST ASSUMING?  IS THAT JUST SPECULATION ON YOUR

3    PART?

4    A.   NO, IT'S NOT SPECULATION, IT'S SAYING I BELIEVE THAT HE

5    TOOK IT.  I JUST COULDN'T SAY 100 PERCENT FOR SURE.

6    Q.   DO YOU KNOW WHAT BUILDING IS THERE IN THE BACKGROUND?

7    A.   NOT FOR SURE.

8    Q.   SO YOU MAY HAVE DONE OTHER THINGS WITH THE BACKPACK ONCE

9    YOU HAD SECURED IT IN YOUR VEHICLE, RIGHT?

10   A.   PARDON ME?

11   Q.   YOU MAY HAVE DONE OTHER THINGS WITH THE BACKPACK ONCE

12   YOU SECURED IT IN YOUR VEHICLE?

13   A.   BY DOING OTHER THINGS YOU MEAN?

14   Q.   YOU TESTIFIED JUST A FEW MOMENTS AGO THAT YOU MAY HAVE

15   PUT THE BACKPACK BACK IN MR. SANDERS' TRUCK?

16   A.   YES, TO TAKE A PHOTOGRAPH TO SHOW A GENERAL

17   REPRESENTATION OF HOW IT WAS WHEN WE FOUND IT, YES.

18   Q.   BUT YOU DON'T HAVE ANY MEMORY OF DOING THAT?

19   A.   SPECIFICALLY WHO DID THAT, NO.  I DON'T RECALL IF I DID

20   THAT OR IF I ALLOWED PERRY JOHNSON TO DO THAT OR ONE OF THE

21   AGENTS WOULD HAVE DONE THAT.

22   Q.   NOW, YOU NEVER MIRANDIZED MR. SANDERS?

23   A.   THAT'S CORRECT.

24   Q.   YOU ARRIVED THERE AT 9:00 IN THE MORNING?

25   A.   APPROXIMATELY.

1    Q.    AND YOU SPOKE TO HIM SHORTLY THEREAFTER?

2    A.    YES.

3    Q.    AND YOU DID NOT MIRANDIZE HIM THEN?

4    A.    THAT'S CORRECT.

5    Q.    AND YOU DIDN'T MIRANDIZE HIM AT 10, 11, 12 OR 1:00?

6    A.    NO, SIR.

7    Q.    AND YOU WERE THERE A TOTAL OF ABOUT SIX HOURS?

8    A.    YES, I BELIEVE SO.

9    Q.    AND IN THAT ENTIRE TIME YOU NEVER MIRANDIZED HIM?

10   A.    THAT'S CORRECT.

11   Q.    NOW, MIRANDA RIGHTS ARE PRETTY IMPORTANT?

12   A.    YES.

13   Q.    IT'S SOMETHING THAT YOU WOULDN'T FORGET DOING?

14         MR. AKROTIRIANAKIS:  I'M GOING TO OBJECT THAT IT'S

15   IMPROPER CROSS-EXAMINATION.

16         THE COURT:  MOVE ON TO ANOTHER SUBJECT, MR. AARON.

17         MR. AARON:  YOUR HONOR, THIS IS MY LAST AREA, IF I

18   MIGHT APPROACH.

19         THE COURT:  YES, YOU MAY.

20         (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

21         MR. AARON:  I'M SHOWING -- YOUR HONOR, I'M SHOWING

22   THE COURT WHAT WILL BE MARKED EXHIBIT NO. 206.  THIS IS A

23   SEARCH WARRANT AFFIDAVIT THAT THIS WITNESS SIGNED WHERE HE

24   SAYS HE READ MR. SANDERS HIS MIRANDA RIGHTS.  I'M NOT GOING

25   TO RELITIGATE THIS ISSUE.  I'M JUST GOING TO IMPEACH HIM.

1          THE COURT:  WELL, ALL RIGHT THEN.  I THINK THAT THE

2     JURY SHOULD RECEIVE A LIMITING INSTRUCTION THAT THEY ARE TO

3     CONSIDER THIS ONLY FOR THE PURPOSE IT IS BEING OFFERED FOR,

4     THE PURPOSE OF IMPEACHING THE WITNESS' CREDIBILITY, BECAUSE

5     THERE'S NOTHING -- NO STATEMENTS OF THE DEFENDANT THAT IT'S

6     ALREADY BEEN LITIGATED.  AND, IN FACT, THE COURT HAS ALREADY

7     EXCLUDED ONE STATEMENT.

8          MR. AARON:  I'M NOT GETTING TO ANY STATEMENTS.

9          THE COURT:  I UNDERSTAND THAT.  I DON'T THINK THE

10    JURY SHOULD BE LEFT WITH THE IMPRESSION THAT THIS IS BEING

11    ASKED FOR ANYTHING OTHER THAN THE PURPOSE THAT -- IT'S TO GO

12    TO HIS CREDIBILITY, RIGHT?

13         MR. AARON:  YES.

14         THE COURT:  BUT IT'S NOT -- THE ISSUE OF WHETHER

15    THE MIRANDA RIGHTS WERE OR WERE NOT GIVEN IS NOT BEFORE THE

16    JURY, AND THAT'S --

17         MR. AARON:  WELL, YES, IT'S PROPERLY GOING TO

18    IMPEACHMENT.  I DON'T HAVE AN OBJECTION TO AN INSTRUCTION IF

19    THE COURT WANTS TO GIVE ONE.  I DON'T HAVE AN OBJECTION IF

20    THE COURT WANTS TO GIVE ONE, THAT IT'S LIMITED TO HIS

21    CREDIBILITY AS A WITNESS.  THE ONLY THING I WOULD PROPOSE IS

22    WOULD IT BE POSSIBLE TO DISCUSS THIS LATER, PARTICULARLY THE

23    INSTRUCTION, AFTER I FINISH MY EXAMINATION?

24         THE COURT:  OH, YES.  I MEAN, YOU CAN ELICIT THE

25    TESTIMONY, BECAUSE I'M NOT TRYING TO CUE THE WITNESS.  I

1  UNDERSTAND THAT CONCERN, BUT I'M NOT -- I WILL SAY YOU ARE TO

2  CONSIDER THAT ONLY AS TO CREDIBILITY, BUT I ALSO AM GOING TO

3  INSTRUCT THEM THAT THE ISSUE OF WHETHER OR NOT --

4        MR. MICHAEL:  WHETHER OR NOT MIRANDA WAS GIVEN

5  NECESSARILY IS NOT A MATTER FOR THE JURORS' CONSIDERATION.

6        MR. AKROTIRIANAKIS:  THAT IT WAS AN ILLEGALLY

7  OBTAINED STATEMENT OR SOMETHING LIKE THAT.

8        MR. AARON:  I'M WONDERING IF THEY THINK -- I

9  UNDERSTAND WHAT THE COURT IS SAYING AND I THINK THAT THE

10 EVIDENCE THAT YOU'VE JUST HEARD YOU ARE TO CONSIDER SOLELY

11 FOR THE PURPOSES OF ASSESSING THIS WITNESS' CREDIBILITY.

12       THE COURT:  RIGHT, PERIOD.  AND THEN TO SAY -- I

13 THINK I WOULD INSTRUCT THE JURY THAT ANY ISSUES RELATING TO

14 WHETHER OR NOT THE OFFICER --

15       MR. AARON:  THE COURT COULD JUST SAY -- I'M SORRY

16 TO INTERRUPT -- THE ISSUE ABOUT THE ADMISSIBILITY OF

17 STATEMENTS HAS ALREADY BEEN DECIDED.

18       THE COURT:  I THINK THE JURY NEEDS TO KNOW IT IS

19 NOT FOR THEM TO CONSIDER WHETHER -- A LITTLE MORE STRONGLY

20 THAT THEY ARE NOT TO CONSIDER WHETHER -- HOW MIRANDA RIGHTS

21 ARE TO BE GIVEN, THE COURT DECIDES THAT.

22       MR. AARON:  RIGHT.  BUT THE FACT THAT HE DIDN'T

23 GIVE THEM AND THEN LATER SAID THAT HE DID --

24       THE COURT:  IT'S CREDIBILITY, THAT'S THE ISSUE.

25 MAYBE I SHOULD SAY THAT AS WELL.

1          MR. AARON:  AND THEY CAN CONSIDER THE FACT THAT HE

2    DIDN'T GIVE IT FOR SIX HOURS.

3          THE COURT:  NO, BECAUSE MAYBE HE DIDN'T NEED TO.

4    THAT'S GETTING INTO DECIDING WHAT IS RELEVANT.  AND WHAT

5    YOU'RE ENTITLED TO IMPEACH UPON IS THAT HE SAID ONE THING AT

6    ONE TIME AND HE SAID ANOTHER THING AT ANOTHER.  THAT'S WHAT

7    THEY'RE TO CONSIDER.

8          MR. AARON:  RIGHT.

9          MR. AKROTIRIANAKIS:  YOUR HONOR, JUST SO WE DON'T

10   HAVE TO COME BACK UP HERE AGAIN, I THINK IT'S ONLY FAIR THAT

11   THE GOVERNMENT GETS TO ASK ON REDIRECT WHETHER HIS

12   UNDERSTANDING WAS AT THE TIME THAT HE DIDN'T GIVE THE MIRANDA

13   RIGHTS THAT THEY WERE NOT LEGALLY REQUIRED OR SOMETHING.

14         THE COURT:  NO, I DON'T THINK SO.

15         MR. AKROTIRIANAKIS:  BECAUSE THEN HE'S HAVING IT

16   BOTH WAYS.  HE'S SAYING THAT HE WANTS TO LEAVE -- WELL, HE

17   WANTS TO LEAVE THEM WITH THE IMPRESSION PERHAPS THAT HE'S A

18   BAD COP BECAUSE HE DIDN'T GIVE THE MIRANDA.

19         THE COURT:  THAT'S NOT THE ISSUE.  THAT'S WHY I'M

20   GOING TO INSTRUCT THE JURY THAT'S NOT WHAT'S BEING ASKED AND

21   THAT'S NOT WHAT THEY ARE TO CONSIDER.  HE SAID THEY WERE

22   NEVER GIVEN, PERIOD.  SO YOU CAN'T ASK ABOUT SHOULD THEY HAVE

23   BEEN, BECAUSE THAT'S NOT THE ISSUE.

24         MR. AARON:  THAT'S RIGHT.

25         THE COURT:  HE WAS UNEQUIVOCAL.  HE SAID THEY WERE

1    NOT GIVEN.

2            MR. AKROTIRIANAKIS:  THE ISSUE ABOUT WHETHER HE

3    GAVE MIRANDA OR NOT DOES NOT AFFECT HIS CREDIBILITY IN ANY

4    WAY.

5            THE COURT:  IT'S THAT HE SAID HE DID GIVE THEM AND

6    THEN HE SAID HE DID NOT GIVE THEM.  THAT AFFECTS HIS

7    CREDIBILITY.

8            MR. AKROTIRIANAKIS:  CAN I SEE THAT BEFORE YOU SHOW

9    HIM?

10           MR. AARON:  I HAVE A COPY FOR YOUR HONOR.

11           THE COURT:  ALL RIGHT.

12        (ON-THE-RECORD DISCUSSION AT SIDEBAR CONCLUDED.)

