1           UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2             EASTERN DIVISION-RIVERSIDE

3

        HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING
4

5   UNITED STATES OF AMERICA,        )
                                     )
6                  PLAINTIFF,        )
                                     )
7   V.                               )DOCKET NO. EDCR 04-42(A)-VAP
                                     )
8   JAMES SANDERS,                   )
                                     )
9                  DEFENDANT.        )
    _____)

10

11      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                  RIVERSIDE, CALIFORNIA
12               FRIDAY, JUNE 8, 2007

13

                PHYLLIS A. PRESTON, CSR
14                LICENSE NO. 8701
          FEDERAL OFFICIAL COURT REPORTER
15          UNITED STATES DISTRICT COURT
               3470 TWELFTH STREET
16          RIVERSIDE, CALIFORNIA 92501

17

18

19

20

21

22

23

24

25

1                                    **APPEARANCES**

2

     FOR THE PLAINTIFF:      OFFICE OF THE UNITED STATES ATTORNEY
3                            BY:   BRIAN MICHAEL
                                   JOSEPH AKROTIRIANAKIS
4                            ASSISTANT UNITED STATES ATTORNEYS
                             3880 LEMON STREET, SUITE 210
5                            RIVERSIDE, CALIFORNIA 92501

6

     FOR THE DEFENDANT:      **JEFFREY AARON**
7                            FEDERAL CRIMINAL DEFENSE PANEL
                             THE RIVERSIDE BARRISTER BUILDING
8                            3993 MARKET STREET
                             RIVERSIDE, CALIFORNIA 92501
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            I N D E X

 2      WITNESSES

 3      FOR PLAINTIFF:                                    PAGE

 4      TOM OLIVAS
        DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 32
 5
        MICHAEL IMPERATRICE
 6      DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 41
        CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 57
 7      REDIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . 66
        RECROSS-EXAMINATION BY MR. AARON . . . . . . . . . 71
 8
        CHAY KAHLER
 9      DIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 75
        CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 85
10      REDIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . 87

11      RANDALL MARTIN
        DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 92
12
        JAMES MORAN
13      DIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 193

14      JOSUE MORENO
        CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 265
15      REDIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . 272
        RECROSS-EXAMINATION BY MR. AARON . . . . . . . . . 274
16      FURTHER REDIRECT EXAMINATION BY MR. MICHAEL. . . . . 275

17

18      EXHIBITS                                      ADMITTED

19         40        . . . . . . . . . . . . . . . .     36
           43        . . . . . . . . . . . . . . . .     36
20         48        . . . . . . . . . . . . . . . .     45
           49 - 52   . . . . . . . . . . . . . . . .     48
21         54        . . . . . . . . . . . . . . . .     50
           55        . . . . . . . . . . . . . . . .     50
22         56        . . . . . . . . . . . . . . . .     52
           53        . . . . . . . . . . . . . . . .     55
23         29        . . . . . . . . . . . . . . . .     57
           57        . . . . . . . . . . . . . . . .     79
24         143       . . . . . . . . . . . . . . . .     86
           1 & 2     . . . . . . . . . . . . . . . .     92
25         105       . . . . . . . . . . . . . . . .     229
```

1              FRIDAY, JUNE 8, 2007, RIVERSIDE, CALIFORNIA

2                              ---OOO---

3              (OUTSIDE THE PRESENCE OF THE JURY:)

4              THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

5    PRESENCE OF THE JURY.  PLEASE BE SEATED.

6              MR. AARON, THE CLERK HANDED ME THIS MORNING TWO

7    MOTIONS WHICH WHEN THE CLERK'S OFFICE OPENS YOU OR SOMEONE

8    FROM YOUR OFFICE WILL HAVE TO FILE THEM DOWNSTAIRS.  I KEPT A

9    COPY OF EACH AND I'LL GO AHEAD AND READ AND CONSIDER THEM AS

10   SOON AS I CAN.

11             MR. AARON:  THANK YOU, YOUR HONOR.  AND I WILL

12   ELECTRONICALLY FILE THEM BECAUSE THEY CAN BE ELECTRONICALLY

13   FILED.

14             THE COURT:  I'M SORRY.

15             MR. AARON:  THAT'S OKAY.

16             THE COURT:  SO I WILL BEGIN READING THEM AS SOON

17   AS I CAN.

18             THERE WERE SEVERAL MATTERS THAT WE LEFT HANGING AT

19   THE END OF THE DAY YESTERDAY.  FIRST OF ALL, AS TO

20   MR. MARTIN --

21             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

22             THE COURT:  WHERE DO WE STAND WITH MR. MARTIN?

23             MR. AKROTIRIANAKIS:  HE IS -- THE GOVERNMENT

24   EXPECTS TO CALL HIM TODAY AFTER THE MORNING BREAK.  HIS

25   ATTORNEY, MR. PHILIPS, WILL BE HERE AT THAT TIME.  HE HAS A

1   COURT APPEARANCE ELSEWHERE IN THE DESERT NOW, SO HE'S NOT

2   AVAILABLE NOW, BUT HE WILL BE AVAILABLE TO BE WITH HIS CLIENT

3   AFTER THE MORNING BREAK AND THE GOVERNMENT WOULD CALL HIM

4   THEN.

5             THE COURT:  ALL RIGHT.  SO HE WILL BE THE FIRST

6   WITNESS AFTER THE RECESS?

7             MR. AKROTIRIANAKIS:  HE WILL BE THE FIRST WITNESS

8   AFTER THE COMPLETION OF WHATEVER WITNESS IS ON THE STAND.

9             THE COURT:  WELL, I THINK FROM THE PERSPECTIVE OF

10  THE MARSHALS THEY WOULD PREFER THAT HE BE A WITNESS

11  IMMEDIATELY AFTER THE RECESS IF HE IS IN CUSTODY.

12            MR. AKROTIRIANAKIS:  I DON'T MIND TAKING HIM OUT OF

13  ORDER, YOUR HONOR.

14            MR. AARON:  I DON'T HAVE ANY OBJECTION TO THE

15  PROSECUTION DOING ITS DIRECT AT THAT TIME.  I DO HAVE AN

16  OBJECTION TO ME HAVING TO DO CROSS AT THAT TIME.  I HAVEN'T

17  YET SEEN THE IMMUNITY AGREEMENT.  COUNSEL ALSO SHARED WITH ME

18  THAT HE HAS SOME ADDITIONAL INFORMATION FOR ME.  AND NOT

19  BEING ABLE TO SEE THE --

20            THE COURT:  WHY DON'T WE DO HIM AFTER LUNCH THEN.

21            MR. AARON:  I'M NOT SURE THAT WOULD BE SUFFICIENT

22  TIME.  IT MAY BE.  I WOULD LIKE TO BE ABLE TO GET TO SEE THE

23  IMMUNITY AGREEMENT TO SEE IF I NEED TO DO ANY RESEARCH.

24            THE COURT:  DO YOU HAVE THE IMMUNITY AGREEMENT

25  RIGHT NOW?

1          MR. AKROTIRIANAKIS:  I HAVE IT HERE OR HERE

2     SOMEWHERE IN THE COURTROOM, YOUR HONOR.

3          I ALSO WANT TO PUT ON THE RECORD A FEW OTHER THINGS

4     IN REGARD TO MR. MARTIN JUST SO EVERYTHING IS VERY CLEAR.

5     HIS COUNSEL INFORMED ME -- AND I'M NOW DISCLOSING IT --

6     IMMEDIATELY BEFORE I CAME TO COURT THIS MORNING.  I'M NOW

7     DISCLOSING IT.

8          THE COURT:  WAIT.  LET ME CLARIFY THAT.  HIS

9     COUNSEL INFORMED YOU WHEN OF WHAT YOU'RE ABOUT TO TELL US?

10         MR. AKROTIRIANAKIS:  HE INFORMED ME LITERALLY WHEN

11    I WAS WALKING TO COURT.

12         THE COURT:  THIS MORNING?

13         MR. AKROTIRIANAKIS:  YES.

14         THE COURT:  I THOUGHT THAT'S WHAT YOU MEANT.

15         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  AND I AM NOW

16    DISCLOSING THAT HE INDICATED THAT HE HAD HAD SEXUAL CONTACT

17    WITH A CHILD.

18         THE COURT:  NOT THE COUNSEL BUT MR. MARTIN?  I'M

19    NOT BEING FACETIOUS, BUT REALLY --

20         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  MR. PHILIPS

21    INFORMED ME THAT MR. MARTIN HAD HAD SEXUAL CONTACT WITH A

22    CHILD ON TWO OCCASIONS, ONCE 30 YEARS AGO APPROXIMATELY AND

23    ONCE 7 YEARS AGO.  AND I DISCLOSE THAT PURSUANT TO MY

24    OBLIGATIONS TO DISCLOSE IMPEACHMENT MATERIAL TO THE DEFENSE.

25         THE COURT:  ALL RIGHT.  THANK YOU.

1      MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  PARDON ME.

2      THE COURT:  NOW, WHEN HE DISCLOSED THAT, WAS

3  MR. MARTIN CONVICTED OF ANY CHARGES IN CONNECTION WITH THAT?

4      MR. AKROTIRIANAKIS:  NO.  I MEAN, NOT TO MY

5  KNOWLEDGE, YOUR HONOR.

6      THE COURT:  THIS IS EVERYTHING YOU'VE BEEN

7  INFORMED, THAT HE HAD SUCH A CONTACT BUT YOU WERE NOT

8  INFORMED THAT HE HAD BEEN CONVICTED.

9      MR. AKROTIRIANAKIS:  CORRECT, YOUR HONOR.  I DON'T

10  KNOW IF THE COURT WANTS TO INQUIRE WHETHER THAT'S AN AREA

11  THAT MAY BE GONE INTO ON CROSS OR NOT.  I CAN SEE OTHER

12  ISSUES ARISING FROM IT POTENTIALLY.

13      NOW, OTHER MATTERS RELATED TO RANDALL MARTIN.  I

14  INTEND TO ASK HIM WHETHER IN THE CHATS THIS OR THAT, WHATEVER

15  THEY ARE TALKING ABOUT, IS CHILD PORNOGRAPHY.  AND I WOULD

16  LIKE, WITH THE COURT'S PERMISSION OR MAYBE THE COURT CAN DO

17  IT, TO DEFINE FOR MR. MARTIN WHAT I MEAN WHEN I USE THE TERM

18  "CHILD PORNOGRAPHY" SO THAT --

19      THE COURT:  YOU CAN USE THE WORDS OF THE STATUTE.

20      MR. AKROTIRIANAKIS:  I INTENDED TO, YOUR HONOR.  I

21  WASN'T GOING TO GO INTO DEFINITION OF LEWD AND LASCIVIOUS AND

22  THAT WHOLE LITANY OF FACTORS AND SO ON.  I WAS GOING TO USE

23  THE DEFINITION FROM THE STATUTE.

24      MR. AARON:  JUST ON THAT POINT, YOUR HONOR, ISN'T

25  CHILD PORNOGRAPHY A DETERMINATION THAT THE JURY MAKES?  I

1    THINK HE COULD USE A EUPHEMISM, IS IT SEXUALLY EXPLICIT

2    MATERIALS RELATED TO CHILDREN OR WHATEVER, BUT I THINK IT IS

3    THE JURY THAT HAS TO DETERMINE IF IT'S CHILD PORNOGRAPHY.

4             MR. AKROTIRIANAKIS:  OF COURSE, IT WILL ONLY BE

5    MR. MARTIN'S BELIEF AS TO THE CONTENT OF THAT.  AND WE ARE

6    NOT GOING TO HAVE HIM TESTIFY TO ANY OF THE IMAGES IN THIS

7    CASE.

8             THE COURT:  WELL, LET ME THINK.  IN THE COURSE OF

9    INSTRUCTING THE JURY AT THE END OF THE TRIAL, WON'T WE GIVE

10   THE JURY THE DEFINITION OF CHILD PORNOGRAPHY?  I'M LOOKING AT

11   THE JOINT PROPOSED INSTRUCTIONS.  AND WHEN I SAY WON'T WE

12   DEFINE THAT, WITH THE DEFINITION UNDER 2256 WE DEFINE

13   SEXUALLY EXPLICIT.  SO PERHAPS THE BEST WAY TO DO THIS WOULD

14   BE FOR -- WELL, THERE'S TWO WAYS TO DO IT.  ONE WOULD BE FOR

15   YOU SIMPLY TO ASK -- AS YOU PROPOSED, TO ASK THE WITNESS

16   WHETHER IN THE CHATS THE PARTIES ARE REFERRING TO SENDING OR

17   RECEIVING IMAGES OF SEXUALLY EXPLICIT CONDUCT INVOLVING

18   MINORS, THEY'RE DEPICTING MINORS INVOLVED IN SEXUALLY

19   EXPLICIT CONDUCT.  SO YOU COULD LEAVE IT AT THAT.  I THINK IT

20   WOULD BE PREFERABLE TO FIRST HAVING THAT TERM DEFINED.

21            AND THEN I PREFER, OF COURSE, THAT THE COURT ALWAYS

22   GIVE THE LAW WHETHER IT'S TO THE WITNESS OR TO THE JURORS, SO

23   PROBABLY BEFORE YOU DID THAT THEN I WOULD GIVE THIS

24   INSTRUCTION TO THE JURY WITH THE DEFINITIONS.  AND THEN YOU

25   COULD ASK THE WITNESS, HAVING HEARD THAT INSTRUCTION OR

1    HAVING HEARD THOSE DEFINITIONS, DID THE MATERIAL THAT YOU ARE

2    REFERRING TO DEPICT SEXUALLY EXPLICIT CONDUCT.

3              MR. AKROTIRIANAKIS:  YOUR HONOR, I WOULD RATHER --

4    WELL, YES, YOUR HONOR, I WILL DO THAT.  I WOULD PREFER TO

5    HAVE THE COURT, IF THE COURT WOULD, SIMPLY READ THE CHILD

6    PORNOGRAPHY INSTRUCTION WHICH THEN INCLUDES THE SEXUALLY

7    EXPLICIT CONDUCT INSTRUCTION, AND I DON'T SEE A PROBLEM WITH

8    THAT, PARTICULARLY GIVEN THAT ANY NUMBER OF WITNESSES HAS

9    ALREADY TESTIFIED TO THE TERM "CHILD PORNOGRAPHY."

10             THE COURT:  WHICH INSTRUCTION DO YOU HAVE IN MIND?

11             MR. AKROTIRIANAKIS:  WELL, WHAT I HAD IN MIND OF

12   DOING WAS I WOULD USE THE TERM CHILD PORNOGRAPHY IN MY

13   QUESTION WITH MR. MARTIN.

14             THE COURT:  JUST TELL ME WHICH INSTRUCTION YOU'RE

15   TALKING ABOUT.

16             MR. AKROTIRIANAKIS:  THE TERM "CHILD PORNOGRAPHY"

17   MEANS ANY VISUAL DEPICTION INCLUDING -- I WOULDN'T GO INTO

18   ALL THE MEDIA.  I WOULD JUST SAY A DEPICTION OF SEXUALLY

19   EXPLICIT CONDUCT THAT INVOLVES THE USE OF A MINOR ENGAGING IN

20   SEXUALLY EXPLICIT CONDUCT.  AND THEN I WOULD DEFINE SEXUALLY

21   EXPLICIT CONDUCT TO INCLUDE INTERCOURSE --

22             THE COURT:  WELL, I THINK WE ARE TALKING ABOUT THE

23   SAME THING.

24             MR. AKROTIRIANAKIS:  I WANTED TO BE CLEAR WITH THE

25   COURT SO THAT I DON'T RUN AFOUL OF WHAT YOU WANT.  I WAS

1    PLANNING TO USE THE WORD "CHILD PORNOGRAPHY" IN MY QUESTION

2    WHICH I THINK IS WHAT DEFENSE COUNSEL IS OBJECTING TO.

3            THE COURT:  WELL, I WOULD OVERRULE SUCH AN

4    OBJECTION.  WHAT I'M CONCERNED ABOUT IS, I DON'T HAVE --

5    THERE'S NOTHING OBJECTIONABLE WITH USING THE TERM "CHILD

6    PORNOGRAPHY" BUT --

7            MR. AARON:  YOUR HONOR, I'M SORRY.  I HAD ASKED A

8    WITNESS TO CALL SO I COULD UPDATE THE COURT AND I'VE JUST

9    CHECKED.  IT WAS NOT A CALL, IT WAS A VOICEMAIL.  I'M SORRY.

10   I THOUGHT IT WAS A U.S. MARSHAL, I APOLOGIZE.

11           THE COURT:  SURE.  THAT'S A BIGGER NAME.  JUST

12   KIDDING.

13           MY CONCERN WOULD NOT BE ABOUT THE USE OF THE TERM

14   "PORNOGRAPHY."  I JUST WANT TO HAVE THE WITNESS AND THE JURY

15   UNDERSTAND THE DEFINITION.

16           MR. AARON:  IF I MIGHT, I THINK THE COURT'S

17   SUGGESTION WAS BETTER, THAT -- I THINK IT ONLY NEEDS TO READ

18   SEXUALLY EXPLICIT.  IF IT WANTS TO READ THE REMAINDER OF THE

19   INSTRUCTION TO SATISFY COUNSEL, THAT'S FINE.  I WOULD JUST

20   ASK THAT WHEN COUNSEL ASKS THE WITNESS, THAT HE ASK THE

21   WITNESS, IN YOUR OPINION, WERE THOSE IMAGES CHILD PORNOGRAPHY

22   AS WE'VE DESCRIBED.

23           THE COURT:  I THINK THAT'S FAIR.  I MEAN, THE

24   WITNESS IS ALWAYS -- THAT'S FAIR.  THE WITNESS IS ALWAYS

25   TESTIFYING ABOUT HIS OPINION WHEN IT COMES TO SOMETHING LIKE

1    THAT.  BUT WHAT YOU'RE SUGGESTING I THINK WAS THE SAME THING

2    I HAD IN MIND, WHICH WAS BASICALLY COLLAPSING TWO

3    INSTRUCTIONS, WHICH ARE THE JOINT PROPOSED INSTRUCTION NO. 4

4    AND NO. 5 BECAUSE THE DEFINITION OF CHILD PORNOGRAPHY AND THE

5    DEFINITION -- WELL, WE DON'T NEED THE DEFINITION OF THE TERM

6    "MINOR" OR "VISUAL DEPICTION," BUT WE DO NEED THE DEFINITION

7    OF THE TERM "SEXUALLY EXPLICIT CONDUCT."

8              MR. AKROTIRIANAKIS:  THAT'S CORRECT, YOUR HONOR.

9              THE COURT:  SO PROBABLY THOSE TWO TOGETHER.

10             MR. AARON:  A COUPLE MORE MATTERS, YOUR HONOR, IF

11   COUNSEL IS FINISHED ON THIS ONE.

12             MR. AKROTIRIANAKIS:  I HAD JUST ONE MORE MATTER

13   RELEVANT TO MR. MARTIN'S TESTIMONY.

14             THE COURT:  ALL RIGHT.  GO AHEAD.

15             MR. AKROTIRIANAKIS:  THE STATEMENTS AT THE JAIL,

16   WHAT I HAVE --

17             THE COURT:  YOU MEAN THE STATEMENTS I BROUGHT UP

18   YESTERDAY IN THE YARD?

19             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  WHAT I WOULD

20   PROPOSE TO ASK MR. MARTIN, AND I THINK I'M ALLOWED TO DO IT

21   IF ONLY EVEN BECAUSE COUNSEL RAISED IT UP IN HIS OPENING

22   STATEMENT THAT THE DEFENDANT IS NOT BOYSAN, AND THE DEFENDANT

23   IDENTIFIED HIMSELF TO RANDALL MARTIN AS BOYSAN, SO --

24             THE COURT:  WAIT, WAIT, WAIT.

25             MR. AARON:  I DID NOT RAISE THAT IN MY OPENING

1    STATEMENT.

2           THE COURT:  I DON'T RECALL IT IN THE OPENING

3    STATEMENT.

4           MR. AKROTIRIANAKIS:  I THINK BY INFERENCE HE'S

5    SAYING THAT, YOU KNOW, SOMEBODY HAD IMPERSONATED HIM IN

6    MAKING THESE --

7           THE COURT:  WELL, THAT'S NOT AN OPENING.  YOU MEAN

8    ON SOME OF THE EXAMINATION OF THE WITNESSES?

9           MR. AKROTIRIANAKIS:  ON MY NOTES, WHICH OBVIOUSLY

10   ARE NOT A TRANSCRIPT OF THE OPENING STATEMENT, BUT I

11   UNDERSTOOD THEM TO BE CHALLENGING AND RAISING THE ISSUE

12   WHETHER OR NOT IT WAS, IN FACT, THE DEFENDANT WHO WAS MAKING

13   ALL OF THESE STATEMENTS.

14          MR. AARON:  YOUR HONOR, WE DO ADMIT AND WE WILL

15   ADMIT THAT PEI, OJIBOYSAN, BOYSAN, BOYSAN1 ARE NAMES THAT THE

16   DEFENDANT USED.  IF ON OCCASION OTHER PEOPLE USED THOSE NAMES

17   AND POSTED SPECIFIC INDIVIDUAL MESSAGES, WE INTEND TO EXPLORE

18   THAT, BUT WE ARE NOT DENYING THAT HE HAD THOSE USER NAMES.

19          THE COURT:  ALL RIGHT.

20          MR. AKROTIRIANAKIS:  IF THERE'S A STIPULATION TO

21   THAT EFFECT, I NEED NOT GO INTO ANY OF THIS WITH THE JAIL AND

22   SO ON.

23          MR. AARON:  I DON'T THINK THAT I'M REQUIRED TO

24   STIPULATE TO THAT, YOUR HONOR.  I DON'T THINK THAT'S

25   APPROPRIATE.  I DON'T THINK, THOUGH, THAT THIS COURT WOULD

1    PERMIT ME TO MAKE THESE REPRESENTATIONS AND THEN STAND UP IN

2    CLOSING ARGUMENT AND BASICALLY AFFIRMATIVELY MISLEAD THE

3    COURT AND COUNSEL AND THE JURY.

4            THE COURT:  ALL RIGHT.  SO WHAT YOU'RE

5    REPRESENTING, AND I WILL ACCEPT THAT REPRESENTATION,

6    MR. AARON, IS THAT YOU WOULD NOT -- YOU WILL NOT ARGUE TO THE

7    JURY THAT YOUR CLIENT DID NOT USE THOSE NAMES?

8            MR. AKROTIRIANAKIS:  I STILL HAVE TO PROVE IT,

9    THOUGH, YOUR HONOR.  EVEN APART FROM WHAT HE MAY RAISE, THE

10   JURY NEEDS TO BELIEVE JUST BASED ON THE GOVERNMENT'S CASE

11   THAT HE IS BOYSAN.  IF THEY DON'T BELIEVE THAT, WE LOSE.

12           THE COURT:  SO WHAT ARE YOU PROPOSING TO DO?

13           MR. AKROTIRIANAKIS:  I WOULD ASK MR. MARTIN -- AND

14   THIS WAS THE OTHER DISCLOSURE THAT I HAD BASED ON MY

15   CONVERSATION WITH HIM YESTERDAY EVENING.  HE INDICATED TO ME

16   THAT HE HAD HAD --

17           THE COURT:  PLEASE SLOW DOWN.  IT'S PROBABLY GOING

18   TO BE A LONG DAY.

19           MR. AKROTIRIANAKIS:  HE HAD HAD ONE OR TWO

20   TELEPHONE CONVERSATIONS WITH THE DEFENDANT.  IN ONE OF THOSE

21   CONVERSATIONS THEY DISCUSSED OR THE DEFENDANT INDICATED TO

22   HIM THAT SETH BEKENSTEIN CHILD PORNOGRAPHY VIDEOS - THAT SETH

23   BEKENSTEIN HAD THE CHILD PORNOGRAPHY VIDEOS THAT HAD THE

24   NATIONAL GEOGRAPHIC PLAYING AT THE BEGINNING AND THEN THE

25   CHILD PORNOGRAPHY EMBEDDED LATER IN THE FILM.

```
 1              AND THEN THE OTHER CONVERSATION, OR IT MIGHT HAVE
 2    BEEN THE SAME CONVERSATION, BUT IN A CONVERSATION --
 3              THE COURT:  AND THIS WAS APPROXIMATELY WHAT PERIOD?
 4              MR. AKROTIRIANAKIS:  THERE WAS EITHER ONE OR TWO
 5    CONVERSATIONS.  THE LAST OF THEM, OR PERHAPS THE ONLY ONE,
 6    WAS WITHIN 24 TO 48 HOURS OF MR. MARTIN'S ARREST.  SO WE'RE
 7    TALKING ABOUT --
 8              THE COURT:  WHEN WAS THAT?
 9              MR. AKROTIRIANAKIS:  HE WAS ARRESTED ON APRIL 17,
10    2001.  SO WE'RE TALKING ABOUT APRIL 16TH IN THE CHATS.  THE
11    DEFENDANT, IN EFFECT, CALLED HIM AND TOLD HIM THEY ARE COMING
12    FOR YOU AND, YOU KNOW, WIPE THE HARD DRIVE,
13    DESTROY-THE-EVIDENCE KIND OF CONVERSATION.  AND THEN EITHER
14    AS PART OF THAT CONVERSATION OR PERHAPS ANOTHER ONE, AS HE
15    REMEMBERS THERE WAS EITHER ONE OR TWO, THIS DISCUSSION OF
16    SETH BEKENSTEIN'S VIDEOS HAVING NATIONAL GEOGRAPHIC AT THE
17    BEGINNING AND THEN CHILD PORNOGRAPHY EMBEDDED LATER IN THE
18    FILM.  SEEMS TO ME THAT WOULD HAVE BEEN TWO SEPARATE
19    CONVERSATIONS.  I DON'T THINK WHEN THEY SAY, "HEY, THE POLICE
20    ARE COMING FOR YOU," YOU'D SAY, "OH, AND BY THE WAY, LET'S
21    TALK ABOUT HOW SETH BEKENSTEIN HAD THESE VIDEOS."  IN ANY
22    EVENT, THAT'S WHAT HE TOLD ME.
23              THE COURT:  ALL RIGHT.  NOW, SO THERE'S TWO
24    CONVERSATIONS, BUT WHAT ABOUT --
25              MR. AKROTIRIANAKIS:  AND THEN I WOULD FURTHER IN MY
```

1   EXAMINATION OF HIM SAY, "AND HAVE YOU ALSO HAD OCCASION" -- I

2   WOULD TELL HIM FIRST, "LISTEN TO MY QUESTION CAREFULLY AND

3   ANSWER IT 'YES' OR 'NO' ONLY.  HAVE YOU EVER MET THAT

4   PERSON?"

5           I WOULD EXPECT HE WOULD SAY "YES."

6           "DID HE AT THE TIME INTRODUCE HIMSELF AS BOYSAN?"

7           I WOULD EXPECT HE WOULD SAY, "YES."

8           "DO YOU SEE THAT PERSON IN THE COURTROOM TODAY?"

9           I WOULD EXPECT HIM THEREAFTER TO IDENTIFY THE

10  DEFENDANT.  AND I WILL NOT ASK ANY OTHER QUESTIONS ABOUT THE

11  INTERACTION IN THE PRISON AREA.

12          THE COURT:  HAVE YOU DISCUSSED THIS EXAMINATION

13  WITH THE WITNESS?  HAVE YOU MET WITH THE WITNESS?

14          MR. AKROTIRIANAKIS:  MR. MICHAEL DISCUSSED THAT

15  PORTION OF IT AND I HAVE A REPORT OF THAT.

16          THE COURT:  LET ME ASK MR. MICHAEL THEN, HAVE YOU

17  CAUTIONED HIM NOT TO SAY ANYTHING FURTHER?

18          MR. MICHAEL:  I THINK IT WOULD BE WISE FOR THE

19  GOVERNMENT TO HAVE AN OPPORTUNITY TO CAUTION HIM BEFORE HE

20  TESTIFIES, AGAIN, YOUR HONOR.

21          THE COURT:  PLEASE DO.  NOT SAYING WHERE THE

22  PARTIES WERE DURING THE CONVERSATION THAT -- ABOUT THE

23  DEFENDANT BEING IN CUSTODY, ANYTHING LIKE THAT.

24          MR. MICHAEL:  I WILL LEAVE THAT TO

25  MR. AKROTIRIANAKIS, HE'LL BE DOING THE DIRECT, BUT OBVIOUSLY

 1    THIS WAS YOUR HONOR'S INSTRUCTION.

 2              THE COURT:  WELL, NOT TO DO THAT IN THE COURTROOM.

 3              MR. MICHAEL:  I WILL LEAVE IT TO MR. AKROTIRIANAKIS

 4    TO MEET WITH THE WITNESS AND HIS COUNSEL BEFORE HE TESTIFIES

 5    TO MAKE SURE THAT POINT IS VERY CLEAR.

 6              MR. AARON:  TO AVOID ANY PROBLEMS, WE WOULD BE

 7    WILLING TO STIPULATE, GIVEN AN APPROPRIATE STIPULATION,

 8    THAT -- AND WE CAN EVEN GIVE A TIME FRAME.  AT A CERTAIN

 9    POINT IN TIME MR. SANDERS SPOKE WITH MR. MARTIN AND

10    IDENTIFIED HIM AS BOYSAN.

11              THE COURT:  THAT WOULD BE PREFERABLE.  THEN WE

12    WOULDN'T HAVE ANY PROBLEMS.  WELL, THINK ABOUT WHETHER YOU

13    WANT TO ACCEPT THAT STIPULATION OR WHETHER YOU WANT HIM TO

14    TESTIFY.

15              MR. AKROTIRIANAKIS:  I DON'T HAVE A PROBLEM.  AS WE

16    GET TO THAT POINT I CAN STILL ASK A "YES" OR "NO" QUESTION,

17    HAVE YOU EVER MET THAT PERSON.  ANSWER ONLY "YES" OR "NO."

18    HE WILL ANSWER "YES," AND THEN I CAN READ THE STIPULATION,

19    YOUR HONOR.

20              THE COURT:  ALL RIGHT.

21              MR. AKROTIRIANAKIS:  AND I WOULD ACCEPT IT.

22              MR. AARON:  AND PERHAPS WE SHOULD LIMIT WHEN HE MET

23    HIM BECAUSE HE HADN'T MET HIM AT THE TIME THIS WAS HAPPENING.

24              THE COURT:  HAVE YOU MET -- PUT A TIME LIMIT ON IT.

25              MR. AARON:  LIKE WITHIN THE LAST YEAR HAVE YOU

1    PHYSICALLY MET THIS PERSON, DID HE IDENTIFY HIMSELF AS

2    BOYSAN, THAT WOULD BE ACCEPTABLE.

3              MR. AKROTIRIANAKIS:  I'M SURE THAT WE WILL BE ABLE

4    TO WORK IT OUT, YOUR HONOR.

5              MR. AARON:  JUST A COUPLE MORE THINGS, YOUR HONOR.

6    I REALIZE TIME IS GETTING CLOSE.

7              THE COURT:  WE'VE GOT A MESSAGE THAT ONE OF THE

8    JURORS IS RUNNING A LITTLE LATE.  SHE'S STUCK IN TRAFFIC.  I

9    DON'T KNOW HOW LATE.

10             MR. AARON:  MY UNDERSTANDING -- THANK YOU, YOUR

11   HONOR.  MY UNDERSTANDING IS THAT THERE IS NOTHING NEW IN

12   MR. MARTIN'S TESTIMONY WHICH IS NOT IN THE NUMEROUS REPORTS,

13   INCLUDING THE MOST RECENT ONE -- THE MOST RECENT ONES THAT WE

14   HAVE RECEIVED.

15             THE COURT:  IS THAT CORRECT?

16             MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR?

17             MR. AARON:  THAT THERE'S NOTHING NEW IN

18   MR. MARTIN'S TESTIMONY OTHER THAN THE FACT OF THE SEXUAL

19   ASSAULTS.  THAT'S MY UNDERSTANDING.

20             MR. AKROTIRIANAKIS:  BASED ON MY CONVERSATIONS WITH

21   HIM, OTHER THAN HIM CONFIRMING THAT THEY ARE TALKING ABOUT

22   CHILD PORNOGRAPHY IN THESE VARIOUS INSTANCES HERE, WHICH IS

23   APPARENT FROM THE CHATS ANYWAY, THAT IS WHAT I HAVE TO

24   DISCLOSE -- PARDON ME FOR SPEAKING SO QUICKLY, YOUR HONOR --

25   IN TERMS OF NEW INFORMATION.  WE OBVIOUSLY DIDN'T HAVE TIME

1   TO PREPARE A REPORT BETWEEN LAST NIGHT AND NOW WHEN I'M

2   DISCLOSING IT.

3           THE COURT:  CAREFUL, YOU ALMOST HIT YOUR AGENT.

4           MR. AKROTIRIANAKIS:  I HAVE HERE A COPY OF AGENT

5   MORENO'S -- A DRAFT, SOME NOTES FROM THE FIRST INTERVIEW OF

6   MR. MARTIN FOR WHICH AGENT MORENO AND MR. MICHAEL WERE

7   PRESENT WHEREIN HE TALKED ABOUT THE INTERACTION IN THE PRISON

8   YARD.  AND I MISSPOKE.  IT WASN'T THE FIRST TIME THEY SPOKE,

9   BUT ON THAT OCCASION.  I WILL GIVE THAT TO COUNSEL.

10          MR. AARON:  THAT'S A RULE 16 STATEMENT.  I HAVEN'T

11  RECEIVED THAT YET.

12          MR. MICHAEL:  YOUR HONOR, THIS WAS - WHEN WE

13  DISCLOSED ALL OF THE STATEMENTS ON THE RECORD ABOUT THE

14  INTERACTION IN THE YARD, YOUR HONOR ASKED THE GOVERNMENT IF A

15  REPORT --

16          THE COURT:  TO MAKE ONE.

17          MR. MICHAEL:  AND THIS IS AGENT MORENO'S EFFORT TO

18  PREPARE THAT REPORT.  HE HAS OBVIOUSLY BEEN OCCUPIED IN

19  TRIAL, SO WHAT WE HAVE IS A DRAFT.  TO EXPEDITE THIS, WE ARE

20  PROVIDING IT RIGHT NOW TO DEFENSE COUNSEL.

21          MR. AARON:  EVEN A DRAFT IS RULE 16.  I WOULD LIKE

22  TO KNOW WHEN THAT DOCUMENT WAS PREPARED.

23          MR. AKROTIRIANAKIS:  YOUR HONOR, IF I COULD ADDRESS

24  THIS.  THIS STATEMENT EMBODIES ALL THE DISCLOSURES THAT WERE

25  MADE IN OPEN COURT THAT DAY.

1          THE COURT:  WHICH I DIRECTED YOU TO MAKE AND NOW

2     YOU'VE MADE IT.

3          MR. AKROTIRIANAKIS:  YES.

4          THE COURT:  AND NOW YOU'RE TURNING IT OVER.

5          MR. AKROTIRIANAKIS:  I AM, YOUR HONOR.  I HAVE THE

6     NOTES AS WELL, IF THAT COPY -- I CAN TURN THAT OVER AS WELL.

7          THE COURT:  MR. AARON, WHAT ELSE?

8          MR. AARON:  I DON'T HAVE TIME TO REVIEW THESE RIGHT

9     NOW, YOUR HONOR.  REGARDING THE POSSIBLE HEARING WITH SPECIAL

10    AGENT MORENO, MY CLIENT DID PROVIDE ME AT MY REQUEST -- HIS

11    REQUEST TO HAVE AN ATTORNEY PHONE CALL WHERE HE RECEIVED A

12    RESPONSE THAT ALL ATTORNEY/CLIENT -- ALL ATTORNEY AND CLIENT

13    CALLS ARE SECURE, PRIVATE USE TIER PHONES.  AND IT IS SIGNED

14    BY, I PRESUME, A DEPUTY AT CDC.  THIS IS THE ONLY COPY I

15    HAVE.  WHEN THE CLERK RETURNS, PERHAPS I CAN MAKE A COPY FOR

16    THE COURT.

17         THE COURT:  WHAT DATE DID HE MAKE THAT REQUEST?

18         MR. AARON:  THAT WAS AT 8/29/05.  IT WAS NOT AT THE

19    TIME THAT THESE CALLS WERE SUPPOSEDLY MADE, BUT THE

20    SIGNIFICANCE OF IT IS BASED ON THESE COMMUNICATIONS AND --

21    SORRY, THE RESPONSE WAS DATED 9/1.  I PRESUME THAT'S 9/1 OF

22    '05.  BASED ON THESE COMMUNICATIONS I THINK MY CLIENT HAD A

23    REASONABLE EXPECTATION THAT ALL OF HIS CALLS TO HIS ATTORNEY

24    WOULD BE SECURE AND PRIVATE.

25         THE COURT:  AND ANOTHER QUESTION I HAVE IN

1   CONNECTION WITH THAT MATTER IS, WERE THESE THREE CALLS THAT

2   WERE PLACED ON THE DISK, WERE THESE ALL THE CALLS THAT YOUR

3   CLIENT MADE?  HE MADE OTHERS?

4          MR. AARON:  YES, MY CLIENT HAS MADE OTHER CALLS TO

5   ME.  HE DOES NOT CALL AS FREQUENTLY AS OTHER CLIENTS, BUT I

6   WOULD ESTIMATE THAT EVERY THREE OR FOUR WEEKS SINCE HE'S BEEN

7   IN CUSTODY WE HAVE TALKED OVER THE TELEPHONE.

8          THE COURT:  I'M SORRY.  MY QUESTION WASN'T VERY

9   CLEAR.  FOR THAT PERIOD -- WELL, NO, ACTUALLY, THAT PROBABLY

10  COVERS MY QUESTION.  I GUESS WHAT I WAS WONDERING WAS THAT

11  DISK WAS PREPARED IN JANUARY OF '06, WASN'T IT?

12         MR. AARON:  JANUARY OF '07.

13         THE COURT:  '07.  AND SO YOUR CLIENT HAD RECEIVED

14  OR MADE OTHER PHONE CALLS --

15         MR. AARON:  YES.

16         THE COURT:  -- FROM THE TIME HE ARRIVED AT SAN

17  BERNARDINO TO THE POINT THAT DISK WAS MADE?

18         MR. AARON:  THAT'S CORRECT.  AND HE'S MADE CALLS

19  SINCE.

20         THE COURT:  RIGHT.  WHAT I WAS CURIOUS ABOUT WAS AT

21  THE POINT THAT THAT DISK WAS MADE, WERE THOSE FEW CALLS

22  ISOLATED OR DID THAT DISK CONSIST OF PLACING EVERY CALL THAT

23  HAD BEEN MADE BY YOUR CLIENT OR OTHER CALLS THAT HAD BEEN

24  MADE?

25         MR. AARON:  IF I CAN ANSWER THE COURT'S QUESTION

```
 1    THIS WAY:  IT'S POSSIBLE THAT WHAT THEY DID IS THEY JUST

 2    STARTED TAPING -- THEY JUST STARTED COLLECTING THESE CALLS AT

 3    A CERTAIN POINT AND THEN STOPPED, BECAUSE THE INTERVAL

 4    BETWEEN THE CALLS, I THINK IT IS ABOUT --

 5            THE COURT:  IT'S PRETTY SHORT.

 6            MR. AARON:  IT IS.  BUT IT ACTUALLY SPANS -- IT'S

 7    11/7, 11/15 AND 12/1.  THAT'S, YOU KNOW, TWO TO FOUR WEEKS.

 8    EVERY TWO TO FOUR WEEKS I WOULD RECEIVE A CALL FROM

 9    MR. SANDERS.  THAT WOULD SOUND ABOUT RIGHT TO ME.  WHAT I'M

10    SAYING, FROM NOVEMBER THROUGH THE FIRST PART OF DECEMBER

11    THOSE MAY BE ALL THE CALLS, BUT I DON'T KNOW AND MY CLIENT

12    DOESN'T REMEMBER.

13            THE COURT:  ALL RIGHT.  NOW, WE'RE MISSING THREE

14    JURORS.  APPARENTLY, THERE'S A PROBLEM ON ONE OF THE FREEWAYS

15    THIS MORNING, BUT AS SOON AS THEY HAVE ALL ARRIVED, WE'LL

16    BEGIN.  SO WE HAVE A COUPLE MORE MINUTES.  I THINK WE WILL

17    COME BACK TO THIS QUESTION BECAUSE I'M MORE CONCERNED WITH

18    THE IMMEDIATE PROBLEMS THIS MORNING.

19            MR. AARON:  I DID HAVE AN ISSUE IN THAT ONE OF THE

20    MOTIONS DEALT WITH CHARLES SUTHERLAND WHICH DOES NOT NEED TO

21    BE ADDRESSED NOW.  THE OTHER OF THE MOTIONS DEALS WITH MY

22    BELIEF THAT GOVERNMENT COUNSEL IS NOT ASKING APPROPRIATE

23    QUESTIONS ON DIRECT, THAT FREQUENTLY, WHETHER INTENTIONALLY

24    OR NOT I DON'T KNOW AND I DON'T REALLY CARE AT THIS POINT, IT

25    APPEARS THAT THE WITNESS IS BEING GUIDED BY THE USE OF
```

1    LEADING AND SUGGESTIVE QUESTIONS.  I DON'T THINK THAT'S GOING

2    TO BE AN ISSUE WITH THE NEXT WITNESS, MR. OLIVAS.

3            THE COURT:  WELL, TO A CERTAIN -- LET ME STATE WHAT

4    MY -- LET ME STATE MY RULING ON THAT ISSUE.  LEADING

5    QUESTIONS ARE, EVEN ON DIRECT EXAMINATION, ONLY ALLOWED ON

6    MATTERS OF FOUNDATION, LEAVING ASIDE IF THERE'S A CHILD

7    WITNESS, WHICH WE HAVEN'T HAD THUS FAR.  SO SOME OF THE TIMES

8    WHEN THE OBJECTION HAS BEEN MADE ON THAT BASIS AND HAS BEEN

9    OVERRULED BY THE COURT, IT'S BECAUSE I FELT THAT ALTHOUGH THE

10   QUESTION WAS LEADING, THE MATTER THAT WAS BEING INQUIRED

11   ABOUT WAS ON A MATTER OF FOUNDATION OR TO GIVE CONTEXT AND A

12   LEADING QUESTION IS PERMITTED IN THAT AREA.

13           OTHER TIMES WHEN I'VE SUSTAINED THE OBJECTION, JUST

14   READING THROUGH THE MOTION VERY QUICKLY, EVEN THOUGH THE

15   QUESTION WAS NOT FORMED IN THE MOST, OBVIOUSLY, LEADING

16   MANNER, WHICH IS TO SAY IT WASN'T IN THE CLASSIC

17   CROSS-EXAMINATION STYLE OF SUGGESTING THE ANSWER WITHIN THE

18   QUESTION, IT WAS SOMETIMES IN A LEADING FASHION AT TIMES.

19           I DON'T NECESSARILY AGREE WITH THE MOTION TO THE

20   EXTENT THAT IT STATES THAT THE USE OF LEADING QUESTIONS IS SO

21   PERVASIVE OR HAS BEEN PERVASIVE, BUT I DO THINK THAT THERE

22   HAVE BEEN TIMES WHEN GOVERNMENT COUNSEL HAS LAPSED INTO A

23   HABIT OF ASKING LEADING QUESTIONS.

24           DO YOU WISH TO RESPOND, MR. MICHAEL?

25           MR. MICHAEL:  TO THE EXTENT THAT THIS GOVERNMENT

```
 1    COUNSEL HAS DONE THAT, I WILL PAY ATTENTION TO MY QUESTIONS.

 2    I TRY TO KEEP THE GOVERNMENT'S -- THE COURT'S SUSTAINING AN

 3    OBJECTION BY DEFENSE COUNSEL.  IT'S NOT BEING DONE

 4    INTENTIONALLY.  I THINK THAT AT TIMES MY CONCERN IS TO TRY TO

 5    MOVE TESTIMONY TO THE SUBSTANCE.  THERE'S CERTAIN MATTERS

 6    THAT TO ME MIGHT APPEAR PRELIMINARY BECAUSE THERE HAS BEEN

 7    SIMILAR TESTIMONY PERHAPS FROM OTHER WITNESSES AND I PERHAPS

 8    DIDN'T LAPSE INTO WHAT I THINK ARE CONTEXTUAL QUESTIONS BUT

 9    THEY REALLY NEED TO BE ESTABLISHED FOR THE FIRST TIME WITH

10    THAT WITNESS, SO IT IS INADVERTENT ON MY PART.  SO IT IS

11    REALLY IN THE INTEREST OF TRYING TO GET THROUGH WHAT I THINK

12    ARE PRELIMINARY MATTERS.  IT DOESN'T MEAN I HAVEN'T DONE

13    OTHER LEADING QUESTIONS, AND THAT'S AN APPROPRIATE OBJECTION

14    AND I WILL PAY ATTENTION TO THAT AND I WILL HEED YOUR HONOR'S

15    INSTRUCTION.

16            THE COURT:  NOW, THINKING ABOUT THE QUESTION OR THE

17    ISSUE THAT YOU RAISED A MOMENT AGO AS TO YOUR

18    CROSS-EXAMINATION OF MR. MARTIN, I THINK I WILL ALLOW THE

19    GOVERNMENT TO PUT THAT WITNESS ON IN THE ORDER IT WISHES,

20    ALTHOUGH I WOULD LIKE TO SEE HIM CALLED RIGHT AFTER A BREAK

21    SO WE DON'T HAVE TO SEND THE JURY OUT WHILE WE BRING AN

22    IN-CUSTODY WITNESS IN.

23            MR. AKROTIRIANAKIS:  THAT'S NOT AN ISSUE, YOUR

24    HONOR.  HE'S GOING TO BE WEARING THE JAIL CLOTHES.

25            THE COURT:  IT'S NOT THAT THEY'RE NOT GOING TO
```

1    KNOW, BUT THE MARSHALS STILL PREFER --

2              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

3              THE COURT:  -- SO THAT WE CAN TAKE HIM THROUGH THE

4    WELL AND SO FORTH.

5              MR. AKROTIRIANAKIS:  THAT WOULD BE FINE.  I HAD

6    PLANNED THIS MORNING WE'D HAVE MR. OLIVAS, WHO IS LIKE A 5-,

7    10-MINUTE WITNESS, ASSUMING WE DON'T GET BOGGED DOWN IN THE

8    HEARSAY.

9              THE COURT:  LET ME JUST FINISH.  AND THEN YOU CAN

10   CONDUCT YOUR CROSS-EXAMINATION LATER, AND I'LL TELL THE JURY

11   THAT WE ARE GOING TO CALL A WITNESS OUT OF ORDER.

12             MR. AARON:  YES.  AND ONE MATTER REGARDING MY

13   CROSS-EXAMINATION, WHICH I SHOULD TELL COUNSEL NOW, IS I

14   THINK I AM ENTITLED TO CROSS-EXAMINE HIM ABOUT THE BENEFIT

15   THAT HE WOULD RECEIVE, AND THAT WOULD INCLUDE AVOIDING THE

16   POSSIBILITY OF A TRAVELING -- AIDING AND ABETTING ON THE

17   TRAVELING CHARGE.

18             MR. AKROTIRIANAKIS:  I INTEND TO EXAMINE HIM ON THE

19   IMMUNITY AGREEMENT.  I WASN'T GOING TO OFFER IT BECAUSE I'M

20   NOT SURE THAT WOULD BE APPROPRIATE FOR THE GOVERNMENT TO

21   OFFER THAT ON DIRECT, SO I LEAVE IT TO COUNSEL IF HE WANTS TO

22   OFFER IT.

23             MR. AARON:  I HAVEN'T RECEIVED IT.

24             THE COURT:  THE COURT WOULD, OF COURSE, WANT TO SEE

25   IT, TOO.  I PROBABLY WOULDN'T PERMIT IT TO BE ADMITTED INTO

1    EVIDENCE, BUT YOU CAN SHOW IT TO HIM AND, OF COURSE, EXAMINE

2    HIM ON IT.

3            MR. AKROTIRIANAKIS:  I HAVE THE SIGNED AGREEMENT IN

4    MY OFFICE, YOUR HONOR.  I HAVE --

5            THE COURT:  DO YOU HAVE AN UNSIGNED COPY?

6            MR. AKROTIRIANAKIS:  I DO.

7            THE COURT:  YOU WILL PROVIDE A SIGNED AGREEMENT

8    BEFORE THE WITNESS IS CROSS-EXAMINED?

9            MR. AKROTIRIANAKIS:  IT'S NOT A -- THIS IS A LETTER

10   IMMUNITY AGREEMENT, YOUR HONOR.  IT'S JUST A CONTRACT

11   BETWEEN -- I MEAN, I CAN, CERTAINLY, IF THE COURT WISHES.  IT

12   IS SIMPLY A CONTRACT BETWEEN THE NORTHERN DISTRICT OF TEXAS

13   AND MR. MARTIN.  IT'S NOT A 6001 IMMUNITY FROM THE JUSTICE

14   DEPARTMENT WITH AN ORDER FROM THE COURT.

15           THE COURT:  I THINK HE SHOULD BE ENTITLED TO SEE A

16   SIGNED COPY.  ALL RIGHT.

17           NOW, SO MR. OLIVAS, AND THEN WHO IS YOUR NEXT

18   WITNESS GOING TO BE, AGENT IMPERATRICE?

19           MR. MICHAEL:  AGENT IMPERATRICE, YOUR HONOR.  AND

20   WE INTEND TO CALL THE CINGULAR CUSTODIAN TODAY AS WE BELIEVE

21   THAT WITNESS WON'T BE HERE UNTIL 11 A.M., THOUGH, BECAUSE

22   THEY'RE COMING FROM THEIR JOB, SO WE HAD TO ACCOMMODATE THEIR

23   WORK SCHEDULE.  SO THE NEXT WITNESS WE WOULD HAVE READY TO GO

24   WOULD BE JAMES MORAN OR LEE BROWN WHO ARE BOTH GOING TO BE

25   LENGTHY WITNESSES, YOUR HONOR.

1          SO PERHAPS MAYBE EARLIER THAN YOUR HONOR WOULD

2    WANT, WE COULD TAKE A BREAK AFTER AGENT IMPERATRICE,

3    MR. OLIVAS, AND HOPEFULLY THAT WILL TAKE US -- THE CUSTODIAN

4    OF RECORDS WILL BE HERE BEFORE 11 AND WE CAN PUT THE

5    CUSTODIANS ON.  THE CUSTODIANS TOLD US THAT THEY DON'T KNOW

6    IF THEY CAN BE HERE BEFORE 11 BUT THEY ARE GOING TO TRY TO.

7          THE COURT:  YOU THINK YOU WANT TO PUT ON THE FIRST

8    TWO WITNESSES AND THEN TAKE A BREAK AND THEN PUT ON

9    MR. MARTIN FOR YOUR DIRECT?

10          MR. MICHAEL:  IF THE CUSTODIANS ARE NOT HERE,

11   THAT'S WHAT WE WOULD REQUEST.

12          THE COURT:  ALL RIGHT.  NOW, WHICH WITNESS ARE YOU

13   GOING TO OFFER THAT MANUSCRIPT, OR WERE YOU GOING TO OFFER

14   THAT MANUSCRIPT?

15          MR. MICHAEL:  THAT WAS A MATTER I WANTED TO BRING

16   UP WITH YOUR HONOR.  YOUR HONOR RAISED A POINT LAST NIGHT THE

17   GOVERNMENT TOOK INTO SERIOUS CONSIDERATION, AND WE WENT BACK

18   AND LOOKED AT CURTIN AND LOOKED AT THOSE CONCURRENCES AND

19   REALLY WANTED TO ASSESS THE --

20          THE COURT:  I'M SORRY TO INTERRUPT.  I NEED TO ASK

21   ONE QUESTION.  WHEN WAS THAT MANUSCRIPT WRITTEN?

22          MR. MICHAEL:  THAT MANUSCRIPT HAS A DATE ON IT OF

23   APRIL 2002.  AND IT WAS RECOVERED WHEN DEFENDANT WAS

24   INCARCERATED IN NEW MEXICO.  THE GOVERNMENT HAS DECIDED, UPON

25   A SECOND REVIEW OF THAT OPINION YOUR HONOR NOTED, THAT WE

 1   BELIEVE THERE WAS SOME OPEN QUESTIONS LEFT BY THAT OPINION

 2   AND THE STRATEGIC DECISIONS THE GOVERNMENT IS ENTITLED TO

 3   MAKE BASED ON DEVELOPMENTS IN THE TRIAL, SO WE ARE NOT GOING

 4   TO SEEK TO USE THE MANUSCRIPT.  WE KNOW YOUR HONOR HAS SPENT

 5   A LOT OF TIME ON THIS MATTER AND WE JUST WANT TO RESPECTFULLY

 6   ADVISE THE COURT THAT THIS IS A DECISION WE HAVE JUST COME TO

 7   RECENTLY.

 8           THE COURT:  I WISH I HAD ASKED THE QUESTION EARLIER

 9   ABOUT WHEN IT WAS CREATED, BECAUSE AS I WAS WRITING A WRITTEN

10   DECISION LAST NIGHT ON THIS ISSUE I REALLY BEGAN TO FOCUS ON

11   THE ISSUE THAT'S, I THINK, CRITICAL UNDER CURTIN, AND I COULD

12   NOT REMEMBER WHAT THE DATE WAS ON IT.  AND I THINK THE FACT

13   THAT IT WAS CREATED AFTER THE ALLEGED ACTS HERE WOULD REALLY

14   BE CRITICAL IN A DECISION ON MY PART THAT IT'S NOT

15   ADMISSIBLE.

16           MR. MICHAEL:  WITHOUT TAKING A POSITION ON IT, THE

17   GOVERNMENT DID CONSIDER THAT FACTOR AS WELL, YOUR HONOR.

18           THE COURT:  ALL RIGHT.  THANK YOU.

19           MR. AARON:  YOUR HONOR, TO UPDATE THE COURT ON THE

20   NEW MEXICO WITNESSES, I HAVE CALLED AND I HAVE NOT RECEIVED

21   ANY RESPONSES.  I DID CONTACT THE MARSHALS OFFICE AND THAT

22   WAS A CALL THAT I WAS EXPECTING SO THAT I COULD UPDATE THE

23   COURT.  THE WOMAN IN THE MARSHALS OFFICE WILL BE CONTACTING

24   NEW MEXICO AND WILL GET BACK TO ME.  AND, OBVIOUSLY, I WILL

25   PUT MY PHONE ON SILENCE DURING THE TRIAL, BUT I CAN CHECK IT

1    DURING THE BREAK.

2          IN THE OTHER MOTION TO PROHIBIT OR TO LIMIT THE

3    TESTIMONY OF CHARLES SUTHERLAND, I DID SPEAK ON THIS ISSUE A

4    LITTLE BIT.  THE DEFENSE VIEW I THINK NOW IS THAT WE WOULD

5    PROBABLY NOT CALL THESE WITNESSES IF WE KNOW FOR SURE WHAT

6    MR. SUTHERLAND IS GOING TO TESTIFY TO.  SO FAR I DON'T

7    BELIEVE THAT THE CHATS STANDING BY THEMSELVES ARE NECESSARILY

8    GOING TO NEED THE REBUTTAL OF KALEN S. OR LORI STYLES AND

9    ALSO KAT DUFF AS MIGHT BE NECESSARY.

10         I'M A LITTLE CONCERNED ABOUT THE TESTIMONY OF

11   CHARLES SUTHERLAND, AND COUNSEL AND I HAD A CONVERSATION

12   ABOUT THAT.  IF THE COURT WOULD HAVE AN OPPORTUNITY TO LOOK

13   AT THAT MOTION, I THINK IT MIGHT HELP EXPEDITE MATTERS.  IF,

14   OBVIOUSLY, THE COURT DECIDES NOT TO ALLOW THEM TO CALL

15   CHARLES SUTHERLAND, THE CASE BECOMES MUCH FASTER BECAUSE IT

16   IS FOR --

17         THE COURT:  I'M SORRY.  I GOT CONFUSED A MOMENT OR

18   TWO AGO.  I GOT LOST WHEN YOU SAID REBUTTAL, BECAUSE YOU'RE

19   TALKING ABOUT NOT THE REBUTTAL CASE, YOUR REBUTTAL TO THEIR

20   EVIDENCE?

21         MR. AARON:  YES.  I'M NOT TALKING ABOUT REBUTTAL

22   EVIDENCE, PER SE.

23         THE COURT:  I'M SORRY, THAT'S WHAT THREW ME FOR A

24   MOMENT.  YOU'RE SAYING THAT YOUR PRIMARY PURPOSE OF CALLING

25   THOSE WITNESSES WOULD BE IN REBUTTAL TO THE GOVERNMENT

1    CALLING MR. SUTHERLAND?

2              MR. AARON:  YES.  BECAUSE I NO LONGER THINK THAT

3    THE REASONS THAT I HAD CITED ALONE ARE THAT IMPORTANT, GIVEN

4    MY VIEW OF THE EVIDENCE NOW, BUT UNFORTUNATELY, I DO NOT KNOW

5    WHAT MR. SUTHERLAND IS GOING TO TESTIFY TO.  I HAD TRIED TO

6    GET INTO THIS.  COUNSEL DID SAY THAT HE WOULD BE WILLING TO

7    MAKE A PROFFER.  THERE'S CERTAIN THINGS ABOUT THAT PROFFER

8    THAT DID CONCERN ME.  AND OUR CONVERSATION BROKE DOWN WHEN I

9    DID INQUIRE WHETHER OR NOT THERE HAD BEEN AN AGENT PRESENT

10   DURING THIS CONVERSATION THAT HE HAD HAD WITH THE WITNESS

11   BECAUSE HE BELIEVED THAT THAT WAS WORK PRODUCT.  I DO NOT.  I

12   BELIEVE THAT ANY NOTES OR MEMORANDUM PREPARED DURING THE

13   QUESTIONING OF A TRIAL WITNESS ARE NOT WORK PRODUCT.

14             THE COURT:  WELL, LET ME -- LET'S GO BACK AND TALK

15   A LITTLE ABOUT ONE OF THE ISSUES I BEGAN TO BRING UP, I THINK

16   IT WAS YESTERDAY, LAST NIGHT.  AND THIS IS A LITTLE BACKWARDS

17   TO THE WAY THAT YOU'RE APPROACHING IT, SO I APOLOGIZE FOR

18   THAT.  IN CONNECTION WITH THE MOTION THE GOVERNMENT FILED, I

19   BELIEVE LAST WEEK, I'VE BEEN RESEARCHING THE ISSUE OF WHAT

20   EVIDENCE, IF ANY, AS I UNDERSTAND WHAT YOU'RE INTENDING TO

21   CALL -- THE DEFENSE IS INTENDING TO CALL MS. STYLES FOR WOULD

22   BE ADMISSIBLE.  AND IN TRYING TO ASSESS THAT, I'VE REVIEWED

23   THE NOTES FROM INVESTIGATOR HUBBARD AGAIN, AND NOTHING THAT I

24   CAN SEE IN THOSE NOTES WOULD BE ADMISSIBLE, IF THAT'S WHAT

25   YOU'RE INTENDING TO ASK HIM ABOUT.

1          MR. AARON:  I'M INTENDING TO ASK HER ABOUT HER

2    STATEMENTS.  SHE DID HAVE STATEMENTS WHERE SHE WAS

3    INTERVIEWED IN NEW MEXICO --

4          THE COURT:  EXACTLY.

5          MR. AARON:  -- BY OTHER PERSONS AND SHE DID STATE

6    THAT CERTAIN THINGS, FOR EXAMPLE, MY CLIENT'S SUPPOSEDLY

7    SLEEPING WITH KALEN S., SHE SAID THAT NEVER HAPPENED.

8          THE COURT:  ALL RIGHT.  WELL, WHAT OTHER THINGS

9    WERE YOU GOING TO INQUIRE ABOUT?

10         MR. AARON:  RIGHT NOW I CAN'T REMEMBER AND I DIDN'T

11   BRING THAT FILE WITH ME, BUT I'M THINKING -- YOU KNOW, I DO

12   NOT WANT TO DISRUPT THE LIVES OF KALEN S. OR LORI STYLES

13   UNNECESSARILY.  AND I BELIEVE --

14         THE COURT:  MAYBE I MISUNDERSTOOD OR MAYBE YOU'VE

15   NOW ADJUSTED YOUR STRATEGY.  MY UNDERSTANDING WAS AND I THINK

16   WHAT THE GOVERNMENT'S MOTION WAS DIRECTED TO, SO THAT'S WHAT

17   I WAS RESEARCHING, WAS THAT YOU MIGHT HAVE INTENDED TO ELICIT

18   TESTIMONY FROM HER ABOUT STATEMENTS THAT SHE MADE, ACCORDING

19   TO INVESTIGATOR HUBBARD'S NOTES, ABOUT KALEN'S CONDUCT, WHICH

20   I THINK FALLS UNDER RULE 412, BUT THAT IS NOT -- AT LEAST AT

21   THIS TIME I DON'T THINK THAT'S ADMISSIBLE.  AND AT THIS TIME

22   I DON'T THINK THAT'S WHAT YOU'RE INTENDING TO ASK HER ABOUT.

23   AM I RIGHT ON THE LATTER POINT, THAT'S NOT WHAT YOU'RE

24   INTENDING TO ASK HER ABOUT?

25         MR. AARON:  I HAVE TO REVIEW MY NOTES.  I THINK

```
 1    THAT'S CORRECT.  BUT, YOUR HONOR, THE MAJOR PROBLEM THAT I

 2    HAVE WITH ALL OF THIS IS THAT I'VE REVIEWED THE STATEMENT

 3    THAT MR. SUTHERLAND GAVE AND I ATTACHED A COPY OF IT TO MY

 4    MOTION, AND I REVIEWED THE ROI IN WHICH IT'S KIND OF

 5    SUMMARIZED WHAT HE WOULD SAY, BUT IF YOU LOOK AT THE

 6    TRANSCRIPT OF THE CONVERSATION, HE STARTS TALKING ABOUT A

 7    NUMBER OF THINGS WHICH ARE JUST, IN MY OPINION, FLATLY

 8    INADMISSIBLE, AND A NUMBER OF OTHER THINGS WHICH KIND OF

 9    SUGGEST TO ME THAT THIS WITNESS IS WHAT WE WOULD CALL A

10    "LOOSE CANNON."

11              THE COURT:  CAN SOMEBODY SHOW ME WHAT YOU'RE

12    TALKING ABOUT, THE TRANSCRIPT OR THE --

13              MR. AARON:  IT IS ATTACHED TO THE MOTION THAT I

14    FILED.

15              THE COURT:  ALL OF OUR JURORS ARE PRESENT.  CAN WE

16    GET STARTED WITH THE JURY?

17              MR. MICHAEL:  THE GOVERNMENT IS READY TO PROCEED.

18              MR. AARON:  WE'RE READY.

19              THE COURT:  LET'S BRING THE JURY IN.

20              MR. AKROTIRIANAKIS:  WE HAVE ANOTHER EXHIBIT TO BE

21    ADDED.  IT IS FOR THE FIRST WITNESS.  MAY I APPROACH?

22              THE COURT:  YES.

23                   (IN THE PRESENCE OF THE JURY:)

24              THE COURT:  GOOD MORNING.  I UNDERSTAND THAT SOME

25    OF YOU HAD A TERRIBLE TIME ON THE FREEWAYS THIS MORNING.  I'M
```

```
 1   GLAD YOU'RE ALL HERE SAFELY.
 2          LET THE RECORD REFLECT THE PRESENCE OF ALL MEMBERS
 3   OF THE JURY, ALL COUNSEL, AND THE DEFENDANT ALSO PRESENT.
 4          AND THE GOVERNMENT MAY CALL ITS NEXT WITNESS.
 5          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.  THE
 6   GOVERNMENT CALLS TOM OLIVAS.
 7          THE COURT:  PLEASE COME FORWARD.
 8          THE CLERK:  PLEASE STOP NEXT TO THE COURT
 9   REPORTER.  PLEASE RAISE YOUR RIGHT HAND.
10          PLAINTIFF'S WITNESS, TOM OLIVAS, WAS SWORN
11          THE CLERK:  PLEASE TAKE THE STAND.  STATE YOUR
12   FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD.
13          THE WITNESS:  MY FULL NAME IS TOM OLIVAS, AND IT IS
14   O-L-I-V-A-S.
15          THE COURT:  THANK YOU.  YOU MAY INQUIRE.
16          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.
17                      DIRECT EXAMINATION
18   BY MR. AKROTIRIANAKIS:
19   Q.   MR. OLIVAS, HOW ARE YOU EMPLOYED?
20   A.   I'M SORRY, WHAT?
21   Q.   HOW ARE YOU EMPLOYED?
22   A.   I'M EMPLOYED WITH THE GIRL SCOUT COUNCIL OF ORANGE
23   COUNTY AS THE SENIOR DIRECTOR OF PROPERTY AND TECHNOLOGY.
24   Q.   AND WHEN YOU GO TO WORK, TYPICALLY WHERE IS THE LOCATION
25   THAT YOU GO TO WORK?
```

```
 1    A.    TYPICALLY, I GO TO WORK IN ORANGE COUNTY AT THE

 2    HEADQUARTERS THERE, BUT I ALSO REPORT TO CAMP SHERMAN

 3    SOMETIMES.

 4    Q.    AND WHERE IS CAMP SHERMAN?

 5    A.    CAMP SHERMAN IS LOCATED IN MOUNTAIN CENTER, CALIFORNIA.

 6    Q.    ARE YOU FAMILIAR WITH THE CAMP ITSELF, THE PHYSICAL

 7    LAYOUT OF IT AND SO ON?

 8    A.    YES, I AM VERY FAMILIAR WITH IT.

 9    Q.    AND IS THAT CAMP RUN BY THE GIRL SCOUT COUNCIL?

10    A.    THAT'S CORRECT.

11    Q.    IS THERE A LAKE AT THE CAMP?

12    A.    THERE IS, YES.

13    Q.    ARE YOU FAMILIAR WITH THE PACIFIC CREST TRAIL?

14    A.    YES, I AM.

15    Q.    IS THAT A HIKING TRAIL?

16    A.    IT IS A HIKING TRAIL THAT TRAVERSES ALONG THE EDGE OF

17    THE CAMP.

18    Q.    VERY NEAR THE CAMP?

19    A.    VERY CLOSE TO THE CAMP, YES.

20    Q.    MAY I REFER YOU TO EXHIBITS 40 TO 43 IN THE BOX THERE

21    BEHIND YOU?  YOU MAY WANT TO ALSO RETRIEVE 58 AS WELL.  IF

22    YOU WILL JUST PULL THE FOLDER OUT, MR. OLIVAS.

23    A.    42 APPEARS TO BE MISSING.

24    Q.    I BEG YOUR PARDON.  WHY DON'T YOU JUST PULL EXHIBITS 40

25    AND 43.
```

1          THE COURT:  YOU MAY PUT THAT BEFORE THE WITNESS.

2          MR. AKROTIRIANAKIS:  BY MY RECORD, YOUR HONOR, 42

3    WAS RECEIVED BY THE COURT.

4          THE COURT:  TO BE ADMITTED?

5          MR. AKROTIRIANAKIS:  YES, IT WAS ADMITTED.  I JUST

6    WANT TO MAKE CERTAIN OF THAT BEFORE I PROCEED.

7          THE COURT:  YOU MAY PUBLISH.

8          MR. AKROTIRIANAKIS:  MY RECORD IS INCONSISTENT WITH

9    MY RECOLLECTION.  I WOULD OFFER 42 BASED ON THE FOUNDATION

10   LAID YESTERDAY, IF IT HAS NOT ALREADY BEEN ADMITTED IN

11   EVIDENCE.

12         THE COURT:  IT WAS ADMITTED.

13         MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

14   BY MR. AKROTIRIANAKIS:

15   Q.   ARE YOU FAMILIAR -- HAVE YOU HAD THE OPPORTUNITY TO

16   REVIEW EXHIBIT 40?

17   A.   NO, I HAVEN'T.  GIVE ME A SECOND.

18         OKAY.  YEAH, I HAVE LOOKED AT IT.

19   Q.   AND ARE YOU ALSO -- HAVE YOU HAD THE OPPORTUNITY TO LOOK

20   AT EXHIBIT 43?

21   A.   YES.

22   Q.   DOES EXHIBIT 40 FAIRLY AND ACCURATELY PORTRAY CAMP JOE

23   SHERMAN AS YOU KNOW IT?

24   A.   YES, IT DOES.

25   Q.   AND IS THAT LIKEWISE TRUE WITH REGARD TO EXHIBIT 43?

```
 1    A.   YES, IT DOES.

 2              MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 40 AND

 3    43.

 4              THE COURT:  ANY OBJECTION?

 5              MR. AARON:  NONE.

 6              THE COURT:  THANK YOU.

 7              EXHIBITS 40 AND 43 ARE ORDERED ADMITTED.  YOU MAY

 8    PUBLISH.

 9    BY MR. AKROTIRIANAKIS:

10    Q.   I'VE PLACED EXHIBIT 40 ON THE OVERHEAD DOCUMENT CAMERA.

11    MY QUESTION TO YOU, MR. OLIVAS, IS WHERE I AM INDICATING NOW

12    NEAR THE TOP OF THE PHOTOGRAPH SLIGHTLY TO THE LEFT OF

13    CENTER, IS THAT THE LAKE YOU PREVIOUSLY TESTIFIED TO?

14    A.   THAT WOULD BE THE LAKE, YES.

15    Q.   I'M PLACING EXHIBIT 43 ON THE OVERHEAD CAMERA.  IS THAT

16    BUILDING IN THE CENTER SLIGHTLY TO THE LEFT OF THE CENTER OF

17    THE PHOTOGRAPH WITH THE DARKER ROOF THE MAINTENANCE BUILDING

18    AT CAMP JOE SHERMAN?

19    A.   YES, IT IS.

20    Q.   AND WHAT IS THIS BUILDING OVER HERE ON THE BOTTOM

21    SLIGHTLY TO THE RIGHT OF CENTER OF THE PHOTOGRAPH?

22    A.   THAT IS A RESIDENCE.  IT WAS MR. SANDERS' RESIDENCE AT

23    THE TIME.

24    Q.   WHAT'S THIS BUILDING, THE LEFT OF THE BUILDING YOU JUST

25    TESTIFIED TO?
```

```
 1    A.    THAT IS A GARAGE.

 2    Q.    ARE YOU FAMILIAR WITH JAMES SANDERS?

 3    A.    YES.

 4    Q.    DO YOU SEE HIM HERE IN COURT TODAY?

 5    A.    YES, I DO.

 6    Q.    CAN YOU IDENTIFY HIM FOR THE RECORD BY WHERE HE'S SEATED

 7    AND WHAT HE'S WEARING?

 8    A.    HE'S SITTING NEXT TO COUNSEL IN A CHARCOAL COLORED SUIT

 9    WITH A WHITE PIN STRIPE.

10          MR. AKROTIRIANAKIS:  YOUR HONOR, MAY THE RECORD

11    REFLECT THE IDENTIFICATION OF THE DEFENDANT?

12          THE COURT:  YES, THE RECORD SHALL REFLECT THAT THE

13    WITNESS HAS IDENTIFIED THE DEFENDANT HERE IN COURT, JAMES

14    SANDERS.

15    BY MR. AKROTIRIANAKIS:

16    Q.    WAS THE DEFENDANT EMPLOYED PREVIOUSLY BY THE GIRL

17    SCOUTS?

18    A.    YES, HE WAS.

19    Q.    IN WHAT CAPACITY WAS THE DEFENDANT EMPLOYED BY THE GIRL

20    SCOUTS?

21    A.    HE WAS EMPLOYED AS ASSISTANT SITE MANAGER.

22    Q.    WAS THE DEFENDANT EMPLOYED BY THE GIRL SCOUTS UNTIL

23    APPROXIMATELY JUNE OF 2001?

24    A.    THAT'S CORRECT.

25    Q.    DO YOUR DUTIES IN YOUR POSITION WITH THE GIRL SCOUTS
```

1    INCLUDE A REVIEW OF COSTS TO THE GIRL SCOUTS CAMPS,

2    PARTICULARLY CAMP JOE SHERMAN?

3    A.   YES, IT DOES.

4    Q.   DO THOSE DUTIES INCLUDE THE REVIEW OF THE COSTS OF

5    CELLULAR TELEPHONES SUBSCRIBED TO BY THE GIRL SCOUTS?

6    A.   YES, IT DOES.

7    Q.   DO SOME OF THE EMPLOYEES OF CAMP JOE SHERMAN, AT LEAST

8    IN FEBRUARY OF 2001, DID THEY HAVE CELLULAR TELEPHONES ISSUED

9    TO THEM BY THE GIRL SCOUTS?

10   A.   YES, THEY DID.

11   Q.   AT SOME POINT NEAR TO FEBRUARY 2001 DID THE GIRL SCOUTS

12   SWITCH CELLULAR CARRIERS?

13   A.   YES, WE SWITCHED CARRIERS AROUND THAT TIME.  I'M NOT

14   SURE OF THE EXACT DATE.

15   Q.   DID YOU AT OR ABOUT THAT TIME UNDERTAKE A REVIEW OF

16   COSTS IN CONNECTION WITH THE SWITCHING OF CARRIERS BY THE

17   GIRL SCOUTS?

18   A.   YES, I DID.

19   Q.   AT THAT TIME DID YOU PREPARE A REPORT CONCERNING YOUR

20   COST REVIEW OF THE CELLULAR TELEPHONE RECORDS AND BILLS?

21   A.   YES.

22   Q.   IN CONNECTION WITH THAT REPORT WERE YOU FAMILIAR WITH

23   THE FACT -- WELL, DID YOU KNOW AT THE TIME WHETHER A CELLULAR

24   TELEPHONE HAD BEEN ISSUED TO DEFENDANT THAT HAD BEEN

25   SUBSCRIBED BY THE GIRL SCOUTS?

1    A.    YES.

2    Q.    AND WERE YOU AT THAT TIME FAMILIAR WITH THE PHONE NUMBER

3    OF THE CELLULAR TELEPHONE THAT HAD BEEN ISSUED TO THE

4    DEFENDANT BY THE GIRL SCOUTS?

5    A.    YES, I WAS.

6    Q.    AS YOU SIT HERE TODAY IN 2007, DO YOU RECALL WHAT THAT

7    TELEPHONE NUMBER WAS?

8    A.    YES.  IT WAS (909) 323-6459.

9    Q.    DID I UNDERSTAND YOU TO SAY (909) 323-6459?

10   A.    THAT'S CORRECT.

11   Q.    AND HAD YOU REVIEWED RECORDS CONCERNING THAT PRIOR TO

12   COMING TO COURT TODAY?

13   A.    NO.

14   Q.    HOW IS IT THAT YOU RECALL THE TELEPHONE NUMBER THAT WAS

15   ISSUED TO THE DEFENDANT THESE MANY YEARS LATER?

16   A.    I HAD REVIEWED RECORDS SINCE THE LAST TIME I WAS HERE

17   TESTIFYING AND THEN FROM THE TIME THAT I PULLED THESE RECORDS.

18   Q.    DID YOU IN CONNECTION WITH THE IMMIGRATION -- LET ME

19   WITHDRAW THAT, PLEASE.

20            ARE YOU AWARE THAT THE IMMIGRATION AND CUSTOMS

21   ENFORCEMENT SERVICE, FORMERLY THE UNITED STATES CUSTOMS

22   SERVICE, WAS CONDUCTING AN INVESTIGATION OF THE DEFENDANT IN

23   OR ABOUT MAY AND JUNE OF 2001?

24   A.    YES, I WAS AWARE OF IT.

25   Q.    IN CONNECTION WITH THAT INVESTIGATION HAD THE UNITED

```
 1   STATES CUSTOMS SERVICE OR IMMIGRATION AND CUSTOMS ENFORCEMENT

 2   EITHER AT THAT TIME OR SUBSEQUENTLY ASKED GIRL SCOUTS TO

 3   PROVIDE TELEPHONE BILLS TO THE IMMIGRATION AND CUSTOMS

 4   ENFORCEMENT SERVICE?

 5   A.   THAT IS CORRECT.  WE WERE REQUESTED BY U.S. CUSTOMS TO

 6   PROVIDE A NUMBER OF RECORDS TO THEM.

 7   Q.   AND DID YOU ON BEHALF OF THE GIRL SCOUTS PROVIDE SUCH

 8   RECORDS TO CUSTOMS?

 9   A.   I DID.

10   Q.   BEFORE YOU IS AN EXHIBIT NUMBERED 143.  DO YOU SEE THAT?

11   A.   I DO.

12   Q.   ACTUALLY, IT IS RIGHT -- IF YOU FLIP IT OVER THERE IS A

13   LITTLE YELLOW STICKER ON THE BACK THAT SAYS 143.  IS THAT

14   EXHIBIT 143 AMONG THE TELEPHONE RECORDS THAT YOU ON BEHALF OF

15   THE GIRL SCOUTS PROVIDED TO THE CUSTOMS SERVICE?

16   A.   YES.  I PROVIDED A RANGE OF CELLULAR AND REGULAR PHONE

17   BILLS.

18   Q.   WAS EXHIBIT 143 ONE OF THOSE PHONE BILLS?

19   A.   YES.

20        MR. AKROTIRIANAKIS:  MAY I HAVE JUST A MOMENT,

21   YOUR HONOR?

22   BY MR. AKROTIRIANAKIS:

23   Q.   IS THAT PHONE BILL THAT'S BEFORE YOU, EXHIBIT 143, FOR

24   THE CELLULAR TELEPHONE SUBSCRIBED TO BY THE GIRL SCOUTS AND

25   ISSUED TO THE DEFENDANT?
```

1   A.   YES, IT WAS.

2   Q.   FOR WHAT DATE PERIOD IS EXHIBIT 143?  AND I BELIEVE IT'S

3   ACTUALLY TWO DOCUMENTS THAT ARE APPENDED TO EACH OTHER SO YOU

4   MAY WANT TO REFER TO THE ENTIRETY OF THE DOCUMENT.  IT MAY OR

5   MAY NOT BE TWO.  YOU TELL US, PLEASE.

6   A.   THE CALLS RANGE FROM 12/12 TO 1/11.

7   Q.   IS THAT 12/12 OF 2000 AND 1/11 OF 2001?

8   A.   THAT'S CORRECT.

9            MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

10           THE COURT:  THANK YOU.

11           CROSS-EXAMINATION?

12           MR. AARON:  NO QUESTIONS.

13           THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  YOU ARE

14  EXCUSED.

15           YOUR NEXT WITNESS?

16           MR. AKROTIRIANAKIS:  SPECIAL AGENT MICHAEL

17  IMPERATRICE.

18           THE CLERK:  PLEASE COME FORWARD AND STOP NEXT TO

19  THE COURT REPORTER.  PLEASE RAISE YOUR RIGHT HAND.

20      PLAINTIFF'S WITNESS, MICHAEL IMPERATRICE, WAS SWORN

21           THE WITNESS:  YES, I DO.

22           THE CLERK:  PLEASE TAKE THE STAND.

23           STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

24  THE RECORD.

25           THE WITNESS:  MY NAME IS MICHAEL IMPERATRICE AND IT

1    IS I-M-P-E-R-A-T-R-I-C-E.

2              THE COURT:  THANK YOU.  YOU MAY INQUIRE.

3              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

4                     DIRECT EXAMINATION

5    BY MR. AKROTIRIANAKIS:

6    Q.   AGENT IMPERATRICE, HOW ARE YOU NOW EMPLOYED?

7    A.   I AM EMPLOYED BY THE DEPARTMENT OF HOMELAND SECURITY,

8    IMMIGRATION AND CUSTOMS ENFORCEMENT, AS A SENIOR SPECIAL

9    AGENT.

10   Q.   AND PRIOR TO YOUR EMPLOYMENT AS A SENIOR SPECIAL AGENT

11   WITH IMMIGRATION AND CUSTOMS ENFORCEMENT WERE YOU EMPLOYED BY

12   THE UNITED STATES CUSTOMS SERVICE?

13   A.   YES, I WAS.

14   Q.   DID YOU BECOME AN ICE AGENT OR IMMIGRATION AND CUSTOMS

15   ENFORCEMENT AGENT AS A RESULT OF THE MERGER OF THE UNITED

16   STATES CUSTOMS SERVICE INTO THE DEPARTMENT OF HOMELAND

17   SECURITY?

18   A.   YES.

19   Q.   ON WHAT DATE APPROXIMATELY DID YOU ENTER ON DUTY AS A

20   UNITED STATES CUSTOMS SERVICE AGENT?

21   A.   I ENTERED ON DUTY AUGUST 17TH OF 1998.

22   Q.   WHAT IS YOUR PRESENT POST?

23   A.   I AM PRESENTLY POSTED IN WASHINGTON, D.C.

24   Q.   WHERE WERE YOU POSTED IN JUNE OF 2001?

25   A.   IN JUNE OF 2001 I WAS IN LAS VEGAS, NEVADA.  THAT WAS MY

1   DUTY STATION.

2   Q.   AND WHAT WAS YOUR ASSIGNMENT IN LAS VEGAS, NEVADA, IN

3   JUNE OF 2001?

4   A.   I INVESTIGATED MONEY LAUNDERING, NARCOTICS, AND CHILD

5   PORNOGRAPHY.

6   Q.   ON JUNE 5, 2001, DID YOU HAVE A CONVERSATION WITH UNITED

7   STATES CUSTOMS AGENT MICHAEL ARNOLD?

8   A.   YES, I DID.

9   Q.   WHERE AT THE TIME WAS AGENT ARNOLD ASSIGNED?

10  A.   AGENT ARNOLD WAS ASSIGNED AS THE RAC, RIVERSIDE OFFICE,

11  RESIDENT AGENT IN CHARGE, RIVERSIDE.

12  Q.   SO HIS OFFICE WAS HERE IN RIVERSIDE?

13  A.   IN CALIFORNIA, YES.

14  Q.   AND YOUR OFFICE WAS IN LAS VEGAS?

15  A.   YES, SIR.

16  Q.   APPROXIMATELY WHAT TIME IN THE DAY DID YOU HAVE THE

17  CONVERSATION WITH AGENT ARNOLD ON JUNE 5, 2001?

18  A.   LATE IN THE AFTERNOON.

19  Q.   IN WHAT CITY WERE YOU AT THE TIME YOU HAD THAT

20  CONVERSATION?

21  A.   I WAS IN LAS VEGAS, NEVADA.

22  Q.   AND WHAT DID YOU DO AFTER YOUR CONVERSATION WITH SPECIAL

23  AGENT ARNOLD?

24  A.   I WENT TO THE SMOKE RANCH STORAGE UNIT AND CONTACTED THE

25  MANAGER.

1    Q.    SMOKE RANCH STORAGE, WHAT TYPE OF -- IS THAT A BUSINESS?

2    A.    IT IS A BUSINESS.

3    Q.    WHAT TYPE OF BUSINESS IS THAT?

4    A.    IT'S A STORAGE UNIT BUSINESS, PUBLIC STORAGE.

5    Q.    AND WHY HAD YOU GONE TO SMOKE RANCH STORAGE IN LAS

6    VEGAS?

7    A.    I WAS TOLD BY SPECIAL AGENT ARNOLD THAT DURING THE

8    EXECUTION OF THE SEARCH WARRANTS IN CALIFORNIA HIS GUYS NOTED

9    A RECEIPT FOR A STORAGE UNIT IN LAS VEGAS, NEVADA, AT THE

10   SMOKE RANCH STORAGE UNITS.

11   Q.    DID YOU, IN FACT, PROCEED TO THE SMOKE RANCH STORAGE --

12   A.    YES, SIR.

13   Q.    I'M SORRY, THAT WAS A POOR QUESTION, BUT FOR THE SAKE OF

14   THE RECORD, AT LEAST LET ME TRY AND FINISH AND I WILL LET YOU

15   TRY AND FINISH YOUR ANSWERS.

16            AT WHAT TIME APPROXIMATELY DID YOU ARRIVE AT SMOKE

17   RANCH STORAGE?

18   A.    I ARRIVED AT SMOKE RANCH APPROXIMATELY AT 7 P.M.

19   Q.    WHAT DID YOU DO UPON YOUR ARRIVAL TO THE STORAGE

20   FACILITY?

21   A.    I CONTACTED THE MANAGER OF THE STORAGE FACILITY.

22   Q.    WAS THERE A PARTICULAR UNIT THAT WAS IN QUESTION UPON

23   WHICH YOU CONTACTED THE FACILITY MANAGER?

24   A.    YES, THERE WAS.

25   Q.    WHAT WAS THE NUMBER OF THAT UNIT?

1    A.    IT WAS NO. 649.

2    Q.    MAY I REFER YOU TO EXHIBIT 48 WHICH IS IN THE FOLDERS IN

3    THE BOX BEHIND YOU?  YOU MIGHT JUST PULL OUT THE FOLDERS FOR

4    48 THROUGH 56, AND ALSO 29 ACTUALLY, TOO.

5          HAVE YOU HAD AN OPPORTUNITY TO REVIEW EXHIBIT 48?

6    A.    YES.

7    Q.    WHAT DOES THAT PHOTOGRAPH DEPICT?

8    A.    EXHIBIT 48 IS A PHOTO OF THE OUTSIDE OF THE STORAGE UNIT

9    INDICATING THE NO. 649 AT THE TOP.

10   Q.    DOES IT FAIRLY AND ACCURATELY PORTRAY THAT STORAGE UNIT

11   ON JUNE 5, 2001, WHEN YOU FIRST SAW IT?

12   A.    YES.

13         MR. AKROTIRIANAKIS:  GOVERNMENT OFFERS 48.

14         THE COURT:  ANY OBJECTION TO 48?

15         MR. AARON:  NO, YOUR HONOR.

16         THE COURT:  THANK YOU.

17         EXHIBIT 48 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

18   BY MR. AKROTIRIANAKIS:

19   Q.    AGENT IMPERATRICE, DO YOU KNOW WHETHER THE PHOTOGRAPH

20   SHOWN IN EXHIBIT 48 WAS TAKEN -- LET ME BACK UP.

21         DID YOU ULTIMATELY SEARCH UNIT 649?

22   A.    YES, WE DID.

23   Q.    DO YOU KNOW WHETHER THIS PHOTOGRAPH, EXHIBIT 48, WAS

24   TAKEN BEFORE OR AFTER YOU HAD SEARCHED UNIT 649?

25   A.    THIS IS AN AFTER PHOTO.

1    Q.    AND HOW DO YOU KNOW THAT FACT?

2    A.    I KNOW THAT FACT BECAUSE THE LOCK IS DIFFERENT FROM THE

3    LOCK THAT WE CUT OFF THE UNIT.

4    Q.    THIS IS A LOCK THAT YOU PLACED ON THE UNIT?

5    A.    YES, IT IS.

6    Q.    NOW, WHEN YOU FIRST ARRIVED TO SMOKE RANCH STORAGE AND

7    SPOKE WITH THE FACILITY MANAGER ABOUT UNIT 649, DID YOU DO

8    ANYTHING IN PARTICULAR AT THAT TIME IN YOUR INVESTIGATION?

9    A.    WE CONTACTED THE MANAGER WHO TOLD US THAT --

10             MR. AARON:  OBJECTION, HEARSAY.

11             THE COURT:  SUSTAINED.

12   BY MR. AKROTIRIANAKIS:

13   Q.    DID YOU HAVE A CONVERSATION WITH THE FACILITY'S MANAGER?

14   A.    YES.

15   Q.    AND BASED ON THAT CONVERSATION WHAT DID YOU DO IN REGARD

16   TO UNIT 649?

17   A.    WE SECURED THE UNIT.

18   Q.    WHAT DO YOU MEAN BY SECURED THE UNIT?

19   A.    WE SAT OUT IN FRONT OF IT SO NO ONE COULD ENTER, TAMPER,

20   OR TOUCH ANYTHING WITHIN THE UNIT.

21   Q.    WAS THE UNIT UNDER CONSTANT SURVEILLANCE FROM THAT POINT

22   ON UNTIL THE TIME OF YOUR SEARCH?

23   A.    YES, IT WAS.

24   Q.    WE ARE STILL TALKING ABOUT THE EVENING OF JUNE 5, 2001?

25   A.    YES.

1    Q.    AND ON WHAT DATE WAS YOUR SEARCH OF THE UNIT?

2    A.    IT WAS THE NEXT DAY.

3    Q.    NOW, FROM THE TIME THAT YOU ORDERED THE UNIT BE SECURED

4    UNTIL THE TIME THAT YOU SEARCHED IT DID YOU LEAVE THE

5    PREMISES?

6    A.    YES, I DID.

7    Q.    FOR WHAT PURPOSE DID YOU LEAVE SMOKE RANCH STORAGE?

8    A.    I LEFT TO SEE THE MAGISTRATE JUDGE TO SECURE THE SEARCH

9    WARRANT.

10   Q.    AND WAS IT YOUR INSTRUCTIONS TO YOUR TEAM AT THE TIME

11   THAT YOU LEFT SMOKE RANCH STORAGE THAT NO ONE WAS TO ENTER OR

12   OTHERWISE TAMPER WITH UNIT 649?

13   A.    YES, THOSE WERE MY INSTRUCTIONS.

14   Q.    WHAT DID YOU DO UPON OBTAINING -- WELL, DID YOU OBTAIN A

15   FEDERAL SEARCH WARRANT --

16   A.    YES, I DID.

17   Q.    -- FOR UNIT 649?

18   A.    YES.

19   Q.    AND WHAT DID YOU DO UPON OBTAINING THAT SEARCH WARRANT?

20   A.    WE CUT THE LOCK OFF THE UNIT AND OPENED THE UNIT.

21   Q.    AT WHAT TIME DID YOU ARRIVE AT SMOKE RANCH STORAGE TO

22   CUT THE LOCK OFF THE UNIT AND EXECUTE THE SEARCH WARRANT ON

23   THE UNIT?

24   A.    APPROXIMATELY 2:28 IN THE AFTERNOON.

25   Q.    AND DID YOU THEREAFTER SEARCH THE ENTIRE UNIT?

1    A.    YES.

2    Q.    DID YOU TAKE PHOTOGRAPHS DURING THE SEARCH OF THAT UNIT?

3    A.    YES, WE TOOK PHOTOGRAPHS.

4    Q.    ARE YOU FAMILIAR WITH THOSE PHOTOGRAPHS?

5    A.    YES, I AM.

6    Q.    CAN I REFER YOU NOW TO EXHIBITS 48 -- I'M SORRY, 49, 50,

7    51, 52, AND 53?

8    A.    OKAY.

9    Q.    ARE EXHIBITS 49 THROUGH 52 PHOTOGRAPHS THAT WERE TAKEN

10   DURING THE EXECUTION OF THE SEARCH WARRANT ON JUNE 6TH, 2001?

11   A.    YES, THEY ARE.

12   Q.    AND ARE THE ITEMS DEPICTED IN THOSE PHOTOGRAPHS ITEMS

13   THAT WERE FOUND WITHIN THE STORAGE UNIT 649?

14   A.    YES, THEY ARE.

15   Q.    DO THE PHOTOGRAPHS THAT ARE EXHIBITS 49 THROUGH 53

16   FAIRLY AND ACCURATELY DEPICT THE ITEMS FOUND WITHIN THE

17   STORAGE UNIT AS THEY EXISTED ON JUNE 6TH, 2001?

18   A.    YES.

19   Q.    I BEG YOUR PARDON.  I MISSPOKE.  49 THROUGH 52.

20   A.    YES.

21             MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 49

22   THROUGH 52.

23             MR. AARON:  NO OBJECTION.

24             THE COURT:  THANK YOU.

25             EXHIBITS 49 THROUGH 52 ARE ORDERED ADMITTED AND YOU

```
 1    MAY PUBLISH.

 2    BY MR. AKROTIRIANAKIS:

 3    Q.   PLACING EXHIBIT 49 ON THE OVERHEAD CAMERA, IS THAT A

 4    YELLOW CRATE THAT WAS FOUND WITHIN UNIT 649?

 5    A.   YES.

 6    Q.   AND WERE THERE ITEMS IN THAT CRATE AS SHOWN IN THE

 7    EXHIBIT?

 8    A.   YES.

 9    Q.   I'M PLACING EXHIBIT 50 ON THE DOCUMENT CAMERA.  IS THIS

10    A TOP VIEW, IF YOU WILL, OF THE CONTENTS OF THAT CRATE?

11    A.   YES.

12    Q.   CAN I HAVE YOU REFER, AGENT IMPERATRICE, TO EXHIBIT 54?

13    AND IF YOU WOULD PLEASE PULL 55 FROM THERE AS WELL.

14             MR. AKROTIRIANAKIS:  WHILE HE'S DOING THAT, YOUR

15    HONOR, MAY I APPROACH WITH EXHIBIT 56?

16             THE COURT:  YOU MAY.

17             THE WITNESS:  54, 55, 56, OKAY.  THANK YOU.

18    BY MR. AKROTIRIANAKIS:

19    Q.   WHAT IS EXHIBIT 54, AGENT IMPERATRICE?

20    A.   EXHIBIT 54 IS A FEDEX PACKAGE THAT WAS FOUND WITHIN THE

21    UNIT.

22    Q.   IS EXHIBIT 54 THE FEDEX PACKAGE THAT WE SEE HERE

23    DEPICTED IN THE YELLOW CRATE WHICH IS EXHIBIT 50 WHICH IS NOW

24    ON THE DOCUMENT CAMERA?

25    A.   YES, IT IS.
```

```
 1              MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 54.

 2              MR. AARON:  NO OBJECTION.

 3              THE COURT:  THANK YOU.

 4              EXHIBIT 54 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

 5              MR. AKROTIRIANAKIS:  WITH THE COURT'S PERMISSION, I

 6    WILL PUBLISH A PHOTOCOPY OF IT FOR THE SAKE OF TIME.

 7              THE COURT:  GO AHEAD.

 8    BY MR. AKROTIRIANAKIS:

 9    Q.   WHO IS THE ADDRESSEE OF THIS PACKAGE?

10    A.   IT IS ADDRESSED TO SETH BEKENSTEIN.

11    Q.   AND EXHIBIT 55, WHAT IS THAT ITEM?

12    A.   EXHIBIT 55 IS A GATEWAY COMPUTER PACKING SLIP.

13    Q.   WAS THAT ITEM ALSO FOUND WITHIN UNIT 649 DURING THE

14    EXECUTION OF YOUR SEARCH WARRANT ON JUNE 6TH, 2001?

15    A.   YES.

16    Q.   I WILL PLACE EXHIBIT 52 ON THE DOCUMENT CAMERA -- WHICH

17    IS IN EVIDENCE ON THE DOCUMENT CAMERA.  IS THAT THE SAME

18    ITEM?

19    A.   YES.

20              MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS

21    EXHIBIT 55.

22              MR. AARON:  NO OBJECTION.

23              THE COURT:  THANK YOU.

24              EXHIBIT 55 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

25    BY MR. AKROTIRIANAKIS:
```

1    Q.   CAN YOU JUST HOLD IT UP SO THE JURY CAN SEE IT, AGENT

2    IMPERATRICE?

3         ONCE AGAIN, I'LL PUT EXHIBIT 52, THE PHOTOGRAPH OF

4    EXHIBIT 55, ON THE DOCUMENT CAMERA.  IS THIS THE STATEMENT --

5    OR, RATHER, IS THIS A PHOTOGRAPH OF IT AT THE TIME IT WAS

6    FOUND IN UNIT 649, AGENT IMPERATRICE?

7    A.   YES, IT IS.

8    Q.   DID YOU FIND ANY COMPUTER STORAGE MEDIA IN UNIT 649 ON

9    JUNE 6TH, 2001?

10   A.   YES, WE DID.

11   Q.   WHAT TYPE OF COMPUTER STORAGE MEDIA?

12   A.   WE FOUND APPROXIMATELY 62 COMPUTER FLOPPY DISKS.

13   Q.   INCIDENTALLY, THE GATEWAY BILL OR THE GATEWAY PACKING

14   SLIP THAT YOU JUST HELD UP, WHAT'S THE NAME ON THAT?  AND

15   THAT'S EXHIBIT 55 FOR THE RECORD.

16   A.   THIS HAS THE NAME OF SETH BEKENSTEIN ON IT.

17   Q.   NOW, THE COMPUTER DISKS THAT YOU'VE TESTIFIED TO, DO YOU

18   RECOGNIZE THOSE AS EXHIBIT 56 BEFORE YOU?

19   A.   YES.

20   Q.   AND WERE THOSE DISKS FOUND WITHIN UNIT 649 ON JUNE 6TH,

21   2001?

22   A.   YES, THEY WERE.

23        MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 56, THE

24   COMPUTER DISKS.

25        MR. AARON:  NO OBJECTION.

```
 1              THE COURT:  THANK YOU.

 2              EXHIBIT 56 IS ORDERED ADMITTED.

 3   BY MR. AKROTIRIANAKIS:

 4   Q.   DID YOU ASK THAT THOSE -- THE CONTENT OF THOSE DISKS

 5   BEING FORENSICALLY REVIEWED?

 6              LET ME ASK YOU THIS:  WHAT DID YOU DO WITH THE

 7   DISKS AFTER YOU RECOVERED THEM FROM UNIT 649?

 8   A.   THE DISKS AND ANY OTHER EVIDENCE WE RECOVERED WE LOCKED

 9   UP AND STORED AT OUR RESIDENT AGENT IN CHARGE EVIDENCE LOCKUP

10   IN LAS VEGAS, NEVADA.

11   Q.   DID YOU ULTIMATELY SEND THOSE ITEMS TO SPECIAL AGENT

12   MIKE ARNOLD?

13   A.   YES, THE ITEMS WERE ULTIMATELY SENT TO THE RESIDENT

14   AGENT IN CHARGE, RIVERSIDE OFFICE.

15   Q.   I'M PLACING EXHIBIT 51 ON THE OVERHEAD CAMERA.  IS THAT

16   A PHOTOGRAPH OF THE DISKS TAKEN JUNE 6TH, 2001, AFTER THEY

17   WERE BAGGED IN UNIT 649?

18   A.   YES, IT IS.

19   Q.   THAT'S THE SAME BAG OF DISKS THAT'S BEFORE YOU?

20   A.   YES.

21   Q.   NOW, I BELIEVE YOU TESTIFIED THAT YOU BEGAN YOUR

22   EXECUTION OF THE SEARCH WARRANT AT OR ABOUT 2:28 P.M. ON

23   JUNE 6TH, 2001?

24   A.   YES.

25   Q.   ABOUT HOW LONG DID IT TAKE YOU TO COMPLETE THE SEARCH OF
```

1    THAT UNIT?

2    A.    WE COMPLETED THE SEARCH OF THE UNIT AT APPROXIMATELY

3    3:45, QUARTER TO 4.

4    Q.    DID YOU FIND OTHER ITEMS IN THE UNIT OTHER THAN WHAT

5    YOU'VE NOW TESTIFIED TO HERE IN COURT?

6    A.    YES.

7    Q.    WHAT YOU'VE TESTIFIED TO, HOWEVER, ARE THOSE THE ITEMS

8    OF INVESTIGATORY INTEREST THAT YOU FOUND DURING THE SEARCH?

9    A.    YES.

10   Q.    WHAT DID YOU DO WITH THE UNIT AFTER THE COMPLETION OF

11   YOUR SEARCH OF IT?

12   A.    WE SECURED IT WITH THE NEW LOCK.  WE LOCKED IT UP AND

13   SECURED IT.

14   Q.    DID ANY PERSON ARRIVE AT UNIT 649 DURING THE JUNE 6TH,

15   2001 EXECUTION OF THE WARRANT THERE?

16   A.    YES.

17   Q.    DO YOU SEE THAT PERSON IN COURT TODAY?

18   A.    YES, I DO.

19   Q.    CAN YOU IDENTIFY HIM FOR THE RECORD BY WHERE HE'S SEATED

20   AND WHAT HE'S WEARING?

21   A.    HE'S SEATED NEXT TO THE DEFENSE ATTORNEY IN THE GREEN.

22   HE'S WEARING A GRAY SUIT TO THE RIGHT.

23          MR. AKROTIRIANAKIS:  MAY THE RECORD REFLECT, YOUR

24   HONOR, IDENTIFICATION OF THE DEFENDANT?

25          THE COURT:  YES, THE RECORD SHALL REFLECT THAT THE

1    WITNESS HAS IDENTIFIED THE DEFENDANT'S PRESENCE IN THE

2    COURTROOM, JIM SANDERS.  THANK YOU.

3    BY MR. AKROTIRIANAKIS:

4    Q.   AT WHAT POINT IN TIME DURING YOUR SEARCH DID THE

5    DEFENDANT ARRIVE AT UNIT 649 IN LAS VEGAS ON JUNE 6TH, 2001?

6    A.   HE ARRIVED RIGHT AT THE END OF THE SEARCH.

7    Q.   WAS HE IN A VEHICLE?

8    A.   YES, HE WAS.

9    Q.   DO YOU REMEMBER WHAT TYPE OF VEHICLE IT WAS?

10   A.   HE WAS IN A FORD BRONCO, LARGE SPORT UTILITY VEHICLE.

11   Q.   MAY I REFER YOU TO EXHIBIT 53 WHICH IS BEFORE YOU?  DO

12   YOU HAVE THAT BEFORE YOU?

13   A.   YES.

14   Q.   DO YOU RECOGNIZE THAT PHOTOGRAPH?

15   A.   YES.  IT'S A PHOTOGRAPH OF MR. SANDER'S VEHICLE.

16   Q.   IS THAT AT SMOKE RANCH STORAGE FACILITY?

17   A.   YES.

18   Q.   WAS IT TAKEN JUNE 6TH, 2001, AT THE TIME THAT HE ARRIVED

19   AT THAT FACILITY?

20   A.   YES, IT WAS.

21   Q.   DOES IT FAIRLY AND ACCURATELY DEPICT THE VEHICLE IN

22   WHICH THE DEFENDANT ARRIVED?

23   A.   YES.

24          MR. AKROTIRIANAKIS:  GOVERNMENT OFFERS 53.

25          MR. AARON:  NO OBJECTION.

```
 1                    THE COURT:  THANK YOU.

 2                    EXHIBIT 53 IS ORDERED ADMITTED.  YOU MAY PUBLISH.

 3    BY MR. AKROTIRIANAKIS:

 4    Q.   WHAT IS THIS ITEM THAT'S HOOKED TO THE BACK OF THE

 5    VEHICLE SHOWN IN EXHIBIT 53?

 6    A.   A MOUNTAIN BIKE.

 7    Q.   CAN YOU READ THE NAME OR ARE YOU ABLE TO READ THE NAME

 8    OF THE BRAND OF THIS BIKE?

 9    A.   LOOKS LIKE NISHIKI, N-I-S-H-I-K-I.

10    Q.   DID ANY OTHER PERSON ARRIVE AT THE STORAGE FACILITY

11    DURING YOUR SEARCH OF IT?

12    A.   NO.

13    Q.   DID SETH BEKENSTEIN ARRIVE?

14    A.   NO.

15    Q.   DID YOU ASK THE DEFENDANT'S PERMISSION TO CONDUCT A

16    SEARCH OF HIS VEHICLE, EXHIBIT 53?

17    A.   YES, I DID.

18    Q.   RATHER, AS SHOWN IN EXHIBIT 53.

19                    DID HE GRANT YOU PERMISSION TO SEARCH HIS VEHICLE?

20    A.   YES, HE DID.

21    Q.   AND DID YOU FIND ANY ITEMS OF INVESTIGATIVE INTEREST IN

22    THE VEHICLE?

23    A.   WE FOUND ADDITIONAL COMPUTER DISKS IN THE VEHICLE.

24    Q.   AND DID YOU SECURE -- DID YOU SEIZE THOSE DISKS?

25    A.   YES, WE DID.
```

```
 1   Q.   DID YOU SECURE THEM IN THE MANNER THAT YOU PREVIOUSLY

 2   DESCRIBED SECURING THE 62 DISKS THAT WERE FOUND WITHIN

 3   UNIT 649?

 4   A.   YES, WE DID.

 5           MR. AKROTIRIANAKIS:  THANK YOU.  NOTHING FURTHER.

 6           THE COURT:  THANK YOU.

 7           CROSS-EXAMINATION?

 8           MR. AARON:  YOUR HONOR, WHILE COUNSEL IS CLEANING

 9   UP, CAN I APPROACH AND TAKE A LOOK AT EXHIBIT 56?

10           THE COURT:  YOU MAY.

11           MR. AKROTIRIANAKIS:  I FORGOT ONE QUESTION.  MAY I

12   ASK --

13           THE COURT:  YOU MAY STILL APPROACH, MR. AARON.

14           MR. AKROTIRIANAKIS:  MAY I REOPEN MY DIRECT

15   EXAMINATION FOR THAT PURPOSE?

16           THE COURT:  YES.

17   BY MR. AKROTIRIANAKIS:

18   Q.   IN THE BOX THAT COUNSEL IS GOING THROUGH THERE IS

19   EXHIBIT NO. 29.  IF YOU COULD REFER TO THAT, AGENT

20   IMPERATRICE, AND MY QUESTION IS ONLY GOING TO BE WHETHER

21   THOSE ARE THE DISKS THAT YOU FOUND IN THE DEFENDANT'S VEHICLE

22   ON JUNE 6TH, 2001?

23           MR. AARON:  NO, I DON'T THINK 29 IS HERE, YOUR

24   HONOR.

25           THE COURT:  IS 29 ONE OF THE DOCUMENTS IN THE
```

1    FOLDER?

2              MR. AKROTIRIANAKIS:  IT'S COMPUTER STORAGE MEDIA,

3    YOUR HONOR.

4              THE CLERK:  IT'S NOT HERE.

5              MR. AKROTIRIANAKIS:  I HAD ASKED HIM PREVIOUSLY TO

6    REMOVE IT FROM THE BOX.  THAT'S THE CONFUSION.

7    BY MR. AKROTIRIANAKIS:

8    Q.   DO YOU HAVE EXHIBIT 29 BEFORE YOU, AGENT IMPERATRICE?

9    A.   YES, I'M SORRY.

10   Q.   DO YOU RECOGNIZE THOSE AS THE DISKS THAT YOU PREVIOUSLY

11   TESTIFIED TO?

12   A.   YES.

13   Q.   AND WERE THOSE REMOVED FROM THE DEFENDANT'S VEHICLE

14   WHICH IS SHOWN IN EXHIBIT 53?

15   A.   YES.

16             MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS 29.

17             MR. AARON:  NO OBJECTION.

18             THE COURT:  THANK YOU.

19             EXHIBIT 29 IS ORDERED ADMITTED.

20             MR. AKROTIRIANAKIS:  AND WITH THAT, YOUR HONOR, I

21   HAVE NO FURTHER QUESTIONS.

22             THE COURT:  THANK YOU.

23             YOU MAY INQUIRE.

24             MR. AARON:  THANK YOU.

25   ///

1                        <u>CROSS-EXAMINATION</u>

2   BY MR. AARON:

3   Q.   GOOD MORNING, AGENT IMPERATRICE.

4   A.   GOOD MORNING, SIR.

5   Q.   YOU CONDUCTED YOUR SEARCH ON JUNE 1ST?

6   A.   NO, THE SEARCH WAS ON JUNE THE 6TH.

7   Q.   AND BEFORE YOU CONDUCTED THE SEARCH, YOU HAD A WARRANT,

8   RIGHT?

9   A.   YES.

10  Q.   AND BEFORE YOU GOT THE WARRANT YOU SPOKE TO OTHER

11  FEDERAL AGENTS, RIGHT?

12  A.   YES.

13  Q.   AND YOU TALKED TO THEM ABOUT A FEDERAL INVESTIGATION

14  INTO CHILD PORNOGRAPHY IN SAN FRANCISCO, RIGHT?

15  A.   YES.

16  Q.   AND THEY TOLD YOU ABOUT A PERSON NAMED SETH BEKENSTEIN?

17  A.   YES.

18  Q.   AND THEY TOLD YOU THAT HE HAD BEEN ARRESTED IN THE CHILD

19  PORNOGRAPHY INVESTIGATION, RIGHT?

20  A.   THEY HAD TOLD ME THAT HE WAS INVOLVED.  I'M NOT POSITIVE

21  THEY SAID HE WAS ARRESTED, BUT, YES, I WOULD ASSUME SO.

22            MR. AARON:  MAY I APPROACH, YOUR HONOR?

23            THE COURT:  YOU MAY.

24  BY MR. AARON:

25  Q.   IF YOU WOULD, PLEASE, READ TO YOURSELF PAGE 220 FROM

```
 1   LINE 18 TO LINE 25, AND ON PAGE 221, LINES 1 THROUGH 4.  READ
 2   THAT TO YOURSELF, PLEASE, AND LET US KNOW WHEN YOU'RE DONE.
 3   A.   OKAY.
 4   Q.   THANK YOU.  AGENT, DOES THAT REFRESH YOUR RECOLLECTION
 5   OF YOUR CONVERSATION WITH SPECIAL AGENT ARNOLD?
 6   A.   YES.
 7   Q.   AND HE DID, IN FACT, TELL YOU THAT MR. BEKENSTEIN HAD
 8   BEEN ARRESTED?
 9   A.   YES, HE DID THEN, YES.
10   Q.   AND YOU KNEW THAT BEFORE YOU -- OBVIOUSLY BEFORE YOU GOT
11   YOUR WARRANT?
12   A.   YES.
13   Q.   NOW, YOU WERE ASKED ON DIRECT EXAMINATION IF
14   MR. BEKENSTEIN HAD ARRIVED WHEN YOU WERE EXECUTING THE
15   WARRANT?
16   A.   YES.
17   Q.   BUT YOU KNEW HE HAD ALREADY BEEN ARRESTED?
18   A.   YES.
19   Q.   YOU TALKED TO AGENTS ABOUT AN INVESTIGATION IN MOUNTAIN
20   CENTER, CALIFORNIA, RIGHT?
21   A.   CORRECT.
22   Q.   AND THEY TOLD YOU ABOUT MR. JAMES SANDERS?
23   A.   YES.
24   Q.   AND THEY TOLD YOU THAT THEY HAD DISCOVERED A RENTAL
25   AGREEMENT FOR THE STORAGE UNIT?
```

1    A.    A RENTAL RECEIPT FOR THE STORAGE UNIT.

2    Q.    DID THEY FAX YOU A COPY OF THE AGREEMENT OR RECEIPT OR

3    WHATEVER IT WAS?

4    A.    I DON'T RECALL.

5              MR. AARON:  IF I MIGHT HAVE A MOMENT, YOUR HONOR.

6    YOUR HONOR, MAY I HAVE EXHIBIT 36, PLEASE?

7              THE COURT:  CERTAINLY.

8              MR. AARON:  MAY I APPROACH THE CLERK?

9              THE COURT:  WHICH ONE IS IT?

10             MR. AARON:  THE RECEIPT OR THE AGREEMENT.

11             MAY I APPROACH, YOUR HONOR?

12             THE COURT:  YOU MAY.

13   BY MR. AARON:

14   Q.    SHOWING YOU -- AND I'M REMOVING IT FROM ITS ENVELOPE.

15   SHOWING YOU EXHIBIT 36 WHICH IS TWO SHEETS OF PAPER; IS THAT

16   CORRECT?

17   A.    YES.

18   Q.    DID YOU SEE THIS DOCUMENT BEFORE YOU GOT THE WARRANT?

19   A.    YES.

20   Q.    AND THIS DOCUMENT IS A RENTAL RECEIPT.  IT'S DATED I

21   BELIEVE MAY 8TH, 2001?

22   A.    YES.

23   Q.    AND THERE'S NO SIGNATURE ON THE RENTAL AGREEMENT?

24   A.    THERE'S NO SIGNATURE ON IT.

25   Q.    BUT THE TENANT INFORMATION IS JAMES SANDERS?

1    A.    YES, JAMES SANDERS.

2    Q.    NOW, I IMAGINE IN YOUR WORK AS A CUSTOMS AGENT AS WELL

3    AS -- IN THE FORMERLY KNOWN CUSTOMS SERVICE AND IN THE

4    IMMIGRATION AND CUSTOMS ENFORCEMENT YOU'VE DEALT WITH STORAGE

5    UNITS QUITE A BIT?

6    A.    YES.

7    Q.    AND YOU'VE KNOWN PEOPLE TO RENT STORAGE UNITS FOR

8    THEMSELVES?

9    A.    YES.

10   Q.    AND YOU'VE KNOWN PEOPLE WHO RENT STORAGE UNITS FOR

11   OTHERS?

12   A.    YES.

13   Q.    PARTICULARLY WHEN PEOPLE ARE NOT IN A POSITION TO RENT

14   THE STORAGE UNIT FOR THEMSELVES?

15   A.    I GUESS SO.

16   Q.    WELL, LIKE WHEN PEOPLE ARE OVERSEAS OR IF THEY'RE IN

17   JAIL, THINGS LIKE THAT?

18   A.    PROBABLY, YES.

19   Q.    ONE OF THE REASONS WHY YOU LOOK AT DOCUMENTATION IN A

20   STORAGE UNIT OR A HOME FOR THAT MATTER OR ANYPLACE IS IT WILL

21   TELL YOU WHO THE PROPERTY BELONGS TO, RIGHT?

22   A.    YES.

23   Q.    IN THIS CASE IF I COULD DIRECT YOUR ATTENTION TO

24   EXHIBIT NO. 50, AND I'M GOING TO TRY TO DISPLAY A PHOTOGRAPH

25   OF IT.  THAT WAS ONE OF THE ITEMS THAT YOU SEIZED, RIGHT?

1    A.   YES.

2    Q.   AND THAT'S A PACKAGE, RIGHT?

3    A.   YES, IT IS.

4    Q.   AND IT'S A PACKAGE TO MR. BEKENSTEIN?

5    A.   THAT'S WHO IT'S ADDRESSED TO, YES.

6    Q.   LET ME DIRECT YOUR ATTENTION TO EXHIBIT 55.  I'M SHOWING

7    YOU PART OF THAT EXHIBIT.  THAT'S THE GATEWAY PACKING SLIP?

8    A.   YES, IT IS.

9    Q.   AND THAT'S ADDRESSED TO MR. BEKENSTEIN?

10   A.   YES, IT IS.

11   Q.   IF I COULD DIRECT YOUR ATTENTION TO EXHIBIT 54,

12   EXHIBIT 54 IS ACTUALLY A NUMBER OF DOCUMENTS, RIGHT?

13   A.   IT'S A FEDEX PACKAGE.

14   Q.   AND THERE IS AN ADDRESS LABEL IN 54?

15   A.   YES.

16   Q.   FROM FEDEX ADDRESSED TO MR. BEKENSTEIN?

17   A.   YES.

18   Q.   AND THEN THERE'S AN RCA MAIL ORDER RECEIPT, RIGHT?

19   A.   YES.

20   Q.   AND, AGAIN, THAT'S ADDRESSED TO MR. BEKENSTEIN?

21   A.   YES, IT IS.

22   Q.   AND THEN THERE'S A GERAC MAIL ORDER LABEL, RIGHT?

23   A.   YES.

24   Q.   AND THAT'S ALSO ADDRESSED TO MR. BEKENSTEIN?

25   A.   YES, IT IS.

1    Q.   WOULD YOU TURN TO EXHIBIT 56?  I THINK IT'S RIGHT BEHIND

2    YOU.  NOW, THESE ARE THE DISKS THAT WERE TAKEN FROM THE

3    STORAGE UNIT, RIGHT?

4    A.   CORRECT.

5    Q.   AND THEY WEREN'T ALL IN A NEAT PACKAGE TOGETHER IN THE

6    STORAGE UNIT, WERE THEY?

7    A.   NO.

8    Q.   THEY WERE AT VARIOUS LOCATIONS THROUGHOUT THE STORAGE

9    UNIT?

10   A.   YES.

11   Q.   YOU HUNTED THROUGH THE STORAGE UNIT, FOUND THEM, AND

12   BROUGHT THEM ALL TOGETHER AND THEN SEIZED THEM?

13   A.   YES.

14   Q.   CAN YOU TAKE A LOOK AT DISK NO. 4?  ACTUALLY, WHY DON'T

15   YOU JUST TAKE A LOOK AT DISK 2, 3 AND 4.

16   A.   2, 3 AND 4?

17   Q.   YES.

18           MR. AARON:  MAY I APPROACH, YOUR HONOR?

19           THE COURT:  YOU MAY.

20   BY MR. AARON:

21   Q.   WE HAD ANOTHER HEARING IN THIS MATTER AND WE ALSO LOOKED

22   THROUGH THOSE DISKS, CORRECT?

23   A.   YES.

24   Q.   AND A NUMBER OF THOSE DISKS ARE NOT LABELED, CORRECT?

25   A.   COULD YOU REPEAT THE QUESTION?  SORRY.

1  Q.   A NUMBER OF THOSE DISKS ARE NOT LABELED, CORRECT?

2  A.   YES.

3  Q.   AND THERE WAS ONE OF THOSE DISKS WHICH WAS LABELED "SETH

4  BEKENSTEIN, NO. 3, TAX RECORDS, '97, '98."  DO YOU RECALL

5  TESTIFYING TO THAT?

6  A.   I RECALL SEEING THE DISK LABELED "SETH BEKENSTEIN."

7  Q.   AND THERE WAS ANOTHER DISK THAT WAS LABELED "SETH

8  BEKENSTEIN, NO. 2, SELF-EVALUATION, SCOTT AND RICK'S REVIEW"?

9  A.   YES.

10 Q.   AND THERE WAS AT LEAST HALF A DOZEN DISKS THAT HAD THE

11 NAME SETH BEKENSTEIN AND I BELIEVE ONE THAT HAD THE NAME

12 SCOTT?

13 A.   YES, SCOTT, I THINK HALF A DOZEN.

14 Q.   BEG YOUR PARDON, SIR?

15 A.   I THINK HALF A DOZEN APPROXIMATELY.

16 Q.   DID YOU FIND ANY DISKS -- OF THOSE 62 DISKS IN THAT

17 STORAGE UNIT, DID YOU FIND ANY DISKS THAT HAD THE NAME JIM?

18 A.   NO.

19 Q.   JAMES?

20 A.   NO.

21 Q.   SANDERS?

22 A.   NO.

23 Q.   DID YOU FIND ANY DOCUMENTS IN THE STORAGE UNIT THAT HAD

24 THE NAME JIM?

25 A.   I DON'T RECALL IF ANY OF THE OTHER DOCUMENTS --

1    Q.   JAMES?

2    A.   I DON'T THINK SO.

3    Q.   SANDERS?

4    A.   NO.

5    Q.   ANY PACKAGES IN THE STORAGE UNIT ADDRESSED TO JIM OR

6    JAMES SANDERS?

7    A.   I DON'T THINK SO.

8    Q.   AND IF YOU HAD FOUND THAT INFORMATION OR THAT EVIDENCE,

9    YOU WOULD HAVE PRESERVED IT, RIGHT?

10   A.   YES.

11   Q.   BECAUSE YOU WERE LOOKING TO FIND EVIDENCE RELATED TO JIM

12   OR JAMES SANDERS, RIGHT?

13   A.   CORRECT.

14   Q.   AND IF YOU FOUND ANY EVIDENCE SHOWING HIS NAME, THAT

15   MIGHT SHOW THAT HE HAD POSSESSED THAT PROPERTY OR THAT HIS

16   PROPERTY WAS COMMINGLED THERE, RIGHT?

17   A.   YES.

18   Q.   AND YOU WOULD PRESERVE IT?

19   A.   YES.

20   Q.   AND YOU LOOKED PRETTY CAREFULLY, RIGHT?

21   A.   YES.

22   Q.   YOU LOOKED FOR OVER AN HOUR?

23   A.   YES.

24   Q.   AND YOU DIDN'T FIND IT?

25   A.   YES.

1    Q.   ONE OF THE THINGS THAT LAW ENFORCEMENT CAN DO IS YOU CAN

2    USE TRACE EVIDENCE, PHYSICAL EVIDENCE, SCIENTIFIC EVIDENCE,

3    TO ESTABLISH IDENTITY, RIGHT?

4    A.   YES.

5    Q.   FOR EXAMPLE, YOU CAN TAKE SOMETIMES A GUN THAT HAS A

6    FINGERPRINT ON IT AND MATCH IT TO A SUSPECT, RIGHT?

7    A.   YES.

8    Q.   AND IF IT MATCHES, THAT WOULD GIVE YOU INFORMATION THAT

9    THIS GUN MAY HAVE BEEN HANDLED BY THIS INDIVIDUAL AT ONE

10   TIME?

11   A.   RIGHT.

12   Q.   AND ANOTHER THING THAT YOU CAN DO IS YOU CAN COLLECT

13   THAT TRACE EVIDENCE OR TISSUE SAMPLES OR DNA SAMPLES, RIGHT?

14   A.   CORRECT.

15   Q.   AND YOU CAN COLLECT DNA FROM ALL SORTS OF THINGS, RIGHT?

16   A.   YES.

17   Q.   BECAUSE IT'S MICROSCOPIC, RIGHT?

18   A.   RIGHT.

19   Q.   AND IF YOU HAD DNA, FOR EXAMPLE, ON ONE OF THESE DISKS

20   AND YOU MATCHED IT WITH SOMEONE ELSE'S DNA, THAT MIGHT SHOW

21   THAT THEY HAD TOUCHED IT OR BEEN IN THE -- COME INTO CONTACT

22   WITH IT IN SOME WAY, RIGHT?

23   A.   YES.

24   Q.   DID YOU EVER REQUEST THAT YOUR OFFICE DO FINGERPRINT

25   ANALYSIS OR DNA ANALYSIS TO TRY AND LINK ANY ITEMS IN THE

1    STORAGE UNIT WITH MR. SANDERS?

2    A.   NO.

3              MR. AARON:  THANK YOU.  I HAVE NOTHING FURTHER.

4              THE COURT:  ANY REDIRECT EXAMINATION?

5              MR. AKROTIRIANAKIS:  VERY BRIEFLY, YOUR HONOR.

6                       REDIRECT EXAMINATION

7    BY MR. AKROTIRIANAKIS:

8    Q.   AGENT IMPERATRICE, WILL YOU PLEASE PULL OUT OF THE

9    STACKS BEFORE YOU DISKS 47, 51 AND 58 THROUGH 62.  AND WHILE

10   YOU'RE DOING THAT, I'LL ASK YOU, YOU TESTIFIED THAT YOU

11   DIDN'T FIND ANYTHING IN THE STORAGE UNIT WITH THE NAME JIM OR

12   JAMES SANDERS ON IT; IS THAT RIGHT?

13   A.   YES.

14   Q.   DID YOU HAVE THE STORAGE RENTAL AGREEMENT ITSELF WITH

15   THE NAME JAMES SANDERS ON IT?

16   A.   YES.

17   Q.   AND IN YOUR EXPERIENCE AS AN INVESTIGATOR OF CHILD

18   PORNOGRAPHY, DO YOU KNOW WHETHER IT IS COMMON FOR PERSONS WHO

19   POSSESS OR CONSPIRE TO POSSESS CHILD PORNOGRAPHY TO HIDE

20   THEIR CHILD PORNOGRAPHY?

21   A.   YES.

22   Q.   DO YOU TYPICALLY FIND IT LABELED CHILD PORNOGRAPHY?

23   A.   NO.

24   Q.   IS IT COMMON FOR THEM TO ENGAGE IN VARIOUS MISDIRECTIONS

25   AIMED AT THROWING OFF LAW ENFORCEMENT FROM THE FACT THAT THEY

1    ARE POSSESSING CHILD PORNOGRAPHY?

2    A.   YES.

3    Q.   NOW, EVEN THOUGH YOU DIDN'T FIND ANY ITEMS WITH THE NAME

4    JAMES SANDERS ON IT IN THE STORAGE UNIT 649 ON JUNE 6TH,

5    2001, DID YOU FIND OTHER INDICIA OF MR. SANDERS, THE

6    DEFENDANT'S, OWNERSHIP OF ITEMS FOUND WITHIN THAT STORAGE

7    UNIT?

8    A.   BESIDES THE RENTAL RECEIPT?

9    Q.   BESIDES THE RENTAL RECEIPT AND THE FACT THAT HE SHOWED

10   UP DURING THE SEARCH, WAS THERE ANY OTHER INDICATORS THAT HE

11   ACTUALLY WAS THE OWNER OR THE POSSESSOR OF VARIOUS ITEMS IN

12   THAT STORAGE UNIT?

13   A.   I DON'T RECALL.

14           MR. AKROTIRIANAKIS:  MAY I APPROACH, YOUR HONOR?

15           THE COURT:  YOU MAY.

16           MR. AARON:  MAY I APPROACH, TOO, YOUR HONOR?

17           THE COURT:  YOU MAY.

18   BY MR. AKROTIRIANAKIS:

19   Q.   47, 51 AND 58 THROUGH 62, I BELIEVE YOU TESTIFIED --

20           MR. AKROTIRIANAKIS:  MAY I INQUIRE FROM HERE, YOUR

21   HONOR, WHILE I DO THIS?

22           THE COURT:  GO AHEAD.

23   BY MR. AKROTIRIANAKIS:

24   Q.   I BELIEVE YOU TESTIFIED PREVIOUSLY THAT THE DISKS WERE

25   FOUND IN DIFFERENT LOCATIONS THROUGHOUT THE STORAGE UNIT?

1    A.    CORRECT.

2    Q.    I'M PLACING THE DISK FROM WITHIN EXHIBIT 56 THAT IS

3    LABELED 47 ON THE OVERHEAD PROJECTOR, WITH THE COURT'S

4    PERMISSION.

5              THE COURT:  GO AHEAD.

6    BY MR. AKROTIRIANAKIS:

7    Q.    NO. 47 IS ON THE BACK OF THE DISK AND I WILL NOW TURN IT

8    OVER.  DO YOU KNOW WHOSE HANDWRITING THAT IS?

9    A.    NO, I DO NOT.

10   Q.    AND IT READS S-C-H-E-D.  IS THAT A COMMON ABBREVIATION

11   IN YOUR EXPERIENCE FOR SCHEDULE?

12   A.    YES.

13   Q.    AND IT SAYS, "CLEAN FORMS, TEN V" AND THEN "END" IN

14   PARENTHESES.  DO YOU SEE THAT?

15   A.    YES.

16   Q.    DO YOU KNOW IF THIS DISK ALSO CONTAINS CHILD

17   PORNOGRAPHY?

18   A.    I DON'T KNOW.

19   Q.    YOU DIDN'T DO THE FORENSIC REVIEW OF THIS DISK?

20   A.    NO.

21   Q.    I'M PLACING DISK 51 ON THE DOCUMENT CAMERA AND I'M NOW

22   TURNING IT OVER.  IT HAS A LABEL BUT IT'S BLANK; IS THAT

23   RIGHT, AGENT IMPERATRICE?

24   A.    YES.

25   Q.    DO YOU KNOW IF THIS DISK 51 CONTAINS CHILD PORNOGRAPHY?

1    A.   I WOULDN'T KNOW.

2    Q.   YOU DIDN'T PERFORM THE FORENSIC REVIEW ON THIS DISK

3    EITHER?

4    A.   DID NOT PERFORM THE FORENSIC REVIEW.

5    Q.   I'M PLACING DISKS 58 THROUGH 62 ON THE DOCUMENT CAMERA.

6    MY QUESTION TO YOU, AGENT IMPERATRICE, DOES IT APPEAR TO YOU

7    THAT THE HANDWRITING ON ALL THESE DISKS IS THE SAME PERSON'S

8    HANDWRITING?

9            MR. AARON:   OBJECT, LACK OF PERSONAL KNOWLEDGE.

10           THE COURT:   SUSTAINED.

11   BY MR. AKROTIRIANAKIS:

12   Q.   IN YOUR LAY OPINION, DOES IT APPEAR THAT THIS IS THE

13   HANDWRITING BY THE SAME PERSON ON EACH OF THOSE DISKS?

14           MR. AARON:   SAME OBJECTION AND ALSO NOT A PROPER

15   SUBJECT FOR LAY OPINION.

16           THE COURT:   THE OBJECTION IS OVERRULED.

17           THE WITNESS:   THE HANDWRITING LOOKS LIKE IT IS THE

18   SAME ON ALL THE DISKS, ON ALL THESE DISKS.

19           MR. AKROTIRIANAKIS:   MAY I APPROACH THE CLERK TO

20   RETRIEVE EXHIBIT 14, YOUR HONOR --

21           THE COURT:   YES.

22           MR. AKROTIRIANAKIS:   -- WHICH IS IN EVIDENCE?

23           THE COURT:   YES.  DO YOU WANT THE CLERK TO PUT IT

24   BEFORE THE WITNESS?

25           MR. AKROTIRIANAKIS:   I WOULD JUST PUT IT ON THE

1    CAMERA, IF THAT'S OKAY.

2              THE COURT:   THAT'S FINE.

3    BY MR. AKROTIRIANAKIS:

4    Q.    EXHIBIT 14 IS A BAG OF A COLLECTION OF PAPERS WITH

5    HANDWRITING ON THEM.   HAVE YOU HAD THE OPPORTUNITY AS PART OF

6    THIS INVESTIGATION AND PREPARATION FOR THIS TRIAL TO REVIEW

7    THIS DOCUMENT?

8    A.    YES.

9    Q.    IS IT YOUR UNDERSTANDING THAT THIS COLLECTION OF PAPERS

10   WAS SEIZED FROM WITHIN A BACKPACK AT THE GIRL SCOUTS CAMP IN

11   THE MOUNTAINS HERE?

12   A.    YES.

13   Q.    DID YOU REVIEW THIS PAGE OF HANDWRITTEN NOTES?

14   A.    YES.

15   Q.    NOW, DISK 62 IS LABELED "FREEDOM BACKUP"; IS THAT

16   CORRECT?

17   A.    YES, THAT'S CORRECT, CORRECT.

18   Q.    DOES IT APPEAR TO YOU, IN YOUR LAY OPINION, THAT THE

19   PERSON WHO WROTE "FREEDOM" ON THAT DISK ALSO WROTE "FREEDOM"

20   ON THIS PIECE OF PAPER?

21   A.    THEY LOOK VERY, VERY SIMILAR.

22              MR. AKROTIRIANAKIS:   I HAVE NO FURTHER QUESTIONS,

23   YOUR HONOR.

24              MR. AARON:   YOUR HONOR, MAY I ASK TWO QUESTIONS?

25              THE COURT:   YES.

1                      <u>RECROSS-EXAMINATION</u>

2    BY MR. AARON:

3    Q.    SHOWING YOU WHAT'S BEEN MARKED -- AND IT'S VERY

4    DIFFICULT TO READ.  IT IS EXHIBIT NO. 46.  WELL, DISK NO. 46

5    IN EXHIBIT 56.  DO YOU SEE THAT?

6    A.    YES.

7    Q.    SHOWING YOU THE FRONT, THIS IS ONE OF THE DISKS THAT WAS

8    NAMED BY COUNSEL.  WHAT DO YOU SEE CROSSED OUT AT THE VERY

9    TOP LINE?

10   A.    "SETH'S BACKUP DISK."

11   Q.    AND RIGHT BELOW THAT?

12   A.    "SETH.

13   Q.    SETH LETTERS?

14   A.    SETH 3.

15   Q.    SETH 3 LETTERS?

16   A.    LETTERS, YES, CORRECT.

17   Q.    SECOND QUESTION.  IN YOUR EXPERIENCE, HAVE YOU KNOWN

18   PEOPLE TO REUSE COMPUTER DISKS?

19   A.    YES.

20   Q.    EVEN DISKS THAT HAVE BEEN WRITTEN ON BY OTHER PEOPLE?

21   A.    YES.

22   Q.    SO THE FACT THAT A DISK HAS WRITING BY ONE PERSON

23   DOESN'T MEAN THAT THAT PERSON PUT THE IMAGES OR TEXT WHICH IS

24   SAVED ON THE DISK?

25   A.    THAT'S POSSIBLE.

1         MR. AARON:  THANK YOU.  NOTHING FURTHER.

2         THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

3         MR. AKROTIRIANAKIS:  I HAVE NO FURTHER QUESTIONS,

4    YOUR HONOR.

5         THE COURT:  THANK YOU.

6         MR. AKROTIRIANAKIS:  MAY I CHECK IN THE HALLWAY TO

7    SEE IF THE BRIEF WITNESS IS HERE, AND IF NOT --

8         THE COURT:  THE CUSTODIAN OF RECORDS WITNESS?

9         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I DON'T

10   THINK THAT PERSON IS HERE, BUT IF HE'S NOT THEN I WOULD

11   INTEND TO CALL THAT OTHER WITNESS WE DISCUSSED EARLIER.

12        THE CUSTODIAN IS NOT YET PRESENT.

13        THE COURT:  LADIES AND GENTLEMEN, WE WILL TAKE OUR

14   MORNING RECESS AND WE WILL BE IN RECESS FOR 15 MINUTES.

15   AGAIN, PLEASE REMEMBER, DON'T DISCUSS THE CASE AMONGST

16   YOURSELVES OR WITH ANYONE.  DON'T DISCUSS ANY OF THE EVIDENCE

17   IN THE CASE OR ANYTHING RELATED IN ANY FASHION TO ANY OF THE

18   EVIDENCE THAT YOU'VE HEARD.  DON'T DISCUSS ANYONE INVOLVED IN

19   THE CASE.  THAT MEANS THE WITNESSES, THE PARTIES, COUNSEL,

20   ANYONE THAT YOU SEE IN THE COURTROOM OR THAT YOU'VE HEARD

21   ABOUT IN CONNECTION WITH THE CASE.  DON'T DO ANY

22   INVESTIGATION ABOUT ANYTHING CONNECTED WITH THE CASE.  DON'T

23   DO ANY RESEARCH, INVESTIGATION, ANYTHING LIKE THAT.  THANK

24   YOU VERY MUCH FOR YOUR PATIENCE AND ATTENTION.  WE WILL SEE

25   YOU IN 15 MINUTES.

1              YOU'RE EXCUSED.

2                  (OUTSIDE THE PRESENCE OF THE JURY:)

3              THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

4    PRESENCE OF THE JURY.

5              DO YOU INTEND TO CALL MR. SUTHERLAND TODAY?

6              MR. MICHAEL:  NO, YOUR HONOR, NOT UNTIL TUESDAY.

7    AND THE CUSTODIAN JUST CALLED ME TO TELL ME HE'S WALKING FROM

8    THE PARKING LOT, SO WE CAN PUT HIM ON IMMEDIATELY AFTER THE

9    BREAK.

10             THE COURT:  WELL, ALL RIGHT.  IF WE DO THAT, THEN

11   WHO WOULD YOU CALL AFTER THAT?

12             MR. MICHAEL:  MR. MARTIN.

13             THE COURT:  ACTUALLY, EITHER WAY WE ARE GOING TO

14   HAVE TO SEND THE JURY BACK OUT JUST TO WAIT WHILE WE TAKE

15   MR. MARTIN OFF THE STAND.

16             MR. AKROTIRIANAKIS:  MR. MARTIN'S TESTIMONY MAY

17   WELL --

18             THE COURT:  TAKE US TO THE LUNCH BREAK?

19             MR. AKROTIRIANAKIS:  -- TAKE US TO THE BREAK OR

20   PERHAPS JUST RIGHT BEFORE IT OR SOMETHING OF THAT SORT.

21             THE COURT:  THAT WOULD BE FINE.

22             MR. MICHAEL:  MY ONLY CONCERN -- OBVIOUSLY, THE

23   CONCERNS ABOUT MR. MARTIN ARE PARAMOUNT, BUT THE CINGULAR

24   WITNESS IS A LAY WITNESS WHO'S TAKEN TIME OFF FROM HIS WORK.

25   HE ACTUALLY MANAGES A STORE AND IS COMING HERE.  OBVIOUSLY, I

1    APOLOGIZE FOR THE TIMING.  HE LITERALLY CALLED AS THE JURORS

2    WERE WALKING OUT OF THE ROOM AND TOLD ME HE WAS WALKING HERE

3    RIGHT NOW.

4              THE COURT:  LET ME CONFER WITH THE MARSHALS AND

5    I'LL LET YOU KNOW BEFORE WE BRING THE JURY IN.

6              MR. MICHAEL:  THANK YOU, YOUR HONOR.

7              THE COURT:  THANK YOU.  WE ARE IN RECESS.

8                        (RECESS)

9              THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

10   ALL MEMBERS OF THE JURY, COUNSEL, AND THE DEFENDANT ALSO

11   PRESENT.

12             LADIES AND GENTLEMEN, I UNDERSTAND THAT ONE OR MORE

13   OF YOU WERE ASKING THE CLERK ABOUT THE PICTURES I PROMISED

14   YOU OF THE WITNESSES.  WE HAVE RECEIVED MOST OF THEM AND MY

15   SECRETARY IS GOING TO PUT THEM IN THE NOTEBOOKS AT THE LUNCH

16   RECESS.

17             YOU MAY CALL YOUR NEXT WITNESS.

18             MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT CALLS CHAY

19   KAHLER.

20             THE COURT:  IS THAT PERSON IN THE COURTROOM?

21             MR. AKROTIRIANAKIS:  AGENT MORENO IS RETRIEVING

22   MR. KAHLER.

23             THE CLERK:  PLEASE COME FORWARD AND STOP NEXT TO

24   THE COURT REPORTER.

25             PLEASE RAISE YOUR RIGHT HAND.

1              <u>PLAINTIFF'S WITNESS, CHAY KAHLER, WAS SWORN</u>

2              THE CLERK:  PLEASE TAKE THE STAND.

3              PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

4    NAME FOR THE RECORD.

5              THE WITNESS:  CHAY KAHLER, K-A-H-L-E-R.

6              THE COURT:  THANK YOU.  YOU MAY INQUIRE.

7                     <u>DIRECT EXAMINATION</u>

8    BY MR. MICHAEL:

9    Q.   SIR, YOU DON'T NEED TO SIT SO CLOSE TO THE MICROPHONE.

10   IT WILL PICK YOU UP JUST FINE.

11   A.   OKAY.

12   Q.   CAN YOU SPELL YOUR FIRST NAME FOR THE RECORD?

13   A.   SURE.  IT'S C-H-A-Y.

14   Q.   SIR, HAVE YOU TESTIFIED IN COURT BEFORE?

15   A.   NO.

16   Q.   I'M JUST GOING TO ASK THAT YOU LET ME FINISH MY

17   QUESTIONS AND THEN JUST ANSWER SLOWLY AND I WILL TRY TO SPEAK

18   SLOWLY AS WELL, BECAUSE THE COURT REPORTER WILL BE REPORTING

19   YOUR ANSWERS.

20   A.   OKAY.

21   Q.   MR. KAHLER, WHO DO YOU WORK FOR?

22   A.   AT&T.

23   Q.   WHAT IS YOUR CURRENT TITLE?

24   A.   STORE MANAGER.

25   Q.   HOW LONG HAVE YOU WORKED FOR AT&T?

```
 1    A.    TEN YEARS.

 2    Q.    AND HOW LONG HAVE YOU BEEN A STORE MANAGER?

 3    A.    FIVE.

 4    Q.    WHERE ARE YOU CURRENTLY A STORE MANAGER?

 5    A.    SAN BERNARDINO.

 6    Q.    IN ADDITION TO BEING A STORE MANAGER ARE YOU ALSO A

 7    CUSTODIAN OF RECORDS FOR AT&T?

 8    A.    YES, I AM.

 9    Q.    WHAT ARE SOME OF THE NAMES AT&T WAS BEFORE IT WAS AT&T?

10    A.    IN REVERSE ORDER IT WAS CINGULAR WIRELESS, AT&T WIRELESS

11    AND LA CELLULAR.

12    Q.    DID YOU WORK FOR THE SAME COMPANY THAT IS NOW KNOWN AS

13    AT&T WHEN IT WAS KNOWN AS AT&T WIRELESS?

14    A.    YES, I DID.

15    Q.    AND IN THE COURSE OF YOUR RESPONSIBILITIES DID YOU

16    RECEIVE TRAINING IN CONNECTION WITH YOUR JOB AS WELL?

17    A.    YES, I HAVE.

18    Q.    AND IN THE COURSE OF YOUR RESPONSIBILITIES HAVE YOU

19    BECOME FAMILIAR THE BILLING SYSTEM OF AT&T WIRELESS?

20    A.    YES.

21    Q.    AND WHAT THEIR BILLING RECORDS LOOK LIKE?

22    A.    YES.

23    Q.    AND HOW THEY ARE CREATED?

24    A.    YES.

25    Q.    AND HOW THEY ARE MAINTAINED?
```

1    A.   YES.

2    Q.   SIR, I'M GOING TO ASK YOU TO -- THERE'S A BOX BEHIND

3    YOU.  IF YOU COULD REACH IN AND REMOVE WHAT'S BEEN MARKED --

4    THERE'S A BOX BEHIND YOU WITH A BUNCH OF MANILA FOLDERS.  IF

5    YOU COULD PULL OUT THE MANILA FOLDER LABELED 57, PLEASE, AND

6    THEY SHOULD BE IN NUMERICAL ORDER.  IF YOU COULD OPEN THAT

7    FOR ME AND LOOK AT THAT DOCUMENT, PLEASE.

8              WITHOUT DESCRIBING THE CONTENTS, WHAT IS THIS

9    DOCUMENT?

10   A.   IT IS A BILLING INVOICE.

11   Q.   AND HAVE YOU SEEN THIS DOCUMENT BEFORE?

12   A.   YES.

13   Q.   AND IS THIS A DOCUMENT THAT'S KEPT IN THE REGULAR COURSE

14   OF -- WELL, WAS THIS A DOCUMENT THAT WAS KEPT IN THE REGULAR

15   COURSE OF AT&T WIRELESS AND THE REGULAR PRACTICE OF AT&T

16   WIRELESS' BUSINESS?

17   A.   YES.

18   Q.   AND WAS IT THE REGULAR PRACTICE OF AT&T WIRELESS TO

19   CREATE THIS RECORD?

20   A.   YES.

21   Q.   AND IS THE DATA IN THIS RECORD AND THE EVENTS IN THIS

22   RECORD, WAS IT PUT IN THIS RECORD AT OR NEAR THE TIME THAT

23   THESE EVENTS TOOK PLACE THAT THE DATA WAS CREATED?

24   A.   YES.

25   Q.   AND WOULD THIS RECORD BE KEPT IN THE COURSE OF THE

1    REGULARLY CONDUCTED ACTIVITY OF AT&T WIRELESS?

2    A.   YES.

3    Q.   AND WAS IT THE REGULAR PRACTICE OF AT&T TO CREATE THIS

4    RECORD?

5    A.   YES.

6    Q.   WHEN I SAY "AT&T," I'M REFERRING TO AT&T WIRELESS.  DO

7    YOU UNDERSTAND THAT?

8    A.   YES.

9    Q.   AND TO THE EXTENT THAT THERE'S INFORMATION IN THIS

10   RECORD THAT WAS GENERATED BY COMPUTER, WERE THE COMPUTER AND

11   THE PROGRAM USED GENERALLY ACCEPTED IN THE FIELD OF BILLING

12   AND CREATING CUSTOMER INVOICES?

13   A.   YES.

14   Q.   AND WAS THE COMPUTER, AS YOU UNDERSTOOD IT, TO BE IN

15   GOOD WORKING ORDER IN DECEMBER 2000 AND JANUARY OF 2001?

16   A.   YES.

17   Q.   AND WAS IT YOUR UNDERSTANDING THAT THE COMPUTER OPERATOR

18   POSSESSED THE KNOWLEDGE AND THE TRAINING TO CORRECTLY OPERATE

19   THE COMPUTERS THAT WOULD HAVE GENERATED DATA IN THIS RECORD?

20   A.   YES.

21          MR. AKROTIRIANAKIS:  YOUR HONOR, THE GOVERNMENT

22   WOULD MOVE TO ADMIT EXHIBIT 57 AS A BUSINESS RECORD.

23          MR. AARON:  NO OBJECTION.

24          THE COURT:  THANK YOU.

25          EXHIBIT 57 IS ORDERED ADMITTED AND YOU MAY PUBLISH.

```
 1   BY MR. MICHAEL:
 2   Q.   WOULD YOU REMOVE THE DOCUMENT FROM THE FOLDER.  AND HOW
 3   MANY PAGES IS THE DOCUMENT?
 4   A.   FOUR.
 5   Q.   AND HAVE YOU HAD AN OPPORTUNITY TO REVIEW THIS DOCUMENT
 6   BEFORE YOUR TESTIMONY TODAY?
 7   A.   YES.
 8           MR. MICHAEL:  YOUR HONOR, MAY I PUBLISH?
 9           THE COURT:  YOU MAY.
10   BY MR. MICHAEL:
11   Q.   WAS THIS DOCUMENT GENERATED FROM THE COMPUTER SYSTEM
12   MAINTAINED BY THE COMPANY YOU CURRENTLY WORK FOR?
13   A.   YES, IT IS.
14   Q.   AND I'M GOING TO POINT TO THE UPPER LEFT CORNER OF THE
15   DOCUMENT.  WHAT IS THE ACCOUNT NAME?
16   A.   GIRLS S. COUNCIL OF OR.
17   Q.   AND WHAT IS THE MOBILE NUMBER?
18   A.   (909) 323-6459.
19   Q.   AND WHAT IS THE BILLING DATE, PLEASE?  AND I'M NOW
20   POINTING TO THE RIGHT CORNER OF THE DOCUMENT.
21   A.   JANUARY 14TH, 2001.
22   Q.   NOW, THIS UPPER PORTION OF THE DOCUMENT THAT HAS
23   INFORMATION ABOUT TAXES AND CHARGES AND DOLLAR AMOUNTS, WHAT
24   IS THAT?
25   A.   THAT'S THE BILLING INFORMATION.
```

1   Q.   NOW, BENEATH IT I'M POINTING TO A LINE THAT READS "HOME,

2   AIRTIME AND LONG DISTANCE CHARGES," AND THEN IT LOOKS LIKE

3   THERE'S A SERIES OF DATES AND TIMES AND CALLS.  WHAT DOES

4   THIS SECTION REFLECT?

5   A.   THAT IS THE CALLS YOU MADE.

6   Q.   WHEN YOU SAY "YOU," WOULD THAT BE THE PERSON USING THIS

7   PHONE?

8   A.   THAT WOULD BE CORRECT.

9           MR. AARON:  I WILL OBJECT AND ASK TO APPROACH

10  QUICKLY.

11          THE COURT:  YOU MAY APPROACH.

12      (ON-THE-RECORD DISCUSSION WAS HELD AT SIDEBAR.)

13          THE COURT:  SORRY, YOUR HONOR, I THINK THERE'S A

14  RULE 11 ERROR.  I THINK THAT'S THE ACCOUNT NUMBER.  I THOUGHT

15  WE WERE SUPPOSED TO HAVE THAT DELETED.

16          THE COURT:  THE RULE 11 -- IT IS NOT RULE 11 BUT

17  THERE IS A LOCAL RULE.  I'M SORRY, THAT ACCOUNT NUMBER SHOULD

18  HAVE BEEN DELETED, ALTHOUGH THE ACCOUNT IS PROBABLY BY NOW --

19          MR. MICHAEL:  IT IS CLOSED BY NOW.  THIS PROVIDER

20  HAS TOLD US THEY ARE NOT USING THAT ACCOUNT ANYMORE.  I'M

21  HAPPY TO REMOVE IT AND REDACT IT.

22          THE COURT:  BEFORE IT GOES TO THE JURY.  THANK YOU.

23      (ON-THE-RECORD DISCUSSION AT SIDEBAR CONCLUDED.)

24          MR. AARON:  WITHDRAWN, YOUR HONOR.

25          THE COURT:  PARDON?

1          MR. AARON:  WITHDRAWN.

2          THE COURT:  THANK YOU.

3   BY MR. MICHAEL:

4   Q.   MR. KAHLER, TO CONTINUE WITH THE LINE OF QUESTIONS --

5   AND IT MIGHT BE SELF-EVIDENT FROM THE DOCUMENT.  I'M GOING TO

6   TRY TO MOVE QUICKLY THROUGH THIS.

7          WHEN IT INDICATES THE DATE I'M SHOWING ALONG THE

8   LOWER LEFT SIDE OF THIS FIRST PAGE, WHAT DOES THAT DATE REFER

9   TO?

10  A.   DECEMBER 12.

11  Q.   AND GENERALLY, WHAT DO THOSE DATES MEAN?  WOULD IT BE

12  FAIR TO SAY THOSE ARE DATES OF CALL ACTIVITY?

13  A.   THAT IS CORRECT.

14  Q.   AND WOULD THE TIME REFLECT THE DATE OF THAT CALL

15  ACTIVITY?

16  A.   YES.

17  Q.   WOULD THESE BE CALLS IN -- BECAUSE OF THE DATE OF THE

18  BILL ON JANUARY 14, 2001, WHAT TIME PERIOD WOULD THESE CALLS

19  BE FROM THAT ONLY INDICATE A MONTH AND A DAY?

20  A.   I'M SORRY, CAN YOU REPEAT THAT?

21  Q.   WOULD THESE CALLS BE IN DECEMBER OF 2000?

22  A.   YES.

23  Q.   AND WHEN IT INDICATES THERE'S SOME INFORMATION HERE.  IT

24  LOOKS LIKE IT'S UNDER A HEADER OF CALLS.  WOULD THIS REFLECT

25  WHETHER OR NOT IT WAS AN INCOMING OR AN OUTGOING CALL?

```
 1   A.   THAT IS CORRECT.

 2   Q.   AND WOULD IT REFLECT WHERE A CALL WAS INCOMING FROM?

 3   A.   THAT IS CORRECT.

 4   Q.   AND THEN IF IT'S A HOME AIRTIME, WHAT DOES HOME AIRTIME

 5   MEAN?

 6   A.   HOME AIRTIME IS THE MINUTES YOU USED IN YOUR LOCAL AREA.

 7   Q.   AND WHEN IT SAYS "CALLS FROM" AND IT HAS AN LX LISTED

 8   THERE, WHAT AREA IS THAT?

 9   A.   THAT WOULD BE THE MARKET YOU CALL FROM.

10   Q.   AND WHAT MARKET IS LX?

11   A.   LA.

12   Q.   AND WHAT MARKET IS SA?

13   A.   SAN DIEGO.

14   Q.   I'M GOING TO DIRECT YOUR ATTENTION NOW TO -- WELL, TO

15   THE SECOND PAGE OF THE DOCUMENT AND DIRECT YOUR ATTENTION TO

16   LOOKS LIKE REFERENCE 23, 12/22 AT 1:33 P.M.  DO YOU SEE THAT?

17   A.   YES.

18   Q.   AND WHEN IS THE NEXT -- WOULD THAT BE A TIME THAT THERE

19   WAS A CALL RECEIVED WHEN THE PHONE WAS DEEMED TO BE IN ITS

20   HOME AREA?

21   A.   YES.

22   Q.   AND WHEN YOU TURN TO THE NEXT ENTRY 24, 12/28, AT 5:07

23   P.M., WOULD THAT BE THE NEXT TIME THAT A NUMBER WAS CALLED

24   WHEN IT WAS IN ITS HOME AREA?

25   A.   YES.
```

1    Q.    TURNING YOUR ATTENTION TO NOW THE THIRD PAGE OF THE

2    DOCUMENT, AT THE TOP HERE -- AND MY COPY IS CUT OFF SLIGHTLY,

3    BUT WHAT IS THIS WORD RIGHT HERE WHERE MY FINGER IS POINTING?

4    A.    ROAMING CHARGES.

5    Q.    AND WHAT ARE ROAMING CHARGES?

6    A.    THAT'S WHEN YOU LEAVE YOUR LOCAL COVERAGE AREA AND YOU

7    USE YOUR PHONE IN A DIFFERENT MARKET.

8    Q.    AND WHAT IS THE DATE OF THE FIRST CALL MADE IN THE

9    ROAMING SECTION?

10   A.    12/20.

11   Q.    AND DOES IT INDICATE -- NOW, IT SAYS "CALLS MADE FROM"

12   AND THEN THERE'S A LOCATION UP HERE.  CAN YOU READ THAT?

13   A.    SANTA FE.

14   Q.    AND WHAT'S AFTER THAT?

15   A.    NEW MEXICO.

16   Q.    AND SO WHAT DOES THAT INDICATE WITH REGARD TO WHERE THE

17   PHONE WAS WHEN THESE CALLS WERE MADE?

18   A.    THE PHONE WAS IN SANTA FE, NEW MEXICO.

19   Q.    NOW, WOULD IT HAVE BEEN ONLY IN THAT CITY OR WOULD IT

20   HAVE BEEN THE GENERAL CALLING AREA AROUND SANTA FE, NEW

21   MEXICO?

22   A.    THE COVERAGE AREA.

23   Q.    ALONG HERE THERE'S A SERIES OF NM.  WOULD THAT REFLECT

24   WHERE THE PHONE WAS WHEN THE CALLS WERE MADE?

25   A.    THAT IS CORRECT.

1    Q.    AND THEN BELOW IT THERE'S A SERIES OF CALLS, LOOKS CALLS

2    15 THROUGH 19, AND IT SAYS "CALLS MADE FROM," INDICATES

3    ALBUQUERQUE/EL PASO, NM.  WHAT WOULD THAT MEAN?

4    A.    THAT'S WHERE THE CALLS WERE GENERATED FROM.

5    Q.    SO THE CALL FROM WOULD HAVE BEEN THE ALBUQUERQUE, NEW

6    MEXICO/EL PASO, NEW MEXICO AREA?

7    A.    THAT IS CORRECT.

8    Q.    AND CAN I ASK YOU TO NOW TURN YOUR ATTENTION TO

9    EXHIBIT 143?  IT SHOULD BE IN A MANILA ENVELOPE JUST TO YOUR

10   RIGHT SIDE, PLEASE.  IT'S ALREADY BEEN PULLED OUT OF THE BOX,

11   SIR.  IF YOU COULD OPEN THE ENVELOPE, PLEASE, AND LOOK AT THE

12   DOCUMENT.  WHAT IS THIS DOCUMENT, SIR?

13   A.    THIS IS THE CUSTOMER'S INVOICE.

14   Q.    AND WHEN YOU SAY IT'S THE CUSTOMER'S INVOICE, ARE YOU

15   REFERRING TO THE NUMBER (909) 323-6259?

16   A.    THAT IS CORRECT.

17   Q.    IS THAT DOCUMENT FOR THE SAME BILLING DATE AS THE

18   EXHIBIT 143 THAT YOU WERE JUST TESTIFYING ABOUT A MOMENT AGO?

19   A.    YES, IT IS.

20   Q.    EXCUSE ME.  I MEANT EXHIBIT 57.  I MISSPOKE.

21   A.    YES, THIS IS THE SAME.

22   Q.    AND HAVE YOU HAD AN OPPORTUNITY TO REVIEW EXHIBIT 143

23   BEFORE?

24   A.    YES.

25   Q.    AND IS THE INFORMATION CONTAINED IN EXHIBIT 57 AND 143

1    THE SAME?

2    A.    YES.

3    Q.    EXHIBIT 143, WHO RECEIVES THAT COPY OF THE BILL?

4    A.    THE CUSTOMER.

5    Q.    AND WOULD IT BE FAIR TO SAY IT'S THE SAME BILL AS

6    EXHIBIT 57 JUST IN A MORE SORT OF USER FRIENDLY FORMAT, MORE

7    READER FRIENDLY FORMAT?

8    A.    YES, THAT'S CORRECT.

9    Q.    AND IS ALL THE SAME CALL INFORMATION LOCATED IN

10   EXHIBIT 143 THAT'S IN EXHIBIT 57?

11   A.    YES.

12          MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT MOVES TO

13   ADMIT EXHIBIT 143 INTO EVIDENCE.

14          MR. AARON:  NO OBJECTION.

15          THE COURT:  EXHIBIT 143 IS ORDERED ADMITTED AND YOU

16   MAY PUBLISH.

17          MR. MICHAEL:  NOTHING FURTHER.

18          THE COURT:  THANK YOU.

19          CROSS-EXAMINATION.

20                    CROSS-EXAMINATION

21   BY MR. AARON:

22   Q.    GOOD MORNING, SIR.

23   A.    GOOD MORNING.

24   Q.    TURNING YOUR ATTENTION TO PAGE 3 OF EXHIBIT 57, AND IT

25   AMAZES ME THAT WE ACTUALLY SEEM AS IF WE'RE UNDERSTANDING A

```
 1    CELL PHONE BILL.
 2              THERE APPEAR TO BE FOUR NUMBERS WHICH WERE CALLED
 3    IN NEW MEXICO.  DOES THAT SEEM RIGHT TO YOU?  IF YOU'D LOOK
 4    AT THE FIRST ENTRY MADE FROM SANTA FE, NEW MEXICO, AND IF I
 5    CAN ASSIST YOU, ONE IS 9100 NUMBER?
 6    A.   OKAY.
 7    Q.   2 IS A 2938 NUMBER?
 8    A.   OKAY.
 9    Q.   AND 3 IS A 2666 NUMBER?
10    A.   OKAY.
11    Q.   AND 4 IS 2600 NUMBER?
12    A.   YES.
13    Q.   SO THAT'S CORRECT, THERE APPEAR TO BE ABOUT FOUR
14    SEPARATE NUMBERS THAT ARE CALLED, SOME OF THEM MORE THAN
15    ONCE?
16    A.   THAT IS CORRECT.
17    Q.   HERE AT CALL NO. 4 AND CALL NO. 9 IT APPEARS INCOMING
18    AND THERE'S NO NUMBER.
19    A.   THAT IS CORRECT.
20    Q.   IS THERE A WAY THAT THIS BILL TRACKS THE NUMBER THAT
21    CALLS THE ACCOUNT?
22    A.   NO.
23              MR. AARON:  THANK YOU.  NOTHING FURTHER.
24              MR. MICHAEL:  BRIEFLY, YOUR HONOR.
25              THE COURT:  GO AHEAD.
```

1              <u>REDIRECT EXAMINATION</u>

2    BY MR. MICHAEL:

3    Q.   DIRECTING YOUR ATTENTION TO THAT SAME PAGE, SIR, THERE'S

4    A HEADER HERE "MIN."  WHAT DOES THAT REFER TO?

5    A.   MINUTES USED.

6    Q.   AND SO THE NUMBERS BENEATH IT, WOULD THAT REFLECT TO THE

7    LENGTH OF THE TIME ASSOCIATED WITH THE RELEVANT CALL?

8    A.   YES.

9              MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

10             THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  YOU ARE

11   EXCUSED.

12             ALL RIGHT.  LADIES AND GENTLEMEN, BEFORE WE --

13   WHILE WE BRING THE NEXT WITNESS IN, I'M GOING TO ASK THE

14   CLERK TO ESCORT YOU AND JUST HAVE YOU WAIT IN THE HALLWAY FOR

15   A MINUTE.

16             (OUT OF THE PRESENCE OF THE JURY:)

17             MR. AARON:  YOUR HONOR, A COUPLE OF THINGS.  I

18   DIDN'T OBJECT OBVIOUSLY TO COUNSEL'S --

19             THE COURT:  I'M SORRY, WE'RE ON THE RECORD OUTSIDE

20   THE PRESENCE OF THE JURY.

21             MR. AARON:  I DIDN'T OBJECT TO COUNSEL LEADING THIS

22   WITNESS BECAUSE THIS WITNESS IS ESSENTIALLY A CHAIN WITNESS

23   AND IT WAS ALL FOUNDATION ARGUMENT, BUT I THOUGHT I WOULD

24   BRING THAT TO THE COURT'S ATTENTION.  WE ARE NOT WITHDRAWING

25   THAT OBJECTION.  WE DO BELIEVE THAT COUNSEL SHOULD DO PROPER

1    DIRECT EXAMINATION.

2              MR. MICHAEL:  MAY I RESPOND, YOUR HONOR?

3              THE COURT:  IT'S NOT NECESSARY TO RESPOND, BUT --

4    WELL, GO AHEAD.

5              MR. MICHAEL:  THE GOVERNMENT WAS MINDFUL OF YOUR

6    HONOR'S INSTRUCTION THAT FOUNDATIONAL QUESTIONS WERE ALLOWED

7    TO BE LEADING, AND THAT WAS THE SPIRIT IN WHICH THOSE

8    QUESTIONS WERE ASKED, YOUR HONOR.

9              MR. AARON:  THAT'S FINE.  YOUR HONOR, ONE MORE

10   THING.

11             THE COURT:  THAT'S FINE.  GO AHEAD.

12             MR. AARON:  ARE WE GOING TO BE BREAKING FROM 12 TO

13   1 THIS AFTERNOON?

14             THE COURT:  WELL, WHAT I WOULD LIKE TO DO THIS

15   AFTERNOON IS TO BREAK FROM -- WELL, LET'S HAVE THIS WITNESS

16   TAKE THE OATH ON THE WITNESS STAND SO HE CAN GO AHEAD AND SIT

17   DOWN.  THANK YOU.

18             I HAVE A MEETING.  I'M IN A VIDEO CONFERENCE WITH

19   MY COLLEAGUES IN LOS ANGELES.  I WOULD ACTUALLY LIKE TO GO

20   UNTIL ABOUT 12:15 TODAY AND THEN BREAK FROM SAY 12:15 UNTIL

21   ABOUT 1:30, IF THAT WORKS WITNESS-WISE.  IF WE ARE DONE WITH

22   THE WITNESS BEFORE 12:15, THEN WE WILL RECESS AT THAT POINT,

23   BUT IN TERMS OF THE LENGTH OF TIME, THAT'S WHAT I'M THINKING

24   ABOUT, AN HOUR AND 15 MINUTES.  I WOULD RATHER MAKE IT AN

25   HOUR BECAUSE WE HAVE TO RECESS EARLY SO I MAY DO IT FROM

1   12:15 TO 1:15.

2             WHAT'S YOUR CONCERN, MR. AARON?

3             MR. AARON:  I WAS HOPING I WOULD HAVE SOME TIME TO

4   DO SOME RESEARCH AND GET A LUNCH, BUT IT DEPENDS ON WHAT

5   COUNSEL ASKS ON DIRECT.  IT IS POSSIBLE I MIGHT NOT NEED TO

6   RESEARCH THOSE AREAS.

7             THE COURT:  I'M GOING TO LET YOU RECALL THE WITNESS

8   TO DO YOUR CROSS AT A LATER TIME.

9             MR. AARON:  OH, THANK YOU.

10            THE COURT:  I'M SORRY, I THOUGHT I HAD MENTIONED

11  THAT EARLIER.

12            MR. AARON:  I THOUGHT YOU WERE JUST GOING TO MAKE

13  ME DO IT AFTER LUNCH.

14            MR. MICHAEL:  YOUR HONOR?  SORRY.

15            THE COURT:  ALL RIGHT.  LET'S BRING THE JURY IN.

16            IS THERE SOMETHING ELSE WE HAVE TO BRING UP BEFORE

17  WE GET STARTED?

18            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I HAVE THE

19  IMMUNITY AGREEMENT THE COURT WANTED TO SEE.

20            THE COURT:  THANK YOU.  AND YOU'VE GIVEN A COPY TO

21  MR. AARON?

22            MR. AKROTIRIANAKIS:  WELL, I'VE GIVEN THE COPY THAT

23  IS UNSIGNED.  THIS IS THE ORIGINAL.

24            THE COURT:  LET'S BRING THE JURY IN.

25            MR. AKROTIRIANAKIS:  I THINK I ALREADY DID PROVIDE

1    THE COURT WITH THE SUBSTANCE OF THAT AGREEMENT EARLIER TODAY.

2    IF I HADN'T, I HAVE NOW.

3            MR. AARON:  ARE WE BREAKING EARLY TODAY BECAUSE OF

4    THE JUROR?

5            THE COURT:  YES, AT 4.

6                (IN THE PRESENCE OF THE JURY:)

7            THE COURT:  AGAIN, ALL MEMBERS OF THE JURY ARE

8    PRESENT IN THE COURTROOM WITH ALL COUNSEL AND THE DEFENDANT.

9            YOU MAY STAND SO YOU MAY BE SWORN.

10           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

11           PLAINTIFF'S WITNESS, RANDALL MARTIN, WAS SWORN

12           THE COURT:  YOU MAY BE SEATED.

13           THE CLERK:  PLEASE STATE YOUR NAME -- I'M SORRY.

14   PLEASE STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR

15   LAST NAME.

16           THE WITNESS:  RANDALL EARL MARTIN, M-A-R-T-I-N.

17           THE COURT:  THANK YOU.

18           YOU MAY INQUIRE.

19           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.  MAY I

20   APPROACH THE CLERK WITH THE PARTIES' JOINT PROPOSED

21   INSTRUCTION?

22           THE COURT:  I HAVE IT.  I ALREADY HAVE IT.  OH, I'M

23   SORRY, BUT YOU MAY.

24           MR. AKROTIRIANAKIS:  MAY I JUST SHOW IT TO COUNSEL,

25   YOUR HONOR?

```
 1              THE COURT:  YES.

 2                    (COUNSEL CONFER)

 3              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.  I

 4    DON'T NEED TO DO THAT, I SUPPOSE.

 5              THE COURT:  ARE THERE ANY CHANGES?

 6              MR. AKROTIRIANAKIS:  NOT TO THE ONE THAT --

 7              MR. AARON:  NO, THERE WAS JUST SOME CONFUSION ABOUT

 8    WHAT INSTRUCTION THE COURT WAS GOING TO READ.

 9              THE COURT:  SO THE ONE THAT I SHOWED COUNSEL, THERE

10    ARE NO CHANGES TO IT?

11              MR. AARON:  THAT'S CORRECT.

12              THE COURT:  NO OBJECTIONS TO IT?

13              MR. AARON:  NO.

14              THE COURT:  THANK YOU VERY MUCH.  GO AHEAD.

15              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.  AND

16    THE GOVERNMENT OFFERS EXHIBITS 1 AND 2 ON THE FOUNDATION LAID

17    BY THE WITNESSES YESTERDAY.

18              THE COURT:  FOR ADMISSION?

19              MR. AKROTIRIANAKIS:  OFFERED FOR ADMISSION, YES,

20    YOUR HONOR.

21              THE COURT:  ANY OBJECTIONS OTHER THAN THOSE

22    PREVIOUSLY STATED?

23              MR. AARON:  NO, YOUR HONOR.

24              THE COURT:  THANK YOU.

25              EXHIBITS 1 AND 2 ARE ORDERED ADMITTED.  AND YOU MAY
```

```
 1   BEGIN TO PUBLISH.

 2              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

 3                        DIRECT EXAMINATION

 4   BY MR. AKROTIRIANAKIS:

 5   Q.   GOOD MORNING, MR. MARTIN.  ARE YOU PRESENTLY

 6   INCARCERATED?

 7   A.   I AM.

 8   Q.   WHERE ARE YOU PRESENTLY INCARCERATED?

 9   A.   IN FORT WORTH, TEXAS, IN A FEDERAL CORRECTIONAL

10   INSTITUTION.

11              THE COURT:  MR. MARTIN, I'M GOING TO ASK YOU TO

12   KEEP YOUR VOICE UP SO EVERYONE CAN HEAR YOU, AND YOU CAN MOVE

13   CLOSER TO THE MICROPHONE WHICH CAN BE ADJUSTED CAREFULLY.

14              THE WITNESS:  YES, MA'AM.

15              THE COURT:  EXPENSIVE PIECE OF EQUIPMENT, TO PICK

16   UP YOUR VOICE.  THANK YOU.

17              GO AHEAD.

18              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

19   BY MR. AKROTIRIANAKIS:

20   Q.   YOU WERE BROUGHT FROM FORT WORTH FEDERAL CORRECTIONAL

21   INSTITUTE TO SOUTHERN CALIFORNIA TO TESTIFY IN THIS TRIAL?

22   A.   YES, I WAS.

23   Q.   FOR WHAT CRIME WERE YOU CONVICTED FOR WHICH YOU'RE

24   PRESENTLY INCARCERATED?

25   A.   POSSESSION OF CHILD PORNOGRAPHY.
```

1   Q.   AT THE TIME THAT YOU WERE ARRESTED IN CONNECTION WITH

2   THAT OFFENSE DID YOU AGREE TO BE COOPERATIVE WITH THE

3   GOVERNMENT?

4   A.   I DID.

5   Q.   DID YOU PLEAD GUILTY TO THAT CRIME, THE POSSESSION OF

6   CHILD PORNOGRAPHY?

7   A.   I DID.

8   Q.   HAVE YOU BEEN SENTENCED?

9   A.   I HAVE.

10  Q.   IS IT YOUR UNDERSTANDING THAT THE SENTENCE YOU RECEIVED

11  WAS THE MAXIMUM SENTENCE ALLOWED BY LAW?

12  A.   YES, SIR.

13  Q.   DO YOU HAVE ANY REASON TO BELIEVE THAT THE SENTENCE YOU

14  RECEIVED WOULD BE REDUCED OR OTHERWISE AFFECTED BY -- AS A

15  RESULT OF YOUR TESTIMONY HERE?

16  A.   NO, SIR.

17  Q.   HAVE YOU RECEIVED ANYTHING OF VALUE IN ORDER THAT YOU

18  AGREED TO TESTIFY?

19  A.   NO, SIR.

20  Q.   ARE YOU A PARTY TO AN IMMUNITY AGREEMENT IN THIS CASE?

21  A.   I AM.

22  Q.   IT'S YOUR UNDERSTANDING THAT THAT AGREEMENT IMMUNIZES

23  YOU FROM PROSECUTION BASED ON YOUR TESTIMONY TODAY?

24  A.   I DO UNDERSTAND THAT, YES, SIR.

25  Q.   IS THE IMMUNITY THAT YOU RECEIVED CONDITIONED ON THE

1    ACTUAL CONTENT OF YOUR TESTIMONY?

2    A.   I BELIEVE SO.

3    Q.   LET ME -- I MAY HAVE CONFUSED YOU.

4         IS THE IMMUNITY THAT YOU RECEIVED DEPENDENT ON THE

5    OUTCOME OF THIS TRIAL?

6    A.   I DON'T THINK SO.

7    Q.   IS THE IMMUNITY THAT YOU RECEIVED THEN DEPENDENT ON WHAT

8    YOU ACTUALLY SAY IN YOUR TESTIMONY AS OPPOSED TO THE FACT OF

9    TESTIFYING?

10   A.   I'M NOT SURE I UNDERSTAND WHAT YOU'RE ASKING ME.  I'M

11   SORRY.

12   Q.   YOU'VE RECEIVED IMMUNITY IN EXCHANGE FOR TESTIFYING IN

13   THIS CASE?

14   A.   THAT IS CORRECT.

15   Q.   HAS ANYONE TOLD YOU HOW YOU NEED TO ANSWER MY QUESTIONS

16   IN ORDER TO RECEIVE A BENEFIT UNDER THIS IMMUNITY AGREEMENT?

17   A.   OH, NO.

18   Q.   DO YOU HAVE AN ATTORNEY?

19   A.   I DO.

20   Q.   IS HE PRESENT IN COURT?

21   A.   YES, SIR.

22   Q.   IS IT DAVE PHILIPS HERE?

23   A.   IT IS.

24        MR. AKROTIRIANAKIS:  MAY THE RECORD REFLECT

25   MR. PHILIPS' PRESENCE IN THE COURTROOM, YOUR HONOR?

1          THE COURT:  SO NOTED FOR THE RECORD.

2     BY MR. AKROTIRIANAKIS:

3     Q.    ON WHAT DATE WERE YOU ARRESTED FOR THE CHARGES FOR WHICH

4     YOU'RE PRESENTLY INCARCERATED?

5     A.    APRIL 17TH, 2001.

6     Q.    DID YOU EVER RECEIVE CHILD PORNOGRAPHY FROM SETH

7     BEKENSTEIN?

8     A.    I DID.

9          MR. AKROTIRIANAKIS:  YOUR HONOR, THE GOVERNMENT

10    WOULD REQUEST THE READING OF THE INSTRUCTION.

11         THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, I'M

12    GOING TO GIVE YOU ANOTHER INSTRUCTION.  THE TERM "CHILD

13    PORNOGRAPHY" MEANS ANY VISUAL DEPICTION, INCLUDING ANY

14    PHOTOGRAPH FILM, VIDEO, PICTURE OR COMPUTER OR

15    COMPUTER-GENERATED IMAGE OR PICTURE WHETHER MADE OR PRODUCED,

16    ELECTRONIC, MECHANICAL, OR OTHER MEANS OF SEXUALLY EXPLICIT

17    CONDUCT WHERE THE PRODUCTION OF VISUAL DEPICTION INVOLVES THE

18    USE OF A MINOR ENGAGING IN SEXUALLY EXPLICIT CONDUCT OR SUCH

19    VISUAL DEPICTION HAS BEEN CREATED, ADAPTED, OR MODIFIED TO

20    APPEAR THAT AN IDENTIFIABLE MINOR IS ENGAGING IN SEXUALLY

21    EXPLICIT CONDUCT.

22         THE TERM "SEXUALLY EXPLICIT CONDUCT" MEANS ANY OF

23    THE FOLLOWING:  ONE, SEXUAL INTERCOURSE INCLUDING GENITAL,

24    ORAL GENITAL, ANAL GENITAL, OR ORAL ANAL, WHETHER BETWEEN

25    PERSONS OF THE SAME OR OPPOSITE SEX; OR TWO, MASTURBATION; OR

```
 1    THREE, SADISTIC OR MASOCHISTIC ABUSE; OR FOUR, LASCIVIOUS

 2    EXHIBITION OF THE GENITALS OR PUBIC AREA OF ANY PERSON.

 3              THANK YOU.  YOU MAY CONTINUE.

 4              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

 5    BY MR. AKROTIRIANAKIS:

 6    Q.   MR. MARTIN, DID YOU HEAR AND UNDERSTAND THE COURT'S

 7    INSTRUCTION AS TO THE DEFINITION OF CHILD PORNOGRAPHY?

 8    A.   YES, SIR.

 9    Q.   DO YOU HAVE THAT DEFINITION IN MIND?

10    A.   YES, SIR.

11    Q.   AS I USE THE TERM "CHILD PORNOGRAPHY" IN MY QUESTIONS OF

12    YOU, I INTEND THE SAME MEANING THAT THE COURT JUST GAVE.

13              DO YOU UNDERSTAND THAT?

14    A.   I DO.

15    Q.   DO YOU AGREE TO ANSWER MY QUESTIONS WITH THAT MEANING IN

16    MIND?

17    A.   YES, SIR.

18    Q.   THE CHILD PORNOGRAPHY YOU TESTIFIED SETH BEKENSTEIN SENT

19    TO YOU, HAD YOU REQUESTED THAT THAT PORNOGRAPHY, CHILD

20    PORNOGRAPHY, BE SENT TO YOU?

21    A.   I DID.

22    Q.   IN WHAT FORMAT WAS THE CHILD PORNOGRAPHY THAT SETH

23    BEKENSTEIN SENT TO YOU?

24    A.   THEY WERE DISKS.

25    Q.   WERE THOSE DISKS THAT LOOKED LIKE A COMPACT DISK?
```

1    A.   CD DISK, YES, I'M SORRY, CD COMPACT DISK.

2    Q.   WERE THOSE INTENDED TO BE PLAYED EITHER IN A COMPUTER OR

3    A DVD PLAYER?

4    A.   I THINK I COULD ONLY PLAY THEM ON A COMPUTER.

5    Q.   WHAT WAS THE CONTENT OF THE COMPACT DISKS THAT SETH

6    BEKENSTEIN SENT TO YOU THAT YOU'VE NOW TESTIFIED TO?

7    A.   THEY HAD STILLS, THEY HAD CLIPS.

8    Q.   WHAT DO YOU MEAN BY STILLS?

9    A.   PHOTOGRAPHS.

10   Q.   AND WHAT IS CLIPS?

11   A.   CLIPS WOULD BE MAYBE A FIVE- OR TEN-MINUTE MOVIE OF THE

12   SAME THING.

13   Q.   WHAT WAS SHOWN IN THE STILLS THAT YOU RECEIVED ON THE

14   CD'S FROM SETH BEKENSTEIN?

15   A.   I GUESS BOY-ON-BOY ACTION, MEN-ON-BOY --

16   Q.   AND WHEN YOU SAY -- I BEG YOUR PARDON.

17   A.   -- PHOTOS LIKE THAT.

18   Q.   WHEN YOU SAY "BOY-ON-BOY ACTION," YOU MEAN SEXUALLY

19   EXPLICIT CONDUCT AS THE COURT HAS DEFINED THAT TERM BETWEEN

20   TWO BOYS?

21   A.   YES, SIR.

22   Q.   AND DO YOU MEAN THE SAME MEANING WITH REGARD TO

23   MAN-ON-BOY EXCEPT WITH A MALE ADULT AND A BOY?

24   A.   I DO.

25   Q.   WHEN YOU USE THE TERM "BOY," DO YOU MEAN A CHILD UNDER

1    THE AGE OF THE MAJORITY; THAT IS, A CHILD UNDER 18?

2    A.    YES, SIR.

3    Q.    WHAT AGE RANGE WERE THE CHILDREN DEPICTED IN THE STILLS

4    THAT SETH BEKENSTEIN SENT YOU ON THESE CD'S?

5    A.    PROBABLY PREPUBESCENT AND UP.

6    Q.    WHAT DO YOU MEAN WHEN YOU SAY PREPUBESCENT?  WHAT AGE

7    RANGE?

8    A.    SEVEN, EIGHT, NINE, TEN.

9    Q.    SO SEVEN, EIGHT, NINE, TEN AND HIGHER UP THROUGH BELOW

10   THE AGE OF MAJORITY?

11   A.    YES, SIR.

12   Q.    IS THAT LIKEWISE TRUE FOR THE CLIPS SHOWN AND CONTAINED

13   ON THE CD'S THAT SETH BEKENSTEIN SENT YOU?

14   A.    YES.

15   Q.    DID YOU ASK SETH BEKENSTEIN TO SEND YOU THAT CHILD

16   PORNOGRAPHY DIRECTLY TO YOURSELF?

17   A.    NO, SIR.

18   Q.    TO WHOM DID YOU ASK SETH BEKENSTEIN -- WELL, DID YOU ASK

19   SETH BEKENSTEIN TO SEND YOU THAT CHILD PORNOGRAPHY TO ANOTHER

20   PERSON OR CARE OF ANOTHER PERSON FOR YOUR RECEIPT ULTIMATELY?

21   A.    I DID.

22   Q.    WHO WAS THAT OTHER PERSON?

23   A.    MY BROTHER.

24   Q.    WHAT'S YOUR BROTHER'S NAME?

25   A.    RONALD.

1    Q.    RONALD MARTIN?

2    A.    YES.

3    Q.    DID YOUR BROTHER, RONALD MARTIN, KNOW WHAT IT WAS YOU

4    WERE RECEIVING FROM SETH BEKENSTEIN?

5    A.    HE HAD AN IDEA.

6    Q.    DID HE HAVE AN IDEA OR DID HE KNOW?

7    A.    HE EVENTUALLY KNEW.

8    Q.    DID YOU HAVE SETH BEKENSTEIN SEND THE CD'S WITH CHILD

9    PORNOGRAPHY, AS YOU'VE DESCRIBED IT, TO YOUR BROTHER'S

10   RESIDENCE?

11   A.    YES, SIR.

12   Q.    IS THAT ALSO IN THE SAME PART OF TEXAS THAT YOU LIVED IN

13   AT THE TIME?

14   A.    YES, SIR.

15   Q.    AND DID YOUR BROTHER RONALD ULTIMATELY LEARN THE NATURE

16   OF THOSE ITEMS THAT SETH BEKENSTEIN WAS SENDING YOU BY

17   HIMSELF OPENING THOSE PACKAGES?

18   A.    HE NEVER OPENED THEM.

19   Q.    IS IT YOUR RECOLLECTION THAT YOU NEVER TOLD ANY PERSON

20   IN THE INSTANT MESSAGE CHAT THAT YOUR BROTHER LOOKED IN THE

21   PACKAGES?

22   A.    I DON'T RECALL.

23   Q.    MAYBE I'LL BE ABLE TO REFRESH YOUR RECOLLECTION.   THE

24   CHILD PORNOGRAPHY THAT SETH BEKENSTEIN SENT TO YOUR BROTHER,

25   RONALD MARTIN, WAS THAT INTENDED FOR YOU?

1  A.   IT WAS INTENDED FOR ME, YES, SIR.

2  Q.   DO YOU KNOW WHETHER SETH BEKENSTEIN SENT CHILD

3  PORNOGRAPHY TO OTHER PERSONS OTHER THAN YOURSELF THROUGH YOUR

4  BROTHER, RONALD MARTIN?

5  A.   I DON'T KNOW.

6  Q.   HAVE YOU PARTICIPATED IN INSTANT MESSAGE CHATTING

7  DISCUSSIONS WITH OTHER PERSONS CONCERNING SETH BEKENSTEIN'S

8  DISTRIBUTION OF CHILD PORNOGRAPHY?

9  A.   I BELIEVE I DID.

10  Q.   WAS IT YOUR UNDERSTANDING BASED ON THE STATEMENTS MADE

11  TO YOU BY OTHERS IN THOSE INSTANT MESSAGE CHATS THAT SETH

12  BEKENSTEIN WAS SENDING CHILD PORNOGRAPHY TO THEM AS WELL?

13        MR. AARON:  I WILL OBJECT, LACK OF PERSONAL

14  KNOWLEDGE, SPECULATION.

15        THE COURT:  SUSTAINED.  YOU MAY REWORD THE

16  QUESTION.

17  BY MR. AKROTIRIANAKIS:

18  Q.   DID YOUR DISCUSSIONS CONTAIN -- PARDON ME.

19        DID YOUR DISCUSSIONS INCLUDE DISCUSSIONS OF THE

20  VIEWING AND SHARING OF CHILD PORNOGRAPHY GENERALLY?

21  A.   I BELIEVE IT DID, YES.

22  Q.   AND DID THOSE DISCUSSIONS ALSO INCLUDE DISCUSSIONS OF

23  THE RECEIPT OF CHILD PORNOGRAPHY BY PERSONS OTHER THAN

24  YOURSELF?

25        MR. AARON:  YOUR HONOR, I WOULD OBJECT, RULE 611.

1          THE COURT:  THE OBJECTION IS OVERRULED.

2    BY MR. AKROTIRIANAKIS:

3    Q.   DID YOU DISCUSS THE OTHER PERSON'S RECEIPT OF CHILD

4    PORNOGRAPHY?

5    A.   I DON'T REMEMBER.

6    Q.   DO YOU RECALL OTHER PEOPLE DISCUSSING THEIR RECEIPT OF

7    CHILD PORNOGRAPHY FROM SETH BEKENSTEIN?

8    A.   SEEMS LIKE I DID.

9    Q.   IS THAT YOUR RECOLLECTION AS YOU SIT HERE?

10   A.   YES, SIR.

11   Q.   HAVE YOU YOURSELF MADE CHILD PORNOGRAPHY AVAILABLE TO

12   OTHERS FOR VIEWING?

13   A.   I HAVE.

14   Q.   WHAT IS THE MANNER IN WHICH YOU ACCOMPLISHED THAT?

15   A.   I UPLOADED ALL OF MY COLLECTION TO A PUBLIC SERVER THAT

16   HOUSED AND STORED PHOTOGRAPHS.

17   Q.   WHEN YOU SAY "COLLECTION," YOU MEAN A COLLECTION OF

18   PICTURES?

19   A.   PICTURES, YES, SIR.

20   Q.   DID IT INCLUDE VIDEOS?

21   A.   IT DID NOT.

22   Q.   WERE YOUR PICTURES CHILD PORNOGRAPHY AS THE COURT HAS

23   DEFINED IT?

24   A.   THEY WERE.

25   Q.   WAS ALL OF IT CHILD PORNOGRAPHY AS THE COURT HAS DEFINED

1   IT?

2   A.   YES, SIR.

3   Q.   DID IT INCLUDE ALSO -- WITHDRAW THAT.

4            HOW MANY PICTURES WERE IN YOUR COLLECTION

5   APPROXIMATELY?

6   A.   BETWEEN 1,500 AND 2,000.

7   Q.   ARE YOU FAMILIAR WITH ZING?

8   A.   I AM.

9   Q.   WHAT IS ZING?

10  A.   ZING IS THE STORAGE OF THE -- THE PUBLIC STORAGE THAT

11  HELD THOSE PHOTOGRAPHS.

12  Q.   ARE YOU FAMILIAR WITH THE TERM "OFF-SITE SERVER"?

13  A.   I AM.

14  Q.   WHAT IS AN OFF-SITE SERVER?

15  A.   OFF-SITE SERVER WOULD BE ONE THAT YOU CAN GET ACCESS TO

16  AND DOWNLOAD IMAGES OR CLIPS.

17  Q.   NOW, RETURNING --

18  A.   THAT'S MY UNDERSTANDING OF THAT.

19  Q.   RETURNING TO ZING, ARE YOU ALSO FAMILIAR WITH PHOTO

20  ISLAND?

21  A.   I AM.

22  Q.   WHAT IS PHOTO ISLAND?

23  A.   IT'S THE SAME THING AS ZING.  IT'S A PUBLIC STORAGE OF

24  PERSONAL PHOTOS, PHOTOGRAPHS.

25  Q.   IS IT AN ACTUAL PHYSICAL LOCATION LIKE A STORAGE UNIT OR

1    A ROOM?

2    A.    I ASSUME SO.

3    Q.    HOW DOES ONE ACCESS ZING OR PHOTO ISLAND?

4    A.    YOU JOIN THE SITE, CREATE A PASSWORD, AND THEN CREATE

5    YOUR ALBUMS AND UPLOAD THE PICTURES TO THE ALBUMS THAT YOU

6    CREATED.

7    Q.    AND DID YOU DO ALL OF THAT THAT YOU'VE DESCRIBED?

8    A.    YES, SIR, I DID.

9    Q.    DID YOU DO IT IN REGARD WITH BOTH ZING AND PHOTO ISLAND?

10   A.    I DID.

11   Q.    DID YOU THEN MAKE THOSE PHOTOS AND COLLECTION AS YOU

12   CALLED IT AVAILABLE TO OTHERS?

13   A.    I DID.

14   Q.    IS A PASSWORD REQUIRED TO VIEW THOSE PHOTOS IN YOUR

15   COLLECTION?

16   A.    I BELIEVE IT WAS.

17   Q.    DID YOU PROVIDE THAT PASSWORD TO OTHER PERSONS?

18   A.    I DID.

19   Q.    DID YOU HAVE MULTIPLE ALBUMS POSTED ON ZING AND/OR PHOTO

20   ISLAND?

21   A.    YES, SIR.

22   Q.    HOW MANY DIFFERENT ALBUMS DID YOU HAVE?

23   A.    I BELIEVE I HAD FIVE DIFFERENT ALBUMS.

24   Q.    WAS IT IN THOSE FIVE DIFFERENT ALBUMS THAT THE NUMBER OF

25   PHOTOGRAPHS YOU PREVIOUSLY INDICATED WAS STORED?

1    A.    YES, SIR.

2    Q.    AND HOW MANY WAS THAT AGAIN?

3    A.    BETWEEN 1,500 AND ABOUT 2,000.  I CAN'T RECALL THE EXACT

4    NUMBER.

5    Q.    HOW WERE YOUR FIVE ALBUMS CATEGORIZED?

6    A.    I REMEMBER A FEW OF THEM.  ONE WAS CATEGORIZED AS JUST

7    UNDERWEAR AND SPEEDOS.

8    Q.    LET ME STOP YOU THERE.  WERE YOUR ALBUMS CATEGORIZED BY

9    SUBJECT MATTER?

10   A.    YES, SIR.

11   Q.    IN ONE OF THOSE SUBJECT MATTERS WAS THE SUBJECT OF THE

12   PHOTOGRAPHS POSED IN UNDERWEAR OR SPEEDOS OR OTHER SCANTILY

13   ABBREVIATED CLOTHING?

14   A.    YES, SIR.

15   Q.    AND THOSE PICTURES THAT YOU'VE REFERRED TO, MAY I SIMPLY

16   REFER TO THEM COLLECTIVELY AS UNDERWEAR PICTURES?

17   A.    SURE.

18   Q.    DID THOSE SHOW YOUNG BOYS IN UNDERWEAR?

19   A.    YES, SIR.

20   Q.    PREPUBESCENT AND POSTPUBESCENT?

21   A.    YES, SIR.

22   Q.    DID IT SHOW THOSE CHILDREN IN THE UNDERWEAR POSED IN

23   LASCIVIOUS MANNERS?

24   A.    IT DID.

25   Q.    SUCH AS WITH AN ERECTION FOR, AN EXAMPLE?

1    A.   YES, SIR.

2    Q.   WHAT WERE THE OTHER -- WHAT WERE THE OTHER SUBJECT

3    MATTERS THAT YOU DIVIDED -- UPON WHICH YOU CATEGORIZED THE

4    ALBUMS YOU TESTIFIED TO?

5    A.   ONE WAS JUST NUDE IMAGES WITH OR WITHOUT ERECTIONS.

6    Q.   OF CHILDREN?

7    A.   YES, SIR.

8    Q.   BOYS?

9    A.   YES, SIR.

10   Q.   PRE AND POSTPUBESCENT?

11   A.   YES, SIR.

12   Q.   WHAT WERE THE OTHERS?

13   A.   ONE I BELIEVE WAS JUST EROTIC IMAGES IN POSES OR SOME

14   ACT.

15   Q.   WHEN YOU SAY "EROTIC IMAGES," WERE THOSE NUDE

16   PHOTOGRAPHS?

17   A.   YES, SIR.

18   Q.   WHEN YOU SAY "EROTIC IMAGES," DO YOU MEAN NOT ACTUALLY

19   ENGAGED IN SEX ACTS?

20   A.   SOME OF THEM COULD HAVE BEEN ENGAGED IN SEX ACTS, YES,

21   SIR.

22   Q.   THE OTHERS THAT WERE NOT ENGAGED IN SEX ACTS, DID THOSE

23   INCLUDE NUDE IMAGES OF LASCIVIOUS EXHIBITION OF THE GENITALS

24   OR PUBIC AREA OF THE BOYS, FOR EXAMPLE, WITH ERECTIONS?

25   A.   YES, SIR.

1    Q.   WHAT WERE THE OTHER SUBJECT MATTERS ON WHICH YOU

2    CATEGORIZED YOUR ALBUMS?

3    A.   ONE I REMEMBER WAS SPECIFICALLY FOR ERECTIONS AND

4    ANOTHER WAS BOY-ON-BOY OR MEN-ON-BOY ACTION.   I CAN'T

5    REMEMBER -- I CAN'T RECALL THE NAME OF THAT ONE.

6    Q.   WHAT WERE THE OTHERS?

7    A.   THAT'S ALL I'M RECALLING RIGHT NOW.

8    Q.   ARE YOU FAMILIAR, MR. MARTIN, WITH THE TERM "CUM SHOT"?

9    A.   THERE WAS ONE CUM SHOT.   YES, SIR, I AM.

10   Q.   WAS THAT ONE OF THE CATEGORIES OF YOUR ALBUMS?

11   A.   IT WAS.

12   Q.   AND DOES THAT TERM, IN YOUR MIND, REFER TO ONE SUBJECT

13   OF THE IMAGE EJACULATING UPON ANOTHER SUBJECT IN THE IMAGE?

14   A.   YES, SIR.

15   Q.   AND DID THOSE INCLUDE -- DID THOSE INCLUDE BOYS BEING

16   SUBJECTED TO THAT TREATMENT?

17   A.   YES, SIR.

18   Q.   PREPUBESCENT?

19   A.   SOME.

20   Q.   POSTPUBESCENT?

21   A.   YES, SIR.

22        MR. AKROTIRIANAKIS:   YOUR HONOR, MAY EXHIBIT 2

23   WHICH IS IN EVIDENCE BE PLACED BEFORE THE WITNESS?

24        THE COURT:   YES.   YOU WANT TO TELL THE WITNESS

25   WHERE EXHIBIT 2 IS?

1          MR. AKROTIRIANAKIS:  IT'S IN EVIDENCE.  IT'S IN THE

2   CUSTODY OF THE COURT'S DEPUTY.  I'M SORRY, IT'S THE SMALLER

3   OF THE TWO BINDERS.

4   BY MR. AKROTIRIANAKIS:

5   Q.   MR. MARTIN, I WOULD ASK YOU BRIEFLY TO LOOK AT THAT

6   EXHIBIT 2, AND MY QUESTION FOR YOU WILL BE WHETHER THOSE ARE

7   A COLLECTION OF SOME OF THE INSTANT MESSAGE CHATS THAT YOU

8   ENGAGED IN WITH OTHERS.

9   A.   IT IS.

10          MR. AKROTIRIANAKIS:  WITH THE COURT'S PERMISSION,

11   MAY I PLACE THE FIRST PAGE OF THE EXHIBIT ON THE OVERHEAD

12   CAMERA?

13          THE COURT:  YOU MAY.

14   BY MR. AKROTIRIANAKIS:

15   Q.   THIS IS THE FIRST PAGE, FOR THE RECORD, OF SECTION A OF

16   EXHIBIT 2.

17          ARE YOU ABLE TO SEE THAT ON THE SCREEN BEFORE YOU,

18   MR. MARTIN?

19   A.   YES, SIR.

20          THE COURT:  EXCUSE ME.  ACTUALLY, COUNSEL NEED TO

21   APPROACH THE SIDEBAR.

22          (ON-THE-RECORD DISCUSSION WAS HELD AT SIDEBAR.)

23          THE COURT:  COUNSEL, I THINK THIS WOULD BE THE TIME

24   TO GIVE THE LIMITING INSTRUCTION ABOUT THE PURPOSE FOR WHICH

25   THEY ARE TO CONSIDER THIS EVIDENCE.

1          MR. AARON:  WELL, LET ME GET THE INSTRUCTION

2    BECAUSE I DID HAVE OBJECTIONS.

3          MR. AKROTIRIANAKIS:  I CAN, YOUR HONOR, REFRAIN

4    FROM SHOWING ANYTHING AT THIS POINT THAT IS NOT A CHAT

5    BETWEEN THE WITNESS AND THE DEFENDANT TO THE EXTENT THAT THAT

6    AFFECTS THE TIMING OF THIS.

7          MR. AARON:  I'M SORRY, YOU WON'T SHOW ANYTHING

8    THAT'S NOT A CHAT?

9          THE COURT:  BETWEEN THE DEFENDANT AND THIS --

10          MR. AKROTIRIANAKIS:  IN OTHER WORDS, THE ONLY CHATS

11    THAT I WILL PUT ON THE OVERHEAD THROUGH THIS WITNESS --

12          THE COURT:  WOULDN'T BE ANY CO-CONSPIRATOR?

13          MR. AKROTIRIANAKIS:  NO, THEY WOULD BE THE

14    DEFENDANT'S OWN ADMISSIONS.

15          MR. AARON:  OKAY.  BECAUSE THAT IS NOT --

16          THE COURT:  WELL, IT IS NOT ON RIGHT NOW.

17          MR. AKROTIRIANAKIS:  I TOOK IT OFF WITH THAT IN

18    MIND.  THAT WOULD BE THE WITNESS' STATEMENTS, OUT-OF-COURT

19    STATEMENTS THAT HE IS HERE TO TESTIFY TO THEM AND THE

20    DEFENDANT'S ADMISSIONS.

21          THE COURT:  ALL RIGHT.

22          MR. AARON:  WELL, I STILL HAVE ISSUES WITH THOSE.

23    I'VE ALREADY MADE MY OBJECTIONS.

24          THE COURT:  I'M SORRY, WHAT ISSUES DID YOU HAVE

25    WITH THOSE?

```
 1              MR. AARON:  THAT WAS MY OBJECTION TO THE CHATS IN

 2    GENERAL.  AND MY OBJECTION IS THAT ALTHOUGH THEY'RE

 3    STATEMENTS BY THE DEFENDANT, THEY'RE IRRELEVANT TO THE

 4    VARIOUS CONSPIRACIES.

 5              THE COURT:  AND I'VE RULED ON THOSE.

 6              MR. AARON:  YES.

 7              THE COURT:  I WOULD OVERRULE THOSE OBJECTIONS.

 8              MR. AARON:  YES.  THE COURT WOULD STILL -- I

 9    BELIEVE COUNSEL IS MAINTAINING UNDER GRANT AND CURTIN THAT

10    THEY CAN CONSIDER THE EVIDENCE OF THE CHILD PORN TO GO TO

11    THE --

12              THE COURT:  TO COUNTS 3 AND 4.

13              MR. AARON:  YES.

14              THE COURT:  THE TRAVEL COUNTS YOU SAID.  I'M SORRY,

15    I THOUGHT YOU SAID TRAFFICKING.

16              MR. AKROTIRIANAKIS:  ALL THE CHATS I'M NOW

17    REFERRING TO WITH THIS WITNESS ARE ADMISSIBLE AS TO ALL FOUR

18    COUNTS.

19              THE COURT:  THAT'S YOUR POSITION?

20              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THAT WAS MY

21    UNDERSTANDING AT THE PRETRIAL, AND THE COURT WAS GOING TO SO

22    INSTRUCT THE JURY.

23              MR. AARON:  RIGHT.  I UNDERSTAND THAT.  AND THE

24    COURT DID MAKE THAT RULING, BUT THE COURT HAD ALSO SAID IT

25    WAS GOING TO INSTRUCT ON THAT.
```

```
1              THE COURT:  YES.

2              MR. AARON:  SO YOU WERE SAYING THAT THE DEFENDANT'S

3    STATEMENT YOU NEED TO -- BUT YOU WOULD STILL NEED TO

4    INSTRUCT.

5              THE COURT:  WHY DON'T YOU GET YOUR COPY OF THE

6    INSTRUCTION AND TELL ME WHAT YOU OBJECT TO.

7              MR. AKROTIRIANAKIS:  THE GOVERNMENT, IN LIGHT OF,

8    YOUR HONOR, CO-CONSPIRATOR STATEMENTS AND ALSO 404(B) CRAFTED

9    INSTRUCTIONS THAT WOULD ADDRESS THAT, AND I HAVE PROVIDED TO

10   DEFENSE COUNSEL THIS MORNING, SO THAT'S WHAT I THINK HE'S

11   SPEAKING OF.

12             MR. AARON:  I'LL GET IT.

13             MR. MICHAEL:  IF I MAY, YOUR HONOR, THIS IS BRIAN

14   MICHAEL, FOR THE RECORD.  THE PREVIOUS INSTRUCTION WE HAD

15   ADDRESSED CO-CONSPIRATOR STATEMENTS AND OTHER ACTS, AND I

16   BELIEVE YOU ASKED -- WE TRIED TO BREAK THEM OUT IN A WAY THAT

17   ACKNOWLEDGED THOSE CO-CONSPIRATORS 404(B) AND THERE IS SOME

18   OVERLAP BETWEEN THOSE TWO MATTERS.

19             THE COURT:  ALL RIGHT.

20             MR. AARON:  TO THE FIRST INSTRUCTION, ACTUALLY, I

21   WAS GIVEN WITH THE CO-CONSPIRATOR ONE ON CHILD PORNOGRAPHY, I

22   WOULD OBJECT.  I DON'T THINK IT IS A CORRECT STATEMENT OF

23   LAW.  I THINK IT NEEDS TO INCLUDE THE LANGUAGE THAT THEY HAVE

24   TO FIND THAT THE STATEMENTS ARE IN FURTHERANCE.

25             MR. MICHAEL:  THERE WAS NO OBJECTION TO THE
```

1    INSTRUCTION OF STATEMENTS HAVE TO BE MADE DURING THE COURSE

2    OF AND THEN IN FURTHERANCE OF THE CONSPIRACY.

3           MR. AARON:  THEY HAVE TO FIND THAT IT WAS IN

4    FURTHERANCE AND THEY HAVE TO FIND THE EXISTENCE OF A

5    CONSPIRACY.  MAYBE THE COURT WOULD WANT -- OUGHT TO READ THE

6    CONSPIRACY INSTRUCTION AS WELL.  THAT'S A DIFFICULT --

7           MR. MICHAEL:  THE GOVERNMENT WOULD HAVE NO

8    OBJECTION TO THAT, YOUR HONOR.

9           THE COURT:  ALL RIGHT.  THAT'S A GOOD IDEA.  I WILL

10   READ THAT DEFINITION AND THEN I WILL CHANGE THIS TO SAY THERE

11   -- IN OTHER WORDS, IT WILL READ:  YOU MAY CONSIDER STATEMENTS

12   OF DEFENDANT'S CO-CONSPIRATORS ONLY AS TO CONSPIRACY AND ONLY

13   IF YOU FIND THE CONSPIRACY EXISTED, AND IF YOU FIND THE

14   STATEMENTS WERE MADE IN FURTHERANCE OF THE CONSPIRACY AND

15   THEN ONLY TO ASSESS.

16          MR. AARON:  THAT THE CONSPIRACY EXISTED BUT THE

17   DEFENDANT WAS A MEMBER OF IT AND THAT THE STATEMENTS

18   WERE -- OKAY.  THE SECOND -- IT IS REALLY KIND OF -- GETTING

19   BACK TO ONE, I'M KIND OF CONFUSED ABOUT THE LAST PART BECAUSE

20   IT LOOKS LIKE IT IS 404(B) EVIDENCE.  IT LOOKS LIKE IT IS

21   BEING ADMITTED FOR TWO PURPOSES, ONE IS 404(B) AND ONE IS FOR

22   CONSPIRACY.

23          MR. MICHAEL:  IF I MAY, YOUR HONOR, WHEN THE

24   GOVERNMENT CRAFTED THIS IT RECOGNIZED THAT DEFENDANT CAN

25   ADOPT CO-CONSPIRATOR STATEMENTS AND CAN MAKE REACTIONS IN AND

1    OF THEMSELVES.  DEFENSE COUNSEL IS TALKING ABOUT THE SECOND

2    PARAGRAPH.  THE GOVERNMENT CONTEMPLATED MAKING A REFERENCE TO

3    THE SECOND PARAGRAPH IN THE OTHER ACT IN THE CO-CONSPIRATOR

4    STATEMENTS TO THE JURORS, UNDERSTANDING THERE IS OVERLAP

5    BETWEEN THE TWO AND WAS GOING TO BRING THAT TO YOUR HONOR'S

6    ATTENTION.  I SUGGEST LANGUAGE IN THE CO-CONSPIRATOR

7    STATEMENTS INSTRUCTION THAT THE STATEMENTS MAY BE USED FOR A

8    LIMITED PURPOSE THAT I WILL DESCRIBE AS TO DEFENDANT IN

9    ANOTHER INSTRUCTION AND THEN GIVE THE OTHER INSTRUCTION RIGHT

10   AFTERWARDS.

11        MR. AARON:  AND THE SECOND INSTRUCTION I'M JUST

12   GOING TO OBJECT THAT IT IS AN INCORRECT STATEMENT OF THE LAW

13   AND RENEW MY PREVIOUS OBJECTIONS TO THIS EVIDENCE, BECAUSE I

14   BELIEVE THAT THE CASES THAT COUNSEL CITED AREN'T REALLY

15   AUTHORITY FOR THIS.

16        THE COURT:  ON THE ISSUE OF MOTIVE AND CONSPIRACY?

17        MR. AARON:  ON THE ISSUE OF -- I'M TALKING ABOUT IN

18   THE INSTRUCTION.

19        THE COURT:  THE SECOND PARAGRAPH?

20        MR. AARON:  NO, THE SECOND INSTRUCTION THAT -- I

21   THINK WHAT COUNSEL IS TRYING TO DO -- IT IS SIMILAR TO THE

22   GRANT CASE THAT HE HAD CITED EARLIER WHERE THEY'RE USING THE

23   EVIDENCE OF CHILD PORNOGRAPHY TO SHOW THERE WAS AN INTENT TO

24   COMMIT TRAVELING.  I THINK WHAT HE IS DOING IS 404(B)

25   EQUIVALENT BY USING THE STATEMENTS MADE IN THE CHATS TO SHOW

 1    THAT THERE WAS THE 404(B) ELEMENTS, OPPORTUNITY, AND ALL THAT

 2    SORT OF THING.

 3            THE COURT:  WELL, I'M UNCOMFORTABLE WITH THE SECOND

 4    PARAGRAPH ALTOGETHER BECAUSE -- ESPECIALLY THE PARENTHETICAL

 5    ABOUT THE ADOPTED ADMISSIONS OR HIS SILENCE, SO I AM INCLINED

 6    TO GIVE THE FIRST PARAGRAPH.

 7            MR. AARON:  AND I HADN'T EVEN GOTTEN TO THAT POINT

 8    BECAUSE WE DON'T KNOW -- WE DON'T KNOW WHETHER OR NOT HE HAS

 9    LOGGED ON OR NOT.

10            THE COURT:  I WOULD GIVE THE FIRST PARAGRAPH.  I

11    THINK THE FIRST PARAGRAPH WITH THE OTHER ACTS INSTRUCTION AND

12    WITH THE CHANGE TO THE CO-CONSPIRATOR STATEMENT INSTRUCTION I

13    THINK IS ACCURATE WITH THE ADDITION OF THE ELEMENTS, AND I

14    WILL READ THE DEFINITION OF CONSPIRACY.

15            MR. AARON:  WE ARE NOT WAIVING -- WITHOUT WAIVING

16    OUR OBJECTION, WE AGREE THE COURT CAN GIVE THE INSTRUCTION

17    NOW AND PROVIDE COUNSEL WITH A COPY.

18            THE COURT:  I'M GOING TO MAKE THIS CLARITY, THE

19    FOLLOWING CHANGES:  IN THIS FIRST PARAGRAPH I'M GOING TO

20    GIVE -- I THINK IT IS CLEAR FOR THIS LAST SENTENCE TO SAY:

21    YOU MAY CONSIDER SUCH STATEMENTS MADE BY THE DEFENDANT AS TO

22    ALL FOUR COUNTS CHARGED IN THE INDICTMENT, BUT ONLY TO

23    ASSESS.

24            MR. AARON:  CAN I ASK THAT OUR OBJECTIONS BE DEEMED

25    CONTINUOUS SO WE DON'T HAVE TO MAKE THEM --

1          THE COURT:  YES.

2          MR. MICHAEL:  THANK YOU, YOUR HONOR.

3          THE COURT:  SO I NEED TO DO THESE RIGHT NOW.

4      (ON-THE-RECORD DISCUSSION AT SIDEBAR WAS CONCLUDED.)

5          THE COURT:  I APOLOGIZE FOR KEEPING YOU WAITING,

6   LADIES AND GENTLEMEN.  BEFORE WE GET TO THE NEXT EXHIBIT,

7   BEFORE YOU CONSIDER IT, I NEED TO GIVE YOU SOME INSTRUCTIONS

8   ABOUT YOUR CONSIDERATION OF THIS EVIDENCE, AND I'LL DO SO

9   RIGHT NOW.

10          FIRST, I'M -- WITH THIS HUGE BENCH YOU WOULD THINK

11   I WOULD HAVE PLENTY OF ROOM, SO I NEED TO TAKE A MOMENT TO

12   SORT MYSELF OUT.

13          FIRST, I'M GOING TO DEFINE FOR YOU OR GIVE YOU THE

14   ELEMENTS OF THE OFFENSE OF CONSPIRACY.  AS YOU HAVE HEARD,

15   THE DEFENDANT IS CHARGED IN COUNT 1 OF THE FIRST SUPERSEDING

16   INDICTMENT WITH CONSPIRING TO POSSESS CHILD PORNOGRAPHY.

17          IN ORDER FOR A DEFENDANT TO BE FOUND GUILTY OF THAT

18   CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

19   ELEMENTS OF THAT OFFENSE BEYOND A REASONABLE DOUBT:  ONE,

20   THAT THERE WAS AN AGREEMENT BETWEEN TWO OR MORE PERSONS TO

21   COMMIT AT LEAST ONE CRIME AS CHARGED IN AN INDICTMENT;

22   SECOND, THE DEFENDANT BECAME A MEMBER OF THE CONSPIRACY

23   KNOWING OF AT LEAST ONE OF ITS OBJECTS AND INTENDING TO HELP

24   ACCOMPLISH IT.  IN OTHER WORDS, A CONSPIRACY IS A KIND OF

25   CRIMINAL PARTNERSHIP, AN AGREEMENT OF TWO OR MORE PERSONS TO

1    COMMIT ONE OR MORE CRIMES.

2          THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO

3    SOMETHING UNLAWFUL.  IT DOES NOT MATTER WHETHER THE CRIME

4    AGREED UPON WAS COMMITTED.

5          FOR A CONSPIRACY TO HAVE EXISTED, IT IS NOT

6    NECESSARY THAT THE CONSPIRATORS MADE A FORMAL AGREEMENT OR

7    THAT THEY AGREED ON EVERY DETAIL OF THE CONSPIRACY.  IT'S NOT

8    ENOUGH, HOWEVER, THAT THEY SIMPLY MET, DISCUSSED MATTERS OF

9    COMMON INTEREST, ACTED IN SIMILAR WAYS, OR PERHAPS HELPED ONE

10   ANOTHER.  YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT AT

11   LEAST ONE OF THE CRIMES ALLEGED IN THE INDICTMENT AS AN

12   OBJECT OF THE CONSPIRACY WITH ALL OF YOU AGREEING AS TO THE

13   PARTICULAR CRIME WHICH THE CONSPIRATORS AGREED TO COMMIT.

14         ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY

15   PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE

16   OR FURTHER SOME OBJECT OR PURPOSE OF THE CONSPIRACY, EVEN

17   THOUGH THE PERSON DOESN'T HAVE FULL KNOWLEDGE OF ALL OF THE

18   DETAILS OF THE CONSPIRACY.

19         FURTHERMORE, ONE WHO WILLFULLY JOINS AN EXISTING

20   CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE ORIGINATORS.  ON

21   THE OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF A CONSPIRACY, BUT

22   HAPPENS TO ACT IN A WAY WHICH FURTHERS SOME OBJECT OR PURPOSE

23   OF THE CONSPIRACY DOESN'T THEREBY BECOME A CONSPIRATOR.  AND

24   SIMILARLY, A PERSON DOESN'T BECOME A CONSPIRATOR MERELY BY

25   ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS,

1    NOR MERELY BY KNOWING THAT A CONSPIRACY EXISTS.

2          YOU'RE GOING TO HEAR EVIDENCE THAT DEFENDANT'S

3    ALLEGED CO-CONSPIRATORS MADE STATEMENTS ABOUT CHILD

4    PORNOGRAPHY AS WELL AS THEIR SEXUAL INTEREST IN YOUNG BOYS

5    OTHER THAN THE ALLEGED VICTIM IDENTIFIED IN THE INDICTMENT.

6    THESE INCLUDE ACTUAL, INTENDED, OR DESIRED SEXUAL ACTS WITH

7    THESE OTHER YOUNG BOYS.  YOU MAY CONSIDER STATEMENTS OF THE

8    DEFENDANT'S CO-CONSPIRATORS ONLY IF YOU FIND THAT A

9    CONSPIRACY EXISTED, THAT THE DEFENDANT WAS A MEMBER OF THE

10    CONSPIRACY, THAT THE STATEMENTS WERE MADE IN FURTHERANCE OF

11    THE CONSPIRACY.  AND THEN YOU CAN CONSIDER THE STATEMENTS OF

12    THE DEFENDANT'S CO-CONSPIRATORS ONLY FOR THE PURPOSE OF

13    ASSESSING THE ALLEGED CO-CONSPIRATORS' MOTIVE, OPPORTUNITY,

14    INTENT, PREPARATION, PLAN, IDENTITY, OR ABSENCE OF MISTAKE OR

15    ACCIDENT.

16          YOU'LL HEAR EVIDENCE THAT THE DEFENDANT MADE

17    STATEMENTS ABOUT HIS SEXUAL INTEREST IN YOUNG BOYS OTHER THAN

18    THE ALLEGED VICTIM IDENTIFIED IN THE INDICTMENT.  THESE

19    INCLUDE ACTUAL, INTENDED, OR DESIRED SEXUAL ACTS WITH THESE

20    OTHER YOUNG BOYS.  YOU MAY CONSIDER SUCH STATEMENTS MADE BY

21    THE DEFENDANT AS TO ALL FOUR COUNTS CHARGED IN THE

22    INDICTMENT, BUT ONLY TO ASSESS THE DEFENDANT'S MOTIVE,

23    OPPORTUNITY, INTENT, PREPARATION, PLAN, IDENTITY, ABSENCE OF

24    MISTAKE OR ACCIDENT.

25          THANK YOU.  GO AHEAD.

1          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

2    BY MR. AKROTIRIANAKIS:

3    Q.   I'M PLACING THE FIRST PAGE OF EXHIBIT 2, SECTION C, ON

4    THE OVERHEAD CAMERA.  ARE YOU ABLE TO SEE THAT SUFFICIENTLY

5    SO THAT YOU CAN READ THAT, MR. MARTIN?

6    A.   YES.

7          MR. AKROTIRIANAKIS:  YOUR HONOR, THE GOVERNMENT

8    WOULD REQUEST THE COURT INQUIRE WHETHER THE JURORS CAN SEE IT

9    SUFFICIENTLY TO READ IT.

10          THE COURT:  CAN ALL OF YOU SEE THAT?

11          MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I ACTUALLY PUT

12   THE SCREEN IN THE WELL?

13          THE COURT:  I THINK EVERYBODY CAN SEE IT.

14          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

15   BY MR. AKROTIRIANAKIS:

16   Q.   MR. MARTIN, IS THIS A PRINTOUT OF YOUR INSTANT MESSAGE

17   CHATTING?

18   A.   IT IS.

19   Q.   AND DO YOU SEE THE SCREEN NAME THAT YOU USED FOR

20   CHATTING ON THIS PAGE?

21   A.   I DO.

22   Q.   I'M POINTING TO THE FIRST LINE.  I'M SORRY, IT'S THE

23   FIRST FULL ENTRY ON THE PAGE AND WE SEE THE WORD "RICOCHET."

24   IS RICOCHET YOUR SCREEN NAME?

25   A.   IT WAS.

1    Q.   AND IS THE PERSON YOU'RE HAVING THIS CONVERSATION WITH

2    BOYSAN1?

3    A.   IT IS.

4    Q.   NOW, YOU PREVIOUSLY TESTIFIED THAT YOU PROVIDED

5    PASSWORDS TO YOUR ALBUMS OF CHILD PORNOGRAPHY TO OTHER

6    PERSONS, CORRECT?

7    A.   CORRECT.

8    Q.   WAS BOYSAN1 AMONG THOSE PERSONS TO WHOM YOU PROVIDED THE

9    PASSWORD TO YOUR CHILD PORNOGRAPHY ALBUMS?

10   A.   YES, SIR.

11   Q.   DID YOU ALSO KNOW THE PERSON BOYSAN1 BY OTHER NAMES

12   OTHER THAN BOYSAN1, OTHER SCREEN NAMES?

13   A.   YES, SIR.

14   Q.   DID THOSE SCREEN NAMES INCLUDE OJIBOYSAN,

15   O-J-I-B-O-Y-S-A-N?

16   A.   YES, SIR.

17   Q.   DID THOSE PASSWORDS INCLUDE OJITEMP, O-J-I-T-E-M-P?

18   A.   I DON'T REMEMBER ALL OF THEM.

19   Q.   I MISSPOKE.  DID THAT SCREEN NAME -- IF I SAID PASSWORD

20   INSTEAD OF SCREEN NAME WITH REGARD TO OJIBOYSAN -- LET ME

21   REASK THE QUESTION.

22        YOU UNDERSTOOD THAT THE PERSON WITH THE SCREEN NAME

23   BOYSAN AND THE PERSON WITH THE SCREEN NAME OJIBOYSAN WERE THE

24   SAME PERSON?

25   A.   I DID UNDERSTAND THAT.

1    Q.   AND WHEN I SAID BOYSAN A MINUTE AGO, I MEANT BOYSAN1.

2    THAT WAS YOUR UNDERSTANDING?

3    A.   YES, SIR.

4    Q.   DID YOU ALSO UNDERSTAND THAT THE PERSON USING THE SCREEN

5    NAME OJITEMP WAS THE SAME PERSON AS OJIBOYSAN AND BOYSAN1?

6    A.   I DON'T REMEMBER OJITEMP.

7    Q.   CAN I HAVE YOU TURN IN THE DOCUMENT BEFORE YOU TO THE

8    TAB THAT'S "M" AS IN MICHAEL AND THE PAGE WITHIN THAT

9    DOCUMENT THAT HAS THE ENTRIES FOR APRIL 16, 2001?

10   A.   I SEE IT.

11   Q.   DO YOU SEE THE REFERENCE TO OJITEMP ON THAT PAGE?

12   A.   I DO.

13   Q.   AND DOES THAT HELP REFRESH YOUR RECOLLECTION?

14   A.   I DON'T REMEMBER THE O-J-I TEMP.

15   Q.   CAN YOU REFER TO -- READING BELOW OJITEMP, CAN YOU REFER

16   TO THE CONTENT OF THE CONVERSATION ITSELF, THE BACK AND FORTH

17   BETWEEN YOURSELF AND OJITEMP?

18            MR. AARON:  YOUR HONOR, IF I MIGHT, WHICH -- WHERE

19   ARE WE NOW?

20            THE COURT:  WHAT'S THE TIME ENTRY?

21            MR. AARON:  ACTUALLY, I HAVEN'T EVEN GOTTEN THERE,

22   YOUR HONOR.  I'M STILL  --

23            THE COURT:  WHICH LETTER?

24            MR. AARON:  YES.

25            THE COURT:  I THINK WE'RE STILL A, AREN'T WE?

```
 1              MR. AKROTIRIANAKIS:  I'M SORRY, I'M REFRESHING HIS

 2    RECOLLECTION AS TO OJITEMP USING M, BEGINNING AT APRIL 16,

 3    2001, AT 3:04 P.M.

 4              MR. AARON:  THANK YOU.

 5              THE WITNESS:  I DO REMEMBER THE CONVERSATION.

 6    BY MR. AKROTIRIANAKIS:

 7    Q.   IS IT YOUR RECOLLECTION THAT THE PERSON THAT YOU WERE

 8    HAVING THAT CONVERSATION WITH YOU UNDERSTOOD AT THE TIME TO

 9    BE THE SAME PERSON THAT YOU HAD THE OJIBOYSAN AND THE BOYSAN1

10    CONVERSATIONS WITH?

11    A.   YES, SIR.

12    Q.   SO HAVING REVIEWED THE CONTENT OF THAT CONVERSATION, IS

13    IT YOUR TESTIMONY THAT YOU UNDERSTOOD AT THE TIME THAT

14    BOYSAN1, OJIBOYSAN, AND OJITEMP WERE ALL, IN YOUR

15    UNDERSTANDING, THE SAME PERSON?

16              MR. AARON:  I'LL OBJECT AS COMPOUND AND RULE 611.

17              THE COURT:  OVERRULED.

18              THE WITNESS:  YES, LOOKING AT IT NOW, I BELIEVE

19    THEY WERE ALL THE SAME PERSON.

20              MR. AKROTIRIANAKIS:  RETURNING TO THE FIRST PAGE

21    OF -- WELL, THE PAGE THAT'S ON THE OVERHEAD CAMERA, WHICH FOR

22    THE RECORD, YOUR HONOR, IS THE FIRST PAGE OF TAB C AS IN

23    CAT.

24              THE COURT:  THANK YOU.

25    BY MR. AKROTIRIANAKIS:
```

1    Q.   MR. MARTIN, IS THIS A CONVERSATION BETWEEN YOU AND

2    BOYSAN1?

3    A.   IT IS.

4    Q.   I WANT YOU TO LISTEN VERY CAREFULLY TO THIS NEXT

5    QUESTION I'M GOING TO ASK YOU.  AND I'M GOING TO ASK YOU TO

6    ANSWER IT WITH EITHER "YES" OR "NO."  DO YOU UNDERSTAND?

7    A.   YES, SIR.

8    Q.   HAVE YOU AT ANY POINT WITHIN THE LAST YEAR MET WITH OR

9    MET THE PERSON YOU BELIEVED TO BE THE PERSON WITH THE SCREEN

10   NAME BOYSAN1, "YES" OR "NO"?

11   A.   YES.

12   Q.   AND AT THAT TIME WHEN YOU MET THAT PERSON, DID THAT

13   PERSON INTRODUCE HIMSELF TO YOU AS BOYSAN, "YES" OR "NO"?

14   A.   YES.

15   Q.   AND "YES" OR "NO," DO YOU SEE THAT PERSON IN THE

16   COURTROOM TODAY?

17   A.   YES.

18   Q.   AND WILL YOU IDENTIFY HIM FOR THE RECORD BY WHERE HE IS

19   SEATED AND WHAT HE'S WEARING, PLEASE?

20   A.   HE IS SEATED AT THE DEFENDANT TABLE TO THE LEFT OF HIS

21   COUNSEL.  HE'S WEARING A DARK GRAY COAT.  THE REST OF IT IS

22   BLOCKED BY THE MONITOR.

23          MR. AKROTIRIANAKIS:  YOUR HONOR, MAY THE RECORD

24   REFLECT IDENTIFICATION OF THE DEFENDANT?

25          THE COURT:  YES, THE RECORD SHALL REFLECT THAT THE

 1    WITNESS HAS IDENTIFIED THE DEFENDANT IN THIS ACTION.

 2    BY MR. AKROTIRIANAKIS:

 3    Q.   MR. MARTIN, HAVE YOU ALSO HAD TELEPHONE CONVERSATIONS --

 4    ONE OR MORE TELEPHONE CONVERSATIONS WITH THE DEFENDANT?

 5    A.   YES.

 6    Q.   DO YOU RECALL AS YOU SIT HERE WHETHER IT WAS ONE OR SOME

 7    NUMBER MORE THAN ONE TELEPHONE CONVERSATIONS THAT YOU HAD?

 8    A.   MORE THAN ONE.

 9    Q.   IN ANY OF YOUR CONVERSATIONS WITH THE DEFENDANT DID YOU

10    DISCUSS SETH BEKENSTEIN?

11    A.   WE DID.

12    Q.   DID YOU DISCUSS SETH BEKENSTEIN'S DISTRIBUTION OF CHILD

13    PORNOGRAPHY VIDEOS?

14    A.   WE TALKED ABOUT HIS PORNOGRAPHY AND WHAT GOT HIM IN

15    TROUBLE AND HOW IT GOT HIM IN TROUBLE.

16    Q.   DO YOU RECALL A CONVERSATION CONCERNING VIDEOS BEING

17    DISTRIBUTED BY SETH BEKENSTEIN THAT INCLUDED AN INITIAL

18    PORTION OF THE VIDEO THAT WOULD MAKE IT APPEAR TO BE A

19    NATIONAL-GEOGRAPHIC-TYPE DOCUMENTARY?

20    A.   YES.

21    Q.   AND DO YOU RECALL CONVERSATIONS IN WHICH YOU DISCUSSED

22    THOSE VIDEOS WHICH APPEARED TO BE NATIONAL-GEOGRAPHIC-TYPE

23    DOCUMENTARIES HAVING EMBEDDED WITHIN THEM CHILD PORNOGRAPHY

24    FILMS?

25    A.   YES.

1    Q.   DID YOU HAVE THE OPPORTUNITY TO REVIEW EXHIBIT 2, THE

2    CHAT LOGS, BEFORE COMING TO COURT TODAY?

3    A.   THIS IS EXHIBIT 2?

4    Q.   YES.   EXHIBIT 2 IS BEFORE YOU.

5    A.   YES, I'VE SEEN THEM, YES, SIR.

6    Q.   HAVE YOU HAD THE OPPORTUNITY TO REVIEW AT LEAST A

7    PORTION OF THAT DOCUMENT?

8    A.   YES, SIR.

9    Q.   DO YOU HAVE ANY REASON AS YOU SIT HERE TO DOUBT THE

10   ACCURACY OF THE DATES AND TIMES SHOWN IN THAT DOCUMENT?

11   A.   NO, SIR.

12   Q.   RETURNING TO THE PAGE OF -- IT IS THE FIRST PAGE OF

13   EXHIBIT 2C WHICH IS ON THE OVERHEAD CAMERA, AND I'LL READ

14   FROM THE DOCUMENT.

15        RICOCHET, 11/7/00, THAT'S A REFERENCE TO

16   NOVEMBER 7, 2000; IS IT NOT?

17   A.   YES, SIR.

18   Q.   9:31 A.M.:  I HAVE CLOSE TO 1,500 PICS THERE NOW AND AM

19   ABOUT TO ADD MORE.

20        BY PICS DO YOU MEAN PICTURES?

21   A.   I DO.

22   Q.   AND BY 1,500 PICS DO YOU MEAN 1,500 PICTURES OF CHILD

23   PORNOGRAPHY?

24   A.   YES, SIR.

25   Q.   AND WHEN YOU SAY THE PICS ARE THERE, WHAT ARE YOU

```
 1    REFERRING TO AS THERE?

 2    A.   I HAD ALREADY UPLOADED THEM TO THE SERVER.

 3    Q.   IS THAT YOUR ZING ALBUM?

 4    A.   YES, SIR.

 5    Q.   CONTINUING IN THE DOCUMENT, BOYSAN1:  I WAS TALKING

 6    ABOUT THE OTHER ALBUM SITES LIKE ZING.  WOW, THAT'S A LOT.  I

 7    WISH I COULD DOWNLOAD MORE THAN ONE AT A TIME.

 8              YOUR ZING ALBUMS WERE CHILD PORNOGRAPHY PICTURES AS

 9    THE COURT HAS DEFINED THE TERM "CHILD PORNOGRAPHY"?

10    A.   THEY WERE.

11    Q.   BOYSAN1:  DO YOU HAVE ANY OF THE ANDY PICS?

12              ARE YOU FAMILIAR WITH ANDY PICS, MR. MARTIN?

13    A.   I REMEMBER THEM.  I CAN'T REMEMBER EXACTLY ALL OF THEM,

14    BUT I REMEMBER THEY WERE --

15    Q.   WERE THEY CHILD PORNOGRAPHY?

16    A.   THEY WERE CHILD PORNOGRAPHY.

17    Q.   AT 9:51 A.M., BOYSAN1:  I'M SPREADING OUT SO I DON'T

18    HAVE EVERYTHING IN ONE PLACE.

19              WHAT DID YOU UNDERSTAND THAT COMMENT TO MEAN?

20    A.   I GUESS HE WAS TRYING TO SPREAD IT OUT SO THAT IT WASN'T

21    ALL IN ONE PLACE.

22    Q.   BASED ON YOUR CONVERSATIONS WITH THE DEFENDANT, DID YOU

23    UNDERSTAND WHY HE WAS SPREADING IT OUT SO IT WASN'T ALL IN

24    ONE PLACE?

25              MR. AARON:  I'LL OBJECT AS SPECULATION.
```

```
 1              THE COURT:  SUSTAINED.

 2   BY MR. AKROTIRIANAKIS:

 3   Q.   TURNING TO -- DID YOU HAVE ANY UNDERSTANDING WHATSOEVER

 4   IN THAT REGARD?

 5   A.   I'M SORRY, ASK ME AGAIN.

 6   Q.   IN REGARD TO THE DEFENDANT'S STATEMENT THAT HE WAS

 7   SPREADING IT OUT SO HE WOULDN'T HAVE IT ALL IN ONE PLACE, DID

 8   YOU HAVE ANY UNDERSTANDING AS TO WHY HE WAS DOING THAT?

 9              MR. AARON:  SAME OBJECTION.

10              THE COURT:  SUSTAINED.

11   BY MR. AKROTIRIANAKIS:

12   Q.   TURNING TO THE PAGE WITHIN EXHIBIT 2 THAT -- IT'S THE

13   FOURTH PAGE OF THE DOCUMENT.  AT THE VERY BOTTOM OF THE PAGE

14   THERE'S AN ENTRY NOVEMBER 7, 2000, 1:24 P.M.  RICOCHET:  SO

15   SEEN ANY GOOD VIDS LATELY?

16              DO YOU SEE THAT, SIR?

17   A.   YES, SIR.

18   Q.   WHEN YOU SAID "VIDS," WERE YOU REFERRING TO CHILD

19   PORNOGRAPHY VIDEOS?

20   A.   I WAS.

21   Q.   CONTINUING THE CONVERSATION, BOYSAN1:  A COUPLE ANDY'S

22   FRIEND AND ANDY'S BRO AND A LITTLE BOYS PARTY.

23              ANDY'S FRIEND, ANDY'S BRO AND BOYS PARTY, SIR, DO

24   YOU REMEMBER ANY OF THOSE TITLES?

25   A.   I DO.
```

1   Q.   WERE THOSE CHILD PORNOGRAPHY VIDEOS?

2   A.   THEY WERE.

3   Q.   CONTINUING ON, RICOCHET:  THE HOTTEST ONE I HAVE SEEN IN

4   A WHILE IS HMV006.  VERY HOT.

5        IS HMV006 CHILD PORNOGRAPHY?

6   A.   YES, SIR, IT WAS.

7   Q.   CONTINUING ON, BOYSAN1:  I HAVEN'T HEARD OF THAT ONE.

8        AGAIN, BOYSAN1:  IS IT BB OR MB?

9        RICOCHET:  BB.

10       WHAT IS BB, MR. MARTIN?

11  A.   BOY ON BOY.

12  Q.   AND WHAT IS MB?

13  A.   MAN ON BOY.

14  Q.   CONTINUING ON, BOYSAN1:  DO YOU HAVE A STILL?

15       WHAT IS A STILL?

16  A.   I'M ASSUMING IT WAS A PHOTOGRAPH.

17  Q.   WHAT DID YOU UNDERSTAND BOYSAN1 TO BE ASKING YOU FOR

18  WHEN HE SAID, "DO YOU HAVE A STILL"?

19  A.   HE WAS ASKING IF I HAD A STILL FROM THE CLIP IN

20  QUESTION.

21  Q.   WAS THAT HMV006 YOU UNDERSTOOD HIM TO BE ASKING ABOUT?

22  A.   YES, SIR.

23  Q.   BOYSAN1:  DO YOU HAVE A STILL?

24       RICOCHET:  YES.  IT'S ABOUT 15 -- 500 MB LONG.

25       IS THAT MEGABYTES?

1    A.    YES, SIR.

2    Q.    IS 500 MEGABYTES LONG REFERRING TO THE ACTUAL MOVIE

3    HMV006?

4    A.    I BELIEVE IT WAS.

5    Q.    IT'S A CHILD PORNOGRAPHY MOVIE?

6    A.    IT WAS.

7    Q.    BOYSAN1:  I WOULD LOVE TO SEE THAT.  A STILL IS A PIC.

8              DID YOU UNDERSTAND BOYSAN1 TO BE EXPLAINING TO YOU

9    WHAT HE MEANT BY THE USE OF HIS WORD "STILL"?

10   A.    YES.

11   Q.    RICOCHET:  I DON'T THINK I HAVE A PIC OR A WAY TO MAKE

12   ONE.  YOU MIGHT SEE IF GAINEY HAS IT AND CON PUT IT ON THE

13   SERVER.

14             DID YOU MEAN CAN PUT IT ON THE SERVER?

15   A.    YES, SIR.

16   Q.    AND GAINEY, IS THAT ANOTHER PERSON WITH WHOM YOU WOULD

17   INSTANT MESSAGE?

18   A.    YES, SIR.

19   Q.    IS THAT ANOTHER PERSON WITH WHOM YOU INSTANT MESSAGED

20   CONVERSATIONS ABOUT YOUR -- ABOUT AN INTEREST YOU HAD IN

21   CHILD PORNOGRAPHY?

22   A.    YES, SIR.

23   Q.    AND DID GAINEY -- WHEN YOU MADE THIS COMMENT, DID YOU

24   UNDERSTAND GAINEY TO BE A PERSON WITH WHOM THE DEFENDANT WAS

25   ALSO FAMILIAR?

1    A.   YES, SIR.

2    Q.   READING ON, BOYSAN1:  THANKS.  I'LL ASK HIM.  THANKS.

3         I'M NOW TURNING TO THE PAGE IN EXHIBIT 2 THAT

4    BEGINS WITH DECEMBER 7, 2000, AT 9:43 A.M.  GOING TO THE

5    FIRST ENTRY AT 9:51 A.M., BOYSAN1:  HAVE YOU MET ANY CUTIES

6    LATELY?

7         RICOCHET:  NO.  I'M NOT IN A POSITION TO DO THAT.

8         YOU SAID THAT YOU'RE NOT IN A POSITION TO MEET ANY

9    CUTIES.  WHAT DID YOU MEAN BY CUTIES?

10   A.   I'M ASSUMING HE MEANT BOYS.

11   Q.   SO WHEN YOU ANSWERED THE QUESTION, DID YOU MEAN BOYS?

12   A.   I DID.

13   Q.   AND DID YOU UNDERSTAND HIM TO MEAN BOYS?

14   A.   I DID.

15   Q.   UNDERAGE BOYS?

16   A.   YES, SIR.

17   Q.   UNDER THE AGE OF 18?

18   A.   YES, SIR.

19   Q.   ANSWER:  NO, I'M NOT IN A POSITION TO DO THAT.  I DID GO

20   WATCH MY SON WRESTLE, SAW SOME PRETTY NEAT BULGES.

21        BOYSAN1:  I BET.  THOSE WRESTLER BOYS WORK OUT A

22   LOT.  HOW OLD WERE THEY?

23        RICOCHET:  PROBABLY 15 TO 18.

24        BOYSAN1:  AH, YOUNG ADULTS.  I LIKE 11YO WRESTLERS.

25        YOU UNDERSTAND 11YO TO MEAN 11 YEARS OLD?

1    A.   YES, SIR.

2    Q.   AND DO YOU UNDERSTAND THE 2 COLON FOLLOWED BY 2 CLOSED

3    PARENTHESES MARKS TO BE WHAT'S CALLED A MODICUM OF TWO SMILEY

4    FACES?

5    A.   YES, SIR.

6    Q.   RICOCHET:  11YO, 11-YEAR-OLD DON'T CUM.  HOWEVER, I

7    WOULD NOT KICK ONE OUT OF BED.

8             SIR, DID YOU MEAN IN BED FOR THE PURPOSE OF SEXUAL

9    CONTACT?

10   A.   YES.

11   Q.   BOYSAN1:  HEHEHE, THAT'S FOR SURE.  I HAVE TO GET READY

12   FOR A COUPLE OF HOURS.

13            CONTINUING ON TO THE NEXT PAGE:  IN THE CAMP OFFICE

14   SO MY RESPONSE TIME WILL BE SLOW FOR A FEW MINUTES.

15            AND YOU SAY K.

16            DID YOU MEAN OKAY?

17   A.   YES, SIR.

18   Q.   FURTHER DOWN THE PAGE, THE ENTRY AT 4:30, RICOCHET:  I

19   UPDATED MY ZING ALBUMS, ADDED OVER 100 PICS.  ENJOY.

20            THE 100 PICS THAT YOU ADDED TO YOUR ZING ALBUM,

21   WERE THOSE CHILD PORNOGRAPHY AS THE COURT HAS DEFINED THAT

22   TERM?

23   A.   THEY WERE.

24   Q.   AND BY "ENJOY" WERE YOU INVITING BOYSAN1, THE DEFENDANT,

25   TO GO TO YOUR ZING ALBUMS AND VIEW THAT CHILD PORNOGRAPHY?

1    A.    I WAS.

2    Q.    AND THE 100 PICS THAT YOU WERE ADDING, WAS THAT IN

3    ADDITION TO THE 1,500 PICS REFERENCED EARLIER IN YOUR CHAT

4    LOG?

5    A.    ADDITIONAL TO INCLUDE.

6    Q.    SO IT WOULD BE APPROXIMATELY 1,600 PICS AT THAT POINT?

7    A.    YES, SIR.

8    Q.    BOYSAN1:  COOL.  I'LL CK THEM OUT SOME MORE.  DID YOU

9    UNDERSTAND THAT COMMENT TO MEAN I'LL CHECK THEM OUT SOME

10   MORE?

11   A.    I DID.

12   Q.    COOL.  I WILL CHECK THEM OUT SOME MORE.  THANKS HEAPS

13   FOR GIVING ME ACCESS TO THEM.  SEE YOU LATER.

14          TO YOUR RECOLLECTION, WAS A PASSWORD REQUIRED TO

15   ACCESS YOUR CHILD PORNOGRAPHY ALBUMS ON ZING?

16   A.    I BELIEVE IT SHOULD HAVE BEEN.

17   Q.    MOVING ON TO WHAT'S HIGHLIGHTED IN PINK ON THE SAME

18   PAGE, THE DISCUSSION BEGINNING AT JANUARY 3RD, 2001, AT

19   10:07:00 A.M., BOYSAN1:  HI, MAN.  HAPPY NEW YEAR.

20          RICOCHET:  GOOD MORNING.

21          BOYSAN1:  I JUST GOT BACK FROM A TWO-WEEK VACATION.

22          RICOCHET:  MUST BE NICE.  WHAT ELSE IS GOING ON?

23          BOYSAN1:  HEHEHEHE.  IT WAS.  I WAS HANGING OUT

24   WITH KALEN THE WHOLE TIME.  NOW I'M BACK AT THE CAMP WORKING

25   OUT A WAY TO BE WITH HIM ALL THE TIME.  SMILEY FACES.

1        MR. AARON:  IS THAT A QUESTION?

2   BY MR. AKROTIRIANAKIS:

3   Q.   ONCE AGAIN, ON THE TOP OF THE NEXT PAGE, READING AGAIN

4   FROM THE DOCUMENT AT THE TOP OF THE NEXT PAGE CONTINUING ON,

5   RICOCHET:  YOU ONCE AGAIN ARE A LUCKY DOG.

6        MR. MARTIN, DID YOU UNDERSTAND THIS CONVERSATION

7   AND THE REFERENCE TO KALEN --

8        MR. AARON:  YOUR HONOR, I'LL OBJECT AND ASK TO

9   APPROACH.

10       THE COURT:  YOU MAY APPROACH.

11     (ON-THE-RECORD DISCUSSION WAS HELD AT SIDEBAR.)

12       MR. AARON:  YOUR HONOR, COUNSEL IS REPEATEDLY

13  READING EXCERPTS INTO THE RECORD.  HE IS NOT ASKING

14  QUESTIONS, HE IS JUST READING EXCERPTS.

15       THE COURT:  HE IS ENTITLED TO READ THE DOCUMENT AND

16  HE COULD PUT A WITNESS -- HE COULD PUT A READER ON THE STAND

17  AND DO BACK AND FORTH READING.

18       MR. AARON:  HE COULD, BUT THAT'S NOT WHAT HE'S

19  DOING.  AND SO THE PURPOSE OF HAVING A WITNESS IS TO DO AN

20  EXAMINATION AND HE'S NOT DOING THAT.  IF HE SAID, MR. MARTIN,

21  WOULD YOU READ BLAH, BLAH, BLAH, THEN THAT'S ONE THING.  HE

22  IS BASICALLY JUST READING.

23       MR. AKROTIRIANAKIS:  I THINK I'M READING QUESTIONS

24  AND THEN ASKING THIS WITNESS WHAT HE MEANT BY THINGS OR WHAT

25  HE UNDERSTOOD THE DEFENDANT TO MEAN.  THAT IS A PROPER WAY TO

1    EXAMINE A WITNESS OF A DOCUMENT THAT'S IN FRONT OF THE

2    WITNESS.

3              MR. AARON:  HE'S DONE THAT A COUPLE OF TIMES.  I

4    HAVE MENTIONED IS THAT A QUESTION AND HE --

5              THE COURT:  I DON'T THINK HE FINISHED BECAUSE HE

6    WAS TURNING THE PAGE TO GO TO THE NEXT LINE.

7              MR. AARON:  NO, HE WENT TO ANOTHER SECTION.

8              MR. AKROTIRIANAKIS:  I WAS CONTINUING THE SAME CHAT

9    THAT WAS AT THE TOP OF THE NEXT PAGE.

10              THE COURT:  I THINK ON THAT PARTICULAR ONE HE

11    HADN'T FINISHED THE SECTION TO GET TO THE QUESTION.

12              MR. AKROTIRIANAKIS:  I THINK IN REGARD TO EACH

13    PORTION I'VE READ I'VE ASKED A QUESTION.

14              THE COURT:  THE OBJECTION IS OVERRULED.  THANK YOU.

15         (ON-THE-RECORD DISCUSSION AT SIDEBAR CONCLUDED.)

16              THE COURT:  WE ARE GOING TO TAKE A LUNCH BREAK,

17    LADIES AND GENTLEMEN, BUT JUST FOR SOME SCHEDULING PURPOSES

18    IT WILL BE A FEW MORE MINUTES.  THANK YOU.

19              THE COURT:  YOU MAY CONTINUE.

20              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

21    BY MR. AKROTIRIANAKIS:

22    Q.   RETURNING TO THE CONVERSATION IN WHICH THE DEFENDANT

23    MENTIONED KALEN AND YOU RESPONDED -- MENTIONED KALEN AND

24    INDICATED, I WAS HANGING OUT WITH KALEN THE WHOLE TIME,

25    REFERRING TO A TWO-WEEK VACATION, AND YOU INDICATED, ONCE

1    AGAIN, YOU ARE A LUCKY DOG, DID YOU UNDERSTAND THAT KALEN WAS

2    A CHILD?

3    A.    I DID.

4    Q.    AND WAS THAT UNDERSTANDING BASED ON THE DEFENDANT'S

5    STATEMENTS TO YOU?

6    A.    I BELIEVE IT WAS STATEMENTS MADE IN EARLIER CHATS.

7    Q.    READING ON IN THIS SAME CHAT, YOU ASKED:  HOW OLD IS HE?

8         THIS IS AT 10:15 A.M. FOR THE RECORD.

9         AND BOYSAN1 RESPONDED:  SEVEN.

10        DID YOU UNDERSTAND HIM TO MEAN SEVEN YEARS OLD?

11   A.    YES, SIR.

12   Q.    AND AT THE TOP AGAIN WHEN YOU SAID YOU ARE A LUCKY --

13   YOU, ONCE AGAIN, ARE A LUCKY DOG, DID YOU CONSIDER THE

14   DEFENDANT TO -- BY THAT STATEMENT WERE YOU INDICATING THAT

15   YOU CONSIDERED THE DEFENDANT A LUCKY DOG BECAUSE HE HAD SUCH

16   A CHILD AVAILABLE TO HIM?

17   A.    YES.

18   Q.    AND DID YOU THINK HE WAS LUCKY BECAUSE YOU DID NOT HAVE

19   SUCH A CHILD AVAILABLE TO YOU?

20   A.    NOT NECESSARILY, NO, SIR.

21   Q.    GOING ON READING FROM THE FIRST ENTRY AT 10:15, BOYSAN1:

22   HEHEHE.  WHEN WE TOOK A SHOWER TOGETHER MONDAY MORNING I

23   FINALLY HAD MY DIGITAL CAMERA READY BUT HE GOT CAMERA SHY SO

24   I COULDN'T TAKE ANY NUDIE SHOTS.  THERE WAS SOME GREAT POSES

25   AND SITUATIONS TO SHOOT.

1          RICOCHET:  THAT'S TOO BAD.

2          BY NUDIE SHOTS DID YOU UNDERSTAND THE DEFENDANT TO

3   BE REFERRING TO PICTURES OF THE BOY KALEN NAKED IN THE

4   SHOWER?

5   A.   YES, I DID.

6   Q.   DID YOU AT ANY TIME UNDERSTAND OR HAVE EXPLAINED TO YOU

7   BY THE DEFENDANT THE STATEMENTS OF THIS NATURE WERE MERELY AN

8   EXPRESSION OF FANTASY?

9   A.   NO.

10  Q.   DID YOU UNDERSTAND, BASED ON THESE DISCUSSIONS, THAT THE

11  DEFENDANT WAS INDICATING ACTUAL ACTS ON AN ACTUAL CHILD?

12  A.   YES.

13          MR. AARON:  I'LL OBJECT, LACK OF PERSONAL

14  KNOWLEDGE.

15          THE COURT:  OVERRULED.

16  BY MR. AKROTIRIANAKIS:

17  Q.   YOUR ANSWER, SIR?

18  A.   YES.

19  Q.   READING AGAIN FROM THE SECOND ENTRY AT 10:15, RICOCHET:

20  THAT'S TOO BAD.  HOW OLD IS HE?

21          BOYSAN1:  SEVEN.

22          BOYSAN1:  I THOUGHT I TOLD YOU ABOUT HIM.

23          RICOCHET:  WOW.  A LITTLE YOUNG FOR ME.  NO, I WAS

24  NOT AWARE OF HIM, BUT HE DOES SOUND SWEET.

25          BOYSAN1:  HE'S YOUNG, BUT HE'S VERY INTELLIGENT.

1          I'LL STOP THERE.  WHEN YOU SAID "A LITTLE YOUNG FOR

2    ME," WERE YOU REFERRING TO YOUR PERSONAL AGE PREFERENCE IN

3    REGARD TO YOUNG BOYS?

4    A.   YES, SIR.

5    Q.   HE'S YOUNG BUT HE'S VERY INTELLIGENT AND DECIDED THAT HE

6    LIKED BOYS AND ME WHEN HE WAS SIX.

7          RICOCHET:  HE WILL BE A TREASURE WHEN HE HITS HIS

8    TEENS.

9          RICOCHET:  I TEND TO FAVOR 13 TO 16 Y OLDS.

10         BY THAT, SIR, DID YOU MEAN TO EXPRESS THAT YOUR AGE

11   PREFERENCE WAS 13- TO 16-YEAR-OLD CHILDREN?

12   A.   CORRECT.

13   Q.   AND GOING ON TO THE NEXT PAGE, RICOCHET:  THEY ARE SO

14   INNOCENT AND EXPERIENCING WHAT ORGASMS REALLY FEELS LIKE.  I

15   BETTER STOP.  LOL.

16         IS LOL LAUGH OUT LOUD?

17   A.   I BELIEVE IT WAS.

18   Q.   IS THAT HOW YOU MEANT IT WHEN YOU WROTE IT THERE IN YOUR

19   CHAT?

20   A.   LAUGH OUT LOUD OR LOTS OF LAUGHS.

21   Q.   BOYSAN1:  HEHEHE.  8 AND 11 ARE MY FAVORITE.

22         DID YOU UNDERSTAND THAT TO BE THE DEFENDANT'S

23   EXPRESSION OF HIS AGE PREFERENCE IN CHILDREN?

24   A.   YES, I DID.

25   Q.   TO HAVE SEXUAL RELATIONS WITH?

1    A.   YES, SIR.

2    Q.   I JUST MET A NEW 11-YEAR-OLD TWO WEEKS AGO AND AM

3    LOOKING FORWARD TO SOME GREAT TIMES WITH HIM.  HIS NAME IS

4    KELVY.

5         RICOCHET:  NOW YOU'RE GETTING INTO MY LEAGUE.

6         WELL, IT SAYS I-N-O-T.  DID YOU MEAN "INTO," SIR?

7    A.   I PROBABLY DID, YES, SIR.

8    Q.   BOYSAN1:  I KNOW HE WON'T BE CAMERA SHY.  TWO SMILEY

9    FACES.

10        RICOCHET:  THEN I HOPE TO SEE PHOTOS.

11        DID YOU WANT THE DEFENDANT TO SEND YOU PHOTOS OF

12   THIS BOY KELVY THAT HE WAS DISCUSSING THAT WAS CLOSER TO YOUR

13   AGE PREFERENCE?

14   A.   YES, SIR.

15   Q.   AND LOWER DOWN THE PAGE BOYSAN1:  WHEN MY BOYS TURN 14 I

16   ENCOURAGE THEM TO MATE WITH GIRLS.  THEY ARE YOUNG ADULTS AT

17   THAT AGE AND I LOSE INTEREST IN THEM AS SEXUAL PARTNERS.

18   THEY NEED TO HAVE BOYS OF THEIR OWN SO I CAN KEEP THINGS

19   GOING.  HEHEHEHEHE.

20        I'M ABOUT TO MOVE ON TO ANOTHER AREA.

21        THE COURT:  NOW, IS A GOOD TIME TO RECESS FOR LUNCH

22   THEN.

23        LADIES AND GENTLEMEN, LET'S TAKE A ONE-HOUR LUNCH

24   BREAK BECAUSE WE'RE GOING TO RECESS A LITTLE EARLY TO ALLOW

25   ONE OF YOUR MEMBERS TO MAKE AN IMPORTANT APPOINTMENT.  SO WE

1   WILL BE IN RECESS UNTIL LET'S SAY 1:15.

2           AND AGAIN, PLEASE REMEMBER, DON'T DISCUSS THE CASE

3   AMONGST YOURSELVES OR WITH ANYONE IN ANY FASHION OR DISCUSS

4   ANY OF THE EVIDENCE, ANYONE INVOLVED IN THE CASE, ANY OF THE

5   WITNESSES, PARTIES, COUNSEL, ANYONE.  DON'T FORM ANY OPINIONS

6   ABOUT THE CASE IN ANY FASHION.

7           THANK YOU.  YOU'RE EXCUSED.  WE WILL SEE YOU AT

8   1:15.

9           (OUT OF THE PRESENCE OF THE JURY:)

10          THE COURT:  THE WITNESS MAY STEP DOWN.  AND WE'RE

11  ON THE RECORD OUTSIDE THE PRESENCE OF THE MEMBERS OF THE

12  JURY.

13          MR. MICHAEL:  YOUR HONOR, MAY I ADDRESS ONE MATTER?

14          THE COURT:  CERTAINLY.

15          MR. MICHAEL:  WITH REGARD TO THE LIMITING

16  INSTRUCTION I KNOW THAT YOUR HONOR WAS FORCED TO MAKE SOME

17  EDITS RIGHT BEFORE YOU GAVE IT.  WHEN YOU READ IT -- AND YOU

18  CAN OBVIOUSLY CHECK WITH THE TRANSCRIPT -- I BELIEVE YOU

19  INDICATED WITH REGARD TO CO-CONSPIRATOR STATEMENTS THAT THEY

20  MAY BE USED ONLY TO ASSESS MOTIVE, OPPORTUNITY, ET CETERA.

21  AND THE GOVERNMENT WOULD SUBMIT THAT THEY ARE -- EXCUSE ME.

22          THE COURT:  I'M SORRY.

23          MR. MICHAEL:  FOR THE CO-CONSPIRATOR STATEMENT

24  INSTRUCTION THERE IS AN "ONLY" IN THERE.  THAT'S ONE OF THE

25  LATTER CLAUSES.  AND YOU INDICATE THE STATEMENTS CAN ONLY BE

 1   CONSIDERED AS TO THE CONSPIRACY CHARGE.  AND YOU THEN SAID

 2   THAT ONCE THEY FIND WHAT'S NECESSARY UNDER THE CONSPIRACY

 3   LAW, UNDER THE CONSPIRACY INSTRUCTION, THEY MAY THEN CONSIDER

 4   THOSE STATEMENTS, AND I BELIEVE YOU SAID, "ONLY TO ASSESS THE

 5   ALLEGED CO-CONSPIRATOR'S MOTIVE, OPPORTUNITY."

 6        THE COURT:  INSTEAD OF "INCLUDING TO ASSESS"?

 7        MR. MICHAEL:  EXACTLY.  THE GOVERNMENT SUBMIT IT'S

 8   DIRECT EVIDENCE AS WELL AS EVIDENCE OF THEIR MOTIVE AND

 9   OPPORTUNITY, BECAUSE THE CO-CONSPIRATOR'S MOTIVE AND

10   OPPORTUNITY IS NOT 404(B), IT'S JUST TO CLARIFY FOR THE

11   JURORS.  IT IS DIRECT EVIDENCE THAT INCLUDES THOSE FACTORS AS

12   WELL, WHICH IS THE INSTRUCTION WE GAVE TO THEM IN THE LAST

13   TRIAL, YOUR HONOR.  SO YOU DON'T NEED TO INDICATE IT'S DIRECT

14   EVIDENCE NECESSARILY BUT THAT IT'S NOT LIMITED ONLY FOR THOSE

15   PURPOSES, YOUR HONOR.

16        THE COURT:  OH, I SEE.  I'M GOING TO PUT THESE IN

17   WRITTEN FORM WITH THE CHANGES AND THEN I'LL SHOW YOU.  IN THE

18   WRITTEN FORM THEY WILL BE CORRECT.

19        MR. MICHAEL:  THAT WOULD BE THE GOVERNMENT'S

20   REQUEST, YOUR HONOR.

21        THE COURT:  DID YOU HAVE ANYTHING TO ADD?

22        MR. AARON:  YOUR HONOR, IF I CAN RECEIVE A WRITTEN

23   COPY OF THE INSTRUCTION THAT THE COURT ACTUALLY READ AND THEN

24   IF THE PARTIES WANT TO INDICATE WHATEVER CHANGES, IT'S FINE.

25   IT WAS IMPOSSIBLE FOR ME TO FOLLOW COUNSEL'S ARGUMENT.

 1          THE COURT:  I JUST RECEIVED A NOTE FROM JUROR

 2   NO. 5, MR. SHANTELER, WHICH SAYS, "IT IS DIFFICULT TO SEE THE

 3   SCREEN.  IT'S DARK AND SOMETIMES IT'S OUT OF FOCUS.  THIS

 4   USUALLY HAPPENS WHEN SHOWING DOCUMENTS OR DARK PICS.  THE

 5   CHAT LOGS ARE BLURRY AND SMALL.

 6          SO YOU NEED TO MAKE ADJUSTMENTS.

 7          MR. AKROTIRIANAKIS:  I WILL, YOUR HONOR.  I THINK

 8   IN THE LAST TRIAL WE HAD THE SCREEN HERE.

 9          THE COURT:  WE CAN UNPLUG WHERE IT IS PLUGGED AND

10   PLUG IT IN THE MIDDLE DURING THE LUNCH HOUR AND THEN WE CAN

11   MOVE IT MORE TOWARD THE MIDDLE OF THE JURY AREA.

12          MR. AKROTIRIANAKIS:  I THINK THAT WOULD ASSIST

13   JUROR NO. 5 BECAUSE IT WOULD BE CLOSER TO HIM AT THAT POINT.

14          MR. AARON:  IT'S DIFFICULT -- SORRY TO INTERRUPT.

15   IT'S DIFFICULT TO OBSERVE THE JURY WHEN THEY HAVE THE SCREEN

16   BLOCKING THEM, SO IT'S HARD FOR ME TO TELL WHAT IMPACT, IF

17   ANY, THE EVIDENCE IS HAVING ON THEM, BUT I UNDERSTAND THE

18   PROBLEM.

19          THE COURT:  WELL, I THINK IT IS PARAMOUNT THAT THEY

20   BE ABLE TO SEE THINGS.  IF YOU WANT TO MOVE AROUND THE

21   COURTROOM UNOBTRUSIVELY WHEN A LOT OF EVIDENCE IS BEING

22   DISPLAYED AND SIT AT A DIFFERENT ANGLE, YOU MAY DO SO.

23   DURING EXAMINATION LIKE THIS WHEN -- I'M NOT GOING TO LEAVE

24   IT THERE, BECAUSE I THINK WHEN OTHER DOCUMENTS ARE BEING

25   PLACED LIKE PHOTOGRAPHS, IT'S NOT SO CRITICAL.

```
 1              MR. AARON:  IF I MIGHT, IS THERE ONLY ONE OF THESE

 2   DISPLAY MONITORS, BECAUSE IF THERE WAS TWO MAYBE WE COULD PUT

 3   ONE AT EACH SIDE?

 4              THE COURT:  WELL, I DON'T KNOW IF THERE IS ONE, BUT

 5   WE ARE NOT GOING TO MOVE THE ONE FROM JUDGE LARSON'S

 6   COURTROOM OVER HERE.

 7              MR. AARON:  I THOUGHT HE WAS ON VACATION.

 8              THE COURT:  HE IS, BUT MOVING -- WELL, FOR REASONS

 9   I'M NOT GOING TO GO INTO, WE'RE NOT GOING TO MOVE IT BECAUSE

10   IT'S VERY EXPENSIVE, HARD TO MOVE, AND WE WOULD HAVE TO THEN

11   GET IT WIRED INTO THIS.

12              MR. AARON:  OH.

13              THE COURT:  I'LL BE RETIRED BY THE TIME ALL THAT

14   TAKES PLACE.

15              MR. MICHAEL:  WE WOULD HATE TO SEE POTENTIAL

16   CHARGES OF THEFT, YOUR HONOR.  OFF THE RECORD.

17              THE COURT:  IT'S BEYOND MY -- IT IS JUST NOT GOING

18   TO HAPPEN.  THANKS.

19              IF YOU ARE ABLE TO PREPARE YOUR CROSS-EXAMINATION

20   OVER THE LUNCH HOUR, LET ME KNOW.  OTHERWISE, I WILL JUST

21   TELL THE JURY WE ARE PUTTING A WITNESS ON OUT OF ORDER AND

22   YOU CAN DO IT ON TUESDAY.

23              MR. AARON:  THANK YOU, YOUR HONOR.

24              THE COURT:  WE ARE IN RECESS.

25                      (RECESS)
```

 1          THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

 2   ALL MEMBERS OF THE JURY, COUNSEL FOR BOTH PARTIES, AND THE

 3   DEFENDANT ALSO PRESENT.

 4          I THINK THAT THE PLACEMENT OF THE SCREEN THERE

 5   SHOULD MAKE IT EASIER FOR YOU ALL TO SEE.  WE MAY NOT KEEP IT

 6   THERE.  WE WILL DEFINITELY KEEP IT THERE WHILE THE TRANSCRIPT

 7   EXHIBITS ARE BEING DISPLAYED.  WE MAY MOVE IT BACK WHEN

 8   THERE'S NOT GOING TO BE A LONG DISCUSSION ABOUT THE

 9   TRANSCRIPTS.

10          ALL RIGHT.  THANK YOU.  AND I WILL TALK TO YOU THIS

11   AFTERNOON ABOUT THE SCHEDULE FOR NEXT WEEK.

12          GO AHEAD.

13          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

14   BY MR. AKROTIRIANAKIS:

15   Q.  AGAIN, PLACING THE DOCUMENT FROM EXHIBIT 2, TAB C, AND

16   THE PAGE THAT STARTS WITH THE FIRST LINE OF JANUARY 3, 2001,

17   10:20 A.M.

18          MR. AKROTIRIANAKIS:  DID THE COURT WISH TO MAKE ANY

19   INQUIRY WITH REGARD TO THE VISIBILITY?

20          THE COURT:  CAN EVERYONE SEE BETTER NOW?

21          A JUROR:  YES, MUCH BETTER.

22          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

23          YOUR HONOR, MAY I MOVE THE PODIUM ABOUT AN INCH

24   OVER THIS WAY?  I'M NOT AS SLIM AS I USED TO BE TO FIT IN

25   HERE EASILY.

1          THE COURT:  GO AHEAD.

2          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

3   BY MR. AKROTIRIANAKIS:

4   Q.   NOW, MR. MARTIN, CAN YOU SEE WHAT I'VE PUT ON THE SCREEN

5   THERE BEFORE YOU?

6   A.   YES.

7   Q.   I'VE HIGHLIGHTED IN BLUE AN ENTRY THAT YOU MADE AT 10:23

8   A.M.:  IT'S A SHAME YOU ARE OUT WEST, LOL.

9          AND THEN LATER THE DEFENDANT WRITES:  WHY IS IT A

10  SHAME?  WOULD YOU LIKE TO MEET?

11         RICOCHET:  I WOULD LOVE TO MEET AND BE FRIENDS

12  WITH -- I'M GOING OVER TO THE NEXT PAGE -- ANOTHER BL.  IT IS

13  SOMETHING I ONLY DREAM ABOUT.

14         WHAT DID YOU MEAN BY BL?

15  A.   BOY LOVER.

16  Q.   AND CONTINUING.  BOYSAN1:  YEAH, IT'S GREAT TO HANG WITH

17  ANOTHER BL SOMETIMES.  IT FEELS GOOD TO SHARE FREELY AND

18  CHECK OUT BOYS TOGETHER -- TWO SMILEY FACES.

19         RICOCHET:  I KEEP LOOKING IN MY AREA FOR ONE.

20  PEOPLE SEE IT AS TOO RISKY.

21         BOYSAN1:  JUST TELL THEM TO GET ALL EVIDENCE OUT OF

22  THE HOUSE FIRST, THEN THERE'S NO WORRIES.

23         IN THAT EXCHANGE WHAT DID YOU UNDERSTAND THE

24  DEFENDANT TO MEAN WHEN HE SAYS, "JUST TELL THEM TO GET ALL

25  EVIDENCE OUT OF THE HOUSE FIRST, THEN THERE'S NO WORRIES"?

1    EVIDENCE OF WHAT?

2    A.    I'M ASSUMING EVIDENCE OF CHILD PORNOGRAPHY.

3           MR. AARON:   OBJECTION, MOVE TO STRIKE, LACK OF

4    PERSONAL KNOWLEDGE.

5           THE COURT:   THE MOTION TO STRIKE IS GRANTED.

6           AND THAT MEANS, LADIES AND GENTLEMEN, YOU ARE TO

7    DISREGARD THE WITNESS' ANSWER TO THE LAST QUESTION.

8    BY MR. AKROTIRIANAKIS:

9    Q.    DID YOU HAVE AN UNDERSTANDING OF WHAT THE DEFENDANT WAS

10   EXPRESSING TO YOU WHEN HE MADE THE STATEMENT, "JUST TELL THEM

11   TO GET ALL EVIDENCE OUT OF THE HOUSE FIRST AND THEN THERE'S

12   NO WORRIES"?

13          MR. AARON:   I'LL OBJECT.   IT'S ASKED AND ANSWERED.

14   IT'S ANSWERED WITH SPECULATION.

15          THE COURT:   THE OBJECTION IS OVERRULED.

16   BY MR. AKROTIRIANAKIS:

17   Q.    WHAT WAS YOUR UNDERSTANDING?

18   A.    MY UNDERSTANDING WAS THAT THEY NEEDED TO REMOVE EVIDENCE

19   THAT WOULD GET THEM IN TROUBLE.   THAT WOULD BE ILLEGAL

20   PHOTOGRAPHS.

21   Q.    AND DID YOU DISCUSS WITH THE DEFENDANT METHODS BY WHICH

22   SUCH EVIDENCE COULD BE EITHER HIDDEN OR DESTROYED?

23   A.    I DID.

24   Q.    IN ADDITION TO YOUR CONVERSATIONS ABOUT BOY LOVERS OR

25   BOY LOVE, CHILD PORNOGRAPHY AND DESTROYING AND/OR HIDING

1   EVIDENCE OF CHILD PORNOGRAPHY, DID YOU SHARE ANY INTERESTS

2   WITH THE DEFENDANT?

3   A.   WHAT DO YOU MEAN?

4   Q.   DID YOU HAVE ANY OTHER INTERESTS IN COMMON THAT YOU

5   DISCUSSED?

6   A.   NO.

7   Q.   WERE ALL THE CONVERSATIONS IN RELATION TO THE TOPICS

8   THAT I'VE JUST MENTIONED, CHILD PORNOGRAPHY AND SHARING CHILD

9   PORNOGRAPHY AND DESTROYING AND HIDING EVIDENCE OF CHILD

10  PORNOGRAPHY?

11  A.   CORRECT.

12  Q.   AND BL.  AND WHAT AGAIN IS BL?

13  A.   BOY LOVER.

14  Q.   I'M MOVING NOW TO TAB J OF EXHIBIT 2.  AND THIS IS THE

15  PAGE WITHIN TAB J THAT HAS AS THE FIRST LINE OF THE PAGE

16  JANUARY 30, 2001, AT 1:43 P.M.  AND LOWER DOWN THAT PAGE AT

17  9:38 A.M. ON JANUARY 31 THERE'S A STATEMENT BY OJIBOYSAN.

18          AND HERE, AGAIN, YOU UNDERSTOOD OJIBOYSAN TO BE THE

19  DEFENDANT?

20  A.   YES.

21  Q.   I WAS IN YOUR ZINGS A FEW TIMES WHILE YOU WERE GONE AND

22  HAD A NICE TIME THERE -- TWO SMILEY FACES.

23          RICOCHET:  I AM ALWAYS GLAD WHEN SOMEONE LIKES MY

24  ALBUMS.  IT'S TAKEN ME A WHILE TO GET THEM THE WAY THEY ARE.

25          THE ZINGS THAT THE DEFENDANT IS REFERRING TO AND

1    THE ALBUMS THAT YOU'RE REFERRING TO, THOSE ARE YOUR CHILD

2    PORNOGRAPHY ALBUMS THAT YOU PREVIOUSLY TESTIFIED TO?

3    A.   YES.

4              MR. AARON:  OBJECTION, LEADING AND SUGGESTIVE.

5              MR. AKROTIRIANAKIS:  PARDON ME, YOUR HONOR.  MAY I

6    WITHDRAW THE QUESTION?

7              THE COURT:  YOU MAY.

8    BY MR. AKROTIRIANAKIS:

9    Q.   ARE YOU REFERRING TO THE CHILD PORNOGRAPHY ALBUMS THAT

10   YOU PREVIOUSLY TESTIFIED TO?

11             MR. AARON:  SAME OBJECTION, YOUR HONOR.

12             THE COURT:  THE OBJECTION IS OVERRULED.

13             THE WITNESS:  YES.

14   BY MR. AKROTIRIANAKIS:

15   Q.   DID YOU UNDERSTAND THE DEFENDANT IN HIS REFERENCE TO

16   YOUR ZINGS ALSO TO BE REFERRING TO THE CHILD PORNOGRAPHY

17   ALBUMS YOU PREVIOUSLY TESTIFIED TO?

18             MR. AARON:  OBJECTION.  SAME OBJECTION.

19             THE COURT:  SUSTAINED AS LEADING.

20   BY MR. AKROTIRIANAKIS:

21   Q.   AND MOVING OVER TO THE TOP OF THE NEXT PAGE.

22             OJIBOYSAN:  YEAH, YOU'VE DONE WELL WITH THEM.

23             DID YOU HAVE AN UNDERSTANDING OF WHAT OJIBOYSAN

24   MEANT BY "THEM" THAT YOU'VE DONE WELL WITH?

25   A.   YES.

1    Q.    AND WHAT WAS YOUR UNDERSTANDING IN THAT REGARD?

2    A.    THAT HE WAS --

3                MR. AARON:  OBJECTION, SPECULATION, LACK OF

4    PERSONAL KNOWLEDGE AS TO WHAT THE OTHER SPEAKER MEANT.

5                THE COURT:  OVERRULED.

6    BY MR. AKROTIRIANAKIS:

7    Q.    WHAT WAS YOUR UNDERSTANDING, SIR?

8    A.    THAT HE WAS HAPPY WITH THE WAY I HAD ARRANGED THE ALBUMS

9    AND, I GUESS, LIKED WHAT WAS THERE.

10   Q.    NOW, GOING BACK TO THE PRIOR PAGE -- AND BY THE ALBUMS,

11   SIR, YOU'RE TALKING ABOUT THE CHILD PORNOGRAPHY ALBUMS YOU

12   PREVIOUSLY TESTIFIED TO?

13   A.    YES, I AM.

14               MR. AARON:  OBJECTION, LEADING AND SUGGESTIVE.

15               THE COURT:  OVERRULED.

16   BY MR. AKROTIRIANAKIS:

17   Q.    BY -- I'M SORRY, GOING BACK TO THE PREVIOUS PAGE, THE

18   LAST ENTRY, RICOCHET:  WHAT'S GOING TO HAPPEN TO SETH?

19               WHAT SETH ARE YOU REFERRING TO?

20   A.    SETH BLANKENSHIP.

21   Q.    SETH BEKENSTEIN?

22   A.    I'M SORRY, BEKENSTEIN.

23               MR. AARON:  OBJECTION, LEADING AND SUGGESTIVE.

24               MR. AKROTIRIANAKIS:  LET ME WITHDRAW THAT, YOUR

25   HONOR, IF I COULD.

1      THE COURT:  AND REFRAIN FROM LEADING QUESTIONS.

2      MR. AKROTIRIANAKIS:  PARDON ME, YOUR HONOR.

3  BY MR. AKROTIRIANAKIS:

4  Q.   ARE YOU REFERRING TO THE SAME SETH -- WELL, WHAT'S THE

5  FIRST NAME OF THE PERSON WHO YOU WERE RECEIVING CHILD

6  PORNOGRAPHY CD'S FROM?

7  A.   SETH.

8  Q.   IS THIS THE SAME SETH?

9  A.   YES.

10  Q.   I'M PUTTING THE NEXT PAGE FROM THE -- I'M PUTTING THE

11  NEXT PAGE FROM THE EXHIBIT -- TAB J OF EXHIBIT 2 ON THE

12  OVERHEAD CAMERA, SIR.  DO YOU SEE IT IN THE BINDER?

13  ACTUALLY, BEFORE YOU THERE IS A PAGE THAT STARTS WITH

14  9:41 A.M. ON JANUARY 31, 2001.

15  A.   I SEE THE PAGE.

16  Q.   OKAY.  I WANT YOU TO READ TO YOURSELF DOWN THAT PAGE A

17  LITTLE BIT.  MY QUESTION TO YOU IS WHETHER THE NEXT SEVERAL

18  ENTRIES ARE A CONTINUATION OF YOUR DISCUSSION CONCERNING

19  SETH, "YES" OR "NO"?

20  A.   YES.

21  Q.   THEY ARE A DISCUSSION OF SETH?

22  A.   YES.

23  Q.   ARE THEY A DISCUSSION OF -- WELL, I'M NOW DIRECTING YOUR

24  ATTENTION TO THE ENTRY AT 9:46 ON THAT PAGE.  DO YOU SEE

25  THAT, SIR?

1    A.   YES.

2    Q.   AND IT READS:

3            OJIBOYSAN:  YEAH, JUST FOR HAVING AND DISTRIBUTING

4    CENSORED LITERATURE AND VIDS.

5            DID YOU HAVE AN UNDERSTANDING OF WHAT THE DEFENDANT

6    MEANT BY HAVING AND DISTRIBUTING CENSORED LITERATURE AND

7    VIDS?

8    A.   YES.

9            MR. AARON:  OBJECTION, CALLS FOR SPECULATION AS TO

10   WHAT THE OTHER PERSON INTENDED.

11           THE COURT:  OVERRULED.

12   BY MR. AKROTIRIANAKIS:

13   Q.   WHAT WAS YOUR UNDERSTANDING, BASED ON THIS AND OTHER

14   CONVERSATIONS, CHAT CONVERSATIONS WITH THE DEFENDANT, OF WHAT

15   WAS INTENDED BY VIDS?

16   A.   BY VIDS?

17   Q.   RIGHT.

18   A.   THE SHORT VIDEO CLIPS.

19   Q.   CHILD PORNOGRAPHY VIDEOS?

20   A.   YES, SIR.

21   Q.   AND "LITERATURE," IS THAT ALSO A REFERENCE TO CHILD

22   PORNOGRAPHY?

23           MR. AARON:  OBJECTION, LEADING.

24           THE COURT:  OVERRULED.

25           THE WITNESS:  IT CERTAINLY WOULD HAVE BEEN.

 1    BY MR. AKROTIRIANAKIS:

 2    Q.    AND CONTINUING TO THE NEXT PAGE OF THE DOCUMENT AND

 3    BEGINNING WITH THE ENTRY AT 10:03 A.M.:

 4              RICOCHET:  I HOPE HE COVERED HIS TRACK WELL.

 5              OJIBOYSAN:  NO, HE WAS WIDE OPEN.

 6              RICOCHET:  WHAT I MEAN IS A LONG TIME AGO HE SENT

 7    ME SOME CD'S.  I DON'T KNOW IF THE ADDY WOULD BE

 8    DISCOVERABLE.

 9              OJIBOYSAN: ASSUME THAT IT IS.

10              RICOCHET:   I WAS HOPING NOT TO HEAR THAT.  I GUESS

11    I JUST NEED TO BATTEN DOWN THE HATCHES.

12              OJIBOYSAN:  YES, TOTALLY.

13              LET ME ASK YOU ABOUT THE FIRST PART OF THIS

14    CONVERSATION.  WHEN YOU SAY, "I HOPE HE COVERED HIS TRACK

15    WELL," TO WHOM ARE YOU REFERRING?

16    A.    SETH.

17    Q.    AND WHEN YOU SAY, "WHAT I MEAN IS, A LONG TIME AGO HE

18    SENT ME SOME CD'S," WHO ARE YOU REFERRING TO AS HAVING SENT

19    YOU SOME CD'S?

20    A.    SETH.

21    Q.    AND WHAT IS THE CONTENT OF THE CD'S THAT YOU'RE

22    REFERRING TO, IN GENERAL TERMS?

23    A.    CHILD PORNOGRAPHY.

24    Q.    AND CONTINUING ON IN THE DISCUSSION:  YES, TOTALLY --

25              OJIBOYSAN AT 10:07 A.M.:  YES, TOTALLY.  NOTHING

 1   LEFT ON THE COMP OVERNIGHT.  ENCRYPT EVERYTHING AND WIPE ALL

 2   YOUR FREE SPACE EVERY NIGHT.

 3           OJIBOYSAN:  AND, OF COURSE, WHEN YOU DELETE

 4   ANYTHING, DO IT WITH WIPE.

 5           DID YOU HAVE AN UNDERSTANDING OF WHAT OJIBOYSAN

 6   MEANT BY "COMP" AS HE HAS USED IT IN THE 10:07 A.M. ENTRY?

 7   A.   YES, SIR.

 8   Q.   WHAT'S YOUR UNDERSTANDING?

 9   A.   MY UNDERSTANDING IS HE WAS REFERRING TO A COMPUTER.

10   Q.   WHAT IS YOUR UNDERSTANDING OF -- WELL, DO YOU HAVE AN

11   UNDERSTANDING OF WHAT THE DEFENDANT MEANS BY ENCRYPT

12   EVERYTHING AND WIPE ALL YOUR FREE SPACE EVERY NIGHT?

13   A.   YES.

14   Q.   WHAT IS YOUR UNDERSTANDING?

15   A.   MY UNDERSTANDING IS IF I HAD THE SOFTWARE TO ENCRYPT IT

16   SO THAT IT COULDN'T BE SEEN BY REGULAR PEOPLE WITHOUT A

17   PASSWORD, AND SOFTWARE TO WIPE ANY FREE SPACE SO THAT NOTHING

18   COULD BE SEEN THAT HAD BEEN THERE BEFORE.  IT WAS DELETED.

19   Q.   DID YOU UNDERSTAND THESE COMMENTS TO BE INSTRUCTIONS ON

20   HOW TO HIDE OR DESTROY EVIDENCE OF THE POSSESSION OF CHILD

21   PORNOGRAPHY?

22   A.   YES, I DID.

23           MR. AARON:  I OBJECT, YOUR HONOR.  HE CAN TESTIFY

24   TO WHAT HIS UNDERSTANDING IS, BUT HE CAN'T TESTIFY AS TO WHAT

25   THE OTHER PERSON'S UNDERSTANDING OR INTENTION IS.

1          THE COURT:  WELL, THE QUESTION -- THE OBJECTION TO

2    THIS QUESTION IS OVERRULED.

3    BY MR. AKROTIRIANAKIS:

4    Q.   DO YOU HAVE MY QUESTION IN MIND, SIR?

5    A.   WOULD YOU REPEAT IT, PLEASE?

6    Q.   DID YOU UNDERSTAND THE DEFENDANT TO BE GIVING YOU

7    INSTRUCTIONS ON HOW TO EITHER HIDE OR DESTROY EVIDENCE OF THE

8    POSSESSION OF CHILD PORNOGRAPHY?

9    A.   YES, I DID.

10   Q.   WAS THAT YOUR UNDERSTANDING?

11   A.   IT WAS MY UNDERSTANDING.

12   Q.   YOU TESTIFIED THAT YOU HAD SEVERAL ALBUMS?

13   A.   YES, SIR.

14   Q.   AND YOU TESTIFIED THAT THOSE ALBUMS HAD DIFFERENT

15   CONTENT, DEPENDING ON THE SUBJECT MATTER?

16   A.   YES, SIR.

17   Q.   I'M REFERRING TO THE PAGE IN EXHIBIT J WHERE THE FIRST

18   DATE AND TIME ENTRY IS JANUARY 31, 2001, AT 11:16 A.M.

19          INCIDENTALLY, MR. MARTIN, IN REGARD TO THE PREVIOUS

20   SERIES OF STATEMENTS THAT WE WENT THROUGH TALKING ABOUT

21   ENCRYPTION AND WIPE, WAS THAT THE ONLY DISCUSSION THAT YOU

22   HAD WITH THE DEFENDANT ABOUT HOW TO EITHER HIDE OR DESTROY

23   EVIDENCE OF THE POSSESSION OF CHILD PORNOGRAPHY?

24   A.   NO.

25   Q.   DID YOU HAVE SEVERAL DISCUSSIONS?

```
 1    A.    I CAN RECALL ONE OTHER.

 2    Q.    THE ENTRY AT 1/31/01 AT 11:24 A.M.:

 3          OJIBOYSAN:  DO YOU HAVE A FUCK ZING ALBUM?

 4          RICOCHET:  THE ONLY ALBUM THAT COMES CLOSE, THE

 5    EROS ALBUM.  YOU SHOULD HAVE ACCESS TO THAT ONE.

 6          OJIBOYSAN:  YEAH, I HAVE IT, THANKS.  I WAS IN IT A

 7    FEW DAYS AGO, BUT I DIDN'T...

 8          THEN IT GOES ON TO THE NEXT PAGE.

 9          WHAT WAS THE CONTENT OF YOUR EROS ALBUM, TO THE

10    BEST OF YOUR RECOLLECTION, MR. MARTIN?

11    A.    PROBABLY MORE HARD CORE CHILD PORNOGRAPHY.

12    Q.    DID THAT INCLUDE UNDERAGED CHILDREN ENGAGED IN SEXUALLY

13    EXPLICIT CONDUCT AS THE COURT HAS DEFINED THAT TERM?

14    A.    IT DID.

15    Q.    DID IT INCLUDE SEXUAL INTERCOURSE BETWEEN ADULTS AND

16    CHILDREN OR BETWEEN TWO CHILDREN OR MORE CHILDREN?

17    A.    I DON'T REMEMBER THE ADULT PART, BUT IT CERTAINLY HAD

18    BETWEEN CHILDREN.

19    Q.    BOY-ON-BOY ACTION AS YOU'VE PREVIOUSLY DESCRIBED IT?

20    A.    YES, SIR.

21    Q.    GOING ON TO THE TOP OF THE NEXT PAGE:

22          RICOCHET, 11:51 A.M.:  I NEED TO UPDATE THOSE

23    ALBUMS.  I HAVE MORE PICS TO PUT THERE, BUT USUALLY WAIT

24    UNTIL I HAVE THEM ON CD FIRST.

25          THEN LOWER DOWN ON THE PAGE AT 11:52:
```

```
 1            OJIBOYSAN:  COOL, NO RUSH, THOUGH.  I HAVE TO START

 2   ANOTHER ALBUM THERE, TOO.

 3            RICOCHET:  HOW MANY ALBUMS DO YOU HAVE?

 4            RICOCHET:  AND DO I HAVE ACCESS?  LOL

 5            OJIBOYSAN:  JUST THE ONE THERE AT THE MOMENT.

 6            OJIBOYSAN:  YOU WILL ALWAYS HAVE ACCESS.  YOU HAVE

 7   MY PASSWORD AND CAN SEE EVERYTHING IN THAT ACCOUNT.

 8            RICOCHET:  I DON'T HAVE IT ANYMORE.  I MUST HAVE

 9   DELETED IT.  I WOULD NOT WANT TO KEEP ACCESS TO YOUR FRONT

10   DOOR.

11            DID YOU AT LEAST AT SOME POINT, MR. MARTIN, HAVE

12   ACCESS TO THE ALBUM THE DEFENDANT IS DESCRIBING?

13   A.   I DON'T REMEMBER.

14   Q.   DOES REVIEWING THE TEXT BEFORE YOU REFRESH YOUR

15   RECOLLECTION AT ALL IN THAT REGARD?

16   A.   IT DOES NOT.

17   Q.   WHEN YOU WERE ASKING, "AND DO I HAVE ACCESS?  LOL," WHAT

18   WERE YOU REQUESTING OF THE DEFENDANT?

19   A.   PASSWORD TO THAT FILE OR ALBUM.

20   Q.   WERE YOU HOPING TO SEE CHILD PORNOGRAPHY THERE?

21   A.   I WAS.

22   Q.   DO YOU HAVE ANY REASON TO BELIEVE, AS YOU SIT HERE

23   TODAY, THAT WHAT YOU WROTE AT THE TIME WAS NOT TRUE?

24   A.   NO REASON TO BELIEVE IT, NO.

25   Q.   GOING OVER TO THE TOP OF THE NEXT PAGE.
```

1              OJIBOYSAN:  I DIDN'T MIND.  I'LL SEND YOU THE P/W

2    FOR THE NEW ONE WHEN I PUT IT IN.

3              DID YOU HAVE AN UNDERSTANDING OF P/W?

4    A.   YES, I DID.

5    Q.   WHAT WAS YOUR UNDERSTANDING?

6    A.   THAT IT MEANT PASSWORD.

7    Q.   DID YOU UNDERSTAND THE DEFENDANT THEREFORE TO BE TELLING

8    YOU, I'LL SEND YOU THE PASSWORD FOR THE NEW ONE WHEN I PUT IT

9    IN?

10   A.   YES, SIR.

11   Q.   I'M REFERRING TO THE PAGE IN THIS EXHIBIT THAT -- THE

12   FIRST ENTRY.

13             MR. AARON:  OBJECTION.  ASK TO APPROACH, YOUR

14   HONOR.

15             THE COURT:  CAN YOU MOVE ON TO ANOTHER SUBJECT?

16             MR. AARON:  YOUR HONOR, I'M SORRY TO INTERRUPT.

17   PERHAPS COUNSEL CAN MOVE ON TO ANOTHER AREA.

18             THE COURT:  EXACTLY.  WE'LL COME BACK TO THAT.

19             MR. AARON:  YES.

20   BY MR. AKROTIRIANAKIS:

21   Q.   I'M REFERRING TO THE ENTRY IN TAB J OF THE EXHIBIT

22   THAT'S AT 11:15 A.M. ON FEBRUARY 1, 2001.

23             RICOCHET:  YOU AND I BOTH KNOW THAT POSSESSION OF

24   THESE TYPES OF PICS ARE BAD.

25             OJIBOYSAN:  MY NEW METHOD FOR DEALING WITH THEM IS

1   TO MOVE THEM ALL TO A TRASH FOLDER AND WIPING IT.  AHH, SO IT

2   DOES WIPE THEM.

3            WHAT DID YOU MEAN, MR. MARTIN, BY "THESE TYPES OF

4   PICS"?

5   A.   CHILD PORNOGRAPHY.

6   Q.   AND WHAT DID YOU MEAN BY "BAD" AS YOU USED IT, THAT

7   POSSESSION OF THESE TYPES OF PICS ARE BAD?

8   A.   THEY ARE ILLEGAL TO POSSESS THEM.

9   Q.   I'M REFERRING TO THE ENTRY THAT BEGINS WITH 11:19 A.M.

10  ON FEBRUARY 1, 2001.

11            RICOCHET:  IF THE FEDS WERE LOOKING IN YOUR PUTER

12  FOR PICS, TEMP INTERNET FILES WOULD NOT TELL THEM WHERE THEY

13  WERE.

14            RICOCHET:  I WOULD HOPE YOU WOULD KEEP YOUR

15  PASSWORD TO MY ZING ALBUMS OFF YOUR HD.

16            WHAT DID YOU MEAN BY "FEDS," MR. MARTIN?

17  A.   FEDERAL AGENTS, LAW ENFORCEMENT.

18  Q.   AND WHAT DID YOU MEAN BY "PUTER"?

19  A.   COMPUTER.

20  Q.   WHAT DID YOU MEAN WHEN YOU WROTE "TEMP INTERNET FILES

21  WOULD NOT TELL THEM WHERE THEY WERE"?

22  A.   I CAN'T RECALL ON THAT ONE.

23  Q.   WHAT DID YOU MEAN WHEN YOU WROTE "I WOULD HOPE YOU" --

24  WELL, THE "YOU" IN THAT SENTENCE.  "I WOULD HOPE YOU WOULD

25  KEEP YOUR PASSWORD TO MY ZING ALBUMS OFF YOUR HD," WHO IS THE

1    "YOU" THAT YOU'RE CHATTING WITH?

2    A.    OJIBOYSAN.

3    Q.    OJIBOYSAN?

4    A.    YES, SIR, SAME PERSON.

5    Q.    AND WHAT IS HD?

6    A.    HARD DRIVE.

7    Q.    WHY HAVE YOU HOPED THAT OJIBOYSAN WOULD KEEP YOUR

8    PASSWORD TO YOUR ZING ALBUMS OFF HIS HARD DRIVE?

9    A.    WELL, IF HE GOT IN TROUBLE AND GOT ARRESTED, THAT

10   INFORMATION WOULD BE AVAILABLE TO THE LAW ENFORCEMENT AND

11   THEY WOULD HAVE ACCESS TO MY ZING ALBUMS.

12   Q.    AND BY YOUR ZING ALBUMS, ARE YOU REFERRING TO THE CHILD

13   PORNOGRAPHY THAT YOU PREVIOUSLY TESTIFIED TO?

14   A.    YES, SIR.

15   Q.    ON THE NEXT PAGE I'M REFERRING TO THE ENTRY

16   FEBRUARY 6TH, 2001, AT 9:08 A.M.:   OJI MEANS UNCLE IN

17   JAPANESE -- TWO SMILEY FACES.

18           IS THIS PART OF A DISCUSSION BETWEEN YOU AND THE

19   DEFENDANT OF SCREEN NAMES?

20   A.    I BELIEVE IT IS.

21   Q.    REFERRING TO THE SAME PAGE IN THE EXHIBIT -- I'M SORRY,

22   A LATER PAGE IN THE EXHIBIT, AND THE ENTRY AT 9:19 A.M., ON

23   FEBRUARY 22, 2001:   JUST A LITTLE SLOW HERE.

24           RICOCHET:   JUST A LITTLE SLOW HERE.   BEEN TRYING TO

25   DECIDE IF I'M GOING TO GIVE UP ALL THIS BL STUFF.   TOO RISKY

1    AND HARD TO MAKE FRIENDS.

2             WHAT DID YOU MEAN BY THAT COMMENT, SIR?

3    A.   TOO RISKY AND HARD TO MAKE FRIENDS?

4    Q.   YES.

5    A.   IT WAS RISKY BECAUSE I DIDN'T WANT TO GET CAUGHT WITH

6    IT, BECAUSE GOING TO JAIL WOULD BE ASSURED.  AND THE ONLY

7    FRIENDS I'VE MADE WERE THE FEW THAT I'VE TALKED TO ON THE

8    LINE.

9    Q.   CONTINUING.

10            OJIBOYSAN:  WHAT DO YOU MEAN TOO HARD TO MAKE

11   FRIENDS?

12            RICOCHET:  SINCE THE SETH INCIDENT, MOST OF THE

13   BL -- THERE, IS BL A REFERENCE TO BOY LOVER?

14   A.   YES, SIR.

15   Q.   MOST OF THE BOY LOVER FRIENDS I KNEW SCATTERED.

16   GOING OVER TO THE TOP OF THE NEXT PAGE.

17            AND THEN LATER ON IN THAT SAME DISCUSSION, DO YOU

18   AND OJIBOYSAN DISCUSS SETH?  IF YOU LOOK AT THE BOOK IN FRONT

19   OF YOU, SIR, PERHAPS I CAN JUST ALTER THE PAGE.

20   A.   REFRESH ME WHERE IT'S AT, PLEASE.

21   Q.   I WILL DIRECT YOU TO AN ENTRY AT 9:22 A.M.:  HOW IS

22   SETH?

23            DO YOU RECALL WHETHER IN THIS -- LATER IN THE SAME

24   DISCUSSION YOU AND THE DEFENDANT DISCUSSED SETH?

25   A.   YES.

1    Q.    HAVE YOU EVER ACTUALLY MET SETH IN PERSON?

2    A.    NO.

3    Q.    GOING BACK TO THE PREVIOUS PAGE AT THE BEGINNING OF THAT

4    CHAT:

5              RICOCHET, 9:19 A.M.:  JUST A LITTLE SLOW HERE.

6    BEEN TRYING TO DECIDE IF I'M GOING TO GIVE UP ALL THIS BL

7    STUFF.  TOO RISKY AND HARD TO MAKE FRIENDS.

8              OJIBOYSAN:  WHAT DO YOU MEAN TOO HARD TO MAKE

9    FRIENDS?

10              RICOCHET:  SINCE THE SETH INCIDENT, MOST OF THE BL

11   FRIENDS I KNEW SCATTERED.

12              RICOCHET:  DON'T GET ME WRONG, I DO HAVE A COUPLE

13   FRIENDS WHICH I CHERISH DEARLY.  YOU ARE ONE OF THEM.

14              OJIBOYSAN:  YEAH, BUT YOU WENT OFF WHEN EVERYONE

15   CHANGED OVER TO NEW, A-C-C-T-S, AND NICKS -- TWO SMILEY

16   FACES.

17              WHAT DID YOU UNDERSTAND BY THE A-C-C-T-S?

18   REFERRING TO THIS WORD RIGHT HERE, SIR?

19   A.    I BELIEVE IT REFERRED TO ACCOUNTS.

20   Q.    IS THAT AN ICQ CHATTING ACCOUNT?

21   A.    I CAN'T RECALL.

22   Q.    WHAT DID YOU UNDERSTAND BY NICKS?

23   A.    I BELIEVE I UNDERSTOOD IT TO BE NICKNAMES.

24   Q.    IS THAT THE SAME AS SCREEN NAME?

25   A.    YES, SIR.

1   Q.   AND CONTINUING ON.

2          OJIBOYSAN:  I FEEL THE SAME ABOUT YOU.  IT WOULDN'T

3   BE THE SAME HERE WITHOUT YOU AROUND.

4          RICOCHET:  I DID NOT CHANGE ANYTHING.  I FIGURED I

5   WOULD HAVE TO START OVER AGAIN.

6          RICOCHET:  HOW IS SETH?

7          OJIBOYSAN:  HE'S DOING WELL -- HE'S DOING AS WELL

8   AS POSSIBLE UNDER THE CIRCUMSTANCES.  HE MAY BE LOOKING FOR A

9   JOB SOON.

10          OJIBOYSAN:  DO YOU WANT TO SAY HI?

11          RICOCHET:  YES.

12          OJIBOYSAN:  OKAY.  I'M TALKING WITH HIM TODAY AND

13   WILL TELL HIM, UNLESS YOU WANT TO CALL HIM YOURSELF -- TWO

14   SMILEY FACES.

15          RICOCHET:  HELLO.  ANYBODY THERE?

16          DID THE DEFENDANT GIVE YOU FURTHER INSTRUCTION ON

17   HOW YOU COULD CONTACT SETH USING THAT CELL PHONE?

18   A.   I DON'T RECALL THAT.

19   Q.   CONTINUE ON THE NEXT PAGE.

20          RICOCHET, 9:28 A.M.:  I HOPE HE DOES WELL.

21          WHO IS THE "HE" YOU ARE REFERRING TO?

22   A.   SETH.

23   Q.   CONTINUING.

24          IF HE WILL LET ME HAVE HIS CELL NUMBER, I WILL CALL

25   HIM LATER.  IF NOT, I UNDERSTAND.

1          OJIBOYSAN:  I CALL HIM AT A PAY PHONE WITH A PHONE

2     CARD.

3          RICOCHET:  HE MUST BE -- REALLY -- DID YOU MEAN

4     LONELY BY THAT NEXT WORD?

5     A.   YES.

6     Q.   HE MUST REALLY BE LONELY AND GOING CRAZY.  HE WAS REALLY

7     HOOKED ON THIS STUFF.  LIKE WE AREN'T, RIGHT?

8          OJIBOYSAN:  I'M GETTING # HEHEHE, REALLY.

9          WHAT DID YOU MEAN BY "HOOKED ON THIS STUFF"?

10    WHAT'S THE STUFF YOU'RE REFERRING TO?

11    A.   CHILD PORNOGRAPHY.

12    Q.   OJIBOYSAN:  (925) 899-4646.

13         RICOCHET:  THAT'S A CELL #?

14         GOING OVER TO THE TOP OF THE NEXT PAGE.

15         OJIBOYSAN:  IF YOU CALL HIM, BE SURE TO DO IT THE

16    WAY I DESCRIBED.

17         OJIBOYSAN:  YES, HIS NEW ONE.

18         RICOCHET:  USE A PAY PHONE AND A CALLING CARD,

19    RIGHT?

20         DID YOU HAVE AN UNDERSTANDING OF WHY YOU SHOULD TRY

21    AND CONTACT SETH USING A PAY PHONE AND A CALLING CARD?

22    A.   SO THAT IT COULDN'T BE TRACED.

23    Q.   REFERRING TO FEBRUARY 22ND, 2001, 9:47 A.M.

24         RICOCHET:  PHOTO ISLAND IS MUCH LIKE ZING.  ZING

25    HAS NOT LET ME -- DID YOU MEAN LET ME DOWN?

1    A.    YES.

2    Q.    ZING HAS NOT LET ME DOWN AS OF YET.  I HAVE OVER

3    100 MEGABYTES OF PICS THERE.  THEY SAY -- DID YOU MEAN SPACE?

4    A.    YES, SIR.

5    Q.    THEY SAY THE SPACE IS UNLIMITED.  I MAY DELETE SOME OF

6    THE SMALLER ALBUMS TO KEEP THE MOST POPULAR.

7              OJIBOYSAN:  IT'S GREAT.  I'VE ENJOYED YOUR ALBUMS.

8              THE ALBUMS THAT YOU HAD ON ZING, ARE THOSE THE

9    CHILD PORNOGRAPHY ALBUMS YOU PREVIOUSLY TESTIFIED TO?

10   A.    YES, SIR.

11   Q.    AND THE ALBUMS THAT -- WELL, THE PHOTO ISLAND THAT

12   YOU'RE REFERRING TO, DID YOU INTEND AT THE TIME YOU WROTE

13   THIS TO POST PICTURES OR OTHER ITEMS TO PHOTO ISLAND?

14   A.    I WAS EITHER GOING TO POST OR MOVE ALL OF MY ZING ALBUMS

15   OVER.

16   Q.    AND WHAT WERE YOU GOING TO PUT ON PHOTO ISLAND?

17   A.    CHILD PORNOGRAPHY.

18   Q.    CONTINUING THE REMAINDER OF THE ENTRY AT 9:47 A.M. BY

19   OJIBOYSAN:  YOU HAVE FREEDOM RUNNING, DON'T YOU?

20             RICOCHET:  WHAT DO YOU MEAN?

21             OJIBOYSAN:  THE TOP OF THE LINE PROXY SERVER,

22   FREEDOM DOT NET.

23             RICOCHET:  I HAVE NEVER HEARD OF THEM.  ARE THEY AN

24   OFF-SITE STORAGE SERVER?

25             OJIBOYSAN:  NO, A PROXY SERVER.

1          DID YOU MEAN "THAT MAKES IT"?

2   A.   I'M SORRY?

3   Q.   THIS WORD RIGHT HERE, T-H-A, DID YOU MEAN "THAT"?

4   A.   I PROBABLY DID.

5          MR. AARON:  OBJECTION, THAT WAS NOT MR. --

6          MR. AKROTIRIANAKIS:  I'M SORRY.  I APOLOGIZE, YOUR

7   HONOR.  I WITHDRAW THE QUESTION.

8          THE COURT:  THANK YOU.

9   BY MR. AKROTIRIANAKIS:

10  Q.   NO, A PROXY SERVER THE MAKES IT IMPOSSIBLE FOR ANYONE TO

11  TRACE YOU OR READ YOUR E-MAIL OF SEE WHERE YOU'RE AT IN THE

12  NET.

13         RICOCHET:  HOW DOES IT WORK?

14         OJIBOYSAN:  YOU LOAD THEIR PROGRAM AND WHENEVER YOU

15  GO ONLINE YOU LINK IN WITH THE FREEDOM SERVER IN CANADA AND

16  THEN GO OUT ON THE WEB FROM THERE.  THE ONLY PLACE MY ISP

17  EVER SEES ME GO IS FREEDOM NET.

18         OJIBOYSAN:  EVERYTHING GOING OUT AND COMING INTO MY

19  COMPUTER IS ENCRYPTED.

20         OJIBOYSAN:  IF SOMEONE OUT THERE TRIES TO TRACE MY

21  THEY GET A GOVERNMENT IP # OUT IN THE BOONIES.

22         WAS IT IMPORTANT TO YOU, MR. MARTIN, TO CONCEAL

23  WHERE YOU HAD BEEN ON THE INTERNET?

24  A.   I WOULD LIKE TO HAVE.

25  Q.   WHY IS THAT?

1    A.    BECAUSE OBVIOUSLY THEY FOUND EVERYTHING I HAD.

2    Q.    DID YOU AT SOME POINT ATTEMPT TO EMPLOY THE ENCRYPTION

3    AND WIPING STRATEGIES THE DEFENDANT DESCRIBED TO YOU THAT

4    YOU'VE PREVIOUSLY TESTIFIED TO?

5    A.    I DID HAVE SOME OF THE -- I DID HAVE SOME OF IT.

6    Q.    DID YOU MAKE -- DID YOU ATTEMPT TO MAKE USE OF THOSE

7    ITEMS?

8    A.    YES, SIR.

9    Q.    DID YOU ATTEMPT TO USE THEM IN ORDER TO HIDE CHILD

10   PORNOGRAPHY?

11   A.    I DID.

12   Q.    DID YOU ATTEMPT TO USE THEM TO DESTROY EVIDENCE OF YOUR

13   POSSESSION OF CHILD PORNOGRAPHY?

14   A.    I DID.

15   Q.    REFERRING TO THE ENTRY IN EXHIBIT M, APRIL 2, 2001,

16   4:35 P.M.:

17              RICOCHET:  I AM STILL STRUGGLING WITH ALL THIS BL

18   STUFF.  SEEMS AWFUL RISKY.  MAYBE NOT ALL WORTH IT.

19              RICOCHET:  JUST ALL SEEMS LIKE A TEASE.

20              RICOCHET:  SOMETHING WE CAN NEVER HAVE.

21              RICOCHET:  LOOK WHERE IT GOT SETH.

22              OJIBOYSAN:  IT'S NOT JUST THE PICS AND VIDS.

23              OJIBOYSAN:  WHY CAN'T YOU HAVE IT?

24              GOING OVER TO THE TOP OF THE NEXT PAGE.

25              RICOCHET:  PICS AND VIDS ARE ONE THING.  FINDING A

1    BOY TO LOVE A MAN IS ANOTHER.

2              RICOCHET:  IT'S JUST NOT REALITY.

3              OJIBOYSAN:  ALL BOYS LOVE MEN.  IT'S JUST MAKING IT

4    HAPPEN, THAT'S THE TRICKY PART.

5              RICOCHET:  I STAY IN FEAR EVERY DAY OF GETTING

6    CAUGHT FOR HAVING AND VIEWING THE STUFF.

7              WHAT IS THE STUFF THAT YOU'RE REFERRING TO?

8    A.   (NO AUDIBLE RESPONSE).

9    Q.   MR. MARTIN, LET ME ASK YOU, WHAT IS THE STUFF YOU WERE

10   HAVING THAT YOU WERE IN FEAR EVERY DAY OF GETTING CAUGHT

11   WITH?

12   A.   CHILD PORN.

13   Q.   SIR, DO YOU CARE FOR ANY WATER?  IT IS RIGHT THERE

14   BEFORE YOU IF YOU DO.  DO YOU NEED A MOMENT, SIR?

15   A.   PLEASE.

16             MR. AKROTIRIANAKIS:  MAY I PAUSE BRIEFLY, YOUR

17   HONOR?

18             THE COURT:  CERTAINLY.

19             THE WITNESS:  I'M SORRY.

20             MR. AKROTIRIANAKIS:  MAY I PROCEED, YOUR HONOR?

21             THE COURT:  YOU MAY.  GO AHEAD.

22             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

23   BY MR. AKROTIRIANAKIS:

24   Q.   APRIL 2, 2001, 4:39 P.M.:  SO WHAT ARE YOU WANTING TO DO

25   IN VEGAS?

```
 1              RICOCHET:  SO WHAT ARE YOU WANTING TO DO IN VEGAS?

 2              LOWER DOWN THE PAGE.

 3              OJIBOYSAN: I HAVE A 10YO BF THERE.

 4              WHAT DID YOU UNDERSTAND BF TO MEAN, IF ANYTHING?

 5    A.   BOYFRIEND.

 6    Q.   GOING OVER TO THE TOP OF THE NEXT PAGE.

 7              OJIBOYSAN:  HEHEHE.

 8              RICOCHET:  NOW THAT'S LUCK FOR YOU.  HOW DID YOU

 9    MANAGE THAT?  HEHEHE.

10              OJIBOYSAN:  I THINK YOU'RE OVERREACTING BECAUSE OF

11    THE HYPE AND SETH.

12              RICOCHET:  MAYBE.

13              OJIBOYSAN:  LUCK IS THE POINT WHERE PREPARATION AND

14    OPPORTUNITY MEET.

15              MR. MARTIN, DID YOU HAVE AN UNDERSTANDING OF WHAT

16    THE DEFENDANT MEANT BY "WHERE PREPARATION AND OPPORTUNITY

17    MEET," THE OPPORTUNITY TO DO WHAT?

18    A.   I GUESS MEET UP WITH BOYS.

19    Q.   WHEN YOU SAY "MEET UP WITH BOYS," DO YOU MEAN FOR THE

20    PURPOSE OF HAVING SEXUAL --

21              THE COURT:  JUST A MOMENT.  YOU NEED TO REWORD THAT

22    QUESTION.

23              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

24    BY MR. AKROTIRIANAKIS:

25    Q.   FOR WHAT PURPOSE MEETING UP WITH BOYS?
```

1    A.   FOR WHAT PURPOSE?

2         THE COURT:  YOU NEED TO ASK THE WITNESS WHAT HIS

3    UNDERSTANDING WAS, BECAUSE YOU'RE REFERRING TO -- IF I

4    UNDERSTAND YOUR QUESTION CORRECTLY, YOU'RE NOT ASKING HIM

5    ABOUT A PORTION OF THIS EXHIBIT WHERE HE WAS WRITING BUT

6    ABOUT WHERE THE OTHER WRITER WAS WRITING.  SO YOU HAVE TO ASK

7    WHAT HIS UNDERSTANDING WAS.

8         MR. AKROTIRIANAKIS:  I THOUGHT I HAD, YOUR HONOR.

9    I WILL NOW.

10        THE COURT:  YOU DIDN'T.  THANK YOU.

11        MR. AKROTIRIANAKIS:  I APOLOGIZE.

12   BY MR. AKROTIRIANAKIS:

13   Q.   MR. MARTIN, DID YOU HAVE AN UNDERSTANDING OF WHAT THE

14   DEFENDANT MEANT IN THE CONTEXT OF THIS CONVERSATION OF HAVING

15   AN OPPORTUNITY AND WHERE PREPARATION AND OPPORTUNITY MEET?

16   A.   YES.

17   Q.   IN YOUR UNDERSTANDING, THE OPPORTUNITY TO DO WHAT?

18        MR. AARON:  I WILL OBJECT, YOUR HONOR.  I BELIEVE

19   HE IS TRYING TO GET HIM TO SAY WHAT HE BELIEVES THE DEFENDANT

20   MAY HAVE MEANT BY THAT AND HE CAN'T.

21        THE COURT:  ALL HE CAN ASK IS WHAT -- HE CAN ASK

22   THIS WITNESS WHAT THIS WITNESS' UNDERSTANDING WAS.  AND I

23   BELIEVE THAT THAT'S WHAT THE QUESTION -- HOW THE QUESTION WAS

24   WORDED THIS TIME.  SO THE OBJECTION IS OVERRULED.

25        THE WITNESS:  MY UNDERSTANDING WAS HOW TO MEET UP

```
 1   WITH BOYS.

 2   BY MR. AKROTIRIANAKIS:

 3   Q.   FOR WHAT PURPOSE WAS YOUR UNDERSTANDING?

 4   A.   JUST TO HAVE SEX WITH THEM.

 5   Q.   APRIL 10, 2001, 2:34 P.M.

 6            OJIBOYSAN:  HI, MAN, SO NICE TO SEE YOU AGAIN --

 7   TWO SMILEY FACES.

 8            RICOCHET:  YOU, TOO.  HOW ARE YOU?

 9            RICOCHET:  HOW IS SETH?

10            OJIBOYSAN:  I'M DOING GREAT.  I'M GOING TO BE

11   SPENDING A WEEK WITH KALEN IN A FEW DAYS.

12            GOING OVER TO THE TOP OF THE NEXT PAGE.

13            OJIBOYSAN:  SETH MISSES EVERYONE A LOT.

14            RICOCHET:  WHO IS KALEN?

15            OJIBOYSAN:  MY 7YO BF.

16            RICOCHET:  HOW ARE YOU GETTING AROUND PARENTS?

17            OJIBOYSAN:  JUST WITH HIS MOM.  SHE KNOWS HE LIKES

18   BOYS AND ME AND SUPPORTS HIS DECISION AND CHOSEN SEXUALITY.

19            RICOCHET:  WOW.  THAT'S A ONCE-IN-A-LIFETIME

20   SITUATION.

21            OJIBOYSAN:  YEAH.  WE BONDED WHEN HE WAS THREE MO.

22   OLD, AND WHEN HE WAS SIX HE STARTED HIS CONQUEST OF ME,

23   HEHEHE.

24            RICOCHET:  LUCKY DOG.  LOL.

25            OJIBOYSAN:  HEHEHE.  THE M CAME ON STRONG LAST YEAR
```

1  AND HASN'T LET UP SINCE.  WE SLEEP TOGETHER EVERY NIGHT WE

2  ARE TOGETHER AND NEVER GET ANY SLEEP.

3           RICOCHET:  HE MUST HAVE BEAUTIFUL ORGASMS.

4           OJIBOYSAN:  HEHEHE.  WE ARE JUST ARRIVING AT THAT.

5           GOING OVER TO THE TOP OF THE NEXT PAGE.

6           I'M KEEPING THE PACE SLOW SO THAT HE WILL BE

7  COMFORTABLE WITH IT WHEN I'M NOT THERE.

8           RICOCHET:  YOU'RE STILL A LUCK DOG -- SMILEY FACE.

9           DID YOU MEAN, YOU'RE STILL A LUCKY DOG?

10 A.   YES, SIR.

11 Q.   OJIBOYSAN:  HEHEHE.  I GAVE HIM A MASSAGE LAST TIME AND

12 HE KEPT TELLING ME TO GO LOWER UNTIL I WAS MASSAGING HIS

13 LITTLE ASSHOLE.

14          RICOCHET:  WOW.  WELL, HAVE FUN WHILE IT LASTS, MY

15 FRIEND.

16          OJIBOYSAN:  IT WILL LAST SIX MORE YEARS.

17          RICOCHET:  WHAT HAPPENS THEN?

18          OJIBOYSAN:  HE BECOMES FOURTEEN.

19          OJIBOYSAN:  A MAN.

20          RICOCHET:  FOURTEEN IS JUST RIGHT FOR ME.

21          OJIBOYSAN:  I HAVE HIM GET INTERESTED IN

22 REPRODUCING THEN -- TWO SMILEY FACES.

23          OJIBOYSAN:  I HAVE TO GET BACK TO THE OFFICE.  SEE

24 YOU LATER.

25          RICOCHET:  OKAY.  HAVE A GOOD WEEK.

```
 1              OJIBOYSAN:  THANKS.  I'LL BE ON AS PEI314.

 2              MR. MARTIN, DO YOU RECALL IF PEI314 WAS ANOTHER

 3    SCREEN NAME USED BY THE DEFENDANT?

 4    A.   I CAN'T RECALL.

 5    Q.   GOING OVER TO THE TOP OF THE NEXT PAGE.

 6              RICOCHET:  DO I HAVE THAT ONE IN MY CONTACT LIST?

 7              RICOCHET:  I HAVE PEI.

 8              RICOCHET:  BUT NOT PEI314.

 9              OJIBOYSAN:  OKAY.  PEI IS IT.  I WASN'T SURE HOW IT

10    WAS LISTED.

11              DOES REVIEWING THAT PORTION OF THE CHAT,

12    MR. MARTIN, REFRESH YOUR RECOLLECTION THAT PEI WAS ANOTHER

13    SCREEN NAME?

14    A.   I'M SORRY, IT DOES NOT.  IT DOES NOT.

15    Q.   AT 4/6/2001 AT 11:28 A.M.

16              RICOCHET:  WHAT IS YOUR -- PARDON ME.

17              8:51 A.M.  OJITEMP:  OKAY.  DON'T FORGET TO SEND ME

18    AN INVITE AT MY HOME PC ACCOUNT.  SEE YOU LATER.

19              RICOCHET:  WHAT IS YOUR E-MAIL AND I WILL?  HAVE

20    YOU TALKED WITH SETH YET ON IF HE HAD ANY ADDRESS IN HIS

21    SYSTEM?

22              OJITEMP:  ELLIOT1@FREEDOM.NET.

23              3:10 P.M.  RICOCHET:  GREAT.  DID YOU TALK WITH

24    SETH LAST NIGHT, FIND OUT IF HE HAD ADDRESSES FOR THEM TO

25    FIND?
```

1           WHO IS THE "THEM" THAT YOU'RE REFERRING TO?

2    A.    LAW ENFORCEMENT.

3    Q.    YOU MADE THAT COMMENT ON 4/16/2001.  THAT'S APRIL 16TH,

4    2001.  WHAT WAS THE DATE AGAIN THAT YOU WERE ARRESTED,

5    MR. MARTIN?

6    A.    I BELIEVE IT WAS APRIL 17TH, '01.

7    Q.    THE NEXT DAY?

8    A.    YES, SIR.

9    Q.    RICOCHET:  GREAT.  DID YOU TALK WITH SETH LAST NIGHT,

10   FIND OUT IF HE HAD ADDRESSES FOR THEM TO FIND.

11           AND GOING OVER TO THE TOP OF THE NEXT PAGE.

12           OJITEMP:  HE SAID THEY JUST HAD YOUR BROTHER'S

13   ADDY.

14           DID YOU HAVE AN UNDERSTANDING OF WHO THE DEFENDANT

15   MEANT BY "YOUR BROTHER"?

16   A.    YES, SIR.

17   Q.    WHAT'S YOUR UNDERSTANDING?

18   A.    THAT MY BROTHER'S ADDRESS WAS IN SETH'S COMPUTER AND IT

19   WAS DISCOVERABLE.

20   Q.    RICOCHET:  DAMN.

21           RICOCHET:  DOES HE THINK THEY WILL PAY HIM A VISIT?

22           WHO DID YOU MEAN WHEN YOU SAID "THEY"?

23   A.    LAW ENFORCEMENT.

24   Q.    AND WHO DID YOU -- WHO IS THE "HIM" THAT YOU WERE

25   WONDERING IF LAW ENFORCEMENT WOULD PAY A VISIT TO?

```
 1    A.    MY BROTHER.

 2    Q.    CONTINUING ON.

 3              OJITEMP:  I AGREE, BUT THAT DOESN'T MEAN THEY WILL

 4    COME TO VISIT.  THEY ARE REALLY LOOKING FOR IMPORTERS.

 5              RICOCHET:  HOW DO YOU KNOW?

 6              OJITEMP:  HE DOESN'T KNOW BUT IT'S GOOD TO HAVE

 7    YOUR ACT TOGETHER.

 8              OJITEMP:  HE TOLD ME.

 9              RICOCHET:  I'M WORKING ON IT.

10              OJITEMP:  COOL.

11              RICOCHET:  HOW LONG BEFORE YOU THINK THE COAST IS

12    CLEAR?

13              OJITEMP:  THEY'RE ALWAYS GOING TO BE AFTER US.  WE

14    ARE THE FLAVOR OF THE DAY.  TWO SMILEY FACES..

15              OJITEMP:  WE JUST HAVE TO KEEP UPGRADING OUR

16    DEFENSES.

17              OJITEMP:  AS LONG AS WE DO THAT, WE WILL STAY AHEAD

18    OF THE TRADERS.

19              GOING OVER TO THE TOP OF THE NEXT PAGE.

20              RICOCHET:  I'M WORRIED ABOUT MY BROTHER.

21              RICOCHET:  HE'S THE KIND THAT MIGHT CRACK.

22              MR. MARTIN, WHY WERE YOU WORRIED ABOUT YOUR

23    BROTHER?

24    A.    I WAS AFRAID THAT THEY WOULD COME TALK TO HIM.

25    Q.    WHAT WERE YOU AFRAID THAT LAW ENFORCEMENT MIGHT LEARN IF
```

1    THEY COME TO TALK TO YOUR BROTHER?

2    A.   THAT ULTIMATELY THE DISKS THAT WERE BEING SENT WERE

3    PORNOGRAPHY.

4    Q.   CONTINUE ON.

5             OJITEMP:  AS LONG AS THERE'S NO EVIDENCE THERE'S

6    NOTHING TO WORRY ABOUT.

7             RICOCHET:  HE DOESN'T EVEN HAVE A PUTER.

8             WHAT DID YOU MEAN BY PUTER?

9    A.   COMPUTER.

10            OJITEMP:  DID HE SEE WHAT WAS IN THE PACKAGES?

11            OJITEMP:  KEWL.

12            RICOCHET:  YES.

13            MR. MARTIN, DOES THAT PORTION OF THE CHAT REFRESH

14   YOUR RECOLLECTION AS TO WHETHER YOU UNDERSTOOD AT THE TIME

15   THAT YOUR BROTHER HAD, IN FACT, SEEN WHAT WAS IN THE PACKAGES

16   SETH BEKENSTEIN HAD SENT TO YOU?

17   A.   HE DID SEE WHAT WAS IN THE PACKAGES, BUT HE DIDN'T OPEN

18   THEM.

19            OJITEMP:  HE WILL HAVE TO LIE THEN.

20            RICOCHET:  HE CAN DO THAT.  I JUST NEVER INTENDED

21   TO PUT HIM THROUGH THIS.

22            RICOCHET:  HE DOESN'T EVEN HAVE A WORKING VCR.

23            OJITEMP:  THAT'S GOOD.  THERE WILL BE NOTHING FOR

24   THEM IF THEY SHOULD COME BY.

25            DID YOU EVER LEARN, MR. MARTIN, THAT THE FEDERAL

```
 1    LAW ENFORCEMENT AUTHORITIES DID COME BY YOUR BROTHER'S

 2    RESIDENCE?

 3    A.   I DID.

 4    Q.   AND WHAT DAY WAS THAT IN RELATION TO THE CHAT I'VE JUST

 5    REFERRED TO?

 6    A.   IT WOULD HAVE BEEN THE DAY AFTER.

 7    Q.   NOW, EARLIER IN YOUR TESTIMONY YOU TESTIFIED THAT YOU

 8    HAD MORE THAN ONE TELEPHONE CONVERSATION WITH THE DEFENDANT;

 9    IS THAT CORRECT?

10    A.   I BELIEVE I DID, YES.

11    Q.   DIRECTING YOUR ATTENTION TO THE VERY LAST TELEPHONE

12    CONVERSATION YOU HAD WITH THE DEFENDANT, WHAT WAS THE DATE OF

13    THAT CONVERSATION IN RELATION TO THE DATE UPON WHICH YOU WERE

14    ARRESTED APRIL 17, 2001?

15    A.   I'M NOT SURE OF THE EXACT DATE, BUT I BELIEVE IT WAS

16    WITHIN 48 HOURS OF LAW ENFORCEMENT SHOWING UP.

17    Q.   WHAT DID YOU DISCUSS WITH THE DEFENDANT IN YOUR

18    CONVERSATION ON OR ABOUT THE DATE YOU'VE JUST REFERRED TO,

19    THE VERY LAST CONVERSATION YOU HAD WITH THE DEFENDANT SHORTLY

20    BEFORE YOU WERE ARRESTED?

21    A.   WE TALKED ABOUT SETH, AND HE JUST SAID THAT HE THOUGHT

22    SETH MAY HAVE GIVEN ME AND I NEEDED TO BE PREPARED FOR THEM

23    TO COME OR THAT THEY MIGHT BE SHOWING UP.

24    Q.   DID YOU DISCUSS ANYTHING MORE?

25    A.   NOTHING THAT I CAN RECALL.
```

1    Q.   DID YOU DISCUSS WHAT YOU MIGHT DO TO PREPARE FOR THE

2    AUTHORITIES COMING FOR YOU IF, IN FACT, SETH HAD GIVEN YOU

3    UP?

4    A.   I CAN'T RECALL.

5    Q.   DO YOU RECALL WHAT YOU DID AFTER THAT CONVERSATION, IF

6    ANYTHING, TO PREPARE FOR THE AUTHORITIES COMING TO YOU?

7    A.   I HAD GONE BACK UPSTAIRS TO MY JOB AND WAS CONTINUING TO

8    DELETE AND WIPE THE COMPUTER.

9    Q.   DID YOU DO THAT WITH YOUR HOME COMPUTER AS WELL?

10   A.   I DID.

11   Q.   WHY DID YOU DO THAT, TRY AND DELETE OR WIPE FILES FROM

12   YOUR WORK AND HOME COMPUTER?

13   A.   WELL, IF LAW ENFORCEMENT WAS COMING, I DIDN'T WANT THEM

14   TO FIND THEM.

15            MR. AKROTIRIANAKIS:  MAY I HAVE JUST A MOMENT, YOUR

16   HONOR.

17            THE COURT:  YOU MAY.

18            MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

19            MR. AARON:  YOUR HONOR, I UNDERSTOOD WE WERE GOING

20   TO BE TAKING THE NEXT WITNESS OUT OF ORDER.

21            THE COURT:  OH, THAT'S RIGHT.  SO WHY DON'T WE HAVE

22   AN AFTERNOON RECESS AND THEN WE WILL CALL THE NEXT WITNESS.

23            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

24            THE COURT:  WE'LL BE IN RECESS FOR 15 MINUTES.

25   LADIES AND GENTLEMEN, PLEASE, AGAIN, REMEMBER, DON'T DISCUSS

1    ANY OF THE TESTIMONY OR THE EVIDENCE INCLUDING THE EVIDENCE

2    THAT YOU'VE JUST HEARD AND SAW, AND DON'T DISCUSS ANYTHING

3    ELSE ABOUT THE CASE, OF COURSE, AND ANY OF THE OTHER

4    EVIDENCE.  DON'T FORM ANY OPINIONS ABOUT IT YET.  DON'T

5    DISCUSS ANYTHING CONNECTED WITH IT, ANY OF THE WITNESSES'

6    TESTIMONY.

7            THANK YOU VERY MUCH.  YOU ARE EXCUSED.

8            MR. AARON:  YOUR HONOR, WE HAD THE OTHER ISSUE TO

9    TALK ABOUT DURING THE RECESS.

10           THE COURT:  LET'S MAKE IT 20 MINUTES, LADIES AND

11   GENTLEMEN.  AND THEN WHEN YOU COME BACK I'LL TELL YOU ABOUT

12   THE SCHEDULE FOR NEXT WEEK ALSO.

13              (OUT OF THE PRESENCE OF THE JURY:)

14           THE COURT:  YOU CAN HAVE A SEAT, SIR.  I'M NOT SURE

15   YOU'RE GOING TO BE EXCUSED YET.

16           MR. AKROTIRIANAKIS:  I HAVE NO FURTHER QUESTIONS

17   ABOUT THAT ISSUE OR OTHERWISE FOR THIS WITNESS, SO HE MAY BE

18   EXCUSED FROM THE GOVERNMENT'S PERSPECTIVE.

19           THE COURT:  ALL RIGHT.  THAT TAKES CARE OF THAT

20   ISSUE.

21           THANK YOU.  YOU MAY STEP DOWN.

22           ON THE SCHEDULE FOR NEXT WEEK, DURING VOIR DIRE I

23   TOLD THE JURY -- WELL, IF WE'RE STILL GOING BY THURSDAY,

24   THAT'S THE DAY WE WILL GO FROM 8 TO 1:30.  JUDGE GUTIERREZ,

25   WHO IS ONE OF THE NEW DISTRICT JUDGES, HIS INDUCTION CEREMONY

```
 1   IS ON WEDNESDAY AT 4:00 IN LOS ANGELES, AND I WOULD LIKE TO

 2   GO TO THAT.  SO I WAS THINKING I MIGHT RUN THE TRIAL -- BUT

 3   IT DEPENDS ON WHERE WE ARE.  BUT I MIGHT DO A SHORTENED

 4   SCHEDULE THAT DAY.  BUT IF THE JURY IS DELIBERATING, I

 5   PROBABLY WON'T.  I WILL PROBABLY STAY HERE.  SO I WANTED TO

 6   ASK YOU SO I CAN ANSWER THE JURY'S QUESTION ABOUT THE

 7   SCHEDULE FOR NEXT WEEK WHERE YOU THINK YOU WILL BE.

 8            HOW MANY MORE WITNESSES DOES THE GOVERNMENT HAVE?

 9            MR. AKROTIRIANAKIS:  JUST A FEW ACTUALLY, YOUR

10   HONOR.  WE HAVE --

11            THE COURT:  WE CAN GO OFF THE RECORD AT THIS POINT.

12                     (RECESS)

13            (OUT OF THE PRESENCE OF THE JURY:)

14            THE COURT:  BACK ON THE RECORD.

15            MR. AARON:  THERE WAS ON 2J, EXHIBIT 2J, ON

16   FEBRUARY 1ST AT 11:10 A.M. THERE WAS -- PART OF THAT EXHIBIT

17   WAS SHOWN TO THE JURY AND THAT EXHIBIT CONTAINS THE

18   FOLLOWING:  IT'S A -- THE PAGE BEGINS WITH RICOCHET SPEAKING

19   WHERE HE'S MENTIONING DISK CLEANUP.

20            THE NEXT ENTRY IS AT 2/1/01 AT 11:10 A.M.  AND IT

21   SAYS:  YOU THINK HE WILL ACTUALLY BE IN JAIL FOR TWO YEARS?

22            THE NEXT ENTRY BY RICOCHET AT 11:11 SAYS:  OR JUST

23   PRORATE HIS SENTENCE.

24            THE COURT:  RIGHT.  THAT SHOULD HAVE BEEN TAKEN

25   OUT.  SO THAT WAS DISPLAYED?
```

1          MR. AARON:  THAT WAS DISPLAYED ON THE MONITOR.

2          MR. MICHAEL:  YOUR HONOR, I DON'T KNOW IF YOU

3     NOTICED --

4          THE COURT:  I SAW YOU PULL IT.

5          MR. MICHAEL:  I GRABBED IT OFF WHEN I NOTICED THAT

6     BECAUSE THE ORIGINAL WAS REDACTED, WE REDACTED YOUR HONOR'S

7     COPY AND THE GOVERNMENT'S COPY, AND I AND MR. AKROTIRIANAKIS

8     HAD A WORKING COPY THAT HE WAS PREPARING AND PERHAPS IT

9     DIDN'T GET REDACTED THE ONE HE WAS USING HERE.

10         MR. AKROTIRIANAKIS:  I DID HAVE THE EXHIBIT I WAS

11    USING WITH THE JURY CONFORMED TO THE COURT'S ORDERS.  AND IF

12    THAT WAS IN THERE, THAT WAS JUST AN OVERSIGHT IN CONFORMING

13    THAT ONE COPY, BUT MR. MICHAEL DID PULL IT OFF IMMEDIATELY

14    AND I FOLDED IT AND DID NOT GO BACK TO IT.

15         I WOULD ALSO ADD, YOUR HONOR, IF I COULD, THAT

16    MR. AARON HIMSELF IN CROSS-EXAMINING AGENT IMPERATRICE THIS

17    MORNING REFERRED TO THE FACT THAT SETH BEKENSTEIN WAS IN

18    JAIL.

19         THE COURT:  ALL RIGHT.  LEAVING THAT ASIDE,

20    MR. AARON, DO YOU WANT ME TO INSTRUCT THE JURY ABOUT THIS?

21         MR. AARON:  WELL, MY EXAMINATION OF AGENT

22    IMPERATRICE REFERRING TO SETH BEKENSTEIN IN JAIL HAS TO DO

23    WITH REALLY HIS PRE-CONVICTION CONFINEMENT.  IT DOESN'T HAVE

24    ANYTHING TO DO WITH PENALTY OR PUNISHMENT.  IT'S JUST THE

25    FACT THAT HE'S NOT AVAILABLE TO GO TO THE STORAGE LOCKER.

1    THIS IS A COMPLETELY DIFFERENT MATTER HERE.  AND IT IS NOT A

2    QUESTION OF GOOD FAITH OR BAD FAITH.  THE COURT HAD ORDERED

3    THIS INFORMATION NOT TO GO TO THE JURY AND IT DID.  I

4    THINK --

5            THE COURT:  IT WAS VERY FLEETING, THOUGH.

6            MR. AARON:  YES, AND I UNDERSTAND THAT.  AND I

7    THINK THAT IT MIGHT BE REASONABLE FOR THE COURT TO MAKE AN

8    INQUIRY TO SEE IF ANYONE EVEN SAW IT, BECAUSE IT'S POSSIBLE

9    THAT THEY MIGHT NOT HAVE.  I DOUBT THAT, THOUGH.

10           THE COURT:  WELL, I THINK RATHER THAN DO THAT I

11   THINK THAT -- BECAUSE THERE WERE REFERENCES -- THERE WERE

12   ALSO REFERENCES INCLUDING THE POINT AT WHICH THE WITNESS ON

13   THE STAND BROKE DOWN ABOUT SERVING TIME, SO IT MIGHT BE

14   APPROPRIATE, WITHOUT DRAWING ATTENTION TO THIS PARTICULAR

15   PASSAGE WHICH WAS ON THE DISPLAY VERY FLEETINGLY, JUST TO

16   ELABORATE A LITTLE ON THE FORM INSTRUCTION THAT WHILE THE

17   JURY HAS HEARD REFERENCE TO PUNISHMENT OF OTHER PERSONS,

18   PERHAPS WOULD BE A WAY TO PUT IT.

19           MR. MICHAEL:  THERE WAS ALSO REFERENCE, YOUR HONOR,

20   TO THE FACT THAT MR. MARTIN IS DOING THE MAXIMUM SENTENCE AS

21   WELL.

22           THE COURT:  RIGHT.

23           MR. AARON:  NOW, THE REFERENCES TO MR. MARTIN I DID

24   NOT HAVE A PROBLEM WITH COUNSEL BRINGING THAT UP BECAUSE THAT

25   IS A RELEVANT POINT AND I DON'T HAVE ANY ISSUE WITH BRINGING

1   THAT UP.

2            THE COURT:  WHAT I'M SUGGESTING, THOUGH, IS THAT I

3   THINK WHAT THE APPROPRIATE THING TO DO HERE IS FOR THE COURT

4   TO GIVE THE INSTRUCTION THAT THE JURY -- THEY'VE HEARD

5   REFERENCE -- THERE'S BEEN REFERENCE TO THE ISSUE OF

6   PUNISHMENT IN CONNECTION WITH OTHER PERSONS.

7            MR. AARON:  WHAT I'M CONCERNED ABOUT HERE, YOUR

8   HONOR, IT'S NOT SO MUCH THE ACTUAL REFERENCE TO A SENTENCE.

9   PROBABLY BEFORE MR. MARTIN IS DONE WE WILL HEAR MORE ABOUT

10  HIS SENTENCE AND THINGS LIKE THAT.  THAT'S NOT WHAT CONCERNS

11  ME SO MUCH AS A REAL POSSIBILITY OF THE JURORS HAVING SEEN

12  THIS AND FIGURING, OH, WELL, HE'S ONLY GOT TWO YEARS TO DO.

13  THESE CHARGES REALLY AREN'T THAT SERIOUS.  AND, IN FACT,

14  THESE CHARGES ARE EXTRAORDINARILY SERIOUS.

15           AND I DON'T WANT THEM TO THINK THAT -- AND I'M

16  WILLING TO WORK WITH THE COURT OR THE PROSECUTION TO COME UP

17  WITH AN APPROPRIATE INSTRUCTION, BUT I JUST THINK THAT THE

18  INSTRUCTION NOT TO CONSIDER PENALTY OR PUNISHMENT IS NOT

19  SUFFICIENT HERE.  I WOULD PREFER THAT THE COURT ACTUALLY

20  INQUIRE OF THE JURORS TO FIND OUT WHO SAW IT AND HOW IT MIGHT

21  INFLUENCE THEM, BECAUSE I'M AFRAID THEY'LL SAY IF HE'S ONLY

22  GOING TO GET A YEAR OR TWO FOR SOMETHING LIKE THIS, IT'S NOT

23  REALLY THAT SERIOUS.

24           THE COURT:  DO YOU WANT ME TO ASK THEM AS A GROUP

25  IF ANYBODY --

1      MR. AARON:  MAYBE WE SHOULD JUST DO WHAT WE DID

2  YESTERDAY.

3      THE COURT:  CALL THEM IN EACH ONE BY ONE AND SAY,

4  DID YOU SEE SOMETHING THAT WAS PUT ON THE SCREEN AND THEN

5  TAKEN OFF THAT SAID, "DO YOU THINK YOU WILL ACTUALLY BE IN

6  JAIL FOR TWO YEARS"?  DON'T YOU THINK THAT MAKES IT MUCH

7  WORSE?

8      MR. AARON:  WELL, YOUR HONOR, IT MIGHT MAKE IT

9  WORSE, BUT ON THE OTHER HAND, UNLESS WE DO THAT, WE DON'T

10 KNOW.  SO WE DON'T KNOW -- IF WE COULD JUST SAY, IF I MAKE A

11 SUGGESTION --

12     THE COURT:  LET'S SAY I DO THAT AND EVERY ONE OF

13 THEM SAYS "NO, I DIDN'T SEE THAT," BUT NOW THEY KNOW.

14     MR. AARON:  I THINK WHAT THE COURT COULD DO,

15 THOUGH, IS SAY, "DID YOU SEE ANYTHING PUT ON THE SCREEN

16 REFERRING TO PENALTY OR PUNISHMENT?"

17     THE COURT:  BUT THERE WERE THINGS ON THE SCREEN

18 ABOUT PENALTY OR PUNISHMENT THAT THEY WERE ENTITLED TO SEE,

19 BECAUSE THERE WERE REFERENCES THROUGHOUT THIS ABOUT PENALTY

20 OR PUNISHMENT, IF YOU PUT IT THAT BROADLY, INCLUDING THE

21 POINT AT WHICH THE WITNESS BROKE DOWN AND CRIED BECAUSE HE

22 SAID HE WAS SO AFRAID OF GOING TO JAIL.  THAT HAS TO DO WITH

23 PENALTY OR PUNISHMENT.  THAT'S THE WAY I UNDERSTAND IT.

24     MR. AARON:  ACTUALLY, I THINK HE BROKE DOWN AND

25 CRIED ON A DIFFERENT POINT.  BUT, IN ANY CASE, YOUR HONOR, WE

 1   COULD PERHAPS PHRASE IT A LITTLE BIT MORE INCISIVELY,

 2   SOMETHING TO THE EFFECT OF --

 3            THE COURT:  I'M SORRY FOR INTERRUPTING YOU, BUT I

 4   THINK IT WOULD BE BETTER TO INSTRUCT THE JURY THAT DURING THE

 5   EXAMINATION THERE WAS A PORTION OF THE TRANSCRIPT THAT WAS

 6   INADVERTENTLY PLACED ON THE SCREEN VERY BRIEFLY THAT HAD A

 7   REFERENCE -- AND THEN I DON'T KNOW HOW YOU WANT TO WORD

 8   THAT -- TO PUNISHMENT.

 9            MR. MICHAEL:  YOUR HONOR, PERHAPS A REFERENCE TO A

10   SPECIFIC PERIOD OF INCARCERATION, TO THE EXTENT THAT ANY OF

11   YOU SAW IT, AND THEN YOU CAN GIVE THE STANDARD INSTRUCTION

12   THAT THEY ARE NOT TO CONSIDER --

13            THE COURT:  THAT THAT WAS INADVERTENT.

14            MR. MICHAEL:  AND IT SHOULDN'T BE CONSIDERED IF ANY

15   OF YOU SAW IT.

16            MR. AKROTIRIANAKIS:  IF THE COURT WANTED TO DEFUSE

17   IT FURTHER, PERHAPS YOU COULD MENTION TO THEM, YOU ALSO HEARD

18   REFERENCES THAT MR. MARTIN IS PRESENTLY INCARCERATED AND

19   YOU'RE NOT TO -- ELABORATING ON THE STANDARD INSTRUCTION, YOU

20   ARE NOT TO CONSIDER ANY PUNISHMENT FOR ANY PURPOSE WHATSOEVER

21   OR SPECULATE AS TO WHAT POTENTIAL PUNISHMENTS MIGHT BE.

22            MR. AARON:  YOUR HONOR, THEY'RE NOT TO CONSIDER

23   PENALTY OR PUNISHMENT AS TO THE DEFENDANT.  THE REASON WE

24   KEPT THIS OUT IS THEY MAY THINK BECAUSE MR. BEKENSTEIN GOT

25   THIS DEAL OR THIS SENTENCE THAT MAYBE MR. SANDERS WILL AS

1   WELL.

2           THE COURT:  I UNDERSTAND THAT'S WHAT YOUR CONCERN

3   IS.  SO IF I GAVE THIS CURATIVE ADMONITION THAT SOMETHING WAS

4   PUT ON THE SCREEN, IF THEY SAW IT, AND -- SOMETHING WAS PUT

5   ON THE SCREEN AND IT MADE A REFERENCE TO PUNISHMENT OR A

6   SPECIFIC TERM OF INCARCERATION.  IF THEY SAW IT, THEY SHOULD

7   DISREGARD IT.

8           MR. AARON:  I WOULD ACTUALLY LIKE INQUIRY TO BE

9   MADE WITH THE JURORS, YOUR HONOR.  AND THERE'S AN ADDITIONAL

10  REASON WHY.  THIS MATERIAL IS SOME OF THE MOST SHOCKING TO

11  DATE IN THE TRIAL.  AND I'VE NOTICED THAT THE JURORS ARE

12  RIVETED ON THE MONITORS.  SO MY FEELING IS -- MY SUSPICION, I

13  DON'T KNOW, BUT MY SUSPICION IS THAT ALMOST ALL OF THEM HAVE

14  SEEN IT.  SO I'M MOVING TO THE SECOND STEP OR WHAT I WOULD

15  SEE AS THE SECOND STEP OF THE INQUIRY, TO FIND OUT WHAT

16  EFFECT IT WOULD HAVE ON THEM.

17          THE COURT:  WELL, MY CONCERN IS THAT WITHOUT

18  TELLING THEM WHAT IT IS WE'RE ASKING ABOUT, THERE WERE MANY

19  REFERENCES THAT COULD BE INTERPRETED AS A REFERENCE TO

20  INCARCERATION.

21          MR. AARON:  I THINK IF THE COURT WERE TO SAY, "DID

22  YOU SEE ANY REFERENCE PUT ON THE MONITOR FROM THE TRANSCRIPT

23  DEALING WITH A SPECIFIC PERIOD OF INCARCERATION," THERE WAS

24  NOTHING ABOUT MARTIN'S MAXIMUM TERM OF FIVE YEARS BEING PUT

25  ON THE TRANSCRIPT.  THE ONLY THING PUT ON THE TRANSCRIPT THAT

1   DEALT WITH A SPECIFIC TERM OF INCARCERATION WAS WITH

2   MR. BEKENSTEIN.

3           THE COURT:  PERHAPS WE SHOULD SAY BEKENSTEIN'S

4   SPECIFIC PERIOD OF INCARCERATION OR SENTENCE.

5           MR. AARON:  THAT'S EVEN MORE PRECISE.

6           THE COURT:  AND DO ANY OF YOU RECALL WHAT THAT WAS?

7           MR. AARON:  YES.

8           THE COURT:  WE HAVE NOW ABOUT FOUR MINUTES FOR A

9   RECESS.

10              (RECESS)

11          (OUT OF THE PRESENCE OF THE JURY:)

12          THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

13  PRESENCE OF THE JURY WHICH IS LINING UP IN THE HALLWAY.  YOU

14  HAVE ANOTHER MATTER TO PUT ON THE RECORD.

15          MR. AARON:  I DID, YOUR HONOR.  I GAVE THE COURT

16  SOME NOTICE ABOUT THIS BEFORE WHERE I SAID I WOULD HAVE AN

17  OBJECTION AS TO THE PHOTOS.  AND I JUST WANTED TO SAY WHAT

18  THAT OBJECTION WOULD BE, AND IT WOULD BE CONTINUING SO I

19  DON'T NEED TO REMAKE IT EVERY SINGLE TIME, BECAUSE I BELIEVE

20  COUNSEL WILL BE SHOWING A LOT OF PHOTOS THIS AFTERNOON,

21  ALTHOUGH THOSE WILL NOT BE THE CHILD PORN PHOTOS.

22          THE COURT:  I'M SORRY, WHAT'S YOUR OBJECTION?

23          MR. AARON:  HE'S GOING TO BE SHOWING A LOT OF

24  FAMILY PHOTOS, THINGS LIKE THAT.

25          THE COURT:  HOW MANY OF THOSE PHOTOS ARE YOU GOING

1    TO SHOW?

2            MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT IS GOING

3    TO GO THROUGH THE PHOTOS THAT WE IDENTIFIED FOR YOU IN THE

4    LAST TRIAL.

5            THE COURT:  THERE'S ABOUT TEN OF THEM, CORRECT?

6            MR. MICHAEL:  NO, THERE'S MORE THAN THAT.  YES, THE

7    NUMBER OF IMAGES OF KALEN THERE WERE ABOUT -- EXHIBIT 68 TO

8    74 ARE IMAGES OF KALEN ALONE, YOUR HONOR.

9            THE COURT:  THAT'S ABOUT SIX OR SEVEN.

10           MR. MICHAEL:  I THINK THERE WAS THREE OR

11   FOUR PICTURES OF KALEN WITH HIS FATHER.  AND THESE WERE TAKEN

12   DURING THE RELEVANT TIME PERIOD.  THERE'S A PICTURE OF KALEN,

13   DUSTIN, AND HIS FATHER, WHICH IS KALEN'S BROTHER.  THERE WERE

14   THREE PICTURES OF DUSTIN.  THEN GOVERNMENT ALSO HAS ABOUT

15   EIGHT OR NINE PICTURES OF MR. BEKENSTEIN.  AND THEN THERE

16   WERE THREE PHOTOS OF SOME OTHER BOYS THAT WERE TAKEN IN TAOS,

17   NEW MEXICO, THE TWO BOYS STANDING IN FRONT OF THE PIANO, AND

18   THEN A PICTURE OF ONE OF THOSE BOYS THAT WAS CROPPED OUT.

19   AND THEN THE GOVERNMENT HAS ABOUT FIFTEEN OR SO PICTURES OF

20   THE OTHER BOY CALEB THAT WERE TAKEN.  AND THOSE WOULD BE

21   PICTURES SOME OF WHICH ARE REFERRED TO IN THE CHATS

22   SPECIFICALLY BY THE DEFENDANT.  I'M NOT GOING TO USE THAT

23   NAME, BUT THAT'S A SHORTHAND SO YOUR HONOR KNOWS WHO'S IN THE

24   PHOTOS, THE OTHER BLOND BOY.  AND THEN THERE'S ONE PICTURE OF

25   THE DEFENDANT, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  THE OBJECTIONS ARE

2   OVERRULED.  THAT'S NOT UNDULY CUMULATIVE OR PREJUDICIAL.  I

3   THINK THAT'S WHAT THE BASIS OF THE OBJECTIONS WERE.

4          MR. AARON:  IT IS.  AND IF I COULD JUST STATE

5   SOMETHING, YOUR HONOR.  WE WOULD SAY THAT THEY ARE

6   IRRELEVANT.  THEY ARE CUMULATIVE AND REPETITIVE.  WE ALSO

7   MADE THE 403 OBJECTION THAT THEY WOULD RESULT IN UNFAIR

8   PREJUDICE AND THEY WOULD BE CONFUSING.  AND THAT'S TO ALL OF

9   THE IMAGES THAT COUNSEL IS GOING TO BE INTRODUCING THROUGH

10  THIS WITNESS.

11         THE COURT:  THANK YOU.

12         MR. AARON:  COULD I ASK THAT THAT OBJECTION BE MADE

13  CONTINUING?

14         THE COURT:  YES.

15         MR. MICHAEL:  YOUR HONOR, WE HAVE HANDED UP TO YOUR

16  COURTROOM DEPUTY, IN CASE WE GET TO IT, THE BINDER OF THE

17  ILLICIT IMAGES ON TOP OF YOUR COUNTER.

18         THE COURT:  THE WITNESS IS IN THE COURTROOM, THE

19  NEXT WITNESS?

20         MR. MICHAEL:  I'LL GO GRAB HIM RIGHT NOW.

21         THE COURT:  AGENT MORAN.

22             (IN THE PRESENCE OF THE JURY:)

23         THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

24  ALL MEMBERS OF THE JURY, COUNSEL FOR BOTH PARTIES, AND THE

25  DEFENDANT ALSO PRESENT.

1          YOU MAY ALL BE SEATED FOR A MOMENT BEFORE WE CALL

2     THE WITNESS UP TO THE STAND.

3          FIRST OF ALL, AS TO THE SCHEDULE FOR NEXT WEEK, I'M

4     HAPPY TO TELL YOU THAT I BELIEVE THAT WE ARE RIGHT ON

5     SCHEDULE FROM WHAT I TOLD YOU AT THE BEGINNING OF THE TRIAL.

6     I THINK THAT THE ONLY DIFFERENCE IN THE SCHEDULE NEXT WEEK

7     WOULD BE THAT ON THURSDAY WE WOULD BE IN -- RATHER THAN YOUR

8     SCHEDULE OF 9 TO 4 OR 4:30, WE WILL HAVE THAT COMPRESSED

9     SCHEDULE I MENTIONED WHERE WE'LL BE IN SESSION WITH YOU FROM

10    8:00 IN THE MORNING UNTIL 1:30 IN THE AFTERNOON THAT THURSDAY

11    OF NEXT WEEK.

12          THERE'S A SLIGHT POSSIBILITY, BUT IT IS PRETTY

13    REMOTE, THAT WE MIGHT DO THAT OR SOMETHING LIKE THAT ON

14    WEDNESDAY, BUT AT THIS POINT I DON'T THINK SO.  IF THAT

15    HAPPENS, I'LL TELL YOU TUESDAY, BUT I DON'T THINK THAT'S

16    GOING TO BE THE CASE.  SO FOR YOUR PLANNING PURPOSES RIGHT

17    NOW, WHEN YOU COME BACK ON TUESDAY -- YOU WON'T BE HERE ON

18    MONDAY BECAUSE I HEAR OTHER MATTERS ON MONDAY, SO YOU WON'T

19    NEED TO BE HERE ON MONDAY.  AND WHEN YOU RETURN ON TUESDAY,

20    IT IS THE SAME SCHEDULE, THE 9 TO 4:30.  AND PROBABLY

21    WEDNESDAY WILL BE THAT, TOO.  AND THURSDAY WILL BE THE 8 TO

22    1:30 SCHEDULE.  AND THEN IF WE NEED YOU STILL ON FRIDAY,

23    WHICH WE PROBABLY STILL WILL, IT WOULD BE -- YOU WOULD

24    PROBABLY BE DELIBERATING BY THEN, SO THAT WOULD BE THE

25    REGULAR 9 TO 4:30, ALL RIGHT?

1          ONE MORE THING, LADIES AND GENTLEMEN, BEFORE THE

2     RECESS, DURING THE EXAMINATION OF THE LAST WITNESS A PAGE OF

3     TRANSCRIPT WAS INADVERTENTLY DISPLAYED TO YOU FOR A BRIEF

4     MOMENT THAT WAS NOT INTENDED FOR YOUR VIEW.  DID ANY OF YOU

5     SEE ANY REFERENCE TO A SPECIFIC TERM OF INCARCERATION OR

6     IMPRISONMENT IN REFERENCE TO MR. SETH BEKENSTEIN?

7          DID ANYONE SEE THAT?

8          A JUROR:  I DID.

9          THE COURT:  ANYONE REMEMBER SEEING THAT?

10         A JUROR:  NO.

11         MR. MICHAEL:  YOUR HONOR, I BELIEVE ONE JUROR SAID

12    SHE DID.

13         THE COURT:  IF YOU DID, PLEASE RAISE YOUR HAND.

14    OH, MS. DILLARD.  MS. DILLARD, I'M GOING TO ASK YOU TO STEP

15    DOWN AND COME OVER HERE TO THE SIDEBAR.

16         A JUROR:  I DID ALSO.

17         THE COURT:  YOU DID?  I'LL TALK TO YOU NEXT IN A

18    MOMENT.

19         JUROR NO. 1, IF YOU COULD COME OVER HERE WHERE

20    YOU'VE SEEN US GATHER.  AND I WILL ASK COUNSEL TO APPROACH.

21      (ON-THE-RECORD DISCUSSION AT SIDEBAR WITH JUROR DILLARD:)

22         THE COURT:  THIS IS THE SPECIAL PLACE, THE SIDEBAR.

23    IT'S NOT REALLY THAT MAGICAL.

24         ALL RIGHT.  MS. DILLARD, THIS MICROPHONE, IF YOU

25    WOULD SPEAK IN CLOSE.  KEEP YOUR VOICE CLOSE TO THE

 1    MICROPHONE THAT WAY THE COURT REPORTER CAN HEAR WHAT YOU

 2    SAY.

 3              CAN YOU TELL US WHAT YOU REMEMBER SEEING?

 4              JUROR DILLARD:  THAT HE WAS SENTENCED TO A TWO-YEAR

 5    SENTENCE.  BY THEN THEY TOOK THE PAPER OFF, BUT I STARTED TO

 6    READ THE PARTS THAT WERE HIGHLIGHTED.

 7              THE COURT:  I'M GOING TO ASK YOU -- WELL, FIRST OF

 8    ALL, DID YOU HAVE ANY PARTICULAR REACTION WHEN YOU SAW THAT?

 9              JUROR DILLARD:  NO.  THEY WERE ALREADY DISCUSSING

10    SOMETHING THAT HAD HAPPENED TO THE MAN THAT THEY WERE TALKING

11    ABOUT ALREADY.

12              THE COURT:  HAVE YOU HAD A CHANCE -- HAVE YOU

13    THOUGHT ABOUT IT SINCE THEN?

14              JUROR DILLARD:  NOT UNTIL NOW.

15              THE COURT:  I'M GOING TO, FIRST OF ALL, INSTRUCT

16    YOU TO DISREGARD THAT BECAUSE IT WASN'T INTENDED FOR YOUR

17    VIEW.  IT'S NOT RELEVANT TO ANYTHING.  WOULD YOU BE ABLE TO

18    DO THAT?

19              JUROR DILLARD:  YES.

20              THE COURT:  IT DOESN'T HAVE ANYTHING TO DO WITH

21    THIS CASE.

22              JUROR DILLARD:  RIGHT.

23              THE COURT:  ONE OF THE OTHER INSTRUCTIONS THAT ALL

24    THE JURORS WILL GET IS THAT THE JURY IS NOT TO CONSIDER IN

25    ANY WAY WHAT THE SENTENCE MIGHT BE OR PUNISHMENT MIGHT BE

1    INDICATED IN THIS CASE IF THEY DECIDE OR WHEN THEY ARE

2    DECIDING THE ISSUES OF GUILT OR INNOCENCE.

3              DO YOU UNDERSTAND THAT?

4              JUROR DILLARD:  NO.

5              THE COURT:  WELL, LET ME TRY REWORDING IT.  I

6    DIDN'T SAY IT VERY WELL.  ONE OF THE THINGS I WILL BE

7    INSTRUCTING ALL THE JURORS ON, AND THE JURORS ARE ALWAYS

8    INSTRUCTED ON IN ANY CRIMINAL CASE, IS THAT WHEN YOU ARE

9    DECIDING ON YOUR VERDICT IN THIS CASE ABOUT THE GUILT OR

10   INNOCENCE OF THE DEFENDANT, WHETHER OR NOT THE DEFENDANT IS

11   GUILTY OR NOT GUILTY, IS THAT YOU MUST NOT CONSIDER

12   PUNISHMENT IN ANY FASHION.

13             DO YOU UNDERSTAND THAT?

14             JUROR DILLARD:  YES.

15             THE COURT:  OKAY.  SO IF I TELL YOU THAT, I'VE

16   ALREADY TOLD YOU THAT YOU'RE INSTRUCTED TO DISREGARD ANYTHING

17   YOU SAW ABOUT THE PUNISHMENT OF SOMEONE ELSE BECAUSE IT'S NOT

18   RELEVANT IN ANY WAY --

19             JUROR DILLARD:  RIGHT.

20             THE COURT:  -- YOU WOULD BE ABLE TO DO THAT?

21             JUROR DILLARD:  YES.

22             THE COURT:  WOULD YOU ALSO BE ABLE TO GIVE ME YOUR

23   ASSURANCE THAT YOU WOULD FOLLOW THE INSTRUCTION OF THE COURT

24   ABOUT NOT CONSIDERING THE SUBJECT OF SENTENCING OR PUNISHMENT

25   WHEN YOU'RE DECIDING ON YOUR VERDICT IN THIS CASE?

1           JUROR DILLARD:  YES, I WILL.

2           THE COURT:  YOU WILL NOT DISCUSS WHAT WE WERE

3   DISCUSSING HERE WITH ANY OF THE OTHER JURORS DURING

4   DELIBERATIONS?

5           JUROR DILLARD:  YES.

6           THE COURT:  COUNSEL WISH TO INQUIRE?  MR. AARON?

7           MR. AARON:  BEFORE WE HAD THIS CONVERSATION, DID

8   YOU HAVE OCCASION TO TALK ABOUT IT WITH ANYONE ON THE JURY?

9           JUROR DILLARD:  NO.

10          THE COURT:  DID ANYONE ELSE ON THE JURY MENTION IT?

11          JUROR DILLARD:  NO.

12          MR. AARON:  THANK YOU.

13          MR. MICHAEL:  NOTHING, YOUR HONOR.

14          THE COURT:  THANK YOU VERY MUCH.  YOU MAY GO BACK

15  TO YOUR SEAT.

16          MS. BONDI.

17    (ON-THE-RECORD DISCUSSION AT SIDEBAR WITH JUROR BONDI:)

18          THE COURT:  MS. BONDI, THIS IS A MICROPHONE SO I'M

19  GOING TO ASK YOU TO STAND NEXT TO IT BECAUSE THAT WAY THE

20  COURT REPORTER CAN HEAR YOUR RESPONSES.

21          JUROR BONDI:  OKAY.

22          THE COURT:  WHAT DO YOU RECALL SEEING ABOUT ANY

23  TERM OF IMPRISONMENT FOR MR. BEKENSTEIN?

24          JUROR BONDI:  I THINK IT SAID TWO TO THREE YEARS

25  MINIMUM SECURITY AND SOMETHING ABOUT PROBATION.

1          THE COURT:  DID YOU HAVE ANY REACTION WHEN YOU SAW

2     THAT OR SINCE YOU SAW IT?

3          JUROR BONDI:  NO.

4          THE COURT:  DID YOU THINK ANYTHING ABOUT WHAT KIND

5     OF A SENTENCE IT WAS OR ANYTHING LIKE THAT?

6          JUROR BONDI:  NO.

7          THE COURT:  DID YOU DISCUSS IT WITH ANYONE?

8          JUROR BONDI:  NO.

9          THE COURT:  DID YOU HEAR ANYONE ELSE -- ANY OTHER

10    JURORS DISCUSS IT?

11         JUROR BONDI:  NO.

12         THE COURT:  I'M GOING TO INSTRUCT YOU TO DISREGARD

13    WHAT YOU SAW --

14         JUROR BONDI:  OKAY.

15         THE COURT:  -- AND NOT CONSIDER IT IN ANY FASHION

16    AT ALL.  I'M ALSO GOING TO BE INSTRUCTING ALL OF -- WOULD YOU

17    BE ABLE TO FOLLOW THAT INSTRUCTION?

18         JUROR BONDI:  YES.

19         THE COURT:  I'M ALSO GOING TO BE INSTRUCTING ALL OF

20    THE JURORS IN THIS CASE, AS IN EVERY CRIMINAL CASE, THAT THEY

21    ARE NOT TO CONSIDER THE ISSUE OF PUNISHMENT IN DECIDING ON

22    THEIR VERDICT; THAT IS, DECIDING WHETHER THE DEFENDANT IS

23    GUILTY OR NOT GUILTY.

24         DO YOU UNDERSTAND THAT?

25         JUROR BONDI:  YES.

1          THE COURT:  WOULD YOU BE ABLE TO FOLLOW THAT

2    INSTRUCTION?

3          JUROR BONDI:  YES.

4          THE COURT:  SO IN YOUR DELIBERATIONS IN THIS CASE

5    WOULD YOU GIVE ME YOUR ASSURANCE THAT YOU WILL NOT DISCUSS

6    WITH THE OTHER JURORS WHAT YOU SAW?

7          JUROR BONDI:  YES.

8          THE COURT:  AND YOU WOULD NOT DISCUSS THE ISSUE IN

9    ANY FASHION OF PUNISHMENT OR WHAT SORT OF A SENTENCE THE

10   DEFENDANT MIGHT RECEIVE?

11         JUROR BONDI:  YES.

12         THE COURT:  YOU UNDERSTAND THAT WHAT YOU SAW

13   RELATED TO ANOTHER PERSON, OTHER CHARGES, HAS NOTHING AT ALL

14   TO DO WITH THIS CASE?

15         JUROR BONDI:  YES.

16         THE COURT:  DO YOU HAVE ANY -- AND YOU -- WELL, DO

17   YOU HAVE ANY QUESTIONS YOURSELF?

18         JUROR BONDI:  NO.

19         THE COURT:  COUNSEL WISH TO INQUIRE?

20         MR. AARON:  NO.

21         MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

22         THE COURT:  THANK YOU VERY MUCH.  YOU MAY BE

23   SEATED.

24         COUNSEL WISH TO INQUIRE OF ANY OTHER JURORS OR THE

25   PANEL AS A WHOLE?

1            MR. AARON:  NO, I THINK THE COURT KIND OF ALREADY

2    DID THAT.  THE ONLY THING -- WE DON'T NEED TO ADDRESS THIS

3    NOW.

4            THE COURT:  I THINK I MADE IT CLEAR THAT THEY

5    WEREN'T TO CONSIDER PUNISHMENT AS TO GUILT OR INNOCENCE.

6            MR. AARON:  OR LACK OF GUILT.

7            THE COURT:  THANK YOU.

8        (ON-THE-RECORD DISCUSSION AT SIDEBAR CONCLUDED.)

9            THE COURT:  THE WITNESS MAY COME FORWARD.

10           MR. MICHAEL:  THE GOVERNMENT CALLS MR. JAMES

11   MORAN.

12           THE CLERK:  MR. MORAN, PLEASE STOP AND RAISE YOUR

13   RIGHT HAND.

14           PLAINTIFF'S WITNESS, JAMES MORAN, WAS SWORN

15           THE CLERK:  PLEASE TAKE THE STAND.

16           STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

17   THE RECORD.

18           THE WITNESS:  JAMES MORAN, M-O-R-A-N.

19           THE COURT:  THANK YOU.

20           YOU MAY INQUIRE.

21           MR. MICHAEL:  THANK YOU, YOUR HONOR.

22                     DIRECT EXAMINATION

23   BY MR. MICHAEL:

24   Q.   SIR, WHERE DO YOU WORK?

25   A.   I WORK FOR THE DEPARTMENT OF HOMELAND SECURITY AT THE

1    IMMIGRATION AND CUSTOMS ENFORCEMENT AGENCY.

2    Q.   WHAT IS YOUR TITLE?

3    A.   I'M A GROUP SUPERVISOR, AND THAT'S ALSO KNOWN AS A

4    SUPERVISORY SENIOR SPECIAL AGENT.

5    Q.   HOW LONG HAVE YOU BEEN A SPECIAL AGENT?

6    A.   APPROXIMATELY 17 YEARS.

7    Q.   AND IS IMMIGRATION AND CUSTOMS ENFORCEMENT ALSO KNOWN AS

8    ICE?

9    A.   YES.

10   Q.   AND IS THIS A PREDECESSOR AGENCY OF THAT, THE UNITED

11   STATES CUSTOMS SERVICE?

12   A.   YES, IT IS.

13   Q.   DID YOU START AS A SPECIAL AGENT FIRST WITH THE CUSTOMS

14   SERVICE?

15   A.   STARTED AS CRIMINAL INVESTIGATOR FOR THE CUSTOMS

16   SERVICE, BUT, YES, AS SPECIAL AGENT WITH THE CUSTOMS SERVICE.

17   Q.   SO WHEN YOU FIRST BECAME A SPECIAL AGENT WAS IT WITH THE

18   CUSTOMS SERVICE?

19   A.   YES.

20   Q.   AND BEFORE YOU BECAME A SPECIAL AGENT WHAT DID YOU DO?

21   A.   I WAS A CRIMINAL INVESTIGATOR WITH THE CUSTOMS SERVICE.

22   Q.   WAS THAT A LAW ENFORCEMENT POSITION?

23   A.   YES.

24   Q.   HOW LONG DID YOU HOLD THAT POSITION?

25   A.   APPROXIMATELY THREE YEARS.

1    Q.    SO HAVE YOU BEEN IN LAW ENFORCEMENT FOR APPROXIMATELY

2    20 YEARS?

3    A.    THAT'S CORRECT.

4    Q.    AS A GROUP SUPERVISOR ARE YOU CURRENTLY ASSIGNED TO A

5    PARTICULAR GROUP OR DO YOU OVERSEE A PARTICULAR GROUP?

6    A.    YES.

7    Q.    WHICH GROUP IS THAT?

8    A.    THE COMPUTER FORENSICS GROUP.

9    Q.    WHERE?

10   A.    IN LONG BEACH.

11   Q.    CALIFORNIA?

12   A.    CALIFORNIA, YES.

13   Q.    HOW LONG HAVE YOU HELD THAT TITLE FOR?

14   A.    SINCE MARCH OF 2002.

15   Q.    AND WHAT IS YOUR ROLE IN GENERAL AS A GROUP SUPERVISOR?

16   A.    I OVERSEE OTHER COMPUTER FORENSICS AGENTS AND OTHER

17   MANAGEMENT DUTIES.

18   Q.    ARE THE AGENTS IN YOUR UNIT COMPUTER FORENSICS

19   EXAMINERS?

20   A.    YES, WITH THE EXCEPTION OF ONE WHO IS A SEIZED PROPERTY

21   CUSTODIAN.

22   Q.    ARE YOU A COMPUTER AND DIGITAL MEDIA FORENSIC EXAMINER?

23   A.    YES.

24   Q.    BEFORE YOU BECAME A GROUP SUPERVISOR DID YOU CONDUCT

25   FORENSIC EXAMS?

1    A.    YES.

2    Q.    DO YOU STILL CONDUCT FORENSIC EXAMS?

3    A.    YES.

4    Q.    DO YOU STILL PARTICIPATE IN INVESTIGATIONS ALTHOUGH YOU

5    ARE IN A SUPERVISORY CAPACITY?

6    A.    YES.

7    Q.    WHEN DID YOU FIRST START DOING FORENSIC EXAMS?

8    A.    I WAS TRAINED IN 1998, AND IN ABOUT THE YEAR 2000 I

9    BEGAN DOING FORENSIC EXAMS.

10   Q.    BEFORE FORENSIC -- AT A CERTAIN POINT IN TIME DID YOU

11   EVER BEGIN TO DO FORENSIC WORK FULL TIME?

12   A.    YES.

13   Q.    WHEN WAS THAT?

14   A.    APPROXIMATELY 2001.

15   Q.    BEFORE FORENSIC -- FORENSICS, WHAT TYPES OF CASES DID

16   YOU WORK ON AS AN AGENT?

17   A.    VARIOUS TYPES OF SMUGGLING, NARCOTICS SMUGGLING, CHILD

18   PORNOGRAPHY CASES, STRATEGIC INVESTIGATIONS, VARIOUS TYPES OF

19   INVESTIGATIONS.

20   Q.    AND WITH REGARD TO FORENSICS, HAVE YOU RECEIVED

21   SPECIALIZED TRAINING?

22   A.    YES.

23   Q.    HAVE YOU TAKEN CLASSES, SEMINARS, AND COURSES ON

24   COMPUTERS, FORENSICS AND RELATED TOPICS?

25   A.    YES.

1    Q.    HAVE YOU RECEIVED ON-THE-JOB-TRAINING?

2    A.    YES.

3    Q.    HAVE YOU REVIEWED ARTICLES AND PUBLICATIONS ON THOSE

4    SUBJECTS?

5    A.    YES.

6    Q.    HAVE YOU TRAINED OTHER AGENTS IN THAT AREA -- IN THOSE

7    AREAS?

8    A.    YES.

9    Q.    AND YOU MAKE EFFORTS TO KEEP CURRENT WITH THE STATE OF

10   COMPUTERS, FORENSICS, AND RELATED AREAS?

11   A.    YES.

12   Q.    NOW, IN GENERAL TERMS, WHAT DOES A FORENSIC EXAMINER --

13   WHAT ROLE DOES A FORENSIC EXAMINER PLAY IN AN INVESTIGATION?

14   A.    A FORENSICS EXAMINER WILL GATHER TYPES OF MEDIA, WHETHER

15   IT'S COMPUTERS OR EXTERNAL HARD DRIVES, CD'S, THUMB DRIVES,

16   WHATEVER DIGITAL MEDIA IS PRESENTED TO US.  WE'LL EXAMINE IT,

17   WE'LL EXTRACT DATA THAT WILL BE OF EVIDENTIARY VALUE, AND

18   WE'LL GIVE THAT TO THE CASE AGENT AS PART OF THE

19   INVESTIGATION.

20   Q.    WHEN YOU EXTRICATE THAT DATA, DO YOU DO IT IN A WAY TO

21   PROTECT THE INTEGRITY OF THE ORIGINAL EVIDENCE?

22   A.    YES.

23   Q.    AS WELL AS THE DATA THAT IS EXTRACTED?

24   A.    YES.

25   Q.    DO YOU USE ESTABLISHED RELIABLE METHODS?

1   A.   YES.

2   Q.   ONCE YOU'VE EXTRICATED THAT DATA DO YOU GIVE IT TO

3   ANYONE?

4   A.   YES.  WE TURN OVER OUR REPORTS TO THE CASE AGENT AND

5   EXTRACTED DATA.

6   Q.   AND WOULD THAT BE IN CONNECTION WITH THAT AGENT'S

7   ONGOING INVESTIGATIONS?

8   A.   YES.

9   Q.   AND I THINK YOU MAY HAVE MENTIONED SEVERAL TYPES OF

10  DIGITAL MEDIA.  WOULD THAT INCLUDE LAPTOPS, DISKETTES, AND

11  EXTERNAL HARD DRIVES?

12  A.   YES.

13  Q.   WERE YOU CONDUCTING FORENSIC EXAMS IN 2001?

14  A.   YES.

15  Q.   NOW, IN 2001 CAN YOU OUTLINE WHAT THE BASIC STEPS --

16  OUTLINE THE BASIC STEPS THAT A COMPUTER FORENSICS EXAMINER

17  WOULD TAKE WHEN CONDUCTING A FORENSICS EXAM OF A COMPUTER

18  HARD DRIVE?

19  A.   YOU WOULD ENGAGE A WRITE BLOCKING DEVICE BECAUSE YOU

20  DON'T WANT TO ALTER THE ORIGINAL EVIDENCE.  YOU WOULD THEN

21  ATTACH THAT MEDIA TO YOUR FORENSICS EXAMINING COMPUTER, YOUR

22  WORK STATION, EITHER THROUGH A CABLE OR OTHER MEANS, AND MAKE

23  A COPY OF THAT DATA.

24  Q.   AND WHEN YOU USE THAT WRITE BLOCKER WOULD THAT BE ON A

25  CONTROL BOOT DISKETTE?

1   A.   YES.

2   Q.   AND WOULD YOU USE A FORENSIC LAB COMPUTER?

3   A.   YES.

4   Q.   AND IN ADDITION TO USING A WRITE BLOCKER, AS I

5   UNDERSTOOD YOUR TESTIMONY, TO PROTECT, WHAT DOES A WRITE

6   BLOCKER DO?

7   A.   IT DOES NOT ALLOW WRITES TO THE SUSPECT MEDIA.

8   Q.   AND WHEN YOU SAY "WRITES," WOULD IT BE FAIR TO SAY THAT

9   MEANS CHANGES OR ALTERATIONS?

10   A.   THAT'S CORRECT.

11   Q.   AND AFTER YOU'VE EMPLOYED THE WRITE BLOCKER, WHAT DO YOU

12   DO?

13   A.   WE LAUNCH OUR FORENSIC SOFTWARE IN ORDER TO MAKE A

14   FORENSIC COPY OF THE MEDIA.

15   Q.   AND IN 2001 WHAT WAS THE FORENSIC SOFTWARE PROGRAM THAT

16   YOU WERE USING?

17   A.   IT WAS ENCASE.

18   Q.   AND WHAT IS ENCASE?

19   A.   ENCASE IS A FORENSICS SUITE THAT'S MADE SPECIFICALLY FOR

20   FORENSIC EXAMINATIONS.  IT ALLOWS YOU TO MAKE A COPY OF THE

21   MEDIA, TO ANALYZE THE MEDIA, AND EVEN REPLICATE THE MEDIA TO

22   YET ANOTHER PIECE OF MEDIA.

23   Q.   AND DOES ENCASE HAVE A FUNCTION WHEREBY IT PROTECTS

24   ALTERATIONS TO THE COPIES ITSELF?

25   A.   YES.

```
 1    Q.    AND IN 2001 HAD YOU USED ENCASE MANY TIMES BEFORE?

 2    A.    YES.

 3    Q.    HAD YOU FOUND IT -- WAS IT A RELIABLE PROGRAM?

 4    A.    YES.

 5    Q.    DID IT WORK WELL?

 6    A.    YES.

 7    Q.    WAS IT YOUR UNDERSTANDING AND PERHAPS STILL TODAY THAT

 8    ENCASE IS AND WAS COMMONLY USED IN COMPUTER FORENSIC EXAMS?

 9    A.    YES.

10    Q.    HOW WIDELY USED IS IT, TO YOUR UNDERSTANDING?

11    A.    IT IS USED WORLDWIDE.

12    Q.    NOW, ONCE ENCASE IS USED TO MAKE A FORENSIC COPY OF,

13    LET'S SAY IN THIS CASE, A HARD DRIVE, HOW DOES -- WHAT'S

14    AVAILABLE TO YOU TO VERIFY THAT THE COPY IS AN ACCURATE

15    FORENSIC COPY OF THE ORIGINAL?

16    A.    WE USE A BUILT-IN MECHANISM WHERE A VALUE IS GENERATED

17    FOR EACH BIT ON THE HARD DRIVE AND IT'S CALLED AN MD5 HASH

18    VALUE.

19    Q.    AND WHAT IS THAT -- HOW DO YOU USE THAT HASH VALUE?

20    A.    DURING THE ACQUISITION PHASE THE MEDIA WILL GENERATE A

21    CERTAIN LENGTHY VALUE.  AND LATER, WHEN YOU LOOK AT YOUR COPY

22    THAT YOU'RE DOING YOUR ANALYSIS ON, THAT SAME NUMBER SHOULD

23    APPEAR.  AND THAT WAY YOU WILL KNOW IF IT'S BEEN VERIFIED AS

24    A TRUE FORENSIC COPY OF THE ORIGINAL.

25    Q.    ARE YOU ABLE TO COMPARE THE HASH VALUE OF THE ORIGINAL
```

1    MEDIA TO THE DUPLICATE MEDIA?

2    A.    YES.

3    Q.    AND IF THOSE HASH VALUES ARE THE SAME, WHAT DOES THAT

4    INDICATE TO YOU?

5    A.    THAT IT IS AN ACCURATE AND TRUE FORENSIC COPY.

6    Q.    AND IF IT'S NOT AN ACCURATE AND TRUE COPY WOULD THE HASH

7    VALUES BE DIFFERENT?

8    A.    YES.

9    Q.    AND IF THAT HAPPENS, CAN YOU DISCARD THE COPY AND

10   ATTEMPT TO CREATE A NEW ONE?

11   A.    YES.

12   Q.    AND IF YOU CREATE A NEW ONE AND THE HASH VALUE MATCHES,

13   ARE YOU ABLE TO PROCEED WITH AN EXAMINATION?

14   A.    YES.

15   Q.    ARE YOU ABLE TO COMPARE THE HASH VALUES REPEATEDLY

16   DURING THE COURSE OF AN EXAMINATION?

17   A.    YES.

18   Q.    AND I THINK BEFORE YOU USED "ACQUISITION PHASE."  DOES

19   ACQUISITION MEAN THE COPY?

20   A.    YES.  THAT WOULD BE TO ACQUIRE IT AND TO ACTUALLY MAKE

21   THE COPY.

22   Q.    SO ONCE YOU'VE MADE A COPY WITH ENCASE AND YOU HAVE

23   VERIFIED IT'S A DUPLICATE BY USING THESE HASH VALUES, WHAT DO

24   YOU DO WITH THE ORIGINAL MEDIA, THE ORIGINAL HARD DRIVE LET'S

25   SAY IN THIS CASE?

1    A.    THAT WOULD BE RETURNED TO EVIDENCE.

2    Q.    AND ONCE YOU MAKE THE COPY WITH ENCASE, WHAT DO YOU DO

3    WITH THE COPY?

4    A.    WE WOULD --

5    Q.    WELL, LET ME ASK YOU.   WHERE DO YOU STORE THAT COPY?

6    A.    IT WOULD BE ON A HARD DRIVE THAT'S BEEN PREPARED TO

7    RECEIVE THAT DATA.

8    Q.    ARE YOU THEN ABLE TO CONDUCT A REVIEW OF THE COPY?

9    A.    YES.

10   Q.    WOULD YOU USE ENCASE FOR THAT REVIEW?

11   A.    YES.

12   Q.    AND I THINK YOU MENTIONED IT BRIEFLY, BUT WHAT ARE THE

13   CAPABILITIES THAT ENCASE HAS?   WHAT DOES IT ALLOW YOU TO DO

14   DURING A FORENSIC REVIEW?

15   A.    WHILE YOU'RE REVIEWING IT, ENCASE ALLOWS YOU TO SORT

16   FILES IN VARIOUS MANNERS.   IT ALLOWS YOU TO EXAMINE SOME

17   FILES.   IT ALLOWS YOU TO DO KEYWORD SEARCHES WHERE YOU CAN

18   SEARCH FOR CERTAIN TERMS OR NUMBERS OR EVEN EXAMINE IMAGES AS

19   THEY APPEAR ON THE COMPUTER.

20   Q.    ARE YOU ABLE TO SEE THE CONTENTS AND BROWSE AND SEE THE

21   CONTENTS OF FOLDERS?

22   A.    YES.

23   Q.    ARE YOU ABLE TO CREATE A FILE TREE?

24   A.    YES.

25   Q.    AND WHAT IS A FILE TREE?

1    A.   A FILE TREE IS A LISTING OF FILES IN FOLDERS IN A

2    FASHION THAT ALLOWS TO YOU SEE WHAT'S UNDERNEATH WHICH FOLDER

3    IN A TREE-LIKE FASHION.

4    Q.   WOULD IT BE FAIR TO DESCRIBE IT AS A HIERARCHICAL

5    FASHION?

6    A.   YES.

7    Q.   AND WHEN YOU REVIEW THE DATA ON A HARD DRIVE, ARE YOU

8    ABLE TO ORGANIZE IT?

9    A.   YES.

10   Q.   BY TYPE?

11   A.   YES.

12   Q.   AND ARE YOU ABLE TO -- WHAT ARE YOU ABLE TO DO, IF

13   ANYTHING, IF YOU SEE A SUSPECT FILE, A FILE OF INTEREST?

14   A.   WHAT YOU WOULD DO SINCE THERE ARE SO MANY FILES ON A

15   COMPUTER, WE HAVE A FUNCTION BUILT INTO THE SOFTWARE THAT

16   ALLOWS US TO PUT A CHECKMARK OR BOOKMARK THAT THE FILE IS OF

17   INTEREST.

18   Q.   WOULD THAT ALLOW YOU TO BE ABLE TO KEEP TABS ON WHAT ARE

19   THE SUSPECT FILES OR FILES OF INTEREST?

20   A.   YES.

21   Q.   AND WHAT ABOUT DELETED FILES, ARE YOU ABLE TO REVIEW

22   DELETED FILES?

23   A.   YES, UNLESS THEY'RE OVERWRITTEN.

24   Q.   UNLESS THEY ARE OVERWRITTEN?

25   A.   CORRECT.

1   Q.   IF THE DELETED FILE HAS NOT BEEN OVERWRITTEN, ARE YOU

2   ABLE TO SEE IT WITH ENCASE?

3   A.   YES.

4   Q.   NOW, WHEN YOU USE ENCASE FOR A FORENSIC REVIEW, ARE YOU

5   ALWAYS ABLE TO SEE THE CONTENTS OF ALL OF THE FILES THAT ARE

6   ON THE HARD DRIVE OR ANY OTHER MEDIA?

7   A.   NOT ALWAYS.

8   Q.   WHAT WOULD A REASON BE WHY YOU WOULD NOT BE ABLE TO SEE

9   THE CONTENTS?

10  A.   IF THE FILE'S ENCRYPTED WE WOULD JUST SEE RANDOM

11  CHARACTERS.  AND IF A FILE IS DEPENDENT ON A PROGRAM AS ITS

12  READER, WE WOULD NEED THAT PROGRAM TO INTERPRET THAT DATA TO

13  MAKE IT USABLE AND RENDER IT READABLE.

14  Q.   SO IN ENCASE IS IT POSSIBLE TO RUN THAT ASSOCIATED

15  PROGRAM IN ENCASE TO BE ABLE TO READ THAT DATA OR WOULD IT

16  HAVE TO BE READ SOMEPLACE ELSE, OR WOULD THAT ASSOCIATED

17  PROGRAM HAVE TO BE RUN SOMEPLACE ELSE?

18  A.   THAT WOULD BE THE BEST WAY TO DO IT, YES.

19  Q.   AND THEN UPON RUNNING THAT PROGRAM WOULD YOU TYPICALLY

20  BE ABLE TO SEE THE DATA AFTER RUNNING THE ASSOCIATED PROGRAM?

21  A.   YES.

22  Q.   SO IF YOU'RE USING ENCASE AND THE FILES OR DATA IS NOT

23  ENCRYPTED, YOU WOULD THEN BE ABLE TO CONDUCT THE TYPE OF

24  REVIEW YOU WERE DISCUSSING BEFORE?

25  A.   YES.

1    Q.    WOULD YOU TYPICALLY BE ABLE TO CONDUCT AN EXAM OF ALL OF

2    THE CONTENTS OF A HARD DRIVE?

3    A.    YES.

4    Q.    NOW, WOULD THE CONTENTS INCLUDE BEING ABLE TO SEE

5    IMAGES?

6    A.    YES.

7    Q.    VIDEOS?

8    A.    YES.

9    Q.    WHAT ABOUT CHAT TRANSCRIPTS?

10   A.    DEPENDING ON THE PROGRAM, YOU WOULD MOST LIKELY NEED THE

11   ACTUAL CHAT PROGRAM OR THIRD PARTY PROGRAM TO READ A CHAT

12   DIALOGUE.

13   Q.    WOULD THE CHAT TRANSCRIPT DATA BE ON THE COMPUTER HARD

14   DRIVE?

15   A.    YES.

16   Q.    WOULD IT BE IN A READABLE FORMAT?

17   A.    NOT CLEARLY READABLE, NO.

18   Q.    SO IF YOU RAN THE ASSOCIATED PROGRAM, WOULD IT THEN BE

19   READABLE?

20   A.    YES.

21   Q.    NOW, IN ADDITION TO BEING ABLE TO SEE THE CONTENTS OF

22   FOLDERS, ARE YOU ALSO ABLE TO SEE THE NAMES OF FOLDERS?

23   A.    YES.

24   Q.    AND THEN AFTER YOU'VE CONDUCTED A REVIEW OF THE CONTENTS

25   OF A HARD DRIVE, WHAT DO YOU DO WITH THE INFORMATION YOU

1    GATHER?

2    A.    WE GROUP IT BY FILE TYPE AND BURN IT TO A COMPACT DISC

3    AND ALSO CREATE A FORENSICS REPORT WHICH IS JUST A

4    COMPILATION OF THESE ITEMS THAT HAVE BEEN BOOKMARKED AND THEN

5    BURN THAT TO A CD OR DVD AND FORWARD IT TO THE CASE AGENT FOR

6    REVIEW.

7    Q.    WOULD THAT BE IN CONNECTION WITH ONGOING INVESTIGATIONS?

8    A.    YES.

9    Q.    AND ARE YOU ABLE TO PRESERVE THE INTEGRITY OF THE COPIES

10   OF THE DATA THAT YOU GIVE TO THE AGENTS?

11   A.    YES.   THE CD'S ARE CLOSED SESSIONS SO THEY CAN'T BE

12   ALTERED.

13   Q.    AND WOULD THE AGENT THEN BE ABLE TO REVIEW THE SAME

14   ITEMS THAT YOU WOULD HAVE BOOKMARKED AND REVIEWED?

15   A.    YES.

16   Q.    NOW, IS A FORENSIC REVIEW OF DISKETTES DONE EXACTLY THE

17   SAME WAY AS A FORENSIC REVIEW OF A COMPUTER HARD DRIVE IS

18   PERFORMED?

19   A.    NOT EXACTLY.

20   Q.    WHAT STEPS ARE DIFFERENT?

21   A.    ON A FLOPPY DISKETTE THERE'S A LITTLE SWITCH THAT WOULD

22   EMPLOY A WRITE BLOCKING MECHANISM.

23   Q.    THERE'S A SWITCH ON THE DISKETTE ITSELF?

24   A.    YES.

25   Q.    YOU'LL SEE THERE'S A BAG NEXT TO YOU WITH A BUNCH OF

1    DISKETTES, AND THAT'S PREVIOUSLY BEEN MARKED I BELIEVE AS

2    EXHIBIT 56.  IF YOU COULD JUST PULL THE DISK OUT AND JUST

3    SHOW ONE OF THESE SWITCHES ON A DISK, PLEASE.  WOULD YOU JUST

4    HOLD UP THE DISKETTE AND SHOW THE JURORS WHERE IT IS ON THE

5    DISK, PLEASE.

6              MR. MICHAEL:  LET THE RECORD REFLECT THAT THE AGENT

7    HAS JUST MANEUVERED A LITTLE SWITCH ON WHAT WOULD BE THE

8    UPPER RIGHT CORNER OF THE DISKETTE AS IT FACES THE JURORS.

9    BY MR. MICHAEL:

10   Q.   THANK YOU, AGENT MORAN.  YOU CAN ACTUALLY LEAVE THAT IN

11   THE BAG, SIR.  THANK YOU.

12             SO OTHER THAN MANEUVERING THAT LITTLE SWITCH TO ACT

13   AS THE WRITE BLOCKER, ARE THE STEPS NECESSARY TO CONDUCT A

14   FORENSICS REVIEW OF A DISKETTE THE SAME OR DIFFERENT FROM A

15   COMPUTER HARD DRIVE?

16   A.   THEY WOULD BE THE SAME.

17   Q.   SO ALL THE SAME STEPS YOU JUST OUTLINED ABOUT HOW YOU

18   MAKE THE COPY AND HOW YOU REVIEW IT AND VERIFY ITS INTEGRITY

19   WOULD BE THE SAME?

20   A.   RIGHT, WITH THE EXCEPTION THAT WE ACTUALLY PUT THE DISK

21   IN OUR FORENSICS EXAMINATION MACHINE.

22   Q.   AND YOU WOULD DO THAT TO MAKE THE COPY?

23   A.   THAT'S CORRECT.

24   Q.   AND IF YOU EVER CONDUCT A REVIEW OF MULTIPLE FORMS OF

25   MEDIA, LET'S SAY DISKETTES AND A COMPUTER HARD DRIVE OR

```
 1   MULTIPLE HARD DRIVES IN THE COURSE OF ONE INVESTIGATION, AND

 2   YOU'RE REVIEWING THEM AT THE SAME TIME, THE COPIES, ARE YOU

 3   ABLE TO PRESERVE THE INTEGRITY OF EACH PIECE OF MEDIA?

 4   A.   YES.

 5   Q.   AND KEEP THE COPIES SEPARATE FROM EACH OTHER DURING YOUR

 6   REVIEW?

 7   A.   YES.

 8   Q.   AND ARE YOU ABLE TO COMPARE HASH VALUES FOR EACH

 9   INDIVIDUAL PIECE OF MEDIA TO ENSURE THEIR INTEGRITY?

10   A.   YES.

11   Q.   WHAT ABOUT THE STEPS TO CONDUCT A FORENSIC EXAM OF AN

12   EXTERNAL HARD DRIVE?

13   A.   FOR THAT WE WOULD --

14   Q.   WELL, LET ME -- INSTEAD OF GOING THROUGH THE STEPS, LET

15   ME ASK YOU.  ARE THE STEPS THE SAME OR DIFFERENT TO CONDUCT A

16   REVIEW OF AN EXTERNAL HARD DRIVE AS OPPOSED TO A COMPUTER

17   HARD DRIVE?

18   A.   THEY WOULD BE THE SAME.

19   Q.   AND THAT WOULD INCLUDE PROTECTING THE INTEGRITY OF THE

20   DATA?

21   A.   YES.

22   Q.   AND MAKING A FORENSIC COPY?

23   A.   THAT'S CORRECT.

24   Q.   AND THEN CONDUCTING A REVIEW?

25   A.   THAT'S RIGHT.
```

1   Q.   ARE YOU THEN ABLE TO VERIFY THE ACCURACY WITH HASH

2   VALUES?

3   A.   YES.

4   Q.   DIRECTING YOUR ATTENTION TO THIS CASE, WERE YOU WORKING

5   AS A SPECIAL AGENT IN JANUARY OF 2001?

6   A.   YES.

7   Q.   WERE YOU CONDUCTING FORENSIC REVIEWS AT THAT TIME?

8   A.   YES.

9   Q.   DID THERE COME A TIME THAT YOU WERE ASSIGNED TO ASSIST

10  IN THE INVESTIGATION OF JAMES SANDERS?

11  A.   YES.

12  Q.   WHAT WAS THE NATURE OF THAT INVESTIGATION?

13  A.   THIS WAS A CHILD PORNOGRAPHY INVESTIGATION.

14  Q.   AND WHAT WAS MR. SANDERS SUSPECTED OF DOING?

15  A.   POSSESSING CHILD PORNOGRAPHY.

16  Q.   AND IS MR. SANDERS THE DEFENDANT IN THIS CASE?

17  A.   YES.

18  Q.   AND WHAT ROLE DID YOU PLAY IN THE INVESTIGATION?

19  A.   I WAS ASSIGNED TO EXAMINE THE DIGITAL MEDIA.

20  Q.   AND WHERE DID THAT DIGITAL MEDIA COME FROM?

21  A.   THAT WAS DELIVERED TO ME IN LONG BEACH FROM AN AGENT IN

22  RIVERSIDE.

23  Q.   AND WHICH AGENT DELIVERED IT TO YOU?

24  A.   MICHAEL ARNOLD.

25  Q.   WAS HE THE CASE AGENT?

1    A.    YES.

2    Q.    AND WHAT'S YOUR UNDERSTANDING OF HOW MICHAEL -- EXCUSE

3    ME -- AGENT ARNOLD GOT THE DIGITAL MEDIA?

4    A.    IT WAS PURSUANT TO FEDERAL SEARCH WARRANTS.

5    Q.    AND WHAT'S YOUR UNDERSTANDING OF WHEN THOSE SEARCH

6    WARRANTS WERE EXECUTED APPROXIMATELY?

7    A.    JUNE 5TH OR 6TH OF 2001.

8    Q.    WERE YOU PRESENT FOR THE SEIZURES?

9    A.    NO.

10   Q.    BUT WAS THE MEDIA SEIZED FROM THOSE SEIZURES BROUGHT TO

11   YOU?

12   A.    YES.

13   Q.    AND DID YOU THEN CONDUCT A FORENSIC REVIEW OF THAT

14   MEDIA?

15   A.    YES.

16   Q.    DO YOU RECALL WHAT SOME OF THE ITEMS WERE THAT YOU

17   CONDUCTED THE FORENSIC REVIEW OF?

18   A.    SONY VAIO LAPTOP, A GATEWAY DESKTOP, A BUSLINK EXTERNAL

19   HARD DRIVE, A COMPACT DISC AND OTHER MEDIA.

20   Q.    YOU JUST MENTIONED A LAPTOP AND A DESKTOP, AND IT MIGHT

21   BE OBVIOUS TO MOST, BUT IN CASE IT'S NOT, IF YOU COULD

22   DESCRIBE WHAT THE DIFFERENCE -- ARE YOU REFERRING TO

23   COMPUTERS?

24   A.    YES.

25   Q.    WHAT'S THE DIFFERENCE IN REAL BASIC TERMS BETWEEN A

1    DESKTOP AND A LAPTOP?

2    A.    A DESKTOP COMPUTER WOULD BE A LARGE BOX THAT'S MEANT TO

3    REMAIN STATIONERY ON A DESKTOP.   IT USUALLY HAS PERIPHERALS

4    ATTACHED.   WHEREAS A NOTEBOOK COMPUTER WOULD BE A PORTABLE

5    DEVICE THAT HAS ALL THE COMPONENTS INTEGRATED.

6    Q.    WHEN YOU SAY "NOTEBOOK," IS NOTEBOOK -- ARE NOTEBOOK AND

7    LAPTOP INTERCHANGEABLE TERMS?

8    A.    YES.

9    Q.    I'M GOING TO DIRECT YOUR ATTENTION TO SOME PHYSICAL

10   ITEMS OF EVIDENCE NEXT TO YOU ON THE SHELF RIGHT THERE.

11   THERE IS A LAPTOP COMPUTER THAT'S BEEN MARKED AS EXHIBIT 24,

12   IF YOU COULD PLACE THAT IN FRONT OF YOU, AND IT'S ALREADY

13   BEEN ADMITTED INTO EVIDENCE, AND REMOVE IT FROM THE BAG,

14   PLEASE.

15         HAVE YOU SEEN EXHIBIT 24 BEFORE?

16   A.    YES.

17   Q.    WHAT IS EXHIBIT 24?

18   A.    IT IS A SONY VAIO LAPTOP.

19   Q.    AND WHEN DID YOU SEE THIS LAPTOP?   WELL, WHAT LAPTOP IS

20   THIS?

21   A.    IT BELONGS TO JAMES SANDERS.

22   Q.    IS THIS THE LAPTOP YOU CONDUCTED THE FORENSIC REVIEW OF?

23   A.    YES.

24   Q.    AND HOW DO YOU KNOW THAT?

25   A.    MY STICKER I CREATED IS ON IT.

1  Q.   I'M SORRY, SAY THAT AGAIN?

2  A.   THE STICKER I CREATED IS ON IT.

3  Q.   IS THAT STANDARD PROTOCOL TO IDENTIFY AN ITEM THAT

4  YOU'VE CONDUCTED A REVIEW OF -- A LAPTOP YOU CONDUCTED A

5  REVIEW OF?  STANDARD PROTOCOL -- IS THAT SOMETHING THAT YOU

6  USED TO HELP IDENTIFY MEDIA THAT YOU REVIEWED?

7  A.   YES.

8  Q.   AND IF THERE WAS -- THERE'S ANOTHER PHYSICAL PIECE OF

9  EVIDENCE, AN EXTERNAL HARD DRIVE.  YOU CAN LEAVE IT OUT OF

10 THE BAG, SIR, AND JUST SET IT ASIDE.

11         THIS HAS BEEN PREVIOUSLY ADMITTED AS EXHIBIT 35.

12 IS THIS THE EXTERNAL HARD DRIVE THAT YOU CONDUCTED YOUR

13 REVIEW OF?

14 A.   YES.

15 Q.   AND HOW DO YOU KNOW THAT?

16 A.   AGAIN, I HAVE A STICKER THAT I CREATED ON IT.

17 Q.   YOU CAN SET THAT ASIDE, PLEASE.

18         IN ADDITION TO CONDUCTING A REVIEW OF -- WELL,

19 THERE'S A BAG THERE OF DISKS THAT YOU PREVIOUSLY WERE -- YOU

20 PULLED A SINGLE DISKETTE OUT OF -- THAT'S BEEN MARKED AS

21 EXHIBIT 56.  HAVE YOU SEEN THOSE DISKS BEFORE?

22 A.   YES.

23 Q.   ARE THOSE THE DISKETTES THAT YOU CONDUCTED A FORENSIC

24 REVIEW OF IN THIS CASE?

25 A.   YES.

1    Q.    AND HOW DO YOU KNOW THAT?

2    A.    I LABELED THEM WITH A SILVER SHARPIE PEN.

3    Q.    WHEN YOU SAY "LABELED THEM," LABELED THEM WITH WHAT?

4    A.    I NUMBERED THEM.

5    Q.    HAVE YOU HAD AN OPPORTUNITY TO REVIEW THE DISKS AS WELL

6    AS THE LAPTOP AND EXTERNAL HARD DRIVE BEFORE YOU TESTIFIED

7    HERE TODAY TO ENSURE THAT THEY WERE THE SAME ITEMS THAT YOU

8    HAD REVIEWED PREVIOUSLY?

9    A.    YES.

10         MR. AARON:  I'M SORRY, YOUR HONOR, WAS COUNSEL

11   REFERRING TO THE DISKS IN EXHIBIT 56?

12         MR. MICHAEL:  IN EXHIBIT 56.

13         THE COURT:  THE COURT IMPOSES ITS OWN OBJECTION AND

14   THAT'S TO THE SPEED OF THE QUESTIONING.

15         MR. MICHAEL:  I APOLOGIZE, YOUR HONOR.

16         THE COURT:  THAT'S FINE, BUT I'M SUSTAINING MY OWN

17   OBJECTION.  PLEASE SLOW DOWN.

18         MR. MICHAEL:  YES, YOUR HONOR.

19   BY MR. MICHAEL:

20   Q.    FOR EACH OF THESE ITEMS, THE LAPTOP, THE EXTERNAL HARD

21   DRIVE, AND THE BAG OF DISKETTES, DID YOU USE THE METHODS YOU

22   JUST DESCRIBED IN CONDUCTING YOUR REVIEW?

23   A.    YES.

24   Q.    AND THAT INCLUDED THE STEPS THAT YOU TAKE TO PRESERVE

25   THE INTEGRITY OF THE ORIGINAL MEDIA AS WELL AS THE COPY?

1   A.   YES.

2   Q.   AND DID THAT INCLUDE MAKING COPIES OR ATTEMPTING TO MAKE

3   COPIES WITH THE ENCASE PROGRAM, FORENSIC PROGRAM?

4   A.   YES.

5   Q.   DID THAT INCLUDE VERIFYING, AFTER MAKING THOSE COPIES

6   USING HASH VALUES, THAT THEY WERE CORRECT FORENSIC COPIES?

7   A.   YES.

8   Q.   AND DID YOU THEN CONDUCT -- DID YOU RETURN THE ORIGINAL

9   ITEMS OF EVIDENCE TO THE EVIDENCE STORAGE?

10   A.   YES.

11   Q.   AND THEN DID YOU ACTUALLY CONDUCT A REVIEW?

12   A.   YES.

13   Q.   DO YOU RECALL WITH REGARD TO THE HARD DRIVES AND THE

14   DISKS WHAT VERSION OF ENCASE YOU USED TO CONDUCT YOUR REVIEW?

15   A.   INITIALLY 2.17.

16   Q.   WAS THAT THE CURRENT VERSION AT THE TIME?

17   A.   YES.

18   Q.   HAD YOU USED THAT VERSION BEFORE?

19   A.   YES.

20   Q.   WAS IT RELIABLE?

21   A.   YES.

22   Q.   DID IT ACCOMPLISH WHAT IT WAS SUPPOSED TO?

23   A.   YES.

24   Q.   DID YOU FIND THAT IT PRESERVED THE INTEGRITY OF THE COPY

25   THAT YOU REVIEWED?

1    A.    YES.

2    Q.    AND WOULD MAKE THEN AN ACCURATE FORENSIC COPY?

3    A.    YES.

4    Q.    AT ANY POINT DURING THE COURSE OF YOUR WORK THAT YOU'VE

5    USED THAT VERSION OF ENCASE, DID YOU DEVELOP ANY CONCERNS

6    REGARDING THE INTEGRITY OF THE COPIES THAT IT MAKES?

7    A.    NO.

8    Q.    AND HAVE NEWER VERSIONS OF ENCASE BEEN CREATED BY THE

9    COMPANY SINCE THEN?

10   A.    YES.

11   Q.    HAVE YOU CONDUCTED REVIEWS USING THOSE NEWER VERSIONS?

12   A.    YES.

13   Q.    AND ALTHOUGH YOU'VE USED THE NEWER VERSIONS, HAVE YOU

14   FOUND THAT THOSE NEWER VERSIONS ARE BETTER THAN ENCASE 2 AT

15   CREATING CORRECT FORENSIC COPIES?

16   A.    NO.

17   Q.    AND, IN FACT, DURING THE COURSE OF ANY OF YOUR REVIEWS

18   IN THIS CASE, DID YOU EVER USE ANY OF THOSE NEWER VERSIONS OF

19   ENCASE TO CONDUCT YOUR FORENSIC REVIEWS?

20   A.    YES.

21   Q.    AND WOULD THAT BE NEWER COPIES THAT CAME OUT OVER THE

22   COURSE OF TIME AS YOU WERE STILL CONDUCTING YOUR REVIEWS?

23   A.    YES.

24   Q.    NOW, THE COPY THAT YOU USED TO CONDUCT THOSE REVIEWS,

25   WAS THAT STILL A COPY THAT YOU MADE USING ENCASE 2?

1    A.    THE ORIGINAL ACQUISITION WAS USED IN THE SUBSEQUENT

2    VERSIONS OF ENCASE.

3    Q.    SO THE INTEGRITY OF THOSE ORIGINAL COPIES WAS NEVER

4    AFFECTED BY USING THE NEWER VERSIONS?

5    A.    THAT'S CORRECT.

6    Q.    AND YOU WERE ABLE TO CONDUCT REVIEWS USING THOSE NEWER

7    VERSIONS?

8    A.    THAT'S CORRECT.

9    Q.    TURNING YOUR ATTENTION TO THE DESKTOP COMPUTER WHICH IS

10   NOT BEFORE YOU, IT'S NOT IN EVIDENCE, I'M JUST GOING TO ASK

11   YOU SOME QUESTIONS ABOUT IT.   YOU TESTIFIED THAT YOU

12   CONDUCTED A FORENSIC REVIEW OF THE DESKTOP HARD DRIVE,

13   CORRECT?

14   A.    CORRECT.

15   Q.    AND DURING YOUR REVIEW OF THAT -- ACTUALLY, I THINK I

16   ONLY ASKED YOU MAYBE ABOUT THE LAPTOP AND THE EXTERNAL AND

17   THE DISK.   DID YOU CONDUCT A REVIEW OF THE DESKTOP HARD

18   DRIVE?

19   A.    YES.

20   Q.    AND THAT WAS THE GATEWAY YOU WERE TALKING ABOUT?

21   A.    YES.

22   Q.    DID YOU USE ALL THE SAME METHODS AND PROCEDURES THAT

23   YOU'VE ALREADY DESCRIBED?

24   A.    YES.

25   Q.    AND WAS THE COPY OF THAT A CORRECT FORENSIC COPY?

```
1    A.    YES.

2    Q.    AND YOU VERIFIED THAT?

3    A.    YES.

4    Q.    DURING YOUR REVIEW OF THE DESKTOP HARD DRIVE DID YOU

5    FIND ANY SUSPECTED CHILD PORNOGRAPHY ON THE HARD DRIVE?

6    A.    NO.

7    Q.    DID YOU FIND ANY PROGRAMS OR FILES OF NOTE TO THE

8    INVESTIGATION ON THE COMPUTER?

9    A.    YES.

10   Q.    WHAT PROGRAMS OR FILES DID YOU FIND?

11   A.    FOUND EVIDENCE ELIMINATOR, BC WIPE, AND --

12   Q.    WELL, LET ME ASK YOU, DID YOU FIND EVIDENCE OF ANY

13   ENCRYPTION PROGRAMS ON THE HARD DRIVE?

14   A.    YES.

15   Q.    WHAT ENCRYPTION PROGRAM DID YOU FIND?

16   A.    BESTCRYPT.

17   Q.    AND WHAT IS EVIDENCE ELIMINATOR?

18   A.    EVIDENCE ELIMINATOR IS SOFTWARE THAT HAS SETTINGS THAT

19   ALLOWS A PERSON TO ERASE THEIR INTERNET HISTORY, DELETE

20   UNWANTED FILES, AND CLEAN UP REGISTRY ENTRIES, BASICALLY

21   CLEAN UP TRACKS AFTER THEY'VE BEEN USING THEIR COMPUTER.

22   Q.    DOES IT ERASE ITS FILES ON THE COMPUTER?

23   A.    YES.

24   Q.    ARE YOU ABLE TO APPLY IT AS WELL TO DELETED FILES?  ARE

25   YOU ABLE TO ALSO USE IT TO ERASE DELETED FILES FROM A
```

1   COMPUTER HARD DRIVE?

2   A.   YES, YOU CAN DO THAT.

3   Q.   ARE YOU FAMILIAR WITH THE TERM "FILE WIPING" OR "FILE

4   CLEANING" PROGRAM?

5   A.   YES.

6   Q.   WOULD THAT BE THIS TYPE OF PROGRAM?

7   A.   IT WILL CLEAN UP FILES THAT HAVE BEEN DELETED, YES.

8   Q.   I'M SAYING IN GENERAL, ARE YOU FAMILIAR WITH WHAT A FILE

9   WIPING PROGRAM IS?

10  A.   YES.

11  Q.   AND IS EVIDENCE ELIMINATOR A FILE WIPING PROGRAM?

12  A.   YES, IT CAN BE.

13  Q.   AND ARE YOU FAMILIAR WITH -- AND WHAT IS BC WIPE?

14  A.   BC WIPE WOULD BE A PROGRAM WHERE IF YOU WANTED TO GET

15  RID OF A FILE, YOU COULD TELL THE COMPUTER TO ERASE IT

16  COMPLETELY AND JUST WRITE OVER IT A NUMBER OF TIMES SO IT'S

17  COMPLETELY OBLITERATED AND UNRECOVERABLE.

18  Q.   SO IS BC WIPE A FILE WIPING OR CLEANING PROGRAM?

19  A.   YES.

20  Q.   AND EVIDENCE ELIMINATOR HAS THAT CAPABILITY BUT ALSO

21  ALLOWS YOU TO CLEAN TRACKS AS WELL?

22  A.   YES.

23  Q.   AND WHAT IS BESTCRYPT?

24  A.   BESTCRYPT IS ENCRYPTION SOFTWARE THAT ALLOWS YOU TO

25  CREATE A CONTAINER ON A HARD DRIVE.

1    Q.    AND IS THAT CONTAINER ENCRYPTED?

2    A.    YES.

3    Q.    I'M GOING TO ASK YOU SOME QUESTIONS ABOUT ENCRYPTION, SO

4    LET ME JUST ASK YOU ANOTHER COUPLE QUESTIONS.

5              THESE PROGRAMS, EVIDENCE ELIMINATOR, BESTCRYPT,

6    BC WIPE, ARE THESE PROGRAMS THAT A USER WOULD HAD TO HAVE PUT

7    ONTO THEIR COMPUTER HARD DRIVE?

8    A.    YES.

9    Q.    ARE THEY COMMERCIALLY AVAILABLE PROGRAMS OR AVAILABLE

10   OVER THE INTERNET?

11   A.    YES.

12   Q.    AND DURING YOUR REVIEW OF THE DESKTOP HARD DRIVE DID YOU

13   DETERMINE WHAT TYPE OF OPERATING SYSTEM IT HAD?

14   A.    YES.

15   Q.    WHAT OPERATING SYSTEM?

16   A.    IT HAD WINDOWS.

17   Q.    DO YOU RECALL WHAT VERSION OF WINDOWS?

18   A.    WINDOWS 98.

19   Q.    AND IS THAT JUST THE NAME OF THE SOFTWARE PROGRAM THAT

20   PROVIDES ITS PRIMARY OPERATING SYSTEM?

21   A.    THAT'S CORRECT.

22   Q.    NOW, WERE YOU ABLE TO DETERMINE WHAT INFORMATION, IF

23   ANY, THERE WAS ABOUT WHEN THAT OPERATING SYSTEM HAD BEEN

24   INSTALLED ON THE DESKTOP HARD DRIVE?

25   A.    YES.

1  Q.   WHEN HAD IT BEEN INSTALLED?

2  A.   THE WINDOWS FOLDER WHICH HOUSES THE OPERATING SYSTEM WAS

3  CREATED ON 5/19/01, MAY 19TH, 2001.

4  Q.   AND, AGAIN, WHEN WAS THIS DESKTOP HARD DRIVE SEIZED?

5  A.   APPROXIMATELY JUNE 5TH OR 6TH, 2001.

6  Q.   SO THE OPERATING SYSTEM HAD BEEN PUT ONTO THIS DESKTOP

7  ONLY ABOUT TWO OR THREE WEEKS BEFORE IT WAS SEIZED?

8  A.   THAT'S CORRECT.

9  Q.   DID YOU CONDUCT A REVIEW OF THE EXTERNAL HARD DRIVE THAT

10  YOU JUST LOOKED AT A MOMENT AGO?

11  A.   YES.

12  Q.   DID YOU FIND ANY SUSPECTED FILES CONTAINING CHILD

13  PORNOGRAPHY?

14  A.   NO.

15  Q.   WERE YOU ABLE TO VIEW THE CONTENTS OF ALL OF THE FILES

16  ON THE EXTERNAL HARD DRIVE?

17  A.   NO.

18  Q.   WHY NOT?

19  A.   THERE WERE THREE ENCRYPTED CONTAINERS ON THAT DRIVE.

20  Q.   AND WERE EACH OF THOSE THREE CONTAINERS ENCRYPTED?

21  A.   YES.

22  Q.   I THINK YOU MAY HAVE SAID THAT, SIR.  I APOLOGIZE.

23        AND WHAT WAS THE SIZE OF EACH OF THOSE CONTAINERS?

24  A.   THOSE WERE FOUR GIGABYTES EACH.

25  Q.   AND APPROXIMATELY HOW MANY IMAGE FILES COULD BE STORED

1   IN A FOUR-GIGABYTE ENCRYPTED CONTAINER?

2   A.   SEVERAL THOUSAND.

3   Q.   AND APPROXIMATELY HOW MANY HOURS OF VIDEO FILE COULD BE

4   STORED IN A CONTAINER OF THAT SIZE?

5   A.   DEPENDING ON THE QUALITY, PROBABLY ABOUT FOUR HOURS

6   WORTH.

7   Q.   COULD THAT INCLUDE MANY, SMALLER, SHORTER VIDEOS?

8   A.   YES.

9   Q.   NOW, YOU'VE DESCRIBED THE ENCRYPTED -- YOU'VE DESCRIBED

10  ENCRYPTED CONTAINERS.  WHAT DO YOU MEAN BY A CONTAINER?

11  A.   A CONTAINER IS A PART OF THE HARD DRIVE THAT'S BEEN

12  PREPARED FOR USE BY THE ENCRYPTION PROGRAM.  SO THE USER WILL

13  CREATE A CHUNK OF HARD DRIVE SPACE AND IT WILL APPEAR AS A

14  FILE WITHOUT IT BEING OPENED, BUT ONCE IT'S OPENED WITH A

15  PASSWORD OR PASSPHRASE, THEN IT ACTS AS A REPOSITORY FOR

16  OTHER FILES, PROGRAMS, WHATEVER, THAT CAN BE PUT IN AND TAKEN

17  OUT.

18  Q.   I THINK YOU MENTIONED A PASSWORD.  IS A PASSWORD

19  NECESSARY TO OPEN AN ENCRYPTED CONTAINER?

20  A.   IF THE USER DECIDES TO USE ONE, YES.

21  Q.   SO THE USER CAN CHOOSE TO MAKE THE ENCRYPTED CONTAINER

22  PASSWORD PROTECTED?

23  A.   YES.

24  Q.   AND IS IT ALWAYS WITH A PASSWORD OR WOULD THERE BE OTHER

25  TYPES OF PHRASES THAT COULD BE USED?

1   A.   YEAH.   YES, A USER COULD USE A PASSPHRASE WHICH COULD BE

2   SOMETHING LIKE "MARY HAD A LITTLE LAMB," AND THEN IT GETS

3   VERY COMPLICATED FROM THERE.   THEY COULD SUBSTITUTE NUMBERS

4   FOR LETTERS AND CAPITALIZATION AND MAKE IT VERY DIFFICULT TO

5   COME UP WITH A MATCHING PASSWORD.

6   Q.   SO IF YOU DON'T HAVE THE USER -- IF AN INDIVIDUAL

7   DOESN'T HAVE A PASSWORD TO A CONTAINER, WOULD THEIR ACCESS TO

8   THAT CONTAINER BE RESTRICTED, OR WOULD IT BE -- WOULD THEY BE

9   UNABLE TO ACCESS THAT CONTAINER?

10   A.   YES.

11   Q.   AND WOULD THEY BE UNABLE TO SEE WHAT FILES ARE INSIDE

12   THAT CONTAINER?

13   A.   THAT'S CORRECT.

14   Q.   AND IF A USER HAD THE PASSWORD, WOULD THEY BE ABLE TO

15   OPEN THAT CONTAINER?

16   A.   YES.

17   Q.   WOULD THEY BE ABLE TO VIEW THE FILES AND THEIR CONTENTS

18   THAT ARE WITHIN THE CONTAINER?

19   A.   YES.

20   Q.   WOULD THEY BE ABLE TO REMOVE FILES FROM THE CONTAINER?

21   A.   YES.

22   Q.   WOULD THEY BE ABLE TO ADD FILES TO THE CONTAINER?

23   A.   YES.

24   Q.   SO LONG AS THEY HAD THE PASSWORD AND OPENED THE

25   CONTAINER?

1   A.   THAT'S CORRECT.

2   Q.   SO ANY OF THE FILES WITHIN THAT CONTAINER WOULD BE

3   PROTECTED BY THE ENCRYPTION?

4   A.   THAT'S CORRECT.

5   Q.   NOW, DID YOU TRY TO DECRYPT THESE -- EXCUSE ME, TRY TO

6   ENCRYPT THESE CONTAINERS?

7   A.   I ATTEMPTED TO TRY AND --

8   Q.   I DON'T KNOW IF I ASKED YOU.  I THINK I CONFUSED MYSELF.

9        DID YOU TRY TO DETERMINE THE PASSWORD OF THESE

10  CONTAINERS?

11  A.   YES.

12  Q.   WOULD THAT BE KNOWN AS AN ATTEMPT TO DECRYPT?

13  A.   YES.

14  Q.   HOW EXTENSIVE WERE YOUR EFFORTS?

15  A.   VERY EXTENSIVE.

16  Q.   WERE YOU SUCCESSFUL?

17  A.   NO.

18  Q.   I'M GOING TO ASK YOU SOME MORE QUESTIONS ABOUT YOUR

19  EFFORTS TO DO DECRYPTION IN THIS CASE, BUT LET ME MOVE ON TO

20  THE LAPTOP HARD DRIVE.  THE LAPTOP THAT YOU JUST REVIEWED A

21  MOMENT AGO, YOU CONDUCTED A REVIEW OF THAT LAPTOP HARD DRIVE,

22  CORRECT?

23  A.   YES.

24  Q.   WERE YOU ABLE TO OBSERVE THE CONTENTS OF SOME OF THE

25  FILES --

1    A.    YES.

2    Q.    -- ON THE HARD DRIVE?

3    A.    YES.

4    Q.    WERE YOU ABLE TO OBSERVE THE CONTENTS OF SOME OF THE

5    FILES USING THE ENCASE PROGRAM?

6    A.    YES.

7    Q.    WERE YOU ABLE TO OBSERVE SOME OF THE FILES ON THE

8    COMPUTER USING OTHER TECHNIQUES?

9    A.    YES.

10   Q.    AND WERE THOSE OTHER TECHNIQUES TECHNIQUES THAT WERE --

11   TECHNIQUES THAT YOU HAD USED BEFORE IN CONDUCTING FORENSIC

12   REVIEWS?

13   A.    YES.

14   Q.    AND WERE THEY RELIABLE TECHNIQUES?

15   A.    YES.

16   Q.    WERE THEY COMMONLY USED --

17   A.    YES.

18   Q.    -- IN THE FIELD OF FORENSICS?

19   A.    YES.

20   Q.    NOW, YOU SAID THAT YOU WERE ABLE TO OBSERVE SOME OF THE

21   CONTENTS.   WERE YOU ABLE TO VIEW THE CONTENTS OF ALL OF THE

22   FILES ON THE LAPTOP HARD DRIVE?

23   A.    NO.

24   Q.    WHY NOT?

25   A.    THERE WAS AN ENCRYPTED CONTAINER ON THE LAPTOP AS WELL

1  AS CERTAIN PROGRAM FILES THAT WOULD NEED THE ASSOCIATED

2  PROGRAM TO VIEW THE DATA.

3  Q.   WHEN YOU SAY "THE ASSOCIATED PROGRAM," ARE YOU REFERRING

4  TO THE ENCRYPTION PROGRAM ITSELF?

5  A.   YES.

6  Q.   AND WERE THERE OTHER FILES AND OTHER DATA THAT YOU

7  NEEDED AN ASSOCIATED PROGRAM TO BE ABLE TO RUN?

8  A.   YES.

9  Q.   AND SO FOR THAT LATTER CATEGORY, FILES WHERE YOU NEED AN

10  ASSOCIATED PROGRAM TO RUN WITH IT, WOULD THAT INCLUDE, FOR

11  EXAMPLE, LIKE A CHAT FILE?

12  A.   YES.

13  Q.   AND WOULD THAT MEAN THAT THE DATA WAS -- WAS THE DATA

14  PRESENT ON THE HARD DRIVE?

15  A.   YES.

16  Q.   WAS IT IN A READILY READABLE FORMAT UPON FIRST

17  DISCOVERING IT?

18  A.   NO.

19  Q.   AND UPON RUNNING AN ASSOCIATED PROGRAM WOULD THAT

20  TYPICALLY MAKE IT READABLE?

21  A.   YES.

22  Q.   NOW, LET'S TALK ABOUT THE ENCRYPTED CONTAINER.  HOW MANY

23  ENCRYPTED CONTAINERS WERE ON THE LAPTOP HARD DRIVE?

24  A.   ONE.

25  Q.   WHAT WAS THE SIZE OF IT?

1    A.    ONE GIGABYTE.

2    Q.    AND APPROXIMATELY HOW MANY IMAGE FILES COULD BE STORED

3    IN A ONE GIGABYTE CONTAINER?

4    A.    THOUSANDS.

5    Q.    AND WOULD THE FOUR-GIGABYTE CONTAINER ON THE EXTERNAL

6    HARD DRIVE BE ABLE TO HOLD FOUR TIMES AS MANY IMAGES?

7    A.    YES.

8    Q.    SO WOULD THOSE, ALL TOLD, THE THREE ENCRYPTED CONTAINERS

9    ON THE EXTERNAL HARD DRIVE BE ABLE TO HOLD 12 TIMES THE

10   NUMBER OF IMAGES APPROXIMATELY?

11   A.    YES.

12   Q.    AND APPROXIMATELY HOW MANY HOURS OF VIDEO COULD BE

13   STORED IN A ONE-GIGABYTE CONTAINER?

14   A.    APPROXIMATELY ONE HOUR.

15   Q.    AND, AGAIN, THAT COULD BE MANY SHORTER VIDEOS?

16   A.    YES.

17   Q.    OR COULD IT BE SOME COMBINATION OF VIDEOS AND IMAGES?

18   A.    YES.

19   Q.    AND THAT'S TRUE FOR ANY ENCRYPTED CONTAINER?

20   A.    THAT'S CORRECT.

21   Q.    WHAT WAS THE ENCRYPTION PROGRAM USED ON THE LAPTOP?

22   A.    BESTCRYPT.

23   Q.    AND WHAT'S THE NAME OF THE COMPANY THAT CREATES

24   BESTCRYPT?

25   A.    JETICO.

1    Q.    AND HOW WOULD YOU SPELL THAT?

2    A.    J-E-T-I-C-O.

3    Q.    AND DID YOU DETERMINE WHETHER OR NOT THERE WERE ANY

4    OTHER ENCRYPTION PROGRAMS PRESENT ON THE LAPTOP HARD DRIVE?

5    A.    YES.

6    Q.    WHAT WAS THE NAME OF THE OTHER PROGRAM OR PROGRAMS?

7    A.    THERE WAS ONE CALLED CRYPTTEXT.

8    Q.    APPROXIMATELY -- EXCUSE ME.  WHAT DOES THAT ENABLE A

9    USER TO ENCRYPT?

10    A.    AS OPPOSED TO A CONTAINER WHERE YOU CAN STORE MULTIPLE

11    FILES IN AN AREA THAT'S PASSWORD PROTECTED OR PASSPHRASE

12    PROTECTED --

13    Q.    NOW --

14    A.    -- CRYPTTEXT ALLOWS YOU TO ENCRYPT INDIVIDUAL FILES SO

15    YOU DON'T HAVE TO HAVE A LARGE GROUPING.  YOU CAN DO

16    INDIVIDUAL FILES AND HAVE THOSE ENCRYPTED.

17    Q.    SO BESTCRYPT ALLOWS YOU TO CREATE AN ENCRYPTED CONTAINER

18    AND CRYPTTEXT ALLOWS YOU TO CREATE ENCRYPTED INDIVIDUAL

19    FILES?

20    A.    THAT'S CORRECT.

21    Q.    DID YOU CREATE -- AND I BELIEVE YOUR TESTIMONY WAS YOU

22    TYPICALLY WOULD.  SO, IN THIS CASE, DID YOU CREATE AN ENCASE

23    REPORT OF YOUR REVIEW OF THE COMPUTER?

24    A.    YES.

25    Q.    I'M GOING TO DIRECT YOUR ATTENTION TO A MANILA FOLDER

1    RIGHT IN FRONT OF YOU.  IT'S BEEN LABELED FOR IDENTIFICATION

2    EXHIBIT 105.  IF YOU COULD REVIEW THE DOCUMENT, PLEASE, AND

3    TELL ME IF YOU RECOGNIZE IT.

4    A.   YES.

5    Q.   WHAT IS THIS DOCUMENT?

6    A.   IT'S AN ENCASE REPORT FOR THE SONY VAIO COMPUTER.

7    Q.   IS THIS THE ENCASE REPORT YOU CREATED IN CONNECTION WITH

8    YOUR REVIEW IN THIS CASE?

9    A.   YES.

10           MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD MOVE

11   TO ADMIT EXHIBIT 105 INTO EVIDENCE.

12           THE COURT:  ANY OBJECTION?

13           MR. AARON:  NONE EXCEPT AS PREVIOUSLY MADE, YOUR

14   HONOR.

15           THE COURT:  EXHIBIT 105 IS ORDERED ADMITTED.  YOU

16   MAY PUBLISH.

17           MR. MICHAEL:  I'M ACTUALLY NOT GOING TO PUBLISH IT

18   AT THIS MOMENT, YOUR HONOR.

19           THE COURT:  ALL RIGHT.

20   BY MR. MICHAEL:

21   Q.   WITH REGARD TO AN ENCRYPTED CONTAINER, AGENT MORAN, WHAT

22   LIMITS, IF ANY, ARE THERE WITH REGARD TO THE NUMBER OF IMAGES

23   OR VIDEOS THAT CAN BE PUT INTO IT?

24   A.   I'M SORRY?

25   Q.   WHAT LIMITS ARE THERE, IF ANY, WITH REGARD TO THE NUMBER

1    OF IMAGES OR VIDEOS THAT CAN BE STORED IN AN ENCRYPTED

2    CONTAINER?

3    A.    JUST THE SIZE OF THE CONTAINER ITSELF.

4    Q.    AND WHAT ABOUT THE TYPES OF IMAGES OR VIDEOS, ARE THERE

5    ANY LIMITS?

6    A.    NO.

7    Q.    AND IN THIS CASE WHAT WAS THE ENCRYPTED CONTAINER

8    CALLED?

9    A.    PRIVATE1 WITH A NUMBER, SO IT WOULD BE P-R-I-V-A-T-E-1,

10   DOT J-B-C.

11   Q.    AND WHAT'S YOUR UNDERSTANDING OF WHAT THE JBC STANDS

12   FOR?

13   A.    THAT'S A FILE EXTENSION THAT'S ASSOCIATED WITH JETICO

14   BESTCRYPT.

15   Q.    SO JBC STANDS FOR JETICO BESTCRYPT?

16   A.    YES.

17   Q.    AND THAT IDENTIFIES THIS CONTAINER -- WOULD IT BE FAIR

18   TO SAY THAT IDENTIFIES THIS CONTAINER AS AN ENCRYPTED

19   CONTAINER CREATED WITH THAT PROGRAM?  IS THAT WHAT YOU MEAN

20   BY A FILE EXTENSION?

21   A.    YES.  A FILE EXTENSION ASSOCIATES WITH THE PROGRAM.

22   Q.    SO THAT WAY THE PROGRAM IS ABLE TO KNOW WHAT THE

23   ENCRYPTED CONTAINER IS?

24   A.    THE OPERATING SYSTEM WOULD, YES.

25   Q.    THE OPERATING SYSTEM.

```
 1              THE COURT:  IS THIS A GOOD BREAKING POINT?

 2              MR. MICHAEL:  YES, YOUR HONOR.

 3              THE COURT:  THANK YOU VERY MUCH, LADIES AND

 4    GENTLEMEN, FOR YOUR PATIENCE AND ATTENTION THIS WEEK.  WE

 5    WILL SEE YOU BACK ON TUESDAY MORNING AT 9:00.  AND, AGAIN,

 6    PLEASE REMEMBER, IN THE NEXT THREE DAYS DON'T DISCUSS THE

 7    CASE WITH ANYONE.  IF YOU ARE GOING BACK TO WORK ON MONDAY,

 8    LIKE I SAID, PEOPLE ARE ALWAYS CURIOUS ABOUT SOMEONE ELSE'S

 9    JURY DUTY, SO APART FROM SAYING YOU'VE BEEN SEATED AS A JUROR

10    IN THE FEDERAL COURT, DON'T SAY ANYTHING ELSE ABOUT THIS CASE

11    OR ABOUT THE EVIDENCE OR ANYONE INVOLVED IN THE CASE OR

12    ANYTHING ELSE, ALL THE WARNINGS I'VE BEEN GIVING YOU ALL

13    WEEK.  DON'T MAKE UP YOUR MINDS ABOUT IT.  DON'T FORM ANY

14    OPINIONS ABOUT IT.  THANK YOU VERY MUCH AND WE WILL SEE YOU

15    BACK AT 9:00 ON TUESDAY MORNING.  YOU'RE EXCUSED.

16              (OUT OF THE PRESENCE OF THE JURY:)

17              THE COURT:  AGENT MORAN, YOU MAY STEP DOWN.

18              THE WITNESS:  THANK YOU.

19              THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

20    PRESENCE OF THE JURY.  AND WE NEED TO TAKE UP A FEW MATTERS

21    THIS AFTERNOON BEFORE WE ADJOURN.

22              LET'S START WITH THE ISSUE OF CHARLES SUTHERLAND.

23    I'VE READ THE DEFENDANT'S MOTION AND I'VE READ THE TRANSCRIPT

24    OF THE INTERVIEW, I GUESS THAT MR. SUTHERLAND HAD WITH LAW

25    ENFORCEMENT.  IN A NUTSHELL, AND MAYBE THIS IS TOO
```

 1   ABBREVIATED, BUT TO THE EXTENT THAT THE MOTION ARGUES THAT

 2   THE GOVERNMENT SHOULD NOT BE ALLOWED TO PUT THAT WITNESS ON

 3   THE STAND TO TESTIFY THAT HE HAD A FEELING THAT THERE WAS

 4   SOMETHING NOT QUITE RIGHT ABOUT THE DEFENDANT OR HE DIDN'T

 5   WANT -- OR HE HAD A FEELING THAT HE DIDN'T WANT THE DEFENDANT

 6   TO BE AROUND EITHER OF HIS TWO SONS, AND HIS ONLY BASIS FOR

 7   THAT THAT HE REALLY SPECIFIED HAD TO DO WITH WHEN HE WAS

 8   ASKED ABOUT IT BY THE INVESTIGATOR THAT HE WAS SPEAKING TO

 9   WAS, AS I REVIEWED IT, AS I REVIEWED THE TRANSCRIPT, HAD TO

10   DO WITH HIS, MR. SUTHERLAND'S, DIFFERENCE IN VALUES

11   REGARDING -- WHAT HE HAD BEGAN TO PERCEIVE AS A DIFFERENT SET

12   OF VALUES FROM THOSE THAT HE BELIEVED THE DEFENDANT HELD

13   REGARDING A WORK ETHIC OR THE DEFENDANT'S -- I THINK HE

14   CALLED IT THE DEFENDANT'S ATTITUDE TOWARD WOMEN OR THE TYPES

15   OF REMARKS HE WOULD MAKE ABOUT OTHER PEOPLE.  AND TO THE

16   EXTENT THAT THE GOVERNMENT WOULD TRY TO EITHER ELICIT OR

17   WOULD INSUFFICIENTLY CONTROL THE WITNESS FROM SAYING THOSE

18   THINGS, I THINK THE DEFENSE MOTION IS WELL TAKEN, NONE OF

19   THAT IS ADMISSIBLE BECAUSE IT'S NOT RELEVANT.

20           THE WITNESS IN THIS INVESTIGATION -- IN THIS

21   INTERVIEW, I SHOULD SAY THIS INVESTIGATORY INTERVIEW, APART

22   FROM SOME STATEMENTS ABOUT THE DEFENDANT'S COMPUTER USAGE

23   WHICH MIGHT BE RELEVANT, I'M NOT SURE WHAT ELSE THAT'S IN

24   HERE THAT THE GOVERNMENT MIGHT SEEK TO -- IN TERMS OF SUBJECT

25   MATTER, THE GOVERNMENT MIGHT BE SEEKING TO INTRODUCE THROUGH

1    THIS WITNESS.

2             SO I WOULD ASK COUNSEL FOR THE GOVERNMENT, IN

3    GENERAL TERMS, WHAT'S YOUR PROFFER ABOUT WHAT YOU'RE CALLING

4    MR. SUTHERLAND TO TESTIFY TO?

5             MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT HAS NEVER

6    HAD ANY INTENT TO ELICIT FROM MR. SUTHERLAND TESTIMONY ABOUT

7    HIS VIEWS, EITHER NOW OR AT THE TIME OR EVER, ABOUT THE

8    DEFENDANT'S WORK ETHIC, ATTITUDE TOWARDS WOMEN, OR HIS

9    REMARKS ABOUT OTHER PEOPLE, AND I'M ASSUMING DEROGATORY

10   REMARKS ABOUT PEOPLE IN GENERAL.

11            THE COURT:  BUT ARE YOU GOING TO ASK THE WITNESS

12   WHY HE DIDN'T WANT HIS SONS TO BE AROUND THE DEFENDANT, WHY

13   HE BEGAN TO HAVE, IN HIS WORDS --

14            MR. MICHAEL:  I BELIEVE HE SAID HE WAS VERY --

15            THE COURT:  -- HE STARTED SUSPECTING SOMETHING?

16            MR. MICHAEL:  YOUR HONOR, IF I MAY, JUST TO PUT

17   THIS INTERVIEW INTO CONTEXT, I BELIEVE THIS INTERVIEW WAS

18   DONE ON JUNE 7TH, 2001, SO LITERALLY WITHIN A DAY OF --

19            THE COURT:  VERY EARLY ON.

20            MR. MICHAEL:  WITHIN A DAY OF HIM LEARNING OF THE

21   POSSIBLE SEXUAL ABUSE OF HIS SEVEN-YEAR-OLD SON BY AN OLD

22   CLOSE FAMILY FRIEND.  AND MY UNDERSTANDING IS THAT IT WAS A

23   COMPLETE SHOCK TO HIM THAT SOMETHING HAD ACTUALLY HAPPENED.

24            BUT AS THE GOVERNMENT READS THE STATEMENTS, IT

25   SEEMS TO INTERTWINE WITH PERHAPS HIM NOT LIKING THE INFLUENCE

1    THAT MR. SANDERS MAY HAVE BEEN ON HIS TWO SONS.  HE ALSO

2    INDICATES, YOU KNOW, I STARTED SUSPECTING SOMETHING LAST

3    YEAR.  I CAN'T -- AND HE GOES ON TO SAY, "I STARTED FEELING

4    SOMETHING.  I CAN'T REALLY PINPOINT IT.  I DIDN'T LIKE IT."

5    HE SAYS A LOT OF IT WAS HIS DEROGATORY LANGUAGE, SEXUAL

6    OVERTONE, AND A SICK WAY TOWARDS WOMEN, HIS LACK OF WORK

7    ETHIC.  HE BELIEVED PEOPLE SHOULDN'T HAVE TO WORK AND SUCH.

8    SO THE GOVERNMENT IS NOT SEEKING TO ELICIT THAT.

9          HE GOES ON TO SAY, AND THAT THEN I JUST DIDN'T LIKE

10   THE CLOSENESS I WAS NOTICING, KIND OF THE CUDDLING UP THAT I

11   WAS NOTICING FROM KALEN.  AND I NOTICED THAT.  AND IT WAS

12   SOMETHING THAT -- IT WAS SOMETHING, THE CLOSENESS.  I CAN'T

13   PINPOINT IT NOW.  NOW I'M SAYING MY EYES ARE A LOT MORE OPEN,

14   BUT I'M GOING BACK TO THEN.  AND BACK TO THEN, I HAD THIS

15   FEELING THAT I JUST WASN'T COMFORTABLE WITH THE WAY THE

16   INTERACTION WAS GOING AND I DIDN'T KNOW WHY.

17         AND THE GOVERNMENT SUBMITS THAT THAT IS HIGHLY

18   RELEVANT AND ADMISSIBLE.  IN LIGHT OF THE TESTIMONY OF AGENT

19   CLEMENTE, THE GOVERNMENT WILL CERTAINLY INSTRUCT THE WITNESS,

20   TO THE EXTENT HE TESTIFIES ABOUT ANY SUSPICIONS HE HAD OR ANY

21   UNCOMFORTABLE FEELINGS, THAT IT BE LIMITED ONLY TO THAT AREA

22   AND NOTHING ELSE, AND NOT EVEN IMPLY THAT THERE WERE OTHER

23   AREAS THAT HE WAS CONCERNED ABOUT.  AND I CAN TELL YOU FROM

24   HAVING TALKED TO THE WITNESS, I BELIEVE HIS TESTIMONY WILL BE

25   CONSISTENT WITH THIS.

1            I THINK DEFENSE COUNSEL IS CONCERNED, AS HE TOLD

2    ME, THAT THERE'S GOING TO BE SOME BOMBSHELL DROPPED BY

3    MR. SUTHERLAND.  I WOULD IMAGINE THE GOVERNMENT WILL ELICIT

4    ADDITIONAL DETAILS FROM HIM ABOUT THAT CLOSENESS AND HIS

5    OBSERVATIONS OF THE DEFENDANT'S INTERACTION WITH KALEN.

6            THE COURT:  ALL RIGHT.  SO YOU'RE CALLING

7    MR. SUTHERLAND TO TESTIFY ABOUT WHAT HE OBSERVED ABOUT THE

8    INTERACTIONS, THE PHYSICAL INTERACTIONS, BETWEEN KALEN AND

9    MR. SANDERS?

10           MR. MICHAEL:  CORRECT, AS WELL AS OPPORTUNITY, TIME

11   TOGETHER, AND TIME TOGETHER --

12           THE COURT:  PARDON ME AGAIN FOR INTERRUPTING YOU.

13   IN OTHER WORDS, WHEN THE DEFENDANT VISITED THE FAMILY, WERE

14   THERE TIMES WHEN KALEN WAS ALONE WITH THE DEFENDANT?

15           MR. MICHAEL:  YES, YOUR HONOR.

16           THE COURT:  THAT KIND OF TESTIMONY?

17           MR. MICHAEL:  OR WAS ALONE WITH, MY UNDERSTANDING,

18   WAS ALONE WITH MAYBE HIS BROTHER AND THE DEFENDANT.  BUT MY

19   UNDERSTANDING IS THERE WAS ALSO TIME WHEN KALEN WAS ALONE

20   WITH THE DEFENDANT, OR WHEN DEFENDANT SOUGHT TIME WITH THE

21   BOYS, THE SONS TOGETHER.  AND I THINK THAT MR. SUTHERLAND

22   WILL TESTIFY TO THAT EFFECT ABOUT THE DEFENDANT'S INTEREST IN

23   TIME WITH HIS TWO BOYS AS WELL AS OPPORTUNITY AND TIME TO BE

24   ALONE WITH THE ONE BOY AT A TIME OR --

25           THE COURT:  THERE ARE REFERENCES TO THAT --

1          MR. MICHAEL:  YES.

2          THE COURT:  -- A LITTLE BIT IN THIS TRANSCRIPT.

3          MR. MICHAEL:  AND, YOUR HONOR, I MEAN HIS STATEMENT

4    THEN THAT I'M NOW SEEING MORE, MY EYES ARE A LOT MORE OPEN,

5    YOU KNOW, HE'S HAD TIME TO REFLECT SINCE THIS INTERVIEW,

6    TAKEN VERY CLOSE IN TIME, AND IT WAS A SINGLE INTERVIEW ABOUT

7    MR. SANDERS.  AND, QUITE FRANKLY, HE HASN'T REFLECTED ABOUT

8    IT RECENTLY, BECAUSE IT'S BEEN SOME TIME, BUT THE GOVERNMENT

9    HAS REACHED OUT TO HIM UPON REQUESTING THAT HE BE A WITNESS

10   IN THIS CASE AND HAVE ASKED HIM TO REALLY THINK ABOUT WHAT

11   WENT ON.

12          AND I THINK THAT HE WILL ADD SOME LEVEL OF DETAIL.

13   I DON'T EXPECT THERE TO BE SOME BOMBSHELL DROPPED.  AND I CAN

14   TELL YOU HE DOESN'T REMEMBER ALL OF THE INTERACTION BETWEEN

15   HIS SON, AS I UNDERSTAND IT, AT LEAST WHEN I LAST SPOKE TO

16   HIM, BUT THAT AT LEAST CERTAINLY THIS TESTIMONY IS CONSISTENT

17   WITH GROOMING, IT SHOWS OPPORTUNITY, IT SHOWS PERHAPS INTENT,

18   AND THAT KNOWING THAT THE PURPOSE OF GROOMING, TO THE EXTENT

19   THE GOVERNMENT CAN SHOW IT HERE, IS THAT IT BASICALLY

20   DECEIVES AND FOOLS THE PARENTS.

21          MR. SUTHERLAND DIDN'T SAY, I SEE THINGS WITH MY

22   EYES MORE WIDELY OPEN NOW.  HE FROM THIS POINT FORWARD BEGAN

23   TO PUT SOME THINGS TOGETHER.  HE'S NOT GOING TO TESTIFY THAT

24   HE EVER WITNESSED AN ACT OF SEXUAL MOLESTATION.  HE'S NOT

25   GOING TO TESTIFY, OBVIOUSLY, ANYTHING HE'S LEARNED FROM HIS

 1    SON ABOUT ACTUAL ACTS OF SEXUAL MOLESTATION THAT HIS SON HAS

 2    TOLD HIM ABOUT.  HE IS ONLY GOING TO TESTIFY ABOUT HIS

 3    OBSERVATIONS AND, AS I ALSO ADDED, ABOUT OPPORTUNITY AND

 4    RELEVANT DATES LEADING UP TO AND AT THE ACTUAL TIME OF THE

 5    EVENTS CHARGED IN THE INDICTMENT.

 6            THE COURT:  ALL RIGHT.  WELL, AS WITH ALL

 7    WITNESSES -- WELL, AS WITH ALL WITNESSES, OF COURSE, EVERY

 8    ATTORNEY HAS A RESPONSIBILITY TO -- EVERY ATTORNEY THAT IS

 9    CALLING A WITNESS HAS A RESPONSIBILITY TO CAUTION THEM ABOUT

10    LISTENING TO THE QUESTION, ANSWERING ONLY THE QUESTION AND SO

11    FORTH.  THAT GOES FOR ALL WITNESSES.  WE ALL KNOW THAT SOME

12    WITNESSES -- AND I'M NOT OPINING AS TO MR. SUTHERLAND BECAUSE

13    HE DIDN'T TESTIFY IN THE FIRST TRIAL, SO I HAVE NO REASON TO

14    BELIEVE THAT HE'S GOING TO BE A MORE DIFFICULT WITNESS THAN

15    ANY OTHER, BUT WE ALL KNOW THAT SOME WITNESSES ARE MORE PRONE

16    TO HAVE DIFFICULTY IN CONFINING THEMSELVES TO THE QUESTION.

17            AND I'LL SAY MORE THAN THAT.  MY EXPERIENCE AND,

18    FURTHERMORE, MY COMMON SENSE WOULD TELL ME A WITNESS IN A

19    POSITION THAT MR. SUTHERLAND IS IN -- THAT IS, THE FATHER OF

20    A CHILD WHO IS ALLEGED TO BE THE VICTIM OF THIS CRIME --

21    WOULD BE A WITNESS THAT WOULD ALWAYS GIVE THE COURT SOME

22    ANXIETY ABOUT WHETHER OR NOT HE'S GOING TO HAVE MORE

23    DIFFICULTY THAN ANOTHER WITNESS IN FOLLOWING ADMONITIONS

24    ABOUT LISTENING TO THE QUESTION, ONLY ANSWERING THE QUESTION

25    THAT'S ASKED.  SO COUNSEL HAS THE RESPONSIBILITY, DO YOUR

```
 1    BEST, TO REMIND HIM OF THOSE CONDITIONS.

 2              MR. MICHAEL:  COUNSEL HAS ALREADY BEGUN THAT

 3    PROCESS, YOUR HONOR, AND IS CONFIDENT, WITHOUT ASSURANCES,

 4    THAT HE WILL COMPLY WITH THE COURT'S ORDER AND GIVE YOU AS

 5    MUCH ASSURANCE AS WE POSSIBLY CAN.

 6              THE COURT:  THERE'S NO GUARANTEES, AS WE ALL KNOW.

 7              MR. MICHAEL:  I TRULY DON'T EXPECT THAT TO BE A

 8    PROBLEM HERE.

 9              THE COURT:  ALL RIGHT.  THANK YOU.

10              MR. AARON, DO YOU HAVE ANYTHING TO ADD?

11              MR. AARON:  I DO, YOUR HONOR.  AND I'M VERY

12    CONCERNED ABOUT THIS.  I'VE HAD A LOT OF EXPERIENCE TRYING

13    THESE TYPES OF CASES ON THE STATE LEVEL WHERE THEY ARE MUCH

14    MORE COMMON AND I'VE DEALT WITH WITNESSES LIKE -- OBVIOUSLY

15    NOT THE SAME AS CHARLES SUTHERLAND, KALEN S., AND LORI

16    STYLES -- MANY, MANY TIMES.

17              I THINK, FIRST OF ALL, I SHOULD ALERT THE COURT TO

18    THE FACT THAT THESE WITNESSES ARE EXTREMELY HOSTILE IN SOME

19    WAYS TO THE DEFENSE IN THAT I HAVE TRIED MANY TIMES TO

20    CONTACT THESE WITNESSES.  THEY DON'T RETURN TELEPHONE CALLS.

21    NOW, I APPARENTLY DON'T HAVE THE CORRECT ADDRESSES FOR AT

22    LEAST ONE OF THEM.  I DIDN'T KNOW THAT KALEN S. WAS ON

23    VACATION, ALTHOUGH IT APPEARS I DID HAVE HIS CORRECT ADDRESS,

24    BUT I'M NOT QUITE SURE ABOUT THAT.  BUT I CERTAINLY HAD HIS

25    MOTHER'S ADDRESS.
```

1          LET ME RESPOND, IF I MIGHT, TO A COUPLE OF THINGS

2    THAT COUNSEL RAISED.  THAT THE INTERVIEW WAS ON JUNE 7TH,

3    2001, VERY EARLY ON, THIS IS THE ONLY DISCOVERY THAT WE HAVE.

4    THIS IS THE ONLY WITNESS STATEMENT THAT WE HAVE FOR THIS

5    WITNESS.  SO IF IT'S EARLY AND COUNSEL IS IMPLYING THAT IT'S

6    CHANGED AND IT'S MATURED AND IT'S BECOME DIFFERENT, IF SO,

7    HE'S GOT THE RESPONSIBILITY TO GIVE US THAT INFORMATION IF

8    IT'S IN A WRITTEN OR RECORDED STATEMENT, OR JUST IF IT IS

9    IMPEACHMENT MATERIAL.  IF IT'S INCONSISTENT, IT'S IMPEACHMENT

10   MATERIAL.  AND MY UNDERSTANDING UNDER AGURS AND BAGLEY AND

11   BRADY IS THAT IMPEACHMENT MATERIAL IS EXCULPATORY MATERIAL

12   AND WE SHOULD HAVE THAT.

13          I KNOW THAT -- AND I'VE SEEN THIS UNFOLD IN MANY,

14   MANY TRIALS, THAT THE COURT TRIES TO LIMIT THE TESTIMONY OF A

15   WITNESS AND ONCE THE WITNESS GETS ON THE STAND HE'S

16   UNCONTROLLABLE.  I HAVE A FEELING -- AND I'M NOT MAKING ANY

17   PERSONAL REMARKS ABOUT COUNSEL AT ALL, BUT I HAVE THE FEELING

18   THAT THIS IS GOING TO BE A BIG PROBLEM FOR THE DEFENSE IN

19   THAT THE PROSECUTION HAS INFORMATION THAT THE DEFENSE DOES

20   NOT HAVE.  THE PROSECUTOR MAY THINK THAT HE DOESN'T NEED TO

21   DISCOVER THIS INFORMATION, BUT I BELIEVE THAT HE DOES.  AND I

22   BELIEVE THAT WE ARE GOING TO HAVE A BIG PROBLEM WITH THIS.

23          WHEN WE HAVE A WITNESS GETTING UP ON THE STAND, AND

24   WE KNOW FROM HIS PRIOR STATEMENTS THAT HE HAD, QUOTE/UNQUOTE,

25   A FEELING THAT HE, QUOTE/UNQUOTE, FELT UNCOMFORTABLE, BUT HE

1   CANNOT ARTICULATE IT.  THAT'S IN THE STATEMENT AND THAT'S IN

2   THE REPORTS OF THE INTERVIEWS.  HE TELLS INVESTIGATORS, I

3   CAN'T ARTICULATE WHY.  NOW COUNSEL IS TELLING US HE'S HAD

4   TIME TO CONSIDER THAT.  HE'S GOING TO TALK ABOUT INCIDENTS.

5   MY FEELING AND MY SUSPICION IS THAT HE IS GOING TO SAY, I

6   JUST DIDN'T REALIZE AT THE TIME.  MY EYES HADN'T BEEN OPENED,

7   BUT, YES, IT WAS THE PHYSICAL CLOSENESS, IT WAS THE TOUCHING,

8   IT WAS THE FACT THAT HE WOULD JUMP IN THE DEFENDANT'S LAP,

9   THINGS LIKE THAT.

10        ON THE ISSUE ABOUT HIM WANTING -- MR. SANDERS

11   WANTING TO SPEND TIME WITH THE CHILDREN, I DON'T RECALL MUCH

12   ABOUT THAT IN THE TRANSCRIPTS AT ALL.

13        THE COURT:  WELL --

14        MR. AARON:  AND PERHAPS THE COURT OR COUNSEL COULD

15   DIRECT ME.

16        THE COURT:  IT COULD BE THAT I'M MIXING THAT UP

17   WITH THE NOTES FROM MS. STYLES' DISCUSSION WITH INVESTIGATOR

18   HUBBARD, BUT I THINK IT'S IN HERE, AND LET ME SHOW YOU WHERE

19   I THOUGHT IT WAS.

20        MR. MICHAEL:  YOUR HONOR, IF I CAN DIRECT YOU TO

21   PAGE 5 OF THE TRANSCRIPT, PARAGRAPH BEGINNING ON LINE 18,

22   THERE IS CERTAINLY A REFERENCE THERE THAT JIM WOULD BE -- HIS

23   MAIN FOCUS WAS DEFINITELY TO SPEND TIME WITH THE CHILDREN.

24        THE COURT:  AND ALSO UP ABOVE THAT.

25        MR. MICHAEL:  HE'S TALKING ABOUT SPENDING TIME AT

1    LORI'S HOUSE.

2            THE COURT:  TO BE WITH THE KIDS WHEN THE KIDS WERE

3    THERE.

4            MR. AARON:  THAT'S NOT ACTUALLY WHAT IT SAYS.  IT

5    SAYS:  UM, WHEN HE WAS HERE, HE WOULD TEND TO SPEND MORE TIME

6    AT LORI'S HOUSE, BE WITH THE KIDS WHEN THE KIDS WERE THERE."

7    THAT DOESN'T MEAN THAT HE SOUGHT THEM OUT OR ANYTHING.  THE

8    OTHER REMARK DOES SEEM TO INDICATE THAT, BUT JIM WOULD BE --

9    HIS MAIN FOCUS WAS DEFINITELY TO SPEND TIME WITH THE

10   CHILDREN.

11           NOW, IF THERE WAS JUST THAT ONE REMARK, YOUR HONOR,

12   I WON'T HAVE A PROBLEM WITH IT, BUT I BELIEVE THAT COUNSEL --

13   COUNSEL IS KIND OF INDICATING THAT HE HAS ADDITIONAL

14   INFORMATION WHICH IS NOT IN THE REPORT AND THE STATEMENT THAT

15   I HAVE.  AND JUST BECAUSE IT'S CONSISTENT, THAT DOESN'T MEAN

16   IT'S NOT IMPORTANT TO THE DEFENSE AND IT'S NOT ESSENTIAL FOR

17   THE DEFENSE TO KNOW IT.  BECAUSE IF HE TALKS ABOUT SPECIFIC

18   INSTANCES, I CAN TALK TO LORI AND KALEN S. ABOUT THOSE AND I

19   CAN USE THOSE IN MY DETERMINATION WHETHER OR NOT TO CALL

20   THOSE WITNESSES.

21           IF IT WAS JUST A CASE OF THIS WITNESS GETTING UP ON

22   THE STAND AND SAYING, I WAS UNCOMFORTABLE, I HAD A FEELING, I

23   DIDN'T LIKE HOW CLOSE HE WAS TO MY SON, I NOTED THAT A COUPLE

24   OF TIMES -- BECAUSE I BELIEVE HE'S ONLY TALKING ABOUT A

25   COUPLE OF INSTANCES HE CAME OVER -- HIS MAIN INTEREST WAS

1   STAYING WITH THE CHILDREN AND I DIDN'T LIKE THAT, THAT WOULD

2   BE ONE THING.  I MIGHT EVEN MAKE THE DECISION THAT IT'S NOT

3   IMPORTANT TO CALL KALEN S. OR LORI STYLES REGARDING CHARLES

4   SUTHERLAND'S TESTIMONY, BUT I THINK HE IS GOING TO GO BEYOND

5   THAT AND I BELIEVE THAT --

6           THE COURT:  WELL, HE MAY.  HE MAY.

7           MR. AARON:  I SHOULD BE ENTITLED TO THAT

8   INFORMATION.

9           THE COURT:  WELL, THE GOVERNMENT MAY NOT HAVE THAT

10   INFORMATION, NUMBER ONE.  AND NUMBER TWO, IF THE ATTORNEYS

11   FOR THE GOVERNMENT, AND NOT AN AGENT, HAVE HAD DISCUSSIONS

12   WITH THE WITNESS, THEN WE ALL KNOW WHAT YOUR

13   CROSS-EXAMINATION IS GOING TO CONSIST OF; AND THAT IS, YOU'RE

14   GOING TO ASK THE WITNESS ON CROSS-EXAMINATION IF HE'S TALKED

15   WITH THE ATTORNEYS FOR THE GOVERNMENT AND HOW MANY TIMES AND

16   DID THEY COACH HIM TO SAY THESE THINGS AND SO FORTH AS A WAY

17   OF IMPEACHING.  AND YOU WILL BE ENTITLED TO FIND OUT EVERY

18   SINGLE THING THE ATTORNEYS FOR THE GOVERNMENT TOLD HIM AND

19   WHAT HE SAID TO THEM AND WHAT HE REVIEWED IN PREPARING FOR

20   HIS TESTIMONY.  I CAN'T POSSIBLY THINK OF EVERYTHING THAT

21   YOU'VE ALREADY THOUGHT OF IN TERMS OF HOW TO DO THAT

22   CROSS-EXAMINATION, BUT THAT'S THE WAY IT'S GOING TO UNFOLD.

23           MR. AARON:  THE TRUTH IS, YOUR HONOR, WE ALREADY

24   KNOW THAT HE'S TALKED TO THE GOVERNMENT.

25           THE COURT:  THE GOVERNMENT HAS ALREADY TOLD US THAT

1    THEY'VE TALKED TO HIM.

2          MR. AARON:  WE HAVEN'T BEEN GIVEN ANY MEMORANDUM.

3    WE HAVEN'T BEEN GIVEN ANY NOTES.  WE HAVEN'T EVEN BEEN TOLD

4    IF AN AGENT WAS PRESENT THERE, AND I DID ASK THAT.

5          THE COURT:  WELL, IF AN AGENT WAS PRESENT, THEN AN

6    AGENT WOULD HAVE DONE A REPORT, CORRECT?  IF AN AGENT

7    INTERVIEWED, THERE WOULD HAVE BEEN A REPORT WHICH WOULD HAVE

8    BEEN DISCOVERABLE.

9          MR. MICHAEL:  THE GOVERNMENT AT TIMES -- AND I'M

10   NOT SPECIFICALLY ABOUT A CASE -- WE MEET WITH A WITNESS AND

11   ASK AN AGENT TO BE PRESENT.

12         THE COURT:  BUT IF COUNSEL IS INTERVIEWING A

13   WITNESS, IF IT'S FOR TRIAL PREPARATION --

14         MR. MICHAEL:  CORRECT.

15         THE COURT:  -- THAT'S WORK PRODUCT.

16         MR. MICHAEL:  CORRECT.  THE AGENT IS ONLY THERE TO

17   THE EXTENT THE WITNESS WERE TO CLAIM THAT THE GOVERNMENT DID

18   SOMETHING INAPPROPRIATE, MERELY AS A WITNESS AS TO THE

19   CONDUCT OF THE ATTORNEY, BUT THE SUBSTANCE OF THE

20   INTERVIEW -- AND I WILL TELL THE COURT THIS:  THE INTERVIEWS

21   THAT HAVE BEEN CONDUCTED, NOT EVEN INTERVIEWS, BECAUSE THERE

22   HASN'T BEEN A FULL DEBRIEFING OF MR. SUTHERLAND BECAUSE OF

23   TIME CONSTRAINTS.  I HAD ONE MEETING WITH HIM WHEN WE THOUGHT

24   HE WAS GOING TO TESTIFY AT THE LAST TRIAL.  WE BEGAN A

25   DISCUSSION OF HIS POSSIBLE TESTIMONY.  THEN HE LEFT TOWN AND

```
 1   I'VE NOT MET WITH HIM SINCE THEN BECAUSE HE HAD TO LEAVE.  I
 2   THINK, AS WE TOLD YOU, HE HAD SCHEDULING RESTRICTIONS LAST
 3   TIME.  HE HAS THOSE RESTRICTIONS THIS TIME.  THAT'S BEEN
 4   TRIAL PREP.  I THINK THIS IS ALREADY DIVULGING WORK PRODUCT
 5   AND THE TOOLS AND METHODS OF THE GOVERNMENT THAT'S REALLY
 6   BEYOND WHAT'S APPROPRIATE.
 7        MR. AARON:  WORK PRODUCT, YOUR HONOR, IS
 8   STRATEGIES, IMPRESSIONS, AND THINGS LIKE THAT.  WHAT WE ARE
 9   TALKING ABOUT HERE ARE NOT MR. MICHAEL'S STRATEGY AND
10   IMPRESSIONS, WE'RE TALKING ABOUT SPECIFIC STATEMENTS THAT THE
11   WITNESS MADE.
12        FOR EXAMPLE, MR. MICHAEL SAID THE GOVERNMENT WILL
13   ELICIT ADDITIONAL DETAILS ABOUT INTERACTIONS.  I'M NOT SAYING
14   TELL ME WHY YOU WANT TO ELICIT THOSE ADDITIONAL DETAILS.  I'M
15   SAYING WHAT ADDITIONAL DETAILS HAVE YOU TALKED ABOUT, HAS
16   THAT WITNESS TOLD YOU.  I'M NOT SAYING GIVE ME YOUR STRATEGY,
17   YOUR IMPRESSIONS OF THOSE ADDITIONAL DETAILS.  I'M SAYING
18   WHAT ARE THEY, BECAUSE I NEED THEM TO PREPARE MY CASE.
19        MR. MICHAEL:  YOUR HONOR, IF I MAY.  MR. SUTHERLAND
20   AND HIS FAMILY HAVE KNOWN THE DEFENDANT FOR MANY, MANY YEARS.
21   OBVIOUSLY, THIS INTERVIEW WAS VERY FOCUSED WHEN IT WAS
22   PERFORMED.  AND THE GOVERNMENT IS ENTITLED TO PROBE
23   MR. SUTHERLAND ABOUT THE RELATIONSHIP AND HISTORY WITH
24   MR. SANDERS.  AND MR. SANDERS WAS PRESENT FOR WHATEVER
25   INTERACTION MR. SUTHERLAND WOULD BE TALKING ABOUT, SO HE
```

1    WOULD KNOW WHAT CONTACT THERE WAS OR WASN'T AND HE WOULD KNOW

2    IF MR. SUTHERLAND WAS LYING ON THE STAND AND COULD ADVISE HIS

3    COUNSEL TO TAKE APPROPRIATE STEPS.

4          THE GOVERNMENT AT THIS POINT, AS I SAID, HAS NOT

5    SPENT MUCH TIME WITH MR. SUTHERLAND.  AND I WILL TELL YOU I

6    DON'T SEE ANY IMPEACHMENT MATERIAL WHICH THE GOVERNMENT WOULD

7    CERTAINLY TURN OVER HAD IT LEARNED IN THE LIMITED INTERACTION

8    IT HAD WITH HIM.

9          AS YOUR HONOR IS AWARE, THE GOVERNMENT AT SEVERAL

10   POINTS DURING THIS TRIAL AND THE PRIOR TRIAL HAS TURNED

11   THINGS OVER SUBJECT TO STERN ADMONITIONS FROM THE COURT AND

12   RECOGNIZING THAT IT WASN'T PERHAPS IN THE TIME FRAME THAT THE

13   COURT WOULD HAVE PREFERRED TO HAVE SEEN, BUT THE GOVERNMENT

14   HAS MADE EVERY EFFORT TO COMPLY WITH ITS OBLIGATIONS.  AS

15   SOON AS IT LEARNS OF ANY INFORMATION IT BELIEVES IT'S

16   SUPPOSED TO TURN OVER, WE'VE TURNED IT OVER, JUST LIKE WE DID

17   WITH THOSE AUDIO RECORDINGS.  THE GOVERNMENT IS NOT TRYING TO

18   HIDE ANYTHING, BUT THE GOVERNMENT IS ENTITLED TO PREPARE ITS

19   CASE AND HAVE A WORK PRODUCT PRIVILEGE IN DOING THAT.

20         MR. AARON:  CERTAINLY I UNDERSTAND THAT THE

21   GOVERNMENT IS ENTITLED TO PREPARE ITS CASE, BUT SO IS THE

22   DEFENSE.  AND HERE THE STANDARDS, THEY ARE NOT QUITE EQUAL.

23   THE GOVERNMENT HAS THE DUTY TO ENSURE JUSTICE; WE DO NOT.

24   AND THAT'S THE CRUCIAL DIFFERENCE.

25         UNLIKE THE GOVERNMENT, HOWEVER, I HAVE BEEN

1   FORCED -- WITH LORI STYLES, KALEN S. AND THE KAT DUFF

2   SITUATION, I HAVE BEEN FORCED TO GIVE THE GOVERNMENT ALL

3   SORTS OF INFORMATION ABOUT MY POSSIBLY CALLING THESE

4   WITNESSES THAT ORDINARILY THEY WOULDN'T BE ENTITLED TO.  SO I

5   THINK IN THE INTEREST OF JUSTICE TO SAY, LOOK --

6           THE COURT:  WELL, YOU HAVEN'T BEEN -- I DON'T KNOW

7   EXACTLY WHAT YOU MEAN, YOU HAVE BEEN FORCED TO.  YOU'VE DONE

8   THAT BECAUSE YOU NEEDED THE GOVERNMENT'S -- OR AS I

9   UNDERSTAND IT, SO PLEASE CORRECT ME IF I'M MISSTATING THINGS,

10  BUT YOU HAVE DISCUSSED THAT WITH THE GOVERNMENT AS TO

11  MS. STYLES AND KALEN, I BELIEVE BECAUSE YOU'VE RECEIVED SOME

12  ASSISTANCE FROM THE GOVERNMENT IN TERMS OF GETTING THOSE

13  WITNESSES' COOPERATION IN COMING TO THIS TRIAL TO TESTIFY.

14          MR. AARON:  NO, I HAVE NOT RECEIVED ANY

15  COOPERATION.  THE GOVERNMENT I DON'T BELIEVE HAS HAD TIME TO

16  CONTACT THOSE WITNESSES, SO I DON'T KNOW IF --

17          THE COURT:  WELL, I GUESS I SHOULD ASK YOU WHAT YOU

18  MEAN WHEN YOU SAY YOU'VE BEEN FORCED TO DISCUSS THAT DECISION

19  WITH THE GOVERNMENT.

20          MR. AARON:  WELL, I'VE BEEN FORCED TO REVEAL THAT

21  INFORMATION THAT ORDINARILY I WOULDN'T HAVE HAD TO REVEAL.

22  ORDINARILY, I COULD HAVE SUBPOENAED THOSE WITNESSES AND

23  DECIDED MYSELF WHETHER OR NOT TO CALL THEM.  AND ORDINARILY,

24  I COULD HAVE WAITED UNTIL AFTER CHARLES SUTHERLAND TESTIFIED.

25  BECAUSE THEY ARE OUT-OF-STATE WITNESSES, BECAUSE THE COURT

1    HAD SAID WE NEED TO MAKE A DECISION ON THIS SOON --

2              THE COURT:  BY THE TIME I SAID THAT, IT HAD LONG

3    BEEN DISCLOSED THAT YOU WERE SEEKING A SUBPOENA AND SEEKING

4    PAYMENT AND EXPENSES.  AND JUST SO THE RECORD IS CLEAR,

5    ALTHOUGH I THINK WITHOUT THE COURT STATING THIS IT WOULD BE

6    CLEAR, YOU DID NOT FILE YOUR APPLICATION FOR ISSUANCE OF THE

7    OUT-OF-COURT SUBPOENAS UNDER SEAL AND YOU DID NOT FILE YOUR

8    APPLICATION FOR PAYMENT OF THEIR EXPENSES UNDER SEAL.  YOU

9    DISCLOSED ALL OF THAT TO THE GOVERNMENT.  SO THE COURT DIDN'T

10   ORDER YOU TO DO THAT, YOU DID THAT.

11             MR. MICHAEL:  YOUR HONOR --

12             THE COURT:  JUST A MOMENT.  LET ME FINISH, COUNSEL.

13             MR. MICHAEL:  I APOLOGIZE.

14             THE COURT:  AND THAT'S TO BE COMMENDED.  I THINK

15   THERE'S BEEN A LOT OF OPENNESS, AND THAT'S TO BE COMMENDED.

16             SO I JUST WANT TO MAKE IT CLEAR THAT THE ONLY

17   REASON, AS I THINK I SAID YESTERDAY, WAS I REALLY WANTED TO

18   KNOW -- I NEEDED TO KNOW WHETHER A DECISION WAS BEING MADE

19   WHETHER KALEN WAS BEING CALLED WAS BECAUSE I NEED TO MAKE

20   ARRANGEMENTS, IF WE GET TO THAT, TO SET UP AT LEAST -- WELL,

21   FOR TWO REASONS.  ONE, WE MAY HAVE TO HAVE A HEARING TO

22   DECIDE WHETHER WE HAVE TO HAVE THAT TESTIMONY TAKEN BY CLOSED

23   CIRCUIT TELEVISION.  AND WE HAVE TO WORK THAT INTO THE

24   SCHEDULE SO THAT WE DON'T KEEP THE JURY WAITING.

25             AND NUMBER TWO, IF THAT REQUEST BY THE GOVERNMENT

1    IS GRANTED OR THE COURT FINDS IT NECESSARY TO CONDUCT THE

2    HEARING VIA TWO-WAY CLOSED CIRCUIT -- WELL, IT'S NOT CLOSED

3    CIRCUIT, TWO-WAY TELEVISION, THE REQUIREMENTS, AS I READ

4    THEM, ARE PRETTY TECHNICALLY COMPLICATED.  AND I'VE BEEN

5    RECEIVING E-MAILS ON A VERY REGULAR BASIS FROM THE COURT'S

6    TECHNICAL STAFF IN LOS ANGELES ABOUT WHAT DAY THAT TESTIMONY

7    IS GOING TO TAKE PLACE AND WHERE AND HOW THAT IS GOING TO BE

8    SET UP.

9              MR. AARON:  I APPRECIATE THE COURT SHARING THAT

10   WITH US, BECAUSE I DID NOT KNOW THAT WAS BEHIND --

11             THE COURT:  I'M SORRY.  I THINK I DID SHARE THAT

12   THE LAST COUPLE OF DAYS, BUT THERE HAS BEEN AN AWFUL LOT OF

13   DISCUSSION, SO YOU MAY NOT REMEMBER THAT.  I DID SHARE

14   CONCERNS ABOUT HOW WE WERE GOING TO DO THIS AND THAT I'VE

15   BEEN WORKING WITH THE STAFF IN LOS ANGELES ON THIS ISSUE.

16             MR. AARON:  YOUR HONOR, I DID NOT SEAL THE REQUEST

17   FOR THE ISSUANCE OF THE OUT-OF-DISTRICT SUBPOENA AND THE

18   PAYMENT OF THOSE EXPENSES AND I KNEW THAT THE GOVERNMENT

19   WOULD HAVE THAT INFORMATION.  AND I DID THAT FOR A NUMBER OF

20   REASONS.  I WOULD NOTE, YOUR HONOR, WE HAVE BEEN PRETTY ABOVE

21   BOARD.  WE HAVE BEEN PRETTY CANDID WITH THE GOVERNMENT AND

22   WITH THE COURT REGARDING THOSE OUT-OF-STATE WITNESSES, EVEN

23   THOUGH IT SOMETIMES WORKED TO OUR DISADVANTAGE.

24             ALL THAT I'M SAYING IS I WOULD HOPE THAT WE WOULD

25   RECEIVE THE SAME CANDOR AND COOPERATION FROM THE GOVERNMENT.

```
 1   AND WHEN WE HAVE A WITNESS THIS IMPORTANT WITH THIS POTENTIAL
 2   FOR WHAT I'VE CALLED A BOMBSHELL AND UNBELIEVABLE PREJUDICE,
 3   THAT'S WHY I WOULD -- THAT'S WHAT I HAVE BEEN HOPING IS THAT
 4   WE WOULD GET MORE THAN -- OTHER THAN, WELL, THE GOVERNMENT
 5   WILL ELICIT ADDITIONAL DETAILS ABOUT THE INTERACTIONS.  WELL,
 6   OBVIOUSLY, THE GOVERNMENT KNOWS, HAS SOME INFORMATION ABOUT
 7   WHAT THIS WITNESS IS GOING TO SAY.  THEY'VE DEBRIEFED HIM
 8   ALREADY AT LEAST ONCE FOR THE FIRST TRIAL.
 9        THE COURT:  WELL, THERE'S ONE -- I MEAN, FIRST OF
10   ALL, I HAVE TO SAY THAT -- WELL, FIRST OF ALL, LET ME JUST
11   STATE ON THE RECORD THAT I THINK BOTH SIDES HAVE BEEN -- I
12   MEAN, BOTH SIDES ARE VERY APPROPRIATELY ZEALOUS.  AND BOTH
13   SIDES HAVE APPROPRIATELY STRONG FEELINGS ABOUT WHAT YOUR ROLE
14   IS, AND IT HAS SO FAR BEEN A VERY WELL-TRIED CASE.  AND I
15   HAVE EVERY CONFIDENCE THAT IT WILL CONTINUE TO BE TRIED IN
16   THAT SAME FASHION FOR THE NEXT FEW DAYS.  I DON'T SAY THAT IN
17   EVERY CASE.  I MEAN THAT VERY SINCERELY.
18        I DON'T VIEW THE ANTICIPATED TESTIMONY FROM
19   MR. SUTHERLAND WITH QUITE THE SAME TREPIDATION THAT DEFENSE
20   COUNSEL DOES, ALTHOUGH, OBVIOUSLY, HE IS, OF ALL OF THE
21   WITNESSES THAT THE GOVERNMENT IS GOING TO CALL, THE ONE THAT
22   IS -- IT'S HARD TO PREDICT, BUT THE ONE THAT IS PROBABLY MOST
23   LIKELY TO NEED THE GREATEST DEGREE OF CONTROL AND CAUTION
24   GIVEN HIS ROLE AS THE FATHER OF THE ALLEGED VICTIM.
25        BUT READING THIS STATEMENT -- EVERYTHING THAT I'VE
```

1   HEARD THIS AFTERNOON BOILS DOWN TO THIS:  I HAVE A STATEMENT

2   THAT HAS NOT A LOT OF DETAIL BUT THAT STATES THAT THE FATHER

3   OF KALEN S. IS BEGINNING TO LOOK BACK ON SOME OF THE

4   INTERACTIONS BETWEEN THE DEFENDANT AND HIS SON FROM A

5   DIFFERENT PERSPECTIVE AFTER THE CHARGES IN THIS CASE -- WELL,

6   AFTER THE INVESTIGATION BEGAN, AND I GUESS CHARGES HADN'T

7   BEEN MADE AT THAT TIME OR MAYBE THEY HAD, BUT WAS ALREADY

8   TELLING INVESTIGATORS TO A CERTAIN DEGREE ABOUT THE

9   DEFENDANT'S ACCESS TO HIS SON AND A CERTAIN LEVEL OF

10  UNCOMFORTABLE CLOSENESS, I THINK IS PRETTY ACCURATE AND CLOSE

11  TO THE WITNESS' OWN WORDS.

12          SO IF THE WITNESS NOW TAKES THE STAND AND TESTIFIES

13  CONSISTENTLY WITHOUT REFERENCE TO THE THINGS THAT I'VE

14  ALREADY STATED WOULD BE INADMISSIBLE AND WHICH THE GOVERNMENT

15  HAS STATED THEY WOULD NOT ELICIT AND ADDS A FEW MORE DETAILS

16  TO THAT, I DON'T REGARD THAT AS A BOMBSHELL.  I'M NOT SURE I

17  EVEN REGARD THAT AS REALLY IMPEACHMENT EVIDENCE IF THERE'S A

18  FEW MORE DETAILS ADDED, ALTHOUGH I'M SURE THAT THERE WILL BE

19  EFFECTIVE CROSS-EXAMINATION.  I DON'T VIEW THAT AS A

20  BOMBSHELL.  I DON'T DISAGREE THAT THERE'S POTENTIAL, MORE

21  POTENTIAL WITH THIS WITNESS THAN WITH OTHERS, GIVEN THE

22  NATURE OF HIS RELATIONSHIP TO THIS MATTER, BUT I DON'T THINK

23  AT THIS TIME THAT THERE'S ANYTHING BEFORE THE COURT THAT

24  MAKES THE COURT THINK THAT THE GOVERNMENT COUNSEL HAS NOT

25  COMPLIED WITH ITS OBLIGATIONS.  I WILL REMAIN OPEN-MINDED, AS

1    I TELL THE JURY THROUGHOUT THE TRIAL, AND IF SOMETHING COMES

2    TO THE COURT'S ATTENTION THAT CHANGES MY MIND ON THAT, BOTH

3    SIDES WILL HEAR ABOUT IT.

4            THE ONLY OTHER THING I'M GOING TO ADD ON THIS POINT

5    IS THAT I WILL -- IT SEEMS TO ME THAT THE ONLY THING THAT THE

6    COURT COULD DO WITH RESPECT TO THIS WITNESS, AND AT THIS

7    POINT I'M NOT INCLINED TO DO IT, BUT I'LL CONSIDER IT, I'M

8    GOING TO THINK ABOUT IT A LITTLE MORE; AND THAT IS, I READ A

9    CASE ABOUT THIS SOMETIME EARLIER THIS WEEK, AND YOU MAY HAVE

10   SUGGESTED THIS IN YOUR PAPERS, TOO, BUT ONE POSSIBILITY IS,

11   OF COURSE, THAT THE COURT COULD REQUIRE THE GOVERNMENT TO

12   EXAMINE THIS WITNESS OUTSIDE THE PRESENCE OF THE JURORS TO

13   MAKE SURE THAT THE TESTIMONY THAT'S BEING ELICITED IS

14   ADMISSIBLE.  I'M NOT SURE THAT THAT'S NECESSARY AT THIS TIME,

15   BUT, IF ANYTHING, THAT WOULD BE THE REMEDY.  I JUST DON'T SEE

16   THE NECESSITY FOR IT AT THIS TIME.

17           MR. MICHAEL:  YOUR HONOR --

18           THE COURT:  YES.

19           MR. MICHAEL:  MAY I BRIEFLY, JUST A COUPLE OF QUICK

20   POINTS?  I WANT THERE TO BE A COMPLETE RECORD.

21           THE COURT:  GO AHEAD.

22           MR. MICHAEL:  DEFENSE COUNSEL, BEFORE HE EVEN FILED

23   HIS SUBPOENA REQUESTS, NOTIFIED THE GOVERNMENT DURING THE

24   LAST TRIAL THAT HE WAS THINKING ABOUT IT.  AT THAT TIME THE

25   GOVERNMENT MADE EXTENSIVE EFFORTS TO GET HIM INTO TELEPHONIC

1    CONTACT WITH MS. STYLES.  IN FACT, I BELIEVE HE TALKED TO HER

2    ON MY TELEPHONE BECAUSE I FACILITATED THE CONVERSATION.  THE

3    GOVERNMENT HAS PROVIDED WHAT IT HAS AS MS. DUFF'S CURRENT

4    ADDRESS.  THE GOVERNMENT SPOKE WITH MS. DUFF AND TOLD HER

5    THAT SHE WOULD BE SUBPOENAED AND SHE SHOULD EXPECT IT.  THE

6    GOVERNMENT HAS PROVIDED MS. LENWELL'S CONTACT INFORMATION,

7    KALEN'S PSYCHOTHERAPIST, TO DEFENSE COUNSEL.  THE GOVERNMENT

8    INDICATED EARLIER TODAY IT WAS SURPRISED THAT KALEN HADN'T

9    BEEN SERVED YET AND THOUGHT HE WOULD HAVE BEEN BY NOW.

10          AND I TOLD DEFENSE COUNSEL THAT I KNEW LORI HAD

11    BEEN SERVED BECAUSE I SPOKE WITH HER JUST TO TELL HER SHE WAS

12    GOING TO BE SERVED AND LEARNED SHE HAD BEEN.  AND I BELIEVE I

13    ALSO GAVE A PHONE NUMBER TO HER SO SHE COULD CONTACT

14    MR. AARON TO FACILITATE HER TRAVEL HERE BECAUSE THAT WAS HER

15    CONCERN.  MY UNDERSTANDING IS THAT SHE IS PLANNING ON

16    COMPLYING WITH THE SUBPOENA.  SHE EXPECTS HER SON WILL COMPLY

17    WITH THE SUBPOENA, AT LEAST THAT'S MY UNDERSTANDING.

18          AND THE GOVERNMENT TOLD DEFENSE COUNSEL TODAY THAT

19    I WAS GOING TO MAKE AN INQUIRY TO FIGURE OUT WHERE KALEN WAS

20    AND FIGURE OUT WHERE MS. DUFF WAS.  AND IF I COULD DETERMINE

21    THAT, I WOULD LET HIM KNOW.  IF I COULD FIND A NEW ADDRESS

22    FOR MS. DUFF, I WOULD LET HIM KNOW.  I THINK THE GOVERNMENT

23    HAS GONE WAY BEYOND ITS OBLIGATION AND SHOWN NOTHING BUT GOOD

24    FAITH AND INTEREST THAT JUSTICE BE DONE HERE AND THE

25    DEFENDANT HAVE A FAIR TRIAL.

 1              SO I JUST WANT THAT STATED FOR THE RECORD, YOUR

 2     HONOR.

 3              THE COURT:  THANK YOU.  AND THAT ANSWERS ANOTHER

 4     QUESTION I HAVE ON MY LIST OF THINGS TO TALK ABOUT.  IS THAT

 5     WHY MS. SASSE HANDED ME THE RESUME' FOR MS. LENWELL?

 6              MR. MICHAEL:  MY UNDERSTANDING IS THAT SHE IS GOING

 7     TO BE MEETING WITH KALEN TO ASSESS HOW HE WOULD REACT TO

 8     BEING IN THE COURTROOM WITH THE DEFENDANT.  SHE WOULD BE WHO

 9     THE GOVERNMENT WOULD SEEK TO CALL AS A WITNESS TO ESTABLISH

10     WHAT NEEDS TO BE SHOWN FOR YOUR HONOR TO MAKE THE NECESSARY

11     FINDINGS.  I THOUGHT IT WOULD BE HELPFUL TO DEFENSE COUNSEL

12     TODAY TO GIVE HER C.V. SO HE CAN RESEARCH HER BEFORE ANY SUCH

13     HEARING.  SHE HASN'T BEEN RETAINED.  SHE HAS NOT BEEN

14     SUBPOENAED.  SHE MIGHT NOT EVEN BE AVAILABLE NEXT WEEK, BUT

15     I'VE BEEN TRYING TO SEE IF I CAN MAKE THAT HAPPEN.  AND I

16     HAVE PROVIDED THAT TO THE COURT AS WELL.

17              THE COURT:  THANK YOU.  I DIDN'T SEE HER NAME ON

18     THE WITNESS LIST.

19              MR. MICHAEL:  SHE COULD BE A POSSIBLE REBUTTAL

20     WITNESS IF KALEN WERE CALLED, BUT AT THIS POINT SHE CAN HELP

21     FACILITATE THE FINDING FOR THE CLOSED CIRCUIT TV.

22              THE COURT:  YOU'RE NOT GOING TO CALL HER AS A

23     WITNESS IN YOUR CASE-IN-CHIEF, SHE WOULD BE A WITNESS IN THE

24     HEARING BEFORE THE COURT?

25              MR. MICHAEL:  AND A POSSIBLE REBUTTAL WITNESS IF

1   KALEN WERE TO TESTIFY.

2          THE COURT:  NOW, IN CONNECTION WITH -- WELL, WE MAY

3   NOT NEED TO GET INTO IT AND MAYBE BOTH SIDES ARE AWARE OF

4   THIS, MY RESEARCH ON THE ISSUE OF A CHILD WITNESS TESTIFYING

5   IS THAT -- AND LET ME TELL YOU THAT SO FAR THE COURT STAFF

6   TELLS ME THE BEST PLACE TO DO IT WOULD BE IN A CONFERENCE

7   ROOM THAT'S OVER IN THE BANKRUPTCY COURT.  THERE'S A

8   TELEVISION THERE THAT WE COULD MOST EASILY USE FOR THIS

9   PURPOSE.  SO THAT'S WHAT WE'RE OPERATING UNDER THE ASSUMPTION

10  THAT WE WOULD USE IF WE GOT TO THIS.

11         MY UNDERSTANDING -- I DON'T HAVE THE MEMO IN FRONT

12  OF ME -- IS THAT THE LAW REQUIRES THAT THE WITNESS BE -- THE

13  WITNESS WOULD BE IN THAT ROOM WITH GOVERNMENT COUNSEL AND THE

14  DEFENSE COUNSEL IN THAT ROOM.  THE JUDGE REMAINS IN THIS

15  COURTROOM.  THE DEFENDANT REMAINS IN THIS COURTROOM.  THE

16  MONITOR THAT IS IN THE ROOM WHERE THE WITNESS IS MUST SHOW

17  THE DEFENDANT'S IMAGE, FACE, AND THE COURT'S VOICE HAS TO BE

18  ABLE TO BE HEARD BY THE WITNESS.  SO THAT'S MY

19  UNDERSTANDING -- AND IT HAS TO BE TWO-WAY COMMUNICATION.

20         MR. MICHAEL:  WHAT WOULD BE VISIBLE TO THE CHILD,

21  YOUR HONOR?

22         THE COURT:  THERE HAS TO BE A MONITOR IN THE ROOM

23  WHERE THE CHILD IS WITHIN HIS LINE OF VISION, WHERE THE

24  DEFENDANT'S IMAGE IS DISPLAYED LIVE.

25         MR. MICHAEL:  I HAVE NO -- I'M UNFAMILIAR WITH ALL

1    THE PROCEDURES.  IS THAT EVEN THE CASE WHERE THE BOY IS BEING

2    CALLED AS A DEFENSE WITNESS?  DOES IT MAKE A DIFFERENCE IF

3    THE CONFRONTATION CLAUSE IS NOT BEING IMPLICATED?

4            THE COURT:  I HAVE NOT BEEN ABLE TO FIND A CASE

5    WHERE IT MAKES A DIFFERENCE.

6            MR. MICHAEL:  I THINK THAT'S WHAT'S UNIQUE ABOUT

7    THIS SITUATION.  I THINK TYPICALLY IT'S THE GOVERNMENT

8    CALLING THE CHILD WITNESS.

9            THE COURT:  I UNDERSTAND.  BUT I HAVE NOT BEEN ABLE

10   TO FIND ANYTHING THAT MAKES THAT DIFFERENCE.  SO TO BE ON THE

11   SAFE SIDE, I THINK WE SHOULD FOLLOW ALL THE PROCEDURES THAT

12   ARE SET FORTH IN THE RULE AND THAT THE CASES OR THE RULE ARE

13   SPECIFIC THAT THE MONITOR THAT DISPLAYS THE DEFENDANT LIVE,

14   THE CHILD JUST HAS TO BE CAPABLE -- IT HAS TO BE WITHIN THE

15   CHILD'S RANGE OF VISION, BUT IT DOESN'T HAVE TO BE PLACED

16   DIRECTLY IN FRONT OF THE CHILD.  IT'S JUST A COURTROOM SORT

17   OF A SET-UP.

18           SO I THINK THAT THE BANKRUPTCY COURT CONFERENCE

19   ROOM WOULD BE AN ACCEPTABLE SETTING UNDER THE RULES.  AND IF

20   WE GET TO THAT POINT I WOULD BE HAPPY TO TAKE COUNSEL OVER

21   THERE TO VIEW IT PERHAPS ON TUESDAY.  OF COURSE, I HAVE TO

22   ASK MY COLLEAGUES AT THE BANKRUPTCY COURT, BUT I'M NOT TOO

23   WORRIED ABOUT THAT AT THE MOMENT.  SO IF WE GET TO THAT

24   POINT, THAT'S WHAT AT THIS POINT WE'RE CONTEMPLATING DOING.

25           NOW, THE HEARING TO ASSESS WHETHER WE NEED TO USE

1    THOSE PROCEDURES CAN BE DONE EVEN IN CHAMBERS UNDER THE RULE,

2    SO I PROBABLY WOULD DO THAT IN CHAMBERS.

3            MR. MICHAEL:  CAN I ASK YOU A QUESTION IN THAT

4    REGARD, YOUR HONOR?

5            THE COURT:  YES.

6            MR. MICHAEL:  MS. LENWELL HAS AN ACTIVE THERAPY

7    PRACTICE.  AND SHE SAID SHE'S DONE MANY OF THESE CASES.  YOU

8    CAN SEE FROM HER RESUME'.  SHE MAY NOT BE ABLE TO TRAVEL HERE

9    IN A WAY THAT WOULDN'T INCONVENIENCE THE TRIAL SCHEDULE.  I

10   DON'T KNOW IF DEFENSE COUNSEL WOULD BE WILLING TO DO IT.  SHE

11   SAID SHE COULD MAKE HERSELF, AT A MINIMUM, AVAILABLE OVER THE

12   PHONE.  I DON'T THINK VIDEO CONFERENCING COULD BE SET UP ON

13   SHORT NOTICE.  I DON'T KNOW IF THE GOVERNMENT WOULD BE ABLE

14   TO FLY HER HERE.  WE OBVIOUSLY COULD DO AN AFFIDAVIT, BUT

15   PRESUME THAT DEFENSE COUNSEL WOULD WANT TO HAVE AN

16   OPPORTUNITY TO QUESTION HER.  WE ARE STILL WORKING ON IT.  I

17   JUST WANTED TO LAY THAT OUT THERE AS A POSSIBILITY THAT COULD

18   ARISE.

19           THE COURT:  ALL RIGHT.  WE COULD SET UP -- WELL, IF

20   SHE COULD MAKE HERSELF AVAILABLE AT A COURT REPORTER'S OFFICE

21   OR SOMEPLACE WHERE SHE COULD VIDEO CONFERENCE, THE COURT

22   COULD DO THAT.

23           MR. MICHAEL:  AND WHAT I WILL DO IS, SINCE WE HAVE

24   BILL HUBBARD, THE INVESTIGATOR FROM THE DA'S OFFICE IN NEW

25   MEXICO, AS ONE OF OUR WITNESSES, I CAN INQUIRE, PERHAPS THE

1   DA'S OFFICE HAS THAT.  I KNOW SHE -- TAOS IS THREE HOURS FROM

2   ALBUQUERQUE AND TWO HOURS FROM SANTA FE, SO IT'S NOT CLOSE TO

3   MAJOR METROPOLITAN AREAS, BUT I WILL INQUIRE OF MS. LENWELL

4   AND PERHAPS INVESTIGATOR HUBBARD TO SEE IF THEY'RE FAMILIAR

5   WITH ANY FACILITIES THAT MIGHT EXIST.

6            THE COURT:  AND THAT WOULD GIVE THE DEFENSE TIME TO

7   SEE WHETHER THEY WOULD STIPULATE TO THAT.  OF COURSE, THE

8   GOVERNMENT CAN RESEARCH WHETHER HER TESTIMONY CAN BE TAKEN IN

9   THAT FASHION.

10           MR. MICHAEL:  WE WILL CERTAINLY LOOK INTO IT, YOUR

11  HONOR.

12           MR. AARON:  I CAN DO BETTER THAN THAT, YOUR HONOR.

13  I'M STILL HOPING THAT PERHAPS WE CAN AVOID THE NEED FOR THIS.

14  AND I'M HOPING THAT PERHAPS TO ASSIST ME IN MY INVESTIGATION

15  PERHAPS THE COURT COULD DIRECT THE GOVERNMENT TO GIVE ME THE

16  TELEPHONE NUMBER FOR MR. SUTHERLAND AND I COULD CONTACT HIM

17  AND SIMPLY ASK HIM.

18           THE COURT:  ASK HIM WHAT?

19           MR. AARON:  WHAT HE'S PLANNING TO SAY.

20           MR. MICHAEL:  YOUR HONOR, I THINK I WILL GET HIS

21  PHONE NUMBER.  HE IS TECHNICALLY A VICTIM IN THIS CASE.  I

22  THINK -- I DON'T KNOW IF HE FALLS UNDER THE DEFINITION AS THE

23  FATHER OF THE CHILD, AND HE IS CERTAINLY ENTITLED TO BE

24  PROTECTED FROM HARASSMENT.  MY UNDERSTANDING IS THAT

25  OBVIOUSLY --

1          THE COURT:  WELL, LET ME JUST SEE IF I CAN SHORTCUT

2     THIS.  DO YOU WANT TO ASK HIM FIRST WHETHER HE IS WILLING TO

3     BE CONTACTED?

4          MR. MICHAEL:  YES, YOUR HONOR.

5          THE COURT:  AND IF HE IS WILLING TO BE CONTACTED

6     THEN YOU WOULD BE WILLING TO GIVE DEFENSE COUNSEL HIS NUMBER.

7          MR. MICHAEL:  WITHOUT HESITATION.

8          THE COURT:  LET'S PROCEED IN THAT FASHION.

9          MR. AARON:  I WILL TELL THE GOVERNMENT THIS:

10    PERHAPS I HAVEN'T BEEN LIVING MY LIFE THE RIGHT WAY, BUT I

11    HAVEN'T BEEN ACCUSED OF HARASSING TOO MANY PEOPLE RECENTLY.

12    I WOULD SAY IF I RECEIVE -- AND I'M NOT GOING TO ASK -- I'M

13    NOT GOING TO EXPECT HIM TO TELL ME EVERYTHING THAT HE COULD

14    POSSIBLY SAY, BUT I THINK I WOULD BE ABLE TO TELL FROM THE

15    TENURE OF THE CONVERSATION AND SOME OF HIS COMMENTS WHETHER

16    OR NOT THERE IS A RISK OF WHAT I'M REALLY CONCERNED WITH.  IF

17    NOT, THEN I MAY NOT CALL ANY OF THOSE WITNESSES AT ALL.  AND

18    I WOULD BE ABLE TO -- IF I WAS ABLE TO GET INTO CONTACT WITH

19    HIM I THINK PROBABLY IN THE COURSE OF A DAY I CAN MAKE THAT

20    DETERMINATION, SO I'M HOPEFUL THAT I WILL BE ABLE TO GET IN

21    CONTACT WITH HIM THIS WEEKEND AND REPORT TO THE COURT ON

22    MONDAY.

23          THE COURT:  THAT'S FINE.  I UNDERSTAND YOU'RE NOT

24    MAKING ANY GUARANTEES THAT IF YOU TALK TO HIM YOU WON'T CALL

25    KALEN, BUT YOU'RE NOT GUARANTEEING THAT, BUT I THINK WHAT YOU

1    ARE TELLING THE COURT IS THAT YOU CAN MAKE A BETTER DECISION

2    ABOUT WHETHER TO CALL KALEN IF YOU HAD BEEN ABLE TO TALK TO

3    HIM.  IS THAT A FAIR --

4            MR. AARON:  YES, YOUR HONOR.

5            THE COURT:  AM I UNDERSTANDING YOU CORRECTLY?

6            MR. AARON:  YES, YOUR HONOR.  AND I WOULD LIKE TO

7    ASSURE THE COURT AND COUNSEL THAT I'M NOT DOING THIS SIMPLY

8    TO GET ANOTHER -- I'VE ALREADY TALKED WITH MR. SUTHERLAND.

9    I'M NOT DOING THIS SIMPLY TO GET ANOTHER CHANCE TO SPEAK WITH

10   HIM.  I AM DOING IT TO AVOID -- BECAUSE THERE IS A DOWNSIDE

11   ALSO TO CALLING MS. STYLES AND KALEN S.  AND PERHAPS IF I

12   SPEAK WITH -- PERHAPS IF I GET A CHANCE TO SPEAK WITH

13   MR. SUTHERLAND, I MAY SAY, WELL, THE BEST THING WE CAN DO IS

14   SIMPLY NOT CALL THESE OTHER WITNESSES.

15           THE COURT:  ALL RIGHT.

16           MR. MICHAEL:  YOUR HONOR, THIS IS THE FIRST REQUEST

17   THIS HAS BEEN MADE.  I NEED TO SAY ON THE RECORD MY

18   UNDERSTANDING IS MR. SUTHERLAND WILL NOT BE AVAILABLE UNTIL

19   MONDAY.  HE IS AWAY FOR THE WEEKEND WHICH I WAS GOING TO

20   FIGURE OUT IF KALEN WAS WITH HIM.  I'M NOT AWARE OF THAT.  I

21   PROBABLY CAN'T FACILITATE ANYTHING UNTIL MONDAY.

22           THE COURT:  I KNOW YOU HAVE OTHER CASES TO WORK ON

23   OVER THE WEEKEND.

24           MR. MICHAEL:  ALSO, MY UNDERSTANDING IS THAT

25   DEFENSE COUNSEL HAD BEEN IN TOUCH WITH MR. SUTHERLAND BEFORE,

1    WAS UNAWARE THAT MY INVOLVEMENT WAS NECESSARY.  LIKE I SAID,

2    WE WILL DO IT WITHOUT HESITATION.

3          THE COURT:  ALL RIGHT.  THANK YOU BOTH.

4          ALL RIGHT.  MS. STYLES.  WELL, LET'S WAIT AND TALK

5    ABOUT MS. STYLES WHEN -- WE WILL CROSS THAT WHEN WE GET TO

6    IT.

7          THE JURY INSTRUCTION CONFERENCE.  IN TERMS OF

8    TIMING, THERE'S NOT TOO MUCH TO DISCUSS.  YOU DON'T HAVE MANY

9    DISPUTED INSTRUCTIONS.

10         AND FROM WHAT YOU'RE TELLING ME, THE GOVERNMENT

11   WON'T BE RESTING ON TUESDAY.

12         MR. MICHAEL:  THERE IS A CHANCE, BUT WE DIDN'T WANT

13   TO GUARANTEE IT BECAUSE IT DEPENDS ON THE LENGTH OF

14   CROSS-EXAMINATION OF MR. MARTIN, MR. MORAN.  AND I THINK

15   MORAN AND HAS A LITTLE BIT -- HAS A LENGTH TO GO.  AGENT

16   BROWN WILL BE OF LENGTH SO I WOULDN'T WANT MISADVISE THE

17   COURT.  THAT'S WHAT THE GOVERNMENT ANTICIPATES.

18         THE COURT:  IF YOU DON'T I'LL LOSE MY TEMPER RIGHT

19   AWAY AND TAKE YOUR HEAD OFF.

20         MR. MICHAEL:  WE ARE TRYING TO GO AS FAST AS WE

21   CAN.

22         THE COURT:  YOU WERE SUPPOSED TO CONTRADICT ME.

23   THAT HURT MY FEELINGS THAT YOU WERE GOING TO AGREE WITH --

24         MR. MICHAEL:  NO, NO, NO.  I MEANT TO IMPLY IT WAS

25   SO OBVIOUSLY A JOKE FROM YOUR HONOR BECAUSE THERE IS NO WAY

```
 1    YOU WOULD LOSE YOUR TEMPER.

 2             THE COURT:  I DON'T KNOW.  NOW I MIGHT HAVE TO DO

 3    IT JUST TO SHOW YOU I'M CAPABLE.

 4             WHAT I'M CONCERNED ABOUT IS REALISTICALLY ARE YOU

 5    GOING TO FINISH EARLY?  AND THEN IF THE DEFENSE ISN'T PUTTING

 6    ON A CASE, I DON'T WANT TO BE IN THIS POSITION, BELIEVE IT OR

 7    NOT, THINGS CAN HAPPEN THIS WAY.  LET'S SAY YOU FINISHED AT

 8    2:00, THE DEFENDANT STANDS UP AND SAYS, "I DON'T HAVE A

 9    CASE," I DON'T WANT TO SEND MY JURY HOME BECAUSE WE HAVEN'T

10    DONE THE JURY INSTRUCTIONS, ALTHOUGH I DON'T THINK THE

11    CHARGING CONFERENCE WOULD TAKE THAT LONG.

12             MR. AKROTIRIANAKIS:  I DON'T THINK THAT THERE'S A

13    CHANCE THAT WE WOULD FINISH AT 2:00 ON TUESDAY, YOUR HONOR.

14             THE COURT:  OR EARLIER.

15             MR. AKROTIRIANAKIS:  OR EARLIER.  NO, I MEAN, THE

16    COURT RECALLS AGENT BROWN -- THE BREADTH OF AGENT BROWN'S

17    TESTIMONY IN THE FIRST TRIAL.  HE TESTIFIED FOR ABOUT AN HOUR

18    AND A HALF ON THE FRIDAY MORNING RIGHT BEFORE WE HAD THE --

19             THE COURT:  THAT WAS AGENT BROWN?

20             MR. AKROTIRIANAKIS:  -- UNSPEAKABLE INCIDENT.  AND

21    THAT WAS ONLY REGARDING SETH BEKENSTEIN'S CHATS.  I'M GOING

22    TO STREAMLINE THAT NOW, BECAUSE, YOU KNOW, THERE'S A LOT OF

23    STUFF, YOU KNOW, THE IDENTITIES AND DIFFERENT THINGS THAT

24    NEED NOT BE ESTABLISHED, BUT THERE IS IN ADDITION TO THE

25    DEFENDANT'S CHATS WHICH ARE OF APPROXIMATELY THE SAME LENGTH
```

1    AS THE SETH BEKENSTEIN CHATS, MAYBE ONE OR TWO POINTS, BUT I

2    DIDN'T FEEL IT WAS REALLY APPROPRIATE OR NECESSARY TO GO INTO

3    IT WITH MR. MARTIN TODAY, BUT FROM THOSE CHATS, EXHIBIT 2.

4            THE COURT:  ALL RIGHT.  SO WE CAN PLAN TO HAVE THE

5    CHARGING CONFERENCE ON TUESDAY AFTERNOON AFTER WE LET THE

6    JURY GO.  I DON'T THINK IT WILL TAKE THAT LONG.  I MEAN,

7    THERE'S TWO OR THREE INSTRUCTIONS THAT ARE AT ISSUE.

8            MR. MICHAEL:  I THINK THE GOVERNMENT -- THIS IS

9    NOT MEANT TO SLIGHT, BUT I DON'T THINK WE HAVE RECEIVED THE

10   BASIS FOR DEFENSE COUNSEL'S OBJECTION.  WE WOULD ASK TO HAVE

11   AN OPPORTUNITY TO REVIEW THOSE BEFORE THE CONFERENCE, IF

12   POSSIBLE.

13           THE COURT:  WE NEED TO GET THOSE, TOO, MR. AARON.

14   IF YOU WOULD GIVE US THOSE AND -- WELL, YOU NEED TO FILE

15   THOSE WITH THE COURT AND SERVE THEM ON OPPOSING COUNSEL BY

16   NOON ON MONDAY, THE BASIS FOR THE OBJECTIONS TO THE

17   GOVERNMENT'S SPECIAL INSTRUCTIONS.

18           NOW, THAT ONLY LEAVES ME WITH I THINK ONE OTHER

19   THING; AND THAT IS, WE GAVE YOU THE INSTRUCTIONS E, F, G.  E

20   IS THE FORMED INSTRUCTION ON THE ELEMENTS OF CONSPIRACY AND F

21   AND G.  AND I WANT TO PUT THOSE IN THE JURY NOTEBOOKS BEFORE

22   TUESDAY SO IF YOU ALL HAVE ANY OBJECTIONS TO THEM, LET ME

23   KNOW.

24           MR. MICHAEL:  AND WHAT LETTER IS THE CHILD

25   PORNOGRAPHY INSTRUCTION, YOUR HONOR.

1          THE COURT:  IT'S EITHER F OR G.

2          THE COURT:  NO, THAT WAS AN EARLIER ONE.  THAT WAS

3  D.  THAT WAS ALREADY IN THERE.

4          MR. MICHAEL:  THANK YOU, YOUR HONOR.

5          MR. AKROTIRIANAKIS:  MAY I ASK, YOUR HONOR, DOES

6  THIS COURT CHARGE THE JURY BEFORE OR AFTER --

7          THE COURT:  BEFORE YOU ARGUE.

8          MR. MICHAEL:  YOUR HONOR, WITH REGARD TO JURY

9  INSTRUCTIONS, I DON'T THINK THE GOVERNMENT INCLUDED AN

10  INSTRUCTION ON ATTEMPT BECAUSE I THINK WE SAW THAT AS A

11  STANDARD INSTRUCTION.  WE JUST WANTED TO POINT THAT OUT TO

12  THE COURT.

13          THE OTHER POINT IS I DON'T KNOW IF AN INSTRUCTION

14  ON WHAT THE MEANING OF TO POSSESS IS APPROPRIATE IN THIS CASE

15  OR NOT OR IS A CHARGED DEFINITION.  I BELIEVE THERE IS A

16  STANDARD INSTRUCTION ON POSSESSION AND THE GOVERNMENT DID NOT

17  INCLUDE THAT AS WELL.

18          THE COURT:  DO YOU WANT THAT ONE, TOO?

19          MR. MICHAEL:  YES.

20          THE COURT:  DO YOU WANT THE STANDARD ONE ON ATTEMPT

21  AND THE STANDARD ONE ON --

22          MR. MICHAEL:  IF WE WERE TO LOOK AT IT THIS WEEKEND

23  AND THINK OTHERWISE, WE'LL LET YOU KNOW, BUT AS OF NOW, THAT

24  IS OUR INTENTION.

25          THE COURT:  YOU WANT THE NINTH CIRCUIT FORM ON

1   THOSE TWO.

2           MR. MICHAEL:  YES, YOUR HONOR.

3           THE COURT:  ALL RIGHT.  ANYTHING ELSE FROM EITHER

4   SIDE?

5           MR. AARON:  YES, YOUR HONOR.  AS I SAID EARLIER, I

6   WILL E-FILE THOSE MOTIONS WHEN I GET BACK TO MY OFFICE.  I

7   WOULD LIKE TO ADDRESS TWO MORE MATTERS, IF I MIGHT.

8           ONE IS THE COURT HAD MENTIONED HAVING A HEARING

9   REGARDING AGENT MORENO.

10          THE COURT:  THAT'S RIGHT.

11          MR. AARON:  I DON'T KNOW IF THE COURT WANTS TO DO

12  THAT NOW.  WE ARE PREPARED TO GO FORWARD WITH THAT, BUT I

13  WOULD ALSO LIKE TO BRING UP -- I HAVE TALKED TO COUNSEL ABOUT

14  GETTING THE PATHWAYS THAT AGENT MORAN IS GOING TO TESTIFY TO,

15  AND IF I COULD GET AN ASSURANCE FROM COUNSEL THAT -- I KNOW

16  THEY DON'T HAVE THAT AT THEIR FINGERTIPS BUT IF THEY COULD

17  HAVE AGENT MORAN OR IF THEY THEMSELVES COULD E-MAIL IT TO ME

18  THIS WEEKEND, I WOULD APPRECIATE THAT.

19          THE COURT:  THE PATHWAYS?

20          MR. AARON:  THERE ARE FILE PATHWAYS WHERE FILES ARE

21  KEPT.  A NUMBER OF THEM WERE KEPT IN UNALLOCATED SPACE.

22          THE COURT:  AREN'T THOSE ALREADY AN EXHIBIT IN THIS

23  CASE?

24          MR. AARON:  NO.

25          MR. MICHAEL:  WELL, THERE'S A LOT OF DIGITAL

1    EVIDENCE.  I THINK THAT THERE MIGHT BE BEYOND THE FILE NAME

2    PERHAPS SOME OTHER INDICATIONS ABOUT WHERE A HANDFUL OF ITEMS

3    WERE, BECAUSE MOST OF THEM WERE IN THE UNALLOCATED FREE SPACE

4    AND WOULD NOT HAVE THAT.  I ALREADY TOLD DEFENSE COUNSEL I

5    WOULD DO THIS, SO I UNDERSTAND HE WANTS TO PUT IT ON THE

6    RECORD, BUT I'VE ALREADY TOLD HIM I WOULD DO IT.  AND THIS IS

7    EVIDENCE OBVIOUSLY THAT HAS BEEN AVAILABLE TO THE DEFENSE FOR

8    A LONG TIME.

9             THE COURT:  ALL RIGHT.  THANK YOU.

10            HOW LONG DO YOU THINK IT WOULD -- I DON'T THINK IT

11   WOULD TAKE YOU VERY LONG TO EXAMINE AGENT MORENO SO WE COULD

12   PROBABLY DO IT THIS AFTERNOON.

13            MR. AARON:  PROBABLY LESS THAN TEN MINUTES.

14            THE COURT:  LET'S TAKE A SHORT RECESS AND THEN WE

15   WILL DO THAT.

16                      (RECESS)

17            (OUT OF THE PRESENCE OF THE JURY:)

18            MR. MICHAEL: YOUR HONOR, SHOULD AGENT MORENO TAKE

19   THE STAND?

20            THE COURT:  YES.

21            THE CLERK:  PLEASE STOP THERE.

22        PLAINTIFF'S WITNESS, JOSUE MORENO, WAS SWORN

23            THE CLERK:  PLEASE TAKE THE STAND.

24            STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

25   THE RECORD.

```
1              THE WITNESS:  MY NAME IS JOSUE E. MORENO,

2    M-O-R-E-N-O.

3              THE COURT:  THANK YOU.

4              MR. MICHAEL:  YOUR HONOR, DO YOU WANT THE

5    GOVERNMENT TO INQUIRE OR DEFENSE COUNSEL?

6              THE COURT:  I THINK I WOULD LET DEFENSE COUNSEL GO

7    FIRST.

8              MR. AARON:  THANK YOU.  I PROBABLY WILL BE ABLE TO

9    DO IT FAST BECAUSE I KNOW WHAT I'M LOOKING FOR.

10             THE COURT:  JUST BEFORE THAT, I'M GOING TO ASK THE

11   COURT CLERK TO HAND BACK TO COUNSEL FOR THE GOVERNMENT THE

12   NOTEBOOK THAT HAS SOME EXHIBITS.

13             GO AHEAD, MR. AARON.

14                        CROSS-EXAMINATION

15   BY MR. AARON:

16   Q.   GOOD AFTERNOON, AGENT.  DID THERE COME A TIME WHEN YOU

17   RECEIVED A CD FROM SAN BERNARDINO?

18   A.   YES, THERE WAS.

19   Q.   AND YOU UNDERSTOOD THAT TO CONTAIN THE CONVERSATIONS BY

20   MR. SANDERS?

21   A.   I DID NOT.  I DID NOT.

22   Q.   I'M SORRY, WHEN DID YOU RECEIVE THAT CD?

23   A.   WITH A PACKAGE THAT I PICKED UP.

24   Q.   AND WHEN WAS THAT?

25             THE COURT:  I'M SORRY, WITH A PATCH?
```

```
 1                  THE WITNESS:  A PACKAGE.

 2                  THE COURT:  A PACKAGE.  THANK YOU.

 3   BY MR. AARON:

 4   Q.   WHEN WAS THAT?

 5   A.   THAT WAS ON FEBRUARY 16TH, 2007.

 6   Q.   WHO DID YOU PICK IT UP FROM?

 7   A.   FROM THE MARSHAL LIAISON AT THE SAN BERNARDINO COUNTY

 8   SHERIFF'S.

 9   Q.   AND WHO WAS THAT?

10   A.   I DO NOT REMEMBER.

11   Q.   WAS THERE ANYTHING ELSE WITH THE CD?

12   A.   PHOTOCOPIES.

13   Q.   WERE YOU SUMMONED DOWN TO PICK UP THOSE ITEMS OR DO YOU

14   REGULARLY GO DOWN AND PICK THEM UP?

15   A.   NO, I WAS IN CONTACT WITH THEM ABOUT SOME PHOTOCOPIES AT

16   THE TIME AND HAD MADE ARRANGEMENTS WHEN I HAD AVAILABILITY TO

17   GO DOWN AND PICK THEM UP.

18   Q.   AND WHEN YOU WENT DOWN THERE AND YOU SAW THAT THERE WERE

19   THE PHOTOCOPIES WHICH YOU HAD TALKED ABOUT AND THERE WAS

20   ANOTHER ITEM, DID YOU MENTION THAT TO THE PEOPLE AT SAN

21   BERNARDINO?

22   A.   NO.  I DIDN'T SEE THE OTHER ITEM IN THE PACKAGE.

23   Q.   WHEN YOU GOT BACK TO YOUR OFFICE, I PRESUME YOU OPENED

24   IT UP AND SAW THE OTHER ITEM?

25   A.   I DON'T RECALL.
```

1    Q.   DO YOU RECALL --

2              THE COURT:  EXCUSE ME.  WHEN YOU'RE BOTH REFERRING

3    TO THE "OTHER ITEM," YOU'RE REFERRING TO THE DISK?

4              THE WITNESS:  YES, MA'AM.

5              THE COURT:  THE DISK.  THE ENVELOPE THAT HAD THE

6    DISK WITH THE CONVERSATIONS RECORDED ON IT?

7              THE WITNESS:  YES, MA'AM.

8              THE COURT:  THANK YOU.

9    BY MR. AARON:

10   Q.   WHAT'S THE NEXT THING YOU REMEMBER DOING WITH THE

11   ENVELOPE THAT HAD THE DISKS?

12   A.   THE PACKAGE IS WHAT I ACTUALLY TOOK CARE OF.  I DIDN'T

13   KNOW THAT -- I REALLY DIDN'T EVEN TAKE AN OBSERVATION OF THAT

14   ENVELOPE UNTIL RECENTLY.

15   Q.   ALL RIGHT.  YOU RECEIVED THE PHOTOCOPIES AND YOU

16   RECEIVED THE PACKAGE?

17   A.   IT WAS IN THE PACKAGE -- IT WAS IN WITH THE PHOTOCOPIES.

18   Q.   AND YOU TOOK NO STEP TO INVESTIGATE WHAT IT WAS?

19   A.   I DIDN'T EVEN KNOW IT WAS IN THERE.  I HADN'T REALLY

20   EVEN OBSERVED IT.

21   Q.   WHEN DID YOU NOTICE THAT IT WAS IN THERE?

22   A.   JUST THE OTHER NIGHT.

23   Q.   WHEN YOU RECEIVE INFORMATION OR EVIDENCE, DON'T YOU

24   EXAMINE IT?

25   A.   YES.

1    Q.    DON'T YOU LOG IT IN?

2    A.    I DID LOG IT IN, YES.

3    Q.    WHERE DID YOU LOG IT IN?

4    A.    INTO MY CHRONOLOGY REPORT THAT I HAVE IN MY CASE FILE.

5              MR. AARON:  MAY I APPROACH, YOUR HONOR?

6              THE COURT:  YES.

7    BY MR. AARON:

8    Q.    DO YOU REMEMBER THE ENTRY THAT YOU WROTE -- LET ME JUST

9    SHOW YOU TO REFRESH YOUR RECOLLECTION.  IS THAT A COPY OF

10   YOUR CHRONOLOGY?

11   A.    YES, IT IS.

12   Q.    WOULD YOU READ THAT TO YOURSELF AND LET US KNOW WHEN

13   YOU'RE DONE?

14   A.    I'M DONE.

15   Q.    DOES THAT REFRESH YOUR RECOLLECTION OF WHAT YOU WROTE?

16   A.    YES, IT DOES.

17   Q.    WHAT DID YOU WRITE?

18   A.    I WROTE, "RECEIVED PHOTOCOPIES AND TAPES FROM CDC

19   MARSHAL LIAISON," ON FEBRUARY 16TH OF '07.

20   Q.    AND WHEN YOU SAID "TAPES," ARE YOU REFERRING TO THIS

21   ENVELOPE?

22   A.    YES.

23   Q.    NOW, WHEN YOU RECEIVED THE PHOTOCOPIES, WHAT DID YOU DO

24   WITH THEM?

25   A.    I PUT THEM INTO A SECURE LOCATION LIKE MY FILING

1    CABINET.

2    Q.    AND YOU SEPARATED THEM FROM THE TAPES?

3    A.    I DID NOT.   THERE WAS ONE PACKAGE.   WHATEVER I TOOK I

4    JUST PUT INTO A FILE CABINET AT THE TIME.

5    Q.    AND DID YOU MAKE COPIES OF THE PHOTOCOPIES TO GIVE TO

6    GOVERNMENT COUNSEL?

7    A.    NO, I JUST ADVISED THEM THAT I HAD PICKED THEM UP.

8              THE COURT:   EXCUSE ME.   COULD I ASK YOU BOTH TO GO

9    A LITTLE MORE SLOWLY.

10             MR. AARON:   I'M SORRY.

11             THE COURT:   AND LET ME JUST MAKE SURE I DIDN'T MISS

12   SOMETHING A FEW MOMENTS AGO.

13             ARE YOU TESTIFYING, AGENT MORENO, THAT YOU PUT

14   EVERYTHING TOGETHER, EVERYTHING THAT YOU RECEIVED TOGETHER

15   INTO THE FILING CABINET?

16             THE WITNESS:   YES, YOUR HONOR.

17             THE COURT:   THANK YOU.

18   BY MR. AARON:

19   Q.    HOW DID YOU KNOW THAT THIS WAS THE TAPE?

20   A.    I DIDN'T.

21   Q.    WHY DID YOU WRITE TAPES?

22   A.    I HAD WRITTEN TAPES AS EXACTLY WHAT I RECEIVED FROM THE

23   CDC AND INADVERTENTLY JUST TOOK IT FOR WHAT IT WAS, THAT THIS

24   WAS WHAT I WAS RECEIVING.   I DID NOT EXAMINE THAT I HAD

25   ACTUALLY RECEIVED THAT CD.

1    Q.   WEREN'T YOU PUZZLED TO BE GIVEN TAPES?

2    A.   WELL, I TOOK IT AS TAPES.  I THINK I PUT TAPES ONLY

3    BECAUSE THEY TOLD ME THEY WERE GOING TO GIVE ME -- OR THEY

4    WERE GIVING ME TAPES OR RECORDINGS.  I ASSOCIATED TO TAPES,

5    I ASSUME.  I DON'T RECALL WHY I PUT TAPES.

6    Q.   DIDN'T YOU ASK THEM WHAT THE RECORDINGS WERE OF?

7    A.   I DON'T RECALL.

8    Q.   YOU KNEW WHAT THE PHOTOCOPIES WERE OF?

9    A.   I DO.

10   Q.   AND YOU DID WHEN YOU WENT TO GO GET THEM?

11   A.   YES, I DID KNOW WHAT THEY WERE.

12   Q.   BUT THEY TOLD YOU THEY WERE GOING TO GIVE YOU THESE

13   TAPES.  YOU DIDN'T KNOW WHAT THE TAPES WERE OF OR WHO THEY

14   WERE?

15   A.   I DID KNOW THEY WERE GOING TO PROBABLY BE PHONE CALLS OF

16   MR. SANDERS.

17   Q.   SO YOU KNEW YOU HAD STATEMENTS FROM THE DEFENDANT THAT

18   WERE RECORDED AND YOU DIDN'T ALERT GOVERNMENT COUNSEL?

19   A.   I DON'T RECALL IF I DID.

20   Q.   SO YOU COULD HAVE, YOU JUST DON'T REMEMBER?

21   A.   IT'S POSSIBLE.

22   Q.   AND THERE WERE TWO GOVERNMENT COUNSEL AT THAT TIME,

23   RIGHT, MR. MICHAEL AND MS. CARPENTER?

24   A.   YES.

25   Q.   AND YOU HAD BEEN CORRESPONDING WITH -- YOU HAD BEEN

1    COMMUNICATING WITH MS. CARPENTER ABOUT DISCOVERY?

2    A.   YES.

3    Q.   IS THERE ANOTHER ENTRY IN YOUR CASE CHRONOLOGY ABOUT THE

4    TAPES AND PHOTOCOPIES, BECAUSE THE COPY YOU GAVE ME ENDS AT

5    216?

6    A.   NO, THERE'S NOT.

7    Q.   AND HOW DID YOU HAPPEN TO NOTICE THE ITEMS THE OTHER

8    DAY?

9    A.   I WAS ACTUALLY PUTTING SOME -- JUST KIND OF CLEANING UP

10   AROUND THE OFFICE PUTTING SOME FILES AWAY AND REORGANIZING MY

11   FILES AND I CAME ACROSS THE ENVELOPE THAT YOU SEE.

12   Q.   DID YOU DO A PROPERTY RECEIPT, A FORM 6051?

13   A.   NO, I DID NOT.

14   Q.   DID YOU DO THAT FOR THE PHOTOCOPIES?

15   A.   NO, I DID NOT.

16   Q.   AND ARE THE PHOTOCOPIES OF LETTERS?

17   A.   YES, THEY ARE.

18   Q.   DID YOU GIVE THOSE TO GOVERNMENT COUNSEL?

19   A.   NO, I DID NOT.

20   Q.   DO YOU HAVE THEM?

21   A.   I HAD THEM IN MY FILE.

22   Q.   HAVE THEY BEEN DISCLOSED TO ANYONE OTHER THAN YOURSELF?

23   A.   THEY'VE BEEN -- I THINK I SPOKE TO COUNSEL ABOUT THE

24   SUBSTANCE OF THEM, BUT I HAD NOT SHOWN THEM EVERY PIECE OF

25   IT.

1  Q.   AND HAVE YOU SPOKEN WITH SAN BERNARDINO SINCE ABOUT THE

2  STATEMENTS?

3  A.   I'VE NEVER EVEN HEARD OF STATEMENTS.

4  Q.   NO, I'M SORRY.  I MISSPOKE.  HAVE YOU SPOKEN TO THEM

5  SINCE ABOUT THE CD?

6  A.   NO, I HAVEN'T.

7  Q.   AND YOU HAVE NO IDEA WHO ACTUALLY PUT THE DISKS -- THE

8  CONVERSATIONS ON CD'S?

9  A.   NO, I DO NOT.

10         MR. AARON:  THANK YOU.  I HAVE NOTHING FURTHER.

11         THE COURT:  MR. MICHAEL.

12                   REDIRECT EXAMINATION

13 BY MR. MICHAEL:

14 Q.   AGENT MORENO?

15 A.   YES.

16 Q.   WHEN YOU SAY THAT YOU KNEW YOU RECEIVED TAPES, ARE YOU

17 REFERRING TO THE ENVELOPE THAT YOU RECEIVED FROM SAN

18 BERNARDINO?

19 A.   YES.

20 Q.   HOW ARE YOU ABLE TO TELL -- AND I GUESS YOU SAID YOU USE

21 THE WORD "TAPES" FOR RECORDINGS.  IS THAT, IN YOUR MIND, THE

22 SAME AS A CD THAT'S IN THERE?

23 A.   YES.

24 Q.   IS THAT WHAT YOU MEANT?

25 A.   YES.

1   Q.   HOW WERE YOU ABLE TO TELL THAT THERE WAS A CD INSIDE THE

2   ENVELOPE?

3   A.   JUST BY THE WEIGHT AND THE FEEL OF THE ENVELOPE.

4   Q.   DID YOU EVER ACTUALLY OPEN THE ENVELOPE?

5   A.   NO, I DID NOT.

6   Q.   SO YOU NEVER REMOVED THE CD -- PRIOR TO THE OTHER DAY

7   WHEN YOU DISCOVERED THE CD, DID YOU EVER REMOVE IT FROM THE

8   ENVELOPE?

9   A.   NO, I DID NOT.

10  Q.   HAVE YOU EVER LISTENED TO THE CD?

11  A.   NO, I DID NOT.

12  Q.   AND HAVE YOU EVER HAD ANY CONVERSATIONS WITH ANYBODY

13  FROM SAN BERNARDINO ABOUT THE CONTENTS OF ANY RECORDED PHONE

14  CALLS PERTAINING TO MR. SANDERS?

15  A.   NO, I HAVE NOT.

16  Q.   AND PREVIOUSLY HAD YOU ASKED SAN BERNARDINO COUNTY JAIL

17  IF THEY HAD ANY RECORDINGS OF MR. SANDERS' PHONE CALLS?

18  A.   YES, I HAVE.

19  Q.   AND WHEN YOU MADE THAT REQUEST WERE YOU SEEKING FOR

20  PRIVILEGED ATTORNEY/CLIENT PHONE CALLS?

21  A.   NO, I WAS NOT.

22  Q.   AND WHAT DID THEY TELL YOU IN RESPONSE TO YOUR REQUEST

23  FOR PHONE CALLS?

24  A.   THAT WAS DURING MY -- WHEN I DID ASK, THEY HAD TOLD ME

25  HE HAD NOT MADE ANY PHONE CALLS.

1          MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

2          MR. AARON:  MAY I HAVE TWO MORE QUESTIONS, YOUR

3   HONOR?

4          THE COURT:  CERTAINLY.

5          LET ME ASK MYSELF, WHEN DID YOU HAVE THAT

6   CONVERSATION WITH SAN BERNARDINO COUNTY ABOUT THE PHONE

7   CALLS?

8          THE WITNESS:  I PROBABLY HAD ABOUT TWO OR

9   THREE CONVERSATIONS WITH THEM, YOUR HONOR, IN THE TIME THAT

10  HE'S BEEN INCARCERATED JUST TO INQUIRE IF HE HAD MADE ANY

11  PHONE CALLS SO I COULD RECEIVE SOME TAPES.

12         THE COURT:  AND DO YOU RECALL WHEN YOU MADE THOSE

13  INQUIRIES?

14         THE WITNESS:  I WOULD SAY IT WAS SHORTLY AFTER HE

15  WAS INCARCERATED OR HE WAS TAKEN OVER TO THE CDC FOR THE

16  FIRST TIME I HAD MADE THAT REQUEST TO HAVE THEM MONITOR AND

17  PRESENT ME WITH ANY TAPES OR NOTIFY ME.  AND PROBABLY A MONTH

18  AFTER THAT I INQUIRED, AND THEY HAD TOLD ME THAT HE HAD NOT

19  MADE ANY PHONE CALLS.  AND PROBABLY THREE MONTHS AFTER THAT,

20  AGAIN, JUST TO INQUIRE.  THEY TOLD ME THEY DIDN'T HAVE ANY

21  RECORD OF HIM MAKING PHONE CALLS.

22         THE COURT:  THANK YOU.

23                      RECROSS-EXAMINATION

24  BY MR. AARON:

25  Q.   ISN'T IT STANDARD PRACTICE IN YOUR AGENCY WHEN YOU

1    RECEIVE EVIDENCE TO LOG IT IN AND DO A PROPERTY RECEIPT?

2    A.   AT THE TIME THEY WERE PHOTOCOPIES WHERE SAN

3    BERNARDINO -- I'M SORRY, TO ANSWER YOUR QUESTION, YES, THAT'S

4    TRUE.

5              MR. AARON:  THANK YOU.  NOTHING FURTHER.

6              MR. MICHAEL:  MAY I, YOUR HONOR?

7              THE COURT:  GO AHEAD.

8                    FURTHER REDIRECT EXAMINATION

9    BY MR. MICHAEL:

10   Q.   WERE THE PHOTOCOPIES ORIGINAL EVIDENCE OR WERE THEY JUST

11   COPIES?

12   A.   THEY WERE COPIES.

13   Q.   WHERE WERE THE ORIGINALS?

14   A.   IN THE PERSONAL PROPERTY OF MR. SANDERS AT CDC.

15   Q.   WHEN YOU SOUGHT THE ORIGINALS FROM SAN BERNARDINO COUNTY

16   JAIL, WHAT DID THEY TELL YOU?

17   A.   THAT I WOULD NEED TO OBTAIN A SEARCH WARRANT.

18   Q.   DID YOU EVER OBTAIN THAT SEARCH WARRANT?

19   A.   I DID NOT.

20   Q.   DID YOU DISCUSS THAT WITH THE PROSECUTORS IN THIS CASE?

21   A.   YES, I DID.

22             MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

23             THE COURT:  ALL RIGHT.  ANYTHING ELSE, MR. AARON?

24             MR. AARON:  NO, YOUR HONOR.

25             THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

1            THE WITNESS:  THANK YOU, YOUR HONOR.

2            MR. MICHAEL:  YOUR HONOR, MAY THE AGENT REMAIN IN

3     THE ROOM OR WOULD YOU PREFER THAT HE LEAVE?

4            THE COURT:  I THINK I WOULD PREFER THAT HE WAIT

5     OUTSIDE DURING ARGUMENT.  THANK YOU.

6            SO THE EVIDENCE THAT WAS RECEIVED WAS THE

7     PHOTOGRAPHS THAT I PREVIOUSLY HEARD ABOUT THAT WERE SENT TO

8     THE DEFENDANT FROM MR. BEKENSTEIN?

9            MR. MICHAEL:  CORRECT, YOUR HONOR.  AND I BELIEVE

10    THERE WERE SOME LETTERS IN THERE AS WELL.

11           THE COURT:  I THINK THAT WAS ACTUALLY WHAT WAS

12    CONFUSING ME.

13           MR. MICHAEL:  IT'S MY UNDERSTANDING THAT IT WAS ALL

14    CORRESPONDENCE FROM MR. BEKENSTEIN.  AND THEN AS THE

15    GOVERNMENT ALERTED THE COURT AND DEFENSE COUNSEL, WE FOUND

16    TWO LETTERS OF DEFENDANT IN THERE AND TURNED THOSE OVER.

17           THE COURT:  ALL RIGHT.

18           MR. AARON:  YOUR HONOR, WE RECEIVED THAT SOME TIME

19    AGO.

20           THE COURT:  I HEARD REFERENCE TO IT SOME TIME AGO.

21           MR. AARON:  AND THE WITNESS TESTIFIED THAT HE HAD

22    PUT THIS STUFF IN A FILE CABINET TOGETHER AND HADN'T NOTICED

23    IT UNTIL JUST THE OTHER DAY.

24           MR. MICHAEL:  I DIDN'T SAY THAT WE PRODUCED THESE

25    MATERIALS.  I SAID THAT THERE WERE MATERIALS THAT THE

1    GOVERNMENT HAD SOUGHT TO INTRODUCE.  I DIDN'T SAY THAT.

2    PREVIOUSLY THE GOVERNMENT REFERENCED MATERIALS IN ITS 404(B)

3    PAPERS.

4           IN THIS CASE AGENT MORENO I BELIEVE HAD THIS OTHER

5    SET OF MATERIALS AND ONLY RECENTLY REDISCOVERED THAT HE HAD

6    THEM AND ALERTED THE GOVERNMENT TO THEIR PRESENCE.  IN THE

7    OFFICE THEY USE A TRIAL ROOM.  THEY WERE IN A BOX.  THAT'S

8    WHEN HE DISCOVERED THAT THESE MATERIALS WERE THERE,

9    DISCOVERED THE DEFENDANT'S LETTERS AND DISCOVERED THE CD.  AS

10   I UNDERSTOOD HIS TESTIMONY, HE RECEIVED THE MATERIALS, HE PUT

11   THEM IN A FILING CABINET, AND IT SOUNDS AS IF HE FORGOT THAT

12   THEY WERE THERE.  WE CERTAINLY CAN INQUIRE OF HIM.

13          THE COURT:  OKAY.  LET ME ASK YOU TO BACK UP A

14   LITTLE BIT.  THE PHOTOGRAPHS AND THE LETTERS, MY

15   UNDERSTANDING IS THAT YOU TOLD ME BEFORE THE LAST TRIAL THAT

16   THE DEFENDANT RECEIVED FROM SETH BEKENSTEIN WHILE HE WAS IN

17   CUSTODY IN SAN BERNARDINO LETTERS THAT HAD SOME ENCLOSURES

18   THAT INCLUDED CHILD EROTICA, RIGHT?

19          MR. MICHAEL:  CORRECT.

20          THE COURT:  NOW, THIS IS PART OF THE MATERIAL THAT

21   AGENT MORENO JUST TESTIFIED ABOUT?

22          MR. MICHAEL:  CORRECT.  AND GOVERNMENT COUNSEL'S

23   UNDERSTANDING WAS THAT THOSE MATERIALS, THE ORIGINALS, WERE

24   IN SAN BERNARDINO COUNTY CUSTODY, OR RATHER, IN THE PERSONAL

25   PROPERTY OF DEFENDANT WHICH SAN BERNARDINO COUNTY CONSIDERS

1    DEFENDANT'S PROPERTY, AS WE UNDERSTOOD IT.  AND I BELIEVE

2    AGENT MORENO, MY UNDERSTANDING IS, EITHER -- I DON'T KNOW

3    WHY -- I DON'T RECALL THE EXACT CONVERSATIONS, BUT WITH

4    REGARD TO GETTING THE MATERIALS, WE WERE TOLD WE NEEDED A

5    SEARCH WARRANT AND DISCUSSED WHETHER OR NOT THE GOVERNMENT

6    WANTED TO PURSUE A SEARCH WARRANT FOR THAT AND WE DECIDED FOR

7    VARIOUS REASONS NOT TO, AND SO WE DIDN'T.

8         WHAT I THINK HAPPENED HERE, AND I CAN INQUIRE OF

9    AGENT MORENO -- I DON'T KNOW IF I DISCUSSED THIS POINT WITH

10   HIM.  SPECIFICALLY, HE RECEIVED COPIES OF SOME OF THOSE

11   MATERIALS FROM SAN BERNARDINO AND PUT THEM IN A FILING

12   CABINET, AND THEN WE MADE A DECISION THAT AT A CERTAIN

13   SUBSEQUENT POINT WE WEREN'T GOING TO GO TO SAN BERNARDINO AND

14   SEEK THE ORIGINALS, AND I THINK HE FORGOT HE HAD GOTTEN SOME

15   COPIES FROM SAN BERNARDINO, AND THERE WAS THIS ENVELOPE IN

16   THERE THAT HE HAD SET ASIDE.

17        AND I WILL -- I BELIEVE THERE WAS SOME CONVERSATION

18   WITH GOVERNMENT COUNSEL DURING THAT PERIOD OF TIME ABOUT

19   WHETHER OR NOT THE GOVERNMENT WAS INTERESTED IN PURSUING THAT

20   AVENUE OF INVESTIGATION AND, ULTIMATELY, GOVERNMENT COUNSEL

21   TOLD AGENT MORENO THERE WAS NO NEED TO PURSUE IT FURTHER.

22        THE COURT:  ALL RIGHT.

23        MR. MICHAEL:  BECAUSE THE GOVERNMENT DIDN'T DEEM IT

24   AS EVIDENCE RELEVANT TO THE TRIAL, YOUR HONOR.

25        THE COURT:  BUT SOMEWHERE DURING THIS POINT YOU DID

1   TELL ME THAT THERE WAS THIS EVIDENCE?

2          MR. MICHAEL:  WE DID.  WE DISCLOSED IT IN ONE OF

3   OUR 404(B) MOTIONS THAT THERE WERE THESE MATERIALS IN THE

4   PERSONAL PROPERTY AND THAT A SEARCH WARRANT WAS REQUIRED IF

5   THE GOVERNMENT WANTED TO OBTAIN IT, AND WE HAD NOT OBTAINED

6   IT.  WE ALSO ALERTED THE COURT THAT WE HAD ADVISED DEFENSE

7   COUNSEL.

8          AND GOVERNMENT COUNSEL WAS PROVIDED WITH A

9   SAMPLING, ABOUT FIVE PAGES OF THESE MATERIALS THAT I THINK

10  AGENT MORENO COPIED UPON AT ONE TIME MAKING A VISIT TO THE

11  JAIL.  I THINK THEY LET HIM COPY A FEW PAGES.  HE PROVIDED

12  THOSE TO GOVERNMENT COUNSEL, SAID THESE ARE THE TYPES OF

13  MATERIALS THAT ARE BEING RECEIVED.  WE PRODUCED THOSE TO

14  DEFENSE COUNSEL AND INDICATED THAT WHEN WE INQUIRED ABOUT THE

15  SUM TOTAL OF THEM, AT A LATER DATE, IF WE COULD OBTAIN THEM,

16  BUT WE NEED A SEARCH WARRANT.  SO WE TOLD DEFENSE COUNSEL WE

17  CAN'T GET THEM, MAYBE YOU CAN, IF YOU WANT TO.  AND ALL WE

18  REQUESTED IS THAT HE NOT DESTROY THEM IF YOU WERE TO TAKE

19  THEM INTO CUSTODY.  DEFENSE COUNSEL ADVISED US THAT HE

20  ATTEMPTED TO AND HE WAS DENIED ACCESS AS WELL.  SO I BELIEVE

21  ALL THINGS ARE STILL THERE IN DEFENDANT'S PERSONAL PROPERTY.

22          THE COURT:  ALL RIGHT.  SO I THINK THE ISSUE IS AT

23  THE TIME THAT THE AGENT GOT ALL THIS MATERIAL FROM SAN

24  BERNARDINO, WHICH WAS IN FEBRUARY HE GETS IT ALL, HE NOTICES

25  THAT THERE IS THE DISK, BECAUSE HE LOGS IT IN AS A TAPE.  AND

```
 1    FURTHERMORE, HE ALSO TOLD US THAT HE WAS TOLD THAT HE WAS --
 2    THAT HE WAS TOLD THAT SAN BERNARDINO COUNTY WAS GOING TO BE
 3    GIVING HIM THE TAPE AND HE KNEW -- OR THE DISK, AND HE KNEW
 4    THAT ON IT WERE PHONE CALLS.  WHAT HE DOESN'T RECALL IS
 5    WHETHER WHEN HE RECEIVED IT AND WHEN HE PUT IT IN THE FILING
 6    CABINET, HE DOESN'T RECALL WHETHER HE TOLD GOVERNMENT COUNSEL
 7    ABOUT IT.  AND HE ALSO TESTIFIED THAT ONCE HE PUT IT IN THE
 8    FILING CABINET, HE SAYS HE DID NOT REALLY HAVE A CONVERSATION
 9    WITH GOVERNMENT COUNSEL ABOUT IT OR WHETHER HE TOLD
10    GOVERNMENT COUNSEL THAT THAT DISK WAS IN THERE UNTIL THE
11    OTHER NIGHT.
12            MR. MICHAEL:  AND MY UNDERSTANDING FROM HAVING
13    TALKED TO HIM IS THAT HE FORGOT THE DISK WAS IN THERE.  AND I
14    THINK AS HE IS TRYING TO REFRESH HIS MEMORY AND GO BACK, I
15    THINK HE BELIEVES HE MAY HAVE BEEN TOLD THAT THERE WERE CALLS
16    FROM THE DEFENDANT, BUT HE NEVER HAD FIRSTHAND KNOWLEDGE OF
17    THAT BECAUSE HE NEVER LISTENED TO THE RECORDING.
18            THE COURT:  WHAT DID HE TESTIFY?  HE'S NEVER
19    LISTENED TO IT, BUT HE TESTIFIED THAT HE --
20            MR. MICHAEL:  THAT HE KNEW THAT.  I'M ASSUMING --
21            THE COURT:  HE TESTIFIED THAT SOMEBODY AT SAN
22    BERNARDINO, I GUESS IT'S THE LIAISON PERSON, TOLD HIM THAT.
23            MR. MICHAEL:  AND, AGAIN, I CAN'T SPEAK FOR
24    AGENT MORENO, BUT MY INTERPRETATION OF THE SITUATION IS THAT
25    HE THOUGHT OF THIS MATERIAL WHEN, YOU KNOW -- AS THE STACK OF
```

1   MATERIALS AND FORGOT THAT THE CD WAS IN THERE.  AND I CAN

2   TELL YOU THIS GOVERNMENT COUNSEL WAS NEVER ALERTED TO THE

3   PRESENCE OF A CD, AND HAD THIS GOVERNMENT COUNSEL BEEN

4   ALERTED TO THAT, WE CERTAINLY WOULD HAVE TURNED IT OVER.  AND

5   CONSISTENT WITH THAT, AS SOON AS GOVERNMENT COUNSEL LEARNED

6   ABOUT IT THE OTHER NIGHT, WE MADE AN EFFORT TO TURN IT OVER

7   THE FIRST THING THE NEXT MORNING.

8           SO IT APPEARS TO HAVE BEEN AN OVERSIGHT BY

9   AGENT MORENO, AND I THINK, AGAIN, I CAN'T SPEAK FOR HIM, BUT

10  BECAUSE THE AVENUE OF EXPLORING WHAT MATERIALS MR. BEKENSTEIN

11  WAS SENDING TO THE DEFENDANT WAS, HE WAS ADVISED BY THE

12  GOVERNMENT THAT IN LIGHT OF ALL THAT HAD TO BE DONE FOR THIS

13  CASE, THAT WE WEREN'T GOING TO PURSUE THAT BECAUSE -- THE

14  STUFF FOR MR. BEKENSTEIN TO THE DEFENDANT -- AND SO IT'S NOT

15  THE DEFENDANT'S MATERIALS, AND EVEN THOUGH IT IS BEING SENT

16  TO HIM AS OPPOSED TO THE STUFF IN NEW MEXICO THAT WAS

17  RECOVERED FROM HIS JAIL CELL, THIS WAS COMING FROM THE JAIL

18  AND SAN BERNARDINO OFFICIALS.

19          AND FOR VARIOUS OTHER REASONS THE GOVERNMENT, I

20  THINK BECAUSE OF THE TIMING OF IT AND HOW FAR OUT IT WAS FROM

21  THE EVENTS IN QUESTION, THE GOVERNMENT SAID THERE'S OTHER

22  MATTERS THAT WE NEED TO FOCUS ON IN THIS CASE, WHICH IS

23  OBVIOUSLY A SIGNIFICANT -- A CASE WITH A LOT OF OTHER MATTERS

24  RELEVANT TO IT.

25          I THINK WHAT HAPPENED HERE IS THAT AGENT MORENO WAS

1   TOLD WE DON'T NEED TO PURSUE THIS, WE'RE NOT GOING TO

2   INVESTIGATE IT FURTHER, AND FORGOT THAT HE HAD RECEIVED

3   COPIES.  AND AT A LATER DATE WHEN WE DISCUSSED IT, WE ALL

4   KNEW THE ORIGINALS, ALL OF THE MATERIALS WERE STILL IN SAN

5   BERNARDINO, AND THAT'S WHEN WE REALIZED THERE WERE ALL THESE

6   MATERIALS IN SAN BERNARDINO STILL THERE IN DEFENDANT'S

7   PERSONAL PROPERTY.  THE GOVERNMENT ADVISED DEFENSE COUNSEL OF

8   THAT SO HE COULD AVAIL HIMSELF OF THOSE MATERIALS.

9          SO TO THE EXTENT THAT WE HAD COPIES IN OUR

10  POSSESSION, THE GOVERNMENT MADE DEFENSE COUNSEL AWARE.  AND

11  IT WAS OUR UNDERSTANDING, SINCE THEY WERE DEFENDANT'S

12  PERSONAL PROPERTY, THEY WERE RETRIEVABLE BY DEFENDANT OR HIS

13  AGENT AND JUST LEARNED THE OTHER DAY THAT DEFENSE COUNSEL WAS

14  UNSUCCESSFUL IN GETTING THOSE.  THAT WAS A SURPRISE TO

15  GOVERNMENT COUNSEL.

16          THE COURT:  MR. AARON.

17          MR. AARON:  YOUR HONOR, MAYBE I'M JUST SLOW, MAYBE

18  IT'S THE END OF THE DAY.  I'M NOT QUITE SURE WHAT HAPPENED TO

19  THE FIRST ISSUE.  I BELIEVE I HAD GOTTEN COPIES OF

20  MATERIALS -- THE MATERIALS THAT THEY'RE TALKING ABOUT,

21  MATERIALS INVOLVING A COUPLE OF LETTERS FROM MR. SANDERS AS

22  WELL AS PHOTOCOPIES.  IF I UNDERSTAND COUNSEL CORRECTLY, HE

23  IS SAYING I RECEIVED THAT, BUT THERE WAS OTHERS THAT WEREN'T

24  COPIED.  IS THAT THE COURT'S --

25          THE COURT:  WELL, I THINK WHAT DEFENSE COUNSEL IS

1    SAYING IS THAT --

2            MR. MICHAEL:  GOVERNMENT COUNSEL?

3            THE COURT:  YES, I'M SORRY.  THANK YOU.  THAT AT

4    ONE POINT AGENT MORENO WENT OVER TO THE JAIL AND THEY LET HIM

5    MAKE FIVE PHOTOCOPIES?

6            MR. MICHAEL:  APPROXIMATELY, YES, YOUR HONOR, AND

7    WE PRODUCED THOSE FIVE PAGES.

8            MR. AARON:  I SEE THAT COUNSEL HAS A LETTER, IF I

9    MIGHT HAVE A MOMENT, YOUR HONOR.

10           MR. MICHAEL:  I JUST WANT SO THE RECORD IS CLEAR, A

11   LETTER WAS SENT ON APRIL 23RD, 2007, VIA FAX AND U.S. MAIL TO

12   DEFENSE COUNSEL, ADVISED HIM:

13           ENCLOSED PLEASE FIND COPIES OF DOCUMENTS, BATES

14   STAMP 6679 TO 6686, WHICH THE SAN BERNARDINO COUNTY SHERIFF'S

15   DEPARTMENT HAS PROVIDED TO THIS OFFICE.  THE GOVERNMENT'S

16   UNDERSTANDING IS THAT THE ENCLOSED ITEMS INCLUDE LETTERS AND

17   IMAGES SETH BEKENSTEIN SENT YOUR CLIENT SINCE HE WAS TAKEN

18   INTO FEDERAL CUSTODY IN CONNECTION WITH THE CHARGES IN THIS

19   MATTER.

20           THE GOVERNMENT FURTHER UNDERSTANDS THAT ADDITIONAL

21   ITEMS, PARENTHETICAL, SIMILAR IN NATURE TO THE ENCLOSED,

22   CLOSE PARENTHETICAL, WERE RECOVERED FROM YOUR CLIENT BY THE

23   SHERIFF'S DEPARTMENT.  SINCE THESE ITEMS WERE LODGED AS YOUR

24   CLIENT'S PERSONAL PROPERTY, THEY ARE NOT AVAILABLE TO THE

25   GOVERNMENT.  TO THE EXTENT THAT YOU OR SOMEONE ELSE ACTING ON

1    YOUR CLIENT'S BEHALF OBTAIN THESE OTHER ITEMS, THE GOVERNMENT

2    REQUESTS THAT YOU OBTAIN AND NOT DESTROY THEM.   THE

3    GOVERNMENT DOES NOT INTEND TO OFFER THE ENCLOSED ITEMS IN ITS

4    CASE-IN-CHIEF AT TRIAL BUT RESERVES THE RIGHT TO OFFER SUCH

5    EVIDENCE ON CROSS-EXAMINATION OR REBUTTAL, PARTICULARLY

6    SHOULD YOUR CLIENT CHOOSE TO TESTIFY.

7            AND THEN WE HAVE A STANDARD SENTENCE AT THE END

8    ABOUT DISCOVERY AND NOT WAIVING OUR RIGHTS BY PRODUCING THIS

9    STUFF.

10           SO THE EXISTENCE OF NOT THE TAPE BUT THE MATERIALS

11   THAT IT CAME WITH WERE DISCLOSED, SO JUST TO THE EXTENT THAT

12   IS A RELATED ISSUE.

13           THE COURT:  I GUESS MY QUESTION -- I KNOW THAT

14   MR. AARON IS TRYING TO ASK QUESTIONS, BUT WERE YOUR

15   ENCLOSURES WITH THAT?  WAS IT EVERYTHING BUT THE TAPE?

16           MR. MICHAEL:  WHAT I SENT HIM WAS ABOUT FIVE OR

17   SIX PAGES.  THAT'S WHAT WAS GIVEN TO ME.  AND WHAT JOSH

18   MORENO --

19           THE COURT:  SO WHAT YOU SENT HIM WITH THAT LETTER

20   WAS THE FIVE OR SIX PAGES THAT AGENT MORENO COPIED?

21           MR. MICHAEL:  ORIGINALLY.  AND I BELIEVE HE LATER

22   WAS -- SAN BERNARDINO PROVIDED HIM A LARGER STACK OF

23   MATERIALS AND HE HAD GOTTEN THEM.  AND I THINK THAT --

24           THE COURT:  IS THAT APRIL OF THIS YEAR?

25           MR. MICHAEL:  IT WAS APRIL OF THIS YEAR.

1            THE COURT:  BUT THEN HE GOT THAT WHOLE STACK IN

2    FEBRUARY OF THIS YEAR?

3            MR. MICHAEL:  CORRECT.  AND I THINK THAT THOSE FIVE

4    PAGES HE HAD, HE HAD PREVIOUSLY GOTTEN A COPY OF.  I DON'T

5    KNOW EXACTLY WHEN HE GOT THOSE.  I KNOW THEY WERE PROVIDED TO

6    DEFENSE COUNSEL AND THAT THEY WEREN'T --

7            THE COURT:  WHAT DOESN'T MAKE SENSE TO ME THEN IS

8    THAT IN APRIL YOU ARE SENDING A LETTER TO DEFENSE COUNSEL

9    SAYING HERE'S THE FIVE COPIES, HERE'S FIVE OR SO PAGES, BUT

10   YOU'VE GOT THE WHOLE FILE.  YOU'VE GOT COPIES OF EVERYTHING.

11           MR. MICHAEL:  GOVERNMENT COUNSEL, BRIAN MICHAEL, I

12   HAD THOSE FIVE PAGES, AND AGENT MORENO PROVIDED THEM TO ME.

13   AND I THINK ON TWO OCCASIONS HE HAD INTERACTED WITH SAN

14   BERNARDINO.  ON ONE OCCASION HE MADE THE EXCERPTS OF THE

15   FIVE PAGES.

16           THE COURT:  RIGHT.

17           MR. MICHAEL:  ON ANOTHER OCCASION HE GOT THE LARGE

18   STACK.  AND HE PROVIDED TO ME THE FIVE PAGES.

19           THE COURT:  AND YOU DIDN'T KNOW HE HAD THE WHOLE

20   THING?

21           MR. MICHAEL:  CORRECT.  I THINK BY THAT TIME HE HAD

22   FORGOTTEN THAT HE HAD THE LARGER COLLECTION AS WELL, AND HE

23   PROVIDED THE SMALLER EXCERPTED STUFF TO THE GOVERNMENT.  AND

24   HE MIGHT HAVE EVEN -- HE DEFINITELY PROVIDED IT TO THE

25   GOVERNMENT BEFORE APRIL 23RD, BUT THE GOVERNMENT DIDN'T SEE

1   IT AS RULE 16 DISCOVERY BECAUSE IT WAS FOR MR. BEKENSTEIN.

2   THERE WAS NOTHING EXCULPATORY IN IT, SO THERE WAS NO REASON

3   TO HAVE PRODUCED IT.  THE GOVERNMENT TURNED IT OVER, QUITE

4   FRANKLY, IN AN EXCESS OF CAUTION BECAUSE IT HAD MATERIALS AND

5   BECAUSE WE KNEW THAT THERE WERE OTHER MATERIALS THERE, AND WE

6   THOUGHT, YOU KNOW, WE ACTUALLY ADVISED DEFENSE COUNSEL OF IT.

7            THE COURT:  ALL RIGHT.

8            MR. AARON:  ONCE COUNSEL SHOWED ME THE LETTER, YOUR

9   HONOR, I DO REMEMBER RECEIVING THAT.  I DON'T REMEMBER IT

10   BEING LATE IN APRIL, BUT IT COULD HAVE BEEN.  MY DISTINCT

11   RECOLLECTION IS THAT I HAD A NUMBER OF IMAGES AND LETTERS

12   FROM -- I MIGHT BE CONFUSING IT WITH MATERIALS FROM NEW

13   MEXICO.

14            MR. MICHAEL:  THE GOVERNMENT HAS PROVIDED A LARGE

15   NUMBER OF THOSE MATERIALS FROM NEW MEXICO.

16            THE COURT:  BUT YOU INCLUDED THOSE --

17            MR. MICHAEL:  IN THE 404(B) PAPERS, EXACTLY, YOUR

18   HONOR.  AND HONESTLY, I BELIEVE THAT ONE OF THE REASONS THERE

19   WAS CONFUSION ON MR. MORENO'S PART IS THAT WHEN WE WERE

20   COMPILING THOSE MATERIALS AND PUTTING THEM TOGETHER, MAYBE HE

21   FORGOT THAT THERE WAS TWO SETS OF MATERIALS FROM TWO

22   DIFFERENT JAILS.  I THINK IT WAS A HUMAN ERROR IN THIS

23   REGARD.  I THINK THERE'S NO SHOWING OF ANY INTENT TO WITHHOLD

24   INFORMATION.  AND CERTAINLY DEFENSE COUNSEL WAS PUT ON NOTICE

25   OF THE EXISTENCE OF ALL THE DOCUMENTS.

1          NOW, THE TAPE, IT'S OBVIOUSLY DIFFERENT FROM THE

2     DOCUMENTS, AND THAT'S THE REAL PURPOSE I UNDERSTAND OF THIS

3     HEARING.  AND AGENT MORENO HAS STATED ON THE RECORD THAT HE

4     FORGOT IT WAS THERE.  AND AS SOON AS WE REALIZED IT WAS

5     THERE, WE TURNED IT OVER.  AND AT THE TIME THAT HE OBTAINED

6     IT, HE PUT IT IN A FILING CABINET AND FORGOT THEY WERE THERE.

7          AND MORE IMPORTANTLY, WITH REGARD TO THE TAINT IN

8     THIS CASE, HE'S NEVER -- HE NEVER OPENED IT OR LISTENED TO

9     IT, SO THERE'S NO POSSIBILITY OF TAINT, YOUR HONOR.

10          THE COURT:  WELL, THE POSSIBILITY OF TAINT GOES

11    BEYOND THAT, AS I SAID YESTERDAY.  THE POSSIBILITY OF TAINT

12    WOULD INCLUDE WHETHER HE HAD ANY CONVERSATIONS WITH ANYONE AT

13    SAN BERNARDINO COUNTY JAIL WHO MIGHT HAVE LISTENED TO IT AND

14    SO FORTH, SO I THINK THAT THAT POSSIBILITY HAS BEEN

15    DISPELLED.

16          WELL, MR. AARON, DO YOU WISH TO BE HEARD ANY

17    FURTHER ON THE ISSUE AS TO GOVERNMENT COUNSEL?

18          MR. AARON:  NO, YOUR HONOR.

19          THE COURT:  I WANT TO TALK FURTHER WITH DEPUTY

20    MARSHAL O'CONNOR WHEN I HAVE AN OPPORTUNITY, BECAUSE I DO

21    WANT TO FOLLOW UP WITH WHAT IS BEING DONE WITH THE PROCEDURES

22    AT THE JAIL.

23          MR. MICHAEL:  CAN I MENTION ONE THING ON THAT, YOUR

24    HONOR?

25          THE COURT:  YES.

1        MR. MICHAEL:  I SPOKE TO DEPUTY O'CONNOR BRIEFLY

2   AND I TALKED TO AGENT MORENO, AND IT'S MY UNDERSTANDING THAT

3   WHAT SAN BERNARDINO DOES TYPICALLY WHEN THEY HAVE THESE CALLS

4   IS, THAT THEY'RE RECORDED SOMEHOW, AND IF THEY SEND THEM OUT,

5   THEY DON'T NEED TO LISTEN TO THEM TO TRANSFER THEM TO ANOTHER

6   PIECE OF MEDIA, LIKE A CD.  MY UNDERSTANDING -- AGAIN, I

7   CAN'T SPEAK FIRSTHAND -- IS THAT THEY DON'T LISTEN TO THEM.

8   THEY JUST TRANSFER IT TO A STAFF PERSON WHOSE JOB IT IS TO

9   FIND THE RELEVANT CALLS ASSOCIATED WITH THE INMATE NUMBER.

10        THE COURT:  WHY WOULD THEY JUST PICK THESE THREE?

11        MR. MICHAEL:  PERHAPS THOSE WERE THE ONLY THREE

12  CALLS THAT WERE --

13        THE COURT:  NOT ACCORDING TO WHAT DEFENSE COUNSEL

14  HAS SAID.  HE SAID THAT HIS CLIENT CALLED MORE OFTEN.

15        MR. MICHAEL:  PERHAPS THEY WERE THE ONLY THREE THAT

16  WERE RECORDED OR THAT WERE RETAINED AT THE TIME THE RECORDING

17  WAS MADE.  THE OTHER POSSIBILITY, YOUR HONOR, AND I DON'T

18  KNOW HOW DEFENDANT MAKES HIS PHONE CALLS, BUT INMATES ARE

19  ABLE TO MAKE PHONE CALLS AT TIMES USING OTHER INMATE NUMBERS

20  WHICH IS A WAY TO AVOID DETECTION OF YOUR PHONE CALLS.  I'M

21  NOT ACCUSING DEFENDANT OF ANYTHING, BUT THERE ARE OTHER WAYS

22  TO MAKE PHONE CALLS THAT IT WOULDN'T BE RECORDED AS YOUR

23  PHONE CALL.  AND I HAVE HAD -- I'VE BEEN AWARE OF THAT

24  HAPPENING IN OTHER CASES, AND THAT VERY POSSIBLY MIGHT BE A

25  SITUATION HERE.  AND I'M NOT SAYING THERE IS ANYTHING LIKE

1    THAT GOING ON, BUT THAT IS A POSSIBILITY.

2              THE COURT:  IT'S A POSSIBILITY.  BUT, FIRST OF ALL,

3    MY UNDERSTANDING OF THE WAY THEY OPERATE AT SAN BERNARDINO IS

4    THAT THEY RECORD ALL -- THERE'S NO LIVE MONITORING.  THEY

5    RECORD EVERYTHING.  SO IT WOULDN'T MAKE SENSE TO ME THAT THEY

6    DIDN'T RECORD ALL OF THOSE PHONE CALLS AS A REASON FOR WHY WE

7    HAVE ON A DISK ONLY THOSE THREE.

8              MR. MICHAEL:  THEY JUST WOULDN'T BE ABLE TO RECEIVE

9    THEM AS MR. SANDERS' PHONE CALLS IF THEY DIDN'T KNOW THAT

10   THEY WERE HIS CALLS.

11             THE COURT:  THAT'S A DISTINCT POSSIBILITY.

12             MR. MICHAEL:  THAT'S ALL I'M MENTIONING, YOUR

13   HONOR.

14             THE COURT:  THAT'S A DISTINCT POSSIBILITY.  THAT

15   DOESN'T SEEM LIKELY TO ME, IF THEY'RE CALLS TO COUNSEL.  IF

16   IT'S A CALL TO AN ALLEGED CO-CONSPIRATOR OR SOMETHING LIKE

17   THAT, THAT WOULD BE LIKELY, BUT IF IT'S A PHONE CALL TO

18   COUNSEL, THAT DOESN'T SEEM VERY LIKELY TO ME.  SO I DO WANT

19   TO FOLLOW UP TO FIND OUT EXACTLY WHAT'S GOING ON, BECAUSE I'M

20   VERY TROUBLED BY A DISK BEING TURNED OVER THAT HAS NOTHING ON

21   IT BUT SELECTED CALLS THAT WERE MADE BY THE DEFENDANT TO HIS

22   LAWYER.

23             MR. MICHAEL:  AND THE GOVERNMENT IS TROUBLED BY IT.

24   THE GOVERNMENT DOESN'T WANT THESE CALLS, YOUR HONOR, AND

25   WISHES THEY NEVER ENDED UP IN THE GOVERNMENT'S POSSESSION.

```
 1              THE COURT:  THIS IS THE SECOND ONE OF MY CASES

 2   WHERE THIS HAS HAPPENED.

 3              MR. MICHAEL:  I WOULD DEFER TO SAN BERNARDINO TO

 4   ADDRESS YOUR HONOR'S CONCERNS.

 5              THE COURT:  THANK YOU.  ANYTHING FURTHER?

 6              MR. AKROTIRIANAKIS:  YOUR HONOR, DID YOU WANT ME

 7   TO --

 8              MR. AARON:  NO, YOUR HONOR.

 9              MR. AKROTIRIANAKIS:  -- UNHOOK THIS THING AND PUT

10   IT BACK OVER THERE?

11              THE COURT:  YES.  AGAIN, CAREFULLY.

12              MR. AKROTIRIANAKIS:  I WILL, OF COURSE.  MAY I DO

13   IT NOW?

14              THE COURT:  YES.  THAT WOULD BE GREAT.  THANK YOU.

15              WE ARE ADJOURNED.

16                   (PROCEEDINGS ADJOURNED)

17                        ---O0O---

18

19

20

21

22

23

24

25
```

# C E R T I F I C A T E

### DOCKET NO. EDCR 04-42(A) VAP

         I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,
TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND
ACCURATE TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED
PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE
TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS
OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____
PHYLLIS A. PRESTON, CSR          DATED:  OCTOBER 16, 2008
FEDERAL OFFICIAL COURT REPORTER
LICENSE NO. 8701