1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2          EASTERN DIVISION-RIVERSIDE

3
      HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING
4

5  UNITED STATES OF AMERICA,        )
                                    )
6                 PLAINTIFF,        )
                                    )
7  V.                               )DOCKET NO. EDCR 04-42(A)-VAP
                                    )
8  JAMES SANDERS,                   )
                                    )
9                 DEFENDANT.        )
   _____)
10

11      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                  RIVERSIDE, CALIFORNIA
12              TUESDAY, JUNE 12, 2007

13
                PHYLLIS A. PRESTON, CSR
14                LICENSE NO. 8701
           FEDERAL OFFICIAL COURT REPORTER
15          UNITED STATES DISTRICT COURT
                3470 TWELFTH STREET
16          RIVERSIDE, CALIFORNIA 92501

17

18

19

20

21

22

23

24

25

1                                **APPEARANCES**

2

   FOR THE PLAINTIFF:        OFFICE OF THE UNITED STATES ATTORNEY
3                            BY:  BRIAN MICHAEL
                                  JOSEPH AKROTIRIANAKIS
4                            ASSISTANT UNITED STATES ATTORNEYS
                             3880 LEMON STREET, SUITE 210
5                            RIVERSIDE, CALIFORNIA 92501

6

   FOR THE DEFENDANT:        JEFFREY AARON
7                            FEDERAL CRIMINAL DEFENSE PANEL
                             THE RIVERSIDE BARRISTER BUILDING
8                            3993 MARKET STREET
                             RIVERSIDE, CALIFORNIA 92501
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2    WITNESSES

3    FOR PLAINTIFF:                                     PAGE

4    JAMES MORAN
     DIRECT EXAMINATION RESUMED BY MR. MICHAEL. . . . . . 12
5    CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . . 111

6    RANDALL MARTIN
     CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . . 140/144
7    REDIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . 179
     CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . . 200
8
     JAMES MORAN
9    CROSS-EXAMINATION RESUMED BY MR. AARON . . . . . . . 203
     REDIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 231
10   RECROSS-EXAMINATION BY MR. AARON . . . . . . . . . . 237

11   LEE BROWN
     DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 238
12


13


14   EXHIBITS                                      ADMITTED

15     108        . . . . . . . . . . . . . . . . .     32
       111 - 129  . . . . . . . . . . . . . . . . .     58
16     130 & 131  . . . . . . . . . . . . . . . . .     63
       132        . . . . . . . . . . . . . . . . .     65
17     133        . . . . . . . . . . . . . . . . .     68
       134 - 138  . . . . . . . . . . . . . . . . .     69
18     59 - 82  . . . . . . . . . . . . . . . . . .     73
       84 - 94  . . . . . . . . . . . . . . . . . .     73
19     107        . . . . . . . . . . . . . . . . .    105
       3          . . . . . . . . . . . . . . . . .    238
20     4          . . . . . . . . . . . . . . . . .    241

21

22

23

24

25
```

1          TUESDAY, JUNE 12, 2007, RIVERSIDE, CALIFORNIA

2                            ---OOo---

3          THE CLERK:  CALLING ITEM NO. 1, EDCR 04-42(A) VAP,

4     UNITED STATES OF AMERICA VERSUS JAMES SANDERS.

5          THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

6     PRESENCE OF THE JURY.  MS. INGRAM IS GOING TO GO DO A HEAD

7     COUNT RIGHT NOW TO SEE IF THEY'RE ALL HERE.

8          BEFORE WE BRING THEM IN, COUNSEL, YOU HAVE AN ISSUE

9     TO BRING UP?

10         MR. MICHAEL:  YES, YOUR HONOR.

11         MR. AARON:  YOUR HONOR, BEFORE WE DO THAT, I JUST

12    WANT TO LET THE COURT KNOW, AND I APOLOGIZE FOR INTERRUPTING

13    COUNSEL, WE ARE NOT GOING TO BE CALLING KALEN S., LORI

14    STYLES, OR KAT DUFF, AND I INFORMED THE WITNESSES THIS WEEK,

15    WITH THE EXCEPTION OF KALEN, OF THAT.  SO AT THIS POINT, IT

16    DOESN'T APPEAR THAT THERE WILL BE A DEFENSE CASE, OF COURSE,

17    SUBJECT TO THE DEVELOPMENTS OF THE DAY.

18         THE COURT:  THANK YOU FOR LETTING ME KNOW.  AND

19    I'LL LET THE COURT STAFF KNOW IN TERMS OF PREPARATIONS FOR

20    THE CLOSED-CIRCUIT TELEVISIONS.

21         MR. MICHAEL:  JUST TO PUT ON THE RECORD, YOUR

22    HONOR, THE GOVERNMENT DID FACILITATE A CONVERSATION BETWEEN

23    MR. SUTHERLAND, KALEN'S FATHER, AND DEFENSE COUNSEL OVER THE

24    WEEKEND SO THAT DEFENSE COUNSEL COULD ASSESS WHETHER OR NOT

25    TO CALL THE WITNESSES AS WELL AS PROVIDED THE OTHER

1    INFORMATION TO DEFENSE COUNSEL THAT WAS REQUESTED ON THE

2    RECORD ON FRIDAY.

3              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

4              MR. MICHAEL:  WITH REGARD TO TODAY, YOUR HONOR, I'M

5    GOING TO LET MR. AKROTIRIANAKIS ADDRESS IT BECAUSE IT HAS TO

6    DO WITH THE ORDER OF THE WITNESSES AND AN ISSUE THAT EXISTS

7    WITH REGARD TO MR. MARTIN, SHOULD HE TAKE THE STAND FOR

8    CROSS-EXAM NOW.

9              MR. AKROTIRIANAKIS:  FOR THE CONVENIENCE OF A LOT

10   OF PEOPLE, INCLUDING THE MARSHALS, YOUR HONOR, WE THINK THAT

11   PROBABLY IT IS EASIEST TO PUT ON RANDALL MARTIN FOR

12   CROSS-EXAMINATION NOW, AND DEFENSE COUNSEL HAS NO OBJECTION

13   TO THAT.

14             THE COURT:  ALL RIGHT.

15             MR. AKROTIRIANAKIS:  AFTER REVIEWING THE --

16             THE COURT:  EXCUSE ME FOR INTERRUPTING, BUT DO YOU

17   WANT TO GO AHEAD AND PUT MR. MARTIN ON THE STAND?  AND ONCE

18   WE GET THE JURY READY, WE CAN --

19             MR. AKROTIRIANAKIS:  YOUR HONOR, I THINK FOR THE

20   NEXT TWO POINTS THAT ARE GOING TO BE RAISED, ONE BY ME AND

21   ONE BY DEFENSE COUNSEL --

22             THE COURT:  WE DON'T WANT TO HAVE THEM IN THE

23   COURTROOM.

24             MR. AKROTIRIANAKIS:  YEAH.

25             THE COURT:  I'M SORRY.

1    MR. AKROTIRIANAKIS:  LAST WEEK I HAD MADE A

2  DISCLOSURE IN OPEN COURT ABOUT CERTAIN COMMENTS THAT

3  MR. MARTIN HAD MADE TO HIS ATTORNEY AND HIS ATTORNEY THEN

4  TOLD ME ABOUT.  AFTER REVIEWING RULE 609 AND CONSIDERING THE

5  MATTER OVER THE WEEKEND, THE GOVERNMENT'S POSITION IS THAT

6  THAT IS NOT AN APPROPRIATE AREA FOR CROSS-EXAMINATION, IN

7  LIGHT OF THE FACT THAT MR. MARTIN HAS NOT EVER BEEN CONVICTED

8  OR EVEN CHARGED WITH ANY CRIME RELATED TO THOSE ACTS.

9    WE HAVE A DISAGREEMENT ABOUT THAT MATTER, AND I

10  THINK WE NEED A RULING FROM THE COURT IN THAT REGARD.  IN

11  ADDITION, THERE IS ANOTHER MATTER UPON WHICH MR. AARON

12  INTENDED TO ADDRESS IN CROSS-EXAMINATION THAT, I GUESS, I

13  WILL LET HIM ADDRESS.

14    THE COURT:  ALL RIGHT.  SO THE GOVERNMENT'S

15  POSITION IS THAT -- WELL, LET ME JUST STRAIGHTEN THIS OUT.

16  THE DEFENSE INTENDS TO EXAMINE MR. MARTIN ON THE EVIDENCE OF

17  PRIOR ACTS UNDER 404 AS IMPEACHMENT EVIDENCE?

18    MR. AARON:  THAT'S CORRECT.  YOUR HONOR, WHAT WE

19  ANTICIPATE IS THAT I ANTICIPATE CROSSING MR. RANDALL MARTIN

20  ABOUT HOW TRUTHFUL HE WAS WITH LAW ENFORCEMENT OFFICERS.  I

21  BELIEVE HE KEPT THIS INFORMATION FROM LAW ENFORCEMENT

22  OFFICERS.  I BELIEVE HE IS BEING DECEPTIVE HERE IN THIS

23  COURT, AND HE'S BEEN DECEPTIVE THROUGHOUT THE TIME THAT HE

24  HAS TALKED TO LAW ENFORCEMENT.  HE HAS GIVEN THEM SOME TRUE

25  STATEMENTS AND SOME FALSE STATEMENTS.  HE HAS CONTINUALLY

1    TRIED TO SHIELD HIMSELF FROM THE WORST OF THE LIABILITY HE

2    COULD FACE IN ORDER TO GET A GOOD DEAL FOR HIMSELF, AND I

3    BELIEVE FROM MY CROSS-EXAMINATION THE JURY WILL CONCLUDE THAT

4    HE IS NOT A RELIABLE WITNESS, THAT HIS BIAS, INTEREST, AND

5    MOTIVE IN TESTIFYING IS MUCH GREATER THAN HIS DESIRE TO TELL

6    THE TRUTH.

7          THE COURT:  WELL, GENERALLY, YOU CAN ONLY IMPEACH

8    WITH CONVICTIONS.  AS TO PRIOR CRIMES, YOU CAN ONLY IMPEACH

9    WITH CONVICTIONS AND NOT WITH ARRESTS.  WE DON'T EVEN HAVE

10   AN ARREST AS TO THIS.  SO IS WHAT YOU'RE SAYING IS YOU WANT

11   TO IMPEACH HIM ON THE BASIS THAT HE WAS NOT TRUTHFUL WITH LAW

12   ENFORCEMENT?

13         MR. AARON:  YES.  IF I MIGHT, YOUR HONOR.  LAW

14   ENFORCEMENT ASKED HIM ABOUT PRIOR ACTS WITH CHILDREN, AND HE

15   TALKED ABOUT ONE, AND HE DIDN'T MENTION THE OTHER.  HE

16   CONCEALED THAT.

17         THE COURT:  I THINK I WOULD PERMIT THAT THEN.

18         MR. AKROTIRIANAKIS:  YEAH, I DON'T HAVE NECESSARILY

19   A PROBLEM WITH THAT.  I'M NOT TRYING TO PROTECT MR. MARTIN OR

20   ANYTHING OF THAT SORT.  I WOULD EXPECT IN THOSE

21   CIRCUMSTANCES, SINCE THAT IS NOT COVERED BY HIS IMMUNITY

22   AGREEMENT, THAT HE WOULD ASSERT HIS FIFTH AMENDMENT

23   PRIVILEGE, WHICH --

24         THE COURT:  WELL, THAT HAS TO BE DONE OUTSIDE THE

25   PRESENCE OF THE JURY.

```
 1              MR. AKROTIRIANAKIS:  WHICH IS WHY I BRING IT UP
 2    BEFORE HE TAKES THE STAND, YOUR HONOR.  AND HIS LAWYER IS ON
 3    HIS WAY RIGHT NOW.  I SPOKE TO HIM.
 4              THE COURT:  THEN WHY DON'T WE GET STARTED WITH THE
 5    JURY ON OTHER AREAS.  CAN WE DO THAT ON CROSS-EXAMINATION?
 6    HOW LONG IS YOUR CROSS-EXAMINATION?
 7              MR. AARON:  THAT'S KIND OF HARD WITH MARTIN,
 8    YOUR HONOR, BECAUSE I DO NOT HAVE THAT LENGTHY OF
 9    CROSS-EXAMINATION.
10              THE COURT:  LET'S PUT ANOTHER WITNESS ON THEN.
11              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THERE
12    APPEARS TO BE A PROBLEM WITH THE EQUIPMENT HERE.  I HAVE IT
13    SET UP EXACTLY THE WAY I HAD IT LAST WEEK.
14              MR. AARON:  YOUR HONOR, I APOLOGIZE FOR
15    INTERRUPTING COUNSEL, BUT BEFORE WE LEAVE MARTIN, I WANTED
16    TO -- THERE WAS ANOTHER ISSUE WHICH COUNSEL HAD RAISED.
17              THE COURT:  BUT RIGHT NOW WHO WAS THE LAST WITNESS
18    ON THE STAND?  AGENT MORAN?
19              MR. MICHAEL:  YES, IN THE MIDDLE OF HIS DIRECT
20    EXAMINATION.
21              THE COURT:  LET'S PUT MR. MORAN ON THE STAND SO WE
22    DON'T KEEP THE JURY WAITING AND THEN WE'LL DO MARTIN.
23              IS AGENT MORAN HERE?
24              MR. AKROTIRIANAKIS:  YES, YOUR HONOR, BUT IN ORDER
25    THAT I NOT PUBLISH INADVERTENTLY ANY OBSCENE MATERIAL DURING
```

1    HIS EXAMINATION, I NEED TO BE ABLE TO SEE THE COURT'S MONITOR

2    TO MAKE SURE THAT THE SCREEN HERE IS BLANK SO I KNOW THAT ONE

3    IS BLANK AND MINE IS NOT BLANK, AND THEN WHEN THE COURT

4    GRANTS PERMISSION TO THE GOVERNMENT TO PUBLISH THE EXHIBIT,

5    I CAN PUT IT THERE ON THE COURT'S MONITOR.

6              MR. MICHAEL:  WE TESTED IT THIS MORNING, YOUR

7    HONOR, AND IT WAS WORKING JUST FINE, AND NOW IT HAS SORT OF

8    FIZZLED OUT.

9              THE COURT:  ALL RIGHT.  LET'S GO OFF THE RECORD

10   WHILE YOU SORT THIS OUT.

11                   (OFF THE RECORD BRIEFLY)

12             THE COURT:  YOU STARTED TO TELL ME ABOUT ANOTHER

13   ISSUE WITH MR. MARTIN.  THIS IS BACK ON THE RECORD.

14             MR. AARON:  I'M SORRY, YOUR HONOR.

15             THE COURT:  I JUST WANTED TO GO BACK ON THE RECORD.

16   WE'RE ABOUT TO BRING THE JURY IN, BUT I WANT TO HEAR WHAT THE

17   ISSUE IS SO I CAN --

18             MR. AARON:  IT WOULD BE EASIEST WHEN WE START

19   IMPEACHING HIM WITH RELATION TO HIS HAVING RECEIVED IMMUNITY,

20   WE WANT TO BE ABLE TO TALK TO HIM TO EXPOSE HIS BIAS, MOTIVE,

21   AND INTEREST IN TESTIFYING, TO TALK TO HIM ABOUT WHAT EXACTLY

22   HE IS GETTING IMMUNITY FOR AND WHAT HE KNOWS THOSE CRIMES TO

23   CARRY, BECAUSE IT'S DIFFERENT IF HE'S GETTING IMMUNITY FOR

24   SOMETHING THAT HE COULD MAYBE DO A YEAR OR TWO; WHEREAS,

25   THESE CHARGES, HIS BIAS AND INTEREST IN COOPERATING WITH LAW

 1    ENFORCEMENT IS EXTREME BECAUSE THE NATURE OF THE CHARGES ARE

 2    SO SERIOUS.

 3             SO I BELIEVE THAT THE PROSECUTION IS CONCERNED

 4    BECAUSE WE MAY ASK HIM A QUESTION LIKE, WELL, ONE OF THE

 5    THINGS THAT YOU WANTED IMMUNITY HERE FOR IN THE IMMUNITY

 6    AGREEMENT IS SO THAT YOU WOULDN'T FACE ANY POSSIBLE LIABILITY

 7    FOR AIDING AND ABETTING OR ANY INVOLVEMENT IN TRAVELING,

 8    AGGRAVATED SEXUAL ABUSE, OR TRAVELING TO HAVE SEX WITH A

 9    MINOR, THINGS LIKE THAT, BECAUSE YOU KNOW THOSE ARE SERIOUS

10    CRIMES.  YOU KNOW THOSE CRIMES CARRY X-NUMBER OF YEARS, THAT

11    SORT OF THING.

12             MR. AKROTIRIANAKIS:  WELL, THE PROBLEM WITH THAT,

13    FIRST, YOUR HONOR, HE'S THEN BASICALLY MAKING AN ARGUMENT TO

14    THE JURY THAT -- THE JURY NULLIFICATION ARGUMENT BECAUSE HIS

15    CLIENT FACES THE SAME CRIME.  SO WHEN HE SAYS, "YOU KNOW

16    THAT" --

17             THE COURT:  YOU MEAN THE SAME PUNISHMENT.  HE'S

18    FACING THE SAME CHARGES.

19             MR. AKROTIRIANAKIS:  SAME CHARGES AND THEREFORE THE

20    SAME PUNISHMENT.  SO, BASICALLY, WHAT HE'S SAYING IS, WHEN HE

21    ASKS RANDALL MARTIN, "YOU KNOW IF YOU WERE CONVICTED OF

22    COUNT 4 IN THIS CASE, YOU WOULD GET LIFE IMPRISONMENT,

23    POTENTIALLY."

24             MR. AARON:  THE ARGUMENT MORE, YOUR HONOR, AND I

25    WOULD RETAIN A LIMITING INSTRUCTION, BECAUSE THEY'RE NOT TO

```
 1    CONSIDER IT FOR THAT PURPOSE, BUT I THINK IT'S REASONABLE AND
 2    PROPER TO SAY, "LOOK, YOU'RE GETTING IMMUNITY" --
 3              THE COURT:  ALL RIGHT.  LET ME CONSIDER IT.
 4              (IN THE PRESENCE OF THE JURY:)
 5              THE COURT:  GOOD MORNING.  LET THE RECORD REFLECT
 6    THE PRESENCE OF ALL MEMBERS OF THE JURY AND ALL COUNSEL AND
 7    THE DEFENDANT ALSO PRESENT.  YOU MAY BE SEATED.
 8              I APOLOGIZE FOR KEEPING YOU WAITING.  WE WERE
 9    HAVING SOME TECHNICAL DIFFICULTIES WITH THE EQUIPMENT AND WE
10    HAD TO GET THOSE SORTED OUT.  I'M SORRY THAT WE KEPT YOU
11    WAITING THIS MORNING.
12              YOU MAY PUT THE WITNESS BACK ON THE STAND.
13              GOOD MORNING, AGENT MORAN.  YOU MAY RESUME THE
14    WITNESS STAND.
15              THE WITNESS:  THANK YOU, YOUR HONOR.
16        PLAINTIFF'S WITNESS, JAMES MORAN, WAS PREVIOUSLY SWORN
17              THE COURT:  YOU DON'T NEED TO BE SWORN AS A WITNESS
18    AGAIN BECAUSE YOU WERE SWORN ON FRIDAY, AND YOUR TESTIMONY IS
19    STILL GIVEN UNDER OATH AND UNDER PENALTY OF PERJURY.
20              DO YOU UNDERSTAND THAT?
21              THE WITNESS:  I UNDERSTAND.
22              THE COURT:  THANK YOU.  YOU MAY BE SEATED.
23              AND YOU MAY CONTINUE TO INQUIRE ON DIRECT
24    EXAMINATION.
25              MR. MICHAEL:  THANK YOU, YOUR HONOR.
```

1                    DIRECT EXAMINATION (RESUMED)

2    BY MR. MICHAEL:

3    Q.    GOOD MORNING, AGENT MORAN.

4    A.    GOOD MORNING.

5    Q.    SIR, DO YOU RECALL LAST FRIDAY ON DIRECT EXAM I HAD

6    ASKED YOU SOME QUESTIONS ABOUT YOUR FORENSIC REVIEW OF THE

7    LAPTOP COMPUTER SEIZED FROM THE DEFENDANT?

8    A.    YES.

9    Q.    AND I BELIEVE WE ENDED YOUR TESTIMONY AT THE POINT IN

10   WHICH YOU HAD IDENTIFIED THE NAME OF THE ENCRYPTED CONTAINER

11   THAT YOU FOUND ON HIS LAPTOP.

12              DO YOU RECALL THAT TESTIMONY?

13   A.    YES.

14   Q.    WHAT WAS THE NAME OF THAT ENCRYPTED CONTAINER?

15   A.    PRIVATE1.JBC.

16   Q.    AND WHAT DOES "JBC" STAND FOR?

17   A.    IT'S A FILE EXTENSION ASSOCIATED WITH JETICO BESTCRYPT.

18              THE COURT:  EXCUSE ME.  AGENT MORAN, COULD YOU

19   ADJUST THAT MICROPHONE SO IT'S RIGHT IN FRONT OF YOU SO

20   EVERYONE CAN HEAR YOU.  THANK YOU.

21              MR. MICHAEL:  AND IF YOU COULD ALSO JUST SPEAK UP

22   AND SPEAK SLOWLY FOR THE SAKE OF THE COURT REPORTER, PLEASE.

23   BY MR. MICHAEL:

24   Q.    IS JETICO BESTCRYPT THE NAME OF THE COMPANY THAT MAKES

25   THE ENCRYPTION PROGRAM?

1    A.    JETICO, YES.

2    Q.    NOW, WHEN YOU'RE CONDUCTING A FORENSIC REVIEW OF A

3    LAPTOP WITH AN ENCRYPTED CONTAINER ON IT, SUCH AS IN THIS

4    CASE, IS ENCASE ABLE TO DEFEAT THE ENCRYPTION TO FIGURE OUT

5    WHAT THE PASSWORD IS?

6    A.    NO.

7    Q.    WHEN YOU'RE LOOKING AT THE CONTAINER USING ENCASE, ARE

8    YOU ABLE TO TELL WHETHER OR NOT THERE'S ANYTHING INSIDE THE

9    ENCRYPTED CONTAINER?

10   A.    NO.

11   Q.    COULD THE CONTAINER HAVE BEEN EMPTY?

12   A.    NO.

13   Q.    COULD IT BE FULL?

14   A.    YES.

15   Q.    IF THERE WERE FILES INSIDE, SUCH AS IMAGES OR VIDEOS,

16   WOULD YOU BE ABLE TO SEE THE NAMES OF THOSE FILES?

17   A.    NO.

18   Q.    AND HOW LARGE AGAIN WAS THIS ENCRYPTED CONTAINER?

19   A.    APPROXIMATELY ONE GIGABYTE.

20   Q.    AND APPROXIMATELY HOW MANY IMAGES AND VIDEOS --

21   APPROXIMATELY HOW MANY IMAGES COULD BE HELD IN A ONE GIGABYTE

22   CONTAINER?

23   A.    THOUSANDS.

24   Q.    AND APPROXIMATELY HOW MUCH VIDEO COULD BE HELD IN THIS

25   CONTAINER?

1   A.   APPROXIMATELY ONE HOUR.

2   Q.   AND ALTHOUGH YOU WERE UNABLE TO SEE THE CONTENTS OF THE

3   CONTAINER USING ENCASE OR WHETHER OR NOT THERE WAS ANYTHING

4   EVEN INSIDE OF IT, WAS THERE ANY INFORMATION ON THE HARD

5   DRIVE INDICATING WHETHER THE ENCRYPTED CONTAINER HAD EVER

6   BEEN ACCESSED BY THE LAPTOP USER?

7   A.   YES.

8   Q.   COULD YOU TELL WHAT FILES HAD BEEN PLACED INTO THE

9   CONTAINER OR REMOVED FROM THE CONTAINER?

10  A.   NO.

11  Q.   COULD YOU TELL THAT -- BUT YOU COULD TELL THAT IT HAD

12  BEEN ACCESSED?

13  A.   YES.

14  Q.   NOW, DID YOU MAKE EFFORTS TO DECRYPT PRIVATE1.JBC, THE

15  ENCRYPTED CONTAINER?

16  A.   YES.

17  Q.   AND DID YOU ALSO MAKE THE FIRST EFFORT TO DECRYPT THE

18  THREE CONTAINERS ON THE EXTERNAL HARD DRIVE THAT YOU

19  TESTIFIED ABOUT ON FRIDAY?

20  A.   YES.

21  Q.   AND WHEN I SAY "DECRYPT," YOU UNDERSTAND THAT TO MEAN TO

22  FIND THE PASSWORD, FIGURE OUT THE PASSWORD?

23  A.   YES.

24  Q.   NOW, WITH REGARD TO -- HOW EXTENSIVE WERE YOUR EFFORTS

25  TO DECRYPT THE EXTERNAL HARD DRIVE AND THE LAPTOP COMPUTER?

1    A.    THEY WERE VERY EXTENSIVE.

2    Q.    NOW, WITH REGARD TO THE LAPTOP HARD DRIVE, WHAT DID YOU

3    FIRST DO BEFORE YOU ACTUALLY TRIED TO DECRYPT THE CONTAINER?

4    A.    THE ONLY THING YOU COULD DO IS TAKE THAT FILE OUT OF MY

5    FORENSIC IMAGE AND PUT IT ON MY FORENSIC EXAMINER MACHINE.

6    Q.    AND WHEN YOU SAY OUT OF YOUR FORENSIC IMAGE, ARE YOU

7    REFERRING TO THE ENCASE COPY?

8    A.    THAT'S CORRECT.

9    Q.    AND WHEN YOU SAY "THAT FILE," ARE YOU REFERRING TO THE

10   CONTAINER, PRIVATE1.JBC?

11   A.    YES.

12   Q.    AND THEN WHY DO YOU HAVE TO COPY THE ENCRYPTED CONTAINER

13   FROM THE ENCASE COPY TO YOUR FORENSIC MACHINE?

14   A.    I NEEDED TO RUN THE ASSOCIATED PROGRAM AGAINST THAT FILE

15   TO TRY AND OPEN IT.

16   Q.    AND WOULD THAT ASSOCIATED PROGRAM BE THE BESTCRYPT

17   PROGRAM?

18   A.    YES.

19   Q.    AND ARE YOU UNABLE TO RUN THE ASSOCIATED BESTCRYPT

20   PROGRAM WITH THE CONTAINER ON THE ENCASE COPY?

21   A.    THAT'S CORRECT.

22   Q.    SO ONCE YOU HAD COPIED THE CONTAINER TO YOUR FORENSIC

23   MACHINE TO RUN IT WITH THE BESTCRYPT PROGRAM, WHAT DID YOU --

24   WELL, FIRST OF ALL, WHY DO YOU WANT TO RUN IT WITH THE

25   BESTCRYPT PROGRAM?  WHAT DOES THAT ENABLE YOU TO TRY TO DO?

1    A.    IT WOULD ALLOW ME TO ENTER PASSWORDS AND TRY AND OPEN

2    THE ENCRYPTED CONTAINER.

3    Q.    SO WHAT DID YOU FIRST TRY TO DO TO DEFEAT THE ENCRYPTION

4    WHEN YOU RAN THE PROGRAM?

5    A.    I GATHERED WHAT KNOWN PASSWORDS THERE WERE ASSOCIATED

6    WITH THIS CASE AND TRIED THOSE, MANUALLY ENTERING THEM.

7    Q.    AND WHERE DID YOU GET THOSE POSSIBLE PASSWORDS FROM?

8    A.    THERE WAS A LIST IN THE DEFENDANT'S BACKPACK AND THROUGH

9    THE COURSE OF THE INVESTIGATION ON THE FORENSIC ANALYSIS.

10   Q.    AND IF I COULD DIRECT YOUR ATTENTION TO EXHIBIT 14, IT

11   SHOULD BE IN ONE OF THE MANILA FOLDERS NEXT TO YOU THERE,

12   WHICH IS ALREADY ADMITTED INTO EVIDENCE.  IT'S SOME PIECES OF

13   PAPER WITH HANDWRITTEN NOTES.  IF YOU COULD REMOVE IT FROM

14   THE PLASTIC BAG, PLEASE.

15          WOULD THIS BE AN EXAMPLE OF ONE OF THE SOURCES YOU

16   WENT INTO TO TRY TO IDENTIFY THE DEFENDANT'S PASSWORDS OR

17   TYPES OF INFORMATION YOU WOULD HAVE LOOKED TO USE?

18   A.    YES.

19   Q.    AND WHEN YOU MANUALLY TRIED TO DETERMINE THE PASSWORD,

20   WERE YOU SUCCESSFUL?

21   A.    NO.

22   Q.    AND WHAT OTHER PROGRAMS, IF ANY, DID YOU RUN TO TRY TO

23   DEFEAT THE PASSWORD PROTECTION ON THE ENCRYPTED CONTAINER ON

24   THE HARD DRIVE?

25   A.    THERE IS FORENSIC SOFTWARE CALLED ACCESS DATA PASSWORD

1    RECOVERY TOOLKIT.

2    Q.   AND THEN WHAT IS THAT PROGRAM?

3    A.   IT ATTEMPTS TO FIND PASSWORDS FOR PASSWORD PROTECTED

4    FILES.

5    Q.   HOW MANY PASSWORDS DOES IT TRY?

6    A.   MILLIONS.

7    Q.   AND WHAT DO THOSE PASSWORDS CONSIST OF?

8    A.   VARIOUS COMBINATIONS OF LETTERS, NUMBERS, AND

9    CHARACTERS.

10   Q.   WOULD IT INCLUDE PASSWORD PHRASES?

11   A.   YES.

12   Q.   AND DID YOU RUN THAT PROGRAM IN THIS CASE?

13   A.   YES.

14   Q.   AND WERE YOU SUCCESSFUL IN YOUR EFFORTS TO DECRYPT THE

15   ENCRYPTION OF THE CONTAINER BY RUNNING THIS PROGRAM?

16   A.   NO.

17   Q.   AND HOW MANY PASSWORDS DO YOU THINK ACCESS DATA PASSWORD

18   RECOVERY TOOLKIT TRIED?

19   A.   MILLIONS.

20   Q.   AND DID YOU TAKE THE SAME STEPS TO TRY TO DECRYPT THE

21   THREE CONTAINERS ON THE EXTERNAL HARD DRIVE?

22   A.   YES.

23   Q.   AND THAT WOULD INCLUDE RUNNING THE BESTCRYPT PROGRAM AND

24   MANUALLY ENTERING PASSWORDS?

25   A.   YES.

1   Q.   WOULD THAT INCLUDE USING THE ACCESS DATA PROGRAM YOU

2   JUST DESCRIBED?

3   A.   YES.

4   Q.   AND WERE THOSE EFFORTS SUCCESSFUL?

5   A.   NO.

6   Q.   AND WHAT RELEVANCE, IF ANY, WOULD THE LENGTH OF THE

7   PASSWORD HAVE WITH REGARD TO YOUR EFFORTS TO TRY TO DETERMINE

8   WHAT IT IS?

9   A.   THE LONGER THE PASSWORD, THE MORE DIFFICULT IT IS.

10  EXPONENTIALLY THERE'S JUST WAY MORE POSSIBILITIES.

11  Q.   AND IF IT'S A VERY LONG PASSWORD, IS IT POSSIBLE THAT IT

12  WOULD NEVER BE CRACKED WITHIN A REASONABLE AMOUNT OF TIME

13  USING THE METHOD YOU DESCRIBED?

14  A.   YES.

15  Q.   AND WHEN I SAY "A REASONABLE AMOUNT OF TIME," WOULD THAT

16  INCLUDE BEYOND THE LIFETIME OF EVERYBODY IN THIS COURTROOM?

17  A.   YES.

18  Q.   AND DID YOU ATTEMPT ONLY ONCE OR ON MULTIPLE OCCASIONS

19  TO TRY TO DETERMINE THE PASSWORDS FOR THE CONTAINER ON THE

20  LAPTOP HARD DRIVE AS WELL AS ON THE EXTERNAL HARD DRIVE?

21  A.   MULTIPLE TIMES.

22  Q.   AND WERE YOU EVER SUCCESSFUL?

23  A.   NO.

24  Q.   DID YOU EVER SEEK TO HAVE ANYONE ELSE TRY TO DEFEAT THE

25  ENCRYPTION ON THE LAPTOP AND THE EXTERNAL HARD DRIVE?

1    A.    YES.

2    Q.    WHO?

3    A.    THE ACCESS DATA SOFTWARE PEOPLE.

4    Q.    SO THE PEOPLE WHO ACTUALLY MADE THE PASSWORD RECOVERY

5    PROGRAM YOU'VE DESCRIBED?

6    A.    YES.

7    Q.    AND WHAT DID YOU SEND TO THEM?

8    A.    I SENT THEM A COPY OF MY ENCASE IMAGE AS WELL AS THE

9    EXTRACTED CONTAINERS.

10   Q.    FROM THE LAPTOP HARD DRIVE AND FROM THE EXTERNAL HARD

11   DRIVE?

12   A.    YES.

13   Q.    AND DID THEY ATTEMPT TO DECRYPT THOSE CONTAINERS?

14   A.    YES.

15   Q.    WERE THEY SUCCESSFUL?

16   A.    NO.

17   Q.    BASED ON YOUR TRAINING AND YOUR EXPERIENCE, IN 2001 HOW

18   ADVANCED WAS THE ENCRYPTION USED ON THE DEFENDANT'S LAPTOP?

19   A.    IT WAS VERY ADVANCED.

20   Q.    AND HOW ADVANCED WAS THE ENCRYPTION USED ON HIS EXTERNAL

21   HARD DRIVE?

22   A.    VERY ADVANCED.

23   Q.    AND SITTING HERE TODAY, HAVE YOU EVER BEEN ABLE TO

24   DEFEAT THE ENCRYPTION ON EITHER THE LAPTOP HARD DRIVE OR THE

25   EXTERNAL HARD DRIVE?

1    A.    NO.

2    Q.    SO THOSE CONTAINERS REMAIN ENCRYPTED TODAY?

3    A.    THAT'S CORRECT.

4    Q.    AND WHATEVER CONTENTS, IF ANY, ARE IN THEM, YOU'RE

5    UNABLE TO IDENTIFY?

6    A.    THAT'S CORRECT.

7    Q.    NOW, DESPITE THE ENCRYPTION ON THE LAPTOP, THAT

8    PRIVATE1.JBC CONTAINER, WERE YOU STILL ABLE TO RECOVER SOME

9    DATA RELATIVE TO THE INVESTIGATION FROM THAT HARD DRIVE USING

10   ENCASE?

11   A.    YES.

12   Q.    AND WERE YOU ALSO ABLE TO RECOVER SOME DATA RELEVANT TO

13   THE INVESTIGATION USING TECHNIQUES OTHER THAN ENCASE?

14   A.    YES.

15   Q.    AND THEN DURING THE COURSE OF THIS INVESTIGATION, DID

16   YOU ATTEMPT TO EXTRACT DATA FROM THE LAPTOP HARD DRIVE USING

17   ENCASE AND THOSE OTHER TECHNIQUES ON MULTIPLE OCCASIONS?

18   A.    YES.

19   Q.    AND DID YOU ALSO DO THE SAME WITH REGARD TO THE EXTERNAL

20   HARD DRIVE?

21   A.    YES.

22   Q.    AND THESE OTHER TECHNIQUES YOU USED, WHICH I'M GOING TO

23   ASK YOU SOME QUESTIONS ABOUT LATER ON, WERE THEY WITHIN

24   STANDARD FORENSIC PROTOCOLS USED BY YOUR OFFICE?

25   A.    YES.

1   Q.   AND WERE THEY ACCEPTABLE AND RELIABLE METHODS?

2   A.   YES.

3   Q.   AND WERE THEY METHODS THAT WERE COMMONLY USED BY

4   FORENSIC EXAMINERS?

5   A.   YES.

6   Q.   NOW, I'M GOING TO ASK YOU SOME QUESTIONS ABOUT WHAT IT

7   IS YOU ACTUALLY RECOVERED.   DID THERE APPEAR TO YOU, FROM

8   YOUR REVIEW USING ENCASE, TO BE ANY FILES OR FOLDERS ON THE

9   LAPTOP THAT APPEARED TO BE ASSOCIATED BY NAME WITH THAT

10  ENCRYPTED CONTAINER, THE PRIVATE1.JBC CONTAINER?

11  A.   YES.

12  Q.   AND WHAT WAS THE NAME OF THAT FILE OR FOLDER?

13  A.   THERE WAS A FILE FOLDER NAMED "FROM PRIVATE1 CONTAINER."

14  Q.   AND WHERE WAS THAT SAVED ON THE LAPTOP HARD DRIVE?

15  A.   IT WAS ON THE LAPTOP HARD DRIVE IN THE D DRIVE.

16  Q.   AND WOULD THE D DRIVE JUST BE A PART OF THE HARD DRIVE?

17  A.   YES.   THERE ARE TWO PARTITIONS ON THE HARD DRIVE, A C

18  DRIVE AND A D DRIVE.

19  Q.   AND THEY'RE BOTH CAPABLE OF SAVING DATA ON THEM?

20  A.   YES.

21  Q.   AND WERE YOU ABLE TO OPEN "FROM PRIVATE1 CONTAINER,"

22  THAT ASSOCIATED FILE?   YOU WERE ABLE TO SEE INSIDE THAT

23  FOLDER?

24  A.   YES.

25  Q.   AND WERE YOU ABLE TO SEE ITS CONTENTS?

1    A.    YES.

2    Q.    AND WERE THERE ANY SUBFOLDERS WITHIN IT?

3    A.    YES.

4    Q.    AND WAS THERE ANYTHING WITHIN THOSE SUBFOLDERS?

5    A.    YES.

6    Q.    WHAT DID YOU OBSERVE WITHIN THOSE SUBFOLDERS?

7    A.    IN ONE SUBFOLDER IT WAS TITLED "FAMILY ALBUM" WITH A

8    100_FUJI FOLDER UNDERNEATH THAT ONE THAT HAD DIGITAL PICTURES

9    IN IT AND OTHER PROGRAM FILES THAT WERE IN THAT.

10   Q.    AND WHAT WERE SOME OF THE PROGRAM FILES?  I'M GOING TO

11   ASK YOU ABOUT THOSE DIGITAL PICTURES IN A MOMENT, BUT WHAT

12   WERE SOME OF THOSE PROGRAM FILES YOU FOUND IN THIS FOLDER,

13   THESE SUBFOLDERS?

14   A.    THERE WAS NEOTRACE PRO AND NEOWATCH.

15   Q.    AND REAL GENERALLY WHAT DO THOSE PROGRAMS ENABLE THE

16   USER TO DO?

17   A.    NEOTRACE PRO ALLOWS YOU TO TRACK YOUR PATH ON THE

18   INTERNET, WHAT MACHINE YOU'RE CONNECTING TO, AND NEOWATCH

19   ANALYZES WHAT'S GOING ON IN YOUR LOCAL MACHINE, WHAT

20   COMMUNICATIONS ARE GOING IN AND OUT.

21   Q.    AND WITH REGARD TO THE PHOTOS, JUST TO MAKE SURE IT'S

22   CLEAR, THEY WERE WITHIN A FOLDER CALLED "FAMILY ALBUM" WITHIN

23   ANOTHER SUBFOLDER CALLED "100_FUJI"; IS THAT CORRECT?

24   A.    THAT'S CORRECT.

25   Q.    WHAT DID IT APPEAR THAT THE ITEMS WERE IN THE 100_FUJI

1   FOLDER?

2   A.   DIGITAL CAMERA PHOTOS.

3   Q.   AND IS THAT 100_FUJI FOLDER THE TYPE OF FOLDER YOU WOULD

4   NORMALLY SEE ASSOCIATED WITH DIGITAL CAMERA PICTURES ON A

5   LAPTOP?

6   A.   YES.

7   Q.   AND DID YOU REVIEW THE IMAGES WITHIN THAT SUBFOLDER?

8   A.   YES.

9   Q.   WERE THEY PORNOGRAPHIC IMAGES?

10  A.   NO.

11  Q.   AND DID IT APPEAR TO YOU WHETHER OR NOT THERE WERE OTHER

12  FOLDERS OR FILES ON THE LAPTOP WITH THAT SAME NAME, "FAMILY

13  ALBUM"?

14  A.   YES.

15  Q.   AND DID THEY CONTAIN SOME OR ALL OF THOSE SAME

16  PHOTOGRAPHS YOU REVIEWED?

17  A.   YES.

18  Q.   AND WERE THEY AT A DIFFERENT OR THE SAME LOCATION?  THIS

19  OTHER FAMILY ALBUM FOLDER WITH THE SAME PHOTOS, WERE THEY AT

20  THE SAME OR DIFFERENT LOCATION ON THE COMPUTER HARD DRIVE?

21  A.   DIFFERENT LOCATION.

22  Q.   AND NONE OF THESE IMAGES WERE PORNOGRAPHIC; IS THAT

23  CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   AND DID IT APPEAR THAT ALL THESE IMAGES HAD BEEN TAKEN

```
 1   BY A DIGITAL CAMERA?

 2   A.   YES.

 3   Q.   I'M GOING TO SHOW YOU SOME OF THOSE IMAGES IN A LITTLE

 4   BIT AND ASK YOU SOME QUESTIONS ABOUT THEM.  LET'S GO FORWARD

 5   WITH SOME OF THE OTHER INFORMATION YOU RECOVERED FROM THE

 6   LAPTOP HARD DRIVE.

 7        WHAT INFORMATION DID YOU FIND WITH REGARD TO

 8   PROGRAMS THAT WERE ON THE LAPTOP, THAT WERE USED BY THE

 9   LAPTOP?

10   A.   UNDER THE PROGRAMMING FILES THERE WERE VARIOUS PROGRAMS

11   INSTALLED.

12   Q.   AND WHICH OF THOSE PROGRAMS DID YOU FIND THAT YOU

13   BELIEVE ARE RELEVANT TO THIS INVESTIGATION?

14   A.   THERE WAS EVIDENCE ELIMINATOR AND BCWIPE.

15   Q.   AND ARE THOSE FILE WIPING, CLEANING-TYPE PROGRAMS?

16   A.   YES.

17   Q.   AND CAN THOSE PROGRAMS BE USED TO ALSO CLEAN DELETED

18   DATA OFF OF A COMPUTER?

19   A.   YES.

20   Q.   AND I THINK YOU TESTIFIED TO THIS, BUT WAS THERE

21   INTERNET TRACING PROGRAMS?

22   A.   YES.

23   Q.   WOULD THAT INCLUDE THE NEOWATCH AND NEOTRACE YOU

24   TESTIFIED ABOUT?

25   A.   THAT'S CORRECT.
```

1    Q.   AND WAS THERE ANY INFORMATION REGARDING USE OF A PROXY

2    SERVER?

3    A.   THERE WAS A PROGRAM THAT ALLOWED THAT.

4    Q.   AND WHAT WAS THE NAME OF THAT PROGRAM?

5    A.   "FREEDOM."

6    Q.   AND WAS THERE ANY INFORMATION ABOUT E-MAIL CAPABILITIES

7    ON THE LAPTOP?

8    A.   YES.

9    Q.   AND WHAT WERE THE E-MAILING CAPABILITIES THAT IT HAD?

10   A.   I FOUND AN E-MAIL THAT WAS FROM HOTMAIL, AN ACCOUNT FOR

11   THE DEFENDANT.

12   Q.   THERE WAS AN ACCOUNT FOR THE DEFENDANT, YOU SAID?

13   A.   YES.

14   Q.   AND WHAT ABOUT AN INSTANT MESSENGER/CHAT SOFTWARE, WAS

15   THERE EVIDENCE OF THOSE TYPES OF PROGRAMS?

16   A.   YES.

17   Q.   AND WHAT WERE THE CHAT PROGRAMS THAT YOU OBSERVED?

18   A.   ONE WAS ICQ AND ANOTHER WAS YAHOO MESSENGER.

19   Q.   AND WERE THERE FILE FOLDERS ASSOCIATED WITH THE PROGRAMS

20   AND THE DATA RELATED TO ICQ ON THE LAPTOP?

21   A.   YES.

22   Q.   AND ARE YOU FAMILIAR WITH THE SCREEN NAME -- DURING THE

23   COURSE OF THIS INVESTIGATION, HAVE YOU BECOME FAMILIAR WITH

24   THE SCREEN NAME OJIBOYSAN?

25   A.   YES.

1    Q.   AND WERE THERE ANY FILE FOLDERS ASSOCIATED WITH THAT

2    NAME?

3    A.   YES.

4    Q.   WHAT WAS THE NAME OF THAT FOLDER?

5    A.   OJIBOYSAN.

6    Q.   WERE THERE ANY CONTENTS TO THAT FOLDER THAT YOU WERE

7    ABLE TO OBSERVE?

8    A.   ONE LOCATION, NO; ANOTHER, YES.

9    Q.   AND WAS WHAT YOU FOUND IN THOSE FILE FOLDERS RELEVANT TO

10   THE INVESTIGATION?

11   A.   YAHOO MESSENGER CHAT.

12   Q.   SO THERE WAS A YAHOO MESSENGER CHAT IN THE FILE FOLDER

13   ENTITLED "OJIBOYSAN"?

14   A.   RIGHT.

15   Q.   NOW, WAS THERE ANY EVIDENCE REGARDING THE SCREEN NAMES

16   THAT THE DEFENDANT USED FOR HIS CHAT AND/OR E-MAIL ACCOUNTS?

17   A.   YES.

18   Q.   AND WHAT WERE THOSE?

19   A.   ICQ SCREEN NAME WAS P-E-I.  I'M NOT SURE HOW YOU

20   PRONOUNCE IT, PEI OR PEI.

21   Q.   YOU CAN JUST SPELL IT.

22   A.   P-E-I.

23   Q.   WHAT WAS IT WITH REGARD TO THE HOTMAIL ACCOUNT?

24   A.   THE HOTMAIL ACCOUNT WAS PEI314@HOTMAIL.COM.

25   Q.   AND DID YOU FIND ANY SOFTWARE RELATED TO NEWSGROUPS OR

1    PROGRAMS RELATED TO NEWSGROUPS ON THE LAPTOP HARD DRIVE?

2    A.   YES.

3    Q.   AND WOULD THAT PROGRAM ENABLE THE USER TO DOWNLOAD

4    IMAGES FROM NEWSGROUPS?

5    A.   YES.

6    Q.   WHAT IS THAT KNOWN AS?

7    A.   ONE PROGRAM IS CALLED XNEWS.

8    Q.   IS THAT A NEWSGROUP READER?

9    A.   YES.

10   Q.   AND DID YOU FIND ANY FOLDERS ASSOCIATED WITH ONLINE

11   PHOTO ALBUMS ON THE LAPTOP HARD DRIVE?

12   A.   YES.

13   Q.   AND WHAT WAS THE NAME OF THAT ONLINE PHOTO ALBUM?

14   A.   THERE WAS A ZING ALBUM.

15   Q.   AND WAS THERE ANYTHING INSIDE THAT FILE FOLDER?

16   A.   NO.

17   Q.   NOW, TO THE EXTENT THAT FOLDERS YOU FOUND ON THE LAPTOP

18   WERE EMPTY, WERE YOU ABLE TO TELL THAT THERE HAD PREVIOUSLY

19   BEEN SOMETHING PUT INTO THOSE FOLDERS AND SUBSEQUENTLY

20   DELETED AND WIPED?

21   A.   NO.

22   Q.   AND TO THE EXTENT THAT FILE FOLDERS ON THE HARD DRIVE

23   HAD NO CONTENTS, WOULD THE USE OF EVIDENCE ELIMINATOR OR

24   BCWIPE AND THOSE TYPES OF PROGRAMS HAVE BEEN ABLE TO WIPE

25   AWAY ANY TRACE OF ANY FILES OR PROGRAMS THAT HAD EVER BEEN IN

1    THOSE FOLDERS?

2    A.    YES.

3    Q.    AND IF THE CONTENTS OF THOSE FOLDERS HAD BEEN COPIED TO

4    SOME OTHER MEDIA OR SAVED TO THE ENCRYPTED CONTAINER, YOU

5    WOULDN'T BE ABLE TO DETERMINE THAT, WOULD YOU?

6    A.    NO.

7    Q.    NOW, DURING YOUR REVIEWS USING ENCASE, DID YOU ALSO

8    RECOVER ANY INFORMATION ABOUT WEB SITE TRAFFIC OR ACCESS THAT

9    THE LAPTOP HAD PERFORMED?

10    A.    YES.

11    Q.    AND ARE YOU ALSO FAMILIAR WITH THE TERM "SWAP FILE,"

12    S-W-A-P?

13    A.    YES.

14    Q.    WHAT IS A SWAP FILE?

15    A.    A SWAP FILE IS BUILT INTO THE OPERATING SYSTEM THAT'S A

16    TEMPORARY BUFFER.  IT HOLDS INFORMATION THAT THE COMPUTER IS

17    ACCESSING AT THAT GIVEN TIME.

18    Q.    SO THOSE WOULD BE PROGRAMS OR INFORMATION -- THE

19    INFORMATION IN THE SWAP FILE WOULD REFLECT PROGRAMS OR

20    INFORMATION THAT THE COMPUTER WAS USING OR HAD ACCESSED?

21    A.    YES.

22    Q.    AND THE INFORMATION WITH REGARD TO WEB SITES THAT HAD

23    BEEN VISITED OR ACCESSED BY THE LAPTOP, WAS THERE ANY OF THAT

24    INFORMATION IN THE SWAP FILE?

25    A.    THERE WAS A LIST OF WEB SITES.

1  Q.   SO THERE WAS A LIST OF WEB SITES THAT WAS IN THE SWAP

2  FILE?

3  A.   CORRECT.

4  Q.   AND WAS THAT SAME LIST OF WEB SITES ANYWHERE ELSE ON THE

5  LAPTOP COMPUTER?

6  A.   YES.

7  Q.   WHERE?

8  A.   ALSO IN THE UNALLOCATED OR FREE SPACE.

9  Q.   SO WHAT WOULD THAT INDICATE TO YOU IF THE -- WAS IT

10 EXACTLY THE SAME OR VIRTUALLY IDENTICAL?  CAN YOU SIT HERE

11 AND SAY?

12 A.   IT WAS NOT EXACTLY THE SAME BUT VERY, VERY CLOSE.

13 Q.   AND THAT INFORMATION IN THOSE TWO LISTS, WHAT WOULD IT

14 MEAN IF THAT SIMILAR INFORMATION WAS FOUND IN THE UNALLOCATED

15 SPACE?  WHAT WOULD THAT INDICATE TO YOU?

16 A.   AT SOME POINT THAT FILE HAD BEEN OPENED AND PROCESSED BY

17 THE COMPUTER.

18 Q.   AND WOULD IT HAVE SUBSEQUENTLY BEEN DELETED TO END UP IN

19 THE ALLOCATED SPACE OR SOMEHOW NOT USED ANYMORE?

20 A.   IT COULD HAVE BEEN DELETED.  IT COULD HAVE JUST BEEN

21 USED BY THE COMPUTER AND WRITTEN TO A TEMPORARY FILE AND THEN

22 THAT WAS DELETED, BUT SOMEHOW IT HAD BEEN OPENED, PROCESSED

23 AND WAS NO LONGER USED BY THE OPERATING SYSTEM AS A LOGICAL

24 FILE.

25 Q.   AND DID YOU REVIEW THE LISTING OF WEB SITES AND WHAT

1   THEY WERE CALLED AND WHAT THE INFORMATION WAS JUST IN THE

2   LIST THAT YOU HAD?

3   A.   YES.

4   Q.   AND WHAT DID IT APPEAR TO YOU, BASED ON YOUR TRAINING

5   AND EXPERIENCE, THAT THESE WEB SITES WERE ABOUT?

6   A.   THEY DEALT WITH YOUNG BOYS.

7            MR. AARON:  I'LL OBJECT.  IT CALLS FOR SPECULATION.

8            THE COURT:  OVERRULED.

9   BY MR. MICHAEL:

10  Q.   LET ME ASK, IN YOUR TRAINING AND EXPERIENCE, HAVE YOU

11  BECOME FAMILIAR WITH WEB SITES USED TO TRAFFIC IN CHILD

12  PORNOGRAPHY?

13  A.   YES.

14  Q.   WHAT DID IT APPEAR TO YOU THAT THESE WEB SITES WERE

15  ABOUT?

16  A.   THEY APPEARED TO FOCUS ON YOUNG BOYS AS SEX OBJECTS,

17  CHILD PORNOGRAPHIC-TYPE TERMS AND OTHER DESCRIPTIVE

18  TERMINOLOGY THAT WOULD INDICATE BOY LOVER SITES.

19  Q.   WHEN YOU SAY "BOY LOVER," ARE YOU REFERRING TO MEN

20  INTERESTED IN SEX WITH BOYS?

21  A.   THAT'S CORRECT.

22  Q.   AND WERE YOU ABLE TO SEE THE CONTENTS OF WHAT HAD BEEN

23  DOWNLOADED INTO THE HARD DRIVE FROM THESE WEB SITES OR JUST

24  THE NAMES OF THE WEB SITES?

25  A.   JUST THE NAMES.

1    Q.    AND ARE YOU FAMILIAR WITH YAHOO GROUPS OR EGROUPS?

2    A.    YES.

3    Q.    AND JUST REAL GENERALLY WHAT ARE THOSE?

4    A.    GROUPS ARE AREAS OF THE INTERNET THAT ARE SPONSORED BY A

5    THIRD PARTY THAT PEOPLE CAN POST IMAGES OR DATA TO THAT ARE

6    ACCESSIBLE BY THOSE THAT ARE WITHIN THAT GROUP.

7    Q.    AND BASED ON YOUR TRAINING AND EXPERIENCE, DO YOU KNOW

8    IF THESE TYPES OF GROUPS ARE USED TO POST/SHARE TRAFFIC IN

9    CHILD PORNOGRAPHY?

10   A.    YES.

11   Q.    AND IN THAT LIST WAS THERE ANY INFORMATION ABOUT YAHOO

12   OR EGROUPS AS WELL?

13   A.    YES.

14   Q.    AND WHAT DID IT APPEAR TO YOU, BASED ON THE INFORMATION

15   OF WHAT THESE GROUPS WERE ABOUT, WHAT THE SUBJECT MATTER WAS?

16   A.    THEY WERE SIMILAR IN CONTENT TO WHAT I DESCRIBED

17   EARLIER, DEALING WITH YOUNG BOYS AND BOYS.

18   Q.    AND WOULD THAT INCLUDE CHILD PORNOGRAPHY?

19   A.    I BELIEVE SO, YES.

20   Q.    AGAIN, THIS IS BASED ON YOUR TRAINING AND EXPERIENCE?

21   A.    YES.

22   Q.    WAS THERE ANY INFORMATION ABOUT THE ZING WEB SITE IN

23   THIS LIST?

24   A.    YES.

25   Q.    AND DID IT APPEAR FROM THE INFORMATION ON THE WEB SITE

```
 1    WHETHER OR NOT THE ZING ONLINE PHOTO ALBUM HAD, IN FACT, BEEN
 2    ACCESSED BY THE COMPUTER HARD DRIVE?
 3    A.   YES.
 4    Q.   I'M GOING TO DIRECT YOUR ATTENTION TO EXHIBIT 108.  IT'S
 5    IN THE FILE FOLDER NEXT TO YOU, THE MANILA FOLDER THAT'S BEEN
 6    MARKED FOR IDENTIFICATION AS EXHIBIT 108.
 7              HAVE YOU SEEN THIS COMPACT DISK BEFORE?
 8    A.   YES.
 9    Q.   WHAT'S ON THIS COMPACT DISK?
10    A.   THERE ARE DATA EXTRACTS AND HISTORY FROM THE DEFENDANT'S
11    SONY VAIO LAPTOP.
12    Q.   DID YOU ALSO RECOVER INFORMATION ABOUT THE DEFENDANT'S
13    INTERNET HISTORY?
14    A.   YES.
15    Q.   AND HOW DO YOU KNOW THAT THAT'S WHAT'S ON THIS DISK?
16    A.   I CREATED IT.
17    Q.   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THE INTERNET
18    HISTORY IN A MOMENT, BUT I'M NOW GOING TO NOW MOVE TO ADMIT
19    EXHIBIT 108 INTO EVIDENCE AND REQUEST TO PUBLISH IT.
20              THE COURT:  ANY OBJECTION TO EXHIBIT 108?
21              MR. AARON:  NONE EXCEPT AS PREVIOUSLY STATED.
22              THE COURT:  EXHIBIT 108 IS ORDERED ADMITTED AND YOU
23    MAY PUBLISH.
24    BY MR. MICHAEL:
25    Q.   I'M GOING TO BE USING A COPY, AGENT MORAN, OF THAT DISK
```

```
 1    THAT'S ALREADY IN THE LAPTOP HERE.  I'M OPENING A FILE ON
 2    THIS COMPUTER TITLED "WING386."
 3              ARE YOU FAMILIAR WITH THAT FILE?
 4    A.   YES.
 5    Q.   AND IT HAS BEEN PUBLISHED TO THE JURORS.  WHAT IS
 6    CONTAINED IN THIS FILE?
 7    A.   THESE ARE THE DATA THAT WAS EXTRACTED OUT OF THE SWAP
 8    FILE THAT PERTAINED TO WHAT I HAD JUST TESTIFIED ABOUT.
 9    Q.   AND LET ME DIRECT YOUR ATTENTION TO THE TOP OF THE LIST
10    WHERE THERE ARE SEVERAL ENTRIES THAT SAY, "GROUPS@YAHOO.COM."
11              CAN YOU READ WHAT SOME OF THOSE GROUP NAMES ARE,
12    PLEASE?
13    A.   OKAY.  DO YOU WANT ME TO START WITH "HTTP:"?
14    Q.   NO.  ACTUALLY, I'LL JUST GO AHEAD AND READ IT AND JUST
15    ASK IF THESE ARE SOME OF THE GROUPS LISTED IN THERE:
16    BOYS-FOR-BOYS, TYLERSROOM, YOUNGCOCKSUCKERS, BOYPHOTOS,
17    AND BOY, WITH REGARD TO THE YAHOO GROUPS?
18    A.   YES.
19    Q.   AND THEN THERE ARE ALSO MULTIPLE ENTRIES FOR EGROUPS?
20    A.   CORRECT.
21    Q.   AND WOULD THAT INCLUDE EGROUPS, IN JUST LOOKING DOWN THE
22    LIST, NUDE BIG/LITTLE BOY, JOY OF BEING A BOY, INNOCENCE,
23    HAMBURGER BUNS, DONNY PAL PICS, COOLEST GROUPS, BOYS FILMS,
24    BOY, TEENBOYS AND OTHER SIMILAR NAMES?
25    A.   THAT'S CORRECT.
```

1   Q.   AND THEN AT THE BOTTOM THERE'S SOME MORE YAHOO GROUPS

2   LISTED, INCLUDING ONE TITLED "GAY_NUDE_TEENS_10-15YO"?

3   A.   CORRECT.

4   Q.   WERE THESE THE TYPES OF GROUPS THAT YOU WERE TALKING

5   ABOUT THAT APPEARED TO YOU TO PERTAIN TO CHILD PORNOGRAPHY?

6   A.   YES.

7   Q.   AND NOW THERE'S A BUNCH OF -- IT LOOKS LIKE THERE'S

8   ALMOST LIKE A BREAK IN THE PAGE AND THEN A HEADER, AND IF YOU

9   COULD POINT TO IT WITH YOUR FINGER TITLED "URL'S, USERNAME,

10  AND PASSWORD," PLEASE.

11  A.   OKAY.

12  Q.   CAN YOU TAP THE SCREEN, PLEASE, WHERE IT'S LISTED?

13  A.   OKAY.

14  Q.   SO RIGHT ABOVE THAT RED DOT THERE, IS THAT WHERE URL'S,

15  USERNAME, AND PASSWORD IS LOCATED?

16  A.   CORRECT.

17  Q.   AND WHAT DO THOSE HEADERS THERE REFER TO WITH REGARD TO

18  THE INFORMATION THAT'S LISTED BENEATH IT?

19  A.   IT CATEGORIZES IT IN COLUMNS, EVEN THOUGH IT'S NOT

20  DIRECTLY OVER THE COLUMN'S HEADING.

21  Q.   OKAY.  WELL, DIRECTING YOUR ATTENTION -- FOR EXAMPLE,

22  IF YOU GO DOWN ABOUT FOUR ITEMS, THERE'S, I GUESS, A URL

23  BOYSWILLBEBOYS.NET, AND THERE'S ONE LISTED ABOVE IT CALLED

24  BOYERECTION.COM, AND THEN THERE'S A SERIES OF LETTERS OR

25  NUMBERS FOLLOWING EACH OF THEM.

1           WHAT DOES THAT INFORMATION INDICATE TO YOU

2    FOLLOWING THOSE WEB SITES?

3    A.    BASED ON THE HEADER, "URL" IS THE WEB ADDRESS, UNIFORM

4    RESOURCE LOCATOR.   THAT WOULD GIVE YOU YOUR

5    WWW.BOYERECTION.COM, AND THEN THE USERNAME WOULD BE THE

6    SERIES OF NUMBERS AND LETTERS FOLLOWING THAT, AND THEN THE

7    PASSWORD WOULD BE AFTER THAT, SO --

8    Q.    SO LISTED HERE ON THIS LIST THAT YOU RECOVERED FROM

9    DEFENDANT'S LAPTOP WAS THE NAME OF THE WEB SITE WITH THE

10   USERNAME AND PASSWORD FOR THAT WEB SITE?

11   A.    YES.

12   Q.    AT LEAST AS IT APPEARS FROM THE LIST?

13   A.    YES.

14   Q.    AND THEN BENEATH THAT IT LOOKS LIKE THERE'S SEVERAL

15   ENTRIES FOR WWW.ZING.COM-ALBUM.   IS THIS WHAT YOU WERE

16   TESTIFYING ABOUT BEFORE, THAT THERE WAS A REFERENCE TO ZING

17   ALBUMS BEING ACCESSED OR AT LEAST APPEARED TO HAVE BEEN

18   ACCESSED?

19   A.    FROM THE LIST IT GIVES THE ABILITY TO ENTER INTO THE

20   ZING GROUPS.

21   Q.    LET ME ASK YOU, WAS THERE INFORMATION ON THE LAPTOP THAT

22   WOULD ENABLE THE USER TO ACCESS -- THAT WOULD APPEAR TO YOU

23   TO ENABLE THE USER TO ACCESS THE ZING ALBUMS?

24   A.    YES.

25   Q.    NOW, AFTER THE ZING ALBUM LISTINGS, THERE'S A BUNCH OF

 1   NUMBERS, AND THEN IT SAYS "NO USERNAME" AND THEN A

 2   PARENTHETICAL, AND THEN YOU HAVE SOME NAMES THERE INCLUDING

 3   DUNCAN L., LLOYD, JURE, AND ALEX.

 4        SO WHAT DOES THAT INDICATE TO YOU?

 5   A.   IT WOULD JUST BE THE WEB ADDRESS, AND EACH GROUP WOULD

 6   HAVE A SEPARATE NUMBER FOR THEIR FOLDER SO THEN YOU WOULD NOT

 7   NEED TO ENTER A USERNAME, AND THEN THE PASSWORD WOULD BE

 8   THOSE NAMES, SUCH AS DUNCAN L. AND LLOYD.

 9   Q.   SO YOU DON'T KNOW IF THOSE NAMES DUNCAN L. AND LLOYD ARE

10   THE SUBJECT OF THOSE FOLDERS OR JUST THE USERNAME, BUT IT'S

11   ASSOCIATED WITH THAT ZING ALBUM IN SOME WAY?

12   A.   YES.

13   Q.   AND THEN BENEATH THESE THERE ARE MORE WEB SITES LISTED

14   THERE.  I GUESS THESE APPEAR TO BE OTHER USERNAMES AND

15   PASSWORDS, INCLUDING ONE ABOUT THREE DOWN FROM THE LAST ZING

16   ALBUM AND IT'S INDICATED THERE, IT SAYS,

17   "WWW.DUTCHBOYS.COM-CHUBBY-MEMBERS."

18        DID YOU SEE REFERENCE TO -- IN ADDITION TO THIS

19   LIST, REFERENCE TO THE TERM "CHUBBY" ON THE DEFENDANT'S WEB

20   SITE?

21   A.   YES.

22   Q.   EXCUSE ME.  ON HIS LAPTOP HARD DRIVE?

23   A.   YES.

24   Q.   AND OTHER PLACES AS WELL?

25   A.   YES.

1    Q.    AND I THINK WE'LL HAVE ANOTHER EXHIBIT THAT'S GOING TO

2    SHOW YOU THAT IN A MOMENT.   I'M QUICKLY GOING TO ANOTHER

3    FOLDER THAT YOU HAVE ON THIS DISK.   THIS ONE IS TITLED,

4    "DRIVE FREE SPACE."   AND IF YOU WOULD HIT THE LOWER RIGHT

5    CORNER OF YOUR SCREEN TO ERASE THE RED MARKS, PLEASE.

6              IS THIS THE LISTING OF VIRTUALLY IDENTICAL WEB

7    SITES THAT YOU TALKED ABOUT THAT WAS LISTED IN THE FREE

8    SPACE, THE UNALLOCATED SPACE OF THE DEFENDANT'S HARD DRIVE?

9    A.    YES.

10   Q.    AND WE'RE NOT GOING TO GO THROUGH IT, BUT DID IT CONTAIN

11   MUCH OF THE SAME INFORMATION THAT YOU JUST TESTIFIED ABOUT?

12   A.    YES.

13   Q.    LAST QUESTION ON THIS SUBJECT:   TO THE EXTENT THAT

14   THIS INFORMATION THAT YOU JUST TESTIFIED ABOUT WAS IN THE

15   UNALLOCATED SPACE OR IN A SWAP FILE, WHICH YOU DESCRIBED AS A

16   TEMPORARY FILE, BASED ON YOUR TRAINING AND EXPERIENCE, WOULD

17   THAT INFORMATION TYPICALLY HAVE RESIDED FIRST IN THE HARD

18   DRIVE OF THE COMPUTER AND THEN ENDED UP IN THE UNALLOCATED

19   SPACE OR ASSOCIATED FILES AND FOLDERS THAT HAD BEEN ON THE

20   HARD DRIVE, AND THUS YOU HAVE THESE INDICATIONS IN THE SWAP

21   FILE IN THE UNALLOCATED SPACE OF THE TYPES OF FOLDERS?

22   A.    YES.   THAT FILE WOULD HAVE HAD TO HAVE BEEN ACCESSED AND

23   USED ON THAT COMPUTER.

24   Q.    AND TO THE EXTENT THAT ANY IMAGES WERE DOWNLOADED FROM

25   THESE WEB SITES OR THESE GROUPS OR THE ZING ALBUM TO THE

1   COMPUTER, IF THEY HAD BEEN, AFTER DOWNLOADED, SUBSEQUENTLY

2   MOVED TO AN ENCRYPTED FILE OR SAVED TO ANOTHER PIECE OF

3   MEDIA, LIKE AN EXTERNAL HARD DRIVE OR A DISK, WOULD YOU BE

4   ABLE TO DETERMINE THAT NECESSARILY?

5   A.   NO.

6   Q.   AND IF THE FILE HAD RESIDED ON THE HARD DRIVE AND WAS

7   DELETED, AND THE EVIDENCE OF THE DELETION WAS WIPED, WOULD

8   YOU BE ABLE TO KNOW THAT?

9   A.   NO.

10  Q.   YOU TESTIFIED ON EXHIBIT 108 THERE WAS ALSO INFORMATION

11  REGARDING THE INTERNET HISTORY OF THIS COMPUTER.  WHAT IS

12  "INTERNET HISTORY"?  WHAT DOES THAT SHOW?

13  A.   INTERNET HISTORY ALLOWS YOU TO VIEW WEB SITES THAT HAVE

14  BEEN VISITED OR FILES ACCESSED ON A COMPUTER USING INTERNET

15  EXPLORER.

16  Q.   AND IS INTERNET EXPLORER THE NAME OF THE PROGRAM THAT

17  ALLOWS THE USER TO ACCESS INTERNET FILES?

18  A.   YES, IT'S KNOWN AS A WEB BROWSER.

19  Q.   CAN INTERNET EXPLORER BE ALSO USED TO ACCESS FILES THAT

20  RESIDE ON THE HARD DRIVE OF THE COMPUTER?

21  A.   YES.

22  Q.   AND IN THIS CASE WAS THERE ANY INDICATION THAT INTERNET

23  EXPLORER, IN ADDITION TO BEING USED -- WAS THERE ANY

24  INDICATION THAT IT HAD BEEN USED TO ACCESS THE INTERNET IN

25  THIS CASE?

1    A.    YES.

2    Q.    AND IN ADDITION TO THAT, WAS THERE INFORMATION

3    INDICATING THAT INTERNET EXPLORER HAD ALSO BEEN USED TO

4    ACCESS ACTUAL FILES AND FOLDERS THAT RESIDED ON THE

5    DEFENDANT'S HARD DRIVE?

6    A.    YES.

7    Q.    AND DO YOU RECALL WHAT SOME OF THOSE FILES OR FOLDERS

8    WERE PERTAINING TO?

9    A.    SOME OF THE FILES WERE A LETTER WITH "SETH" IN THE TITLE

10   IN PRIVATE1.JBC CONTAINERS, AND THERE WERE OTHER INTERNET

11   SITES.

12   Q.    SO WHEN YOU SAY "PRIVATE1.JBC," THERE WAS INFORMATION

13   THAT THAT CONTAINER HAD BEEN ACCESSED USING INTERNET

14   EXPLORER?

15   A.    YES.

16          MR. AARON:  OBJECTION, LEADING.

17          THE COURT:  OVERRULED.

18   BY MR. MICHAEL:

19   Q.    AND WAS THERE ANY INFORMATION INDICATING WHETHER OR NOT

20   INTERNET EXPLORER HAD BEEN USED TO ACCESS ANY FILES RELATED

21   TO THE ICQ CHAT PROGRAM?

22   A.    YES.

23   Q.    AND YOU MENTIONED THAT THERE WAS ALSO AN INDICATION IT

24   HAD BEEN USED TO ACCESS A LETTER THAT HAD "SETH" IN THE NAME;

25   IS THAT CORRECT?

1  A.   THAT'S CORRECT.

2  Q.   NOW, WAS THERE INFORMATION IN THE INTERNET HISTORY, IN

3  ADDITION TO SHOWING THAT INTERNET EXPLORER HAD BEEN USED TO

4  ACCESS THE INTERNET, AS WELL AS FILES ON THE HARD DRIVE, THAT

5  OTHER TYPES OF -- REGARDING THE NEWSGROUPS AND WHETHER THE

6  NEWSGROUP READER HAD EVER BEEN USED TO ACCESS FILES?

7  A.   YES.

8  Q.   AND WOULD THAT BE USING XNEWS?

9  A.   YES.

10  Q    NOW, DOES THE INTERNET HISTORY ALSO SHOW -- ARE YOU

11  FAMILIAR WITH THE PROGRAM WINDOWS EXPLORER?

12  A.   YES.

13  Q.   WHAT IS WINDOWS EXPLORER?

14  A.   WINDOWS EXPLORER ALLOWS YOU TO NAVIGATE FILES THAT ARE

15  RESIDENT ON YOUR IMMEDIATE MACHINE OR NETWORK MACHINE.  IT'S

16  A AWAY TO VIEW FILES AND ACCESS FILES.

17  Q.   IS IT A SIMILAR TYPE OF PROGRAM TO INTERNET EXPLORER?

18  A.   THEY'RE BOTH SIMILAR IN THE FACT THAT THEY CAN NAVIGATE

19  TO FILES OR THE INTERNET.

20  Q.   AND WOULD INFORMATION ABOUT -- AND DOES WINDOWS -- IS

21  WINDOWS EXPLORER PART OF THE WINDOWS OPERATING SYSTEM?

22  A.   YES.

23  Q.   AND WAS THERE A WINDOWS OPERATING SYSTEM ON THIS LAPTOP

24  COMPUTER?

25  A.   YES.

1   Q.   AND WOULD THE INTERNET HISTORY SHOW, IN ADDITION TO WHAT

2   YOU'VE ALREADY TESTIFIED ABOUT, FILES OR PROGRAMS THAT WERE

3   ACCESSED ON THE COMPUTER HARD DRIVE USING WINDOWS EXPLORER?

4   A.   YES.

5   Q.   NOW, WITH REGARD TO INFORMATION ABOUT FILES THAT HAVE

6   BEEN ACCESSED USING INTERNET EXPLORER AND WINDOWS EXPLORER

7   AND THE NEWSGROUP READER, DID IT INDICATE WHERE MANY OF THESE

8   FILES HAD BEEN DOWNLOADED TO, WHERE THEY RESIDED ON THE HARD

9   DRIVE?

10   A.   MANY OF THEM WENT TO THE D DRIVE OF THE HARD DRIVE.

11   Q.   SO, FOR EXAMPLE, IF THERE WAS INFORMATION IN THERE THAT

12   FILES HAD BEEN DOWNLOADED USING THE XNEWS READER FROM

13   NEWSGROUPS TO THE HARD DRIVE, WHERE DID IT SHOW THAT THOSE

14   FILES WENT TO?

15   A.   THERE WERE --

16   Q.   WHICH DRIVE DID IT SHOW THAT THEY WENT TO ON THE HARD

17   DRIVE?

18   A.   THE D DRIVE.

19   Q.   AND THAT'S IN THE ALLOCATED SPACE OF THE COMPUTER,

20   CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   AND HOW OFTEN HAD THESE TYPES OF FILES AND INFORMATION

23   BEEN ACCESSED AND DOWNLOADED TO THE -- HAD BEEN ACCESSED ON

24   THE HARD DRIVE USING WINDOWS EXPLORER AND INTERNET EXPLORER?

25   A.   THERE WERE NUMEROUS INSTANCES.

1   Q.   AND THIS INFORMATION ABOUT WHAT HAD BEEN ACCESSED ON THE

2   INTERNET HISTORY, IS THE INTERNET HISTORY ITSELF IN THE

3   ALLOCATED SPACE OR THE UNALLOCATED SPACE?

4   A.   ALLOCATED SPACE.

5   Q.   AND WITH REGARD TO THE TYPES OF FILES THAT WERE

6   DOWNLOADED AND ACCESSED, DID IT INCLUDE IMAGE FILES?

7   A.   YES.

8   Q.   VIDEOS?

9   A.   YES.

10  Q.   AND HOW MANY FILES DID IT APPEAR TO YOU TO BE IMAGES AND

11  VIDEOS?

12  A.   FOR IMAGES, HUNDREDS; VIDEOS, SEVERAL.

13  Q.   AND WHAT WERE THE NAMES ASSOCIATED WITH THOSE TYPES OF

14  FILES, THOSE IMAGES AND VIDEOS?

15  A.   SOME OF THEM HAD "BOY" REFERENCES AND SEXUAL REFERENCES

16  AND AGES REFERRED TO THEM.

17  Q.   AND SIMILAR TO THE WEB SITES YOU TESTIFIED ABOUT BEFORE,

18  DID IT APPEAR TO YOU, BASED ON YOUR TRAINING AND EXPERIENCE,

19  THAT THESE FILES, MANY OF THESE FILES, THESE IMAGE FILES AND

20  VIDEOS WERE ASSOCIATED WITH OR ACTUALLY CHILD PORNOGRAPHY?

21  A.   YES.

22  Q.   WAS THERE EVIDENCE THAT SOME OF THESE FILES HAD BEEN

23  RECEIVED VIA ICQ?

24  A.   YES.

25  Q.   NOW, COULD YOU SEE THE CONTENTS OF THESE FILES, WHAT THE

1    IMAGES AND VIDEOS WERE, OR JUST THAT THEY HAD BEEN ACCESSED?

2    A.    JUST THEIR FILE NAME AND THEIR ACCESS.

3    Q.    AND WOULD THAT HAVE INCLUDED THE NAMES OF, I THINK AS

4    YOU'VE TESTIFIED, HUNDREDS OF IMAGE AND VIDEO FILES

5    DOWNLOADED FROM NEWSGROUPS?

6    A.    YES.

7    Q.    AND THESE TYPES OF FILES FROM NEWSGROUPS, DID THEY HAVE

8    THE SAME TYPES OF NAMES, AS YOU'VE JUST TESTIFIED ABOUT, THAT

9    APPEARED TO YOU TO BE RELATED TO CHILD PORNOGRAPHY?

10   A.    YES.

11   Q.    HOW DID YOU KNOW THAT SOME OF THESE FILES WITH THESE

12   NAMES HAD ACTUALLY BEEN OBTAINED FROM ICQ OR THE NEWSGROUPS?

13   A.    BASED ON THE FILE PATH.

14   Q.    AND IS THAT INFORMATION ABOUT THE SOURCE OF THE FILE?

15   A.    WHERE IT RESIDES, YES, ON THE HARD DRIVE.

16   Q.    WAS THERE INFORMATION OF ANY VIDEO CLIPS RECEIVED VIA

17   ICQ?

18   A.    YES.

19   Q.    DO YOU RECALL IF THE NAME "ASIA2" IS FAMILIAR TO YOU?

20   A.    YES.

21   Q.    DID THAT APPEAR TO BE ONE OF THE VIDEO CLIPS RECEIVED ON

22   THE HARD DRIVE VIA ICQ?

23   A.    YES.

24   Q.    WHERE WAS THAT SAVED, THAT VIDEO?  WAS IT IN THE

25   ALLOCATED OR UNALLOCATED SPACE?

1    A.    IT WAS IN THE ALLOCATED SPACE.

2    Q.    DID YOU VIEW THAT VIDEO?

3    A.    YES.

4    Q.    WHAT DID IT APPEAR TO DEPICT TO YOU?

5    A.    A BOY HAVING ANAL SEX PERFORMED ON HIM.

6    Q.    AND WHO DID IT INDICATE THIS FILE HAD BEEN SENT BY TO

7    THE DEFENDANT'S COMPUTER?

8    A.    IT WAS IN A SUBDIRECTORY ENTITLED "CROW18."

9    Q.    WOULD THAT HAVE BEEN -- WAS THAT A SCREEN NAME?

10   A.    YES.

11   Q.    NOW, WAS THERE ANY NAMES OR NAME IN THIS INFORMATION

12   WITH REGARD TO THE NEWSGROUP THAT WAS BEING ACCESSED AND USED

13   TO DOWNLOAD IMAGES AND OTHER FILES TO THE LAPTOP HARD DRIVE?

14   A.    YES.

15   Q.    AND WHAT WAS THE NAME OF THAT NEWSGROUP?

16   A.    "ASPARAGUS" WAS ONE OF THEM.

17   Q.    AND ARE YOU FAMILIAR WITH THAT DURING THE COURSE OF YOUR

18   TRAINING AND EXPERIENCE?

19   A.    YES.

20   Q.    AND WHAT IS THE ASPARAGUS NEWSGROUP?

21   A.    ASPARAGUS IS DEDICATED TO BOYS AND CHILD PORNOGRAPHY.

22   Q.    AND DID THIS INCLUDE MANY OF THE FILES YOU TALKED ABOUT

23   THAT HAD NAMES THAT APPEARED TO YOU TO PERTAIN TO CHILD

24   PORNOGRAPHY?

25   A.    I'M SORRY?

1    Q.    AND DID THE FILES DOWNLOADED FROM ASPARAGUS, THE NAMES

2    THAT YOU SAW ON THE HARD DRIVE, DID THAT INCLUDE FILE NAMES

3    THAT APPEARED TO YOU TO BE ABOUT CHILD PORNOGRAPHY?

4    A.    YES.

5    Q.    AND WERE THERE MOVIE CLIPS DOWNLOADED FROM NEWSGROUPS?

6    A.    YES.

7    Q.    DO YOU RECALL THE NAMES OF ANY OF THOSE MOVIE CLIPS?

8    A.    THERE WAS "ANDY" IN THE TITLE WITH MINUTES AND SECONDS.

9    Q.    AND ARE YOU FAMILIAR WITH KDV?

10   A.    YES.

11   Q.    WHAT IS KDV?

12   A.    IT'S A SERIES OF CHILD PORNOGRAPHY VIDEOS.

13   Q.    AND WERE THERE ANY FILES NAMED KDV FROM THE NEWSGROUPS?

14   A.    YES.

15   Q.    NOW, WAS THERE ANY INFORMATION REGARDING WHETHER WINDOWS

16   EXPLORER HAD BEEN USED TO ACCESS THE PRIVATE1.JBC CONTAINER?

17   A.    IT WAS CONTAINED WITHIN THE HISTORY, YES.

18   Q.    SO WAS THAT -- AND THAT'S THE ENCRYPTED CONTAINER ON THE

19   HARD DRIVE, CORRECT?

20   A.    YES.

21   Q.    AND DID IT APPEAR TO YOU WHETHER OR NOT, FROM THE

22   INFORMATION THERE, THAT THE CONTAINER HAD BEEN ACCESSED ON

23   MULTIPLE OCCASIONS?

24   A.    YES.

25   Q.    DID IT APPEAR THAT IT HAD BEEN ACCESSED ON MULTIPLE

1    OCCASIONS?

2    A.   YES.

3    Q.   AND HOW RECENTLY HAD IT BEEN ACCESSED?

4    A.   I BELIEVE WITHIN A DAY OR TWO OF THE DATE OF SEIZURE.

5    Q.   AND ARE YOU REFERRING TO JUNE 5TH, 2001, WITH REGARD TO

6    THE DATE OF SEIZURE?

7    A.   THAT'S CORRECT.

8    Q.   AND I BELIEVE YOU ALREADY TESTIFIED ABOUT THIS, BUT WAS

9    THERE A REFERENCE TO "SETH" IN A FILE NAME THAT HAD BEEN

10   ACCESSED USING WINDOWS EXPLORER?

11   A.   YES.

12   Q.   AND WAS THERE ALSO INFORMATION ABOUT WEB SITES THAT HAD

13   NAMES THAT APPEARED TO YOU TO BE PERTAINING TO CHILD

14   PORNOGRAPHY THAT HAD BEEN ACCESSED IN THE INTERNET HISTORY?

15   A.   YES.

16   Q.   AND WOULD THAT HAVE BEEN USING INTERNET EXPLORER TO

17   ACCESS THOSE WEB SITES?

18   A.   YES.

19   Q.   AND WAS THERE INFORMATION REGARDING ZING ALBUMS IN THE

20   INTERNET HISTORY?

21   A.   YES.

22   Q.   AND WAS THERE INFORMATION ABOUT WHETHER OR NOT ZING

23   ALBUMS HAD BEEN CREATED?

24   A.   YES.

25   Q.   WHAT ABOUT ACCESSED?

1    A.   YES.

2    Q.   AND WAS THERE INFORMATION REGARDING ANY INTERNET GROUPS

3    PERTAINING TO THE TERM "BL"?

4    A.   YES.

5    Q.   I'M GOING TO DIRECT YOUR ATTENTION BACK TO THE SCREEN,

6    EXHIBIT 108, WHICH I BELIEVE YOU TESTIFIED HAD SOME INTERNET

7    HISTORY ON IT.  I'M GOING TO DIRECT YOUR ATTENTION TO --

8    PUBLISHED ON THE SCREEN NOW IS A LIST OF, IT LOOKS LIKE, A

9    LOT OF DIFFERENT WEB-SITE-TYPE INFORMATION AND FILE FOLDER

10   INFORMATION.

11           IS THIS WHAT YOU'RE TALKING ABOUT IN THE INTERNET

12   HISTORY THAT YOU REVIEWED?  IS THIS WHAT IT LOOKED LIKE?

13   A.   YES.

14   Q.   IF I CAN DIRECT YOUR ATTENTION TO ENTRY NO. 317 -- THE

15   NUMBERS RUN DOWN THE LEFT-HAND SIDE OF THE EXHIBIT.  DO YOU

16   SEE ENTRY 317?  ACTUALLY, EVEN ABOVE IT, 314, DO YOU SEE THAT

17   ENTRY?

18   A.   UNFORTUNATELY MY SCREEN ISN'T DISPLAYING THE FAR LEFT

19   COLUMN.

20   Q.   WELL, I WILL READ IT TO YOU.

21   A.   I'M NOT --

22   Q    ENTRY 314 --

23   A.   IT'S THE AREA RIGHT HERE?

24   Q.   THAT'S WHAT I'M TALKING ABOUT, CORRECT, THAT ONE THERE

25   WHERE THE RED MARK IS WHERE IT SAYS,

1   "WWW.ZING.COM/MEMBER/JOIN/SUBMIT."  IS THIS THE TYPE OF

2   INFORMATION YOU WERE TALKING ABOUT THAT INDICATED THE ZING

3   WEB SITE HAD BEEN ACCESSED?

4   A.   YES, IT IS.

5   Q.   AND UNDERNEATH IT IT SAYS FIRST NAME "ELLIOTT" AND LAST

6   NAME "BURSON," AND THEN IT HAS E-MAIL = ELLIOTT@FREEDOM.NET,

7   AND THEN THE USERNAME IS PEI314.  AND THEN IF WE SCROLL OVER

8   TO THE LEFT -- I THINK THAT'S THE EXTENT OF THE INFORMATION I

9   WAS GOING TO POINT OUT TO YOU.

10          THAT INFORMATION "ELLIOTT BURSON" AND THE E-MAIL

11   AND THE PASSWORD, THAT PERTAINS TO THE ZING ALBUM, CORRECT?

12   A.   CORRECT.

13   Q.   AND BELOW IT THERE IS ENTRY 315, "ZING.COM MEMBER SIGN

14   OUT."  DOES THAT INDICATE THAT SOMEONE HAD BEEN ON ZING AND

15   THEN SIGNED OUT FROM THE WEB SITE?

16   A.   YES.

17   Q.   AND THEN TWO ENTRIES BELOW IT, 317, YOU HAVE

18   ZING.COM/ALBUM/NEW/CREATE, AND THEN BENEATH IT THERE IS A

19   SERIES OF WORDS SEPARATED BY SOME OTHER CHARACTERS, "GENERAL

20   PRIVATE," "PRIVATE PICS."

21          WOULD THIS APPEAR TO YOU THAT A ZING ALBUM HAD BEEN

22   CREATED USING THIS COMPUTER?

23   A.   YES.

24   Q.   I'M GOING TO DIRECT YOU TO SOME MORE OF THE INTERNET

25   HISTORY.  I'M NOW PUTTING UP SOME MORE OF THE INTERNET

1    HISTORY.  I'LL DIRECT YOUR ATTENTION TO ITEM NO. 8.

2    IF YOU CAN'T SEE THE NUMBER THERE, IT INDICATES -- IT SAYS,

3    "DEFAULT AT FILE," AND THEN THERE'S SOME WORDS MIXED IN WITH

4    SOME CHARACTERS, AND IT SAYS -- SOME OF THE WORDS ARE "FAMILY

5    ALBUM," "100_FUJI."

6            WOULD THAT INDICATE TO YOU THAT THAT ALBUM HAD BEEN

7    ACCESSED USING THIS COMPUTER?

8    A.   YES.

9    Q.   AND THEN TWO ENTRIES DOWN, NO. 10, THERE'S AN ENTRY

10   THERE THAT LOOKS LIKE IT'S FROM THE C DRIVE, AND IT SAYS,

11   "DOCUMENTS/SETH LETTER."

12           WOULD THAT INDICATE THAT A LETTER WAS ON THE C

13   DRIVE -- OR NOT A LETTER, BUT THAT WOULD INDICATE A DOCUMENT

14   CALLED "SETH LETTER" WAS ACCESSED ON THE C DRIVE OF THIS

15   COMPUTER?

16   A.   YES.

17   Q.   AND THE C DRIVE IS ON THE ALLOCATED SPACE OF THE HARD

18   DRIVE; IS THAT CORRECT?

19   A.   THAT'S CORRECT.

20   Q.   AND THERE ARE OTHER NAMES LISTED IN FRONT OF THE ENTRIES

21   BELOW, NO. 11 "EXCEL," NO. 12 "GAIN," NO. 13, AGAIN, "SETH."

22   THOSE ALL APPEAR TO BE DOCUMENTS OR IMAGES THAT WERE ACCESSED

23   ON THIS COMPUTER?

24   A.   YES.

25   Q.   CAN YOU TAP THE LOWER RIGHT SIDE OF THE SCREEN, PLEASE?

1          NOW I'M GOING TO TAKE YOU DOWN TO ENTRY NUMBER --

2     WELL, BEFORE WE DO THAT, AS I'M SCROLLING THROUGH HERE,

3     THERE'S A LOT OF LISTINGS HERE FOR D, THE D DRIVE, FOLLOWED

4     BY "MAY," AND THEN IT LOOKS LIKE IT SAYS, "20NEWS," AND THEN

5     THERE'S A LOT -- THEY ALL END IN .JPG.

6          WHAT DOES ".JPG" REFER TO?

7     A.   THAT'S A FILE EXTENSION FOR A PICTURE FILE.

8     Q.   AND ALL OF THESE PICTURE FILES THAT APPEAR TO BE ON THE

9     D DRIVE, WHERE DOES IT APPEAR TO YOU THAT THEY'RE COMING

10    FROM?

11    A.   NEWSGROUPS.

12    Q.   AND A LOT OF THEM ARE NUMBERED.  THERE ARE SOME WITH

13    NAMES.  I'M LOOKING AT ENTRY 103.  IT HAS THE NAME "BROCK."

14    I'M SCROLLING DOWN FURTHER, AND IT LOOKS LIKE AT ENTRY

15    NO. 141 AT THE BOTTOM OF THE SCREEN THERE'S SOMETHING ON THE

16    D DRIVE CALLED "VIDS NASTY."  THERE'S SOME CHARACTERS AND

17    NUMBERS, BUT THEN IT SAYS, "PENIS SUCK BOYS MPG."

18         WHAT IS AN MPG FILE?

19    A.   THAT'S A MOTION PICTURE FILE.

20    Q.   A VIDEO FILE?

21    A.   YES.

22    Q.   AND I'M JUST GOING TO SCROLL THROUGH.  THESE ARE ALL

23    ENTRIES ABOUT IMAGES OR VIDEOS THAT WERE -- THE GREAT

24    MAJORITY, EXCUSE ME, ARE IMAGES OR VIDEO THAT WERE ACCESSED

25    ON THE D DRIVE FROM NEWSGROUPS?

1    A.    YES.

2    Q.    AND THEY HAVE BOYS' NAMES.  I SEE AT 176, 177 "ANDREW";

3    IS THAT CORRECT?

4    A.    THAT'S CORRECT.

5    Q.    AS I'M SCROLLING DOWN, I'M NOT GOING TO READ THEM.  IT

6    APPEARS THAT MANY OF THEM HAVE BOYS' NAMES AND NUMBERS.

7              BASED ON YOUR TRAINING AND EXPERIENCE, DO THESE

8    APPEAR TO BE A SERIES OF CHILD PORNOGRAPHY PICTURES TO YOU OR

9    RATHER A SERIES OF PICTURES OF BOYS?

10   A.    YES.

11   Q.    NOW, AT NO. 288 --

12             THE COURT:  MR. MICHAEL, PLEASE REFRAIN FROM

13   LEADING QUESTIONS.

14             MR. MICHAEL:  YES, YOUR HONOR.

15   BY MR. MICHAEL:

16   Q.    AT NO. 288 THERE'S SOME ENTRIES THERE.  WHAT DO THESE

17   ENTRIES INDICATE, STARTING AT NO. 288, IF YOU CAN SEE IT ON

18   YOUR COMPUTER?

19   A.    IT IS A FILE THAT WAS REFERENCED IN THE MAYNEWS,

20   ASPARAGUS FEATURE MOVIE ANDY 28 MINUTES DAY1.JPG.

21   Q.    WHAT DO THESE APPEAR TO BE TO YOU?

22   A.    FRAMES FROM MOTION PICTURE OR VIDEO CLIP.

23   Q.    WHEN YOU SAY "FRAME," YOU MEAN LIKE A STILL IMAGE?

24   A.    YES.

25   Q.    AND WHAT NEWSGROUP ARE THESE FROM?

1    A.    ASPARAGUS IS IN THE TITLE.

2    Q.    AND THE NAME OF THE PICTURE ITSELF IS AT THE VERY END

3    THERE, THAT PORTION.  IS THAT THE NAME AT THE VERY END OF THE

4    IMAGE ITSELF?

5    A.    THE FILE NAME WOULD BE THE ENTIRE THING, THE ENTIRE

6    POINT FROM "ASPARAGUS."

7    Q.    AND THEN ARE THERE JUST MORE LISTINGS FOR THESE TYPES OF

8    FILES AND FOLDERS IN THIS INTERNET HISTORY?

9    A.    YES.

10   Q.    GOING NOW BACK TO -- ACTUALLY, YOU KNOW WHAT?  WE'LL

11   TAKE THE EXHIBIT OFF NOW, BUT IS THIS WHAT THE INTERNET

12   HISTORY LOOKS LIKE THAT YOU WERE TESTIFYING ABOUT?

13   A.    YES.

14   Q.    AND THIS IS WHERE ALL THOSE INTERNET HISTORY FILES THAT

15   YOU SAVED ON THE DISK WERE, ALL THE TYPES OF INFORMATION YOU

16   TESTIFIED ABOUT WOULD RESIDE?

17   A.    YES.

18   Q.    I JUST WANT TO SHOW YOU ONE LAST ENTRY FROM IT AND THEN

19   WE'LL BE FINISHED.  THE THIRD ENTRY ON THIS, WHICH I'M GOING

20   TO PUBLISH NOW FOR THE JURY, AND THIS WAS ON THE INTERNET

21   HISTORY, WHAT IS THAT INFORMATION THERE?

22   A.    THIS SHOWS A FILE ACCESSED IN THE C PROGRAM FILES ICQ,

23   RECEIVED FILES CROW18 AND THEN A MOVIE PHOTO CALLED

24   "A MOVIE," FILE CALLED "ASIA2.MPG."

25   Q.    IS THIS THE CHILD PORNOGRAPHIC VIDEO THAT APPEARED TO

1    YOU TO BE CHILD PORNOGRAPHY THAT YOU VIEWED ON THE COMPUTER?

2    A.   YES.

3    Q.   AND WAS THAT SEEN -- I FORGET.  WAS THAT IN THE

4    ALLOCATED OR UNALLOCATED SPACE?

5    A.   ALLOCATED.

6    Q.   AND NOW EARLIER I SHOWED YOU SOME NEWSGROUP IMAGES THAT

7    YOU SAID HAD NAMES OF BOYS BUT COULDN'T TELL WHAT WAS IN

8    THEM.  IS ENTRY NO. 9 HERE, WHERE IT ENDS WITH "9YO3," IS

9    THAT THE TYPE OF IMAGE THAT, TO YOU, WOULD INDICATE CHILD

10   PORNOGRAPHY?

11   A.   YES, IT IS.

12   Q.   AND AT THE VERY END HERE, ITEMS NO. 76, 77, AND 78,

13   AND 76 WHERE IT SAYS "PRIVATE1.JBC," IS THAT WHAT YOU WERE

14   TALKING ABOUT WITH REGARD TO INTERNET HISTORY SHOWING THAT

15   THAT CONTAINER WAS ACCESSED?

16   A.   YES.

17   Q.   AND THEN BENEATH THAT THERE'S MORE ENTRIES PERTAINING TO

18   THE SETH LETTER.  IS THAT ALSO WHAT YOU TESTIFIED ABOUT

19   PREVIOUSLY?

20   A.   YES.

21   Q.   WE'RE DONE WITH THIS EXHIBIT NOW.  YOU CAN SET IT ASIDE.

22   THANK YOU.

23           NOW, IN ADDITION TO THE INFORMATION THAT YOU FOUND

24   ABOUT WEB SITES, INTERNET HISTORY AND GROUPS AND ZING ALBUMS

25   THAT YOU JUST TESTIFIED ABOUT, WERE YOU ACTUALLY ABLE TO

1   RECOVER ANY IMAGES OF SUSPECTED CHILD PORNOGRAPHY FROM THE

2   DEFENDANT'S HARD DRIVE?

3   A.   YES.

4   Q.   AND WHERE ON THE HARD DRIVE WERE THESE IMAGES THAT YOU

5   FOUND?

6   A.   IN THE UNALLOCATED SPACE.

7   Q.   SO WOULD THAT BE DIFFERENT FROM THE VIDEO THAT YOU FOUND

8   IN THE ALLOCATED SPACE THAT YOU TESTIFIED ABOUT?

9   A.   YES.

10  Q.   SO DESPITE ALL THE INFORMATION THAT YOU JUST TESTIFIED

11  ABOUT THAT YOU FOUND ON THE COMPUTER, YOU DIDN'T FIND ANY

12  IMAGE FILES ANYWHERE IN THE ALLOCATED SPACE OF THIS LAPTOP

13  HARD DRIVE?

14  A.   THAT'S CORRECT.

15  Q.   AND WHAT EFFECT, IF ANY, WOULD USING THE PROGRAMS

16  EVIDENCE ELIMINATOR, BCWIPE, AND BESTCRYPT HAVE HAD ON THAT

17  FACT?

18  A.   THEY ALL WOULD THWART FORENSIC EXAMINATION.

19  Q.   AND WOULD THAT BE A POSSIBLE EXPLANATION AS TO WHY YOU

20  DIDN'T FIND ANY ACTUAL IMAGES ON THIS LAPTOP?

21  A.   YES.

22  Q.   WHEN I SAY "ACTUAL IMAGES," I MEAN IMAGES IN THE

23  ALLOCATED SPACE.

24  A.   THAT'S CORRECT.

25  Q.   NOW, THE IMAGES THAT YOU DID RECOVER FROM THE

1    UNALLOCATED SPACE, WHAT DID THEY APPEAR TO DEPICT TO YOU?

2    A.    THEY WERE CHILD PORNOGRAPHIC IN NATURE.

3    Q.    AND WERE THEY INVOLVING BOYS OR GIRLS?

4    A.    BOYS.

5    Q.    DID THEY INVOLVE ADULT MEN?

6    A.    SOME, YES.

7    Q.    AND BASED ON YOUR TRAINING AND EXPERIENCE, WHERE DO

8    IMAGES FOUND IN THE UNALLOCATED SPACE TYPICALLY COME FROM?

9    A.    THEY WOULD NEED TO BE RESIDENT ON THE HARD DRIVE OR

10   PROCESSED BY THE COMPUTER ON THE HARD DRIVE AT SOME POINT.

11   Q.    AND THEN AFTER THEY ARE PROCESSED ON THE HARD DRIVE AT

12   SOME POINT -- AND WHEN YOU SAY "RESIDENT," DO YOU JUST MEAN

13   "ON"?

14   A.    YES.

15   Q.    AND THEN HOW WOULD THEY END UP IN THE UNALLOCATED SPACE?

16   A.    EITHER THROUGH DELETION OR JUST THROUGH THE PROCESSING

17   OF THE COMPUTER.

18   Q.    SO TO THE EXTENT THAT YOU FOUND IMAGES IN THE

19   UNALLOCATED SPACE, COULD THEY HAVE BEEN WRITTEN OVER?

20   A.    YES.

21   Q.    THE ONES YOU FOUND, HAD THEY BEEN WRITTEN OVER?

22   A.    SOME PARTS OF IT, YES.

23   Q.    AND WHAT DOES IT MEAN TO -- HAD SOME NOT BEEN WRITTEN

24   OVER AT ALL?  WELL, LET ME ASK YOU THIS:  WERE YOU ABLE TO

25   VIEW THE IMAGES?

1    A.    YES.

2    Q.    AND TO THE EXTENT THAT IT APPEARED THAT THEY WERE

3    PARTIALLY WRITTEN OVER, WHAT DOES THAT MEAN?

4    A.    PARTS OF THE PICTURE WEREN'T PRESENT AS IT EXISTED IN

5    ITS ENTIRETY PREVIOUSLY.

6    Q.    AND WOULD THOSE IMAGES STILL HAVE BEEN VIEWABLE IN SOME

7    INSTANCES?

8    A.    YES.

9    Q.    SO NOW WHEN YOU RECOVERED THESE IMAGES USING ENCASE,

10   WERE YOU ABLE TO DETERMINE WHEN THEY HAD BEEN DELETED FROM

11   THE LAPTOP AND ENDED UP IN THE ALLOCATED SPACE?

12   A.    NO.

13   Q.    OR WHO WOULD HAVE DELETED THEM?

14   A.    NO.

15   Q.    WHETHER OR NOT WHERE ON THE HARD DRIVE THEY HAD

16   PREVIOUSLY BEEN SAVED?

17   A.    NO.

18   Q.    WHETHER OR NOT THEY HAD BEEN TRANSFERRED TO AN ENCRYPTED

19   CONTAINER?

20   A.    NO.

21   Q.    WERE YOU ABLE TO DETERMINE WHETHER OR NOT THE IMAGES YOU

22   FOUND IN THE UNALLOCATED SPACE HAD BEEN SAVED TO SOME OTHER

23   FORM OF MEDIA, LIKE AN EXTERNAL HARD DRIVE?

24   A.    NO.

25   Q.    AND WERE SOME OF THE IMAGES PARTIALLY WRITTEN OVER?

1    A.   YES.

2    Q.   WERE YOU ABLE TO STILL SEE THEM?

3    A.   YES.

4            MR. MICHAEL:  AT THIS TIME, YOUR HONOR, WE'RE GOING

5    TO SHOW THE IMAGES TO THE JURORS WITH YOUR PERMISSION.

6            THE COURT:  ALL RIGHT.  NOW, WHICH EXHIBIT NUMBERS

7    ARE THESE?

8            MR. MICHAEL:  THESE ARE GOING TO START WITH

9    EXHIBITS 111 TO 129.

10           THE COURT:  I THINK YOU HAVE TO MOVE THEM INTO

11   EVIDENCE.

12           MR. MICHAEL:  ALL RIGHT.  I JUST WANTED TO LET YOU

13   KNOW.

14           THE COURT:  ALL RIGHT.

15   BY MR. MICHAEL:

16   Q.   NEXT THERE'S A REDWELD FOLDER THAT HAS SOME MANILA

17   FOLDERS IN IT, AND IT SHOULD HAVE EXHIBITS -- STARTING AT

18   EXHIBIT 111.  AND IF YOU COULD REMOVE EXHIBITS 111 TO 129,

19   PLEASE, AND REVIEW EACH ONE OF THEM, PLEASE.

20           WELL, LET ME ASK YOU, HAVE YOU HAD AN OPPORTUNITY

21   TO REVIEW EXHIBITS 111 TO 129 BEFORE YOUR TESTIMONY TODAY?

22   A.   YES.

23   Q.   AND ARE THOSE SOME OF THE IMAGES THAT YOU RECOVERED FROM

24   THE UNALLOCATED SPACE OF THE LAPTOP HARD DRIVE?

25   A.   YES.

1          MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD MOVE

2     TO ADMIT EXHIBITS 111 TO 129.

3          THE COURT:  ANY OBJECTIONS TO THOSE EXHIBITS BEING

4     ADMITTED?

5          MR. AARON:  NONE EXCEPT AS PREVIOUSLY NOTED.

6          THE COURT:  EXHIBITS 111 THROUGH 129 ARE ORDERED

7     ADMITTED AND YOU MAY PUBLISH.

8          MR. MICHAEL:  I WILL NOW BE PUBLISHING

9     EXHIBIT 111.

10    BY MR. MICHAEL:

11    Q.   THERE IS AN IMAGE OF WHAT APPEARS TO SHOW A BOY'S

12    BUTTOCKS BEING HELD APART BY ANOTHER BOY OR YOUNG ADULT WHILE

13    ANOTHER INDIVIDUAL'S HAND APPEARS TO HAVE A WHIP WHILE ALSO

14    INSERTING A FOREIGN OBJECT INTO THE BOY'S ANUS.

15          AGENT MORAN, THIS IS ONE OF THE IMAGES THAT YOU

16    RECOVERED?

17    A.   YES.

18    Q.   NOW, AT THE BOTTOM THERE IT'S A LITTLE HARDER TO SEE

19    THAN AT THE TOP PORTION OF THE PICTURE.  WOULD THAT BE --

20    WELL, WHAT IS THAT AN INDICATION OF TO YOU?

21    A.   THAT THE IMAGE WAS PARTIALLY OVERWRITTEN.

22    Q.   SO ALTHOUGH IT'S BEEN PARTIALLY OVERWRITTEN AND IT'S

23    SOMEWHAT OBSCURED, CAN YOU STILL DEPICT -- CAN YOU STILL VIEW

24    MUCH OF WHAT'S DEPICTED THERE?

25    A.   YES.

1    Q.   EXHIBIT 112 CAN BE PUBLISHED NOW, PLEASE.

2              AGENT MORAN, TO THE EXTENT THAT THESE IMAGES HAVE,

3    SUCH AS EXHIBIT 112, SOME -- IT LOOKS LIKE THEY'RE PARTIALLY

4    OBSCURED, IS THAT WHAT YOU'RE TALKING ABOUT WITH REGARD TO

5    BEING PARTIALLY WRITTEN OVER?

6    A.   YES.

7    Q.   I'M NOT GOING TO ASK THAT QUESTION ANYMORE, BUT I'M JUST

8    GOING TO QUICKLY SHOW THE IMAGES.

9              EXHIBIT 112 APPEARS TO BE A YOUNG BOY WITH AN ADULT

10   PENIS AGAINST HIS FACE, AND IT APPEARS THERE MIGHT BE SOME

11   EJACULATE ON HIS FACE.

12             EXHIBIT 113, PLEASE.  EXHIBIT 113 IS AN IMAGE OF

13   ONE YOUNG BOY PERFORMING ORAL SEX ON ANOTHER YOUNG BOY WITH

14   SOME OF IT PARTIALLY WRITTEN OVER.  BOTH BOYS ARE NUDE.

15             EXHIBIT 114.  EXHIBIT 114 SHOWS ANAL PENETRATION

16   FROM BEHIND.  IT'S PARTIALLY WRITTEN OVER.

17             IF YOU'D GO TO THE NEXT EXHIBIT, PLEASE.

18   EXHIBIT 115 DEPICTS TWO NUDE YOUNG BOYS.  ONE IS AROUSED AND

19   ONE IS ON HIS STOMACH WITH HIS BUTTOCKS SHOWING, AND THE BOY

20   HAS A DEVICE AGAINST THE BUTTOCKS OF THE BOY WHO IS ON HIS

21   STOMACH.

22             IF YOU CAN GO TO THE NEXT IMAGE, PLEASE.

23   EXHIBIT 116 APPEARS TO BE THOSE SAME BOYS NOW WITH ONE

24   PERFORMING ORAL SEX ON THE OTHER BOY.

25             THE NEXT EXHIBIT, PLEASE.  THIS IS EXHIBIT 117 AND

1    THIS DEPICTS WHAT APPEARS TO BE A PREPUBESCENT BOY BEING

2    ANALLY PENETRATED BY AN ADULT MALE.  IT'S A BLACK AND WHITE

3    IMAGE.

4         YOU CAN GO TO EXHIBIT 118, PLEASE.  THIS APPEARS TO

5    BE THE SAME IMAGE THAT'S DEPICTED IN EXHIBIT 114.

6         EXHIBIT 119, PLEASE.  THIS IMAGE APPEARS TO DEPICT

7    A BOY BEING ANALLY PENETRATED BY SOME OBJECT, BLACK AND

8    WHITE.

9         NEXT EXHIBIT, PLEASE.  THIS EXHIBIT, NO. 120,

10   APPEARS TO DEPICT A CHILD BEING ANALLY PENETRATED BY AN ADULT

11   MALE, THE ADULT MALE BEING ON TOP OF THE SMALLER CHILD

12   BENEATH HIM.

13        EXHIBIT 121 APPEARS TO DEPICT A YOUNG BOY

14   PERFORMING ORAL SEX ON ANOTHER BOY.  THE BOY WHO'S HAVING

15   ORAL SEX PERFORMED ON HIM IS NUDE.  THE OTHER BOY APPEARS

16   CLOTHED.

17        EXHIBIT 122, THIS IMAGE APPEARS TO DEPICT TWO NUDE

18   YOUNG BOYS.  ONE BOY APPEARS TO BE PERFORMING -- OR PERHAPS

19   SIMULATED ANAL SEX ON A BOY WHO IS ON HIS STOMACH.

20        NEXT IMAGE, PLEASE.  EXHIBIT 123 APPEARS TO DEPICT

21   TWO NUDE BOYS.  ONE BOY IS AROUSED AND APPEARS TO ALSO BE

22   PERFORMING ORAL SEX ON ANOTHER BOY.

23        EXHIBIT 124, PLEASE.  EXHIBIT 124 IS A BLACK AND

24   WHITE PHOTO AND DEPICTS A BOY WHO, WHILE PARTIALLY OBSCURED

25   BY PERHAPS BEING WRITTEN OVER, APPEARS TO BE AROUSED.

1          EXHIBIT 125 DEPICTS WHAT APPEARS TO BE A YOUNG BOY

2    BEING ANALLY PENETRATED BY AN ADULT MALE.

3          EXHIBIT 126, PLEASE.  EXHIBIT 126 APPEARS TO DEPICT

4    A PREPUBESCENT BOY WHO IS TOUCHING HIS GENITALS WHILE

5    DIGITALLY PENETRATING HIS OWN ANUS.

6          EXHIBIT 127 APPEARS TO DEPICT A BOY ON HIS BACK

7    WITH A PAIR OF UNDERWEAR ON AND IS AROUSED AND HAS SOME SORT

8    OF DEVICE BEING HELD BY ANOTHER AGAINST HIS AROUSED PENIS.

9          EXHIBIT 128.  EXHIBIT 128 APPEARS TO BE TWO NUDE

10   BOYS.  ONE BOY IS AROUSED AND APPEARS TO BE PERFORMING

11   SIMULATED ANAL SEX WITH THE OTHER BOY.

12         EXHIBIT 129.  EXHIBIT 129 APPEARS TO DEPICT A BOY,

13   PREPUBESCENT, WHO IS FONDLING HIMSELF.

14         AGENT MORAN, WERE ALL OF THESE IMAGES RECOVERED

15   FROM THE UNALLOCATED SPACE OF THE DEFENDANT'S LAPTOP

16   COMPUTER?

17   A.   YES.

18   Q.   IN ADDITION TO THOSE IMAGES THAT WERE JUST PUBLISHED TO

19   THE JURORS, DID YOU ALSO RECOVER IMAGES THAT -- WELL, FIRST

20   OF ALL, WITH REGARD TO THE IMAGES THAT WERE JUST SHOWN, WERE

21   YOU ABLE TO DETERMINE THEIR SOURCE, WHERE THEY CAME FROM?

22   A.   NO.

23   Q.   WOULD THAT INFORMATION BE AVAILABLE WITH REGARD TO ANY

24   IMAGE THAT'S BEEN DELETED IN THE UNALLOCATED SPACE?

25   A.   NOT NORMALLY, NO.

1   Q.   AT TIMES IS IT POSSIBLE TO RECOVER SUCH INFORMATION WITH

2   REGARD TO A DELETED FILE?

3   A.   YES.

4   Q.   AND SO IN ADDITION TO THE IMAGES THAT WERE JUST

5   PUBLISHED TO THE JURORS AND ADMITTED, WERE THERE IMAGES OF

6   SUSPECTED CHILD PORNOGRAPHY YOU RECOVERED FROM THE

7   UNALLOCATED SPACE OF THE LAPTOP FROM WHICH YOU WERE ABLE TO

8   DETERMINE INFORMATION ABOUT THEIR SOURCE?

9   A.   YES.

10  Q.   AND WERE THOSE -- WAS THAT INFORMATION -- WHERE WAS THAT

11  INFORMATION?

12  A.   THE INFORMATION CONSISTED OF TEXT IMMEDIATELY PRECEDING

13  WHERE THE IMAGE STARTED.

14  Q.   AND BASED ON YOUR TRAINING AND EXPERIENCE, WERE YOU ABLE

15  TO DETERMINE THAT THAT TEXT, THAT INFORMATION WAS ASSOCIATED

16  WITH THE IMAGE?

17  A.   YES.

18  Q.   AND WHERE DID IT APPEAR TO YOU THAT THESE IMAGES CAME

19  FROM?  WHAT WAS THEIR SOURCE?

20  A.   THE ASPARAGUS NEWSGROUP.

21  Q.   AND THAT'S THE NEWSGROUP YOU PREVIOUSLY TESTIFIED ABOUT

22  THAT PERTAINS TO CHILD PORNOGRAPHY?

23  A.   YES.

24  Q.   AGENT MORAN, I'D ASK YOU TO LOOK AT EXHIBIT 130 AND 131

25  THAT ARE IN FRONT OF YOU, PLEASE.

1    HAVE YOU HAD AN OPPORTUNITY TO REVIEW THESE

2    EXHIBITS BEFORE?

3    A.   YES.

4    Q.   ARE THESE THE TWO IMAGES -- ARE THESE TWO IMAGES THE

5    IMAGES YOU JUST TESTIFIED ABOUT?

6    A.   YES.

7    Q.   FROM THE ASPARAGUS NEWSGROUP?

8    A.   YES.

9         MR. MICHAEL:  THE GOVERNMENT WOULD MOVE TO ADMIT

10   EXHIBITS 130 TO 131, YOUR HONOR, AND REQUEST PERMISSION TO

11   PUBLISH.

12        THE COURT:  ANY OBJECTIONS TO 130 AND 131?

13        MR. AARON:  NONE OTHER THAN MADE PREVIOUSLY.

14        THE COURT:  EXCUSE ME.  130 AND 131 ARE ORDERED

15   ADMITTED AND YOU MAY PUBLISH.

16   BY MR. MICHAEL:

17   Q.   NOW BEING PUBLISHED TO THE JURY IS EXHIBIT 130.  IT

18   DEPICTS TWO NUDE BOYS ON A COUCH WITH A PLAID BLANKET.  ONE

19   BOY APPEARS TO BE ON HIS BACK DISPLAYING HIS GENITALS AND HIS

20   ANUS, THE OTHER BOY APPEARS TO BE AROUSED, AND THEY ARE

21   PARTIALLY LYING ON TOP OF EACH OTHER.

22        IS THIS SOME OF THE IMAGES -- WHAT WAS THE SOURCE

23   OF THIS IMAGE, AGENT MORAN?

24   A.   THE ASPARAGUS NEWSGROUP.

25   Q.   AND NOW EXHIBIT 131, IT'S A BLACK AND WHITE IMAGE THAT

1    SHOWS ONE PREPUBESCENT BOY THAT APPEARS TO BE AROUSED OR

2    PARTIALLY AROUSED WITH ANOTHER YOUNG BOY PERFORMING WHAT

3    APPEARS TO BE SIMULATED ORAL SEX WHILE FONDLING THE BOY.

4            IS THIS THE OTHER IMAGE YOU DETERMINED CAME FROM

5    THE ASPARAGUS NEWSGROUP?

6    A.   YES.

7    Q.   AND BOTH OF THESE IMAGES WERE IN THE UNALLOCATED SPACE

8    OF THE DEFENDANT'S LAPTOP HARD DRIVE; IS THAT CORRECT?

9    A.   THAT'S CORRECT.

10   Q.   NOW, IN ADDITION TO THESE IMAGES, YOU PREVIOUSLY

11   TESTIFIED THAT YOU RECOVERED A VIDEO CLIP, I BELIEVE YOU

12   CALLED "ASIA2."

13           DO YOU RECALL THAT TESTIMONY?

14   A.   YES.

15   Q.   WAS THAT THE ONLY VIDEO CLIP YOU RECOVERED FROM THE

16   LAPTOP COMPUTER OF SUSPECTED CHILD PORNOGRAPHY?

17   A.   THE ONLY FUNCTIONING ONE, YES.

18   Q.   AND WERE YOU ABLE TO -- THIS WAS A VIDEO CLIP THAT YOU

19   WERE ABLE TO OBSERVE?

20   A.   YES.

21   Q.   AND WHERE AGAIN WAS THIS VIDEO CLIP STORED?

22   A.   IT CAME FROM THE ICQ RECEIVED FOLDER FOR CROW18.

23   Q.   AND WAS IT ON THE ALLOCATED SPACE OR THE UNALLOCATED

24   SPACE?

25   A.   ALLOCATED SPACE.

1    Q.    SO, AS OPPOSED TO ALL THE IMAGES THAT WERE JUST

2    PUBLISHED TO THE JURORS AND ADMITTED, THIS VIDEO WAS ACTUALLY

3    ON THE ALLOCATED SPACE OF THE HARD DRIVE?

4    A.    YES.

5    Q.    WOULD THIS IMAGE FILE HAVE BEEN VIEWABLE -- READILY

6    AVAILABLE AND VIEWABLE TO THE USER OF THE LAPTOP COMPUTER?

7    A.    YES.

8    Q.    I'M GOING TO ASK YOU TO LOOK AT EXHIBIT 132 THAT'S BEEN

9    MARKED FOR IDENTIFICATION IN THE FOLDER IN FRONT OF YOU.

10   IT'S A CD.

11          HAVE YOU PREVIOUSLY HAD AN OPPORTUNITY TO REVIEW

12   THE CONTENTS OF THIS EXHIBIT 132?

13   A.    YES.

14   Q.    AND WHAT'S ON THIS VIDEO?

15   A.    IT'S A VIDEO OF CHILD PORNOGRAPHY.

16   Q.    IS THIS THE VIDEO YOU JUST TESTIFIED ABOUT?

17   A.    YES.

18   Q.    AND HOW DO YOU KNOW THAT'S ON THIS CD?

19   A.    I MADE THE CD.

20          MR. MICHAEL:  THE GOVERNMENT WOULD MOVE TO ADMIT

21   EXHIBIT 132, YOUR HONOR.

22          THE COURT:  ANY OBJECTION TO 132?

23          MR. AARON:  NONE EXCEPT AS MADE PREVIOUSLY.

24          THE COURT:  132 IS ORDERED ADMITTED AND YOU MAY

25   PUBLISH.

```
 1              MR. MICHAEL:  IT IS NOW BEING PUBLISHED FOR THE

 2    JURORS, YOUR HONOR.

 3    BY MR. MICHAEL:

 4    Q.   IT APPEARS TO DEPICT A YOUNG, PERHAPS, ASIAN BOY WHO

 5    LOOKS PREPUBESCENT BEING ANALLY PENETRATED, AND THERE IS SOME

 6    ASIAN SCRIPT IN THE UPPER LEFT-HAND CORNER OF THE VIDEO CLIP.

 7              NOW, IN ADDITION TO YOUR FORENSIC REVIEW OF THE

 8    LAPTOP COMPUTER, AGENT MORAN, YOU PREVIOUSLY TESTIFIED ON

 9    FRIDAY THAT YOU CONDUCTED A FORENSIC REVIEW OF FLOPPY

10    DISKETTES.

11              DO YOU RECALL THAT TESTIMONY?

12    A.   YES.

13    Q.   AND DID YOU RECOVER ANY SUSPECTED CHILD PORNOGRAPHY FROM

14    ANY OF THESE FLOPPY DISKETTES?

15    A.   YES.

16    Q.   AND WHEN YOU CONDUCTED YOUR REVIEW, I BELIEVE YOU

17    TESTIFIED ON FRIDAY THAT YOU INDIVIDUALLY NUMBERED THE

18    DISKETTES SEIZED IN THIS CASE; ISN'T THAT CORRECT?

19    A.   THAT'S CORRECT.

20    Q.   AND HOW MANY OF THE DISKS HAD SUSPECTED CHILD

21    PORNOGRAPHY ON THEM?

22    A.   A FEW.

23    Q.   AND IF I CAN DIRECT YOUR ATTENTION TO THE BAG OF

24    DISKETTES NEXT TO YOU WHERE THEY ARE ALL INDIVIDUALLY

25    NUMBERED, DO YOU RECALL THE NUMBERS OF THE DISKETTES THAT HAD
```

1    CHILD PORNOGRAPHY ON THEM?

2    A.    51 AND 47.

3    Q.    AND WHERE WERE DISKS 47 AND 51 RECOVERED FROM?

4    A.    THE STORAGE LOCKER IN LAS VEGAS.

5    Q.    AND WERE YOU ABLE TO OBSERVE THE IMAGES ON THESE DISKS?

6    A.    YES.

7    Q.    DIRECTING YOUR ATTENTION TO DISK 51 -- AND I'M NOT GOING

8    TO MAKE YOU DIG THROUGH THE BAG AND FIND IT.  I BELIEVE YOUR

9    TESTIMONY ABOUT THAT LAST WEEK COVERED WHAT WAS IN THAT BAG.

10   HOW MANY IMAGES OF SUSPECTED CHILD PORNOGRAPHY WERE FOUND ON

11   DISK 51?

12   A.    THERE WAS ONE IN THE UNALLOCATED SPACE.

13   Q.    IN THE UNALLOCATED SPACE?

14   A.    THAT'S CORRECT.

15   Q.    SO DOES THAT INDICATE IT MAY HAVE BEEN -- THAT IT HAD

16   BEEN DELETED?

17   A.    YES.

18   Q.    I WOULD REQUEST THAT YOU LOOK AT EXHIBIT 133, PLEASE, IN

19   FRONT OF YOU.  IS THIS THE IMAGE FOUND ON THAT DISK?

20   A.    YES, YES.

21         MR. MICHAEL:  GOVERNMENT WOULD MOVE TO ADMIT

22   EXHIBIT 133, YOUR HONOR.

23         THE COURT:  ANY OBJECTION, OTHER THAN WHAT'S BEEN

24   PREVIOUSLY STATED, TO 133?

25         MR. AARON:  NO, YOUR HONOR.

1          THE COURT:  THANK YOU.  EXHIBIT 133 IS ORDERED

2    ADMITTED AND YOU MAY PUBLISH.

3          ACTUALLY, YOU MAY PUBLISH, AND THEN I WOULD LIKE TO

4    SEE COUNSEL AT SIDEBAR.

5    BY MR. MICHAEL:

6    Q.   NOW PUBLISHING EXHIBIT 133.  IT APPEARS TO DEPICT A BOY

7    PERFORMING ORAL SEX ON ANOTHER BOY, AND THEN THERE'S SOME

8    PARTIAL WRITTEN OVER, BUT THE PICTURE IS CLEAR, AND IT'S A

9    CLOSE-UP OF WHAT I JUST DESCRIBED.

10         NOW, ON DISK 47 --

11         THE COURT:  CAN I SEE COUNSEL AT THE SIDEBAR,

12   PLEASE?

13         MR. MICHAEL:  SURE, YOUR HONOR.

14      (AN OFF-THE-RECORD DISCUSSION WAS HELD AT SIDEBAR.)

15   BY MR. MICHAEL:

16   Q.   AGENT MORAN, WITH REGARD TO DISK 47, APPROXIMATELY HOW

17   MANY IMAGES OF SUSPECTED CHILD PORNOGRAPHY WERE RECOVERED

18   FROM THIS DISK?

19   A.   APPROXIMATELY FOUR, FIVE MAYBE.

20   Q.   AND WERE THESE IMAGES IN THE ALLOCATED OR THE

21   UNALLOCATED SPACE?

22   A.   ALLOCATED.

23   Q.   SO THEY WERE STILL IN THE ALLOCATED SPACE?

24   A.   YES.

25   Q.   IF I CAN DIRECT YOUR ATTENTION TO EXHIBITS 134 TO 138,

1    DID YOU HAVE AN OPPORTUNITY TO REVIEW THESE EXHIBITS BEFORE

2    COMING HERE TODAY AND TESTIFYING?

3    A.    YES.

4    Q.    AND ARE THESE THE IMAGES THAT YOU RECOVERED FROM DISK

5    NO. 47 IN THE ALLOCATED SPACE?

6    A.    YES.

7              MR. MICHAEL:  THE GOVERNMENT MOVES TO ADMIT

8    EXHIBITS 134 TO 138, YOUR HONOR.

9              THE COURT:  ANY OBJECTION, OTHER THAN WHAT HAS

10   BEEN PREVIOUSLY STATED, TO EXHIBITS 134 THROUGH 138?

11             MR. AARON:  NO, YOUR HONOR.

12             THE COURT:  ALL RIGHT.  134 THROUGH 138 ARE

13   ADMITTED AND YOU MAY PUBLISH.

14   BY MR. MICHAEL:

15   Q.    AGENT MORAN, THESE ARE THE LAST SET OF THE IMAGES I'M

16   GOING TO BE SHOWING YOU.

17             EXHIBIT 134 APPEARS TO DEPICT THREE BOYS,

18   PREPUBESCENT, IN A TREE, AND IT'S LOOKING UP AT THEM, UP AT

19   THEIR GENITALS AND THEIR BUTTOCKS AREA FOR AT LEAST TWO, AND

20   ONE BOY IS BENT OVER AND APPEARS TO BE COVERED BY THE TREE,

21   OBSCURED BY THE TREE.

22             EXHIBIT 135 SHOWS TWO YOUNG BOYS, PREPUBESCENT,

23   LAYING ON THEIR BACKS ARM AND ARM.  ONE BOY HAS HIS LEGS

24   RAISED AND IS DISPLAYING HIS GENITALS AS WELL AS HIS ANUS.

25             EXHIBIT 136 DEPICTS THE BUTTOCKS OF A PREPUBESCENT

1    CHILD THAT ARE BEING SPREAD APART, A CLOSE-UP PICTURE OF

2    BEING SPREAD APART BY WHAT APPEAR TO BE ADULT HANDS, AND THE

3    PICTURE IS JUST THE BUTTOCKS AND THE BOY'S ANUS.

4              AND EXHIBIT 137 APPEARS TO DEPICT A YOUNG BOY

5    PERFORMING ORAL SEX ON THE PENIS OF ANOTHER YOUNG BOY,

6    ALTHOUGH THE OTHER YOUNG BOY IS NOT VIEWABLE.

7              AND EXHIBIT 138 APPEARS TO DEPICT A PREPUBESCENT

8    PENIS OF A BOY THAT APPEARS TO BE AROUSED.

9              AND THESE WERE ALL THE IMAGES, AGENT MORAN,

10   RECOVERED FROM DISK NO. 47?

11   A.   THAT'S CORRECT.

12             MR. MICHAEL:  YOUR HONOR, WOULD YOU LIKE TO TAKE A

13   MORNING BREAK?  IS THIS A GOOD POINT OR SHOULD I CONTINUE ON?

14             THE COURT:  DO YOU HAVE MUCH MORE WITH THIS

15   WITNESS?

16             MR. MICHAEL:  I DO HAVE MORE WITH THIS WITNESS,

17   YOUR HONOR.  I'M MOVING ONTO DIFFERENT IMAGES ALTOGETHER.

18             THE COURT:  THEN WHY DON'T YOU CONTINUE ON FOR JUST

19   A FEW MORE MINUTES.

20             MR. MICHAEL:  YES, YOUR HONOR.

21   BY MR. MICHAEL:

22   Q.   AGENT MORAN, PREVIOUSLY YOU TESTIFIED ABOUT THE FOLDERS

23   CALLED "FAMILY ALBUM."  DO YOU RECALL THAT?

24   A.   YES.

25             THE COURT:  EXCUSE ME.  BUT THERE ARE NO MORE

1    IMAGES?

2              MR. MICHAEL:  NO MORE CHILD PORNOGRAPHY.

3              THE COURT:  CAN WE MOVE THE SCREEN?

4              MR. MICHAEL:  THERE ARE MORE IMAGES TO BE SHOWN,

5    YOUR HONOR, FROM THE FAMILY ALBUM.

6              THE COURT:  THEN GO AHEAD.

7    BY MR. MICHAEL:

8    Q.   AND I BELIEVE YOUR TESTIMONY, AGENT MORAN, WAS THAT

9    THERE WERE NONPORNOGRAPHIC DIGITAL IMAGES FOUND IN THOSE

10   FOLDERS.  IS THAT WHAT YOUR TESTIMONY WAS?

11   A.   THAT'S CORRECT.

12   Q.   AND THOSE IMAGES, JUST AGAIN TO MAKE SURE WE'RE ALL

13   TALKING ABOUT THE SAME IMAGES, APPEAR IN TWO FOLDERS --

14   MULTIPLE FOLDERS CALLED "FAMILY ALBUM" ON THE LAPTOP HARD

15   DRIVE?

16   A.   YES.

17   Q.   NOW, WHAT INFORMATION, IF ANY, DID YOU RECOVER ABOUT THE

18   TYPE OF DIGITAL CAMERA THAT HAD BEEN USED TO TAKE THESE

19   PICTURES IN THE FAMILY ALBUM FOLDER?

20   A.   EMBEDDED WITHIN THE DIGITAL PHOTOGRAPH ITSELF IS A

21   REFERENCE TO A DIGITAL CAMERA.

22   Q.   AND WHAT TYPE OF DIGITAL CAMERA WAS IT?

23   A.   IT'S A FUJI FINEPIX 2400 ZOOM.

24   Q.   IF I CAN -- IS THAT A DIGITAL CAMERA?

25   A.   YES.

1   Q.   IF I CAN DIRECT YOUR ATTENTION TO EXHIBIT 25 ALREADY

2   ADMITTED NEXT TO YOU IN A PLASTIC BAG, HAVE YOU HAD AN

3   OPPORTUNITY TO REVIEW THIS EXHIBIT BEFORE?

4   A.   YES.

5   Q.   AND IF YOU KNOW WHAT IT IS, YOU DON'T HAVE TO TAKE IT

6   OUT OF THE BAG.   WHAT IS THIS?

7   A.   IT'S A FUJI FINEPIX 2400 ZOOM CAMERA.

8   Q.   AND IS THIS THE CAMERA THAT WAS RECOVERED FROM THE

9   DEFENDANT?

10  A.   YES.

11  Q.   I'M GOING TO DIRECT YOUR ATTENTION NOW TO -- THERE'S

12  ANOTHER MANILA FOLDER NEXT TO YOU WITH SOME -- EXCUSE ME --

13  A REDWELD FOLDER WITH SOME MANILA FOLDERS IN IT WHICH HAS A

14  SERIES OF EXHIBITS.   IF I CAN DIRECT YOUR ATTENTION FIRST TO

15  EXHIBITS 68 TO 74.

16         ACTUALLY, IF I CAN DIRECT YOUR ATTENTION TO ALL OF

17  EXHIBITS 59 THROUGH 94 THAT ARE IN THAT REDWELD, PLEASE.

18         EXHIBIT 83, YOUR HONOR, HAS PREVIOUSLY BEEN

19  ADMITTED, SO IF I MAY, AGENT MORAN, IF EXHIBIT 83 IS NOT IN

20  THE STACK YOU'RE LOOKING AT, IT WILL BE IN THE --

21         THE COURT:   DO YOU WANT TO APPROACH THE WITNESS AND

22  ASSIST HIM?

23         MR. MICHAEL:   MAY I, YOUR HONOR --

24         THE COURT:   CERTAINLY.

25         MR. MICHAEL:   -- WHILE HE'S REVIEWING THESE

1    EXHIBITS?

2    BY MR. MICHAEL:

3    Q.   AGENT MORAN, HAVE YOU HAD AN OPPORTUNITY BEFORE

4    TESTIFYING TODAY TO REVIEW THE IMAGES THAT ARE IN THE

5    EXHIBITS I JUST ASKED YOU TO LOOK AT?

6    A.   YES.

7    Q.   AND ARE THESE -- WHAT ARE THESE IMAGES?  WITHOUT SAYING

8    WHAT THEY ARE, WHERE DO THESE IMAGES COME FROM?

9    A.   THEY CAME FROM THE FAMILY ALBUM FOLDERS.

10   Q.   ARE THESE THE IMAGES YOU PREVIOUSLY TESTIFIED ABOUT?

11   A.   YES.

12           MR. MICHAEL:  FOR THE RECORD, I HAVE ALSO HANDED

13   THE WITNESS EXHIBIT 83 WHICH WAS PREVIOUSLY ADMITTED INTO

14   EVIDENCE.

15           THE GOVERNMENT WOULD AT THIS TIME MOVE YOUR HONOR

16   TO ADMIT ALL OF EXHIBITS 59 THROUGH 94, EXCLUDING 83 WHICH

17   HAS ALREADY BEEN ADMITTED, YOUR HONOR.

18           THE COURT:  ANY OBJECTIONS?

19           MR. AARON:  NONE AS EXCEPT MADE PREVIOUSLY.

20           THE COURT:  THANK YOU.  IS IT 59?

21           MR. MICHAEL:  59 THROUGH 94, EXCLUDING 83 WHICH WAS

22   PREVIOUSLY ADMITTED.

23           THE COURT:  THE OBJECTIONS ARE OVERRULED, AND 59

24   THROUGH 94 ARE ORDERED ADMITTED.  YOU MAY PUBLISH.

25           MR. MICHAEL:  AT THIS TIME I'M GOING TO BE

1    PUBLISHING EXHIBIT 68.  EXHIBIT 68 IS A PICTURE OF A YOUNG

2    BOY SMILING IN A CAR.

3              AND I'M JUST GOING TO -- AT THIS TIME, YOUR HONOR,

4    RATHER THAN DESCRIBING WHAT EACH PICTURE DEPICTS ON THE

5    RECORD, THERE MIGHT BE A COUPLE WHERE I WILL STOP; OTHERWISE,

6    WE'RE JUST GOING TO GO THROUGH EACH PICTURE ONE AT A TIME,

7    WITH YOUR HONOR'S PERMISSION.

8              THE COURT:  GO AHEAD.

9    BY MR. MICHAEL:

10   Q.   THIS IS EXHIBIT 68.  EXHIBIT 69.  EXHIBIT 70.

11             THE COURT:  WE'RE NOT SEEING THEM.

12             MR. MICHAEL:  OH, I APOLOGIZE.  WE'RE GOING TO GO

13   BACK AND START OVER AGAIN.

14             LET THE RECORD REFLECT THAT THE JURORS AND THE

15   WITNESS INDICATED THE IMAGES WERE NOT SHOWING, AND WE ARE NOW

16   SHOWING THEM.

17   BY MR. MICHAEL:

18   Q.   EXHIBIT 68.  EXHIBIT 69.  EXHIBIT 70.  EXHIBIT 71.

19        EXHIBIT 72, THIS APPEARS TO DEPICT THE SAME BOY WITH HIS

20   SHIRT OFF AT THIS POINT.

21             EXHIBIT 73.  EXHIBIT 74.

22             EXHIBIT 75 WHICH APPEARS TO DEPICT THE SAME BOY

23   WITH AN ADULT MALE.

24             EXHIBIT 76.  EXHIBIT 77.  EXHIBIT 78.

25             EXHIBIT 79 APPEARS TO SHOW A BOY WITH THE SAME

1    ADULT MALE AND ANOTHER BOY IN THE PICTURE.

2              EXHIBIT 81 DEPICTS ANOTHER BOY.

3              EXHIBIT 82.

4              NOW, I'M GOING TO SHOW YOU EXHIBIT 83 WHICH WAS

5    PREVIOUSLY ADMITTED.  IT'S A PHOTOGRAPH OF TWO BOYS STANDING

6    IN FRONT OF A PIANO.  WAS THIS IMAGE RECOVERED IN THAT SAME

7    ALBUM ON THE DEFENDANT'S LAPTOP COMPUTER?

8    A.   YES.

9    Q.   MOVING ON NOW TO EXHIBIT 84, THIS APPEARS TO BE A

10   CROPPED PHOTO OR CLOSE-UP OF ONE OF THOSE BOYS.

11             EXHIBIT 85 IS A CLOSER IMAGE OF THAT SAME BOY.

12             EXHIBIT 86 IS A PICTURE OF AN ADULT MALE.

13             EXHIBIT 87 APPEARS TO BE A PICTURE OF ANOTHER YOUNG

14   BOY IN A CAR.

15             EXHIBIT 88 APPEARS TO BE THAT SAME BOY WITH HIS

16   SHIRT TIED IN A DAISY DUKE-TYPE FASHION.

17             89 APPEARS TO BE THE SAME BOY WITH WHAT APPEARS TO

18   BE A PIECE OF BLUE CANDY IN HIS MOUTH.

19             EXHIBIT 90 APPEARS TO BE THE SAME BOY STANDING NEXT

20   TO A CAR.

21             EXHIBIT 91 APPEARS TO BE THE SAME BOY SITTING AT A

22   COMPUTER HOLDING AN ITEM IN HIS HAND WITH WHAT APPEARS TO BE

23   ADULT LEGS PARTIALLY OBSCURED.

24             THE NEXT EXHIBIT APPEARS TO BE THE SAME BOY AT THE

25   COMPUTER.

1           EXHIBIT 93 APPEARS TO BE THE SAME BOY IN DIFFERENT

2    ATTIRE AT A COMPUTER RESTING HIS HAND ON HIS CHIN.

3           THE NEXT IMAGE APPEARS TO BE THE SAME BOY, AT LEAST

4    FROM THE SHIRT, AND IT'S ONLY A PICTURE OF HIS -- WHAT

5    APPEARS TO BE HIS CLOTHED BUTTOCKS FROM BEHIND, AND THERE ARE

6    PICTURES OF WHAT APPEAR TO BE ADULT MALE LEGS PARTIALLY

7    OBSCURED IN THE PHOTO AS WELL.

8           NOW GOING BACK TO EXHIBIT 59 -- THAT WAS EXHIBIT 94

9    THAT WAS JUST SHOWN.  EXHIBIT 59 APPEARS TO DEPICT AN ADULT

10   MALE STANDING ON SOME STEPS TO A STRUCTURE.  HE'S GOT HIS

11   HANDS IN FRONT OF HIM.

12          60 IS THE SAME MALE AT THE SAME LOCATION.

13          AND NEXT, EXHIBITS 59 THROUGH 67, WILL ALL BE

14   PICTURES OF THAT SAME ADULT MALE.

15          EXHIBIT 62.  EXHIBIT 63.  AND EXHIBIT 63, THAT

16   ADULT MALE APPEARS TO BE STANDING IN FRONT OF A BUDGET MOVING

17   OR RENTAL TRUCK.

18          EXHIBIT 64, SAME MAN IN FRONT OF THE SAME TRUCK.

19          85 IS A MAN IN FRONT OF A STRUCTURE -- 65.  EXCUSE

20   ME.  I MISSPOKE WHEN I SAID 85.

21          EXHIBIT 66 IS THE SAME MALE SITTING AT A DESK WITH

22   SOME REMOTE CONTROLS IN FRONT OF HIM.

23          AND EXHIBIT 67 IS THE SAME MALE AT A DESK WITH HIS

24   HAND ON A FLOOR LAMP.

25   BY MR. MICHAEL:

```
 1   Q.   AGENT MORAN, THE IMAGES THAT WERE JUST PUBLISHED TO THE

 2   JURY, DO THESE IMAGES APPEAR -- THESE ARE THE IMAGES THAT

 3   APPEAR IN THE FAMILY ALBUM FOLDER OR FOLDERS?

 4   A.   YES.

 5   Q.   WERE YOU ABLE TO RECOVER ANY DATE INFORMATION WITH

 6   REGARD TO THESE PHOTOS?

 7   A.   YES.

 8   Q.   AND BEFORE I ASK YOU ABOUT DATE INFORMATION RELATED TO

 9   THOSE PHOTOS, LET ME ASK YOU SOME PRELIMINARY QUESTIONS ABOUT

10   DATE INFORMATION.

11        WHAT CATEGORIES OF DATE INFORMATION DID YOU RECOVER

12   WITH REGARD TO THE PHOTOS IN THE EXHIBITS THAT WERE JUST

13   SHOWN TO THE JURORS?

14   A.   THE FILE CREATED DATE, LAST WRITTEN DATE, AND THE LAST

15   ACCESS DATE.

16   Q.   WHAT IS A CREATED DATE?

17   A.   FILE CREATED DATE WOULD BE THE DATE THE FILE WAS

18   ORIGINALLY DEVELOPED OR THE LAST TIME IT HAD AN OPERATION,

19   SUCH AS CROPPING AND SAVING THOSE CHANGES.

20   Q.   THAT WOULD BE THE LAST CREATED DATE?

21   A.   YES, LAST WRITTEN.  I'M SORRY.  LET ME DO THAT AGAIN.

22   Q.   OKAY.  LET ME MAKE SURE WE'RE TALKING ABOUT THE SAME

23   THING.  WHAT IS THE LAST CREATED DATE?

24   A.   THE CREATED DATE?

25   Q.   RIGHT.
```

1    A.    THE CREATED DATE IS THE DATE THAT A FILE BECOMES

2    RESIDENT ON THE COMPUTER, SO THE DATE THE FILE WAS PLACED ON

3    THE HARD DRIVE.

4    Q.    SO, IF THE PHOTO WAS TAKEN ON A DIGITAL CAMERA, LET'S

5    SAY, AND THEN TRANSFERRED TO THE COMPUTER HARD DRIVE, THAT

6    DATE THAT IT WAS TRANSFERRED TO THE HARD DRIVE WOULD BE THE

7    CREATED DATE?

8    A.    YES.

9    Q.    NOW, WHAT IS THE LAST WRITTEN DATE?

10   A.    LAST WRITTEN DATE IS THE LAST TIME THE FILE HAD BEEN

11   WRITTEN TO BY THE MEDIA DEVICE.  SO IF IT WAS TAKEN BY THE

12   CAMERA OR MODIFIED IN SOME WAY AND SAVED, THAT WOULD BE AN

13   EXAMPLE OF THE LAST WRITTEN.

14   Q.    NOW, WHEN YOU SAY IT HAD BEEN WRITTEN TO, PREVIOUSLY YOU

15   TESTIFIED ABOUT THE TERM "WRITES."  ARE YOU USING "WRITTEN

16   TO" IN THAT CONTEXT?

17   A.    YES.

18   Q.    WOULD THAT MEAN -- PREVIOUSLY I THINK YOU TESTIFIED THAT

19   "WRITES" ARE ALTERATIONS.

20   A.    YES.

21   Q.    IS THAT WHAT YOU MEAN WHEN YOU SAY "WRITES" HERE?

22   A.    YES.

23   Q.    NOW, IF AN IMAGE IS TAKEN ON A CERTAIN DATE ON A DIGITAL

24   CAMERA AND IT'S NEVER MODIFIED AFTER THE DATE IT WAS TAKEN,

25   WHAT DATE WOULD THE LAST WRITTEN DATE BE?

1    A.    IT WOULD MAINTAIN THE LAST WRITTEN DATE IF IT WERE

2    PLACED ON ALTERNATE MEDIA OR ANOTHER HARD DRIVE.

3    Q.    BUT AT THE OUTSET FOR THAT IMAGE, WOULD THE LAST WRITTEN

4    DATE BE THE DATE THAT IT WAS TAKEN?

5    A.    YES.

6    Q.    SO IF THE IMAGE IS NEVER ALTERED, IT'S NEVER WRITTEN

7    OVER OR CHANGED IN ANY WAY, AND IT'S TRANSFERRED FROM A

8    DIGITAL CAMERA TO A COMPUTER HARD DRIVE, WOULD THE COMPUTER

9    HARD DRIVE -- WOULD THE LAST WRITTEN DATE BE THE SAME AFTER

10   IT WAS TRANSFERRED TO THE COMPUTER HARD DRIVE?

11   A.    YES.

12   Q.    AND IF THE IMAGE, ONCE IT'S ON THAT HARD DRIVE, IS NEVER

13   ALTERED IN ANY WAY, LET'S SAY IT'S NEVER CROPPED OR THERE'S

14   NEVER ANY ALTERATIONS MADE, BUT IT'S REMAINED THE SAME, WOULD

15   THE LAST WRITTEN DATE REMAIN THE SAME?

16   A.    YES.

17   Q.    AND WHAT IS THE LAST ACCESSED DATE?

18   A.    THAT WOULD BE THE LAST TIME THE FILE WAS OPENED BY THAT

19   COMPUTER.

20   Q.    AND WHEN YOU SAY "THAT COMPUTER," IF THE IMAGE HAD BEEN

21   TAKEN ON A DIGITAL PICTURE AND TRANSFERRED TO THE HARD DRIVE

22   AND WAS ACCESSED AT SOME POINT AFTER IT'S TRANSFERRED TO THE

23   HARD DRIVE, WOULD THAT BE THE LAST ACCESS DATE?

24   A.    YES.

25   Q.    NOW, THE DATES THAT ARE ON A HARD DRIVE, PERTAINING TO

1    DIGITAL PICTURES WITH REGARD TO CREATED DATE, WRITTEN DATE,

2    AND LAST ACCESS DATE, ARE THEY ALWAYS 100 PERCENT ACCURATE?

3    A.   NOT ALWAYS.

4    Q.   AND WITH THAT, THE DATE INFORMATION, IS THERE SOMETIMES

5    TIME INFORMATION AS WELL, ABOUT WHAT TIME OF DAY THE PHOTO

6    MAY HAVE BEEN TAKEN?

7    A.   YES.

8    Q.   AND WHY IS IT THAT THAT INFORMATION MAY NOT ALWAYS

9    BE 100 PERCENT ACCURATE?

10   A.   DEPENDING ON THE DEVICE THAT WAS USED TO CREATE THE

11   FILE.  IF IT WAS SET AT AN INCORRECT TIME, THAT TIME WOULD

12   REFLECT IN THE TRANSFERENCE OVER TO THE OTHER MEDIA, IN THIS

13   CASE ON THE COMPUTER.

14   Q.   SO IF THE DATE SETTING FOR THE DIGITAL CAMERA IS OFF IN

15   SOME WAY, WOULD THAT POSSIBLY BE REFLECTED IN THE INFORMATION

16   ABOUT THE PHOTO?

17   A.   YES.

18   Q.   AND IF THE DATE IS OFF SOMEHOW, THE DATE SETTING ON THE

19   HARD DRIVE, COULD THAT POSSIBLY BE REFLECTED ON THE PHOTO?

20   A.   YES.

21             THE COURT:  WHY DON'T WE BREAK FOR OUR MORNING

22   RECESS.

23             AND AGAIN, LADIES AND GENTLEMEN, PLEASE REMEMBER

24   NOT TO DISCUSS THE CASE, NOT TO DISCUSS ANY OF THE EVIDENCE

25   THAT YOU HAVE SEEN OR HEARD EITHER THIS MORNING OR AT ANY

1    OTHER TIME DURING THE CASE.  DON'T DISCUSS ANY OF THE

2    PARTICIPANTS IN THE TRIAL, THE WITNESSES, THE LAWYERS, THE

3    DEFENDANT, ANYONE.

4              YOU MAY REMEMBER THAT I, DURING JURY SELECTION,

5    TOLD YOU THAT DURING THE COURSE OF THIS TRIAL, YOU WOULD ALL,

6    IF YOU WERE CHOSEN AS JURORS, BE ASKED TO AT TIMES VIEW OR

7    LISTEN TO VERY DISTURBING EVIDENCE AND YET YOU WOULD HAVE TO

8    GIVE ME YOUR ASSURANCE THAT DESPITE THAT, YOU WOULD BE ABLE

9    TO DO A VERY DIFFICULT THING, WHICH IS BE TRUE TO THE OATH

10   YOU WERE TAKING NOT TO DISCUSS THE CASE UNTIL THE TIME OF

11   DELIBERATION.  SO PLEASE REMEMBER THAT YOU HAVE ALL GIVEN ME

12   YOUR ASSURANCE THAT YOU WOULD DO THAT.  KEEP THAT IN MIND.

13   DON'T DISCUSS THE CASE.  DON'T MAKE UP YOUR MIND ABOUT IT

14   YET.  THANK YOU.

15             WE WILL BE IN RECESS FOR 15 MINUTES.

16             (OUTSIDE THE PRESENCE OF THE JURY:)

17             THE COURT:  THANK YOU.  YOU MAY STEP DOWN,

18   AGENT MORAN.

19             THE WITNESS:  THANK YOU.

20             THE COURT:  JUST VERY QUICKLY, IN TERMS OF THE

21   CROSS-EXAMINATION OF MR. MARTIN, HOW LONG DO YOU THINK YOUR

22   CROSS-EXAMINATION OF AGENT MORAN WILL BE, MR. AARON?  WILL IT

23   TAKE US TO LUNCH?

24             MR. AARON:  YES, I'M ESTIMATING.

25             THE COURT:  THAT'S ALL RIGHT.  WE'LL GET TO THE

1    PROCEDURES FOR THE IMPLICATION OF THE FIFTH AMENDMENT DURING

2    OUR LUNCH HOUR.  IN TERMS OF MAKING A DETERMINATION, MY

3    UNDERSTANDING OF THE LAW IS THAT HE WOULD PROBABLY HAVE TO DO

4    THE IMPLICATION OF HIS FIFTH AMENDMENT RIGHT IN FRONT OF THE

5    JURY ON THESE ISSUES, BUT THE COURT NEEDS TO MAKE A

6    DETERMINATION AS TO WHETHER HE'S ENTITLED TO INVOKE THE FIFTH

7    AMENDMENT, AND I PROBABLY NEED TO MAKE THAT DETERMINATION

8    OUTSIDE THE PRESENCE OF THE JURY.

9              SO IN TERMS OF MR. PHILIPS' TIME, MR. PHILIPS, IF

10   YOU COULD JUST PLAN TO BE BACK HERE ABOUT NOON SO WE CAN TAKE

11   CARE OF THAT RIGHT AT NOON, AND THEN WE'LL BREAK FOR LUNCH.

12   IT SHOULDN'T TAKE VERY LONG.  ALL RIGHT?

13             MR. PHILIPS:  OKAY.

14             THE COURT:  THANK YOU VERY MUCH.

15                       (RECESS)

16             THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

17   ALL MEMBERS OF THE JURY AND COUNSEL FOR BOTH PARTIES AND THE

18   DEFENDANT ARE ALSO PRESENT.  THE WITNESS IS BACK ON THE

19   WITNESS STAND, AND YOU MAY CONTINUE.

20             MR. MICHAEL:  THANK YOU, YOUR HONOR.

21   BY MR. MICHAEL:

22   Q.   AGENT MORAN, BEFORE THE BREAK I HAD ASKED YOU SOME

23   QUESTIONS ABOUT TIME AND DATE SETTINGS FOR DIGITAL PHOTOS.

24             DID YOU EVER CHECK THE TIME AND DATE SETTINGS ON

25   THE DEFENDANT'S LAPTOP COMPUTER?

1    A.    YES.

2    Q.    WERE THEY ACCURATE?

3    A.    THEY WERE WITHIN A FEW MINUTES OF THE ACTUAL TIME AND

4    THE CORRECT DATE.

5    Q.    I'M SORRY?

6    A.    AND THE CORRECT DATE.

7    Q.    AND THE CORRECT DATE.  DID YOU EVER CHECK THE DATE AND

8    TIME SETTINGS ON THE DEFENDANT'S DIGITAL CAMERA?

9    A.    NO.

10   Q.    DID YOU EVER THINK TO?

11   A.    YES.

12   Q.    AND WHY DIDN'T YOU?

13   A.    BY THAT TIME THE BATTERY WOULD HAVE DIED.

14   Q.    AND WHAT EFFECT WOULD THE BATTERY HAVING DIED ON THE

15   DIGITAL CAMERA HAVE ON THE DATE AND TIME SETTINGS?

16   A.    IT WOULD RESET IT TO ITS FACTORY DEFAULTS.

17   Q.    NOW, WHEN YOU REVIEWED THE TIME AND DATE FOR THE CREATED

18   LAST WRITTEN, LAST ACCESS DATE FOR THESE PHOTOS, DID YOU

19   INCLUDE THAT INFORMATION IN YOUR ENCASE REPORT?

20   A.    YES.

21   Q.    IF I CAN DIRECT YOUR ATTENTION TO EXHIBIT 105, IT'S IN

22   ONE OF THOSE MANILA FOLDERS THAT HAS ALREADY BEEN ADMITTED

23   INTO EVIDENCE.  AND ACTUALLY BEFORE THAT, I WANT TO ASK YOU

24   JUST A COUPLE OF QUESTIONS TO CLARIFY SOME OF YOUR PREVIOUS

25   TESTIMONY.

1          EXHIBIT 83, IF WE CAN PUT THAT UP ON THE SCREEN,

2    PLEASE, WHICH WAS ADMITTED PREVIOUS TO YOUR TESTIMONY, A

3    PICTURE OF TWO BOYS IN FRONT OF A PIANO.  YOU TESTIFIED THAT

4    YOU FOUND THIS IMAGE IN ONE OF THE FAMILY ALBUM FOLDERS?

5    A.   YES.

6    Q.   NOW, YOU ALSO TESTIFIED ABOUT EXHIBITS 84 AND 85 WHICH

7    APPEAR TO BE CLOSE-UPS OF THE BOYS STANDING IN THE SAME

8    PHOTO.  WERE THOSE CLOSE-UP PHOTOS ALSO FOUND, EXHIBITS 84

9    AND 85, IN THE FAMILY ALBUM FOLDER?

10   A.   NO.

11   Q.   WHAT FOLDER WERE THEY FOUND IN?

12   A.   IN THE "MY DOCUMENTS" FOLDER AND SUBFOLDER.

13   Q.   SO THE RECORD SHOULD REFLECT THAT WE PUBLISHED

14   EXHIBITS 83, 84, AND 85 FOR THE JURORS.

15          SO IT WAS THE LARGER PHOTO OF THE TWO BOYS THAT WAS

16   IN THE FAMILY ALBUM?  WAS IT THE LARGER OF THE THREE PHOTOS

17   OF THE TWO BOYS THAT WAS IN THE FAMILY ALBUM FOLDER?

18   A.   YES, THAT'S CORRECT.

19   Q.   WHEN I SAY "LARGER," I JUST MEAN WITH REGARD TO HOW MUCH

20   OF THE PICTURE WAS BEING SHOWN.

21          NOW, MOVING BACK TO DATE AND TIME, DIRECTING YOUR

22   ATTENTION TO EXHIBIT 105, AND IF I CAN DIRECT YOUR ATTENTION

23   TO NEAR THE END OF THE ENCASE REPORT, THERE'S A SECTION

24   TITLED "ADDITIONAL PHOTOS," AND THERE APPEAR TO BE A SERIES

25   OF PHOTOS THAT ARE ALL INDIVIDUALLY NUMBERED.

1           LET ME KNOW WHEN YOU'RE THERE, PLEASE.

2    A.    I'M THERE.

3    Q.    IN THIS PORTION OF THE ENCASE REPORT, DOES THIS INCLUDE

4    THE PHOTOS THAT WERE JUST ADMITTED AND PUBLISHED FOR THE

5    JURORS?

6    A.    YES.

7    Q.    IF I CAN DIRECT YOUR ATTENTION TO ITEM NO. 12 IN THE

8    "ADDITIONAL PHOTOS" SECTION, AND I'M GOING TO PUBLISH

9    EXHIBIT 68.  IT'S A PICTURE OF A BOY SMILING IN AN ORANGE

10   SHIRT IN A CAR.

11           WHAT IS THE LAST WRITTEN DATE FOR THIS PHOTOGRAPH?

12   WELL, FIRST OF ALL, IS ITEM NO. 12 THE SAME PHOTOGRAPH AS

13   EXHIBIT 68?

14   A.    YES.

15   Q.    AND WHAT IS THE LAST WRITTEN DATE?

16   A.    12/21 OF 2000.

17   Q.    AND WHAT'S THE TIME LISTED THERE?

18   A.    10:41:36 P.M.

19   Q.    NOW, DOES IT APPEAR THAT THIS PHOTO WAS TAKEN IN THE

20   DAYTIME OR THE NIGHTTIME?

21   A.    DAYTIME.

22   Q.    SO DO YOU HAVE ANY REASON TO BELIEVE THAT THERE IS ANY

23   PROBLEM WITH THE TIME?

24   A.    IT APPEARS THAT THE CAMERA WAS NOT SET CORRECTLY.

25   Q.    HOW COULD SOMETHING LIKE THIS HAVE HAPPENED FOR THIS

1    IMAGE, IF YOU KNOW?

2    A.    A USER COULD SET THE RIGHT TIME, BUT IT MAY NOT HAVE THE

3    A.M. OR P.M. SET PROPERLY, SO IT WOULD SHIFT 12 HOURS.

4    Q.    BUT THE DATE AND TIME, DO THEY REFLECT A TRUE EVENT WITH

5    THIS PICTURE?

6    A.    YES.

7    Q.    AND DOES THIS PHOTOGRAPH, EXHIBIT 68 -- YOU'RE LOOKING

8    AT NO. 12.  IF I CAN DIRECT YOUR ATTENTION TO ITEM NO. 58 IN

9    THE SAME LIST OF PHOTOGRAPHS THAT YOU HAVE.

10   A.    YES.

11   Q.    DOES THIS PHOTO DEPICT EXHIBIT 68 AS WELL?

12   A.    YES.

13   Q.    AND WHAT IS THE LAST WRITTEN DATE FOR THIS VERSION OF

14   THE PHOTOGRAPH?

15   A.    LAST WRITTEN DATE IS 12/21 OF 2000 AT 10:41:36 P.M.

16   Q.    SO IT HAS THE SAME LAST WRITTEN DATE AS THE OTHER COPY

17   OF THE PHOTOGRAPH?

18   A.    THAT'S CORRECT.

19   Q.    AND ARE THESE TWO IMAGES THAT YOU'RE LOOKING AT HERE IN

20   YOUR ENCASE REPORT THAT MATCH EXHIBIT 68, ARE THEY IN THE

21   SAME FOLDER OR DIFFERENT FOLDERS?

22   A.    DIFFERENT FOLDERS.

23   Q.    IF THE LAST WRITTEN DATE AND TIME IS THE SAME FOR BOTH,

24   WHAT DOES THAT LEAD YOU TO BELIEVE?

25   A.    IF THE LAST WRITTEN DATE IS THE SAME FOR BOTH, I BELIEVE

1    THAT THE IMAGE HAD NOT BEEN ALTERED OR HAD A SAVE WRITTEN TO

2    IT.

3    Q.    COULD THAT REFLECT THE DATE THE IMAGE WAS TAKEN?

4    A.    YES.

5    Q.    NOW, IF I COULD DIRECT YOUR ATTENTION TO THE CREATED

6    DATES FOR ITEMS 12 AND 58, WHICH BOTH DEPICT EXHIBIT 68, IN

7    THE FIRST VERSION OF ITEM 12, WHAT DOES IT INDICATE THE

8    CREATED DATE IS?

9    A.    CREATED WOULD BE 12/29/2000.

10   Q.    AND THE TIME, PLEASE?

11   A.    TIME IS 12:13:30 P.M.

12   Q.    AND SO WHAT WOULD THAT INDICATE, THAT CREATED DATE?

13   A.    THAT WOULD BE THE DATE AND TIME THAT IT WAS SAVED ONTO

14   THE LAPTOP COMPUTER.

15   Q.    AND THEN IF I CAN DIRECT YOUR ATTENTION BACK TO ITEM 58,

16   WHAT'S THE CREATED DATE THERE?

17   A.    CREATED WOULD BE 5/14/01 AT 3:23:08 P.M.

18   Q.    AND HOW COULD IT BE THAT THE SAME PHOTOGRAPH WOULD HAVE

19   DIFFERENT CREATED DATES?

20   A.    THEY WERE PLACED ON A COMPUTER HARD DRIVE AT DIFFERENT

21   TIMES.

22   Q.    AND ARE THESE BOTH THE SAME COPIES WITH A DIFFERENT --

23   SO THESE ARE TWO DIFFERENT PHOTOS IN TWO DIFFERENT ALBUMS?

24   A.    THAT'S CORRECT.

25   Q.    LET ME REPHRASE.  IT'S THE SAME PHOTO IN TWO DIFFERENT

1    ALBUMS?

2    A.    YES.

3    Q.    SO THE CREATED DATE WOULD REFLECT WHEN THAT COPY OF THE

4    PHOTO WAS SAVED TO THAT ALBUM?

5    A.    YES.

6    Q.    AND THEN WHAT IS THE LAST ACCESS DATE FOR NO. 12 HERE

7    WHICH REFERS TO EXHIBIT 68?

8    A.    LAST ACCESS DATE WOULD BE 4/21 OF 2001.

9    Q.    AND WHAT WOULD THE LAST ACCESS DATE BE FOR THE COPY OF

10   THE SAME PHOTO THAT'S LISTED AS ITEM 58 -- EXHIBIT 68 LISTED

11   AS ITEM 58 IN THE ENCASE REPORT?

12   A.    5/14/2001.

13   Q.    NOW, WITH REGARD TO ALL OF THE PHOTOGRAPHS THAT YOU

14   PREVIOUSLY TESTIFIED ABOUT AND THAT APPEAR IN THIS ENCASE

15   REPORT, DID YOU INCLUDE FOR ALL OF THEM THE CREATED DATE, THE

16   LAST WRITTEN DATE, AND THE LAST ACCESS DATES?

17   A.    YES.

18   Q.    AND DID YOU INCLUDE FOR ALL OF THEM THE INFORMATION ON

19   WHAT FOLDERS THEY WERE STORED IN?

20   A.    YES.

21   Q.    AND FROM YOUR REVIEW, DID IT APPEAR THAT MANY OF THESE

22   PHOTOGRAPHS HAD BEEN TAKEN -- DID IT APPEAR WHETHER OR NOT

23   MANY OF THESE PHOTOGRAPHS HAD BEEN TAKEN IN DECEMBER OF 2000?

24   A.    YES.

25   Q.    AND WHAT WAS THAT BASED UPON?

1    A.    THE LAST WRITTEN DATES OF THE PHOTOS.

2    Q.    NOW, IF I COULD DIRECT YOUR ATTENTION TO ITEM NUMBER --

3    EXCUSE ME FOR ONE MOMENT.  ITEM NO. 28.  EXCUSE ME.  ITEM

4    NO. 29 AND PUBLISH EXHIBIT 90.

5          WHAT IS THE NAME OF THE FOLDER THAT EXHIBIT 90 --

6    WELL, IS THIS THE SAME IMAGE, ITEM NO. 29, ON YOUR ENCASE

7    REPORT AS EXHIBIT 90?

8    A.    YES.

9    Q.    AND WHAT DOES IT INDICATE IS THE FOLDER OR ONE OF THE

10   FOLDERS THAT THIS PICTURE WAS IN?

11   A.    IT CAME FROM THE D DRIVE IN A FOLDER CALLED "LVPICS" AND

12   "100_FUJI."

13   Q.    AND WHAT IS "LV" COMMONLY REFERRED TO, IF ANYTHING?

14   A.    LAS VEGAS.

15   Q.    AND THEN IF I CAN DIRECT YOUR ATTENTION TO ITEM NO. 40

16   IN YOUR ENCASE REPORT.  OH, EXCUSE ME.  I'M SORRY.  BACK TO

17   THAT ONE YOU WERE JUST LOOKING AT, WHAT IS THE LAST WRITTEN

18   DATE FOR THAT IMAGE?

19   A.    LAST WRITTEN WOULD BE 4/13/2001 AT 9:48:40 P.M.

20   Q.    SO IF THE TIME WAS OFF ON THE DIGITAL CAMERA, LET'S SAY

21   BY 12 HOURS, WOULD THAT BE AUTOMATICALLY CORRECTED BY THE

22   COMPUTER ONCE THE IMAGE WAS TRANSFERRED TO THE COMPUTER?

23   A.    NO.

24   Q.    AND IF I CAN NOW DIRECT YOUR ATTENTION TO ITEM NO. 40.

25   I'M GOING TO PUBLISH EXHIBIT 61.

1              ARE YOU AT EXHIBIT 61?  I'M SORRY.  ARE YOU AT

2    ITEM 40?

3    A.    YES.

4    Q.    AND IS THAT IMAGE THE SAME AS EXHIBIT 61?

5    A.    YES.

6    Q.    AND WHAT IS THE NAME OF THE FOLDER THAT THIS IMAGE IS

7    SAVED IN?

8    A.    IT'S IN THE D DRIVE "MAYPICS" FOLDER.

9    Q.    IT SAYS, "MAYPICS"?

10   A.    MAYPICS.

11   Q.    AND WHAT IS THE LAST WRITTEN DATE FOR THIS IMAGE?

12   A.    5/11/2001 AT 7:19:20 P.M.

13   Q.    AND ARE ALL OF THE PHOTOS WITH THIS MAN DEPICTED IN

14   EXHIBIT 61, ARE THERE OTHER PHOTOS OF THIS MAN IN THE MAYPICS

15   FOLDER?

16   A.    YES.

17   Q.    AND DO THEY ALL APPEAR TO HAVE A LAST WRITTEN DATE AT OR

18   ABOUT 5/11/2001?

19   A.    YES.

20   Q.    AND NOW DIRECTING YOUR ATTENTION TO ITEM NO. 53 IN THIS,

21   AND IN HERE ARE -- STARTING AT ITEM NO. 53, ARE THERE SEVERAL

22   PHOTOS IN HERE THAT MATCH EXHIBITS PREVIOUSLY TESTIFIED ABOUT

23   THAT DEPICT THAT LITTLE BLOND BOY IN THE ORANGE SHIRT --

24   APPEAR TO DEPICT THE SAME BLOND BOY IN THE ORANGE SHIRT THAT

25   WAS IN EXHIBIT 68?

1    A.    YES.

2    Q.    AND IF YOU WOULD JUST BRIEFLY LOOK THROUGH HERE AND LOOK

3    AT THESE PHOTOGRAPHS HERE.  FIRST OF ALL, WHERE ARE THESE

4    PHOTOGRAPHS STORED ON THE LAPTOP COMPUTER, WHAT FOLDER?

5    A.    THIS IS IN THE D DRIVE FROM PRIVATE1 CONTAINER, FAMILY

6    ALBUM, 100_FUJI FOLDER.

7    Q.    AND DO THE PHOTOS THAT APPEAR IN HERE, DO THEY ALL

8    APPEAR THEY WERE TAKEN SOMETIME IN LATE DECEMBER 2000?

9    A.    YES.

10   Q.    OR AT LEAST THE LAST WRITTEN DATE IS LATE DECEMBER 2000?

11   A.    YES.

12   Q.    YOU CAN SET THE EXHIBIT ASIDE.  THANK YOU.

13            NOW, IN ADDITION TO USING ENCASE, YOU TESTIFIED

14   EARLIER THAT YOU USED OTHER TECHNIQUES WHEN YOU CONDUCTED

15   YOUR REVIEW OF THE LAPTOP HARD DRIVE; IS THAT CORRECT?

16   A.    YES.

17   Q.    AND YOU ALSO INDICATED -- I BELIEVE YOU CONDUCTED

18   MULTIPLE REVIEWS OR MULTIPLE TIMES ATTEMPTED TO REVIEW THE

19   HARD DRIVE; IS THAT CORRECT?

20   A.    YES.

21   Q.    NOW, WERE YOU ABLE TO RECOVER ANY ADDITIONAL DATA BY

22   USING THESE ADDITIONAL TECHNIQUES OTHER THAN ENCASE?

23   A.    YES.

24   Q.    ARE YOU FAMILIAR WITH THE TERM ACCESS DATA REGISTRY?

25   A.    YES.

92

1    Q.    WHAT IS THAT?

2    A.    ACCESS DATA MAKES A PROGRAM CALLED REGISTRY VIEWER THAT

3    ALLOWS THE FORENSIC EXAMINER TO SEE SETTINGS AND PREFERENCES

4    OF PROGRAMS CONTAINED ON THE COMPUTER.

5    Q.    NOW, HAD THIS SOFTWARE BEEN AVAILABLE TO YOU IN 2001

6    WHEN YOU FIRST DID YOUR REVIEW OF THE LAPTOP COMPUTER?

7    A.    NO.

8    Q.    DID IT LATER BECOME AVAILABLE TO YOU?

9    A.    YES.

10   Q.    AND DID YOU USE IT IN CONNECTION WITH YOUR INVESTIGATION

11   OF THE LAPTOP COMPUTER HERE?

12   A.    YES.

13   Q.    AND WHAT DID YOU RECOVER -- DID YOU RECOVER INFORMATION

14   RELEVANT TO THE INVESTIGATION?

15   A.    YES.

16   Q.    WHAT INFORMATION DID YOU RECOVER WITH REGARD TO SETTINGS

17   PERTAINING TO NEWSGROUPS AS THEY EXISTED ON THE LAPTOP

18   COMPUTER?

19   A.    SETTINGS FOR THE XNEWS NEWSGROUP READER INCLUDED A LIST

20   OF MEMBERSHIP NEWSGROUPS.

21   Q.    AND WHAT GROUPS WERE THERE MEMBERSHIP INFORMATION FOR ON

22   THE LAPTOP COMPUTER?

23   A.    THOSE NEWSGROUPS HAD IN THEIR NAMES "BOYS," "MULTI-MEDIA

24   BOYS," "PRETTY BOY," "ASPARAGUS," AND "SNUFFLES."

25   Q.    AND ARE YOU FAMILIAR WITH THESE NEWSGROUPS?

1    A.   YES.

2    Q.   BASED ON YOUR TRAINING AND EXPERIENCE, WHAT IS THE

3    SUBJECT MATTER OF THESE NEWSGROUPS?

4    A.   YOUNG BOYS AS SEX OBJECTS.

5    Q.   WOULD THAT INCLUDE CHILD PORNOGRAPHY?

6    A.   YES.

7    Q.   AND WHAT NAME, IF ANY, WAS THE LAPTOP REGISTERED TO?

8    A.   THE REGISTERED OWNER NAME WAS ELLIOTT BURSON.

9    Q.   IF I CAN DIRECT YOUR ATTENTION TO EXHIBIT 14, THE SAME

10   HANDWRITTEN NOTES YOU LOOKED AT BEFORE WHEN YOU WERE

11   TESTIFYING ABOUT THE PASSWORDS, DOES THAT NAME ELLIOTT BURSON

12   APPEAR ON EXHIBIT 14 ANYWHERE?

13   A.   YES.

14   Q.   WHERE?

15   A.   AS A -- WELL, IT SAYS "MY LAPTOP" AND "REGISTRY" AND

16   "PASSWORD," AND IT SAYS "ELLIOTT BURSON" ON THE NEXT LINE.

17          MR. MICHAEL:  YOUR HONOR, SINCE THE COPY WE HAVE IS

18   NOT A GREAT COPY, MAY I QUICKLY RETRIEVE THE EXHIBIT AND

19   PUBLISH IT FOR THE JURORS?

20          THE COURT:  YES, YOU MAY.

21   BY MR. MICHAEL:

22   Q.   DO YOU KNOW WHO THESE HANDWRITTEN NOTES WERE RECOVERED

23   FROM?

24   A.   YES.

25   Q.   WHO?

1    A.    THE DEFENDANT.

2    Q.    IN THE REGISTRY INFORMATION ON THE COMPUTER AND WHEN YOU

3    REVIEWED THE ACCESS DATA REGISTRY VIEWER PROGRAM, DID YOU

4    RECOVER INFORMATION ABOUT OTHER SCREEN NAMES THAT WERE

5    REGISTERED ON THE LAPTOP?

6    A.    YES.

7    Q.    WHAT WERE THOSE SCREEN NAMES?

8    A.    FOR ICQ IT WAS PEI, FOR YAHOO MESSENGER IT WAS

9    OJIBOYSAN, AND THAT'S ALL I CAN REMEMBER RIGHT NOW.

10   Q.    AND WAS THERE ANY INFORMATION IN THE REGISTRY ABOUT

11   OTHER PROGRAMS THAT YOU'VE ALREADY TESTIFIED ABOUT?

12   A.    YES.

13   Q.    WHAT TYPES OF PROGRAMS?

14   A.    EVIDENCE ELIMINATOR, BCWIPE, AND BESTCRYPT.

15   Q.    WHAT ABOUT FREEDOM?

16   A.    AND FREEDOM, YES.

17   Q.    AND WHAT ABOUT NEOTRACE?

18   A.    YES.

19   Q.    AND IN ADDITION TO USING THE ACCESS DATA REGISTRY

20   VIEWER, DID YOU USE ANY OTHER TECHNIQUES TO TRY TO RECOVER

21   DATA FROM THE LAPTOP COMPUTER?

22   A.    YES.

23   Q.    AND WHAT OTHER TECHNIQUE DID YOU USE?

24   A.    WE USED A SYSTEM RESTORE POINT.

25   Q.    AND WHEN YOU SAY "SYSTEM RESTORE POINT," WHAT WAS THE

1    SYSTEM IN THIS CASE, THE OPERATING SYSTEM FOR THIS LAPTOP?

2    A.    YES, IT WAS A MICROSOFT WINDOWS MILLENIUM EDITION OR

3    IT'S CALLED WINDOWS ME.

4    Q.    AND WHAT IS RESTORE POINT?  WHAT DOES IT DO?

5    A.    RESTORE POINT IS A FUNCTION BUILT INTO THE OPERATING

6    SYSTEM THAT ALLOWS A USER TO GO BACK IN TIME ON THEIR

7    COMPUTER.

8    Q.    AND IF YOU COULD EXPLAIN HOW IT DOES THAT.  HOW DOES IT

9    WORK?

10   A.    EITHER THE USER CAN DO IT OR IT'S DONE AUTOMATICALLY.

11   A SNAPSHOT OF THE COMPUTER IN ITS CURRENT STATE IS TAKEN AND

12   PRESERVED AND PUT INTO A BANK-LIKE AREA FOR USE LATER.  THIS

13   IS DONE PRIMARILY IF YOU'RE HAPPY WITH THE WAY YOUR COMPUTER

14   IS OPERATING, OR IF THERE'S SUBSTANTIAL CHANGES MADE LATER

15   THAT AFFECT THE OPERATING SYSTEM, YOU CAN ROLL BACK OR RESET

16   YOUR COMPUTER TO HOW IT PERFORMED PRIOR TO MAKING THOSE

17   CHANGES.

18   Q.    AND WOULD THE DATE THAT IT COULD BE ROLLED BACK TO BE

19   THE DATE THAT THE SNAPSHOT WAS CREATED?

20   A.    YES.

21   Q.    AND WHEN YOU SAY THE SNAPSHOT IS PUT IN A BANK, WHAT DO

22   YOU MEAN "PUT IN A BANK"?  WHERE IS IT STORED?

23   A.    IT'S STORED IN A RESTORE FOLDER.

24   Q.    AND IS THE DATA PROTECTED WITHIN THAT FOLDER?

25   A.    YES.

1    Q.   ONCE THE SNAPSHOT IS CREATED AND STORED IN THAT FOLDER,

2    IS IT SAVED AND MAINTAINED THERE?

3    A.   YES.

4    Q.   DOES THE USER EVER HAVE TO GO BACK TO THAT FOLDER AND

5    USE WHAT'S IN THAT SNAPSHOT?

6    A.   NO.

7    Q.   IF A USER WANTED TO, COULD THEY GO BACK TO THAT SNAPSHOT

8    AND DELETE IT?

9    A.   YES.

10   Q.   IF THE SNAPSHOT REMAINS IN THE FOLDER AND IT'S NOT

11   DELETED, IF THE USER RUNS THE RESTORE POINT PROGRAM, WHAT

12   HAPPENS TO THAT INFORMATION, THAT SNAPSHOT THAT'S IN THE

13   RESTORE POINT FOLDER?

14   A.   IT WILL WRITE THE NEW INFORMATION WHICH HAD BEEN SAVED

15   TO THE CURRENT STATE OF THE OPERATING SYSTEM.

16   Q.   SO WHEN YOU SAY "NEW INFORMATION," ARE YOU REFERRING TO

17   THE INFORMATION THAT WAS STORED IN THE RESTORE POINT FOLDER?

18   A.   YES.

19   Q.   AND THAT INFORMATION IS AS OF THE EARLIER DATE THAT THE

20   COPY WAS MADE?

21   A.   YES.

22   Q.   WOULD IT BE FAIR TO CHARACTERIZE IT TO ANYTHING LIKE A

23   REWIND OR RESET BUTTON BACK TO A CERTAIN DATE?

24   A.   YES.

25   Q.   NOW, ONCE THE RESTORE POINT PROGRAM IS RUN AND THE

1    SNAPSHOT IS ACTIVATED, IS A USER THEN ABLE TO USE THEIR

2    COMPUTER WITH THE DATA AND PROGRAMS THAT ARE RESTORED?

3    A.    YES.

4    Q.    AND WOULD IT BE AS IF THE USER WAS USING THE COMPUTER AS

5    IT EXISTED ON THE DATE OF THE RESTORE POINT?

6    A.    YES.

7    Q.    WOULD THAT INCLUDE ACCESS TO FILES OR PROGRAMS THAT

8    EXISTED AS OF THE DATE OF THE SNAPSHOT?

9    A.    YES.

10   Q.    NOW, WHAT HAPPENS IF DATA IS DELETED FROM THE MAIN

11   OPERATING SYSTEM BEFORE THE SNAPSHOT IS ACTIVATED, BEFORE

12   IT'S RESTORED?  WHAT HAPPENS IF THE SAME DATA IS IN THE

13   RESTORE POINT FOLDER?

14   A.    COULD YOU --

15   Q.    LET ME ASK A BETTER QUESTION.  IF THERE IS DATA ON THE

16   COMPUTER THAT'S SAVED IN THAT SNAPSHOT AND THE SNAPSHOT IS

17   NEVER ACTIVATED, IT STAYS IN THAT FOLDER AND THE USER GOES

18   ON WITH THEIR COMPUTER AND DELETES THE DATA ON THE MAIN

19   OPERATING SYSTEM, WOULD THAT AFFECT THAT SAME DATA AS IT

20   EXISTED IN THE RESTORE POINT FOLDER?

21   A.    NO.

22   Q.    SO WOULD THE DATA STILL BE IN THE RESTORE POINT FOLDER?

23   A.    YES.

24   Q.    DID YOU RUN THE RESTORE POINT PROGRAM IN THIS CASE?

25   A.    YES.

1   Q.    HOW DID YOU KNOW THAT THIS PROGRAM EXISTED ON THE

2   DEFENDANT'S LAPTOP COMPUTER?

3   A.    IT IS BUILT INTO THE WINDOWS OPERATING SYSTEM.

4   Q.    NOW, BEFORE YOU RAN THE RESTORE POINT PROGRAM, DID YOU

5   KNOW WHETHER DEFENDANT HAD CREATED SUCH A SNAPSHOT?

6   A.    NO.

7   Q.    AND WHAT COPY OF THE HARD DRIVE DID YOU USE TO RUN THE

8   RESTORE POINT PROGRAM?

9   A.    FROM MY ENCASE COPY I GENERATED A COPY OF THE ORIGINAL

10  HARD DRIVE WHICH I PLACED IN ANOTHER MACHINE AND I WAS ABLE

11  TO WORK ON THAT ONE LIVE.

12  Q.    AND WERE YOU ABLE TO RUN THE RESTORE POINT PROGRAM ON

13  THAT COPY?

14  A.    YES.

15  Q.    WAS IT NECESSARY TO REMOVE IT FROM ENCASE TO BE ABLE TO

16  RUN THE RESTORE POINT PROGRAM?

17  A.    YES.

18  Q.    WHAT HAPPENED WHEN YOU ACTIVATED THE RESTORE POINT?

19  A.    IT RESET THE OPERATING SYSTEM TO AN EARLIER TIME.

20  Q.    SO WAS THERE A SNAPSHOT CREATED AT AN EARLIER TIME?

21  A.    YES.

22  Q.    WHAT WAS THE DATE OF THAT SNAPSHOT?

23  A.    MAY 29TH, 2001.

24  Q.    AND THAT WOULD HAVE BEEN THE DATE THAT THE DATA IN THE

25  RESTORE POINT FOLDER WAS PUT IN THAT SNAPSHOT FOLDER?

1    A.    YES.

2    Q.    AND WHAT DATE AGAIN WAS THE LAPTOP SEIZED?

3    A.    JUNE 5TH, APPROXIMATELY, 2001.

4    Q.    SO THE RESTORE POINT DATE WAS JUST A MATTER OF DAYS

5    BEFORE THE -- WAS IT JUST A MATTER OF DAYS BEFORE THE

6    SEIZURE?

7    A.    YES.

8    Q.    AND THEN ONCE YOU DID THE RESTORE POINT, WERE YOU ABLE

9    TO RECOVER DATA FROM DEFENDANT'S LAPTOP THAT HAD BEEN WITHIN

10   THAT RESTORE SNAPSHOT?

11   A.    YES.

12   Q.    AND WAS THAT DATA THAT YOU WERE PREVIOUSLY ABLE TO

13   RECOVER OR NOT PREVIOUSLY ABLE TO RECOVER?

14   A.    WAS NOT PREVIOUSLY ABLE TO RECOVER THAT.

15   Q.    HAD THAT DATA ALWAYS BEEN IN THE RESTORE POINT FOLDER?

16   A.    YES.

17   Q.    AND ONCE YOU GAINED ACCESS TO THE DATA IN THE RESTORE

18   POINT FOLDER, WERE YOU ABLE TO REVIEW IT?

19   A.    YES.

20   Q.    AS FAR AS YOU COULD TELL, WHY HADN'T THIS DATA

21   PREVIOUSLY BEEN AVAILABLE TO YOU WHEN YOU CONDUCTED YOUR

22   ENCASE REVIEW?

23   A.    IT DIDN'T EXIST IN THAT STATE.

24   Q.    WHEN YOU SAY "IN THAT STATE," YOU MEAN THE STATE THAT IT

25   EXISTED AFTER THE RESTORE POINT SNAPSHOT?

1    A.   THAT'S CORRECT.

2    Q.   IS IT POSSIBLE THAT THAT DATA HAD BEEN DELETED FROM THE

3    MAIN OPERATING SYSTEM?

4    A.   YES.

5    Q.   WERE YOU ABLE TO RECOVER -- WITH REGARD TO THE DATA YOU

6    RECOVERED, WERE YOU ABLE TO RECOVER ANY IMAGES OR VIDEOS?

7    A.   NO.

8    Q.   WERE YOU ABLE TO RECOVER ANY OF THE IMAGES -- AND WITH

9    REGARD TO THAT, IS IT YOUR UNDERSTANDING AS TO WHETHER OR NOT

10   WHEN YOU DO A RESTORE POINT, THAT IT TYPICALLY RESTORES

11   INFORMATION REGARDING IMAGES AND VIDEOS?

12   A.   IT CAN.

13   Q.   NOW, WHAT DID YOU RECOVER THAT WAS RELEVANT TO THIS

14   INVESTIGATION?

15   A.   ICQ CHAT LOGS WERE PRESENT.

16   Q.   AND WHEN YOU SAY "CHAT LOGS," WHAT DO YOU MEAN BY THAT?

17   A.   THERE WERE CHAT SESSIONS THAT HAD BEEN SAVED ON THE HARD

18   DRIVE THAT WERE RECOVERABLE BY LAUNCHING AN ICQ PROGRAM.

19   Q.   AND APPROXIMATELY HOW MANY DIFFERENT PEOPLE WERE IN THE

20   CHAT LOGS?

21   A.   IN THE MID TWENTIES.

22   Q.   SO WERE THERE APPROXIMATELY 20?  IS THAT THE NUMBER OF

23   CHAT LOGS YOU FOUND BASED ON THE NUMBER OF USERS?

24   A.   YES.

25   Q.   AND WERE THESE CHAT LOGS PREVIOUSLY AVAILABLE TO YOU

1    WHEN YOU DID YOUR REVIEW WITH THE ENCASE?

2    A.   NO.

3    Q.   WHEN YOU RAN THE RESTORE POINT, WERE THEY THEN AVAILABLE

4    TO YOU?

5    A.   YES.

6    Q.   NOW, WHEN YOU FOUND THESE ICQ DATA FILES, WERE YOU ABLE

7    TO READ THEM RIGHT AWAY OR DID YOU HAVE TO CONVERT THEM INTO

8    A READABLE FORMAT?

9    A.   I NEEDED TO RUN A PROGRAM TO READ THEM.

10   Q.   AND WHAT PROGRAM DID YOU RUN THAT ALLOWED YOU TO READ

11   THEM?

12   A.   THE DEFENDANT'S ICQ PROGRAM.

13   Q.   NOW, YOU SAID, "THE DEFENDANT'S ICQ PROGRAM."  WHAT DO

14   YOU MEAN BY THAT?

15   A.   I WAS USING A COPY OF HIS HARD DRIVE, SO ALL THE

16   PROGRAMS AND DATA WERE MADE INTO THAT HARD DRIVE.

17   Q.   SO WERE YOU USING THE SAME ICQ PROGRAM THAT DEFENDANT

18   WOULD HAVE USED --

19   A.   YES.

20   Q.   -- ON HIS OWN LAPTOP COMPUTER?

21   A.   YES.

22   Q.   AND WHEN YOU CONVERTED THOSE DATA FILES, WERE THEY

23   READABLE?

24   A.   YES.

25   Q.   AND DID THEY APPEAR TO BE LOGICAL?

1   A.   YES.

2   Q.   LOGICAL CONVERSATIONS?

3   A.   YES.

4   Q.   AND THE DATES AND TIMES, WERE THEY IN SEQUENCE?

5   A.   YES.

6   Q.   WHAT SCREEN NAME DID IT APPEAR THAT DEFENDANT HAD USED

7   FOR THESE ICQ CHATS?

8   A.   PEI.

9   Q.   AND DID YOU REVIEW THESE?

10  A.   YES.

11  Q.   DID THEY APPEAR TO BE RELEVANT, THE SUBSTANCE OF THEM,

12  THESE CHAT LOGS, TO THE INVESTIGATION?

13  A.   YES.

14  Q.   AND WHEN YOU CONVERTED THEM, DID YOU EVER EDIT THE

15  SUBSTANCE OR CONTENT OF THEM?

16  A.   NO.

17  Q.   WERE THEY EXACTLY AS THEY EXISTED ON THE DEFENDANT'S

18  HARD DRIVE AS OF MAY 29TH, 2001?

19  A.   YES.

20  Q.   AND WHAT IS THAT DATE AGAIN?

21  A.   THAT WAS THE DATE OF THE RESTORE POINT CREATION.

22  Q.   SO THE CONTENT OF THE CHATS WOULD HAVE BEEN THE SAME?

23  A.   YES.

24  Q.   WHAT DID YOU DO WITH THESE CHAT LOGS AFTER YOU FOUND

25  THEM AND REVIEWED THEM?

1    A.   I COPIED THEM OUT, PUT THEM ON A COMPACT DISK, AND

2    SUPPLIED THEM TO THE CASE AGENT.

3    Q.   I'M GOING TO DIRECT YOUR ATTENTION TO EXHIBIT 3 WHICH IS

4    A BLACK BINDER WHICH SHOULD BE UP THERE.

5              DO YOU HAVE EXHIBIT 3 IN FRONT OF YOU?

6    A.   YES.

7    Q.   HAVE YOU HAD AN OPPORTUNITY TO REVIEW THIS EXHIBIT

8    BEFORE?

9    A.   YES.

10             THE COURT:  MR. MICHAEL, PLEASE SLOW DOWN.

11             MR. MICHAEL:  YES, YOUR HONOR.

12   BY MR. MICHAEL:

13   Q.   WHAT IS IN THIS EXHIBIT?

14   A.   THESE ARE EXCERPTS FROM CHAT SESSIONS THAT HAVE BEEN

15   RECOVERED FROM THE RESTORE POINT.

16   Q.   AND ARE THESE THE CHAT SESSIONS THAT YOU WERE JUST

17   TESTIFYING ABOUT?

18   A.   YES.

19   Q.   AND HAVE YOU REVIEWED THESE EXCERPTS THAT ARE ON

20   EXHIBIT 3?

21   A.   YES.

22   Q.   DO THEY ACCURATELY REFLECT CHATS THAT YOU RECOVERED AND

23   PROVIDED TO THE CASE AGENTS?

24   A.   YES.

25   Q.   YOU CAN SET THAT EXHIBIT ASIDE.

```
 1            IN ADDITION TO ICQ, WHAT ELSE OF NOTE DID YOU
 2   RECOVER DURING THE INVESTIGATION AFTER YOU RAN THE RESTORE
 3   POINT PROGRAM?
 4   A.   I WAS ABLE TO SEE HOW THE DEFENDANT'S OPERATING SYSTEM
 5   APPEARED, WHAT RECENT FILES HAD BEEN USED AND WHAT OTHER
 6   ACTIVITIES HAD TAKEN PLACE THAT AREN'T AS READILY AVAILABLE
 7   TO SEE WITH ENCASE.
 8   Q.   AND WHAT, IF ANYTHING, DID YOU CREATE TO DOCUMENT THAT?
 9   A.   AS I WAS MOVING THROUGH THE HARD DRIVE EXAMINATION, I
10   WOULD CREATE A SCREEN CAPTURE OR SCREENSHOT OF WHAT WAS ON
11   THE SCREEN AS I SAW IT.
12   Q.   AND JUST IN LAYPERSON'S TERMS, WHAT DOES THAT MEAN,
13   "SCREENSHOT" OR "SCREEN CAPTURE"?
14   A.   BASICALLY MADE A PICTURE OF WHAT WAS ON THE SCREEN.
15   Q.   AND WHAT DID YOU DO WITH THOSE PICTURES?
16   A.   I SAVED THOSE TO A COMPACT DISK AND SUPPLIED THOSE TO
17   THE CASE AGENT.
18   Q.   IF YOU CAN LOOK AT WHAT'S BEEN MARKED AS EXHIBIT 107,
19   PLEASE.  WHAT IS EXHIBIT 107?
20   A.   107 IS A COMPACT DISK WHICH SAYS, "SCREENSHOTS FROM
21   RESTORED HARD DRIVE."
22   Q.   ARE THESE THE SCREENSHOTS THAT YOU JUST TESTIFIED ABOUT?
23   A.   YES.
24   Q.   AND HOW DO YOU KNOW THAT THEY'RE ON THIS DISK?
25   A.   I CREATED THE DISK.
```

1    Q.    HAVE YOU HAD AN OPPORTUNITY TO REVIEW THIS DISK BEFORE

2    YOUR TESTIMONY TODAY?

3    A.    YES.

4            MR. MICHAEL:    YOUR HONOR, THE GOVERNMENT MOVES TO

5    ADMIT EXHIBIT 107.

6            THE COURT:    ANY OBJECTIONS TO 107?

7            MR. AARON:    NONE.

8            THE COURT:    THANK YOU.    EXHIBIT 107 IS ORDERED

9    ADMITTED AND YOU MAY PUBLISH.

10   BY MR. MICHAEL:

11   Q.    AGENT MORAN, MY LAST SERIES OF QUESTIONS HERE ARE JUST

12   ABOUT THE SCREENSHOTS.    I'M GOING TO PUBLISH ONE OF THOSE

13   SCREENSHOTS FOR YOU THAT ARE ON DISK 107.

14           WHAT DOES THIS SCREENSHOT SHOW, AGENT MORAN?

15   A.    THIS DEPICTS BESTCRYPT DECRYPTION/ENCRYPTION PROGRAM

16   WITH A FILE BY THE NAME OF PRIVATE1.JBC WHO IS DESCRIBED AS

17   "FRIENDS" AND SHOWS THE ENCRYPTION "ALGORITHM" AND "CHEAP

18   GENERATION."

19   Q.    WOULD THIS INDICATE TO YOU WHETHER OR NOT THIS ENCRYPTED

20   CONTAINER WAS AVAILABLE TO THE USER ON THE LAPTOP?

21   A.    YES.

22   Q.    WOULD THIS HAVE BEEN HOW THE USER COULD HAVE ACCESSED

23   IT?

24   A.    YES.

25   Q.    THE NEXT SCREENSHOT, PLEASE.    THERE APPEARS TO BE A

1    HEADER OR AN ITEM CALLED "DOCUMENTS" THAT'S HIGHLIGHTED, AND

2    THEN IT HAS SEVERAL ITEMS THAT APPEAR TO BE COMING OFF OF IT.

3          WHAT DOES THIS DEPICT?

4    A.    THIS IS THE MOST RECENT DOCUMENTS THAT HAVE BEEN

5    ACCESSED BY THE COMPUTER.

6    Q.    AND IF YOU LOOK TO THE BOTTOM ITEMS LISTED THERE, NOT

7    THE VERY LAST ONE BUT THE THREE RIGHT ABOVE IT, WHAT DO THEY

8    INDICATE?

9    A.    "SETH LETTER" WAS ACCESSED THROUGH INTERNET EXPLORER,

10   THAT LITTLE "E".  "SETH LETTER" WAS ACCESSED WITH WORD.

11   Q.    AND WHAT WAS THE ACCESS RIGHT ABOVE THAT?

12   A.    PRIVATE1, WHICH IS THE JETICO BESTCRYPT ENCRYPTED

13   CONTAINER.

14   Q.    THE NEXT SCREENSHOT, PLEASE.  AND WHAT DOES THIS

15   REFLECT?

16   A.    THESE ARE THE MOST RECENTLY USED PROGRAMS ON THE

17   COMPUTER.

18   Q.    AND WHAT PROGRAMS DOES IT INDICATE WERE THE MOST

19   RECENTLY USED PROGRAMS?

20   A.    BESTCRYPT, THE FILE ENCRYPTION, ICQ, THE CHAT LOG, SOME

21   PICTURES, GAMES.

22   Q.    IF YOU CAN GO DOWN TO THE -- ONE, TWO, THREE, FOUR,

23   FIVE, SIX -- SEVENTH ITEM, WHAT IS THAT?

24   A.    UNSENSOREDNEWS.COM IS A WAY TO ACCESS NEWSGROUPS.

25   Q.    WOULD THAT BE A WAY TO ACCESS THE TYPES OF NEWSGROUPS

```
 1    YOU PREVIOUSLY TESTIFIED ABOUT?

 2    A.   YES.

 3    Q.   NEXT SCREENSHOT, PLEASE.  WHAT DOES THIS SHOW?

 4    A.   THIS IS THE EVIDENCE ELIMINATOR PROGRAM, AND IT SAYS,

 5    "YOU CANNOT ELIMINATE EVIDENCE FROM HIDDEN DISK AREAS," AND

 6    THEN IT LISTS THE DRIVES.

 7    Q.   AND WHAT DRIVES IS IT SET TO?

 8    A.   C DRIVE AND D DRIVE.

 9    Q.   AND ARE THOSE DRIVES THAT YOU PREVIOUSLY TESTIFIED HAD A

10    LOT OF THE TYPES OF IMAGE AND VIDEO FILES THAT YOU SAW OTHER

11    INFORMATION ABOUT ON THE COMPUTER?

12    A.   YES.

13    Q.   THE NEXT SCREENSHOT, PLEASE.  WHAT DOES THIS SHOW?

14    A.   THIS SHOWS FILES THAT WERE RECEIVED FROM CROW18.

15    Q.   AND THROUGH WHAT PROGRAM WERE THEY RECEIVED?

16    A.   THIS WAS DONE THROUGH THE ICQ PROGRAM.

17    Q.   AND WHAT ARE THE NAMES OF THE FILES IN THOSE?

18    A.   THERE IS A PHOTOGRAPH OF 12ARILEY, ASIA2, AND RILEY1.

19    Q.   WHAT DOES ASIA2 DEPICT?

20    A.   ASIA2 IS A MOVIE THAT WAS PREVIOUSLY SHOWN.

21    Q.   IS THAT THE VIDEO OF SUSPECTED CHILD PORNOGRAPHY THAT

22    YOU TESTIFIED ABOUT?

23    A.   YES.

24    Q.   WOULD THAT HAVE BEEN EXHIBIT 132 --

25    A.   YES.
```

1   Q.   -- OR IF YOU DON'T RECALL PERHAPS.

2           MOVING ON TO THE NEXT SCREENSHOT, WHAT DOES THIS

3   SHOW?

4   A.   THIS SHOWS AT THE VERY TOP THE CROW18 USER.  WE HAVE THE

5   HISTORY AND WE HAVE INCOMING FILES.

6   Q.   AND IS THAT IN CONNECTION WITH THE ICQ CHAT PROGRAM?

7   A.   YES, IT IS.

8   Q.   AND WOULD THAT SHOW THAT THERE HAVE BEEN COMMUNICATIONS

9   THROUGH ICQ WITH CROW18?

10  A.   THAT'S CORRECT.

11  Q.   NEXT SCREENSHOT, PLEASE.  WHAT DOES THIS INDICATE?

12  A.   THIS INDICATES ACCESS TO PRIVATE1 FILE FOLDER SAVED AS A

13  FAVORITE THROUGH HIS INTERNET EXPLORER.

14  Q.   SO PREVIOUSLY YOU TESTIFIED THAT INTERNET EXPLORER HAD

15  BEEN USED TO ACCESS PRIVATE1.  DOES THIS SHOW THAT OR DOES --

16  LET ME REPHRASE THAT.  WHAT DOES THIS SHOW WITH REGARD TO HOW

17  INTERNET EXPLORER WAS USED IN CONNECTION WITH PRIVATE1?

18  A.   IT COULD BE JUST CLICKED ON TO GET ACCESS.

19  Q.   AND PRIVATE1 WAS SAVED AS WHAT?

20  A.   THIS IS IN HIS FAVORITES FOLDER.

21  Q.   WHAT DOES THAT MEAN, "FAVORITES FOLDER"?

22  A.   IT'S AN AREA WHERE YOU SELECT COMMONLY OR FREQUENTLY

23  VISITED AREAS SO YOU DON'T HAVE TO TYPE IN THE WEB ADDRESS OR

24  FILE LOCATION.  YOU CAN JUST CLICK ON IT AND GO TO IT.

25  Q.   NOW, THERE ARE ALSO WEB SITES IN THIS FAVORITES FOLDER?

1   A.   YES.

2   Q.   AND IF YOU CAN GO DOWN TO WHAT APPEARS TO BE THE SECOND

3   WEB SITE, WHAT IS IT CALLED, PLEASE?

4   A.   THIS ONE IS CHUBBYTEENBOYPARADISE.

5   Q.   NEXT SCREENSHOT, PLEASE.  AND WHAT DOES THIS SCREENSHOT

6   SHOW?

7   A.   A DIFFERENT VIEW OF THE SAME INFORMATION.

8   Q.   AND IT LOOKS LIKE CHUBBYTEENBOYPARADISE IS HIGHLIGHTED;

9   IS THAT CORRECT?

10  A.   THAT'S CORRECT.

11  Q.   AND THIS ALSO SHOWS THAT PRIVATE1 WAS A FAVORITE SET ON

12  THE LAPTOP COMPUTER?

13  A.   CORRECT.

14  Q.   NEXT SCREENSHOT.  WHAT IS THIS NEXT SCREENSHOT?

15  A.   URBAN VIEW IS THE PROGRAM.  IT'S AN IMAGE VIEWER AND IT

16  SHOWS MOST RECENTLY USED DIRECTORIES, AND WITHIN THAT YOU SEE

17  THE FAMILY ALBUM AND OTHER FOLDERS.

18  Q.   WHAT ARE THE NAMES OF THE OTHER ALBUMS?

19  A.   DNYTRIP, 100_FUJI, EFAMILY ALBUM, 100_FUJI, GEXCEL,

20  A SETH LETTER FILES.

21  Q.   AND WHAT'S THE ONE BENEATH IT?

22  A.   THE BOTTOM ONE SAYS, "GLLOYD AND DEAN TAPE."

23  Q.   NOW, THE OTHER INFORMATION THAT'S IN THE SQUARE BOX

24  ABOVE IT, IS THAT INFORMATION YOU PREVIOUSLY TESTIFIED ABOUT?

25  A.   (NO AUDIBLE RESPONSE).

1    Q    AND WHAT IS THAT INFORMATION WHERE IT STARTS "GANNY

2    LETTER"?

3    A.   YES, THAT'S A REMNANT FROM THE MOST RECENTLY USED

4    DOCUMENTS.

5    Q.   DOES THAT INCLUDE PRIVATE1 AND SETH LETTER?

6    A.   YES.

7    Q.   NEXT SCREENSHOT.  WHAT DOES THIS SCREENSHOT SHOW?

8    A.   THIS SHOWS THE WINDOWS MEDIA PLAYER, AND BY CLICKING ON

9    THE FILE IT SHOWS A RECENTLY VIEWED VIDEO THAT, IN THIS

10   INSTANCE, WAS ANDY VIDEO SAVED TO THE D DRIVE.

11   Q.   AND WHAT OTHER INFORMATION IS THERE ABOUT THE ANDY

12   VIDEO, ABOUT ITS LENGTH OF TIME?

13   A.   IT SAYS, "28 MINUTES, 16 SECONDS."

14   Q.   AND THEN THE MPG, WHAT DOES THAT INDICATE?

15   A.   A MOVIE FILE.

16   Q.   NEXT SCREENSHOT, PLEASE.  WHAT DOES THIS INDICATE?

17   A.   THIS IS THE DELETED MEDIA, AND IT SHOWS A FILE BY THE

18   NAME OF BOY01011Y FROM CROW17 FOLDER.

19   Q.   NEXT SCREENSHOT, PLEASE.  AND WHAT DOES THIS SCREENSHOT

20   SHOW?

21   A.   THIS SHOWS MICROSOFT MESSENGER.  IT IS THE ACCOUNT

22   INFORMATION SHOWING THE DEFENDANT'S HOTMAIL ADDRESS.

23   Q.   WHAT IS THE SCREEN NAME?

24   A.   THE ADDRESS HERE IS PEI314@HOTMAIL.COM.

25   Q.   NEXT SCREENSHOT, PLEASE.  ARE WE BACK AT THE BEGINNING

1    NOW?

2    A.    YEAH, I BELIEVE SO.

3    Q.    THESE SCREENSHOTS REFLECT -- DO THESE SCREENSHOTS

4    REFLECT ACTIVITY ON THE COMPUTER AT OR AROUND THE TIME OF

5    MAY 29TH, 2001?

6    A.    YES.

7              MR. MICHAEL:  NO FURTHER QUESTIONS, YOUR HONOR.

8              THE COURT:  THANK YOU.

9              MR. AARON, CROSS-EXAMINATION.

10                     CROSS-EXAMINATION

11    BY MR. AARON:

12    Q.    GOOD MORNING, SIR.

13    A.    GOOD MORNING.

14    Q.    HOW MANY TIMES ALTOGETHER DID YOU EXAMINE MR. SANDERS'

15    LAPTOP COMPUTER?

16    A.    APPROXIMATELY A DOZEN.

17    Q.    BEGINNING IN 2001, RIGHT?

18    A.    THAT'S CORRECT.

19    Q.    AND IN THIS CASE YOU WROTE TWO REPORTS?

20    A.    THREE ACTUALLY.

21    Q.    THERE'S ONE DATED 8/2/06, RIGHT?

22    A.    I DON'T HAVE THE DATES MEMORIZED.  I'M SORRY.

23    Q.    DO YOU REMEMBER THE NUMBERS IN SEQUENCE WHEN YOU WROTE

24    THEM?

25    A.    YES.

```
 1    Q.    OKAY.  AND THERE ARE THREE?

 2    A.    YES.

 3    Q.    YOUR REPORT NO. 14?

 4    A.    14.

 5    Q.    REPORT NO. 37?

 6    A.    CORRECT.

 7    Q.    AND REPORT NO. 39?

 8    A.    26.

 9    Q.    AGAIN, WHAT WAS THAT?

10    A.    I BELIEVE IT'S 26.

11    Q.    DID YOU WRITE A REPORT NO. 39?

12    A.    NOT THAT I KNOW OF.

13          MR. AARON:  MAY I APPROACH, YOUR HONOR?

14          THE COURT:  YOU MAY.

15    BY MR. AARON:

16    Q.   I'M GOING TO SHOW YOU SOME DOCUMENTS TO REFRESH YOUR

17    RECOLLECTION.  JUST TAKE A LOOK AT THE FIRST PAGE OF EACH AND

18    LET US KNOW WHEN YOU'RE DONE.

19          ARE YOU DONE?

20    A.    YES.

21    Q.    OKAY.  SIR, DOES THAT REFRESH YOUR RECOLLECTION --

22    A.    YES.

23    Q.    -- WHICH REPORTS YOU WROTE AND APPROXIMATELY WHEN YOU

24    WROTE THEM?

25    A.    YES.
```

1   Q.    SO YOU WROTE A REPORT NO. 14?

2   A.    I'M TRYING TO REMEMBER.

3   Q.    DO YOU WANT TO LOOK AT IT AGAIN, SIR?

4   A.    SURE.

5           MR. AARON:  MAY I APPROACH AGAIN, YOUR HONOR?

6           THE COURT:  YOU MAY.

7   BY MR. AARON:

8   Q.    LET ME JUST SHOW YOU ONE AT A TIME.  IF YOU WOULD TAKE A

9   LOOK AT THAT AND LET US KNOW WHEN YOU'RE DONE.

10  A.    OKAY.

11  Q.    ARE YOU DONE?

12  A.    YES.

13  Q.    DOES THAT REFRESH YOUR RECOLLECTION ABOUT WRITING REPORT

14  NO. 14?

15  A.    YES.

16  Q.    AND THAT WAS ABOUT IN APRIL OF '02?

17  A.    CORRECT.

18  Q.    AND THEN YOU WROTE A REPORT NO. 37, SHOWING YOU THE

19  DOCUMENT TO REFRESH YOUR RECOLLECTION?

20  A.    YES.

21  Q.    IS THAT RIGHT, YOU WROTE A REPORT NO. 37?

22  A.    YES.

23  Q.    AND THAT WAS IN AUGUST OF '06?

24  A.    YES.

25  Q.    AND THEN LASTLY YOU WROTE A REPORT NO. 39?

1    A.    YES.

2    Q.    DOES THAT REFRESH YOUR RECOLLECTION?

3    A.    YES.

4    Q.    AND DID YOU, IN FACT, WRITE A REPORT NO. 39?

5    A.    YES.

6    Q.    AND WAS THAT IN APRIL OF '07?

7    A.    YES.

8    Q.    WHEN YOU DID THESE FORENSIC EXAMINATIONS ON -- EACH OF

9    THE DOZEN TIMES THAT YOU EXAMINED MY CLIENT'S COMPUTER WAS A

10   FORENSIC EXAMINATION, RIGHT?

11   A.    YES.

12   Q.    AND YOU TOOK NOTES, RIGHT?

13   A.    SOMETIMES, YES.

14   Q.    ARE YOU SAYING ON OCCASION YOU EXAMINED HIS COMPUTER

15   FORENSICALLY AND DIDN'T TAKE ANY NOTES?

16   A.    YES.

17   Q.    SOMETIMES YOU WOULD INCORPORATE YOUR NOTES INTO ONE OR

18   MORE OF THE REPORTS?

19   A.    YES.

20   Q.    BUT YOU DIDN'T WRITE A SEPARATE REPORT EACH EXAMINATION?

21   A.    THAT'S CORRECT.

22   Q.    AND WHAT DID YOU DO WITH YOUR NOTES?

23   A.    I MAINTAINED THEM IN THE CASE FILE.

24   Q.    DID YOU GIVE THEM TO THE PROSECUTORS?

25   A.    I HAVE SUBMITTED THEM THROUGH THE CASE AGENT TO THE

1    PROSECUTOR.

2    Q.    YOU SOUND A LITTLE HESITANT.  YOU PUT THE NOTES IN YOUR

3    CASE FILE, RIGHT?

4    A.    YES.

5    Q.    AND YOU GAVE THE CASE FILE TO THE AGENT ON THE CASE,

6    AGENT MORENO?

7    A.    YES.

8    Q.    DO YOU KNOW -- AND IF YOU DON'T KNOW, IT'S OKAY, BUT DO

9    YOU KNOW IF HE GAVE THOSE TO THE GOVERNMENT?

10   A.    I DON'T KNOW, BUT I BELIEVE HE DID, YES.

11   Q.    AND ABOUT HOW MANY NOTES WERE THOSE, LIKE HOW MANY

12   PAGES?

13   A.    APPROXIMATELY TEN.

14   Q.    THOSE WERE HANDWRITTEN NOTES?

15   A.    YES.

16   Q.    AND WERE THOSE DEALING WITH A VARIETY OF THE

17   EXAMINATIONS THAT YOU DID?

18   A.    YES.

19   Q.    NOW, IN 2001 WINDOWS HAD A RESTORE FUNCTION, RIGHT?

20   A.    YES.

21   Q.    BUT YOU DIDN'T DO THE EXAMINATION BY MEANS OF THE

22   RESTORE FUNCTION IN 2001, DID YOU?

23   A.    NO, I DID NOT.

24   Q.    YOU ONLY DID THE EXAMINATION BY MEANS OF THE RESTORE

25   FUNCTION FIVE YEARS LATER, RIGHT?

1   A.   THAT'S CORRECT.

2   Q.   AND THAT WAS THE FIRST TIME THAT YOU USED THAT FUNCTION?

3   A.   YES.

4   Q.   WHAT I UNDERSTAND YOU TO BE SAYING IN YOUR TESTIMONY IS

5   THAT WE CANNOT RELY, WHEN WE LOOK AT THE ENCASE PRINTOUT, OR

6   I GUESS WHEN WE ACCESS ON OUR OWN COMPUTERS WHEN WE ACCESS

7   WINDOWS, WE CAN'T RELY ON THE ACCURACY OF THE DATE CREATED OR

8   THE DATE WRITTEN OR THE ACCESS DATE?

9   A.   NOT ALWAYS.

10   Q.   IF I COULD DIRECT YOU TO EXHIBIT NO. 105, IF YOU CAN

11   TAKE A LOOK AT -- IT'S IN THE "ADDITIONAL PHOTOS" SECTION AND

12   IT'S PHOTOS 64 THROUGH 66.

13   A.   I HAVE IT.

14   Q.   GENERALLY SPEAKING, WE WOULD EXPECT THE DATE CREATED,

15   THE FILE DATE CREATED, TO BE THE EARLIEST OF DATES, RIGHT?

16   LET ME REPHRASE THAT.  THE DATE CREATED IS THE DATE THAT THE

17   IMAGE OR THE FILE LANDED ON THE HARD DRIVE, RIGHT?

18   A.   YES.

19   Q.   AND AFTER THAT IF IT'S BEEN WRITTEN OR ALTERED, THERE

20   WOULD BE LATER DATES, RIGHT?

21   A.   FOR THE LAST WRITTEN.

22   Q.   RIGHT, OR LAST ACCESSED?

23   A.   CORRECT.

24   Q.   FOR ANYTHING THAT HAPPENED AT A LATER DATE?

25   A.   THAT'S CORRECT.

1    Q.    BUT IN THESE IMAGES HERE, 64, 65, 66 AND OTHER IMAGES IN

2    THE ADDITIONAL PHOTOS, WE SEE AN EARLIER DATE FOR LAST

3    WRITTEN THAN WE DO FOR CREATED, RIGHT?

4    A.    THAT'S CORRECT.

5    Q.    AND THAT'S ONE OF THE REASONS WHY YOU BELIEVE YOU CANNOT

6    RELY ON THESE DATES?

7    A.    NO, THAT'S JUST A FUNCTION OF HOW WINDOWS KEEPS TRACK OF

8    THEIR TIMES AND DATES.

9    Q.    WE TALKED A LITTLE BIT ABOUT -- IN THAT SAME EXHIBIT

10   AND IN THAT SAME SECTION WE TALKED A LITTLE BIT ABOUT

11   EXHIBIT NO. 12.  I'M SORRY.  NOT EXHIBIT NO. 12.  I MISSPOKE.

12   PHOTO NO. 12 IN EXHIBIT NO. 105.

13   A.    I HAVE THAT.

14   Q.    NOW, YOU MENTIONED -- YOU RESPONDED "YES" TO A QUESTION

15   THAT THE PROSECUTOR ASKED YOU, AND THE QUESTION WAS -- I

16   FORGOT THE FIRST PART OF THE QUESTION.  PERHAPS YOU CAN HELP

17   ME.  IT WAS SOMETHING TO THE EFFECT OF "AND THIS REPRESENTS A

18   TRUE EVENT," AND YOU SAID, "YES."

19            DO YOU REMEMBER THAT QUESTION AND ANSWER?

20   A.    YES.

21   Q.    I HAD TROUBLE HEARING.  WHAT WAS THE FIRST PART OF THAT

22   QUESTION?

23   A.    I DON'T REMEMBER.  I'M SORRY.

24   Q.    WHEN YOU SAID "YES," WHAT DID YOU MEAN TO SAY?

25   A.    THAT AN ACTUAL EVENT WAS LOGGED THROUGH THE USE OF THESE

1    PHOTOS.

2    Q.    I'M SORRY.  CAN YOU EXPLAIN THAT?

3    A.    SURE.  AN ACTUAL EVENT HAD OCCURRED, AND THESE WERE THE

4    TIME AND DATE STAMPS THAT WERE CREATED WHEN THAT ACTUAL EVENT

5    OCCURRED.

6    Q.    BUT YOU DON'T KNOW WHETHER OR NOT THOSE DATES ARE

7    ACCURATE?

8    A.    THAT'S CORRECT.

9    Q.    IT COULD BE THAT THE TIME -- YOU HAD SPECULATED THAT THE

10   A.M./P.M. SETTING WAS OFF?

11   A.    THAT'S CORRECT.

12   Q.    AND YOU SPECULATED THAT THEY WERE INVERTED?

13   A.    THAT'S CORRECT.

14   Q.    AND WHEN IT SAYS "P.M.," IT REALLY MEANS "A.M."?

15   A.    THAT'S CORRECT.

16   Q.    BUT THAT'S SPECULATION ON YOUR PART?

17   A.    YES, IT IS.

18   Q.    THERE'S NO WAY FOR YOU TO CONFIRM THAT, RIGHT?

19   A.    NO, THERE ISN'T.

20   Q.    IT'S POSSIBLE THAT THE TIME AND DATE HERE ARE SIMPLY

21   WRONG?

22   A.    YES.

23   Q.    YOU SAID THAT YOU HAD EXAMINED MR. SANDERS' COMPUTER AND

24   THAT THE TIME WAS ACCURATE TO WITHIN A FEW MOMENTS AND THE

25   DATE WAS ACCURATE.

1    A.    YES.

2    Q.    THERE IS NO SETTING ON WINDOWS UP TO WINDOWS XP WHICH

3    TELLS YOU WHEN THE TIME AND DATE WAS SET, IS THERE?

4    A.    I'M SORRY?

5    Q.    THERE'S NO SETTING WHICH TELLS YOU THAT, YES, THE

6    COMPUTER ON THIS DATE HAD THE TIME AND DATE SET TEN MINUTES

7    AGO OR AN HOUR AGO?

8    A.    THAT'S CORRECT.

9    Q.    SO IF YOU WENT ON MY COMPUTER RIGHT NOW AND LOOKED AT

10   THE TIME AND DATE, YOU WOULDN'T KNOW IF I HAD SET IT RIGHT

11   WHEN I WAS LISTENING TO YOUR DIRECT EXAMINATION OR IF I SET

12   IT A YEAR AGO?

13   A.    THAT'S CORRECT.

14   Q.    SO WHEN YOU EXAMINED MR. SANDERS' COMPUTER, ALL YOU CAN

15   TELL US IS THAT IT HAD THE CORRECT TIME AND DATE

16   APPROXIMATELY, BUT YOU DON'T KNOW WHEN THAT WAS SET?

17   A.    THAT'S CORRECT.

18              MR. AARON:  YOUR HONOR, DOES THE COURT WANT ME TO

19   PROCEED?

20              THE COURT:  DO YOU HAVE A FEW MORE QUESTIONS?

21              MR. AARON:  I PROBABLY WOULD NOT BE ABLE TO FINISH

22   BEFORE THE COURT WANTED TO BREAK.

23              THE COURT:  THAT'S FINE.

24              WE WILL RECESS UNTIL 1:15 THIS AFTERNOON, LADIES

25   AND GENTLEMEN.  AND AGAIN, PLEASE REMEMBER EVERYTHING I HAVE

1   ADMONISHED YOU ABOUT ALREADY DURING THIS TRIAL, NOT TO FORM

2   ANY OPINIONS ABOUT THE CASE, NOT TO MAKE UP YOUR MINDS IN ANY

3   FASHION ABOUT IT, NOT TO DISCUSS ANYTHING THAT'S OCCURRED IN

4   THE COURTROOM, NOT TO DISCUSS ANY OF THE EVIDENCE OR ANYTHING

5   RELATED TO THE TRIAL OR ANY OF THE PARTICIPANTS IN THE

6   TRIAL.  THANK YOU VERY MUCH FOR YOUR PATIENCE AND ATTENTION.

7   WE WILL SEE YOU BACK AT 1:15.

8              (OUT OF THE PRESENCE OF THE JURY:)

9         THE COURT:  YOU MAY STEP DOWN.

10        THE WITNESS:  THANK YOU, YOUR HONOR.

11        THE COURT:  WE HAVE TWO ISSUES -- WE ARE ON RECORD

12   OUTSIDE THE PRESENCE OF THE JURY.  WE HAVE TWO ISSUES TO TAKE

13   UP WITH RESPECT TO THE EXAMINATION OF MR. MARTIN.  ONE ISSUE

14   IS THE PROPOSED CROSS-EXAMINATION OF MR. MARTIN ON THE

15   SUBJECT OF THE NATURE OF THE SENTENCE THAT HE COULD FACE IF

16   HE WAS CONVICTED ON CHARGES OF AIDING AND ABETTING THE

17   DEFENDANT IN THIS CASE OF WHAT'S CHARGED -- WELL, OF

18   TRAVELING ACROSS STATE LINES TO SEXUALLY ASSAULT A MINOR AND

19   WHAT'S CHARGED IN COUNT 4, IN THIS CASE, THE SEXUAL ASSAULT

20   OF A MINOR.  AND THE DEFENSE SEEKS TO CROSS-EXAMINE HIM ON

21   THAT SUBJECT ON THE BASIS THAT THE WITNESS'S UNDERSTANDING

22   REGARDING THE BENEFIT CONFERRED ON HIM VIA THE IMMUNITY

23   AGREEMENT GOES TO THIS WITNESS'S POTENTIAL BIAS, MOTIVE, AND

24   INTEREST.

25             IS THAT A CORRECT SUMMARY OF YOUR POSITION?

1          MR. AARON:  IT IS.

2          THE COURT:  ALL RIGHT.  AND THE GOVERNMENT'S

3   POSITION -- THE GOVERNMENT OPPOSES THIS PROPOSED

4   CROSS-EXAMINATION ON THE BASIS THAT IT WOULD BE IMPROPER FOR

5   THE JURY TO CONSIDER THE SUBJECT OF PUNISHMENT AND THAT THE

6   DEFENSE'S PROPOSED CROSS-EXAMINATION ON THIS SUBJECT, IN THE

7   WORDS OF COUNSEL FOR THE GOVERNMENT, WOULD BE AN INVITATION

8   FOR THE JURY TO ENGAGE IN JURY ALTERCATION, THAT IS BECAUSE

9   ACCORDING TO GOVERNMENT COUNSEL, IF THE JURY IS INFORMED OF

10  THE POTENTIAL SENTENCE THAT ACCOMPANIES THESE TYPES OF

11  CHARGES, THEY WOULD BE RELUCTANT TO CONVICT.

12         I WOULD ALSO POINT OUT THAT ON FRIDAY DURING THE

13  GOVERNMENT'S EXAMINATION OF MR. MARTIN ON DIRECT, GOVERNMENT

14  COUNSEL INADVERTENTLY DISPLAYED TO THE JURY A PORTION OF ONE

15  OF THE CHATS THAT MENTIONED -- I THINK IT WAS THE DEFENDANT

16  WHO WAS STATING IN THE CHATS WHAT THE DEFENDANT BELIEVED

17  MR. BEKENSTEIN'S POTENTIAL SENTENCE WOULD BE ON CHARGES OF

18  POSSESSION OF CHILD PORNOGRAPHY, AND IT WAS INADVERTENTLY

19  DISPLAYED ON THE SCREEN FOR A VERY BRIEF TIME.

20         AND AT THE REQUEST OF COUNSEL FOR THE DEFENDANT,

21  THE COURT EXAMINED EACH OF THE JURORS AS TO WHETHER OR NOT

22  THEY HAD SEEN WHAT WAS DISPLAYED ON THE SCREEN, AND TWO OF

23  THE JURORS SAID THEY HAD, AND I ADMONISHED THEM ABOUT NOT

24  CONSIDERING ANYTHING LIKE THAT AND NOT CONSIDERING THE

25  SUBJECT OF PUNISHMENT IN DECIDING THE QUESTION OF WHETHER OR

1    NOT THE DEFENDANT WAS GUILTY ON THE COUNTS ON WHICH HE IS

2    CHARGED IN THIS CASE, AND THEY ASSURED THAT THEY WOULD BE

3    ABLE TO DO THAT.

4            NOW, ONE THING I HAVE CONSIDERED AS TO THIS ISSUE

5    IS TO PERMIT THE DEFENSE TO CROSS-EXAMINE THIS WITNESS IN

6    GENERAL TERMS ON THIS SUBJECT BY ASKING HIM IF HE HAS BEEN

7    INFORMED BY HIS LAWYER ABOUT WHAT THE POTENTIAL SENTENCE

8    IS FOR BOTH OF THOSE CHARGES, AND IF HE UNDERSTANDS THE

9    SERIOUSNESS OF THE CHARGES AND THAT HE WOULD BE FACING A

10   SENTENCE LONGER THAN WHAT HE RECEIVED IN CONNECTION WITH THE

11   CRIME FOR WHICH HE IS INCARCERATED NOW.  AND THAT IS, I

12   THINK, ANOTHER WAY TO DO IT, WHICH, I THINK, WOULD NOT BE A

13   -- WHICH I'M NOT INCLINED TO DO BUT WHICH IS ANOTHER

14   POSSIBILITY.

15           I GUESS IF I WAS PERSUADED BY THE DEFENSE'S

16   POSITION THAT THEY SHOULD BE ABLE TO FULLY CROSS-EXAMINE

17   THE WITNESS ABOUT HIS UNDERSTANDING ABOUT THE BENEFITS

18   CONFERRED, I WOULD BE MORE INCLINED TO THINK THAT THE COURT

19   SHOULD INSTRUCT THE JURY ABOUT THE -- WELL, THE PARTIES COULD

20   STIPULATE -- I MEAN, I KNOW THE GOVERNMENT IS NOT GOING TO

21   WAIVE ITS OBJECTION ABOUT THIS LINE OF QUESTIONING, BUT THE

22   PARTIES COULD STIPULATE AS TO WHAT THE STATUTORY MAXIMUM IS

23   AS TO THOSE TWO COUNTS, THE AIDING AND ABETTING CONVICTION.

24           IS THERE A MANDATORY MINIMUM ON EITHER?

25           MR. AKROTIRIANAKIS:  THERE IS NOT, YOUR HONOR.

1    I HAVE AN ADDITIONAL GROUND UPON WHICH I OBJECT TO THE LINE

2    OF CROSS-EXAMINATION.

3              THE COURT:  GO AHEAD.

4              MR. AKROTIRIANAKIS:  AS I UNDERSTAND IT -- I

5    UNDERSTAND THE COURT'S CHARACTERIZATION OF IT WITH WHICH

6    DEFENSE COUNSEL AGREED, THE IDEA IS THAT HE IS IMMUNIZED FROM

7    PROSECUTION, AND THAT'S IMPROPER BECAUSE IT'S AN UNFAIR AND

8    MISLEADING CHARACTERIZATION OF THE IMMUNITY AGREEMENT.

9              THE COURT:  HOW WOULD YOU CHARACTERIZE THE IMMUNITY

10   AGREEMENT?

11             MR. AKROTIRIANAKIS:  WELL, IT'S USE IMMUNITY WHICH

12   DOESN'T MEAN THAT HE CAN'T BE PROSECUTED.  IT MEANS THAT WHAT

13   HE SAYS CANNOT BE USED TO PROSECUTE HIM, WHAT HE SAYS HERE IN

14   COURT ON THE DAY OF HIS TESTIMONY.  HE CAN STILL BE

15   PROSECUTED; HOWEVER, HIS STATEMENTS CAN'T BE USED AGAINST HIM

16   IN THAT PROSECUTION.

17             I THINK THAT THAT CHANGES THE BALANCE IN A MATERIAL

18   WAY ON THIS POINT AND I THINK IT -- I'M NOT SAYING -- I'M

19   STILL NOT SAYING THAT THE GOVERNMENT IS HERE TO PROTECT

20   RANDALL MARTIN OR ANY OF THAT, BUT I DO THINK IF COUNSEL IS

21   GOING TO BE ALLOWED TO CROSS-EXAMINE THE WITNESS WITH THIS

22   DOCUMENT, THAT HE SHOULD BE REQUIRED TO FAIRLY CHARACTERIZE

23   THE DOCUMENT AND NOT TRY TO MISLEAD THE WITNESS WHO MAY NOT

24   HAVE SUCH A REFINED VIEW OR UNDERSTANDING OF THESE POINTS OF

25   LAW AND ALMOST CERTAINLY DOES NOT.

1           SINCE IT DOESN'T IMMUNIZE HIM FROM PROSECUTION FOR

2    THOSE CRIMES, I THINK WHATEVER PROBATIVE VALUE THERE IS IN

3    CROSS-EXAMINING HIM ABOUT WHAT THE POTENTIAL SENTENCES ARE

4    FOR CRIMES HE CAN YET BE PROSECUTED FOR IS NEGLIGIBLE AT

5    BEST.  I MEAN, I THINK THAT -- I'M NOT SAYING IT'S UNFAIR

6    TO CROSS-EXAMINE HIM USING THE DOCUMENT, BUT FAIRLY

7    CHARACTERIZING THE DOCUMENT WOULD --

8           THE COURT:  OF COURSE, BOTH SIDES HAVE TO INQUIRE

9    FAIRLY OF THE WITNESS, OR AT THE VERY LEAST THEIR OPPONENT IS

10   GOING TO POINT OUT IN THE NEXT EXAMINATION OR ON OBJECTION IT

11   WILL BE SUSTAINED ON THE FAIRNESS OF THE QUESTION.

12          MR. AARON:  I'M NOT SURE WHAT COUNSEL EXACTLY MEANS

13   BY INQUIRING UNFAIRLY OF THE WITNESS.  I DON'T HAVE A DUTY TO

14   ENHANCE MR. MARTIN'S CREDIBILITY OR TO MAKE HIM APPEAR TO BE

15   A GOOD PERSON OR AN HONEST PERSON.  IN FACT, MY DUTY IS THE

16   REVERSE, SO I VIEW IT AS, YES, I CAN --

17          THE COURT:  WELL, THE WAY I VIEW IT -- I'M SORRY.

18   I DON'T WANT TO TAKE UP TIME WITH THAT POINT, BECAUSE THE WAY

19   I VIEW IT IS IF THE QUESTION IS OBJECTIONABLE AND IF AN

20   OBJECTION IS MADE, I'LL SUSTAIN THE OBJECTION.  THAT'S MY

21   ROLE.

22          MR. AARON:  THE ISSUE THAT HE'S BEING GIVEN USE

23   IMMUNITY IS CORRECT.  THAT'S WHAT HE'S BEING GIVEN.  HE

24   TECHNICALLY COULD BE PROSECUTED FOR THESE CRIMES, BUT THE

25   DEAL THAT HE'S MADE WITH THE PROSECUTION IS THAT NONE OF THE

1    STATEMENTS HE MAKES HERE TODAY WILL BE USED -- CAN BE USED

2    IN THEIR CASE-IN-CHIEF.  SO, IN OTHER WORDS, HE CAN'T BE

3    PROSECUTED BASED ON ANYTHING TODAY.

4         THE COURT:  PARDON ME FOR INTERRUPTING, BUT IT'S

5    STILL -- OF COURSE IT'S STILL A BENEFIT THAT HE HAS USE

6    IMMUNITY AND IT'S STILL VERY RELEVANT TO THE CREDIBILITY OF

7    HIS TESTIMONY.

8         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

9         THE COURT:  SO, I MEAN, IT'S RELEVANT TO THE

10   COURT'S DECISION ABOUT HOW THIS PROBLEM SHOULD BE ADDRESSED.

11        MR. AKROTIRIANAKIS:  WELL, I MEAN, IF YOU THINK

12   ABOUT HOW THIS WOULD HAVE PLAYED OUT IN THE ABSENCE OF THE

13   IMMUNITY AGREEMENT, IF HE WAS ASKED THE QUESTIONS I ASKED

14   HIM, HE WOULD SIMPLY HAVE ASSERTED HIS FIFTH AMENDMENT

15   PRIVILEGE, I WOULD EXPECT, INSOFAR AS HE INTENDS TO ASSERT IT

16   TO THE OTHER QUESTIONS.  SO HE'S GIVEN USE IMMUNITY SAYING,

17   SAY THE TRUTH AND THESE THINGS WON'T BE USED AGAINST YOU, NOT

18   THAT NOBODY IS EVER GOING TO PROSECUTE YOU FOR AIDING AND

19   ABETTING AND SO ON AND SO FORTH.

20        THE NORTHERN DISTRICT OF TEXAS HAS ONLY AGREED NOT

21   TO PROSECUTE HIM FOR AIDING AND ABETTING COUNTS 3 AND 4, IF

22   YOU WILL, BASED ON THE TESTIMONY HE GIVES.  THEY'RE NOT

23   SAYING THEY'RE NOT GOING TO PROSECUTE HIM.  THEY'RE JUST

24   PROVIDING THIS SO THAT HE CAN -- WOULD NO LONGER HAVE THE

25   FIFTH AMENDMENT PRIVILEGE THAT HE WOULD OTHERWISE ASSERT IN

1    RESPONSE TO MY QUESTIONS.

2            I'M NOT SAYING THAT HE CAN'T -- THAT IT CAN'T IN

3    ANY WAY BE INQUIRED UPON.

4            THE COURT:  MR. AARON, LET ME ASK YOU THIS:  IF

5    YOU'RE GOING TO ASK HIM WHAT HIS UNDERSTANDING IS ABOUT THE

6    POTENTIAL SENTENCE HE FACES, ISN'T HE GOING TO -- WELL, THE

7    WITNESS ISN'T HERE, SO I CAN SAY THIS:  I MEAN, IT SEEMS TO

8    ME THAT HIS UNDERSTANDING IS GOING TO BE WHAT HIS ATTORNEY

9    TOLD HIM. WHICH HE'S NOT GOING TO TESTIFY TO.

10           MR. AARON:  NO, HE CAN TESTIFY TO THAT.

11           THE OTHER THING, YOUR HONOR --

12           THE COURT:  WELL, HE CAN, BUT HE DOESN'T HAVE TO

13   BECAUSE HE HAS ATTORNEY/CLIENT PRIVILEGE.

14           MR. AARON:  WELL, HIS UNDERSTANDING MIGHT BE

15   DIFFERENT THAN HIS ATTORNEY'S COMMUNICATIONS BECAUSE THE

16   INFORMATION --

17           THE COURT:  IF HE HAS ANY UNDERSTANDING APART FROM

18   WHAT HIS ATTORNEY TOLD HIM, HE CAN TESTIFY TO THAT.  IF HIS

19   ONLY UNDERSTANDING ABOUT WHAT HE FACES IS FROM WHAT HIS

20   ATTORNEY TOLD HIM, HE DOESN'T HAVE TO TESTIFY TO THAT.

21           MR. AARON:  WELL, LET'S EXPLORE THAT FOR A MOMENT.

22   IF WHAT THE COURT IS SAYING IS CORRECT, THEN IF I GET UP TO

23   TESTIFY IN A ROBBERY CASE AND I SAY, YES, I AM A ROBBER AND

24   IN RETURN I HAVE BEEN PROMISED A TWO-YEAR SENTENCE AS OPPOSED

25   TO A POSSIBLE 20-YEAR SENTENCE, AND HOW DO I KNOW THAT?  MY

1    ATTORNEY TOLD ME.

2         SO YOU'RE CROSS-EXAMINING ME AND YOU SAY, WELL,

3    MR. AARON, ISN'T IT TRUE YOU GOT A TWO-YEAR DEAL?  AND I SAY,

4    OH, I OBJECT, ATTORNEY/CLIENT.  THAT SIMPLY CAN'T BE RIGHT.

5    AND ONE OF THE REASONS IT CAN'T BE RIGHT IS BECAUSE I'M NOT

6    ASKING YOU FOR THE STATEMENTS OF YOUR ATTORNEY.  I'M ASKING

7    YOU FOR YOUR UNDERSTANDING.  HIS ATTORNEY MAY HAVE TOLD HIM,

8    LOOK, THIS IS USE IMMUNITY, X, Y, AND Z, BUT HIS

9    UNDERSTANDING MAY BE DIFFERENT.  AND IT'S HIS UNDERSTANDING,

10   NOT HIS ATTORNEY'S COMMENTS, WHICH ARE IMPORTANT HERE.

11        AND I WOULD NOTE SOMETHING ELSE, AND I BRING IT UP

12   NOW BECAUSE I DON'T KNOW IF COUNSEL IS GOING TO MAKE AN ISSUE

13   OF THIS.  I KNOW THE COURT LIKES TO RESOLVE THESE MATTERS

14   OUTSIDE THE PRESENCE.

15        THE NORTHERN DISTRICT GAVE HIM USE IMMUNITY.  THIS

16   DISTRICT DID NOT.  HE COULD BE PROSECUTED IN THIS DISTRICT,

17   AND I INTEND TO QUESTION HIM ABOUT THAT AS WELL.  I DON'T

18   KNOW IF HIS ATTORNEY HAS ARRANGED ANY SORT OF AGREEMENT WITH

19   THE CENTRAL DISTRICT OF CALIFORNIA NOT TO PROSECUTE HIM, AND

20   I DON'T KNOW IF THE WITNESS IS GOING TO INVOKE BASED ON THAT,

21   BUT NONETHELESS I INTEND TO QUESTION HIM ON THAT.

22        THE COURT:  WELL, THEN THAT WOULD BRING US BACK TO

23   THE ISSUE THAT I THINK WAS BROUGHT TO THE COURT'S ATTENTION

24   LAST WEEK AS TO A DETERMINATION OF WHETHER HE HAS A FIFTH

25   AMENDMENT PRIVILEGE TO --

```
 1            MR. AKROTIRIANAKIS:  THE GOVERNMENT'S POSITION IN

 2    THAT REGARD IS THAT HE DOES NOT, AND THAT'S THE REASON WHY WE

 3    DON'T HAVE A USE IMMUNITY AGREEMENT WITH HIM OURSELVES.

 4            THE COURT:  YOUR POSITION IS BASED ON THE STATUTE

 5    OF LIMITATIONS --

 6            MR. AKROTIRIANAKIS:  NO, IT'S WITHIN STATUTE.

 7            THE COURT:  -- OR --

 8            MR. AKROTIRIANAKIS:  WELL, WE MAY BE WITHIN

 9    STATUTE.

10            THE COURT:  JUST A MOMENT.  I'M SORRY.  I WAS

11    PAUSING, AND SOMETIMES I KNOW THAT'S MISLEADING.

12            YOUR POSITION IS THAT HE DIDN'T COMMIT ACTS THAT

13    WOULD SUBJECT HIM TO LIABILITY FOR AIDING AND ABETTING IN

14    THESE CRIMES?

15            MR. AKROTIRIANAKIS:  THAT'S CORRECT.  AND THE

16    REASON WHY IS THE DEFENDANT MOLESTED KALEN IN DECEMBER OF

17    2000.  THE FIRST MENTION OF KALEN BY THE DEFENDANT TO

18    MR. MARTIN IS NOT UNTIL JANUARY, AND THEN AGAIN, I BELIEVE,

19    APRIL, IMMEDIATELY BEFORE MR. MARTIN'S ARREST.  SO MR.

20    MARTIN, BY HIS STATEMENTS IN THESE CHATS WITH THE DEFENDANT,

21    CANNOT HAVE AIDED AND ABETTED AN ACT THAT HAD BEEN COMPLETED.

22    THAT'S THE LEGAL DEFINITION OF THE TERM.  SO HE HAS NO

23    LIABILITY IN THE VIEW OF THE U.S. ATTORNEY HERE FOR AIDING

24    AND ABETTING.

25            MR. AARON:  IF THAT'S SO, YOUR HONOR, THEN THOSE
```

```
 1    STATEMENTS -- THE JURY HAS BEEN WRONGLY INSTRUCTED THAT THEY
 2    CAN CONSIDER THOSE STATEMENTS AS TO COUNTS 3 AND 4, BECAUSE
 3    THEY CAN'T HAVE IT BOTH WAYS.  THEY CAN'T SAY, YOU CAN
 4    CONSIDER THESE CHATS, ALL THESE CHATS WITH RICOCHET,
 5    QUOTE/UNQUOTE, AS PROVIDING ELEMENTS IN PARTS OF COUNTS 3 AND
 6    4, BUT ON THE OTHER HAND, HE'S GOT NO LIABILITY WHATSOEVER.
 7              THE COURT:  WELL, THERE'S A DIFFERENCE BETWEEN
 8    WHETHER THE JURY HAS BEEN INSTRUCTED THEY CAN CONSIDER THOSE
 9    AS TO MR. SANDERS AND WHETHER THEY CAN CONSIDER IT AS TO
10    AIDING -- WELL, NOT BEING ASKED TO CONSIDER THE GUILT OF
11    MR. MARTIN AS TO AIDING AND ABETTING.  IT MAY NOT HAVE ANY
12    RELEVANCE AS TO WHETHER SOMEONE AIDED AND ABETTED A PAST ACT.
13    THEY CAN STILL CONSIDER AS TO WHETHER IT'S AN ADMISSION THE
14    DEFENDANT COMMITTED A PAST ACT.
15              MR. AARON:  WELL, THEY CAN CONSIDER -- YES, THAT'S
16    TRUE.  THEY CAN CONSIDER WHETHER OR NOT HE MADE ADMISSIONS,
17    BUT THE PROBLEM IS THAT THE COURT'S INSTRUCTION WAS THAT THEY
18    CAN CONSIDER IT FOR INTENT, PLANNING, ALL SORTS OF THINGS.
19              THE COURT:  INTENT?
20              MR. AARON:  YES.  IF WE LOOK AT THE COURT'S
21    INSTRUCTION, I BELIEVE THAT IT TALKED ABOUT THAT.  AND PART
22    OF THE PROBLEM IS YOU CAN CONSIDER AFTER INTENT.  HE'S GOT TO
23    HAVE HAD THE INTENT TO HAVE SEX WHEN HE LEFT.
24              THE COURT:  BEFORE, RIGHT, BUT A STATEMENT, AN
25    ADMISSION, EVEN IF IT'S AFTER THE FACT, CAN STILL BE EVIDENCE
```

1    OF WHAT THE INTENT WAS WHEN THE ACT WAS COMMITTED.

2         MR. AARON:  YES, WERE HE TO SAY SOMETHING THAT

3    COULD BE CONSTRUED AS, WHEN I WENT TO NEW MEXICO -- GROSSLY,

4    WHEN I WENT TO NEW MEXICO, I WAS INTENDING TO HAVE SEXUAL

5    RELATIONS WITH THIS CHILD.

6         THE COURT:  RIGHT.

7         MR. AARON:  SURE, THAT'S ABSOLUTELY THE CASE, BUT A

8    LOT OF THE CONVERSATIONS ARE NOTHING LIKE THAT.  THERE IS

9    JUST AN INTEREST IN -- I THINK EVEN THE PROSECUTION WOULD

10   AGREE THAT AT MOST, IT WAS JUST AN INTEREST OR AN OBSESSION,

11   IF YOU WILL, TO TALK ABOUT SEXUAL RELATIONS WITH YOUNG BOYS.

12   THAT REALLY IS GOING TO DIFFERENT TYPES OF THINGS OTHER THAN

13   JUST INTENT.  AND THE JURY INSTRUCTION --

14        THE COURT:  THE INSTRUCTION TELLS THE JURY THAT

15   THEY MAY CONSIDER THE EVIDENCE INSOFAR AS IT MAY BEAR ON

16   THESE THINGS.  IF IT DOESN'T BEAR ON THOSE THINGS, THAT'S A

17   QUESTION FOR THE JURY TO DECIDE.  I MEAN, IT MAY NOT, BUT

18   SOME OF IT DOES, OR THE JURY COULD FIND THAT IT DOES.

19        MR. AARON:  IN TERMS OF THE OTHER ISSUE THAT THE

20   COURT BROUGHT UP IN RESPONSE TO COUNSEL, I'M NOT SURE THAT --

21   WE DID HAVE SOME CONVERSATIONS EARLIER IN DECEMBER IN

22   EXHIBIT -- FOR EXAMPLE, EXHIBIT 2C, I BELIEVE, HAS SOME

23   CONVERSATIONS IN DECEMBER WHICH IS BEFORE SUPPOSEDLY THE LAST

24   TRIP TO SEE KALEN S.

25        MR. AKROTIRIANAKIS:  EXHIBIT 2C, YOUR HONOR, IS

1    WHAT COUNSEL IS REFERRING TO.

2          THE COURT:  ALL RIGHT.  WHICH PAGE OR WHICH TIME

3    ENTRY, DATE AND TIME ENTRY?

4          MR. AARON:  I THINK FROM THE VERY BEGINNING IT GOES

5    FROM NOVEMBER OF '00 TO --

6          THE COURT:  AND 2C IS MR. MARTIN'S COMPUTER?

7          MR. AKROTIRIANAKIS:  THAT'S CORRECT, YOUR HONOR.

8          MR. AARON:  THAT'S CORRECT.  AND THERE IS AN

9    EXTENSIVE CONVERSATION ABOUT A 14-YEAR-OLD BOYFRIEND, AND

10   THAT'S AT APPROXIMATELY 11/7/00 AT 1:52 P.M.

11         THE COURT:  11/7?

12         MR. AARON:  11/7/00 AT 1:52 P.M.

13         THE COURT:  OH, I REMEMBER THIS, YES.  BUT THIS IS

14   NOT KALEN.

15         MR. AARON:  THAT'S TRUE, BUT I INTEND TO QUESTION

16   THIS WITNESS ABOUT OTHER CONVERSATIONS HE'S HAD, AND I

17   BELIEVE THAT HE WILL SAY THAT HE'S HAD OTHER CONVERSATIONS,

18   NOT JUST THESE.  AND MY VIEW IS THAT NOT ONLY DID HE HAVE A

19   FIFTH AMENDMENT PRIVILEGE AS TO THE MATTERS IN THE NORTHERN

20   DISTRICT OF TEXAS, BUT I THINK HE HAS IT FOR HERE AS WELL

21   BECAUSE I BELIEVE THEY COULD FILE ON HIM HERE.

22         THE COURT:  ALL RIGHT.  SO YOUR POSITION IS THAT,

23   FOR EXAMPLE, IN THIS CHAT IN 2C THAT IN THIS DISTRICT AS TO

24   THIS CONVERSATION REGARDING THE 14-YEAR-OLD, MR. MARTIN COULD

25   BE CHARGED WITH AIDING AND ABETTING?

1          MR. AARON:  NO, I DON'T THINK -- NO, BECAUSE I

2   DON'T BELIEVE THAT'S A CONVERSATION THAT REFERS TO KALEN S.

3          THE COURT:  RIGHT.  BUT AS TO THIS 14-YEAR-OLD, YOU

4   THINK HE COULD BE CHARGED WITH AIDING AND ABETTING?

5          MR. AARON:  HE MIGHT BE ABLE TO BE CHARGED WITH

6   AIDING AND ABETTING AS TO A TRAVELING COUNT AS TO THAT ONE,

7   BUT I'M NOT SURE BECAUSE THAT --

8          THE COURT:  HE'S GOING TO TALK ABOUT TRAVELING.

9          MR. AARON:  RIGHT.  AND I'M NOT SURE THAT PERSON

10  LIVES INTERSTATE, BUT I BELIEVE THAT THERE IS OTHER

11  CONVERSATIONS THAT THIS WITNESS IS GOING TO TESTIFY TO THAT

12  ARE NOT IN THE CHATS.  IN OTHER WORDS, HE HAD OTHER CHATS

13  WHICH ARE NOT REFLECTED IN THE TRANSCRIPTS.

14          MR. AKROTIRIANAKIS:  YOUR HONOR, IF I COULD

15  COMPLETE MY POINT.

16          AFTER THE POINT THAT COUNSEL IS REFERRING TO, THAT

17  THEY HAVE A CHAT ON DECEMBER 7 OF 2000, THEN IT SKIPS TO

18  JANUARY 3 OF '01 AT 10:07 A.M., THE DEFENDANT AND RANDALL

19  MARTIN EXCHANGE THEIR HAPPY NEW YEAR'S, AND THEN THE

20  DEFENDANT SAYS, "I WAS HANGING OUT WITH KALEN THE WHOLE

21  TIME."

22          AND GOING OVER TO THE NEXT PAGE RICOCHET SAYS, "HOW

23  OLD IS HE?"

24          THE DEFENDANT SAYS, "SEVEN.  I THOUGHT I TOLD YOU

25  ABOUT HIM."

```
 1            AND RICOCHET SOUNDS SURPRISED.  "I WAS NOT AWARE.
 2   HE SOUNDS A LITTLE YOUNG."
 3            THIS IS THE FIRST TIME HE IS HEARING ABOUT KALEN,
 4   PERIOD, AND IT IS AFTER THE ABUSE THAT IS ALLEGED.  THERE'S
 5   ANOTHER REFERENCE LATER IN THE CHAT IN TAB M.  THEY TALK
 6   ABOUT KALEN THERE, AND THAT, OF COURSE, IS APRIL OF 2001,
 7   IMMEDIATELY BEFORE RANDALL MARTIN'S ARREST.
 8            THE COURT:  ALL RIGHT.  SO THEN THE DEFENDANT
 9   ALTERNATIVELY SAYS HE'S GOING TO CROSS-EXAMINE THE WITNESS
10   ABOUT OTHER CHATS THAT WE DON'T HAVE TRANSCRIPTS OF?
11            MR. AARON:  THAT'S CORRECT.
12            THE COURT:  WELL, HOW LONG DO YOU THINK YOUR
13   CROSS-EXAMINATION OF MR. MORAN OR AGENT MORAN WILL BE?
14            MR. AARON:  IT'S GOING A LITTLE BIT MORE SLOWLY
15   THAN I THOUGHT IT MIGHT.  MAYBE ANOTHER 30, 45 MINUTES.
16            THE COURT:  DO YOU HAVE OTHER WITNESSES THAT WOULD
17   TAKE UP THE REST OF THE AFTERNOON?
18            MR. AKROTIRIANAKIS:  CERTAINLY, YOUR HONOR.  I
19   WOULD OFFER, THOUGH, I THINK -- I'VE SPOKEN WITH RANDALL
20   MARTIN ON A COUPLE OF OCCASIONS AND HE DIDN'T REMEMBER EVEN
21   THESE CHATS WITHOUT BEING REFRESHED.  UNLESS THERE ARE CHATS
22   WITH WHICH HE NOW IS GOING TO BE REFRESHED, I WOULD DOUBT
23   THAT -- AND THAT IS SOMETHING THAT PERHAPS CAN BE TAKEN CARE
24   OF OUTSIDE THE PRESENCE OF THE JURY AND PROPERLY QUESTIONED
25   BEFORE WE RESUME, UNLESS COUNSEL HAS CHATS THAT HE CAN SHOW
```

1    HIM.  PROBABLY WHAT'S GOING TO HAPPEN IS HE'LL ASK HIM, "WHAT

2    OTHER CHATS HAVE YOU HAD?"  "I DON'T REMEMBER ANY."  BECAUSE

3    I'VE ASKED HIM THAT QUESTION.

4           MR. AARON:  THAT'S FAIR.  WE COULD HAVE HIM JUST

5    TESTIFY FOR JUST A COUPLE MINUTES OUTSIDE THE PRESENCE OF THE

6    JURY, AND WE COULD RESOLVE THAT ISSUE.

7           THE COURT:  ALL RIGHT.  WE COULD DO THAT.  I JUST

8    DON'T WANT TO BE IN A POSITION WHERE WE END UP STARTING LATE

9    BECAUSE WE'VE ALREADY DONE THAT ONCE TODAY, BUT IF HE DOESN'T

10   REMEMBER, THEN WE DON'T HAVE AN ISSUE ON THAT POINT.  BUT

11   THAT PUTS US BACK -- ASSUMING WE DON'T HAVE AN ISSUE ON THAT

12   POINT, THEN WE PROBABLY DON'T HAVE AN ISSUE AS TO INVOKING

13   THE FIFTH AMENDMENT AS TO ANYTHING OTHER THAN WHAT'S ALREADY

14   BEEN IDENTIFIED, SO THAT COMES DOWN TO TWO AREAS.

15          AND I THINK I WOULD BE PREPARED TO FIND, BASED ON

16   MY REVIEW OF THE TRANSCRIPTS WHICH I DID LAST WEEK WHEN THIS

17   ISSUE WAS FIRST BROUGHT TO MY ATTENTION, THAT IS THE ISSUE OF

18   WHETHER OR NOT THERE WAS GOING TO BE A NEED FOR THE COURT TO

19   MAKE A FINDING ABOUT A NEED FOR IMMUNITY, THAT THERE IS

20   NOTHING WITHIN THIS DISTRICT THAT WOULD SHOW THAT THE WITNESS

21   LEARNED ABOUT THE DEFENDANT'S PLAN TO TRAVEL ACROSS STATE

22   LINES WITH THE INTENT TO SEXUALLY ASSAULT OR SEXUALLY MOLEST

23   KALEN S. UNTIL AFTER THAT TRAVEL HAD BEEN COMPLETED.

24          SO IT'S NOT NECESSARY FOR THE DEFENDANT TO BE

25   IMMUNIZED WHEN HE DOESN'T HAVE A FIFTH AMENDMENT RIGHT TO

1    INVOKE AS WITHIN THIS DISTRICT, SO I THINK AS TO THAT, THAT

2    WOULD BE MY FINDING ON THAT ISSUE.

3              NOW, THAT STILL LEAVES OPEN THE QUESTION THAT WE

4    STARTED WITH, WHICH IS THE EXTENT TO WHICH THE DEFENSE SHOULD

5    BE ABLE TO CROSS-EXAMINE THE WITNESS ON THE NATURE OF THE

6    SENTENCE HE MIGHT BE FACING IF HE WAS CONVICTED ON AIDING AND

7    ABETTING CHARGES ELSEWHERE.  I'M NOT SURE I AGREE WITH

8    DEFENSE COUNSEL'S EXAMPLE IN RESPONSE TO MY CONCERN ABOUT

9    WHAT THE WITNESS -- IF THE WITNESS ONLY GAINED HIS KNOWLEDGE

10   ABOUT A POTENTIAL SENTENCE THROUGH CONVERSATIONS WITH HIS

11   ATTORNEY, BECAUSE THE EXAMPLE THAT YOU GAVE IN RESPONSE,

12   MR. AARON, IS DIFFERENT FROM THE SITUATION THAT WE HAVE HERE.

13             IN YOUR EXAMPLE, THE WITNESS OFFERED HIS

14   UNDERSTANDING BUT THEN REFUSED TO TESTIFY ABOUT IT ON CROSS.

15   IN OTHER WORDS, HE USED THE PRIVILEGE AS A SHIELD AFTER USING

16   THE INFORMATION AS A SWORD, WHICH IS NOT ALLOWED.  THAT'S NOT

17   THE SITUATION HERE.

18             HIS UNDERSTANDING, IF HE GAINED THE UNDERSTANDING

19   FROM ANY SOURCE, OTHER THAN WHAT HE WAS ADVISED BY HIS

20   ATTORNEY, AND ON REFLECTION I THINK HE MUST HAVE HAD SOME

21   UNDERSTANDING.  THAT MUST HAVE COME FROM THE PROSECUTOR'S

22   OFFICE, BUT I COULD BE WRONG ABOUT THAT.  BUT I THINK YOU'RE

23   ENTITLED TO ASK HIM ABOUT THE NATURE OF THE BENEFIT THAT HE'S

24   RECEIVED.

25             IN THE ABSENCE OF ANY AUTHORITY FROM EITHER SIDE

1    THAT SAYS THAT THAT'S NOT PERMITTED ONCE THE COURT GIVES THE

2    JURY A LIMITING INSTRUCTION THAT THEY ARE ONLY TO CONSIDER IT

3    FOR THE PURPOSE OF CONSIDERING THE BENEFIT, IF ANY, THAT THE

4    WITNESS HAS RECEIVED AND THEREFORE TO CONSIDER IT IN TERMS OF

5    JUDGING HIS CREDIBILITY, I'M GOING TO GIVE A LIMITING

6    INSTRUCTION TO THAT EFFECT, BUT OTHERWISE I WILL ALLOW THE

7    DEFENSE TO INQUIRE INTO THAT.

8         THE OTHER ISSUE THAT WE NEED TO TAKE UP WAS ABOUT

9    THE EXTENT TO WHICH THE DEFENSE CAN ASK HIM ABOUT THE

10   UNCHARGED SEXUAL CONDUCT WITH A MINOR.  AS TO THIS, THE

11   DEFENDANT COULD INVOKE HIS FIFTH AMENDMENT RIGHT, OF COURSE.

12   AND THE NINTH CIRCUIT HAS ADDRESSED, I THINK, MOST OF THE

13   QUESTIONS ON THIS ISSUE IN UNITED STATES V. SKIFERT,

14   S-K-I-F-E-R-T, 648 F.2D 557, WHICH IS A 1980 CASE, BUT IT'S

15   STILL GOOD LAW.

16        IN MY VIEW THE -- JUST VERY QUICKLY, EVEN IF HE

17   REFUSES TO ANSWER THOSE QUESTIONS BY INVOKING HIS FIFTH

18   AMENDMENT PRIVILEGE, THAT DOESN'T MEAN THAT THE REST OF HIS

19   TESTIMONY HAS TO BE STRICKEN, WHICH I THINK IT'S IMPEACHMENT

20   ON A COLLATERAL MATTER.  MY INITIAL REACTION, AS I SAID TO

21   COUNSEL EARLIER, WAS THAT THE INVOCATION OF HIS FIFTH

22   AMENDMENT PRIVILEGE ON THOSE MATTERS SHOULD BE DONE OUTSIDE

23   THE PRESENCE OF THE JURY, BUT ACTUALLY THE NINTH CIRCUIT IN

24   SKIFERT DISAGREED WITH THAT AND STATED THAT IT SHOULD BE DONE

25   IN THE PRESENCE OF THE JURY BECAUSE IT'S SOMETHING THE JURY

1    IS ENTITLED TO CONSIDER.

2           SO COUNSEL SHOULD BE PERMITTED TO INQUIRE ABOUT IT.

3    AND AGAIN, WITH A LIMITING INSTRUCTION, THE JURY SHOULD BE

4    TOLD TO CONSIDER IT BECAUSE HERE IT GOES TO -- IT'S

5    IMPEACHMENT AND IT GOES TO WHETHER IT'S A PRIOR INCONSISTENT

6    STATEMENT AS TO WHAT HE TOLD LAW ENFORCEMENT, SO THAT'S THE

7    PURPOSE THEY ARE TO CONSIDER IT AND FOR NO OTHER IF HE

8    ANSWERS OR IF THERE IS -- WHEN THE QUESTION IS ASKED, THAT'S

9    WHAT THEY WILL BE TOLD.  AND IF HE INVOKES HIS FIFTH

10   AMENDMENT PRIVILEGE, THAT'S THAT.

11          MR. AKROTIRIANAKIS:  SO IF I UNDERSTAND THE COURT,

12   HE'LL BE ASKED THE QUESTION, IS IT TRUE THAT YOU -- SOMETHING

13   TO THE EFFECT, IS IT TRUE THAT YOU COMMITTED THESE ACTS MANY

14   YEARS AGO OR WHATEVER, AND HE WILL INVOKE HIS FIFTH AMENDMENT

15   PRIVILEGE AT THAT POINT, AND THEN THERE WON'T BE ANY FURTHER

16   EXAMINATION ON IT?

17          THE COURT:  WELL, IN ORDER TO, I THINK, PROPERLY

18   INSTRUCT THE JURY OF THE LIMITED USE OF THE TESTIMONY, I'M

19   ASSUMING THAT MR. AARON, FROM WHAT HE SAID EARLIER, WILL BE

20   ASKING THE WITNESS -- AND CORRECT ME IF I'M WRONG, MR. AARON,

21   BUT I THOUGHT THAT WHAT YOU WERE TRYING TO DO HERE WAS TO --

22   WELL, EITHER BEFORE OR AFTER, MR. AARON WILL BE SHOWING THE

23   WITNESS THE STATEMENT FROM THE WITNESS TO LAW ENFORCEMENT

24   WHERE THE WITNESS SAID OR ADMITTED ONE SET OF ACTS, I THINK

25   MR. AARON SAID ANOTHER.  AND SO IF THE STATEMENT IS BEING

1    OFFERED FOR IMPEACHMENT, THERE WOULD HAVE TO BE SOMETHING TO

2    IMPEACH AGAINST, AND THAT IS THE -- MY UNDERSTANDING FROM

3    MR. AARON'S STATEMENT EARLIER IS THAT THE IMPEACHMENT IS THAT

4    HE DID NOT ADMIT THIS TO LAW ENFORCEMENT WHEN SPECIFICALLY

5    ASKED ABOUT IT.  SO THAT HAS TO BE -- THAT EVIDENCE HAS TO

6    BE INTRODUCED AT SOME POINT SO THAT THE INSTRUCTION TO THE

7    JURY AS TO HOW THEY ARE TO CONSIDER IT MAKES SENSE.

8         DO I UNDERSTAND YOUR PROPOSED USE OF THIS TESTIMONY

9    CORRECTLY, MR. AARON?

10        MR. AARON:  THAT'S CORRECT.  AND IN ANSWER TO

11   COUNSEL'S OTHER INQUIRY, I THINK ONCE THIS WITNESS SAYS, I

12   REFUSE TO ANSWER ON THE GROUNDS THAT MY ANSWER MIGHT

13   INCRIMINATE ME, AND THE COURT SUSTAINS THAT PRIVILEGE, THEN

14   THERE CAN BE NO FURTHER INQUIRY BECAUSE THAT'S -- I CAN

15   ARGUE, YOU KNOW, THE INFERENCES FROM IT, BUT THERE'S NO MORE

16   INQUIRY TO BE MADE ON THAT POINT.

17        THE COURT:  ACCORDING TO THE COURT IN SKIFERT, IT

18   SAYS THE WITNESS IN THAT CASE HAD ANSWERED EVERY OTHER

19   QUESTION PUT TO HIM, BUT HIS REFUSAL TO ANSWER THE ONE

20   QUESTION WOULD BE A FORM OF IMPEACHMENT, WHICH TO ME SAYS IT

21   COULD BE ARGUED.

22        MR. AKROTIRIANAKIS:  YES, YOUR HONOR, I THINK

23   THEY'RE ENTITLED TO IN THAT INFERENCE.

24        THE COURT:  ALL RIGHT.  LET'S RECESS FOR LUNCH AND

25   I THINK WE'RE JUST GOING TO HAVE TO COME BACK MAYBE FIVE

1    MINUTES AFTER 1, SO TAKE A HALF HOUR FOR LUNCH AND THAT WILL

2    GIVE US TIME TO INQUIRE OF MR. MARTIN VERY QUICKLY.  ALL

3    RIGHT.  THANK YOU VERY MUCH.

4             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

5             MR. AARON:  WHAT TIME DOES THE COURT WANT US BACK?

6             THE COURT:  ABOUT A HALF AN HOUR.

7                       (RECESS)

8             THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

9    PRESENCE OF THE JURY.  COUNSEL AND THE DEFENDANT ARE PRESENT

10   AND THE WITNESS, RANDALL MARTIN, ON THE WITNESS STAND.

11    PLAINTIFF'S WITNESS, RANDALL MARTIN, WAS PREVIOUSLY SWORN

12            MR. MARTIN, YOU WERE PREVIOUSLY SWORN AS A WITNESS,

13   SO YOU DO NOT NEED TO BE RESWORN, AND YOU UNDERSTAND THAT

14   YOUR TESTIMONY IS STILL GIVEN UNDER PENALTY OF PERJURY?

15            THE WITNESS:  YES, MA'AM.

16            THE COURT:  WHEN THE JURY IS PRESENT IN THE

17   COURTROOM, I WILL GIVE YOU THAT REMINDER AGAIN IN FRONT OF

18   THE JURY.

19            THE WITNESS:  YES, MA'AM.

20            THE COURT:  ALL RIGHT.  THANK YOU.

21            MR. AKROTIRIANAKIS:  YOUR HONOR, MAY THE RECORD

22   ALSO REFLECT THE PRESENCE OF MR. MARTIN'S COUNSEL, DAVE

23   PHILIPS?

24            THE COURT:  YES.  THANK YOU.

25            ALL RIGHT.  MR. AARON?

1              MR. AARON:  THANK YOU.

2                     CROSS-EXAMINATION

3    BY MR. AARON:

4    Q.   MR. MARTIN, HAVE YOU READ THE CHATS IN EXHIBIT 2A

5    THROUGH WHATEVER THEY ARE?

6    A.   I HAVE READ MOST OF THEM.

7    Q.   AND DO YOU REMEMBER THEM?

8    A.   SOME OF THEM.

9    Q.   DID YOU HAVE OTHER CHATS WITH MR. SANDERS OR WITH THE

10   SCREEN NAME THAT WE'VE BEEN TALKING ABOUT, PEI OR OJIBOYSAN

11   OR BOYSAN OR ANY OF THOSE SCREEN NAMES?  DID YOU HAVE OTHER

12   CHATS BESIDES THE ONES THAT ARE IN EXHIBIT 2?

13   A.   IF THAT'S NOT A REPRESENTATION OF ALL OF THE CHATS, THEN

14   I GUESS I DID.

15   Q.   WELL, I'M ASKING --

16              THE COURT:  I'M SORRY.  COULD YOU REPEAT YOUR

17   ANSWER, SIR?

18              THE WITNESS:  IF THAT IS NOT A REPRESENTATION OF

19   THE ENTIRE CHAT LOGS THAT WERE IN MY COMPUTER, THEN THERE MAY

20   BE OTHER CHATS.

21   BY MR. AARON:

22   Q.   DO YOU REMEMBER ANY OTHER CONVERSATIONS BESIDES THE ONES

23   THAT YOU'VE READ?

24   A.   NO, SIR.

25   Q.   DO YOU REMEMBER ANY CONVERSATIONS ABOUT KALEN S. OR A

1    BOY NAMED KALEN OTHER THAN THE ONES YOU HAVE READ?

2    A.   NO, SIR.

3    Q.   THANK YOU.

4         THE COURT:  THANK YOU.  DOES THE GOVERNMENT HAVE

5    ANY QUESTIONS?

6         MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

7         THE COURT:  ALL RIGHT.  THANK YOU.  BEFORE WE BRING

8    THE JURY IN, LET ME TELL COUNSEL QUICKLY -- I CAN'T PASS THIS

9    OUT TO YOU BECAUSE THESE ARE JUST ROUGH NOTES ABOUT THE

10   INSTRUCTION I'M GOING TO GIVE THE JURY -- WELL, ACTUALLY, LET

11   ME SEE COUNSEL AT THE SIDEBAR IF I COULD, PLEASE.

12        (ON-THE-RECORD DISCUSSION WAS HELD AT SIDEBAR.)

13        THE COURT:  THIS IS THE INSTRUCTION I'M GOING TO

14   GIVE ON THE ISSUE OF THE IMMUNITY AGREEMENT:  YOU ARE ABOUT

15   TO HEAR TESTIMONY REGARDING THE POTENTIAL PUNISHMENT FOR

16   CERTAIN CRIMES.  THIS EVIDENCE IS BEING ADMITTED FOR THE

17   LIMITED PURPOSE OF ASSESSING THE CREDIBILITY OF THE WITNESS

18   AND THAT YOU ARE TO CONSIDER IT FOR THAT PURPOSE AND NO

19   OTHER.

20        YOU MAY REMEMBER THAT I EARLIER INSTRUCTED YOU

21   REGARDING THE FACT THAT YOU MAY CONSIDER IN DECIDING WHETHER

22   OR NOT TO BELIEVE THE TESTIMONY OF ANY WITNESS IN THIS CASE

23   AND THAT ONE OF THOSE FACTORS IS THE WITNESS' INTEREST IN THE

24   OUTCOME OF THE CASE AND ANY BIAS OR PREJUDICE THAT'S DIRECTLY

25   FROM THAT FORM INSTRUCTION.

1          THE EVIDENCE THAT THE WITNESS, RANDALL MARTIN,

2    RECEIVED A BENEFIT IN THIS CASE IN THE FORM OF AN AGREEMENT

3    THAT HIS TESTIMONY IN THIS TRIAL WOULD NOT BE USED IN ANY

4    PROSECUTION AGAINST HIM IS ONLY BEING OFFERED FOR THE LIMITED

5    PURPOSE OF ASSESSING HIS CREDIBILITY.

6          MR. AARON:  I DON'T HAVE A PROBLEM WITH THAT.  I

7    WOULD WANT -- ALL I WANT TO SAY IN TERMS OF ASSESSING THE

8    WITNESS'S CREDIBILITY, BIAS, MOTIVE, OR INTEREST IN

9    TESTIFYING BUT -- MAY I TAKE A LOOK?

10         THE COURT:  I DON'T KNOW IF YOU WILL BE ABLE TO

11   FOLLOW IT, BUT I WILL MAKE COPIES FOR ALL OF YOU.  IT IS A

12   LITTLE HARD TO FOLLOW BUT -- NOW, COULD YOU REPEAT WHAT YOU

13   JUST SAID, MR. AARON?

14         MR. AARON:  WHENEVER THE COURT SAID THE WITNESS'

15   CREDIBILITY, I THINK IT SHOULD BE THE WITNESS' CREDIBILITY,

16   COMMA, BIAS, COMMA, INTEREST, COMMA, MOTIVE IN TESTIFYING.

17   ALTHOUGH THE COURT TALKED ABOUT THAT A LITTLE BIT LATER IN

18   THE INSTRUCTION, I COULDN'T QUITE FOLLOW IT.

19         THE COURT:  ALL RIGHT.  WELL, IT IS JUST UNDER THE

20   FORM JURY INSTRUCTION.  THOSE THINGS ARE FACTORS IN DECIDING

21   CREDIBILITY --

22         MR. AARON:  OKAY.

23         THE COURT:  -- WHICH I HAVE SPELLED OUT.

24         MR. MICHAEL:  IN ADDITION, YOUR HONOR, YOU SAY,

25   "ANY PROSECUTION."  I THINK THE AGREEMENT ONLY COVERS

```
 1    NORTHERN DISTRICT OF TEXAS.

 2            THE COURT:  I SHOULD SAY, "ANY PROSECUTION IN THE

 3    DISTRICT COURT IN THE NORTHERN DISTRICT OF TEXAS."

 4            MR. MICHAEL:  CORRECT.

 5            THE COURT:  OKAY.  I CAN MAKE COPIES OF THIS REAL

 6    QUICK FOR BOTH OF YOU.

 7            MR. AKROTIRIANAKIS:  YOUR HONOR, THAT SCREEN IS NOT

 8    GOING TO BE USED EITHER WITH MR. MARTIN OR PROBABLY FOR THE

 9    REST OF THE DAY.

10            THE COURT:  MAYBE WE CAN GET RID OF IT THIS

11    AFTERNOON.

12            WE CAN GO OFF THE RECORD.  WE'RE JUST DOING

13    HOUSEKEEPING.

14        (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

15            THE COURT:  COUNSEL, BEFORE WE BRING THE JURY IN,

16    THERE'S ONE OTHER SPECIAL INSTRUCTION, CORRECT, OR WAS THAT

17    THE ONLY INSTRUCTION?

18            MR. AARON:  REGARDING THIS WITNESS?

19            THE COURT:  FOR THIS WITNESS.

20            MR. AARON:  YES.  THERE WERE TWO ISSUES THAT THE

21    COURT RESOLVED, BUT THERE WAS ONLY ONE INSTRUCTION.

22            MR. MICHAEL:  THE OTHER INSTRUCTION, YOUR HONOR,

23    I BELIEVE, WAS THAT IF COUNSEL WERE TO INQUIRE AS TO THE

24    INVOCATION OF THE FIFTH AMENDMENT, THAT YOU WOULD GIVE A JURY

25    INSTRUCTION AS TO -- IN THAT CONTEXT, SHOULD THE WITNESS
```

1    INVOKE AND COUNSEL WERE TO INQUIRE, I THINK THAT YOU WOULD

2    GIVE A STATEMENT ABOUT THE PURPOSE OF THE INQUIRY IS TO

3    IMPEACH BASED ON A PRIOR INCONSISTENT STATEMENT.

4              THE COURT:  THAT'S RIGHT.  THANK YOU.

5              (IN THE PRESENCE OF THE JURY:)

6              THE COURT:  GOOD AFTERNOON.  LET THE RECORD REFLECT

7    THE PRESENCE OF ALL MEMBERS OF THE JURY AND COUNSEL FOR BOTH

8    PARTIES AND THE DEFENDANT ALSO PRESENT.  THE WITNESS ON THE

9    STAND IS RANDALL MARTIN.

10             MR. MARTIN, GOOD AFTERNOON.  YOU RECALL THAT YOU DO

11   NOT NEED TO BE RESWORN AS A WITNESS AS YOU WERE PREVIOUSLY

12   SWORN ON FRIDAY WHEN YOU FIRST TESTIFIED AND YOUR TESTIMONY

13   IS STILL GIVEN UNDER PENALTY OF PERJURY?

14             THE WITNESS:  YES, MA'AM.

15             THE COURT:  THANK YOU.  AND LADIES AND GENTLEMEN,

16   WE'RE RECALLING THIS WITNESS BECAUSE WE CALLED ANOTHER

17   WITNESS OUT OF ORDER BEFORE COUNSEL FOR THE DEFENSE HAD AN

18   OPPORTUNITY TO CROSS-EXAMINE.  THANK YOU.

19             YOU MAY CROSS-EXAMINE.

20             MR. AARON:  THANK YOU.

21                       CROSS-EXAMINATION

22   BY MR. AARON:

23   Q.   MR. MARTIN, DO YOU RECALL TESTIFYING IN YOUR DIRECT

24   TESTIMONY ABOUT THE QUOTE "LUCK IS WHEN PREPARATION MEETS

25   OPPORTUNITY"?

```
 1   A.   I'M SORRY.  SAY IT AGAIN.
 2   Q.   DO YOU RECALL TESTIFYING IN YOUR DIRECT EXAMINATION BY
 3   THE GOVERNMENT ABOUT A QUOTE "LUCK IS WHEN PREPARATION MEETS
 4   OPPORTUNITY"?
 5   A.   NO, SIR.
 6   Q.   DO YOU RECALL HAVING COUNSEL FOR THE GOVERNMENT SHOW YOU
 7   THAT QUOTE IN THE CHATS?
 8   A.   I CAN'T RECALL, SIR.
 9   Q.   AS YOU SIT HERE TODAY, DID YOU KNOW THAT, QUOTE, LUCK IS
10   WHEN PREPARATION MEETS OPPORTUNITY, END QUOTE, IS A FAMOUS
11   QUOTE?
12   A.   NO, SIR.
13   Q.   WOULD IT BE FAIR TO SAY, MR. MARTIN, THAT YOU WERE
14   ADDICTED TO PORNOGRAPHY?
15   A.   THAT I WAS ADDICTED?
16   Q.   YES.
17   A.   YES.
18   Q.   AND YOU WOULD DO ANYTHING TO SATISFY YOUR DESIRES,
19   RIGHT?
20   A.   I WOULD DO ANYTHING?
21   Q.   YES.  YOU WOULD DO ANYTHING TO SATISFY YOUR DESIRES?
22   A.   NOT NECESSARILY.
23   Q.   YOU WOULDN'T DO WHATEVER YOU WANTED TO DO TO SATISFY
24   WHAT YOU WANTED?
25   A.   NO.
```

1    Q.   YOU WOULDN'T HURT PEOPLE TO SATISFY YOUR DESIRES?

2    A.   NO, SIR.

3    Q.   YOU WOULDN'T USE PEOPLE TO SATISFY YOUR DESIRES?

4    A.   NO.

5    Q.   YOU HAD CHILD PORN SENT TO YOUR BROTHER, RIGHT?

6    A.   YES.

7    Q.   AND YOU KNEW HE MIGHT GET IN TROUBLE FOR THAT, RIGHT?

8    A.   THE RISK WAS THERE, YES, SIR.

9    Q.   YOU KNEW HE MIGHT GET ARRESTED?

10   A.   YES, SIR.

11   Q.   MIGHT EVEN GET PROSECUTED?

12   A.   YES, SIR.

13   Q.   BUT YOU STILL HAD THE CHILD PORN SENT THERE?

14   A.   YES.

15   Q.   AND YOU DID THAT BECAUSE YOU WANTED THE CHILD PORN?

16   A.   YES, SIR.

17   Q.   AND WHAT YOU WANTED WAS MORE IMPORTANT THAN YOUR

18   BROTHER'S WELFARE, RIGHT?

19   A.   NOT NECESSARILY.

20   Q.   YOUR DESIRE FOR PORNOGRAPHY WAS MORE IMPORTANT THAN THE

21   RISK THAT YOUR BROTHER HAD TO FACE, RIGHT?

22   A.   I SUPPOSE IT COULD BE, YES, SIR.

23   Q.   YOU HAD A SON AROUND THE TIME YOU WERE ARRESTED, RIGHT?

24   A.   YES, SIR.

25   Q.   AND HE HAD FRIENDS AT SCHOOL?

```
 1    A.    HE HAD A FRIEND.

 2    Q.    FRIENDS IN SPORTS?

 3    A.    YES, SIR.

 4    Q.    AND YOU WOULD ATTEND ACTIVITIES AT THE SCHOOL WITH HIM?

 5    A.    YES, SIR.

 6    Q.    DO YOU SEE BEHIND YOU THE BINDER WITH EXHIBIT NO. 2?

 7    A.    DO I SEE WHAT NOW?

 8    Q.    IF YOU WOULD LOOK BEHIND YOU --

 9            MR. AARON:  MAY I APPROACH, YOUR HONOR?

10            THE COURT:  YOU MAY.

11    BY MR. AARON:

12    Q.    LET ME SEE IF I CAN ASSIST YOU THERE FOR A MOMENT.

13    SIR, I'M PLACING IN FRONT OF YOU EXHIBIT NO. 2 AND IT'S

14    TURNED TO PAGE 2C.

15            COULD YOU TAKE A LOOK AT THE ENTRY ON DECEMBER 7TH

16    AT 9:53 A.M.?

17    A.    DECEMBER 7TH?

18    Q.    DECEMBER 7TH.

19    A.    THERE IS NOT A NO. 7 ON THIS PAGE.

20    Q.    NO, INSIDE IF YOU TURN A FEW PAGES, YOU WILL SEE --

21            MR. AARON:  MAY I APPROACH AGAIN, YOUR HONOR?

22            THE COURT:  YOU MAY.

23    BY MR. AARON:

24    Q.    TURNING YOUR ATTENTION TO THE ENTRY FOR RICOCHET,

25    DECEMBER 7TH, 9:53 A.M., CAN YOU READ THAT ENTRY, PLEASE?
```

```
 1   A.   "NO, I'M NOT IN A POSITION TO DO THAT.  I DID GO WATCH

 2   MY SON WRESTLE, SAW SOME PRETTY NEAT BULGES."

 3   Q.   WHEN YOU SAID "SOME PRETTY NEAT BULGES," WHAT DID YOU

 4   MEAN?

 5   A.   BULGES FROM THE GROIN, BULGES FROM THE GROIN OF THE

 6   WRESTLERS.

 7   Q.   YOU WERE TALKING ABOUT -- I'M SORRY.  DID YOU FINISH?

 8   A.   I DID FINISH.

 9   Q.   YOU WERE TALKING ABOUT WATCHING YOUR SON'S FRIENDS

10   WRESTLE?

11   A.   YES, SIR.

12   Q.   YOUNG BOYS?

13   A   (NO AUDIBLE RESPONSE).

14   Q   IS THAT "YES"?

15   A.   YES, SIR.

16   Q.   AND YOU WERE TALKING ABOUT WATCHING THE BULGES FROM

17   THEIR PENISES?

18   A.   YES, SIR.

19   Q.   AND THAT EXCITED YOU?

20   A.   IT DIDN'T EXCITE ME.

21   Q.   BUT YOU MENTIONED IT TO YOUR FRIEND ON THE CHAT?

22   A.   I DID.

23   Q.   BUT YOU WEREN'T INTERESTED IN HAVING RELATIONS WITH

24   THEM?

25   A.   NO, SIR.
```

1   Q.   THAT DIDN'T CREATE ANY FEELINGS OF LUST OR DESIRE IN

2   YOU?

3   A.   NOT NECESSARILY.

4   Q.   WOULD YOU AGREE WITH ME THAT BOYSAN, THE PERSON THAT YOU

5   TALKED TO ON THE CHAT, SEEMED PRETTY LONELY?

6   A.   I DIDN'T GET THAT.

7   Q.   YOU SPOKE TO HIM A COUPLE OF TIMES OVER THE TELEPHONE,

8   RIGHT?

9   A.   YES, SIR.

10  Q.   TWICE?

11  A.   I BELIEVE IT'S TWICE.

12  Q.   AND HE REALLY SEEMED TO LIKE YOU?

13  A.   I THOUGHT HE DID.

14  Q.   IF YOU TAKE A LOOK AT EXHIBIT 2J, 1/31 AT 10:52 A.M.

15  A.   2:52?

16  Q.   1/31/01 AT 10:52 A.M.  THERE'S AN ENTRY BY YOU,

17  RICOCHET, WHICH SAYS, "AHH, GO ON, LOL," RIGHT?

18  A.   YES, SIR.

19  Q.   AND RIGHT ABOVE THAT THERE'S AN ENTRY FROM OJIBOYSAN

20  WHICH SAYS, IN PART, "JUST HAVING YOU AS A FRIEND IS PLENTY."

21  A.   I SEE IT.

22  Q.   AND THEN LATER IF YOU COULD TAKE A LOOK ALSO IN J AT THE

23  ENTRY ON FEBRUARY 22ND, 2/22 AT 9:21 A.M.

24  A.   AT WHAT TIME?

25  Q.   9:21 A.M.

1    A.    OKAY.

2    Q.    AND DID YOU SEE THE ENTRY THERE BY OJIBOYSAN?

3    A.    THERE'S SEVERAL HERE.

4    Q.    THE ENTRY THAT STATES, "I FEEL THE SAME ABOUT YOU.  IT

5    WOULDN'T BE THE SAME HERE WITHOUT YOU AROUND."

6    A.    I SEE IT.

7    Q.    WOULD YOU TAKE A LOOK AT 2M?  THE DATE IS 4/2 AND THE

8    TIME IS 4:41.

9    A.    WHICH ONE?

10   Q.    4/2/01 AT 4:41 P.M., THE ENTRY FROM OJIBOYSAN, "I WOULD

11   NOT ENJOY SEEING YOU DISAPPEAR FROM MY LIFE OVER FEAR."

12   A.    I SEE IT.

13   Q.    DID IT SEEM TO YOU THAT OJIBOYSAN OR BOYSAN OR PEI,

14   WHATEVER, ALL THE OTHER SCREEN NAMES, DID IT SEEM TO YOU THAT

15   HE WAS KIND OF ATTACHED TO YOU?

16   A.    I JUST THOUGHT HE LIKED ME AS A FRIEND.

17   Q.    DID YOU THINK THAT ODD ONLY HAVING TALKED TO HIM OVER

18   THE TELEPHONE TWICE?

19   A.    NOT REALLY.

20   Q.    AND YOU DIDN'T FEEL THE SAME WAY ABOUT HIM?

21   A.    I'M SORRY?

22   Q.    YOU DID NOT FEEL THE SAME WAY ABOUT HIM?

23   A.    HE WAS JUST AN ACQUAINTANCE.

24   Q.    YOU WERE ANXIOUS TO COOPERATE AGAINST HIM ONCE YOU GOT

25   ARRESTED, RIGHT?

1    A.   THEY ASKED IF I WOULD COOPERATE AND I TOLD THEM I WOULD.

2    Q.   DID YOU COOPERATE RELUCTANTLY OR DID YOU DO IT

3    WILLINGLY?

4    A.   NOTHING EVER CAME FROM IT UNTIL NOW.

5    Q.   ALL RIGHT.  WE'LL GET INTO THAT IN A MINUTE.

6         WHEN DID YOU ACTUALLY GO INTO CUSTODY?  I'M SORRY.

7    LET ME BACK UP.  WHEN WERE YOU ACTUALLY ARRESTED?

8    A.   I GUESS THE DAY OF MY ARRAIGNMENT.

9    Q.   WHEN DID THE POLICE COME AND DO THE SEARCH AT YOUR HOME?

10   A.   ON THE 17TH.

11   Q.   APRIL 17TH?

12   A.   YES, SIR.

13   Q.   OF WHAT YEAR?

14   A.   '01.  I'M SORRY.

15   Q.   AND WHEN DID YOU ACTUALLY GO INTO CUSTODY?

16   A.   FEBRUARY 6TH, '04.

17   Q.   SO ALMOST SOME THREE YEARS LATER AFTER YOUR ARREST?

18   A.   YES, SIR.

19   Q.   NOW, CHARGES WERE FILED AGAINST YOU BEFORE THEN, RIGHT?

20   A.   I ASSUME SO.

21   Q.   WELL, YOU HAD GONE TO COURT BEFORE THEN, RIGHT?

22   A.   I DID.

23   Q.   AND YOU WERE COOPERATING WITH THE POLICE BEFORE THEN,

24   RIGHT?

25   A.   YES, SIR.

1    Q.   AND YOU DIDN'T GO INTO ACTUAL PHYSICAL CUSTODY UNTIL

2    FEBRUARY OF '04?

3    A.   CORRECT.

4    Q.   ONE OF THE REASONS WHY YOU WANTED TO COOPERATE WITH THE

5    FEDERAL AUTHORITIES WAS TO GET A REDUCED SENTENCE, RIGHT?

6    A.   THEY SAID THEY WOULD GO EASY ON ME IF I DID.

7    Q.   IS THAT A "YES"?

8    A.   YES, SIR.

9    Q.   AND YOU GOT THE MAXIMUM SENTENCE AT THAT TIME YOU COULD

10   GET FOR CHILD PORN, RIGHT?

11   A.   YES, SIR.

12   Q.   YOU GOT FIVE YEARS?

13   A.   YES, SIR.

14   Q.   BUT BECAUSE YOU COOPERATED WITH THE PROSECUTION, THEY

15   WERE EASY ON YOU, RIGHT?

16           MR. AKROTIRIANAKIS:  I WILL OBJECT FOR THE REASONS

17   STATED OFF THE RECORD, YOUR HONOR, TO THE LINE OF

18   QUESTIONING.

19           THE COURT:  THE OBJECTION IS OVERRULED.

20   BY MR. AARON:

21   Q.   BECAUSE YOU COOPERATED, THE PROSECUTION WAS EASY ON YOU,

22   RIGHT?

23   A.   I ASSUMED THEY WERE EASY ON ME.

24   Q.   THEY COULD HAVE FILED OTHER CHARGES RELATED TO THAT

25   INCIDENT, RIGHT?

1    A.    PROBABLY.

2    Q.    THEY COULD HAVE FILED CONSPIRACY TO POSSESS CHILD

3    PORNOGRAPHY, RIGHT?

4    A.    PROBABLY.

5    Q.    THEY COULD HAVE FILED DISTRIBUTION AND TRAFFICKING IN

6    CHILD PORNOGRAPHY, RIGHT?

7    A.    PROBABLY.

8    Q.    AND ALL THEY FILED WAS POSSESSION OF CHILD PORNOGRAPHY,

9    RIGHT?

10   A.    YES, SIR.

11   Q.    SO YOU COULD HAVE ENDED UP DOING A LOT MORE TIME, BUT

12   YOU DIDN'T?

13   A.    CORRECT.

14   Q.    HOW MUCH MORE TIME?

15   A.    I HAVE NO IDEA.

16   Q.    YOU UNDERSTOOD THAT CONSPIRACY, DISTRIBUTION,

17   TRAFFICKING WERE MORE SERIOUS THAN YOUR POSSESSION, RIGHT?

18   A.    I UNDERSTAND IT'S MORE SERIOUS.  THE WORD "CONSPIRACY"

19   NEVER CAME UP DURING THE INVESTIGATION.

20   Q.    BUT IT'S FAIR TO SAY THAT YOU UNDERSTOOD THAT THE

21   PROSECUTOR COULD HAVE FILED OTHER CHARGES AND MORE SERIOUS

22   ONES TOO BUT DIDN'T?

23   A.    LOOKING BACK NOW, YES.

24   Q.    YOU DON'T LIKE BEING IN PRISON, DO YOU?

25   A.    NO, SIR.

1   Q.   IT'S VERY UNPLEASANT?

2   A.   ABSOLUTELY.

3   Q.   AND YOU DON'T WANT TO STAY IN PRISON ONE MORE DAY LONGER

4   THAN YOU HAVE TO, RIGHT?

5   A.   NO, SIR.

6   Q.   AND YOU WOULD DO WHATEVER YOU COULD TO GET OUT OF

7   PRISON, RIGHT?

8   A.   NOT NECESSARILY.

9   Q.   WELL, YOU WOULD INFORM ON PEOPLE, RIGHT?

10  A.   IN THE BEGINNING I WOULD HAVE.

11  Q.   WELL, YOU'RE TESTIFYING AGAINST MR. SANDERS RIGHT NOW,

12  RIGHT?

13  A.   YES, SIR.

14  Q.   AND YOU WOULD TESTIFY AGAINST OTHER PEOPLE IF THE

15  PROSECUTORS ASKED YOU TO, WOULDN'T YOU?

16  A.   I DON'T KNOW.

17  Q.   WOULD YOU TELL THEM NO?

18  A.   I DON'T KNOW.

19  Q.   WHY MIGHT YOU TELL THEM NO?

20  A.   I GUESS FROM THE VERY BEGINNING I DIDN'T THINK THERE

21  WERE ANY OTHER CO-DEFENDERS.

22  Q.   YOU DIDN'T THINK THERE WERE ANY OTHER CO-DEFENDANTS?

23  A.   I WASN'T LOOKING AT ANYONE ELSE IN TERMS OF

24  CO-DEFENDANTS.  I ASSUMED WHAT I DID, I DID ALONE.

25  Q.   WHEN YOU SIGNED AN AGREEMENT TO COOPERATE, DIDN'T YOU

1   SIGN AN AGREEMENT THAT YOU WOULD GIVE INFORMATION ABOUT OTHER

2   PERSONS?

3   A.   I DON'T REMEMBER SIGNING AN AGREEMENT.  I'M SURE I DID,

4   BUT I DON'T REMEMBER.

5   Q.   DO YOU RECALL SIGNING AN AGREEMENT THAT NOT ONLY WOULD

6   YOU TESTIFY AGAINST OTHER PERSONS BUT YOU WOULD HELP

7   PARTICIPATE IN INVESTIGATIONS INVOLVING OTHER PERSONS?

8   A.   I DON'T REMEMBER AN AGREEMENT.  I DID AGREE TO HELP IF

9   THEY ASKED ME TO.  IT HAS BEEN A WHILE NOW.

10  Q.   DO YOU RECALL READING THE FACTUAL RESUME' OF YOUR

11  SENTENCING?

12  A.   I'M SURE I DID READ IT.

13  Q.   DO YOU RECALL BEING INTERVIEWED BY A PROBATION OFFICER?

14  A.   FOR THE PURPOSE OF DRAWING UP A PSI?

15  Q.   YES.

16  A.   YEAH, I DID.

17  Q.   DO YOU RECALL TELLING THEM THAT YOU HAD AGREED TO

18  COOPERATE?

19  A.   I DON'T RECALL.

20  Q.   SO IT'S YOUR TESTIMONY THAT YOU DIDN'T KNOW THAT YOU

21  MIGHT BE ASKED TO TESTIFY AGAINST OTHER PERSONS.  IS THAT

22  FAIR TO SAY?

23  A.   ONCE I GOT IN PRISON, I FIGURED THAT THAT CHANCE HAD

24  COME AND GONE.

25  Q.   OKAY.  I'M SORRY.  I MISUNDERSTOOD.  SO YOU WOULD AGREE

1   TO TESTIFY AGAINST OTHER PEOPLE UP TO THE POINT WHEN YOU GOT

2   INTO PRISON, AND THEN ONCE YOU GOT INTO PRISON, YOU REALIZED

3   THERE WAS NO CHANCE OF THAT?

4   A.   I DIDN'T THINK ABOUT IT AGAIN AFTER THAT.   NO ONE ASKED

5   ME TO DO ANYTHING UNTIL A COUPLE OF MONTHS AGO.

6   Q.   AND WHEN THEY DID ASK YOU, YOU SAID "YES," RIGHT?

7   A.   I WAS -- I DIDN'T WANT TO DO IT.   I DIDN'T WANT TO COME

8   OUT HERE.   I MADE THAT VERY CLEAR.

9   Q.   WHEN YOU'RE IN PRISON, YOU'RE AT THE MERCY OF THE LAW

10  ENFORCEMENT OFFICERS THERE, RIGHT?

11  A.   YES.

12  Q.   IF THERE IS A DISPUTE BETWEEN YOU AND A LAW ENFORCEMENT

13  OFFICER IN A PRISON, IT'S GOING TO BE YOUR WORD AGAINST A

14  FEDERAL AGENT'S WORD, RIGHT?

15  A.   MY WORD AGAINST THEM, SURE.

16  Q.   AND YOU KNOW EVERYONE IS GOING TO KNOW THAT YOU WERE

17  CONVICTED OF CHILD PORNOGRAPHY, RIGHT?

18  A.   YES, SIR.

19  Q.   YOU KNOW THAT FEDERAL OFFICERS CAN DO A LOT IF THEY

20  WANTED TO TO MAKE YOUR TIME IN FEDERAL PRISON VERY

21  UNPLEASANT?

22  A.   SURE.

23  Q.   AND YOU KNOW THAT YOU WOULDN'T BE ABLE TO DO MUCH ABOUT

24  THAT, RIGHT?

25  A.   NOT A THING.

1    Q.   AND YOU'VE HEARD OF PRISONERS WHO'VE GOTTEN INTO

2    PERSONAL BEEFS WITH OFFICERS?

3    A.   YES, SIR.

4    Q.   AND YOU KNOW IT'S NOT A SMART THING TO DO?

5    A.   NO, SIR.

6    Q.   AND YOU KNOW THAT OFFICERS CAN RETALIATE AGAINST INMATES

7    IN A LOT OF WAYS?

8    A.   I'VE WATCHED IT HAPPEN.

9    Q.   PARTICULARLY IF A PERSON HAS A REPUTATION FOR BEING

10   UNCOOPERATIVE OR A TROUBLEMAKER?

11   A.   I'VE WATCHED THAT HAPPEN TOO.

12   Q.   AND YOU DON'T WANT THAT, RIGHT?

13   A.   NO, SIR.

14   Q.   YOU'RE NOT GOING TO BE GETTING OUT OF FEDERAL CUSTODY

15   UNTIL JUNE 14TH, 2008?

16   A.   THAT'S MY OUT DAY, YES, SIR.

17   Q.   AND THERE'S A LOT OF DANGEROUS PEOPLE IN FEDERAL PRISON,

18   RIGHT?

19   A.   I UNDERSTAND THERE IS, YES.

20   Q.   AND PEOPLE WHO ARE INVOLVED IN CHILD PORNOGRAPHY ARE NOT

21   VERY POPULAR?

22   A.   NO, THEY ARE NOT.

23   Q.   AND PEOPLE WHO ARE INVOLVED IN CRIMES AGAINST CHILDREN

24   ARE NOT VERY POPULAR?

25   A.   THAT IS TRUE.

1    Q.   IN FACT, IF YOU WERE HOUSED WITH REGULAR INMATES, YOU

2    MIGHT GET HURT?

3    A.   THAT RISK IS THERE, YES, SIR.

4    Q.   YOU MIGHT GET KILLED?

5    A.   THAT RISK IS THERE TOO.

6    Q.   THAT IS PRETTY FRIGHTENING, RIGHT?

7    A.   YES, SIR.

8    Q.   AND AS UNPLEASANT AS YOUR CUSTODY SITUATION IS NOW

9    BEFORE YOU CAME TO TESTIFY, IT COULD GET EVEN WORSE, ISN'T

10   THAT TRUE?

11   A.   IT COULD.

12   Q.   WHAT FACILITY ARE YOU HELD AT?

13   A.   FORTH WORTH FCI.

14   Q.   AND FCI IS A FEDERAL CORRECTIONAL INSTITUTE, RIGHT?

15   A.   YES, SIR.

16   Q.   AND YOU UNDERSTAND THAT TO BE AN INSTITUTION WHICH HAS A

17   LOWER SECURITY CLASSIFICATION THAN A UNITED STATES PRISON,

18   RIGHT?

19   A.   YES, SIR.

20   Q.   IN OTHER WORDS, PEOPLE AT A UNITED STATES PRISON ARE

21   CONVICTED OF MORE VIOLENT CRIMES OR ARE MORE DANGEROUS,

22   RIGHT?

23   A.   CORRECT.

24   Q.   AND INSTEAD OF DOING TIME AT AN FCI, IT'S POSSIBLE YOU

25   COULD END UP DOING TIME AT A USP, RIGHT?

1    A.   I COULD?

2    Q.   YES.

3    A.   BASED ON?

4    Q.   BASE UPON WHAT THE BUREAU OF PRISONS DECIDES?

5         MR. AKROTIRIANAKIS:  OBJECTION, FOUNDATION.

6         THE COURT:  OVERRULED.

7         DO YOU WANT TO REPEAT THE QUESTION?

8         MR. AARON:  I'LL REPHRASE.

9    BY MR. AARON:

10   Q.   IT WOULD BE WORSE FOR YOU TO GO TO A UNITED STATES

11   PRISON THAN TO REMAIN AT AN FCI, RIGHT?

12   A.   SURE.

13   Q.   YOU KNEW THAT BOYSAN WAS HAVING COMPUTER PROBLEMS IN

14   YOUR CHATS, RIGHT?

15   A.   YES, SIR.

16   Q.   AND YOU KNEW HE WAS GETTING VIRUSES FROM THE INTERNET,

17   RIGHT?

18   A.   I DON'T RECALL THE VIRUSES.

19   Q.   IF I COULD PLEASE DIRECT YOUR ATTENTION TO 2C,

20   NOVEMBER 7TH, 11:53 A.M., ONE ENTRY AT THE BOTTOM OF THE PAGE

21   AND IF YOU TURN TO THE NEXT PAGE AND READ TO 11:56 A.M.

22   A.   "HEHEHE, I DON'T FEEL SICK."

23   Q.   READ IT TO YOURSELF FIRST.

24   A.   OH, I'M SORRY.

25   Q.   AND LET US KNOW WHEN YOU'RE DONE.

1    A.    OKAY.

2    Q.    ISN'T IT TRUE, MR. MARTIN, THAT BOYSAN1 TOLD YOU,

3    "HEHEHE, I DON'T FEEL SICK.  I RECEIVED A TROJAN HORSE ON

4    SUNDAY FROM A FRIEND"?

5    A.    YES, HE DID.

6    Q.    AND WHAT WAS YOUR RESPONSE?

7    A.    MY RESPONSE WAS THAT I HAD NEVER HEARD OF A TROJAN

8    HORSE.

9    Q.    YOU SAID, "I'M NOT TOO FAMILIAR WITH A TROJAN HORSE"

10   QUESTION MARK?

11   A.    YES, SIR.

12   Q.    AND HE WROTE YOU, "IT'S A VERY AGGRESSIVE AND FAMOUS

13   VIRUS THAT HAS ZAPPED A FEW BIG DATABASES A COUPLE MONTHS AGO

14   WHEN IT FIRST APPEARED"?

15   A.    YES, SIR.

16   Q.    AND HE TOLD YOU A NUMBER OF TIMES ABOUT HIS PROBLEMS

17   WITH COMPUTERS, RIGHT?

18   A.    YES, SIR.

19   Q.    TAKE A LOOK AT EXHIBIT G.

20   A.    G?

21   Q.    G, DATE 12/18, 1:23 A.M.  IF YOU COULD READ THE ENTRY

22   FROM BOYSAN1 TO YOURSELF AND LET US KNOW WHEN YOU'RE DONE.

23   A.    AT 1:23 A.M.?

24   Q.    PLEASE.

25   A.    OKAY.

1    Q.    AND AT THAT TIME BOYSAN WROTE YOU:  URL, HURRY, FORWARD

2    TO ALL, INCLUDING ME, SO I KNOW THAT YOU GOT THIS.  URL'S

3    DESCRIPTION, HIS NUMBER=50454771.  HE SENDS VIRUSES.

4    NICKNAME IS PETER.  VERY URGENT.  PLEASE SEND TO EVERYONE.

5    RIGHT?

6    A.    I SEE IT.

7    Q.    AND YOU UNDERSTOOD THAT TO MEAN A VIRUS WAS GOING

8    AROUND?

9    A.    YES, SIR, THAT'S WHAT IT LOOKED LIKE.

10   Q.    IF YOU TAKE A LOOK AT 2J, PLEASE.  TAKE A LOOK AT THE

11   ENTRY FOR RICOCHET AT 1/31 AT 9:28 A.M.

12   A     1/28?

13   Q.    1/31/01 AT 9:28 A.M.

14   A.    I SEE IT.

15   Q.    DO YOU SEE THE ENTRY RIGHT BELOW THAT FOR OJIBOYSAN,

16   9:36 A.M.?

17   A.    YES, SIR.

18   Q.    AND IT READS:  NO, HE'S PAST THAT NOW.  MY COMP FROZE

19   UP.

20   A.    YES, SIR.

21   Q.    AND "COMP" SPELLED C-O-M-P, YOU UNDERSTOOD THAT TO MEAN

22   COMPUTER?

23   A.    I DID.

24   Q.    AND YOU UNDERSTOOD THAT TO MEAN THAT OJIBOYSAN WAS

25   HAVING A COMPUTER PROBLEM?

1   A.   YES, SIR.

2   Q.   HE ALSO TOLD YOU ABOUT PROBLEMS NOT JUST WITH INTERNET

3   AND WITH THE COMPUTER BUT WITH HIS OPERATING SYSTEM, RIGHT?

4   A.   YES, SIR.

5   Q.   PLEASE TAKE A LOOK AT 2C, 11/7 AT 11:40.

6   A.   11/7 AT 11:40?

7   Q.   YES, THE VERY FIRST PAGE OF 2C.

8   A.   YES.

9   Q.   AND THE ENTRY BEGINS BOYSAN1, 11/7/00, 11:40 A.M.:  HI,

10   WINDOWS CRASHED, ET CETERA, ET CETERA?

11   A.   YES, SIR.

12   Q.   YOU UNDERSTOOD THAT TO BE A REFERENCE TO A PROBLEM WITH

13   HIS OPERATING SYSTEM?

14   A.   I DID.

15   Q.   AND GENERALLY SPEAKING, THE CHATS -- YOU HAVEN'T SEEN

16   ANYTHING INACCURATE IN THE CHATS?

17   A.   NOT SO FAR.  SOME OF IT I DON'T REMEMBER, BUT --

18   Q.   THE PARTS THAT YOU'VE READ AND THAT YOU DO REMEMBER, DO

19   YOU SEE ANYTHING INACCURATE IN THE SENSE OF MISSING SPEAKERS

20   OR COMMENTS ATTRIBUTED TO ONE PERSON THAT SHOULD BE

21   ATTRIBUTED TO A DIFFERENT PERSON OR ANYTHING LIKE THAT?

22   A.   NO, SIR, THE STUFF I REMEMBER SEEMS TO BE ACCURATE.

23   Q.   IF YOU TAKE A LOOK AT EXHIBIT 2G, THAT'S ONE THAT YOU'VE

24   READ BEFORE?

25   A.   PAGE WHAT, SIR?

1    Q.    2G.

2    A.    THE WHOLE SECTION?

3    Q.    HAVE YOU READ THAT BEFORE?

4    A.    I WOULD HAVE TO GO THROUGH IT TO BE SURE.

5    Q.    WELL, LET ME DIRECT YOUR ATTENTION TO THE ENTRY AT THE

6    BOTTOM OF THE FIRST PAGE BY SPEED AT 12/19/00 THROUGH THE

7    NEXT PAGE AND THE NEXT PAGE AFTER THAT AND THE NEXT PAGE

8    AFTER THAT UP TO THE ENTRY BY DRAGON ON 12/31/00 AT

9    5:06 P.M.  READ THAT TO YOURSELF, PLEASE, AND LET US KNOW

10   WHEN YOU'RE DONE.

11   A.    OKAY.

12   Q.    AND TURNING YOUR ATTENTION BACK TO THE ENTRY, SPEED --

13   FIRST OF ALL, IN ALL OF 2G, DO YOU APPEAR AT ALL?

14   A.    I DON'T SEE MY NAME ANYWHERE.

15   Q.    IS THAT A "NO"?

16   A.    YES, SIR.  NO.

17   Q.    IF YOU COULD GO BACK TO DECEMBER 19TH, 10:37 A.M.,

18   THAT'S AN ENTRY BY SPEED, RIGHT?

19   A.    10:37 A.M.?

20   Q.    YES.

21   A.    IT IS.

22   Q.    AND YOU NEVER USED THE MONIKER OR SCREEN NAME OF

23   "SPEED," DID YOU?

24   A.    I DID NOT.

25   Q.    THE ENTRY SAYS, HI, RABBIT -- WAS RABBIT A NICKNAME?

1    A.    IT WAS.

2    Q.    FOR YOU?

3    A.    IT WAS.

4    Q.    THEN LOOK AT THE NEXT ENTRY.   THE NEXT ENTRY IS BY

5    SPEED, NOT RICOCHET, RIGHT?

6    A.    YES, SIR.

7    Q.    AND THAT'S 12/19/00 AT 10:40 A.M., HOW YOU DOING, BUDDY?

8    A.    YES, SIR.

9    Q.    THAT ENTIRE PAGE IS THERE ANY ENTRY BY RICOCHET?

10   A.    NO, SIR.

11   Q.    CAN YOU TAKE A LOOK AT THE NEXT PAGE?   NOW, THE DIALOGUE

12   THAT BEGAN AT 12/19/00 AT 10:37 A.M. APPEARS TO END AT

13   12/19/00 AT 10:59 A.M.; IS THAT RIGHT?

14   A.    IT LOOKS THAT WAY, YES, SIR.

15   Q.    AND IT BEGINS WITH SPEED, RIGHT?

16   A.    YES, SIR.

17   Q.    AND IT ENDS WITH SPEED, RIGHT?

18   A.    IT DOES.

19   Q.    AND ALL OF THE ENTRIES ARE BY SPEED?

20   A.    YES, SIR.

21   Q.    THE NEXT ENTRY IS A WHOLE -- IS WEEKS AWAY.   IT'S

22   12/28/00, RIGHT?

23   A.    AFTER 12/31?

24   Q.    NO.   THE LAST ENTRY IN THAT CONVERSATION ON

25   DECEMBER 19TH IS AT 10:59 A.M., RIGHT?

1    A.    OH, YES.

2    Q.    AND IF YOU LOOK AT THE NEXT ENTRY ON THE TRANSCRIPT IT

3    SAYS, 12/28/00 AT 5:25 P.M., RIGHT?

4    A.    YES, SIR.

5    Q.    OKAY.  SO THERE'S A GAP OF AT LEAST A COUPLE OF WEEKS,

6    RIGHT?

7    A.    THERE APPEARS TO BE.

8    Q.    OR NINE DAYS, ACTUALLY.

9            IN THAT CONVERSATION ON DECEMBER 19TH, YOU DON'T

10   APPEAR AT ALL?

11   A.    NO, SIR.

12   Q.    NOW, DID YOU KNOW HOW TO EDIT YOUR ICQ TRANSCRIPTS?

13   A.    NO, I DID NOT.

14   Q.    DID YOU EVER DO THAT?

15   A.    NO, SIR, I WASN'T EVEN SURE THEY WERE EVEN THERE.

16   Q.    OKAY.  TAKE A LOOK RIGHT AT 12/28/00 AT 5:25 P.M. WHEN

17   THE TRANSCRIPT RESUMES WITH SPEED.  OKAY?

18   A.    I SEE IT.

19   Q.    THEN GO TO THE NEXT PAGE.  THAT CONVERSATION ON 12/28

20   BEGINS AT -- IT BEGINS AT 5:25 P.M. AND IT ENDS AT 5:37 P.M.

21   ON THAT NEXT PAGE, RIGHT?

22   A.    YES, SIR.

23   Q.    AND IT BEGAN WITH A COMMENT BY SPEED, RIGHT?

24   A.    YES, SIR.

25   Q.    AND IT ENDED WITH A COMMENT BY SPEED, RIGHT?

```
 1    A.    YES, SIR.

 2    Q.    AND ALL OF THE COMMENTS IN THE MIDDLE ARE BY SPEED,

 3    RIGHT?

 4    A.    YES, SIR.

 5    Q.    YOU DON'T APPEAR IN THAT CONVERSATION AT ALL?

 6    A.    NO, SIR.

 7    Q.    AND YOU DIDN'T EDIT THAT TRANSCRIPT, DID YOU?

 8    A.    NO, SIR.

 9    Q.    YOU DIDN'T PUT THESE TWO TRANSCRIPTS TOGETHER, DID YOU?

10    A.    NO, SIR, I DON'T EVEN REMEMBER THIS.

11    Q.    YOU WERE WORRIED -- WHEN YOU WERE ON THE INTERNET WHEN

12    YOU WERE ON THE CHATS, YOU WERE WORRIED ABOUT TALKING TO

13    PEOPLE WHO WERE IMITATING OTHER PEOPLE, RIGHT?

14    A.    I DON'T UNDERSTAND YOUR QUESTION.

15    Q.    WELL, YOU WERE WORRIED THAT YOU MIGHT BE TALKING TO

16    SOMEONE WHO MIGHT ACTUALLY BE A DIFFERENT PERSON THAN YOU

17    THOUGHT YOU WERE TALKING TO?

18    A.    I DON'T KNOW THAT I THOUGHT ABOUT IT.

19    Q.    WEREN'T YOU CONCERNED THAT YOU MIGHT BE TALKING TO

20    SOMEONE THAT YOU WOULD HOPE WOULD BE A BOY BUT IT MIGHT TURN

21    OUT JUST TO BE A MAN?

22    A.    NO.

23    Q.    IF YOU TAKE A LOOK AT 2C, NOVEMBER 7TH AT 2:05 P.M.

24    A.    OKAY.

25    Q.    DO YOU RECALL THAT BOYSAN, THE SPEAKER IDENTIFIED AS
```

```
 1    BOYSAN, SAID, "DO YOU HAVE SOME BOYS THAT YOU CHAT WITH?"

 2    AND WHAT WAS YOUR RESPONSE?

 3    A.    NO.

 4    Q.    BEG YOUR PARDON?

 5    A.    IT SAYS, "NO, I DON'T."

 6    Q.    YOUR FULL RESPONSE.

 7    A.    OH, MY FULL -- "WISH I DID.  HOW WOULD I BE SURE IT WAS

 8    A BOY AND NOT A MAN POSING AS A BOY?"

 9    Q.    SO YOU WERE A LITTLE WORRIED ABOUT TALKING TO SOMEONE

10    THAT YOU WOULD THINK WAS A BOY BUT WAS ACTUALLY A MAN POSING

11    AS A BOY?

12    A.    YES, SIR.

13    Q.    ONE OF THE PRECONDITIONS IN YOUR IMMUNITY AGREEMENT

14    WITH THE UNITED STATES IS THAT YOU TESTIFY TRUTHFULLY, RIGHT?

15    A.    YES, SIR.

16    Q.    AND YOU'RE NOT -- ONCE YOU WERE CAUGHT, YOU WERE NOT

17    ABOUT TO LIE TO ANYONE, RIGHT?

18    A.    NO, SIR.

19    Q.    YOU TOLD THE -- YOU'RE TELLING THE TRUTH TO THE

20    GOVERNMENT, RIGHT?

21    A.    YES, SIR.

22    Q.    TO THE COURT?

23    A.    YES, SIR.

24    Q.    TO THIS JURY?

25    A.    YES, SIR.
```

1    Q.    TO LAW ENFORCEMENT?

2    A.    YES, SIR.

3    Q.    BUT YOU HAD LIED TO LAW ENFORCEMENT ORIGINALLY, RIGHT?

4    A.    ABOUT?

5    Q.    EARLIER WHEN YOU SPOKE -- YOU SPOKE TO LAW ENFORCEMENT

6    ON DECEMBER 28TH, 2001, RIGHT?

7    A.    I DON'T REMEMBER THE DATE.

8              MR. AARON:   MAY I APPROACH, YOUR HONOR?

9              THE COURT:   YOU MAY.

10   BY MR. AARON:

11   Q.    LET ME SHOW YOU A COPY OF THE REPORT TO REFRESH YOUR

12   RECOLLECTION.   IF YOU COULD PLEASE READ TO YOURSELF THE

13   SUMMARY HERE AND THE SUMMARY HERE AND LET US KNOW WHEN YOU'RE

14   DONE.

15   A.    HERE?

16   Q.    BEG YOUR PARDON?

17   A.    YOU SAID HERE, START HERE?

18   Q.    OH, STARTING RIGHT THERE WHERE IT SAYS, "MARTIN,

19   PLEASE" --

20   A.    OKAY.

21   Q.    YOU TOLD LAW ENFORCEMENT ON NOVEMBER 28TH, 2001 THAT YOU

22   HAD HAD AN INAPPROPRIATE SEXUAL RELATIONSHIP WITH A 15- OR

23   16-YEAR-OLD MALE BOY?

24   A.    WITH ADVICE OF COUNSEL, I'M GOING TO TAKE THE FIFTH

25   AMENDMENT ON THAT.

1    Q.    DID YOU LATER TELL THE GOVERNMENT THAT THERE WAS ANOTHER

2    CHILD THAT YOU HAD HAD A SEXUAL RELATIONSHIP WITH?

3    A.    AGAIN, THE FIFTH AMENDMENT, SIR.

4    Q.    YOU GOT IMMUNITY TO TESTIFY IN THIS CASE, RIGHT?

5              THE COURT:  EXCUSE ME.  MR. AARON, LET ME JUST TAKE

6    A MOMENT TO INSTRUCT THE JURY ABOUT THE EVIDENCE THAT THEY

7    JUST HEARD.

8              WELL, ACTUALLY, I NEED TO SEE COUNSEL AT THE

9    SIDEBAR, PLEASE.

10             (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

11             THE COURT:  ACTUALLY, THE JURY HASN'T HEARD

12   EVIDENCE.  THEY HAVE ONLY HEARD A QUESTION, AND I ALREADY

13   TOLD THEM, OF COURSE, THAT THE QUESTION ISN'T EVIDENCE.

14             NOW, ARE YOU GOING TO GET --

15             MR. AARON:  I THINK WE CAN STIPULATE THAT BECAUSE I

16   THINK AGENT MORENO HEARD THE SECOND -- YOU WERE THE ONE WHO

17   TOLD ME ABOUT THE SECOND OFFENSE.

18             MR. AKROTIRIANAKIS:  HIS LAWYER TOLD THAT TO ME.

19   I ONLY SAID IT BECAUSE IT WAS THEN KNOWLEDGE WITHIN THE

20   GOVERNMENT'S POSSESSION THAT I AM OBLIGATED TO SHARE BECAUSE

21   IT COULD LEAD TO IMPEACHMENT INFORMATION.

22             MR. AARON:  RIGHT.  I THINK WE CAN JUST HAVE A

23   STIPULATION THAT HE HAD TOLD IN THIS ONE INSTANCE ABOUT AN

24   INAPPROPRIATE SEXUAL RELATIONSHIP, AND THE SECOND ONE WE'RE

25   NOT DISCLOSING WAS -- WE CAN JUST SAY THE GOVERNMENT PROVIDED

1    INFORMATION THAT HE HAD MENTIONED A SECOND INAPPROPRIATE

2    SEXUAL RELATIONSHIP.

3            THE COURT:  BUT SEE, WHAT HASN'T HAPPENED IS THERE

4    HASN'T BEEN ANY IMPEACHMENT ON A PRIOR INCONSISTENT STATEMENT

5    AND SO --

6            MR. AARON:  WELL, BECAUSE I DID NOT ANTICIPATE

7    AFTER HAVING TOLD THE POLICE ABOUT IT, THE FIRST ONE, THAT HE

8    WOULD TAKE THE FIFTH AMENDMENT ON THE FIRST ONE.  I'M NOT

9    SURE HE STILL HAS A FIFTH AMENDMENT.  I MEAN, TECHNICALLY IF

10   THEY WERE GOING TO PROSECUTE HIM, THEY WOULD HAVE THE SAME

11   INFORMATION.  NOW THEY WOULD JUST HAVE A BLANKET STATEMENT:

12   I DID HAVE AN INAPPROPRIATE RELATIONSHIP.  AND BASICALLY THAT

13   WAS FROM THE DOCUMENT.  THEY WOULDN'T HAVE ANYTHING NEW OTHER

14   THAN WHAT THEY HAD IN THE ORIGINAL REPORT.

15           THE COURT:  ARE YOU ASKING ME TO -- SEE, YOU

16   WEREN'T GOING TO INQUIRE ABOUT THAT.  WHAT YOU WANTED TO

17   INQUIRE ABOUT --

18           MR. AARON:  IT WAS FOUNDATIONAL.

19           THE COURT:  SO WHAT YOU REALLY INQUIRED ABOUT WAS

20   NOT THAT BUT THE FACT THAT HE DENIED THE SECOND ONE AND HAS

21   NOW ADMITTED IT?

22           MR. AARON:  RIGHT.

23           THE COURT:  WE DON'T HAVE THAT EVIDENCE IN FRONT OF

24   THE JURY, SO THERE IS NO REASON FOR A LIMITED INSTRUCTION.

25           MR. AARON:  I WILL JUST ASK HIM, "ISN'T IT TRUE

1    WHEN YOU SPOKE TO THE POLICE YOU DENIED HAVING ANY OTHER

2    SEXUAL INAPPROPRIATE RELATIONSHIP OTHER THAN A PREVIOUS ONE

3    INCIDENT INVOLVING A 15- OR 16-YEAR-OLD?"

4         THE COURT:  THAT'S FINE IF YOU WANT TO DO THAT.  I

5    WAS ABOUT TO GIVE A LIMITING INSTRUCTION.  WE DON'T NEED TO

6    AT THIS POINT BECAUSE RIGHT NOW THERE IS NO EVIDENCE BEFORE

7    THE JURY.

8         MR. AARON:  BUT IF HE TRIES TO TAKE THE FIFTH

9    AMENDMENT ON THAT ONE --

10         THE COURT:  I'M SORRY.  THE QUESTION YOU'RE GOING

11    TO ASK HIM NOW, "ISN'T IT TRUE THAT YOU DENIED" -- "ISN'T

12    IT TRUE THAT WHEN YOU SPOKE TO THE POLICE ON NOVEMBER 28TH,

13    2001, YOU DENIED HAVING AN INAPPROPRIATE SEXUAL RELATION WITH

14    A MINOR OTHER THAN THE ONE INVOLVING A 15- OR 16-YEAR-OLD

15    BOY?"  AND THE TRUTH IS, I DON'T KNOW HOW THAT WOULD

16    INCRIMINATE HIM BECAUSE THAT'S JUST A PRIOR STATEMENT

17    SOMEBODY MADE.  IF HE MADE THAT STATEMENT OR HE DIDN'T, HE IS

18    NOT SAYING THAT HE HAD THAT RELATIONSHIP.  HE IS SAYING HE

19    MADE THAT STATEMENT.

20         MR. MICHAEL:  MAKING THE SAME STATEMENT A SECOND

21    TIME IT COULD INCRIMINATE AND CERTAINLY COULD BE USED IN A

22    CRIMINAL PROCEEDING.

23         THE COURT:  I THINK IF HE ADMITS NOW THAT HE DIDN'T

24    SAY IT EARLIER, THIS COULD BE INCRIMINATING FOR HIM TO NOW

25    ADMIT THAT HE FAILED --

1          MR. MICHAEL:  STATEMENTS WITH REGARD TO EITHER OF

2    THE PRIOR ADMISSIONS OR THE PRIOR DENIAL JUST BECAUSE HE --

3    THE PREVIOUS STATEMENT OF ONE DOESN'T MEAN ADDITIONAL

4    STATEMENTS AREN'T FURTHER INCRIMINATING.  CERTAINLY THE

5    GOVERNMENT WOULD ARGUE THE ONE STATEMENT IS MORE

6    INCRIMINATING THAN ANOTHER AND A DENIAL IS INCRIMINATING.

7          MR. AARON:  I'M HAVING TROUBLE.  I CAN'T HEAR WITH

8    TWO PEOPLE TALKING.  I'M SORRY.

9          THE COURT:  I THINK THE PROBLEM WITH THIS QUESTION

10   IS THE QUESTION THAT YOU'RE ABOUT TO ASK IS THAT HE MAY

11   INCRIMINATE HIMSELF AGAIN, BECAUSE YOU'RE ASKING HIM TO

12   INCRIMINATE HIMSELF REGARDING WHETHER OR NOT HE FAILED TO

13   ANSWER THE INVESTIGATOR'S QUESTIONS TRUTHFULLY BACK IN

14   DECEMBER OF -- WAS IT 2000?

15         MR. AARON:  THE STATUTE ON OBSTRUCTION IS FIVE

16   YEARS.  I BELIEVE THE STATUTE ON OBSTRUCTION IS FIVE YEARS,

17   SO THE STATUTE ON THAT IS WRONG.

18         MR. AKROTIRIANAKIS:  THE GOVERNMENT WOULDN'T HAVE

19   HAD KNOWLEDGE OF THE FALSENESS OF THE STATEMENT UNTIL NOW, SO

20   IF HE HAS RELIABILITY FOR THAT STATEMENT, HE ALSO HAS, AS YOU

21   MENTIONED, OBSTRUCTION OF JUSTICE.

22         MR. AARON:  THEN I WOULD ASK THE GOVERNMENT TO

23   STIPULATE THAT IT MADE THAT PRIOR STATEMENT, THAT HE DENIED

24   ANY OTHER AND THAT LATER HE HAD ADMITTED THAT THERE WAS

25   ANOTHER ACT.  BECAUSE IF THE GOVERNMENT FAILS TO DO THAT,

1    THEN BASICALLY THEY ARE PUTTING ON A WITNESS THAT THEY KNOW

2    HAS BEEN UNTRUTHFUL, THAT THEY KNOW THIS IS IMPEACHMENT

3    EVIDENCE OUT THERE AND THEY ARE OBJECTING TO IT AND

4    PREVENTING ME FROM IMPEACHING THE WITNESS, AND CLEARLY I

5    THINK THIS IMPEACHMENT EVIDENCE IS RIGHT.

6            THE COURT:  THEY DISCLOSED IT TO YOU --

7            MR. AARON:  THEY DID.

8            THE COURT:  -- AS SOON AS THEY LEARNED ABOUT IT.

9            MR. AARON:  WELL, YES, BUT WAY TOO LATE FOR ME TO

10   GET SUBPOENAS FOR INVESTIGATORS IN DALLAS, TEXAS, BROUGHT OUT

11   HERE.  THIS WAS ON THE EVE OF TRIAL.

12           THE COURT:  THEY DISCLOSED IT AS SOON AS THEY KNEW

13   ABOUT IT.

14           MR. AARON:  BUT THAT DOESN'T CHANGE THE FACT THAT

15   ALTHOUGH THEY MAY HAVE DISCLOSED IT, THEY ARE PREVENTING ME

16   FROM PRESENTING THIS EXCULPATORY EVIDENCE.

17           THE COURT:  THE REASON I CALLED COUNSEL TO THE

18   SIDEBAR WAS I DIDN'T FEEL ON THE BASIS OF THE TWO QUESTIONS

19   YOU HAD ASKED THERE WAS A REASON TO GIVE A LIMITING

20   INSTRUCTION, BECAUSE THERE WAS NO EVIDENCE IN -- ALTHOUGH

21   THERE WAS A QUESTION, A QUESTION ISN'T EVIDENCE.

22           NOW, YOU MAY ARGUE, AS I HAVE ALREADY SAID, THE

23   IMPORT OF THE IMPLICATION OF THE FIFTH AMENDMENT PRIVILEGE.

24   YOU MAY ASK YOUR NEXT QUESTION AND SEE WHAT THE WITNESS -- IF

25   HE INVOKES HIS FIFTH AMENDMENT PRIVILEGE, AND WE WILL GO FROM

1    THERE.  IF YOU CHOOSE TO ASK HIM MORE QUESTIONS, YOU MAY.

2      (ON-THE-RECORD DISCUSSION HELD AT SIDEBAR IS CONCLUDED.)

3            THE COURT:  MR. AARON, GO AHEAD.  YOU MAY INQUIRE.

4            MR. AARON:  THANK YOU.

5    BY MR. AARON:

6    Q.   ALL RIGHT.  WHEN YOU SPOKE TO LAW ENFORCEMENT ON

7    NOVEMBER 28TH, 2001, THEY ASKED YOU IF YOU HAD EVER COMMITTED

8    SEXUAL ASSAULT AGAINST MINORS, RIGHT?

9    A.   FIFTH AMENDMENT AGAIN, SIR.

10           MR. AARON:  I'M GOING TO ASK THE COURT TO OVERRULE

11   THAT.

12           THE COURT:  I'M SORRY.  DID YOU SAY YOU WERE

13   INVOKING YOUR FIFTH AMENDMENT?

14           THE WITNESS:  YES, MA'AM.

15           THE COURT:  I DIDN'T HEAR YOU.

16           I'M GOING TO DECLINE TO OVERRULE IT AT THIS TIME.

17   BY MR. AARON:

18   Q.   YOU GOT IMMUNITY TO TESTIFY IN THIS CASE, RIGHT?

19   A.   YES, SIR.

20   Q.   AND YOU HAD ASKED FOR IMMUNITY, RIGHT?

21   A.   YES, SIR.

22   Q.   AND THE REASON YOU ASKED FOR IT IS THAT YOU WERE AFRAID

23   THAT YOU MIGHT TESTIFY TO SOMETHING THAT MIGHT GET YOU INTO

24   TROUBLE, RIGHT?

25   A.   CORRECT.

1   Q.   AND YOU WERE WORRIED THAT -- WELL, YOU UNDERSTOOD YOUR

2   IMMUNITY AGREEMENT TO MEAN THAT THE GOVERNMENT COULD NOT USE

3   ANY STATEMENTS THAT YOU MADE IN THIS PROCEEDING AGAINST YOU,

4   RIGHT?

5   A.   YES, SIR.

6   Q.   EVEN IF YOU TALKED ABOUT NEW OR DIFFERENT CRIMES, RIGHT?

7   A.   YES, SIR.

8   Q.   YOU KNOW EVEN IF YOU TALKED ABOUT PAST CRIMES, THEY

9   CAN'T USE YOUR STATEMENTS AGAINST YOU, RIGHT?

10  A.   YES, SIR.

11  Q.   AND YOU KNOW THAT -- YOU WERE WORRIED ABOUT TWO SPECIFIC

12  CRIMES, RIGHT?

13  A.   YES, SIR.

14  Q.   YOU WERE WORRIED ABOUT BEING POSSIBLY CHARGED WITH

15  AIDING AND ABETTING, TRAVELING TO HAVE SEX WITH A MINOR,

16  RIGHT?

17  A.   I'M SORRY.  SAY IT AGAIN.

18  Q.   YOU WERE WORRIED ABOUT TWO SPECIFIC CRIMES, RIGHT?

19  A.   I ONLY RECALL ONE.

20  Q.   YOU WERE WORRIED ABOUT BEING CHARGED AS AN AIDER AND

21  ABETTOR IN THE CRIMES THAT MR. SANDERS IS FACING TRIAL ON,

22  RIGHT?

23  A.   THAT IS CORRECT.

24  Q.   AND YOU KNOW ONE OF THOSE CHARGES TO BE TRAVELING TO

25  HAVE SEX WITH A MINOR, RIGHT?

1    A.    IT'S THE FIRST I'VE HEARD OF THAT.

2    Q.    WERE YOU AWARE THAT THE PENALTY FOR THAT CHARGE WAS 15

3    YEARS?

4    A.    NO, SIR.

5    Q.    WERE YOU AWARE THAT MR. SANDERS IS ALSO CHARGED WITH

6    AGGRAVATED SEXUAL ABUSE?

7    A.    I HAVE NOT BEEN TOLD IT OFFICIALLY.

8    Q.    WERE YOU AWARE THAT --

9            MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

10           THE COURT:  WHAT'S YOUR OBJECTION?

11           MR. AKROTIRIANAKIS:  NO FOUNDATION AND IT'S

12   SPECULATION AS TO THE NEXT QUESTION ABOUT TO BE ASKED.

13   IT'S 403.

14           THE COURT:  WELL, AS TO NO FOUNDATION, YOU

15   MEAN -- WELL, THE OBJECTION IS SUSTAINED.

16   BY MR. AARON:

17   Q.    WERE YOU TOLD THE POSSIBLE PENALTIES FOR THE CHARGES

18   THAT YOU MIGHT FACE?

19   A.    NO, SIR.

20   Q.    YOU HAD NO UNDERSTANDING WHAT THOSE CHARGES COULD BE?

21   A.    JUST AIDING AND ABETTING IS THE ONLY ONE THAT I HAD

22   HEARD.

23   Q.    RIGHT.  DID YOU HAVE ANY IDEA WHAT THE POSSIBLE PENALTY

24   FOR THAT CHARGE COULD BE?

25   A.    NO, SIR.

1    Q.    WHY DID YOU WANT IMMUNITY?

2    A.    I JUST FELT COMFORTABLE HAVING IT.

3    Q.    DID YOU BELIEVE THAT IF YOU HAD IMMUNITY THAT YOU COULD

4    BE PROSECUTED FOR ANY PAST STATEMENTS THAT YOU MADE?

5    A.    NO.

6              MR. AARON:  YOUR HONOR, I WOULD ASK TO APPROACH.

7              THE COURT:  YOU MAY APPROACH.

8              (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

9              MR. AARON:  YOUR HONOR, I THINK WE HAVE

10   ESTABLISHED THAT THE WITNESS CAN'T BE PROSECUTED FOR ANY

11   STATEMENTS THAT HE MAKES HERE.  THAT BEING THE CASE, I WOULD

12   ASK THE COURT TO OVERRULE HIS ASSERTION OF THE FIFTH

13   AMENDMENT PRIVILEGE BECAUSE THIS INFORMATION CANNOT BE USED

14   AGAINST HIM, SO HE WOULD NOT BE INCRIMINATING HIMSELF.

15             MR. AKROTIRIANAKIS:  HIS UNDERSTANDING OF THE

16   IMMUNITY AGREEMENT AND HIS COUNSEL'S ADVICE TO HIM ARE TWO

17   DIFFERENT MATTERS.

18             THE COURT:  AS TO THE IMPLICATION OF THE FIFTH

19   AMENDMENT ON THAT LAST ISSUE, I'M GOING TO EXPLORE IT FURTHER

20   OUTSIDE THE PRESENCE OF THE JURY BEFORE I GO ANY FURTHER TO

21   OVERRULE IT.

22             MR. AARON:  PENDING THAT --

23             THE COURT:  I NEED TO INSTRUCT THE JURY WITH THAT

24   OTHER INSTRUCTION.

25             MR. AARON:  THANK YOU.

1      (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

2            THE COURT:  LADIES AND GENTLEMEN, YOU HEARD

3    TESTIMONY A MOMENT AGO REGARDING THE POTENTIAL PUNISHMENT FOR

4    CERTAIN CRIMES.  THAT EVIDENCE IS ADMITTED FOR THE FOLLOWING

5    LIMITED PURPOSE OF ASSESSING THE CREDIBILITY OF THE WITNESS

6    WHO'S TESTIFYING ON THE STAND RIGHT NOW, AND YOU'RE TO

7    CONSIDER IT FOR THAT PURPOSE AND FOR NO OTHER PURPOSE.

8            YOU MAY REMEMBER THAT I EARLIER INSTRUCTED YOU

9    REGARDING THE FACTORS THAT YOU MAY CONSIDER IN DECIDING

10   WHETHER OR NOT TO BELIEVE THE TESTIMONY OF ANY WITNESS, AND

11   ONE OF THOSE FACTORS IS THE WITNESS' INTEREST IN THE OUTCOME

12   OF THE CASE AND ANY BIAS OR PREJUDICE ON THE PART OF THE

13   WITNESS.

14           THE EVIDENCE THAT THIS WITNESS, RANDALL MARTIN,

15   RECEIVED A BENEFIT IN THIS CASE IN THE FORM OF AN AGREEMENT

16   THAT HIS TESTIMONY DURING THIS TRIAL WOULD NOT BE USED IN ANY

17   PROSECUTION IN THE U.S. DISTRICT COURT IN THE NORTHERN

18   DISTRICT OF TEXAS AGAINST HIM IS ONLY BEING OFFERED FOR THE

19   LIMITED PURPOSE OF ASSESSING HIS CREDIBILITY, THAT MEANS

20   DECIDING WHETHER OR NOT YOU BELIEVE OR DISBELIEVE HIS

21   TESTIMONY, ALL OF IT OR ANY PART OF IT.  THANK YOU.

22           MR. AARON:  NOTHING FURTHER.

23           THE COURT:  THANK YOU.  REDIRECT EXAMINATION.

24           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

25   ///

1                    <u>REDIRECT EXAMINATION</u>

2    BY MR. AKROTIRIANAKIS:

3    Q.   MR. MARTIN, ARE YOU HERE TESTIFYING WILLINGLY?

4    A.   I'M SORRY?

5    Q.   ARE YOU TESTIFYING WILLINGLY OR WERE YOU BROUGHT HERE

6    PURSUANT TO A COURT ORDER, DO YOU KNOW?

7    A.   I WAS BROUGHT HERE PURSUANT TO A COURT ORDER.

8    Q.   ARE YOU RECEIVING ANYTHING AT ALL IN EXCHANGE FOR YOUR

9    TESTIMONY OTHER THAN THE USE IMMUNITY AGREEMENT THAT YOU'VE

10   TESTIFIED TO IN YOUR DIRECT EXAMINATION AND NOW AGAIN IN

11   CROSS-EXAMINATION?

12   A.   NOTHING.

13   Q.   IS IT YOUR UNDERSTANDING OF THAT USE IMMUNITY AGREEMENT

14   THAT IT IS LIMITED TO IMMUNITY FROM ONLY CERTAIN TYPES OF

15   FEDERAL CRIMINAL PROCEEDINGS AND ONLY SUCH PROCEEDINGS

16   BROUGHT IN THE NORTHERN DISTRICT OF TEXAS?

17   A.   YES, SIR.

18   Q.   IS IT YOUR FURTHER UNDERSTANDING THAT THE PROSECUTOR,

19   THE ASSISTANT UNITED STATES ATTORNEY IN THE NORTHERN DISTRICT

20   OF TEXAS, DOES NOT HERSELF BELIEVE THAT ANY SUCH CHARGES

21   COULD BE BROUGHT --

22             MR. AARON:   OBJECTION, LEADING, A FACT NOT IN

23   EVIDENCE.

24             THE COURT:   THE OBJECTION IS SUSTAINED ON THE BASIS

25   THAT THE QUESTION IS LEADING.

```
 1                    YOU MAY REPHRASE IT.
 2   BY MR. AKROTIRIANAKIS:
 3   Q.   DO YOU HAVE ANY UNDERSTANDING ABOUT WHETHER THE FEDERAL
 4   PROSECUTOR IN THE NORTHERN DISTRICT OF TEXAS BELIEVES THAT
 5   THE CHARGES THAT YOU'RE IMMUNIZED FROM COULD BE BROUGHT?
 6             MR. AARON:   LACK OF PERSONAL KNOWLEDGE,
 7   SPECULATION, AND RELEVANCE.
 8             THE COURT:   SUSTAINED.
 9   BY MR. AKROTIRIANAKIS:
10   Q.   DID YOU READ THE IMMUNITY AGREEMENT BEFORE YOU SIGNED
11   IT?
12   A.   I DID.
13   Q.   AND DID YOU HAVE AN UNDERSTANDING OF IT AT THE TIME THAT
14   YOU SIGNED IT, WHAT THE TERMS WERE?
15   A.   YES, SIR.
16             THE COURT:   MR. AKROTIRIANAKIS, PLEASE SLOW DOWN.
17             MR. AKROTIRIANAKIS:   PARDON ME, YOUR HONOR.
18   BY MR. AKROTIRIANAKIS:
19   Q.   DID YOU UNDERSTAND WHAT THOSE TERMS WERE?
20   A.   YES, SIR.
21   Q.   DID YOU UNDERSTAND THE WRITING ITSELF TO REPRESENT WHAT
22   THE TERMS OF THE AGREEMENT WERE?
23   A.   YES, SIR.
24   Q.   DO YOU RECALL EACH OF THOSE TERMS AS YOU SIT HERE TODAY?
25   A.   I PROBABLY NEED TO READ THE DOCUMENT AGAIN.
```

1    Q.   DO YOU RECALL WHETHER YOUR IMMUNITY AGREEMENT CONTAINED

2    A RECITAL OR A STATEMENT BY THE PROSECUTOR'S OFFICE IN TEXAS

3    ABOUT THEIR BELIEF WHETHER THE CHARGES THAT YOU'RE BEING

4    IMMUNIZED FROM COULD ACTUALLY BE BROUGHT AGAINST YOU?

5              MR. AARON:  SAME OBJECTIONS.

6              THE COURT:  THE OBJECTION IS OVERRULED.

7              DO YOU RECALL WHAT'S IN THE DOCUMENT ON THAT

8    SUBJECT?

9              THE WITNESS:  I RECALL MOST OF WHAT'S IN THE

10   DOCUMENT.

11             THE COURT:  DO YOU RECALL WHAT'S IN THE DOCUMENT ON

12   THAT SUBJECT THAT THE PROSECUTOR JUST ASKED YOU ABOUT?

13             THE WITNESS:  WOULD YOU ASK ME AGAIN, PLEASE?

14   BY MR. AKROTIRIANAKIS:

15   Q.   DO YOU RECALL WHETHER THE DOCUMENT, THE IMMUNITY

16   AGREEMENT, CONTAINED A RECITAL OR A STATEMENT BY THE

17   PROSECUTOR IN TEXAS WHETHER THAT PROSECUTOR BELIEVED THAT THE

18   CHARGES COULD IN ANY EVENT BE BROUGHT AGAINST YOU?

19   A.   I RECALL THAT, YES, SIR.

20   Q.   OKAY.  WHAT'S YOUR UNDERSTANDING OF THE POSITION OF THE

21   NORTHERN DISTRICT OF TEXAS IN THAT REGARD?

22   A.   THAT THERE WAS NOTHING THAT THEY COULD COME AND

23   PROSECUTE ME FOR BASED ON ANYTHING I SAID ON THE STAND.

24   Q.   DO YOU RECALL FURTHER STATEMENTS CONTAINED IN THE

25   IMMUNITY AGREEMENT ABOUT WHETHER OR NOT THOSE CHARGES COULD

```
 1    BE BROUGHT AGAINST YOU BECAUSE THEY WERE TOO OLD?

 2    A.   NO.

 3              MR. AKROTIRIANAKIS:  MAY I APPROACH THE WITNESS,

 4    YOUR HONOR?

 5              THE COURT:  YOU MAY.

 6              MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I ASK ONE

 7    QUESTION FROM HERE?

 8              THE COURT:  YES.

 9    BY MR. AKROTIRIANAKIS:

10    Q.   I WILL DIRECT YOUR ATTENTION TO THE SECOND ENTRY THAT

11    I HAVE HIGHLIGHTED THERE AND ASK YOU IF YOU HAD ANY

12    UNDERSTANDING, WITHOUT TELLING US WHAT IT WAS, OF THAT TERM

13    AT THE TIME THAT YOU SIGNED THIS AGREEMENT.

14    A.   YES.

15    Q.   DOES REVIEWING THE AGREEMENT, MR. MARTIN, REFRESH YOUR

16    RECOLLECTION AS TO WHETHER OR NOT IT CONTAINS STATEMENTS BY

17    THE PROSECUTOR IN TEXAS WHETHER SHE BELIEVED THAT THE CHARGES

18    YOU WERE CONCERNED WITH WERE TOO OLD TO BE BROUGHT AGAINST

19    YOU IN ANY EVENT?

20              MR. AARON:  SAME OBJECTIONS, YOUR HONOR.

21              THE COURT:  YOU MAY REWORD THE QUESTION TO CLARIFY

22    YOU'RE ONLY ASKING FOR THIS WITNESS' UNDERSTANDING.

23    BY MR. AKROTIRIANAKIS:

24    Q.   DO YOU -- WELL, LET ME ASK YOU FIRST, DOES HAVING

25    REVIEWED THE DOCUMENT RIGHT NOW REFRESH YOUR RECOLLECTION?
```

1    A.   ON THAT ONE STATEMENT YOU SHOWED ME, YES.

2    Q.   WHAT WAS YOUR UNDERSTANDING, IF ANY, THAT YOU HAD ABOUT

3    WHETHER THE PROSECUTOR IN TEXAS BELIEVED THAT THE CHARGES YOU

4    WERE CONCERNED ABOUT WERE TOO OLD TO BE BROUGHT AGAINST YOU?

5    A.   IF I UNDERSTAND THE LINE THAT YOU HAVE SHOWED ME, THEY

6    WOULD NEED FURTHER INFORMATION FROM ME TO DETERMINE WHETHER

7    OR NOT THAT WOULD BE TRUE.

8    Q.   THANK YOU.  LET ME MOVE ON HERE.

9              DO YOU HAVE ANY BELIEF BASED ON YOUR -- IS IT

10   YOUR -- LET ME WITHDRAW THAT, PLEASE.

11             IS IT YOUR UNDERSTANDING BASED ON YOUR IMMUNITY

12   AGREEMENT THAT YOU CAN BE PROSECUTED IF YOU PERJURE YOURSELF

13   IN THIS PROCEEDING?

14   A.   I DID UNDERSTAND THAT, YES.

15   Q.   WHAT'S YOUR UNDERSTANDING IN THAT REGARD?

16   A.   MY UNDERSTANDING IS THAT IF I PERJURE MYSELF, THEN I

17   WOULD BE LIABLE FOR CHARGES RELATED TO THAT.

18   Q.   YOU TESTIFIED IN YOUR -- IN CROSS-EXAMINATION RELEVANT

19   TO A PLEA AGREEMENT THAT YOU ENTERED.  LET ME WITHDRAW THAT.

20             YOU TESTIFIED CONCERNING VIRUSES AND COMPUTER

21   PROBLEMS ON CROSS-EXAMINATION.  DO YOU RECALL THAT TESTIMONY?

22   A.   I DO.

23   Q.   OKAY.  AND YOU REVIEWED SOME CHATS ABOUT THAT.  DO YOU

24   RECALL THAT?

25   A.   I DID.

1    Q.   DO YOU RECALL EVER AT ANY TIME THE DEFENDANT SAYING TO

2    YOU THAT PEOPLE WERE SENDING HIM CHILD PORNOGRAPHY HE DIDN'T

3    WANT?

4    A.   NO, I DON'T RECALL THAT.

5    Q.   DID HE ASK YOU TO PROVIDE HIM WITH ACCESS TO CHILD

6    PORNOGRAPHY?

7    A.   HE DID NOT.

8    Q.   HE NEVER -- THE DEFENDANT NEVER ASKED YOU?

9    A.   OH, THE DEFENDANT.  I'M SORRY.  I THOUGHT YOU WERE

10   REFERRING TO THE COUNSEL.  I'M SORRY.  ASK ME AGAIN.

11   Q.   LET ME START OVER.

12   A.   OKAY.

13   Q.   DID THE DEFENDANT AT ANY TIME EVER TELL YOU THAT PEOPLE

14   WERE SENDING HIM CHILD PORNOGRAPHY THAT HE DIDN'T WANT?

15   A.   I CAN'T RECALL.

16   Q.   YOU CAN'T RECALL HIM EVER SAYING THAT?

17   A.   I CAN'T RECALL HIM SAYING IT.

18   Q.   OKAY.  DID THE DEFENDANT EVER ASK YOU TO PROVIDE HIM

19   WITH ACCESS TO CHILD PORNOGRAPHY PICTURES IN YOUR ALBUMS?

20   A.   I DON'T RECALL HIM ASKING ME THAT.

21   Q.   DO YOU RECALL WHETHER THE DEFENDANT EVER ASKED YOU FOR

22   PASSWORDS TO YOUR CHILD PORNOGRAPHY ALBUMS YOU TESTIFIED TO?

23   A.   I CAN'T RECALL THAT EITHER.

24   Q.   YOU TESTIFIED ABOUT -- YOU TESTIFIED IN

25   CROSS-EXAMINATION ABOUT THE DEFENDANT TALKING TO YOU ABOUT

1   COMPUTER PROBLEMS.  DO YOU RECALL THAT TESTIMONY?

2   A.   I DO.

3   Q.   AND DO YOU RECALL THAT THE DEFENDANT -- WELL, DO YOU

4   RECALL WHETHER THE DEFENDANT ACTUALLY PROVIDED YOU ADVICE ON

5   HOW YOU YOURSELF COULD AVOID COMPUTER PROBLEMS AND HOW YOU

6   COULD DEAL WITH COMPUTER PROBLEMS?

7   A.   I SEEM TO RECALL SOMETHING ABOUT THAT, YES.

8   Q.   WELL, WAS ONE OF THE OCCASIONS ON WHICH THE DEFENDANT

9   PROVIDED YOU COMPUTER ADVICE -- WELL, WAS ONE OF THE SUBJECTS

10   ON WHICH THE DEFENDANT PROVIDED YOU COMPUTER ADVICE, WAS ONE

11   OF THOSE SUBJECTS ON HOW TO DESTROY EVIDENCE IN YOUR

12   POSSESSION OF CHILD PORNOGRAPHY?

13   A.   IT WAS.

14   Q.   DID THE DEFENDANT ALSO PROVIDE YOU WITH ADVICE ON HOW TO

15   HIDE EVIDENCE OF YOUR POSSESSION OF CHILD PORNOGRAPHY?

16   A.   IT'S POSSIBLE.  IT'S ALL KIND OF RUNNING TOGETHER THERE.

17   Q.   ARE YOU FAMILIAR WITH THE TERM "ENCRYPTION"?

18   A.   I AM.

19   Q.   OKAY.  DID HE PROVIDE YOU ADVICE ABOUT ENCRYPTION?

20   A.   HE DID.

21   Q.   AND WAS ONE OF THE OCCASIONS ON WHICH THE DEFENDANT

22   PROVIDED YOU WITH ADVICE ABOUT ENCRYPTION AND/OR THE

23   DESTRUCTION OF EVIDENCE OF YOUR POSSESSION OF CHILD

24   PORNOGRAPHY ON OR ABOUT THE DAY BEFORE THE SEARCH WARRANT WAS

25   ACTUALLY EXECUTED AT YOUR BROTHER'S HOME AND THEN YOUR

1    BUSINESS AND THEN YOUR HOME?

2    A.    YES.

3    Q.    DO YOU RECALL AT THAT TIME WHETHER YOU WERE CONCERNED

4    ABOUT WHAT STATEMENTS YOUR BROTHER WOULD MAKE TO THE POLICE?

5    A.    YES.

6    Q.    AND DO YOU RECALL WHAT THE DEFENDANT'S ADVICE IN THAT

7    REGARD WAS?

8    A.    I WOULD NEED TO REFRESH MYSELF WITH THE LOG.

9    Q.    CAN YOU TURN TO TAB M IN THE BOOK BEFORE YOU, AND IT'S

10   APRIL 16, 2001, 4/16/01 AT 3:18 P.M.

11   A.    APRIL 16TH, 3:18 P.M.?

12   Q.    YES.  DO YOU SEE THE -- THERE'S MULTIPLE ENTRIES AT --

13   I THINK IT'S 3:18 P.M.

14   A.    YES, SIR.

15   Q.    DO YOU SEE THE VERY LAST ONE THERE?  WELL, DO YOU SEE

16   WHERE YOU WROTE SOMETHING AT 3:19 P.M.?

17   A.    YES, SIR.

18   Q.    THEN DO YOU SEE THE ONE RIGHT BEFORE THAT, THE VERY LAST

19   ENTRY AT 3:18 P.M.?

20   A.    YES, SIR.

21   Q.    I WANT YOU TO READ THE ENTRY TO YOURSELF.

22   A.    OKAY.

23   Q.    MY QUESTION FOR YOU, MR. MARTIN, IS WHETHER HAVING READ

24   THAT ENTRY IT REFRESHES YOUR RECOLLECTION AS TO WHAT THE

25   DEFENDANT'S ADVICE WAS TO YOU, GIVEN YOUR CONCERNS ABOUT WHAT

1    YOUR BROTHER MIGHT SAY TO LAW ENFORCEMENT?

2    A.    YES, SIR, I RECALL IT.

3    Q.    AND WHAT IS YOUR RECOLLECTION?

4    A.    THAT HE SAID MY BROTHER WOULD NEED TO LIE.

5    Q.    NOW, I WOULD LIKE YOU TO TURN TO THE PAGE IMMEDIATELY

6    BEFORE THAT.   THE SECOND TO LAST ENTRY ON THE PAGE, DO YOU

7    SEE THAT?

8    A.    4/16, 3:16 P.M.?

9    Q.    CORRECT.   DO YOU SEE THAT?

10   A.    YES, SIR.

11   Q.    OKAY.   DO YOU RECALL WHETHER THIS ENTRY ALSO WAS

12   SOMETHING THAT WAS A CONVERSATION YOU WERE HAVING THE VERY

13   DAY BEFORE LAW ENFORCEMENT AUTHORITIES CAME FOR YOU?

14   A.    I SEE WE'RE IN A CHAT LOG, SO I OBVIOUSLY TALKED ABOUT

15   IT.

16   Q.    AND WAS THAT THE DAY BEFORE THE -- BASED ON WHAT YOU SEE

17   HERE, WAS THAT THE DAY BEFORE?

18   A.    THAT'S THE DAY BEFORE, YES.

19   Q.    OKAY.   I WILL READ FROM THE DOCUMENT WITH THE COURT'S

20   PERMISSION BEGINNING AT ONE OF THE ENTRIES, AT THE FIRST

21   ENTRY AT 3:13 P.M.

22            THE COURT:   GO AHEAD.

23   BY MR. AKROTIRIANAKIS:

24   Q.    OJITEMP:   I AGREE, BUT THAT DOESN'T MEAN THEY'LL COME TO

25   VISIT.   THEY'RE REALLY LOOKING FOR IMPORTERS.

```
 1              RICOCHET:  HOW DO YOU KNOW?

 2              OJITEMP:  HE DOESN'T KNOW, BUT IT'S GOOD TO HAVE

 3   YOUR ACT TOGETHER.

 4              OJITEMP:  HE TOLD ME.

 5              RICOCHET:  I'M WORKING ON IT.

 6              OJITEMP:  COOL.

 7              RICOCHET:  HOW LONG BEFORE YOU THINK THE COAST IS

 8   CLEAR?

 9              OJITEMP:  THEY'RE ALWAYS GOING TO BE AFTER US.

10   WE'RE THE FLAVOR OF THE DAY.

11              OJITEMP:  WE JUST HAVE TO KEEP UPGRADING OUR

12   DEFENSES.

13              OJITEMP:  AS LONG AS WE DO THAT, WE'LL STAY AHEAD

14   OF THE TRADERS.

15              AND THEREAFTER, TURNING OVER TO THE NEXT PAGE, IS

16   THAT WHERE YOU STARTED EXPRESSING YOUR CONCERN OF WHAT

17   STATEMENTS YOUR BROTHER WOULD MAKE TO THE POLICE?

18   A.   IT IS.

19              MR. AKROTIRIANAKIS:  MAY I HAVE JUST A VERY BRIEF

20   MOMENT, YOUR HONOR?

21              THE COURT:  GO AHEAD.

22   BY MR. AKROTIRIANAKIS:

23   Q.   MR. MARTIN, CAN YOU TURN TO TAB J AND JANUARY 31, 2001,

24   AT 11:24 A.M.?

25   A.   JANUARY 31.  WHAT WAS THE TIME?
```

1    Q.    AT 11:24 A.M.

2    A.    I HAVE IT.

3    Q.    A FEW MOMENTS AGO I HAD ASKED YOU WHETHER THE DEFENDANT

4    HAD AT ANY POINT REQUESTED THAT YOU PROVIDE HIM ACCESS TO

5    YOUR CHILD PORNOGRAPHY ALBUMS, AND YOU SAID YOU COULDN'T

6    REMEMBER.  I WANT YOU TO READ FROM 11:24 -- I WANT YOU TO

7    READ TO YOURSELF FROM 11:24 DOWN TO THE BOTTOM OF THE PAGE

8    AND THE FIRST COUPLE OF LINES ON THE TOP OF THE NEXT PAGE.

9    A.    "DID YOU HAVE" --

10   Q.    NO, NO.  MR. MARTIN, I WANT YOU TO READ THEM TO

11   YOURSELF.

12   A.    OH, I'M SORRY.

13   Q.    AND JUST THE FIRST COUPLE OF LINES ON THE NEXT PAGE.

14   A.    OKAY.

15   Q.    DOES REVIEWING THAT PORTION OF EXHIBIT 2 REFRESH YOUR

16   RECOLLECTION ON THE QUESTION I PREVIOUSLY ASKED YOU, WHETHER

17   OR NOT THE DEFENDANT HAD REQUESTED THAT YOU PROVIDE HIM

18   ACCESS TO YOUR CHILD PORNOGRAPHY ALBUMS?

19   A.    BUT WHEN HE MADE THE STATEMENT HERE, HE ALREADY HAD IT.

20   Q.    WELL, DOES REVIEWING THAT STATEMENT NOW REFRESH YOUR

21   RECOLLECTION WHETHER AT SOME POINT HE HAD ASKED YOU FOR

22   ACCESS TO YOUR CHILD PORNOGRAPHY ALBUMS?

23   A.    YES.

24   Q.    AND WHAT IS YOUR RECOLLECTION?  HAD HE OR HAD HE NOT

25   REQUESTED ACCESS TO YOUR CHILD PORNOGRAPHY ALBUMS?

```
 1   A.   HE ASKED SPECIFICALLY ABOUT SPECIFIC IMAGES THAT WERE

 2   WITHIN THE ALBUMS.

 3   Q.   AND THOSE ARE CHILD PORNOGRAPHY IMAGES?

 4   A.   YES, SIR.

 5   Q.   OKAY.   THE LAST COUPLE OF QUESTIONS HERE, THE LAST

 6   THING I'M GOING TO DIRECT YOU TO, IF YOU CAN TURN TO

 7   FEBRUARY 1, 2001, AT 11:19 -- IT'S IN THE SAME LITTLE TAB

 8   THERE BUT FEBRUARY 1 AT 11:19 A.M.

 9   A.   OKAY.

10   Q.   AND WITH THE COURT'S PERMISSION, I'LL READ FROM THE

11   DOCUMENT.

12        THE COURT:  GO AHEAD.

13   BY MR. AKROTIRIANAKIS:

14   Q.   RICOCHET:  IF THE FEDS WERE LOOKING IN YOUR PUTER FOR

15   PICS, TEMP INTERNET FILES WOULD NOT TELL THEM WHERE THEY

16   WERE.

17        RICOCHET:  I WOULD HOPE YOU WOULD KEEP YOUR

18   PASSWORD TO MY ZING ALBUMS OFF YOUR HARD DRIVE.

19        MR. MARTIN, DOES MY READING OF THAT PORTION OF THIS

20   EXHIBIT REFRESH YOUR RECOLLECTION THAT YOU HAD, IN FACT,

21   PROVIDED YOUR PASSWORD TO THE DEFENDANT?

22   A.   SURE.

23        MR. AKROTIRIANAKIS:  NOTHING FURTHER.

24        MR. AARON:  YOUR HONOR, MAY WE HAVE --

25        THE COURT:  ACTUALLY, WHY DON'T WE TAKE OUR
```

1    RECESS.

2         LADIES AND GENTLEMEN, WE WILL BE IN RECESS FOR 20

3    MINUTES AT THIS TIME.  AND PLEASE REMEMBER WHAT I'VE TALKED

4    TO YOU ABOUT BEFORE.  DON'T DISCUSS THE CASE.  DON'T DISCUSS

5    ANY OF THE EVIDENCE, ANY OF THE PARTICIPANTS, ANYTHING

6    CONNECTED WITH THE CASE.  DON'T MAKE UP YOUR MINDS ABOUT IT

7    YET.  THANK YOU.  WE ARE IN RECESS UNTIL 10 MINUTES TO 3.

8              (OUT OF THE PRESENCE OF THE JURY:)

9         THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

10   PRESENCE OF THE JURY.  BEFORE WE TAKE CARE OF THIS LAST

11   MATTER WITH RESPECT TO THIS WITNESS, WHICH IS THE COURT'S

12   DETERMINATION ABOUT WHETHER THE WITNESS CAN PROPERLY INVOKE

13   THE FIFTH AMENDMENT AS TO THAT THIRD MATTER IN WHICH HE HAS

14   SO FAR INVOKED IT, MR. PHILIPS, DO YOU WISH TO DISCUSS THAT

15   WITH -- ACTUALLY, I SHOULD SAY, MR. MARTIN, DO YOU WANT TO

16   HAVE A MOMENT TO DISCUSS THIS WITH YOUR LAWYER?

17        THE WITNESS:  IT PROBABLY WOULDN'T HURT.

18        THE COURT:  ALL RIGHT.  THEN WHY DON'T WE -- LET'S

19   SEE.  WHEN MS. INGRAM COMES BACK IN, SHE CAN PUT THAT BUFFER

20   NOISE ON SO THAT WILL GIVE YOU --

21        DO ANY OF YOU KNOW HOW TO DO THAT?  LET'S DO THAT.

22   I WILL STEP DOWN AND GIVE YOU A FEW MOMENTS TO CONFER AND

23   THEN WE'LL PICK IT BACK UP.

24              (RECESS)

25              (OUT OF THE PRESENCE OF THE JURY:)

1          MR. AKROTIRIANAKIS:  YOUR HONOR, I HAVE EXPLAINED

2    TO MR. PHILIPS IN GENERAL TERMS THE TOPICS OF THE

3    CONVERSATION THAT WAS HAD OUTSIDE THE PRESENCE OF THE JURY

4    DURING SESSION, AND HAVING CONFERRED WITH HIS CLIENT, HE

5    INFORMS ME THAT THE WITNESS INTENDS TO CONTINUE TO ASSERT HIS

6    RIGHTS UNDER THE FIFTH AMENDMENT.

7          THE COURT:  ALL RIGHT.  THE LAST QUESTION ON WHICH

8    THIS WITNESS INVOKED HIS FIFTH AMENDMENT PRIVILEGE WAS, "WHEN

9    YOU SPOKE TO LAW ENFORCEMENT ON NOVEMBER 28TH, 2001, THEY

10   ASKED YOU IF YOU HAD EVER COMMITTED SEXUAL ASSAULT AGAINST

11   MINORS, RIGHT?"  AND AS TO THAT QUESTION, AS TO WHETHER HE

12   WAS ASKED ABOUT IT BY LAW ENFORCEMENT, HE DOESN'T HAVE A

13   FIFTH AMENDMENT PRIVILEGE AS TO WHETHER HE WAS ASKED ABOUT IT

14   BY LAW ENFORCEMENT.

15         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I THINK THAT

16   WE WERE LOOKING TO -- WHEN I SAY "WE," I DON'T MEAN THE

17   GOVERNMENT.  I THINK I MEAN --

18         THE COURT:  RIGHT, ALL COUNSEL.

19         MR. AKROTIRIANAKIS:  WE'RE LOOKING TO THE NEXT

20   QUESTION WHERE HE WOULD BE ASKED WHETHER HE DENIED IT AT THAT

21   POINT, THEREFORE SETTING UP THE IMPEACHMENT, AND THAT WAS A

22   FALSE STATEMENT TO WHICH HE WOULD PRESUMABLY ASSERT HIS FIFTH

23   AMENDMENT.

24         THE COURT:  SO OPERATING ON THE ASSUMPTION THAT THE

25   WITNESS -- IF I OVERRULE THE OBJECTION OR HIS INVOCATION OF

1    THE FIFTH AMENDMENT TO THIS QUESTION WHETHER HE WAS ASKED

2    ABOUT IT BY LAW ENFORCEMENT, OPERATING ON THE ASSUMPTION THAT

3    HE WOULD THEN ANSWER, YES, HE WAS ASKED ABOUT IT, THEN

4    MR. AARON, YOUR NEXT QUESTION WOULD BE WHAT?

5              MR. AARON:  "AND YOU ANSWERED THEM?"  AND HE WOULD

6    SAY, "YES, I ANSWERED THEM."  BECAUSE THAT'S NOT PROTECTED

7    EITHER.  "AND WHAT DID YOU SAY?"  AND AT THAT POINT I GUESS

8    HE'S GOING TO ASSERT, BECAUSE THEN HE WOULD HAVE TO SAY, AT

9    LEAST ACCORDING TO THE REPORT, "I HAD TOLD THEM ABOUT ONE

10   INCIDENT AND THEN" --

11             THE COURT:  I THINK HE'S ALREADY ANSWERED THAT

12   QUESTION.

13             MR. AARON:  NO, HE HAS NOT.

14             THE COURT:  I THOUGHT HE EARLIER SAID THAT HE HAD

15   TOLD -- I THINK HE EARLIER SAID HE HAD TOLD LAW ENFORCEMENT.

16   YOU ASKED HIM THAT, DIDN'T YOU?

17             MR. AARON:  NO, I THINK HE TOOK THE FIFTH AMENDMENT

18   AS TO BOTH QUESTIONS.

19             THE COURT:  AS TO WHETHER HE TOLD LAW ENFORCEMENT

20   THAT?

21             MR. AARON:  YES.

22             THE COURT:  YOU'RE RIGHT, HE DID INVOKE HIS FIFTH

23   AMENDMENT PRIVILEGE AS TO THAT QUESTION.  SO YOU'RE NOW GOING

24   TO ASK HIM WHAT?

25             MR. AARON:  I THINK WE WOULD PROCEED THIS WAY:

1   I WOULD ASK HIM, ISN'T IT TRUE THAT ON SUCH AND SUCH A DATE

2   LAW ENFORCEMENT ASKED YOU IF YOU EVER COMMITTED ANY SEXUAL

3   ASSAULTS AGAINST MINORS?  AND HE WOULD HAVE TO SAY, YES,

4   THEY DID.  ISN'T IT TRUE THAT ON SUCH AND SUCH A DATE YOU

5   TOLD THEM OF ONE SEXUAL ASSAULT WITH A 15- OR 16-YEAR-OLD

6   BOY?  ANSWER, NO.  THE NEXT QUESTION WOULD BE, "ISN'T IT TRUE

7   THAT YOU ANSWERED THAT QUESTION?"  AND HE WOULD SAY, "YES, I

8   DID."  "WHAT WAS YOUR ANSWER?"  AND AT THAT POINT HE WOULD

9   OBJECT ON THE GROUNDS OF THE FIFTH AMENDMENT BECAUSE HIS

10  ANSWER WOULD HAVE TO BE, "I TOLD THEM ABOUT THIS ONE

11  INCIDENT."  IF HE ANSWERED, YES, I TOLD THEM ABOUT THE ONE

12  INCIDENT, I WOULD SAY, "AND THEN THEY ASKED YOU" -- BECAUSE

13  THAT'S IN THE REPORT TOO -- "ABOUT ANY OTHER INCIDENTS AND

14  YOU DENIED IT?"  AND IF HE SAID YES, THEN I WOULD ASK HIM

15  ABOUT THE SECOND INCIDENT.

16            THE COURT:  ALL RIGHT.  WELL, ACCORDING TO THE

17  SUPREME COURT'S DECISION IN UNITED STATES V. HOFFMAN AND IN

18  OTHER CASES, WHAT THE COURT IS SUPPOSED TO DO IN MAKING ITS

19  DETERMINATION IS TO DETERMINE UNDER ALL THE CIRCUMSTANCES OF

20  THIS CASE WHETHER THE DIRECT ANSWER TO A PROPOSED QUESTION

21  WOULD HAVE A TENDENCY TO INCRIMINATE A WITNESS.  SO THE FACT

22  THAT THE WITNESS IN THIS CASE HAS USED IMMUNITY FROM THE

23  NORTHERN DISTRICT OF TEXAS DOESN'T NECESSARILY ANSWER ALL THE

24  QUESTIONS THAT THE COURT WOULD NEED TO HAVE ANSWERED IN ORDER

25  TO MAKE THAT DETERMINATION, RIGHT?  BECAUSE, OF COURSE, THE

1    ANSWER TO THE QUESTION COULD INCRIMINATE THE WITNESS IN THE

2    STATE JURISDICTION, NOT JUST THE FEDERAL JURISDICTION.

3              IN FACT, WE DON'T EVEN KNOW WHAT JURISDICTION THE

4    CONDUCT OCCURRED IN, SO WE DON'T KNOW IF IT'S LIMITED TO OR

5    EVEN OCCURRED IN THE NORTHERN DISTRICT OF TEXAS.  I DON'T

6    KNOW WHEN IT OCCURRED.  ALTHOUGH, THE CONVERSATION THAT TOOK

7    PLACE WITH LAW ENFORCEMENT AGENTS, ONE OF THE CONVERSATIONS,

8    THAT THE STATEMENTS MADE TO LAW ENFORCEMENT TOOK PLACE IN

9    DECEMBER OF 2000.  SO WITHOUT KNOWING WHERE THE CONDUCT TOOK

10   PLACE, WITHOUT KNOWING WHAT JURISDICTION YOU WOULD BE SUBJECT

11   TO PROSECUTION IN AND WHAT THE STATUTE OF LIMITATIONS IS IN

12   THAT JURISDICTION FOR THE CRIMES HE COULD BE CHARGED WITH --

13             MR. AARON:  WELL, WE KNOW -- SORRY TO INTERRUPT.

14   WE KNOW IT TOOK PLACE -- AT LEAST ONE OF THE INCIDENTS TOOK

15   PLACE IN TEXAS.  WE KNOW IT TOOK PLACE BEFORE 2001.  THAT'S

16   THE FIRST INSTANCE.  WE DON'T KNOW ANY DETAILS ABOUT THE

17   SECOND INCIDENT.  SO I WOULD ASSUME --

18             THE COURT:  AND THEN THE SECOND ONE IS THE ONE HE

19   DID NOT TELL LAW ENFORCEMENT ABOUT, ACCORDING TO YOUR

20   POSITION?

21             MR. AARON:  THAT'S CORRECT.

22             THE COURT:  SO WITHOUT KNOWING ANYTHING ABOUT THAT

23   SECOND INCIDENT, WHICH IS THE ONE WE WOULD NEED TO KNOW

24   ABOUT, THE COURT CAN'T DETERMINE THAT HE IS NOT IN REAL

25   DANGER OF PROSECUTION, MEANING HE WOULD BE IN DANGER OF STATE

1    PROSECUTION, HE MAY BE IN DANGER OF FEDERAL PROSECUTION IN

2    ANOTHER DISTRICT FOR THE SEXUAL CONTACT ITSELF, AND THERE IS

3    ALSO, OF COURSE, THE DANGER OF EITHER -- WELL, WHAT

4    INVESTIGATORS WAS HE SPEAKING TO, FEDERAL OR STATE?

5            MR. AKROTIRIANAKIS:  I BEG YOUR PARDON, YOUR HONOR?

6            MR. AARON:  HE WAS SPEAKING TO --

7            MR. AKROTIRIANAKIS:  FEDERAL AUTHORITIES.  IT WAS

8    AGENT MCGAHA WHO TESTIFIED PREVIOUSLY.

9            THE COURT:  SO IT WOULD BE A FEDERAL CRIME.  IT

10   WOULD BE A FEDERAL CHARGE OF OBSTRUCTION OF JUSTICE, AND

11   THERE IS A FIVE-YEAR STATUTE OF LIMITATIONS ON THAT.  AND THE

12   STATUTE WOULD HAVE RUN ON EITHER AN OBSTRUCTION OF JUSTICE

13   CHARGE OR A 1001 CHARGE, CORRECT?

14           MR. AARON:  YES.

15           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

16           THE COURT:  SO HE DOESN'T HAVE A FIFTH AMENDMENT

17   PRIVILEGE AS TO THOSE CHARGES, BUT THAT DOESN'T RESOLVE THE

18   QUESTION OF WHETHER HE'S GOT A FIFTH AMENDMENT PRIVILEGE AS

19   TO THE FEDERAL/SUBJECT CRIME.

20           MR. AKROTIRIANAKIS:  LET ME WITHDRAW THE -- YES.

21   I SHOULD SAY, YOUR HONOR, YOU MENTIONED AT THE SIDEBAR, I'M

22   NOT SURE WHEN THAT STATUTE OF LIMITATIONS RUNS FROM, BUT ALSO

23   IT HAS BECOME APPARENT TO THE FEDERAL GOVERNMENT AND PERHAPS

24   ANY OF THE FEDERAL AUTHORITIES ANYWHERE, ONLY IN THE LAST FEW

25   DAYS.  SO IF, IN FACT, IT'S SORT OF A DISCOVERY TYPE STATUTE

```
 1   OF LIMITATIONS --
 2           THE COURT:  IS IT, THOUGH?
 3           MR. AKROTIRIANAKIS:  I DON'T KNOW.  I CAN IMAGINE
 4   CIRCUMSTANCES WHERE SUCH A STATUTE OF LIMITATIONS WOULD APPLY
 5   IN THESE TYPES OF --
 6           THE COURT:  YOU WOULD HAVE TO SHOW ME THAT
 7   AUTHORITY.
 8           MR. AKROTIRIANAKIS:  YES, AND I'M NOT PREPARED TO
 9   DO THAT RIGHT NOW.
10           THE COURT:  IN ANY EVENT, THE COURT IS MORE
11   CONCERNED WITH THE FACT THAT THERE'S NO AUTHORITY THAT'S BEEN
12   PRESENTED TO ME THAT HE'S NOT UNDER A DANGER OF PROSECUTION
13   FOR THE SUBSTANTIVE CRIMES IN THE JURISDICTION WHERE THEY
14   OCCURRED, BECAUSE I HAVE NO INFORMATION PRESENTED TO ME AS TO
15   WHAT THE STATUTE OF LIMITATIONS IS FOR ANY JURISDICTION WHERE
16   THEY MIGHT HAVE OCCURRED OR WHEN THEY OCCURRED.  SO ON THAT
17   BASIS AND ON THE FACT THAT THE FIFTH AMENDMENT, ACCORDING TO
18   THE SUPREME COURT IN HOFFMAN V. UNITED STATES, MUST BE
19   ACCORDED LIBERAL CONSTRUCTION IN FAVOR OF THE RIGHT IT WAS
20   INTENDED TO SECURE, AND THAT THE COURT IS, IN APPRAISING THE
21   CLAIM, MUST BE GOVERNED AS MUCH BY THE COURT'S PERSONAL
22   PERCEPTIONS OF THE PECULIARITIES OF THE CASE AS WELL AS THE
23   FACTS THAT ARE IN EVIDENCE HERE.
24           I'M GOING TO FIND AT THIS POINT THAT THE INVOCATION
25   OF THE FIFTH AMENDMENT PRIVILEGE BY THIS WITNESS IS PROPERLY
```

1    IMPLIED, THE IMPLICATION OF THE FIFTH AMENDMENT PRIVILEGE IS

2    PROPER.

3              MR. AARON:  A COUPLE THINGS, YOUR HONOR.  WE WOULD

4    MOVE TO STRIKE THIS WITNESS' TESTIMONY.  WE DON'T BELIEVE

5    THIS IS A MINOR POINT, THE FACT THAT HE PREVIOUSLY LIED TO

6    LAW ENFORCEMENT, NOR DO WE BELIEVE IT IS A MINOR POINT THAT

7    HE TOLD THIS JURY THAT HE WAS TRUTHFUL WITH LAW ENFORCEMENT

8    WHEN, IN FACT, WE KNOW THAT TO BE A LIE.  THOSE ARE ALL

9    IMPORTANT MATTERS GOING TO HIS CREDIBILITY.  AND THE PROBLEM

10   HERE IS WE HAVE THE GOVERNMENT WHICH IS GOING TO ARGUE TO

11   THIS JURY THAT YOU SHOULD BELIEVE MR. MARTIN, THAT HE'S

12   CREDIBLE.  AND WHEN WE ARGUE, NO, YOU SHOULD NOT BELIEVE HIM,

13   HE IS NOT CREDIBLE, WHAT EVIDENCE DO WE HAVE TO SUPPORT THAT?

14             THE EVIDENCE THAT WE HAVE TO SUPPORT THAT HAS BEEN

15   SUPPRESSED BY THE GOVERNMENT AND BY MR. MARTIN.  WE HAVE NO

16   WAY OF SHOWING THE TRUE STATE OF AFFAIRS.  SO TO THE EXTENT

17   THAT A TRIAL IS A SEARCH FOR TRUTH, WE HAVE BEEN HANDICAPPED

18   AND THE JURY IS ALLOWED TO HAVE A MISLEADING IMPRESSION OF

19   THIS WITNESS' CREDIBILITY AND HIS PRIOR CONTACTS WITH LAW

20   ENFORCEMENT.  ALL OF THAT, I THINK, CREATES A SERIOUS,

21   SERIOUS PROBLEM, SO WE WOULD MOVE TO HAVE THIS WITNESS'

22   TESTIMONY STRICKEN.

23             THE COURT:  WELL, I DISAGREE WITH YOUR

24   CHARACTERIZATION OF THE EVIDENCE IN TWO WAYS.  FIRST OF ALL,

25   THIS IS IMPEACHMENT EVIDENCE, AND YOU HAVE HAD OTHER EVIDENCE

1    THAT YOU USED TO IMPEACH THE WITNESS VERY ABLY, I BELIEVE IN

2    THE COURT'S PERCEPTION OF YOUR EXAMINATION, STARTING FROM THE

3    VERY BEGINNING WITH THE WITNESS' OWN WORDS DURING THE CHAT

4    SESSIONS.

5          AND SECONDLY -- WELL, IT IS COLLATERAL IN THE SENSE

6    THAT THERE IS OTHER EVIDENCE THAT THE WITNESS HAS GIVEN,

7    WHICH IS THE REAL SUBSTANCE OF HIS TESTIMONY, AND THIS IS

8    IMPEACHMENT EVIDENCE AS TO TRUTHFULNESS.  AND CONSIDERING ALL

9    OF THE EVIDENCE IN THE CASE, IT IS IMPEACHMENT EVIDENCE ON

10   THE COLLATERAL ISSUE.

11         THIRDLY, I DON'T THINK THAT THIS IS EVIDENCE THAT

12   THE GOVERNMENT HAS SUPPRESSED.  YOU WILL BE ABLE TO ARGUE TO

13   THE JURY THAT THE WITNESS HAS INVOKED HIS FIFTH AMENDMENT

14   PRIVILEGE, AND YOU MAY ARGUE THE INFERENCES FROM THAT AS TO

15   THIS WITNESS.  FOR THOSE REASONS, I'M GOING TO ABIDE BY MY

16   RULING THAT I STATED A MOMENT AGO.

17         LET'S TAKE A RECESS AND THEN I WILL LET YOU REOPEN

18   BECAUSE YOU SAID YOU HAD A QUESTION OR TWO, THAT YOU WISH TO

19   REOPEN YOUR CROSS-EXAMINATION.

20         MR. AARON:  YES, YOUR HONOR.  AND WE HAVE SOME

21   PROBLEMS THAT WE'D LIKE TO BRING TO THE COURT'S ATTENTION

22   REGARDING MR. SUTHERLAND'S TESTIMONY.  WE DON'T NEED TO DO

23   THAT NOW.  I BELIEVE HE'S LIKELY TO TESTIFY TODAY, BUT JUST

24   TO LET THE COURT KNOW.

25         THE COURT:  ALL RIGHT.  THANK YOU.  SO LET'S TAKE A

1    RECESS FOR A FEW MOMENTS, AS SHORT AS POSSIBLE.  THANK YOU.

2                        (RECESS)

3               (IN THE PRESENCE OF THE JURY:)

4          THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

5    ALL MEMBERS OF THE JURY, COUNSEL, AND THE DEFENDANT ALSO

6    PRESENT AND THE WITNESS ON THE WITNESS STAND.

7          AND MR. AARON, YOU WISH TO REOPEN YOUR

8    CROSS-EXAMINATION?

9          MR. AARON:  THANK YOU, YOUR HONOR.

10                   CROSS-EXAMINATION

11   BY MR. AARON:

12   Q.   TURNING YOUR ATTENTION TO THE IMMUNITY AGREEMENT THAT

13   YOU SIGNED, THE PROSECUTOR ASKED YOU A FEW QUESTIONS ABOUT

14   YOUR UNDERSTANDING OF THAT AGREEMENT?

15   A.   HE DID.

16   Q.   AND I BELIEVE YOU TESTIFIED THAT YOU UNDERSTOOD FROM THE

17   AGREEMENT THAT THE U.S. ATTORNEY WOULD NOT PROSECUTE YOU?

18   A.   I DID.

19   Q.   AND YOU BELIEVE THAT?

20   A.   I BELIEVE THAT.

21   Q.   AND YOU HAD TESTIFIED THAT IT WAS YOUR UNDERSTANDING

22   THAT THE U.S. ATTORNEY HAD SAID THEY COULD NOT PROSECUTE YOU?

23   A.   THE U.S. ATTORNEY IN TEXAS SAID THAT, YES.

24   Q.   AND YOU BELIEVE THAT?

25   A.   I DO.

1   Q.   AND THE U.S. ATTORNEY HAD SAID THAT THEY MIGHT BE UNABLE

2   TO PROSECUTE YOU BECAUSE OF THE STATUTE OF LIMITATIONS?

3   A.   YES, SIR.

4   Q.   AND YOU BELIEVE THAT?

5   A.   I DO.

6   Q.   BUT YOU STILL ASKED FOR IMMUNITY, RIGHT?

7   A.   I DID.

8   Q.   THE U.S. ATTORNEY WASN'T PRESENT DURING ALL OF YOUR

9   DEALINGS ON THE INTERNET OR WITH MINORS, RIGHT?

10  A.   CORRECT.

11  Q.   YOU WERE PRESENT?

12  A.   CORRECT.

13  Q.   YOU KNOW WHAT HAPPENED, RIGHT?

14  A.   I DO.

15  Q.   THEY DON'T KNOW WHAT HAPPENED?

16  A.   CORRECT.

17  Q.   AND THAT'S WHY YOU ASKED FOR IMMUNITY?

18  A.   YES, SIR.

19           MR. AARON:  THANK YOU.  NOTHING FURTHER.

20           THE COURT:  ANYTHING ELSE FROM THE GOVERNMENT?

21           MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  THANK YOU.

22           THE COURT:  THANK YOU.  I'M SORRY, LADIES AND

23  GENTLEMEN, I NEED TO ASK YOU TO JUST WAIT IN THE HALLWAY FOR

24  A MOMENT.  IF YOU WILL JUST WAIT RIGHT OUTSIDE.  THANK YOU.

25           (OUT OF THE PRESENCE OF THE JURY:)

1          THE COURT:  GO AHEAD.  I'M SORRY.  I FORGOT TO SAY

2    THANK YOU, YOU'RE EXCUSED.

3          MR. AARON:  YOUR HONOR, IF WE COULD HAVE HIM REMAIN

4    SUBJECT TO RECALL UNTIL THE END OF THE DAY.  I JUST WANT TO

5    GO OVER SOME THINGS WITH MY CLIENT.

6          THE COURT:  HE CAN REMAIN SUBJECT TO RECALL.

7          THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

8          MR. MICHAEL:  THE GOVERNMENT WOULD ASK AGENT MORAN

9    TO RESUME HIS CROSS-EXAMINATION.

10         THE COURT:  WE'RE ON CROSS?

11         MR. AARON:  YES.  WHAT HOUR DID THE COURT WANT TO

12   GO TO?

13         THE COURT:  WE CAN GO TO 4:30, PROBABLY CLOSE TO 4

14   BECAUSE I DON'T THINK THE CHARGING CONFERENCE WILL TAKE THAT

15   LONG.

16              (IN THE PRESENCE OF THE JURY:)

17         THE COURT:  ONCE AGAIN, WE ARE IN THE PRESENCE OF

18   ALL MEMBERS OF THE JURY, COUNSEL IS PRESENT.

19         AGENT MORAN, YOU MAY TAKE THE WITNESS STAND.

20         THE WITNESS:  THANK YOU, YOUR HONOR.

21         THE CLERK:  YOU MAY BE SEATED.

22      PLAINTIFF'S WITNESS, JAMES MORAN, PREVIOUSLY SWORN

23         THE COURT:  YOU MAY RESUME YOUR CROSS-EXAMINATION,

24   MR. AARON.

25         MR. AARON:  THANK YOU, YOUR HONOR.

1                    <u>CROSS-EXAMINATION</u> (RESUMED)

2    BY MR. AARON:

3    Q.   GOOD AFTERNOON, SIR.

4    A.   GOOD AFTERNOON.

5    Q.   DO YOU KNOW WHAT A MORPHED IMAGE IS?

6    A.   YES.

7    Q.   CAN YOU EXPLAIN TO THE JURY WHAT A MORPHED IMAGE IS?

8    A.   THAT WOULD BE THE SUBSTITUTION OF ONE BODY PART ON

9    ANOTHER IMAGE OF A PERSON.

10   Q.   OR AN IMAGE WHICH HAS BEEN ALTERED?

11   A.   YES.

12   Q.   THERE ARE PROGRAMS THAT YOU CAN USE TO ALTER IMAGES?

13   A.   YES.

14   Q.   PHOTO SHOPS, FOR INSTANCE?

15   A.   YES.

16   Q.   AND YOU CAN TAKE IMAGES AND COMBINE THEM?

17   A.   YES.

18   Q.   YOU CAN TAKE ONE IMAGE AND AGE IT?

19   A.   I BELIEVE SO, YES.

20   Q.   YOU CAN TAKE AN IMAGE AND MAKE IT YOUNGER?

21   A.   I BELIEVE SO, YES.

22   Q.   AND HAVE YOU SEEN MORPHED IMAGES?

23   A.   YES.

24   Q.   AND THEY CAN BE VERY REALISTIC?

25   A.   YES.

1    Q.    DEPENDING UPON THE SKILL OF THE -- WELL, I DON'T WANT TO

2    SAY "MORPHER" -- THE SKILL OF THE PERSON MANIPULATING THE

3    IMAGE?

4    A.    YES.

5    Q.    AND IT CAN BE INDISTINGUISHABLE OF A REAL PHOTOGRAPH OF

6    A REAL PERSON, RIGHT?

7    A.    SOMETIMES, YES.

8    Q.    AND YOU CAN HAVE A MORPHED IMAGE WHICH APPEARS TO BE

9    CHILD PORNOGRAPHY BUT IS ACTUALLY AN IMAGE OF A PERSON WHO IS

10   NOT A REAL CHILD?

11   A.    THAT'S CORRECT, YES.

12   Q.    YOU'RE FAMILIAR WITH THE PRACTICE ON SOME PORNOGRAPHIC

13   WEB SITES OR SOME PORNOGRAPHERS OF HAVING CHILDREN WHO ARE

14   OLDER APPEAR AS YOUNGER CHILDREN?

15   A.    YES.

16   Q.    AND HAVING YOUNG ADULTS APPEAR AS CHILDREN?

17   A.    YES.

18   Q.    WHEN YOU SAID AN IMAGE -- IN YOUR DIRECT EXAMINATION

19   WHEN YOU SAID AN IMAGE APPEARED TO BE CHILD PORN OR WAS CHILD

20   PORN, YOU DON'T KNOW FOR SURE, BUT IN YOUR OPINION YOU

21   BELIEVE IT TO BE CHILD PORN, RIGHT?

22   A.    THAT'S CORRECT.

23   Q.    IT MIGHT NOT ACTUALLY BE CHILD PORN, RIGHT?

24   A.    THAT'S CORRECT.

25   Q.    AND PORNOGRAPHY THAT DOES APPEAR TO BE CHILD PORN CAN BE

1    ACTUALLY LAWFUL PORNOGRAPHY?

2    A.   YES.

3    Q.   YOU SAID THERE WAS EVIDENCE THAT A ZING ALBUM WAS

4    CREATED BY USING THIS COMPUTER?

5    A.   YES.

6    Q.   AND YOU HAVE NOT YET SEEN THAT ZING ALBUM; IS THAT

7    CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   YOU SAID THERE WAS EVIDENCE THAT MR. SANDERS HAD BEEN ON

10   VARIOUS WEB SITES, RIGHT?

11   A.   YES.

12   Q.   AND IN RESPONSE TO COUNSEL'S QUESTION, YOU SAID THAT

13   THOSE APPEARED TO BE CHILD PORNOGRAPHY WEB SITES?

14   A.   YES.

15   Q.   AND YOU HAVE NOT BEEN ON ALL OF THOSE WEB SITES, RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   AND SO YOU DON'T KNOW FOR SURE?

18   A.   THAT'S CORRECT.

19   Q.   YOU'RE JUST SAYING THAT YOU'RE MAKING THAT ASSUMPTION

20   BASED UPON THE NAMES?

21   A.   YES, THAT'S CORRECT.

22   Q.   ON PORNOGRAPHIC WEB SITES THERE IS OFTEN WHAT IS CALLED

23   A 2252 DISCLAIMER, RIGHT?

24   A.   YES.

25   Q.   AND THAT DISCLAIMER IS SAYING ALL MODELS ARE ABOVE THE

1  AGE OF 18 AND AGE VERIFICATION IS WITH THE PORNOGRAPHER?

2  A.   YES.

3  Q.   AND A NUMBER OF WEB SITES WILL HAVE THE WORDS "TEENAGER"

4  OR "LOLIDA" OR "TEEN" IN THE NAME OF THE WEB SITE, RIGHT?

5  A.   YES.

6  Q.   BUT, IN FACT, THEY HAVE LAWFUL PORNOGRAPHY ON THAT

7  WEB SITE?

8  A.   YES.

9  Q.   SO ONE OR MORE OF THOSE WEB SITES THAT YOU SAW MAY

10  ACTUALLY HAVE LAWFUL PORNOGRAPHY, RIGHT?

11  A.   YES.

12  Q.   WHEN YOU ACCESS A WEB SITE -- AND LET'S SAY IT IS A

13  WEB SITE THAT CONTAINS CHILD PORNOGRAPHY, WHEN YOU ACCESS

14  THAT WEB SITE, ARE YOU DOWNLOADING CHILD PORN FROM IT?

15  A.   YES.

16  Q.   HOW DOES THAT WORK?

17  A.   THE FILES ARE WRITTEN TO THE COMPUTER THAT ARE STORED IN

18  THE TEMPORARY INTERNET FILES THAT RETAIN THE IMAGES THAT ARE

19  ON THE WEB SITE.

20  Q.   SO ACCESSING THAT WEB SITE, JUST BROWSING THE WEB, YOU

21  ARE DOWNLOADING CHILD PORN TO YOUR HARD DRIVE, RIGHT?

22  A.   THAT'S CORRECT.

23  Q.   EVEN THOUGH YOU'RE NOT INTENDING TO DO SO?

24  A.   THAT'S CORRECT.

25  Q.   BECAUSE THERE IS EVIDENCE THAT MR. SANDERS MAY HAVE

1    ACCESSED THIS OR THAT WEB SITE, THAT DOESN'T MEAN THAT HE

2    INTENTIONALLY DOWNLOADED IMAGES FROM THAT WEB SITE, CORRECT?

3    A.    THAT'S CORRECT.

4    Q.    SPECIAL AGENT OWEN TESTIFIED THAT DATA CAN BE SAVED TO

5    THE ALLOCATED SPACE ON THE HARD DRIVE WITHOUT THE COMPUTER

6    USER TRYING TO SAVE THAT DATA.

7              DO YOU AGREE OR DISAGREE WITH THIS TESTIMONY?

8              MR. MICHAEL:  OBJECTION, YOUR HONOR.  CAN WE SEE

9    THE TESTIMONY WHERE HE'S CITING FROM TO MAKE SURE HE'S

10   CORRECTLY STATING THE PRIOR TESTIMONY OF SPECIAL AGENT OWEN?

11   AGENT MORAN WAS NOT PRESENT FOR THAT.

12             THE COURT:  THE OBJECTION IS SUSTAINED.  YOU MAY

13   REWORD THE QUESTION.

14   BY MR. AARON:

15   Q.    DATA CAN BE SAVED TO THE ALLOCATED SPACE OF THE HARD

16   DRIVE WITHOUT THE COMPUTER USER TRYING TO SAVE THAT DATA,

17   CORRECT?

18   A.    CORRECT.

19   Q.    IF I COULD DIRECT YOUR ATTENTION, PLEASE, TO

20   EXHIBIT 111.

21   A.    I DON'T HAVE THAT ONE IN FRONT OF ME.

22             MR. AARON:  MAY I APPROACH, YOUR HONOR?

23             THE COURT:  YOU MAY.

24             MR. AARON:  THERE SHOULD BE A FILE OF GRAPHIC

25   IMAGES.

1          MR. MICHAEL:  YOUR HONOR, CAN I PROVIDE SOME

2    ASSISTANCE?

3          THE COURT:  WHAT IS 111?

4          MR. MICHAEL:  IT IS ONE OF THE IMAGES FROM THE

5    CHILD PORNOGRAPHY BINDER, YOUR HONOR.

6          THE COURT:  THEY SHOULD ALL BE IN THE SAME PLACE.

7          MR. MICHAEL:  THEY WERE ALL IN THE FILE FOLDERS.

8    IF I MAY APPROACH, YOUR HONOR?

9          THE COURT:  GO AHEAD.

10          MR. AARON:  I CAN SIMPLIFY THIS.  MAY I APPROACH?

11          MR. MICHAEL:  WE'VE GOT IT.

12          THE COURT:  WE'VE GOT IT, MR. AARON.

13          THE WITNESS:  I HAVE 111 IN FRONT OF ME.

14    BY MR. AARON:

15    Q.   ALL RIGHT.  THAT EXHIBIT HAS NO FILE NAME, RIGHT,

16    ASSOCIATED WITH IT?

17    A.   THAT'S CORRECT.

18    Q.   IT WAS FOUND IN UNALLOCATED SPACE, RIGHT?

19    A.   THAT'S CORRECT.

20    Q.   THERE'S NO WAY TO TELL WHEN IT WAS DOWNLOADED, RIGHT?

21    A.   THAT'S CORRECT.

22    Q.   THERE'S NO WAY TO TELL WHEN IT WAS DELETED?

23    A.   THAT'S CORRECT.

24    Q.   THERE DOES APPEAR TO BE SOME DAMAGE OR SOME MISSING

25    RESOLUTION IN THE PHOTOGRAPH?

```
 1    A.    YES.

 2    Q.    SO SOME OF IT MAY HAVE BEEN DELETED?

 3    A.    YES.

 4    Q.    I MEAN -- WELL, IT WAS ALL DELETED, BUT SOME OF IT MAY

 5    HAVE BEEN OVERWRITTEN?

 6    A.    THAT'S CORRECT.

 7    Q.    NOW, WE DON'T KNOW FOR SURE WHAT OTHER PARTS OF THE

 8    PHOTOGRAPH MIGHT BE THERE, RIGHT?

 9    A.    THAT'S CORRECT.

10    Q.    BECAUSE WE DON'T KNOW WHAT'S BEEN DELETED BECAUSE WE

11    HAVEN'T BEEN ABLE TO SEE IT?

12    A.    THAT'S CORRECT.

13    Q.    BECAUSE IT'S IN UNALLOCATED SPACE -- WHEN YOU DELETE A

14    FILE, IT GOES INTO UNALLOCATED SPACE, RIGHT?

15    A.    THAT'S RIGHT.

16    Q.    SO THIS MIGHT BE SOMETHING THAT THE COMPUTER USER TRIED

17    TO DELETE, RIGHT?

18    A.    YES.

19    Q.    WE DON'T KNOW IF THIS FILE CAME FROM A POP-UP, RIGHT?

20    A.    RIGHT.

21    Q.    WE DON'T KNOW IF IT CAME FROM A FILE TRANSFER?

22    A.    THAT'S CORRECT.

23    Q.    WE DON'T KNOW ANYTHING ABOUT THE SOURCE OF THIS FILE?

24    A.    THAT'S RIGHT.

25    Q.    AND THAT'S TRUE OF EXHIBIT 111 UP TO AND INCLUDING
```

1    EXHIBIT 131, RIGHT?

2    A.   THAT'S CORRECT.

3    Q.   NOW, TURNING YOUR ATTENTION TO EXHIBITS 130 AND 131.

4            THE COURT:  130 AND 131, DID YOU SAY?

5            MR. AARON:  YES.

6            THE WITNESS:  THANK YOU, YOUR HONOR.

7    BY MR. AARON:

8    Q.   AGAIN, THESE PHOTOGRAPHS ARE IMAGES FROM UNALLOCATED

9    SPACE, RIGHT?

10   A.   THAT'S CORRECT.

11   Q.   WE DON'T KNOW WHEN THEY WERE DOWNLOADED?

12   A.   THERE IS SOME TIME AND DATE INFORMATION ASSOCIATED IN

13   THE TEXT ADJACENT TO THE FILES, BUT THE ACTUAL TIME AND DATE

14   OF THE ACTUAL IMAGE IS NOT KNOWN.

15   Q.   WE DO KNOW THAT THERE'S TEXT IN THE UNALLOCATED SPACE

16   NEXT TO THESE IMAGES, RIGHT?

17   A.   THAT'S CORRECT.

18   Q.   AND IT'S TEXT THAT COMES BEFORE THE IMAGES?  IN OTHER

19   WORDS, IT'S ON THE HARD DRIVE IN THE UNIT, THE STORAGE AREA

20   BEFORE THE IMAGES, RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   AND HOW MUCH OF THE TEXT BEFORE THE IMAGE BELONGS TO THE

23   IMAGE?

24   A.   THERE'S HEADER INFORMATION ABOUT THE IMAGE AND THEN THE

25   IMAGE FOLLOWS.

1   Q.   HOW DO YOU KNOW THAT HEADER INFORMATION BELONGS TO THIS

2   IMAGE AND NOT TO ANOTHER IMAGE?

3   A.   JUST THROUGH THE CONTINUITY OF THE DATA THAT EXISTED.

4   Q.   NOW, THIS IS AN UNALLOCATED SPACE, RIGHT?

5   A.   THAT'S CORRECT.

6   Q.   AND WHEN YOU DELETE SOMETHING, IT JUST GOES INTO

7   UNALLOCATED SPACE, RIGHT?

8   A.   THAT'S CORRECT.

9   Q.   IT JUST GOES TO WHERE THE SPACE IS FIRST AVAILABLE,

10   RIGHT?

11   A.   THAT'S CORRECT.

12   Q.   LET ME GIVE YOU AN EXAMPLE.  I THOUGHT I HAD A MARKER.

13   I GUESS NOT.  WHEN YOU DELETE A FILE, THE WHOLE FILE GOES

14   INTO UNALLOCATED SPACE, RIGHT?

15   A.   CORRECT.

16   Q.   IF YOU HAD NO TEXT ASSOCIATED WITH THE IMAGE BUT THERE

17   WAS TEXT IN THE UNALLOCATED FILES, THAT IMAGE MIGHT GO RIGHT

18   NEXT TO THAT TEXT, RIGHT?

19   A.   IT COULD, YES.

20   Q.   SO THAT TEXT THAT YOU SEE MIGHT NOT ACTUALLY APPLY TO

21   THAT IMAGE, RIGHT?

22   A.   THAT'S CORRECT.

23   Q.   IT'S SPECULATION ON YOUR PART THAT THAT TEXT APPLIES TO

24   THAT IMAGE, RIGHT?

25   A.   YES.

1   Q.   WHEN WE'RE TALKING ABOUT TEXT -- DO YOU HAVE A COPY OF

2   YOUR REPORT UP THERE?

3   A.   NO, I DON'T.

4   Q.   IT'S EXHIBIT NO. 37.

5            MR. AARON:  MAY I APPROACH, YOUR HONOR?

6            THE COURT:  YOU MAY.

7   BY MR. AARON:

8   Q.   LET ME SHOW YOU, SIR, A COPY OF YOUR REPORT NO. 37.

9   THERE IS A NUMBER OF IMAGES FROM UNALLOCATED SPACE.  IF YOU

10  COULD JUST TAKE A QUICK LOOK AND FAMILIARIZE YOURSELF WITH

11  THAT, PLEASE.

12  A.   OKAY.

13  Q.   THANK YOU.  THE IMAGES THAT WE'RE TALKING ABOUT, 130

14  AND 131, THOSE ARE ASSOCIATED WITH NOS. 1 AND 6 IN YOUR

15  REPORT RESPECTIVELY?

16  A.   THAT'S CORRECT.

17  Q.   NOW, ONE OF THE THINGS THAT YOU CAN TELL US IS YOU CAN

18  TELL US THE PHYSICAL LOCATION OF THE IMAGE ON THE DISK,

19  RIGHT?

20  A.   RIGHT.

21  Q.   AND YOU CAN TELL US WHAT SECTOR IT'S IN, RIGHT?

22  A.   RIGHT.

23  Q.   AND YOU CAN TELL US WHAT TYPE OF CONTENT AND TRANSFER

24  CODING IT'S GOT, RIGHT?

25  A.   YES.

1    Q.   IT WAS SEVEN BIT, RIGHT?

2    A.   YES.

3    Q.   THE TEXT THAT YOU'RE TALKING ABOUT INCLUDES A NUMBER OF

4    THINGS, RIGHT?

5    A.   YES.

6    Q.   AND IT INCLUDES A VERY KIND OF CONFUSING -- THERE'S

7    ABOUT THREE OR FOUR LINES OF CONTINUOUS TEXT?

8    A.   YES.

9    Q.   AND IT'S NOT TEXT THAT MAKES SENSE IN LIKE NORMAL

10   COMMUNICATION, RIGHT?

11   A.   NO.

12   Q.   IT IS A SPECIFIC TYPE OF TEXT, RIGHT?

13   A.   RIGHT.

14   Q.   AND WHAT TYPE IS THAT?

15   A.   I WOULD HAVE TO SEE THE EXACT TEXT.  I COULDN'T MAKE --

16           MR. AARON:  MAY I APPROACH?

17           THE COURT:  YOU MAY.

18   BY MR. AARON:

19   Q.   AND IF YOU COULD, TO SPEED THINGS UP, JUST CONCERN

20   YOURSELF WITH NO. 1, PLEASE.

21   A.   OKAY.

22   Q.   THAT'S NOT A NORMAL TYPE OF TEXT, RIGHT?

23   A.   CORRECT.

24   Q.   IT'S THE TYPE THAT YOU WOULD HAVE TO HAVE SOME TRAINING

25   IN COMPUTERS TO UNDERSTAND WHAT IT MEANS?

```
 1    A.    YES.

 2    Q.    AND WHAT ACTUALLY DOES IT MEAN?

 3    A.    IT'S SERVERS THAT HAVE COME IN CONTACT WITH THIS

 4    POSTING.

 5    Q.    IN OTHER WORDS, THE POSTING GOES FROM ONE TO ANOTHER,

 6    THAT SORT OF THING?

 7    A.    YES, IT CAN.

 8    Q.    AND AS WE KNOW, THAT INFORMATION ON THE INTERNET CAN

 9    SOMETIMES BE INACCURATE, RIGHT?

10    A.    YES.

11    Q.    AND WE'VE GOT NO WAY OF VERIFYING THE ACCURACIES JUST

12    LOOKING AT IT RIGHT NOW?

13    A.    NOT JUST LOOKING AT IT, NO.

14    Q.    SOME OF THE TEXT NEXT TO THE IMAGES HAS MORE TEXT THAN

15    OTHERS, RIGHT?

16    A.    YES.

17    Q.    SOME HAS ACTUAL DATES, RIGHT?

18    A.    YES.

19    Q.    BUT AS WE'VE TALKED ABOUT BEFORE, YOU CAN'T ALWAYS TRUST

20    THOSE DATES, RIGHT?

21    A.    THAT'S CORRECT.

22    Q.    BUT WHAT WE DO KNOW FOR SURE IS THAT IT WAS FOUND IN

23    UNALLOCATED SPACE, SO IT WAS DELETED?

24    A.    THAT'S CORRECT.

25    Q.    WHAT'S A DOT DAT FILE?
```

```
 1    A.    I'M SORRY?

 2    Q.    DOT DAT FILE EXTENSION, WHAT DOES THAT MEAN?

 3    A.    THAT IS A FILE EXTENSION THAT'S ASSOCIATED WITH DATA.

 4    Q.    OKAY.  WELL, EVERYTHING ON A COMPUTER IS PRETTY MUCH

 5    ASSOCIATED WITH DATA.  WHAT MAKES THAT SPECIAL?

 6    A.    IT'S A FILE LIKE ANY OTHER FILE.

 7    Q.    BUT IT'S NOT A FILE THAT'S HUMANLY READABLE, RIGHT?

 8    A.    NO.

 9    Q.    YOU CAN'T JUST READ A DAT FILE?

10    A.    NOT NORMALLY, NO.

11    Q.    AND IT DOESN'T HOLD A DOCUMENT-BASED BINARY FILE IN IT?

12    A.    IT DOESN'T HOLD WHAT?  I'M SORRY.

13    Q.    A DOCUMENT-BASED BINARY FILE.

14    A.    I DON'T KNOW.

15    Q.    YOU'VE GOT TO USE A PROGRAM TO READ A DOT DAT FILE

16    EXTENSION, RIGHT?

17    A.    YES, MOST OFTEN, YES.

18    Q.    AND FORGIVE ME IF I'M MISSTATING YOUR TESTIMONY, BUT I

19    THOUGHT YOU SAID ON DIRECT EXAMINATION THAT IT WAS READILY A

20    DOT -- A DAT EXTENSION FILE WAS READILY VIEWABLE?

21    A.    NOT WITHOUT -- NO.

22    Q.    OKAY.  NOW, THE FILE EXTENSION FOR THIS FILE IS

23    CPROGRAMFILES/ICQ/RECEIVEDFILES/CROW18/ASIA2.MA, RIGHT?

24    A.    THAT'S CORRECT.

25          MR. MICHAEL:  YOUR HONOR, HE SAID, "THIS FILE."
```

1   CAN HE CLARIFY WHICH FILE HE'S TALKING ABOUT?

2          THE COURT:  YES.

3          MR. AARON:  I BEG YOUR PARDON.  I'M TALKING ABOUT

4   EXHIBIT 132.

5          THE WITNESS:  OKAY.

6   BY MR. AARON:

7   Q.   BEARING THAT IN MIND, IS YOUR ANSWER THE SAME?

8   A.   YES.

9   Q.   OKAY.  IT WAS FOUND IN A FILE IN THE ICQ PROGRAM, RIGHT?

10  A.   THAT'S CORRECT.

11  Q.   SO IT MAY HAVE BEEN SENT FROM A MESSAGE IN ICQ, RIGHT?

12  A.   YES.

13  Q.   AND JUST LOOKING AT THE FILE, THERE'S NO WAY TO TELL

14  WHETHER OR NOT IT WAS OPENED, RIGHT?

15  A.   THAT'S CORRECT.

16  Q.   NO WAY TO TELL THAT IT WAS INTENTIONALLY SAVED OR JUST

17  APPEARED THAT WAY?

18  A.   THAT'S CORRECT.

19  Q.   MR. SANDERS MAY NOT HAVE SOLICITED THAT FILE, MAY NOT

20  HAVE WANTED IT, BUT NONETHELESS SOMEONE MAY HAVE SENT IT,

21  RIGHT?

22  A.   YES.

23  Q.   HE MAY NOT HAVE OPENED IT, BUT NONETHELESS IT'S THERE,

24  RIGHT?

25  A.   YES.

```
1    Q.   HE MAY NOT EVEN HAVE KNOWN THAT IT WAS IN HIS COMPUTER?

2    A.   I'M NOT SURE IF THAT'S A QUESTION.

3              MR. MICHAEL:  YOUR HONOR, I'M GOING TO OBJECT.

4    SPECULATION, NO BASIS, NO FOUNDATION.

5              MR. AARON:  I'LL REPHRASE IT.

6              THE COURT:  THE OBJECTION IS SUSTAINED.

7    BY MR. AARON:

8    Q.   IT IS POSSIBLE TO HAVE THAT FILE ON YOUR COMPUTER AND

9    NOT KNOW IT, RIGHT?

10   A.   YES.

11   Q.   LET'S GO TO EXHIBIT NO. 33.

12             MR. AARON:  MAY I APPROACH AGAIN, YOUR HONOR?

13             THE COURT:  YOU MAY.

14             MR. AARON:  LET ME ASSIST YOU.  I WANT YOU TO GET

15   TWO DISKS FROM EXHIBIT NO. 56.  LET ME ASSIST YOU WITH THAT.

16   WE ARE GOING TO BE LOOKING FOR DISK NOS. 47 AND 51.

17             THE WITNESS:  47.

18             MR. AARON:  THANK YOU.

19             IF I COULD HAVE JUST A MOMENT, YOUR HONOR?

20             THE COURT:  GO AHEAD.

21             MR. AARON:  YOUR HONOR, IN THE INTEREST OF TIME,

22   CAN I JUST SHOW THE IMAGES, THE EXHIBITS TO THE WITNESS AND

23   THEN TO THE JURY?

24             THE COURT:  CERTAINLY.  DOES THE PLASMA SCREEN NEED

25   TO BE MOVED SLIGHTLY?
```

```
 1              MR. AKROTIRIANAKIS:  IT'S NOT HOOKED UP.  THAT'S
 2   THE PROBLEM.
 3              THE COURT:  GO AHEAD AND HOOK IT UP.
 4              MR. AKROTIRIANAKIS:  I CAN PULL IT OUT OF THE FLOOR
 5   RIGHT HERE.
 6              MR. AARON:  THANK YOU.
 7   BY MR. AARON:
 8   Q.   SIR, SHOWING YOU EXHIBIT NO. 51, THIS IS ONE OF THE
 9   DISKS THAT YOU FOUND ITEMS ON, CORRECT?
10   A.   THAT IS CORRECT.
11              MR. MICHAEL:  TO CLARIFY THE RECORD, HE CALLED IT
12   EXHIBIT 51, YOUR HONOR.  IT IS DISK 51 FROM A DIFFERENT
13   EXHIBIT.
14              MR. AARON:  IT IS.  I APOLOGIZE, YOUR HONOR.
15              THE COURT:  THANK YOU.
16   BY MR. AARON:
17   Q.   SHOWING YOU DISK 51 OF EXHIBIT 56, THAT DISK HAS NO
18   LABELING ON IT, RIGHT?
19   A.   THERE'S AN IBM FORMAT LABEL THAT'S BLANK.
20   Q.   THAT'S THE FRONT OF IT.  THAT'S THE FRONT OF IT, AND THE
21   REVERSE HAS NO WRITING ON IT OTHER THAN THE "51"?
22   A.   THAT'S CORRECT.
23   Q.   AND SHOWING YOU EXHIBIT NO. 47, THE BACK HAS "47" ON IT?
24   A.   CORRECT.
25   Q.   AND THE FRONT APPEARS TO HAVE SOME WRITING ON IT,
```

1  CORRECT?

2  A.   YES.

3  Q.   NOW, THESE ARE THE TWO DISKS FROM EXHIBIT 56 THAT YOU

4  FOUND SUSPECTED CHILD PORNOGRAPHY ON, RIGHT?

5  A.   THAT'S CORRECT.

6  Q.   NONE OF THE OTHER DISKS DID YOU FIND IT?

7  A.   THERE WERE OTHER IMAGES THAT WEREN'T PRESENTED.

8           MR. MICHAEL:  YOUR HONOR, PERHAPS A SIDEBAR TO

9  CLARIFY, AND WE WOULD MOVE TO STRIKE HIS ANSWER.  WELL,

10 RATHER THAN MAKE THAT MOTION, I THINK A VERY BRIEF SIDEBAR

11 WOULD ADDRESS THE ISSUE.

12          THE COURT:  I DON'T THINK THAT'S NECESSARY, IS IT?

13          ALL RIGHT.  COUNSEL MAY APPROACH.

14          (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

15          MR. MICHAEL:  YOUR HONOR, THE REASON THE GOVERNMENT

16 ASKED FOR THIS, THERE WERE IMAGES RECOVERED DURING THIS

17 INVESTIGATION, AS YOU KNOW, THAT WERE NOT ADMITTED.

18          EVERYTHING HAS BEEN ADMITTED, AND THERE ARE IMAGES

19 THAT ARE CHILD EROTICA BY LEGAL DEFINITION.  THEY ARE

20 INCLUDED.  IN AGENT MORAN'S VIEW, THEY MIGHT BE SUSPECTED

21 CHILD PORNOGRAPHY.  OTHER IMAGES WE DIDN'T INCLUDE.  I DON'T

22 KNOW IF DEFENSE COUNSEL -- WITH THIS QUESTIONING HE IS

23 OPENING AN AREA THAT THIS MOTION --

24          MR. AARON:  I THINK WE NEED TO CORRECT THAT.  THERE

25 IS OTHER IMAGES.  I WILL AGREE THAT HE CAN JUST SAY THAT

1    THERE IS IMAGES THAT HE CAN'T ESTABLISH AS CHILD PORNOGRAPHY.

2           MR. MICHAEL:  I DON'T KNOW IF HE NEEDS TO CORRECT

3    IT.  AS THE QUESTION INVITED BY DEFENSE COUNSEL'S QUESTION --

4           MR. AARON:  WELL, HE CAN SAY IN HIS EXPERIENCE AS

5    AN OFFICER.

6           MR. MICHAEL:  I THINK HE IS TRYING TO ANSWER

7    TRUTHFULLY.  HE HAS NO LIABILITY IN THIS CASE.  YOUR HONOR,

8    I'M SORRY.  HE IS NOT AWARE -- I THINK THAT TO THE EXTENT

9    THAT HE FOUND OTHER SUSPECTED IMAGES ON THE DISKS, THAT HE IS

10   SUPPOSED TO NOT ANSWER TRUTHFULLY IF ASKED BY DEFENSE COUNSEL

11   WHETHER OR NOT THERE WERE IMAGES ON THE DISK.

12          THE COURT:  WAIT A MINUTE.  HE DID ANSWER THE

13   QUESTION, DIDN'T HE?

14          MR. AARON:  I THOUGHT THAT HE SAID THAT THERE WERE

15   OTHER IMAGES.

16          THE COURT:  THAT'S RIGHT.  SO WHAT'S THE PROBLEM?

17          MR. MICHAEL:  HE ASKED FOR CORRECTIVE --

18          MR. AARON:  I DIDN'T ASK FOR ANYTHING.

19          THE COURT:  NO, YOU DID.

20          MR. AARON:  YOU ASKED TO APPROACH.

21          MR. MICHAEL:  WITHDRAW THE MOTION.  I JUST WANTED

22   TO MAKE THE COURT AWARE OF THAT, TO THE EXTENT THAT DEFENSE

23   COUNSEL IS PROBING THIS AREA.

24          THE COURT:  ARE YOU GOING ANY FURTHER WITH THIS?

25          MR. AARON:  NO.

1          THE COURT:  ALL RIGHT.  THANK YOU.

2      (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

3          THE COURT:  GO AHEAD, MR. AARON.

4          MR. AARON:  THANK YOU.

5  BY MR. AARON:

6  Q.   I'M TALKING ABOUT EXHIBITS 133 THROUGH 138.  THOSE ARE

7  THE EXHIBITS THAT YOU TESTIFIED IN TRIAL ABOUT, RIGHT?

8  A.   THAT'S CORRECT.

9  Q.   NOW, THOSE IMAGES WERE ALL FOUND ON TWO DISKS, RIGHT?

10  A.   THAT'S CORRECT.

11  Q.   133 WAS FOUND ON DISK 51, CORRECT?

12  A.   THAT'S CORRECT.

13  Q.   134 THROUGH 138 WERE FOUND ON DISK 47, RIGHT?

14  A.   THAT'S CORRECT.

15  Q.   DISK 51, IT WAS THE BLANK ONE, RIGHT?

16  A.   THAT'S CORRECT.

17  Q.   LET ME SHOW YOU SOMETHING.  THIS IS FROM EXHIBIT

18  NO. 13.  DOES THIS WRITING APPEAR TO BE SIMILAR?  I'M PUTTING

19  EXHIBIT NO. 13 RIGHT NEXT TO THE DISKETTE.  DOES THAT WRITING

20  APPEAR TO YOU TO BE SIMILAR?

21  A.   I'M NOT A HANDWRITING ANALYSIS EXPERT, BUT IT DOES

22  APPEAR TO HAVE SIMILAR CHARACTERISTICS.

23  Q.   AND EXHIBIT 13 IS AN ENVELOPE WHICH HAS A RETURN ADDRESS

24  OF SETH BEKENSTEIN?

25  A.   YES, IT APPEARS TO BE SO.

1    Q.   IN 151 THE INFORMATION IS FOUND IN THE UNALLOCATED SPACE

2    OF THE DISK, RIGHT?

3    A.   THAT'S CORRECT.

4    Q.   IN DISK NO. 47 IT'S FOUND IN THE ALLOCATED SPACE, RIGHT?

5    A.   THAT'S CORRECT.

6    Q.   AND YOU HAVE TO OPEN UP THAT DISK TO SEE IT BECAUSE YOU

7    CAN'T TELL FROM LOOKING AT IT THAT IT CONTAINS CHILD

8    PORNOGRAPHY, RIGHT?

9    A.   THAT'S CORRECT.

10            MR. AARON:  MAY I APPROACH, YOUR HONOR?

11            THE COURT:  YOU MAY.

12   BY MR. AARON:

13   Q.   WHAT'S THE G DRIVE?

14   A.   THE G DRIVE WAS REFERENCED ON THE INTERNET HISTORY, AND

15   IT'S A DRIVE THAT I DON'T KNOW THE ORIGIN OR WHAT IT IS.

16   Q.   OKAY.  THERE WAS A SCREENSHOT WHICH YOU TESTIFIED TO ON

17   DIRECT WHICH INVOLVED A MEDIA PLAYER?

18   A.   YES.

19   Q.   AND I DON'T KNOW IF IT WAS WINDOWS MEDIA OR REALPLAYER

20   OR WHAT.  DO YOU REMEMBER WHAT IT WAS?

21   A.   I BELIEVE IT WAS WINDOWS MEDIA PLAYER.

22   Q.   AND THAT HAD A FILE WITH G://CROW, RIGHT?

23   A.   IN ESSENCE, YES.

24   Q.   AND YOU DON'T KNOW IF THAT'S CHILD PORN OR NOT?

25   A.   THAT'S CORRECT.

1    Q.    AND YOU HAVEN'T FOUND THAT FILE?

2    A.    THAT'S CORRECT.

3    Q.    DID YOU HAVE ANY ERRORS IN READING FROM THESE DISKETTES?

4          MR. MICHAEL:  YOUR HONOR, JUST TO CLARIFY WHICH

5    DISKETTES HE'S REFERRING TO.

6          MR. AARON:  YES.

7    BY MR. AARON:

8    Q.    DID YOU HAVE ANY ERRORS IN READING FROM THE DISKETTES IN

9    EXHIBIT 56?

10   A.    I WOULD NEED TO SEE MY REPORT.

11   Q.    OKAY.  AS IT IS, YOU CAN'T REMEMBER WHETHER OR NOT THERE

12   WAS ANY ERRORS?

13   A.    I REMEMBER THERE WERE ERRORS IN MEDIA CARDS; HOWEVER,

14   I'M NOT -- I DON'T REMEMBER THE FLOPPY DISKETTES.

15   Q.    YOU DON'T REMEMBER ANY ERRORS IN READING THE SECTOR

16   BLOCKS IN THE FLOPPY DISKETTES?

17   A.    NOT WITHOUT SEEING THE REPORT.

18   Q.    AND FROM THE TWO DISKS THAT YOU FOUND SUSPECTED CHILD

19   PORN, YOU DON'T REMEMBER OFFHAND IF THERE WAS ANY ERRORS

20   READING FROM THOSE DISKS?

21   A.    NO, I DON'T.

22         MR. AARON:  MAY I APPROACH, PLEASE?

23         THE COURT:  YOU MAY.

24   BY MR. AARON:

25   Q.    ACTUALLY, IF YOU COULD JUST TURN TO EXHIBIT 106, PLEASE,

1    PAGE 21.

2    A.    WHAT PAGE WAS THAT?

3    Q.    PAGE 21, PLEASE.

4    A.    OKAY.  I'M THERE.

5    Q.    CAN YOU LOOK AT THE LAST ENTRY ON THAT PAGE?

6    A.    FOR FLOPPY DISK 51?

7    Q.    YES.

8    A.    THERE IS A NOTATION HERE, "THE FOLLOWING SECTOR BLOCKS

9    ARE PURPORTED READ ERRORS."

10            MR. MICHAEL:  OBJECTION, IT'S NOT IN EVIDENCE,

11   YOUR HONOR.

12            THE COURT:  WERE YOU ASKING THE WITNESS TO READ IT

13   TO HIMSELF?

14            MR. AARON:  I'M SORRY.

15   BY MR. AARON:

16   Q.    PLEASE READ IT TO YOURSELF JUST WITH REGARD TO DISK 51.

17   DOES THAT REFRESH YOUR RECOLLECTION?

18   A.    YES.

19   Q.    AND WHEN YOU WERE TRYING TO ANALYZE DISK 51, THERE WAS

20   AN ERROR READING FROM ONE SECTOR BLOCK, RIGHT?

21   A.    YES.

22   Q.    AND THAT MEANS YOU COULDN'T READ THE DATA FROM THAT

23   SECTOR BLOCK, RIGHT?

24   A.    THAT'S CORRECT.

25   Q.    YOU READ MANY OF MR. SANDERS' CHATS?

1    A.   YES.

2    Q.   AND YOU CAN ONLY SEE -- IN THE CHAT TRANSCRIPT YOU CAN

3    ONLY SEE THE SPEAKERS WHO SPEAK, RIGHT?

4    A.   I'M NOT SURE I UNDERSTAND THE QUESTION.  I'M SORRY.

5    Q.   IN THE CHAT TRANSCRIPT IT LISTS SPEAKERS AND THEN IT HAS

6    WHAT THEY'RE SAYING, RIGHT?

7    A.   YES.

8    Q.   NOW, IF THERE'S A SPEAKER WHO IS NOT SPEAKING BUT IS

9    PRESENT DURING THE CHAT, YOU WOULDN'T KNOW THAT, RIGHT?

10   A.   THAT'S CORRECT.

11   Q.   NOW, MANY TIMES DURING HIS CHATS, MR. SANDERS TALKS

12   ABOUT HAVING COMPUTER PROBLEMS, RIGHT?

13   A.   YES.

14   Q.   CAN YOU TAKE A LOOK AT EXHIBIT 3L?  LOOK AT PAGE 6874.

15   A.   PAGE 6874, I HAVE IT IN FRONT OF ME.

16   Q.   HAVE YOU READ THAT?

17   A.   OKAY.

18   Q.   AND THE NEXT PAGE I WOULD PRESUME IS 6875, BUT THAT'S

19   MISSING, RIGHT?

20   A.   YES.

21   Q.   AND THE NEXT PAGE AFTER THAT IS 6876, RIGHT?

22   A.   YES.

23            MR. AARON:  YOUR HONOR, IF I MIGHT INQUIRE OF THE

24   CLERK, WHAT'S THE DEFENSE EXHIBIT NEXT IN ORDER?

25            THE CLERK:  207.

```
 1              MR. AARON:  MAY I APPROACH WITH EXHIBIT NO. 207?

 2              THE COURT:  YES, YOU MAY.

 3    BY MR. AARON:

 4    Q.   IF YOU WOULD TAKE A LOOK AT THAT AND LET US KNOW WHEN

 5    YOU'RE DONE.  READ IT TO YOURSELF, PLEASE, AND LET US KNOW

 6    WHEN YOU'RE DONE.

 7    A.   OKAY.

 8              MR. AARON:  IF I MIGHT HAVE A MOMENT.

 9              THE COURT:  GO AHEAD.

10    BY MR. AARON:

11    Q.   AND THAT APPEARS TO DEAL WITH MR. SANDERS' COMPUTER

12    PROBLEMS?

13    A.   YES.

14    Q.   AND, IN FACT, HE IS TALKING ABOUT HIS OPERATING SYSTEM

15    BEING CORRUPT, RIGHT?

16    A.   YES.

17    Q.   THAT'S HOW HE BEGINS THE DIALOGUE, RIGHT?

18              MR. MICHAEL:  OBJECTION, YOUR HONOR, HE'S REFERRING

19    TO CONTENTS OF THE DOCUMENT THAT IS NOT IN EVIDENCE AND

20    YOUR HONOR HAS ALSO GIVEN --

21              THE COURT:  THE OBJECTION IS SUSTAINED AND THE

22    TESTIMONY IS ORDERED STRICKEN.

23              LADIES AND GENTLEMEN, THE WITNESS' ANSWER TO THE

24    LAST QUESTION IS ORDERED STRICKEN.  THAT MEANS YOU ARE TO

25    DISREGARD IT.
```

1   BY MR. AARON:

2   Q.   YOU'VE NEVER EDITED THESE CHATS, RIGHT?

3   A.   RIGHT.

4   Q.   AND YOU NEVER ALTERED ANY OF THEM, RIGHT?

5   A.   RIGHT.

6   Q.   AND BASED UPON WHAT YOU KNOW, THOSE CHATS SHOULD ALL

7   REFLECT ACCURATELY WHAT THE SPEAKERS ARE SAYING?

8   A.   THAT'S CORRECT.

9   Q.   AND IT SHOULD REFLECT ACCURATELY WHO THE SPEAKERS ARE,

10  RIGHT?

11  A.   YES.

12  Q.   AND PAGE 6875, WAS THAT ONE OF THE PAGES THAT YOU

13  DOWNLOADED AND PRINTED OUT?  I'M SORRY.  THAT'S A PAGE THAT

14  I SHOWED YOU THAT'S NOT IN THE EXHIBIT.  IS THAT ONE OF THE

15  PAGES THAT YOU DOWNLOADED AND HAD PRINTED OUT?

16  A.   I RAN THE PROGRAM AND COPIED THE INFORMATION ON A DISK.

17  Q.   IS THAT --

18  A.   I DIDN'T DOWNLOAD IT.  I JUST OPENED THE FILE AND

19  EXTRACTED THE INFORMATION.

20  Q.   IS THIS ONE OF THE PAGES THAT YOU PRINTED OUT?

21  A.   IT APPEARS TO BE, YES.

22          MR. AARON:  THANK YOU.  I HAVE NOTHING FURTHER.

23          THE COURT:  THANK YOU.  ANY REDIRECT EXAMINATION?

24          MR. MICHAEL:  BRIEFLY, YOUR HONOR.

25          THE COURT:  GO AHEAD.  YOU MAY INQUIRE.

1          MR. MICHAEL:  YOUR HONOR, THERE WAS A PRIOR

2     INSTRUCTION THAT YOUR HONOR GAVE WITH EXCERPTS.  I DON'T KNOW

3     IF IT WOULD BE AN APPROPRIATE INSTRUCTION AT THIS TIME WITH

4     REGARD TO THE EXHIBIT THAT'S BEEN DISCUSSED WITH THE WITNESS.

5          THE COURT:  REMIND ME WHICH OF THE SPECIAL

6     INSTRUCTIONS THAT WAS.

7          MR. MICHAEL:  YES, YOUR HONOR.

8          THE COURT:  WAS IT INSTRUCTION A?

9          MR. MICHAEL:  YES, YOUR HONOR, IT WAS.

10         THE COURT:  ALL RIGHT.

11         MR. MICHAEL:  NO, YOUR HONOR, THERE WAS ANOTHER

12    INSTRUCTION.  I BELIEVE IT WAS PERHAPS B OR C, YOUR HONOR.

13    IT WAS WITH REGARD TO YOUR HONOR'S ORDER ABOUT EXCERPTS IN

14    THE EXHIBIT, YOUR HONOR, BEING INCLUDED.

15         MR. AARON:  YOUR HONOR, PERHAPS WE SHOULD TALK

16    ABOUT THIS AT SIDEBAR.

17         THE COURT:  YES.

18         (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

19         THE COURT:  SO THE ISSUE IS THAT THE GOVERNMENT

20    DOESN'T WANT THE JURY TO BE LEFT WITH THE IMPRESSION THAT THE

21    GOVERNMENT SELECTIVELY INCLUDED THINGS?

22         MR. MICHAEL:  CORRECT.

23         MR. AARON:  THERE IS NO OTHER WAY FOR ME TO BRING

24    THIS TO THE WITNESS' ATTENTION OTHER THAN TO TELL HIM IT IS

25    NOT PART OF THE EXHIBIT BECAUSE OTHERWISE HE WOULD SAY,

1    "WHERE IS THIS PAGE FROM?"  I HAD TO DO THAT.

2              THE COURT:  I AGREE.  THERE IS NOTHING WRONG WITH

3    WHAT YOU DID.

4              MR. AARON:  I THINK THE GOVERNMENT IS A LITTLE

5    OVERLY SENSITIVE.  I DON'T THINK THAT I WAS TRYING TO IMPLY

6    THAT THEY'RE SECRETING THIS EVIDENCE.  THEY TURNED IT OVER TO

7    THE DEFENSE.

8              MR. MICHAEL:  THE GOVERNMENT IS NOT ACCUSING

9    DEFENSE COUNSEL OF DOING ANYTHING UNDERHANDED.  WE BELIEVE IT

10   IS AN IMPRESSION THAT WAS LEFT BASED ON THE CROSS IN LIGHT OF

11   THE GOVERNMENT'S COMPLIANCE WITH YOUR HONOR'S RULING.

12             THE COURT:  ALL I WANT TO DO IS TO MAKE SURE THAT

13   THERE IS NO -- LET ME JUST BACK UP A MOMENT.  THERE IS NO

14   REASON FOR EITHER SIDE TO FEEL THAT THERE IS ANY CRITICISM

15   INTENDED, AT LEAST BY THE COURT, REGARDING THE CONDUCT OF THE

16   EXAMINATION OF THIS WITNESS.  ALL I WANT TO DO IS MAKE SURE

17   THAT THE JURY IS NOT UNINTENTIONALLY LEFT WITH ANY

18   MISAPPREHENSION AS TO THE STATE OF THE EVIDENCE HERE.  SO

19   YOU CROSS-EXAMINED THIS WITNESS AS TO A PAGE THAT WASN'T

20   INTRODUCED ON DIRECT EXAMINATION OR OF ANY WITNESS?

21             MR. MICHAEL:  CORRECT.

22             THE COURT:  SO ALL THE JURY NEEDS TO BE TOLD AT

23   THIS POINT IS THAT I THINK THIS APPLIES TO EXHIBITS 1, 2,

24   AND 3.

25             MR. MICHAEL:  CORRECT, YOUR HONOR.

1          THE COURT:  EXHIBITS 1, 2, AND 3 CONSIST OF

2     EXCERPTS OF MATERIAL THAT WAS RETRIEVED FROM THE COMPUTERS OF

3     ONE, SETH BEKENSTEIN, TWO IS RANDALL MARTIN, AND THREE IS THE

4     DEFENDANT.

5          GO AHEAD.

6          MR. MICHAEL:  ALL I WOULD ASK IS THAT THE EXHIBITS

7     ARE EXCERPTS --

8          THE COURT:  THAT WERE EDITED UNDER THE COURT'S

9     DIRECTION TO REMOVE MATERIAL PARTS.

10          MR. AARON:  THIS WAS NOT IN REGARDS TO THE COURT'S

11     RULINGS.  THIS IS SOMETHING THAT THEY JUST LEFT OUT.  I GUESS

12     YOU COULD SAY IT'S FAIR TO SAY THAT THE EXCERPTS DO NOT

13     INCLUDE ALL THE PAGES THAT WERE DOWNLOADED.

14          THE COURT:  FINE.

15          MR. MICHAEL:  THAT'S TRUE.

16          THE COURT:  ALL RIGHT.  WHY DON'T WE JUST SAY THE

17     EXCERPTS -- THESE ARE EXCERPTS.

18          MR. AARON:  THE EXCERPTS MAY NOT INCLUDE PAGES THAT

19     WERE DOWNLOADED.

20          THE COURT:  IF I CAN REMEMBER THAT.

21       (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

22          THE COURT:  LADIES AND GENTLEMEN, THE EVIDENCE

23     THAT WAS ADMITTED AS EXHIBITS 1, 2, AND 3 ARE TRANSCRIPTS, AS

24     YOU KNOW, OF INTERNET CHAT ROOM DISCUSSIONS THAT WERE

25     RETRIEVED FROM THE COMPUTERS OF, FROM EXHIBIT 1, SETH

1    BEKENSTEIN, FROM EXHIBIT 2, THE COMPUTER OF RANDALL MARTIN,

2    AND FROM EXHIBIT 3, THE COMPUTER OF THE DEFENDANT.  THESE ARE

3    EXCERPTS AND THEY DON'T INCLUDE ALL THE MATERIAL THAT WAS

4    RETRIEVED BY THE INVESTIGATORS IN THIS CASE.  THANK YOU.

5                       REDIRECT EXAMINATION

6    BY MR. MICHAEL:

7    Q.   AGENT MORAN, DO YOU RECALL ON CROSS-EXAMINATION YOU WERE

8    ASKED SOME QUESTIONS BEFORE, I BELIEVE, THE LUNCH BREAK WITH

9    REGARD TO LAST CREATED, LAST WRITTEN, LAST ACCESS DATES?

10   A.   YES.

11   Q.   DO YOU RECALL THAT YOU WERE ASKED QUESTIONS ABOUT HOW

12   THOSE DATES MIGHT REFLECT ACTUAL EVENTS?

13   A.   YES.

14   Q.   NOW, IF THE LAST WRITTEN DATE THAT APPEARS IS EARLIER

15   THAN THE LAST CREATED DATE, WOULD THAT INDICATE TO YOU THAT

16   THE PICTURE HAD BEEN TAKEN BEFORE OR AFTER THAT CREATED DATE?

17   A.   THE PICTURE WOULD HAVE BEEN TAKEN EARLIER IN RELATION TO

18   THE CREATED DATE ON THE HARD DRIVE.

19   Q.   SO DOES THE LAST CREATED DATE HAVE ANYTHING TO DO WITH

20   WHEN THE PICTURE WAS TAKEN?

21   A.   NO.

22   Q.   CAN A DOCUMENT BE PUT ON A HARD DRIVE FROM A DIGITAL

23   CAMERA LONG AFTER IT WAS TAKEN OR ANY NUMBER OF DAYS AFTER IT

24   WAS TAKEN ON A DIGITAL CAMERA?

25   A.   YES.

1   Q.   AND DO YOU RECALL ON CROSS-EXAMINATION THAT YOU WERE

2   ASKED QUESTIONS ABOUT THE ASIA2 VIDEO FILE THAT WAS FOUND IN

3   THE ICQ RECEIVED FILE?

4   A.   YES.

5   Q.   DO YOU RECALL YOU WERE ASKED QUESTIONS ABOUT WHETHER OR

6   NOT THAT -- YOU KNEW WHETHER OR NOT THAT IMAGE, THAT FILE,

7   THAT VIDEO FILE HAD EVER BEEN OPENED OR VIEWED?

8   A.   YES.

9   Q.   NOW, THAT WAS ON THE ALLOCATED SPACE?  WAS THAT ON THE

10  ALLOCATED OR THE UNALLOCATED SPACE?

11  A.   THAT WAS ALLOCATED SPACE.

12  Q.   AND WOULD IT HAVE BEEN READILY AVAILABLE FOR VIEWING BY

13  THE USER OF THE LAPTOP COMPUTER?

14  A.   YES.

15  Q.   AND WHEN YOU REVIEWED THE CHAT TRANSCRIPTS THAT YOU

16  RECOVERED FROM THE COMPUTER, DID YOU OBSERVE THE NAME CROW18

17  IN THERE?

18  A.   YES.

19  Q.   AND WHO IS CROW18?  LET ME REPHRASE THE QUESTION.  WAS

20  CROW18 SOMEONE THAT DEFENDANT WAS CHATTING WITH?

21  A.   YES.

22  Q.   AND WAS THE RECEIVED FILE THAT THE VIDEO WAS IN

23  ASSOCIATED WITH CROW18?

24  A.   YES.

25  Q.   DO YOU RECALL YOU WERE ASKED SOME QUESTIONS ON

1    CROSS-EXAMINATION ABOUT THE DISKS THAT YOU FOUND THE IMAGES

2    ON IN DISK 51 AND DISK 47?

3    A.    YES.

4    Q.    WHOSE STORAGE LOCKER WERE THOSE DISKS RECOVERED FROM?

5    A.    THE DEFENDANT'S.

6    Q.    AND EVEN IF THERE WAS SOMEONE HANDWRITING ON A DISK THAT

7    WAS NOT THE DEFENDANT'S, WOULD HE HAVE BEEN ABLE TO USE THAT

8    DISK?

9    A.    YES.

10   Q.    AND WOULD HE HAVE BEEN ABLE TO VIEW WHAT WAS ON THAT

11   DISK IF HE PUT IT INTO HIS COMPUTER?

12   A.    THE ALLOCATED IMAGES, YES.

13   Q.    AND THE ALLOCATED IMAGES WERE ON THE DISK THAT HAD THE

14   HANDWRITING THAT YOU WERE ASKED ABOUT ON CROSS-EXAMINATION?

15   A.    DISK 47, YES.

16   Q.    DO YOU RECALL YOU WERE ASKED SOME QUESTIONS ABOUT

17   EXHIBITS 130 AND 131, TWO IMAGES THAT CAME FROM THE

18   UNALLOCATED SPACE BUT THAT YOU HAD TESTIFIED THERE WAS TEXT

19   ASSOCIATED WITH THEM?

20   A.    YES.

21   Q.    AND DO YOU RECALL YOU WERE ASKED QUESTIONS ABOUT YOUR

22   ASSESSMENT THAT THOSE IMAGES HAD BEEN RECEIVED ON THE

23   COMPUTER VIA NEWSGROUPS?

24   A.    YES.

25   Q.    NOW, DO YOU RECALL SAYING THAT YOUR ANSWER ABOUT YOUR

1   DETERMINATION AS TO THE CONNECTION BETWEEN THE TEXT AND THE

2   IMAGES WAS SPECULATION?  DO YOU RECALL THAT?

3   A.   YES.

4   Q.   NOW, I WANT TO PROBE THAT ANSWER OF YOURS.  WHERE WAS

5   THE TEXT IN RELATION TO THE IMAGE?

6   A.   IT WAS A FLOWING STREAM THAT WAS INTEGRATED FROM START

7   TO FINISH.

8   Q.   AND WERE THERE OTHER IMAGES THAT HAD SIMILAR TEXT THAT

9   APPEARED TO YOU TO BE ASSOCIATED WITH THEM IN THIS PORTION OF

10  THE UNALLOCATED SPACE?

11  A.   THERE WERE IMAGES LIKE THAT, YES.

12  Q.   AND I RECALL IN THE REPORT THAT YOU WERE SHOWN, THERE

13  WERE OTHER IMAGES -- WERE THERE OTHER IMAGES LIKE THAT THAT

14  YOU DOCUMENTED IN THE REPORT ROI37?

15  A.   YES.

16  Q.   NOW, WHEN YOU SAY YOU WERE SPECULATING, WHAT WAS THE

17  BASIS FOR YOUR CONCLUSION THAT THAT TEXT WAS ASSOCIATED WITH

18  THOSE IMAGES?

19  A.   THE FACT THAT IT WOULD HAVE TO BE -- IT'S A VERY

20  LONGSHOT THAT ANOTHER IMAGE WOULD HAVE TO SOMEHOW

21  MIRACULOUSLY LAND IN THAT EXACT SAME PLACE HOLDER AND BE THE

22  EXACT SAME LENGTH AS THE IMAGE THAT WOULD HAVE BEEN THERE HAD

23  IT BEEN REPLACED WITH ANOTHER.

24  Q.   SO WHEN YOU SAY YOU ARE SPECULATING, IS THAT BASED ON

25  YOUR TRAINING AND EXPERIENCE THAT YOU CAME -- LET ME REPHRASE

1    THAT QUESTION.

2              WAS YOUR CONCLUSION BASED AT ALL ON YOUR TRAINING

3    AND EXPERIENCE THAT IT WOULD BE VERY UNLIKELY AN IMAGE COULD

4    END UP RIGHT NEXT TO THAT TEXT IN THAT FASHION THAT YOU

5    OBSERVED?

6    A.   THAT WOULD BE HIGHLY UNLIKELY, YES.

7    Q.   SO WAS IT YOUR CONCLUSION, BASED ON THAT, THAT THAT TEXT

8    AND THAT IMAGE WERE ASSOCIATED WITH EACH OTHER?

9    A.   YES.

10             MR. AARON:  OBJECTION, LEADING.

11             THE COURT:  SUSTAINED.

12   BY MR. MICHAEL:

13   Q.   WERE THERE OTHER IMAGES THAT YOU DREW THE SAME

14   CONCLUSION?

15   A.   YES.

16   Q.   AND THAT WOULD BE THE SAME CONCLUSION THAT YOU DREW FOR

17   EXHIBITS 130 AND -- WOULD THAT BE THE SAME CONCLUSION THAT

18   YOU DREW FOR EXHIBITS 130 AND 131?

19             MR. AARON:  OBJECTION, IT'S OBVIOUSLY LEADING AND

20   SUGGESTIVE.

21             THE COURT:  SUSTAINED.

22   BY MR. MICHAEL:

23   Q.   WITH REGARD TO EXHIBITS 130 AND 131, THE TEXT

24   INFORMATION, WHERE DID IT INDICATE THAT IT HAD BEEN

25   DOWNLOADED FROM?

1    A.    ASPARAGUS NEWSGROUP.

2    Q.    AND YOU PREVIOUSLY TESTIFIED ON DIRECT EXAM ABOUT THE

3    ASPARAGUS NEWSGROUP, CORRECT?

4    A.    THAT'S CORRECT.

5    Q.    AND WAS THERE A NEWSGROUP READER PROGRAM ON DEFENDANT'S

6    LAPTOP COMPUTER?

7    A.    YES.

8    Q.    AND DID IT APPEAR TO YOU FROM YOUR REVIEW OF HIS LAPTOP

9    COMPUTER THAT HE HAD REGULARLY DOWNLOADED IMAGES FROM

10   NEWSGROUPS?

11   A.    YES.

12   Q.    AND DID IT APPEAR TO YOU THAT THE NEWSGROUP READER

13   WAS -- OR THAT THOSE IMAGES THAT HE HAD DOWNLOADED FROM

14   NEWSGROUPS WERE SAVED TO HIS HARD DRIVE?

15   A.    YES.

16   Q.    AND DID IT APPEAR WHETHER OR NOT THEY HAD BEEN SAVED TO

17   ALLOCATED OR UNALLOCATED SPACE WHEN THEY FIRST LANDED ON THE

18   HARD DRIVE?

19   A.    ALLOCATED SPACE.

20            MR. MICHAEL:  ONE MOMENT, PLEASE, YOUR HONOR.

21            THE COURT:  GO AHEAD.

22            MR. MICHAEL:  NOTHING FURTHER, YOUR HONOR.

23            MR. AARON:  YOUR HONOR, MIGHT I RECROSS JUST ON

24   THAT LAST POINT?

25            THE COURT:  GO AHEAD.

1                        <u>RECROSS-EXAMINATION</u>

2    BY MR. AARON:

3    Q.    HOW DID IT APPEAR TO YOU THAT HE HAD USED THE NEWSGROUP

4    READER TO DOWNLOAD IMAGES?

5    A.    BASED ON THE FILE PATH OF NUMEROUS INTERNET HISTORY

6    ENTRIES.

7    Q.    YOU FOUND NO IMAGES IN ALLOCATED SPACE FROM NEWSGROUPS,

8    RIGHT?

9    A.    THAT'S CORRECT.

10   Q.    NONE?

11   A.    CORRECT.

12   Q.    THANK YOU.

13            MR. AARON:  NOTHING FURTHER.

14            THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

15            THE WITNESS:  THANK YOU, YOUR HONOR.

16            THE COURT:  THE GOVERNMENT MAY CALL ITS NEXT

17   WITNESS.

18            MR. AKROTIRIANAKIS:  SPECIAL AGENT LEE BROWN,

19   YOUR HONOR.

20            THE COURT:  PLEASE COME FORWARD.  COME FORWARD AND

21   STAND RIGHT BY THE COURT REPORTER AND RAISE YOUR RIGHT HAND.

22            <u>PLAINTIFF'S WITNESS, LEE BROWN, WAS SWORN</u>

23            THE COURT:  THANK YOU.  YOU MAY BE SEATED.

24            PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

25   NAME FOR THE RECORD.

1            THE WITNESS:  MY NAME IS LEE BROWN, B-R-O-W-N.

2            THE COURT:  THANK YOU.  YOU MAY INQUIRE.

3            MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

4            BEFORE I DO, THE GOVERNMENT OFFERS EXHIBIT 3 BASED

5    ON THE FOUNDATION LAID BY AGENT MORAN.

6            THE COURT:  THANK YOU.  ANY OBJECTION?

7            MR. AARON:  NONE ACCEPT AS PREVIOUSLY MADE.

8            THE COURT:  THANK YOU.  EXHIBIT 3 IS ORDERED

9    ADMITTED AND YOU MAY PUBLISH.  GO AHEAD.

10           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

11                      DIRECT EXAMINATION

12   BY MR. AKROTIRIANAKIS:

13   Q.   AGENT BROWN, HOW ARE YOU NOW EMPLOYED?

14   A.   I'M A SPECIAL AGENT WITH IMMIGRATION AND CUSTOMS

15   ENFORCEMENT.

16   Q.   PRIOR TO THE CREATION OF THE IMMIGRATION AND CUSTOMS

17   ENFORCEMENT SERVICE, WERE YOU EMPLOYED BY THE UNITED STATES

18   CUSTOMS SERVICE?

19   A.   YES.

20   Q.   IN WHAT CAPACITY?

21   A.   I WAS A SPECIAL AGENT WITH THE U.S. CUSTOMS SERVICE.

22   Q.   IN WHAT YEAR DID YOU BECOME EMPLOYED BY THE UNITED

23   STATES CUSTOMS SERVICE?

24   A.   IN JANUARY 1998.

25   Q.   AND IN WHAT CAPACITY DID YOU SERVE THAT AGENCY?

1    A.   I SERVED AS A CRIMINAL INVESTIGATOR.

2    Q.   AND YOU'RE A SPECIAL AGENT?

3    A.   YES.

4    Q.   WHAT WAS YOUR SPECIFIC ASSIGNMENT IN JANUARY 2001?

5    A.   I WAS ASSIGNED TO THE SMUGGLING INVESTIGATION GROUP.

6    Q.   AND WHAT IS THE SMUGGLING INVESTIGATION GROUP?

7    A.   THE GROUP WAS CHARGED WITH INVESTIGATING ALLEGATIONS OF

8    CHILD PORNOGRAPHY, NARCOTICS SMUGGLING, AUTO EXPORT

9    SMUGGLING.

10   Q.   ON JANUARY 4, 2001, WERE YOU INVOLVED IN THE EXECUTION

11   OF A FEDERAL SEARCH WARRANT ON A RESIDENCE?

12   A.   YES.

13   Q.   WAS THAT IN CONNECTION WITH A CHILD PORNOGRAPHY

14   INVESTIGATION BY THIS SMUGGLING INVESTIGATION GROUP?

15   A.   YES.

16   Q.   ON WHOSE RESIDENCE WAS THAT FEDERAL SEARCH WARRANT ON

17   JANUARY 4, 2001?

18   A.   ON MR. SETH BEKENSTEIN.

19          MR. AKROTIRIANAKIS:  WITH THE COURT'S PERMISSION,

20   I'M GOING TO PUBLISH EXHIBIT 59 THROUGH 67 WHICH ARE IN

21   EVIDENCE.

22          THE COURT:  YOU MAY.

23   BY MR. AKROTIRIANAKIS:

24   Q.   AGENT BROWN, I'M GOING TO DIRECT YOUR ATTENTION TO THE

25   SCREEN BEFORE YOU.  EXHIBIT 59 IS ON THE SCREEN.  EXHIBIT 59

```
 1    IS NOW ON THE SCREEN.

 2            ARE YOU ABLE TO SEE EXHIBIT 59 BEFORE YOU?

 3    A.    YES.

 4    Q.    AND DO YOU RECOGNIZE THAT PERSON?

 5    A.    YES.

 6    Q.    WHO IS THAT PERSON?

 7    A.    THAT IS MR. SETH BEKENSTEIN.

 8    Q.    I'M SHOWING YOU EXHIBIT 60.  IS THAT THE SAME PERSON?

 9    A.    YES, IT IS.

10    Q.    61, IS THAT THE SAME PERSON?

11    A.    YES, IT IS.

12    Q.    62, SAME QUESTION.

13    A.    YES.

14    Q.    63, SAME QUESTION.

15    A.    YES.

16    Q.    64, SAME QUESTION.

17    A.    YES, IT IS.

18    Q.    65, SAME QUESTION.

19    A.    YES, IT IS.

20    Q.    NOW, WHERE IS THIS PICTURE TAKEN?  ARE YOU FAMILIAR WITH

21    THAT LOCATION?

22    A.    YEAH, THAT APPEARS TO BE IN THE APARTMENT COMPLEX WHERE

23    HE RESIDED.

24    Q.    WAS SPECIAL AGENT KELLY CORSETTI A MEMBER OF THE SEARCH

25    TEAM FOR THE SEARCH WARRANT YOU EXECUTED AT THE APARTMENT YOU
```

1    JUST TESTIFIED TO ON JANUARY 4, 2001?

2    A.    YES, SHE WAS.

3    Q.    WHAT WAS AGENT CORSETTI'S ROLE IN THAT OPERATION?

4    A.    SHE WAS THE EVIDENCE CUSTODIAN.

5    Q.    AND WHAT WAS YOUR ROLE IN THE OPERATION?

6    A.    I WAS THE CASE AGENT OR CO-CASE AGENT AT THE TIME.

7    Q.    AS THE CASE AGENT, DID YOU REVIEW ALL OF THE ITEMS OF

8    PHYSICAL EVIDENCE THAT WERE SEIZED DURING THE SEARCH OF

9    JANUARY 4, 2001 AT THE BEKENSTEIN RESIDENCE?

10   A.    YES.

11   Q.    DID THOSE ITEMS INCLUDE AN ADDRESS BOOK?

12   A.    YES.

13   Q.    I WOULD LIKE YOU TO RETRIEVE EXHIBIT 4 FROM THE BOX

14   BEHIND YOU AND TELL ME IF YOU RECOGNIZE THAT ITEM.  DO YOU

15   RECOGNIZE THAT ITEM, AGENT BROWN?

16   A.    YES.

17   Q.    WHAT IS IT?

18   A.    IT'S A PHONE BOOK AT MR. BEKENSTEIN'S RESIDENCE.

19            MR. AKROTIRIANAKIS:  THE GOVERNMENT OFFERS

20   EXHIBIT 4.

21            THE COURT:  ANY OBJECTION TO EXHIBIT 4?

22            MR. AARON:  NO, YOUR HONOR.

23            THE COURT:  THANK YOU.  EXHIBIT 4 IS ORDERED

24   ADMITTED AND YOU MAY PUBLISH.

25            MR. AKROTIRIANAKIS:  MAY I RETRIEVE IT FROM THE

1    WITNESS?

2              THE COURT:  YOU MAY.

3    BY MR. AKROTIRIANAKIS:

4    Q.    AGENT BROWN, I'M GOING TO OPEN EXHIBIT 4 OF THE ADDRESS

5    BOOK TO THE PAGE FOR THE LETTER B AND PLACE IT ON THE

6    DOCUMENT CAMERA AND ZOOM IT IN.

7              CAN YOU SEE FROM WHERE YOU'RE SEATED THAT ENTRY?

8    A.    YES.

9    Q.    IT READS "BOYSAN" AND UNDERNEATH THAT "JIM SANDERS

10   P.O. BOX 277, MOUNTAIN CENTER, CALIFORNIA, 92561," AND THERE

11   IS A 909 AREA CODE PHONE NUMBER.

12             AS THE CASE AGENT HANDLING THE INVESTIGATION OF

13   SETH BEKENSTEIN, WAS THAT INFORMATION THAT I HAVE JUST READ

14   FROM THE B PAGE IN THE ADDRESS BOOK, EXHIBIT 4, IMPORTANT TO

15   YOUR INVESTIGATION?

16   A.    YES, IT WAS.

17   Q.    DID YOU DO ANYTHING WITH THAT INFORMATION AFTER

18   RECOVERING IT FROM SETH BEKENSTEIN'S APARTMENT?

19   A.    YES.

20   Q.    WHAT DID YOU DO?

21   A.    WE FORWARDED THAT INFORMATION DOWN TO THE OFFICE THAT

22   COVERS THAT AREA THAT WE IDENTIFIED FROM MOUNTAIN CENTER.

23   Q.    AT THE TIME THAT YOU RECOVERED EXHIBIT 4 FROM THE

24   BEKENSTEIN APARTMENT, WERE YOU ACQUAINTED WITH JAMES SANDERS?

25   A.    NO.

1    Q.    DO YOU TODAY KNOW WHO JAMES SANDERS IS?

2    A.    YES, I DO.

3    Q.    DO YOU SEE THAT PERSON SEATED IN THE COURTROOM?

4    A.    YES.

5    Q.    CAN YOU PLEASE DESCRIBE FOR THE RECORD WHERE HE'S SEATED

6    AND WHAT HE'S WEARING?

7    A.    HE'S SEATED NEXT TO THE DEFENSE COUNSEL AT THE DEFENDANT

8    TABLE AND HE'S WEARING A GRAY PINSTRIPED SUIT.

9             MR. AKROTIRIANAKIS:  YOUR HONOR, MAY THE RECORD

10   REFLECT IDENTIFICATION OF THE DEFENDANT?

11            THE COURT:  THE RECORD SHALL REFLECT THAT THE

12   WITNESS HAS IDENTIFIED THE DEFENDANT IN THIS ACTION, JAMES

13   SANDERS.

14   BY MR. AKROTIRIANAKIS:

15   Q.    AGENT BROWN, IN CONNECTION WITH YOUR CHILD PORNOGRAPHY

16   INVESTIGATIONS, HAVE YOU HAD OCCASION TO INVESTIGATE

17   DIFFERENT SERIES OF CHILD PORNOGRAPHY?

18   A.    YES, I HAVE.

19   Q.    WHAT DOES THAT WORD "SERIES" MEAN AS IT RELATES TO CHILD

20   PORNOGRAPHY?

21   A.    A SERIES IS EITHER A COLLECTION OF PICTURES AND/OR

22   VIDEOS EITHER FROM ONE PRODUCER OR MANUFACTURER OR ONE

23   VICTIM, AS IT WERE, AND THOSE ARE GIVEN A SIMILAR NAME AND

24   DISTRIBUTED AS A COLLECTION OR A SERIES.

25   Q.    ARE YOU FAMILIAR, BASED ON YOUR WORK INVESTIGATING CHILD

1   PORNOGRAPHY, WITH A SERIES OF CHILD PORNOGRAPHY VIDEOS KNOWN

2   AS THE RUSSIAN FLOWERS SERIES?

3   A.   YES, I AM.

4   Q.   HAVE YOU VIEWED ANY OF THOSE VIDEOS IN CONNECTION WITH

5   YOUR DUTIES INVESTIGATING CHILD PORNOGRAPHY?

6   A.   YES, I HAVE.

7   Q.   AND APPROXIMATELY HOW MANY VIDEOS ARE THERE IN THE

8   RUSSIAN FLOWERS SERIES?

9   A.   APPROXIMATELY 19 RUSSIAN FLOWERS.

10   Q.   HAVE YOU VIEWED A NUMBER OF THOSE VIDEOS, THE RUSSIAN

11   FLOWERS SERIES?

12   A.   YES.

13   Q.   HAVE YOU SPECIFICALLY REVIEWED RUSSIAN FLOWERS 19, THE

14   LAST OF THE VIDEOS?

15   A.   YES, I HAVE.

16   Q.   NOW, DURING YOUR SEARCH OF THE BEKENSTEIN APARTMENT ON

17   JANUARY 4, 2001, DID YOU FIND ANY CHILD PORNOGRAPHY?

18   A.   YES, YES, WE DID.

19   Q.   DID YOU RECOVER IMAGES?

20   A.   YES.

21   Q.   DID YOU RECOVER VIDEOS?

22   A.   YES.

23   Q.   DID YOU RECOVER MORE THAN 10,000 IMAGES?

24   A.   YES.

25   Q.   DID YOU RECOVER MORE THAN 50,000 IMAGES?

1    A.    YES.

2    Q.    MORE THAN 90,000 IMAGES?

3    A.    YES.

4    Q.    HOW MANY VIDEOS DID YOU RECOVER DURING YOUR SEARCH OF

5    THE BEKENSTEIN APARTMENT ON JANUARY 4, 2001?

6    A.    APPROXIMATELY OVER 100 OR 200 VIDEOS.

7    Q.    AND HOW MANY -- ARE YOU TALKING ABOUT -- WHEN YOU SAY

8    VIDEOS --

9    A.    I SAY VIDEOTAPES.  ARE YOU TALKING ABOUT ON THE

10   COMPUTER?  THE VIDEO CLIPS IN THE COMPUTER WERE OVER --

11   Q.    I GOT THAT CONFUSED.  LET ME ASK YOU THE QUESTION AS TO

12   THE DIFFERENT MEDIA.  DID YOU FIND VIDEOS SAVED TO DIFFERENT

13   MEDIA OR WERE THEY ALL ON THE SAME MEDIA?

14   A.    NO, THEY WERE IN DIFFERENT MEDIA.

15   Q.    DID YOU FIND VIDEO CASSETTES?

16   A.    YES.

17   Q.    DID YOU ALSO FIND DIGITAL MEDIA, SUCH AS A CD OR A DVD?

18   A.    YES.

19   Q.    OKAY.  HOW MANY VIDEO CASSETTES DID YOU FIND?

20   A.    APPROXIMATELY 200.

21   Q.    AND APPROXIMATELY HOW MANY CDS OR DVDS OR OTHER DIGITAL

22   MEDIA DID YOU FIND?

23   A.    OVER 300.

24   Q.    NOW, DID YOU FIND ANY OTHER MEDIA?

25   A.    THE COMPUTER.

1    Q.   AND ON THE OTHER COMPUTER DID YOU ALSO FIND VIDEO FILES?

2    A.   YES.

3    Q.   SO TAKING THE COMPUTER VIDEO FILES TOGETHER WITH THE CDS

4    OR DVDS YOU TESTIFIED TO ALREADY AND THE VIDEOTAPES THAT

5    YOU'VE TESTIFIED TO ALREADY, APPROXIMATELY HOW MANY TOTAL

6    VIDEOS DID YOU FIND DURING YOUR SEARCH OF THE BEKENSTEIN

7    APARTMENT ON JANUARY 4, 2001?

8    A.   THAT WOULD BE WELL OVER 1500.

9    Q.   NOW, WAS A COPY OF THE VIDEO RUSSIAN FLOWERS 19 AMONG

10   ANY OF THE VIDEOS THAT YOU RECOVERED DURING THE SEARCH OF THE

11   BEKENSTEIN APARTMENT?

12   A.   YES.

13   Q.   IN WHAT FORMAT WAS THAT PARTICULAR VIDEO?

14   A.   IT WAS IN A VIDEOTAPE.

15   Q.   DID YOU REVIEW -- WELL, LET ME ASK YOU THIS:  HOW WAS

16   THE TAPE THAT YOU SAW LABELED?

17   A.   IT WAS LABELED RF19.

18   Q.   DID YOU VIEW THAT SPECIFIC VIDEO, RF19, IN CONNECTION

19   WITH THIS INVESTIGATION?

20   A.   YES.

21   Q.   AND CAN YOU DESCRIBE IN GENERAL TERMS WHAT ONE WOULD SEE

22   IF THEY SIMPLY PUT THE VIDEOTAPE IN AND BEGAN PLAYING IT FROM

23   THE BEGINNING?

24   A.   FROM THE BEGINNING YOU SEE NATIONAL GEOGRAPHIC IN

25   RUSSIAN, BUT YOU SEE SCENES OF NATURE OR THE OUTDOORS FOR

1    APPROXIMATELY AN HOUR, AND THEN IT SPLICES INTO AN OPENING

2    WITH CREDITS FOR WHATEVER TAPE IT IS FOR RUSSIAN FLOWERS,

3    NO. 19, AND AT THAT POINT THERE IS, YOU KNOW, A COLLECTION OF

4    CHILD PORNOGRAPHY ON THERE, AND THEN AT THE END -- DEPENDING

5    ON HOW LONG THAT SERIES IS, AT THE END IT SPLICES BACK INTO

6    THE NATIONAL GEOGRAPHIC.

7    Q.    NOW, IS THIS EMBEDDING OF CHILD PORNOGRAPHY IN A VIDEO

8    WITHIN A NATIONAL GEOGRAPHIC-TYPE DOCUMENTARY CONSISTENT IN

9    THE RUSSIAN FLOWERS VIDEOS IN YOUR UNDERSTANDING AS A CHILD

10   PORNOGRAPHY INVESTIGATOR?

11   A.    YES, IT IS.

12   Q.    IN CONNECTION WITH THIS CASE AGAINST THE DEFENDANT, HAVE

13   YOU BEEN ASKED TO REVIEW IMAGES OF CHILD PORNOGRAPHY?

14   A.    YES.

15   Q.    WERE YOU ASKED TO ATTEMPT TO MAKE MATCHES BETWEEN A

16   COLLECTION OF CHILD PORNOGRAPHY IMAGES THAT YOU WERE ASKED TO

17   VIEW AND IMAGES OF CHILD PORNOGRAPHY WITH WHICH YOU ARE

18   GENERALLY FAMILIAR BASED ON YOUR WORK AS A CHILD PORNOGRAPHY

19   INVESTIGATOR?

20   A.    YES.

21   Q.    WERE YOU ABLE TO MAKE ANY MATCHES FROM THE IMAGES YOU

22   WERE ASKED TO VIEW IN THIS CASE WITH VIDEOS THAT YOU ARE

23   FAMILIAR WITH BASED ON YOUR EXPERIENCE AS A CHILD PORNOGRAPHY

24   INVESTIGATOR?

25   A.    YES.

1    Q.   WERE ANY OF THOSE VIDEOS OF THE RUSSIAN FLOWERS SERIES?

2    A.   YES.

3    Q.   WHICH OF THE RUSSIAN FLOWERS VIDEOS?

4    A.   RUSSIAN FLOWERS 19.

5    Q.   HOW MANY MATCHES OF CHILD PORNOGRAPHY IMAGES WERE YOU

6    ABLE TO MAKE TO RUSSIANS FLOWERS 19?

7    A.   TWO.

8    Q.   BASED UPON THE REVIEW OF THE TWO IMAGES THAT YOU MATCHED

9    TO RUSSIAN FLOWERS 19 AS WELL AS YOUR REVIEW OF THE RUSSIAN

10   FLOWERS 19 VIDEO ITSELF, WERE YOU ABLE TO FORM ANY OPINIONS

11   AS TO THE AGE OF THE VICTIMS SHOWN IN THAT SPECIFIC CHILD

12   PORNOGRAPHY, THE TWO IMAGES YOU WERE ABLE TO MATCH?

13   A.   YES.

14   Q.   AND CAN YOU PLEASE EXPLAIN VERY BRIEFLY WHAT THE BASIS

15   FOR THAT OPINION IS?

16   A.   MY SEVERAL YEARS OF WORKING WITH CHILDREN, BEING AROUND

17   CHILDREN OF THAT PARTICULAR AGE, AND IN MY EXPERIENCE AS AN

18   INVESTIGATOR.

19   Q.   AND ALL TOTAL, TOTAL NUMBER OF CHILDREN IN THE TWO

20   IMAGES THAT YOU WERE ABLE TO MATCH TO RUSSIAN FLOWERS 19, HOW

21   MANY CHILDREN ARE THERE?

22   A.   FOUR.

23   Q.   ARE THOSE FOUR CHILDREN IN THE SAME GENERAL AGE RANGE?

24   A.   YES, THEY ARE.

25   Q.   AND IN YOUR OPINION, AGENT BROWN, WHAT IS THE AGE RANGE

1    THAT THOSE CHILDREN SHARED, THE FOUR CHILDREN SHOWN IN THE

2    CHILD PORNOGRAPHY IMAGES THAT YOU WERE ABLE TO MATCH TO

3    RUSSIAN FLOWERS 19?

4    A.   APPROXIMATELY 10 TO 13 YEARS.

5    Q.   I'M GOING TO DIRECT YOUR ATTENTION TO THE SCREEN, AND

6    WITH THE COURT'S PERMISSION, I WOULD LIKE TO BRIEFLY SHOW ON

7    THE SCREEN EXHIBITS 121 AND 128, AND I CAN TURN OFF THIS

8    MONITOR IF THE COURT WOULD LIKE.

9            THE COURT:  GO AHEAD.  PLEASE TURN OFF THAT

10   MONITOR.

11   BY MR. AKROTIRIANAKIS:

12   Q.   AGENT BROWN, ON THE SCREEN BEFORE YOU IS EXHIBIT 121.

13   DO YOU RECOGNIZE EXHIBIT 121 AS ONE OF THE CHILD PORNOGRAPHY

14   IMAGES SHOWING TWO CHILDREN THAT YOU WERE ABLE TO MATCH TO

15   RUSSIAN FLOWERS 19?

16   A.   YES, YES, IT IS.

17   Q.   I'M NOW SHOWING YOU ON THE SCREEN BEFORE YOU EXHIBIT 128

18   AND I'LL ASK YOU THE SAME QUESTION.  IS THIS ANOTHER IMAGE OF

19   TWO CHILDREN ENGAGED IN SEXUALLY EXPLICIT CONDUCT THAT YOU

20   WERE ABLE TO MATCH TO RUSSIAN FLOWERS 19?

21   A.   YES, IT IS.

22   Q.   AGENT OWEN, YOU TESTIFIED -- PARDON ME.  AGENT BROWN,

23   ARE YOU FAMILIAR WITH SPECIAL AGENT JOHN OWEN?

24   A.   YES, I AM.

25   Q.   AND DO YOU KNOW HIM TO BE A FORENSIC EVALUATOR IN YOUR

1    SAME RESIDENT OFFICE THERE IN SAN FRANCISCO?

2    A.   YES, HE WAS FORMERLY THERE, YES.

3    Q.   AND DID HE PLAY A ROLE IN THE INVESTIGATION OF SETH

4    BEKENSTEIN?

5    A.   YES.

6    Q.   DID THAT INCLUDE A FORENSIC EVALUATION OF SETH

7    BEKENSTEIN'S COMPUTERS?

8    A.   YES.

9    Q.   DID AGENT OWEN PROVIDE YOU WITH A DISK FROM SETH

10   BEKENSTEIN'S COMPUTERS?

11   A.   YES, HE DID.

12   Q.   DID YOU REVIEW THE CONTENTS OF THAT DISK?

13   A.   YES.

14   Q.   DID IT CONTAIN INSTANT MESSAGING CHATS?

15   A.   YES, IT DID.

16   Q.   HAVE YOU HAD THE OPPORTUNITY TO REVIEW ALL OF THOSE

17   CHATS?

18   A.   YES, I HAVE.

19   Q.   AND HAVE YOU ALSO REVIEWED OTHER CHATS PROVIDED TO YOU?

20   A.   YES, I HAVE.

21          MR. AKROTIRIANAKIS:  I'M GOING TO TURN TO THE

22   CHATS, YOUR HONOR, IF I CAN APPROACH.  I WOULD LIKE TO

23   APPROACH THE WITNESS WITH THE COURT'S PERMISSION WITH

24   EXHIBITS 1 THROUGH 3.

25          THE COURT:  AREN'T THEY UP HERE?  I BELIEVE THEY

1    ARE.

2              MR. AKROTIRIANAKIS:  I BEG YOUR PARDON.

3              THE WITNESS:  EXHIBIT 3 IS HERE.

4              MR. AKROTIRIANAKIS:  THERE IS A SERIES OF THREE

5    BINDERS BEFORE YOU.  IF YOU OPEN UP JUST THE VERY COVER OF

6    THE BINDER, THERE WILL BE A YELLOW STICKER ON THE FIRST PAGE.

7              THE COURT:  ACTUALLY, IF YOU'RE GOING TO TURN TO

8    THOSE, WHY DON'T WE ADJOURN --

9              MR. AKROTIRIANAKIS:  VERY WELL, YOUR HONOR.

10             THE COURT:  -- SINCE IT IS A NEW SUBJECT.

11             LADIES AND GENTLEMEN, WE WILL BE IN RECESS AS FAR

12   AS YOU'RE CONCERNED UNTIL TOMORROW MORNING.  THANK YOU FOR

13   YOUR PATIENCE AND ATTENTION TODAY.  I'M SORRY ABOUT THE

14   COUPLE OF SHORT DELAYS THAT WE EXPERIENCED.

15             PLEASE REMEMBER WHAT I HAVE INSTRUCTED YOU

16   PREVIOUSLY.  DON'T DISCUSS THE CASE WITH ANYONE.  DON'T

17   DISCUSS ANYTHING RELATED TO ANY PART OF THE CASE, ANY OF THE

18   EVIDENCE IN THE CASE, EVIDENCE THAT YOU HAVE EITHER SEEN OR

19   HEARD TODAY OR IN ANY OF THE OTHER DAYS OF THE TRIAL.  DON'T

20   DISCUSS ANY OF THE PARTICIPANTS IN THE TRIAL, AND THAT WOULD

21   BE ANY OF THE WITNESSES, THE ATTORNEYS, ANYONE THAT YOU'VE

22   SEEN IN THE COURTROOM OR ANYONE THAT HAS ANYTHING TO DO WITH

23   THE TRIAL.  DON'T MAKE UP YOUR MINDS ABOUT THE CASE.

24             I WANT TO REASSURE YOU THAT WE'RE RIGHT ON

25   SCHEDULE, REMEMBER AS I TOLD YOU WHEN WE STARTED THE CASE, IF

1    NOT A LITTLE BIT AHEAD OF SCHEDULE.  AND I'M CONFIDENT THAT

2    WE'LL FINISH THIS WEEK.  SO I WANT TO REASSURE YOU OF THAT.

3    WE'VE HAD A FEW SHORT DELAYS, BUT WE'RE WELL ON SCHEDULE, IF

4    NOT AHEAD OF SCHEDULE.  THANK YOU VERY MUCH, LADIES AND

5    GENTLEMEN.  YOU ARE EXCUSED.

6              (OUT OF THE PRESENCE OF THE JURY:)

7              THE COURT:  THANK YOU, AGENT.  YOU MAY STEP DOWN.

8              THE WITNESS:  THANK YOU.

9              MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I APPROACH THE

10   CLERK WITH EXHIBIT 4 NOW IN EVIDENCE?

11             THE COURT:  YES.

12             ALL RIGHT.  LET'S TAKE CARE OF A COUPLE OF THINGS.

13             FIRST OF ALL, WHAT'S THE GOVERNMENT'S ESTIMATE FOR

14   THE LENGTH OF ITS EXAMINATION OF AGENT BROWN?

15             MR. AKROTIRIANAKIS:  I HAVE TO GO THROUGH ALL

16   THE CHATS.  ALTHOUGH THE RICOCHET CHATS, EXHIBIT 2, ARE

17   SIGNIFICANTLY STREAMLINED.  I'VE CONTINUED -- PROBABLY THE

18   COURT HAS SEEN WHILE AT THE TABLE -- TO STREAMLINE THE OTHERS

19   AS WELL.  EXHIBIT 3, THE DEFENDANT'S CHATS, ARE MORE

20   VOLUMINOUS THAN THE OTHER TWO.  I HOPE TO BE DONE SHORTLY

21   AFTER THE MORNING BREAK TOMORROW, PROBABLY REALISTICALLY

22   ABOUT THE MIDDLE OF THE SECOND SESSION, SO THE PERIOD AFTER

23   THE MORNING BREAK BEFORE LUNCH, ABOUT THE MIDDLE OF THERE.

24             THE COURT:  SO WHEN YOU SAY "THE RICOCHET CHATS," I

25   DON'T --

1          MR. AKROTIRIANAKIS:  THERE ARE A FEW ITEMS THAT ARE

2     IN THE --

3          THE COURT:  THAT WERE NOT IN EXHIBIT 2?

4          MR. AKROTIRIANAKIS:  THEY WERE IN EXHIBIT 2.

5     MR. MARTIN WAS NOT ABLE TO TESTIFY TO THEM.  THEY ARE VERY

6     LIMITED IN SCOPE.

7          THE COURT:  ALL RIGHT.  I'M JUST INQUIRING.  AND

8     CROSS-EXAMINATION, ABOUT -- WHAT, ABOUT AN HOUR?

9          MR. AARON:  I'M THINKING ABOUT THAT, YOUR HONOR.

10    IT'S HARD TO SAY FOR SURE.

11         THE COURT:  ALL RIGHT.  I'M JUST TRYING TO GET --

12    THEN YOUR NEXT WITNESS WOULD BE?

13         MR. MICHAEL:  THE NEXT WITNESS WOULD BE DISTRICT

14    ATTORNEY INVESTIGATOR BILL HUBBARD.  AS YOUR HONOR KNOWS THAT

15    BEKENSTEIN IS NO LONGER A WITNESS.  AND THEN IT WOULD BE

16    MR. SUTHERLAND.  AND THEN NEXT IS MONIQUE BUENO AND THEN

17    ICE SPECIAL AGENT MORENO.  ONE SECOND, PLEASE, YOUR HONOR.

18         ALTHOUGH, TO THE EXTENT THAT WE DO CALL AGENT

19    MORENO, IT WOULD BE ABBREVIATED, YOUR HONOR.

20         THE COURT:  DO YOU THINK YOU WOULD FINISH TOMORROW?

21         MR. MICHAEL:  THAT IS OUR SINCERE HOPE AND PLAN,

22    YOUR HONOR.

23         MR. AKROTIRIANAKIS:  WE'LL FINISH TOMORROW,

24    YOUR HONOR.

25         THE COURT:  THANK YOU.  THAT'S THE ANSWER I WAS

1    LOOKING FOR.

2            MR. AKROTIRIANAKIS:  YOUR HONOR, IF I MAY IN REGARD

3    TO THE CHATS, THE JURORS DID COMMENT TO US AFTER THE LAST

4    TRIAL THAT -- AND I KNOW THE COURT KNOWS THAT WE MADE EVERY

5    EFFORT TO STREAMLINE THAT AND ORGANIZE IT IN A WAY THAT WE

6    COULD GO VERY QUICKLY -- THEY DID THINK THAT WE WERE GOING

7    TOO QUICKLY AND THEY DID WANT TO SEE IT LONGER, ACTUALLY, THE

8    ACTUAL PUBLISHING OF THE CHATS.  WITH THAT IN MIND, I WILL

9    CUT DOWN ON THE AMOUNT OF THINGS I SHOW, BUT I WOULD

10   SOMEWHAT -- AND TO THE EXTENT I BELIEVE I CAN, I WOULD ASK,

11   YOU KNOW, AS WE'RE GOING, AT LEAST TO --

12           THE COURT:  ALL RIGHT.  WELL, I APPRECIATE YOU

13   BRINGING THAT TO MY ATTENTION AND I WILL KEEP THAT IN MIND.

14           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

15           THE COURT:  ALL RIGHT.  ONE PIECE OF UNFINISHED

16   BUSINESS FROM LAST WEEK IS I DID GIVE COUNSEL THE SPECIAL

17   INSTRUCTIONS E, F, AND G, AND I THINK THEY'RE READY TO BE PUT

18   IN THE JURORS' NOTEBOOKS, AND I HAVEN'T HEARD ANY OBJECTIONS

19   FROM YOU, SO I WANT TO BE ABLE TO TELL MY STAFF THAT WE CAN

20   GO AHEAD.

21           MR. AARON:  I'M SORRY TO INTERRUPT, YOUR HONOR.

22   WHICH ONES WERE E, F, AND G?

23           THE COURT:  E, F, AND G -- E IS THE DEFINITION --

24   IT'S THE INSTRUCTION THAT WAS ALREADY READ TO THE JURY AT THE

25   BEGINNING OF THE TRIAL OF WHAT THE DEFENDANT IS CHARGED WITH

1    HERE IN THE CONSPIRACY COUNT COMBINED WITH THE DEFINITION OF

2    CONSPIRACY FROM THE NINTH CIRCUIT MODEL INSTRUCTIONS.  F WAS

3    THE LIMITING INSTRUCTION AS TO STATEMENTS OF THE DEFENDANT'S

4    CO-CONSPIRATORS ONLY.  G WAS THE LIMITING INSTRUCTION AS TO

5    CONSIDERATION OF THE --

6              MR. AARON:  I HAVE THEM, YOUR HONOR.

7              THE COURT:  YOU'VE GOT THEM?

8              MR. AARON:  I DIDN'T HAVE ANY OBJECTION TO THEM

9    OTHER THAN WHAT I PREVIOUSLY MADE.

10             THE COURT:  ALL RIGHT.

11             MR. AARON:  I DON'T BELIEVE THAT THERE WAS ANY -- I

12   MAY BE WRONG, BUT I DON'T BELIEVE THERE WAS ANY OBJECTION

13   MADE AS TO THE CONSPIRACY INSTRUCTION, BUT THERE WAS A LOT OF

14   LITIGATION ABOUT THE LIMITING INSTRUCTIONS.

15             THE COURT:  CORRECT.  ALL RIGHT.  THEN I THINK

16   THOSE ARE READY TO BE PLACED IN.

17             MR. MICHAEL:  THE GOVERNMENT HAS NO OBJECTION TO

18   THEM.

19             MR. AARON:  YOUR HONOR, I DON'T KNOW IF THE COURT

20   IS FINISHED WITH ITS AGENDA.

21             THE COURT:  THAT'S FINE.

22             MR. AARON:  THERE IS A PROBLEM WITH

23   MR. SUTHERLAND'S TESTIMONY.

24             MR. MICHAEL:  ACTUALLY, YOUR HONOR, THERE IS A

25   MATTER I BROUGHT UP WITH COUNSEL THAT I INDICATED I WANTED TO

```
 1   PUT ON THE RECORD, SO I WOULD ONLY REQUEST HIS GIVING ME AN

 2   OPPORTUNITY TO PUT THE ISSUE -- WELL, I DON'T BELIEVE IT'S

 3   AN ISSUE -- PUT THE INFORMATION ON THE RECORD AND THEN

 4   DEFENSE COUNSEL CAN RAISE WHAT HE BELIEVES TO BE THE ISSUE,

 5   YOUR HONOR.

 6            THE COURT:  GO AHEAD.

 7            MR. MICHAEL:  GOVERNMENT COUNSEL HAD MET WITH

 8   MR. SUTHERLAND LAST NIGHT TO PREPARE HIM FOR HIS TESTIMONY,

 9   AND THE GOVERNMENT WOULD SUBMIT THAT MY MEETING WITH HIM IS

10   ATTORNEY WORK PRODUCT TO PREPARE HIM TO TESTIFY, BUT

11   UNDERSTANDING DEFENSE COUNSEL'S CONCERN ABOUT UNFAIR

12   SURPRISE, THE GOVERNMENT DOESN'T HAVE ANY MATERIAL FROM THE

13   INTERVIEW WITH MR. SUTHERLAND LAST NIGHT -- NOT THE

14   INTERVIEW, THE WITNESS PREP THAT THE GOVERNMENT BELIEVES IS

15   JENCKS MATERIAL, BECAUSE THERE'S NO CONTEMPORANEOUS RECORDED

16   STATEMENT OR REPORT NOR DOES THE GOVERNMENT BELIEVE THAT IT'S

17   IMPEACHMENT MATERIAL.

18            IN FACT, THE GOVERNMENT, AS WE PUT ON THE RECORD

19   PREVIOUSLY, MADE MR. SUTHERLAND -- REACHED OUT TO HIM AND

20   MADE HIM AVAILABLE AND REQUESTED THAT HE MAKE HIMSELF

21   AVAILABLE TO DEFENSE COUNSEL TO SPEAK OVER THE WEEKEND SO

22   THAT DEFENSE COUNSEL COULD ASSESS WHETHER OR NOT HE WANTED TO

23   SUBPOENA KALEN, MR. SUTHERLAND'S SON.

24            AND MY UNDERSTANDING IS THAT THEY SPOKE, THAT

25   MR. SUTHERLAND DIDN'T HAVE THE TRANSCRIPT OF HIS PRIOR
```

1    STATEMENT IN JUNE 2001, BUT THAT SOME QUESTIONS FROM DEFENSE

2    COUNSEL WERE POSED, AND THE ANSWERS THAT MR. SUTHERLAND GAVE,

3    GAVE DEFENSE COUNSEL SATISFACTION THAT HE DID NOT WANT TO

4    CALL KALEN AS A WITNESS.

5              THE GOVERNMENT HAD PREVIOUSLY REPRESENTED THAT IT

6    HAD MET WITH MR. SUTHERLAND ONCE BEFORE TO PREPARE HIM FOR

7    HIS TESTIMONY FOR THE LAST TRIAL.  THAT GOT INTERRUPTED

8    BECAUSE OF THE MISTRIAL, BUT THE GOVERNMENT HAD INDICATED IT

9    WAS GOING TO ELICIT FROM MR. SUTHERLAND INFORMATION ABOUT

10   KALEN'S INTERACTION WITH THE DEFENDANT AND MR. SUTHERLAND'S

11   OBSERVATIONS.

12             DEFENSE COUNSEL OBVIOUSLY HAD AN OPPORTUNITY TO

13   SPEAK TO MR. SUTHERLAND, AND I DON'T KNOW THE FULL EXTENT OF

14   THE CONVERSATION THEY HAD THIS WEEK.  UPON TALKING TO

15   MR. SUTHERLAND, I ALERTED DEFENSE COUNSEL OF A COUPLE DETAILS

16   THAT I EXPECT HE WILL TESTIFY ON HIS DIRECT.

17             THE COURT:  I'M SORRY.  YOU ALERTED DEFENSE

18   COUNSEL?

19             MR. MICHAEL:  TODAY I ALERTED DEFENSE COUNSEL.

20             AGAIN, HERE'S --

21             THE COURT:  COULD YOU PLEASE SLOW DOWN A LITTLE?

22             MR. MICHAEL:  I'M SORRY, YOUR HONOR.  I'M ACTUALLY

23   FROM NEW YORK, SO IT'S NOT -- I'VE BEEN TRAINED MY WHOLE LIFE

24   TO TRY AND TALK SLOWER, SO I APOLOGIZE.

25             THE COURT:  YOUR TRAINING HASN'T BEEN SUCCESSFUL.

1          MR. MICHAEL:  AGAIN, THE GOVERNMENT DOESN'T BELIEVE

2     IT WAS OBLIGATED TO TURN OVER INFORMATION IF IT DOESN'T

3     APPEAR TO BE IMPEACHMENT OR <u>JENCKS</u>, BUT AGAIN, IN THE SPIRIT

4     OF CANDOR, WE GAVE THIS INFORMATION TO DEFENSE COUNSEL.

5          ACCORDING TO MR. SUTHERLAND, HE RECALLS ONE TIME,

6     AND HE WASN'T CLEAR ON THE DATE, AND HE DID INDICATE TO

7     GOVERNMENT COUNSEL THAT IT HAPPENED IN DECEMBER OF 2000 WHEN

8     THE EVENTS ARE CHARGED, THAT THE DEFENDANT AND KALEN WENT TO

9     THE NEIGHBOR'S HOUSE TOGETHER AND USED THE HOT TUB, AND THERE

10    WAS -- WHEN INQUIRED SPECIFICALLY AS TO, AGAIN, NOT IN

11    CONNECTION WITH THE HOT TUB BUT IN GENERAL AS TO WHETHER OR

12    NOT THE DEFENDANT HAD EVER PURCHASED ANY GIFTS FOR KALEN,

13    MR. SUTHERLAND RECALLED THAT THERE HAD BEEN A BATHING SUIT

14    PURCHASED FOR KALEN AND THAT I GUESS HE SAID THAT IT WAS A

15    SPEEDO BATHING SUIT THAT APPEARED WAS THE SAME TYPE OF

16    BATHING SUIT THAT DEFENDANT WORE HIMSELF, AND MR. SUTHERLAND

17    SAW THE BATHING SUIT.

18          AND THEN HE ALSO INDICATED THAT -- AND HE WASN'T

19    ENTIRELY CLEAR ON DATES, AND THE GOVERNMENT PRESSED HIM ON

20    THIS, THAT HE THINKS THAT IN EARLY 2001, SO THAT'S

21    IMMEDIATELY AFTER THE TRIP TO NEW MEXICO, THAT THE DEFENDANT

22    MAY HAVE MET WITH MR. SUTHERLAND AND HIS BOYS IN SAN DIEGO

23    WHERE MR. SUTHERLAND'S FATHER HAS A BEACH HOUSE, AND AT THAT

24    BEACH HOUSE WHILE THEY WERE THERE, AGAIN, IN EARLY 2001 RIGHT

25    AROUND THE NEW YEAR, HE BELIEVES THE DEFENDANT TOOK KALEN

```
 1   ALONE TO A SWIMMING POOL TO GO SWIMMING.

 2            THE COURT:  THAT WAS IN SAN DIEGO?

 3            MR. MICHAEL:  THAT WOULD BE IN SAN DIEGO.  SO

 4   OBVIOUSLY, YOUR HONOR, I DON'T THINK THE GOVERNMENT -- I

 5   MEAN, THE GOVERNMENT HAS CHARGED CONDUCT IN NEW MEXICO, AND

 6   THIS IS CONDUCT -- THIS IS INTERACTION THAT WOULD HAVE

 7   HAPPENED AFTERWARDS.

 8            THE COURT:  LET ME ASK YOU THIS:  MR. SUTHERLAND

 9   DOESN'T KNOW OF ANY CONDUCT THAT OCCURRED --

10            MR. MICHAEL:  CORRECT.

11            THE COURT:  -- IN SAN DIEGO?

12            MR. MICHAEL:  CORRECT.

13            THE COURT:  HE JUST KNOWS THAT -- ALL HE CAN

14   TESTIFY TO IS THAT THE DEFENDANT WAS ALONE -- WELL, THE

15   DEFENDANT WAS WITH KALEN AT A SWIMMING POOL IN SAN DIEGO?

16            MR. MICHAEL:  CORRECT, IN EARLY 2001.  AND AGAIN,

17   HE CAN TESTIFY THAT AT SOME POINT THE DEFENDANT BOUGHT A

18   BATHING SUIT FOR KALEN AND AT SOME POINT THE DEFENDANT WENT

19   TO THE NEIGHBOR'S HOUSE IN NEW MEXICO WITH KALEN AND USED THE

20   HOT TUB.

21            THE COURT:  BUT HE DIDN'T WITNESS --

22            MR. MICHAEL:  RIGHT.

23            THE COURT:  HE CAN'T TESTIFY TO ANY --

24            MR. MICHAEL:  HE WILL NOT BE TESTIFYING TO ANY SEX

25   ACTS OR ATTEMPTED ACTS.  AGAIN, HE'S ONLY TESTIFYING TO HIS
```

1    OBSERVATION.  AND, YOUR HONOR, I KNOW, IS FAMILIAR WITH HIS

2    JUNE 2001 STATEMENT WHICH -- THAT THE GOVERNMENT HAS POINTED

3    OUT WAS A STATEMENT MADE THE DAY OR TWO AFTER HE HAD FIRST

4    LEARNED WHAT OBVIOUSLY WAS VERY SIGNIFICANT INFORMATION.  I

5    CAN TELL YOU FROM MY OWN INQUIRY OF HIM, HE REALLY DOESN'T

6    REMEMBER GIVING THE STATEMENT.  AND WHEN WE SPOKE --

7            THE COURT:  WHEN YOU SAY "HE," YOU'RE TALKING ABOUT

8    MR. SUTHERLAND?

9            MR. MICHAEL:  MR. SUTHERLAND.  HE DOESN'T REALLY

10   REMEMBER THE SPECIFICS OF WHAT HE SAID.  IN FACT, WHEN I

11   SPOKE WITH HIM TO FACILITATE THE MEETING WITH DEFENSE

12   COUNSEL, I SUGGESTED, YOU KNOW, "THERE IS A TRANSCRIPT IF YOU

13   WANT TO SEE IT.  MAYBE YOU WANT TO LOOK AT IT."  I LEFT THAT

14   SAME MESSAGE FOR DEFENSE COUNSEL THAT I HAD MADE TO

15   MR. SUTHERLAND.  I DON'T BELIEVE HE EVER READ IT BEFORE HE

16   SPOKE TO DEFENSE COUNSEL.

17           SO, ACCORDING TO DEFENSE COUNSEL, AND I HAD ADVISED

18   HIM OF THIS INFORMATION, HE INDICATED TO ME THAT HE BELIEVES

19   THE NEW DETAILS MAY BE IMPEACHMENT MATERIAL BECAUSE HE

20   BELIEVES IT'S INCONSISTENT -- AND AGAIN, HE CAN SPEAK FOR

21   HIMSELF, BUT MY UNDERSTANDING IS HE BELIEVES IT'S

22   INCONSISTENT WITH THE PRIOR STATEMENT OF MR. SUTHERLAND.

23           THE COURT:  ALL RIGHT.  MR. AARON?

24           MR. AARON:  I DO BELIEVE THAT, YOUR HONOR, AND I

25   WOULD NOTE THAT MR. SUTHERLAND ON A NUMBER OF OCCASIONS IN

1   HIS PREVIOUS STATEMENT SAYS HE DOESN'T REMEMBER ANY SPECIFIC

2   DETAILS.

3           IF I MIGHT, WHEN I SPOKE TO MR. SUTHERLAND THIS

4   WEEKEND, I DID SO IN GOOD FAITH HOPING TO SPARE HIM AND HIS

5   EX-WIFE, YOU KNOW, WHAT CAN ONLY BE A PAINFUL EXPERIENCE

6   COMING HERE AND TESTIFYING.  I WAS AS CANDID AS COULD

7   POSSIBLY BE.  IN FACT, WHEN I SPOKE WITH MR. SUTHERLAND, I

8   SAID, "SIR, WHAT I'M CONCERNED ABOUT IS THAT YOU WILL GET ON

9   THE STAND AND THERE WILL BE SOME BOMBSHELL OR THERE WILL BE

10  NEW INFORMATION."  AND I SAID, "SIR, DO YOU REMEMBER ANY

11  SPECIFIC INCIDENTS, YOU KNOW, THINGS THAT MADE YOU

12  UNCOMFORTABLE, ANY SPECIFIC INCIDENTS?"

13          AND HE SAID, "WELL, YOU KNOW" -- AND HE DID SAY

14  EXACTLY WHAT COUNSEL HAS SAID, THAT WHEN HE FIRST MADE THE

15  INITIAL STATEMENT FOR WHICH WE HAVE THE TRANSCRIPT, HE HAD

16  JUST RECENTLY HEARD THESE EVENTS AND WAS TRYING TO COME TO

17  GRIPS WITH THEM.

18          I TOLD HIM, "WELL, LOOKING BACK, IS THERE ANYTHING

19  THAT YOU SEE NOW LOOKING BACK, ANY SPECIFIC INCIDENTS?"

20          AND HE SAID, "NO.  IT'S JUST GENERALIZED.  NO

21  SPECIFIC INSTANCES AT ALL."  AND SURE ENOUGH, AS SOON AS I

22  LET THE OTHER WITNESSES GO, AND AGAIN, THERE WAS NO SECRET

23  ABOUT THAT, I LET THE WITNESSES GO, I TOLD THEM THEY NEED NOT

24  APPEAR, I EVEN TOLD COUNSEL I HAD LET THE WITNESSES GO, AND

25  AS SOON AS THAT HAPPENS, THE DAY BEFORE THE WITNESS IS TO

```
 1    TESTIFY -- IN FACT, HE COULD HAVE EVEN TESTIFIED TODAY, THE
 2    DAY OF HIS TESTIMONY OR THE DAY BEFORE HIS TESTIMONY, I LEARN
 3    ALL OF THIS NEW INFORMATION.
 4            THE PROBLEM IS, YOUR HONOR, EFFECTIVE COUNSEL
 5    WOULD HAVE TO INVESTIGATE THE INFORMATION AGAINST MY CLIENT.
 6    THIS INFORMATION IS BRAND NEW.  THERE IS NO WAY I COULD HAVE
 7    LEARNED ANY OF THIS INFORMATION.  MR. SUTHERLAND DIDN'T TELL
 8    ME, AND I SPECIFICALLY ASKED HIM IF THERE WAS ANY NEW AND
 9    DIFFERENT INFORMATION.  I ASKED FOR ANYTHING THAT HE
10    REMEMBERED, AND HE DIDN'T TELL ME.  HE TOLD MR. MICHAEL.
11    THERE'S NO WAY THAT I CAN INVESTIGATE THIS BEFOREHAND.
12            I WOULD ASK THE COURT TO EXCLUDE THE INFORMATION OR
13    TO CONTINUE THE CASE SO THAT I CAN INVESTIGATE IT.  THE ONLY
14    WAY I CAN INVESTIGATE, YOUR HONOR, IS TALK TO MS. LORI STYLES
15    OR KALEN.  I PREFER TO TALK TO MS. STYLES.  I WOULD TALK TO
16    HER ABOUT WHETHER OR NOT A SWIMMING SUIT WAS BOUGHT, WHETHER
17    OR NOT SHE RECALLS HIM GOING TO THE NEIGHBOR'S HOUSE AT THE
18    HOT TUB.  SHE WOULD NOT HAVE ANY INFORMATION ABOUT THE POOL
19    IN SAN DIEGO.
20            THE COURT:  WELL, MY RECOLLECTION IS THAT THIS IS
21    NOT THE FIRST TIME I'VE HEARD OF THIS.  I THINK THAT THERE IS
22    A MENTION OF TWO OF THE THREE ITEMS.  I THINK THAT THERE IS A
23    MENTION IN THE CHATS, AT LEAST I THINK THAT'S WHERE IT IS, OF
24    THE SWIMSUIT BECAUSE THAT SOUNDS FAMILIAR TO ME.
25            MR. AARON:  I DON'T THINK THERE'S A MENTION IN THE
```

1    CHATS OF THE SWIMSUIT, AND COUNSEL CAN CORRECT ME IF I'M

2    WRONG, BUT THERE IS A MENTION ABOUT GOING SWIMMING.  AND

3    THAT'S THE PERNICIOUS NATURE OF THIS NEW EVIDENCE IS THAT IT

4    CORROBORATES EVIDENCE THAT -- STATEMENTS THAT MY CLIENT

5    SUPPOSEDLY MADE, AND THAT'S THE REAL DANGER.  THAT'S ONE OF

6    THE REASONS I SPECIFICALLY TALKED TO MR. SUTHERLAND ABOUT

7    WHETHER OR NOT HE REMEMBERS SPECIFIC INCIDENTS.

8            THE COURT:  THERE'S AN AWFUL LOT OF EVIDENCE IN

9    THIS CASE AND FROM A LOT OF DIFFERENT SOURCES, SO I AM

10   RELUCTANT TO PUT TOO MUCH WEIGHT ON MY RECOLLECTION, BUT ON

11   THE CHANCE THAT IT MIGHT BE OF ANY ASSISTANCE TO COUNSEL FOR

12   BOTH SIDES, I WILL SAY THAT I BELIEVE THAT THERE WAS A

13   MENTION IN THE EVIDENCE THAT I'VE READ, WHETHER IT WAS

14   PERHAPS ONE OF THE INVESTIGATOR'S NOTES, BUT MORE LIKELY IN

15   THE CHAT TRANSCRIPTS THAT I'VE READ, THAT THE DEFENDANT

16   BOUGHT A SPEEDO SWIMSUIT LIKE HIS OWN FOR KALEN S.  I JUST

17   RECALL SEEING THAT.

18           THE OTHER POSSIBILITY, HOWEVER, IS THAT I THINK IN

19   THE -- IT'S POSSIBLE THAT I MAY BE CONFUSING THAT WITH THE

20   STORY THAT THE GOVERNMENT SOUGHT TO INTRODUCE AND THEN LATER

21   WITHDREW, WHICH HAD A LOT OF REFERENCES TO YOUNG BOYS WEARING

22   THOSE KIND OF SWIMSUITS, SO IT'S POSSIBLE THAT THAT'S WHAT

23   I'M CONFUSING IT WITH.  BUT I BELIEVE THERE'S SOMETHING IN

24   THE CHAT ROOM TRANSCRIPTS ABOUT THE DEFENDANT STATING THAT HE

25   BOUGHT THAT KIND OF A BATHING SUIT FOR KALEN S.

1          THERE ARE SEVERAL REFERENCES IN THE TRANSCRIPTS TO

2    THE DEFENDANT GOING SWIMMING, AND THERE IS ALSO STATEMENTS BY

3    KALEN S. IN HIS INTERVIEW THAT THE DEFENDANT TOOK HIM

4    SWIMMING.  AS TO WHETHER THIS IS EITHER IMPEACHMENT TESTIMONY

5    OR IMPEACHMENT MATERIAL AND AS TO ITS IMPORTANCE OR WHETHER

6    IT'S WHAT'S BEEN CALLED FOR SEVERAL DAYS "BOMBSHELL

7    EVIDENCE," THAT'S ANOTHER MATTER ENTIRELY.

8          TAKING UP THE FIRST ISSUE FIRST, THAT IS, WHETHER

9    IT'S PROPER IMPEACHMENT MATERIAL BECAUSE IT'S INCONSISTENT

10   WITH THE STATEMENTS THAT WERE GIVEN BY MR. SUTHERLAND WHEN HE

11   WAS FIRST INTERVIEWED BY LAW ENFORCEMENT IN 2001, THAT THESE

12   ARE FURTHER -- I GUESS THE QUESTION IS, ARE THESE STATEMENTS

13   INCONSISTENT WITH HIS EARLIER STATEMENTS TO INVESTIGATORS, AS

14   THE DEFENSE ARGUES; OR ALTERNATIVELY, AS THE GOVERNMENT

15   ARGUES, ARE THEY NOT INCONSISTENT BUT SIMPLY FURTHER

16   RECOLLECTIONS OF THE WITNESS AT A LATER TIME WHEN HE IS NO

17   LONGER IN A STATE OF BEING SOMEWHAT SHOCKED BY THE RECENT

18   ALLEGATIONS OF THE SEXUAL ASSAULT ON HIS SON?

19         I THINK IT'S A MATTER FOR BOTH COUNSEL TO ARGUE TO

20   THE JURY AS TO WHETHER OR NOT -- HOW THE JURY SHOULD CONSIDER

21   THIS.  AGAIN, IF YOU GO BACK TO THE JURY INSTRUCTION THAT'S

22   GIVEN TO THE JURORS AS TO HOW THEY EVALUATE THE CREDIBILITY

23   OF A WITNESS, THAT LIST IS, I THINK, SEVEN FACTORS, AND ABOUT

24   THREE OF THEM WOULD BE GERMANE TO THIS QUESTION, AND SO

25   THEREFORE, I THINK THAT IT IS FAIR GAME FOR THE DEFENSE TO

1    INQUIRE AS TO WHEN THE WITNESS RECALLED THIS INFORMATION AND

2    WHAT TRIGGERED HIS RECALL AND WHY HE DIDN'T TELL COUNSEL FOR

3    THE DEFENSE ABOUT IT DURING HIS TELEPHONIC INTERVIEW WITH

4    THE WITNESS AND SO FORTH.  SO I WOULD ALLOW, OF COURSE,

5    CROSS-EXAMINATION ON IT.  I WOULDN'T FORBID THE WITNESS FROM

6    TESTIFYING, SO THAT LEAVES ONLY THE QUESTION OF THE REQUEST

7    FOR A CONTINUANCE SO THAT THE DEFENSE MAY INVESTIGATE THIS

8    TESTIMONY.

9            NOW, I DON'T KNOW WHAT KIND OF LENGTH OF A

10   CONTINUANCE YOU WANT.  IT SEEMS TO ME THERE'S A COUPLE OF

11   POSSIBILITIES.  ONE, OF COURSE, YOU CAN CALL -- I THINK,

12   FRANKLY, THAT GOVERNMENT COUNSEL HAS BEEN VERY PROFESSIONAL

13   ABOUT TRYING TO FACILITATE THE CONTACT BETWEEN MR. SUTHERLAND

14   AND MS. STYLES AND DEFENSE COUNSEL, SO PERHAPS THERE COULD BE

15   ANOTHER OPPORTUNITY FOR DEFENSE COUNSEL TO TALK TO

16   MR. SUTHERLAND TONIGHT AND MS. STYLES IF DEFENSE COUNSEL

17   WANTS TO DO THAT.

18           I DON'T KNOW WHAT ORDER YOU'RE PLANNING TO PUT YOUR

19   WITNESSES ON, BUT IN ANY EVENT IT SOUNDS LIKE IT'S GOING TO

20   TAKE ALMOST ALL MORNING TO GET THROUGH AGENT BROWN.  I DON'T

21   KNOW WHO YOU PLAN TO CALL AFTER LUNCH.  BUT THE WORST CASE

22   SCENARIO, IT SEEMS TO ME, IS THAT WE COULD ACCOMMODATE THE

23   REQUEST FOR A CONTINUANCE SUCH THAT MR. SUTHERLAND IS NOT PUT

24   ON THE STAND UNTIL THURSDAY MORNING.  HE WOULD BE THE LAST

25   WITNESS.  AND THAT WOULD ALLOW SOME BRIEF TIME FOR FURTHER

1    INVESTIGATION BY THE DEFENSE.  I MEAN, I WOULD INSTRUCT THE

2    JURY, YOU WOULD ARGUE.  THIS IS GOING TO BE A BRIEF WITNESS

3    NO MATTER WHAT.  AND SO THE CASE WOULD GO TO THE JURY ON

4    THURSDAY, AND THAT'S JUST ABOUT WHAT WE TOLD THEM WHEN WE

5    BEGAN THIS CASE.  THAT'S WHAT I THINK HOW THAT ISSUE SHOULD

6    BE RESOLVED.  AND THE BEST RESULT WOULD BE IF DEFENSE COUNSEL

7    HAS THE OPPORTUNITY TO TALK TO MR. SUTHERLAND TONIGHT IF

8    MR. SUTHERLAND IS WILLING TO BE INTERVIEWED BY HIM OVER THE

9    TELEPHONE, AND MS. STYLES.  THAT'S UP TO THE WITNESSES.

10           MR. MICHAEL:  THE GOVERNMENT WILL MAKE THAT INQUIRY

11   AND REQUEST THAT HE AGAIN MAKE HIMSELF AVAILABLE JUST AS WE

12   REQUESTED OVER THE WEEKEND.

13           THE COURT:  ALL RIGHT.

14           MR. MICHAEL:  FOR THE RECORD, THE GOVERNMENT HAS NO

15   CONTROL OVER WHAT MR. SUTHERLAND TELLS DEFENSE COUNSEL.  I

16   CAN JUST SAY FROM MY OWN EXPERIENCE WITH HIM, IT TAKES A LOT

17   OF QUESTIONS SOMETIMES TO GET HIM TO RECALL ANY -- TO RECALL

18   CERTAIN EVENTS BY ASKING THE RIGHT QUESTIONS, AND SO PERHAPS

19   DEFENSE COUNSEL NOW IS SORT OF ALERTED TO THAT FACT.  INSTEAD

20   OF ASKING BROAD, OPEN-ENDED QUESTIONS, HE CAN ASK MORE

21   SPECIFIC, FOCUSSED QUESTIONS.

22           THE COURT:  NOW HE KNOWS WHAT SOME OF THE EVIDENCE

23   IS.

24           MR. MICHAEL:  RIGHT.  AND HE MIGHT EVEN BRING UP

25   THINGS THAT MR. SUTHERLAND HASN'T RECALLED WITH ME, I DON'T

1   KNOW, BUT I THINK THAT -- I WOULD JUST SUGGEST THAT HE TRY

2   THAT WITH MR. SUTHERLAND.

3            THE COURT:  ALL RIGHT.  THAT'S MY RULING ON THAT

4   ISSUE.

5            LET'S SEE.  THURSDAY IS THE DAY WE'RE GOING TO GO

6   FROM 8 TO 1:30.  THAT SHOULD STILL WORK.

7            MR. MICHAEL:  CAN I BRING UP TWO RELATED MATTERS

8   THAT -- INFORMATION I ALERTED DEFENSE COUNSEL OF TODAY?

9            THE COURT:  YES.

10           MR. MICHAEL:  MR. SUTHERLAND ALSO ADVISED THE

11  GOVERNMENT THAT MORE THAN 20-PLUS YEARS AGO, IN THE 1970S

12  AND '80S, HE USED RECREATIONAL DRUGS, MARIJUANA AND OTHER

13  PRODUCTS, I'M NOT SURE, USED A LOT OF DIFFERENT DRUGS WITH

14  THE DEFENDANT.  LET THE RECORD --

15           THE COURT:  WAIT.

16           MR. MICHAEL:  MR. SUTHERLAND.

17           THE COURT:  WITH THE DEFENDANT, DID YOU SAY?

18           MR. MICHAEL:  YES, WHEN THEY WERE FRIENDS.  THE

19  GOVERNMENT OBVIOUSLY WASN'T PLANNING ON ELICITING THIS

20  TESTIMONY BECAUSE IT'S BEEN -- I THINK IT'S BEEN 20-PLUS

21  YEARS.  THERE'S NO ARRESTS.  THERE'S NO CONVICTIONS.  THAT

22  WOULD BE AN IMPROPER LINE OF INQUIRY ON CROSS, AND I

23  OBVIOUSLY WANTED TO MAKE YOUR HONOR AWARE OF THAT INFORMATION

24  AND PROVIDE IT TO DEFENSE COUNSEL SHOULD DEFENSE COUNSEL

25  CHOOSE TO CROSS ON IT.

1              THE COURT:  I DID NOT UNDERSTAND WHAT YOU SAID.

2    DID YOU SAY IT WAS YOUR POSITION THAT IT WOULD OR WOULDN'T BE

3    IMPROPER?

4              MR. MICHAEL:  IT WOULD NOT BE AN APPROPRIATE LINE

5    OF INQUIRY ON CROSS-EXAM.

6              THE OTHER INFORMATION THAT THE GOVERNMENT ALERTED

7    DEFENSE COUNSEL TO, THAT BILL HUBBARD, THE DA INVESTIGATOR

8    WHO WILL BE TESTIFYING TOMORROW, WAS A NUMBER OF YEARS AGO --

9    I THINK OVER TEN YEARS AGO WAS A LAW ENFORCEMENT OFFICER IN

10   TEXAS.  HE WAS INDICTED ON FALSIFYING -- I THINK CHARGES OF

11   FALSIFYING RECORDS.  HE ULTIMATELY FILED A CIVIL RICO ACTION

12   IN FEDERAL COURT AND AN INJUNCTION WAS ISSUED BARRING THE

13   STATE PROSECUTION FROM PROCEEDING BECAUSE THE STATE

14   PROSECUTION WAS DEEMED A VINDICTIVE PROSECUTION.  MR. HUBBARD

15   HAD BEEN INVESTIGATING THAT DA OR COLLEAGUES OF THAT DA FOR

16   CORRUPTION.  ULTIMATELY, THE INJUNCTION BECAME A PERMANENT

17   INJUNCTION.  THE STATE CHARGES WERE DISMISSED WITH PREJUDICE

18   AND THE RECORD WAS EXPUNGED, ANY RECORD OF THE ARREST, ANY

19   RECORD OF THE CHARGES.  AND MY UNDERSTANDING IS THAT

20   MR. HUBBARD ACTUALLY WROTE A NOVEL ABOUT IT WHICH HAS BEEN

21   PUBLISHED AND IS COMMERCIALLY AVAILABLE.

22             THE GOVERNMENT ACTUALLY HAS THIS NOVEL, AND I HAVE

23   TO TELL YOU CANDIDLY IT WAS A GIFT TO ME FROM MR. HUBBARD,

24   AND I DIDN'T REALIZE IT WAS HIS STORY ABOUT HIM IN

25   PARTICULAR.  SO ALTHOUGH I HAD IT, I DIDN'T --

1    THE COURT:  IT'S A NOVEL?

2    MR. MICHAEL:  WELL, I THINK IT'S A NONFICTION

3 ACCOUNT OF HIS EXPERIENCE.

4    THE COURT:  SO IT'S NOT A NOVEL?

5    MR. MICHAEL:  I USED THE WRONG WORD, YOUR HONOR.

6    THE COURT:  TRY BOOK.

7    MR. MICHAEL:  SO, ANYWAY, THE GOVERNMENT ALERTED

8 DEFENSE COUNSEL OF THIS.  AGAIN, WE DON'T BELIEVE IT WOULD BE

9 A PROPER LINE OF INQUIRY ON CROSS.  WE DON'T BELIEVE IT'S

10 HENTHORNE OR GIGLIO MATERIAL, BUT WE ALSO WANTED TO DISCLOSE

11 IT TO DEFENSE COUNSEL AND LET YOUR HONOR KNOW THAT TO THE

12 EXTENT DEFENSE COUNSEL THOUGHT IT WAS A PROPER LINE OF

13 INQUIRY ON CROSS, THE GOVERNMENT WOULD OBJECT TO THAT.

14    MR. AARON:  YOUR HONOR, WE ARE NOT PLANNING ON

15 DELVING INTO MR. HUBBARD'S SITUATION.  ALTHOUGH, I SHOULD

16 NOTE THAT MR. MICHAEL HAS PROMISED THAT I WILL GET AN

17 AUTOGRAPHED COPY OF THE BRIAN MICHAEL STORY, WHICH I GREATLY

18 APPRECIATE.

19    IN REGARDS TO THE INFORMATION ABOUT THE --

20    THE COURT:  AS LONG AS YOU BOTH FILE THE

21 APPROPRIATE FINANCIAL DISCLOSURES.

22    MR. AARON:  IN REGARDS TO THE EVIDENCE OF DRUG USE,

23 I'M NOT ANTICIPATING GOING INTO THAT.  I DON'T THINK THAT'S

24 ADMISSIBLE IMPEACHMENT.  IT MIGHT BECOME ADMISSIBLE DEPENDING

25 ON THE WITNESS'S STATE OF HIS MEMORY AND SO FORTH.  I KIND OF

```
 1   DOUBT THAT.  I TALKED TO HIM AND I DIDN'T THINK HE WAS THAT

 2   DISORGANIZED, BUT IT'S POSSIBLE THAT COULD COME UP IN A

 3   COLLATERAL WAY.

 4           I WOULD JUST ASK IN TERMS OF WE HAD MOVED TO

 5   EXCLUDE MR. SUTHERLAND'S TESTIMONY AND, YOUR HONOR, IF I

 6   COULD, I WOULD LIKE TO STATE MY OBJECTIONS.  I WOULD OBJECT

 7   TO THE ADMISSION OF HIS TESTIMONY ON THE GROUNDS OF THE FIFTH

 8   AMENDMENT DUE PROCESS, SIXTH AMENDMENT EFFECTIVE ASSISTANCE

 9   OF COUNSEL AND RIGHT TO A FAIR TRIAL AND ASK THAT MY

10   OBJECTION BE DEEMED CONTINUED SO I DON'T NEED TO REMAKE IT IN

11   FRONT OF THE JURY.

12           THE COURT:  ALL RIGHT.  YOU MAY HAVE A CONTINUING

13   OBJECTION.

14           NOW, MR. AARON, I GUESS YOU'LL LET ME KNOW IN THE

15   MORNING REGARDING YOUR REQUEST WHETHER YOU'RE GOING TO

16   REQUEST THAT HE NOT BE PUT ON THE STAND UNTIL THURSDAY?

17           MR. AARON:  YOUR HONOR, IF IT'S POSSIBLE, MAYBE

18   MR. MICHAEL AND I COULD SPEAK TO THE WITNESSES TOMORROW

19   MORNING.  MAYBE WE CAN JUST ARRIVE HERE AT 8:00.  WE CAN

20   SPEAK TO THE WITNESSES THEN.  WE COULD MAYBE EVEN CALL -- WE

21   COULD CONTACT LORI STYLES AND HAVE HER BE AVAILABLE BY

22   TELEPHONE AND WE COULD --

23           THE COURT:  I'LL LET THE TWO OF YOU DISCUSS HOW --

24           MR. AARON:  IF SO, WE COULD TELL THE COURT RIGHT

25   AT 8:30.
```

1          THE COURT:  THAT WOULD BE FINE.

2          MR. AARON:  THE OTHER THING IS, REGARDLESS OF

3   WHETHER OR NOT MR. SUTHERLAND TESTIFIES TOMORROW OR THURSDAY,

4   WOULD WE BE ARGUING THURSDAY MORNING?

5          THE COURT:  WELL, AS OPPOSED TO WHAT?

6          MR. AARON:  AS OPPOSED TO ARGUING WEDNESDAY

7   AFTERNOON.

8          THE COURT:  WELL, HERE'S MY -- IT'S A LITTLE HARD

9   TO SAY IN THE ABSTRACT, BUT HERE ARE MY RULES ABOUT THAT:  I

10  WILL GET AN ESTIMATE AND THEN I'LL GIVE YOU MY ESTIMATE AS TO

11  HOW LONG YOUR CLOSING SHOULD BE, BUT WHAT I DON'T WANT TO SEE

12  HAPPEN, UNLESS IT'S ABSOLUTELY UNAVOIDABLE AND I DON'T SEE

13  WHY THAT WOULD BE THE CASE HERE, IS TO HAVE ARGUMENTS TAKE

14  PLACE ON DIFFERENT DAYS.

15          IT'S POSSIBLE THAT THINGS MIGHT GO FASTER TOMORROW

16  THAN WE ANTICIPATE, AND I WOULDN'T WANT TO HAVE A LOT OF DEAD

17  TIME TOMORROW.  SO IF IT'S POSSIBLE FOR BOTH -- AND THIS MAY

18  SOUND REALLY OBVIOUS, BUT THAT'S -- UNLIKE THE TWO OF YOU OR

19  THE THREE OF YOU, I'M A LITTLE TIRED.  I'M SURE THAT YOU'RE

20  ALL FRESH AS DAISIES, BUT THIS MAY SOUND A LITTLE OBVIOUS,

21  BUT I'M HAVING TROUBLE THINKING.  SO IF WE FINISH EARLY

22  ENOUGH WITH ALL THE WITNESSES TOMORROW AND WE HAVE ENOUGH

23  TIME FOR ALL THE ARGUMENT TO TAKE PLACE AND TO INSTRUCT AND

24  THEN ALL THE ARGUMENT TO TAKE PLACE IN ONE DAY, TOMORROW,

25  THEN YOU COULD ARGUE TOMORROW, BUT ONLY THEN.  OTHERWISE,

```
 1    ARGUMENT WOULD TAKE PLACE ON THURSDAY MORNING.
 2              MR. AARON:  THAT WOULD INDICATE TO ME WE WOULD HAVE
 3    TO BE DONE AT 2:00 BECAUSE IT WILL TAKE A HALF HOUR TO
 4    INSTRUCT, IT MIGHT TAKE AN HOUR FOR THE PROSECUTION
 5    ARGUMENTS, AN HOUR FOR THE DEFENSE ARGUMENTS, MAYBE A HALF
 6    HOUR FOR CLOSING INSTRUCTIONS AND REBUTTAL ARGUMENT.
 7              THE COURT:  WELL, IT WILL TAKE A HALF AN HOUR --
 8    THERE'S NOT THAT MANY INSTRUCTIONS.  A HALF AN HOUR FOR
 9    INSTRUCTIONS.  THE TIME LIMIT I'M GOING TO GIVE AFTER
10    CONSULTING WITH COUNSEL ABOUT WHAT YOU WOULD LIKE WILL BE THE
11    SAME AMOUNT FOR BOTH SIDES, AND THEN THE GOVERNMENT CAN USE
12    ITS -- THEY HAVE TO DIVIDE ITS TIME UP BETWEEN THE TWO
13    PORTIONS OF ITS CLOSING.  YOU CAN DIVIDE IT UP HOWEVER YOU'D
14    LIKE.  LET'S JUST SAY THEORETICALLY I WAS TO GIVE EACH SIDE
15    HALF AN HOUR.  YOU CAN USE THAT HALF AN HOUR HOWEVER YOU'D
16    LIKE BETWEEN YOUR OPENING AND YOUR REBUTTAL -- WELL, 20
17    MINUTES, MR. AKROTIRIANAKIS, IF YOU DIDN'T LIKE THE
18    HALF-AN-HOUR ESTIMATE.
19              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
20              THE COURT:  I WANT THE LAUGH OF MR. AKROTIRIANAKIS.
21    I DIDN'T WANT YOU TO FEEL LEFT OUT.
22              MR. AKROTIRIANAKIS:  I WILL ALERT MY MOTHER,
23    YOUR HONOR.
24              MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD JUST
25    REQUEST THAT MAYBE -- IF IT'S POSSIBLE TO RECONSIDER,
```

1   PERHAPS, THE GOVERNMENT IN LIGHT OF THE FACT THERE ARE FOUR

2   COUNTS AND SO MUCH EVIDENCE IN THIS CASE --

3          THE COURT:  I'M NOT SAYING HALF AN HOUR IS GOING TO

4   BE MY --

5          MR. MICHAEL:  I UNDERSTAND THAT.  TO THE EXTENT

6   THAT I DON'T KNOW IF YOU'RE THINKING -- WELL, I DON'T KNOW IF

7   YOU'RE SAYING IT WOULD BE EQUAL TIME FOR THE TWO SIDES.

8          THE COURT:  THIS IS THE WAY IT WORKS:  YOU'RE

9   SUPPOSED TO -- YOU GIVE YOUR OPENING ARGUMENT, THE DEFENSE

10  THEN CAN ADDRESS WHAT YOU DID AND ANY AFFIRMATIVE DEFENSES IT

11  HAS, BUT IT DOESN'T REALLY HAVE ANY AFFIRMATIVE DEFENSES IN

12  THIS CASE.  ITS DEFENSE IS THAT YOU HAVEN'T MET YOUR BURDEN

13  OF PROOF.  IT'S NOT PUTTING ON A CASE.  SO YOU WILL NOT NEED

14  ANY EXTRA TIME TO ADDRESS AFFIRMATIVE DEFENSES.  SO THE TIME

15  THAT YOU HAVE -- YOU MAY NEED TO ADDRESS THE DEFENSE'S

16  ARGUMENTS, BUT THE TIME YOU HAVE IS REALLY TO -- YOU DON'T

17  NEED ANY EXTRA TIME TO ADDRESS AFFIRMATIVE DEFENSES.

18         SO, IN ANY EVENT, I THINK AN HOUR FOR BOTH SIDES

19  WOULD BE MORE THAN ENOUGH.

20         DOES EITHER SIDE HAVE AN ISSUE WITH HAVING AN HOUR?

21         MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WOULD JUST

22  ASK -- WOULD ENDEAVOR TO DO IT IN AN HOUR BUT WOULD ASK FOR

23  AN HOUR AND 15 TO BE ABLE TO SPLIT UP BETWEEN THE TWO HAVING

24  STARTED DRAFTING OUR -- THE INITIAL CLOSING AND JUST GOING

25  THROUGH THE FOUR COUNTS AND THE EVIDENCE AND ANTICIPATING A

1   VIGOROUS, LONG DEFENSE CLOSING OF ABOUT AN HOUR, AND I'M SURE

2   THERE WILL BE MANY STRONG ARGUMENTS MADE, AND WE WANT TO HAVE

3   AMPLE TIME TO RESPOND TO THEM AS WE'RE ENTITLED TO WITH OUR

4   REBUTTAL.

5          THE COURT:  MR. AARON, DO YOU FEEL THAT YOU CAN

6   COMPLETE YOUR ARGUMENT IN ROUGHLY AN HOUR?

7          MR. AARON:  I DO.

8          THE COURT:  ALL RIGHT.  WELL, EITHER SIDE -- I

9   THINK BOTH SIDES SHOULD HAVE AN HOUR.  IF YOU RUN OVER BY 25

10  PERCENT OF THAT, THAT'S FINE, BUT TRY TO KEEP IN MIND THE

11  JURY.  IT'S HARD WORK LISTENING.

12         MR. MICHAEL:  WE UNDERSTAND, YOUR HONOR, AND WE

13  UNDERSTAND THE VALUE OF A SHORT CLOSING.

14         THE COURT:  THAT'S FINE.  I'LL GIVE BOTH SIDES THE

15  SAME AMOUNT OF TIME.

16         MR. AARON:  THAT BEING SAID, HALF HOUR FOR

17  INSTRUCTIONS, UP TO AN HOUR FOR EACH COUNSEL APPROXIMATELY,

18  THAT'S TWO AND A HALF HOURS.

19         THE COURT:  IT ONLY TAKES ABOUT THREE MINUTES FOR

20  MY CLOSING INSTRUCTIONS.  THERE IS JUST A COUPLE.

21         MR. AARON:  THAT WOULD STILL INDICATE TO ME THAT WE

22  WOULD HAVE TO -- BECAUSE THAT DOESN'T INCLUDE BREAKS, AND WE

23  MAY NEED A BREAK.

24         THE COURT:  WE WILL NEED A BREAK.

25         MR. AARON:  PROBABLY WE WOULD HAVE TO END ABOUT

```
 1    2:30, END THE EVIDENCE AT 2:30.
 2              THE COURT:  AT LEAST.  I AGREE.  PROBABLY MORE LIKE
 3    2:00.  THAT SEEMS UNLIKELY TOMORROW, BUT IT'S NOT IMPOSSIBLE.
 4              MR. AARON:  WELL, IN TERMS OF PLANNING, SHOULD WE
 5    JUST -- WOULD IT JUST BE BETTER TO SAY WHEREVER WE END --
 6    BECAUSE WE HAVEN'T EVEN HAD THE JURY INSTRUCTIONS
 7    CONFERENCE -- WHEREVER WE END, WE'LL JUST DO ARGUMENTS
 8    THURSDAY MORNING?
 9              THE COURT:  WELL --
10              MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT WILL BE
11    PREPARED TO CLOSE WEDNESDAY BUT --
12              THE COURT:  ALL RIGHT.  LET ME JUST SAY THIS -- AND
13    WE CAN GO OFF THE RECORD BECAUSE I WANT TO GIVE THE COURT
14    REPORTER A BREAK.
15              THE COURT:  NOW, THE CHARGING CONFERENCE, I THINK
16    WE WILL HAVE ENOUGH TIME TOMORROW AFTERNOON TO DO THE
17    CHARGING CONFERENCE.
18              MR. AARON:  OKAY.
19              THE COURT:  AND LET ME JUST GIVE YOU A COUPLE OF
20    THOUGHTS ABOUT -- WELL, ONE INSTRUCTION IN PARTICULAR,
21    BECAUSE I THINK THERE'S ONE INSTRUCTION THAT I FIND TROUBLING
22    THAT YOU MIGHT GIVE SOME THOUGHT TO TONIGHT; THAT IS,
23    GOVERNMENT'S INSTRUCTION NO. 1 ABOUT THE DEFINITION OF CHILD
24    PORNOGRAPHY OF WHICH THE DEFENSE HAS OBJECTED TO THE
25    GOVERNMENT'S PROPOSED INSTRUCTION NO. 1, AND I'M INCLINED
```

1    TO SUSTAIN, AT LEAST IN PART, SOME OF THOSE OBJECTIONS, IN

2    PARTICULAR AS TO THE SECOND PARAGRAPH ABOUT WHAT THE

3    GOVERNMENT IS NOT REQUIRED TO PROVE, WHICH I THINK IS UNDULY

4    ARGUMENTATIVE.

5         I THINK WHAT -- THERE IS A NEED, OF COURSE, FOR AN

6    INSTRUCTION THAT DEFINES CHILD PORNOGRAPHY, AND I'M GOING TO

7    IN A MOMENT -- BEFORE YOU LEAVE TONIGHT, I HAVE A DEFINITION

8    -- I HAVE AN INSTRUCTION SIMILAR TO THIS THAT WAS GIVEN IN AN

9    EARLIER TRIAL THAT I THINK TRACKS THE LANGUAGE OF THE STATUTE

10   AND SIMPLY THAT.  SO I WILL BE MORE INCLINED TO USE SOMETHING

11   LIKE THAT.

12        ON INSTRUCTION NO. 2 I DISAGREE WITH THE OBJECTION

13   THAT THERE'S NO NEED FOR A DEFINITION OF THE WORD.  THE

14   NATURE OF THE OBJECTION TO NO. 2 IS THERE IS NO NEED FOR A

15   DEFINITION OF THE WORD "LASCIVIOUS."  AS TO THAT OBJECTION,

16   I WOULD OVERRULE THAT OBJECTION.  AND AS TO THE OTHER

17   OBJECTIONS TO THE DEFINITION THAT'S PROVIDED, I THINK THAT

18   INSOFAR AS THE INSTRUCTION GOES BEYOND THE DEFINITION AND I

19   THINK PERHAPS THE ELEVENTH CIRCUIT PATTERN INSTRUCTION IS

20   APPROPRIATE TOO, BUT THAT'S ABOUT AS MUCH OF AN INSTRUCTION I

21   WOULD GIVE.  I THINK THAT'S WHAT THE INSTRUCTION CONSISTS OF,

22   AS I RECALL.

23        I WOULD NOT GIVE -- I WOULD NOT GIVE THE PROPOSED

24   INSTRUCTION NO. 3.  I THINK IT'S ARGUMENTATIVE.  I THINK THAT

25   WOULD BE PROPER ARGUMENT FROM WHAT THE DEFINITION OF "INTENT"

1    IS.  I MEAN, THAT COULD PROPERLY BE ARGUED, BUT IT'S JUST NOT

2    A PROPER INSTRUCTION.  IT'S TOO ARGUMENTATIVE TO BE GIVEN AS

3    AN INSTRUCTION.

4           MR. AKROTIRIANAKIS:  IS THERE A FORM INSTRUCTION,

5    YOUR HONOR -- I THINK THERE IS -- THAT INDICATES THAT THIS

6    WOULDN'T BE A DEFENSE ANYWAY?

7           THE COURT:  WELL, IF YOU WANT TO SUBMIT A REQUEST

8    FOR A FORM INSTRUCTION, THAT'S FINE.  THE OBJECTION TO

9    INSTRUCTION NO. 4, MY TENTATIVE RULING IS TO OVERRULE THAT

10   OBJECTION, AND I WOULD GIVE THE -- I WOULD OVERRULE THE

11   OBJECTION AND GIVE THE PROPOSED INSTRUCTION NO. 5, WHICH IS

12   THE DEVITT & BLACKMAR INSTRUCTION.  AND I THINK THOSE ARE

13   ALL.  SO THAT'S MY TENTATIVE RULING.  THAT MAY BE HELPFUL TO

14   YOU WHEN WE DO THE CHARGING CONFERENCE TOMORROW.

15          ANYTHING ELSE THAT WE NEED TO TAKE UP?

16          MR. AARON:  I JUST REMEMBERED, YOUR HONOR, I HAVE A

17   RULE 29 MOTION TOMORROW AS WELL.

18          THE COURT:  ALL RIGHT.  THANK YOU.

19          MR. AKROTIRIANAKIS:  I WILL TRY TO FIND THAT FORM

20   INSTRUCTION.  IT MAY NOT BE THE NINTH CIRCUIT.  I MAY HAVE

21   MIXED IT UP WITH ANOTHER CIRCUIT.

22          THE COURT:  I THINK THERE IS A NINTH CIRCUIT

23   INSTRUCTION OR IT MAY BE A DEVITT & BLACKMAR INSTRUCTION.

24          MR. AKROTIRIANAKIS:  YES.

25          THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE IN

1    RECESS.

2              MR. AKROTIRIANAKIS:  MR. MARTIN IS RELEASED ON

3    THE --

4              MR. MICHAEL:  JEFF, ARE YOU DONE WITH MARTIN?

5              THE COURT:  HE WANTED TO TALK TO HIS CLIENT BEFORE

6    HE MADE A DECISION ABOUT THAT.

7              MR. AARON:  THE ONE THING THAT TROUBLED ME ABOUT

8    MARTIN'S TESTIMONY IS THAT HE SAID THAT HE DIDN'T AGREE TO GO

9    TESTIFY AGAINST OTHER PEOPLE, SO I WAS WONDERING IF THERE WAS

10   SOME QUESTION IN HIS COOPERATION AGREEMENT THAT --

11             MR. MICHAEL:  THE PLEA AGREEMENT IS THE ONLY

12   AGREEMENT THAT WE'RE AWARE OF THAT EMBODIES HIS

13   RESPONSIBILITIES.  I THINK HE AGREED TO COOPERATE AND THEN

14   PLED --

15             THE COURT:  WAS THAT REJECTED BY THE SENTENCING

16   JUDGE?

17             MR. MICHAEL:  MY UNDERSTANDING WAS HE AGREED TO

18   COOPERATE AND PLED PURSUANT TO A PLEA AGREEMENT AND THAT THE

19   GOVERNMENT MADE A SENTENCING RECOMMENDATION.  IT WASN'T

20   NECESSARILY PURSUANT TO WHAT WE KNOW IN THE NINTH CIRCUIT AS

21   THE COOPERATION AGREEMENT, BUT MADE A SENTENCING WITH THAT

22   RECOMMENDATION THAT WAS NOT LESS THAN THE FIVE-YEAR MAX, AND

23   THE JUDGE REJECTED THAT SENTENCING RECOMMENDATION AND THE

24   JUDGE --

25             THE COURT:  BUT IT WASN'T A BINDING PLEA AGREEMENT?

1             MR. MICHAEL:  NO, NOT THAT THE GOVERNMENT'S AWARE

2    OF.  THE ONLY AGREEMENT WE ARE AWARE OF AND THE ONLY

3    OBLIGATION THAT EXISTED BETWEEN HIM AND THE GOVERNMENT ARE IN

4    THE AGREEMENT WE TURNED OVER TO DEFENSE COUNSEL.

5             MR. AARON:  I DON'T THINK WE'VE SEEN THE PLEA

6    AGREEMENT.  ALTHOUGH, WE'VE SEEN THE --

7             MR. AKROTIRIANAKIS:  IN FACT, I THINK YOUR HONOR IS

8    ACTUALLY HOLDING IT.

9             MR. AARON:  MAYBE I'M CONFUSED.  I THOUGHT THERE

10   WAS A SENTENCING.

11            THE COURT:  WE CAN GO OFF THE RECORD, I THINK.

12                 (OFF THE RECORD BRIEFLY)

13            MR. AARON:  YOUR HONOR, THAT'S CORRECT.  I RECEIVED

14   THE PLEA AGREEMENT.  HE CAN BE RELEASED.

15            THE COURT:  HE CAN BE RELEASED?

16            MR. AARON:  HE CAN BE RELEASED.

17                 (PROCEEDINGS ADJOURNED)

18                      ---OOO---

19

20

21

22

23

24

25

# C E R T I F I C A T E

### DOCKET NO. EDCR 04-42(A) VAP

I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____
PHYLLIS A. PRESTON, CSR            DATED:  OCTOBER 16, 2008
FEDERAL OFFICIAL COURT REPORTER
LICENSE NO. 8701