1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2            EASTERN DIVISION-RIVERSIDE

3

        HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING
4

5  UNITED STATES OF AMERICA,        )
                                    )
6              PLAINTIFF,           )
                                    )
7  V.                               )DOCKET NO. EDCR 04-42(A)-VAP
                                    )
8  JAMES SANDERS,                   )
                                    )
9              DEFENDANT.           )
   _____)
10

11      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                  RIVERSIDE, CALIFORNIA
12            WEDNESDAY, JUNE 13, 2007

13

               PHYLLIS A. PRESTON, CSR
14               LICENSE NO. 8701
            FEDERAL OFFICIAL COURT REPORTER
15           UNITED STATES DISTRICT COURT
                 3470 TWELFTH STREET
16           RIVERSIDE, CALIFORNIA 92501

17

18

19

20

21

22

23

24

25

1                                    <u>APPEARANCES</u>

2

    FOR THE PLAINTIFF:      OFFICE OF THE UNITED STATES ATTORNEY
3                           BY:  <u>BRIAN MICHAEL</u>
                                 <u>JOSEPH AKROTIRIANAKIS</u>
4                           ASSISTANT UNITED STATES ATTORNEYS
                            3880 LEMON STREET, SUITE 210
5                           RIVERSIDE, CALIFORNIA 92501

6

    FOR THE DEFENDANT:      <u>JEFFREY AARON</u>
7                           FEDERAL CRIMINAL DEFENSE PANEL
                            THE RIVERSIDE BARRISTER BUILDING
8                           3993 MARKET STREET
                            RIVERSIDE, CALIFORNIA 92501
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2   WITNESSES

 3   FOR PLAINTIFF:                              PAGE

 4   LEE BROWN
     DIRECT EXAMINATION BY MR. AKROTIRIANAKIS (RESUMED) . 19
 5
     WILLIAM HUBBARD
 6   DIRECT EXAMINATION BY MR. AKROTIRIANAKIS . . . . . . 180
     CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . . 190
 7
     CHARLES SUTHERLAND
 8   DIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . . 191
     CROSS-EXAMINATION BY MR. AARON . . . . . . . . . . . 231
 9   REDIRECT EXAMINATION BY MR. MICHAEL. . . . . . . . . 241

10

11

12   EXHIBITS                                  ADMITTED

13     207       . . . . . . . . . . . . . . . . . . .    161

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              WEDNESDAY, JUNE 13, 2007, RIVERSIDE, CALIFORNIA

 2                              ---O0O---

 3                  (OUT OF THE PRESENCE OF THE JURY:)

 4              THE COURT:  COUNSEL HAS SOMETHING TO TAKE UP

 5    BEFORE WE BRING THE JURY IN?

 6              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THE THING

 7    THAT I WANTED TO MENTION, AND THIS IS -- WELL, AT THE END OF

 8    THE DAY YESTERDAY IN THE COURSE OF MY EXAMINATION OF

 9    AGENT BROWN I HAD ASKED HIM WHETHER HE HAD MATCHED CERTAIN OF

10    THE PORNOGRAPHIC IMAGES TO RUSSIAN FLOWERS AND ALL OF THAT.

11    AND OUT OF RESPECT FOR THE JURORS' SENSIBILITIES I HAD ASKED

12    TO TURN OFF THE MONITOR.  I THOUGHT THEY WOULDN'T WANT TO

13    SEE, YOU KNOW, MORE THAN IS NECESSARY.  I THINK SOME OF THE

14    JURORS WERE ACTUALLY TRYING TO, YOU KNOW, SEE THE MONITOR UP

15    THERE AND KIND OF -- AND I THINK IN ORDER TO MAKE SENSE OF

16    ALL OF THIS, UPON REFLECTION, AND PARTICULARLY CONSIDERING

17    THAT COUNSEL NOW APPEARS TO BE RAISING A MORPHING ARGUMENT,

18    IT IS IMPORTANT TO THE ARGUMENT TO ESTABLISH CLEARLY THE FACT

19    THAT AT LEAST THREE OF THE IMAGES THAT THE JURORS HAVE SEEN

20    ARE TAKEN FROM MOVIES -- WELL, MOVIES THAT WE KNOW OF AND, OF

21    COURSE, THERE'S THE ADDITIONAL ONE OF THE YOUNG ASIAN BOY,

22    BUT TO SHOW THAT THOSE WERE FROM MOVIES SO THAT THEY CANNOT

23    HAVE BEEN MORPHED IMAGES.

24              SO WHAT I WOULD LIKE TO DO VERY BRIEFLY IS TO JUST

25    ASK AGENT BROWN -- SHOW FOR A SPLIT SECOND 121 AND 128 TO THE
```

1    JURY AND AGENT BROWN AND ASK HIM IF THOSE WERE THE IMAGES WE

2    TALKED ABOUT YESTERDAY FROM RUSSIAN FLOWERS 19 AND THEN TO

3    SHOW HIM 111, WHICH IS FROM THIEF'S PUNISHMENT, AND ASK HIM

4    IF THAT MATCHES THIEF'S PUNISHMENT.  AND THEN TO SHOW THE

5    CLIP FROM -- THE FIVE-SECOND CLIP FROM THIEF'S PUNISHMENT

6    WHERE THAT ACTUALLY COMES FROM WHICH IS ALREADY IN EVIDENCE.

7           THE COURT:  I GUESS I'M SOMETIMES -- AT THIS POINT

8    IT'S A LITTLE HARD TO SORT OUT WHAT WAS DONE IN THIS TRIAL

9    AND WHAT WAS DONE THE FIRST TIME AROUND.

10          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

11          THE COURT:  OF COURSE --

12          MR. AKROTIRIANAKIS:  IN THIS REGARD IN THAT I HAVE

13   DISCUSSED RIGHT NOW, EVERYTHING HAS BEEN IDENTICAL TO THE

14   FIRST TRIAL EXCEPT PERHAPS --

15          THE COURT:  IT'S JUST THAT AGENT BROWN TESTIFIED IN

16   THE FIRST TRIAL.  THAT'S WHY I'M THINKING THAT HAS ALREADY

17   BEEN DONE --

18          MR. AKROTIRIANAKIS:  AT NO --

19          THE COURT:  -- DURING THIS TRIAL, BUT IT HASN'T

20   YET.

21          MR. AKROTIRIANAKIS:  IT HAS BEEN DONE IN THIS TRIAL

22   AT THE VERY END OF THE DAY YESTERDAY; HOWEVER, AT NO POINT IN

23   THIS TRIAL --

24          THE COURT:  BUT YOU HAVEN'T SHOWN THE CLIPS?

25          MR. AKROTIRIANAKIS:  THAT'S RIGHT, NEITHER THIS

1    TRIAL NOR THE LAST TRIAL.

2              THE COURT:  YOU MAY PROCEED.

3              MR. AARON:  ACTUALLY, SORRY TO INTERRUPT.  I THINK

4    WE DID SEE THE CLIPS.

5              THE COURT:  WE DID SEE THE CLIPS BUT THE JURY

6    HASN'T BEEN SHOWN THE CLIPS AT THE SAME TIME WHILE A WITNESS

7    HAS BEEN ASKED WHO COULD IDENTIFY THE CLIPS AND THE STILL

8    IMAGES FROM THE COMPUTER.

9              IS THAT WHAT YOU'RE TRYING TO DO WITH THIS WITNESS?

10             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THAT'S ONE

11   OF THE THINGS.

12             THE COURT:  WELL, BY SHOWING THE CLIPS TO THE JURY

13   AGAIN.

14             MR. AKROTIRIANAKIS:  ONLY TO ESTABLISH THE POINT

15   ABOUT THE MORPHING.  AND I WON'T SHOW THE RUSSIAN FLOWERS

16   CLIPS.  THE ONLY VIDEO CLIP I WOULD SHOW WOULD BE ONE OF THE

17   TWO THIEF'S PUNISHMENT CLIPS AND IT'S THE FIVE-SECOND

18   APPROXIMATELY EXCERPT.

19             THE COURT:  OF THE BOY UNDRESSING?

20             MR. AKROTIRIANAKIS:  NO, NO, THE OTHER ONE, YOUR

21   HONOR, BECAUSE THAT'S THE ONE THAT MATCHES TO THE IMAGE

22   THAT'S IN EVIDENCE.

23             THE COURT:  THAT IS THE RUSSIAN FLOWER ONE, ISN'T

24   IT?

25             MR. AKROTIRIANAKIS:  NO, THAT'S THIEF'S PUNISHMENT,

1    YOUR HONOR.  RUSSIAN FLOWER IS IMAGES 121 AND 128 THAT WERE

2    SHOWN YESTERDAY THROUGH AGENT MORAN.

3              THE COURT:  ALL RIGHT.  ANYTHING ELSE?

4              MR. AARON:  YES.  I HAD SPOKEN WITH CHARLES

5    SUTHERLAND LAST EVENING AND I DON'T THINK A CONTINUANCE WOULD

6    BE HELPFUL BECAUSE THE ONLY PEOPLE WHO WOULD HAVE PERCEIVED

7    THE EVENTS THAT I HAD LEARNED ABOUT WERE EITHER KALEN,

8    MR. SANDERS, MR. SUTHERLAND OR MR. SUTHERLAND'S OLDER SON.

9    SO WE WILL BE PREPARED TO PROCEED WITH EXAMINATION OF

10   MR. SUTHERLAND TODAY.

11             THE COURT:  THANK YOU.

12             MR. AARON:  BASED ON THE INFORMATION I HAVE NOW.

13             THE COURT:  THANK YOU.  ALL RIGHT.  ANYTHING ELSE?

14             MR. AKROTIRIANAKIS:  YOUR HONOR, THE OTHER THIEF'S

15   PUNISHMENT CLIP IS -- THE ONE OF THE BOY UNDRESSING IS NOT OF

16   THE GRAPHIC NATURE THAT, PERHAPS NOT AS GRAPHIC, AS THE ONE

17   THAT I DID INTEND TO SHOW, BUT IT'S IMPORTANT I THINK IN

18   ORDER TO BRING THIS ALL TOGETHER IN THE JURORS' MINDS,

19   BECAUSE THAT IS IMPORTANT TO SHOW THAT IT IS A CHILD, AN

20   ACTUAL CHILD.

21             THE COURT:  SO, MR. AKROTIRIANAKIS, DO YOU WANT TO

22   SHOW THAT ONE, TOO, TODAY?

23             MR. AKROTIRIANAKIS:  WITH THE COURT'S PERMISSION.

24             THE COURT:  THAT'S FINE.

25             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

```
 1              THE COURT:  ANYTHING ELSE?

 2              MR. AKROTIRIANAKIS:  I HAD SOME OBJECTIONS TO

 3    EITHER -- THE GOVERNMENT HAD OBJECTIONS TO THE DEFENSE'S

 4    PROPOSED JURY INSTRUCTIONS THAT WE'VE NOW HAD AN OPPORTUNITY

 5    TO LOOK AT.  I CAN RAISE THEM NOW OR WE CAN DO IT ALL AT THE

 6    CHARGING CONFERENCE LATER.

 7              THE COURT:  DID YOU SUBMIT WRITTEN OBJECTIONS OR DO

 8    YOU WANT TO MAKE THEM ORALLY?

 9              MR. AKROTIRIANAKIS:  I HADN'T.  I THINK WE GOT IT

10    AT THE BEGINNING OF THE DAY YESTERDAY.

11              THE COURT:  I HAVEN'T SEEN THEM.

12              MR. AKROTIRIANAKIS:  THEY WERE E-FILED.

13              THE COURT:  THEY WERE E-FILED YESTERDAY?

14              MR. AKROTIRIANAKIS:  THE DAY BEFORE PERHAPS.  I

15    JUST BARELY GOT THEM.

16              MR. AARON:  I'M SORRY, YOUR HONOR, ARE YOU TALKING

17    ABOUT THE GOVERNMENT SUBMITTING OBJECTIONS TO MY

18    INSTRUCTIONS?

19              THE COURT:  WHEN WERE YOUR INSTRUCTIONS SUBMITTED?

20              MR. AARON:  MY INSTRUCTIONS WERE SUBMITTED ON

21    MONDAY.

22              MR. MICHAEL:  ON MONDAY BEFORE NOON, YOUR HONOR.

23              MR. AKROTIRIANAKIS:  I THINK THEY'RE ACTUALLY --

24              THE COURT:  NO, I DID SEE THEM BECAUSE THEY'RE

25    ATTACHED TO YOUR OBJECTIONS TO THE GOVERNMENT'S, CORRECT?
```

1          MR. AKROTIRIANAKIS:  THAT'S RIGHT, YOUR HONOR.

2          THE COURT:  I'VE SEEN THEM.

3          MR. AARON:  ONE MORE THING, YOUR HONOR.  REGARDING

4  WITNESS BUENO, I DON'T KNOW WHEN THE GOVERNMENT IS PLANNING

5  ON CALLING WITNESS BUENO OR IF THEY STILL ARE.

6          MR. AKROTIRIANAKIS:  YES, WE INTEND TO CALL ANALYST

7  BUENO.  I THINK THAT SHE WILL PROBABLY TESTIFY --

8          THE COURT:  TODAY?

9          MR. AKROTIRIANAKIS:  I WOULD HOPE BUT, YOU KNOW, I

10  KNOW THE COURT WANTS TO LEAVE EARLY TODAY TO GO TO --

11          THE COURT:  I MEAN, I'M ONLY PLANNING TO DO THAT IF

12  YOU'RE DONE WITH YOUR WITNESSES.

13          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

14          THE COURT:  THE TRIAL TAKES PRIORITY.

15          MR. AKROTIRIANAKIS:  SHE WILL TESTIFY TODAY.  I

16  EXPECT TO FINISH TODAY.

17          MR. AARON:  WELL, WE HAVE AN OBJECTION TO HER

18  TESTIMONY BECAUSE I BELIEVE WHAT SHE IS GOING TO DO IS TO SAY

19  THAT, WELL, THERE WERE THESE MAGAZINES PUBLISHED IN SEQUENCE,

20  AND THIS MAGAZINE IS IN BETWEEN THOSE TWO; THEREFORE IT MUST

21  HAVE BEEN PUBLISHED AROUND THIS TIME.  AND WE HAVE A NUMBER

22  OF OBJECTIONS TO HER TESTIMONY, TO HER USE OF THOSE

23  MAGAZINES.

24          THE COURT:  ALL RIGHT.  WELL, IT SEEMS TO ME THAT

25  SHE COULD TESTIFY -- I DON'T KNOW WHAT THE GOVERNMENT IS

1    PROFFERING.  IF THE GOVERNMENT IS PROFFERING THE FIRST PART

2    OF WHAT YOU JUST SAID, THAT IS, THIS MAGAZINE WAS PUBLISHED

3    THIS DATE, THIS MAGAZINE WAS PUBLISHED THIS DATE, THE JURY

4    CAN DRAW THE INFERENCE IN A MAGAZINE WITH A NUMBER IN BETWEEN

5    THOSE TWO THAT IT WAS PUBLISHED IN BETWEEN.  SHE COULDN'T

6    TESTIFY TO THAT, BUT THEY CAN DRAW AN INFERENCE.

7            MR. MICHAEL:  THAT IS EXACTLY WHAT SHE WILL BE

8    TESTIFYING TO, THAT THIS IS A VOLUME NUMBER THAT'S IN

9    BETWEEN -- I THINK THE NUMBERS WERE 75, 76, 77.  I COULD BE

10   OFF BY A NUMBER OR TWO.  SHE'LL SAY 1975 MAGAZINE AND SHE'LL

11   BRING THE ORIGINAL WITH HER WHICH WAS MAINTAINED BY THE FBI

12   IN A DATABASE, HAS THIS DATE OF PUBLICATION IN DENMARK.  77

13   HAS THE SAME INFORMATION.  THE ONE IN THE MIDDLE, 76, IN

14   WHICH THERE WAS A MATCH OF AN IMAGE IN THAT MAGAZINE TO A

15   STILL IN THE DEFENDANT'S COMPUTER, DOESN'T HAVE A DATE ON IT

16   BUT FALLS IN THE MIDDLE.  SO SHE'S JUST GOING TO TESTIFY --

17   SHE'S NOT GOING TO OFFER AN OPINION OTHER THAN SHE'S JUST

18   OFFERING FACT TESTIMONY ABOUT THESE MAGAZINES.

19           THE COURT:  ALL RIGHT.  NOW, ARE YOU GOING TO

20   OFFER -- I SUGGEST YOU'RE NOT GOING TO OFFER THE TWO

21   MAGAZINES INTO EVIDENCE.

22           MR. MICHAEL:  WHAT THE GOVERNMENT HAD DONE AND

23   WHAT WE NOTICED OF THE EXHIBIT WAS THE VERY FIRST PAGE OF THE

24   MAGAZINE, OF THE BOOKEND MAGAZINES, THAT SHOW THE VOLUME

25   DATE, THE VOLUME ON THE FIRST PAGE AND THEN THE PAGE INSIDE

1    THAT HAS THE PUBLICATION INFORMATION.  SO WE'VE ONLY PULLED

2    OUT THOSE TWO PAGES, THE COPIES, AND SHE'LL BE ABLE TO LOOK

3    AT THOSE EXHIBITS AND SAY THIS IS A COPY OF THE FIRST PAGE

4    AND A COPY OF THE PUBLICATION PAGE FROM THIS MAGAZINE.

5            THE COURT:  WHERE ARE THOSE EXHIBITS?

6            MR. MICHAEL:  THEY ARE IN THE BINDER WITH CHILD

7    PORNOGRAPHY.

8            MR. AARON:  THEY ARE NUMBERS 140 AND 142.

9            MR. MICHAEL:  MAY I APPROACH?

10           THE COURT:  YES, YOU MAY.  I WOULD LIKE TO LOOK AT

11   THOSE.  SO YOUR OBJECTION, IS THAT UNDERSTANDING AS TO WHAT

12   THE GOVERNMENT'S PROFFER IS YOUR OBJECTION?

13           MR. AARON:  MY OBJECTION IS FOUNDATION, HEARSAY,

14   AND THE RISK OF UNFAIR PREJUDICE.  I BELIEVE I'VE LOOKED AT

15   THOSE MAGAZINES EARLIER IN THE TRIAL AND I DON'T HAVE MY

16   GRAPHIC IMAGES FOLDER, BUT I BELIEVE THEY ARE SEXUALLY

17   EXPLICIT.  IF I COULD HAVE A MOMENT.  WELL, 140 APPEARS TO BE

18   JUST AN IMAGE OF WHAT APPEARS TO BE CHILDREN WITH THEIR

19   GENITALS EXPOSED.  THE NEXT PAGE IS THE PUBLICATION PAGE.  IT

20   HAS GRAPHIC MATERIAL THERE AS WELL.  EXHIBIT 141 APPEARS TO

21   BE -- OH, A WHOLE ENTIRE MAGAZINE OF CHILD PORNOGRAPHY.

22           THE COURT:  RIGHT.  YOU'RE NOT GOING TO INTRODUCE

23   ALL OF THIS.

24           MR. MICHAEL:  WELL, YOUR HONOR, THE GOVERNMENT WAS

25   SEEKING TO INTRODUCE THE MAGAZINE SO THAT THE JURORS CAN SEE

1    THAT IT WAS PART OF THE MAGAZINE AND ASSESS THEMSELVES

2    WHETHER OR NOT THIS WAS AN IMAGE THAT WAS MORPHED OR AN IMAGE

3    THAT ACTUALLY APPEARED IN A MAGAZINE FROM THE 1970S.  AND THE

4    GOVERNMENT HAS USED THIS PROCEDURE BEFORE IN OTHER TRIALS,

5    AND IF YOUR HONOR WANTS, THE GOVERNMENT WOULD HAVE NO

6    OBJECTION TO A LIMITING INSTRUCTION MAKING IT CLEAR THAT

7    DEFENDANT POSSESSED THIS MAGAZINE.

8         THE COURT:  I DON'T THINK WE NEED THE ENTIRE

9    MAGAZINE.

10        MR. AARON:  YOUR HONOR, JUST BECAUSE IT SAYS 1979

11   DOESN'T MEAN IT WAS ACTUALLY PUBLISHED IN 1979.  SOMEONE

12   COULD HAVE PUT THAT DATE ON IT.

13        MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT SUBMITS

14   THAT'S ARGUMENT THAT COULD BE MADE TO THE JURY.

15        MR. AARON:  WOULDN'T THAT BE FOUNDATION?

16        THE COURT:  FIRST OF ALL, THE FOUNDATION OBJECTION

17   GOES TO THE WITNESS' -- WELL, FIRST OF ALL, IS YOUR

18   FOUNDATION OBJECTION ADDRESSED TO THE WITNESS' ABILITY TO

19   TESTIFY AS TO ALL THREE OF THE MAGAZINES OR ONLY AS TO

20   EXHIBIT 141?

21        MR. AARON:  ALL THREE OF THEM, YOUR HONOR.

22        THE COURT:  WELL, WE HAVE TO LISTEN TO WHAT HER

23   TESTIMONY IS AND AS TO WHAT HER CREDENTIALS AND SO FORTH ARE.

24   I CAN'T RULE ON FOUNDATION AT THIS POINT.  IF SHE HAS THE

25   KNOWLEDGE, EXPERIENCE, AND TRAINING TO TESTIFY ABOUT THE

1    PROMINENCE OF THE MAGAZINES -- OF THE TWO MAGAZINES THAT --

2    WHAT COUNSEL HAS CALLED THE BOOKEND MAGAZINES, THEN THERE IS

3    A FURTHER QUESTION AS TO WHETHER THERE WOULD BE FOUNDATION TO

4    TESTIFY ABOUT -- WELL, I WAS ABOUT TO SAY THAT THERE'S A

5    FURTHER QUESTION AS TO WHETHER THERE IS FOUNDATION TO TESTIFY

6    ABOUT 141.  IS THAT THE ONE IN QUESTION WITH THE --

7            MR. MICHAEL:  YES, YOUR HONOR.

8            THE COURT:  I THINK THE JURY IS BEING ASKED TO DRAW

9    AN INFERENCE AS TO THE DATE OF THAT AND IT IS A MATTER OF

10   ARGUMENT.  ASSUMING THAT THERE'S FOUNDATION FOR HER TESTIMONY

11   ABOUT THE PUBLICATION DATES OF THE OTHER TWO, THEN I THINK

12   THERE WOULD BE SUFFICIENT EVIDENCE FROM WHICH THE JURY COULD

13   DRAW AN INFERENCE ABOUT THE PUBLICATION DATE OF EXHIBIT 141,

14   BUT WE WILL HAVE TO WAIT AND SEE WHAT THE TESTIMONY IS AS TO

15   WHETHER THERE'S SUFFICIENT FOUNDATION.

16           AS TO WHAT I INTERPRET TO BE A 403 OBJECTION AS TO

17   140 AND 142, LEAVING ASIDE THE QUESTION OF HOW MUCH OF 141

18   COULD COME IN IF THE FOUNDATION IS LAID --

19           MR. MICHAEL:  MAY I ADDRESS THAT POINT, YOUR HONOR,

20   WITH REGARD TO WHAT THE GOVERNMENT WOULD PROPOSE TO ADDRESS

21   THE CONCERN?

22           THE GOVERNMENT WOULD PROPOSE DOING WHAT IT'S DONE

23   WITH THE MAGAZINE THAT HAS THE MASKED IMAGE, TAKING SIMILAR

24   STEPS THE GOVERNMENT HAS ALREADY TAKEN WITH REGARD TO THE

25   BOOKEND VOLUMES.  AND JUST SO THE NUMBERS ARE CORRECT FOR THE

1    RECORD, WE'RE TALKING ABOUT VOLUMES 27 ON ONE END AND ON THE

2    OTHER END WHICH IS EXHIBIT 140, EXHIBIT 142 IS VOLUME 32.

3    AND THE VOLUME IN QUESTION WITH THE MATCHED IMAGE IS

4    VOLUME 29.

5            AND WHAT THE GOVERNMENT WOULD ASK TO DO WITH

6    VOLUME 29 THAT HAS THE MATCHED IMAGE, IT HAS THE FIRST PAGE

7    THAT SHOWS IT'S FROM THE PICCOLO SERIES AND THE VOLUME

8    NUMBER, HAVE THE PAGE THAT HAS THE PICTURE, THE MATCHED

9    IMAGE, AND THEN THERE IS AN ADDITIONAL PAGE WHICH I THINK

10   COMES -- THE SECOND PAGE AFTER THE MASKED IMAGE WHICH HAS THE

11   PUBLICATION INFORMATION.  THERE'S NO DATE IN THERE BUT IT

12   INDICATES IT WAS PUBLISHED IN DENMARK BY THE SAME COMPANY.

13   AND THE GOVERNMENT HAS THE BURDEN TO PROVE AN INTERSTATE

14   ELEMENT, AND THIS GOES TO THAT AS WELL.

15           AND THE GOVERNMENT WOULD DENOTE TO THE COURT THAT

16   THE IMAGES ON THE ADDITIONAL PAGES SHOW BOYS, YOUNG BOYS WITH

17   ERECT PENISES, BUT NO OTHER SEX ACTS.  AND THE MATCHED IMAGE

18   SHOWS A PREPUBESCENT BOY BEING ANALLY PENETRATED BY AN ADULT

19   MALE, SO THERE'S NO EVIDENCE BASED ON INCLUDING THESE OTHER

20   IMAGES ALONG WITH IT, BECAUSE THEY ARE CERTAINLY NO MORE

21   GRAPHIC AND ARE QUITE SIGNIFICANTLY LESS GRAPHIC THAN THE

22   MATCHED IMAGE ITSELF.

23           THE COURT:  SO YOU'RE TALKING ABOUT A PAGE BEFORE

24   AND A PAGE AFTER?

25           MR. MICHAEL:  CORRECT, YOUR HONOR.  EXACTLY.  SO IT

1    WOULD BE THREE PAGES OF THE EXHIBIT ALL TOLD.

2            THE COURT:  NOW, THAT LEAVES US -- I WAS ADDRESSING

3    ACTUALLY THE BOOKEND.

4            MR. MICHAEL:  AND WITH REGARD TO THE BOOKEND

5    IMAGES, YOUR HONOR, EXHIBIT 140, THE FIRST PICTURE SHOWS TWO

6    BOYS IN AN EMBRACE WITH ERECT PENISES.  IT DOES NOT SHOW ANAL

7    PENETRATION BY AN ADULT MALE.  AND THEN THERE IS --

8            THE COURT:  YOU DON'T NEED TO READ INTO THE RECORD.

9            MR. MICHAEL:  I APOLOGIZE.

10           THE COURT:  THAT'S ALL RIGHT, JUST TO SAVE TIME

11   HERE.

12           MR. MICHAEL:  THE GOVERNMENT WOULD SUBMIT THAT THE

13   IMAGES THAT ARE INCLUDED IN THE TWO PAGES, BECAUSE WE DON'T

14   HAVE A MATCHED IMAGE PAGE, ALL WE HAVE IS THE COVER PAGE WITH

15   THE VOLUME NUMBER AND THEN THE PAGE WITH THE --

16           THE COURT:  RIGHT.  SO ALL YOU REALLY NEED FOR

17   THOSE TWO -- I MEAN, WHY DO YOU NEED ANY OF THE IMAGES?

18   COULDN'T THOSE BE -- AT LEAST THE PORTIONS OF THE CHILDREN'S

19   BODIES, OF THE GENITALIA, WHY COULDN'T THOSE HAVE SOME SORT

20   OF REDACTION OR SOMETHING DONE SO THAT WHEN THEY GO BACK INTO

21   THE JURY ROOM, ALL THE JURY REALLY NEEDS TO COMPARE -- MAYBE

22   THEY NEED SOMETHING SO THAT THEY CAN SEE THE NATURE OF THE

23   MAGAZINES, BUT WHEN THEY'RE MAKING THAT COMPARISON, IT SEEMS

24   TO ME THAT THERE COULD BE SOMETHING DONE TO THE IMAGES SO

25   THAT THEY'RE NOT AS GRAPHIC AS NECESSARY.  BUT PERHAPS THAT'S

1    NECESSARY, GIVEN THAT WE'RE ONLY TALKING ABOUT A FEW PAGES.

2          MR. MICHAEL:  AND THE GOVERNMENT WOULD SUBMIT, YOUR

3    HONOR, WHILE THERE ARE SOME IMAGES DEPICTED IN EXHIBITS 140

4    AND 142, THE BOOKENDS, THE GOVERNMENT WOULD SUBMIT THAT

5    THEY'RE NO MORE GRAPHIC IN NATURE THAN THE MATCHED IMAGE.

6    AND LIKE YOUR HONOR HAS NOTED, THEY'RE NECESSARY FOR THE JURY

7    TO ACCEPT THE NATURE OF THE MAGAZINES AND THE CONTEXT AND TO

8    SEE THAT THESE ARE REAL MAGAZINES THAT REALLY DEAL WITH THIS

9    SUBJECT, BECAUSE THEY'RE NOT GOING TO SEE A WHOLE HOST OF

10   IMAGES THAT THEY CAN ASSESS THESE ARE ALL REAL IMAGES FROM

11   THE 1970'S, THEY'RE ONLY GO TO SEE A SMALL HANDFUL.  AND

12   ANTICIPATING A MORPHING ARGUMENT FROM THE DEFENSE, THE

13   GOVERNMENT DOES NEED TO BE EQUIPPED TO ARGUE TO THE JURORS

14   AND MEET THE BURDEN THAT THIS IS A REAL CHILD BEYOND A

15   REASONABLE DOUBT.

16         THE COURT:  MR. AARON.

17         MR. AARON:  I WOULD JUST NOTE, YOUR HONOR, THAT

18   YESTERDAY WHEN WE WERE TALKING ABOUT MR. MARTIN MAKING

19   INCRIMINATING COMMENTS AND I SAID, WELL, HE'S ALREADY MADE

20   THOSE COMMENTS IN THE PAST WITH LAW ENFORCEMENT, THERE'S

21   NOTHING MORE THAT CAN BE INCRIMINATING, COUNSEL FOR THE

22   GOVERNMENT WAS THE FIRST TO STAND UP AND SAY, NO, THE FACT

23   THAT THERE'S CUMULATIVE STATEMENTS IS, IN FACT, EVEN MORE

24   INCRIMINATING.  SO WHEN WE HAVE THIS TYPE OF EVIDENCE WHICH,

25   MY GOODNESS, IF YOU LOOK AT THESE PICTURES IT'S JUST

1    HORRIBLE, AND TO SAY, WELL, PUTTING IN MORE OF THEM DOESN'T

2    INCREASE THE PREJUDICE BECAUSE THERE'S ALREADY THAT PREJUDICE

3    FROM THE PICTURES THAT EXIST, I WOULD SUBMIT THAT EVEN MORE

4    SO WHEN YOU'VE GOT MORE AND MORE PICTURES OF LITTLE BOYS WITH

5    ERECT PENISES --

6              THE COURT:  I AGREE.  THAT'S WHY I DON'T THINK IT'S

7    NECESSARY TO PUT -- THE ENTIRE EXHIBIT 141 IS NOT GOING TO

8    COME IN.  I AGREE WITH YOU.

9              I'M NOT SURE I AGREE THAT IT IS NECESSARY TO

10   COUNTER A DEFENSE ARGUMENT OF MORPHING THAT THE ENTIRE --

11   THAT THERE CAN'T BE ANY -- I DON'T WANT TO SAY EDITING.  I'M

12   REALLY SEARCHING FOR THE RIGHT WORD HERE, BUT THERE CAN'T BE

13   ANY CHANGES MADE.  SO I'M GOING TO THINK ABOUT THAT BEFORE WE

14   GET TO THAT ISSUE.

15             MR. MICHAEL:  IF I MAY, YOUR HONOR, MAY THE

16   GOVERNMENT TAKE YOUR COPY OF THE BINDER AND WITH REGARD TO

17   EXHIBIT 141 WHERE THE IMAGE HAS BEEN MATCHED, I WILL PUT

18   YELLOW POST-IT'S ON THE THREE PAGES THAT WE SUBMIT TO INCLUDE

19   OUT OF THE MAGAZINE THAT IS MANY PAGES LONGER, ACCEPTING YOUR

20   HONOR'S CONCERNS AND TRYING TO ADDRESS THAT.

21             WITH REGARD TO 141, EXHIBIT 140 AND 142, THE

22   GOVERNMENT SUBMITS THEY'VE ALREADY BEEN APPROPRIATELY

23   LIMITED, RECOGNIZING THIS POSSIBLE CONCERN.  ALL WE INCLUDED

24   WERE THE TWO PAGES THE GOVERNMENT FELT WERE ABSOLUTELY

25   NECESSARY.  OBVIOUSLY, IF YOUR HONOR WANTS THE GOVERNMENT TO

```
 1   MAKE FURTHER LIMITS, WE WILL.

 2           THE COURT:  I'M NOT THINKING ABOUT PAGE LIMITS.

 3           MR. MICHAEL:  WELL, I MEANT WITH REGARD TO THE

 4   IMAGES THAT ARE DEPICTED ON THE TWO PAGES.

 5           THE COURT:  ALL RIGHT.  LET ME RETURN THIS TO YOU

 6   WHEN THE CLERK COMES BACK IN.

 7           MR. MICHAEL:  MAY I APPROACH, YOUR HONOR?

 8           THE COURT:  YES.

 9           ANYTHING ELSE?

10           MR. AARON:  NOTHING, YOUR HONOR.

11                      (RECESS)

12               (IN THE PRESENCE OF THE JURY:)

13           THE COURT:  GOOD MORNING.  LET THE RECORD REFLECT

14   THE PRESENCE OF ALL MEMBERS OF THE JURY, AND THE ONE THAT'S

15   HIDING, AND COUNSEL FOR ALL PARTIES AND THE DEFENDANT ALSO

16   PRESENT.  THE WITNESS IS AGAIN ON THE WITNESS STAND.

17           AND, AGENT BROWN, YOU DO NOT NEED TO BE SWORN AGAIN

18   AS A WITNESS.  YOU RECALL THAT YOU WERE SWORN YESTERDAY AND

19   YOUR TESTIMONY IS STILL GIVEN UNDER PENALTY OF PERJURY.

20           THE WITNESS:  YES, YOUR HONOR.

21        PLAINTIFF'S WITNESS, LEE BROWN, PREVIOUSLY SWORN

22           THE COURT:  THANK YOU.  YOU MAY CONTINUE.

23           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

24   ///

25   ///
```

1          DIRECT EXAMINATION (RESUMED)

2     BY MR. AKROTIRIANAKIS:

3     Q.    AGENT BROWN, YESTERDAY YOU TESTIFIED AS TO TWO IMAGES

4     THAT FROM A COLLECTION OF IMAGES YOU WERE SHOWN IN THIS CASE

5     THAT YOU WERE ABLE TO MATCH TO RUSSIAN FLOWERS 19.  DO YOU

6     RECALL THAT TESTIMONY?

7     A.    YES, I DO.

8     Q.    I'M GOING TO SHOW YOU THE IMAGES NOW AND ASK YOU IF

9     THOSE WERE THE IMAGES TO WHICH YOU TESTIFIED YESTERDAY.

10          ON THE SCREEN BEFORE YOU IS EXHIBIT 121.  DO YOU

11     RECOGNIZE 121 AS ONE OF THE IMAGES THAT YOU WERE ABLE TO

12     MATCH TO RUSSIAN FLOWERS 19?

13     A.    YES, I DO.

14     Q.    I'M NOW PLACING EXHIBIT 128 ON THE SCREEN BEFORE YOU.

15     AND MY QUESTION AGAIN FOR YOU IS WHETHER YOU RECOGNIZE

16     EXHIBIT 128 AS ONE OF THE IMAGES YOU WERE ABLE TO MATCH TO

17     RUSSIAN FLOWERS 19?

18     A.    YES.

19     Q.    I'M NOW GOING TO -- ARE YOU FAMILIAR, AGENT BROWN, WITH

20     A SERIES OF RUSSIAN MADE CHILD PORNOGRAPHY VIDEOS CALLED

21     THIEF'S PUNISHMENT?

22     A.    YES, I AM.

23     Q.    AND HAVE YOU RECOVERED THOSE IN YOUR CHILD PORNOGRAPHY

24     INVESTIGATIONS?

25     A.    YES.

1   Q.   AND HOW ARE THOSE TAPES TYPICALLY LABELED?

2   A.   IN THIS INSTANCE THEY WERE LABELED TP ON THE VIDEO

3   CASSETTE.

4   Q.   HAVE YOU ALSO SEEN REFERENCES TO THIEF'S PUNISHMENT IN

5   INSTANT MESSAGE CHATTING?

6   A.   YES, I HAVE.

7   Q.   AND HOW IS IT TYPICALLY REFERRED TO?

8   A.   TP AS WELL.

9   Q.   DID YOU FIND -- YOU MAY HAVE ALREADY TESTIFIED TO THIS,

10  BUT DID YOU FIND THIEF'S PUNISHMENT OR TP LABELED VIDEOS IN

11  SETH BEKENSTEIN'S APARTMENT DURING THE EXECUTION OF THE

12  SEARCH WARRANT ON JANUARY 4TH, 2001?

13  A.   YES.

14  Q.   AND HAVE YOU REVIEWED THIEF'S PUNISHMENT AND ARE YOU

15  FAMILIAR WITH ITS CONTENTS?

16  A.   YES, I AM.

17  Q.   WERE YOU ABLE TO MATCH ANY IMAGES IN THIS CASE TO THE

18  THIEF'S PUNISHMENT VIDEOS WITH WHICH YOU'RE FAMILIAR?

19  A.   YES.

20  Q.   I'M GOING TO SHOW YOU EXHIBIT 111.  AND MY QUESTION FOR

21  YOU, AGENT BROWN, WOULD BE WHETHER THIS IS ONE SUCH IMAGE

22  THAT YOU WERE ABLE TO MATCH TO THIEF'S PUNISHMENT?

23  A.   YES, IT IS.

24  Q.   CAN YOU DESCRIBE IN GENERAL TERMS HOW YOU MATCHED IT TO

25  THE THIEF'S PUNISHMENT VIDEO?

1   A.   WELL, I HAD THE STILL IMAGE AND WHILE REVIEWING THE

2   VIDEO CASSETTES, THE VIDEOTAPES, WHEN IT CAME UPON THAT IMAGE

3   I WENT BACK, VIEWED IT, STOPPED IT, AND MATCHED THE IMAGE TO

4   THE WHAT WAS ON THE VIDEO.

5   Q.   I'M GOING TO PLAY A VERY BRIEF CLIP FROM THE THIEF'S

6   PUNISHMENT VIDEO AND I'LL ASK IF YOU RECOGNIZE IT AS THE

7   THIEF'S PUNISHMENT VIDEO THAT YOU'VE NOW TESTIFIED TO.

8                         (VIDEO PLAYED)

9   BY MR. AKROTIRIANAKIS:

10   Q.   AGENT BROWN, DO YOU RECOGNIZE WHAT'S PLAYING NOW, A

11   VIDEO OF AN ADULT MALE UNDRESSING A BOY, AS A PORTION OF THE

12   THIEF'S PUNISHMENT VIDEO THAT YOU'VE NOW TESTIFIED TO?

13   A.   YES, I DO.

14   Q.   I'M GOING TO PLAY ANOTHER CLIP FROM -- I'M GOING TO PLAY

15   ANOTHER VIDEO CLIP, AND MY QUESTION FOR YOU WOULD BE WHETHER

16   YOU RECOGNIZE THIS CLIP AS A PORTION OF THIEF'S PUNISHMENT

17   FROM WHICH YOU WERE ABLE TO MATCH EXHIBIT 111, THE IMAGE YOU

18   PREVIOUSLY TESTIFIED TO.

19                         (VIDEO PLAYED)

20   BY MR. AKROTIRIANAKIS:

21   Q.   AGENT BROWN, THE CLIP I'VE JUST PLAYED WHERE THERE IS A

22   BOY BEING ABUSED BY TWO MALE ADULTS, IS THAT A SEGMENT OF

23   THIEF'S PUNISHMENT TO WHICH YOU WERE ABLE TO MATCH THE IMAGE

24   IN EXHIBIT 111 YOU PREVIOUSLY TESTIFIED TO?

25   A.   YES, IT IS.

1    Q.   AT THE END OF YOUR TESTIMONY YESTERDAY YOU WERE -- I HAD

2    ASKED YOU TO REFER TO EXHIBITS 1, 2 AND 3.   DO YOU HAVE THOSE

3    BINDERS BEFORE YOU AT THIS TIME?

4    A.   YES, I DO.

5    Q.   CAN I AGAIN DIRECT YOUR ATTENTION TO THOSE, PLEASE?

6         DO YOU RECOGNIZE EXHIBITS 1, 2 AND 3?

7    A.   YES, I DO.

8    Q.   WHAT ARE EXHIBITS 1, 2 AND 3, PLEASE?

9    A.   THEY ARE CHAT LOGS.

10   Q.   AND FROM WHAT COMPUTERS IS IT YOUR UNDERSTANDING THAT 1,

11   2 AND 3 COME?

12   A.   MY UNDERSTANDING, THEY COME FROM SETH BEKENSTEIN,

13   RANDALL MARTIN, AND THE DEFENDANT, JAMES SANDERS.

14   Q.   IN THAT ORDER?   SETH BEKENSTEIN EXHIBIT 1, RANDALL

15   MARTIN EXHIBIT 2, AND THE DEFENDANT EXHIBIT 3?

16   A.   YES.

17   Q.   TURNING YOUR ATTENTION TO EXHIBIT 1 -- WELL, TO ALL THE

18   EXHIBITS COLLECTIVELY, AND YOU CAN REFER TO EXHIBIT 1, HAVE

19   YOU REVIEWED AND MADE YOURSELF FAMILIAR WITH THESE INSTANT

20   MESSAGE CHATS?

21   A.   YES, I HAVE.

22   Q.   AND HAVE YOU HAD EXPERIENCE TO REVIEW INSTANT MESSAGE

23   CHATS IN OTHER CHILD PORNOGRAPHY INVESTIGATIONS YOU'VE

24   CONDUCTED?

25   A.   YES, I HAVE.

1    Q.    AND BASED ON YOUR REVIEW IN THIS CASE AND IN YOUR REVIEW

2    IN THOSE OTHER CASES HAVE YOU BECOME FAMILIAR WITH SOME OF

3    THE ABBREVIATIONS AND THE OTHER EXPRESSIONS USED IN THESE

4    KIND OF INSTANT MESSAGE CHATS?

5    A.    YES.

6    Q.    I DIRECT YOUR ATTENTION TO IN EXHIBIT 1, TAB C.  AND DO

7    YOU SEE THAT THERE'S PAGE NUMBERS ON THE BOTTOM?

8    A.    YES.

9    Q.    THIS IS PAGE 139 OF 166.  BASED ON YOUR REVIEW OF

10   EXHIBIT 1, THE BEKENSTEIN CHATS, DO YOU FIND THE SCREEN

11   NICKNAME P-E-I OR PEI AMONG THE EXHIBITS?

12   A.    YES.

13   Q.    AND NOW I'M PUBLISHING THE PAGE YOU PREVIOUSLY TESTIFIED

14   TO.  AND READING FROM THE SECOND TO THE BOTTOM LINE ON THE

15   PAGE, THE SCREEN NAME DR DOOM:  HI, JIM.

16              PEI:  HEHEHE, THAT 11YO HAD A BUTT I WOULD KILL

17   FOR.

18              GOING OVER TO THE TOP OF THE NEXT PAGE:  KILL FOR.

19   I ALSO FOUND OUT HE'S GAY, HEHEHEHEHE.

20              IS THIS ONE SUCH REFERENCE TO THE PEI SCREEN

21   NICKNAME?

22   A.    YES, IT IS.

23   Q.    AND WHO IS YOUR UNDERSTANDING OF THE IDENTITY OF THE

24   PERSON WITH THE DR DOOM SCREEN NAME BASED ON YOUR REVIEW OF

25   EXHIBIT 1 AND EXHIBIT 2 AND EXHIBIT 3?

1    A.    SETH BEKENSTEIN.

2    Q.    AND WHAT IS YOUR UNDERSTANDING OF WHO THE IDENTITY OF

3    THE PERSON WITH THE PEI SCREEN NAME IS?

4    A.    IT'S JAMES SANDERS.

5    Q.    WHAT OTHER SCREEN NAMES DOES -- IN YOUR UNDERSTANDING,

6    BASED ON YOUR REVIEW OF EXHIBIT 1, 2 AND 3, WHAT OTHER SCREEN

7    NAMES DOES THE DEFENDANT USE THROUGHOUT THOSE EXHIBITS?

8    A.    I BELIEVE HE USES OJITEMP, OJIBOYSAN, BOYSAN1.  HE'S

9    REFERRED TO ALSO AS ARAGORN.

10   Q.    NOW, THESE COMMENTS TO THE EFFECT -- BY THE WAY, WHAT IS

11   Y-O?

12   A.    YEARS OLD.

13   Q.    SO COMMENTS SUCH AS "THAT 11-YEAR-OLD HAD A BUTT I WOULD

14   KILL FOR," ARE SIMILAR COMMENTS MADE THROUGHOUT THE EXHIBIT

15   1, 2 AND 3 BY THE PERSON WITH THE SCREEN NAME PEI, BOYSAN1,

16   OJIBOYSAN, OJITEMP, AND THE OTHERS YOU MENTIONED?

17   A.    YES.

18   Q.    IS IN EXHIBIT 1 THERE DISCUSSION, INCLUDING BOYSAN1 OR

19   OTHER OF THE DEFENDANTS SCREEN NAMES, OF ENGAGING IN SEX ACTS

20   WITH YOUNG CHILDREN OR THE INTEREST IN OR APPROVAL OF SUCH

21   ACTIVITIES?

22   A.    YES.

23   Q.    AND, AGAIN, WHO IS THE DR DOOM SCREEN NAME?

24   A.    IT'S MR. SETH BEKENSTEIN.

25   Q.    I DIRECT YOUR ATTENTION TO THE PAGE NOW ON THE MONITOR.

1    DO YOU SEE THIS PAGE THAT I'VE HIGHLIGHTED IN A NUMBER OF

2    DIFFERENT COLORS, ON THE MONITOR, AGENT BROWN?

3    A.    YES.   I WAS TRYING TO FIND IT, YES.

4    Q.    HAVE YOU REVIEWED THIS CHAT SPECIFICALLY?

5    A.    YES, I HAVE.

6    Q.    DO YOU HAVE AN UNDERSTANDING WHETHER THIS CHAT IS

7    ACTUALLY SEVERAL PERSONS CHATTING AT THE SAME TIME?

8    A.    YES.

9    Q.    AND HAVE YOU REVIEWED THE HIGHLIGHTING ACTUALLY THAT'S

10   INDICATED ON THE ONE THAT I NOW HAVE ON THE -- A COPY OF

11   EXHIBIT 1 THAT I NOW HAVE ON THE OVERHEAD PROJECTOR WHICH,

12   FOR THE RECORD, IS PAGE 18 OF 27 FROM TAB G OF EXHIBIT 1?

13   A.    YES.

14   Q.    WERE YOU ABLE TO TRACK THE DIFFERENT CONVERSATIONS

15   THROUGHOUT THAT CHAT?

16   A.    YES.

17   Q.    OKAY.   THERE'S ONE THAT I'VE HIGHLIGHTED IN PINK HERE.

18          IT IS DR DOOM, 1/3/01, AT 6:27 P.M.:   WELL, I WAS

19   NOT VOICE CHATTING, BUT HE IS VERY PRECOCIOUS, AS ON NEW

20   YEARS A BUD OF DRAGONS FIVE YEAR SLEPT OVER AND HE SUCKED HIM

21   OFF.

22          IN TAB G OF EXHIBIT 1 IS THERE A REFERENCE TO

23   DR DOOM HAVING A CONVERSATION ABOUT ANOTHER PERSON USING THE

24   SCREEN NAME DRAGON?

25   A.    YES.

1   Q.   AND IS THERE INDICATION THAT IN THAT CHAT THAT DRAGON

2   HAD A FRIEND WITH A FIVE YEAR OLD WHO IS -- AND THE FIVE YEAR

3   OLD STAYED OVER AT DRAGON'S HOUSE IN THE OCCASION REFERENCED

4   IN THE CHAT I JUST READ?

5   A.   YES.

6   Q.   DOES THE DEFENDANT EXPRESS EITHER INTEREST IN OR

7   APPROVAL OF THIS ACTIVITY, HAVING ORAL SEX WITH A

8   FIVE-YEAR-OLD?

9   A.   YES, HE DOES.

10   Q.   AND IS THIS HIS RESPONSE HERE?  BOYSAN1, 1/3/01, 6:34:

11   COOL, THAT'S AWESOME.

12   A.   YES.

13   Q.   NOW, IN THE SAME CHAT THAT WE NOW HAVE ON THE SCREEN

14   FROM EXHIBIT G IS THERE AN INSTANT MESSAGE CHATTER NAMED

15   FRED?

16   A.   YES.

17   Q.   AND DOES FRED ALSO DISCUSS HAVING SEX WITH CHILDREN?

18   A.   YES.

19   Q.   DOES HE DISCUSS THE INTEREST IN TAKING PICTURES, CHILD

20   PORNOGRAPHIC PICTURES, OF THAT CHILD?

21   A.   YES.

22   Q.   DOES HE INDICATE THAT, IN FACT, HE DID NOT ON THAT

23   OCCASION TAKE PORNOGRAPHIC PICTURES OF THE CHILD?

24   A.   THAT'S CORRECT.

25   Q.   AND DID HE GIVE A REASON AS TO WHY HE DID NOT TAKE THOSE

1    PICTURES?

2    A.   YES.

3    Q.   WHAT IS THE, IN GENERAL TERMS, THE REASON THAT HE GAVE?

4    A.   HE WAS WARY OF CUSTOMS, OF BRINGING THE PHOTOGRAPHS IN

5    THE U.S. WHERE HE RESIDES.

6    Q.   PLACING PAGE 20 OF 27 FROM EXHIBIT 1, TAB G, ON THE

7    OVERHEAD PROJECTOR, I'M READING FROM:

8              FRED, 1/3/01 AT 6:54 P.M.:  I JUST GOT BACK FROM

9    AMSTERDAM.  YES, I DID GET SOME.

10             LATER IN THE SAME CHAT LOWER DOWN THE PAGE AT 6:55:

11             FRED:  12 YEAR OLD BOY.  I MET HIM IN A HOSTEL AND

12   RENTED A ROOM WITH HIM FOR SEVERAL NIGHTS.  WE DID HAVE FUN.

13             GOING OVER TO THE NEXT PAGE AT 6:57 P.M.:  I JUST

14   BEFRIENDED HIM AND WAS HIS COMPANION AT FIRST.

15             6:59:  NO PICS, DIDN'T HAVE A DIGITAL CAM ON ME AND

16   DIDN'T WANT TO TAKE NEGATIVES THROUGH CUSTOMS.

17             IS THAT THE REFERENCE YOU WERE REFERRING TO, AGENT

18   BROWN?

19   A.   YES, IT IS.

20   Q.   7:00, NOW PAGE 22 OF 27:

21             FRED:  WE DRANK A LOT OF BEER THE FIRST NIGHT, AND

22   THEN ONE THING LEAD TO ANOTHER.

23             7:01:  I'M WARY ABOUT CUSTOMS.

24             ARE YOU FAMILIAR, BASED ON YOUR EXPERIENCE AS A

25   CHILD PORNOGRAPHY AND CHILD EXPLOITATION INVESTIGATOR, WITH

1   THE TERM "GROOMING"?

2   A.   YES, I AM.

3   Q.   IS YOUR UNDERSTANDING THAT THESE COMMENTS, "I JUST

4   BEFRIENDED HIM AND WAS HIS COMPANION AT FIRST, WE DRANK A LOT

5   OF BEER THE FIRST NIGHT AND THEN ONE THING LED TO ANOTHER,"

6   DO YOU HAVE AN UNDERSTANDING OF WHETHER THAT IS CONSISTENT

7   WITH GROOMING BEHAVIOR?

8   A.   YES, IT IS.

9        MR. AARON:   I'LL OBJECT.   LACK OF FOUNDATION WITH

10  THIS WITNESS.

11       THE COURT:   SUSTAINED.

12  BY MR. AKROTIRIANAKIS:

13  Q.   WHAT IS YOUR UNDERSTANDING OF GROOMING IN YOUR

14  EXPERIENCE AS A CHILD PORNOGRAPHY AND CHILD EXPLOITATION

15  INVESTIGATOR?

16  A.   MY UNDERSTANDING IS THAT AN ADULT WILL BEFRIEND A CHILD

17  BY GAINING THEIR TRUST, AND OVER AN EXTENDED PERIOD OF TIME

18  WITH THIS GAINED TRUST THEY WILL THEN START TO TOUCH THEM OR

19  START TO HAVE SEXUAL CONTACT WITH THEM OVER A LONG PERIOD OF

20  TIME, AFTER THEY'VE GAINED THE TRUST OF THIS INDIVIDUAL

21  INVOLVED, AS IN THIS INSTANCE, GIVING ALCOHOL OR SPENDING A

22  FEW DAYS WITH THEM.

23  Q.   HAVE YOU HAD SPECIALIZED TRAINING ON GROOMING BEHAVIORS?

24  A.   YES, I HAVE.

25  Q.   IS THIS BEHAVIOR THAT I'VE REFERRED TO IN THE CHATS

1    CONSISTENT IN YOUR UNDERSTANDING WITH GROOMING BEHAVIOR?

2    A.   YES, IT IS.

3    Q.   NOW, ELSEWHERE IN THE SAME CHAT IS THERE A DISCUSSION

4    BETWEEN DR DOOM OR SETH BEKENSTEIN AND A PERSON USING THE

5    ICQ LOG-ON NO. 95111077?

6    A.   YES.

7    Q.   DO SETH BEKENSTEIN AND THAT PERSON -- I'LL JUST REFER TO

8    THEM AS 951.  WILL YOU KNOW WHO I'M TALKING ABOUT?

9    A.   YES, I DO.

10   Q.   DO SETH BEKENSTEIN AND 951 DISCUSS SETH BEKENSTEIN'S

11   DISTRIBUTION OF CHILD PORNOGRAPHY?

12   A.   YES.

13   Q.   DO THEY ALSO DISCUSS BL OR BOY LOVER?

14   A.   YES, THEY DO.

15   Q.   PLACING PAGE 16 OF 27 ON THE OVERHEAD, THE LINE

16   BEGINNING AT 6:03.

17            DR DOOM:  HELLO.

18            951:  HELLO.

19            DR DOOM:  YOU GAVE ME YOUR ICQ.

20            951:  OKAY.  THEN, I KNOW WHO YOU ARE SINCE YOU ARE

21   THE ONLY ONE THAT HAS IT.

22            DR DOOM, 6:05:  I GATHER YOU ARE IN THE USA AS I

23   AM.

24            951:  YES, I AM IN IDAHO.

25            DR DOOM:  I KNOW ANOTHER BL IN IDAHO.

1              DR DOOM:  HOW OLD ARE YOU, IF YOU DON'T MIND ME

2   ASKING?  I AM 39.

3              951:  I DON'T KNOW ANYONE THAT IS A BL IN THIS

4   AREA, BUT THEN AGAIN, IT ISN'T SOMETHING THAT YOU JUST ASK

5   SOMEONE. I AM 35.

6              DR DOOM:  THE SAFEST THING IS FOR YOU TO GET A

7   HUSHMAIL EMAIL SO WE CAN SEND SECURE EMAILS TO EACH OTHER.

8              951:  OKAY.  AND HOW WOULD I GO ABOUT DOING THAT?

9              GOING OVER TO THE TOP OF THE NEXT PAGE.

10             I HAVE ONLY USED AOL.

11             DOES SETH BEKENSTEIN HEREAFTER INSTRUCT 951 ABOUT

12  HOW TO SET UP A HUSHMAIL ACCOUNT?

13  A.   YES, HE DOES.

14  Q.   DO THEY DISCUSS CHILD PORNOGRAPHY AND SETH BEKENSTEIN'S

15  DISTRIBUTION OF CHILD PORNOGRAPHY?

16  A.   YES, THEY DO.

17  Q.   PAGE 18 OF 27 AT 6:31, DR DOOM:  I AM STOKED AS GOT A

18  GUY IN EUROPE THAT'S GOT PRIVATE MAN/BOY TAPES FOR ME.

19             DOES SETH BEKENSTEIN HEREAFTER ACTUALLY E-MAIL TWO

20  PICTURES TO 951 OVER THE HUSHMAIL ACCOUNT THAT HE'S

21  INSTRUCTED 951 TO SET UP?

22  A.   YES.

23  Q.        951:  DID U GET MY E-MAIL?

24             DR DOOM:  GOT IT AND AM SENDING YOU TWO PICS FROM A

25  VID I HAVE AS A TEST.

1          GOING OVER TO THE TOP OF THE NEXT PAGE WHICH IS

2   PAGE 19.

3          951 AT 6:48 P.M.:  OKAY.

4          951, 6:49:  CHECKING IT NOW.

5          ON PAGE 20, 951 AT 6:55 P.M.:  OKAY THE PICS CAME

6   OVER.

7          6:55, 951:  ARE ALL THE PICS SUCH POOR QUALITY?

8          PARDON ME, YOUR HONOR.  I MISREAD THAT.

9          ARE ALL THE PICS SUCH POOR CLARITY?

10          GOING OVER TO THE NEXT PAGE, 21 OF 27, 6:56 P.M.

11          DR DOOM:  SOME ARE BETTER THAN OTHERS BUT THE VIDS

12   ARE MUCH BETTER QUALITY.

13          LOWER DOWN THE PAGE.

14          951:  ARE THESE VIDEOS PRIMARILY OUT OF RUSSIA?

15          DR DOOM, 6:57:  MANY ARE BUT MANY ARE FROM OTHER

16   PARTS OF EUROPE AND ASIA AS WELL AS SOME AMERICAN ONES.

17          DR DOOM, 6:58:  THAT'S WHERE MOST OF THEM ARE MADE.

18   POVERTY EQUALS PORN.

19          951:  WHICH DO YOU FEEL IS THE BETTER QUALITY, THE

20   CD'S OR THE VHS?

21          GOING OVER TO THE TOP OF THE NEXT PAGE, 22 OF 27.

22          951 AT 7 P.M.:  WHAT ARE RF TAPES?

23          ARE YOU FAMILIAR WITH RF, AGENT BROWN?

24   A.   YES, I AM.

25   Q.   WHAT IS RF?

1    A.    RUSSIAN FLOWERS.

2    Q.    LOWER DOWN ON THE PAGE, DR DOOM, 7:01:  RUSSIAN FLOWERS

3    ALL THE ONES TITLED RF.

4           951, 7:03 P.M.:  OH, I SEE, SO COULD YOU SEND ME

5    SOME CLEARER PICS, ESPECIALLY OF THE ONES THAT I SPECIFIED IN

6    MY E-MAIL, AND LET ME KNOW THE NAME OF THE VIDEO THAT THEY

7    ARE IN SO THAT I CAN CHOOSE WHICH ONES THAT I WANT?

8           DO 951 AND DR DOOM ALSO DISCUSS BEING WARY OF LAW

9    ENFORCEMENT?

10   A.    YES.

11   Q.    DR DOOM, 1/3/01, 7:16 P.M.:  I HAVE ONLY SOLD TO ABOUT 2

12   PEEPS I KNOW AND YOU WOULD BE THE FIRST STRANGER.

13          951, 7:17:  WELL, AS LONG AS YOU ARE NOT A FED OR

14   ANYONE DEALING WITH THE LAW ENFORCEMENT, I'M SURE THAT I WILL

15   BE BUYING SEVERAL FROM YOU.

16          DOES 951 THEREON GO AFTER TO DISCUSS HIS

17   PREFERENCES FOR TYPES OF CHILD PORNOGRAPHY?

18   A.    YES.

19   Q.    PAGE 23 OF 27 AT 7:05 P.M., 951:  PREFER BOYS THAT ARE

20   LIKE WITH NO HAIR BUT ARE BIG ENOUGH TO FUCK AND CUM OR THAT

21   HAVE VERY LITTLE HAIR.

22          951:  SOUNDS GOOD AND HOW DOES THIS TRANSACTION

23   TAKE PLACE?

24          951, 7:08 P.M.:  APPROXIMATELY HOW MANY VIDEOS DO

25   YOU HAVE?

1          DR DOOM:  CD'S I HAVE 430 AND ABOUT 75 VHS TAPES.

2          951:  WOW, LOOKS LIKE I WILL BE SPENDING SOME

3   MONEY --

4          GOING OVER TO THE TOP OF THE NEXT PAGE.

5          -- TO HAVE A GOOD COLLECTION AND VARIETY -- SMILEY

6   FACE.

7          951, 7:09 P.M.:  GOOD THING I HAVE A GOOD PAYING

8   JOB.

9          951, 7:10 P.M.:  AREN'T YOU WORRIED THAT A FED MAY

10  FIND OUT ABOUT YOU AND BE TRAPPING YOU?

11         DR DOOM:  YES.

12         7:11 P.M.:  YES, BUT I REQUIRE EVERYONE TO SEND ME

13  SOMETHING FIRST SO THEY CAN'T BE A FED AS THAT'S ENTRAPMENT.

14          951, 7:12 P.M.:  WHAT DO YOU MEAN SEND FIRST?"

15         DR DOOM:  I MEAN IF YOU CAN SEND ME SOME PICS VIA

16  ICQ, YOU CAN'T BE A FED.

17         951:  OH, I SEE.  WELL, THAT WOULD MAKE SENSE.

18         LATER ON THE TOP OF THE NEXT PAGE, 26, 7:19.

19         DR DOOM:  THAT'S OKAY.  I ONLY DO FTP WITH LIKE 5

20  PEEPS.

21         DO YOU KNOW WHAT FTP IS, AGENT BROWN?

22  A.   YES, I DO.

23  Q.   WHAT IS FTP?

24  A.   FILE TRANSFER PROTOCOL.

25  Q.   WHAT IS FILE TRANSFER PROTOCOL?

1    A.    IT'S MY UNDERSTANDING IT WILL GIVE THE ABILITY FOR

2    PEOPLE TO TRADE FILES.

3    Q.    951 AND DR DOOM HEREAFTER MAKE PLANS FOR DR DOOM TO

4    DISTRIBUTE CHILD PORNOGRAPHY TO 951?

5    A.    YES.

6    Q.    951 AT 7:19 P.M.:   OKAY.   THEN I GUESS I WILL ONLY HAVE

7    TO WAIT TILL YOU SEARCH YOUR STASH FOR WHAT I'M LOOKING FOR

8    AND THEN I WILL HAVE TO PICK AND CHOOSE WHICH I WANT THEN WE

9    ARE BOTH IN BUSINESS.

10           DR DOOM, 7:20:  K.

11           951, 7:21:  NO PROBLEM, AS I'M SURE THAT YOU ARE

12   PROBABLY AWARE THAT I WILL ONLY BE PURCHASING ONE THE FIRST

13   TIME, AND IF THAT GOES WELL, I WILL PURCHASE MORE FROM YOU

14   MORE FREQUENTLY.

15           ARE THERE REFERENCES TO SETH BEKENSTEIN USING A

16   SCREEN NAME OTHER THAN DR DOOM IN THE CHAT HERE IN EXHIBIT 1?

17   A.    YES.

18   Q.    WHAT IS THAT SCREEN NAME?

19   A.    SPEED.

20   Q.    AND DOES SPEED DISCUSS HIS OWN OR BEKENSTEIN'S

21   DISTRIBUTION OF RUSSIAN FLOWERS VIDEOS?

22   A.    YES.

23   Q.    I'M REFERRING TO TAB Y, AND THE PAGE THAT INCLUDES THE

24   REFERENCE FOR JANUARY 1, 2001, AT 11 A.M.

25           RWP:  HEHE, HOW WAS YOUR NIGHT?

1          SPEED:   NOT BAD EXCEPT MY FTP FUCKED UP AND LOST

2   THE FIRST 150 MEGABYTES OF A GIJS MOVIE.

3          BASED ON YOUR REVIEW OF THE CHATS, DO YOU HAVE AN

4   UNDERSTANDING OF WHO GIJS IS?

5   A.   NO, I DO NOT.

6   Q.   RWP, LATER DOWN THE PAGE:   GREAT, KEN HAS BEEN UPLOADING

7   THE RF8'S.

8          AND GOING OVER TO THE TOP OF THE PAGE, THE NEXT

9   PAGE, 11:06.

10          RWP:   YEP, HEHE, AND THEY ARE RBV'S BUT UNCUT, HAS

11   A LOT OF EXTRA FOOTAGE IN THEM.

12          AND LOWER DOWN THE PAGE, RWP AT 11:10 A.M.:   SO

13   WHOEVER HAS THE RF'S NOW HAS ALL THE UNCUT RBV STUFF?

14          ARE YOU FAMILIAR IN YOUR EXPERIENCE AS A CHILD

15   PORNOGRAPHY INVESTIGATOR WITH RBV?

16   A.   YES, I AM.

17   Q.   WHAT IS RBV?

18   A.   RAIN BOYS VIDEO.

19   Q.   AND IS THERE A RELATIONSHIP BETWEEN RAIN BOYS VIDEO ON

20   THE ONE HAND AND RUSSIAN FLOWERS ON THE OTHER HAND?

21   A.   YES, THERE IS.

22   Q.   WHAT IS THE RELATIONSHIP BETWEEN RAIN BOYS VIDEO AND

23   RUSSIAN FLOWERS?

24   A.   IT'S MY UNDERSTANDING THAT ONE WAS THE PREDECESSOR OF

25   THE OTHER AND USED AND MANUFACTURED CHILD PORNOGRAPHY.   AND

```
 1    THE SUCCESSOR USED THOSE PREVIOUS -- THE PREVIOUS MATERIAL
 2    AND SPLICED IT INTO A COMPILATION AND DISTRIBUTED IT.
 3    Q.    ELSEWHERE IN EXHIBIT 1 DOES SETH BEKENSTEIN REFER TO HIS
 4    DISTRIBUTION OF THIEF'S PUNISHMENT AS WELL AS RUSSIAN
 5    FLOWERS?
 6    A.    YES.
 7    Q.    I'M REFERRING TO TAB E ON PAGE 12 OF 27.  THIS CHAT IS
 8    DR DOOM CHATTING WITH A PERSON BY THE NAME OF MONOMO1?
 9    A.    YES.
10    Q.    AND ALSO IS HE CHATTING WITH A PERSON NAMED MOUSE12?
11    A.    YES.
12    Q.    1/2/01 AT 7:04 P.M., DR DOOM:  HOW MANY CDS AND TAPES
13    DID I SEND YOU?
14            MOUSE12, 7:05 P.M.:  3 TAPES...RF1, RF2, AND
15    TP...11CDS.
16            DR DOOM:  COOL.  MANY HOURS OF WANKING.
17            ELSEWHERE IN THIS EXHIBIT DOES DR DOOM, USING THE
18    SCREEN NAME -- I'M SORRY, DOES SETH BEKENSTEIN, USING THE
19    SCREEN NAME SPEED AS OPPOSED TO DR DOOM, DISCUSS FURTHER THE
20    SALES OF RUSSIAN FLOWERS AND OTHER CHILD PORNOGRAPHY VIDEOS?
21    A.    YES.
22    Q.    AT THE BEGINNING OF THE PAGE, 2 OF 11, FROM EXHIBIT 5E.
23            RWP, 10:39 P.M.:  GOT SOME NEW STUFF IN UPLOADS.
24            SPEED:  COOL.  WHAT IS IT?
25            RWP:  A BUNCH OF SHORT ONES THAT NEED TO BE JOINED.
```

1   THEY ARE RUSSIAN.

2           SPEED:  COOL.

3           SPEED:  I AM JUST ABOUT DONE WITH THE STUFF I FOUND

4   FROM THAT SITE AND THEN WILL FOCUS ON THE THAI ONES.

5           RWB:  MORE COMING.

6           SPEED:  WHO FROM?

7           RWP:  A RUSSIAN WEB SITE.

8           DO SPEED AND RWP GO ON TO CHAT ABOUT DIFFERENT

9   CHILD PORNOGRAPHY?

10  A.   YES.

11  Q.   IN THE SAME CHAT DOES SPEED HAVE A DISCUSSION OF HIS

12  DISTRIBUTION OF CHILD PORNOGRAPHY AND SALE OF CHILD

13  PORNOGRAPHY WITH A PERSON USING THE SCREEN NAME BUBBS71?

14  A.   YES.

15  Q.   10:44 P.M., JANUARY 1, 2001, BUBBS71:  HE LIKES 'EM

16  YOUNG.  DO YOU HAVE ANY YOUNGER THAN WHAT YOU SENT ME?

17          SPEED:  HOW YOUNG?  AS HAVE THEM AS YOUNG AS 7 OR

18  8.

19          BUBBS71:  THAT'S ABOUT RIGHT.  WHAT THE VIDS

20  CALLED?

21          SPEED:  SHIT, I WILL HAVE TO LOOK THROUGH THEM.

22          BUBBS71:  WHENEVER YOU HAVE TIME IS COOL.

23          DO BUBBS71 AND SPEED THEREAFTER DISCUSS THE PRICING

24  THAT SETH BEKENSTEIN PUTS ON THESE CHILD PORNOGRAPHY VIDEOS?

25  A.   YES.

```
1    Q.   BUBBS71, JANUARY 1, 2001 AT 10:48 P.M.:  DON'T HAVE A

2    NEW LIST YET.  NEED TO BURN TOMORROW.  HE WOULD LIKE TO KNOW

3    HOW MUCH PER VID AND HOW WOULD PAYMENT BE ARRANGED.

4              SPEED:  PER TAPE?

5              BUBBS71 AT 10:49:  TAPE, I GUESS.

6              SPEED:  $75 A TAPE.

7              BUBBS71:  HOW LONG IS THE TAPE?

8              SPEED:  ALL OF THEM ARE ABOUT THREE HOURS.

9              BUBBS71:  HOW MUCH DO YOU HAVE OF THE 7 TO 8 YEAR

10   OLDS?

11             SPEED:  ON TAPE, NOT SURE, BUT A NUMBER.  BUT THE

12   TAPES HAVE MULTIPLE KIDS OS SOME THAT AGE AND SOME OTHER

13   AGES.

14             BUBBS71:  HE DON'T REALLY LIKE OLDER.

15             THEN GOING OVER TO THE TOP OF THE NEXT PAGE WHICH

16   IS 4 OF 11.

17             BUBBS71:  ARE THEY THE RF TAPES?

18             SPEED:  SOME YES AND SOME STUDIO 245.

19             ARE YOU FAMILIAR WITH STUDIO 245?

20   A.   YES, I AM.

21   Q.   WHAT IS STUDIO 245?

22   A.   STUDIO 245 WAS A SUCCESSOR TO RUSSIAN FLOWERS IN THE

23   SAME AREA FROM RUSSIA.

24   Q.   BUBBS71:  ANY OTHERS?

25             SPEED:  SOME THAI BUT THEY ARE TEENS.
```

```
 1              SPEED:  I HAVE ABOUT 30 FROM STUDIO 245.

 2              BUBBS71:  OK.  ARE ST245 YOUNG LIKE THAT?

 3              SPEED, 10:53:  SOME ARE YES.

 4              WHAT IS ST245, AGENT BROWN?

 5   A.   STUDIO 245.

 6   Q.   DO THEY GO ON AND FURTHER DISCUSS THE DISTRIBUTION OF

 7   CHILD PORNOGRAPHY, INCLUDING RUSSIAN FLOWERS?

 8   A.   YES.

 9   Q.   IN EXHIBIT 1 DO THE DEFENDANT USING THE BOYSAN SCREEN

10   NAME AND SETH BEKENSTEIN USING THE SPEED SCREEN NAME DISCUSS

11   A TRIP TO MEXICO?

12   A.   YES.

13   Q.   DO THEY DISCUSS THE PURPOSE OF THE TRIP TO MEXICO?

14   A.   YES.

15   Q.   WHAT IS THE PURPOSE OF THE TRIP TO MEXICO AS THEY

16   DISCUSS IT?

17   A.   TO FIND BOYS.

18   Q.   DO THEY DISCUSS FOR WHAT PURPOSE THEY WOULD LIKE TO FIND

19   BOYS?

20   A.   YES.

21   Q.   AND WHAT PURPOSE DO THEY DISCUSS?

22   A.   TO HAVE SEX.

23   Q.   I'M REFERRING TO EXHIBIT 1K AND THE PAGE THAT INCLUDES

24   DECEMBER 14, 2000, 8:06 P.M.

25              BOYSAN1:  YOU ALL PACKED AND READY TO GO?
```

1          IN THIS SAME CHAT, AGENT BROWN, DOES BOYSAN DISCUSS

2     ERRANDS THAT HE WOULD LIKE TO RUN ON THE WAY DOWN TO MEXICO?

3     A.    YES.

4     Q.    REFERRING TO THE PAGE IN THE SAME EXHIBIT THAT INCLUDES

5     DECEMBER 14, 2000, AT 8:18 P.M.

6          BOYSAN1:  HEHEHE, BEST BUY HAS THE SONY LAPTOP I

7     WANT ON SALE BUT THEY DON'T STOCK ENOUGH.  SO IT'S A CHORE

8     FINDING THE STORE THAT HAD THEM IN.  IT'S A SCAM TO GET YOU

9     TO BUY THE NEXT ONE UP WHICH THEY HAVE AN ENDLESS SUPPLY OF,

10    HEHEHE.

11         AND GOING OVER TO THE TOP OF THE NEXT PAGE.

12         BOYSAN1 AT 8:22 P.M.:  I'M GOING TO SD EARLY TO GO

13    TO THE BEST BUY DOWN THERE THAT HAS IT.  MAYBE U CAN HELP ME

14    SET IT UP FOR USE.

15         8:23 P.M., BOYSAN1:  UNLESS YOU'RE TO BUSY FUCKING

16    MEXICAN BOYS -- TWO SMILEY FACES.

17         GOING OVER TO THE NEXT PAGE.

18         BOYSAN1, 8:27 P.M.:  HEHEHE, I'LL BE BUSY FINDING

19    MYSELF ONE.

20         DO SETH BEKENSTEIN AND THE DEFENDANT HEREAFTER

21    DISCUSS THEIR PREFERENCES FOR BOYS THEY WOULD LIKE TO HAVE

22    SEX WITH ON THE TRIP TO MEXICO?

23    A.    YES, THEY DO.

24    Q.    GOING OVER TO THE NEXT PAGE, 12/14/2000, 8:30 P.M.

25         BOYSAN1:  HEHEHEHE, WHAT'S THE OLDEST YOU WOULD

1    LIKE IF YOU HAVE THE OPPORTUNITY?

2            SPEED:  11 OR 12 WOULD BE PERFECT BUT LIKE UP TO 15

3    OR 16 IS COOL.

4            BOYSAN1, 8:32 P.M.:  AAH, YOUNG ADULTS.  YOU HAVE A

5    BETTER CHANCE THAN ME THEN -- TWO SMILEY FACES.

6            GOING OVER TO THE NEXT PAGE AT 8:33 P.M.

7            BOYSAN1:  GOT RUBBERS?

8            ARE THERE REFERENCES TO KALEN IN THIS EXHIBIT 1?

9    A.   YES.

10   Q.   BEFORE I GET TO THAT, DOES BOYSAN REFER TO HIMSELF IN

11   EXHIBIT 1 AS A BL OR BOY LOVER?

12   A.   YES.

13   Q.   AND NOW THE REFERENCE TO KALEN, AND I'M READING FROM

14   TAB K OF EXHIBIT 1, THE BOTTOM OF THE PAGE THAT HAS THE

15   REFERENCE TO DECEMBER 14, 2000, AT 9:07 P.M.

16           BOYSAN1:  I GOTTA HAVE THAT LAPTOP READY FOR WHEN

17   I'M WITH KALEN SO HE CAN ACCIDENTALLY SEE SOME SOFT PORN ON

18   IT LOOKING OVER MY SHOULDER -- TWO SMILEY FACES.

19           IS THAT ANOTHER REFERENCE TO BEHAVIOR THAT IN YOUR

20   UNDERSTANDING IS CONSISTENT WITH GROOMING, AGENT BROWN?

21   A.   YES, IT IS.

22   Q.   GOING OVER TO THE TOP OF THE NEXT PAGE.

23           BOYSAN1, 9:08:  HEHEHE, I THINK IT'S ME THAT NEEDS

24   IT.  JUST A CRACK.

25           SPEED:  NOT ME.  IF HE SHOWS YOU THAT LITTLE HOLE,

```
 1   JUST LUBE IT UP AND ENTER.
 2              IN EXHIBIT 1 DOES BOYSAN1 DISCUSS HIS AGE
 3   PREFERENCES FOR BOYS TO HAVE SEX WITH?
 4   A.   YES.
 5   Q.   DO YOU RECALL A CHAT BETWEEN BOYSAN1 AND SPEED AND A
 6   PERSON NAMED SINGULARIT AND FLAGGWIZAR?
 7   A.   YES.
 8   Q.   I'M REFERRING TO TAB M OF EXHIBIT 1.
 9   A.   YES.
10   Q.   WHICH IS AT THE BOTTOM OF THE PAGE FROM TAB M THAT
11   INCLUDES DECEMBER 14, 2000, 10:45 P.M.:
12              HEHEHEHE, HAVEN'T YOU MET OTHER BL'S BEFORE?
13              AND GOING OVER TO THE TOP OF THE NEXT PAGE.
14              BOYSAN1, THE DEFENDANT, 10:49 P.M.:  ME EITHER.
15   YOU HAVE A WIDER RANGE THAN I DO.  WHEN THEY ARE OVER 14 I
16   LOSE ALL INTEREST IN SEX WITH THEM.
17              GUYUTE -- FOR THE RECORD, G-U-Y-U-T-E:  WILL DO,
18   HAVE A GOOD TRIP, K.
19              LOWER DOWN THE PAGE.
20              BOYSAN1, 10:55 P.M.:  THERE'S NOTHING LIKE THE
21   SMELL OF A 6 YEAR OLD EXCEPT THE TASTE, HEHEHEHE.
22              AND FURTHER DOWN THE PAGE, 10:57.
23              BOYSAN1:  11 YEAR OLDS HAVE THE MOST PERFECT BUTTS
24   OF THE SPECIES.
25              CAN YOU PLEASE REFER TO EXHIBIT 2 IN THE SMALLER OF
```

1    THE THREE BINDERS BEFORE YOU?  ONCE AGAIN, AGENT BROWN, THESE

2    ARE THE RANDALL MARTIN CHATS; IS THAT CORRECT?

3    A.   YES.

4    Q.   IN THE RANDALL MARTIN CHATS DO THE DEFENDANT AND --

5    INCIDENTALLY, BEFORE I LEAVE EXHIBIT 1, IN ADDITION TO WHAT

6    I'VE SHOWN YOU THIS MORNING, ARE THERE NUMEROUS OTHER

7    REFERENCES TO THE POSSESSION AND DISTRIBUTION OF CHILD

8    PORNOGRAPHY THROUGHOUT EXHIBIT 1?

9    A.   YES.

10   Q.   AND DO THEY APPEAR THROUGHOUT THE EXHIBIT?

11   A.   YES.

12   Q.   NOW, TURNING TO EXHIBIT 2, DOES EXHIBIT 2 CONTAIN

13   REFERENCES TO THE DEFENDANT AS HIS MULTIPLE DIFFERENT SCREEN

14   NAMES?

15   A.   YES.

16   Q.   AND REFERRING TO TAB J WITHIN EXHIBIT 2 AND THE PAGE

17   THAT INCLUDES JANUARY 31, 2001, AT 1:35 P.M.

18            OJIBOYSAN:  GOOD, HOW IS IT WITH YOU?

19            AND LATER DOWN THE PAGE.

20            RICOCHET, 1:37 P.M.:  SHALL I DELETE THE BOYSAN1?"

21            OJIBOYSAN, 1:39:  YES, BOYSAN HAD TO BE RETIRED FOR

22   A WHILE -- TWO FROWNING FACES.

23            WHEN WAS JANUARY 30 IN RELATION TO YOUR SEARCH OF

24   THE BEKENSTEIN APARTMENT, BEFORE OR AFTER?

25   A.   THAT WAS AFTER.

```
 1    Q.   WAS IT SHORTLY AFTER?

 2    A.   YES.

 3    Q.   DOES THE DEFENDANT IN HIS CHATS WITH RANDALL MARTIN

 4    EXPLAIN THE SCREEN NAME OJIBOYSAN?

 5    A.   YES, HE DOES.

 6    Q.   REFERRING TO TAB J IN EXHIBIT 2, THE PAGE WITH 26,

 7    FEBRUARY 6TH, 2001, AT 9:06 A.M.:  YOU HAVE YET ANOTHER

 8    SCREEN NAME?

 9              AND LOWER DOWN THE PAGE.

10              OJIBOYSAN, 9:08 A.M.:  OGI MEANS UNCLE IN

11    JAPANESE -- TWO SMILEY FACES.

12              IN EXHIBIT 2, AGENT BROWN, DO THE DEFENDANT AND

13    RICOCHET, APART FROM REFERRING TO EACH OTHER BY DIFFERENT

14    SCREEN NAMES, DISCUSS ITEMS OF PERSONAL INFORMATION OF THE

15    DEFENDANT THAT IDENTIFIES HIM TO THE SCREEN NAMES BOYSAN,

16    OJIBOYSAN, AND THE OTHERS WE'VE DISCUSSED?

17    A.   YES.

18    Q.   DOES THE DEFENDANT DISCUSS THAT HE DOES NOT BELIEVE

19    THAT -- WELL, LET ME WITHDRAW THAT, PLEASE.

20              DOES HE DISCUSS WHETHER HE BELIEVES THAT SOMEONE

21    COULD ACTUALLY IMPERSONATE HIM ONLINE?

22    A.   HE DISCUSSES IT, YES.

23              THE COURT:  I'M SORRY.  COULD YOU REPEAT THAT?

24              THE WITNESS:  HE DISCUSSES IT.

25    BY MR. AKROTIRIANAKIS:
```

1    Q.    I'M SORRY.  DOES HE DISCUSS THAT?

2    A.    YES.

3    Q.    REFERRING TO TAB C IN EXHIBIT 2 AND THE PAGE THAT

4    INCLUDES THE REFERENCE 2:09 P.M., ON NOVEMBER 7, 2000.

5            BOYSAN1:  BOYS HAVE CERTAIN WAYS OF EXPRESSING

6    THEMSELVES AND THEY'RE FAST.  IT'S LIKE SOMEONE POSING AS ME

7    ONLINE WITH YOU.  IT WOULDN'T TAKE YOU LONG TO HAVE DOUBT AND

8    GET CAUTIOUS.

9            THEN REFERRING, AGAIN, TO THE PERSONAL INFORMATION

10   OF THE DEFENDANT, DOES HE DISCUSS TRIPS TO LAS VEGAS?

11   A.    YES.

12   Q.    AND DOES HE DISCUSS WHY HE'S GOING TO LAS VEGAS?

13   A.    YES.

14   Q.    REFERRING TO TAB L IN EXHIBIT 2 IN THE FINAL PAGE OF

15   THAT EXCERPT.

16           RICOCHET, 3/9/01, 3:53 P.M.:  OKAY.  SO I WILL KEEP

17   THE OTHER.  WHAT ARE YOU DOING IN VEGAS?

18           PEI:  LOOKING FOR A HOUSE AND NEW POSITION.

19           RICOCHET:  AHH, LET ME KNOW HOW IT GOES.  TIRED OF

20   CAMPS?

21           ELSEWHERE IN THE CHATS COLLECTIVELY, EXHIBITS 1, 2

22   AND 3, DOES THE DEFENDANT DISCUSS MOVING TO LAS VEGAS AND

23   BUYING A HOUSE AND LOOKING FOR A JOB THERE?

24   A.    YES, HE DOES.

25   Q.    AND DOES HE DISCUSS HIS EMPLOYMENT AT A CAMP?

1    A.   YES.

2    Q.   DOES HE DISCUSS HIS EMPLOYMENT AS A GIRL SCOUTS EMPLOYEE

3    WORKING AT A GIRL SCOUTS CAMP?

4    A.   YES, HE DOES.

5    Q.   DOES THE DEFENDANT IN HIS CHATS WITH RANDALL MARTIN,

6    EXHIBIT 2, DISCUSS AN ENCRYPTION METHOD FOR CHILD PORNOGRAPHY

7    AS A WAY TO AVOID DETECTION BY LAW ENFORCEMENT OR PROSECUTION

8    BY LAW ENFORCEMENT?

9    A.   YES.

10   Q.   I'M REFERRING YOU TO, AGAIN, TAB J AND THE PAGE WITHIN

11   THAT EXCERPT OF THIS EXHIBIT THAT CONTAINS FEBRUARY 1, 2001,

12   AT 11:22 A.M.

13              OJIBOYSAN:  I HAVE A PIC OF A BOY I NEVER SAW

14   BEFORE.

15              AND GOING OVER TO THE TOP OF THE NEXT PAGE.

16              AND WOULD LIKE TO KNOW IF YOU HAVE SEEN MORE OF

17   HIM.  I DON'T KEEP ANY STUFF HERE, IT'S ALL ENCRYPTED ON CD

18   AND HIDDEN.  ALSO I REMEMBER YOURS AND DON'T HAVE TO LOOK IT

19   UP.

20              IS THAT ONE SUCH REFERENCE TO ENCRYPTION BY

21   OJIBOYSAN?

22   A.   YES.

23   Q.   AND DOES THE DEFENDANT MAKE OTHER SUCH REFERENCES?

24   A.   YES.

25   Q.   AND WHERE HE SAYS "I REMEMBER YOURS," IS THAT -- WHAT IS

1    THAT A REFERENCE TO?

2    A.    IT'S A REFERENCE TO A PASSWORD.

3    Q.    IS IT A PASSWORD TO RANDALL MARTIN'S ZING ALBUMS?

4    A.    YES.

5    Q.    REFERRING IN THE SAME EXCERPT OF THE EXHIBIT, THE PAGE

6    WITH FEBRUARY 6TH, 2001, 9:20 A.M.

7              OJIBOYSAN:  I'M JUST DOING A LITTLE HOUSEKEEPING ON

8    THE COMPUTER WHILE WE TALK.

9              RICOCHET, 9:29:  NP.

10             WHAT IS "NP"?

11   A.    NO PROBLEM.

12   Q.    NO PROBLEM.  I'M BUSY ANSWERING PHONE AND SUCH SO BEAR

13   WITH ME.

14             OJIBOYSAN: NO PROBLEM.  TAKE YOUR TIME.  I'M JUST

15   ENCRYPTING AND BURNING AND --

16             GOING ON TO THE NEXT PAGE.

17             -- DELETING WITH WIPE -- TWO SMILEY FACES.

18             DO YOU HAVE AN UNDERSTANDING, IN YOUR EXPERIENCE AS

19   A CHILD PORNOGRAPHY INVESTIGATOR, WITH WIPING PROGRAMS?

20   A.    YES.

21   Q.    ARE THOSE A METHOD TO DESTROY EVIDENCE OF THE POSSESSION

22   OF CHILD PORNOGRAPHY?

23   A.    YES, IT IS.

24   Q.    ELSEWHERE IN EXHIBIT 2 DO THE DEFENDANT AND RANDALL

25   MARTIN DISCUSS THEIR WARINESS OF LAW ENFORCEMENT?

1    A.    YES.

2    Q.    DO THEY DISCUSS CONTACTING SETH BEKENSTEIN BY TELEPHONE?

3    A.    YES.

4    Q.    DO THEY DISCUSS WAYS TO AVOID LAW ENFORCEMENT AND STILL

5    BE ABLE TO TALK TO SETH BEKENSTEIN?

6    A.    YES.

7    Q.    THE PAGE WITHIN EXHIBIT J -- I'M SORRY, TAB J OF

8    EXHIBIT 2 THAT CONTAINS FEBRUARY 22, 2001, 9:35 A.M.

9            RICOCHET:  ARE THEY MONITORING HIS PHONE CALLS?

10           BASED ON YOUR REVIEW OF THIS CHAT, IS THE "THEY" A

11   REFERENCE TO SETH BEKENSTEIN?  DID YOU UNDERSTAND MY

12   QUESTION?

13   A.    CAN YOU RESTATE THE QUESTION?

14   Q.    I SAID IT FAST.  I'M SORRY.

15           RICOCHET:  ARE THEY MONITORING HIS PHONE CALLS?

16           DO YOU UNDERSTAND THE "HIS" TO BE A REFERENCE TO

17   SETH BEKENSTEIN?

18   A.    YES.

19   Q.    AND DO YOU UNDERSTAND THE "THEY" TO BE A REFERENCE TO

20   LAW ENFORCEMENT?

21   A.    YES.

22   Q.    AND SPECIFICALLY THE UNITED STATES CUSTOMS SERVICE?

23   A.    THAT'S CORRECT.

24   Q.    OJIBOYSAN:  NOT THE NEW CELL, BUT POSSIBLY HIS HOME

25   PHONE.

1          RICOCHET:  I WOULD THINK THEY WOULD EVENTUALLY GET

2    HIS NEW CELL.

3          OJIBOYSAN:  POSSIBLY, IF THEY'RE MOTIVATED.  WE

4    NEVER TALK ABOUT ANY ILLEGAL THINGS.

5          RICOCHET:  THAT'S PROBABLY SAFE.

6          OJIBOYSAN:  AS MUCH AS POSSIBLE.

7          DID YOU, IN FACT, IN YOUR INVESTIGATION OF SETH

8    BEKENSTEIN AS THE CASE AGENT EVER SEEK ANY TYPE OF WIRETAP

9    FOR HIS TELEPHONES?

10   A.   NO, WE DID NOT.

11   Q.   IN EXHIBIT 2 DO THE DEFENDANT AND RANDALL MARTIN

12   DISCUSS, IN ADDITION TO THE ENCRYPTION OF CHILD PORNOGRAPHY,

13   THE ACTUAL DESTRUCTION OF EVIDENCE OF THE POSSESSION OF CHILD

14   PORNOGRAPHY?

15   A.   YES.

16   Q.   REFERRING TO EXHIBIT 2J AND THE PAGE THAT CONTAINS

17   JANUARY 31, 2001, AT 11:12 A.M.

18         OJIBOYSAN:  JUST BE SURE TO CLEAN UP AND SECURE ALL

19   YOUR STUFF SOMEWHERE UNTIL IT BLOWS BY OR YOU MOVE.

20         DO YOU UNDERSTAND, BASED ON THE ENTIRETY OF YOUR

21   REVIEW OF THIS CHAT, THE REFERENCE TO "IT BLOWS BY" TO MEAN

22   THE INVESTIGATION OF SETH BEKENSTEIN?

23   A.   YES.

24   Q.   FURTHER DOWN THE PAGE.

25         OJIBOYSAN, 11:14 -- ACTUALLY, I'M SORRY.

```
 1   11:13 A.M.
 2           RICOCHET:  I'M WORKING ON IT.  THE ORDERING OF
 3   BCWIPE DOES NOT APPEAR TO BE EASY.
 4           RICOCHET:  I DON'T WANT TO BUY IT TO FIND I CAN'T
 5   USE IT ON BOTH OF MY PUTERS.
 6           OJIBOYSAN:  BUT YOU CAN WIPE YOUR FREE SPACE WHILE
 7   YOU HAVE IT.
 8           RICOCHET:  TRUE, BUT THAT MEANS STOPPING MY --
 9           GOING OVER TO THE TOP OF THE NEXT PAGE.
10           -- COLLECTING ACTIVITIES, IF YOU KNOW WHAT I MEAN.
11           DOES THE DEFENDANT HEREAFTER ENCOURAGE RANDALL
12   MARTIN THAT HE DOESN'T NEED TO ACTUALLY STOP HIS COLLECTING
13   ACTIVITIES?
14   A.   YEAH, THAT'S CORRECT.
15   Q.   OJIBOYSAN:  YOU SHOULDN'T HAVE TO DO THAT.  I JUST BURN
16   EVERYTHING TO DISK AND WIPE OVERNIGHT.
17           I REFER YOUR ATTENTION -- I REFER YOU, AGENT BROWN,
18   TO EXHIBIT 3, PLEASE.  I'M SORRY, BACK TO THE SAME PAGE JUST
19   VERY BRIEFLY.  AFTER THE COMMENT "I JUST BURN EVERYTHING TO
20   DISK AND WIPE OVERNIGHT."
21           RICOCHET:  I DO, BUT COLLECTING ENOUGH FOR DISK
22   TAKES TIME.  I GUESS THAT'S WHERE CRYPT32 COMES IN.
23           OJIBOYSAN:  I KEEP ADDING TO THE DISK AS I COLLECT.
24           RICOCHET:  THAT'S PROBABLY A GOOD IDEA.  SAVE FILE
25   TO A FLOPPY, THEN MOVE LATER.  THAT KEEPS IT ON THE HD.
```

```
 1              WHAT'S HD?
 2  A.    HARD DRIVE.
 3  Q.    I'M SORRY.  I MISREAD IT.
 4              KEEPS IT OFF THE HARD DRIVE.
 5              OJIBOYSAN:  YEAH, I ENCRYPT AND PUT THEM ON CD.  SO
 6  IF THE CD'S WERE EVER FOUND, THEY WOULDN'T BE ABLE TO READ
 7  THEM -- SMILEY FACES.
 8              NOW, I'M GOING TO REFER YOU TO EXHIBIT 3.  ONCE
 9  AGAIN, AGENT BROWN, EXHIBIT 3 ARE THE CHATS TAKEN FROM THE
10  DEFENDANT'S COMPUTER; IS THAT CORRECT?
11  A.    YES.
12  Q.    AND YOU'VE REVIEWED THIS EXHIBIT?
13  A.    YES, I HAVE.
14  Q.    THROUGHOUT EXHIBIT 3 DOES THE DEFENDANT REFER TO HIS
15  VARIOUS DIFFERENT SCREEN NAMES THAT HE USES?
16  A.    YES, HE DOES.
17  Q.    AND DO THOSE INCLUDE OJIBOYSAN, PEI, OJITEMP, AND
18  BOYSAN1?
19  A.    YES.
20  Q.    ACTUALLY, I TAKE THAT BACK.
21  A.    WELL -- NO.
22  Q.    NOT BOYSAN1 BUT BOYSAN?
23  A.    BOYSAN.
24  Q.    REFERRING TO TAB A IN EXHIBIT 1 AND PAGE 4 OF THAT
25  EXCERPT AT 6:28 P.M. ON MARCH 20, 2001.
```

```
 1              PEI:  LET'S SWITCH OVER TO OJI.

 2              JEREMIAH:  OKAY.

 3              IS THAT ONE SUCH REFERENCE?

 4   A.   YES, IT IS.

 5   Q.   PAGE 8 OF THE SAME EXCERPT.

 6              JEREMIAH, 6:56 P.M.:  WHO ARE YOU?

 7              PEI:  OJIBOYSAN.

 8              YOU TESTIFIED EARLIER TO ARAGORN1 AS A SCREEN NAME

 9   THAT THE DEFENDANT ALSO USED?

10   A.   HE REFERS TO IT, YES.

11   Q.   PAGE 1 OF EXHIBIT 3, TAB D, IN THE VERY FIRST ENTRY.

12              PEI:  HI PETER, THIS IS ARAGORN1 ON MY LAPTOP AS

13   PEI.  I HAVE FAMILY PICS OVER HERE THAT I DON'T HAVE ON THE

14   DESK TOP.

15              IS THAT ONE SUCH REFERENCE?

16   A.   YES.

17   Q.   ARE THERE OTHERS?

18   A.   YES.

19   Q.   DOES THE DEFENDANT ALSO REFER TO HIMSELF BY HIS FIRST

20   NAME IN THESE CHATS?

21   A.   YES.

22   Q.   PAGE 1 OF TAB E, EXHIBIT 2 -- EXHIBIT 3, THE FIRST LINE,

23              PEI:  HI CHUCK, I'M GOING TO LAS VEGAS ON THURSDAY

24   NIGHT AND AM BRINGING MY LAPTOP AS PEI.  SEE YOU LATER, JIM.

25              IS THAT ONE SUCH REFERENCE THAT THE DEFENDANT
```

1    MAKES TO HIMSELF BY FIRST NAME?

2    A.   YES, IT IS.

3    Q.   AND ARE THERE OTHERS THROUGHOUT THE CHATS, 1, 2 AND 3,

4    EITHER THAT HE REFERS TO HIMSELF AS JIM OR OTHERS REFER TO

5    HIM AS JIM?

6    A.   YES.

7    Q.   TAB F OF EXHIBIT 3 ON PAGE 1.

8              PEI, 2:01 P.M. ON MARCH 7, 2001:  HI BABE, I KNOW,

9    AND A SWEET FRIEND YOU ARE.  THIS IS OJIBOYSAN ON MY LAPTOP

10   IN LAS VEGAS.

11             IS IT YOUR UNDERSTANDING, BASED ON YOUR REVIEW OF

12   EXHIBIT 3, AS WELL AS ALL OF THE EVIDENCE COLLECTED IN THE

13   SETH BEKENSTEIN INVESTIGATION AND THIS INVESTIGATION, THAT

14   DEFENDANT WOULD USE THE PEI SCREEN NICKNAME WHEN HE WOULD USE

15   HIS LAPTOP COMPUTER?

16   A.   YES.

17   Q.   PAGE 1 OF TAB H, EXHIBIT 3, AT 2:34 P.M.

18             PEI:  HI, GEORGIE, HOW'S IT GOING?

19             JURE:  WHO IS THIS?

20             PEI:  OJIBOYSAN.

21             PEI:  ON MY LAPTOP.

22             PEI:  IN LAS VEGAS.

23             DOES PEI ALSO REFER TO THE OJITEMP SCREEN NAME?

24   A.   YES.

25   Q.   REFERRING TO PAGE 3 IN THE SAME EXCERPT OF THE EXHIBIT,

1    5:55.

2            PEI:  HI GEORGIE, SORRY I MISSED YOU LAST NIGHT.

3    ICQ AND MY LITTLE ISP WAS CAUSING ME CONNECTION PROBLEMS LAST

4    NIGHT SO I GAVE IT UP ABOUT 10:30.  I'LL BE IN AND OUT ALL

5    DAY AND AM GOING TO LV THIS EVENING.  I SHOULD BE ON AT YOUR

6    FAVORITE TIME AS OJITEMP ON MY FRIEND'S COMPUTER THERE.  SEE

7    YOU LATER, HUGS.

8            REFERRING TO TAB I WITHIN THE SAME EXHIBIT, PAGE 3,

9    AT 1:43 P.M.

10           NICK:  WHO ARE YOU?

11           PEI:  OJIBOYSAN.

12           PEI:  I HAVE A DIFFERENT ACCOUNT FOR THE LAPTOP.

13           NICK:  YOU ARE MY DADDY'S FRIEND, RIGHT?

14           PEI:  YES, AND YOURS NOW TOO -- TWO SMILEY FACES.

15           TAB R OF EXHIBIT 3, PAGE 2, 6:33 A.M.

16           HI HUBY, HOW ARE YOU DOING?

17           FINE, THANKS.  I'M SORRY, I CAN ONLY SEE YOUR ICQ

18   NUMBER, BUT THERE IS NO NAME.  WHO ARE YOU?

19           LOWER DOWN THE PAGE.

20           PEI:  OJIBOYSAN ON MY LAPTOP ACCOUNT.  MY DESKTOP

21   IS IN FOR SECURITY UPGRADE.

22           PEI:  MY LAPTOP ACCOUNT IS UNDER THE NICK OF

23   P-E-I.

24           DO YOU HAVE AN UNDERSTANDING OF THE TERM "NICK" AS

25   IT RELATES TO INSTANT MESSAGE CHATTING?

1    A.    YES, I DO.

2    Q.    WHAT IS THAT UNDERSTANDING?

3    A.    IT'S A NICKNAME.

4    Q.    IN EXHIBIT 3, LIKE EXHIBIT 2, DOES THE DEFENDANT DISCUSS

5    HIS PERSONAL INFORMATION WHICH, IN ADDITION TO -- WELL, WHICH

6    IDENTIFIES HIM AS THE PERSON CHATTING USING THE SCREEN NAMES

7    PEI, OJIBOYSAN, AND SO FORTH?

8    A.    YES.

9            MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I RETRIEVE

10   EXHIBIT 9 FROM THE CLERK?

11           THE COURT:  YOU MAY.

12           MR. AKROTIRIANAKIS:  YOUR HONOR, I CAN PROBABLY USE

13   A COPY AND THAT WOULD BE FASTER.

14           THE COURT:  GO AHEAD.

15   BY MR. AKROTIRIANAKIS:

16   Q.    REFERRING TO TAB A WITHIN EXHIBIT 3 AT 9:26 P.M.

17           PEI:  REMEMBER, I'M A PISCES AND TODAY IS MY TRUE

18   BIRTHDAY -- TWO SMILEY FACES.

19           HAVE YOU REVIEWED OTHER EVIDENCE SEIZED FROM THE

20   DEFENDANT IN THIS CASE?

21   A.    YES.

22   Q.    DOES THAT INCLUDE A PASSPORT?

23   A.    YES.

24   Q.    HAVE YOU REVIEWED THE PASSPORT?

25   A.    YES, I HAVE.

1    Q.   DOES THE PASSPORT, EXHIBIT 9, A COPY OF WHICH I'M

2    PLACING ON THE OVERHEAD, INCLUDE THE DEFENDANT'S DATE OF

3    BIRTH?

4    A.   YES.

5    Q.   AND IS, IN FACT, MARCH 18 HIS TRUE BIRTHDAY?

6    A.   YES, IT IS.

7    Q.   IN THE SAME EXHIBIT, PAGE 14, JEREMIAH, 9:06 P.M.:

8    OKAY.  HMM, COOL.  THANKS, JIM.  I OWE YOU ONE.

9            IS THAT ANOTHER REFERENCE TO PEI AS JIM?

10   A.   YES, IT IS.

11   Q.   SAME EXHIBIT, AN EXCERPT, PAGE 18, MAY 19, 8:47 A.M.

12           PEI:  I HAVE TO GET READY AND GO TO FRY'S

13   ELECTRONICS.  WILL YOU BE ON TONIGHT?

14           MR. AKROTIRIANAKIS:  WITH THE COURT'S PERMISSION,

15   MAY I PUBLISH EXHIBIT 17?

16           THE COURT:  YOU MAY.

17   BY MR. AKROTIRIANAKIS:

18   Q.   HAVE YOU REVIEWED A FRY'S ELECTRONICS INVOICE FOR JAMES

19   SANDERS IN THIS CASE?

20   A.   NO.

21   Q.   I WILL PUBLISH EXHIBIT 17 AND ASK YOU TO REFER TO IT.

22   ACTUALLY, IF YOU'D LIKE TO REFER TO THE ORIGINAL.  CAN YOU

23   SEE THE SCREEN IN FRONT OF YOU?

24   A.   YES, I CAN.

25   Q.   IF YOU CAN'T SEE SUFFICIENT DETAIL ON THE SCREEN, LET ME

1    KNOW AND I'LL ASK YOU TO LOOK AT THE ORIGINAL, WHICH IS NEXT

2    TO YOU THERE.

3              DOES THIS APPEAR TO YOU TO BE AN INVOICE FOR FRY'S

4    ELECTRONICS?

5    A.   YES.

6    Q.   AND IS JAMES SANDERS THE PERSON TO WHOM THE INVOICE IS

7    ADDRESSED AS THE CUSTOMER BILLING AND CUSTOMER SHIPPING

8    INFORMATION?

9    A.   YES.

10   Q.   DO YOU SEE A DATE ON THIS INVOICE?

11   A.   YES.

12   Q.   AND IS THAT MAY 19?

13   A.   YES.

14   Q.   2001?

15   A.   YES.

16   Q.   TAB C OF EXHIBIT 3, PAGE 7, 6:31 P.M.

17             PEI:  I'LL BE BACK AROUND 5 P.M. TOMORROW.  I HAVE

18   TO GO TO FRY'S ELECTRONICS AND THEN ON SAFARI WITH A FRIEND

19   AND THEN BACK UP THE MOUNTAIN.

20             PONY:  GETTING YOUR COMP BACK -- SMILEY FACE.

21             PEI:  NO, NOT TILL NEXT THURSDAY -- FROWNING FACE.

22             PONY:  I GUESS WE ALL BETTER WATCH OUT NEXT WEEKEND

23   THEN, YOU'LL BE SCORCHING THE WEB -- SMILEY FACE.

24             PEI:  HEHEHE, I HOPE SO, AND I'LL HAVE A 40 GIG

25   EXTERNAL HD HOOKED UP.

1          PONY:  I'LL BE INTERESTED IN HOW WELL THAT WORKS

2   FOR YOU.

3          WHAT IS 40 GIG, AGENT BROWN?

4   A.   IT IS A 40 GIGABYTE HARD DRIVE.

5   Q.   HERE, HD MEANING HARD DRIVE?

6   A.   YES.

7   Q.   AND THIS CHAT IS MAY 18, THE DAY BEFORE THE RECEIPT YOU

8   JUST SAW?

9   A.   YES.

10  Q.   I'LL COME BACK TO THAT IN JUST A SECOND, BUT I'LL

11  CONTINUE ON.

12          PAGE 2, TAB E OF EXHIBIT 3, 10:32 A.M.

13          PEI:  HI CHUCK, NICE TO SEE YOU AGAIN.  I HAVE TO

14  GO BACK TO THE CAMP OFFICE FOR A FEW MINUTES.  WILL YOU BE ON

15  FOR A WHILE?

16          IS THAT ANOTHER OF THE REFERENCES TO THE DEFENDANT

17  WORKING AT A CAMP?

18  A.   YES, IT IS.

19  Q.   AND ARE THERE OTHERS?

20  A.   YES, THERE ARE.

21  Q.   ARE YOU FAMILIAR WITH A PACIFIC COAST TRAIL?

22  A.   YES, I AM.

23  Q.   IS THAT A HIKING TRAIL?

24  A.   YES, IT IS.

25  Q.   AND WHERE IS THAT LOCATED?

1    A.   IT'S IN THE EASTERN PART OF CALIFORNIA.  THE CREST OF, I

2   BELIEVE, THE SIERRA MOUNTAINS.

3    Q.   REFERRING TO TAB G IN EXHIBIT 3, PAGE 15, ARE YOU

4   FAMILIAR WITH THE USE OF BRB AS IT RELATES TO INSTANT MESSAGE

5   CHATS?

6    A.   YES.

7    Q.   WHAT DOES BRB MEAN?

8    A.   BE RIGHT BACK.

9    Q.   10:39 A.M.:  YOU CAN ALWAYS SET UP WITH IT -- PARDON ME.

10   YOU CAN ALWAYS SET ME UP WITH IT.  THERE'S SOME BOYS PLAYING

11   BEHIND MY HOUSE.  BE RIGHT BACK.

12          PEI:  JUST A FEW CUTIES GETTING READY TO HIKE UP

13   THE PACIFIC COAST TRAIL.

14          ARE YOU FAMILIAR WITH PALM DESERT, AGENT BROWN?

15   A.   YES, I AM.

16   Q.   AND WHERE IS PALM DESERT IN RELATION TO THE GIRL SCOUTS

17   CAMP?

18   A.   APPROXIMATELY 30 MILES OR SO AWAY.

19   Q.   PAGE 6 OF EXHIBIT 3H, JURE, 9:05 P.M.:  HOW WAS YOUR

20   DAY?

21          PEI:  IT WAS GREAT.  I WENT TO PALM DESERT FOR

22   LUNCH AND WORKED AN HOUR OR SO.

23          SAME EXHIBIT AND EXCERPT, PAGE 23, MAY 19TH, 2001,

24   11:45 P.M., PEI:  WENT FRY'S WITH ANOTHER BL AND PICKED UP AN

25   EXTERNAL HARD DRIVE FOR ME AND SCANNED THE BOYS.

1              IS THIS LATER IN THE EVENING OF THE SAME DATE THAT

2    WE SAW ON THE INVOICE, EXHIBIT 17?

3    A.   YES.

4    Q.   THE NEXT PAGE, 24, 11:18 P.M., PEI:  ANOTHER GREAT DAY

5    IN THE MOUNTAINS OF SO CAL -- TWO SMILEY FACES.

6              JURE:  AIN'T YOU IN NOR CAL?

7              PEI:  NO.

8              JURE:  HMM, I HAVE ALWAYS THOUGHT YOU WERE UP

9    NORTH.  OKAY.  CAN YOU GIVE ME A CLOSE-BY REFERENCE POINT

10   SLASH CITY?

11             PEI:  OKAY.  YOU HAVE TO DELETE IT.

12             JURE:  O-B-K-B.

13             JURE:  AWESOME.  GO DOWN THERE OFTEN?

14             PEI:  ALL THE TIME -- TWO SMILEY FACES.  ACTUALLY

15   PALM DESERT MORE.

16             REFERRING TO TAB L IN EXHIBIT 3, PAGE 16, FREEMAN,

17   12:53 P.M.:  I SECURELY WIPED AND FORMATTED YOUR OLD HARD

18   DRIVE AND INSTALLED WIN98 SECOND ED.

19             ARE YOU FAMILIAR WITH WIN98 SECOND ED?

20   A.   YES, I AM.

21   Q.   WHAT IS THAT?

22   A.   IT IS WINDOWS98 SECOND EDITION.

23   Q.   FREEMAN:  AND TRANSFERRED ALL THE STUFF WE TALKED ABOUT

24   INTO BESTCRYPT CONTAINERS ON THE EXTERNAL.

25             PEI:  COOL, YEAH!!!

1           BASED ON YOUR REVIEW OF EXHIBIT 3 AND THE OTHER

2    CHATS THAT WE'VE GONE THROUGH THIS MORNING IN THEIR ENTIRETY,

3    DO YOU HAVE AN UNDERSTANDING OF WHO FREEMAN IS IN RELATION TO

4    PEI?

5    A.   YES.

6    Q.   DOES IT APPEAR FROM THE CHATS THAT FREEMAN AND PEI HAVE

7    A RELATIONSHIP OTHER THAN JUST CHATTING WITH ONE ANOTHER ON

8    THE COMPUTER?

9    A.   YES.

10   Q.   WHAT IS YOUR UNDERSTANDING OF THAT RELATIONSHIP?

11   A.   IT APPEARS THAT FREEMAN WORKS ON HIS COMPUTER.

12   Q.   IN THE CHATS DOES THE DEFENDANT REFER TO FREEMAN AS

13   BEING ANOTHER BL WHO HE CAN TRUST TO WORK ON HIS COMPUTERS

14   EVEN THOUGH THEY CONTAIN CHILD PORNOGRAPHY?

15   A.   YES.

16   Q.   AND DOES HE DISCUSS FREEMAN INSTALLING VARIOUS SOFTWARE

17   IN THE COMPUTERS?

18   A.   YES.

19   Q.   DOES THAT INCLUDE SOFTWARE TO ENCRYPT THE CONTENT OF THE

20   COMPUTERS?

21   A.   YES.

22   Q.   IS THIS ONE SUCH REFERENCE?

23   A.   YES, IT IS.

24   Q.   SAME EXHIBIT AND EXCERPT, PAGE 18, IS THIS ANOTHER CHAT

25   BETWEEN OR THE SAME CHAT BETWEEN FREEMAN AND PEI?

1    A.    YES.

2    Q.    AND DOES THE DEFENDANT IN HERE DISCUSS MEETING AN ADULT

3    THAT HE WOULD CONSIDER HAVING A SEXUAL RELATIONSHIP WITH?

4    A.    YES.

5    Q.    AND WHAT IS THE AGE OF THAT ADULT?

6    A.    EIGHTEEN YEARS OLD.

7    Q.    PEI, 10:27 P.M.:  I'VE HAD A GREAT DAY.  I MET AN

8    18-YEAR-OLD I WOULD ACTUALLY HAVE SEX WITH.  VERY UNUSUAL FOR

9    ME -- TWO SMILEY FACES.

10             FREEMAN:  HEHE.  HE MUST HAVE BEEN CUTE AND YOUNG

11   LOOKING.

12             PEI:  YEAH, VERY, ABNORMAL.  I FEEL A LITTLE KINKY

13   WITH THIS CONFESSION -- TWO SMILEY FACES.

14             FREEMAN:  HEHE.  WHERE DID YOU MEET HIM?

15             PEI:  IN A RESTAURANT IN IDYLLWILD THIS MORNING.

16             WHERE IS IDYLLWILD IN RELATION TO THE GIRL SCOUTS

17   CAMP?

18   A.    IT IS LESS THAN FIVE MILES FROM THE CAMP.

19   Q.    PEI:  WE TOUCHED BIG TIME ALSO.

20             FREEMAN:  TOUCHED PHYSICALLY OR JUST CONNECTED?

21             PEI:  PHYSICALLY.  HE CREATED THE OPPORTUNITY.

22             PEI:  I FEEL REALLY KINKY SHARING THIS.

23             FREEMAN:  DID YOU TALK OR EXCHANGE NUMBERS OR

24   ANYTHING?

25             AND GOING OVER TO THE NEXT -- TOP OF THE NEXT PAGE.

```
 1                PEI:  I AM A BL AND TO LIKE A YOUNG ADULT IS
 2    DEVIANT BEHAVIOR FOR ME -- TWO SMILEY FACES.
 3                FURTHER DOWN THE PAGE, FREEMAN:  HEHE.  SO DID YOU
 4    TALK TO THE GUY?  HOW DID YOU KNOW HE'S 18?
 5                FREEMAN:  SMILEY FACE.
 6                PEI:  HE COULD HAVE BEEN 17.
 7                IN THE SAME CONVERSATION, AGENT BROWN, ARE PEI AND
 8    FREEMAN DISCUSSING A VIDEO?
 9    A.   YES.
10    Q.   FREEMAN:  COOL.  HEY, DO YOU REMEMBER THE NAME OF THAT
11    VID YOU SAID I SHOULD LOOK AT?
12                PEI:  IF YOU COME TO VISIT ME, WE'LL HAVE LUNCH
13    WHERE HE WORKS.
14                PEI:  SARLO'S FUN.
15                IS IT YOUR UNDERSTANDING THAT SARLO'S FUN IS THE
16    NAME OF THAT VIDEO?
17    A.   YES.
18    Q.   AND DOES PEI ELSEWHERE IN THIS CHAT REFER TO SARLO'S FUN
19    BEING A SHORT OF ONE OF THE HOTTEST VIDEOS?
20    A.   YES.
21    Q.   PEI:  SARLO'S FUN.
22                PEI:  MAKE SURE THE DOOR IS LOCKED WHEN YOU PLAY
23    THAT ONE -- TWO SMILEY FACES.
24                FREEMAN:  COOL.  I'LL LOOK FOR IT.
25                PEI:  AND BE SURE TO SAVE PJK23.  THERE'S ABOUT
```

```
 1    150 MEGS OF THAT DELIGHTFUL ONE THERE.

 2              IN YOUR EXPERIENCE AS A CHILD PORNOGRAPHY

 3    INVESTIGATOR, ARE YOU FAMILIAR WITH PJK --

 4    A.    YES.

 5    Q.    -- AS IT RELATES TO --

 6    A.    YES.

 7    Q.    AND WHAT IS PJK?

 8    A.    IT IS A SERIES OF CHILD PORNOGRAPHY.

 9    Q.    FREEMAN:  AHH, YES, UNCLE BILL.

10              PEI:  HEHEHEHE.  YOU HAVE IT?

11              FREEMAN:  YEAH, I'VE SEEN IT.  IT'S A NICE ONE.

12              PEI:  I'M MISSING A FEW PARTS SO WHEN I COMBINED IT

13    THERE ARE A COUPLE OF SPOTS WHERE THE VID DELAYS TO CATCH UP.

14    DO YOU HAVE JAS?

15              FREEMAN:  NO, I HAVEN'T SEEN THAT ONE I DON'T

16    THINK.

17              PEI:  IT'S THERE.  DOWNLOAD IT.  WITH THAT PROGRAM

18    YOU CAN JOIN A VID WITH MISSING PARTS.

19              FREEMAN:  OH, YES, JOINER AND SPLITTER.  YEAH, I'VE

20    HAD THAT IN THE PAST.

21              FREEMAN:  JUST WATCH SARLO'S FUN.  VERY NICE.  BUT

22    LIKE YOU SAID, TOO BAD THE QUALITY WASN'T BETTER.

23              THE COURT:  PERHAPS NOW WOULD BE A GOOD BREAKING

24    POINT.

25              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
```

1          THE COURT:  WE'LL BE IN RECESS FOR 15 MINUTES,

2     LADIES AND GENTLEMEN.  AGAIN, PLEASE REMEMBER, DON'T DISCUSS

3     THE CASE AMONGST YOURSELVES OR WITH ANYONE AND DON'T DISCUSS

4     ANYTHING RELATED TO THE CASE, THE EVIDENCE, WITNESSES,

5     PARTICIPANTS, LAWYERS, THE DEFENDANT, ANYONE.  DON'T MAKE UP

6     YOUR MINDS ABOUT THE CASE OR ANY ASPECT OF IT.  THANK YOU

7     VERY MUCH FOR YOUR PATIENCE AND ATTENTION.  YOU'RE EXCUSED.

8              (OUTSIDE THE PRESENCE OF THE JURY:)

9              THE COURT:  YOU MAY STEP DOWN.

10             MR. AARON:  YOUR HONOR, THERE'S ONE MATTER.

11             THE COURT:  WE'RE ON THE RECORD OUTSIDE THE

12    PRESENCE OF THE JURY.

13             MR. AARON:  MY UNDERSTANDING WAS THAT THE COURT HAD

14    DIRECTED THE PROSECUTION TO REDACT ANY REFERENCES TO THE TRIP

15    TO MEXICO.

16             MR. AKROTIRIANAKIS:  WHAT THE COURT HAD ORDERED AND

17    WHAT THE GOVERNMENT HAS DONE AND, IN FACT, WHAT THE DEFENSE

18    REQUESTED WAS STRIKING REFERENCES TO MEXICO AND THE PORTIONS

19    OF THE BEKENSTEIN CHATS WHERE IT'S BEKENSTEIN AND OTHER

20    PERSONS OTHER THAN THE DEFENDANT BECAUSE THAT IS NOT PART OF

21    THE CONSPIRACY ALLEGED IN THIS CASE; AND THEREFORE, IT IS NOT

22    WITHIN THE CO-CONSPIRATOR EXCEPTION TO THE HEARSAY RULE.

23             THE DEFENDANT'S OWN CHATS, OF COURSE, ABOUT THE

24    TRIP TO MEXICO ARE HIS PERSONAL ADMISSIONS AND DON'T RELY ON

25    THE CO-CONSPIRATOR EXCEPTION AND THEY ARE EVIDENCE OF HIS

1    INTENT IN REGARDS TO COUNT 3 AS EXPRESSED IN OUR PAPERS.

2            MR. AARON:  THAT MIGHT BE POSSIBLE, YOUR HONOR, ALL

3    I'M SAYING IS I THOUGHT THAT WE HAD REDACTED ALL OF THOSE.  I

4    KNOW THAT I OBJECTED TO ALL OF THEM, BUT THE COURT MIGHT HAVE

5    OVERRULED MY OBJECTIONS ON THAT AND I SIMPLY DON'T REMEMBER.

6            DOES THE COURT REMEMBER?

7            THE COURT:  I'D HAVE TO LOOK BACK.  I WILL HAVE TO

8    ASK THE COURT REPORTER TO LOOK BACK.  I ACTUALLY DON'T RECALL

9    WHETHER -- I DON'T RECALL WHETHER THE OBJECTIONS WERE TO

10   THESE PORTIONS.  I DO RECALL THAT THERE WAS A DISCUSSION

11   ABOUT -- I THINK I RECALL THERE WAS A DISCUSSION ABOUT

12   RELEVANCE AS TO EVEN COUNTS 3 AND 4, OR THE OBJECTION I

13   BELIEVE WAS RAISED AS TO THIS MATERIAL EVEN AS TO COUNTS 3

14   AND 4.

15           MR. AARON:  AND WE WOULD HAVE RAISED A 403

16   OBJECTION AS WELL.

17           MR. AKROTIRIANAKIS:  I HAVE MY NOTES FROM THAT

18   HEARING, YOUR HONOR.

19           THE COURT:  WHY DON'T YOU TAKE A LOOK AT YOUR NOTES

20   AND I'LL ASK THE COURT REPORTER TO LOOK.  YOU'RE NOT GOING TO

21   GET INTO ANY MORE OF IT IN THE MEANTIME?

22           MR. AKROTIRIANAKIS:  I'M NOT GOING TO GET INTO

23   ANYMORE OF IT, PERIOD.

24           THE COURT:  YOU MAY LOOK AT YOUR NOTES AND I'LL ASK

25   THE COURT REPORTER TO LOOK BACK, BECAUSE I THINK YOU HAD A

1    MOTION TO STRIKE.

2             MR. AARON:  I WOULD, AND ADVISE THE JURY.  BUT IF

3    I'VE ALREADY MADE THE OBJECTION AND THE COURT HAD DEEMED IT

4    CONTINUING AND THAT'S WHY I DID NOT RE-OBJECT.

5             THE COURT:  I UNDERSTAND.  IF I HAD RULED IN THE

6    DEFENSE'S FAVOR AND IT CAME IN ANY WAY, THEN WE WILL HAVE TO

7    DEAL WITH THAT.

8             DO YOU REMEMBER WHAT DAY IT WAS THAT WE HAD THIS

9    DISCUSSION?

10            MR. AKROTIRIANAKIS:  YOUR HONOR, ACTUALLY WE CAN

11   RESOLVE IT RIGHT NOW.  THE 845 AND 846 IN THE ONE CHAT,

12   EXHIBIT 1, TAB K, THE COURT HAD RULED THAT IT WAS OUT.  WE

13   TOOK IT OUT.  AND THE OTHER OBJECTIONS TO THAT WERE

14   OVERRULED.

15            THE COURT:  THANK YOU.

16                      (RECESS)

17            THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

18   ALL MEMBERS OF THE JURY, ALL COUNSEL PRESENT, AND THE

19   DEFENDANT ALSO PRESENT.  WE NEED TO RETRIEVE THE WITNESS.

20            MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.  I

21   APOLOGIZE.

22            THE COURT:  AGENT BROWN, YOU MAY RESUME THE WITNESS

23   STAND.

24            AND YOU MAY RESUME YOUR DIRECT EXAMINATION.

25            MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

1    BY MR. AKROTIRIANAKIS:

2    Q.    AGENT BROWN, WHEN WE BROKE WE WERE DISCUSSING THE

3    ASSOCIATION OF SCREEN NAMES AND PERSONAL INFORMATION WITH THE

4    DEFENDANT.  CAN I PLEASE HAVE YOU TURN TO TAB M AND THE

5    SECOND PAGE OF THAT EXCERPT IN EXHIBIT 3.  BASED ON YOUR

6    EXPERIENCE IN THIS INVESTIGATION OF SETH BEKENSTEIN AND LATER

7    INCLUDING THE INVESTIGATION OF THE DEFENDANT, ARE YOU AWARE

8    OF A STORAGE LOCKER IN LAS VEGAS?

9    A.    YES.

10   Q.    ARE YOU ALSO AWARE, BASED ON YOUR REVIEW OF EXHIBIT 3,

11   WHERE SETH BEKENSTEIN PLACED HIS ITEMS WHEN HE WENT TO

12   PRISON?

13   A.    YES.

14   Q.    WAS IT IN LAS VEGAS?

15   A.    NO.

16   Q.    PLACING PAGE 2 ON THE OVERHEAD CAMERA AND READING FROM

17   8:45 P.M.

18          PEI:  HEHEHE -- PARDON ME.  HEHE, HUGS BACK.  I'M

19   DOING GREAT.  I JUST GOT BACK FROM THE BAY AREA AFTER

20   SPENDING SETH'S LAST COUPLE DAYS OF FREEDOM WITH HIM AND

21   HELPING HIM MOVE OUT OF HIS APARTMENT.

22          SOSAD:  COOLS:  WHERE DID YOU PUT HIS STUFF AT?

23          PEI:  WHAT HE WANTED TO KEEP WENT INTO HIS STORAGE

24   IN WALNUT CREEK AND THE REST HE GAVE AWAY.  HE WAS SO HAPPY

25   FOR THE COMPANY AND I MADE HIM STAY HAPPY THE WHOLE TIME.

1              SO SAD:  COOLS.  ME IS GLAD YOU WERE THERE FOR HIM.

2    HOW IT YOUR BF?

3              WHAT IS BF?

4    A.   BOYFRIEND.

5    Q.   HEHEHE.  ME AND CALEB HAD A GREAT TIME TOGETHER ON

6    SATURDAY.  I WENT TO HIS LITTLE LEAGUE GAME IN THE AFTERNOON

7    AND THEN WE HAD LOTS OF FUN AFTER UNTIL ABOUT MIDNIGHT.

8              ARE THERE OTHER REFERENCES TO CALEB THROUGHOUT THE

9    DEFENDANT'S INSTANT MESSAGE CHATS?

10   A.   YES.

11   Q.   AND WAS THAT A SEPARATE AND DISTINCT PERSON FROM KALEN?

12   A.   YES.

13   Q.   IS KALEN ANOTHER BOY THAT THE DEFENDANT CHATS ABOUT?

14   A.   YES.

15   Q.   AGAIN, RETURNING TO THE PERSONAL INFORMATION OF THE

16   DEFENDANT, TAB N OF EXHIBIT 3, PAGE 20, 3:49 P.M.

17              I HAVE A SECRET FOR YOU IF YOU WILL KEEP IT.

18              CROW18:  I PROMISE I WILL KEEP IT.

19              PEI:  YOU CAN SHARE IT WITH YOUR PARENTS IF YOU

20   NEED TO.  I'M AN EXECUTIVE STAFF MEMBER WITH THE GIRL SCOUTS.

21              MOVING ON TO THE NEXT PAGE, 21, 4:58.

22              PEI:  I LIVE JUST BENEATH THE PACIFIC CREST TRAIL.

23              AND ONCE AGAIN, AGENT BROWN, WHERE IS THE PACIFIC

24   TRAIL IN RELATION TO THE GIRL SCOUTS CAMP?

25   A.   IT IS RIGHT NEXT TO THE CAMP.

1    Q.   AND THE PERSON WITH WHOM THE DEFENDANT IS CHATTING IN

2    THE EXCERPT I'VE JUST READ IS CROW18; IS THAT CORRECT?

3    A.   YES .

4    Q.   I'M REFERRING TO LATER IN THE SAME CHAT, PAGE 37, STILL

5    CHATTING WITH CROW18 ON MAY 19TH AT 739 P.M.:

6            PEI:  SMILEY FACE.  I'M DOING GREAT.  I WAS DOWN AT

7    FRY'S ELECTRONICS.  IT'S A HUGE PLACE WITH LOTS OF CUTIES ALL

8    OVER THE PLACE.

9            IS MAY 19 THE SAME DATE AS THE FRY'S ELECTRONICS

10   INVOICE TO JIM SANDERS THAT WE SAW ON JUNE 17TH?

11   A.   YES, IT IS.

12   Q.   AND THE FIRST PAGE OF THE SAME EXHIBIT 3, AN EXCERPT,

13   AND THE FIRST PAGE OF THE CHAT WITH CROW18, 8:17.

14           PEI:  HOW WAS YOUR DAY?

15           CROW18:  OKAY.  YOURS?  LOVE YOU, HUGS YOU, HOW ARE

16   YOU DOING?

17           PEI:  IT WAS GREAT.  ME AND ANOTHER BL FRIEND WENT

18   ON SAFARI IN ONE OF THE BIGGEST MALLS IN THE COUNTRY.  I LOVE

19   YOU, TOO.

20           PEI:  THIS PLACE HAD AN ENORMOUS INDOOR

21   SKATE/SKATEBOARD PARK.  THERE WERE HUNDREDS OF CUTIES.

22   HEHEHE.  YOUNG.

23           CROW18:  COOL.  AJ TOOK US OUT TO EAT AND TO SEE

24   THE MUMMY RETURNS.  IT WAS SO COOL.

25           COOL.  I LIKE THE FIRST ONE.

```
 1                  GOING TO THE TOP OF THE NEXT PAGE.

 2                  CROW18:  YEAH, ME, TOO, BUT THIS ONE HAD A CUTE BOY

 3      IN IT.

 4                  PEI:  HEHEHE.  I WAS GOING TO ASK.  SMILEY FACES.

 5      HEHEHE.

 6                  PEI:  HOW OLD WAS HE?

 7                  CROW18:  EIGHT I THINK.

 8                  PEI:  YOUNG, ONE OF MY FAVORITE AGES.  TWO SMILEY

 9      FACES.

10                  CROW18:  HEHE.

11                  PEI:  DOES HE GET DOWN TO HIS UNDERWEAR?

12                  CROW18:  NO.  FROWNING FACE.

13                  PEI:  TOO BAD.  SO THE MUMMY DOESN'T TRY TO PUT IT

14      IN HIM I SUPPOSE?  MULTIPLE SMILEY FACES.

15                  THE EARLIER REFERENCE IN THE SAME CHAT TO A

16      SKATEBOARD PARK, AGENT BROWN, ARE YOU FAMILIAR WITH OTHER

17      EVIDENCE IN THIS CASE RELATED TO A SKATEBOARD PARK?

18      A.   YES.

19                  MR. AKROTIRIANAKIS:  WITH THE COURT'S PERMISSION,

20      I'D PLACE A COPY OF EXHIBIT 22 ON THE OVERHEAD CAMERA.

21                  THE COURT:  22 IS IN EVIDENCE?

22                  MR. AKROTIRIANAKIS:  IT IS IN EVIDENCE, YOUR HONOR.

23                  THE COURT:  YOU MAY PUBLISH.

24      BY MR. AKROTIRIANAKIS:

25      Q.   EXHIBIT 22 IS NOW ON THE OVERHEAD CAMERA, A SKATEBOARD
```

1    PARK FLIER FROM THE DEFENDANT'S BACKPACK.

2             LATER IN THE SAME CHAT, EXHIBIT M, PAGE 43, MAY 27,

3    10:38 AM.

4             PEI:  HEHEHE.  SO I HEAR SOME NEIGHBOR KIDS

5    OUTSIDE.  BE RIGHT BACK.

6             CROW18:  LOL.

7             WHAT'S LOL, AGENT BROWN?

8    A.   LAUGH OUT LOUD.

9    Q.   LAUGH OUT LOUD, OKAY, HEHE.

10            PEI:  JUST A FEW CUTIES GETTING READY TO HIKE UP TO

11   THE PACIFIC CREST TRAIL.

12            CROW18:  COOL.

13            PEI:  I'M FORMATTING NEW BESTCRYPT CONTAINER ON MY

14   DESKTOP AS WE SPEAK HERE.

15            CROW18:  COOL.

16            PEI:  SO HAVE YOU MADE A CONTAINER YET?

17            THE FINAL ONE IN THIS CATEGORY, AGENT BROWN,

18   REFERRING TO TAB U OF EXHIBIT 3 ON PAGE 1 OF THAT EXCERPT.

19            PEI, 10:18 A.M.:  HI, GANY.  THIS IS BOYSAN ON MY

20   LAPTOP ACCOUNT.  HOW'S IT GOING?

21            BEFORE I MOVE ON TO THE NEXT TOPIC, AGENT BROWN, I

22   HAD ASKED YOU IN RELATION TO EXHIBIT 1, THE SETH BEKENSTEIN

23   CHATS, WHETHER YOU UNDERSTOOD FROM READING THE CHATS THAT

24   DOOM AND DR DOOM AND SPEED WERE SETH BEKENSTEIN'S NAMES.  DO

25   YOU RECALL THAT QUESTION AND ANSWER?

1    A.   YES.

2    Q.   IN ADDITION TO YOUR REVIEW OF THE CHATS ITSELF DOES

3    DR DOOM AND SPEED ACTUALLY REFER TO HIMSELF AS SETH IN THE

4    CHAT?

5    A.   YES.

6    Q.   THIS IS EXHIBIT 1?

7    A.   EXHIBIT 1, YES.

8    Q.   DOES HE DO SO IN MULTIPLE PLACES IN THAT EXCERPT?  I'M

9    SORRY, IN THAT EXHIBIT?

10   A.   YES.

11   Q.   DOES SETH BEKENSTEIN IN OTHER OF THE CHATS USE OTHER

12   SCREEN NICKNAMES OTHER THAN DR DOOM AND SPEED?

13   A.   SAY AGAIN.

14   Q.   IN OTHER OF THE CHATS, OTHER THAN EXHIBIT 1, DOES SETH

15   BEKENSTEIN USE OTHER SCREEN NAMES OTHER THAN SPEED AND

16   DR DOOM?

17   A.   YES.

18   Q.   ARE YOU FAMILIAR WITH THE SCREEN NAME TENNIS?

19   A.   YES.

20   Q.   AND WHO IS TENNIS?

21   A.   SETH BEKENSTEIN.

22   Q.   MOVING ON IN EXHIBIT 3, DOES THE DEFENDANT DISCUSS HIS

23   DESIRE AND DESIRES AND AGE PREFERENCES FOR SEX PARTNERS?

24   A.   YES.

25   Q.   REFERRING TO TAB H OF EXHIBIT 3, PAGE 6 OF THAT

1    DOCUMENT.

2           JURE, 9:09 P.M.:  COOL, YEAH, I SAW YOU ON

3    EARLIER.  OKAY.  NOTHING MUCH SPECIAL.  WELL, OKAY, I GOTTA

4    SEE LUKE NAKED -- SMILEY FACE.

5           PEI:  HEHEHE, ANOTHER BOY?

6           JURE:  YEAH.  MOVED HERE ABOUT THREE WEEKS AGO.

7    HE'S USUALLY NOT HERE, BUT AT MOM'S.  HE'S BRITISH,

8    (ACCENT AND VOICE TO DIE FOR), SIX-YEAR-OLD, GREEN-EYED, DARK

9    HAIRED, LITTLE FRECKLES, AND SKINNY.

10          PEI:  YUMMM.  YOU KNOW HOW I LOVE THAT AGE,

11   HEHEHEHE.

12          JURE:  AYE, I KNOW FOUR BOYS THAT AGE

13   (THAT I'M SURE OF).

14          JURE:  THREE OF THEM GREEN EYED.

15          JURE:  AND HE'S ALSO UNCUT, THE WAY I LOVE THEM AND

16   HIS VOICE WITH THAT ACCENT, OH, SO CUTE.

17          PEI:  WOW.  THAT'S A REAL COINCIDENCE.  I WAS

18   CONNECTING WITH BOYS WHEN I WAS AT SETH'S COMPLEX.  IT'S

19   GREAT TO HAVE SUCH A GOOD POPULATION OF BOYS CLOSE AT HAND --

20   SMILEY FACES.

21          PEI:  CUT OR UNCUT, IT DOESN'T MATTER TO AN ASS MAN

22   LIKE ME, HEHEHEHE.

23          JURE:  YEAH, I REALLY LIKE THE PARK NOW -- SMILEY

24   FACE.

25          JURE:  WELL, I LIKE TO FIDDLE AROUND AND SUCK

```
 1   (DICK THAT IS), AND SKIN ADDS AN EXTRA WAY OF GIVING
 2   PLEASURE.
 3           AND LATER IN THE CONVERSATION THE DEFENDANT SAYS,
 4           PEI:  COOL.  SO DOES SPHINCTER -- TWO SMILEY FACES.
 5           REFERRING TO EXHIBIT 3, TAB H, PAGE 23 OF THAT
 6   DOCUMENT.
 7           PEI, 10:18 P.M.:  SO ANYTHING EXCITING HAPPENING IN
 8   YOUR LOVE LIFE?
 9           JURE:  NOTHING SO FAR.  GOT SOME GOOD GROPES WITH
10   LUKE AND BRANDON BUT THAT'S ABOUT IT SO FAR.
11           PEI:  TOUCH DICK AND ASS?
12           JURE:  YES.
13           JURE:  BOTH BEAUTIFUL GREEN-EYED SIX-YEAR-OLDS AND
14   BOTH UNCUT.
15           PEI:  COOL.  I SURE LOVE THOSE SIX-YEAR-OLDS.
16           JURE:  YES, AND THEY ALL LOVE THE GEORGIE.
17           HAS JURE BEEN IDENTIFIED?
18   A.   NOT POSITIVE, TO MY KNOWLEDGE.
19           JURE:  DON'T KNOW.  HAVEN'T SEEN IT BEFORE.
20   SORRY.
21           I'M REFERRING TO PAGE 28 LATER IN THE SAME EXHIBIT
22   AN EXCERPT.
23           PEI:  BL'S ALWAYS HAVE A POSITIVE EFFECT ON THE
24   BOYS WE CHOOSE TO LOVE AND BOYS THAT CHOOSE US -- SMILEY
25   FACES.
```

1   JURE:  GUESS SO.

2   PEI:  WE'RE LIKE MAGNETS FOR BOYS.  WE REALLY DON'T

3 HAVE TO DO ANYTHING BUT PAY ATTENTION TO ACQUIRE BOYS --

4 SMILEY FACES.

5   JURE:  SEEMS TO WORK FOR ME.  A LOT OF THE BOYS AT

6 THE PARK KNOW GEORGIE.

7   PEI:  HEHEHEHE.  YUP, THAT'S HOW IT WORKS.  AND YOU

8 MIGHT BE SURPRISED HOW MANY OF THEM HAVE SEX WITH EACH OTHER.

9   JURE:  SMILEY FACES.

10   JURE:  IF ONLY THERE WAS A WAY TO TELL.

11   JURE:  DANIEL GIVING IT TO DAVID, MMMM, NICE IMAGE.

12   PEI:  YOU WILL GET SHARPER AT SEEING THEM.  THE

13 MORE YOU'RE WITH THE EASIER IT IS TO SPOT THE ONES THAT WANT

14 A MAN.

15   TAB N OF EXHIBIT 3, THE LAST PAGE, 29, OF THAT

16 DOCUMENT.

17   CROW18, 6:28 P.M.:  THAT'S COOL.  HEHEHE, A FRIEND

18 OF THE FAMILY JUST SWUNG BY AND HIS THREE-YEAR-OLD GRANDSON

19 WITH HIM.  SO DAMN CUTE.  HE CALLS HIS GRANDFATHER PEPE.

20 HEHEHEHE.

21   PEI:  HEHEHE, YOUNG.  A LITTLE THREE-YEAR-OLD

22 DICKEY WOULD BE TASTY -- SMILEY FACES.

23   LOWER DOWN THE PAGE:  HEHEHE.  YOU SHOULD HAVE

24 INVITED HIM TO YOUR ROOM FOR FURTHER STUDY.

25   CROW18:  LAUGH OUT LOUD.  JACKY AND CRAIG ARE

1  PLAYING WITH HIM NOW.  THEY WANT HIM TO SPEND THE NIGHT.

2  HEHEHEHE.

3          PEI:  YES, THAT'S ONE OF THE THINGS LITTLE BOYS ARE

4  ALSO GOOD AT, ATTRACTING OTHER LITTLE BOYS.  HEHEHEHE.

5          CROW18:  LAUGH OUT LOUD.

6          PEI:  YOU REALLY NEED A CAMERA.

7          CROW:  YEAH.

8          PEI:  YOU'LL LIKE THE ONE I USE HERE.  VERY SLICK.

9          CROW18:  COOL.  HEHEHEHE.  I'D LOVE TO BRING MY

10  CAMERA TO MEXICO, BUT I WOULD LOVE -- BUT I WOULD BE AFRAID

11  TO DEVELOP THEM.

12          PEI:  NO, YOU DON'T WANT A FILM CAMERA ANYMORE --

13  SMILEY FACES.  DIGITAL AND DOWNLOAD AND SEE RIGHT AWAY.

14          CROW18:  HEHEHEHE.  THINK WE CAN GET ANY OF THEM

15  NUDE?

16          PEI:  OF COURSE -- SMILEY FACES.

17          PEI:  AND MAYBE FUCK AND SUCK THEM -- SMILEY FACES.

18  IF WE CAN DEAL WITH THE LANGUAGE BARRIER.

19          CROW18:  COOL.  HOW FAR DO YOU THINK WE CAN GET

20  THEM TO GO?  HEHEHEHE, I'M A PIG.  HEHEHE.

21          TAB P, EXHIBIT 3, MAY 18, AT 1158 P.M.

22          PEI:  THAT'S BL LIFE -- SMILEY FACES.  IT'S LIKE A

23  RELIGION.

24          12:03 A.M., MAY 19TH:  I HAVE SEX WITH ANY BOY THAT

25  WANTS TO BUT NEVER QUESTION.

1           IN EXHIBIT 3 DOES THE DEFENDANT ALSO, AGENT BROWN,

2    ENCOURAGE OTHER PERSONS TO ENGAGE IN BL ACTIVITIES?

3    A.   YES.

4    Q.   EXHIBIT 3, TAB N, MAY 6TH, 2001, 1:54 P.M., PAGE 3, IN

5    THIS CHAT, AGENT BROWN, DOES CROW18 REFER TO HIM HAVING SOME

6    CHILDREN THERE IN HIS PRESENCE?

7    A.   YES.

8    Q.   AS HE'S CHATTING WITH THE DEFENDANT?

9    A.   YES.

10   Q.   1:54 P.M.:  WE'RE WATCHING TP1, 1 OF 3.

11           WHAT IS TP?

12   A.   THIEF'S PUNISHMENT.

13   Q.   HEHEHE.  SOUND OFF.  I DON'T WANT TO FRIGHTEN JACKY.

14   HEHEHE.  WE'RE LOVING IT, THOUGH.  HE THINKS SPANKING IS

15   COOL.  I HAVE TO INTRODUCE HIM TO CHRIS.

16           PEI:  HEHEHE, YEAH.  CHRIS WILL HAVE FUN WITH HIM.

17           CROW18:  STILL HAVE TO FIND PART 3.  YEAH, HE

18   WOULD.  HEHEHEHEHE.  THINKS NAUGHTY THOUGHTS.

19           PEI:  DO YOU GUYS SPANK EACH OTHER NOW?

20           CROW18:  NOT EACH OTHER, JUST AJ, AND I'M SPANKING

21   HIM NOW.  HEHEHEHEHE.

22           PEI:  KALEN LET'S ME KNOW WHAT HE WANTS BY NAILING

23   HIM IN THE BUTT WHEN I'M NOT LOOKING.

24           CROW18:  LAUGH OUT LOUD, HEHEHEHE.

25           INCIDENTALLY, IS SPANKING ALSO, BASED ON YOUR

1   TRAINING AND EXPERIENCE AS A CHILD EXPLOITATION INVESTIGATOR,

2   ALSO BEHAVIOR CONSISTENT WITH GROOMING?

3   A.   YES.

4   Q.   CROW18:  AFTER THE SPANKING WE TAKE THE TEMPERATURE OF

5   OUR SICK LITTLE BOYS.

6            PEI:  HEHEHE.  WITH A COUPLE OF FINGERS?

7            CROW18:  YEAH.  THEN IF THEY ARE SICK WE GOT TO

8   GIVE THEM A SHOT IN THE BUTT WHERE WE CAN GIVE THEM WITH

9   MEDICINE IN THEIR MOUTH.  STARTED ALL THESE NICKNAMES THANKS

10  TO A STORY WE READ.

11           PEI:  COOL.  DO THEY GET HARD WHEN YOU SPANK THEM?

12  WHAT NICKNAMES?

13           CROW18:  YES.  TAKING THE TEMP -- YES, TAKING THE

14  TEMP, SHOTS, MEDICINE.  THE SYRINGE IS THE DICK.  MEDICINE IS

15  SPERM.  THE THERMOMETER IS FINGERS.

16           PEI:  HEHEHE.  I HAD ONE WAY.  WHAT'S THE TONGUE?

17  TAKE A SECOND TEMP AFTER IT'S LOOSENED UP?

18           CROW18:  OUR PENISES ARE ALSO LOLLIPOPS.  HAVEN'T

19  COME UP WITH A NICK FOR TONGUES YET.

20           DOES THE DEFENDANT THEREAFTER ACTUALLY SUGGEST A

21  NICKNAME FOR TONGUES?

22  A.   YES.

23  Q.   GOING OVER TO THE NEXT PAGE.

24           PEI:  A PROBE.  HEHEHEHE.

25           CROW18:  I'M GIVING JACKY A GOOD SPANK NOW.  THEN A

1   SHOT.  HE'S BEEN BAD SO I MAY NOT USE ANY SPIT.

2           PEI:  HOW ABOUT A BIG GLOB OF VASELINE?  HEHEHE.

3           CROW18:  MAYBE.

4           PEI:  HEHEHE.  YOU CAN STICK THREE FINGERS IN.

5           CROW18:  I KNOW.  I TOLD MYSELF I NEVER WOULD, BUT

6   I THINK MAYBE I'M STARTING TO LIKE S AND M.

7   Q.   WHAT'S S AND M, AGENT BROWN?

8   A.   SADOMASOCHISM.

9   Q.   PEI:  JUST DON'T LET IT GET TOO FAR OUT THERE -- SMILEY

10  FACES.

11          CROW18:  SMILEY FACES.  HOW FAR IS TOO FAR?

12          PEI:  WHEN SOMEONE DOESN'T WANT IT OR ISN'T HAVING

13  FUN.

14          CROW18:  HEHEHEHE.

15          AND READING ON DOWN THE PAGE.

16          PEI, 2:22 P.M.:  HEHEHE.  I WISH I WAS THERE TO LET

17  YOU FEEL MY NEW LEATHER BELT.  IT'S A NICE ONE.

18          DOES THE THIEF'S PUNISHMENT THAT THEY'RE REFERRING

19  TO EARLIER IN THE SAME DISCUSSION INCLUDE USE OF A LEATHER

20  BELT OR STRAP?

21  A.   YES.

22  Q.   IS IT USED TO BEAT THE CHILD BEING ABUSED IN THAT VIDEO?

23  A.   YES, IT IS.

24  Q.   CROW18, 2:23:  COOL.  WELL, HIS ASS IS NICE AND RED NOW.

25  HE EVEN CRIED A BIT.  SHOULD I DO A DRY RUN OR LUBE?

```
1              PEI:  HEHEHE.  YOU BETTER LUBE HIM UP A BIT FIRST.

2              CROW18:  OKAY.  HERE WE GO.

3              PEI:  YOUNG.

4              PEI:  I'LL BE BACK SHORTLY AFTER YOU CUM -- SMILEY

5      FACES.

6              CROW18:  HEHE, OKAY.

7              PEI:  ARE YOU STILL DOING IT -- SMILEY FACES.

8              CROW18:  HE'S SLEEPING LIKE A BABY.

9              PEI:  HEHEHE, COOL.  DID HE HAVE A CLIMAX?

10             CROW18:  YES.

11             PEI:  YOUNG.  DID YOU LICK HIS ASSHOLE A LITTLE?

12             GOING OVER TO THE TOP OF THE NEXT PAGE, 5.

13             CROW18:  YES.

14             PEI:  THAT'S AWESOME.  I SURE LOVE THE FEEL AND

15     TASTE OF BOY BUTTS.

16             ARE THERE OTHER CHATS INVOLVING CROW18 --

17     A.  YES.

18     Q.  -- AND THE DEFENDANT WHERE THEY DISCUSS THESE TWO

19     CHILDREN, JACKY AND CRAIG?

20     A.  YES.

21     Q.  REFERRING TO EXHIBIT N, PAGE 31, 5/17, 7:55 P.M.

22             CROW18:  HUGS.  HEHEHE.  LOOKS LIKE THE BOYS GOT

23     THEIR WAY.  MARK IS SPENDING THE NIGHT.

24             HEHEHE.  THAT'S AWESOME.  ARE THEY ALL SLEEPING IN

25     YOUR ROOM?
```

1               CROW18:  YUP.

2               PEI:  YEAH, BONER NIGHT.  HEHEHE.

3               CROW18:  LAUGH OUT LOUD.

4               PEI:  IT SHOULD BE FUN.  YOU GOT A PLAN?

5               CROW18:  NO PLAN.

6               PEI:  WING IT -- SMILEY FACES.

7               PEI:  SO WILL JACKY AND CRAIG GO FOR HIM?

8               CROW18:  THEY ARE ALL NAKED ALREADY.

9               PEI:  HEHEHE.  WITH BONERS?

10              CROW18:  YUP.

11              LATER IN THE SAME CHAT, LET ME SKIP AHEAD TO

12     TAB S, THE FIRST PAGE OF THAT EXCERPT, 6:50 A.M.

13              PEI:  HI, DUDE.  NICE TO SEE YOU HERE.  HOW IS IT

14     IN ENGLAND TODAY?

15              PLAYTP:  OKAY.  THANKS.  HOW ARE YOU?

16              PEI:  I'M DOING GREAT.  I'M LEAVING TODAY FOR A

17     WEEK IN LAS VEGAS AND SAN FRANCISCO AND JUST SETTING UP THE

18     LAPTOP FOR THE TRIP.

19              PLAYTP:  COOL.  HOPE YOU HAVE FUN DAY OFF TODAY,

20     THOUGH I GOT STUFF TO DO.

21              PEI:  WELL, I HOPE YOU SEE SOME CUTIES AND MAYBE

22     ACQUIRE ONE.  GIVE US A GOOD STORY -- SMILEY FACES.

23              TAB T OF EXHIBIT 3, PAGE 12, 4:30 P.M.

24              PEI:  COOL.  ARE THEY VISITING TONIGHT?

25              NEO:  NOT TONIGHT.  KURT IS COMING AGAIN TOMORROW I

1  THINK.

2          PEI:  HE SURE IS A CUTIE.

3          NEO --

4          NOW, ARE YOU FAMILIAR WITH WHAT'S INTENDED BY --

5  ARE YOU FAMILIAR WITH THAT EMOTICON?

6  A.   YES, I AM.

7  Q.   WHAT IS IT INTENDED TO REPRESENT?

8  A.   HAPPY WITH OPEN MOUTH SMILE.

9  Q.   AN OPEN MOUTH SMILE?

10 A.   YES.

11 Q.   PEI:  HOW DOES HE TASTE?

12          BASED ON YOUR REVIEW OF THIS CHAT, IS THE KURT THEY

13 ARE REFERRING TO APPEAR TO BE A CHILD?

14 A.   YES.

15 Q.   GOING OVER TO THE TOP OF THE NEXT PAGE.

16          NEO:  DELICIOUS.

17          PEI:  HEHEHE.  DO YOU GIVE HIM LOTS OF ORGASMS?

18          NEO:  YEAH, HE LOVES THEM.

19          PEI:  COOL.  DON'T WE ALL -- HAPPY FACES.  DOES HE

20 LIKE TO SUCK, TOO?

21          NEO:  HE LOVES TO BE SUCKED.

22          PEI:  THAT'S GREAT.  DOES HE LIKE TO DO -- DOES HE

23 LIKE TO DO IT, TOO.

24          NEO:  NO.

25          PEI:  YOU WILL HAVE TO TEACH HIM.  IT IS AN

```
 1   ACQUIRED TASTE -- SMILEY FACES.
 2           NEO:  DON'T WANT TO FORCE HIM TO DO ANYTHING HE
 3   DOESN'T WANT TO DO.
 4           PEI:  NO, THAT WOULD NEVER DO, BUT A BIT OF VIDS
 5   AND PICS HELP CREATE THE URGE I WOULD THINK.
 6           NEO:  SHOW HIM VIDS AND PICS?
 7           PEI:  I'M ABOUT TO DO THAT WITH BOTH MY BOYS, JUST
 8   SOFT THINGS.  THEN IF THEY LIKE IT, SOMETHING MORE
 9   ADVENTUROUS.
10           NEO:  BE RIGHT BACK.
11           PEI:  OKAY.
12           NEO:  SIMON LOVES MAN/BOY VIDEOS.
13           PEI:  HEHEHE, THAT'S GREAT.  WHAT ABOUT KURT?
14           NEO:  TOO YOUNG YET.
15           PEI:  INTERESTING.  BUT NOT TOO YOUNG FOR SEX --
16   SMILEY FACES.
17           NEO:  NO, HE LIKES THAT, BUT GOTTA MAKE SURE HE
18   KEEPS HIS MOUTH SHUT.
19           PEI:  THAT'S FOR SURE.
20           AGENT BROWN, IN YOUR EXPERIENCE AS A CHILD
21   EXPLOITATION INVESTIGATOR, IS THAT SHOWING THE PICTURES AND
22   VIDEOS CONSISTENT WITH GROOMING BEHAVIOR?
23   A.   YES, IT IS.
24   Q.   AND THE KEEPING THE MOUTH SHUT?
25   A.   YES.
```

1    Q.    TAB W, PAGE 1, 8:23 P.M., MAY 17TH.

2              PEI:  YEAH, I BET IT IS.

3              IN THIS CONVERSATION IS THE DEFENDANT HAVING AN

4    INSTANT MESSAGE CHAT WITH SOMEONE NAMED STYX, S-T-Y-X?

5    A.    YES.

6    Q.    AND IS STYX REFERRING TO A BACK INJURY HE SUFFERED?

7    A.    YES.

8    Q.    PEI:  WHEN I HURT MY BACK I WOULD FORGET SOMETIMES AND

9    PAY A STIFF PRICE IN PAIN.

10             PEI:  YOU NEED A COUPLE BOYS LIKE DUNCAN AND LLOYD

11   TO WORK YOU OVER A LITTLE AND WAKE THAT DICK UP -- SMILEY

12   FACES.

13             STYX:  THE PAIN ISN'T TOO BAD NOW.  I HURT MORE

14   AROUND MY LEFT HIP WHICH IS BRUISED THROUGH LYING ON THIS

15   FLOOR.  YEAH, IF I COULDN'T GET IT UP FOR THOSE TWO, I REALLY

16   WOULD BE IN TEARS.

17             PEI:  HEHEHE, THAT'S FOR SURE.  I WOULD BUILD A

18   WORLD FOR THOSE TWO.

19             STYX:  A VERY PRIVATE WORLD.  THERE'S SOME MORE

20   BEAUTIES ON AFPB.

21             PEI:  AH, PRETTY BOYS.

22             STYX:  YEAH, ONLY SP BUT BLOODY BEAUTIFUL.

23             ARE YOU FAMILIAR WITH SP AS IT RELATES TO

24   PORNOGRAPHIC VIDEOS?

25   A.    YES.

1    Q.    WHAT IS SP?

2    A.    SOFT PORN.

3    Q.    GOING OVER TO THE NEXT PAGE.

4            PEI:  SP, QUESTION MARK.

5            STYX:  SOFT PORN.

6            PEI:  AHH, I'M NOT TOO TERRIBLY THRILLED BY THAT

7    UNLESS THE SUBJECT IS STUNNING.

8            STYX:  IT DOESN'T BOTHER ME.  I JUST LOVE THE

9    BEAUTY OF BOYS.

10           AGENT BROWN, IN EXHIBIT 3 DOES THE DEFENDANT

11   DISCUSS THE POSSESSION AND DISTRIBUTION OF CHILD PORNOGRAPHY?

12   A.    YES.

13   Q.    EXHIBIT 3, TAB C, PAGE 6, 12:07 A.M.

14           PONY:  WELL, I WILL LOOK FORWARD TO YOU GETTING IT

15   BACK SOON THEN.

16           IN THIS CHAT ARE PONY AND THE DEFENDANT -- LET ME

17   WITHDRAW THAT, PLEASE.

18           I LOOK FORWARD TO YOU GETTING IT BACK SOON THEN.

19   GET A LITTLE ACTION IN THE GROUP.  SCOTT SAID HE WOULD POST

20   SOME PIC ATTACHMENTS, TOO, BUT I THINK IT WOULD PROBABLY GET

21   DONE AFTER HIS EXAMS.  OPEN MOUTH SMILEY FACE.

22           PEI:  YOU KNOW ME, I HAVE A ZILLION PICS -- SMILEY

23   FACES.

24           PONY:  WELL, IT WON'T HURT TO SPREAD THEM AROUND.

25   MY GROUP SHOULD REMAIN SECURE FOR A LONG TIME.  THE ONLY WAY

1   THEY COULD POSSIBLY FIND IT IS A RANDOM CHECK OF CONTENT.

2          IS THIS DISCUSSION BETWEEN PONY AND THE DEFENDANT

3   IN OVERALL CONTEXT OF THE DISCUSSION CONCERNING SETH

4   BEKENSTEIN'S ARREST FOR POSSESSION OF CHILD PORNOGRAPHY?

5   A.   YES.

6   Q.   TAB D, PAGE 1, AND THE FIRST ENTRY.

7          PEI:  HI, PIETER.  THIS IS ARAGORN1 ON MY LAPTOP AS

8   PEI.  I HAVE FAMILY PICS OVER HERE THAT I DON'T HAVE ON THE

9   DESKTOP.

10         PIETER:  HELLO.  THANKS FOR THE ZING ALBUM.

11         PEI:  HI, YOU'RE WELCOME.  DID YOU ENJOY THAT LONG

12  SERIES IN THERE?

13         PIETER:  YES, WE LIKE ALL DE PICS.

14         PIETER:  YOU MORE ALBUMS?

15         PEI:  NOT YET BUT SOON.

16         PIETER:  OKAY.  ME HAPPY YOU SAVE PASSWORD SO HE

17  CANNOT OPEN VIEW ALBUM.

18         PEI:  I DON'T HAVE ANOTHER ALBUM YET, BUT WHEN I DO

19  I WILL GIVE YOU THE ADDRESS AND PASSWORD FOR IT.

20         TAB G, EXHIBIT 3, PAGE 11, 6:46 P.M.

21         PEI:  WHAT IS THE CORRECT ADDY FOR THE VID GROUP IN

22  UNSENSORED?

23         ARE YOU FAMILIAR WITH UNSENSORED NEWS IN YOUR

24  EXPERIENCE AS A CHILD PORNOGRAPHY INVESTIGATOR?

25  A.   I'M FAMILIAR WITH THE NAME, YES.

1    Q.    INCOGNITO3, PROVIDES A WEB ADDRESS AND YOU HAVE TO HAVE

2    UN MULTIMEDIA SERVER IN ORDER TO GET THAT GROUP.  IS THAT A

3    NEWS GROUP IN YOUR UNDERSTANDING?

4    A.    WHICH ONE ARE YOU REFERRING TO?

5    Q.    ALT DOT BINARIES DOT MULTI MEDIA DOT BOYS?

6    A.    YES.

7    Q.    PEI:  I GOT ALL OF UNSENSORED SERVERS.  I PAY MY $9.95

8    EVERY MONTH -- SMILEY FACES.

9              PEI:  THANKS, MATE.

10             PEI:  THAT'S THE NO. 1 VID SITE, RIGHT?

11             INCOGNITO:  HELL IF I KNOW.  I'M PRETTY MUCH DONE

12   WITH UN.

13             PEI:  I WOULD LIKE TO SEE YOU STAY IN.  I ALWAYS

14   ENJOYED SEEING YOU THERE.

15             INCOGNITO3:  IT TAKES MONEY, JIM.

16             TAB H, PAGE 3, 10:05 ON MAY 13.

17             PEI:  HI, I'VE BEEN GOING DOWN A LOT TONIGHT.

18             JURE:  YEAH, TWICE SINCE I CAME ON TODAY.

19             JURE:  WB.

20             PEI:  HI.  MAYBE I'LL LAST FOR TWO MINUTES NOW --

21   SMILEY FACES.

22             JURE:  GOODIE.

23             PEI:  YEAH, COULD BE TIME TO WIPE THIS THING AND

24   START FRESH -- SMILEY FACES.

25             JURE:  SI.

1          JURE:  SO HOW YOU DOING?  ANY PICS?  EXCUSE MY

2    FINESSE.

3          PEI:  HEHEHE.  YEAH, I MANAGED TO GET TWO AND MISS

4    ABOUT FIFTY.

5          JURE:  YOU'LL GET BETTER.  I MISSED SOME OF THE

6    GOOD ONES, TOO, AT FIRST BUT I LEARNED.  WELL, AT LEAST WITH

7    PICS.

8          JURE:  MAY I PLEASE SEE THOSE TWO PICS?

9          PEI:  SURE.

10         JURE:  COOL.

11         PEI:  THIS LAPTOP SUCKS.  I GOTTA GET IT WORKED ON.

12         JURE:  YEAH, CERTAINLY SEEMS SO.

13         PEI:  THE OTHER ONE IS JUST LOWER DOWN AND CLOSE.

14         JURE:  SHOW, SHOW.

15         JURE:  BLUE EYES?

16         PEI:  OKAY.

17         JURE:  CUTE BUNS.  YOU SHOULD HAVE HIM SITTING ON

18    YOUR --

19         GOING OVER TO THE TOP OF THE NEXT PAGE.

20         -- LEG.  TIM DOES THAT.

21         PEI:  BUT I MISSED SOME GREAT ONES -- FROWNING

22    FACES.

23         NOW, NOW, HAPPENS ALL THE TIME.  KICK YOURSELF IN

24    YOUR ASS AND REMEMBER TO DO IT NEXT TIME.  BTW.

25         WHAT'S BTW, AGENT BROWN?

1   A.   BY THE WAY.

2   Q.   BY THE WAY, WHAT KIND DID YOU MISS?

3        PEI:  HE HAD HIS SHIRT OFF AND JUST SHORTS ON AT

4   BUN LEVEL.  HE HAS A VERY BEAUTIFUL BODY.  HE MADE PLANS FOR

5   US WHEN HE GOES ON BREAK IN JUNE.

6        JURE:  AWESOME.  BLUE-EYED?

7        AGENT BROWN, THROUGHOUT EXHIBIT 3 DOES THE

8   DEFENDANT DISCUSS WHAT HE REFERS TO AS A 10-YEAR-OLD

9   BOYFRIEND IN LAS VEGAS?

10  A.   YES.

11  Q.   AND BASED ON YOUR FAMILIARITY WITH THIS CASE, HAVE YOU

12  SEEN OTHER PICTURES, CLOTHED PICTURES OF THAT BOY, OF A BOY

13  THAT WERE FOUND IN DEFENDANT'S LAPTOP?

14  A.   YES.

15  Q.   AND ARE THEY CONSISTENT WITH THE DESCRIPTIONS OF THE

16  PICTURES THAT THE DEFENDANT DESCRIBES DISTRIBUTING TO VARIOUS

17  CHATTERS HERE?

18  A.   YES, THEY ARE.

19  Q.   EXHIBIT H, PAGE 8, 9:31 P.M.

20       PEI:  SETH CALLED ME COLLECT TODAY.

21       JURE:  SOMETIMES I JUST DON'T FEEL IN A CHATTY MOOD

22  OR I JUST WANT TO TALK TO ONE PERSON.

23       JURE:  WHAT DID HE HAVE TO SAY?

24       PEI:  JUST THAT HE WAS DOING OKAY AND THAT HE HAS

25  TO STAY IN MARIN COUNTY UNTIL AUGUST 17 WHEN HE'S SENTENCED.

```
 1              JURE:  WOW, PRETTY LONG.

 2              JURE:  YEAH, I CAN'T WAIT TO GET OUT OF THIS PIECE

 3   OF CRAP COUNTRY.

 4              JURE:  SO YOUR FIRST GOING TO LV?

 5              WHAT'S LV?

 6   A.   LAS VEGAS.

 7   Q.   LAS VEGAS AND THEN SOMEDAY OUT OF THE COUNTRY.  ANY

 8   IDEAS YET WHERE?

 9              PEI:  A FEW.  MAYBE EL SALVADOR.

10              JURE:  HMM, SO MAINLY LATIN AMERICA?

11              GOING OVER TO THE TOP OF THE NEXT PAGE.

12              PEI:  YEAH, THAT COUNTRY HAS AN OUT OF CONTROL

13   BIRTH RATE.

14              JURE:  WELL, WHAT ABOUT ROMANIA?  ITS DICTATOR

15   BANISHED ALL FORMS OF BIRTH CONTROL AND DECLARED THAT EVERY

16   WOMAN NEEDS TO HAVE FIVE CHILDREN.  CURRENTLY OVER 300

17   THOUSAND CHILDREN ARE ABANDONED SLASH LIVING ON STREETS.  I'M

18   SURE A FEW BL'S COULD HELP MANY OF THEM.  PARENTHESES, AND

19   GL'S, TOO?

20   A.   GIRL LOVER.

21   Q.   PEI:  I'M BOTH, YOUNG.  I'M GOING ON VACATION THERE.

22   HEHEHE.

23              JURE:  WELL, NEED TO BE CAREFUL.  THOSE STREET

24   URCHINS CAN BE VICIOUS IN AND OUT OF BED.  LAUGH OUT LOUD.

25              IN OTHER CHATS, INCLUDING EXHIBIT 1 -- I'M SORRY.
```

1              ELSEWHERE IN THIS CHAT DOES THE DEFENDANT EXPRESS

2    THAT ALTHOUGH HE IS BL AND GL THAT HE HAS A PREFERENCE FOR

3    YOUNG BOYS OVER GIRLS?

4    A.   YES.

5    Q.   PAGE 13 ON THE SAME EXHIBIT, MAY 15, 11:33 P.M.

6              JURE:  WOULD YOU LIKE TO SEE A PICTURE OF TIM'S

7    BONER?

8              PEI:  NO, I WOULDN'T.

9              JURE:  OKAY.  I THOUGHT SO.

10             PEI:  WHAT DO YOU THINK?  I AM THE ULTIMATE BL.

11             THE COURT:  WOULD YOU PLEASE SLOW DOWN,

12   MR. AKROTIRIANAKIS.

13             MR. AKROTIRIANAKIS:  I BEG YOUR PARDON, YOUR HONOR.

14   BY MR. AKROTIRIANAKIS:

15   Q.   SMILEY FACES.

16             JURE:  WELL, YOU'RE ALSO A GL, SO I DON'T KNOW IF

17   YOU ARE 100 PERCENT DEDICATED TO THE BL CAUSE.  HAHAHA.

18             PEI:  I LOVE ALL CHILDREN AND DON'T DISCRIMINATE.

19             JURE:  BUT IF YOU HAD A CHOICE BETWEEN A BOY OR A

20   GIRL, WHOM WOULD YOU CHOSE?  REMEMBER ONE ONLY.

21             PEI:  BOY.

22             JURE:  BY THE WAY, THAT REMINDS ME, I ALSO SAW

23   LUKE'S SISTER NAKED.  I THINK SHE'S AROUND 6 OR SO.

24             JURE:  GOOD ANSWER -- SMILEY FACE.

25             PEI:  I LOVE SIX-YEAR-OLD PUSSY -- SMILEY FACES.

1            JURE:  YOU LOVE ANY YOUNG PUSSY, BOY OR GIRL.

2            PEI:  YES.

3            ELSEWHERE IN EXHIBIT 3, AGENT BROWN, DOES THE

4   DEFENDANT DISCUSS ATTEMPTING TO MATCH STILLS TO VIDEOS?

5   A.   YES.

6   Q.   AND WHAT IS A STILL?

7   A.   STILL IS AN IMAGE, GENERALLY, OFTEN FROM A VIDEO, AND

8   THAT'S COLLECTED OR SAVED AS A PICTURE.

9   Q.   SO AS AN EXAMPLE, THE VIDEO THAT WE EARLIER SAW, THAT

10  CLIP FROM THIEF'S PUNISHMENT, THAT'S A VIDEO, RIGHT?

11  A.   YES.

12  Q.   AND THE PICTURE THAT YOU HAD TESTIFIED THAT YOU HAD

13  MATCHED TO EXHIBIT 111, WOULD THAT BE A STILL?

14  A.   YES.

15  Q.   H, EXHIBIT 3, PAGE 23, 10:07 P.M., MAY 20.

16           PEI:  I HAVE A STILL FROM A VID.  I NEED TO KNOW

17  WHAT VID.

18           JURE:  K.  LET ME SEE IF I KNOW IT.

19           DOES THE DEFENDANT THEREAFTER APPEAR TO SEND THE

20  STILL TO JURE?

21  A.   YES.

22  Q.   LOWER ON THE PAGE, THE LAST ENTRY.

23           JURE:  DON'T KNOW.  HAVEN'T SEEN IT BEFORE.

24  SORRY.

25           AND GOING OVER TO THE TOP OF THE NEXT PAGE.

```
 1              PEI:  IT'S OKAY.  I'LL FIND IT -- SMILEY FACES.

 2              PAGE 25 OF THE SAME EXHIBIT, EXCERPTS.

 3              PEI:  MAY 21, 9:29, I LOST ALL THE WONDERFUL PICS

 4  YOU SENT ME.

 5              JURE:  HOW DID THAT HAPPEN?

 6              PEI:  I DON'T KNOW.  I DID AN EVIDENCE ELIMINATOR

 7  PURGE AND THEY WERE STILL THERE AND I RECEIVED A FILE FROM A

 8  FRIEND AND PUT IT IN THE ICQ RECEIVED FOLDER WHERE YOUR PICS

 9  WERE AND WHEN IT LOADED, YOURS WERE GONE -- FROWNING FACES.

10              JURE:  GOOD GOLLY, MISS MOLLY.  WELL, YOU SHOULD

11  LEARN NOT TO KEEP THEM IN RECEIVED FOLDER BUT PUT THEM

12  SOMEWHERE SAFE -- SMILEY FACES.

13              PEI:  YUP, I KNOW NOW.  I WOULD HAVE HAD THEM

14  SAFELY ON CD BUT THE MAIN MACHINE WON'T BE BACK UNTIL

15  TOMORROW.

16              EXHIBIT 3, TAB M.

17              PEI, PAGE 1, 11 A.M., MAY 3RD, I'LL SEND THE OTHER

18  PICS FROM THIS COMPUTER.

19              SOSAD:  K.

20              SOSAD:  HE IS SO CUTE.

21              PEI:  THESE ARE LIKE WAY PRIVATE.  NO POST AND NO

22  SHARE, OKAY?  YEAH, I LOVE HIM A LOT -- SMILEY FACES.

23              SOSAD:   NEVER WILL.  THEY'RE IN MY PRIVATE AREA.

24              PEI:  THIS IS HIM ON MY LAPTOP.

25              SOSAD:  SMILEY FACE.
```

1              PEI:  THIS LAST ONE IS PRETTY CUTE AND TIMELY.

2              SOSAD:  HE IS SO SWEET AND CUTE.  YOU'RE LUCKY.

3    WITHOUT CLOTHES I BET IS CUTER THAN ME.

4              ARE YOU FAMILIAR WITH THIS EMOTICON?

5    A.    YES.  THE TONGUE STICKING OUT.

6    Q.    A FACE WITH A TONGUE STICKING OUT OF THE MOUTH?

7    A.    YES.

8    Q.    PEI:  I DOUBT THAT BUT WE'RE GOING TO SEE.

9              SOSAD:  HEHEHE.  THINK HE WILL LET YOU?

10             PEI:  THAT COULD BE A SHOT OF YOUR CUM IN HIS

11   MOUTH.  HEHEHE.

12             PEI:  YES, I THINK HE'S GAY AND WANTS TO DO IT.

13             ARE THERE OTHER CHATS IN EXHIBIT 3 WHERE THE

14   DEFENDANT REFERS TO THE SAME PICTURES THAT HE TOOK?

15   A.    YES.

16   Q.    REFERRING TO TAB E, PAGE 1, BEGINNING AT 11:24 A.M.

17             EXSELL:  WHAT THE HELL WAS THAT IN HIS MOUTH?

18             PEI:  HEHEHE.  A JAW BREAKER.

19             EXSELL:  CUTE, VERY CUTE.

20             PEI:  HEHE.

21             EXSELL:  AND WHO IS HE?

22             PEI:  MY LITTLE 10-YEAR-OLD SWEETIE IN LAS VEGAS

23   THAT I TOLD YOU ABOUT.

24             PEI:  CALEB.

25             EXSELL:  SWEETIE IS RIGHT.

```
1              PEI:  HEHEHE.  WE LOVE EACH OTHER A LOT.

2              EXSELL:  THAT'S WONDERFUL.  I WOULD SURE LOVE HIM A

3    LOT, TOO.

4              PEI:  HE LOVES TO POSE.

5              DOES THE DEFENDANT HEREAFTER REFER TO TAKING

6    PICTURES WITH A FUJI 2400 ZOOM CAMERA?

7    A.   YES.

8              MR. AKROTIRIANAKIS:  AND WITH THE COURT'S

9    PERMISSION, I WOULD REQUEST TO PUBLISH EXHIBIT 89.

10             THE COURT:  GO AHEAD.

11   BY MR. AKROTIRIANAKIS:

12   Q.   AGENT BROWN, ARE YOU FAMILIAR WITH THIS PHOTO OF A CHILD

13   WITH A JAW BREAKER IN HIS MOUTH THAT WAS RECOVERED FROM THE

14   DEFENDANT'S COMPUTER?

15   A.   YES, I AM.

16   Q.   AND DOES THAT CHILD, IN YOUR EXPERIENCE TO WHICH YOU

17   TESTIFIED YESTERDAY, APPEAR TO YOU TO BE APPROXIMATELY

18   10 YEARS OF AGE?

19   A.   YES.

20   Q.   ARE YOU FAMILIAR WITH OTHER CHATS BETWEEN THE DEFENDANT

21   AND EXSELL WHEREIN HE REFERS TO HIS 10-YEAR-OLD SWEETIE IN

22   LAS VEGAS AND TAKING PICTURES OF THAT CHILD?

23   A.   WITH EXSELL?

24   Q.   YES.  I'M REFERRING TO EXHIBIT E, PAGES 1 AND 2.

25   A.   YES.
```

1    Q.   I'LL READ FROM THE DOCUMENT, PAGE 2, MAY 3RD, 2001,

2    11:38 A.M.

3              DID YOU SEE THE SHOT WHERE HE TRIES TO LOOK LIKE A

4    GIRL?  PEI.

5              EXSELL:  NO -- FROWNING FACE.  BOY, THAT WOULD HAVE

6    BEEN A GOOD PIC AT THE LAPTOP IF HE WAS STANDING OR KNEELING

7    THERE.

8              WITH THE COURT'S PERMISSION, I WOULD REQUEST TO

9    PUBLISH EXHIBIT 88.

10             THE COURT:  GO AHEAD.

11   BY MR. AKROTIRIANAKIS:

12   Q.   PEI:  IN THIS PIC HE WAS TRYING TO LOOK LIKE A GIRL.

13             EXSELL:  WHAT YOU WERE GOING TO DO PROBABLY WASN'T

14   THE MINOR INTERFERENCE.

15             PARDON ME.

16             PEI:  11:40 A.M., MAY 3RD, 2001.

17             YEAH, WE THOUGHT WE WERE GOING --

18             MR. AARON:  I'M SORRY TO INTERRUPT.  YOUR HONOR, IF

19   I COULD FIND OUT WHAT EXHIBIT THAT COUNSEL IS REFERRING FROM.

20             THE COURT:  EXHIBIT 88.

21             MR. AARON:  THANK YOU.

22             MR. AKROTIRIANAKIS:  EXHIBIT 3, TAB E, PAGE 2.

23             PEI:  YEAH, WE THOUGHT WE WERE GOING TO BE TOGETHER

24   ALL NIGHT, BUT THERE WAS SOME MINOR INTERFERENCE AND IT HAD

25   TO WAIT UNTIL NEXT TIME -- FROWNING FACES.

1          EXSELL:  OH, DEAR, A MINOR INTERFERENCE COULDN'T BE

2    OVERCOME.

3          EARLIER YOU TESTIFIED TO PICTURES OF -- WITHDRAW

4    THAT, PLEASE.

5          REFERRING TO TAB M OF EXHIBIT 3, PAGE 2, IS THAT

6    CHILD THAT WE JUST SAW PICTURED IN EXHIBITS 88 AND 89, ARE

7    THE PICTURES THAT ARE DESCRIBED IN THE CHATS PICTURES OF THE

8    PERSON THE DEFENDANT REFERS TO AS CALEB?

9    A.   YES.

10   Q.   11:46 A.M.:  YOU WILL WHEN CALEB AND I START HAVING SEX.

11   HE LOVES TO POSE -- SMILEY FACES.

12         SOSAD:  THAT'S COOL.

13         PEI:  YEAH, HE'S A SWEET BOY.

14         SOSAD:  YOU'RE MOVING THOSE, RIGHT?

15         PEI:  HE STARTED OUR RELATIONSHIP.

16         ON THE NEXT PAGE -- IN THIS PIC -- PARDON ME, PAGE

17   3, 5/16, 8:56 P.M.

18         IN THIS PIC CALEB HAD JUST GOTTEN OFF MY LAP TO SEE

19   SOMETHING FOR A MINUTE.

20         ARE YOU FAMILIAR WITH A PICTURE THAT APPEARS TO

21   MATCH THAT DESCRIPTION --

22   A.   YES.

23   Q.   -- OF THE SAME CHILD?

24   A.   YES.

25         MR. AKROTIRIANAKIS:  MAY I PUBLISH, YOUR HONOR,

```
 1   EXHIBIT 94?

 2             THE COURT:  YOU MAY.

 3   BY MR. AKROTIRIANAKIS:

 4   Q.   I WILL CONTINUE TO READ FROM THE SAME PAGE.

 5             WE LOVE EACH OTHER COMPLETELY NOW.  HE'S HAVING A

 6   PROBLEM WITH ME LEAVING NOW.

 7             SOSAD:  FROWNING FACE.

 8             PEI:  HE'S ARRANGED A COUPLE OF DAYS AND A NIGHT

 9   FOR US ALONE IN THE FIRST WEEK OF JUNE.

10             SOSAD:  HE IS SO CUTE.  NEED SOME WITH LESS ONE.

11   HEHEHE.

12             PEI:  HEHE.  HE IS A CUTIE.  I MISSED A BUNCH OF

13   AWESOME SHOTS THAT DAY BECAUSE HIS MOM WAS NEAR.

14             SOSAD:  GEEZ, BUMMER.

15             PEI:  I'LL BE ABLE TO GET A LOT WHEN WE ARE

16   TOGETHER NEXT TIME.  CALEB LOVES TO HAVE HIS PICTURE TAKEN.

17             PEI:  YOU WANT TO SEE THE BOTTOM SHOT I TOOK A

18   SECOND LATER, CLOTHED, THOUGH?

19             MR. AKROTIRIANAKIS:  FOR THE RECORD, EXHIBIT 93 IS

20   ON THE SCREEN -- PARDON ME.  94 IS ON THE SCREEN.  WITH THE

21   COURT'S PERMISSION, MAY I PUBLISH EXHIBIT 93?

22             THE COURT:  YES, YOU MAY.

23   BY MR. AKROTIRIANAKIS:

24   Q.   PEI:  YOU WANT TO SEE THE BOTTOM SHOT I TOOK A SECOND

25   LATER, CLOTHED, THOUGH?
```

```
 1              LATER DOWN THE PAGE, LAST ENTRY.

 2              WE'VE BECOME INSEPARABLE.  YOU WANT TO SEE THE

 3   SECOND SHOT I TOOK BEFORE HE SAT BACK DOWN IN MY LAP.

 4              GOING OVER TO THE TOP OF THE NEXT PAGE.

 5              PEI, 9:56:  HEHEHE.  I LOVE HIM SO MUCH.

 6              SOSAD:  WONDER WHAT HE HAS UNDERNEATH ALL THOSE

 7   CLOTHES.

 8              PEI:  IF WE'RE ON SOMETIME WHEN HE'S WITH ME, I'LL

 9   HAVE HIM CHAT WITH YOU IF YOU WANT.  I PLAN TO FIND OUT SOON.

10   I THINK HE'S TOTALLY GAY AND HAS AN INTERESTING NIGHT PLANNED

11   FOR US.

12              ARE YOU FAMILIAR WITH NG'S?

13   A.   YES.

14   Q.   WHAT ARE NG'S?

15   A.   NEWS GROUPS.

16   Q.   EXHIBIT 3, TAB N, MAY 20, 7:20 P.M., PAGE 40.

17              PEI:  THAT'S TOO BAD.  HAVE YOU GOTTEN TO THE NG'S

18   THROUGH MAILING LIST?

19              CROW18:  YES, BUT I COULD NEVER FIND ANYTHING

20   GOOD.

21              PEI:  NO FUCKING AND SUCKING?

22              CROW18:  NOT THAT I SAW.  IT WAS ALL SPLIT VID

23   SHIT.

24              DO YOU KNOW WHAT SPLIT VID IS?

25   A.   NO, NOT EXACTLY.
```

1          THE COURT:  YOU NEED TO KEEP YOUR VOICE UP.

2          THE WITNESS:  I WOULD BE INFERRING, SPLICE OF VIDS.

3    BY MR. AKROTIRIANAKIS:

4    Q.   PEI:  YOU CAN MAKE IT FULL SCREEN.

5          CROW18:  NO, I MEAN SPLIT VID LIKE YOU HAVE TO JOIN

6    IT.

7          PEI:  HEHEHE.  I MISSED WHAT YOU SAID.  JUST

8    DOWNLOAD THE PIECES AND THEN COMBINE THEM.

9          IN EXHIBIT 3 DOES THE DEFENDANT REFER TO SOFTWARE

10   OR OTHER COMPUTER CAPABILITY THAT ALLOWS YOU TO COMBINE

11   VIDEOS TOGETHER?

12   A.   YES.

13   Q.   IN THE MANNER DESCRIBED HERE IN THE CHAT I JUST READ?

14   A.   YES.

15   Q.   EXHIBIT 3, TAB P, PAGE 30, HERE, IS THE DEFENDANT HAVING

16   A CHAT WITH A PERSON USING THE SCREEN NAME

17   PUF-THE-MAGIC-DRAGON, BASED ON YOUR REVIEW OF THE ENTIRE

18   EXHIBIT AND THE EVIDENCE IN THIS CASE?

19   A.   YES.  I REVIEWED THIS.

20   Q.   5/21, 9:09 P.M.:  HEHEHE.  YES, I WAS JUST TALKING ABOUT

21   MOVING TO RUSSIA SO I CAN GET RUSSIAN BOYS TO LAY ON TOP OF

22   ME IN THE EVENT SOMETHING BAD HAPPENS.  GOOD PROTECTION.

23          PEI:  YEAH, AND IF FOSSI HAS TO TAKE A PISS, NO

24   PROBLEM -- SMILEY FACES.

25          PUF:  YOU GOT IT.  I WOULDN'T MIND A BIT.

1          PEI:  HEHEHEHE.  THAT LITTLE SLUT'S PISS IS

2   PROBABLY AS NICE AS HE IS.  DID YOU SEE THE VID OF HIM

3   PISSING ON THE BOY TIED IN THE CHAIR?

4          PUFF:  UM, YOU BET I DID.  I TRY NOT TO MISS SHORT

5   MOVIES, ESPECIALLY OF HIM.  IT WAS JUST A QUICKIE, RIGHT?

6          PEI:  I JUST SAW THE STILLS OF IT.

7          PUFF:  OH?  MAYBE I'LL HAVE TO SEE IF YOU CAN FIND

8   IT AGAIN.  I HAVEN'T SORTED THEM OUT BUT SHOULDN'T TAKE TOO

9   LONG.  IF I FIND IT, I'LL SEND.

10          PEI:  COOL.  THAT WOULD BE AWESOME.

11          ELSEWHERE IN EXHIBIT 3 DO THE DEFENDANT AND THE

12   PERSON USING THE SCREEN NAME STYX DISCUSS THE NEED FOR AN

13   EBERT & ROPER TYPE REVIEWING SYSTEM FOR CHILD PORNOGRAPHY

14   VIDEOS AND WEB SITES?

15   A.   YES, THEY DO.

16   Q.   REFERRING TO TAB Q, EXHIBIT 3, PAGE 12, PEI, 5/21,

17   9 P.M.:  YOU KNOW FREEMAN, RIGHT?

18          STYX:  YES, I DO.

19          PEI:  HE AND I WERE IN A HUGE ELECTRONICS COMPUTER

20   STORE ON SATURDAY AND I HAD A POWERFUL HIGH ENERGY LINK WITH

21   AN 11-YEAR-OLD THERE.  IT WAS SO STRONG THAT PAT WAS A LITTLE

22   AFFECTED BY IT.  HEHEHE.

23          STYX:  A GREAT FEELING, ISN'T IT?

24          PEI:  YEAH, IT'S PRETTY AWESOME WHEN IT HAPPENS.

25   HE WAS BEAUTIFUL.  AND IF I HAD A COUPLE OF DAYS WITH HIM, I

1    COULD HAVE MADE HIM AN INTERNATIONAL STAR -- SMILEY FACES.

2              STYX:  THAT GOOD HE WAS?

3              PEI:  WE WERE BOTH IN AGREEMENT ON THAT.

4              PEI:  TWO THUMBS UP.

5              STYX:  HEHE.  ONLY THUMBS -- SMILEY FACE.

6              PEI:  HEHEHE.  RAPID HEART BEAT.

7              STYX:  HEHE.

8              PEI:  VERY GOOD REVIEWS THAT WAY -- TWO SMILEY

9    FACES.

10             PEI:  TWO DICKS UP.  HEHEHE.  SOMEDAY WHEN THERE'S

11   THOUSANDS MORE VIDS OUT, THERE WILL HAVE TO BE GOOD CRITICS.

12             GOING OVER TO THE TOP OF THE NEXT PAGE.

13             STYX:  YES, BUT GOD WHAT A HARD JOB.  HEHE.

14             DO THEY THEREAFTER DISCUSS A PARTICULAR CHILD

15   PORNOGRAPHIC WEB SITE?

16   A.   YES, THEY DO.

17   Q.   PEI, 9:18 P.M.:  YOU KNOW THAT PRETTY BOY SITE IS CLOSE

18   TO GETTING THE TWO DICKS DOWN RATING IF IT KEEPS GOING THE

19   WAY IT'S BEEN.

20             STYX:  AND THE PICS YOU ASKED ABOUT, CARLOS, YES,

21   THAT IS HIM, WAS WHEN THEY WERE IN FIJI AFTER HIS HAIRCUT.

22   HEHE.

23             PEI:  COOL.  HE IS SUCH A CUTIE.  HE'S THE ONE THAT

24   ORIGINALLY CAPTURED MY INTEREST.

25             STYX:  YES, HE IS, AND HAS A SHY SIDE TO HIM.

```
 1              PEI:  BUT HE SEEMS NORMALLY TO BE VERY OPEN AND

 2     ENJOY MODELING THAT WAY.

 3              LOWER DOWN THE PAGE AT 9:26.

 4              PEI:  HOW COME THEY NEVER MADE A VID?  IT WOULD

 5     HAVE BEEN ADORABLE -- SMILEY FACES.

 6              REFERRING TO TAB T OF EXHIBIT 3, PAGE 9.

 7              NEO, 6:03:  OH, OKAY.  I SEE.  ANY NEW PICS?

 8              PEI:  ALWAYS.

 9              NEO:  COOL.  OF?

10              PEI:  YOU MEAN OF CALEB OR KALEN?

11              NEO:  YEAH.

12              DO NEO AND PEI GO ON TO DESCRIBE THE DEFENDANT'S

13     RELATIONSHIP WITH KALEN?

14     A.   YES.

15     Q.   PAGE 10, NEO, 7:18 P.M.:  HAVE YOU GIVEN KALEN A DRY

16     ORGASM -- OPEN MOUTH SMILE?

17              PEI:  NO.

18              NEO:  BECAUSE YOU DON'T WANT TO OR HE DOESN'T WANT

19     TO?

20              NEO:  OR NOT HAVE CHANCE.

21              NEO:  HELLO.

22              PEI:  WE BOTH WANT TO AND, YES, THE LAST TIME WE

23     HAD THE GREAT OPPORTUNITY AND I WAS TOO CAUTIOUS.

24              NEO:  HOW ARE YOU GOING TO MAKE HIM CUM FOR HIS --

25              GOING OVER TO THE NEXT PAGE.
```

```
 1              -- FIRST TIME?

 2              NEO:  AND HOW DO YOU THINK HE WILL REACT?

 3              PEI:  THE ONLY WAY TO GET A SEVEN-YEAR-OLD TO DO

 4    IT.

 5              NEO:  WHICH IS?

 6              PEI:  HE WILL LOVE IT.

 7              NEO:  JUST COMPARING NOTES -- OPEN MOUTH SMILEY

 8    FACE.

 9              NEO:  HE'S A CUTIE.

10              PEI:  THESE MESSAGES ARE GOING THROUGH TOO SLOW.

11              NEO:  THE PROBLEM IS AT YOUR END, MATE.

12              NEO:  SO YOU INTEND TO GIVE KALEN A NICE CUM?

13              PEI:  YES, THAT'S TRUE.

14              FURTHER DOWN THE PAGE, 7:47.

15              PEI:  HE REALLY WANTS TO DO IT BUT IT'S SO

16    DANGEROUS IN THIS CASE.  I HAVE TO MAKE SURE HE CAN KEEP HIS

17    MOUTH SHUT ABOUT IT.

18              NEO:  YES, I HAVE THE SAME PROBLEM.

19              PEI:  AFTER THE FIRST TIME THE WORLD IS CHANGED AND

20    I HAVE TO ALSO HAVE TIME TO HELP HIM UNDERSTAND WHAT HAPPENED

21    AND HOW TO THINK IT.

22              ELSEWHERE IN THE SAME CHAT DO NEO AND THE DEFENDANT

23    DISCUSS NEWS GROUPS?

24    A.   YES.

25    Q.   PAGE 14, 5/21, 5:28 P.M.
```

```
 1              PEI:  THIS ICQ IS BEING SLOW AGAIN -- FROWNING

 2    FACE.

 3              NEO:  YES.

 4              PEI:  BUT I'M ON WITH MY FRIEND IN AUSTRALIA AND

 5    IT'S GOING THROUGH LIKE LIGHTNING.

 6              NEO:  HMM.

 7              PEI:  NOW IT'S A LITTLE FASTER, THOUGH.

 8              NEO:  YES, VERY STRANGE.

 9              PEI:  I WAS IN THE NEWS GROUP FOR A WHILE AND THAT

10    MAY HAVE PUT TOO MUCH BURDEN ON THIS HUNK OF CRAP.

11              NEO:  DOWNLOADING WHAT?

12              NEO:  VIDS AGAIN?

13              PEI:  YEAH, ANDY.

14         HAVE YOU SEEN REFERENCES IN YOUR REVIEW OF THE

15    CHATS, EXHIBITS 1, 2 AND 3, TO CHILD PORNOGRAPHY PICTURES OR

16    FILMS IN THE ANDY SERIES?

17    A.   YES.

18    Q.   NEO:  COOL.  YOU WILL HAVE TO SEND ME A FEW SOMETIME.

19              NEO:  YOU COULD ALWAYS SHARE YOUR MAIL AND NEWS

20    USER NAME SLASH PASSWORD WITH ME -- OPEN MOUTH SMILING FACE.

21              PEI:  SOUNDS GOOD.  WHEN I GET A HIGH-SPEED

22    CONNECTION MAYBE WE CAN TRADE A FEW.

23         DO NEO AND THE DEFENDANT IN THE SAME CHAT DISCUSS

24    SPANKING KALEN?

25    A.   YES.
```

1   Q.   PAGE 5, 4:34 P.M.:  OPEN MOUTH SMILE.

2           NEO:  HE DOESN'T LIKE SPANKING 'CAUSE HE ONLY GETS

3   THEM WHEN HE'S NAUGHTY.

4           PEI:  KALEN LIKES THEM NOW -- SMILEY FACES.

5           AGENT BROWN, BASED ON YOUR TRAINING AND EXPERIENCE

6   AND YOUR INVOLVEMENT IN VARIOUS CHILD EXPLOITATION

7   INVESTIGATIONS, IS SPANKING CONSISTENT WITH GROOMING

8   BEHAVIOR?

9   A.   YES, IT IS.

10  Q.   PEI:  KALEN LIKES THEM NOW.  HE USUALLY WANTS A FEW

11  WHACKS, THREE OR FOUR TIMES A DAY.

12          NEO:  HAHAHA.

13          GOING OVER TO THE NEXT PAGE, 6.

14          PEI:  ONE EVENING WE WERE SCREWING AROUND AND HE

15  NAILED MY BUTT AND LAID ON HIS BACK.  SO I PULLED OUT MY NICE

16  LEATHER BELT AND HE STARTED REALLY LAUGHING AND HIDING HIS

17  BUTT AND I PULLED HIS BUTT INTO RANGE AND GAVE IT A LITTLE

18  TAP.  HE LOVED IT.

19          NEO:  COOL -- OPEN MOUTH SMILEY FACE.

20          PEI:  BUT HE KNOWS I WOULD NEVER DO IT AS

21  PUNISHMENT.

22          THE COURT:  ALL RIGHT.  IS NOW A GOOD BREAKING

23  POINT?

24          MR. AKROTIRIANAKIS:  I HAVE ONE MORE IN THIS AREA,

25  YOUR HONOR.  MAY I READ THAT ONE?

1            THE COURT:  GO AHEAD.

2   BY MR. AKROTIRIANAKIS:

3   Q.   IN EXHIBIT 3 I'M SPECIFICALLY REFERRING TO TAB V ALSO ON

4   THE TOPIC OF CHILD PORNOGRAPHY POSSESSION AND DISTRIBUTION.

5   DO THE DEFENDANT AND A CHATTER USING THE SCREEN NAME

6   FOREVERKIN DISCUSS THE PRODUCTION OF CHILD PORNOGRAPHY

7   VIDEOS?

8   A.   YES.

9   Q.   TAB V, PAGE 3, 5:08 P.M.

10            PEI:  COOL.  THEN IF YOU CAN GET YOUR HAND OFF YOUR

11   DICK LONG ENOUGH TO SEND ME SOME COPIES, IT WOULD BE

12   AWESOME -- SMILING FACES.

13            FOREVERKIN:  YEAH, OR MAYBE YOU CAN CUM AND WIZIT

14   AND WE CAN SEE THEM TOGETHER WITH SOME SMALL COMPANY.

15            PEI:  THAT WOULD BE GREAT.  AND MAYBE I COULD BRING

16   THE MOVIE CAMERA AND DO A FEW VIDS -- SMILEY FACES.

17            FOREVERKIN:  OH, I WILL BE BEHIND THE CAMERA THEN

18   AND YOU CAN ACT.

19            PEI:  WE CAN TAKE TURNS.  I ALSO WANT TO WRITE

20   SCRIPTS.

21            FOREVERKIN:  SCRIPTS, I LIKE TO IMPROVISE.

22            PEI:  YOU DO, BUT BOYS DON'T HAVE ANYTHING MUCH TO

23   SAY AND NEED SOMETHING TO GO BY.

24            FOREVERKIN:  OH, MAYBE SO.  WE USED HAVE TO GO BY

25   HAND.  SO --

1          GOING OVER TO THE TOP OF THE NEXT PAGE.

2          -- WHAT WOULD BE YOUR FAVORITE SCENARIO?

3          PEI:  AN 11-YEAR-OLD IN A MINI-SKIRT BEING FISTED

4    BY A SIX-YEAR-OLD.

5          THE COURT:  IS NOW A GOOD BREAKING POINT?

6          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THANK YOU.

7          THE COURT:  ALL RIGHT.  THANK YOU, LADIES AND

8    GENTLEMEN.  WE'LL TAKE AN HOUR AND 15 MINUTES FOR LUNCH

9    TODAY.

10         AND AGAIN, PLEASE REMEMBER WHAT I TOLD YOU BEFORE,

11   DON'T DISCUSS THE CASE.  DON'T DISCUSS ANY OF THE EVIDENCE

12   THAT YOU'VE SEEN OR HEARD THROUGHOUT THE TRIAL.  DON'T

13   DISCUSS ANY OF THE PARTICIPANTS.  DON'T MAKE UP YOUR MIND

14   ABOUT THE CASE OR FORM ANY OPINIONS ABOUT THE CASE OR ANY OF

15   THE EVIDENCE IN THE CASE.  THANK YOU VERY MUCH FOR YOUR

16   ATTENTION TODAY AND WE'LL SEE YOU BACK AT 1:15.  YOU ARE

17   EXCUSED.

18         (OUTSIDE THE PRESENCE OF THE JURY:)

19         THE COURT:  YOU MAY STEP DOWN.

20         EITHER SIDE HAVE ANYTHING TO TAKE UP?

21         MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  JUST AS AN

22   UPDATE TO THE COURT ON WHERE I'M AT, I AM VERY NEARLY DONE.

23   I THINK IN ANOTHER 20 MINUTES I WOULD BE.  I'M SORRY THAT

24   IT'S GONE SLOW.  I'VE HAD TO SLOW DOWN, AT LEAST I THOUGHT

25   SO, AND MY CO-COUNSEL HAS REMINDED ME, TOO.  THERE'S JUST A

1   FEW MORE.

2            THE COURT:  ALL RIGHT.  WELL, THE GOVERNMENT STILL

3   THINKS IT WILL REST AT THE END OF THE DAY TODAY?

4            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

5            THE COURT:  BY THE WAY, DOES THE GOVERNMENT -- YOU

6   JUST INTEND TO USE A CLERK'S VERDICT?

7            MR. AKROTIRIANAKIS:  A GENERAL VERDICT.

8            THE COURT:  A GENERAL VERDICT.

9            MR. MICHAEL:  YOUR HONOR, CAN WE CONSULT DURING THE

10  LUNCH AND LET YOU KNOW ABOUT THAT, PLEASE?

11           THE COURT:  YES.  THANK YOU.  WE ARE IN RECESS.

12                    (RECESS)

13           THE COURT:  GOOD AFTERNOON.  LET THE RECORD

14  REFLECT ALL MEMBERS OF THE JURY, COUNSEL AND DEFENDANT ALSO

15  PRESENT, AND THE WITNESS ON THE WITNESS STAND.

16           AND YOU MAY RESUME.

17           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

18  BY MR. AKROTIRIANAKIS:

19  Q.   AGENT BROWN, I DIRECT YOUR ATTENTION TO -- I'M ACTUALLY

20  GOING TO GO BACK AND JUST ASK YOU A COUPLE OF QUESTIONS THAT

21  I INTENDED TO ASK YOU IN REGARD TO EXHIBIT 1.  YOU'RE FREE TO

22  REFER TO THE DOCUMENT, BUT IF YOU CAN SEE IT ON THE OVERHEAD

23  PROJECTOR AS I PUT THE PAGES UP, I WILL -- LET ME KNOW IF YOU

24  CAN'T SEE IT, OKAY?

25           REFERRING TO EXHIBIT 1, TAB D, IN THE PAGE 152 TO

1   166, DOES THE DEFENDANT IN HIS CHATS WITH SETH BEKENSTEIN

2   DISCUSS HIS AGE PREFERENCE FOR CHILDREN TO HAVE SEX WITH?

3   A.   YES.

4   Q.   10:26 P.M., 12/30/00.

5          BOYSAN1:  THAT'S THE BOTTOM LINE, BUT SINCE I'M

6   ONLY SEXUALLY ATTRACTED TO PEOPLE UP TO 14, EVEN SHIT EATERS

7   AND MURDERERS AND REPUBLICANS CAN CONDEMN MY ACTIVITY WITH

8   THEM.

9          LATER DOWN THE PAGE.

10          BOYSAN1:  HEHEHE.  NEW YORKERS LOVE CHILD SEX.

11   HEHEHEHE.

12          BOYSAN1:  WE'RE THE CLOSEST TO IT, NEXT TO THE

13   BRITISH WHO GOT IT FROM SOME OF THE EXPERTS IN IT, THE

14   ROMANS.  WHAT PARTIES THEY HAD.  HEHEHEHE.

15          BOYSAN1:  SO WHAT DO YOU THINK OF THE OLDER BOY IN

16   THAT PIC?

17          DR DOOM:  HE'S VERY CUTE.  I WOULD DO HIM IN A

18   SECOND.

19          TAB U OF EXHIBIT 1, THE PAGE THAT INCLUDES

20   12/26/2000 AT 1:16 A.M., FLAGGWIZAR APPEARS TO BE CHATTING

21   WITH RWP, JOHN, AND SETH BEKENSTEIN; IS THAT CORRECT?

22   A.   YES.

23   Q.   AND THEY REFERENCE STILL LOOKING FOR THAT SPECIAL ONE,

24   YOU KNOW, WITH THE TWO BOYS FROM KDB18.  YOU GOT THAT?

25          AGENT BROWN, ARE YOU FAMILIAR WITH KDB18?

1    A.    YES.

2    Q.    WHAT IS KDB18?

3    A.    KDB IS RUSSIAN FLOWERS CHILD PORNOGRAPHY.

4    Q.    AND THE FINAL REFERENCE HERE, Y.   IN EXHIBIT 1, THE SETH

5    BEKENSTEIN CHATS, DOES HE DISCUSS THE DISTRIBUTING OF A

6    VIDEOTAPE OF PORNOGRAPHY TO THE DEFENDANT?

7    A.    YES.

8    Q.    I'LL JUST SHOW YOU THE LAST PART OF THE REFERENCE.   IT'S

9    THE PAGE IN EXHIBIT Y THAT'S DECEMBER 30, 2000, 4:34 P.M.

10           PEI:   NO, IN THE LITTLE TOWN UP HERE CLOSE TO ME.

11   THANKS FOR THE TAPE.

12           IS THAT PART OF THE DISCUSSION WHERE THEY TALK

13   ABOUT SETH BEKENSTEIN SENDING THAT VIDEO OR A VIDEO TO THE

14   DEFENDANT?

15   A.    YES, IT IS.

16   Q.    NOW, RETURNING TO THE DEFENDANT'S CHATS FROM HIS OWN

17   COMPUTER, DO THESE CHATS INCLUDE REFERENCES TO KALEN?

18   A.    YES.

19   Q.    TAB F, EXHIBIT 3, PAGE 1, 2:06 P.M.

20           PEI:   HEHEHE.   NOT YET.   I'M JUST SETTING UP

21   SECURITY INTO THIS MACHINE.   I JUST LOADED BESTCRYPT AND MADE

22   A ONE-GIG CONTAINER.

23           DANIEL:   ONE GIG IS ENOUGH FOR ONE MONTH?

24           PEI:   HEHEHE, YEAH.   BUT I JUST USE THIS MACHINE

25   WHEN I TRAVEL AND SHOW MY SEVEN-YEAR-OLD BOYFRIEND SOME PICS

1    AND VIDS -- SMILEY FACES.

2              DANIEL:  WHAT KIND OF PICTURES FOR A

3    SEVEN-YEAR-OLD?  HE WANTS THEM NAKED AND AROUSE THEM.  ARE

4    YOU READY TO SHOW THIS TO HIM?

5              PEI:  I GOT CUT OFF.  I SHOW HIM SOFT PORN PICS.

6    NO HARD CORE UNTIL HE'S SEVEN.  HE'S A VERY HORNY

7    SEVEN-YEAR-OLD AND WOULD GET IN YOUR PANTS IN 20 MINUTES.

8    HEHEHE.

9              DANIEL:  OKAY.  NO HARD CORE, I AGREE, BUT NAKED

10   BOYS WITH STIFFIES, YOU SHOULD LET HIM SEE.

11             DANIEL:  I HAVE MY EXPERIENCE WITH SEVEN-YEAR-OLDS.

12   I KNOW HOW EAGERLY DOES WANT TO SEE AND TOUCH.

13             DANIEL:  WITH A 16.5-YEAR-OLD NOTHING STOPS THEM.

14             PEI:  HEHEHE.  HE WOULD HAVE FUN WITH YOU.

15             DANIEL:  SURE HE WOULD AND ME, TOO.

16             PEI:  HE MIGHT WANT YOU TO LICK HIS BUTT, THOUGH,

17   AND HE LIKES TO SPANK -- SMILEY FACES.

18             DANIEL:  CAN ONLY BE FUN SPANKING FOR ME.  I WOULD

19   LICK HIS BUTT.

20             GOING OVER TO THE TOP OF THE NEXT PAGE.

21             PEI:  YUM, YOU DIRTY BOY, HEHEHE.  HE ONLY LIKES

22   FUN ONCE.  I'M GOING TO TRY AND GET SOME CLOSE-UPS OF HIS

23   BUTT AND CROTCH IN A COUPLE WEEKS.

24             DANIEL:  DO SO.  HE WILL LOVE TO BE PICTURED.

25             ARE THERE OTHER REFERENCES TO THE DEFENDANT'S

1    VISITS WITH KALEN IN EXHIBIT 3?

2    A.   YES .

3    Q.   TAB E, PAGE 27, PEI, 5/19, 8:33 A.M.:   I'M SEEING KALEN

4    IN A FEW DAYS.

5            IS THAT ONE SUCH REFERENCE, AGENT BROWN?

6    A.   YES, IT IS.

7    Q.   AND ARE THERE OTHERS?

8    A.   YES.

9    Q.   NOW IN THAT 5/19 AND THEREABOUTS, "I'M SEEING KALEN IN A

10   FEW DAYS," DOES THE DEFENDANT LATER IN THE SAME EXHIBIT REFER

11   TO WHETHER OR NOT HE ACTUALLY GOT TO SEE KALEN ON THAT

12   OCCASION?

13   A.   YES, HE DOES.

14   Q.   AND DID HE GET TO?

15   A.   NO, HE DID NOT.

16   Q.   PAGE 32, TAB P.

17           MR. AARON:   EXCUSE ME, YOUR HONOR.   IS THAT 3, P?

18   BY MR. AKROTIRIANAKIS:

19   Q.   EXHIBIT 3, TAB P, PAGE 32, 6:43 P.M.

20           PEI:   I HAVE TO LOG OFF FOR A WHILE WHILE I MAKE A

21   CALL.   BE BACK IN A WHILE.

22           PUF:   HUGS.   YOU HAVE A GOOD TIME.   I SHOULD BE

23   HERE WHEN WE GET BACK.

24           PEI:   NO, IT WON'T BE A GOOD TIME.   I GOTTA TELL

25   KALEN I CAN'T BE THERE TOMORROW -- FROWNING FACES.

```
 1              AND LATER DOWN THE PAGE.
 2              PEI:  THANKS.  I TOLD HIM THAT I SHOULD BE ABLE TO
 3    BE THERE IN JULY.
 4              AGENT BROWN, ARE THERE REFERENCES TO THE
 5    DEFENDANT'S RELATIONSHIPS WITH OTHER CHILDREN IN HIS CHATS,
 6    EXHIBIT 3?
 7    A.   YES, THERE ARE.
 8    Q.   TAB A OF EXHIBIT 3, PAGE 4, SECOND TO THE LAST ENTRY ON
 9    THE PAGE.
10              PEI:  I SPENT THE WHOLE DAY WITH MY 10-YEAR-OLD
11    CUTIE.
12              JEREMIAH:  AWESOME.  CALEB?
13              GOING OVER TO THE TOP OF THE NEXT PAGE.
14              PEI:  NO, KALEN.  KALEN IS SEVEN.
15              JEREMIAH:  COOL.
16              PEI:  HE'S EXTREMELY CUTE -- SMILEY FACES.
17              JEREMIAH:  COOL.  WHAT DID YOU DO?
18              PEI:  PLAYED COMPUTER GAMES, WENT TO A HUGE FUN
19    ZONE.
20              JEREMIAH:  COOL.  AWESOME.  AT THAT AGE HE DOESN'T
21    CARE HOW HE DRESSED.
22              PEI:  K.
23              JEREMIAH:  ICQ FILE COMING.
24              PEI:  HEHEHE.  COOL PIC.
25              IN THIS -- DOES THIS CHAT CONTINUE ON TO MAY 15,
```

1    2000 -- I'M SORRY, 2001?

2    A.    APRIL 15TH.

3    Q.    4/15 OR APRIL 15, 2001.

4    A.    YES.

5    Q.    IS THAT PART OF THIS CHAT?

6    A.    YES, IT IS.

7    Q.    AND DO THE CHATTERS, JEREMIAH AND PEI, REFER TO THE FACT

8    HAPPY EASTER GREETINGS TO EACH OTHER, ET CETERA?

9    A.    YES, THEY DO.

10   Q.    HAVE YOU DONE ANY RESEARCH, CHECKED THE CALENDARS OR

11   ALMANACS TO DETERMINE WHAT THE DATE OF EASTER WAS IN 2001?

12   A.    YES.

13   Q.    AND WAS IT THE DATE THAT THEY'RE REFERRING TO EASTER?

14   A.    YES, SUNDAY, APRIL 15TH.

15   Q.    DID THEY REFER TO -- DOES THE DEFENDANT REFER TO NOT

16   BEING ABLE TO SPEND TIME WITH THE 10-YEAR-OLD BOYFRIEND

17   BECAUSE THE BOYFRIEND IS GOING TO CHURCH AND LOOKING FOR

18   EASTER EGG HUNTS AND SO ON AND SO FORTH?

19   A.    YES.

20   Q.    SAME EXHIBIT IN TAB -- I'M SORRY, AND EXCERPTS, PAGE 6,

21   PAGE 5 AT THE BOTTOM READS PEI:  COOL.  ARE YOU DOING

22   ANYTHING SPECIAL FOR THE DAY?  HAPPY EASTER, BY THE WAY.

23           JEREMIAH:  NOTHING, JUST CHURCH.

24           PEI:  COOL.  DID YOU GO ALREADY?

25           JEREMIAH:  YES.

1          PEI:  HOW WAS IT?  DID YOU HAVE ANY FANTASIES?

2          PEI:  I DON'T CARE FOR IT TODAY BECAUSE IT'S

3     SEPARATED ME AND MY 10-YEAR-OLD FRIEND FOR THE DAY --

4     FROWNING FACE.

5          JEREMIAH:  HUH.

6          JEREMIAH:  I SEE, YES.

7          PEI:  HE HAD TO GO TO CHURCH AND AN EGG HUNT.

8          AND LATER DOWN THE PAGE, 9:39.

9          PEI:  HE'S THE ONLY 10-YEAR-OLD IN MY LIFE

10    CURRENTLY.

11         9:40:  HE TRIED TO LOOK LIKE A GIRL WHEN I WAS

12    TAKING PICS OF HIM ON FRIDAY.

13         9:41:  I WILL TEACH HIM KISS THE NEXT TIME.

14         JEREMIAH:  HE WILL LOVE THAT.

15         PEI, 9:44:  MAYBE A FEW TAPS ON THE BUTT SOON.

16         JEREMIAH:  COOL.  HE NEEDS A LITTLE.

17         PEI:  HEHEHE.  WOULD YOU LIKE TO LICK A 10-YEAR-OLD

18    CUTIE'S BUTT A LITTLE?

19         JEREMIAH:  YES, I WAS THINKING THAT.

20         ARE THERE OTHER CHATS INVOLVING THIS 10-YEAR-OLD

21    BOYFRIEND?

22    A.   YES, THERE ARE.

23    Q.   AND DOES THE DEFENDANT REFER TO TAKING PICTURES OF THE

24    CHILD?

25    A.   YES.

1    Q.   TAB 3 OF EXHIBIT 3, PAGE 1, IS THIS A CHAT INVOLVING

2    CALEB OR REFERRING TO CALEB, AGENT BROWN?

3    A.   YES.

4    Q.   DOES THE DEFENDANT IN THIS CHAT REFER TO TAKING PICTURES

5    OF THE CHILD?

6    A.   YES.

7    Q.   DOES HE DISTRIBUTE THEM TO EXSELL?

8    A.   YES.

9    Q.   AND DOES HE INDICATE WHAT TYPE OF CAMERA HE'S USING TO

10   TAKE THE PICTURES?

11   A.   YES, HE DOES.

12   Q.   READING FROM 11:37, MAY 3RD, 2001.

13        PEI:  A FUJI 2400 ZOOM.

14        IS THAT ANOTHER SUCH REFERENCE -- I'M SORRY.  IS

15   THAT THE REFERENCE TO THE TYPE OF CAMERA?

16   A.   YES.

17   Q.   IN HIS INSTANT MESSAGE CHATS, EXHIBIT 3, DOES THE

18   DEFENDANT DISCUSS ENCRYPTION METHODS AND OTHER METHODS OF

19   AVOIDING DETECTION AND PROSECUTION OF POSSESSION OF CHILD

20   PORNOGRAPHY?

21   A.   YES, HE DOES.

22   Q.   DOES HE REFER TO THE USE OF A PROGRAM CALLED NEOTRACE?

23   A.   YES.

24   Q.   AND NEOWATCH?

25   A.   YES.

1    Q.    EXHIBIT 3, EXCERPT C, PAGE 5, IS THIS A CONVERSATION

2    BETWEEN THE DEFENDANT AND PONY CONCERNING NEOTRACE AND

3    NEOWATCH?

4    A.    YES, IT IS.

5    Q.    PEI, 11:44 P.M:  NOTHING GETS PAST NEOWATCH.  AND WHEN

6    SOMEONE IS APPROACHING YOUR COMPUTER IT SHOWS THEIR IP ADDY

7    BEFORE THEY ARRIVE.

8          WHAT'S ADDY?

9    A.    ADDRESS.

10   Q.    AND THAT WAS AN ENTRY BY PEI; IS THAT CORRECT?

11   A.    YES.

12   Q.    DOES THE DEFENDANT IN HIS CHATS, EXHIBIT 3, REFER TO

13   PLACING HIS -- PLACING PICS ON EXTERNAL HARD DRIVE?

14   A.    YES, HE DOES.

15   Q.    EXHIBIT 3, TAB G, PAGE 12, DOES HE ALSO REFER TO THE

16   UNSENSORED NEWS WEB SITE THAT YOU PREVIOUSLY TESTIFIED TO?

17   A.    YES.

18   Q.    PAGE 12, INCOGNITO, 7:44 P.M.:  YOU WILL THEN TYPE IN

19   MULTIMEDIA.UNSENSORED-NEWS.COM AND GIVE IT A NAME OF UMMM.

20          PEI:  THAT'S THE ONE.

21          PEI:  COOL.  THANKS HEAPS.

22          PEI:  IT'S A NIGHT OF WEIRDNESS.  I CAN'T SEEM TO

23   BE ABLE TO SAVE ANY VIDS IN A FORMAT THAT THEY CAN BE

24   VIEWED.

25          INCOGNITO3:  ARE YOU DOWNLOADING THE PICS AND THEN

1    JOINING THEM?

2          PEI:  I KNOW HOW TO DO THAT.  I'VE BEEN DOING IT

3    FOR MONTHS.  NOW WITH THIS LAPTOP I DON'T GET AN ARROW CURSOR

4    AND WHEN I RIGHT CLICK ON A PIECE NAME, IT COPIES IN SOME

5    STRANGE FORMAT I NEVER SAW BEFORE.

6          AND THEN LATER IN THE SAME CHAT DOES THE DEFENDANT

7    REFER TO PC HOUSE CLEANING?

8    A.    YES.

9    Q.    I'M SORRY, DO THE CHATTERS, THE DEFENDANT AND

10   INCOGNITO3, REFER TO PC HOUSE CLEANING?

11   A.    YES, THEY DO.

12   Q.    TOP OF PAGE 13, MAY 19, 7:34 P.M.

13         PEI:  HEHEHE.  I HAD TOO MUCH LAYING AROUND, TOO.

14   THAT'S WHY I'M GOING TO PUT EVERYTHING IN THE EXTERNAL HARD

15   DRIVE CONTAINERS.

16         IS THAT ONE OF THE REFERENCES TO EXTERNAL HARD

17   DRIVE CONTAINERS?

18   A.    YES.

19   Q.    DOES THE DEFENDANT REFER TO KEEPING IMAGES IN A

20   BESTCRYPT CONTAINER WITH A PASSWORD?

21   A.    YES, HE DOES.

22   Q.    AND DOES HE GIVE INSTRUCTIONS TO ANOTHER CHATTER,

23   CROW18, ON HOW TO ENCRYPT FILES?

24   A.    YES, HE DOES.

25   Q.    EXHIBIT 3, TAB N, PAGE 44, 11:12 A.M.

```
 1                PEI:  SO YOU SHOULD CHOOSE -- SO YOU SHOULD DO THE
 2     BESTCRYPT WHILE I'M HERE.
 3                CROW18:  OKAY.
 4                PEI:  HOW'S IT GOING?
 5                CROW18:  INSTALLED.  JUST NEED INSTRUCTIONS ON WHAT
 6     TO DO NOW.
 7                PEI:  GO TO THE BESTCRYPT CONTROL PANEL.
 8                NEXT PAGE.
 9                CROW18:  OKAY.
10                PEI:  CLICK CONTAINERS.
11                PEI:  CONTAINER.
12                PEI:  CLICK NEW.
13                CROW18:  OKAY.
14                PEI:  GIVE IT A NAME LIKE PRIVATE OD, FUCK YOU, OR
15     SOMETHING -- SMILEY FACES.
16                CROW18:  OKAY.
17                PEI:  SIZE 2 GIGABYTES.
18                CROW18:  OKAY.
19                PEI:  ALGORITHM 2 FISH.
20                LOWER DOWN THE PAGE.
21                PEI:  IS THE LITTLE BOX TO THE RIGHT CHECKED?
22                PEI:  THE ONE THAT SAYS FILL CONTAINERS?
23                CROW18:  YES.
24                DOES THE DEFENDANT HEREAFTER REFER TO DIFFERENT
25     PASSWORDS?
```

1    A.    YES.

2    Q.    PEI, 11:56:  YOU ALSO HAVE TO HAVE THE MOTHER OF ALL

3    PASSWORDS READY TO INPUT, ONE YOU WON'T EVER FORGET AND CAN'T

4    BE CRACKED.  MIX LETTERS AND NUMBERS, MAYBE A LITTLE LINE YOU

5    HAVE MEMORIZED.

6              PEI:  OKAY.  SO YOU'RE READY TO FORMAT IT.  CLICK

7    CREATE.

8              EXHIBIT 3, TAB R, PAGE 5, 6:28 A.M.

9              PEI:  THEY CAN VISIT ME ANY TIME AND FIND NOTHING.

10   THEY CAN TAKE MY COMPUTER AND NOT FIND ANYTHING, AND

11   EVERYTHING I HAVE IS SAFE AND STILL AVAILABLE TO ME.

12             HUBY:  VERY GOOD.  ORGANIZED.  HOW DO YOU DO THAT?

13             PEI:  I EVEN HAVE ICQ AND MAIL LAUNCH IN A

14   BESTCRYPT CONTAINER SO THEY DON'T GET TO KNOW WHO MY FRIENDS

15   ARE OR WHAT WE TALK ABOUT.

16             HUBY:  WELL, I USE EE EVERY DAY I SHUT OFF MY PC.

17             DO YOU KNOW WHAT EE IS?

18   A.    YES, I DO.

19   Q.    WHAT IS IT?

20   A.    EVIDENCE ELIMINATOR.

21   Q.    PEI:  I BACK EVERYTHING UP ON CD AND KEEP THEM AWAY FROM

22   MY HOUSE AND EVERYTHING ELSE IS IN BESTCRYPT CONTAINERS.

23             PEI:  I USE THAT ALSO -- SMILEY FACES.

24             HUBY:  WHAT MEANS BESTCRYPT CONTAINERS?

25             PEI:  YOU USE THE PROGRAM TO MAKE ANOTHER HARD

```
 1    DRIVE ON YOUR HARD DRIVE.  ONLY THIS ONE ENCRYPTS EVERYTHING
 2    THAT GOES ON IT AND HAS NEVER BEEN CRACKED.
 3              PEI:  WWW.JETICO.COM.
 4              HUBY:  THANKS.  I WILL CHECK THAT OUT NOW.
 5              LOWER DOWN THE PAGE.
 6              PEI:  I ALSO USE CRYPT32 FOR LITTLE QUICKIE
 7    THINGS --
 8              GOING OVER TO THE TOP OF THE NEXT PAGE.
 9              -- ON MY HARD DRIVE THAT I DON'T WANT TO PUT IN THE
10    CONTAINER AT THE MOMENT.
11              AND LOWER DOWN THE PAGE, 6:44 A.M.
12              PEI:  BESTCRYPT IS A VERY GOOD PROGRAM THAT THEY
13    SELL FOR $90.
14              HUBY:  SO YOU CAN'T GET IT FOR FREE?  YOU KNOW,
15    ACTUALLY, THE EVIDENCE ELIMINATOR COSTS $79, TOO, BUT THERE'S
16    A WAY TO GET IT FOR FREE.
17              PEI:  I HAVE THE REGISTRATION NUMBER FOR IT BUT NOT
18    HERE IN THE HOUSE.  JUST DOWNLOAD THE COMMERCIAL RELEASED
19    VERSION.  YOU CAN USE IT FOR 30 DAYS AND I CAN GET YOU THE
20    NUMBER SOMETIME DURING THE TRIAL PERIOD.
21              EARLIER YOU TESTIFIED TO FREEMAN AND HIS WORKING ON
22    THE DEFENDANT'S COMPUTER.  DO YOU RECALL THAT TESTIMONY?
23    A.   YES.
24    Q.   TAB A, PAGE 7, BEGINNING AT 8:20 A.M.
25              PEI:  I DROPPED OFF MY PC FOR SECURITY UPGRADES AND
```

1    ENHANCEMENTS.

2              JEREMIAH:  YOU DID WHAT?  THEY WILL SEE PORN ON

3    IT.

4              PEI:  HEHEHE.  NO, A BL TECH IS DOING THE WORK.  I

5    WOULD NEVER EXPOSE MYSELF LIKE THAT -- SMILEY FACES.

6              PEI:  YOU'RE SO THOUGHTFUL AND CARING.  THANKS.

7              JEREMIAH:  LAUGH OUT LOUD.

8              PEI:  SMILEY FACES.

9              PEI:  I'M DOWNLOADING YAHOO! MESSENGER NOW.  I HOPE

10   IT WORKS THIS TIME.

11             AND GOING OVER TO THE TOP OF THE NEXT PAGE.

12             AFTER SETH BEKENSTEIN WAS ARRESTED -- AFTER THE

13   DATE ON WHICH SETH BEKENSTEIN WAS ARRESTED, DID THE DEFENDANT

14   IN HIS CHATS, EXHIBIT 3, DISCUSS THE NEED FOR THE OTHER CHAT

15   FRIENDS, HIS CHAT FRIENDS, TO UPGRADE AND GET THEIR SECURITY

16   TOGETHER?

17   A.   YES.

18   Q.   AND DID THE DEFENDANT ALSO DISCUSS DESTROYING EVIDENCE

19   SHOULD THE FBI OR THE FEDERAL LAW ENFORCEMENT AUTHORITIES

20   COME FOR HIM?

21   A.   YES.

22   Q.   TAB P, EXHIBIT 3, PAGE 32, DOES HE ACTUALLY POKE A BIT

23   OF FUN AT IT?

24   A.   YES.

25   Q.   PUF:  WELL, IF YOU TALK TO A TECHNICIAN, JUST ASK HIM

1    WHAT HIS FINE TUNING INSTRUMENT IS AND SEE WHAT HE SHOWS YOU.

2    IT WILL ALWAYS BE A HAMMER.

3            PEI:   HEHEHE.   I'M GETTING A MINI SLEDGE FROM AN

4    EXTERNAL HARD DRIVE FOR WHEN THE FBI KICKS MY DOOR IN --

5    SMILEY FACES.

6            PUF:   GOOD IDEA.

7            THE COURT:   ARE YOU ABOUT READY TO WRAP UP?

8            MR. AKROTIRIANAKIS:   I HAVE JUST A FEW MORE, YOUR

9    HONOR.   I'M ABOUT DONE.

10   BY MR. AKROTIRIANAKIS:

11   Q.   DOES THE DEFENDANT DISCUSS GROOMING METHODS ON OCCASIONS

12   OTHER THAN THOSE THAT YOU'VE ALREADY TESTIFIED TO IN HIS

13   CHATS, EXHIBIT 3?

14   A.   YES.

15   Q.   TAB F, PAGE 3, 1:56 P.M.:   I WILL BE SEEING MY

16   10-YEAR-OLD HONEY ON TUESDAY AND SATURDAY.

17           AND LOWER DOWN THE PAGE.

18           I'M COMFORTABLE IN FRONT OF HIS PARENTS.   WE ARE

19   ALWAYS CLOSE AND TOUCHING AND PLAYING, SO --

20           OVER TO THE TOP OF THE NEXT PAGE.

21           -- THEY'RE USED TO IT.

22           DANIEL:   SURE.   WE SLEEP OVER AT EACH OTHER'S HOME,

23   BUT WE DO NOT HAVE THE COURAGE TO DO ALL THE THINGS WE LOVE

24   WHEN THE PARENT ARE TOO NEAR.

25           PEI:   BUT YOU CAN BE CLOSE AND TOUCH IN FRONT OF

1    THEM, CAN'T YOU?

2            PEI:  WE JUST CAN'T KISS IN FRONT OF THEM OR THEY

3    MIGHT THINK THERE'S MORE GOING ON.  HEHEHE.

4            IS THAT ONE SUCH REFERENCE TO GROOMING?

5    A.   YES.

6    Q.   AND REFERRING TO EXHIBIT 3H, THE CHAT WITH JURE,

7    PAGE 11, PEI, 10:37 P.M.:   THIS BOY WANTS SEX.  WHAT ARE YOU

8    WAITING FOR, THE MOMENT TO PASS?

9            JURE:  A GOOD TIME.  RIGHT NOW THEY ARE GETTING

10   READY TO GO OUT OF THIS APARTMENT AND EVERYONE IS STRESSED

11   OUT.  DAD AND HIS GIRLFRIEND ARGUE.  DEWEY IS PESKY AND TIM'S

12   GIRLFRIEND LEFT HIM.  HE HAS WITHDRAWN HIMSELF AND IS HARD TO

13   TALK TO OR MOTIVATE FOR ANYTHING.  MAYBE AFTER THINGS CALM

14   DOWN A BIT.

15           PEI:  SURELY THE MOMENT ISN'T PAST.

16           JURE:  HOPEFULLY NOT, BUT IF IT IS NO-NO, THEN

17   HOPEFULLY ANOTHER.

18           PEI:  YOU JUST -- YOU HAVE TO JUST ASK IF IT'S OKAY

19   IF YOU SUCK IT FOR A MINUTE.  FIRST YOU HAVE TO BE FEELING

20   IT -- SMILEY FACES.

21           JURE, AT 10:46:  YEAH, JUST GOT TO GET HIM NAKED TO

22   SHOW HIM JACKY.

23           PEI, 10:48:  THAT'S A NICE ONE.  JUST REACH OVER

24   AND JERK HIM YOURSELF.  YOU'VE GOT TO TAKE THE LEAD WHEN IT'S

25   IN YOUR FACE.

1          PEI, 10:49:  ACT LIKE YOU GOT A PAIR AND GO FOR IT.

2          PEI, 10:51:  THEN WHILE YOU GOT HIS HARD DICK IN

3   YOUR HAND, ASK HIM IF YOU CAN SUCK IT.

4          IS THAT ANOTHER REFERENCE TO THAT TYPE OF

5   PROGRESSION?  IS THAT ANOTHER REFERENCE TO A GROOMING

6   TECHNIQUE?

7   A.   YES, IT IS.

8   Q.   AGENT BROWN, THE FOREVERKIN CHAT THAT YOU REFERRED TO

9   EARLIER BEFORE THE LUNCH BREAK, IS THIS ANOTHER OF THE

10  STATEMENTS FROM WITHIN THAT CHAT, PAGE 2, OF IT?

11  A.   YES, IT IS.

12  Q.   PEI, 5/17, 1:22 P.M.:  I LOVE BOYS THAT ARE UNDER 14 AND

13  I LIKE TO SUCK THEIR DICKS AND LICK THEIR ASSHOLES AND BALLS

14  AND FUCK THEM IN THE BUTT AND MOUTH AND KISS THEM DEEPLY IF

15  THEY WANT TO -- SMILEY FACES.

16          I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

17          THE COURT:  ALL RIGHT.  CROSS-EXAMINATION?

18          MR. AARON:  YOUR HONOR, MAY WE APPROACH FOR JUST A

19  MOMENT?

20          THE COURT:  YES.

21          (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

22          MR. AARON:  I APOLOGIZE, YOUR HONOR.  I REALLY HAVE

23  TO USE THE MEN'S ROOM.  I DIDN'T WANT TO INTERRUPT COUNSEL'S

24  EXAM.  CAN WE HAVE JUST FIVE MINUTES?  THANK YOU.

25          (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

1          THE COURT:  LADIES AND GENTLEMEN, WE ARE JUST

2     GOING TO TAKE A FIVE-MINUTE STRETCH BREAK.  YOU CAN STAND UP

3     AND STRETCH AND CHAT IF YOU'D LIKE.

4          PLEASE REMEMBER THE ADMONITIONS, LADIES AND

5     GENTLEMEN.  DO NOT DISCUSS THE CASE IN ANY FASHION, DO NOT

6     DISCUSS IT WITH ANYONE ELSE.  WE WILL BE IN RECESS UNTIL

7     5 MINUTES TO 2.  THANK YOU.

8                         (RECESS)

9          THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

10    ALL MEMBERS OF THE JURY AND COUNSEL FOR BOTH PARTIES, THE

11    DEFENDANT ALSO PRESENT, THE WITNESS ON THE WITNESS STAND.

12          AND IN RESPONSE TO YOUR NOTE, MR. SHANTELER, JUROR

13    NO. 5, ARE YOU TALKING ABOUT TOMORROW?

14          JUROR SHANTELER:  NO.

15          THE COURT:  A WEEK FROM TOMORROW?

16          JUROR SHANTELER:  YES.

17          THE COURT:  I DOUBT VERY MUCH THAT WE WILL STILL BE

18    IN THIS TRIAL.

19          JUROR SHANTELER:  OKAY.

20          THE COURT:  BUT IF WE ARE AND THE JURY IS STILL

21    DELIBERATING, YOU WILL BE RELEASED TO GO TO YOUR APPOINTMENT.

22          JUROR SHANTELER:  THANK YOU.

23          THE COURT:  I THOUGHT YOU WERE TALKING ABOUT

24    TOMORROW.  AND TOMORROW, AS YOU DO KNOW, WE DO HAVE THAT

25    SCHEDULE, SO AN AFTERNOON APPOINTMENT WOULDN'T BE A PROBLEM.

1           JUROR SHANTELER:  I TRIED.

2           THE COURT:  YOU COULDN'T CHANGE IT?

3           JUROR SHANTELER:  2:40.

4           THE COURT:  DON'T WORRY.  YOU WILL BE ABLE TO MAKE

5     YOUR APPOINTMENT.

6           JUROR SHANTELER:  THANK YOU, MA'AM.

7           THE COURT:  YOU MAY INQUIRE.

8           MR. AARON:  THANK YOU.

9                     CROSS-EXAMINATION

10    BY MR. AARON:

11    Q.    GOOD AFTERNOON.

12    A.    GOOD AFTERNOON.

13    Q.    YOU HAD BEEN ASKED SOME QUESTIONS AND HAD TESTIFIED

14    EARLIER ABOUT EXHIBIT 1K, AND ONE PART OF THAT I WANT TO TALK

15    TO YOU ABOUT.  YOU MAY NOT NEED TO REFER TO IT AT THIS TIME.

16    THAT'S OKAY.

17    A.    EXHIBIT 1K?

18    Q.    1K.

19    A.    YES.

20    Q.    YOU HAD MENTIONED THAT AT A CERTAIN POINT BOYSAN AND I

21    BELIEVE SPEED WERE TALKING ABOUT GOING DOWN TO MEXICO, RIGHT?

22    IT'S AT 12/14, 8:06 P.M. TO 12/14, 8:18 P.M.

23    A.    HE SAID IT SOMEWHERE BUT I DON'T SEE --

24    Q.    YOU DON'T REMEMBER TESTIFYING ON DIRECT EXAMINATION --

25    A.    YES, BUT I DON'T RECALL BEING THAT EXACT PLACE.  12:14,

```
 1   8:05 P.M.?

 2   Q.    DO YOU RECALL IT BEING SOMEWHERE ELSE?

 3   A.    I BELIEVE IT WAS --

 4   Q.    PERHAPS I WROTE THAT DOWN INCORRECTLY.

 5            MR. AARON:  MAY I CONFER, YOUR HONOR?

 6            THE COURT:  CERTAINLY.

 7                   (COUNSEL CONFER)

 8            THE WITNESS:  DO YOU WANT ME TO REFER YOU?

 9   BY MR. AARON:

10   Q.    CERTAINLY, IF YOU HAVE IT.

11   A.    WE WERE OVER ON 12/14, 8:20 OR AROUND THERE AND THEN

12   OVER ON THE NEXT PAGE.

13   Q.    THANK YOU.  IN THE CHATS INVOLVING MR. SANDERS --

14   ALLEGEDLY INVOLVING MR. SANDERS AND MR. BEKENSTEIN, DID ANY

15   OF THEM EVER SAY THEY HAD ACTUALLY FOUND BOYS, THAT THEY HAD

16   ACTUALLY HAD SEX WITH BOYS IN MEXICO?

17   A.    NO, THEY DIDN'T.

18   Q.    DID MR. SANDERS OR MR. BEKENSTEIN EVER TELL ANY OTHER

19   PERSONS THAT THEY HAD ACTUALLY HAD SEX WITH BOYS IN MEXICO?

20   A.    NO, THEY DIDN'T.

21   Q.    YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT CALEB.  DO

22   YOU RECALL THAT?

23   A.    YES.

24   Q.    AND IN THE CHATS CALEB WAS DESCRIBED AS A 10-YEAR OLD

25   BOY, RIGHT?
```

1    A.    THAT'S CORRECT.

2    Q.    AND YOU MENTIONED THAT MR. SANDERS HAD PHOTOGRAPHS OF A

3    BOY THAT, IN YOUR OPINION, WERE CONSISTENT WITH A 10-YEAR-OLD

4    BOY, RIGHT?

5    A.    THAT'S CORRECT.

6    Q.    NOW, CALEB WAS NEVER IDENTIFIED, RIGHT?

7    A.    TO MY KNOWLEDGE, NOT AT THIS TIME.

8    Q.    AND THE BOY IN THE PHOTOGRAPHS THAT YOU THOUGHT WAS

9    CONSISTENT WITH A 10-YEAR-OLD BOY HAS NOT BEEN IDENTIFIED,

10   RIGHT?

11   A.    NO, NOT TO MY KNOWLEDGE, NO.

12   Q.    SO AS YOU SIT HERE TODAY, YOU ARE NOT ABLE TO CONFIRM

13   THAT THE BOY IN THE PHOTOGRAPH IS CALEB?

14   A.    NO.  BUT AGAIN, MATCHING UP THE CHATS WITH THE ACTUAL

15   PHOTOS, I MEAN, IT WOULD SEEM MORE THAN JUST COINCIDENCE.

16   Q.    I DIDN'T ASK ABOUT MATCHING UP WITH THE CHATS, I JUST

17   ASKED IF YOU WERE ABLE TO CONFIRM IT, RIGHT.

18   A.    THAT'S CORRECT, THAT WAS YOUR QUESTION.

19   Q.    WERE YOU ABLE TO CONFIRM THAT THE BOY IN THE PHOTOGRAPH

20   WAS CALEB?

21   A.    NO.

22   Q.    THANK YOU.  YOU WERE ASKED SOME QUESTIONS ABOUT A PERSON

23   NAMED NICK.  AND IF I COULD, PLEASE, I'M REFERRING YOU TO

24   EXHIBIT 3I, THE DIALOGUE BEGINNING ON THE DATE 5/16.

25   A.    I'M SORRY, CAN YOU SAY AGAIN?  WHERE?

1   Q.   3I AROUND 5/16.

2   A.   THE DATE BEING 5/16 OR THE TIME?

3   Q.   THE DATE.  NOW, THAT WHOLE DIALOGUE SPANS A NUMBER OF

4   DAYS FROM 4/12 TO 5/27, RIGHT?

5   A.   YES.

6   Q.   WELL, ACTUALLY 5/16, RIGHT?

7   A.   I BELIEVE TO 5/27.

8   Q.   THE LAST ENTRY FROM NICK IS AT 5/16, CORRECT?

9   A.   CORRECT.

10  Q.   AND THEN THERE'S A BUNCH OF ENTRIES FROM PEI OR PEI ON

11  5/16, 5/17, 5/19, 5/25 AND 5/27, CORRECT?

12  A.   YES.

13  Q.   AND NICK DOES NOT RESPOND, RIGHT?

14  A.   THERE'S NO RESPONSE ON THERE.

15  Q.   LET ME ACTUALLY SHOW IT THIS WAY.  IT IS EASIER TO

16  VISUALIZE IT.  THERE'S A NUMBER OF COMMENTS BY PEI AND

17  THERE'S NO RESPONSE?

18  A.   YES, YES.

19  Q.   DID YOU EVER IDENTIFY NICK?

20  A.   NO, TO MY KNOWLEDGE, NO.

21  Q.   SO DO YOU HAVE -- AS YOU SIT HERE TODAY, YOU HAVE NO WAY

22  OF DETERMINING WHETHER OR NOT NICK WAS A REAL CHILD OR AN

23  ADULT, CORRECT?

24  A.   NO.

25  Q.   IN THE CHAT TRANSCRIPTS THERE ARE A NUMBER OF PEOPLE

```
 1    THAT YOU HAVEN'T IDENTIFIED, CORRECT?

 2    A.    THAT'S CORRECT.

 3    Q.    THERE ARE A NUMBER OF PEOPLE WHO APPEAR IN THE CHATS

 4    WITH MR. BEKENSTEIN OR WITH MR. MARTIN WHO NEVER APPEAR IN

 5    THE CHATS WITH MR. SANDERS, CORRECT?

 6    A.    YES, THERE ARE INSTANCES, YES.

 7    Q.    AND THERE ARE PEOPLE WHO ONLY APPEAR IN DIALOGUES IN

 8    WHICH MR. SANDERS DOES NOT APPEAR, CORRECT?

 9    A.    CAN YOU RESTATE THE QUESTION, PLEASE?

10    Q.    THERE ARE PEOPLE WHO ONLY APPEAR -- THERE ARE SOME

11    PEOPLE WHO ONLY APPEAR IN A CHAT IN WHICH MR. SANDERS DOES

12    NOT APPEAR, RIGHT?

13    A.    YES.

14    Q.    NOW, JUST TURNING YOUR ATTENTION GENERALLY TO

15    EXHIBITS 1 AND 2, THERE ARE A NUMBER OF DIALOGUES THAT WE'VE

16    DISCUSSED WHERE MR. SANDERS DOES NOT APPEAR AT ALL, RIGHT?

17    A.    THERE ARE.

18    Q.    THERE ARE OTHER CHATS --

19    A.    IN EXHIBIT 2 AS WELL?

20    Q.    YES, EXHIBITS 1 AND 2.

21    A.    CAN YOU POINT IN EXHIBIT 2?

22    Q.    EXHIBIT 2 IS MR. MARTIN.

23    A.    YES, OKAY, YES.

24    Q.    IS THAT CORRECT?

25    A.    YEAH.
```

1    Q.    WOULD IT BE ALSO FAIR TO SAY THAT THERE'S A NUMBER OF

2    TIMES WHERE MR. SANDERS DOES APPEAR IN THE CHAT BUT FOR A

3    LONG TIME HE DOESN'T SAY ANYTHING?

4    A.    YES.

5    Q.    AND WHEN SOMEONE DOESN'T -- ON THESE CHAT LOGS IF

6    SOMEONE IS NOT SAYING SOMETHING, THERE'S NO WAY TO TELL IF

7    THEY'RE STILL LOGGED ON OR NOT, RIGHT?

8    A.    NO, THERE'S NO WAY TO TELL EITHER WAY.

9    Q.    I'M SORRY?

10   A.    THERE'S NO WAY TO TELL EITHER WAY WHETHER THEY'RE LOGGED

11   ON OR NOT.

12   Q.    SO HE COULD HAVE BEEN LOGGED OFF?

13   A.    YES, OR HE COULD HAVE BEEN LOGGED ON, CORRECT.

14   Q.    IN FACT, FREQUENTLY IN THE CHATS WE'LL SEE OR WE'LL READ

15   ONE OR MORE PERSONS ANNOUNCE THEMSELVES, RIGHT?

16   A.    YES.

17   Q.    I BELIEVE YOU WERE SHOWN THIS PHOTOGRAPH EARLIER.  THIS

18   IS EXHIBIT NO. 64.  DO YOU RECOGNIZE THAT?

19   A.    YES.

20   Q.    AND THAT'S MR. BEKENSTEIN?

21   A.    YES, IT IS.

22   Q.    AND THAT'S A MOVING VAN RIGHT BEHIND HIM, RIGHT?

23   A.    THAT APPEARS TO BE A BUDGET VAN, YES.

24   Q.    NOW, YOU WERE AWARE THAT A NUMBER OF ITEMS OF PROPERTY

25   OF MR. BEKENSTEIN WERE DISCOVERED IN THE STORAGE LOCKER IN

1   LAS VEGAS, CORRECT?

2   A.   YES.

3   Q.   AND IN THE CHATS DOESN'T MR. SANDERS MAKE A REFERENCE TO

4   GOING TO SAN FRANCISCO AND LAS VEGAS AND HELPING A FRIEND

5   MOVE?

6   A.   YES.

7   Q.   IN FACT, HE SAYS HE ACTUALLY GOT MONEY FOR HELPING A

8   FRIEND MOVE, RIGHT?

9   A.   YES.

10  Q.   AND IN YOUR OPINION, DIDN'T THAT SEEM TO BE A REFERENCE

11  TO HIS HELPING MR. BEKENSTEIN MOVE HIS PROPERTY TO LAS VEGAS?

12  A.   NO.   HE MOVED HIS PROPERTY -- IN THE CHATS HE REFERENCED

13  MOVING TO A STORAGE IN WALNUT CREEK AND THAT HE GAVE THE

14  OTHER PROPERTY AWAY TO MR. SANDERS, WHAT HE DIDN'T WANT.

15  Q.   ACTUALLY, IT WAS MR. SANDERS WHO SAID THAT, RIGHT?

16  A.   MR. SANDERS SAID IT IN THE CHAT, YES.

17  Q.   NOW, IF MR. BEKENSTEIN HAD NOT WANTED PEOPLE TO KNOW

18  WHERE HIS PROPERTY WAS OR MR. SANDERS DIDN'T WANT PEOPLE TO

19  KNOW WHERE HIS PROPERTY WAS, HE COULD TELL THEM IT WAS IN A

20  DIFFERENT LOCATION, RIGHT?

21          MR. AKROTIRIANAKIS:   OBJECTION, SPECULATION.

22          THE COURT:   SUSTAINED.

23  BY MR. AARON:

24  Q.   DID YOU EVER DISCOVER A STORAGE LOCKER, ANOTHER STORAGE

25  LOCKER THAT HAD MR. BEKENSTEIN'S PROPERTY?

1    A.    WE NEVER ATTEMPTED TO LOOK FOR IT.

2    Q.    AND YOU WERE INVESTIGATING HIM FOR POSSESSION OF CHILD

3    PORNOGRAPHY, RIGHT?

4    A.    AT THAT TIME HE HAD ALREADY BEEN SENTENCED IN OUR

5    CASE-IN-CHIEF.

6    Q.    YOU WERE ALSO INVESTIGATING OTHER PERSONS WHO HAD

7    CORRESPONDED WITH HIM, RIGHT?

8    A.    YES.  THOSE LEADS WERE SENT OUT TO RESPECTIVE OFFICES.

9    Q.    AND IF MR. BEKENSTEIN HAD ANY PROPERTY IN A STORAGE

10   LOCKER THAT COULD BE ASSOCIATED WITH CRIMINAL ACTIVITY, IT

11   MIGHT INVOLVE OTHER PERSONS THAT YOU DON'T EVEN KNOW ABOUT

12   YET, RIGHT?

13           MR. AKROTIRIANAKIS:  OBJECTION, SPECULATION.

14           THE COURT:  OVERRULED.

15           THE WITNESS:  CAN YOU RESTATE THE QUESTION AGAIN?

16   BY MR. AARON:

17   Q.    IF MR. BEKENSTEIN HAD PROPERTY, YOU WOULD WANT TO LOOK

18   AT IT BECAUSE IT MAY HAVE EVIDENCE OF A CRIMINAL ACTIVITY

19   INVOLVING PERSONS THAT YOU DON'T YET KNOW ABOUT, RIGHT?

20   A.    PRIOR TO THAT TIME WE HAD EXECUTED A SEARCH WARRANT AT

21   HIS RESIDENCE AND TO OUR BEST EFFORTS WE HAD OBTAINED

22   EVERYTHING.

23   Q.    IF YOU KNEW -- WELL, YOU DON'T KNOW WHAT'S IN THAT OTHER

24   STORAGE LOCKER, RIGHT?

25   A.    AGAIN, WE DIDN'T ATTEMPT TO LOOK THROUGH IT.

1   Q.   BECAUSE YOU HAVEN'T BEEN THERE, YOU DON'T KNOW WHAT'S

2   THERE, RIGHT?

3   A.   CORRECT.

4   Q.   IT COULD BE EVIDENCE OF NEW AND DIFFERENT CRIMINAL

5   ACTIVITY, RIGHT?

6   A.   IT COULD BE HIS CLOTHES.

7   Q.   YOU WOULD BE INTERESTED IN EVIDENCE OF CRIMINAL

8   ACTIVITY, RIGHT?

9   A.   HE HAD ALREADY BEEN ADJUDICATED OR HAD BEEN SENTENCED IN

10  OUR CASE-IN-CHIEF.  WE WEREN'T INVESTIGATING HIM ANYMORE.

11  Q.   WHEN YOU INVESTIGATED MR. BEKENSTEIN, YOU FOUND OUT

12  ABOUT OTHER PEOPLE, RIGHT?

13  A.   YES.

14  Q.   YOU FOUND OUT ABOUT MR. SANDERS, MR. MARTIN, THAT SORT

15  OF THING?

16  A.   YES.

17  Q.   AND YOU KNEW IF YOU HAD MORE INFORMATION, MORE PROPERTY

18  BELONGING TO MR. BEKENSTEIN, YOU MIGHT FIND OUT ABOUT YET

19  OTHER PEOPLE?

20  A.   WE ALREADY HAD ALL THAT INFORMATION.  THAT WAS SEIZED

21  FROM THE INITIAL SEARCH WARRANT.

22  Q.   ARE YOU TELLING ME --

23  A.   WE HAD -- GO AHEAD.

24  Q.   I'M SORRY, DID YOU FINISH YOUR ANSWER?

25  A.   NO, GO AHEAD.

1    Q.    ARE YOU TELLING ME, OFFICER, THAT IF YOU HAD LEARNED

2    MR. BEKENSTEIN HAD ANOTHER STORAGE LOCKER FILLED WITH

3    PROPERTY AND POSSIBLE CHILD PORNOGRAPHY OR POSSIBLE LEADS TO

4    OTHER PERSONS INVOLVED IN CHILD PORNOGRAPHY, YOU WOULD NOT

5    HAVE REQUESTED THE SEARCH WARRANT TO SEARCH IT?

6    A.    WE NEVER HAD RECEIVED THAT INFORMATION THAT THERE WAS

7    POSSIBLE CHILD PORNOGRAPHY IN ANY RESPECTIVE STORAGE LOCKER.

8    WE NEVER RECEIVED THAT INFORMATION.

9    Q.    WHEN YOU READ THESE CHATS, YOU READ INFORMATION ABOUT

10   ANOTHER STORAGE FACILITY, RIGHT?

11   A.    I JUST REVIEWED THOSE RECENTLY.  MY UNDERSTANDING IS

12   THOSE CAME TO LIGHT RECENTLY.

13   Q.    THOSE CAME RECENTLY?

14   A.    THESE CHATS I'VE REVIEWED ONLY RECENTLY.

15   Q.    BUT OTHER AGENTS HAVE.  YOU'VE ONLY SEEN THEM RECENTLY

16   BUT OTHER AGENTS HAVE THEM?

17   A.    POSSIBLY, YES.  OTHER AGENTS KNEW ABOUT THESE, BUT I DID

18   NOT REVIEW THE STORAGE LOCKER.  I DID NOT BECOME AWARE OF THE

19   STORAGE LOCKER UNTIL RECENTLY.

20   Q.    WEREN'T YOU AWARE THAT IN JUNE OF 2001 THAT MR. SANDERS'

21   RESIDENCE HAD BEEN SEARCHED?

22   A.    JUNE 2001?

23   Q.    DIDN'T YOU KNOW THAT?

24   A.    THERE WAS -- WAS IT JUNE 2001?  THERE WAS A PROBATION

25   SEARCH, BUT THAT WAS A DIFFERENT --

1   Q.   I'M SORRY, WHAT DID YOU SAY?

2   A.   MR. BEKENSTEIN OR MR. --

3   Q.   MR. SANDERS.

4   A.   MR. SANDERS.  I THOUGHT YOU SAID MR. BEKENSTEIN.  I'M

5   SORRY.

6   Q.   WEREN'T YOU AWARE IN JUNE OF 2001 THAT MR. SANDERS'

7   RESIDENCE WAS SEARCHED?

8   A.   YES.

9   Q.   AND YOU WERE AWARE THAT THEY HAD SEIZED PROPERTY, RIGHT?

10  A.   YES.

11  Q.   AND ONE OF THE REASONS THAT THE PROPERTY WAS SEIZED WAS

12  TO DO FORENSIC ANALYSIS OF HIS COMPUTER, RIGHT?

13  A.   YES.

14  Q.   AND YOU KNEW THAT THE CHATS WERE DISCOVERED AT THAT

15  TIME?

16  A.   NO, I DIDN'T.  I DIDN'T BECOME AWARE OF THE CHATS AT

17  THAT TIME.

18  Q.   NOW, EXHIBIT 1 CONTAINS ABOUT 80 PERCENT OF ALL THE

19  CHATS THAT WERE DOWNLOADED, RIGHT?

20  A.   THAT'S CORRECT.

21  Q.   THERE ARE ABOUT -- SO THAT MEANS THERE'S ABOUT

22  20 PERCENT OF THE CHATS CAME FROM MR. BEKENSTEIN'S COMPUTER

23  WHICH ARE NOW EXHIBIT 1?

24  A.   THAT'S CORRECT.

25  Q.   BACK IN 2000 WE DIDN'T HAVE VIRTUAL CHAT ROOMS LIKE WE

1    DO TODAY, RIGHT?

2    A.    THAT'S CORRECT.

3    Q.    AND, IN FACT, THERE'S A REFERENCE IN THE CHATS TO

4    CERTAIN PERSONS SAYING, I WISH WE HAD VIRTUAL CHAT ROOMS,

5    RIGHT?

6    A.    YES, THAT'S CORRECT.

7    Q.    NOW, THERE WERE OTHER PROBLEMS BACK IN 2000 AND 2001

8    INVOLVING HACKERS AND SO FORTH?

9    A.    I'M NOT --

10             MR. AKROTIRIANAKIS:  OBJECTION, FOUNDATION, CALLS

11   FOR SPECULATION.

12   BY MR. AARON:

13   Q.    YOU'VE READ EXHIBIT 1J?

14             MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR, SAME

15   GROUNDS.

16             THE COURT:  EXCUSE ME.  WHAT'S THE BASIS FOR YOUR

17   OBJECTION?

18             MR. AKROTIRIANAKIS:  FOUNDATION AND SPECULATION.

19             THE COURT:  OVERRULED.

20             THE QUESTION WAS, HAVE YOU READ EXHIBIT 1J?

21             THE WITNESS:  YES.  MAY I REFER TO IT?

22             THE COURT:  CERTAINLY.

23   BY MR. AARON:

24   Q.    DO YOU RECALL AN ENTRY BY A PERSON NAMED CUMULUS

25   REFERRING TO PROBLEMS WITH A HACKER?

1    A.    NO.   CAN YOU REFER ME TO THAT?

2    Q.    LET ME ASK YOU FIRST SOME QUESTIONS ABOUT THE TECHNOLOGY

3    IN 2000.   THERE WERE VISIBLE AND INVISIBLE LISTS, RIGHT?

4    A.    I'M NOT SURE I FOLLOW YOU.

5    Q.    WHEN YOU CREATED A CHAT ROOM IN 2000 YOU COULD PUT

6    SOMEONE -- ON ICQ YOU COULD PUT SOMEONE ON AN INVISIBLE LIST,

7    RIGHT?

8    A.    I'M NOT SURE ABOUT THE TECHNOLOGY ON ICQ ABOUT THESE

9    LISTS, BUT ARE YOU REFERRING TO AN ISOLATED CHAT OR --

10   Q.    LET ME REFER YOU TO 2K, 12/14/00 AT 9:39 P.M.

11   A.    EXHIBIT 1K OR 2K?

12   Q.    I BEG YOUR PARDON.   IT'S 1K.

13   A.    I'M SORRY, THE TIME?

14   Q.    DO YOU SEE THAT ENTRY BY SPEED?

15   A.    YES.

16   Q.    AND THERE HE SAYS TWO THINGS, PUT ME ON YOUR VISIBLE

17   LIST SO WE CAN SEE EACH OTHER AND GIVE ME YOUR E-MAIL AGAIN,

18   RIGHT?

19   A.    YES.

20   Q.    AND IF I COULD DIRECT YOUR ATTENTION TO 1L, 12/14/00,

21   9:57.   AND HERE SPEED IS EXPLAINING THE INVISIBLE LIST,

22   RIGHT?

23   A.    YES.

24   Q.    AND HE SAYS:   SURE, AND YOU CAN HIDE FROM THE ONES YOU

25   WANT BY PUTTING THEM ON YOUR INVISIBLE LIST.

1              RIGHT?

2    A.   YES.

3    Q.   DID THAT LEAD YOU TO BELIEVE THAT THERE WERE VISIBLE AND

4    INVISIBLE LISTS?

5    A.   FROM READING THIS, YES.

6    Q.   FOR THE CHAT ROOM, FOR THE ICQ CHAT ROOM?

7    A.   FOR THE CHAT OR FOR THE LIST FOR ICQ, YES.

8    Q.   THANK YOU.   THERE WERE A NUMBER OF PROBLEMS BACK THEN

9    WITH PEOPLE IMPERSONATING OTHER PEOPLE, RIGHT?

10             MR. AKROTIRIANAKIS:   OBJECTION, FOUNDATION.

11             THE COURT:   SUSTAINED.

12   BY MR. AARON:

13   Q.   YOU'VE READ EXHIBIT 1, RIGHT?

14   A.   YES.   IT'S A LOT OF MATERIAL.

15             THE COURT:   I'M SORRY?

16             THE WITNESS:   I SAID IT'S A LOT OF MATERIAL.

17   BY MR. AARON:

18   Q.   I UNDERSTAND.   REFERRING YOUR ATTENTION TO THE ENTRY FOR

19   12/14/00, 10:57 P.M., AND I'M PUTTING IT ON THE MONITOR.

20   A.   OKAY.

21   Q.   AND THERE SPEED SAYS:   I THINK HE AND THIS GUY MATT ARE

22   THE SAME PERSON, SO I ADVISE YOU TO PUT HIM ON YOUR

23   DO-NOT-RECEIVE LIST, AS MARKY IS THE ONE I THINK THAT POSTED

24   MY PIC IN THE NG, AND DO NOT GIVE HIM MY NEW ICQ NUMBERS.

25   A.   I SEE THAT.

1    Q.   IS THAT WHAT HE WROTE?

2    A.   THAT'S WHAT HE WROTE.  BUT AGAIN, PEOPLE HAD MULTIPLE

3    NAMES AS THE DEFENDANT HAD MULTIPLE NAMES.

4    Q.   THAT JUST MEANS HE'S PRETENDING TO BE A DIFFERENT

5    PERSON?

6    A.   A DIFFERENT NAME.  YES, IT COULD BE A DIFFERENT NAME.

7            THE COURT:  THANK YOU.

8    BY MR. AARON:

9    Q.   COULD YOU TAKE A LOOK AT THE ENTRY FOR 12/14 AT

10   11:13 P.M.  AND GUYUTE, G-U-Y-U-T-E, SAYS:  WHO IS HE THEN?

11   YOU SAYING UNCLE FREDDY PRETENDS TO BE MARKY?  WHAT THE HELL

12   KIND OF WEIRDO ARE WE DEALING WITH HERE?

13           AND THEN CONTINUING ON THE NEXT PAGE.

14           SPEED:  SHIT, DUDE.  ADULTS PRETEND TO BE KIDS ALL

15   THE TIME.

16           SO THOSE TWO ENTRIES THEY ARE TALKING ABOUT PEOPLE

17   PRETENDING TO BE OTHER PEOPLE?

18   A.   YEAH, THAT'S WHAT THEY'RE TALKING ABOUT, YES.

19   Q.   WOULD IT BE FAIR TO SAY THAT MR. SANDERS AND OTHER

20   PEOPLE ON THESE ICQ CHATS ENGAGED IN VARIOUS TYPES OF

21   FANTASY?

22           MR. AKROTIRIANAKIS:  OBJECTION, FOUNDATION.

23           THE COURT:  OVERRULED.

24           THE WITNESS:  I DON'T BELIEVE -- FROM THE CONTENTS

25   AND FROM MY KNOWLEDGE AND EXPERIENCE, I DON'T BELIEVE IT TO

1   BE FANTASY.

2   BY MR. AARON:

3   Q.   IF I COULD TURN YOUR ATTENTION TO 3, EXHIBIT 3,

4   SUBPART N, MAY 6TH, 2:24 P.M.

5   A.   CAN YOU SAY THE TAB AGAIN, PLEASE?

6   Q.   3 "N" AS IN NANCY.   AND I HAVEN'T MARKED IT, BUT I WAS

7   TALKING ABOUT THE AREA AROUND 2:24 P.M.   DO YOU HAVE THAT?

8   A.   YES.

9   Q.   IN THIS A LITTLE BIT BEFORE THIS AND A LITTLE BIT AFTER

10  THIS THERE'S KIND OF AN EXTENDED DIALOGUE WHERE IT APPEARS

11  THAT DURING THE DIALOGUE THIS PERSON, CROW18, CLAIMS TO BE

12  MOLESTING A PERSON WHILE THEY'RE SPEAKING WITH PEI?

13  A.   YES.

14  Q.   AND, IN FACT, HE ASKS ADVICE -- I'M REFERRING TO THE

15  ENTRY AT 2:23 P.M. BY CROW18:   COOL.   WELL, HIS ASS IS NICE

16  AND RED NOW.   HE EVEN CRIED A BIT.   SHOULD I DO A DRY RUN OR

17  LUBE?

18          PEI RESPONDS:   HEHEHE.   YOU BETTER LUBE HIM UP A

19  BIT FIRST.

20          AND CROW18 SAYS:   OKAY.   HERE WE GO.

21          DOESN'T THAT APPEAR TO INDICATE THAT CROW18 IS

22  LUBRICATING AN INDIVIDUAL TO HAVE SOME SORT OF INTERCOURSE

23  WITH HIM?

24  A.   I CAN ONLY SEE WHAT'S ON THE CHATS.   I DON'T KNOW WHAT

25  HIS ACTIVITY -- WHAT HE WAS DOING ON THE OTHER SIDE.

1    Q.   DO YOU BELIEVE THAT WAS REALLY HAPPENING AT THE TIME OR

2    DO YOU BELIEVE THAT'S A FORM OF FANTASY?

3    A.   I BELIEVE THAT'S WHAT HE WAS DOING.  HE'S PUTTING THESE

4    KEY STROKES ON THOSE WORDS.

5    Q.   YOU NEVER IDENTIFIED CROW, RIGHT?

6    A.   NO.

7    Q.   IF I COULD TURN YOUR ATTENTION TO 3T, PAGE 10 AND 11,

8    PLEASE.  NOW, IN THIS SECTION, AND I BELIEVE YOU TALKED ABOUT

9    THIS ON DIRECT, THEY'RE TALKING ABOUT -- PEI AND NEO ARE

10   TALKING ABOUT HAVING KALEN HAVE AN ORGASM?

11   A.   THEY'RE TALKING ABOUT IF HE HAS HAD.  HE'S ASKING THE

12   QUESTION, HAVE YOU GIVEN HIM ONE.

13   Q.   AND THEN IT GOES ON LATER HOW HE WILL RESPOND TO IT,

14   GIVING HIM ONE, THAT SORT OF THING, RIGHT?

15   A.   YES.

16   Q.   NOW, AND IT'S MENTIONED THAT KALEN IS SEVEN YEARS OLD,

17   RIGHT?

18   A.   CORRECT.

19   Q.   AND YOU KNOW THAT IT'S PHYSICALLY IMPOSSIBLE FOR A

20   SEVENTEEN-YEAR-OLD BOY TO HAVE A CLIMAX?

21   A.   SEVENTEEN?

22   Q.   I'M SORRY, SEVEN.  IT'S PHYSICALLY IMPOSSIBLE?

23   A.   BUT WHEN HE TALKS ABOUT DRY, HE TALKS ABOUT A DRY

24   ORGASM, HE'S TALKING ABOUT MORE HIS ACTIVITY WITH THE CHILD,

25   NOT SO MUCH THE CHILD'S ORGASM.  HE SAYS IT'S A DRY ORGASM

1    BUT IT'S THE ACT OF WHAT HE'S DOING.

2    Q.   YOUR UNDERSTANDING IS THAT HE'S TALKING ABOUT HIS

3    ORGASM, NOT --

4    A.   NO, NO, HE'S TALKING ABOUT -- HE'S ASKING -- THE

5    QUESTION IS REGARDING KALEN'S ORGASM, BUT IT'S HIM TALKING

6    ABOUT HIS ACT WITH THE CHILD, WHAT HE'S DOING TO THE CHILD.

7    Q.   WELL, HE'S TALKING ABOUT HAVING THE CHILD HAVE AN

8    ORGASM, ISN'T HE?

9    A.   YES, BUT HOW.  HE'S TALKING ABOUT HOW HE'S GOING TO DO

10   THAT.

11   Q.   AND THAT'S NOT POSSIBLE, RIGHT, THAT'S FANTASY?

12   A.   I CAN'T SAY.

13   Q.   WELL, YOU KNOW, FROM YOUR COMMON EXPERIENCE, A

14   SEVEN-YEAR-OLD BOY CAN'T HAVE AN ORGASM?  LET ME TURN YOUR

15   ATTENTION --

16            MR. AKROTIRIANAKIS:  OBJECTION, FOUNDATION.

17            THE COURT:  OVERRULED.

18   BY MR. AARON:

19   Q.   LET ME TURN YOUR ATTENTION TO 5/20, 7:29 P.M.  I HAVE IT

20   INDICATED ON THE MONITOR AS WELL.

21            NEO:  SO YOU INTEND TO GIVE KALEN A NICE CUM?

22            PEI:  YES, THAT'S TRUE.

23            SO THAT INDICATES TO YOU THEY'RE TALKING ABOUT

24   KALEN HAVING A CLIMAX, CORRECT?

25   A.   YEAH, A NICE CUM, YEAH.  BUT BELOW THEY TALK ABOUT MORE

```
 1   DETAIL OF WHAT HIS TECHNIQUE --
 2              THE COURT:  EXCUSE ME.  THERE'S NO QUESTION
 3   PENDING.
 4   BY MR. AARON:
 5   Q.   YOU WERE ABOUT TO VOLUNTEER INFORMATION THAT THEY HAVE
 6   MORE DETAIL BELOW?
 7   A.   YES.
 8   Q.   BUT THEY'RE STILL TALKING ABOUT HAVING HIM CUM, RIGHT,
 9   OR CLIMAX?
10   A.   YES.
11   Q.   AND IF I COULD TURN YOUR ATTENTION, PLEASE, TO 3 "V" AS
12   IN VICTOR.  AND BEGINNING AROUND 5/18, 5:08 ON DOWN, THEY
13   TALK ABOUT OR THEY'RE FANTASIZING TOGETHER ABOUT CREATING A
14   PORNOGRAPHIC VIDEO, RIGHT?
15   A.   I WOULDN'T SAY FANTASY, BUT THAT'S WHAT THEY'RE TALKING
16   ABOUT CREATING.
17   Q.   AND THEY EVEN ASK -- WELL, ONE OF THEM ASKS THE OTHER --
18   I BELIEVE IT'S FOREVERKIN ASKS THE OTHER WHAT HIS FAVORITE
19   SCENARIO WOULD BE.  SHOWING YOU THE NEXT PAGE IN ORDER.  DO
20   YOU SEE THAT RIGHT AT THE TOP?
21   A.   YES.
22   Q.   WHAT WOULD BE YOUR FAVORITE SCENARIO, DO YOU SEE THAT?
23   A.   YES.
24   Q.   AND YOU NEVER RECOVERED ANY PORNOGRAPHIC VIDEOS MADE BY
25   FOREVERKIN OR PEI, RIGHT?
```

1   A.   NOT TO MY KNOWLEDGE, NO.

2   Q.   WOULD YOU AGREE WITH ME THAT THE PEOPLE ON ICQ WERE

3   THERE NOT JUST FOR PURPOSES OF DISCUSSING CHILD PORNOGRAPHY

4   OR SEX WITH YOUNG CHILDREN, BUT THEY ALSO HAD WEIRD PERSONAL

5   RELATIONSHIPS WITH ONE ANOTHER, CORRECT?

6   A.   WHAT DO YOU -- CAN YOU FURTHER DESCRIBE WHAT YOU MEAN?

7   Q.   SURE.  LET ME TURN YOUR ATTENTION, PLEASE, TO

8   EXHIBIT 1S, "S" AS IN SAM.  IT'S AT 12/22 AT 1:06 P.M.

9   A.   WHICH -- I'M SORRY, WERE YOU IN 3 OR IN 1K?

10  Q.   I BEG YOUR PARDON, 1, EXHIBIT 1S.

11  A.   YES.

12  Q.   IS IT FAIR TO SAY THEY EVEN GOSSIP ABOUT ONE ANOTHER,

13  ABOUT THEIR RELATIONSHIPS WITH ONE ANOTHER?

14  A.   WITH OTHER BOYS OR WITH EACH OTHER?

15  Q.   WITH EACH OTHER.

16  A.   YES, IT'S FAIR TO SAY.

17  Q.   AND THERE CT IS SAYING TO PONY:  I DON'T KNOW.  I DON'T

18  UNDERSTAND WHY THIS GUY HATES YOU THAT MUCH.  IT'S

19  INCREDIBLE.

20          RIGHT?

21  A.   YES.

22  Q.   NOW, ONE OF THE THINGS THAT THEY DO WHEN THEY'RE ON ICQ

23  IS THEY CHECK UP ON ONE ANOTHER'S HEALTH AND WELL-BEING,

24  RIGHT?

25  A.   YES.

1    Q.   TURNING YOUR ATTENTION TO 12/21, HERE'S AN ENTRY BY PONY

2    ABOUT A PERSON NAMED DRAGON.

3    A.   WHICH TAB IS THAT?

4    Q.   12/21, 5 P.M., 1R.

5    A.   OKAY.  YES.

6    Q.   AND THERE THERE'S A LONG ENTRY BY PONY ABOUT DRAGON'S

7    CONDITION ABOUT HAVING THE FLU AND SOME OTHER INJURIES?

8    A.   YEAH.  THOSE INFERENCES ARE VERY FEW.

9    Q.   WELL, THAT'S -- LET'S JUST GO TO THE VERY NEXT TAB.

10   LET'S GO TO THE VERY NEXT TAB WHICH WOULD BE 1U.  AND THERE'S

11   ANOTHER ENTRY THERE AGAIN BY PONY ON 12/26, 12:43 P.M.  THIS

12   TIME SETH IS TALKING WITH PONY AND SOME OTHER PEOPLE AND THEY

13   BRING UP THE ISSUE OF SETH'S ILLNESS, RIGHT?  OH, I'M SORRY,

14   THE ENTRY RIGHT THERE.

15            PONY:  I'LL JUST GRIT TEETH AND HOPE IT WILL PASS

16   QUICKLY.  AT LEAST IT'S NOT THE FLU LIKE YOURS.  DID YOU

17   SPEND YESTERDAY FEELING WELL, I.E., YOUR FEVER BROKE OVER THE

18   WEEKEND?

19   A.   YES.

20   Q.   OKAY.  THEY ALSO SEEM TO FLIRT WITH ONE ANOTHER, DON'T

21   THEY?

22   A.   CAN YOU -- I'M SURE YOU'RE GOING TO SHARE AN EXAMPLE.

23   Q.   SURE.  IF YOU COULD PLEASE TURN TO 1W, 12/27, 3:08 P.M.

24            AND THERE SPEED SAYS:  NO, I'M JUST CHATTING WITH

25   LIKE 15 PEEPS.  SORRY, MAN.  HUGS.

```
 1            AND SINGULARIT -- THAT'S ACTUALLY SINGULARIT.
 2            SINGULARIT SAYS:  NP, MEANING NO PROBLEM, MEGA
 3   HAPPY FACE AND HUGS.
 4            AND THEN SPEED SAYS:  SLURPY KISS, BIG RED.
 5            RIGHT?
 6   A.   YES.
 7   Q.   AND THEY FREQUENTLY -- THEY NOT INFREQUENTLY SAY THINGS
 8   TO ONE ANOTHER LIKE "I LOVE YOU," STUFF LIKE THAT?
 9   A.   YEAH.
10   Q.   WAS IT YOUR IMPRESSION THAT OTHER PEOPLE IN THESE CHATS
11   FELT THAT MR. SANDERS WAS MAYBE A LITTLE BIT OFF?
12   A.   THEY DISCUSSED HIS PROCLIVITY.
13            THE COURT:  I'M SORRY?
14            THE WITNESS:  PROCLIVITY.
15   BY MR. AARON:
16   Q.   AT VARIOUS TIMES THEY MENTIONED THAT HE SEEMED TO THEM
17   TO BE A LITTLE UNREASONABLE, RIGHT?
18   A.   WHAT DO YOU MEAN BY UNREASONABLE?
19   Q.   WELL, WHAT HE WAS SAYING SEEMED TO BE A LITTLE
20   FANTASTIC?
21   A.   THEY DIDN'T AGREE WITH HIM.  SOME PEOPLE HAD THEIR OWN
22   PREFERENCES.
23   Q.   DIDN'T IT APPEAR THAT A LOT OF PEOPLE THOUGHT THAT HE
24   WAS MAKING THINGS UP?
25   A.   NO.
```

1    Q.   LET ME TURN YOUR ATTENTION, PLEASE, TO EXHIBIT 2K.  ALL

2    RIGHT.  THIS IS A DIALOGUE INVOLVING HANS AND RICOCHET.  DO

3    YOU KNOW RICOCHET TO BE RANDALL MARTIN?

4    A.   YES.

5    Q.   AND HANS SAYS:  YES, HE'S TELLING BOYS FROM 6, 7 WHERE

6    ASKING HIM FOR SEX.  I CANNOT BELIEVE THAT.

7            RICOCHET:  NO, I CANNOT BELIEVE THAT EITHER.  IT

8    JUST DON'T HAPPEN.

9            HANS:  THAT'S WHY I MAKE NOT THAT MUCH CONTACT WITH

10   HIM, BUT HE'S THE ONLY ONE I KNOW WHO IS TALKING TO SETH.

11           SO AT LEAST TWO PEOPLE WERE TALKING ABOUT

12   MR. SANDERS MAKING THINGS UP?

13   A.   I DON'T KNOW IF IT'S MAKING THINGS UP.

14   Q.   HE WAS TELLING THEM THINGS THAT HAD HAPPENED WHICH THEY

15   DIDN'T BELIEVE HAD HAPPENED, RIGHT?

16   A.   THAT WAS THEIR PERSONAL OPINION.  THE ENTIRETY OF THE

17   CHATS OF EVERYTHING WE HAVE LOOKED AT --

18   Q.   I HAVE NOT -- I DIDN'T ASK YOU TO ARGUE THE

19   PROSECUTION'S CASE, DID I?

20   A.   I'M JUST SAYING, YOU'RE ASKING ME TO ANSWER QUESTIONS,

21   NUMBER ONE.

22   Q.   CERTAINLY.  JUST LIKE THE GOVERNMENT DID ON DIRECT.

23   THAT'S ALL I'M ASKING YOU TO DO IS ANSWER QUESTIONS.

24           IN THIS CHAT ALL THAT YOU SEE IS THAT HANS AND

25   RICOCHET HAVE A CONVERSATION WHERE THEY DISCUSS HOW THEY DID

1    NOT BELIEVE THAT WHAT MR. SANDERS IS SAYING ACTUALLY

2    HAPPENED, RIGHT?

3    A.    YES, ASKING, YES.

4    Q.    ON DIRECT YOU WERE ASKED IF MR. SANDERS TALKED ABOUT HIS

5    BELIEF THAT PEOPLE COULD NOT EASILY IMPERSONATE HIM.   THE

6    REFERENCE, IF YOU COULD TAKE A LOOK AT 2C, 11/17, AT 2:09

7    P.M.   DO YOU RECALL THE PROSECUTOR ASKING YOU ABOUT THE

8    PORTION ON 2:09 P.M.?

9    A.    YES.

10    Q.    AND BASICALLY YOU SAID, YES, HE'S TALKING ABOUT HIS

11    BELIEF THAT PEOPLE WOULD NOT BE ABLE TO EASILY IMITATE HIM,

12    RIGHT?

13    A.    YES.

14    Q.    BUT IN REALITY HE SAYS -- HE'S TALKING ABOUT BOYS,

15    RIGHT, BOYS HAVE CERTAIN WAYS OF EXPRESSING THEMSELVES.   THEN

16    HE TALKS ABOUT SOMEONE POSING AS HIM ONLINE, RIGHT?

17    A.    THAT HE WOULD KNOW THAT THEY COULDN'T, THAT SOMEONE

18    WOULD IDENTIFY BECAUSE THEY WOULD KNOW HIM.

19    Q.    HE SAYS IT WOULDN'T TAKE RICOCHET LONG TO HAVE DOUBTS,

20    RIGHT?   SO HE WOULD HAVE TO TALK -- IN MR. SANDERS' OPINION,

21    RICOCHET WOULD HAVE TO TALK TO THIS PERSON FOR A CERTAIN

22    PERIOD OF TIME BEFORE HE WOULD BEGIN TO HAVE DOUBTS, RIGHT?

23    A.    YEAH, BECAUSE HE'S DIRECTING IT TO RICOCHET AT THE TIME.

24    Q.    AND RICOCHET EVEN DOUBTS THAT, RIGHT?   HIS NEXT ENTRY

25    IS:   THAT'S PROBABLY TRUE.

```
 1              RIGHT?  THAT'S WHAT HE SAID?

 2    A.   YES.

 3    Q.   PROBABLY?

 4    A.   YEAH, PROBABLY.

 5    Q.   NOW, YOU MENTIONED ONLY IN A FEW PLACES DID THEY TALK

 6    ABOUT PERSONAL MATTERS, BUT AMONG THE PEOPLE WHO TALK ABOUT

 7    PERSONAL MATTERS, MR. SANDERS DOES IT THE MOST, DOESN'T HE?

 8    A.   I CAN'T COMMENT WHETHER HE DOES IT THE MOST.  I KNOW HE

 9    DOES MENTION HIS PERSONAL MATTERS, YES.

10    Q.   LET ME DIRECT YOUR ATTENTION, PLEASE, TO EXHIBIT NO. 1G

11    BEGINNING AT 1/3/01 AT 6:06 P.M. AND ENDING AT 1/3/01, 6:15.

12              DO YOU RECALL THIS PORTION OF THE DIALOGUE?  YOU

13    WERE ASKED ABOUT IT ON DIRECT EXAMINATION.

14    A.   YES.

15    Q.   AND YOU WERE ASKED ABOUT IT IN THE CONTEXT OF DR DOOM OR

16    MR. BEKENSTEIN EXPLAINING HOW ONE ACQUIRES A HUSH MAIL

17    ACCOUNT, RIGHT?

18    A.   YES.

19    Q.   MR. SANDERS OR BOYSAN1 APPEARS TO ENGAGE IN THE

20    CONVERSATION, RIGHT?

21    A.   YES.

22    Q.   BUT HE'S NOT TALKING ABOUT THE HUSH MAIL, HE'S TALKING

23    ABOUT MR. BEKENSTEIN'S DIET, RIGHT?

24    A.   YES.

25    Q.   ON 1/3/01, 6:06 HIS COMMENT IS:  HEHEHE.  ARE YOU STILL
```

1    ON NO CARBS?

2         RIGHT?

3    A.   YES.

4    Q.   THE HUSH MAIL CONVERSATION WITH DR DOOM AND 95111077

5    CONTINUES TO THE NEXT PAGE, RIGHT?

6    A.   YES.

7    Q.   AND IN THAT CONVERSATION, AGAIN, BOYSAN MAKES SEVERAL

8    REMARKS RELATED TO MR. BEKENSTEIN'S DIET, RIGHT?

9    A.   YES.

10   Q.   NOW, THEY TALK ABOUT A LOT OF OTHER PERSONAL ACTIVITIES,

11   RIGHT, THEIR INTERESTS, THINGS LIKE THAT, THEIR POLITICAL

12   BELIEFS, STUFF LIKE THAT?

13   A.   YES.

14   Q.   AND AGAIN, MR. SANDERS TALKS ABOUT THAT QUITE

15   FREQUENTLY?

16   A.   HE TALKS ABOUT THEM, YEAH.

17   Q.   HE EVEN TALKS ABOUT GAMES HE LIKES TO PLAY?

18   A.   UM, WHAT TYPE OF GAMES?

19   Q.   IF YOU COULD REFER TO 3H, THE DATE OF 2/15 AND THE TIME

20   OF 12:07.

21   A.   3H?

22   Q.   3H, PLEASE.

23   A.   WHAT PAGE IS AT THE BOTTOM THERE?

24   Q.   PAGE 1.

25   A.   OKAY.

1  Q.   AND IT APPEARS THERE THAT PEI IS TALKING ABOUT CHESS,

2  THE GAME CHESS, RIGHT?

3  A.   YES.

4  Q.   AND HE'S TALKING ABOUT HOW WE SHOULD APPLY IT TO REAL

5  LIFE SITUATIONS, RIGHT?

6  A.   YES.

7  Q.   AND HE AND JURE OR JURE ARE HAVING A CONVERSATION ABOUT

8  WHAT PARTS OF IT THEY LIKE.   AND JURE SAYS HE LIKES THE

9  STRATEGY OF THE GAME, NOT THE TECHNICALITIES?

10 A.   YES.

11 Q.   IF I COULD TURN YOUR ATTENTION TO 3P, THE DATE 5/7,

12 6:58 A.M.   AND THERE PEI SAYS:   HIS DAD GOT IT, TOO.   I DON'T

13 BELIEVE IN MURDER OF ANY KIND SO I'M AGAINST THE DEATH

14 PENALTY.   I DON'T LIKE MY FRIENDS OR ANY CHILD TO HAVE TO

15 ENDURE A VIOLENT PARENT.

16          RIGHT?

17 A.   YES.

18 Q.   AND THERE, AGAIN, THIS IS A CONVERSATION THAT DOESN'T

19 INVOLVE CHILD PORNOGRAPHY OR CHILD MOLESTATION, RIGHT?

20 A.   I THINK THEY WERE TALKING ABOUT SOMEONE -- IF YOU READ

21 THAT ENTIRE PART OF THE CHAT, I THOUGHT THEY WERE TALKING

22 ABOUT SOMEONE THAT WAS BEING EITHER ABUSED OR --

23 Q.   DIDN'T IT APPEAR TO YOU THAT MR. SANDERS WAS USING THESE

24 CHATS, IN PART, AS KIND OF A VIRTUAL NETWORK OF FRIENDS?

25 A.   SIR, VIRTUAL FRIENDS?

1    Q.   YES.

2    A.   THEY SEEM TO BE REAL PEOPLE HE'S TALKING TO.

3    Q.   WELL, HE'S TALKING TO THEM AT VERY ODD HOURS.  HE'S

4    TALKING TO THEM WAY INTO THE EVENING?

5    A.   YES.

6    Q.   WAY INTO THE MORNING?

7    A.   YES.

8    Q.   SOMETIMES HE'S TALKING TO THEM AT 6 OR 7 IN THE MORNING?

9    A.   YES.

10   Q.   SO VIRTUALLY ROUND THE CLOCK HE HAS RECOURSE TO THIS

11   GROUP OF PEOPLE THAT HE TALKS TO ABOUT ALL THESE DIFFERENT

12   SUBJECTS, INCLUDING THE ISSUES OF CHILD PORNOGRAPHY?

13   A.   YES.

14   Q.   AND LIKE ALL FRIENDSHIPS, IT SEEMS TO YOU, DOESN'T IT,

15   THAT AT TIMES HE LIKES TO BUILD HIS FRIENDS UP TO ENCOURAGE

16   THEM?

17   A.   YES.

18   Q.   AND, IN FACT, HERE IN EXHIBIT 3A, 1/21 AT 9:13:  I LIKE

19   YOU.  YOU HAVE A GREAT MIND.  I WOULD LIKE TO SEE IT DEVELOP

20   TO ITS GREATEST POTENTIAL.  SORRY FOR THE OCCASIONAL SLOPOLA,

21   BUT IT'S REFRESHING TO HAVE A SHARP MIND FOR A FRIEND FOR A

22   MOMENT IN TIME.  THERE'S SO MANY DUMMIES OUT THERE -- SMILEY

23   FACES.

24        SO IT APPEARS HE'S JUST EXPRESSING APPRECIATION AND

25   AFFECTION FOR A FRIEND, RIGHT?

```
 1    A.    YES.
 2    Q.    AND HE SAYS, DOESN'T HE, THAT HIS FRIENDSHIP WITH PEOPLE
 3    ON ICQ IS SEPARATE AND APART FROM CHILD PORN ISSUES, RIGHT?
 4    A.    SEPARATE AND APART OR --
 5    Q.    IF I COULD DIRECT YOU TO EXHIBIT 3A, 5/18, 11:09 P.M.
 6    A.    3A?
 7    Q.    LET ME CHECK.  YES, 3A.
 8    A.    I HAVE IT AT 5/13.
 9    Q.    IT'S ACTUALLY WITH SOME BLUE PAGES.
10    A.    SO THE PAGE ON THE BOTTOM?
11    Q.    17.
12    A.    17, OKAY.
13    Q.    AND THERE PEI SAYS:  THAT'S GOOD.  I WAS WORRIED ABOUT
14    YOU, NOT AS A PEDO, BUT AS A FRIEND THAT LOVES YOU.
15          RIGHT?
16    A.    YEAH.
17    Q.    AND PEDO IS SHORT FOR PEDOPHILE?
18    A.    YES.
19    Q.    AND THERE HE'S TALKING ABOUT THE FACT THAT HE'S WORRIED
20    ABOUT HIS FRIENDS REGARDLESS OF SEXUAL ACTIVITIES, RIGHT?
21    A.    WELL, HE'S SAYING THAT HE LOVES THEM I GUESS AS A
22    PEDOPHILE AND AS A FRIEND, OR HE WORRIES ABOUT THEM MORE.
23    Q.    WELL, HE ACTUALLY DOESN'T SAY HE LOVES THEM AS A
24    PEDOPHILE.  HE SAYS:  THAT'S GOOD.
25          RIGHT?  LET'S GO THROUGH THE COMMENT.
```

```
 1              HE SAYS:  THAT'S GOOD.

 2              CORRECT?

 3   A.   YES.

 4   Q.   HE SAYS:  I WAS WORRIED ABOUT YOU.

 5              CORRECT?

 6   A.   YES.

 7   Q.   NOT AS A PEDOPHILE, BUT AS A FRIEND THAT LOVES YOU.

 8              RIGHT?

 9   A.   YES.

10   Q.   AND, IN FACT, MR. SANDERS GETS VERY DISTRESSED WHEN THE

11   FRIENDS WON'T SPEAK TO HIM, RIGHT?  LET ME TURN YOUR

12   ATTENTION TO 3A, 5/13, 9:29.  THAT'S PAGE 14 AT THE BOTTOM.

13   IN HIS CONVERSATION WITH JEREMIAH WHERE THEY'RE TALKING ABOUT

14   DRY FUCKING, QUOTE/UNQUOTE.

15              PEI:  YOU TOLD ME SOMETHING ABOUT DRY FUCKING A BOY

16   TO DEATH.  AND THEN ABOUT TWO HOURS LATER YOU WRITE SLEEP

17   WELL, BOY.

18              THEN THE NEXT DAY IN THE EVENING HE WRITES:  SO WHY

19   AREN'T YOU ON?

20              RIGHT?

21   A.   YES.

22   Q.   THEN AN HOUR -- ABOUT AN HOUR AFTER THAT HE WRITES:

23   LET'S NOT LET THIS COME BETWEEN US.  WE'VE BEEN FRIENDS TOO

24   LONG.  YOU DON'T HAVE TO WORRY ABOUT EXPOSURE.

25              AND THEN IT'S REDACTED AND THEN NEXT ENTRY IS ON
```

1   5/16, RIGHT?

2   A.   YES.

3   Q.   AND THERE HE SAID:  YOU SHOULD REALLY TALK TO ME.  I'VE

4   ONLY BEEN YOUR FRIEND FOR A YEAR AND A HALF.

5           AND THEN HIS FINAL ENTRY IS:  YOU WANT TO SHUT ME

6   OUT, THEN THAT'S YOUR FREE WILL AND ACTION AND I CAN RESPECT

7   THAT, BUT IF YOU DO, IT WILL HURT AND IT WON'T BE GOOD FOR

8   YOU OR I.  I TOLD YOU THAT YOU'RE MY FRIEND NO MATTER WHAT

9   AND THAT MEANS WHO YOU REALLY ARE.

10          RIGHT?

11  A.   YES.

12  Q.   DURING THESE CONVERSATIONS ONE OF THE THINGS THAT

13  MR. SANDERS COMPLAINS ABOUT ARE HIS TECHNICAL PROBLEMS,

14  RIGHT?

15  A.   YES.

16  Q.   AND HE COMPLAINS ABOUT THAT THROUGHOUT THE CHAT

17  TRANSCRIPTS, CORRECT?

18  A.   HE TALKS ABOUT THEM, YES.

19  Q.   HE REFERS TO HIS SYSTEM, HIS COMPUTER, AS, QUOTE, A HUNK

20  OF SHIT SYSTEM, END QUOTE?

21  A.   YES.

22  Q.   HE KEEPS TALKING ABOUT THE MALFUNCTIONS THAT IT HAS,

23  RIGHT?

24  A.   THAT HE HAS PROBLEMS WITH ON OCCASION, YES.

25  Q.   THAT IT FREEZES UP, THEN HE GETS KNOCKED OFF THE ICQ,

1    THINGS LIKE THAT?

2    A.    YES.

3    Q.    FOR EXAMPLE, LET ME JUST SHOW YOU AN ENTRY FROM 3G.

4    IT'S AT PAGE 1.

5    A.    3G?

6    Q.    3G AT PAGE 1 WHERE HE TALKS ABOUT HIS CONNECTION.  AT

7    1:47 HE TALKS ABOUT HIS CONNECTION GOING DOWN AND HE DOESN'T

8    KNOW IF HE'S STILL CONNECTED, RIGHT?

9    A.    YES.

10   Q.    AND THEN FOUR DAYS LATER HE HAS A SYSTEM FAILURE, 3/13

11   AT 10:31 P.M.

12   A.    HE SAID:  GATEWAY FROZE UP.

13   Q.    AND GOT A GREEN LINE ACROSS THE TOP OF THE SCREEN?

14   A.    YES.

15   Q.    AND THERE'S MANY EXAMPLES THROUGHOUT THE CHATS, RIGHT,

16   WHERE HE TALKS ABOUT PROBLEMS WITH HIS MOUSE, WITH HIS ISB,

17   WITH THE INTERNET, WITH HIS OPERATING SYSTEM, WITH CORRUPTED

18   WINDOWS, THAT SORT OF THING?

19   A.    CORRUPTED WINDOWS?

20   Q.    HE DOESN'T TALK ABOUT PROBLEMS WITH HIS OPERATING

21   SYSTEM?

22   A.    HE TALKS ABOUT THE OPERATING SYSTEM, YES.

23   Q.    THAT'S FAIR TO SAY THERE'S MANY ENTRIES DEALING WITH

24   THAT?

25   A.    THERE ARE SOME, YES.

```
 1    Q.    SHOWING YOU EXHIBIT 207 WHICH IS PAGE --

 2             MR. AARON:  MAY I APPROACH, YOUR HONOR?

 3             THE COURT:  YOU MAY.

 4    BY MR. AARON:

 5    Q.    THIS IS ANOTHER PAGE FROM THE CHAT TRANSCRIPTS.

 6    A.    OKAY.

 7    Q.    AND ON MAY 5TH, 2001, HE DOES REFER TO HIS WINDOWS BEING

 8    CORRUPT?

 9    A.    YES.

10             MR. MICHAEL:  OBJECT, YOUR HONOR, IT IS --

11             THE COURT:  EXCUSE ME.

12             MR. AKROTIRIANAKIS:  OBJECTION, DOCUMENT NOT IN

13    EVIDENCE.

14             MR. AARON:  I'LL MOVE IT INTO EVIDENCE.  I BELIEVE

15    THAT IT WAS MR. MORAN WHO TESTIFIED THAT IT WAS SIMILAR TO

16    THE TRANSCRIPT -- IT WAS PART OF THE TRANSCRIPTS THAT HE HAD

17    DOWNLOADED.

18             THE COURT:  ALL RIGHT.  ANY OBJECTION TO 207?

19             MR. AKROTIRIANAKIS:  NO OBJECTION.

20             THE COURT:  EXHIBIT 207 IS ORDERED ADMITTED.  YOU

21    MAY PUBLISH -- OR YOU MAY INQUIRE.

22             MR. AARON:  LET ME JUST PUBLISH IT.  THAT MIGHT BE

23    EASIER.

24             THE COURT:  ALL RIGHT.  THANK YOU.

25    BY MR. AARON:
```

1    Q.    NOW, WE WERE JUST TALKING ABOUT ON MAY 5TH, 2001,

2    11:14 P.M. HE TALKS ABOUT HIS WINDOWS BEING CORRUPT, RIGHT?

3    A.    YES.

4    Q.    AND THE OTHER SPEAKER TALKS ABOUT HIM UPGRADING, RIGHT?

5    A.    YES.

6    Q.    THEN A LITTLE BIT LATER -- WELL, ALMOST -- WELL, MORE

7    THAN A WEEK LATER, EIGHT DAYS LATER, ON THE 13TH HE COMMENTS:

8    IT'S EITHER THIS LAPTOP THAT'S SCREWING UP OR MY ISP.  I'LL

9    FIND OUT TOMORROW WHEN I USE A DIFFERENT ISP.

10          RIGHT?

11   A.    YES.

12   Q.    AND THEN JUST A FEW MINUTES AFTER THAT HE COMMENTS IN

13   RESPONSE TO A REMARK THAT FREEDOM MAKES:  THAT'S PRETTY

14   AWESOME.  I THINK THIS LAPTOP IS IN NEED OF FORMATTING.

15          RIGHT?

16   A.    YES.  AND HE GETS THE FORMATTING LATER ON ON 5/21.

17   Q.    SIR, I DIDN'T ASK YOU IF HE GOT THE FORMATTING.

18   A.    IT'S A PIECE.

19   Q.    DURING YOUR DIRECT EXAMINATION THE PROSECUTION ASKED YOU

20   QUESTIONS ABOUT SPECIFIC SECTIONS IN THE EXCERPTS, RIGHT?

21   A.    CORRECT.

22   Q.    AND IN THIS CROSS-EXAMINATION YOU UNDERSTAND THAT I'M

23   ALLOWED TO ASK YOU QUESTIONS ABOUT SPECIFIC EXCERPTS, RIGHT?

24   A.    OKAY.

25   Q.    IS THAT "YES"?

1    A.   YES.

2    Q.   OKAY.  LET ME TURN YOUR ATTENTION, PLEASE, TO

3    EXHIBIT 3Y.  CAN YOU SEE THAT?

4    A.   YES.

5    Q.   NOW, IT APPEARS, AGAIN, PEI IS TALKING TO AN INDIVIDUAL,

6    RIGHT, OR TRYING TO TALK TO AN INDIVIDUAL?

7    A.   YES.

8    Q.   AND THEY'RE NOT RESPONDING?

9    A.   WELL, THEY DO IN THE MIDDLE.

10   Q.   HE'S TALKING TO AN INDIVIDUAL, TOMMY, AND TOMMY

11   RESPONDS:  WHO ARE YOU?  SAY ME, PLEASE.  THANKS.

12            AND THEN HE MAKES NO OTHER RESPONSE?

13   A.   NO, NOT ON THIS PAGE.

14   Q.   NOW, CAN YOU COMPARE THAT -- DO YOU HAVE 3R IN FRONT OF

15   YOU?

16   A.   YES.

17   Q.   NOW, IF YOU COULD TAKE A LOOK AT -- THIS 3Y IS A

18   DIALOGUE ON 2/18 AND 5/20, RIGHT?

19   A.   YES.

20   Q.   AND 3R ALSO HAS A DIALOGUE ON 5/20, RIGHT?

21   A.   3R?

22   Q.   IT INCLUDES A PERIOD OF TIME FROM 5/14 TO 5/21, IF YOU

23   LOOK AT PAGE 2.

24   A.   YES.

25   Q.   SO THE DIALOGUE IN 3Y TOOK PLACE IN BETWEEN THE

1   DIALOGUES IN 3R, RIGHT?

2   A.   THE PART IN 5/20, YES, IT STARTS AT 2/18.

3   Q.   ALL RIGHT.   THERE IS PART OF 3R WHICH HAPPENS BEFORE 3Y

4   AND PART THAT HAPPENS AFTER 3Y; IS THAT CORRECT?

5   A.   NO, I THINK IT'S THE OTHER WAY AROUND, BECAUSE IT STARTS

6   AT -- 5R STARTS AT 5/7/2001 AND 5Y STARTS AT 2/18.

7   Q.   OKAY.   YOU'RE CORRECT, I'M SORRY.   5Y STARTS AT 2/18 AND

8   THEN IT ENDS, RIGHT?

9   A.   YES.

10  Q.   AND THEN 3R STARTS AT 5/7, RIGHT?

11  A.   YES.

12  Q.   AND THAT GOES UP TO 5/14, RIGHT?   IT GOES UP TO 5/14 AND

13  THEN IT BREAKS?

14  A.   YES, THERE'S A BREAK.

15  Q.   AND 5 -- I'M SORRY.   3Y TAKES OVER FOR 5/20 AND THEN IT

16  BREAKS, RIGHT?

17  A.   YES.

18  Q.   AND YOU GO BACK TO 3Y AND IT STARTS UP AT 5/21 AGAIN?

19  A.   YES.

20  Q.   CAN YOU TAKE A LOOK AT EXHIBIT 3G, PLEASE?   THE VERY

21  FIRST PAGE, DO YOU SEE THE DIALOGUE AT THE TOP OF THE PAGE?

22  A.   YES.

23  Q.   AND IT APPEARS TO BE CONVERSATIONS OVER A NUMBER OF

24  DAYS?

25  A.   YES.

1   Q.   BUT THERE'S -- UNTIL MARCH 13TH, 2000, PEI IS THE ONLY

2   SPEAKER, RIGHT?

3   A.   CORRECT.

4   Q.   DO YOU KNOW IF INCOGNITO OR ANY OTHER SPEAKER HAD EVER

5   RESPONDED TO HIM AND IS NOT ON THE TRANSCRIPT?

6   A.   FROM THE APPEARANCES OF THE TRANSCRIPT, I CAN'T.

7   Q.   YOU CAN'T TELL?

8   A.   NO.

9   Q.   SO THERE MAY BE CONVERSATIONS THAT ARE NOT ON THE

10  TRANSCRIPT, YOU DON'T KNOW?

11  A.   THERE MAY BE.

12          MR. AKROTIRIANAKIS:  OBJECTION, FOUNDATION.

13          THE COURT:  OVERRULED.

14  BY MR. AARON:

15  Q.   SHOWING YOU EXHIBIT 3Y, IT'S THE FIRST PAGE IN THAT, 3Y,

16  THE FIRST PAGE.

17  A.   OKAY.  3I?

18  Q.   I BEG YOUR PARDON, 3Y.  I'M SORRY, 3U.  3U, I MISSPOKE.

19  3U.

20          IF YOU TAKE A LOOK AT THE FIRST ENTRY, IT'S BY PEI,

21  AND HE SAYS:  WHO IS SUPPORTING KAAPMAN?

22  A.   YES.

23  Q.   AND THERE'S NO ANSWER, RIGHT?

24  A.   CORRECT.

25  Q.   THEN THE NEXT ENTRY IS AGAIN BY PEI AND IT'S A DAY

```
 1   LATER.  IT SAYS:  I MISS YOU, MY FRIEND.  IT'S BEEN TOO LONG
 2   SINCE WE TALKED.
 3            RIGHT?
 4   A.   YES.
 5   Q.   AND THEN THE NEXT ENTRY IS ALSO BY PEI AND IT SAYS:  HI,
 6   GANY.  THIS IS BOYSAN ON MY LAPTOP AT CAMP.  HOW'S IT GOING?
 7            RIGHT?
 8   A.   YES.
 9   Q.   NOW, ONE OF THE THINGS THAT THE TRANSCRIPTS DO IS THEY
10   CONTAIN A CHRONOLOGICAL SEQUENCE.  IN OTHER WORDS, SOMEONE
11   SAYS "HI."  THE NEXT COMMENT WHICH MAY BE "HOW ARE YOU" WOULD
12   APPEAR BELOW "HI," RIGHT?
13   A.   IT MAY, BECAUSE I THINK YOU SAID IT MIGHT BE INVISIBLE,
14   BUT IT MAY OR MAY NOT BE THERE.
15   Q.   WELL, WHEN THE PROSECUTOR WAS SHOWING YOU THE
16   CONVERSATIONS, HE COLORCODED THEM?
17   A.   YES.  WHEN IT'S ON THERE, YES, THEY ARE CHRONOLOGICAL.
18   Q.   OKAY.  AND TAKE A LOOK AT THE FIRST TWO ENTRIES AFTER
19   THE INITIAL ENTRY.  THE FIRST ENTRY IS AT 5/15, 12:59 A.M.,
20   RIGHT?
21   A.   YES.
22   Q.   AND THE NEXT ENTRY AFTER THAT IS AT 10:18 A.M., RIGHT?
23   A.   YES.
24   Q.   SAME DAY, RIGHT?
25   A.   YES.
```

1    Q.   NOW, AFTER THAT YOU GET 5/16/2000, 5:04 A.M. AND THERE'S

2    SOME REMARKS TO GANY, RIGHT?

3    A.   YES.

4    Q.   AND THERE'S NO RESPONSE BY GANY?

5    A.   NO.

6    Q.   IN FACT, THERE'S NO RESPONSE BY ANYONE UNTIL YOU GET TO

7    5/18, RIGHT?

8    A.   THAT'S CORRECT.

9    Q.   DO YOU KNOW IF SOMEONE EDITED THESE TRANSCRIPTS?

10   A.   MY UNDERSTANDING THEY -- TO MY KNOWLEDGE, THEY HAVEN'T

11   BEEN EDITED.

12   Q.   DO YOU KNOW WHY SPEAKERS WOULD NOT APPEAR?

13   A.   NO, NO.

14   Q.   YOU DIDN'T DELETE ANY SPEAKERS OR ENTRIES ON THOSE

15   TRANSCRIPTS?

16   A.   NO, I DID NOT.

17   Q.   AND YOU DON'T KNOW WHO WOULD HAVE?

18   A.   NO, I DON'T.

19           MR. AARON:  THANK YOU.  I HAVE NOTHING FURTHER.

20           THE COURT:  WHY DON'T WE TAKE ANOTHER SHORT BREAK

21   AND WE WILL BE IN RECESS FOR 15 MINUTES, LADIES AND

22   GENTLEMEN.  AND AGAIN, PLEASE REMEMBER, DON'T DISCUSS THE

23   CASE, ANY EVIDENCE IN THE CASE, ANY OF THE PARTICIPANTS, AND

24   DON'T MAKE UP YOUR MINDS IN ANY FASHION.  THANK YOU.  YOU ARE

25   EXCUSED.

```
 1                (OUT OF THE PRESENCE OF THE JURY:)
 2          THE COURT:  YOU MAY STEP DOWN.
 3          THE WITNESS:  THANK YOU.
 4          THE COURT:  WE'RE ON THE RECORD OUTSIDE THE
 5  PRESENCE OF THE JURY AND WE'RE SEVERAL HOURS BEHIND SCHEDULE.
 6          MR. AKROTIRIANAKIS:  I DON'T THINK SO, YOUR
 7  HONOR.  FIRST OF ALL, MY REDIRECT OF AGENT BROWN IS GOING TO
 8  BE ABOUT FIVE MINUTES.  AND THEN INVESTIGATOR HUBBARD IS
 9  GOING TO TESTIFY AND HIS TESTIMONY IS EXCEEDINGLY BRIEF.  HE
10  IS BASICALLY GOING TO TESTIFY THAT HE IDENTIFIED KALEN AND
11  HOW THEY DID THAT IN NEW MEXICO.  THEN MR. SUTHERLAND IS
12  GOING TO TESTIFY BRIEFLY.  MONIQUE IS GOING TO TESTIFY.  HER
13  TESTIMONY IS ABOUT FIVE MINUTES AS WELL, MATCHING PICCOLO TO
14  EXHIBIT 117.  AND WE'RE NOT GOING TO CALL AGENT MORENO.  WE
15  WILL BE DONE.
16          THE COURT:  SO THAT LEAVES US WITH THE ISSUE ABOUT
17  THOSE MAGAZINES.
18          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I THINK WHAT
19  THE GOVERNMENT WOULD PROPOSE WOULD BE JUST TO -- WE'RE NOT
20  GOING TO OFFER -- WELL, WE COULD OFFER, BUT WE DON'T NEED TO,
21  THE ORIGINAL MAGAZINES THEMSELVES.  I THINK THAT WE CAN HAVE
22  A COVER PAGE AND A PAGE THAT HAS THE RELEVANT COPYRIGHT OR
23  PRINT DATE INFORMATION AND A PAGE THAT HAS THE CHILD
24  PORNOGRAPHY IN QUESTION FOR 29.  AND THEN FOR 27 AND 32, THE
25  SO-CALLED BOOKEND ISSUES, WE WOULD JUST HAVE THE --
```

1          THE COURT:  WHAT HAPPENED TO EXHIBIT 140, 141?

2          MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  I'M

3  REFERRING TO THE EDITION VOLUME NUMBER ON THE --

4          THE COURT:  OH, NOT THE EXHIBIT NUMBERS.

5          MR. AKROTIRIANAKIS:  WITH THAT, WE WOULD JUST ADD

6  THE COVER AND THE PRINTING DATE.  I DON'T NEED TO SHOW THAT.

7  I THINK I CAN JUST, YOU KNOW, SHE'LL HAVE THE MAGAZINE THERE

8  ON THE STAND AND I'LL JUST ASK HER, IS THERE A PRINTING DATE

9  IN THE MAGAZINE?

10          THE COURT:  BUT YOU'RE GOING TO OFFER THEM INTO

11  EVIDENCE?

12          MR. AKROTIRIANAKIS:  I WILL OFFER THEM, BUT I DON'T

13  THINK THAT THE -- JUST THE XEROXES, YOUR HONOR.  SHE CAN

14  TESTIFY THAT THE XEROXES ARE TRUE COPIES OF THE ORIGINALS

15  WHICH SHE WILL HAVE IN HER POSSESSION.  AND IF THE COURT

16  WOULD LIKE US --

17          THE COURT:  MR. AARON, DO YOU HAVE ANYTHING FURTHER

18  TO ARGUE ON THAT POINT?

19          MR. AARON:  I HAVE MY ORIGINAL OBJECTIONS AND I

20  DON'T KNOW HOW SHE WILL TESTIFY TO THE PUBLICATION DATE.

21  ISN'T THAT HEARSAY?  IT'S NOT OLD ENOUGH TO BE AN ANCIENT

22  DOCUMENT.

23          MR. AKROTIRIANAKIS:  IT'S CERTAINLY OLD ENOUGH TO

24  BE AN ANCIENT DOCUMENT.  IT'S 20 YEARS, YOUR HONOR.

25          THE COURT:  WHAT'S THE DATE, 1970?

1          MR. AKROTIRIANAKIS:  THEY'RE FROM THE '70'S.

2          THE COURT:  WHAT'S THE DATE?  SOME PARTS --

3          MR. AARON:  1979.

4          THE COURT:  1979.  THAT'S NOT 30 YEARS.

5          MR. AARON:  I MUST BE CONFUSED WITH THE STATE

6   RULE.  IT SAYS 20 YEARS.

7          THE COURT:  THEY'RE ANCIENT DOCUMENTS, MAKING ALL

8   OF US FEEL A LITTLE OLDER.

9          MR. AKROTIRIANAKIS:  I LIKE TO FEEL IT'S AN

10  ACCOMPLISHMENT TO USE A MORE OBSCURE EXCEPTION TO THE HEARSAY

11  RULE, YOUR HONOR.  I TRY TO DO THAT.

12         THE COURT:  WELL, THE OBJECTION ON THAT BASIS IS

13  OVERRULED, ON THE OBSCURITY BASIS, THE OBSCURITY EXCEPTION TO

14  THE OBJECTION.

15         BUT SERIOUSLY, THE 403 OBJECTION --

16         MR. MICHAEL:  YOUR HONOR, DID YOU RECEIVE THE

17  BINDER WITH THE TAB PAGES THAT THE GOVERNMENT HAD MARKED?  WE

18  LEFT IT BACK AT YOUR BENCH WHEN YOU STEPPED OUT FOR A BREAK

19  AND WE PUT TABS ON THE THREE PAGES FROM EXHIBIT --

20         THE COURT:  I DON'T SEE IT HERE.

21         MR. MICHAEL:  WITH THE MATCH.  LET ME SEE IF I CAN

22  FIND IT.

23         MR. AARON:  SO THE ONLY OBJECTIONS I HAVE

24  OUTSTANDING --

25         MR. MICHAEL:  YOUR HONOR, I MISSPOKE.  I DID BUT

```
1    YOU WEREN'T HERE SO I REMOVED IT.
2              THE COURT:  THE REMAINING OBJECTIONS WOULD BE
3    OVERRULED.  THE ONLY ONE I AM STILL --
4              MR. AARON:  THAT WAS FOUNDATION AND 403.  AND IF
5    THEY ARE OVERRULED, I WILL BE ABLE TO HAVE A CONTINUING
6    OBJECTION?
7              THE COURT:  YES.  AND THE ONLY ONE I'M STILL
8    CONCERNED ABOUT IS THE 403 OBJECTION, SO LET ME LOOK AT THE
9    TABBED PAGES.  THESE ARE THE ONES THAT YOU'RE INTENDING TO
10   INTRODUCE AT THIS TIME?
11             MR. MICHAEL:  THE BOOKENDS HAVE ONLY THE PAGES.
12   AND THE ONE WITH THE MATCH, WE HAVE THOSE PAGES THAT WE WOULD
13   SEEK TO INTRODUCE.
14             THE COURT:  ALL RIGHT.  I'M INCLINED TO OVERRULE
15   ALL THE OBJECTIONS.  LET ME LOOK FURTHER.  WELL, LET ME MAKE
16   SURE THAT ONLY THE TABBED PAGES -- THAT'S OF THE -- THAT'S OF
17   THE ISSUE THAT WAS WHERE THE IMAGES WERE FOUND OF THE
18   DEFENDANT'S --
19             MR. MICHAEL:  CORRECT.  IF YOUR HONOR WERE TO RULE
20   AS YOU JUST INDICATED, I WILL GO TO THE ORIGINAL EXHIBIT AND
21   CORRECT IT RIGHT NOW.
22             THE COURT:  WHY DON'T YOU DO THAT.  THANK YOU.
23   WE'RE IN RECESS.
24                       (RECESS)
25               (IN THE PRESENCE OF THE JURY:)
```

```
 1              THE COURT:  LET THE RECORD REFLECT ALL MEMBERS OF
 2    THE JURY, BOTH PARTIES, AND DEFENDANT ARE ALSO PRESENT.  THE
 3    WITNESS ON THE WITNESS STAND.
 4              BEFORE YOU BEGIN YOUR REDIRECT, MS. CHILDERS, NOT
 5    TO WORRY.  I THINK WE'RE RIGHT ON SCHEDULE.  AND I REMEMBER
 6    YOU TELLING US DURING JURY SELECTION THAT YOU HAD A
 7    COMMITMENT FOR NEXT WEEK, AND I'M SURE THAT YOU WILL BE ABLE
 8    TO KEEP IT.
 9              JUROR CHILDERS:  OKAY.  THANK YOU.
10              THE COURT:  THANK YOU.  ALL RIGHT.  GO AHEAD.
11              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.
12                      REDIRECT EXAMINATION
13    BY MR. AKROTIRIANAKIS:
14    Q.   AGENT BROWN, DO YOU RECALL BEING ASKED ON
15    CROSS-EXAMINATION ABOUT THE EXISTENCE OF CHATS WHERE THE
16    DEFENDANT IS NOT PRESENT?
17    A.   YES.
18    Q.   AND DO YOU RECALL BEING ASKED ABOUT THERE BEING CHATS
19    WITH BEKENSTEIN -- THE BEKENSTEIN CHATS IN EXHIBIT 1 -- WHERE
20    THE DEFENDANT WAS NOT PRESENT?
21              ARE THERE CHATS IN EXHIBIT 1?
22    A.   YES, THERE ARE.
23    Q.   THE BEKENSTEIN CHATS WHERE THE DEFENDANT IS NOT PRESENT?
24    A.   YES, THERE ARE.
25    Q.   AND THERE ARE CHATS WHERE HE IS PRESENT?
```

1    A.   YES.

2    Q.   AND THERE ARE CHATS BETWEEN THE DEFENDANT AND THE OTHER

3    CHATTERS FROM THE BEKENSTEIN CHATS OTHER THAN MR. BEKENSTEIN

4    IN THE DEFENDANT'S CHATS, AS WELL?

5    A.   CORRECT.

6    Q.   SO, IN OTHER WORDS, A LOT OF THE DIFFERENT CHATTERS ARE

7    CHATTING WITH EACH OTHER IN THE BEKENSTEIN CHATS, IN THE

8    SANDERS CHATS, THE DEFENDANT'S CHATS, EXHIBIT 3, AND SO ON;

9    IS THAT RIGHT?

10              MR. AARON:  OBJECT, LEADING.

11              THE COURT:  SUSTAINED.

12   BY MR. AKROTIRIANAKIS:

13   Q.   LET ME ASK YOU, DOES, FOR EXAMPLE, RICOCHET APPEAR IN

14   THE DEFENDANT'S CHATS?  I'M SORRY.  DOES THE DEFENDANT APPEAR

15   IN RICOCHET'S CHATS?

16   A.   YES.

17   Q.   AND ARE THERE CHATS WHERE BEKENSTEIN AND RICOCHET,

18   RANDALL MARTIN, ARE CHATTING?

19   A.   YES.

20   Q.   AND ARE THERE CHATS WHERE PLAYTP IS CHATTING WITH THE

21   DEFENDANT?

22   A.   YES.

23   Q.   AND ARE THERE CHATS WHERE PLAYTP IS CHATTING WITH

24   BEKENSTEIN?

25   A.   YES.

1    Q.   AND ARE THERE CHATS WHERE JURE IS CHATTING WITH

2    BEKENSTEIN?

3    A.   YES.

4    Q.   AND JURE IS CHATTING WITH THE DEFENDANT?

5    A.   YES.

6    Q.   AND THERE ARE CHATS WHERE FREEMAN IS CHATTING WITH

7    BEKENSTEIN?

8    A.   YES.

9    Q.   AND THERE ARE CHATS WHERE FREEMAN IS CHATTING WITH THE

10   DEFENDANT?

11   A.   YES.

12   Q.   IS THAT LIKEWISE TRUE WITH REGARD TO CROW18?

13   A.   WITH CROW, YES.

14   Q.   AND DANIEL?

15   A.   DANIEL?

16   Q.   I CAN REFER YOU TO --

17   A.   YES.

18   Q.   I CAN REFER YOU TO EXHIBIT 1P, W OR Y.

19   A.   YES.  YES.

20   Q.   IS DANIEL CHATTING WITH BEKENSTEIN?

21   A.   YES, HE IS.

22   Q.   AND IF YOU LOOK AT 3F, IS DANIEL ALSO CHATTING WITH THE

23   DEFENDANT?

24   A.   YES.

25   Q.   AND ALL OF THESE CHATS I REFERRED TO INVOLVE VARIOUS

 1    MATTERS?

 2    A.    YES.

 3    Q.    DO THOSE MATTERS INCLUDE POSSESSION OF CHILD

 4    PORNOGRAPHY?

 5    A.    YES, THEY DO.

 6    Q.    OKAY.  DO YOU RECALL YOU WERE BEING DIRECTED TO 2C OF

 7    THE CONVERSATION BETWEEN RANDALL MARTIN AND THE DEFENDANT

 8    WHERE THEY TALK ABOUT WHETHER SOMEONE COULD IMPERSONATE THE

 9    DEFENDANT?

10    A.    YES.

11    Q.    DOES THE DEFENDANT SAY THAT HE BELIEVES THAT IT WOULDN'T

12    ACTUALLY TAKE VERY LONG FOR RANDALL MARTIN TO FIGURE THAT

13    OUT, IF SOMEONE WAS IMPERSONATING THE DEFENDANT?

14    A.    YES.  HE SAID HE WOULD FIGURE -- HE WOULD BE ABLE TO

15    FIGURE IT OUT.

16    Q.    YOU WERE ASKED ABOUT THE AVAILABILITY OF THE CHAT

17    TRANSCRIPTS FOR EXHIBITS 2 AND 3.  DO YOU RECALL THAT

18    QUESTIONING?

19    A.    YES.

20    Q.    IS IT YOUR UNDERSTANDING THAT ALL OF THESE CHATS HAVE

21    BEEN PROVIDED TO DEFENSE COUNSEL?

22    A.    YES, THEY HAVE.

23    Q.    DO YOU RECALL YOU WERE ASKED ABOUT EXHIBIT 3T AND THERE

24    WAS A DISCUSSION ABOUT KALEN, AND COUNSEL ASKED YOU WHETHER

25    OR NOT YOU KNEW IF IT WAS PHYSIOLOGICALLY POSSIBLE FOR A

1    SEVEN-YEAR-OLD CHILD TO HAVE AN ORGASM?

2    A.   YES.

3    Q.   PUTTING THAT ISSUE ASIDE, DO YOU KNOW WHETHER IT'S

4    POSSIBLE FOR A SEVEN-YEAR-OLD CHILD TO BE IN A STATE OF

5    AROUSAL?

6    A.   NO, I DON'T.

7    Q.   HAVE YOU SEEN CHILDREN THAT AGE BEING ABUSED IN THAT WAY

8    IN THE CHILD PORNOGRAPHY YOU'VE VIEWED AS A CHILD PORNOGRAPHY

9    INVESTIGATOR?

10   A.   I HAVE SEEN THE ABUSE, YES.

11   Q.   HAVE YOU SEEN CHILDREN OF THAT AGE WITH ERECTIONS?

12   A.   YES.

13   Q.   AND ONCE AGAIN THAT 3T, THAT'S A DISCUSSION ABOUT A DRY

14   ORGASM -- TO USE THE WORDS USED IN THE EXHIBIT -- IS THAT

15   RIGHT?

16   A.   YES.

17   Q.   YOU WERE ASKED ABOUT A CHAT BETWEEN HANS -- IT IS

18   EXHIBIT 2K -- HANS AND RICOCHET, WHERE HANS SAYS HE IS

19   TELLING STRANGE STORIES ABOUT LITTLE BOYS, SIX YEARS OLD.

20            I DON'T LIKE THAT, SORRY.

21            AND RICOCHET SAYS, SIX IS TOO YOUNG?

22   A.   YES.

23   Q.   AND THEN HANS SAYS HE WAS TELLING BOYS FROM SIX TO SEVEN

24   WERE ASKING HIM FOR SEX.  I CAN'T BELIEVE THAT.

25            YOU WERE ASKED WHAT YOUR INTERPRETATION OF THAT WAS

1    AND WHETHER YOU INTERPRETED IT AS THE DEFENDANT -- WERE THESE

2    PEOPLE UNDERSTANDING THE DEFENDANT WAS MERELY SAYING

3    FANTASTIC THINGS.

4              DO YOU RECALL THAT QUESTIONING?

5    A.   YES, I DO.

6    Q.   WHEN YOU READ THIS CHAT, DID YOU UNDERSTAND THAT IN FACT

7    HANS IS SAYING WHAT HE CAN'T BELIEVE IS THAT SIX AND SEVEN

8    YEAR OLDS ARE ACTUALLY ASKING FOR SEX AS OPPOSED TO IT BEING

9    FORCED UPON THEM?

10   A.   YES.

11             MR. AARON:  OBJECT, MISSTATES THE TESTIMONY.  I'M

12   SORRY.  MISSTATES THE EXHIBIT.

13             THE COURT:  THE OBJECTION IS SUSTAINED.

14   BY MR. AKROTIRIANAKIS:

15   Q.   YOU WERE ASKED ABOUT FLIRTING AND WHETHER THE CHAT

16   PARTICIPANTS FLIRT WITH EACH OTHER?

17   A.   YES.

18   Q.   WHAT COUNSEL CHARACTERIZED WAS FLIRTING WAS ACTUALLY IN

19   THE CONTEXT OF A CONVERSATION ABOUT CHILD PORNOGRAPHY, RIGHT?

20   A.   YES.

21   Q.   YOU WERE ASKED ON CROSS-EXAMINATION ABOUT YOUR

22   INTERPRETATION OF THE CHAT 3T BETWEEN HANS -- I'M SORRY, 2K,

23   BETWEEN HANS AND RICOCHET ABOUT SIX BEING TOO YOUNG AND SO ON

24   AND SO FORTH?

25   A.   YES.

1    Q.    WHAT IS YOUR INTERPRETATION OF THAT?

2    A.    IT IS BETWEEN HANS AND RICOCHET, THAT THAT'S THEIR

3    PREFERENCE.

4    Q.    DO YOU INTERPRET HANS TO BE SAYING THAT -- WHAT DO YOU

5    INTERPRET HANS TO BE SAYING WHEN HE SAYS HE WAS TELLING BOYS

6    FROM SIX TO SEVEN WERE ASKING HIM FOR SEX?  I CANNOT BELIEVE

7    THAT.

8    A.    THAT HE BELIEVED THAT BOYS THAT YOUNG WOULD BE ASKING

9    HIM -- OR ASKING HIM RATHER THAN HIM ASKING THE BOYS FOR SEX.

10   Q.    YOU WERE ASKED QUESTIONS ABOUT WHETHER THE DEFENDANT WAS

11   ACTUALLY ENCOURAGING HIS FRIENDS AND BUILDING THEM UP AND

12   PICKING THEM UP.  DO YOU RECALL THAT?

13   A.    YES.

14   Q.    AND THAT WAS A CONVERSATION BETWEEN THE DEFENDANT AND

15   JEREMIAH.  DO YOU RECALL THAT PART OF THE EXHIBIT 3A?

16   A.    YES.

17   Q.    IS JEREMIAH ALSO THE PERSON WITH WHOM THE DEFENDANT WAS

18   TALKING ABOUT HOW EASTER EGG HUNTS ARE GIVING A WAY WITH HIM

19   SPENDING TIME WITH HIS 10-YEAR-OLD BOYFRIEND?

20   A.    YES.

21   Q.    IN THE 3A CHAT, PAGE 17, THAT WE'RE REFERRING TO NOW,

22   YOU WERE ASKED QUESTIONS ABOUT WHETHER THE DEFENDANT WAS

23   DISTRESSED WHEN HIS FRIENDS WOULDN'T SPEAK TO HIM, AND YOU

24   REFER TO THIS CHAT BETWEEN JEREMIAH AND THE DEFENDANT?

25   A.    YES.

```
 1   Q.   IN THIS CHAT, DOES THE DEFENDANT IN FACT IDENTIFY

 2   HIMSELF AS A PEDOPHILE?

 3   A.   YES, HE DOES.

 4   Q.   YOU WERE ASKED ABOUT TECHNICAL PROBLEMS?

 5   A.   YES.

 6   Q.   DO YOU RECALL THAT?

 7   A.   YES.

 8   Q.   DO THE TECHNICAL PROBLEMS THAT THE DEFENDANT DISCUSSES

 9   INCLUDE, FOR EXAMPLE, THE INABILITY, BECAUSE OF LIMITATIONS

10   OF THE MACHINERY, TO DOWNLOAD CHILD PORNOGRAPHY FAST ENOUGH?

11   A.   DOWNLOADING, YES.

12            MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

13            THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP

14   DOWN.

15            AND THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

16            MR. AKROTIRIANAKIS:  DA INVESTIGATOR BILL HUBBARD.

17            THE CLERK:  PLEASE COME FORWARD AND STOP NEXT TO

18   THE COURT REPORTER.

19            PLEASE RAISE YOUR RIGHT HAND.

20        PLAINTIFF'S WITNESS, WILLIAM HUBBARD, WAS SWORN

21            THE CLERK:  PLEASE TAKE THE STAND.

22            STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

23   THE RECORD.

24            THE COURT:  I'M SORRY.  GO AHEAD.

25            THE WITNESS:  MY NAME IS WILLIAM MERRICK,
```

```
 1    M-E-R-R-I-C-K, HUBBARD, H-U-B-B-A-R-D.  I GO BY BILL HUBBARD.
 2              THE COURT:  THANK YOU.  YOU MAY INQUIRE.
 3              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.
 4                        DIRECT EXAMINATION
 5    BY MR. AKROTIRIANAKIS:
 6    Q.   INVESTIGATOR HUBBARD, BY WHOM ARE YOU PRESENTLY
 7    EMPLOYED, SIR?
 8    A.   I AM EMPLOYED BY THE STATE OF NEW MEXICO BY THE EIGHTH
 9    JUDICIAL DISTRICT OFFICE OF THE DISTRICT ATTORNEY.
10    Q.   DOES THE EIGHTH JUDICIAL DISTRICT OFFICE OF THE DISTRICT
11    ATTORNEY COVER TAOS, NEW MEXICO?
12    A.   YES, IT DOES.
13    Q.   WHAT IS YOUR CURRENT TITLE IN THAT OFFICE?
14    A.   I AM A CHIEF INVESTIGATOR.
15    Q.   WHAT ARE YOUR CURRENT JOB RESPONSIBILITIES IN THAT
16    REGARD?
17    A.   I HAVE FULL POLICE AUTHORITY WITHIN THE STATE OF NEW
18    MEXICO.  MY PRIMARY JURISDICTION IS THE THREE NORTHEASTERN
19    COUNTIES OF NEW MEXICO.
20              IN THIS CAPACITY, MOSTLY I SERVE AS DETECTIVE FOR A
21    WHOLE BUNCH OF SMALL POLICE DEPARTMENTS THAT AREN'T LARGE
22    ENOUGH TO HAVE DETECTIVES.  I ALSO ASSIST THE ATTORNEYS FOR
23    THE DISTRICT ATTORNEY'S OFFICE IN PREPARING THEIR CASES FOR
24    TRIAL AND ACTUALLY PRESENTATION OF THE CASES IN THE
25    COURTROOM.
```

1   Q.   PRIOR TO BECOMING THE CHIEF INVESTIGATOR FOR THE NEW

2   MEXICO EIGHTH DISTRICT DISTRICT ATTORNEY'S OFFICE, HAVE YOU

3   WORKED AS A POLICE OFFICER?

4   A.   YES, SIR, I HAVE.

5   Q.   DID THOSE INCLUDE VARIOUS JURISDICTIONS?

6   A.   YES, SIR.

7   Q.   FOR HOW MANY YEARS TOTAL HAD YOU WORKED AS A POLICE

8   OFFICER IN THOSE VARIOUS JURISDICTIONS?

9   A.   I AM IN MY 27TH YEAR RIGHT NOW AS A COMMISSIONED PEACE

10  OFFICER.

11  Q.   NOW, IN YOUR 27 YEARS OF LAW ENFORCEMENT EXPERIENCE,

12  HAVE YOUR CASES THAT YOU HAVE HANDLED INCLUDED CASES

13  INVOLVING THE SEXUAL EXPLOITATION OF CHILDREN?

14  A.   YES, SIR.

15  Q.   AND HAVE YOU ALSO RECEIVED SPECIALIZED TRAINING IN THAT

16  REGARD?

17  A.   I HAVE.

18  Q.   IN WHAT CAPACITY WERE YOU EMPLOYED IN JUNE OF 2001?

19  A.   THE SAME AS I HAD WHEN I WAS THE CHIEF INVESTIGATOR FOR

20  THE D.A.'S OFFICE IN TAOS.

21  Q.   IN JUNE OF 2001, AND SPECIFICALLY ON THE 5TH OF THAT

22  MONTH, DID YOU HAVE OCCASION TO SPEAK WITH A WOMAN NAMED KAT

23  DUFF?  FOR THE RECORD, THAT'S K-A-T, LAST NAME D-U-F-F.

24  A.   YES.

25  Q.   ON JUNE 5, 2001, DID YOU ALSO HAVE A CONVERSATION WITH A

```
1    FEDERAL LAW ENFORCEMENT AGENT?

2    A.    YES.

3    Q.    WHO WAS THE FEDERAL LAW ENFORCEMENT AGENT THAT YOU SPOKE

4    TO?

5    A.    HER NAME IS KATHY EDGELL, E-D-G-E-L-L.

6    Q.    AND WHAT FEDERAL LAW ENFORCEMENT AGENCY IS AGENT EDGELL

7    PART OF?

8    A.    UNITED STATES CUSTOMS.

9    Q.    NOW, RETURNING TO MS. DUFF, WHO IS MS. DUFF?

10   A.    KAT DUFF IS A FORENSIC EXAMINER FOR OUR CHILDREN'S SAFE

11   ROOM, IN TAOS COUNTY.

12   Q.    WHAT IS A FORENSIC EXAMINER, AND WHAT IS THE CHILDREN'S

13   SAFE ROOM, IN TAOS COUNTY?

14   A.    THE PROTOCOLS IN THE STATE OF NEW MEXICO CALL FOR --

15   WHEN WE HAVE AN ALLEGED CHILD VICTIM, PARTICULARLY IN

16   SEXUAL-RELATED CASES, THAT LAW ENFORCEMENT OFFICERS ARE NOT

17   TO HAVE TO BEAR THE RESPONSIBILITY OF DOING THE INITIAL

18   EXAMINATIONS OR QUESTIONS OR INTERVIEWS OF THESE CHILDREN.

19   AND WE HAVE A FORENSIC EXAMINER, SUCH AS KAT DUFF, WHO IS

20   SPECIALLY TRAINED TO CONDUCT THESE INITIAL INQUIRIES WITH

21   ALLEGED CHILD VICTIMS.

22   Q.    NOW, RETURNING TO YOUR CONVERSATION WITH AGENT EDGELL,

23   AFTER THAT CONVERSATION, HAD YOU ATTEMPTED TO DO SOMETHING

24   BASED ON WHAT YOU LEARNED DURING YOUR CONVERSATION?

25   A.    YES, SIR.
```

1    Q.   WHAT WAS IT THAT YOU ATTEMPTED TO DO AFTER THE

2    CONVERSATION WITH AGENT EDGELL?

3    A.   I CALLED A MEETING AT MY OFFICE COORDINATING VARIOUS

4    AGENCIES, BOTH SOCIAL SERVICE AGENCIES AND LAW ENFORCEMENT

5    AGENCIES, CALLED A MEETING FOR REPRESENTATIVES TO COME TO MY

6    OFFICE.

7    Q.   AND, IN GENERAL TERMS, WHAT WAS THE PURPOSE OF THAT

8    MEETING?  WHAT WERE YOU GOING TO TRY AND DO?

9    A.   TO DIRECT A COORDINATED EFFORT TO FIND A CERTAIN

10   INDIVIDUAL.

11   Q.   NOW, WHAT WAS IT THAT AGENT EDGELL TOLD YOU THAT CAUSED

12   YOU TO CALL THAT MEETING FOR THAT PURPOSE, THAT YOU TESTIFIED

13   TO?

14   A.   IT WAS MY PURPOSE TO FIND A SEVEN-YEAR-OLD MALE IN THE

15   COMMUNITY OR AREA OF TAOS WITH A UNIQUE FIRST NAME OF KALEN.

16   Q.   WHAT WAS IT THAT AGENT EDGELL TOLD YOU THAT LED YOU TO

17   ATTEMPT TO DO THAT?

18   A.   THAT THERE HAD BEEN CHATS THAT HAD BEEN RECOVERED FROM

19   COMPUTERS THAT LED AGENTS TO BELIEVE -- THAT LED FEDERAL

20   CUSTOMS AGENTS TO BELIEVE THAT THERE COULD BE A VICTIM OF A

21   CHILD SEXUAL EXPLOITATION THAT WOULD BE IN TAOS OF THE NAME

22   AND AGE OF THE CHILD THAT I SPOKE OF.

23   Q.   AND WERE YOU TOLD WHAT THE AGE OF THE CHILD WAS?

24   A.   SEVEN YEARS OLD.

25   Q.   AND WAS THAT SOMETHING THAT EFFECTED HOW YOU WENT ABOUT

1    SEARCHING FOR THIS CHILD?

2    A.   CERTAINLY.

3    Q.   NOW, WHAT WAS -- DID YOU DEVISE A PLAN AT THIS MEETING

4    THAT YOU TESTIFIED TO?

5    A.   YES.

6    Q.   WHAT WAS THE PLAN THAT YOU DEVISED TO ATTEMPT TO LOCATE

7    SEVEN-YEAR-OLD KALEN?

8    A.   OUR AREA IS SO SMALL THAT IT DEEMED REASONABLE TO ME TO

9    DIVIDE UP THE GRADE SCHOOLS AND HAVE VARIOUS REPRESENTATIVES

10   OR PEOPLE AT MY DIRECTION CALL THE SCHOOLS TO SEE IF WE COULD

11   FIND A SEVEN-YEAR-OLD BOY WITH THAT UNIQUE FIRST NAME.

12   Q.   THEREAFTER, DID YOU AND YOUR TEAM OF INVESTIGATORS THAT

13   YOU HAD ASSEMBLED IN FACT IMPLEMENT THAT PLAN THAT YOU

14   DESCRIBED?

15   A.   WE DID.

16   Q.   AND HOW MANY SCHOOLS DID YOU CONTACT?

17   A.   I THINK WE HAD ABOUT SIX THAT WERE ON THE LIST.  IT WAS

18   THE FIRST OR SECOND CALL WHERE WE GAINED SOME NEW

19   INFORMATION.

20   Q.   ULTIMATELY, WERE YOU ABLE TO IDENTIFY A SEVEN-YEAR-OLD

21   BOY WITH THE FIRST NAME "KALEN" IN THOSE SCHOOLS?

22   A.   YES.

23   Q.   NOW, ARE YOU FAMILIAR WITH THE FIRST LETTER OF KALEN'S

24   LAST NAME?

25   A.   I AM.

1  Q.  WHAT IS THE FIRST LETTER OF KALEN'S LAST NAME?

2  A.  FIRST LETTER IS "S" AS IN SAM.

3  Q.  WE WILL REFER TO HIM AS KALEN S., ALL RIGHT?

4  A.  YES, SIR.

5  Q.  WHERE DID YOU LOCATE KALEN S.?

6  A.  IN A COMMUNITY ABOUT SIX MILES NORTH OF TAOS CALLED

7  ARROYO HONDO.

8  Q.  NOW, WAS THERE A NEW MEXICO STATE POLICE DETECTIVE NAMED

9  MARTINEZ WHO WAS ON PART OF YOUR TEAM FOR THIS SEARCH?

10  A.  YES, SIR.

11  Q.  AND DID DETECTIVE MARTINEZ, TO YOUR KNOWLEDGE, HAVE A

12  ROLE IN CONDUCTING INTERVIEWS OF WITNESSES, POTENTIAL

13  WITNESSES?

14  A.  YES, SIR, HE DID.

15  Q.  WHO DID DETECTIVE MARTINEZ INTERVIEW?

16  A.  HE INTERVIEWED THE FATHER OF KALEN S.

17  Q.  NOW, BASED ON DETECTIVE MARTINEZ'S INTERVIEW OF KALEN

18  S.'S FATHER, WERE ANY ARRANGEMENTS MADE TO SET UP A FORENSIC

19  INTERVIEW OF THE TYPE YOU PREVIOUSLY TESTIFIED THAT IS

20  CONDUCTED BY KAT DUFF?

21  A.  YES, SIR.

22  Q.  AND FOR WHAT DATE WAS THAT FORENSIC INTERVIEW SCHEDULED?

23  A.  IT WAS SCHEDULED FOR THE NEXT DAY, WHICH WAS JUNE THE

24  6TH.

25  Q.  WAS AN INTERVIEW OF KALEN S. IN FACT CONDUCTED ON JUNE

1    THE 6TH?

2    A.   YES, SIR.

3    Q.   WERE TWO INTERVIEWS OF KALEN S. IN FACT CONDUCTED ON

4    JUNE THE 6TH?

5    A.   TWO INTERVIEWS WERE CONDUCTED; BOTH OF THEM WERE ON JUNE

6    THE 6TH.

7    Q.   I BELIEVE YOU PREVIOUSLY TESTIFIED THAT THOSE INTERVIEWS

8    ARE VIDEOTAPED?

9    A.   I DON'T BELIEVE I TESTIFIED, BUT THEY ARE.

10   Q.   WELL, LET ME ASK YOU THAT.  ARE THOSE INTERVIEWS

11   VIDEOTAPED?

12   A.   THEY ARE.

13   Q.   AND IS THERE A LAW ENFORCEMENT OFFICER PRESENT IN THE

14   SAFE ROOM TOGETHER WITH THE SAFE ROOM INTERVIEWER AND THE

15   SUSPECTED VICTIM?

16   A.   NORMALLY, IT IS WATCHED BY A VIDEO AND AUDIO MONITOR, OR

17   THE VIDEOTAPE IS IMMEDIATELY TURNED OVER TO LAW ENFORCEMENT

18   AGENTS IN FURTHERANCE OF THE INVESTIGATION.

19   Q.   SO, IN OTHER WORDS, IS THERE NO LAW ENFORCEMENT AGENT IN

20   THE ROOM?

21   A.   HE IS NOT ACTUALLY IN THE ROOM, NO, SIR.

22   Q.   WERE YOU PROVIDED THE VIDEOTAPES OF THE JUNE 6TH, 2001

23   INTERVIEWS OF KALEN S.?

24   A.   I WAS.

25   Q.   AND DID YOU REVIEW THEM?

1    A.    I DID.

2    Q.    DID YOU SPEAK WITH DETECTIVE MARTINEZ ABOUT HIS

3    INTERVIEW OF KALEN S.'S FATHER?

4    A.    I DID.

5    Q.    AND DID YOU DISCUSS THE CONTENTS OF THAT INTERVIEW WITH

6    DETECTIVE MARTINEZ?

7    A.    YES.

8    Q.    AND WHAT, IF ANYTHING, DID YOU DO AFTER YOU REVIEWED THE

9    VIDEOTAPES OF THE TWO SAFE-ROOM INTERVIEWS OF JUNE 6TH, 2001

10   AND DISCUSSED WITH DETECTIVE MARTINEZ THE CONTENTS OF HIS

11   INTERVIEWS OF KALEN S.'S FATHER?

12             MR. AARON:  I OBJECT, YOUR HONOR.  ASK TO APPROACH.

13             THE COURT:  YOU MAY APPROACH.

14         (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

15             MR. AARON:  YOUR HONOR, I'M OBJECTING ON THE

16   GROUNDS OF HEARSAY.  I THINK WHAT COUNSEL IS TRYING TO -- AND

17   THE RELEVANCE OF WHAT COUNSEL IS TRYING TO DO -- IS ESTABLISH

18   THAT KALEN S. IS THE KALEN HE'S REFERRED TO.

19             HE HAS DONE THAT.  HE IS ALLOWED TO DO THAT.

20             HE IS NOT ALLOWED TO SAY, WELL, YOU DID ALL THESE

21   THINGS, AND AS A RESULT OF IT YOU DID THESE OTHER THINGS.

22             BECAUSE WHAT HE IS REALLY DOING IS ALLOWING THE

23   JURY TO DRAW AN INFERENCE FROM THAT THAT THERE WERE TAPES

24   WHICH WERE INCRIMINATING, AND THAT SORT OF THING, WHICH HE

25   CAN'T DO.  AND THAT'S WHAT HE IS TRYING TO DO.  SO I WOULD

1    OBJECT.

2              THE COURT:  YOUR OBJECTION IS BASED ON HEARSAY?

3              MR. AARON:  YES.

4              MR. AKROTIRIANAKIS:  I'M GOING TO BE ATTEMPTING TO

5    ELICIT FROM DETECTIVE HUBBARD -- INVESTIGATOR HUBBARD THAT HE

6    SOUGHT TO ARREST THE DEFENDANT.  AND THIS INFORMATION IS

7    OFFERED FOR A NON-HEARSAY PURPOSE.  THAT IS WHAT CAUSED HIM

8    TO DO WHAT HE DID NEXT; ARREST HIM.

9              MR. AARON:  IN OTHER WORDS, THAT BECAUSE --

10             MR. AKROTIRIANAKIS:  THAT IS THE LAST QUESTION I

11   HAVE FOR HIM.

12             MR. AARON:  -- BECAUSE YOU HEARD THE TAPES, BECAUSE

13   YOU TALKED ABOUT WHAT THE OTHER INTERVIEWS WERE ABOUT, YOU

14   WENT OUT AND ARRESTED HIM.

15             THE CLEAR INFERENCE IS THAT THEY SAID THINGS WHICH

16   WERE INCRIMINATING.

17             THE COURT:  ARE YOU GOING TO ASK WHAT MR. SLOAN

18   TOLD HIM?

19             MR. AKROTIRIANAKIS:  NO.  MR. SUTHERLAND.  THIS IS

20   THE LAST QUESTION I HAVE FOR THIS WITNESS.

21             THE COURT:  IT DOESN'T MATTER IF IT IS THE LAST

22   QUESTION IF IT IS AN OBJECTIONABLE QUESTION.

23             MR. AKROTIRIANAKIS:  OF COURSE.  I UNDERSTAND THAT,

24   YOUR HONOR.  IT IS NOT HEARSAY.

25             THE COURT:  YOU MUST HAVE TWO MORE QUESTIONS

```
 1   BECAUSE YOU'RE GOING TO ASK HIM WHETHER HE ARRESTED THE
 2   DEFENDANT.
 3          MR. AKROTIRIANAKIS:  ACTUALLY, I WON'T.  I WILL ASK
 4   -- JUST THIS CASE, I EXPECT THE ANSWER IS THAT HE DIDN'T
 5   ARREST HIM.
 6          THE COURT:  I'M SORRY.  SO THE PENDING QUESTION IS,
 7   DID YOU --
 8          MR. AKROTIRIANAKIS:  HAVING REVIEWED THE
 9   INTERVIEWS, THE VIDEOTAPES OF THE INTERVIEWS AND THE CONTENT
10   OF DETECTIVE MARTINEZ'S INTERVIEW WITH --
11          THE COURT:  WELL, HE HASN'T ANSWERED THE QUESTION
12   ABOUT WHETHER HE REVIEWED THE INTERVIEW TAPES.
13          MR. AARON:  I THINK HE DID.
14          THE COURT:  SO YOU'RE GOING TO ASK --
15          MR. AKROTIRIANAKIS:  WHAT DID YOU DO AFTER?
16          THE COURT:  I WILL OVERRULE THE OBJECTION TO THAT.
17       (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)
18          THE COURT:  YOU MAY PROCEED.
19          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.
20   BY MR. AKROTIRIANAKIS:
21   Q.   INVESTIGATOR HUBBARD, I ASK YOU AGAIN WHAT, IF ANYTHING,
22   DID YOU DO AFTER YOU HAD REVIEWED THE VIDEOTAPES OF THE SAFE-
23   ROOM INTERVIEWS OF KALEN S. AND DISCUSSED WITH DETECTIVE
24   MARTINEZ THE CONTENTS OF THIS INTERVIEW WITH KALEN S.'S
25   FATHER?
```

1    A.    I SOUGHT TO OBTAIN ADDITIONAL INFORMATION CONCERNING THE

2    CHATS FROM THE FEDERAL AGENTS.

3    Q.    AND DID YOU DO ANYTHING FURTHER BASED ON THAT

4    INFORMATION?

5    A.    YES.

6    Q.    WHAT DID YOU DO?

7    A.    I OBTAINED A WARRANT FOR THE ARREST OF JIM SANDERS.

8           MR. AKROTIRIANAKIS:  NO FURTHER QUESTIONS.

9           THE COURT:  CROSS-EXAMINATION?

10                      CROSS-EXAMINATION

11   BY MR. AARON:

12   Q.    KALEN S. STILL LIVES IN ARROYO HONDO?

13   A.    I KNOW HE STILL LIVES IN TAOS COUNTY.  I DON'T KNOW THAT

14   HE STILL LIVES IN THE SPECIFIC HOUSE THAT HE LIVED IN AT THE

15   TIME.

16          MR. AARON:  THANK YOU.  NOTHING FURTHER.

17          THE COURT:  ANYTHING ELSE?

18          MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  NO REDIRECT.

19          THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

20          THE WITNESS:  MAY I BE EXCUSED, YOUR HONOR?

21          THE COURT:  YES, YOU MAY.

22          THE WITNESS:  THANK YOU.

23          THE COURT:  THE GOVERNMENT MAY CALL ITS NEXT

24   WITNESS.

25          MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT CALLS

```
 1    CHARLES TONY SUTHERLAND -- OR CHARLES ANTHONY SUTHERLAND.

 2              THE COURT:  LADIES AND GENTLEMEN, IS THE

 3    TEMPERATURE NOW COMFORTABLE?

 4              A JUROR:  BETTER.  IT'S GOOD.

 5              THE COURT:  WE TEND TO HAVE TWO SETTINGS HERE: OVEN

 6    AND REFRIGERATOR.  SO I APOLOGIZE.

 7              THE CLERK:  PLEASE COME FORWARD AND STOP NEXT TO

 8    THE COURT REPORTER.  PLEASE RAISE YOUR RIGHT HAND.

 9         PLAINTIFF'S WITNESS, CHARLES SUTHERLAND, WAS SWORN

10              THE CLERK:  PLEASE TAKE THE STAND.

11              STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

12    THE RECORD.

13              THE WITNESS:  CHARLES A. SUTHERLAND,

14    S-U-T-H-E-R-L-A-N-D.

15              THE COURT:  THANK YOU.  YOU MAY INQUIRE.

16                        DIRECT EXAMINATION

17    BY MR. MICHAEL:

18    Q.   GOOD AFTERNOON, MR. SUTHERLAND.

19              DO YOU GO BY ANY NAME OTHER THAN CHARLES?

20    A.   TONY.

21    Q.   AND HOW OLD ARE YOU, SIR?

22    A.   I WILL BE 52 THIS MONTH.

23    Q.   WHERE DID YOU GROW UP?

24    A.   IN SAN DIEGO.  IT IS WHERE I WAS BORN AND RAISED.

25    Q.   WHERE DO YOU LIVE TODAY?
```

```
 1    A.    TAOS, NEW MEXICO.

 2    Q.    HOW LONG HAVE YOU LIVED THERE?

 3    A.    TWENTY-ONE YEARS NOW.

 4          THE COURT:  MR. SUTHERLAND, COULD I ASK YOU TO MOVE

 5    BACK.

 6          THE WITNESS:  IS IT TOO LOUD?

 7          THE COURT:  IT'S NOT THAT IT'S TOO LOUD, BUT WHEN

 8    YOU GET CLOSE YOU GET FEEDBACK.  USUALLY, I'M TELLING PEOPLE

 9    TO MOVE FORWARD.

10          THE WITNESS:  I'M SORRY.

11          THE COURT:  I WILL LET YOU KNOW ONE WAY OR THE

12    OTHER IF WE NEED YOU TO SPEAK UP.  THANK YOU.

13    BY MR. MICHAEL:

14    Q.    AND HOW LONG HAVE YOU LIVED IN TAOS, NEW MEXICO?

15    A.    TWENTY-ONE YEARS.

16    Q.    WHAT DO YOU DO FOR A LIVING?

17    A.    I AM A LUTHIER.  I BUILD STRINGED INSTRUMENTS.

18    Q.    DO YOU HAVE ANY CHILDREN, SIR?

19    A.    I DO.

20    Q.    HOW MANY?

21    A.    I HAVE TWO THAT ARE MY OWN, AND THEN I HAVE TWO

22    STEPCHILDREN, AS WELL.

23    Q.    AND THE TWO CHILDREN THAT ARE YOUR OWN, ARE THEY SONS OR

24    DAUGHTERS?

25    A.    THEY ARE BOTH BOYS.
```

1    Q.    WHAT ARE THEIR NAMES?

2    A.    THE OLDEST ONE IS DUSTIN, AND THE YOUNGEST ONE IS KALEN.

3    Q.    HOW OLD IS DUSTIN TODAY?

4    A.    HE IS GOING TO BE 21 THIS MONTH.

5    Q.    HOW OLD IS KALEN?

6    A.    HE IS 13 RIGHT NOW.

7    Q.    WHEN WAS KALEN'S BIRTHDAY?

8    A.    AUGUST 6TH, 1993.

9    Q.    WHO IS KALEN AND DUSTIN'S MOM?

10   A.    HER NAME IS LORI STYLES.

11   Q.    ARE YOU CURRENTLY IN A RELATIONSHIP WITH THEIR MOTHER?

12   A.    NO, EXCEPT THE FACT THAT WE DO SHARE OUR CHILDREN.

13   Q.    WHEN DID YOU AND -- WERE YOU AND MS. STYLES AT SOME

14   POINT IN A RELATIONSHIP?

15   A.    YES, WE WERE.

16   Q.    AND WHEN DID YOU FIRST SEPARATE?

17   A.    IT WAS BACK IN 2000.

18   Q.    DO YOU RECALL THE MONTH OR MONTHS?

19   A.    IT WAS -- WELL, IT WAS FEBRUARY/MARCH, RIGHT AROUND

20   THERE.

21   Q.    HOW LONG HAD YOU AND MS. STYLES BEEN TOGETHER BEFORE YOU

22   SEPARATED?

23   A.    ABOUT 16 YEARS.

24   Q.    DID YOU EVER GET FORMALLY MARRIED?

25   A.    NO.

1    Q.    WHEN DID YOU AND MS. STYLES MEET?

2    A.    WE MET IN -- IT WAS IN 1985.

3    Q.    WHERE?

4    A.    IN SAN DIEGO.

5    Q.    HOW OLD WERE YOU AT THE TIME?

6    A.    I WAS 30.

7    Q.    WHAT WERE YOU DOING IN SAN DIEGO?

8    A.    I WAS -- ACTUALLY, I WAS LIVING IN HAWAII AT THE TIME

9    AND I CAME TO SAN DIEGO TO GET KNEE SURGERY.  I HURT MY KNEE

10   PLAYING BASKETBALL.

11   Q.    DID YOU AND MS. STYLES START DATING WHILE YOU WERE IN

12   SAN DIEGO?

13   A.    WE DID.

14   Q.    DID THERE COME A TIME WHEN YOU AND MS. STYLES MOVED TO

15   TAOS TOGETHER FROM SAN DIEGO?

16   A.    IT WAS ABOUT A YEAR LATER -- A LITTLE LONGER, ABOUT A

17   YEAR AND A HALF AFTER WE MET.

18   Q.    WHEN WAS THAT?

19   A.    IN 1986, AND SHE WAS EIGHT MONTHS PREGNANT.

20   Q.    WOULD THAT BE DUSTIN OR KALEN?

21   A.    WITH DUSTIN.

22   Q.    WHEN WAS DUSTIN BORN?

23   A.    JUNE 18TH.

24   Q.    1986?

25   A.    1986, YES.

```
1    Q.   WHERE, IN TAOS?

2    A.   IN TAOS.

3    Q.   ONCE YOU MOVED TO TAOS, WHAT DID YOU AND MS. STYLES DO

4    TO SUPPORT YOURSELVES?

5    A.   SHE WAS --

6              MR. AARON:  I OBJECT.  RELEVANCE.

7              THE COURT:  OVERRULED.

8              THE WITNESS:  I'M SORRY?

9              THE COURT:  OVERRULED.  YOU MAY ANSWER.

10             THE WITNESS:  OKAY.  THANK YOU.

11             SHE WAS A PACK MAKER, AND I SOLD THE PACKS THAT SHE

12   MADE.  AND WE STARTED A BUSINESS DOING THAT, LIKE BACKPACKS,

13   FANNY PACKS, THINGS LIKE THAT.

14   BY MR. MICHAEL:

15   Q.   DID THE BUSINESS GROW?

16   A.   IT DID.  IT EVENTUALLY TURNED INTO A MOUNTAIN SHOP, AN

17   OUTDOOR STORE IN TAOS.

18   Q.   NOW, WAS KALEN BORN IN TAOS, AS WELL?

19   A.   HE WAS.

20   Q.   AT THE TIME KALEN WAS BORN, WHAT HOUSE DID YOU AND YOUR

21   FAMILY LIVE IN?

22   A.   LORI AND I BUILT A HOUSE JUST NORTH OF TAOS, AND WE WERE

23   LIVING THERE.

24   Q.   WITH BOTH OF YOUR BOYS?

25   A.   YES.
```

1   Q.   WHERE DOES MS. STYLES LIVE TODAY?

2   A.   SHE LIVES IN THAT HOUSE THAT WE BUILT.

3   Q.   HAS KALEN LIVED IN THAT HOUSE SINCE HIS BIRTH?

4   A.   HIS WHOLE LIFE, YEAH.

5   Q.   WHERE DO YOU LIVE TODAY SINCE YOU HAVE BEEN SEPARATED?

6   A.   I JUST LIVE ABOUT 10 OR 15 MINUTES NORTH OF THERE, AND

7   KALEN IS WITH ME NOW HALF THE TIME.

8   Q.   AND WHEN YOU SAY "NORTH OF THERE," ARE YOU REFERRING TO

9   THE HOUSE MS. STYLES REMAINS IN?

10   A.   YES.  WE ARE BOTH NORTH OF TAOS.

11   Q.   WHERE DOES YOUR OLDER SON DUSTIN CURRENTLY LIVE?

12           MR. AARON:  OBJECTION, RELEVANCE.

13           THE COURT:  OVERRULED.

14           THE WITNESS:  HE LIVES DOWN IN ALBUQUERQUE.  HE IS

15   GOING TO COLLEGE.

16   BY MR. MICHAEL:

17   Q.   AND I THINK YOU TESTIFIED TO THIS, BUT IS THE

18   ARRANGEMENT WITH REGARD TO KALEN A JOINT CUSTODY ARRANGEMENT

19   WITH MS. STYLES?

20   A.   IT IS.

21   Q.   AND IS THAT A LEGAL ARRANGEMENT YOU HAVE WITH MS. STYLES

22   OR AN ARRANGEMENT THAT YOU HAVE MADE BETWEEN EACH OTHER ON

23   YOUR OWN?

24   A.   WE MADE THAT -- WHEN WE CHOSE TO SEPARATE, WE MADE THAT

25   ARRANGEMENT, AND IT HAS WORKED OUT FOR US BOTH.

```
 1    Q.   ARE BOTH OF YOU ACTIVELY INVOLVED IN RAISING KALEN?

 2    A.   YEAH, VERY MUCH SO.

 3    Q.   AND DOES HE SPEND TIME WITH BOTH OF YOU?

 4    A.   YES.

 5    Q.   TODAY, ARE YOU RE-MARRIED?

 6    A.   I AM, YES.

 7    Q.   AND IS THAT HOW YOU HAVE THE TWO STEPKIDS THAT YOU

 8    TALKED ABOUT?

 9    A.   YES.

10    Q.   THROUGH THAT RE-MARRIAGE?

11    A.   UH-HUH.

12    Q.   AND YOU RAISED THOSE STEPKIDS ALONG WITH KALEN?

13    A.   I DID.

14    Q.   DO YOU KNOW SOMEONE NAMED JAMES SANDERS?

15    A.   I DO.

16    Q.   YOU KNOW HIM AS JIM?

17    A.   YES.

18    Q.   HOW LONG HAVE YOU KNOWN HIM?

19    A.   SINCE I WAS 18, SO 34 YEARS.

20    Q.   WHAT YEAR DID YOU MEET THE DEFENDANT?

21    A.   IT WOULD HAVE BEEN '73, '74, BACK THEN.

22    Q.   AND WHERE WERE YOU WHEN YOU MET?  YOU MAY HAVE SAID IT.

23    A.   WHERE WERE WE?

24    Q.   WHERE WERE YOU WHEN YOU FIRST MET HIM?

25    A.   I'M NOT SURE.  IT WAS SOUTHERN CALIFORNIA.  I'M NOT SURE
```

1    IF IT WAS SAN DIEGO OR THE L.A. AREA.

2    Q.    AND WHAT WERE YOU DOING AT THE TIME?

3    A.    I WAS HIRED ON A MAGAZINE CREW.  I WAS WORKING SELLING

4    MAGAZINES.

5    Q.    AND HOW LONG DID YOU HAVE THAT JOB?

6    A.    ABOUT SIX MONTHS.

7    Q.    AND HOW DID YOU MEET THE DEFENDANT DOING THAT JOB?

8    A.    AFTER I WAS ON CREW, HE HIRED ON AS A MANAGER, A PERSON

9    THAT DROVE THE CAR AROUND AND DROPPED US KIDS OFF TO SELL

10   MAGAZINES.

11   Q.    DID YOU WORK TOGETHER?

12   A.    WE DID.

13   Q.    DID YOU BECOME FRIENDS?

14   A.    WE DID.

15   Q.    WOULD YOU CHARACTERIZE IT AS A CLOSE FRIENDSHIP?

16   A.    YEAH.  WE BECAME REALLY GOOD FRIENDS.

17   Q.    DID YOU COME TO TRUST HIM?

18   A.    YES.

19   Q.    YOU SEE HIM IN THE COURTROOM TODAY?

20   A.    I DO.

21   Q.    CAN YOU PLEASE DESCRIBE WHERE HE IS SITTING AND WHAT HE

22   IS WEARING?

23   A.    HE IS RIGHT OVER THERE.

24   Q.    WHAT IS HE WEARING, PLEASE?

25   A.    HE HAS A SUIT AND GLASSES.

1   Q.   AND IS HE THE PERSON IMMEDIATELY TO MY RIGHT OR TWO

2   SEATS OVER?

3   A.   TWO SEATS OVER.

4           MR. MICHAEL:  YOUR HONOR, FOR THE RECORD, MAY IT

5   REFLECT THE WITNESS HAS IDENTIFIED THE DEFENDANT?

6           THE COURT:  THE RECORD SHALL REFLECT THE WITNESS'

7   IDENTIFICATION OF THE DEFENDANT JAMES SANDERS.

8   BY MR. MICHAEL:

9   Q.   SO WHEN YOU FIRST BECAME FRIENDS WITH THE DEFENDANT,

10  WHAT WAS THE NATURE OF THAT RELATIONSHIP, OF YOUR

11  RELATIONSHIP?

12  A.   WELL, WE WORKED TOGETHER.  WE PARTIED TOGETHER.  WE

13  SPENT A LOT OF TIME TOGETHER.  WE HIKED.  YOU KNOW, THINGS

14  LIKE THAT.

15  Q.   WOULD YOU DO ACTIVITIES OUTSIDE OF WORK TOGETHER, SOCIAL

16  ACTIVITIES?

17  A.   UH-HUH.

18  Q.   AND AFTER YOU BECAME FRIENDS IN THE 1970S, DID HE MEET

19  YOUR FAMILY?

20  A.   HE DID.

21  Q.   AND DID YOU HAVE FAMILY IN THE SAN DIEGO AREA AT THAT

22  TIME?

23  A.   YES.  MOST OF MY FAMILY STILL LIVES THERE.

24  Q.   AND WOULD HE JOIN YOUR FAMILY FOR HOLIDAYS AND FAMILY

25  EVENTS IN SAN DIEGO?

1    A.    QUITE A BIT, WHENEVER POSSIBLE.

2    Q.    DID YOU KNOW MUCH ABOUT HIS FAMILY?

3    A.    VERY LITTLE.   HE SHARED A COUPLE OF THINGS BUT NOT THAT

4    MUCH.

5    Q.    DO YOU KNOW WHERE HE WAS RAISED?

6    A.    YEAH.   HE TOLD ME HE WAS RAISED BY HIS GRANNY, HIS

7    GRANDPARENTS IN ARKANSAS.   I THINK IT WAS IN THE SOUTH.

8    Q.    DID YOU EVER MEET ANY OF HIS FAMILY?

9    A.    NO.

10   Q.    DID HE HAVE ANY FAMILY THAT YOU KNEW THAT HE SPENT TIME

11   WITH?

12   A.    NO.

13   Q.    DID YOU EVER COME TO TREAT HIM LIKE PART OF YOUR FAMILY?

14   A.    MM-HMM, YES.

15   Q.    NOW, FROM THE TIME THAT YOU FIRST MET HIM UNTIL YOU

16   TURNED 25 YEARS OLD, JUST TO GIVE YOU A TIMELINE, DID YOUR

17   FRIENDSHIP CONTINUE DURING THAT PERIOD?

18   A.    YEAH.   AFTER I LEFT THE CREW, THEN HE CAME ONCE OR TWICE

19   TO VISIT ME IN SAN DIEGO.   AND THEN WE ACTUALLY WORKED

20   TOGETHER AT THE GIRL SCOUT CAMP UP IN IDYLLWILD.

21   Q.    AND HOW DID IT COME TO BE THAT YOU WORKED TOGETHER AT

22   THE GIRL SCOUT CAMP UP IN IDYLLWILD?

23   A.    I REMEMBER HE HAD GOTTEN THE JOB FIRST, AND THEN I

24   NEEDED A JOB AND HE HELPED GET ME THE JOB THERE.

25   Q.    HOW LONG WAS THAT AFTER YOU FIRST MET?

1    A.    PROBABLY THREE OR FOUR YEARS, I WOULD GUESS.  A COUPLE

2    YEARS, AT LEAST.

3    Q.    WHAT SORT OF WORK DID HE DO AT THE GIRL SCOUT CAMP?

4    A.    HE WAS A MAINTENANCE MAN.

5    Q.    AND WHAT SORT OF WORK DID YOU DO WHEN YOU WORKED THERE?

6    A.    THE SAME THING.  WE WERE SORT OF RANCH HANDS, I GUESS.

7    Q.    DID THE DEFENDANT LIVE AT THE CAMP?

8    A.    YES.

9    Q.    WOULD YOU EVER STAY AT THE CAMP, LIVE AT THE CAMP?

10   A.    I LIVED THERE FOR THE SUMMER, AND I LIVED THERE THROUGH

11   THE WHOLE YEAR BEFORE, TOO, AS WELL.

12   Q.    HOW LONG DID YOU WORK TOGETHER AT THE CAMP?

13   A.    YOU KNOW, IT WAS OFF AND ON.  BUT WE WORKED TOGETHER FOR

14   AT LEAST A COUPLE YEARS TOTAL, BUT IT WAS OVER A FOUR- OR

15   FIVE-YEAR PERIOD.

16   Q.    AND DID IT APPEAR TO YOU WHETHER OR NOT THE DEFENDANT

17   PUT ROOTS DOWN AT THAT CAMP?

18   A.    HE DID, YEAH.  AFTER I HAD ACTUALLY LEFT AND WASN'T

19   WORKING THERE ANYMORE, HE STAYED ON.  SO, HE DID, YES.

20   Q.    WAS IT YOUR UNDERSTANDING THAT HE CAME TO RESIDE AT THE

21   CAMP FULL TIME?

22   A.    YES, HE DID.

23   Q.    NOW, DURING THIS TIME THAT YOU WORKED TOGETHER AT THE

24   CAMP UP UNTIL YOU WERE 25, DID THE FRIENDSHIP REMAIN INTACT?

25   A.    YEAH, UH-HUH.

1    Q.    WOULD YOU ENGAGE IN THE SAME SORTS OF ACTIVITIES THAT

2    YOU DESCRIBED BEFORE?

3    A.    YEAH.  WE HIKED AND WE DID THINGS TOGETHER, YOU KNOW.

4    Q.    AND DO YOU KNOW IF, UP UNTIL THE TIME YOU FIRST MET HIM

5    UNTIL THROUGH YOU WERE AT THE CAMP WITH HIM, WHETHER OR NOT

6    THE DEFENDANT HAD ANY RELATIONSHIPS?

7    A.    YEAH.  HE HAD A GIRLFRIEND WHEN WE WERE ON THE MAGAZINE

8    CREW.  AND THEN ALSO AFTER I HAD LEFT THE CREW HE HAD -- WHEN

9    HE CAME TO VISIT ME ONCE IN SAN DIEGO, HE ALSO HAD A

10   GIRLFRIEND THEN, AS WELL, A DIFFERENT GIRL.

11   Q.    I'M SORRY?

12   A.    IT WAS A DIFFERENT GIRL.

13   Q.    DO YOU KNOW HOW LONG THOSE RELATIONSHIPS LASTED?

14   A.    THE FIRST ONE I THINK THEY KNEW EACH OTHER QUITE A WHILE

15   AND COMMUNICATED A FEW YEARS.  AND THEN THE SECOND ONE I

16   DON'T THINK WAS VERY LONG.

17   Q.    WAS THAT IN THE 1970S?

18   A.    THAT WOULD HAVE BEEN, YEAH.

19   Q.    SO OTHER THAN THE RELATIONSHIP WITH THOSE TWO WOMEN IN

20   THE 1970S, DID HE EVER TELL YOU ABOUT OTHER RELATIONSHIPS

21   THAT HE HAD?

22   A.    NO.  I DON'T RECALL ANY OTHERS.

23   Q.    NOW, WHEN YOU TURNED 25 DID YOU MOVE ANYWHERE?

24   A.    YEAH.  WHEN I - IN 1980 WHEN I WAS 25, I MOVED TO

25   HAWAII.

1   Q.   WHAT DID YOU DO WHEN YOU WERE IN HAWAII?

2   A.   SURFED.  BUT I HAD -- YOU MEAN AS WORK OR --

3   Q.   WELL, DID YOU SUPPORT YOURSELF?

4   A.   ACTUALLY, I WENT THERE FOR A TWO-WEEK VACATION AND I

5   ENDED UP STAYING A YEAR AND A HALF.  AND THE GIRL SCOUT CAMP

6   GAVE ME EMPLOYMENT, WHICH HELPED ME A LOT.  AND AT THAT

7   POINT, I HAD ODD JOBS, AND I ACTUALLY HAD A BUSINESS, A

8   CLEANING COMPANY BUSINESS, AS WELL.

9   Q.   DID YOU SUPPORT YOURSELF?

10  A.   I DID.

11  Q.   AND DID YOU EVER SEE THE DEFENDANT WHILE YOU WERE IN

12  HAWAII?

13  A.   HE WENT WITH ME ON THE FIRST TRIP.

14  Q.   OVERALL, HOW LONG DID YOU END UP LIVING IN HAWAII FOR?

15  A.   FIVE YEARS.  ALTHOUGH, I DID COME BACK AND WORK ONCE AT

16  THE GIRL SCOUT CAMP AT SUMMER.

17  Q.   WAS THE DEFENDANT AT CAMP AT THAT TIME?

18  A.   YES.

19  Q.   DID HE COME TO VISIT YOU AGAIN IN HAWAII?

20  A.   HE DID ONCE, I RECALL.

21  Q.   AND I BELIEVE YOU TESTIFIED YOU HURT YOUR KNEE AT A

22  POINT IN TIME AND YOU WENT BACK TO SAN DIEGO.  WAS THAT FROM

23  HAWAII THAT YOU MOVED TO SAN DIEGO?

24  A.   THAT WAS AROUND '84, '85.

25  Q.   AND WAS THAT WHEN YOU MET MS. STYLES AND STARTED YOUR

1    RELATIONSHIP?

2    A.    IT WAS.

3    Q.    AFTER YOU MOVED TO TAOS, YOUR WIFE GAVE BIRTH -- YOUR --

4    THEN MS. STYLES GAVE BIRTH TO DUSTIN, CORRECT?

5    A.    YEAH, ABOUT A YEAR AND A HALF AFTER.

6    Q.    DID THE DEFENDANT EVER VISIT YOU AND MS. STYLES AND YOUR

7    FAMILY IN TAOS?

8    A.    YES.

9    Q.    AND DID HE VISIT YOU AFTER DUSTIN WAS BORN?

10   A.    YES.

11   Q.    AND THEN SEVERAL YEARS LATER AFTER KALEN WAS BORN DID HE

12   VISIT YOUR FAMILY AROUND THAT TIME, AS WELL?

13   A.    YES.

14   Q.    HAS HE KNOWN BOTH OF YOUR SONS SINCE THEY WERE BORN?

15   A.    YES.

16   Q.    DID HE MEET BOTH OF YOUR SONS WHEN THEY WERE BABIES?

17   A.    YES.

18   Q.    DID HE KNOW THEM AS THEY GREW UP?

19   A.    YES.

20   Q.    AND AFTER YOU ENGAGED IN A RELATIONSHIP WITH MS. STYLES,

21   DID SHE DEVELOP A RELATIONSHIP OR A FRIENDSHIP WITH THE

22   DEFENDANT?

23   A.    THEY BECAME GOOD FRIENDS AS WELL.

24   Q.    AND WHEN THE DEFENDANT WOULD VISIT YOU AND YOUR FAMILY

25   WHILE YOU AND MS. STYLES WERE STILL TOGETHER IN TAOS, WHERE

1    WOULD HE STAY?

2    A.    USUALLY WITH US.  WE -- AT THE BEGINNING, IT MIGHT HAVE

3    BEEN JUST IN OUR HOUSE.  AND THEN I BUILT A SHOP WITH A

4    STUDIO ABOVE IT, SO WE HAD PLACES FOR HIM TO STAY ON OUR

5    LAND.

6    Q.    WHAT WOULD YOU DO WHEN HE CAME TO VISIT YOU AND

7    MS. STYLES AND YOUR CHILDREN?

8    A.    SOMETIMES WE WOULD SKI IF IT WAS WINTER, OR WE WOULD

9    HIKE IF IT WAS SUMMER.

10   Q.    AND DID YOU DO ACTIVITIES WITH THE KIDS OR JUST YOU AND

11   HIM?

12   A.    SOMETIMES JUST HIM AND I.  AND SOMETIMES WITH THE KIDS,

13   TOO.

14   Q.    WOULD HE EVER SPEND HOLIDAYS OR OTHER FAMILY OCCASIONS

15   WITH YOU AND MS. STYLES AND YOUR CHILDREN IN TAOS?

16   A.    OH, YEAH, UH-HUH.

17   Q.    MORE THAN ONCE?

18   A.    YEAH, I THINK WHENEVER POSSIBLE.  I THINK WE WERE LIKE

19   FAMILY, SO --

20   Q.    AND WHILE YOU WERE LIVING IN TAOS, WAS THE DEFENDANT

21   STILL RESIDING FULL TIME AT THE CAMP NEAR IDYLLWILD?

22   A.    YEAH.

23   Q.    AS YOU UNDERSTOOD IT?

24   A.    YES.

25   Q.    AND WHAT WAS HE DOING AT THE CAMP AT THAT POINT?

1    A.    I THINK BY THEN HE HAD MOVED UP.  HE HAD HIS OWN PLACE,

2    AND HE WAS WHAT WAS CALLED A RANGER-2, LIKE SECOND IN CHARGE.

3    Q.    AND DID YOU EVER VISIT HIM THERE?

4    A.    AT TIMES WE WOULD WHEN WE WENT TO SAN DIEGO.  WE WOULD

5    STOP BY AND SEE HIM BECAUSE IT WAS ON THE WAY OR ON THE WAY

6    BACK.  WE WOULD GO TO SAN DIEGO THROUGH IDYLLWILD.

7    Q.    WERE YOU AWARE OF WHETHER HE USED A COMPUTER AT THE

8    CAMP?

9    A.    YEAH, HE DID.  HE HAD A COMPUTER.

10   Q.    DO YOU KNOW IF HE HAD INTERNET ACCESS?

11   A.    HE DID.

12   Q.    WHAT DID HIS INTEREST IN COMPUTERS APPEAR TO BE TO YOU?

13   A.    HE WAS INTO IT.  HE REALLY -- HE SHARED WITH ME HE

14   REALLY LIKED TO SPEND A LOT OF TIME WITH COMPUTERS.

15   SOMETIMES HE WOULD STAY UP TILL 3:00 OR 4:00 IN THE MORNING

16   BECAUSE HE HAD FRIENDS ALL OVER THE WORLD, AND HE REALLY

17   LIKED IT.  AND HE WAS ALWAYS UPGRADING ON THE COMPUTER.  I

18   WOULD GO BACK AFTER NOT BEING THERE A WHILE AND THERE WOULD

19   BE NEW EQUIPMENT.

20   Q.    DO YOU KNOW IF HE HAD A LAPTOP COMPUTER?

21   A.    HE DID.

22   Q.    WOULD HE BRING IT WITH HIM TO TAOS WHEN HE WOULD VISIT

23   YOU AND YOUR FAMILY?

24   A.    WELL, THE ONE TIME I REMEMBER HIM BRINGING IT WAS AROUND

25   CHRISTMASTIME BECAUSE MY OLDEST BOY WAS REALLY INTERESTED IN

1    IT BECAUSE HE WANTED ONE.

2    Q.   WAS THAT DUSTIN YOU ARE REFERRING TO?

3    A.   YES.

4    Q.   NOW, DIRECTING YOUR ATTENTION TO THE 1999 -- UP TO THE

5    1999/2000 PERIOD, I TAKE IT YOUR FRIENDSHIP WITH THE

6    DEFENDANT CONTINUED DURING THAT PERIOD UP UNTIL 1999/2000?

7    A.   YES.

8    Q.   AND DID HE CONTINUE TO SPEND TIME WITH YOU AND YOUR

9    FAMILY?

10   A.   YES.

11   Q.   AND UP UNTIL 1999/2000, DID YOU EVER DEVELOP ANY

12   CONCERNS ABOUT THE DEFENDANT WHEN HE WAS AROUND YOUR BOYS?

13   A.   ABOUT THE TIME THAT LORI AND I BROKE UP -- I HAD SHARED

14   THIS WITH HER -- BUT I WAS STARTING TO GET UNCOMFORTABLE WITH

15   THE AMOUNT OF TIME HE WANTED TO SPEND WITH MY SON, AND I

16   MENTIONED IT TO HER.  AND I DIDN'T, OF COURSE, SAY ANYTHING

17   TO MY SON, BUT I WAS STARTING TO GET -- IT WAS JUST A FEELING

18   I HAD.

19   Q.   WHEN YOU SAY "YOUR SON," WHICH SON ARE YOU REFERRING TO?

20   A.   KALEN.

21   Q.   AND I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THAT

22   FEELING IN A MOMENT, BUT IF I MAY, AROUND THE TIME THAT YOU

23   FIRST STARTED FEELING THAT, WHAT WAS GOING ON IN YOUR FAMILY

24   LIFE AT THAT TIME?

25   A.   WELL, IT WAS TUMULTUOUS FOR ME.  IT WAS FEBRUARY OF 2000

1    THAT LORI AND I DECIDED THAT WE WEREN'T GOING TO BE TOGETHER

2    ANYMORE.  SO I HAD MOVED INTO A RENTAL IN TOWN.

3    Q.   WAS THAT -- IN FEBRUARY 2000, WAS THAT WHEN YOU FIRST

4    SEPARATED?

5    A.   YES, IT WAS.  AND THEN WE ALSO WORKED ON OUR

6    RELATIONSHIP THROUGH A THERAPIST AT THAT POINT FOR ABOUT SIX

7    MONTHS.

8    Q.   WAS THAT A DIFFICULT TIME FOR YOUR ENTIRE FAMILY?

9    A.   I CAN'T REALLY -- I MEAN, IT HAD TO HAVE BEEN.

10   Q.   AND MS. STYLES HAS REMAINED IN THE HOUSE SINCE THAT

11   PERIOD?

12   A.   SHE HAS.  AND WE WENT BACK AND FORTH AND DISCUSSED IT,

13   AND THAT'S HOW WE ENDED UP DOING THE SEPARATION.

14   Q.   AND AFTER YOU SEPARATED, WHERE WOULD YOUR BOYS STAY,

15   KALEN AND DUSTIN?

16   A.   THEY WOULD SHARE TIME BETWEEN MY PLACE AND HERS.

17   Q.   SO THE JOINT CUSTODY ARRANGEMENT HAS BEEN IN PLACE SINCE

18   THE SEPARATION?

19   A.   MM-HMM.

20   Q.   DID THERE COME A TIME WHEN YOUR SEPARATION WITH

21   MS. STYLES BECAME PERMANENT?

22   A.   YEAH.  AFTER ABOUT -- IT WAS ABOUT AUGUST WHEN THE

23   THERAPIST WAS WORKING WITH US THAT IT BECAME CLEAR THAT IT

24   WAS BETTER FOR BOTH OF US.

25   Q.   AND THIS HAD BEEN IN AUGUST OF 2000?

1    A.    YES.   JULY, AUGUST, RIGHT IN THAT TIME.

2    Q.    AND DURING THAT PERIOD THAT YOU AND MS. STYLES SEPARATED

3    AND THEN SPLIT UP, WOULD YOU STILL SEE THE DEFENDANT?

4    A.    YES.

5    Q.    DID HE STILL VISIT YOUR FAMILY IN TAOS?

6    A.    UH-HUH.

7    Q.    AND AFTER YOU AND MS. STYLES SEPARATED AND SHE IS IN THE

8    ORIGINAL HOME AND YOU'RE IN THE NEW PLACE, WHEN THE DEFENDANT

9    CAME TO TAOS, WHERE WOULD HE SLEEP?   WHERE WOULD HE STAY?

10   A.    USUALLY AT LORI'S HOUSE, PRETTY MUCH EXCLUSIVELY, YEAH.

11   Q.    AND HOW WOULD YOU CHARACTERIZE HIS RELATIONSHIP WITH

12   MS. STYLES AFTER YOUR SEPARATION?   DID IT CONTINUE OR DID IT

13   END?

14   A.    THEY WERE FRIENDS.

15   Q.    AND THEN HOW OFTEN WOULD THE KIDS STAY WITH YOU AFTER

16   YOU SEPARATED?

17   A.    ABOUT EQUAL.

18   Q.    AND WOULD THEY SLEEP AT YOUR HOUSE WHEN THEY STAYED WITH

19   YOU?

20   A.    UH-HUH.

21   Q.    NOW, YOU SAID THAT AROUND THE '99/2000 PERIOD OR EARLY

22   2000, PERHAPS IS WHAT YOU SAID, YOU STARTED FEELING SOME --

23   YOU STARTED DEVELOPING SOME CONCERNS.   WHAT WERE YOU FEELING

24   AT THAT TIME?

25   A.    WELL, IT PRETTY MUCH CAME FROM THE WAY MY SON WAS ACTING

1    WITH ME AND HIS MOTHER.  THAT'S WHY WE TALKED ABOUT IT.  BUT

2    HE WAS NEEDING A LOT MORE ATTENTION.  HE WAS A LOT MORE,

3    LIKE, CUDDLY OR KIND OF CLINGY ALMOST.

4    Q.   AND WAS -- WHAT DID YOU OBSERVE WITH REGARD TO KALEN'S

5    INTERACTION WITH THE DEFENDANT DURING THAT PERIOD?

6    A.   THEY WERE CLOSE, AS WELL.

7    Q.   AND WHAT ABOUT WITH REGARD TO PHYSICAL CONTACT WITH

8    REGARD TO WHAT YOU WERE JUST DESCRIBING?

9    A.   KALEN WAS COMFORTABLE WITH PHYSICAL CONTACT WITH JIM, AS

10   WELL.

11   Q.   DID YOU OBSERVE THAT TYPE OF PHYSICAL CONTACT BETWEEN

12   KALEN AND THE DEFENDANT?

13   A.   I DID.

14   Q.   I THINK YOU USED THE WORD "CLINGY."  DID YOU OBSERVE

15   THAT BETWEEN KALEN AND THE DEFENDANT?

16   A.   I DID.

17   Q.   DID YOU OBSERVE ANY CUDDLING OR OTHER AFFECTIONATE

18   CONTACT BETWEEN KALEN AND THE DEFENDANT IN YOUR PRESENCE?

19   A.   UMM, NOT MORE THAN I JUST SAID, NO.

20   Q.   DID THAT PHYSICAL CONTACT BETWEEN KALEN AND THE

21   DEFENDANT, DID THAT ADD TO YOUR DISCOMFORT?

22   A.   I WAS TRYING TO UNDERSTAND IT.  AND THAT'S WHY I SHARED

23   THOSE UNCOMFORTABLE FEELINGS WITH LORI AT THE TIME.  AND I

24   WAS TRYING TO FIGURE OUT -- I DIDN'T HAVE ANY IDEA WHY THAT

25   WAS GOING ON, BUT I WAS TRYING TO UNDERSTAND IT.  I DIDN'T

1    KNOW IF IT WAS A PHASE MY SON WAS GOING THROUGH OR WHAT.

2    Q.   DURING THAT PERIOD OF TIME, WHAT ELSE, IF ANYTHING, DID

3    YOU NOTICE WITH REGARD TO THE DEFENDANT'S DESIRE TO SPEND

4    TIME WITH KALEN?

5    A.   I DON'T UNDERSTAND.

6    Q.   WELL, DURING THAT PERIOD OF TIME DID YOU NOTICE WHETHER

7    OR NOT THE DEFENDANT HAD AN INTEREST IN SPENDING TIME WITH

8    KALEN OR NOT?

9    A.   YOU KNOW, NOW I CAN LOOK BACK ON IT AND SEE STUFF.  BUT

10   AT THE TIME, I WAS JUST THINKING THAT JIM LIKED TO BE WITH

11   OUR FAMILY AND WITH THE KIDS WHEN HE CAME OUT.

12   Q.   AND WHEN YOU LOOK BACK AT IT, WHAT DO YOU REFLECT UPON?

13   A.   WELL, I REMEMBER THAT WHEN THE KIDS WERE AT MY HOUSE JIM

14   WAS OVER THERE.  AND WHEN THE KIDS WERE OVER AT LORI'S, HE

15   WAS OVER THERE.

16   Q.   AND WHEN YOU LOOK BACK AT IT, DID IT APPEAR THAT HE WAS

17   MORE INTERESTED IN BEING WHERE THE KIDS WERE AS OPPOSED TO

18   ANYPLACE ELSE?

19            MR. AARON:  OBJECT, CALLS FOR SPECULATION.

20            THE COURT:  OVERRULED.

21            THE WITNESS:  YEAH.

22   BY MR. MICHAEL:

23   Q.   WHAT SORT OF ACTIVITIES WOULD THE DEFENDANT ENGAGE IN

24   WITH YOUR BOYS?

25   A.   PRETTY MUCH THE SAME THAT WE WOULD DO.  HE WOULD TAKE

1    THEM OUT TO DINNER OR TAKE THEM SKIING.  YOU KNOW, SWIMMING.

2    Q.    WOULD HE EVER DO THINGS WITH THE BOYS ALONE?

3    A.    YEAH.

4    Q.    WOULD HE EVER DO THINGS WITH KALEN ALONE?

5    A.    YEAH.  IT WAS FINE WITH US.

6    Q.    AND WHEN HE TOOK THEM SWIMMING OR WHEN HE TOOK KALEN

7    SWIMMING, WHERE WOULD THEY GO SWIMMING?

8    A.    WELL, IN THE WINTER, YOU KNOW, YOU WOULD GO TO THE

9    NORTHSIDE SPA.  THAT'S WHERE THEY HAVE AN INDOOR POOL.  AND

10   IN THE SUMMER, THERE WAS TWO OPTIONS.  YOU COULD GO DOWN TO

11   QUAIL RIDGE, WHICH IS A HOTEL, OR BY THE NORTHSIDE SPA.

12   Q.    AND WAS THERE A SHOWER AT THE NORTHSIDE SPA?

13   A.    YES.

14   Q.    AND IS THAT THE INDOOR SWIMMING POOL?

15   A.    YES.

16   Q.    AND DID THE DEFENDANT EVER GIVE ANY GIFTS TO KALEN?

17   A.    UM, YOU KNOW, AT CHRISTMASTIME THERE MIGHT HAVE BEEN

18   GIFTS.  BUT I DO REMEMBER HIM ON ONE TIME GIVING KALEN A

19   BATHING SUIT, A SPEEDO, LIKE HIS OWN.

20   Q.    WHEN YOU SAY "LIKE HIS OWN," LIKE WHOSE?

21   A.    LIKE JIM'S.  HE HAD ONE ALSO.

22   Q.    DID YOU SEE THE BATHING SUIT?

23   A.    I DID.  ACTUALLY, MY OLDEST SON AND I LAUGHED AT IT.  WE

24   THOUGHT IT WAS FUNNY.

25   Q.    NOW, WHEN KALEN SPENT TIME WITH THE DEFENDANT, WITHOUT

1    GETTING INTO WHAT HE EVER TOLD YOU, IF ANYTHING, WAS HE OPEN

2    OR CLOSED ABOUT THE TYPES OF ACTIVITIES HE WOULD ENGAGE IN

3    WITH THE DEFENDANT?

4    A.   HE WOULDN'T TALK ABOUT IT MUCH AT ALL.

5    Q.   DO YOU KNOW WHAT THE SLEEPING ARRANGEMENTS WERE WHEN THE

6    DEFENDANT STAYED AT MS. STYLES' HOME?

7             MR. AARON:  OBJECT, CALLS FOR HEARSAY.

8             THE COURT:  THE OBJECTION IS OVERRULED.

9             THE WITNESS:  NO.  I HAVE NO IDEA WHAT THAT WAS.

10   BY MR. MICHAEL:

11   Q.   BEFORE, WHEN YOU SAID WITH REGARD TO THE BATHING SUIT

12   DESCRIBED AS A SPEEDO, WOULD THAT BE LIKE A -- WELL, HOW

13   WOULD YOU DESCRIBE A SPEEDO BATHING SUIT?

14   A.   IT IS A TIGHT LITTLE BATHING SUIT YOU WOULD WEAR IF YOU

15   WERE A SWIMMER.

16   Q.   AND WHEN THE DEFENDANT WOULD STAY AT MS. STYLES' HOUSE

17   AND THE BOYS WERE THERE, DO YOU KNOW IF HE WOULD DO

18   ACTIVITIES ALONE WITH KALEN?

19   A.   I DON'T.

20   Q.   DIRECTING YOUR ATTENTION TO DECEMBER 2000, WERE YOU

21   LIVING IN TAOS AT THE TIME?

22   A.   MM-HMM.

23   Q.   AND THAT WAS WHEN YOU WERE SEPARATED FROM MS. STYLES?

24   A.   BEFORE THAT, IN AUGUST WHEN WE DECIDED THE SEPARATION

25   WAS PERMANENT, I HAD BOUGHT MY OWN HOME, AND I MOVED INTO

1    THAT AROUND OCTOBER.

2    Q.    AND WERE YOU IN TAOS FOR CHRISTMAS?

3    A.    I WAS.

4    Q.    AND HOW DID YOU AND MS. STYLES DO CHRISTMAS THAT YEAR,

5    IN DECEMBER OF 2000, IN LIGHT OF YOUR RECENT SEPARATION?

6    A.    I HAD CHRISTMAS EVE AT MY HOUSE, AND THEN LORI HAD

7    CHRISTMAS DAY AT HERS.  THE KIDS STAYED WITH HER AFTER

8    CHRISTMAS EVE.

9    Q.    AND WHO, IF ANYONE, CAME TO VISIT YOUR FAMILY IN

10   CHRISTMAS 2000, IN TAOS?

11   A.    JIM WAS THERE THAT YEAR.

12   Q.    AND HOW DID HE TRAVEL TO TAOS FOR THAT TRIP?

13   A.    YOU KNOW, I DON'T REMEMBER.  USUALLY, HE WOULD DRIVE OUT

14   IN HIS BRONCO, AND SOMETIMES HE FLEW.  AND I DON'T REALLY

15   REMEMBER HOW HE CAME OUT THAT TIME.

16   Q.    HAD HE FLOWN BEFORE TO TAOS TO VISIT YOU?

17   A.    AT LEAST ONCE, MAYBE MORE.

18   Q.    WHAT AIRPORT WOULD HE FLY INTO WHEN HE CAME TO VISIT

19   YOUR FAMILY?

20   A.    YOU HAVE TO FLY IN TO ALBUQUERQUE.

21   Q.    AND IF YOU WERE TO -- HOW FAR IS TAOS FROM ALBUQUERQUE?

22   A.    ABOUT THREE HOURS.

23   Q.    AND IF YOU WERE TO TRAVEL FROM ALBUQUERQUE TO TAOS, WHAT

24   CITIES WOULD YOU HAVE TO DRIVE THROUGH?

25   A.    THROUGH SANTA FE AND THROUGH ESPANOLA.

1   Q.   I'M GOING TO DIRECT YOUR ATTENTION TO THE SCREEN NEXT TO

2   YOU, SIR.

3            MR. MICHAEL:   YOUR HONOR, MAY I PUBLISH EXHIBIT

4   143, WHICH IS ALREADY IN EVIDENCE?

5            THE COURT:   YOU MAY.

6   BY MR. MICHAEL:

7   Q.   SIR, I'M SHOWING YOU A PHONE BILL.   AND THERE IS A

8   SERIES OF PHONE NUMBERS HERE UNDER A SECTION CALLED "ROAMING

9   CHARGES," AND THERE IS A SERIES OF PHONE CALLS, THERE IS

10  DATES, TIMES, AND THEN IT SAYS "CALLS MADE FROM SANTA FE,"

11  AND THERE IS A SERIES OF PHONE NUMBERS.   CAN YOU IDENTIFY ANY

12  OF THESE PHONE NUMBERS?

13  A.   YEAH.   THE TOP NUMBER, THE 751-9100 IS THE MOUNTAIN SHOP

14  THAT WE OWN.   AND THE OTHER NUMBER BELOW THAT IS LORI'S

15  NUMBER TO HER HOUSE.

16  Q.   IS THAT THE 776-2938 NUMBER?

17  A.   AND THEN THE OTHER NUMBER, THE 2066, WAS MY HOME NUMBER.

18  Q.   SO, 2938 WAS MS. STYLES' NUMBER?   WAS IT HER NUMBER?

19  A.   YES.

20  Q.   AND THEN THE 2 -- I'M SORRY -- 066 WAS YOUR NUMBER?

21  A.   CORRECT.

22  Q.   AND DO YOU KNOW THIS NUMBER, 2600?

23  A.   NO.   IT MIGHT HAVE BEEN A MISTAKE.

24  Q.   IN DECEMBER OF 2000 WHEN THE DEFENDANT -- I DON'T KNOW

25  IF YOU SAID THIS.   WHEN THE DEFENDANT WOULD DRIVE TO VISIT

1    YOUR FAMILY IN TAOS, WHAT WOULD HE DRIVE?

2    A.    HE HAS A BRONCO, FORD BRONCO.

3    Q.    IN DECEMBER 2000 WHEN HE WAS VISITING YOUR FAMILY, WHOSE

4    HOUSE WOULD HE SLEEP AT, YOURS OR MS. STYLES?

5    A.    AT LORI'S HOUSE.

6    Q.    AND WHAT WAS YOUR COMFORT LEVEL AT THAT TIME ABOUT HOW

7    THE DEFENDANT WAS AROUND KALEN?

8    A.    I WAS GETTING -- I WAS FEELING UNCOMFORTABLE.  I WASN'T

9    -- LIKE I SAID, I DON'T KNOW WHY, BUT I WAS.

10   Q.    AND WAS KALEN STILL BEHAVING IN THE AFFECTIONATE MANNER

11   THAT YOU DESCRIBED, IN DECEMBER 2000?

12   A.    UM, YES.

13   Q.    AND DURING THAT TRIP, DID THE DEFENDANT DO ANY

14   ACTIVITIES ALONE WITH KALEN WHILE KALEN WAS WITH YOU?

15   A.    AT MY HOUSE, THEY WERE REALLY ONLY AT MY HOUSE DURING

16   THE DAY, AND ONE TIME WHEN JIM AND KALEN DID GO TO THE HOT

17   TUB NEXT DOOR AT MY NEIGHBOR'S HOUSE.

18   Q.    WHO WENT WITH THEM?

19   A.    NOBODY.  JUST THE TWO OF THEM.

20   Q.    DID THEY GO ANYWHERE ELSE TOGETHER, DO ANY OTHER

21   ACTIVITIES TOGETHER?

22   A.    NOT WHILE WE WERE AT MY PLACE, THAT I RECALL.  THEY

23   MIGHT HAVE GONE SKIING, BUT I DON'T THINK HE WAS AT HIS MOM'S

24   HOUSE.

25   Q.    DID THE DEFENDANT HAVE HIS LAPTOP COMPUTER WITH HIM ON

```
 1    THIS TRIP?

 2    A.    YES, HE DID.

 3    Q.    DID YOU SEE IT?

 4    A.    I DID.

 5              MR. MICHAEL:  YOUR HONOR, I AM GOING TO GO THROUGH

 6    EXHIBITS QUICKLY, 68 THROUGH 83, JUST TO IDENTIFY.

 7              THE COURT:  GO AHEAD.

 8    BY MR. MICHAEL:

 9    Q.    SIR, I'M GOING TO DIRECT YOUR ATTENTION TO THE SCREEN,

10    MR. SUTHERLAND.  SHOWING YOU A PICTURE, EXHIBIT 68.

11              SIR, WHO IS IN THIS PICTURE?

12    A.    THAT'S KALEN, MY SON.

13    Q.    HOW OLD DOES HE APPEAR TO YOU TO BE IN THAT PICTURE?

14    A.    SEVEN.

15    Q.    DO YOU KNOW WHO TOOK THIS PICTURE?

16    A.    I DON'T.

17    Q.    WHEN THE DEFENDANT WAS IN TAOS IN DECEMBER 2000, DO YOU

18    RECALL WHETHER OR NOT HE HAD A DIGITAL CAMERA WITH HIM?

19    A.    I DON'T.

20    Q.    EXHIBIT 69, PLEASE.

21              WHO IS THIS?

22    A.    THAT'S ALSO KALEN.

23    Q.    DO YOU RECOGNIZE THE CAR THAT HE IS IN?

24    A.    IT LOOKS LIKE OUR -- LOOKS LIKE A TOYOTA VAN.  LOOKS

25    LIKE OUR VAN.
```

1    Q.    AND THAT COAT HE IS WEARING, WHAT TIME OF YEAR WOULD HE

2    WEAR THAT COAT?

3    A.    IT IS WINTER.  SKIS IN THE CAR.

4    Q.    EXHIBIT 70, PLEASE.

5    A.    THAT'S KALEN AGAIN, ON A CELL PHONE.

6    Q.    EXHIBIT 71?

7    A.    THAT'S KALEN AT HIS MOM'S HOUSE.

8    Q.    AND THAT'S THE HOUSE -- YOU SAY HIS MOM, MS. STYLES'

9    HOME?

10   A.    YES, THE ONE WE BUILT TOGETHER.

11   Q.    NEXT EXHIBIT PLEASE, EXHIBIT 72.

12   A.    THAT'S KALEN AT MY HOUSE.

13   Q.    DOES HE APPEAR TO YOU TO STILL BE SEVEN YEARS OLD IN

14   THIS PICTURE?

15   A.    YES.

16   Q.    EXHIBIT 73, PLEASE.

17   A.    THAT'S KALEN GOING UP INTO HIS ROOM.  THAT'S A LOFT

18   UPSTAIRS AT MY HOUSE.

19   Q.    DO YOU RECOGNIZE THAT SNEAKER IN THE LOWER RIGHT CORNER

20   OF THE PHOTOGRAPH?

21   A.    IT LOOKS LIKE ONE OF JIM'S.  HE LIKED TO WEAR RUNNING

22   SHOES.

23   Q.    EXHIBIT 74, PLEASE.

24   A.    THAT'S KALEN AGAIN.

25   Q.    NOW, EXHIBIT 75, PLEASE.  EXCUSE ME.  THAT'S NOT EXHIBIT

1    75.  EXHIBIT 75.

2    A.   THAT'S ME AND MY SON AT A RESTAURANT.  I'M NOT SURE OF

3    THE RESTAURANT.

4    Q.   IS THAT THE SAME WINTER COAT THAT KALEN HAS ON?

5    A.   IT IS.

6    Q.   EXHIBIT 76, PLEASE.  EXHIBIT 78, PLEASE.  WHO IS IN THAT

7    PHOTOGRAPH?

8    A.   THAT'S ME AND KALEN, AND THAT'S AGAIN AT MY HOUSE.

9    Q.   NEXT EXHIBIT, PLEASE, EXHIBIT 79.

10   A.   THAT'S MY OTHER SON WITH KALEN AND I AT MY HOUSE.

11   Q.   AND WHAT DOES IT APPEAR THAT YOU ARE DOING IN THAT

12   PICTURE?

13   A.   OPENING GIFTS.

14   Q.   WOULD THAT BE CHRISTMAS?

15   A.   THAT WOULD BE OUR CHRISTMAS EVE.

16   Q.   WOULD THAT BE THE CHRISTMAS EVE IN DECEMBER OF 2000?

17   A.   YES.

18   Q.   NEXT EXHIBIT, PLEASE.

19   A.   THAT'S MY SON DUSTIN, MY OLDEST BOY.

20   Q.   AND THAT'S EXHIBIT 80.

21          EXHIBIT 81, PLEASE.  AND WHERE IS THAT PICTURE

22   TAKEN?

23   A.   THAT'S AT MY HOUSE.  I CAN TELL BY THE ASPEN WOOD COUCH.

24   Q.   AND EXHIBIT 82, PLEASE.

25   A.   ONCE AGAIN, THAT'S DUSTIN.  THAT'S AT HIS MOM'S HOUSE.

1   Q.   DO THESE PICTURES ALL APPEAR TO YOU TO BE TAKEN IN THE

2   SAME TIME FRAME, IN DECEMBER OF 2000?

3   A.   IT LOOKS LIKE WINTER.  THERE'S A LITTLE SNOW AND THE

4   TREES ARE BARE.

5   Q.   EXHIBIT 83, PLEASE.  WHERE IS THIS PHOTOGRAPH TAKEN?

6   A.   THAT'S AT LORI'S HOUSE, AS WELL, AND THAT'S HER PIANO.

7   Q.   DO YOU RECOGNIZE THESE TWO BOYS?

8   A.   THEY ARE MY FRIEND'S KIDS.

9   Q.   NOW, AFTER YOUR FAMILY SPENT CHRISTMAS IN 2000 IN TAOS

10  WITH THE DEFENDANT, WHEN DID YOU SEE THE DEFENDANT NEXT?

11  A.   DURING THAT HOLIDAY SEASON, WE ALSO WENT OUT TO SAN

12  DIEGO.  MY DAD HAS A HOUSE IN MISSION BEACH, AND WE WENT OUT

13  THERE.

14  Q.   AND DID THE DEFENDANT COME VISIT YOU THERE?

15  A.   HE DID, FOR A DAY.

16  Q.   HOW DID THAT COME ABOUT?

17  A.   HE JUST SAID HE WANTED TO COME DOWN, SO HE DID.

18  Q.   HOW WERE YOU FEELING ABOUT HAVING HIM COME DOWN AND

19  VISIT AT THAT POINT?

20  A.   I WAS TRYING TO AVOID IT, I REMEMBER.

21  Q.   DID HE SPEND THE NIGHT IN SAN DIEGO OR DID HE COME FOR

22  THE DAY?

23  A.   I DON'T THINK HE SPENT THE NIGHT.  I THINK HE JUST CAME

24  DOWN FOR THE DAY.

25  Q.   AND DID HE HAVE ANY TIME TO SPEND WITH KALEN IN SAN

1    DIEGO?

2    A.   YEAH, THEY DID.  THEY WENT TO THE POOL AND WENT SWIMMING

3    OVER AT THE PLUNGE AT MISSION BEACH.

4    Q.   DID THEY GO WITH ANYONE ELSE OR DID THEY GO BY

5    THEMSELVES?

6    A.   JUST THE TWO OF THEM.

7    Q.   AND HOW DID THAT COME ABOUT?

8    A.   JIM WANTED TO TAKE HIM SWIMMING.

9    Q.   DID THERE COME A TIME AFTER THAT VISIT AND AFTER THE

10   VISIT IN DECEMBER 2000 WHEN YOU WERE CONTACTED BY THE NEW

11   MEXICO STATE POLICE?

12   A.   YES.

13   Q.   DO YOU RECALL WHEN?

14   A.   YEAH.  IT WAS -- I GOT TO LOOK OVER THIS RECENTLY; IT

15   BROUGHT IT ALL BACK UP.  I KNOW THE DATE.  IT WAS JUNE 5TH,

16   2001.

17   Q.   AND WHERE WERE YOU WHEN THEY CONTACTED YOU?

18   A.   I WAS AT MY HOUSE IN TAOS.

19   Q.   WERE YOU WITH ANYONE OR WERE YOU ALONE?

20   A.   I WAS WITH MY FRIEND STEVE.

21   Q.   AND WHERE WAS KALEN AND DUSTIN?

22   A.   DUSTIN WAS WITH HIS MOM TO GO BIKE TOURING, AND KALEN

23   WAS AT SCHOOL.

24   Q.   WITHOUT SAYING WHAT, DID YOU LEARN CERTAIN INFORMATION

25   FROM THE STATE POLICE THAT DAY?

1    A.    I DID.

2    Q.    AND WITHOUT GETTING INTO WHAT YOU LEARNED, WHAT WAS YOUR

3    REACTION TO THAT INFORMATION?

4    A.    WELL --

5             MR. AARON:  I WILL OBJECT AS TO RELEVANCE AND CALLS

6    FOR A HEARSAY RESPONSE.

7             THE COURT:  OVERRULED.

8             THE WITNESS:  AT FIRST I WAS SHOCKED, AND THEN I

9    BROKE DOWN AND CRIED A LOT.

10   BY MR. MICHAEL:

11   Q.    AND WHAT, IF ANYTHING, DID YOU DO THE NEXT DAY BASED ON

12   THE INFORMATION YOU LEARNED?

13   A.    I BROUGHT KALEN FOR AN INTERVIEW IN TOWN AT SAFE ROOM.

14   Q.    WHAT WAS THE INFORMATION YOU LEARNED THAT CAUSED YOU TO

15   HAVE THAT REACTION AND THAT CAUSED YOU TO BRING KALEN TO THE

16   SAFE ROOM THE NEXT DAY FOR AN INTERVIEW?

17            MR. AARON:  OBJECTION, HEARSAY.

18            THE COURT:  EXCUSE ME?

19            MR. MICHAEL:  WHAT WAS THE INFORMATION YOU LEARNED

20   FROM THE STATE POLICE?  TO BE MORE PRECISE.

21            THE COURT:  THE OBJECTION IS OVERRULED.

22   BY MR. MICHAEL:

23   Q.    WHAT WAS THE INFORMATION, SIR, THAT YOU LEARNED FROM THE

24   STATE POLICE THAT CAUSED YOU TO HAVE THAT REACTION AND THAT

25   CAUSED YOU TO BRING KALEN TO THE SAFE ROOM INTERVIEW THE NEXT

1    DAY?

2    A.    I HAD LEARNED THAT JIM WAS USING MY SON'S NAME IN A CHAT

3    ROOM.

4    Q.    WHAT ELSE DID YOU LEARN THAT CAUSED THOSE THINGS?   WHAT

5    ELSE DID YOU LEARN?

6    A.    WELL, WHAT I LEARNED IS THEY CAME UP TO ME AND THEY SAID

7    THEY HAD BEEN SEARCHING FOR A BOY NAMED KALEN, IN TAOS,

8    BECAUSE OF THAT, AND IT WAS AN UNUSUAL NAME, AND THEY FINALLY

9    FOUND OUT.   AND THEY LOOKED FOR MY HOUSE FOR A COUPLE OF DAYS

10   BECAUSE WE ALL HAVE P.O. BOXES, SO IT TOOK A WHILE FOR THEM

11   TO FIND MY HOUSE.   AND IT WAS -- THEY TOLD ME THAT THEY HAD

12   BEEN LOOKING FOR, LIKE I SAID, A COUPLE OF DAYS FOR KALEN.

13   AND THEY FOUND HIM.   THEY FOUND ME.   AND THEY ASKED ME IF

14   THAT WAS MY SON, AND I SAID YES.   AND THEY ASKED ME IF I KNEW

15   JAMES SANDERS, AND I SAID YES.   AND THEY TOLD ME THAT IT WAS

16   -- CAN I SAY WHAT THEY TOLD ME?

17              THE COURT:   NO.   I THINK YOU HAVE ANSWERED THE

18   QUESTION.   THANK YOU.

19              THE WITNESS:   OKAY.   I'M NOT SURE.

20              THE COURT:   THAT'S FINE.

21   BY MR. MICHAEL:

22   Q.    WHAT WAS THE INFORMATION THAT CAUSED YOU TO BE ANGRY AND

23   TO CRY?

24              MR. AARON:   OBJECT.   I THINK IT HAS BEEN ASKED AND

25   ANSWERED.

1           THE COURT:  OVERRULED.

2           THE WITNESS:  THEY SAID IT WAS -- IT WAS AN

3    INTERNATIONAL CHILD PORNOGRAPHY RING.

4    BY MR. MICHAEL:

5    Q.   WAS THE INTERVIEW FOR THE SAFE ROOM ARRANGED THAT SAME

6    DAY?  IT WAS ARRANGED FOR THE NEXT DAY, BUT WAS IT ARRANGED

7    WHEN THEY CAME TO SEE YOU?

8    A.   YEAH.  AT THAT TIME THEY SAID THEY WOULD LIKE TO ARRANGE

9    THAT FOR KALEN.  AND I CALLED THEM BACK AFTER THEY'D COME

10   BACK BEFORE KALEN GOT HOME AND SAID THAT I WOULD DO THAT.

11   Q.   DID THEY SHARE WITH YOU THE CONTENT OF ANY OF THESE

12   CHATS?

13   A.   I BROUGHT THEM TO THE CHAT ROOM WITH THIS LADY.  HER

14   NAME WAS KATHY, KAT DUFF.

15   Q.   I THINK MAYBE THAT WAS A MISUNDERSTANDING THERE.

16           WITH REGARD TO THE CHATS THAT THEY TALKED ABOUT

17   MR. SANDERS DOING, DID THEY EVER SHARE THOSE CHATS, HIS

18   INTERNET COMMUNICATION, WITH YOU?  DID THEY EVER SHOW IT TO

19   YOU?

20   A.   NO.  NO.

21   Q.   TO THIS DAY, HAVE YOU EVER READ IT?

22   A.   NO.

23   Q.   DID YOU BRING KALEN TO THE SAFE ROOM INTERVIEW THE NEXT

24   DAY?

25   A.   I DID.

1    Q.   WAS HE INTERVIEWED?

2    A.   HE WAS.

3    Q.   AND WHO INTERVIEWED HIM?

4    A.   THIS LADY, HER NAME WAS KAT DUFF.

5    Q.   WAS THERE MORE THAN ONE INTERVIEW ON THAT DAY?

6    A.   THERE WAS TWO.

7    Q.   DID YOU MEET WITH KALEN DURING THE INTERVIEWS?

8    A.   NOT DURING.  HE WENT IN BY HIMSELF.

9    Q.   IN BETWEEN THE TWO INTERVIEWS, DID YOU MEET WITH HIM?

10   A.   I DID.

11   Q.   AND WITHOUT SAYING WHAT HE TOLD YOU, IF ANYTHING, DID

12   YOU TALK WITH HIM ABOUT THE SUBJECT OF THE INTERVIEWS?

13   A.   UM, NO.  I REALLY DIDN'T.

14   Q.   DID YOU LEARN WHAT HE SAID DURING THOSE INTERVIEWS?

15   A.   YOU KNOW, I WAS, UMM, LEARNED PARTS, AND I DIDN'T WANT

16   TO KNOW ANY MORE.  SO, I DIDN'T LEARN VERY MUCH, NO.

17   Q.   WHY DIDN'T YOU WANT TO KNOW ANY MORE?

18          MR. AARON:  I'LL OBJECT.  RELEVANCE AND CALLS FOR A

19   HEARSAY RESPONSE.

20          THE COURT:  OVERRULED ON THE LAST GROUND.  AND IT

21   IS -- OVERRULED.  THE OBJECTION IS OVERRULED.

22          YOU MAY ANSWER.

23          THE WITNESS:  UMM, I REALLY -- LIKE, EVEN JUST

24   TALKING ABOUT IT NOW I GET EMOTIONAL.  BUT AT THAT POINT, I

25   WANTED TO -- I WANTED TO LET THINGS DEVELOP BEFORE I KNEW

```
 1   MUCH OF WHAT WAS GOING ON.  AND I WAS KIND OF REALLY IN
 2   SHOCK, YOU KNOW.  I WAS IN AN EMOTIONAL UPHEAVAL.  I DON'T
 3   KNOW THE EXACT WORDS FOR IT.  BUT I DIDN'T REALLY WANT TO
 4   KNOW.  HE DIDN'T FEEL LIKE SHARING WITH ME, AS WELL, AND SO I
 5   WASN'T GOING TO FORCE HIM TO SHARE SOMETHING WITH ME HE
 6   DIDN'T WANT TO.
 7   BY MR. MICHAEL:
 8   Q.   WHEN YOU SAY "HE," ARE YOU REFERRING TO KALEN?
 9   A.   KALEN.
10   Q.   AT THAT POINT, WHAT DID YOU FEEL ABOUT THE UNCOMFORTABLE
11   FEELING ABOUT THE DEFENDANT?
12   A.   WELL, FOR ME IT RANG TRUE.
13           MR. AARON:  OBJECTION, RELEVANCE.
14           THE COURT:  THE OBJECTION IS SUSTAINED.
15           MR. AARON:  MOVE TO STRIKE.
16           THE COURT:  THE MOTION TO STRIKE IS GRANTED.
17           AND, LADIES AND GENTLEMEN, THAT MEANS THAT YOU
18   DISREGARD THE WITNESS' ANSWER TO THE LAST QUESTION.
19   BY MR. MICHAEL:
20   Q.   AFTER KALEN WAS INTERVIEWED IN THE SAFE ROOM, DID HE
21   EVER MEET WITH ANY OTHER PROFESSIONALS?
22   A.   HE DID.
23   Q.   WHO?
24   A.   HER NAME IS JOSIE.
25   Q.   AND WHO IS SHE?
```

1          MR. AARON:  OBJECTION.  ASK TO APPROACH, YOUR

2   HONOR.

3          THE COURT:  COUNSEL, YOU MAY APPROACH.

4          MR. MICHAEL:  YOUR HONOR, I WILL END THE LINE OF

5   INQUIRY.

6          THE COURT:  ALL RIGHT.  YOU WITHDRAW THE LAST

7   QUESTION?

8          MR. MICHAEL:  I WITHDRAW THE LAST QUESTION, YOUR

9   HONOR.

10         THE COURT:  THANK YOU.

11  BY MR. MICHAEL:

12  Q.   SIR, AFTER YOU WERE CONTACTED BY THE STATE POLICE AND

13  YOU TOOK YOUR SON KALEN TO THE SAFE ROOM INTERVIEW, WERE YOU

14  EVER CONTACTED BY THE DEFENDANT?

15  A.   I WAS.

16  Q.   WHAT HAPPENED?

17  A.   HE CALLED MORE THAN ONCE.  ONE TIME HE CALLED, KALEN

18  PICKED UP THE PHONE.

19  Q.   WHAT HAPPENED WHEN KALEN ANSWERED THE PHONE?

20  A.   HE JUST GOT A REAL BLANK LOOK ON HIS FACE AND HANDED ME

21  THE PHONE.

22  Q.   AND DID YOU SPEAK WITH HIM?

23  A.   I DID.

24  Q.   AND WERE YOU AGITATED WHEN HE CALLED?

25  A.   I WAS REALLY ANGRY.

1   Q.   WERE YOU WORKED UP?   WHILE YOU WERE IN THAT STATE, WHAT

2   DID YOU SAY TO HIM?

3   A.   I TOLD HIM TO NEVER CALL HERE AGAIN.

4   Q.   AND YOU SAY THERE WERE A COUPLE CALLS.   DID HE TRY TO

5   CONTACT YOUR FAMILY AGAIN?

6   A.   HE DID.

7   Q.   WERE YOU ANGRY WHEN HE CALLED THAT TIME?   WELL, WHO

8   ANSWERED THAT CALL?

9   A.   I DID.   I RECALL ANSWERING TWICE AND KALEN ONCE.

10  Q.   AND WERE YOU WORKED UP WHEN HE CALLED YOU THAT SECOND

11  TIME?

12  A.   YEAH.

13  Q.   AND WHAT DID YOU SAY TO HIM WHILE IN THAT STATE?

14  A.   I JUST HUNG UP, ACTUALLY, THE LAST TIME HE CALLED.

15  Q.   HAVE YOU TALKED TO THE DEFENDANT SINCE THAT CALL?

16  A.   NO.

17  Q.   IS TODAY THE FIRST TIME YOU HAVE SEEN HIM SINCE THAT

18  CALL?

19  A.   YES.

20          MR. MICHAEL:   NO FURTHER QUESTIONS, YOUR HONOR.

21          THE COURT:   THANK YOU.

22          CROSS-EXAMINATION.

23          LADIES AND GENTLEMEN, SO THAT WE CAN COMPLETE THE

24  TESTIMONY OF THIS WITNESS, WE ARE GOING TO GO BEYOND 4:30,

25  UNLESS ANY OF YOU HAVE A TIME PROBLEM.   IF YOU DO, DOES

1    ANYONE HAVE ANY DIFFICULTY IF WE GO BEYOND 4:30?  IF YOU DO,

2    LET ME KNOW.

3              MS. GRISHAM?

4              JUROR GRISHAM:  SORRY.

5              THE COURT:  YOU DO?

6              JUROR GRISHAM:  I DO.  IT'S A DOCTOR'S APPOINTMENT.

7              THE COURT:  WHAT TIME DO YOU NEED TO LEAVE?

8              JUROR GRISHAM:  IT'S AT 5:00.  BUT 4:30 I THOUGHT

9    WAS OUR TIME.

10             THE COURT:  IT USUALLY IS.

11             JUROR GRISHAM:  I DIDN'T THINK TO MENTION IT.

12             THE COURT:  WHERE IS YOUR APPOINTMENT?

13             JUROR GRISHAM:  AT KAISER, NEAR THE TYLER MALL.

14             THE COURT:  TYLER MALL?  CAN YOU MAKE A PHONE CALL

15   OR --

16             JUROR GRISHAM:  NO.  IT WOULD BE IRRELEVANT TO DO

17   THAT AT THIS POINT.

18             THE COURT:  AT THIS POINT?

19             JUROR GRISHAM:  YEAH.

20             THE COURT:  WELL, LET ME SEE COUNSEL AT THE

21   SIDEBAR.

22             (ON-THE-RECORD DISCUSSION AT SIDEBAR:)

23             THE COURT:  HOW LONG IS YOUR EXAMINATION?  I'M NOT

24   TRYING TO CUT YOU SHORT.

25             MR. AARON:  RIGHT.  I DON'T KNOW.  I DON'T KNOW HOW

1  LONG.

2          THE COURT:  AT LEAST TEN MINUTES, THOUGH?

3          MR. AARON:  I THINK SO.

4          THE COURT:  ALL RIGHT.  WHAT'S MR. SUTHERLAND'S

5  SCHEDULE?

6          MR. MICHAEL:  SUPPOSED TO CATCH A FLIGHT AT 7:00.

7  I DON'T KNOW IF THERE IS A WAY TO ACCOMMODATE HIM OR NOT.

8          THE COURT:  THE CHOICE IS TO ASK HER TO MISS HER

9  DOCTOR'S APPOINTMENT.

10          MR. MICHAEL:  IN LIGHT OF THE STATUS AS A VICTIM

11  HAVING BEEN OUT HERE TWICE NOW FOR THIS CASE, WE WOULD ASK

12  THAT -- IT IS DIFFICULT FOR HIM TO BE HERE.

13          THE COURT:  WELL, THEN WE CAN EITHER --

14          MR. MICHAEL:  I WOULD REQUEST THAT THE COURT

15  INQUIRE OF THE JUROR TO SEE IF SHE WOULD BE WILLING TO CANCEL

16  HER DOCTOR'S APPOINTMENT.

17          THE COURT:  MS. GRISHAM, COULD I ASK YOU TO COME

18  OVER TO SIDEBAR FOR JUST A MOMENT?

19          MS. GRISHAM --

20          JUROR GRISHAM:  YES.

21          THE COURT:  -- IT IS FINE.  I'M JUST HESITATING.  I

22  AM ABOUT TO ASK YOU TO TELL ME IF IT WOULD BE A HARDSHIP FOR

23  YOU TO CHANGE THIS APPOINTMENT?

24          JUROR GRISHAM:  I DON'T THINK IT WOULD BE A

25  HARDSHIP.

```
 1                THE COURT:  ALL RIGHT.  YOU SURE YOU'RE ALL RIGHT?

 2                JUROR GRISHAM:  IT WOULD NOT BE A HARDSHIP.

 3                THE COURT:  I APPRECIATE IT VERY MUCH, AND I KNOW

 4     COUNSEL DOES.

 5          (ON-THE-RECORD DISCUSSION AT SIDEBAR IS CONCLUDED.)

 6                THE COURT:  YOU MAY INQUIRE.

 7                          CROSS-EXAMINATION

 8     BY MR. AARON:

 9     Q.   GOOD AFTERNOON, MR. SUTHERLAND.

10                THERE WAS A CERTAIN TIME WHEN YOU NOTICED THAT

11     MR. SANDERS WOULD BE UP LATE TALKING TO PEOPLE ALL AROUND THE

12     WORLD?

13     A.   I NEVER NOTICED THAT.

14     Q.   HE JUST TOLD YOU THAT?

15     A.   YES.

16     Q.   DO YOU REMEMBER ABOUT WHEN THAT WAS?  I'M SORRY.  LET ME

17     GIVE YOU SOME MORE DIRECTION.

18                DO YOU REMEMBER ABOUT WHEN THAT STARTED?

19     A.   YOU MEAN WHEN HE WAS -- HAD HIS COMPUTER UP IN

20     IDYLLWILD?

21     Q.   NO.  WHEN HE TOLD YOU OR WHEN HE STARTED TELLING YOU

22     ABOUT THE STAYING UP ALL HOURS OF THE NIGHT TALKING TO PEOPLE

23     AROUND THE WORLD?

24     A.   OH, GOSH.  PROBABLY -- I'M TRYING.  YOU WANT A TIME

25     LINE.  PROBABLY, YOU KNOW, IT WAS '90S, LATE '90S.
```

1    Q.    OKAY.   SOMETIME IN THE LATE '90S?

2    A.    YEAH.   I MEAN, THAT IS A REALLY HARD QUESTION FOR ME TO

3    ANSWER.

4    Q.    AND HE WAS LIVING UP AT THE CAMP JOE SHERMAN AT THAT

5    TIME, RIGHT?

6    A.    CORRECT.

7    Q.    AND THERE WERE ONLY A FEW PEOPLE LIVING FULL TIME AT

8    THAT CAMP?

9    A.    I DON'T KNOW.   FROM LIVING THEIR MYSELF, PEOPLE CAME AND

10   WENT.   SO I'M NOT SURE WHO WAS LIVING THERE AT THAT TIME.

11   Q.    RIGHT.   BUT REGARDLESS OF THE DIFFERENT PERSONALITIES,

12   THERE WERE ONLY SO MANY PEOPLE LIVING THERE FULL TIME?

13   A.    YEAH.   IN THE SUMMER THERE WAS MORE THAN IN THE WINTER.

14   Q.    ALL RIGHT.   AND GENERALLY SPEAKING, HOW MANY WOULD BE

15   LIVING THERE FULL TIME DURING THE WINTER?

16   A.    IT SEEMS LIKE THERE WOULD BE A FAMILY AT THE MAIN HOUSE,

17   AND THEN THERE WOULD BE MAYBE ONE OR TWO OTHERS.

18   Q.    SO IT WAS VERY ISOLATED?

19   A.    I LIVE AT A VERY ISOLATED PLACE.   IN COMPARISON TO

20   SOUTHERN CALIFORNIA, IT IS ISOLATED UP THERE.

21   Q.    AROUND THE TIME THAT YOU SEPARATED FROM MS. STYLES,

22   MR. SANDERS WAS CLOSE TO HER, RIGHT?

23   A.    YEAH.   THEY WERE FRIENDS.

24   Q.    AND WHEN YOU SEPARATED FROM HER, YOU BECAME A LITTLE BIT

25   MORE DISTANT WITH MR. SANDERS AND HE BECAME CLOSER TO HER?

1    A.   IT SEEMED THAT WAY, YEAH.

2    Q.   AND THAT'S AROUND THE TIME THAT YOU ALSO STARTED TO BE

3    UNCOMFORTABLE WITH MR. SANDERS BEING AROUND KALEN?

4    A.   THAT'S TRUE.

5    Q.   NOW, YOU HAD ALWAYS KNOWN MR. SANDERS TO BE INTERESTED

6    IN WOMEN, RIGHT?

7    A.   YEAH, AS FAR AS I KNEW.

8    Q.   AND HE HAD MANY GIRLFRIENDS?

9    A.   TWO THAT I KNEW OF.

10   Q.   DID YOU TELL -- DID YOU TELL LAW ENFORCEMENT THAT HE HAD

11   HAD MANY GIRLFRIENDS?

12   A.   I DON'T REMEMBER IF THEY ASKED ME THAT QUESTION.

13           MR. AARON:  MAY I APPROACH, YOUR HONOR?

14           THE COURT:  YOU MAY.

15   BY MR. AARON:

16   Q.   MR. SUTHERLAND, I'M GOING TO SHOW YOU SOMETHING TO

17   REFRESH YOUR RECOLLECTION.

18   A.   OKAY.

19   Q.   IF YOU COULD JUST READ THE FIRST SENTENCE OR TWO IN THAT

20   PARAGRAPH TO YOURSELF, AND LET US KNOW WHEN YOU'RE DONE.

21   A.   YOU WANT ME TO READ THE WHOLE TOP PARAGRAPH?

22   Q.   NO.  JUST READ THE FIRST COUPLE SENTENCES, PLEASE.

23   A.   I CAN READ IT OUT LOUD?

24   Q.   NO, JUST READ IT TO YOURSELF.

25           OKAY.  YOU HAVE READ IT?

1    A.    YES.

2    Q.    AND THAT'S A REPORT OF AN INTERVIEW THAT YOU GAVE.  DOES

3    THAT REFRESH YOUR RECOLLECTION OF WHAT YOU TOLD LAW

4    ENFORCEMENT?

5    A.    YEAH.  IF THAT WAS RECORDED PROPERLY, IT MUST HAVE BEEN

6    WHAT I SAID.

7    Q.    WELL, DOES IT REFRESH YOUR RECOLLECTION OF WHAT YOU TOLD

8    THEM, THAT MR. SANDERS HAD MANY GIRLFRIENDS?

9    A.    I ACTUALLY DON'T REMEMBER THAT, NO.  I DON'T REMEMBER

10   THAT EXACT MOMENT.

11   Q.    DO YOU RECALL -- AND MR. SANDERS HAD NEVER, TO YOU,

12   EXPRESSED AN INTEREST IN MEN OR CHILDREN AS SEXUAL PARTNERS?

13   A.    NO.

14   Q.    AND, IN FACT, YOU KNEW MR. SANDERS TO HAVE MARRIED ONE

15   OF YOUR OLD GIRLFRIENDS?

16   A.    CORRECT.

17   Q.    YOU KNEW HIM IN THE PERIOD OF TIME FROM '73 TO '75?

18   A.    I DID.

19   Q.    AND AT THAT TIME HE WAS INVOLVED WITH A DEZERAY EILEEN

20   CONWAY?

21   A.    CORRECT.

22   Q.    AND YOU KNEW HIM IN 1974 WHEN HE WAS INVOLVED WITH A

23   MS. HILL?

24   A.    CORRECT.

25   Q.    AND YOU KNEW HIM IN '78 THROUGH '81 WHEN HE WAS INVOLVED

```
 1    WITH A MS. WILLIS?

 2    A.    IS THAT THE SAME PERSON?

 3    Q.    A LARAE WILLIS.  THAT'S A DIFFERENT PERSON THEN --

 4    A.    I THOUGHT THAT WAS DEZERAY.

 5    Q.    NO.  THAT WOULD BE A DIFFERENT PERSON.

 6    A.    DIFFERENT PERSON?  THEN, YES.

 7    Q.    AND YOU KNEW HIM WHEN HE WAS INVOLVED WITH A SUE RYDER

 8    OF PALOS VERDES?

 9    A.    I DIDN'T KNOW HE WAS INVOLVED WITH SUE RYDER.  I KNOW

10    WHO SHE IS, THOUGH.

11    Q.    YOU WERE EXPLAINING ABOUT AN INCIDENT AROUND

12    CHRISTMASTIME OF 2000 WHEN MR. SANDERS AND KALEN WENT TO THE

13    HOT TUB ALONE?

14    A.    MM-HMM.

15    Q.    THAT HOT TUB WAS AT A NEIGHBOR'S HOUSE?

16    A.    YES.

17    Q.    AND THE NEIGHBOR ALLOWED YOU AND YOUR FAMILY TO USE THE

18    HOT TUB?

19    A.    YES.

20    Q.    AND YOU AND YOUR FAMILY MEMBERS WOULD GO THERE?

21    A.    I WAS ONLY THERE ONCE, AND THEY JUST WERE GONE AND THEY

22    LEFT IT ON FOR US.  THEY SAID WE COULD USE IT AT CHRISTMAS.

23    Q.    THAT HOT TUB IS CLOSE TO YOUR HOUSE, RIGHT?

24    A.    IT IS THE NEXT LOT OVER.  WE LIVE ON FIVE-ACRE LOTS.

25    Q.    AND THAT HOT TUB IS ABOUT 100 FEET OR SO FROM YOUR BACK
```

1   DOOR?

2   A.   MAYBE A LITTLE MORE, BUT RIGHT AROUND THERE.

3   Q.   AND THE INCIDENT IN JANUARY WHEN YOU SAY THAT JIM WENT

4   TO THE POOL AT MISSION BEACH AND WENT SWIMMING WITH KALEN,

5   THAT WAS AN OCCASION WHERE JIM DID NOT SPEND THE NIGHT,

6   CORRECT?

7   A.   THAT'S WHAT I RECALL.   RIGHT.

8   Q.   DO YOU RECALL WHEN IN TIME THOSE TWO TELEPHONE CALLS

9   WERE?

10   A.   TELEPHONE CALLS?   I'M SORRY.

11   Q.   YES.   YOU SAID THAT YOU GOT TWO TELEPHONE CALLS FROM

12   MR. SANDERS.

13   A.   OH, YEAH.   THEY WERE AFTER THE STATE POLICE CAME INTO MY

14   DRIVEWAY.

15   Q.   OKAY.   THE STATE POLICE CAME.   THAT WAS YOUR VERY FIRST

16   CONTACT WITH THEM?

17   A.   CORRECT.   THAT WAS ON JUNE 5TH.

18   Q.   AND THEN AT A SUBSEQUENT TIME YOU TOOK KALEN TO THE

19   INTERVIEW?

20   A.   THAT WAS THE NEXT DAY.   JUNE 6TH THAT WOULD BE.

21   Q.   WERE THE CALLS BEFORE YOU TOOK KALEN TO BE INTERVIEWED

22   OR WERE THEY AFTERWARDS?

23   A.   AFTER.

24   Q.   AND HOW FAR AFTER?   OR, I'M SORRY, HOW LONG AFTER?

25   A.   WITHIN THE NEXT COUPLE WEEKS, AS I RECALL.   IT MIGHT

```
 1    HAVE BEEN WITHIN TWO DAYS.  IT MIGHT HAVE BEEN TWO WEEKS.  IT
 2    WAS AFTER THAT WITHIN A COUPLE WEEKS.
 3    Q.   DO YOU RECALL TELLING LAW ENFORCEMENT THAT MR. SANDERS
 4    HAD ONLY CALLED YOU ONCE?
 5    A.   NO, I DON'T RECALL THAT.
 6              MR. AARON:  MAY I APPROACH, YOUR HONOR?
 7              THE COURT:  YOU MAY.
 8              MR. AARON:  MAY I APPROACH?
 9              THE COURT:  YOU MAY.
10    BY MR. AARON:
11    Q.   SIR, AGAIN, I'M GOING TO SHOW YOU A PAGE IN THE POLICE
12    REPORT.  IF YOU COULD PLEASE READ THAT TO YOURSELF AND LET US
13    KNOW WHEN YOU'RE DONE.  THAT WHOLE LAST PARAGRAPH AND A
14    COUPLE LINES ON THE NEXT PAGE.
15    A.   OKAY.
16    Q.   PLEASE READ IT TO YOURSELF AND LET US KNOW WHEN YOU'RE
17    DONE.
18    A.   YOU WANT ME TO READ THIS BOTTOM PART?
19    Q.   OH, NO, THAT'S IRRELEVANT.
20              DOES THAT REFRESH YOUR RECOLLECTION OF WHAT YOU
21    TOLD POLICE ON JUNE 9TH, 2001?
22    A.   YES, IT DOES.  THANK YOU.
23    Q.   AND YOU HAD TOLD THEM THAT YOU HAD RECEIVED A TELEPHONE
24    CALL, RIGHT?
25    A.   YES.
```

1    Q.    AND YOU MENTIONED ONE TELEPHONE CALL, RIGHT?

2    A.    THAT MUST HAVE BEEN ALL I TOLD THEM, YEAH.

3    Q.    DID YOU CONTACT LAW ENFORCEMENT AT ANY TIME AFTER JUNE

4    9TH, 2001?

5    A.    I THINK I DID.

6    Q.    DO YOU RECALL WHEN THAT WAS?

7    A.    YOU KNOW, I DON'T KNOW IF I TALKED TO HIM JUST THAT ONE

8    TIME OR I TALKED TO HIM ANOTHER TIME AFTER THE CALLS, TOO.

9    BUT I BELIEVE I DID CALL THEM A TIME AFTER THAT.  IT WOULD

10   HAVE HAD TO HAVE BEEN BECAUSE THAT WAS THE PURPOSE OF THE

11   CALL.

12   Q.    SO YOU THINK YOU DID CALL THEM ANOTHER TIME?

13   A.    YES.  YES.

14   Q.    CAN YOU REMEMBER APPROXIMATELY WHEN?

15   A.    IT WOULD HAVE BEEN WITHIN A SHORT PERIOD AFTER THAT.

16   Q.    WITHIN A MONTH?

17   A.    I WOULD SAY SO, YEAH.

18   Q.    NOW, YOU HAVE TALKED TO THE PROSECUTOR, MR. MICHAEL, IN

19   PREPARATION FOR YOUR TESTIMONY HERE TODAY?

20   A.    I DID.

21   Q.    HOW MANY TIMES HAVE YOU TALKED TO HIM?

22   A.    I WAS BROUGHT OUT TO RIVERSIDE A COUPLE OF WEEKS AGO FOR

23   THE ORIGINAL --

24   Q.    AND THEN YOU CAME BACK AT A LATER TIME?  YOU CAME OUT

25   FOR THE PROCEEDING?

1    A.    I CAME OUT TO TALK TO HIM.

2    Q.    YOU CAME OUT FOR A PRIOR PROCEEDING?

3    A.    I DID, YES.

4    Q.    THEN YOU CAME BACK OUT AGAIN?

5    A.    I CAME BACK HERE ON MONDAY.

6    Q.    OKAY.  WHEN YOU CAME OUT FOR THE PRIOR PROCEEDING, YOU

7    TALKED TO MR. MICHAEL THEN?

8    A.    YES, I DID.

9    Q.    AND WHEN YOU TALKED TO HIM AT THAT TIME, WAS THERE AN

10   AGENT PRESENT?

11   A.    THERE WAS.

12   Q.    WHO WAS PRESENT?  WAS IT -- DO YOU SEE A GENTLEMAN AT

13   THE END OF THE COUNSEL TABLE?

14   A.    NO.  IT WAS SOMEBODY ELSE WHO WAS HERE.

15   Q.    ANOTHER AGENT WAS PRESENT?

16   A.    YEAH.

17   Q.    AND THAT'S DURING THE -- THAT'S THE CONVERSATION THAT

18   YOU HAD WHEN YOU WERE BROUGHT OUT FOR THE PRIOR PROCEEDING?

19   A.    RIGHT.

20   Q.    ALL RIGHT.  YOU TESTIFIED THAT YOU WERE BROUGHT OUT

21   AGAIN ON MONDAY?

22   A.    YEAH.  I GOT HERE ON MONDAY, THIS LAST MONDAY.

23   Q.    AND YOU MET WITH MR. MICHAEL AGAIN?

24   A.    YES.

25   Q.    WAS AN AGENT PRESENT DURING THAT CONVERSATION?

1    A.    YES.

2    Q.    WAS THAT MR. MORENO?

3    A.    YES, JOSH.

4    Q.    FOR THE RECORD --

5    A.    HIS LAST NAME IS MORENO.  I DIDN'T REALIZE THAT.

6    Q.    FOR THE RECORD, YOU'RE INDICATING THE GENTLEMAN AT THE

7    END OF COUNSEL TABLE?

8    A.    YES.

9          MR. AARON:  FOR THE RECORD, I BELIEVE THAT IS JOSH

10   MORENO.

11         THE COURT:  IT IS.

12   BY MR. AARON:

13   Q.    WHEN YOU WERE BEING -- BOTH TIMES MR. MICHAEL HAD ASKED

14   YOU QUESTIONS AND TALKED TO YOU ABOUT THE CASE?

15   A.    YOU MEAN -- YEAH, YES.

16   Q.    AND BOTH TIMES THE AGENTS WERE THERE DURING THE MEETING?

17   A.    YES.

18   Q.    AND BOTH TIMES THEY WERE TAKING NOTES WHILE THEY WERE

19   TALKING TO YOU?

20   A.    I DON'T RECALL.  BRIAN WAS.  I DON'T KNOW ABOUT THE

21   AGENT THAT -- I WAS TALKING TO BRIAN.

22   Q.    THANK YOU, SIR.

23         MR. AARON:  I HAVE NOTHING FURTHER.

24         THE COURT:  ANY REDIRECT EXAMINATION?

25         MR. MICHAEL:  BRIEFLY, YOUR HONOR.

1                    <u>REDIRECT EXAMINATION</u>

2    BY MR. MICHAEL:

3    Q.   SIR, DO YOU RECALL YOU WERE JUST ASKED SOME QUESTIONS

4    ABOUT HAVING BEEN INTERVIEWED BY LAW ENFORCEMENT?

5    A.   YES.

6    Q.   WAS THAT CLOSE IN TIME TO WHEN YOU LEARNED ABOUT WHAT

7    HAD HAPPENED TO YOUR SON?

8    A.   YES.

9    Q.   WHAT WAS YOUR STATE OF MIND AT THAT TIME?

10   A.   I WAS EXTREMELY ANGRY.

11   Q.   AND DO YOU RECALL WHAT YOU SAID IN THOSE INTERVIEWS?

12   A.   NOT UNTIL I JUST LOOKED AT THEM THESE LAST COUPLE OF

13   WEEKS.

14   Q.   AND WHY WAS IT HARD FOR YOU BEFORE THESE LAST COUPLE OF

15   WEEKS TO RECALL WHAT WAS SAID IN THOSE INTERVIEWS?

16            MR. AARON:   IRRELEVANT, YOUR HONOR.

17            THE COURT:   OVERRULED.

18            THE WITNESS:   I DIDN'T -- YOU KNOW, THIS IS LIKE

19   SOMETHING I NEVER EVER WANTED TO COME BACK TO.

20            MR. MICHAEL:   NOTHING FURTHER, YOUR HONOR.

21            THE COURT:   THANK YOU.   YOU ARE EXCUSED.   YOU MAY

22   STEP DOWN.

23            THE WITNESS:   THANK YOU.

24            THE COURT:   THANK YOU, LADIES AND GENTLEMEN.

25            AGAIN, PLEASE REMEMBER ALL THE ADMONITIONS I HAVE

1    GIVEN YOU THROUGHOUT THE TRIAL, NOT TO DISCUSS THE EVIDENCE

2    AMONGST YOURSELVES OR WITH ANYONE, ANY PORTION OF THE

3    EVIDENCE, ALL OF IT, OR ANY PART OF IT, OR DISCUSS WITH

4    ANYONE HAVING ANYTHING TO DO WITH THE CASE.  DON'T MAKE UP

5    YOUR MINDS IN ANY FASHION.

6              I BELIEVE THERE ARE ONLY TWO BRIEF WITNESSES LEFT

7    FROM THE GOVERNMENT'S CASE.

8              MR. MICHAEL:  JUST ONE BRIEF WITNESS, YOUR HONOR.

9              THE COURT:  FROM THE GOVERNMENT'S CASE.  AND SO, IN

10   ANY EVENT, YOU WILL BE GETTING THE CASE TOMORROW.  AND MY

11   BEST ESTIMATE AT THIS POINT IS YOU WILL PROBABLY BE GETTING

12   THE CASE TO BEGIN YOUR DELIBERATIONS SOMETIME BEFORE LUNCH

13   TOMORROW.

14             SO, AS I SAID YESTERDAY, WE ARE ON SCHEDULE, AND I

15   APPRECIATE VERY MUCH YOUR WILLINGNESS TO GO BEYOND THE

16   SCHEDULED TIME.

17             OH, IT IS NOT BEFORE LUNCH TOMORROW BECAUSE

18   TOMORROW IS THE DAY WE ARE GOING FROM 8:00 TO 1:30, BUT

19   BEFORE WE BREAK TOMORROW YOU WILL GET THE CASE THEN.  SO WE

20   WILL SEE YOU HERE TOMORROW MORNING NO LATER THAN 8:00.  AND

21   PACK YOURSELVES SOME SNACKS BECAUSE WE TAKE TWO RECESSES ON

22   THE DAYS THAT WE GO ON THIS COMPACTED SCHEDULE.  WE TAKE

23   USUALLY TWO ABOUT 20-MINUTE RECESSES SO YOU DON'T GET TOO

24   HUNGRY.

25             ALL RIGHT.  THANK YOU VERY MUCH.  WE WILL SEE YOU

1    TOMORROW.

2            MR. MICHAEL:  IS IT 8 OR 8:30?

3            THE COURT:  8:00.

4                (OUT OF THE PRESENCE OF THE JURY:)

5            THE COURT:  I WOULD LIKE TO FINISH TONIGHT BY

6    5:30.

7            WE'RE ON THE RECORD OUTSIDE THE PRESENCE OF THE

8    JURY.

9            WHAT MR. FATTAHI HAS JUST HANDED COUNSEL ARE COPIES

10   OF WHAT I THINK WOULD BE THE INSTRUCTIONS AS WE'LL GIVE TO

11   THE JURY TOMORROW.  I WILL GO OVER THEM WITH YOU AND EXPLAIN

12   MY RULINGS ON THE OBJECTIONS, THE OUTSTANDING OBJECTIONS.

13           MR. MICHAEL:  YOUR HONOR, THE GOVERNMENT HAS

14   OBJECTIONS TO THE PROPOSED INSTRUCTIONS, INSTRUCTIONS

15   PROPOSED BY THE DEFENSE THAT WERE RECEIVED YESTERDAY.  I

16   DON'T KNOW IF --

17           THE COURT:  WELL, I REVIEWED THOSE.  I WILL LISTEN

18   TO WHAT YOUR OBJECTIONS ARE.  I HAVE REVIEWED THOSE, AND SOME

19   OF THEM I HAVE, AS YOU WILL SEE, EITHER EDITED OR WOULD NOT

20   GIVE.  BUT I WILL, IN TERMS OF WHAT IS IN THIS PACKET THAT

21   REMAINS OF THE DEFENDANT'S PROPOSED INSTRUCTIONS, I WILL

22   CONSIDER YOUR OBJECTIONS.

23           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I DON'T WANT

24   TO TAKE THE COURT'S TIME TO OBJECT TO THE ONES THE COURT IS

25   NOT GOING TO GIVE.  IF YOU TELL ME THE ONES YOU ARE GOING TO

```
 1    GIVE, I WILL STATE MY OBJECTIONS TO THEM.

 2              THE COURT:  I'M GOING TO.

 3              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

 4              THE COURT:  LET ME TELL YOU FOR THE RECORD SO BOTH

 5    SIDES CAN APPROACH THIS.

 6              WHAT WE HAVE FIRST ARE THE UP-TO-DATE NINTH CIRCUIT

 7    INTRODUCTORY INSTRUCTIONS.

 8              MR. AARON, IS YOUR CLIENT -- HAVE YOU MADE A

 9    DECISION AS TO WHETHER YOUR CLIENT IS GOING TO TESTIFY?

10              MR. AARON:  WE HAVE.  HE IS NOT.

11              THE COURT:  ALL RIGHT.  IF YOU LOOK AT -- THERE ARE

12    PENCILED PAGE NUMBERS ON THE BOTTOM.  THIS IS THE ORDER IN

13    WHICH I AM PROPOSING TO GIVE THE INSTRUCTIONS.  SO, IF YOU

14    LOOK AT PAGE NO. 4, THERE IS AN INSTRUCTION TO THAT EFFECT.

15    I'M GOING TO GO AHEAD AT THIS TIME AND TAKE YOUR CLIENT'S

16    WAIVER.

17              IS THAT ACCEPTABLE, MR. AARON?

18              MR. AARON:  IT IS.

19              THE COURT:  MR. SANDERS, YOU HAVE THE RIGHT UNDER

20    THE CONSTITUTION AND THE LAWS OF THE UNITED STATES TO TAKE

21    THE STAND DURING THIS TRIAL AND TESTIFY ON YOUR OWN BEHALF.

22              DO YOU UNDERSTAND THAT YOU HAVE THAT RIGHT?

23              DEFENDANT SANDERS:  I DO.

24              THE COURT:  HAVE YOU DISCUSSED THAT RIGHT WITH YOUR

25    LAWYER?
```

1              DEFENDANT SANDERS:  YES.

2              THE COURT:  HAVE YOU DISCUSSED WITH HIM YOUR

3    DECISION ABOUT WHETHER OR NOT TO TAKE THE STAND IN YOUR CASE

4    AND TESTIFY?

5              DEFENDANT SANDERS:  YES, YOUR HONOR.

6              THE COURT:  HAVE YOU REACHED A DECISION, AFTER

7    CONSULTING WITH YOUR LAWYER, ABOUT WHETHER OR NOT TO TESTIFY

8    ON YOUR OWN BEHALF IN THIS CASE?

9              DEFENDANT SANDERS:  YES, YOUR HONOR.

10             THE COURT:  AND IS IT YOUR DECISION THAT YOU WON'T

11   BE TESTIFYING IN YOUR CASE?

12             DEFENDANT SANDERS:  THAT'S CORRECT.

13             THE COURT:  AND HAVE YOU COME TO THAT DECISION

14   AFTER RECEIVING ADVICE FROM YOUR LAWYER?

15             DEFENDANT SANDERS:  I HAVE, YOUR HONOR.

16             THE COURT:  AND YOU UNDERSTAND THAT YOU HAVE THE

17   RIGHT TO TESTIFY ON YOUR OWN BEHALF?

18             DEFENDANT SANDERS:  I DO, YOUR HONOR.

19             THE COURT:  SO IF YOU DECIDE NOT TO TESTIFY, ARE

20   YOU KNOWINGLY AND WILLINGLY AND VOLUNTARILY GIVING UP YOUR

21   RIGHT TO TESTIFY?

22             DEFENDANT SANDERS:  I AM, YOUR HONOR.

23             THE COURT:  DO YOU HAVE ANY QUESTIONS ABOUT YOUR

24   RIGHT TO TESTIFY?

25             DEFENDANT SANDERS:  I HAVE NO QUESTIONS.

1          THE COURT:  ANY QUESTIONS THAT YOU WANT TO ASK

2   EITHER YOUR LAWYER OR THE COURT AT THIS TIME ABOUT YOUR RIGHT

3   TO TESTIFY AT THIS TRIAL?

4          DEFENDANT SANDERS:  NO, YOUR HONOR.  I UNDERSTAND.

5          THE COURT:  AGAIN, YOU ARE WILLINGLY, KNOWINGLY AND

6   VOLUNTARILY GIVING UP THAT RIGHT?

7          DEFENDANT SANDERS:  MY RIGHTS, YES, YOUR HONOR.

8          THE COURT:  LET ME POINT COUNSELS' ATTENTION I

9   THINK TO JUST ONE OR TWO THINGS HERE IN THE INTRODUCTORY

10  INSTRUCTIONS.  I INCLUDED 3. -- MODEL INSTRUCTION 3.10 WHICH

11  IS CONSISTENT WITH THE SPECIAL INSTRUCTIONS THAT WE HAD GIVEN

12  THROUGHOUT THE TRIAL.

13         3.12 BECAUSE THERE IS MORE THAN ONE COUNT HERE.

14  THE JURY SHOULD BE INSTRUCTED TO CONSIDER EACH COUNT

15  SEPARATELY.

16         THE FIRST OF THE INSTRUCTIONS, IF YOU LOOK AT PAGE

17  16, THE ORIGINAL GOVERNMENT'S PROPOSED INSTRUCTION NO. 1 TO

18  WHICH THE DEFENDANT OBJECTED, THIS DEFINITION WHICH IN THE

19  COURT'S PROPOSED INSTRUCTION WAS -- IT IS ONE SENTENCE FROM

20  THE -- WELL, ACTUALLY, IT IS EASIER IF WE DO THIS:

21         IF YOU GO BACK TO PAGE 14, PAGE 14 HAS THE

22  DEFINITION OF THE TERM "CHILD PORNOGRAPHY."  THAT WAS PART OF

23  THE GOVERNMENT'S PROPOSED INSTRUCTION NO. 1, BUT IT IS

24  REWORDED SLIGHTLY.  BUT THAT'S THE DEFINITION FROM THE

25  STATUTE.

1          AND THEN ON PAGE 15 IS THE DEFINITION OF THE TERM

2     "THE MINOR, VISUAL DEPICTION, AND SEXUALLY EXPLICIT CONDUCT,"

3     THOSE ARE ALL FROM THE STATUTE.

4          AND THEN ON PAGE 16, THAT'S THE DEFINITION -- OR

5     THAT'S NOT THE DEFINITION, BUT THAT'S, I THINK, A CORRECT

6     STATEMENT OF WHAT THE GOVERNMENT MUST PROVE IN TERMS OF AN

7     ACTUAL CHILD BEING DEPICTED.  AND THAT COMES FROM, AS YOU CAN

8     SEE HERE, THE ASHCROFT V. FREE SPEECH COALITION CASE.

9          I WOULD NOT GIVE THE REMAINDER OF WHAT'S -- AS I

10    SAID LAST NIGHT, I WOULD NOT GIVE THE REMAINDER, THAT IS THE

11    SECOND PARAGRAPH OF THE GOVERNMENT'S PROPOSED INSTRUCTION

12    NO. 1.  IN OTHER WORDS, I SUSTAIN THE DEFENDANT'S OBJECTION

13    TO IT.

14         AS TO GOVERNMENT'S PROPOSED INSTRUCTION NO. 2,

15    WHAT'S ON PAGE 17 IS THE FIRST PARAGRAPH OF THAT WHICH

16    PRECISELY TRACKS THE LANGUAGE IN THE STATUTE.  BUT THE

17    REMAINDER OF THE GOVERNMENT'S -- PARAGRAPHS 2 AND 3 OF THE

18    GOVERNMENT'S PROPOSED INSTRUCTION I WOULD NOT GIVE.  IT IS

19    UNNECESSARY.  SO I WOULD SUSTAIN THE DEFENDANT'S OBJECTIONS

20    TO THE REST OF IT.

21         MR. AKROTIRIANAKIS:  YOUR HONOR, BEFORE WE LEAVE

22    THE DEFINITION OF CHILD PORNOGRAPHY, MAY I BE HEARD?

23         THE COURT:  CERTAINLY.

24         MR. AKROTIRIANAKIS:  IN 2256(2)(A)(B), AND SO ON,

25    IT INCLUDED SIMULATED INTERCOURSE.  IT NEED NOT BE ACTUAL

1    INTERCOURSE.  BUT THE COURT'S INSTRUCTION SAYS "SEXUAL

2    INTERCOURSE," AND IT DOESN'T INCLUDE SIMULATED SEXUAL

3    INTERCOURSE.

4             THE COURT:  IT DOES NOT?  OURS DOES NOT?

5             MR. AKROTIRIANAKIS:  IT DOES NOT.  THAT'S PAGE 15.

6    "THE TERM `SEXUALLY EXPLICIT CONDUCT' MEANS ANY OF THE

7    FOLLOWING."

8             IF WE JUST ADD, IT MEANS -- IF WE JUST ADDED

9    "ACTUAL" OR "SIMULATED" TO THE BEGINNING OF 1, 2, 3, AND 4, I

10   THINK THAT WOULD --

11            THE COURT:  ARE YOU LOOKING AT PAGE 15?

12            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

13            MR. AARON:  I WOULD OBJECT TO THAT.  I THINK THAT

14   COUNSEL IS CORRECT, AND I WOULDN'T HAVE A PROBLEM WITH ADDING

15   "ACTUAL OR SIMULATED SEXUAL INTERCOURSE."

16            I REALLY HAVE A PROBLEM IN SOME OF THE OTHER

17   CATEGORIES.  FOR EXAMPLE, ACTUAL OR SIMULATED LASCIVIOUS

18   EXHIBITION OF THE GENITALS.

19            I'M NOT SURE WHAT A SIMULATED LASCIVIOUS EXHIBITION

20   OF THE GENITALS WOULD BE.

21            MR. AKROTIRIANAKIS:  THE DEFINITION OF THE STATUTE,

22   YOUR HONOR, 2256(2)(A) READS, "SEXUALLY EXPLICIT CONDUCT

23   MEANS ACTUAL OR SIMULATED."  AND THEN IT LISTS OUT THE SAME

24   THINGS THE COURT HAS HERE.

25            SO THE EASY FIX WOULD BE IN THE LAST PARAGRAPH OF

1    THE COURT'S INSTRUCTION ON PAGE 15 WE COULD SAY, "THE TERM

2    'SEXUALLY EXPLICIT CONDUCT' MEANS ANY OF THE FOLLOWING,

3    WHETHER SIMULATED OR ACTUAL," OR SOMETHING LIKE THAT, OR

4    ACTUAL OR SIMULATED.

5            THE COURT:  WHERE ARE YOU READING IN THE STATUTE?

6            MR. AKROTIRIANAKIS:  IT IS 2256, AND THEN

7    SUBSECTION (2)(A).

8            THE COURT:  OH, I SEE.  WHERE IT SAYS ACTUAL OR

9    SIMULATED.

10           MR. AARON:  I WOULDN'T THINK THERE IS AN ISSUE WITH

11   THAT.  I WOULDN'T HAVE A PROBLEM WITH THAT, YOUR HONOR.  THE

12   ONLY PROBLEM I HAVE, I REALLY DO NOT UNDERSTAND WHAT

13   "SIMULATED LASCIVIOUS EXHIBITION" WOULD BE.  SOMETHING IS

14   EITHER EXHIBITED OR NOT.  SO THAT SEEMS TO BE REMARKABLY

15   VAGUE AND STANDARDLESS.

16           MR. AKROTIRIANAKIS:  I THINK THAT THE GOVERNMENT

17   MAY HAVE CAUSED THAT CONFUSION WITH OUR -- THE PARTIES' JOINT

18   INSTRUCTION 5 OMITS THE SIMULATED.  BUT I WOULD ASK THAT IT

19   BE INCLUDED HERE.  I THINK THAT SOME OF THE IMAGES MAY FALL

20   INTO THAT CATEGORY.

21           THE COURT:  I DON'T THINK IT IS STANDARDLESS TO SAY

22   THAT IT COULD BE SIMULATED BECAUSE IT'S EVEN CATEGORY 4.  SO

23   I WILL OVERRULE THAT OBJECTION.

24           ALL RIGHT.  WHAT'S ON PAGE 16?

25           MR. AARON:  YOUR HONOR, THERE IS A REFERENCE TO

1    IDENTIFIABLE MINORS EARLIER IN THE INSTRUCTIONS.  AND THIS IS

2    ACTUALLY THE DEFINITION OF IDENTIFIABLE MINOR.

3            THE COURT:  SO YOU WANT THIS TO BE MOVED TO

4    EARLIER?

5            MR. AARON:  NO.  BUT I THINK IT MIGHT BE BETTER TO

6    SAY, FOR EXAMPLE, IT MUST BE PROVED THAT THE PEOPLE IN THE

7    PICTURES ARE IDENTIFIABLE MINORS, I.E., ARE REAL AND THAT

8    THEY ARE MINORS, THAT IS, THAT THEY ARE PERSONS UNDER THE AGE

9    OF 18 YEARS.

10           THE COURT:  I'M SORRY.  I DIDN'T QUITE FOLLOW.

11           MR. AARON:  IT IS NOT SO MUCH AN OBJECTION AS A

12   REQUEST THAT THE COURT DEFINE IDENTIFIABLE MINORS WHICH

13   APPEARS --

14           THE COURT:  OH, I SEE.

15           MR. AARON:  I THOUGHT IT APPEARED EARLIER.  MAYBE

16   IT APPEARS LATER.  NO. 14, LINES 13 TO 14, "...TO APPEAR THAT

17   AN IDENTIFIABLE MINOR" -- THERE IS NO EXPLANATION OF AN

18   IDENTIFIABLE MINOR.  BUT THAT INSTRUCTION FROM ASHCROFT

19   ACTUALLY DOES DEFINE IT.  SO I WOULD PREFER THAT THE JURY

20   ACTUALLY KNOW THAT THAT'S THE DEFINITION OF IDENTIFIABLE

21   MINOR.

22           THE COURT:  WELL, I THINK THAT BECAUSE IT SAYS "AN

23   IDENTIFIABLE MINOR," THEN THE NEXT INSTRUCTION TELLS THEM

24   WHAT A MINOR IS, AND THE FOLLOWING INSTRUCTION TELLS THEM

25   WHAT IT MEANS THAT IS IDENTIFIABLE.  YOU COULD ADD A SENTENCE

1    THERE SAYING, THUS --

2            MR. AARON:  WELL, I THINK ACTUALLY IT DOESN'T

3    REALLY DEFINE IDENTIFIABLE MINOR.  BECAUSE IT SAYS, "THE TERM

4    `MINOR' MEANS ANY PERSON UNDER THE AGE OF 18 YEARS."

5            THE COURT:  NO, IT DEFINES MINOR.

6            MR. AARON:  IDENTIFIABLE MINOR WOULD JUST MEAN IT

7    IS A REAL PERSON UNDER THE AGE OF 18.

8            THE COURT:  I'M SORRY.  MAYBE I DIDN'T MAKE MYSELF

9    CLEAR.  WHAT I SAID WAS, THAT THE NEXT INSTRUCTION DEFINES

10   THE TERM "MINOR."  AND THEN THE FOLLOWING INSTRUCTION DEFINES

11   WHAT THE GOVERNMENT'S BURDEN OF PROOF IS AS TO IT BEING AN

12   "IDENTIFIABLE MINOR."

13           MR. AARON:  YES.  BUT I WOULD JUST PREFER TO, FOR

14   THE SAKE OF CLARITY, TO ACTUALLY TELL THE JURY THAT.

15           THE COURT:  WELL, DO YOU WANT TO SUBMIT A CHANGE TO

16   THAT INSTRUCTION TOMORROW?

17           MR. AARON:  THE ONLY CHANGE THAT I WOULD PROPOSE IS

18   ON PAGE -- ON LINE 6.

19           THE COURT:  OF WHICH PAGE?

20           MR. AARON:  OF PAGE 16.  IT WOULD READ, "PEOPLE IN

21   THE PICTURES ARE IDENTIFIABLE MINORS, I.E., ARE REAL PERSONS

22   AND ARE MINORS," AND THE REMAINDER.

23           THE COURT:  ALL RIGHT.  I HAVE IT READING -- THAT

24   SENTENCE READS AS FOLLOWS:  "IT MUST PROVE THAT THE PEOPLE IN

25   THE PICTURES ARE IDENTIFIABLE MINORS.  THAT IS, THEY ARE REAL

1    PERSONS AND THAT THEY ARE MINORS, THAT IS, PERSONS UNDER THE

2    AGE OF 18 YEARS."

3              MR. AARON:  THANK YOU.

4              THE COURT:  ALL RIGHT.  WE ADDED THE DEFINITION OF

5    POSSESSION, WHICH IS NINTH CIRCUIT MODEL INSTRUCTION 3.18.

6    THAT'S ON PAGE 20.

7              AND THEN PAGE 23, THIS IS WHAT I WOULD GIVE -- WHAT

8    THE COURT WOULD GIVE INSTEAD OF THE GOVERNMENT'S PROPOSED

9    INSTRUCTIONS NOS. 4 AND 5.  WELL, 4, AS TO GOVERNMENT'S

10   PROPOSED INSTRUCTION NO. 4, THIS IS NINTH CIRCUIT MODEL 5.6.

11   AND THE OTHER PART OF IT COMES FROM THE -- WHAT I STILL CALL

12   IT, DEVITT AND BLACKMAR.

13             MR. AKROTIRIANAKIS:  ABOUT CIRCUMSTANTIAL EVIDENCE

14   AND WHAT HAVE YOU?

15             THE COURT:  THE KNOWLEDGE OF THE PERSON POSSESSES

16   AT ANY GIVEN TIME, ET CETERA.

17             MR. AKROTIRIANAKIS:  RIGHT.  YOUR HONOR, THERE IS

18   ANOTHER PART OF SECTION 1704 OF THE BOOK WE'RE ALSO CALLING

19   DEVITT AND BLACKMAR.  IT IS ON PAGE 589.  AND IT TALKS ABOUT

20   THE NINTH CIRCUIT KNOWINGLY DEFINED, AND THIS PART OF THE

21   INSTRUCTION -- AND IT INCLUDES THE SENTENCE IN THE

22   COMMENTARY, "TO REQUIRE PROOF THAT THE DEFENDANT ACTED

23   KNOWINGLY DOES NOT NECESSARILY REQUIRE PROOF OF KNOWLEDGE

24   THAT HIS CONDUCT VIOLATED FEDERAL LAW."

25             AND THE GOVERNMENT WOULD ASK THAT THE COURT INCLUDE

1   THAT SENTENCE IN LIEU OF THE ONE THAT'S OBJECTED TO IN THE

2   INSTRUCTION PROPOSED BY THE GOVERNMENT TO THE EFFECT THAT --

3          THE COURT:  THAT'S FROM THE NINTH CIRCUIT MODEL

4   INSTRUCTION COMMENTARY, OR WHERE?

5          MR. AKROTIRIANAKIS:  NO.  IT IS IN THE COMMENT

6   SECTION RELATING TO NINTH CIRCUIT MODEL INSTRUCTION 5.4 AND

7   5.5 IN THE DEVITT AND BLACKMAR SECTION, VOLUME 1A SECTION

8   17.04.

9          THE COURT:  MR. AARON?

10          MR. AARON:  I'M KIND OF CONFUSED, YOUR HONOR.  IF I

11   CAN HAVE A MOMENT, PLEASE?

12          MR. AKROTIRIANAKIS:  SO, IN OTHER WORDS, AT THE END

13   OF THE INSTRUCTION ON PAGE 22 OF THE COURT'S INSTRUCTIONS,

14   ANOTHER PARAGRAPH, "TO REQUIRE PROOF THAT THE DEFENDANT ACTED

15   KNOWINGLY, OR PROOF THE DEFENDANT ACTED KNOWINGLY DOES NOT

16   NECESSARILY REQUIRE PROOF OF KNOWLEDGE THAT HIS CONDUCT

17   VIOLATED FEDERAL LAW," OR WORDS TO THAT EFFECT.

18          THE COURT:  ACTUALLY, I THINK TO BE CONSISTENT WITH

19   THE OTHER INSTRUCTIONS, AND SIMPLER, TO SIMPLY SAY, "THE

20   GOVERNMENT IS NOT REQUIRED TO PROVE THE DEFENDANT KNEW THAT

21   HIS ACTS WERE UNLAWFUL."

22          MR. AKROTIRIANAKIS:  THAT WOULD BE FINE, AS WELL,

23   YOUR HONOR.

24          THE COURT:  THAT'S WHAT THE GOVERNMENT ORIGINALLY

25   REQUESTED.

1          MR. AARON:  WE HAVE ALREADY OBJECTED TO THAT, YOUR

2    HONOR.

3          THE COURT:  YES.  ALL RIGHT.  I'M GOING TO OVERRULE

4    THAT OBJECTION.

5          I WOULD GIVE DEFENDANT'S REQUESTED INSTRUCTION NO.

6    2, WHICH IS THE DEFINITION FROM 2246 OF THE TERM "SEXUAL

7    ACT."

8          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THE

9    GOVERNMENT WOULD ASK THAT THE LANGUAGE OF THE STATUTE BE USED

10   RATHER THAN THIS BODY CAVITY LANGUAGE THAT'S INCLUDED IN THE

11   DEFENDANT'S PROPOSED INSTRUCTION.

12         THE COURT:  DID YOU LOOK AT THE ONE THE COURT

13   PREPARED?

14         MR. MICHAEL:  WHICH PAGE IS IT, PLEASE, YOUR HONOR?

15         THE COURT:  IT IS ON PAGE 24.

16         MR. AKROTIRIANAKIS:  THE MODIFICATION THE COURT

17   MADE OF THE STATUTE, I TAKE IT, IS ONLY THE DELETION OF THE

18   STUFF RELATED TO FEMALES THAT IS NOT RELEVANT HERE?

19         THE COURT:  I THINK SO.  WELL, LET'S SEE.  I WANT

20   TO MAKE SURE THAT --

21         MR. AKROTIRIANAKIS:  THE ONLY REQUEST THE

22   GOVERNMENT WOULD HAVE, YOUR HONOR, IS TO --

23         THE COURT:  YES.  I THINK IT IS WORD FOR WORD

24   EXCEPT WITH THE REFERENCE TO FEMALE.

25         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  AND ALSO

1    WITH THE EXCEPTION THAT IN PARAGRAPH A, THE PARAGRAPH

2    LETTERED A IN THE COURT'S PROPOSED, "PENIS AND ANUS" SHOULD

3    BE, SO IT SHOULD READ, "BETWEEN THE PENIS AND THE ANUS."

4            IF YOU DELETE THE REFERENCE TO THE FEMALE ANATOMY

5    IN THE STATUTE, YOUR HONOR, IT WOULD BE "...CONTACT BETWEEN

6    THE PENIS AND THE ANUS INVOLVING PENETRATION, HOWEVER

7    SLIGHT."

8            MR. AARON:  YOUR HONOR, I'M SORRY TO INTERRUPT.

9    MR. SANDERS WOULD LIKE TO WAIVE HIS PRESENCE.

10           THE COURT:  OH, THANK YOU.  YOU'RE EXCUSED,

11   MR. SANDERS.

12           ALL RIGHT.  THEN AS TO THE DEFENDANT'S NEXT -- THEN

13   THE NEXT ONE WOULD BE ON PAGE -- I ADDED 4.17.  THAT'S ABOUT

14   EXPERTS.

15           DEFENDANT'S INSTRUCTION, PROPOSED INSTRUCTION

16   NO. 6, LET'S SEE.  I CHANGED THAT TO -- I CHANGED THAT TO THE

17   MODEL INSTRUCTION BECAUSE THERE IS A NINTH CIRCUIT MODEL

18   INSTRUCTION THAT COVERS THAT.  THAT'S ON PAGE 27.

19           MR. MICHAEL:  WHICH MODEL INSTRUCTION, PLEASE, YOUR

20   HONOR?

21           THE COURT:  IT IS 4.9.  AND THAT WAS DEFENDANT'S

22   PROPOSED INSTRUCTION NO. 6, WHICH WAS BASED ON AN EIGHTH

23   CIRCUIT MODEL INSTRUCTION.

24           DOES EITHER SIDE WISH TO BE HEARD ON THAT

25   INSTRUCTION?

1          MR. AARON:  WELL, WE ACTUALLY PREFER THE NINTH

2     CIRCUIT INSTRUCTION.  I'M SURPRISED I MISSED IT.

3          THE COURT:  I THINK THIS MIGHT BE FROM THE WEB SITE

4     RATHER THAN USING THE BOOK.

5          DOES THE GOVERNMENT HAVE ANY OBJECTION?

6          MR. AKROTIRIANAKIS:  I'M SORRY.  DID I UNDERSTAND

7     THE COURT TO SAY THAT THE -- PLEADED GUILTY TO A CRIME

8     ARISING OUT OF THE SAME EVENTS LANGUAGE THAT IS IN THE BOOK,

9     NINTH CIRCUIT'S INSTRUCTION IS DIFFERENT FROM WHAT'S NOW

10    AVAILABLE ON THE WEB SITE?

11         THE COURT:  YES.  THIS IS THE CURRENT VERSION OF

12    IT, WHAT'S IN OUR PACKET -- YOUR PACKET.

13         MR. AKROTIRIANAKIS:  YEAH.  I MEAN, IF THAT'S WHAT

14    WE ARE USING THESE DAYS.

15         THE COURT:  WELL, THE ONE THAT THE DEFENDANT

16    PROPOSED IS FROM ANOTHER CIRCUIT.

17         MR. AKROTIRIANAKIS:  THAT I HAD OTHER OBJECTIONS TO

18    BECAUSE I THINK IT MISSTATES THE LAW AND IS MISLEADING.

19    OTHERWISE, I DON'T HAVE A PROBLEM WITH THIS.

20         I DON'T KNOW IF THE "RECEIVED IMMUNITY" PART SHOULD

21    ALSO BE INCLUDED HERE.  THE GOVERNMENT IS NOT MOVING THAT IT

22    BE INCLUDED.  I'M JUST RAISING IT.

23         THE COURT:  ALL RIGHT.  PAGE NO. 28, THAT WAS

24    DEFENDANT'S NO. 3 -- WELL, REPLACES WHAT WAS DEFENDANT'S

25    NO. 3, WHICH DEFENDANT'S NO. 3 WAS CONSIDERABLY LONGER AND

1    INCLUDED MORE FACTS FROM THIS CASE, WHICH WOULD BE -- I THINK

2    IT IS ARGUMENTATIVE FOR THAT REASON.  BUT THOSE FACTS WOULD

3    BE PROPERLY ARGUED TO THE JURY, BUT THEY DON'T BELONG IN THE

4    INSTRUCTION.

5            MR. AKROTIRIANAKIS:  WE HAVE NO OBJECTION TO 4.1,

6    YOUR HONOR.

7            THE COURT:  THEN WHAT'S ON PAGE 29 WAS WHAT WAS

8    DEFENDANT'S -- WELL, NO, IT WASN'T.  BUT IT'S ANOTHER

9    VERSION, A DIFFERENT VERSION OF WHAT WAS DEFENDANT'S PROPOSED

10   INSTRUCTION NO. 4.  AND IT COMES FROM, AS YOU CAN SEE HERE,

11   IT COMES FROM THE DEVITT AND BLACKMAR VERSION.  IT COVERS

12   PRETTY MUCH THE SAME MATERIAL, BUT I THINK IT IS A LITTLE

13   MORE NEUTRALLY WRITTEN.  SO I WOULD GIVE THIS INSTRUCTION

14   RATHER THAN THE ONE THAT THE DEFENDANT REQUESTED; ALTHOUGH, I

15   THINK IT COVERS THE SAME MATERIAL.

16           MR. AARON?

17           MR. AARON:  WHICH INSTRUCTION NUMBER IS THAT?

18           THE COURT:  LOOKING AT PAGE 29.

19           MR. AARON:  TWENTY-NINE.

20           THE COURT:  IT IS VERY SIMILAR TO WHAT THE DEFENSE

21   REQUESTED.  IT COMES, HOWEVER, FROM DEVITT AND BLACKMAR.

22   YOURS CAME FROM THE FIRST CIRCUIT, THE MODEL JURY

23   INSTRUCTIONS FROM THE FIRST CIRCUIT.

24           MR. AARON:  THAT'S FINE.

25           THE COURT:  DOES THE GOVERNMENT HAVE ANY OBJECTION?

1              MR. AKROTIRIANAKIS:  NO, YOUR HONOR, NOT TO THE

2    ONE.  I DO HAVE OBJECTIONS TO MR. AARON'S.  I DON'T HAVE

3    OBJECTIONS TO THE COURT'S.

4              THE COURT:  THE REMAINDER ARE THE MODEL

5    INSTRUCTIONS.

6              MR. AARON:  YOUR HONOR, JUST A COUPLE OF THINGS,

7    AND SOME OF THESE I APOLOGIZE.  I SHOULD HAVE CAUGHT THESE

8    EARLIER, BUT I DIDN'T.

9              I THINK THERE IS SUPPOSED TO BE AN INSTRUCTION ON

10   ATTEMPT.  IF I UNDERSTAND THE GOVERNMENT'S POSITION, THEY ARE

11   GOING TO BE ASKING FOR SPECIAL FINDINGS REGARDING COUNT 4, A

12   FINDING THAT EITHER HE COMMITTED THESE ACTS OF AGGRAVATED

13   SEXUAL ABUSE OR HE INTENDED TO.

14             THE COURT:  IS THAT CORRECT?

15             MR. MICHAEL:  IT IS, YOUR HONOR.  WE ADVISED YOUR

16   HONOR WE WERE GOING TO CONSIDER IT OVER THE LUNCH BREAK.  WE

17   CAME TO THAT CONCLUSION AND ADVISED DEFENSE COUNSEL, AND WE

18   HAVEN'T HAD AN OPPORTUNITY TO ADVISE THE COURT YET.

19             WE WOULD SEEK, WITH REGARD TO COUNT 4, A VERY

20   SIMPLE VERDICT FORM THAT JUST WOULD HAVE THE OPPORTUNITY OF

21   THE JURORS TO SELECT WHETHER THEY FOUND UNANIMOUSLY HE

22   ENGAGED IN A SEX ACT OR HE ATTEMPTED TO ENGAGE IN A SEX ACT.

23   AND, OBVIOUSLY, THEY CAN FIND BOTH OR ONE.

24             THE COURT:  NOW, THAT BRINGS UP THE OTHER

25   INSTRUCTION THAT THE DEFENSE SOUGHT, WHICH IS THE ENHANCED

1    IMMUNITY INSTRUCTION WHICH WAS DEFENSE PROPOSED INSTRUCTION

2    NO. 1.

3            MR. AKROTIRIANAKIS:  I THINK IN REGARD TO COUNT 4,

4    YOUR HONOR, THE COURT CAN JUST GIVE 7.9 AT THAT POINT WHEN IT

5    IS READING THE ELEMENTS OF COUNT 4, AND FIRST THIS AND SECOND

6    THAT.  AND AT THE END OF SECOND, THE LANGUAGE SUGGESTED BY

7    THE NINTH CIRCUIT, "WOULD ALL OF YOU AGREE..." AND AS TO

8    WHATEVER THE PARTICULAR FACT IS YOU'RE REFERRING TO.

9            THE COURT:  SO THEN YOU WANT TO CHANGE THAT AS TO

10   COUNT 4, WHICH IS -- THAT'S ON PAGE 22.

11           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  SO AT THE

12   PARAGRAPH THAT BEGINS, "SECOND, AFTER CROSSING CALIFORNIA

13   STATE LINE, THE DEFENDANT KNOWINGLY ENGAGED IN A SEXUAL ACT

14   WITH A PERSON WHO HAD NOT ATTAINED THE AGE OF 12 YEARS, OR

15   ATTEMPTED TO ENGAGE IN A SEXUAL ACT WITH A PERSON WHO HAD NOT

16   ATTAINED THE AGE OF 12 YEARS.  AND THEN WITH ALL OF YOU

17   AGREEING AS TO THE ACT ENGAGED IN OR ATTEMPTED."

18           THE COURT:  ALL RIGHT.  I THINK IT SHOULD READ LIKE

19   THIS, THEN:  COMMA, "WITH ALL MEMBERS OF THE JURY AGREEING ON

20   THE SEXUAL ACT THAT THE DEFENDANT ENGAGED IN OR ATTEMPTED TO

21   ENGAGE IN WITH A PERSON UNDER THE AGE OF 12."

22           MR. AARON:  YOUR HONOR, I'M SORRY.  WHAT PAGE

23   NUMBER IS THAT?

24           THE COURT:  TWENTY-TWO.

25           MR. MICHAEL:  YOUR HONOR, WHERE ARE YOU PROPOSING

```
 1   TO INSERT THAT LANGUAGE?

 2           THE COURT:  ON LINE 17, AT THE END OF THE PARAGRAPH

 3   THAT BEGINS "SECOND."

 4           MR. MICHAEL:  I'M SORRY.  IF YOU WOULDN'T MIND

 5   REPEATING THAT, PLEASE.

 6           THE COURT:  "WITH ALL MEMBERS OF THE JURY AGREEING

 7   ON THE SEXUAL ACT THAT THE DEFENDANT ENGAGED IN OR ATTEMPTED

 8   TO ENGAGE IN WITH A PERSON UNDER THE AGE OF 12."

 9           MR. MICHAEL:  YOUR HONOR, FOR THAT REASON, WE THINK

10   THAT THE VERDICT SHEET SHOULD ALLOW THEM TO SELECT ONE OR

11   BOTH OPTIONS.

12           THE COURT:  DO YOU HAVE A VERDICT FORM?

13           MR. MICHAEL:  I HAVEN'T PREPARED IT YET, BUT I CAN

14   GO UP THERE AND E-MAIL IT TO YOUR HONOR AND DEFENSE COUNSEL

15   SIMULTANEOUSLY THIS EVENING.

16           THE COURT:  ALL RIGHT.

17           MR. MICHAEL:  I WILL ASK MY COLLEAGUE

18   MR. AKROTIRIANAKIS TO DO IT BECAUSE I WILL BE WORKING ON MY

19   CLOSING.

20           THE COURT:  WELL, I'LL HAVE TO SUBTRACT FROM THE

21   TIME ALLOTTED FOR YOUR CLOSING FOR THE EXTRA TIME YOU SPENT

22   ON THE WITNESS TODAY, WHICH PUTS YOU AT LIKE NEGATIVE 15

23   MINUTES.

24           MR. MICHAEL:  THAT WAS MR. AKROTIRIANAKIS, YOUR

25   HONOR.  SO, I BARELY KNOW THE GUY, YOUR HONOR.
```

```
 1              MR. AKROTIRIANAKIS:  I APOLOGIZE FOR MY MISS --

 2              MR. AARON:  ALWAYS A POSSIBILITY OF WAIVING

 3    CLOSING.

 4              THE COURT:  THAT'S RIGHT, IF YOU WANT TO MAKE YOUR

 5    MOTION.

 6              MR. AARON:  WELL, COUNSEL COULD AGREE.

 7              THE COURT:  OR THEY COULD WAIVE THEIR CLOSING.  I

 8    THINK THEY WOULD IF YOU WOULD.

 9              LET THE RECORD REFLECT THE DEAFENING SILENCE.

10              MR. AKROTIRIANAKIS:  I APOLOGIZE FOR THAT, YOUR

11    HONOR.  I THOUGHT ABOUT IT LAST NIGHT AFTER I HAD

12    TAPE-RECORDED THAT, REALIZING I AGAIN UNDERESTIMATED TODAY.

13    BUT WHEN I TOLD YOU YESTERDAY WHAT I THOUGHT LEE BROWN'S

14    TESTIMONY WOULD BE, I HAD TO REFLECT UPON THE

15    CROSS-EXAMINATION OF AGENT MORAN, AND I THOUGHT THAT MANY OF

16    THE EXCERPTS TODAY, WHICH I HADN'T INTENDED TO READ, ACTUALLY

17    WERE OFFERED FOR THAT PURPOSE.

18              THE COURT:  ANY OTHER ISSUES WITH THE JURY

19    INSTRUCTIONS?

20              MR. AARON:  YES.

21              THE COURT:  MR. AARON, GO AHEAD.

22              MR. AARON:  I'M SORRY.  I BELIEVE THAT THE COURT

23    HAS TO GIVE AN INSTRUCTION ON ATTEMPT, WHAT CONSTITUTES AN

24    ATTEMPT, IF THE PROSECUTION IS GOING TO BE ARGUING THAT

25    THEORY.
```

1          YOUR HONOR, IT IS 8.138.

2          THE COURT:  IT IS 8.38?

3          MR. AKROTIRIANAKIS:  8.138, YOUR HONOR.

4          THE COURT:  SO THE PARTIES AGREE THAT YOU WANT TO

5   GIVE 8.38?

6          MR. AKROTIRIANAKIS:  8.138.

7          THE COURT:  8.1 --

8          MR. MICHAEL:  YOUR HONOR, WITH ONE MODIFICATION

9   THAT THE GOVERNMENT WOULD PROPOSE.

10          THE COURT:  ALL RIGHT.

11          MR. MICHAEL:  AND THAT WOULD BE WITH REGARD TO THE

12   THIRD, "THE DEFENDANT DID SOMETHING THAT WAS A SUBSTANTIAL

13   STEP, WITH ALL OF YOU AGREEING AS TO WHAT THE SUBSTANTIAL

14   STEP WAS."

15          THE GOVERNMENT POSED SOME INDICATION TO THE JURORS

16   THAT IT NEED NOT BE THE SUBSTANTIAL STEPS IDENTIFIED SOLELY

17   IN THE INDICTMENT.  THE GOVERNMENT'S LANGUAGE WAS "INCLUDING,

18   BUT NOT LIMITED TO..." AND IT LISTED THREE SUBSTANTIAL STEPS.

19   BUT IT NEED NOT BE THE SUBSTANTIAL STEPS THAT ARE ONLY LISTED

20   THERE.  I JUST DON'T WANT THEM TO LOOK AT THE INDICTMENT AND

21   THINK IT HAS TO BE ONE OF THOSE THREE.

22          THE COURT:  WELL, WHY DON'T YOU PROPOSE -- FILL-IN

23   ALL OF THE THINGS THAT NEED TO BE FILLED IN HERE AND E-MAIL

24   IT TO COUNSEL AND TO THE COURT.  AND IF YOU -- WELL, AND WE

25   ARE GOING TO HAVE TO MEET AT 7:30 TOMORROW MORNING FOR THE

```
 1    LAST FEW THINGS.  ANOTHER DEAFENING SILENCE, ACTUALLY SO MUCH

 2    AS GROANS.

 3              MR. AARON:  I THINK IT IS MORE GASPING FOR BREATH.

 4              THE COURT:  WELL, WE CAN SAY 7:45.

 5              THE NEXT WITNESS IS ONLY GOING TO TAKE A COUPLE

 6    MINUTES, AND THEN WE ARE GOING TO HAVE TO GO RIGHT INTO THIS.

 7    WE WON'T EVEN TAKE A BREAK.  THEY ALL HAVE TO BE DONE BEFORE

 8    WE BRING THE JURY IN, AND I DON'T WANT TO KEEP THEM WAITING.

 9              MR. MICHAEL:  IS YOUR PLAN TO INSTRUCT THEM AND

10    JUST GO RIGHT INTO CLOSINGS?

11              THE COURT:  BECAUSE YOUR NEXT WITNESS IS REALLY

12    SHORT, RIGHT?  RIGHT?

13              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

14              THE COURT:  SO WE WON'T BE TAKING -- THERE WON'T BE

15    ANY POINT BECAUSE IT IS ONLY GOING TO TAKE ME A FEW MINUTES.

16    WE MIGHT TAKE A REALLY SHORT -- IF WE'VE GONE FOR AN HOUR, I

17    WILL TAKE A BREAK BEFORE WE DO CLOSING, BUT -- WITH CROSS AND

18    THE INSTRUCTIONS -- BUT I DOUBT IT WOULD BE THAT LONG.  AND

19    IF IT IS ONLY A HALF AN HOUR, I WOULD NOT TAKE A RECESS.

20              ANY OTHER ISSUES?

21              MR. AARON:  YES, YOUR HONOR.

22              I BELIEVE THAT THERE IS AN INSTRUCTION ABOUT A

23    WITNESS RECEIVING BENEFIT.

24              THE COURT:  DO YOU WANT TO HAVE IT IN HERE?

25              MR. AARON:  YES.
```

1          THE COURT:  I THOUGHT THAT WE PUT THAT IN THERE,

2     BUT MAYBE NOT.

3          MR. AARON:  WE HAD THE INSTRUCTION ON A WITNESS

4     PLEADING GUILTY.

5          MR. MICHAEL:  WE SUGGESTED IMMUNITY, AS WELL.

6          MR. AARON:  ACTUALLY, I THINK THE COURT HAS THE

7     NUMBER OF THE INSTRUCTION.  IT IS 4.9.  BUT I REMEMBER THE

8     LANGUAGE BEING DIFFERENT.

9          THE COURT:  OH, YES.  YOU'RE RIGHT.  WE DO NEED THE

10    IMMUNITY ONE, WHICH IS DIFFERENT FROM THE ONE THAT'S IN

11    HERE.  IT IS IN ADDITION.  WE WILL ADD THAT ONE.

12         MR. MICHAEL:  YOUR HONOR, ASK THAT IT BE LIMITED TO

13    -- OBVIOUSLY, HIS TESTIMONY WILL NOT BE USED IN ANY CASE

14    AGAINST THE WITNESS.

15         THE COURT:  THAT'S ONE OF THE CHOICES.

16         MR. MICHAEL:  I WOULD SAY LIMIT THAT TO THE

17    NORTHERN DISTRICT OF TEXAS, OF THE UNITED STATES DISTRICT

18    COURT IN THE NORTHERN DISTRICT OF TEXAS.

19         THE COURT:  ALL RIGHT.  ANY OTHER ISSUES?

20         MR. AARON:  I'M SORRY, YOUR HONOR.  WHAT PAGE WAS

21    THAT INSTRUCTION ON WITH MR. MARTIN?  I'M HAVING TROUBLE

22    FINDING IT.

23         THE COURT:  IT IS ON PAGE 27.

24         MR. AARON:  SO PAGE 27 WILL HAVE THE IMMUNITY

25    LANGUAGE FROM 4.9; IS THAT RIGHT?

1           THE COURT:  THERE SHOULD BE A SEPARATE INSTRUCTION

2    ON THE IMMUNITY ONE.

3           MR. AARON:  BUT IT WILL BE GIVEN AROUND 27?

4           THE COURT:  IT WILL BE GIVEN BEFORE OR AFTER.

5           MR. AARON:  LASTLY, YOUR HONOR, I BELIEVE THE COURT

6    HAD TALKED ABOUT GIVING AN INSTRUCTION ON THE WITNESS

7    EXERCISING THE FIFTH AND INFERENCES THAT CAN BE DRAWN FROM

8    THAT.

9           THE COURT:  I DON'T KNOW THAT THERE IS A MODEL

10   INSTRUCTION.

11          MR. MICHAEL:  YOUR HONOR, WE ALREADY PROVIDED THE

12   INSTRUCTION TO THE WITNESSES DURING THE TRIAL, I THOUGHT,

13   WITH REGARD --

14          THE COURT:  NO.

15          MR. AARON, I THINK THAT YOU SHOULD PROPOSE THAT

16   INSTRUCTION SINCE YOU ARE THE ONE THAT WOULD WANT TO ARGUE

17   THAT INFERENCE.  AND I WILL LOOK FOR SOMETHING IN SOME OF THE

18   SOURCES ON THAT, TOO.  ALL RIGHT.

19          ANYTHING ELSE?

20          MR. MICHAEL:  7:45, YOUR HONOR?

21          THE COURT:  7:45.

22          MR. AKROTIRIANAKIS:  YOUR HONOR, THE GOVERNMENT

23   HASN'T ADDRESSED IT YET; HOWEVER, THE ONLY FACT THAT'S GOING

24   TO BE INTRODUCED THROUGH ANALYST BUENO IS THE IDENTIFICATION

25   OF EXHIBIT 117 TO MAGAZINES FROM THE 1970S.  SO THE

1   GOVERNMENT WOULDN'T HAVE TO SAVE TIME TOMORROW, WOULDN'T HAVE

2   AN OBJECTION TO THE COURT HEARING THE DEFENDANT'S MOTION AT

3   THIS TIME.

4           THE COURT:  WELL, THE DEFENDANT ISN'T PRESENT.

5           MR. AKROTIRIANAKIS:  YOU WANT TO COME EARLIER?

6           THE COURT:  MAYBE WE SHOULD COME EARLIER TOMORROW,

7   AT 7:30, BECAUSE OF THAT, SO YOU HAVE TIME TO MAKE YOUR

8   MOTION.  LET'S BEGIN AT 7:30 TOMORROW.

9           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

10          THE COURT:  AND I'M WORRIED ABOUT THE JURY

11  INSTRUCTIONS GETTING IN FINE SHAPE BECAUSE THERE ARE NOW TWO

12  OR THREE THAT WE NEED TO REVIEW.

13          MR. AARON:  WE LOOK AT IT AS AN OPPORTUNITY TO

14  ASSIST THE COURT, AND WE CAN PREPARE TO BE HERE AT 7:00.  IT

15  IS CHARACTER BUILDING.

16          THE COURT:  THANK YOU.  I REALIZE THAT PERHAPS ALL

17  COUNSEL HAVE A COMMUTE TO MAKE.

18          MR. MICHAEL:  I ACTUALLY WALK THREE BLOCKS --

19          THE COURT:  WE COULD MAKE IT AT 7:00.

20          MR. MICHAEL:  ALSO BEING THAT I HAVE A

21  ONE-AND-A-HALF YEAR OLD AT HOME, I AM THE FIRST PERSON UP AT

22  5:30.  MY CLOCK IS SET.  WHY DON'T WE MAKE IT 6:30.

23          MR. AARON:  ON THE OTHER HAND, I HAVE TWO TEENAGERS

24  AT HOME.

25          THE COURT:  I'M SURPRISED YOU DON'T WANT TO BE HERE

1    AT 6:30.

2                         (PROCEEDINGS ADJOURNED)

3                              ---oOo---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

### DOCKET NO. EDCR 04-42(A) VAP

        I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____
PHYLLIS A. PRESTON, CSR          DATED:  OCTOBER 16, 2008
FEDERAL OFFICIAL COURT REPORTER
LICENSE NO. 8701