13   BY MR. AARON:

14   Q.   I'M SORRY.  WHEN WE LEFT OFF WE WERE TALKING ABOUT THE

15   MIRANDA RIGHTS ARE PRETTY IMPORTANT, RIGHT?

16   A.   YES, SIR.

17   Q.   VERY?

18           MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  THAT'S

19   NOT APPROPRIATE.

20           THE COURT:  OVERRULED.

21           THE WITNESS:  YES.

22   BY MR. AARON:

23   Q.   AND IT'S NOT SOMETHING THAT YOU AS A TRAINED LAW

24   ENFORCEMENT OFFICER EITHER FORGET DOING OR NOT DOING?

25   A.   NO.

1    Q.    AND YOU WOULDN'T LIE ABOUT WHETHER OR NOT YOU HAD GIVEN

2    SOMEONE THEIR MIRANDA RIGHTS?

3    A.    NO.

4    Q.    AND YOU WOULDN'T TESTIFY FALSELY ABOUT THAT, WOULD YOU?

5    A.    NO.

6    Q.    YOU WOULDN'T TESTIFY FALSELY ABOUT ANYTHING?

7    A.    NO.

8    Q.    YOU WOULDN'T GIVE FALSE INFORMATION TO A JUDGE?

9    A.    NO.

10   Q.    NOW, YOU WROTE A SEARCH WARRANT AFFIDAVIT IN THIS CASE,

11   RIGHT?

12   A.    YES.

13             MR. AARON:  YOUR HONOR, MAY I APPROACH?

14             THE COURT:  YOU MAY.

15             MR. AARON:  I HAVE A COPY FOR THE COURT.  I WOULD

16   LIKE TO APPROACH THE WITNESS WITH EXHIBIT 206.

17             THE COURT:  YOU MAY APPROACH.

18   BY MR. AARON:

19   Q.    EXHIBIT NO. 206, IF YOU COULD READ -- ON PAGE 5, IF YOU

20   COULD READ PARAGRAPH -- EXCUSE ME FOR A SECOND.  IT'S

21   PARAGRAPH G ON THAT PAGE.  IF YOU COULD READ PARAGRAPH G TO

22   YOURSELF AND LET US KNOW WHEN YOU'RE DONE.

23   A.    OKAY.

24   Q.    NOW, AN AFFIDAVIT IS SOMETHING YOU WRITE TO THE JUDGE,

25   CORRECT?

1   A.   YES.

2   Q.   AND IT'S A DECLARATION UNDER PENALTY OF PERJURY, IN

3   EFFECT, RIGHT?

4   A.   YES.

5   Q.   WHERE YOU'RE SWEARING TO TELL THE TRUTH?

6   A.   YES.

7   Q.   AND IT'S IMPORTANT BECAUSE THE JUDGE WILL CONSIDER THAT

8   IN DETERMINING WHETHER OR NOT TO GRANT A -- TO ALLOW YOU TO

9   SEIZE PROPERTY PURSUANT TO A WARRANT, RIGHT?

10  A.   YES.

11  Q.   AND IT'S THE SAME TYPE OF OATH THAT YOU TAKE WHEN YOU GO

12  TO COURT, THE OATH TO TELL THE TRUTH, RIGHT?

13  A.   THAT'S CORRECT.

14  Q.   NOW, YOU PREVIOUSLY TESTIFIED THAT YOU DIDN'T GIVE THE

15  MIRANDA WARNINGS.  CAN YOU READ THE SECOND SENTENCE OF

16  PARAGRAPH G ON PAGE 66 OF EXHIBIT 206?

17  A.   GET DUFFY AND I REMOVED SANDERS --

18  Q.   SECOND SENTENCE, PLEASE.

19  A.   I'M SORRY, WHAT?

20  Q.   THE SECOND SENTENCE BEGINNING "I INFORMED..."

21  A.   UNDER G, SECOND SENTENCE?

22  Q.   YES, PLEASE.

23  A.   I INFORMED SANDERS THAT HE WAS NOT UNDER ARREST, BUT I

24  NONETHELESS READ SANDERS HIS MIRANDA RIGHTS.

25            MR. AARON:  THANK YOU, YOUR HONOR.  NOTHING

1   FURTHER.

2           THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN,

3   BEFORE REDIRECT EXAMINATION I WANT TO TELL YOU THAT YOU ARE

4   TO CONSIDER THE WITNESS' TESTIMONY ON THAT LAST ISSUE ONLY --

5   THAT IS, ABOUT THE MIRANDA RIGHTS -- FOR A LIMITED PURPOSE.

6   AND I PREVIOUSLY TOLD YOU OR INSTRUCTED YOU THAT SOMETIMES

7   EVIDENCE COMES IN FOR A LIMITED PURPOSE ONLY, AND WHEN THAT

8   HAPPENS YOU ARE TO CONSIDER IT FOR THAT LIMITED PURPOSE AND

9   FOR NO OTHER PURPOSE.

10          SO THIS TESTIMONY HAS COME IN FOR THE LIMITED

11  PURPOSE ONLY OF DECIDING THE CREDIBILITY OR BELIEVABILITY OF

12  THIS WITNESS' TESTIMONY.  YOU ARE NOT TO CONSIDER IT FOR ANY

13  REASON ON THE ISSUE OF WHETHER MIRANDA RIGHTS SHOULD BE READ

14  OR SHOULD HAVE BEEN READ TO THE DEFENDANT OR WHEN OR HOW.

15  THAT ISSUE IS SOMETHING THAT THE JURY DOESN'T DECIDE, THE

16  COURT DECIDES, AND IT'S ALREADY BEEN DECIDED IN THIS CASE.

17  SO YOU DON'T CONSIDER IT FOR THAT REASON.  IT IS ONLY BEING

18  OFFERED AND IT'S ONLY TO BE CONSIDERED BY YOU FOR THIS

19  LIMITED PURPOSE, DECIDING CREDIBILITY, AND NO OTHER.

20          MR. AKROTIRIANAKIS, YOU MAY INQUIRE ON REDIRECT

21  EXAMINATION.

22          MR. AKROTIRIANAKIS:  THANK YOU.

23                  REDIRECT EXAMINATION

24  BY MR. AKROTIRIANAKIS:

25  Q.   AGENT ARNOLD, YOU'VE JUST BEEN SHOWN A DOCUMENT DATED

1   JUNE 7, 2001, CORRECT?

2   A.   YES.

3   Q.   THAT'S ACTUALLY SIX YEARS OLD TO THE DAY ACTUALLY,

4   TODAY?

5   A.   EXACTLY, YES.

6   Q.   IS THAT SOMETHING THAT YOU WERE JUST SHOWN THAT YOU

7   REVIEWED IN PREPARING FOR YOUR TESTIMONY TODAY?

8   A.   NO.  I HAVEN'T SEEN THIS SINCE JUNE 2001.

9          MR. AKROTIRIANAKIS:  AND THE PHOTOGRAPH OF THE

10   BACKPACK, EXHIBIT 32, MAY I PUBLISH IT, YOUR HONOR?

11          THE COURT:  YOU MAY.

12   BY MR. AKROTIRIANAKIS:

13   Q.   YOU DIDN'T TESTIFY EARLIER, OR DID YOU, THAT THAT

14   PICTURE WAS TAKEN ON MORRIS RANCH ROAD?

15   A.   NO.

16   Q.   DOES THAT PICTURE, EXHIBIT 32, ACCURATELY PORTRAY THE

17   PLACEMENT OF THE BACKPACK WHEN YOU FIRST SAW IT IN THE CAR ON

18   MORRIS RANCH ROAD?

19   A.   YES.  THAT WOULD HAVE BEEN THE PURPOSE FOR TAKING THE

20   PHOTOGRAPH, JUST AS A GENERAL REFLECTION OF HOW WE FOUND THE

21   BACKPACK THAT DAY.

22          MR. AARON:  YOUR HONOR, OBJECTION --

23          THE COURT:  EXCUSE ME.

24          MR. AARON:  I'M SORRY.  I'LL OBJECT.  THE WITNESS

25   IS SPECULATING.  HE DOESN'T KNOW WHO TOOK IT SO I DON'T KNOW

```
 1    HOW --

 2              THE COURT:  SUSTAINED.  NO FURTHER ARGUMENT.

 3    BY MR. AKROTIRIANAKIS:

 4    Q.   DOES EXHIBIT 32 ACCURATELY SHOW WHERE THE BACKPACK WAS

 5    WHEN YOU FIRST SAW IT?

 6    A.   YES.

 7    Q.   AND IT WAS LOCKED AT THAT TIME?

 8    A.   YES.

 9    Q.   DO YOU RECALL WHETHER IT WAS LOCKED FROM THAT TIME AND

10    AT EVERY OTHER TIME TO THE POINT AT WHICH YOU EXECUTED THE

11    SEARCH WARRANT ON THE BACKPACK?

12    A.   YES, IT REMAINED LOCKED.

13    Q.   DID YOU PERSONALLY BREAK THE LOCKS OFF?

14    A.   I DID.

15    Q.   IS THIS THE SAME BACKPACK SHOWN IN EXHIBIT 32 THAT THE

16    DEFENDANT INDICATED HE RECOGNIZED AS HIS OWN BACKPACK?

17    A.   YES.

18    Q.   IS THAT EXHIBIT 8 RIGHT IN FRONT OF YOU THAT BACKPACK?

19    A.   YES.

20    Q.   IS THAT THE SAME BACKPACK THAT THE DEFENDANT INDICATED

21    TO YOU THAT HIS LAPTOP COMPUTER WAS IN?

22    A.   YES.

23    Q.   AND IS THAT THE SAME BACKPACK THAT YOU, IN FACT,

24    RETRIEVED A LAPTOP COMPUTER FROM?

25    A.   YES.
```

1          MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

2          THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

3          AND THE GOVERNMENT'S NEXT WITNESS?

4          MR. AKROTIRIANAKIS:  SPECIAL AGENT PERRY JOHNSON.

5          THE CLERK:  PLEASE COME FORWARD AND STOP BESIDE THE

6     COURT REPORTER.  PLEASE RAISE YOUR RIGHT HAND.

7          PLAINTIFF'S WITNESS, PERRY JOHNSON, WAS SWORN

8          THE CLERK:  PLEASE TAKE THE STAND.  STATE YOUR

9     FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

10         PERRY DANIEL JOHNSON, J-O-H-N-S-O-N.

11         THE COURT:  THANK YOU.

12         YOU MAY INQUIRE.

13         MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

14                    DIRECT EXAMINATION

15    BY MR. AKROTIRIANAKIS:

16    Q.   AGENT JOHNSON, MAY I ASK YOU TO PLACE TO THE SIDE THE

17    BACKPACK THAT'S SITTING BEFORE YOU THERE?

18    A.   YES, SIR.

19    Q.   AGENT JOHNSON, HOW ARE YOU PRESENTLY EMPLOYED?

20    A.   I AM A SPECIAL AGENT WITH THE DEPARTMENT OF HOMELAND

21    SECURITY, IMMIGRATION AND CUSTOMS ENFORCEMENT.

22    Q.   WERE YOU EMPLOYED BY THE UNITED STATES CUSTOMS SERVICE

23    PRIOR TO THE REORGANIZATION OF THAT AGENCY INTO THE

24    IMMIGRATION AND CUSTOMS ENFORCEMENT SERVICE?

25    A.   YES, SIR.

```
 1    Q.    IN WHAT YEAR DID YOU JOIN THE CUSTOMS SERVICE?

 2    A.    IN 1987.

 3    Q.    PRIOR TO 1987 DID YOU HAVE PRIOR SERVICE TO THE FEDERAL

 4    GOVERNMENT?

 5    A.    YES, SIR.

 6    Q.    IN WHAT CAPACITY?

 7    A.    I WAS AN OFFICER OF THE MARINES, AND PRIOR TO THAT I WAS

 8    A MARINE.

 9    Q.    DID YOU PARTICIPATE IN EXECUTION OF A SEARCH WARRANT ON

10    JUNE 5, 2001, AT A GIRL SCOUT CAMP IN THE MOUNTAINS NEAR

11    IDYLLWYLD?

12    A.    YES, SIR.

13    Q.    WHAT WAS YOUR ROLE IN THE EXECUTION OF THAT SEARCH

14    WARRANT?

15    A.    I WAS A SEARCHER AND A COLLECTOR OF EVIDENCE.

16    Q.    I'D ASK YOU TO REFER TO EXHIBIT 47 THAT IS IN THE

17    FOLDERS IN THE BOX DIRECTLY BEHIND YOU.

18    A.    YES, SIR.

19    Q.    DID THE SEARCH WARRANT THAT YOU TESTIFIED TO COVER TWO

20    PREMISES, TWO DIFFERENT BUILDINGS?

21    A.    I RECALL FROM READING THE SEARCH WARRANT THAT IT DID

22    REFER TO TWO DIFFERENT LOCATIONS AT THIS SITE.

23    Q.    AND WERE YOU SPECIFICALLY ASSIGNED TO PERFORM A SEARCH

24    OF ONE OF THE TWO LOCATIONS?

25    A.    YES, SIR.
```

```
 1    Q.    DOES EXHIBIT 47 DEPICT THE LOCATION THAT YOU WERE
 2    ASSIGNED TO SEARCH?
 3    A.    THE RESIDENCE, YES, SIR.
 4    Q.    AND I BELIEVE YOU TESTIFIED THAT YOUR SPECIFIC ROLE
 5    WAS, IN ADDITION TO SEARCHING, THAT YOU WERE THE CUSTODIAN OF
 6    THE EVIDENCE TAKEN FROM THAT BUILDING?
 7    A.    YES, SIR.
 8              MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS
 9    EXHIBIT 47.
10              THE COURT:  ANY OBJECTION TO EXHIBIT 47?
11              MR. AARON:  NONE, YOUR HONOR.
12              THE COURT:  THANK YOU.
13              EXHIBIT 47 IS ORDERED ADMITTED.  YOU MAY PUBLISH.
14    BY MR. AKROTIRIANAKIS:
15    Q.    DID YOU SEIZE ANY ITEMS FROM WITHIN EXHIBIT 47, THE
16    RESIDENCE?
17    A.    YES, SIR.
18    Q.    I'M GOING TO ASK YOU TO LOOK AT A SERIES OF EXHIBITS AND
19    THEN I WILL ASK YOU WHETHER THAT IS AN ITEM THAT WAS FOUND
20    DURING THE SEARCH.
21              EXHIBITS 34 AND 37 ARE IN THE BOX BEHIND YOU AND
22    THERE'S EXHIBIT 35 ON THE TABLE.
23              MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I APPROACH
24    WITH THAT?
25              THE COURT:  GO AHEAD.
```

1    BY MR. AKROTIRIANAKIS:

2    Q.    IS EXHIBIT 34 AN ITEM THAT WAS SEIZED FROM WITHIN THE

3    RESIDENCE SHOWN IN EXHIBIT 47, THE RESIDENCE BUILDING?

4    A.    YES, SIR, IT WAS.

5    Q.    AND IS THAT LIKEWISE TRUE FOR EXHIBIT 37?

6    A.    YES, SIR, IT WAS.

7    Q.    CAN I ACTUALLY ASK YOU TO GRAB EXHIBIT 38 OUT OF THE BOX

8    AS WELL AND 39?

9    A.    YES, SIR.

10   Q.    DOES EXHIBIT 38 FAIRLY AND ACCURATELY PORTRAY WHERE

11   EXHIBIT 37 WAS FOUND WITHIN THE RESIDENCE?  OR RATHER, I

12   BELIEVE THAT'S A PICTURE OF -- DOES EXHIBIT 38 FAIRLY AND

13   ACCURATELY PORTRAY EXHIBIT 37?  EXCUSE ME.

14   A.    EXHIBIT 38 IS A PHOTO OF EXHIBIT 37.

15   Q.    WHAT IS EXHIBIT 37?

16   A.    EXHIBIT 37 IS A -- AS I RECALL, IT'S TWO TORN ENVELOPES

17   THAT WAS RECOVERED FROM THE TRASH.

18   Q.    ARE THOSE LETTER SIZE ENVELOPES?

19   A.    AS I RECALL, THEY ARE, SIR.

20            MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 34, 37,

21   38.

22            THE COURT:  ANY OBJECTION?

23            MR. AARON:  NONE EXCEPT AS PREVIOUSLY NOTED.

24            THE COURT:  THANK YOU.

25            EXHIBITS -- IS IT 34 THROUGH 37?

1          MR. AKROTIRIANAKIS:  34, 37 AND 38.

2          THE COURT:  THANK YOU.  34, 37 AND 38 ARE ORDERED

3    ADMITTED.  YOU MAY PUBLISH.

4          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

5    BY MR. AKROTIRIANAKIS:

6    Q.    PLACING EXHIBIT 38 ON THE OVERHEAD CAMERA, IS

7    EXHIBIT 38, IN ESSENCE, A RE-ASSEMBLY OF THE TWO TORN

8    ENVELOPES YOU FOUND IN THE TRASH CANS IN THE RESIDENCE?

9    A.    IT IS A RE-ASSEMBLY OF THE TORN ENVELOPES RECOVERED FROM

10   THE TRASH BY FRANK DAY THAT I TOOK CUSTODY OF.

11   Q.    AND WHO IS THE RETURN ADDRESSEE ON THOSE ENVELOPES?

12   IT'S A BIT HARD TO READ ON THE OVERHEAD CAMERA.  CAN YOU TELL

13   US BASED ON THE READING OF YOUR COPY, IF YOU COULD JUST READ

14   THE RETURN ADDRESS.

15   A.    IS IT OKAY IF I PUT THESE BACK TOGETHER TO READ THOSE?

16   Q.    CERTAINLY.  I SUPPOSE I SHOULD ASK YOU, IS IT THE SAME

17   RETURN ADDRESSEE ON BOTH OF THE TWO ENVELOPES?

18   A.    THE RETURN ADDRESSEE IS SETH BEKENSTEIN, MARIN COUNTY

19   JAIL, 13 -- LOOKS LIKE CEDAR BETH DRIVE, SAN RAFAEL,

20   CALIFORNIA, 94903.

21   Q.    IS IT ACTUALLY SETH BEKENSTEIN, B-E-K?

22   A.    YES, IT IS, B-E-K-E-N-S-T-E-I-N.

23   Q.    IS THAT TRUE WITH REGARD TO EACH OF THE TWO LETTERS?

24   A.    THEY APPEAR TO BE QUITE SIMILAR AND THE SAME

25   HANDWRITING.

1    Q.   IS IT ALSO SETH BEKENSTEIN ON THE OTHER ENVELOPE AS THE

2    RETURN ADDRESSEE?

3    A.   IT'S TORN BUT IT DOES APPEAR TO BE SETH BEKENSTEIN.

4    Q.   WHAT IS THE NAME OF THE PERSON WHO IS THE ADDRESSEE OF

5    EACH OF THESE TWO LETTERS?

6    A.   APPEARS TO BE JIM SANDERS.

7    Q.   AND BELOW THAT DOES IT READ P.O. BOX 277, MOUNTAIN

8    CENTER, CALIFORNIA, 92561?

9    A.   IT APPEARS TO BE THAT ON EACH ENVELOPE.

10   Q.   EXHIBIT 35 IS THE LARGER ITEM BEFORE YOU THERE.  WHAT IS

11   THAT ITEM THAT YOU TESTIFIED WAS FOUND WITHIN THE RESIDENCE

12   THAT IS DEPICTED IN EXHIBIT 47?

13   A.   THAT IS WHAT I WAS TOLD WAS AN EXTERNAL HARD DRIVE.

14   Q.   AND WHO FOUND THAT ITEM?

15   A.   AGENT FRANK DAY AND MYSELF LOCATED THE DEVICE ON THE

16   DINING ROOM TABLE.

17   Q.   EXHIBIT 39, DOES THE -- DID THE SEARCH WARRANT THAT YOU

18   EXECUTED ON JUNE 5, 2001, PERMIT NOT ONLY A SEARCH OF THE

19   RESIDENCE DEPICTED IN EXHIBIT 47 BUT ALSO OUTBUILDINGS

20   ASSOCIATED WITH THAT RESIDENCE, SUCH AS A GARAGE?

21   A.   MY RECOLLECTION FROM REVIEWING THE SEARCH WARRANT PRIOR

22   TO EXECUTING THE SEARCH WARRANT INDICATED THAT IT DID INCLUDE

23   OUTBUILDINGS.

24   Q.   DID YOU SEARCH ANY OUTBUILDINGS ASSOCIATED WITH THE

25   RESIDENCE SHOWN IN EXHIBIT 47?

```
 1   A.    YES, SIR.

 2   Q.    IS EXHIBIT 39 A PHOTOGRAPH OF ONE OF THOSE BUILDINGS?

 3   A.    YES, SIR.

 4   Q.    AND WAS THIS PICTURE, TO YOUR KNOWLEDGE, TAKEN ON

 5   JUNE 5, 2001?

 6   A.    YES, SIR, I TOOK THE PICTURE.

 7   Q.    HOW DO YOU KNOW THAT?

 8   A.    I HAD IT DEVELOPED AND PUT MY INITIALS ON THE BACK OF IT.

 9           MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 39.

10           THE COURT:  ANY OBJECTION TO 39?

11           MR. AARON:  NO.

12           THE COURT:  EXHIBIT 39 IS ORDERED ADMITTED.  YOU

13   MAY PUBLISH IT.

14   BY MR. AKROTIRIANAKIS:

15   Q.    IS THAT THE GARAGE NEARBY TO THE RESIDENCE?

16   A.    YES, SIR.  THIS IS A DETACHED GARAGE.

17   Q.    THERE'S A VEHICLE IN THERE.  IT APPEARS TO BE A BLUE

18   SUV.  WAS THAT PARKED IN THAT GARAGE AT THE TIME OF THE

19   SEARCH?

20   A.    YES, SIR, IT WAS.

21   Q.    WAS THIS PICTURE TAKEN DURING THE SEARCH?

22   A.    THIS WAS TAKEN DURING THE LATTER PART OF THE SEARCH.

23   Q.    ON JUNE 5, 2001, IN ANY EVENT?

24   A.    YES, SIR.

25           MR. AKROTIRIANAKIS:  NOW, YOUR HONOR, IF I HADN'T,
```

1    I WOULD OFFER 35 AS WELL, THE EXTERNAL HARD DRIVE.

2              THE COURT:  I DON'T THINK 35 HAS BEEN OFFERED.

3              ANY OBJECTION TO 35?

4              MR. AARON:  NONE EXCEPT PREVIOUSLY NOTED.

5              THE COURT:  THANK YOU.

6              35 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

7              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

8    BY MR. AKROTIRIANAKIS:

9    Q.   NOW, RETURNING TO THE DOCUMENT THAT'S ON THE OVERHEAD

10   CAMERA, AGENT JOHNSON, DID YOU, IN FACT, SEARCH THAT GARAGE

11   AND THAT VEHICLE, THE BLUE SUV?

12   A.   YES, SIR.

13   Q.   DO YOU RECALL WHAT KIND OF VEHICLE IT IS?

14   A.   AS I RECALL, IT'S A FORD BRONCO, AN OLDER MODEL, FULL

15   SIZE.

16   Q.   DID YOU FIND ANY ITEMS OF INVESTIGATIVE INTEREST DURING

17   YOUR SEARCH OF THE BLUE FORD BRONCO PARKED IN THE GARAGE

18   SHOWN ON EXHIBIT 39?

19   A.   YES, SIR.

20   Q.   CAN YOU REMOVE EXHIBIT 36 FROM THE BOX OF FOLDERS BEHIND

21   YOU, OR IF YOU'VE ALREADY REMOVED IT, CAN I DIRECT YOUR

22   ATTENTION TO IT THEN?

23   A.   YES, SIR.

24             MR. AKROTIRIANAKIS:  WHILE HE'S REVIEWING THAT,

25   YOUR HONOR, MAY I RETURN AND PUBLISH ON THE CAMERA

1    EXHIBIT 35?

2              THE COURT:  YOU MAY.

3    BY MR. AKROTIRIANAKIS:

4    Q.   I'M PLACING EXHIBIT 35, THE EXTERNAL HARD DRIVE, ON THE

5    DOCUMENT CAMERA.  HAVE YOU HAD AN OPPORTUNITY TO REVIEW

6    EXHIBIT 36?

7    A.   YES, SIR.

8    Q.   WHAT IS EXHIBIT 36 THAT YOU FOUND IN THE BLUE FORD

9    BRONCO?

10   A.   I FOUND THIS IN THE CENTER CONSOLE OF THE FORD BRONCO.

11   THIS IS A DOCUMENT INDICATING IT'S A RENTAL AGREEMENT, A

12   STORAGE LOCKER RENTAL AGREEMENT.  THE SMOKE RANCH JONES

13   RENTAL AGREEMENT.  THE ADDRESS FOR SMOKE RANCH MINI-STORAGE

14   WAS LOCATED AT 5900 SMOKE RANCH ROAD, LAS VEGAS, NEVADA.

15   Q.   AND WHAT DOES THE RENTAL AGREEMENT INDICATE AS BEING

16   RENTED BY THAT AGREEMENT?

17   A.   STORAGE SPACE 649.  IT INDICATES IT'S A 10 X 10 STORAGE

18   LOCKER.

19             MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS

20   EXHIBIT 36.

21             THE COURT:  ANY OBJECTION TO 36?

22             MR. AARON:  NONE EXCEPT AS PREVIOUSLY NOTED.

23             THE COURT:  THANK YOU.

24             EXHIBIT 36 IS ORDERED ADMITTED AND YOU MAY PUBLISH.

25             MR. AKROTIRIANAKIS:  MAY I PUBLISH A PHOTOCOPY OF

1    IT, YOUR HONOR, FOR THE SAKE OF TIME?

2            THE COURT:  YES, YOU MAY.

3    BY MR. AKROTIRIANAKIS:

4    Q.   I PLACED A PHOTOCOPY OF EXHIBIT 36 ON THE OVERHEAD

5    CAMERA.  YOUR COPY THERE, THE ORIGINAL ACTUALLY, WHAT COLOR

6    IS THAT PAPER OF THAT DOCUMENT?  YES.  COULD YOU GIVE IT FOR

7    THE RECORD, SIR?

8    A.   PROBABLY YELLOW.

9    Q.   WOULD YOU SAY CANARY YELLOW?

10   A.   CANARY YELLOW.

11   Q.   DOES WHAT I'VE PLACED ON THE DOCUMENT CAMERA, WHICH IS

12   THE UPPER PORTION OF THE FRONT SIDE OF THE FIRST PAGE OF THAT

13   AGREEMENT, APPEAR TO BE AN ACCURATE PHOTOCOPY OF WHAT YOU

14   HAVE BEFORE YOU?

15   A.   IT DOES.

16   Q.   I WILL READ FROM THE DOCUMENT.  UNDER TENANT

17   INFORMATION, NAME SANDERS, JAMES.  ADDRESS P.O. BOX 277.

18   CITY, MOUNTAIN CTN.  STATE, C-A FOR CALIFORNIA.  ZIP, 92561.

19   STORAGE SPACE NO. 649.  APPROXIMATE SIZE, 10 X 10.

20   INDICATING FURTHER BELOW, PAID THROUGH MAY 31, 2001.

21           DO YOU SEE THAT?  HAVE I READ THAT ACCURATELY?

22   A.   THAT IS CORRECT, SIR.

23   Q.   I BEG YOUR PARDON, SIR?

24   A.   THAT IS CORRECT, YES, SIR.

25           MR. AKROTIRIANAKIS:  MAY I HAVE A MOMENT, YOUR

```
 1   HONOR?

 2            THE COURT:  YOU MAY.

 3            MR. AKROTIRIANAKIS:  THANK YOU.  NOTHING FURTHER.

 4            THE COURT:  THANK YOU.

 5            CROSS-EXAMINATION.

 6                      CROSS-EXAMINATION

 7   BY MR. AARON:

 8   Q.   GOOD AFTERNOON, SIR.

 9   A.   GOOD AFTERNOON, SIR.

10   Q.   WHEN DID YOU START DOING THE SEARCH?

11   A.   AS I RECALL, IT WAS APPROXIMATELY 9:40 IN THE MORNING,

12   SIR.

13   Q.   AND THAT WAS THE FIRST THING THAT YOU DID AFTER ARRIVING

14   AT THE CAMP JOE SHERMAN?

15   A.   NO, SIR.  WHEN I FIRST ARRIVED WE SECURED THE ROAD

16   LEADING UP TO THE CAMP IN CASE ANYONE ATTEMPTED TO FLEE.

17   AFTER THAT, AFTER CONTACT WAS MADE WITH MR. SANDERS, I RECALL

18   GOING UP TO THE RESIDENCE.

19   Q.   I'M SORRY.  LET ME STOP YOU RIGHT THERE.  WERE YOU

20   INVOLVED IN DETAINING MR. SANDERS?

21   A.   I WAS NOT.

22   Q.   AFTER A CERTAIN POINT YOU LEARNED THAT HE HAD BEEN

23   DETAINED AND THEN YOU WENT UP TO THE RESIDENCE?

24   A.   YES, SIR.

25   Q.   DID YOU ENTER THE RESIDENCE?
```

1   A.   NOT IMMEDIATELY.

2   Q.   WERE YOU THERE WHEN ENTRY WAS MADE?

3   A.   YES, SIR.

4   Q.   DID YOU ENTER BY MEANS OF A KEY?

5   A.   AS I RECALL, WE DID, YES, SIR.

6   Q.   AFTER YOU ENTERED THE RESIDENCE ABOUT HOW LONG WERE YOU

7   THERE DOING THE SEARCH?

8   A.   I RECALL BEING THERE ABOUT -- STARTING THE SEARCH AT

9   AROUND 9:40.  I BELIEVE THE SEARCH WAS OVER SHORTLY AFTER

10  NOON.

11  Q.   I'M SORRY, I MISUNDERSTOOD.  DID YOU SAY THE SEARCH WAS

12  OVER IN THE AFTERNOON?

13  A.   IN THE AFTERNOON, SHORTLY AFTER NOON.

14  Q.   SHORTLY AFTER 12?

15  A.   AFTER 12.

16  Q.   AND AFTER THAT DID YOU MEET UP WITH THE OTHER PEOPLE WHO

17  WERE IN THE SEARCH PARTY?

18  A.   YES, SIR.

19  Q.   AND THAT WAS DOWN AT MASSEY HALL?

20  A.   I DON'T RECALL THE NAME OF THE BUILDING, SIR.

21  Q.   DO YOU RECALL DID YOU MEET UP WITH THE TEAM LEADER?

22  A.   YES.

23  Q.   AND THAT WAS MR. ARNOLD?

24  A.   YES, AND OTHERS.

25  Q.   AND WHAT DID YOU DO THERE?

1   A.   SPOKE BRIEFLY WITH MR. ARNOLD AND OTHERS IN REGARDS TO

2   WHAT WE FOUND.  AS I RECALL, WE RETURNED THE KEY TO

3   MR. ARNOLD.  AND AT SOME POINT --

4   Q.   I'M SORRY.  YOU RETURNED THE KEY TO MR. ARNOLD?

5   A.   AS I RECALL, I BELIEVE I DID.

6   Q.   AND HE WAS THE ONE WHO GAVE THE KEY TO YOU?

7   A.   YES, SIR.

8   Q.   AND AFTER THAT WHAT DID YOU DO?

9   A.   AND AT SOME POINT I TURNED THE EVIDENCE THAT WE ACQUIRED

10   FROM THE RESIDENCE AND THE GARAGE OVER TO MY SUPERVISOR,

11   MR. STEVEN COOPER.

12   Q.   AND AFTER THAT, WHAT DID YOU DO?

13   A.   I REMEMBER HANGING OUT THERE FOR SOME TIME WAITING FOR

14   EITHER THE REST OF THE SEARCH TO BE ACCOMPLISHED OR -- I

15   REMEMBER WAITING.

16   Q.   YOU DIDN'T DO ANYTHING ELSE, THOUGH?

17   A.   NO, SIR.

18   Q.   YOU JUST WAITED THERE UNTIL THE SEARCH WAS DONE AND THE

19   PARTY WAS GOING TO LEAVE?

20   A.   AS I RECALL, THAT'S CORRECT.

21   Q.   SO THE EVIDENCE THAT -- THE ONLY EVIDENCE THAT YOU WERE

22   INVOLVED IN WAS THE EVIDENCE FROM THE RESIDENCE AND THE

23   OUTBUILDING?

24   A.   THAT IS CORRECT.

25   Q.   AND YOU WEREN'T INVOLVED IN ANY OTHER WAY WITH ANY OTHER

1    EVIDENCE ON THAT DAY?

2    A.    I SAW A BLACK BACKPACK THAT HAD BEEN ACQUIRED, BUT I DID

3    NOT TAKE CUSTODY OF IT, NOR DID I SEARCH IT.

4    Q.    AND WHERE DID YOU SEE IT?

5    A.    I SAW IT IN MR. ARNOLD'S HANDS.  HE INDICATED THAT HE

6    HAD TAKEN IT FROM THE LOCATION OF WHERE MR. SANDERS WAS.

7    Q.    AND DID YOU SEE WHAT HE DID WITH IT?

8    A.    IT WAS TAKEN INTO EVIDENCE, BUT I DON'T RECALL EXACTLY

9    WHAT IT WENT INTO.

10            MR. AARON:  THANK YOU.  NOTHING FURTHER.

11            THE COURT:  THANK YOU.

12            REDIRECT?

13            MR. AKROTIRIANAKIS:  NO, YOUR HONOR, NO REDIRECT.

14            THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

15            THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

16            MR. AKROTIRIANAKIS:  PEDRO FLORES.

17            MR. MICHAEL:  YOUR HONOR, WE'LL BE USING AN

18    INTERPRETER FOR THIS WITNESS.

19            THE COURT:  THANK YOU.

20            SWEAR THE WITNESS AND THEN WE CAN MOVE THE CHAIR UP

21    AFTER HE'S BEEN SWORN.

22            MR. MICHAEL:  YOUR HONOR, THERE'S ALSO GOING TO BE

23    AN EXHIBIT I'M GOING TO ASK HIM TO REFER TO.  SINCE A BUNCH

24    HAVE BEEN PULLED OUT, CAN I STEP UP THERE REAL QUICK AND JUST

25    GET HIM THE EXHIBIT?

1          THE COURT:  WHILE YOU'RE DOING THAT --

2          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

3      <u>PLAINTIFF'S WITNESS, PEDRO FLORES, WAS SWORN</u>

4          THE COURT:  MR. MICHAEL, WHILE YOU'RE UP THERE,

5   WOULD YOU ASSIST THE INTERPRETER WITH THAT CHAIR?

6          MR. MICHAEL:  YES.

7          THE COURT:  THANK YOU.

8          MR. AKROTIRIANAKIS:  YOUR HONOR, I THINK THE

9   BACKPACK IS ACTUALLY STILL ON THE FLOOR.  THAT PROBABLY

10  DOESN'T NEED TO CLUTTER THAT AREA.

11         THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR

12  LAST NAME FOR THE RECORD.

13         THE WITNESS:  MY NAME IS PEDRO FLORES, P-E-D-R-O,

14  F-L-O-R-E-S.

15         THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN,

16  YOU'RE GOING TO HEAR THE TESTIMONY OF A WITNESS WHO WILL BE

17  TESTIFYING IN A LANGUAGE OTHER THAN ENGLISH.  THE WITNESS

18  WILL BE TESTIFYING THROUGH THE OFFICIAL COURT INTERPRETER,

19  AND ALTHOUGH SOME OF YOU MAY KNOW THE NON-ENGLISH LANGUAGE

20  THAT'S USED, WHICH IN THIS CASE IS SPANISH, IT'S IMPORTANT

21  THAT ALL JURORS CONSIDER THE SAME TESTIMONY; THEREFORE, YOU

22  MUST ACCEPT THE ENGLISH TRANSLATION OF THE WITNESS' TESTIMONY

23  EVEN IF YOU UNDERSTAND THE ORIGINAL LANGUAGE AND YOU MUST

24  DISREGARD ANY DIFFERENT MEANING OF THE NON-ENGLISH WORDS.

25  THANK YOU.

```
 1              MR. MICHAEL:  I APOLOGIZE, YOUR HONOR.  YOUR HONOR,
 2    WITH YOUR PERMISSION, MAY I USE A COPY OF EXHIBIT 41, A
 3    PHOTOGRAPH?
 4              THE COURT:  CERTAINLY.  YOU MAY INQUIRE AT THIS
 5    TIME.
 6                        DIRECT EXAMINATION
 7    BY MR. MICHAEL:
 8    Q.   GOOD AFTERNOON, SIR.
 9    A.   GOOD AFTERNOON.
10    Q.   ARE YOU ABLE TO UNDERSTAND THE COURT REPORTER, SIR?
11    EXCUSE ME.  COURT INTERPRETER, SIR?
12    A.   YES.
13    Q.   AND DO YOU ALSO UNDERSTAND A LITTLE BIT OF ENGLISH AS
14    WELL?
15    A.   YES.
16    Q.   IF AT ANY TIME YOU HAVE DIFFICULTY UNDERSTANDING MY
17    QUESTIONS OR THE INTERPRETER, WOULD YOU PLEASE LET ME KNOW?
18    A.   YES.
19    Q.   MR. FLORES, WHERE DO YOU WORK?
20    A.   AT CAMP SHERMAN.
21    Q.   AND WHERE IS THAT LOCATED?
22    A.   ON MORRIS RANCH ROAD IN GARDEN VALLEY.
23    Q.   IS THAT NEAR MOUNTAIN CENTER, CALIFORNIA?
24    A.   YES.
25    Q.   WHAT COMPANY RUNS THE CAMP, CAMP SHERMAN?
```

1    A.    THE GIRL SCOUTS.

2    Q.    WHAT IS YOUR JOB AT CAMP SHERMAN?

3    A.    MAINTENANCE.

4    Q.    HOW LONG HAVE YOU WORKED IN MAINTENANCE AT CAMP SHERMAN?

5    A.    SIXTEEN YEARS.

6    Q.    HAVE YOU ALWAYS WORKED IN MAINTENANCE AT CAMP SHERMAN?

7    A.    YES.

8    Q.    DO YOU KNOW JAMES OR JIM SANDERS?

9    A.    YES.

10   Q.    WHO IS JIM SANDERS?  LET ME STRIKE THAT QUESTION.

11         DID JIM SANDERS EVER WORK WITH YOU AT CAMP SHERMAN?

12   A.    YES.

13   Q.    HOW LONG DID BOTH OF YOU WORK TOGETHER AT THE CAMP?

14   A.    ABOUT TEN YEARS.

15   Q.    WHAT WAS MR. SANDERS' OR JIM'S JOB THERE?

16   A.    MAINTENANCE ASSISTANT MANAGER.

17   Q.    AND WOULD YOU RECOGNIZE MR. SANDERS IF YOU SAW HIM

18   TODAY?

19   A.    YES.

20   Q.    AND DO YOU SEE MR. SANDERS IN THE COURTROOM TODAY?

21   A.    YES.

22   Q.    I'M JUST GOING TO ASK FOR THE SAKE OF THE COURT REPORTER

23   AND THE INTERPRETER IF YOU COULD WAIT UNTIL THE INTERPRETER

24   FINISHES.  IT WOULD BE VERY HELPFUL.  THANK YOU.

25         AND DO YOU SEE MR. SANDERS IN THE COURTROOM TODAY?

1    A.   YES.

2    Q.   IF YOU COULD IDENTIFY WHERE HE'S SITTING AND WHAT HE'S

3    WEARING, PLEASE, OR POINT TO HIM OR DESCRIBE WHAT HE'S

4    WEARING AND WHERE HE'S SITTING, PLEASE.

5    A.   HE IS TO THE RIGHT OF THE GENTLEMAN THAT IS SITTING

6    BESIDE HIM.

7    Q.   AND CAN YOU DESCRIBE WHAT HE IS WEARING, PLEASE?

8    A.   A GRAY SUIT.

9         MR. AKROTIRIANAKIS:  AND THERE'S TWO INDIVIDUALS.

10   I GUESS HE'S THE ONLY PERSON IN A GRAY SUIT.  YOUR HONOR, THE

11   GOVERNMENT WOULD ASK THE RECORD REFLECT THAT THE DEFENDANT

12   HAS BEEN IDENTIFIED.

13        THE COURT:  THE RECORD SHALL REFLECT THE WITNESS'

14   IDENTIFICATION OF THE DEFENDANT, JIM SANDERS.

15   BY MR. MICHAEL:

16   Q.   MR. FLORES, WERE YOU WORKING AT CAMP SHERMAN IN JUNE

17   2001?

18   A.   YES.

19   Q.   AND DO YOU RECALL A DAY IN JUNE 2001 WHEN THE POLICE

20   ARRIVED AT THE CAMP?

21   A.   YES.

22   Q.   DO YOU RECALL THE SPECIFIC DAY IN JUNE, THE EXACT DAY?

23   A.   NO.

24   Q.   WAS IT IN THE MORNING, AFTERNOON, OR EVENING?

25   A.   IN THE MORNING.

1    Q.   WERE YOU WORKING THAT DAY?

2    A.   YES.

3    Q.   WHAT WERE YOU DOING WHEN YOU FIRST SAW THE POLICE?

4    A.   I WAS COMING FROM THE WEST PART OF THE CAMP TOWARDS THE

5    EAST PART OF IT.

6    Q.   WERE YOU HEADED TOWARDS OR AWAY FROM MORRIS RANCH ROAD?

7    A.   TOWARDS MORRIS RANCH ROAD.

8    Q.   WHEN YOU SAW THE POLICE HOW DID YOU KNOW IT WAS THE

9    POLICE?

10   A.   WELL, FIRST, BECAUSE I SAW A POLICE CAR AND I SAW THEM.

11   Q.   AND WERE THERE OTHER CARS WITH THE POLICE CAR?

12   A.   YES.

13   Q.   WHAT WERE YOU DRIVING -- WERE YOU DRIVING AT THE TIME?

14   A.   YES.

15   Q.   WHAT WERE YOU DRIVING IN?

16   A.   A PICKUP TRUCK.

17   Q.   WHAT COLOR WAS THE PICKUP TRUCK?

18   A.   WHITE.

19   Q.   WHO OWNED THE PICKUP TRUCK?

20   A.   THE GIRL SCOUTS.

21   Q.   IT WAS A CAMP TRUCK?

22   A.   YES.

23   Q.   WHEN YOU WERE DRIVING IN YOUR PICKUP TRUCK AND YOU SAW

24   THE POLICE, WERE YOU PASSING BY ANY BUILDINGS LOCATED AT THE

25   CAMP?

```
1    A.    YES.

2    Q.    WHAT BUILDING?

3    A.    GMC.

4    Q.    WHAT IS DONE IN THE GMC BUILDING?

5    A.    THERE IS -- WHERE WE WORK THERE'S OFFICES THERE AND

6    THERE'S A WOOD SHOP AND THERE'S A MECHANICS SHOP, AUTO SHOP.

7    Q.    WOULD IT BE ACCURATE TO CALL IT A MAINTENANCE BUILDING?

8    A.    YES.

9    Q.    WHEN YOU FIRST SAW THE POLICE WHAT ROAD WERE THEY COMING

10   FROM?

11   A.    THEY WERE TAKING THE ROAD THAT COMES FROM MORRIS RANCH

12   ROAD AND GOES TO THE OFFICES.

13           MR. MICHAEL:  YOUR HONOR, MAY I PUBLISH A COPY OF

14   EXHIBIT 41 ON THE OVERHEAD?

15           THE COURT:  GO AHEAD.  YOU MAY.

16   BY MR. MICHAEL:

17   Q.    SIR, CAN YOU SEE THE PHOTOGRAPH ON THE MONITOR?

18   A.    YES.

19   Q.    HAVE YOU SEEN THIS PHOTOGRAPH BEFORE?

20   A.    YES.

21   Q.    WHAT IS THIS BUILDING IN THE CENTER, THE SQUARE BUILDING

22   THAT I'M POINTING AT WITH MY FINGER?

23   A.    THAT'S THE GMC BUILDING.

24   Q.    WHAT ROAD IS THIS ROAD THAT RUNS ALONG THE LOWER RIGHT

25   CORNER OF THE PHOTOGRAPH THAT I'M USING MY FINGER FOR TO
```

1    MARK?

2    A.   IT'S MORRIS RANCH ROAD.

3    Q.   AND THERE'S ANOTHER ROAD HERE THAT RUNS FROM MORRIS

4    RANCH ROAD AND IT LOOKS LIKE IT GOES TOWARDS THE MAINTENANCE

5    BUILDING, GMC.   IS THAT THE ROAD THAT YOU WERE ON WHEN YOU

6    FIRST SAW THE POLICE?

7    A.   YES.

8    Q.   AND IS THAT THE ROAD THAT THE POLICE WERE ON WHEN THEY

9    WERE HEADED TOWARDS YOU?

10   A.   YES.

11   Q.   WHEN YOU SAW THE POLICE, DID YOU CONTINUE DRIVING OR DID

12   YOU STOP?

13   A.   I STOPPED.

14   Q.   AND BY THE WAY, YOU SAID THERE WERE OFFICES IN THE GMC

15   BUILDING?

16   A.   YES.

17   Q.   WHO USED THOSE OFFICES?

18   A.   THE MANAGERS.

19   Q.   DID THAT INCLUDE MR. SANDERS?

20   A.   YES.

21   Q.   WHEN YOU SAW THE POLICE COMING, WHY DID YOU STOP?

22   A.   BECAUSE THEY WERE ALREADY BLOCKING THE WAY.

23   Q.   IN YOUR APPROXIMATE 16 YEARS AT THE CAMP, HOW MANY TIMES

24   BEFORE HAD THE POLICE BEEN AT THE CAMP?

25   A.   ABOUT THREE TIMES.

1    Q.   SO IN 16 YEARS THE POLICE HAD BEEN THERE ONLY ABOUT

2    THREE TIMES?

3    A.   YES.

4    Q.   AFTER YOU STOPPED WHAT DID YOU DO?

5    A.   I RADIOED MR. SANDERS.

6    Q.   WHAT NAMES DID YOU USE WHEN YOU RADIOED MR. SANDERS?

7    A.   HUNTER TO STRIDER.

8    Q.   WHO IS HUNTER?

9    A.   I.

10   Q.   WHO IS STRIDER?

11   A.   MR. JIM SANDERS.

12   Q.   WOULD IT BE FAIR TO SAY THOSE ARE RADIO NAMES --

13   A.   YES.

14   Q.   -- THAT YOU USED AT WORK?

15   A.   YES.

16   Q.   DID MR. SANDERS ANSWER THE RADIO CALL?

17   A.   YES.

18   Q.   DID YOU HEAR HIM ON THE RADIO?

19   A.   YES.

20   Q.   WHAT DID YOU SAY TO HIM?

21   A.   I CALLED HIM AND I SAID, "HUNTER TO STRIDER, WHAT IS

22   GOING ON?  THERE'S A LOT OF POLICE IN THE CAMP," BUT GOT NO

23   ANSWER.

24   Q.   SO DID MR. SANDERS EVER RESPOND TO WHAT YOU SAID TO HIM

25   OVER THE RADIO?

1    A.   YES.

2    Q.   WHAT DID HE SAY?

3            THE INTERPRETER:   COUNSEL, DO YOU WANT ME TO REPEAT?

4    BY MR. MICHAEL:

5    Q.   CAN YOU REPEAT THAT IN SPANISH SO THE INTERPRETER CAN

6    INTERPRET IT, PLEASE?

7            THE COURT:   CAN YOU ANSWER THE QUESTION AGAIN, SIR?

8    BY MR. MICHAEL:

9    Q.   IF YOU COULD RESTATE WHAT YOU JUST SAID IN SPANISH,

10   PLEASE, THE EXACT SAME THING.

11   A.   I CALLED HIM AND I SAID, "HUNTER TO STRIDER," AND, YOU

12   KNOW, WHEN I ASKED HIM, YOU KNOW, WHAT WAS GOING ON, THAT THE

13   POLICE WERE THERE ON SITE, I DIDN'T GET AN ANSWER ANYMORE.

14   Q.   AFTER YOU DIDN'T GET A RESPONSE ON THE RADIO FROM

15   MR. SANDERS, DID THE POLICE CONTINUE TO COME TOWARDS YOU?

16   A.   YES.

17   Q.   AND DID THE POLICE REACH WHERE YOU WERE?

18   A.   YES.

19   Q.   DID THEY SAY ANYTHING TO YOU?

20   A.   YES.   THEY ASKED ME WHERE MR. JIM SANDERS WAS.

21   Q.   WHAT DID YOU DO IN RESPONSE?

22   A.   I TOLD THEM HE WAS AT THE OFFICE.

23   Q.   AND DID YOU DO ANYTHING ELSE TO HELP SHOW THEM WHERE

24   MR. SANDERS WAS?

25   A.   YES.   WITH MY HAND I POINTED OUT WHERE THE BUILDING WAS.

1    Q.   AND AFTER YOU POINTED DID YOU SEE ANYTHING?

2    A.   NO.

3    Q.   DID YOU EVER LOOK TOWARDS THE GMC BUILDING?

4    A.   YES.

5    Q.   AND DID YOU SEE ANYTHING WHEN YOU LOOKED TOWARD THE GMC

6    BUILDING?

7    A.   I SAW JIM COMING OUT OF THE OFFICE.

8    Q.   AND WHAT DID YOU SEE MR. SANDERS DO?

9    A.   HE GOT INTO A PICKUP TRUCK.

10   Q.   WHAT COLOR PICKUP TRUCK?

11   A.   WHITE.

12   Q.   WHO OWNS THAT PICKUP TRUCK?

13   A.   GIRL SCOUTS.

14   Q.   DO YOU KNOW WHAT OTHER CAR MR. SANDERS OWNS HIMSELF OR

15   OWNED HIMSELF?

16   A.   HOW WAS THAT?

17   Q.   DO YOU KNOW WHAT MR. SANDERS' OWN PERSONAL CAR WAS AT

18   THE TIME?

19   A.   YES.

20   Q.   WHAT WAS HIS PERSONAL CAR?

21   A.   A BRONCO.

22   Q.   AFTER YOU SAW MR. SANDERS ENTER THE PICKUP TRUCK WHAT

23   DID HE DO NEXT?

24   A.   HE MADE A TURN LIKE GOING AROUND THE BUILDING AND TURNED

25   AT THE BUILDING.

```
 1    Q.   IF YOU CAN TOUCH THE SCREEN IN FRONT OF YOU WITH YOUR

 2    FINGER, ACTUALLY TOUCH THE SCREEN, CAN YOU SHOW --

 3              MR. MICHAEL:  ACTUALLY, YOUR HONOR, IS IT WORKING?

 4    YOUR HONOR, I DON'T BELIEVE THAT THE SCREEN IS WORKING.  CAN

 5    I ASK THAT THE WITNESS APPROACH THE PHOTOGRAPH THE SAME WAY

 6    WE DID --

 7              THE COURT:  YOU MAY STEP DOWN, MR. FLORES.

 8              MR. AARON, YOU MAY APPROACH OVER THERE.

 9              HOW LONG DO YOU THINK YOUR EXAMINATION OF THIS

10    WITNESS IS GOING TO BE?

11              MR. MICHAEL:  JUST A FEW MORE QUESTIONS, YOUR

12    HONOR.

13              THE COURT:  GO AHEAD.

14    BY MR. MICHAEL:

15    Q.   SIR, IF YOU CAN SHOW ON THIS PICTURE, WHERE WAS

16    MR. SANDERS' PICKUP TRUCK PARKED?

17    A.   RIGHT HERE.

18    Q.   LET ME ASK YOU A QUESTION.

19    A.   IT'S AROUND -- IT'S RIGHT THERE.

20              MR. MICHAEL:  LET THE RECORD REFLECT THAT HE'S

21    SHOWING THE SORT OF UPPER LEFT CORNER, THE HIGHEST CORNER OF

22    THE SQUARE BUILDING.

23    BY MR. MICHAEL:

24    Q.   AND WHAT DIRECTION DID HE DRIVE IN?

25    A.   THIS WAY GOING DOWN SOMEPLACE IN HERE.
```

1   Q.   DID YOU SEE HIM AT THAT POINT OR DID YOU LOSE SIGHT OF

2   HIM?

3   A.   I LOST SIGHT OF HIM.

4           MR. MICHAEL:  THE RECORD SHOULD REFLECT THAT HE WAS

5   DRIVING TO THE RIGHT AND WENT AROUND THE SIDE AND AROUND THE

6   BACK OF THE BUILDING WHEN MR. FLORES LOST SIGHT OF HIM.

7   BY MR. MICHAEL:

8   Q.   MR. FLORES, WHERE WERE YOU AT THIS POINT IN TIME?

9   A.   RIGHT HERE.

10  Q.   AND IS THAT THE MAIN ENTRANCE TO THE PARKING LOT FOR THE

11  MAINTENANCE BUILDING?

12  A.   YES.

13  Q.   AND WERE THERE ANY OTHER EXITS OR GATES IN THE PARKING

14  LOT?

15  A.   YES.  THERE'S ONE HERE, ONE OVER THERE, AND ONE OVER

16  HERE.

17          MR. MICHAEL:  THE RECORD SHOULD REFLECT HE SHOWED

18  THERE'S ONE GATE ON THE LOWER LEFT SIDE, THERE WAS ONE ON THE

19  PHOTOGRAPH TO THE LOWER RIGHT SIDE OF THE PARKING LOT, AND

20  THEN ONE ON THE UPPER SIDE OF THE PARKING LOT TO THE LEFT OF

21  THE MAIN ENTRANCE.

22          MR. AARON:  I'M SORRY TO INTERRUPT, COUNSEL.  I

23  DIDN'T UNDERSTAND THAT.

24          MR. MICHAEL:  I'LL DO IT FOR THE RECORD AGAIN.

25          THE RECORD SHOULD REFLECT THAT HE POINTED TO ONE

1    GATE TO THE RIGHT AND JUST BELOW THE MAINTENANCE BUILDING.

2    THERE WAS ANOTHER ONE THAT'S TO THE LEFT OF THE BUILDING IN

3    THE PHOTOGRAPH NEAR THE LOWER LEFT CORNER OF THE PHOTOGRAPH.

4    AND THEN THERE WOULD BE ANOTHER ONE THAT'S ALSO TO THE LEFT

5    OF THE MAINTENANCE BUILDING BUT HIGHER UP NEAR ANOTHER LARGE

6    STRUCTURE THAT APPEARS TO HAVE A LONG LIGHT-COLORED ROOF.

7    BY MR. MICHAEL:

8    Q.    AND WERE THOSE GATES TYPICALLY LOCKED OR UNLOCKED?

9    A.    THEY'RE NORMALLY CLOSED.

10   Q.    AND WOULD IT HAVE BEEN POSSIBLE FOR MR. SANDERS TO HAVE

11   GONE FROM WHERE HE WAS PARKED AND JUST GONE PAST THIS TREE

12   DIRECTLY TOWARDS THE MAIN EXIT TO THE PARKING LOT?

13   A.    YES.

14          MR. MICHAEL:  LET THE RECORD REFLECT THAT THE TREE

15   IS JUST TO THE RIGHT OF THE BUILDING -- ABOVE AND TO THE

16   RIGHT OF THE BUILDING.

17          THANK YOU.  YOU CAN RETURN TO YOUR SEAT.

18   BY MR. MICHAEL:

19   Q.    MR. FLORES, WHEN YOU SAW MR. SANDERS LEAVE THE BUILDING

20   AND GET INTO HIS TRUCK AND DRIVE AROUND, WAS HE MOVING

21   QUICKLY OR SLOWLY?

22   A.    QUICKLY.

23          MR. MICHAEL:  NO FURTHER QUESTIONS, YOUR HONOR.

24          THE COURT:  THANK YOU.

25          CROSS-EXAMINATION.

```
 1              MR. AARON:  THANK YOU.

 2                    CROSS-EXAMINATION

 3   BY MR. AARON:

 4   Q.   GOOD AFTERNOON, SIR.

 5   A.   GOOD AFTERNOON.

 6   Q.   ONE OF YOUR JOBS IS TO TELL PEOPLE AT THE CAMP IF OTHER

 7   PEOPLE COME ON THE PREMISES, CORRECT?

 8   A.   YES.

 9   Q.   WHEN YOU SAW THE VEHICLES APPROACHING YOU AND THE PERSON

10   ASKED YOU WHERE JIM WAS, UP TO THAT POINT HAD YOU HEARD A

11   POLICE SIREN?

12   A.   NO.

13   Q.   ABOUT HOW MANY VEHICLES WERE THERE?

14   A.   ABOUT SIX OR SEVEN.

15   Q.   AFTER JIM LEFT DID YOU HEAR A SIREN?

16   A.   NO.

17   Q.   DID YOU HEAR A SIREN AT ANY TIME THAT DAY?

18   A.   NO.

19              MR. AARON:  THANK YOU.  NOTHING FURTHER.

20              THE COURT:  REDIRECT?

21              MR. MICHAEL:  NO REDIRECT, YOUR HONOR.

22              THE COURT:  THANK YOU.  YOU ARE EXCUSED.  YOU MAY

23   STEP DOWN.

24              MR. MICHAEL:  I DIDN'T KNOW IF YOU WANTED US TO

25   CALL ANOTHER WITNESS.
```

1    THE COURT:  LADIES AND GENTLEMEN, WE'RE GOING TO --

2  WE ARE NOT GOING TO CALL ANY FURTHER WITNESSES THIS AFTERNOON

3  BECAUSE I NEED TO DISCUSS A MATTER WITH EACH ONE OF YOU.

4  IT'S NOT GOING TO TAKE VERY LONG, I DON'T THINK, BUT I NEED

5  TO ASK EACH ONE OF YOU SEPARATELY A QUESTION OR TWO.  AND I

6  DON'T WANT TO KEEP YOU LATE THIS AFTERNOON.  SO WHAT I'M

7  GOING TO ASK YOU TO DO IS I'M GOING TO ASK MS. SASSE TO TAKE

8  YOU OUTSIDE.  I THINK IT'S ONLY GOING TO TAKE A MOMENT OR

9  TWO, SO I'LL JUST ASK YOU TO WAIT OUT IN THE HALLWAY AND I'LL

10  CALL YOU IN ONE-BY-ONE.

11    SO I'M GOING TO GIVE YOU AN ADMONITION AGAIN NOW

12  NOT TO DISCUSS THE CASE WITH ANYONE, NOT TO FORM ANY OPINIONS

13  ABOUT IT, NOT TO DISCUSS THE EVIDENCE IN ANY FASHION OR

14  ANYTHING RELATED TO THE CASE IN ANY FASHION, NOT TO DISCUSS

15  ANYTHING, DO ANY INVESTIGATION ABOUT THE CASE, DO ANY

16  RESEARCH ABOUT THE CASE.  I THINK THAT COVERS EVERYTHING.  IF

17  I LEFT ANYTHING OUT THAT I SAID BEFORE, REMEMBER THAT, TOO.

18    THANK YOU VERY MUCH FOR YOUR PATIENCE, LADIES AND

19  GENTLEMEN.  THIS SHOULDN'T TAKE VERY LONG.  PLEASE WAIT

20  OUTSIDE UNTIL MS. SASSE BRINGS YOU IN.

21    (JURY HAS EXITED THE COURTROOM.)

22    THE COURT:  WE CAN START WITH JUROR NO. 1,

23  MS. DILLARD.

24    (JUROR DILLARD IS PRESENT IN THE COURTROOM.)

25    THE COURT:  MS. DILLARD, GOOD AFTERNOON.

1        JUROR DILLARD:  GOOD AFTERNOON.

2        THE COURT:  IN YOUR JUROR NOTEBOOK THERE ARE JURY

3   INSTRUCTIONS BEHIND THE TAB THAT SAYS "JURY INSTRUCTIONS."

4   HAVE YOU HAD A CHANCE TO LOOK AT THOSE YET?

5        JUROR DILLARD:  I HAVEN'T READ THOSE, NO.

6        THE COURT:  YOU HAVEN'T LOOKED AT ANY OF THEM?

7        JUROR DILLARD:  NO.

8        THE COURT:  THAT'S ALL I NEEDED TO KNOW.  THANK YOU

9   VERY MUCH.  I'LL SEE YOU TOMORROW MORNING AT 9:00.

10            (JUROR DILLARD EXITS THE COURTROOM.)

11        THE COURT:  MR. EASTERDAY.

12          (JUROR EASTERDAY IS PRESENT IN THE COURTROOM.)

13        THE COURT:  MR. EASTERDAY, GOOD AFTERNOON.  IN THE

14   JURY NOTEBOOK THAT EACH ONE OF YOU HAS THERE IS A TAB IN IT.

15   ONE OF THE TAB SAYS "JURY INSTRUCTIONS".  HAVE YOU HAD AN

16   OPPORTUNITY TO LOOK AT ANY OF THE JURY INSTRUCTIONS BEHIND

17   THAT TAB?

18        JUROR EASTERDAY:  I JUST GLANCED OVER IT.

19        THE COURT:  DO YOU REMEMBER ANY OF THEM?

20        JUROR EASTERDAY:  SPECIFICALLY?

21        THE COURT:  MM-HMM.

22        JUROR EASTERDAY:  TO NOT DISCUSS THE CASE.  I

23   COULDN'T TELL YOU WORD FOR WORD.

24        THE COURT:  THAT'S OKAY.  IT'S NOT A TEST.  THERE

25   ARE A COUPLE OF INSTRUCTIONS AT THE END.  DID YOU GET ALL THE

1   WAY TO THE END?

2             JUROR EASTERDAY:  NO.

3             THE COURT:  DO YOU REMEMBER SEEING ANY INSTRUCTION

4   ABOUT AGENT ARNOLD'S TESTIMONY?

5             JUROR EASTERDAY:  DO I REMEMBER ANY INSTRUCTION?

6   YES.

7             THE COURT:  DO YOU REMEMBER SEEING AN INSTRUCTION

8   ABOUT AGENT ARNOLD'S TESTIMONY?

9             JUROR EASTERDAY:  IN THE JURY INSTRUCTIONS?

10            THE COURT:  YES.

11            JUROR EASTERDAY:  NO, I DON'T.

12            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU VERY

13   MUCH.

14            LET ME JUST ASK YOU ONE OTHER -- WELL, LET ME

15   INSTRUCT YOU ABOUT ONE OTHER THING.  NOTHING THAT I HAVE

16   ASKED YOU ABOUT THIS AFTERNOON IN CONNECTION WITH THIS,

17   PLEASE DON'T SPECULATE ABOUT THE REASONS FOR ANY OF MY

18   QUESTIONS, ALL RIGHT?

19            THANK YOU VERY MUCH.  YOU'RE FREE TO GO.  SEE YOU

20   TOMORROW MORNING.  THANK YOU.

21            (JUROR EASTERDAY EXITS THE COURTROOM.)

22            THE COURT:  NO. 3, MS. LANDFRIED.

23          (JUROR LANDFRIED IS PRESENT IN THE COURTROOM.)

24            THE COURT:  GOOD AFTERNOON, MS. LANDFRIED.  IN THE

25   JUROR NOTEBOOKS --

1              YOU MAY ALL BE SEATED.

2              IN THE JUROR NOTEBOOKS THERE'S A TAB AMONG THE

3    OTHER TABS THAT SAYS, "JURY INSTRUCTIONS."

4              JUROR LANDFRIED:  YES.

5              THE COURT:  I DON'T KNOW, HAVE YOU HAD A CHANCE TO

6    LOOK THROUGH ANY OF THE INSTRUCTIONS YET?

7              JUROR LANDFRIED:  I LOOKED THROUGH THEM AS YOU WERE

8    READING THEM TO US.

9              THE COURT:  THE FIRST MORNING?

10             JUROR LANDFRIED:  YES.

11             THE COURT:  HAVE YOU HAD A CHANCE TO LOOK THROUGH

12   THEM SINCE THEN?

13             JUROR LANDFRIED:  NO.

14             THE COURT:  THANK YOU VERY MUCH.  THAT'S ALL I

15   NEEDED TO KNOW.

16               (JUROR LANDFRIED EXITS THE COURTROOM.)

17             THE COURT:  MR. EASTIS.

18           (JUROR EASTIS IS PRESENT IN THE COURTROOM.)

19             THE COURT:  MR. EASTIS, GOOD AFTERNOON.

20             JUROR EASTIS:  HI.

21             THE COURT:  MR. EASTIS, THE JUROR NOTEBOOKS THAT

22   EACH ONE OF YOU HAS HAS A TAB THAT SAYS, "JURY INSTRUCTIONS."

23   HAVE YOU HAD A CHANCE TO LOOK THROUGH THE INSTRUCTIONS AT

24   ALL?

25             JUROR EASTIS:  NOT REALLY BECAUSE IT'S BEEN IN HERE

1   ALL THE TIME.  I'M PAYING MORE ATTENTION TO WHAT'S GOING ON.

2          THE COURT:  THAT'S GREAT.  IT'S NOT AN EXAMINATION

3   OF YOUR MEMORY OR ANYTHING ELSE.  THE COURT MADE A MISTAKE

4   AND THERE'S SOMETHING THAT WE LEFT IN THERE THAT SHOULDN'T

5   HAVE BEEN IN THERE, THAT'S WHY I'M ASKING.

6          JUROR EASTIS:  THEN I'M NOT THE BAD GUY.

7          THE COURT:  NO.  I SHOULD HAVE BEEN TELLING THE

8   OTHER JURORS.  EVERYBODY THINKS THEY SHOULD HAVE BEEN READING

9   THEM AND THIS IS SOME KIND OF EXAM.  SO HAVE YOU HAD A CHANCE

10  TO READ ANY OF THE INSTRUCTIONS THAT ARE IN YOUR NOTEBOOK?

11         JUROR EASTIS:  NO.  I FIGURED I'D READ THAT BEFORE

12  WE DELIBERATE.

13         THE COURT:  THAT'S FINE.  THANK YOU VERY MUCH.  SEE

14  YOU TOMORROW MORNING.

15         JUROR EASTIS:  9:00, RIGHT?

16         THE COURT:  9:00.

17         (JUROR EASTIS EXITS THE COURTROOM.)

18         THE COURT:  MR. SHANTELER.

19         (JUROR SHANTELER IS PRESENT IN THE COURTROOM.)

20         THE COURT:  GOOD AFTERNOON, MR. SHANTELER.  THE

21  COURT MADE A MISTAKE ON THE JURY NOTEBOOKS THAT I'M SO PROUD

22  THAT WE HAND OUT AND I THINK ARE SO MUCH BETTER THAN THOSE

23  OLD STENO PADS THEY USED TO GIVE JURORS.  WE LEFT SOME THINGS

24  IN THERE THAT SHOULD HAVE -- OUR MISTAKE, SHOULDN'T HAVE BEEN

25  IN THERE.  HAVE YOU IN THE "JURY INSTRUCTIONS" TAB?  HAVE YOU

1    HAD A CHANCE TO READ THE INSTRUCTIONS OF THE COURT THAT ARE

2    IN THERE OR LOOK THROUGH THOSE AT ALL?

3              JUROR SHANTELER:  I HAVE PERUSED THEM BUT NOT MORE

4    THAN THAT.

5              THE COURT:  DO YOU REMEMBER WHEN YOU LOOKED AT

6    THEM?  WAS IT THE FIRST DAY WHEN I WAS READING THEM ALL TO

7    YOU?

8              JUROR SHANTELER:  JUST GLANCING THROUGH THE BOOK

9    WHEN YOU WERE TALKING ABOUT THE DIFFERENT SECTIONS.  I DIDN'T

10   STOP AND LOOK AT ANYTHING IN PARTICULAR.  I JUST WAS GOING

11   THROUGH THE TABS.

12             THE COURT:  ALL RIGHT.  AND HAVE YOU LOOKED AT THE

13   INSTRUCTIONS SINCE THAT DAY, THAT FIRST DAY?

14             JUROR SHANTELER:  NO, MA'AM.

15             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

16             JUROR SHANTELER:  THANK YOU.

17             (JUROR SHANTELER EXITS THE COURTROOM.)

18             THE COURT:  MR. DREW.

19             (JUROR DREW IS PRESENT IN THE COURTROOM.)

20             THE COURT:  GOOD AFTERNOON, MR. DREW.  BEFORE I

21   FORGET, WE'RE GOING TO RECESS TOMORROW ABOUT 3:45 SO YOU CAN

22   MAKE IT TO YOUR APPOINTMENT ON TIME.

23             JUROR DREW:  THANK YOU.

24             THE COURT:  YOU'RE WELCOME.

25             MR. DREW, THE COURT MADE A MISTAKE IN CONNECTION

1   WITH EVERYONE'S JURY NOTEBOOK, AND THAT'S WHY I'M ASKING

2   THESE QUESTIONS.  HAVE YOU HAD A CHANCE TO READ THE

3   INSTRUCTIONS THAT ARE BEHIND THE TAB IN YOUR JUROR NOTEBOOK

4   THAT SAYS "INSTRUCTIONS"?

5            JUROR DREW:  YES, I HAVE.  I'VE GLANCED AT THEM.

6   I'VE READ THROUGH THEM, YES.

7            THE COURT:  YOU HAVE?  CAN YOU TELL ME WHEN YOU

8   READ THROUGH THEM?

9            JUROR DREW:  I LOOKED AT THEM TODAY.

10           THE COURT:  WHAT TIME TODAY?  WAS IT BEFORE LUNCH

11  OR AFTER?

12           JUROR DREW:  I BELIEVE IT WAS BEFORE LUNCH.

13           THE COURT:  DID YOU GET ALL THE WAY TO THE END?

14           JUROR DREW:  NO, I DID NOT.

15           THE COURT:  DO YOU REMEMBER SEEING AN INSTRUCTION

16  ABOUT AGENT ARNOLD'S TESTIMONY?

17           JUROR DREW:  NO.

18           THE COURT:  ALL RIGHT.  YOU SURE ABOUT THAT?  THE

19  INSTRUCTIONS THAT YOU WERE READING, WERE THEY THE GENERAL

20  ONES I GAVE THE FIRST DAY?

21           JUROR DREW:  YES.

22           THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

23           ANYONE HAVE ANY FURTHER QUESTIONS?

24           MR. AARON:  NO QUESTIONS.

25           THE COURT:  ALL RIGHT.  THANK YOU, SIR.  WE WILL

```
 1    SEE YOU TOMORROW MORNING AT 9:00.
 2              (JUROR DREW EXITS THE COURTROOM.)
 3              THE COURT:  MS. CHILDERS.
 4          (JUROR CHILDERS IS PRESENT IN THE COURTROOM.)
 5              THE COURT:  GOOD AFTERNOON.
 6              JUROR CHILDERS:  HI.
 7              THE COURT:  MS. CHILDERS, YOU DON'T HAVE TO SIT
 8    DOWN.  THIS WILL BE VERY QUICK I THINK.  MS. CHILDERS, THE
 9    COURT MADE A MISTAKE IN PUTTING TOGETHER THE JURY NOTEBOOKS
10    THAT YOU ALL HAVE, AND I JUST WANTED TO ASK YOU, HAVE YOU HAD
11    A CHANCE TO READ THROUGH THE JURY INSTRUCTIONS IN YOUR
12    NOTEBOOK YET?
13              JUROR CHILDERS:  I HAVEN'T.
14              THE COURT:  OKAY.  LOOKED AT THEM AT ALL?
15              JUROR CHILDERS:  I JUST GLANCED THROUGH THEM THE
16    FIRST DAY TO SEE WHAT THEY WERE, BUT I JUST WENT TO THE
17    SECTION THAT SAID "NOTES."  I'VE BEEN TAKING NOTES.
18              THE COURT:  THAT'S ALL I NEED TO KNOW.  THANK YOU
19    VERY MUCH.  SEE YOU TOMORROW.
20              JUROR CHILDERS:  9:00?
21              THE COURT:  9:00.
22              (JUROR CHILDERS EXITS THE COURTROOM.)
23              THE COURT:  MS. BONDY.
24          (JUROR BONDY IS PRESENT IN THE COURTROOM.)
25              THE COURT:  GOOD AFTERNOON.  MS. BONDY, THE COURT
```

1    MADE A MISTAKE IN PUTTING TOGETHER THE JUROR NOTEBOOKS THAT

2    EACH ONE OF YOU HAS, SO I JUST NEED TO ASK YOU A QUESTION OR

3    TWO.  HAVE YOU HAD A CHANCE TO LOOK THROUGH THE INSTRUCTIONS

4    THAT ARE BEHIND THE "INSTRUCTIONS" TAB?

5           JUROR BONDY:  I LOOKED THROUGH A FEW OF THEM TODAY,

6    THE FIRST FEW PAGES.

7           THE COURT:  ALL RIGHT.  DO YOU KNOW WHAT TIME YOU

8    DID THAT TODAY?  BEFORE LUNCH?  AFTER LUNCH?

9           JUROR BONDY:  NO, IT WAS THIS LAST SESSION.

10          THE COURT:  ALL RIGHT.  SO SOMETIME AFTER LUNCH?

11          JUROR BONDY:  YEAH.

12          THE COURT:  ALL RIGHT.  AND YOU SAY YOU LOOKED

13   THROUGH THE FIRST FEW PAGES IS ALL?

14          JUROR BONDY:  YES.

15          THE COURT:  THANK YOU VERY MUCH.  THAT'S ALL I

16   NEEDED TO KNOW.  SEE YOU TOMORROW MORNING.

17             (JUROR BONDY EXITS THE COURTROOM.)

18          THE COURT:  MS. LEWIS.

19          (JUROR LEWIS IS PRESENT IN THE COURTROOM.)

20          THE COURT:  GOOD AFTERNOON, MS. LEWIS.

21          JUROR LEWIS:  GOOD AFTERNOON.

22          THE COURT:  I JUST HAVE A QUESTION OR TWO FOR YOU.

23   FIRST, I HAVE TO CONFESS.  THE COURT MADE A MISTAKE WHEN WE

24   PUT OUR JUROR NOTEBOOKS TOGETHER AND THAT'S THE REASON I'M

25   ASKING THIS.  HAVE YOU HAD A CHANCE TO LOOK THROUGH THE

1    SECTION IN YOUR NOTEBOOK CALLED "JURY INSTRUCTIONS"?

2             JUROR LEWIS:  I GLANCED THROUGH IT, BUT I BELIEVE

3    YOU READ THAT THE FIRST DAY.

4             THE COURT:  RIGHT.  IS THAT WHEN YOU WERE LOOKING

5    THROUGH IT?

6             JUROR LEWIS:  YES.

7             THE COURT:  WHILE I WAS READING THEM TO YOU?

8             JUROR LEWIS:  YES.

9             THE COURT:  HAVE YOU LOOKED THROUGH THEM SINCE

10   THEN?

11            JUROR LEWIS:  NO, I HAVE NOT.

12            THE COURT:  ALL RIGHT.  THAT'S ALL I NEEDED TO

13   KNOW.  THANK YOU VERY MUCH.  WE'LL SEE YOU TOMORROW MORNING.

14            JUROR LEWIS:  GOOD NIGHT.

15            THE COURT:  GOOD NIGHT.

16               (JUROR LEWIS EXITS THE COURTROOM.)

17            THE COURT:  MRS. EDWARDS.

18          (JUROR EDWARDS IS PRESENT IN THE COURTROOM.)

19            THE COURT:  GOOD AFTERNOON.

20            JUROR EDWARDS:  GOOD AFTERNOON.

21            THE COURT:  MRS. EDWARDS, THE COURT MADE A MISTAKE.

22   WHEN WE PUT THOSE JUROR NOTEBOOKS TOGETHER, THERE'S JUST SOME

23   THINGS IN THERE THAT SHOULDN'T HAVE BEEN IN THERE, SO THAT'S

24   WHY I'M GOING TO ASK YOU THIS QUESTION.  HAVE YOU HAD A

25   CHANCE TO REVIEW THE MATERIALS THAT ARE IN YOUR NOTEBOOK

1    BEHIND THE TAB THAT SAYS "JURY INSTRUCTIONS"?

2              JUROR EDWARDS:  NO.

3              THE COURT:  ALL RIGHT.  YOU HAVEN'T LOOKED AT THEM

4    AT ALL?

5              JUROR EDWARDS:  YES, I'VE LOOKED, BUT NOT REALLY,

6    YOU KNOW.

7              THE COURT:  NOT READ THEM?

8              JUROR EDWARDS:  YES.

9              THE COURT:  ALL RIGHT.  DID YOU LOOK AT THEM WHILE

10   I WAS READING THE INSTRUCTIONS TO YOU PERHAPS?

11             JUROR EDWARDS:  NO, I DIDN'T LOOK WHILE YOU WERE

12   READING, NO.

13             THE COURT:  HAVE YOU LOOKED AT THEM SINCE?

14             JUROR EDWARDS:  NO.

15             THE COURT:  OKAY.  SO JUST LOOKED TO SEE WHAT WAS

16   BACK THERE BUT DIDN'T READ THEM?

17             JUROR EDWARDS:  RIGHT.

18             THE COURT:  THAT'S ALL I NEEDED TO KNOW.  THANK YOU

19   VERY MUCH.

20             JUROR EDWARDS:  ALL RIGHT.  THANK YOU.

21             THE COURT:  SEE YOU TOMORROW MORNING.

22                (JUROR EDWARDS EXITS THE COURTROOM.)

23             THE COURT:  MR. ENGLUTT.

24           (JUROR ENGLUTT IS PRESENT IN THE COURTROOM.)

25             THE COURT:  GOOD AFTERNOON, MR. ENGLUTT.  WE MADE A

1    MISTAKE -- WE, THE COURT, NOT COUNSEL -- WHEN WE PUT THE JURY

2    NOTEBOOKS TOGETHER.  THAT'S WHY I'M ASKING THIS.  WHEN YOU

3    RECEIVED YOUR NOTEBOOKS OR ANY TIME SINCE, HAVE YOU HAD A

4    CHANCE TO READ THROUGH THE INSTRUCTIONS THAT ARE IN THE

5    NOTEBOOK BEHIND THE TAB THAT SAYS "JURY INSTRUCTIONS"?

6              JUROR ENGLUTT:  NO.

7              THE COURT:  ALL RIGHT.  YOU HAVEN'T LOOKED AT THEM

8    YET.  OKAY.  THAT'S ALL I NEEDED TO KNOW.  THANK YOU.

9              JUROR ENGLUTT:  DO I HAVE TO?

10             THE COURT:  NOT YET.  BUT THEY'RE THERE FOR YOU IF

11   YOU NEED THEM.  SEE YOU TOMORROW MORNING.

12             (JUROR ENGLUTT EXITS THE COURTROOM.)

13             THE COURT:  MS. GRISHAM.

14          (JUROR GRISHAM IS PRESENT IN THE COURTROOM.)

15             THE COURT:  GOOD AFTERNOON, MS. GRISHAM.

16             JUROR GRISHAM:  HELLO.

17             THE COURT:  I NEED TO ASK YOU JUST A QUESTION OR

18   TWO BECAUSE THE COURT MADE A MISTAKE WHEN PUTTING THE JURY

19   NOTEBOOKS TOGETHER.  HAVE YOU HAD A CHANCE TO REVIEW THE

20   INSTRUCTIONS THAT ARE IN YOUR NOTEBOOK?

21             JUROR GRISHAM:  THE ONE PIECE OF PAPER THAT'S ON

22   THE SIDE IN THE POCKET?

23             THE COURT:  NO, THE ACTUAL MATERIALS THAT ARE

24   BEHIND THE "JURY INSTRUCTIONS" TAB.

25             JUROR GRISHAM:  NO.

1          THE COURT:  ALL RIGHT.  YOU HAVEN'T LOOKED AT THEM

2     YET?

3          JUROR GRISHAM:  NO.

4          THE COURT:  THANK YOU THEN.  THAT'S ALL I NEED TO

5     KNOW.

6          JUROR GRISHAM:  IS THAT A GOOD THING?

7          THE COURT:  THEY'RE THERE IF YOU NEED TO.  THIS IS

8     NOT A TEST TO MAKE SURE YOU HAVE.

9          JUROR GRISHAM:  OKAY.

10          THE COURT:  THANKS A LOT.  WE'LL SEE YOU TOMORROW

11     MORNING.

12              (JUROR GRISHAM EXITS THE COURTROOM.)

13          THE COURT:  MR. ROBINSON.

14         (JUROR ROBINSON IS PRESENT IN THE COURTROOM.)

15          THE COURT:  GOOD AFTERNOON, MR. ROBINSON.

16          JUROR ROBINSON:  HELLO.

17          THE COURT:  I HAVE TO ASK YOU A QUESTION OR TWO

18     BECAUSE THE COURT MADE A MISTAKE WHEN WE PUT TOGETHER THE

19     JUROR NOTEBOOKS THIS TIME.  HAVE YOU HAD A CHANCE TO REVIEW

20     ANY OF THE MATERIALS THAT ARE BEHIND THE TAB IN YOUR NOTEBOOK

21     THAT SAYS "JURY INSTRUCTIONS"?

22          JUROR ROBINSON:  NO.

23          THE COURT:  THANK YOU VERY MUCH.  THAT'S ALL I NEED

24     TO KNOW.  SEE YOU TOMORROW MORNING.

25          JUROR ROBINSON:  ALL RIGHT.

```
 1                    (JUROR ROBINSON EXITS THE COURTROOM.)

 2                 (JUROR PLUNK IS PRESENT IN THE COURTROOM.)

 3              THE COURT:  GOOD AFTERNOON.

 4              JUROR PLUNK:  GOOD AFTERNOON, YOUR HONOR.

 5              THE COURT:  SORRY YOU'RE THE VERY LAST ONE.

 6              JUROR PLUNK:  IT'S ALL RIGHT.

 7              THE COURT:  MS. PLUNK, THE REASON I'M ASKING THIS

 8    QUESTION IS BECAUSE THE COURT MADE A MISTAKE WHEN WE PUT THE

 9    JUROR NOTEBOOKS TOGETHER.  HAVE YOU HAD A CHANCE TO LOOK AT

10    OR READ THE INSTRUCTIONS THAT ARE BEHIND THE TAB THAT SAYS

11    "JURY INSTRUCTIONS" IN YOUR NOTEBOOK?

12              JUROR PLUNK:  I DIDN'T READ THEM, BUT I SKIMMED

13    THEM, SO I COULDN'T --

14              THE COURT:  I'M NOT GOING TO GIVE YOU A TEST.

15              JUROR PLUNK:  YEAH.

16              THE COURT:  EVERYONE SEEMS TO HAVE BEEN ANXIOUS.

17              JUROR PLUNK:  I DID LOOK AT THEM, YES.

18              THE COURT:  WHEN DID YOU LOOK AT THEM?

19              JUROR PLUNK:  THE FIRST DAY WE SAT IN HERE.  THAT

20    MUST HAVE BEEN WEDNESDAY.

21              THE COURT:  WHEN I WAS READING THEM TO YOU?

22              JUROR PLUNK:  AFTER.

23              THE COURT:  HAVE YOU LOOKED AT THEM SINCE?

24              JUROR PLUNK:  NO.

25              THE COURT:  ALL RIGHT.  THAT'S ALL I NEEDED TO
```

1    KNOW.

2              JUROR PLUNK:  OKAY.

3              THE COURT:  THANK YOU VERY MUCH.

4                   (JUROR PLUNK EXITS THE COURTROOM.)

5              JUROR PLUNK:  THOSE SPECIAL INSTRUCTIONS WERE ADDED

6    AFTER THAT FIRST DAY, SO I CAN MAKE THAT REPRESENTATION TO

7    YOU, SO I THINK THAT NONE OF THE JURORS SEEMED TO HAVE HAD

8    ANY EXPOSURE TO THAT.

9              ANYONE WISH TO MAKE ANY OBJECTION BASED ON WHAT THE

10   RECORD HAS BEEN FROM THE JURORS THAT WE'VE TALKED TO?

11             MR. AARON:  NO, YOUR HONOR.

12             MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

13             THE COURT:  BEFORE WE -- YES.

14             MR. MICHAEL:  WE'VE LEARNED SOME NEW INFORMATION

15   ABOUT THE CD THAT I WANTED TO SHARE WITH YOUR HONOR.

16             THE COURT:  ALL RIGHT.

17             MR. MICHAEL:  AGENT MORENO WENT BACK AND LOOKED

18   THROUGH FILES, TRIED TO REFRESH HIS MEMORY ABOUT WHAT HAD

19   GONE ON.  AND HE ULTIMATELY REALIZED THAT THE CD HAD NOT BEEN

20   SENT TO HIM BY WALNUT CREEK.  IT HAD GOTTEN MIXED IN WITH

21   THOSE MATERIALS, SO THAT'S WHAT HE THOUGHT HAD HAPPENED.  HE

22   ACTUALLY -- AND THE GOVERNMENT -- ACTUALLY THERE IS AN ROI

23   THAT WAS GENERATED BY MR. MORENO ABOUT HIS INTERACTION WITH

24   WALNUT CREEK THAT WAS PRODUCED IN DISCOVERY TO DEFENSE

25   COUNSEL UPON ITS CREATION OR UPON THE GOVERNMENT GETTING IT,

1    SO THERE'S BEEN DISCLOSURE ON THAT ISSUE.

2            THE CD APPARENTLY WAS PROVIDED BY SAN BERNARDINO

3    COUNTY SHERIFF'S DIRECTLY TO MR. MORENO.  NOW, MR. MORENO --

4            THE COURT:  SO IT WASN'T SENT TO WALNUT CREEK?

5            MR. MICHAEL:  CORRECT.  SO WE DON'T HAVE TO WORRY

6    ABOUT A THIRD ENTITY.  AND MR. MORENO WILL BE PREPARED TO SAY

7    UNDER OATH THAT HE NEVER REVIEWED THE AUDIOTAPE, HE NEVER

8    LISTENED TO IT.  AND WHAT HAD HAPPENED WAS, AS I THINK WE

9    DESCRIBED, THERE HAD BEEN SOME INTERACTION WITH HIM IN SAN

10   BERNARDINO ABOUT MATERIALS FROM MR. BEKENSTEIN THAT WERE

11   ARRIVING AT THE JAIL INTENDED FOR MR. SANDERS.  AND MR.

12   MORENO INTERACTED WITH THEM ABOUT THAT AND MADE SOME

13   INQUIRIES AND THEY INDICATED THEY WOULD SEND SOME OF THE

14   MATERIALS OR ALLOW HIM TO SEE SOME OF THE MATERIALS OR SEND

15   SOME OF THEM TO HIM AND INCLUDED IN THAT WAS THE DISK.

16           THE COURT:  THAT'S HOW HE OBTAINED THE CD?

17           MR. MICHAEL:  YES.  IT DOESN'T CHANGE THE FACT THAT

18   SAN BERNARDINO STILL RECORDED IT AND SENT IT TO HIM.  I THINK

19   DURING -- PERIODICALLY, MR. MORENO HAS INQUIRED OF SAN

20   BERNARDINO IF THEY HAD ANY TELEPHONE RECORDINGS PERTAINING TO

21   MR. SANDERS, NOT PRIVILEGED BUT FOR OTHER MATTERS, AND THEY

22   REPEATEDLY TOLD HIM, "WE DON'T HAVE ANY, WE DON'T HAVE ANY."

23   SO HIS RECOLLECTION IS AT SOME POINT THIS AUDIO CD SHOWED UP,

24   BUT HE NEVER LISTENED TO IT, AND IT DIDN'T REALLY REGISTER

25   WITH HIM.

1           THE COURT:  ALL RIGHT.  SO DID HE HAVE ANY

2    CONVERSATIONS WITH ANYONE AT THE SAN BERNARDINO COUNTY

3    SHERIFF'S DEPARTMENT ABOUT THAT CD?

4           MR. MICHAEL:  I DON'T BELIEVE SO.  I KNOW THAT WE

5    INQUIRED AND WENT OVER -- HE CERTAINLY HAD NO CONVERSATIONS

6    WITH SAN BERNARDINO COUNTY SHERIFF'S THAT APPEARED TO THE

7    GOVERNMENT OR EVEN TO AGENT MORENO IN ANY WAY, SHAPE, OR FORM

8    TO RELATE TO THE SUBSTANCE OF THE CONVERSATIONS.  I CAN'T

9    STATE RIGHT NOW -- I WOULD HAVE TO ASK MR. MORENO -- IF THEY

10   EVER TOLD HIM THEY WERE SENDING THE CD TO HIM OR IF THE FACT

11   THAT THE CD EXISTED WAS EVER A PART OF A CONVERSATION.  I

12   BELIEVE HIS -- HE HAS NO -- HE NEVER HAD ANY CONVERSATION

13   WITH ANYBODY AT SAN BERNARDINO ABOUT ANYTHING THAT POSSIBLY

14   RELATED TO THE CONTENT OF THAT CD IS MY UNDERSTANDING.  AND

15   HE HAS RETURNED TO THE COURTROOM, AND OBVIOUSLY, IF I CAN

16   JUST INQUIRE REAL QUICK, YOUR HONOR.

17           (COUNSEL AND AGENT MORENO CONFER.)

18           MR. MICHAEL:  WHAT AGENT MORENO FOUND, YOUR HONOR,

19   AND THE GOVERNMENT HAS MADE A COPY IS, HE KEEPS A CASE

20   CHRONOLOGY OF THINGS THAT HAPPEN IN THE CASE, AND HE'S MADE A

21   COUPLE OF ENTRIES.  HE HAS A COUPLE ENTRIES IN THERE THAT HE

22   HAD AND THAT HE HAD FORGOTTEN WERE IN THE CASE FILE AND

23   HADN'T PROVIDED THEM TO THE GOVERNMENT AND HE FOUND THEM NOW.

24   WE HAVE COPIES OF THEM AND WE ARE GOING TO GIVE COPIES TO

25   DEFENSE COUNSEL AS WELL.

1          THERE ARE SOME INTERACTIONS IN THERE, TALK ABOUT

2     INTERACTION WITH AN AUSA WITH REGARD TO TRIAL PREP.  THAT'S

3     WHAT THE GREAT MAJORITY OF IT IS.  THERE'S RECENT

4     COMMUNICATION AFTER TRIAL DATE HAS BEEN SET.  AND HE

5     INDICATES IN THERE THAT HE HAD CONTACT WITH SOMEONE AT THE

6     CDC IN FEBRUARY 2007 AND THAT HE RECEIVED A -- I BELIEVE IT

7     SAYS TAPES AND PHOTOCOPIES.  I THINK THE TAPE REFERS TO THE

8     CD.  BUT, AGAIN, AGENT MORENO WILL BE WILLING TO STATE UNDER

9     OATH THAT HE NEVER LISTENED TO THE CD, YOUR HONOR.

10          THE COURT:  ALL RIGHT.  MR. AARON, I RECEIVED THE

11    PHOTOCOPY OF I GUESS WHAT YOU LEARNED FROM THE DISK; THAT IS,

12    THAT THE THREE CALLS WERE MADE ON NOVEMBER 7TH, 2006;

13    NOVEMBER 15TH, 2006; AND DECEMBER 1ST, 2006.  THEY HAD

14    DURATIONS OF APPROXIMATELY FOUR MINUTES, TWO MINUTES AND

15    FIFTEEN MINUTES AND THEY WERE ALL PLACED ON THE DISK ON

16    JANUARY 31ST, 2007.

17          MR. AARON:  YES, THAT'S CORRECT.  A COUPLE THINGS

18    ARE TROUBLING TO ME, YOUR HONOR.  WE STILL DON'T KNOW HOW

19    THEY GOT -- WELL, I GUESS WE KNOW HOW, BUT WE DON'T KNOW WHO

20    IS INVOLVED IN GETTING THIS INFORMATION ON THE DISK AND THEN

21    TO AGENT MORENO.  I'M KIND OF SURPRISED BECAUSE I WOULD THINK

22    THAT IF AN AGENT WAS GIVEN STATEMENTS OF THE DEFENDANT, WHICH

23    THIS PURPORTS TO BE, THE FIRST THING HE WOULD DO IS LISTEN TO

24    IT BECAUSE THE MOST POWERFUL EVIDENCE, AS WE KNOW, IS A

25    CONFESSION OR ADMISSION OR STATEMENTS.  SO I'M MYSTIFIED THAT

```
 1    HE WOULD NOT LISTEN TO IT.

 2              SECONDLY, IF HE KNOWS IT'S STATEMENTS OF THE

 3    DEFENDANT, WHETHER OR NOT HE LISTENS TO IT, HE KNOWS IT'S

 4    DISCOVERABLE.  HE KNOWS IT NEEDS TO BE DISCOVERED.  SO I'M

 5    VERY TROUBLED BY THOSE TWO ISSUES.

 6              THE COURT:  DO YOU WISH TO INQUIRE OF THE AGENT

 7    UNDER OATH?

 8              MR. AARON:  CERTAINLY.  I DON'T KNOW IF THE COURT

 9    HAS TIME FOR THAT NOW.

10              THE COURT:  WE DON'T AT THIS MOMENT.

11              BUT YOU'RE GOING TO MEET WITH MR. PHILIPS RIGHT

12    NOW, RIGHT?

13              MR. AKROTIRIANAKIS:  I'M GOING TO GO MEET WITH

14    MR. PHILIPS, YOUR HONOR.

15              THE COURT:  I HAVE A MEETING, AS I SAID.  MY

16    MEETING IS BRIEF, I MEAN 15 MINUTES I THINK, 20 MINUTES.  SO

17    I'D LIKE TO RECONVENE.  DOES ANYONE ELSE FIND THAT IMPOSSIBLE

18    TONIGHT?

19              MR. AARON:  THAT MIGHT BE DIFFICULT TONIGHT, YOUR

20    HONOR.  ON FRIDAY WE ARE GOING TO BE BREAKING EARLY BECAUSE

21    OF THE JUROR.

22              THE COURT:  DON'T WE HAVE A COUPLE OF ISSUES THAT

23    WE NEED TO TAKE UP BEFORE -- I MEAN, THIS ISSUE CAN WAIT, BUT

24    I THINK WE HAVE A COUPLE OF OTHER ISSUES THAT WE MIGHT NEED

25    TO TAKE UP TONIGHT.  DON'T YOU WANT TO BE HEARD ON THE
```

1    ADMISSIBILITY OF THE MANUSCRIPT?

2            MR. AARON:  OH, NO, YOUR HONOR, ALL I WANTED TO DO

3    WAS SAY I'M MAKING THE SAME OBJECTIONS I MADE BEFORE.  I

4    THINK I MADE A PRETTY COMPREHENSIVE SET OF OBJECTIONS ON

5    THAT.  AND NOTWITHSTANDING CURTIN, I'M MAKING THE SAME

6    OBJECTIONS BECAUSE I DON'T BELIEVE THAT CURTIN IS BROAD

7    ENOUGH TO INCLUDE THIS TYPE OF EVIDENCE.

8            THE COURT:  WELL, WHAT CURTIN DIDN'T DO IS, OF

9    COURSE, IT DIDN'T REACH THE 403 ISSUE.  IT SENT IT BACK TO

10   THE TRIAL COURT TO DO THAT.  AND THE CONCURRENCES IN CURTIN

11   ARE -- STRONGLY STRESS THAT MOST OF THE -- I THINK MOST OF

12   THE CONCURRENCES THAT MANY OF THE NINTH CIRCUIT JUDGES ARE OF

13   THE OPINION THAT THE EVIDENCE IN THAT CASE WOULD NOT BE

14   ADMISSIBLE AFTER A 403 REVIEW.  SO I THINK THAT IS STILL A

15   LIVE ISSUE HERE.

16           IS THERE ANYTHING ELSE THAT WE NEED TO TAKE UP

17   TONIGHT?

18           WELL, ONE, WHO ARE YOUR WITNESSES GOING TO BE

19   TOMORROW?

20           MR. AKROTIRIANAKIS:  TOM OLIVAS WHO IS THE MAN WHO

21   OWNS THE GIRL SCOUT CAMP.  HE'S LIKE FIVE MINUTES.  HE'S

22   GOING TO SAY THAT WAS THE TELEPHONE NUMBER THAT WAS ASSIGNED

23   TO HIM AT THE TIME.  THAT'S WHAT HE DID LAST TIME.  I SHOULD

24   PREVIEW FOR THE COURT, I WILL AGAIN OFFER IT UNDER 803(5),

25   THE PRESENT RECOLLECTION EXCEPTION AS WE DID IN THE LAST

1   CASE.

2              IT WILL BE MIKE IMPERATRICE, THE AGENT FROM LAS

3   VEGAS WHO DID THE SEARCH OF THE STORAGE UNIT.  RANDALL MARTIN

4   I'M HOPEFUL WILL BE TESTIFYING TOMORROW.  JAMES MORAN.  AND I

5   DON'T THINK THAT WILL QUITE FINISH WITH MORAN.  EVEN IF WE

6   DID, IT WOULD BE THE END OF THE DAY, BUT I COULD PUT LEE

7   BROWN ON IF THERE'S ANY TIME LEFT.  CERTAINLY WE WON'T FINISH

8   AGENT BROWN.

9              THE COURT:  WHAT'S THE STATUS OF YOUR DECISION TO

10  CALL KALEN S., MR. AARON.

11             MR. AARON:  YOUR HONOR, I HAVEN'T THOUGHT ABOUT

12  THAT.  I WENT BACK TO MY OFFICE BRIEFLY.  I DID NOT CHECK MY

13  E-MAIL.  I DO NOT KNOW WHAT MESSAGES MAY HAVE BEEN MADE AND I

14  HAVE NOT CHECKED TO SEE IF I'VE GOTTEN -- I'M NOT SURE THAT

15  THEY'VE BEEN SERVED.  I KNOW THAT LORI STYLES HAS BEEN

16  SERVED.  I SUSPECT THAT KALEN S. HAS BEEN SERVED, BUT I DON'T

17  KNOW FOR SURE.

18             THE COURT:  WE DO NEED TO TALK ABOUT -- WE NEED TO

19  RECONVENE, BECAUSE I WANT TO HEAR WHAT YOUR PROFFER IS AS TO

20  MRS. STYLES' TESTIMONY.  I'M NOT SURE WHAT SHE COULD SAY THAT

21  WOULD BE ADMISSIBLE BASED ON RULE 412.  SO LET'S TAKE A

22  RECESS.

23             MR. AARON:  YOUR HONOR, WOULD IT POSSIBLE TO DO

24  THIS TOMORROW?

25             THE COURT:  YES.  WE CAN START AT 8:30 IN THE

1    MORNING AND COVER IT TOMORROW MORNING.

2           MR. AKROTIRIANAKIS:  8:30?

3           THE COURT:  8:30.  WE ARE ADJOURNED.

4           MR. AARON:  THANK YOU.

5           THE COURT:  I DO NEED TO HAVE A DECISION TOMORROW

6    ABOUT KALEN.

7           MR. AARON:  I'M GOING TO TALK TO COUNSEL ABOUT THAT

8    FOR A FEW MOMENTS, BECAUSE IT REALLY DEPENDS UPON ANOTHER

9    WITNESS THAT UNFORTUNATELY WON'T BE TESTIFYING TOMORROW.

10               (PROCEEDINGS ADJOURNED)

11                    ---O0O---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### C E R T I F I C A T E

DOCKET NO. EDCR 04-42(A) VAP

      I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,
TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND
ACCURATE TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED
PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE
TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS
OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

_____

PHYLLIS A. PRESTON, CSR      DATED:  OCTOBER 16, 2008
FEDERAL OFFICIAL COURT REPORTER
LICENSE NO. 8701